1  TOWNSEND AND TOWNSEND AND CREW LLP
   GREGORY S. GILCHRIST (State Bar No. 111536)
2  GIA L. CINCONE (Bar # 141668)
   Two Embarcadero Center, Eighth Floor
3  San Francisco, California  94111
   Telephone: (415) 576-0200
4  Facsimile: (415) 576-0300
   Email:  gsgilchrist@townsend.com; glcincone@townsend.com
5
   Attorneys for Plaintiff
6  LEVI STRAUSS & CO.

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  LEVI STRAUSS & CO.,                    Case No.    C 07-3752 JSW

12              Plaintiff,                 **PLAINTIFF LEVI STRAUSS & CO.'S NOTICE OF MOTION AND MOTION TO DISQUALIFY HOWREY LLP AS COUNSEL FOR DEFENDANT ABERCROMBIE & FITCH TRADING CO.**
13          v.

14  ABERCROMBIE & FITCH TRADING CO.,

15              Defendant.                 **DATE:  October 26, 2007
                                           TIME:   9:00 a.m.
16                                         COURTROOM: 2**

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2  NOTICE OF MOTION ....................................................................................................1

3  STATEMENT OF RELIEF SOUGHT ...........................................................................1

4  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT ........................2

5  I.    INTRODUCTION ................................................................................................2

6  II.   STATEMENT OF FACTS ..................................................................................3

7        A.    The Underlying Infringement Dispute and the Genesis of Howrey's
                Conflict .................................................................................................3
8
         B.    History of the Instant Litigation ..........................................................6
9
         C.    A&F's Discovery Requests ...................................................................8
10
   III.  UNDER CALIFORNIA LAW, THE HOWREY FIRM MUST BE
11         DISQUALIFIED FROM ANY FURTHER REPRESENTATION OF A&F IN
           THIS LITIGATION .............................................................................................8
12
         A.    Standards on Motion for Disqualification ...........................................8
13
               1.    General Standards....................................................................8
14
               2.    The "Substantial Relationship" Test.......................................9
15
               3.    What Is A "Substantial Relationship"?..................................12
16
         B.    Ms. Basile's Former Representation Of LS&CO. Is "Substantially
17              Related" To Her Representation of A&F, And Her Disqualification Is
                Therefore Mandatory ..........................................................................12
18
         C.    Because Ms. Basile's Disqualification Is Required, Howrey's
19              Disqualification Is Also Required .......................................................15

20        D.    LS&CO. Has Not Waived its Objection to Howrey's Representation of
                A&F .....................................................................................................17
21
   IV.  CONCLUSION ..................................................................................................21
22

23

24

25

26

27

28

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Cases**

3

*Adams v. Aerojet-General Corp.,*
    86 Cal. App. 4th 1324 (2001) ............................................................... 9, 10, 12

4

5

*Asyst Technologies, Inc. v. Empak, Inc.,*
    962 F. Supp. 1241 (N.D. Cal. 1997) ........................................................... 15

6

*Buckley v. Airshield Corp.,*
    908 F. Supp. 299 (D. Md. 1995) ................................................................ 20

7

8

*City and County of San Francisco v. Cobra Solutions, Inc.,*
    38 Cal. 4th 839 (2006) ........................................................... 10, 12, 16

9

*Colorpix Systems of America v. Broan Manufacturing Co., Inc.,*
    131 F. Supp. 2d 331 (D. Conn. 2001) ........................................................ 20

10

11

*Elan Transdermal, Ltd. v. Cygnus Therapeutic Systems,*
    809 F. Supp. 1383 (N.D. Cal. 1992) ...................................................... 11, 16

12

*Emle Industries, Inc. v. Patentex, Inc.,*
    478 F.2d 562 (2d Cir. 1973) ........................................................... 15, 18, 19

13

14

*Employers Insurance of Wausau v. Albert D. Seeno Construction Co.,*
    692 F. Supp. 1150 (N.D. Cal. 1988) ........................................................... 11

15

*Flatt v. Superior Court,*
    9 Cal. 4th 275 (1994) ........................................................... 10, 15

16

17

*Forrest v. Baeza,*
    58 Cal. App. 4th 65 (1997) ........................................................... 18

18

*Franzoni v. Hart Schaffner & Marx,*
    312 Ill. App. 3d 394 (2000) ........................................................... 14, 15

19

20

*Global Van Lines, Inc. v. Superior Court,*
    144 Cal. App. 3d 483 (1983) ........................................................... 10, 13, 14

21

*H.F. Ahmanson & Co. v. Salomon Brothers, Inc.,*
    229 Cal. App. 3d 1445 (1991) ........................................................... 10, 11, 12

22

23

*Hitachi, Ltd. v. Tatung Co.,*
    419 F. Supp. 2d 1158 (N.D. Cal. 2006) ........................................................... 9, 16

24

*Huston v. Imperial Credit Commercial Mortgage Investment Corp.,*
    179 F. Supp. 2d 1157 (C.D. Cal. 2001) ........................................................... 9

25

26

*I-Enterprise Co. LLC v. Draper Fisher Jurvetson Mgmt. Co. V, LLC,*
    No. C 03-1561 MMC, 2005 U.S. Dist. LEXIS 45190 (N.D. Cal. Apr. 4, 2005) .................. 17

27

*Image Technical Services, Inc. v. Eastman Kodak Co.,*
    820 F. Supp. 1212 (N.D. Cal. 1993) ........................................................... 18

28

*Integrated Health Services v. THCI Co. LLC,*
  327 B.R. 200 (D. Del. 2005) ................................................................... 19

*Lappert's Ice Cream, Inc. v. Lappert's, Inc.,*
  No. C 06-1296 SC, 2007 U.S. Dist. LEXIS 21349 (N.D. Cal. Mar. 6, 2007) .................................. 16

*Levi Strauss & Co. v. Vivat Holdings PLC,*
  2000 TTAB LEXIS 817 (2000) ...................................................... 3, 4

*Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.,*
  631 F. Supp. 735 (S.D.N.Y. 1985), *aff'd,* 799 F.2d 867 (2d Cir. 1986) .......................... 3

*Lucent Technologies Inc. v. Gateway, Inc.,*
  No. 03CV1108-B (CAB), 2007 U.S. Dist. LEXIS 35502 (S.D. Cal. May 15, 2007) ..................... 17

*Miller v. Alagna,*
  138 F. Supp. 2d 1252 (C.D. Cal. 2000) .......................................... 19

*Miroglio, S.p.A. v. Morgan Fabrics Corp.,*
  340 F. Supp. 2d 510 (S.D.N.Y. 2004) ........................................... 13

*People ex rel. Department of Corporations v. SpeeDee Oil Change Systems, Inc.,*
  20 Cal. 4th 1135 (1999) ............................................................ 9, 15, 16

*Personalized Mass Media Corp. v. The Weather Channel, Inc.,*
  899 F. Supp. 239 (E.D. Va. 1995) .................................................. 20

*River West, Inc. v. Nickel,*
  188 Cal. App. 3d 1297 (1987) ................................................... 11, 18, 20

*Stitz v. Bethlehem Steel Corp.,*
  650 F. Supp. 914 (D. Md. 1987) .................................................. 14

*Trone v. Smith,*
  621 F.2d 994 (9th Cir. 1980) ................................................... 10, 16

*Trust Corp. of Montana v. Piper Aircraft Corp.,*
  701 F.2d 85 (9th Cir. 1983) ..................................................... 20

*Ullrich v. The Hearst Corp.,*
  809 F. Supp. 229 (S.D.N.Y. 1992) ......................................... 11, 14, 19, 20

*Ultimax Cement Manufacturing Corp. v. CTS Cement Manufacturing Corp.,*
  No. SACV 02-578 AHS (ANx), 2007 U.S. Dist. LEXIS 44096 (C.D. Cal. May 7,
  2007) ................................................................................. 19

*United States v. Clarkson,*
  567 F.2d 270 (4th Cir. 1977) .................................................... 9

*Webb v. E.I. Du Pont de Nemours & Co., Inc.,*
  811 F. Supp. 158 (D. Del. 1992) ................................................ 14

*Western Continental Operating Co. v. Natural Gas Corp. of California,*
  212 Cal. App. 3d 752 (1989) .................................................... 19

**Statutes and Regulations**

15 U.S.C. § 1051(b) .................................................................................................... 6

37 C.F.R. § 10.19(b) .................................................................................................... 6

**Rules**

California Rule of Professional Conduct 3-310(E) .................................................... 9

Civil L.R. 11-4(a)(1) .................................................................................................... 9

**Other Authorities**

1 *McCarthy, Trademarks and Unfair Competition,*
   § 7:38 (4th ed.) ....................................................................................................... 3

3 R. Mallen & J. Smith, *Legal Malpractice,*
   § 23:26 (2007 ed.) ................................................................................................. 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 26, 2007, at 9:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom 2 of the United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California 94102, the Honorable Jeffrey S. White presiding, plaintiff Levi Strauss & Co. will move this Court for an Order disqualifying the law firm of Howrey LLP from representing defendant Abercrombie & Fitch Trading Co. in this action.

The Motion will be based on this Notice; the Memorandum of Point and Authorities in Support which follows; the Declarations of Thomas M. Onda and Gia L. Cincone with exhibits and [Proposed] Order filed herewith; on all of the files and records of this action; and on any additional material that may be elicited at the hearing of this Motion.

## STATEMENT OF RELIEF SOUGHT

Levi Strauss & Co. respectfully requests that this Court issue an order disqualifying the law firm of Howrey LLP from representing defendant Abercrombie & Fitch Trading Co. in this action. LS&CO. believes that Howrey LLP is precluded from representing the defendant due to prior adverse representation of LS&CO. by one of Howrey LLP's partners, who was formerly LS&CO.'s chief intellectual property counsel for the United States, in matters substantially related to those raised by the complaint and answer in this action.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**</u>

**I.    INTRODUCTION**

Levi Strauss & Co. ("LS&CO." or "the Company") and Abercrombie & Fitch Trading Co. ("A&F") are embarking on litigation that will determine whether a pocket stitching design used by A&F on its Ruehl brand jeans infringes LS&CO.'s famous Arcuate Stitching Design Trademark. The Arcuate Trademark has appeared on LEVI'S® jeans since 1873 and is the oldest apparel trademark in the world still in continuous use. But before the trademark infringement can be addressed, this Court must resolve a conflict of interest created by A&F's engagement of the firm of Howrey LLP to defend its interests in this lawsuit.

One of Howrey's partners is Katherine Basile, who formerly was employed by LS&CO. as its Associate General Counsel and Chief Intellectual Property Counsel for the Americas. As advertised – at least until recently – on Howrey's website, Ms. Basile was "responsible for all aspects of brand protection" for LS&CO. In fact, Ms. Basile was the attorney in charge of all brand protection and trademark enforcement matters for LS&CO. in the United States, including enforcement of the Arcuate Trademark. She was instrumental in formulating and executing the Company's policies regarding enforcement of the Arcuate Trademark and the scope of LS&CO.'s rights in the mark; she supervised infringement litigation against other jeans manufacturers over pocket stitching designs, and decided when and under what circumstances to settle those disputes. She consulted extensively with Company management on both general and specific matters involving the mark. Yet despite this prior experience and inside knowledge of LS&CO.'s enforcement policies, Ms. Basile filed an application on behalf of A&F with the United States Patent and Trademark Office to register the pocket stitching design that is at issue in this litigation, and became the attorney of record and direct correspondent for the application.

LS&CO. believes this creates an unacceptable conflict in Howrey's continued representation of A&F. The California Rules of Professional Conduct do not allow an attorney to represent a client, adverse to a previous client of that same attorney, where the two representations are "substantially related." There can be no doubt that Ms. Basile's former representation of LS&CO., as the attorney with primary responsibility for enforcement of the Arcuate Trademark in the United States, is

1 | substantially related to the defense of LS&CO.'s claims that A&F's stitching design infringes the

2 | Arcuate Trademark.  Under these circumstances, California law, which governs this motion,

3 | *conclusively presumes* both that Ms. Basile had access to confidential information of LS&CO., and

4 | that the information will be shared with other attorneys at her firm.  Therefore, the entire Howrey firm

5 | must be disqualified from any further representation of A&F in this litigation.

6 | **II.     STATEMENT OF FACTS**

7 |     **A.     The Underlying Infringement Dispute and the Genesis of Howrey's Conflict**

8 |         This litigation concerns A&F's use of, and application to register, a pocket stitching design that

9 | infringes and dilutes LS&CO.'s Arcuate Stitching Design Trademark (the "Arcuate Trademark").  The

10 | Arcuate Trademark consists of a distinctive pocket stitching design that has been used and promoted

11 | on LEVI'S® brand jeans and other clothing products since 1873; it is the oldest apparel trademark still

12 | in continuous use, and has been federally registered since 1943.  Over the last 125 years, LS&CO. has

13 | spent enormous amounts of money to advertise and market its products that display the Arcuate

14 | Trademark, and has sold hundreds of millions of units bearing the mark representing billions of dollars

15 | in sales.  Display of the mark on LEVI'S® products, where consumers can see and recognize the

16 | design, is a vital component of LS&CO.'s branding strategy.  As a result of LS&CO.'s use and

17 | advertisement of the Arcuate Trademark, consumer association of the mark with LS&CO. and

18 | LEVI'S® products is exceptionally high.  The mark -- an iconic symbol of the LEVI'S® brand -- is

19 | one of LS&CO.'s most valuable assets.[1]

20 |         In order to protect the value of the Arcuate Trademark, LS&CO. has consistently and

21 |

22 | _____

23 | [1] Federal courts and the Trademark Trial and Appeal Board have recognized that the Arcuate Trademark is strong and well-known, and entitled to broad protection.  *See Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 741-42 (S.D.N.Y. 1985) (the Arcuate Trademark is a

24 | fanciful, distinctive trademark with strong consumer recognition), *aff'd*, 799 F.2d 867, 873 (2d Cir. 1986) (the Arcuate Trademark is entitled to "the most protection the Lanham Act can provide . . .

25 | Virtually all jeans consumers associate the stitching pattern with [LS&CO.'s] products.  We agree with the district court that the evidence indicates as a matter of law that [LS&CO.'s] stitching pattern is a

26 | very strong mark."); *Levi Strauss & Co. v. Vivat Holdings PLC*, 2000 TTAB LEXIS 817 (TTAB 2000) (the Arcuate Trademark is "very strong and well-known for clothing" and is "entitled to a broad

27 | scope of protection"); *see also* 1 *McCarthy, Trademarks and Unfair Competition*, § 7:38 at 7-67, 7-68 (4th ed.) (identifying Arcuate Trademark as primary example of a distinctive trademark).

28 |

1  vigorously enforced its rights in the mark through cease and desist efforts; proceedings before the

2  Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office to

3  oppose registration of similar stitching designs; and litigation in this and other federal courts under the

4  Lanham Act and state infringement and dilution statutes.  Over the years, LS&CO. has succeeded in

5  keeping many infringing stitching designs off the apparel market, and off the trademark register.

6      Central to LS&CO.'s enforcement efforts is the role of its in-house counsel.  LS&CO.'s legal

7  department oversees the Company's global brand protection efforts to protect and enforce LS&CO.'s

8  trademarks around the world.   Between April 1994 and April 1999, the individual at LS&CO.

9  responsible for the protection of the Company's intellectual property – including the Arcuate

10  Trademark – in the United States was Katherine Basile, who is now a partner in Howrey LLP's Palo

11  Alto office.

12      In January 1999, Ms. Basile described her job function and responsibilities as LS&CO.'s brand

13  protection counsel in testimony before the TTAB.[2]  She testified that her responsibilities included

14  oversight of all of LS&CO.'s trademark enforcement and brand protection efforts in the United States,

15  and described her enforcement work as follows:

16      Q.  Do your responsibilities include all brands that Levi Strauss & Co.
       manufactures?
17

18      A. . . . [Y]es, I'm responsible for all the -- for all the brands and for all
       the brand protection matters and issues in the United States.

19      . . .

20      Q.  When you say you oversee enforcement activities, can you be a little
       more specific about what that entails?
21

22      A. . . .  I work with paralegals and investigators to make sure that we
       monitor the marketplace for infringements, that a decision is made or I
       may even make a decision about whether or not to take an action against
23      a given infringement and then working with outside counsel or working

24  _____

25  [2] Ms. Basile gave a testimony deposition in proceedings before the TTAB in which LS&CO. was
    opposing registration of an asymmetrical stitching design somewhat similar to the design at issue in
26  this action.  The TTAB eventually sustained LS&CO.'s opposition and refused to register the stitching
    design, holding that it created a likelihood of confusion with the Arcuate Trademark.  *Levi Strauss &*
27  *Co. v. Vivat Holdings PLC*, 2000 TTAB LEXIS 817 (TTAB 2000).

28

with the paralegal who works with outside counsel to make sure that action is indeed taken and we reach resolution of the matter.

Q. Do your responsibilities include oversight of enforcement-related litigation?

A. Yes, it does, and it also includes -- I left out from time to time consulting with my customers or clients or people within our business organization.

(Basile Dep. 1/12/99 at 8:24-9:7, 10:14-11:2, Cincone Dec. Ex. A.)

Ms. Basile testified that she was the primary decision-maker in determining whether action should be taken against potential infringements:

Q. If a potential infringement comes to your attention . . ., what is the process for deciding if any action should be taken?

A. Well, the process can be twofold. Either it's decided within the legal department by the paralegal and me that action should be taken or I will go consult with my business colleagues if I have a question as to whether or not action should be taken and seek their input and we make a decision together as to whether action should be taken or not.

Q. Are you the person primarily responsible for making those decisions?

A. Yes, I am.

(Basile Dep. 1/12/99 at 21:2-15, Cincone Dec. Ex. A.)  She also testified that some 200 enforcement actions against stitching designs and stitching design applications had been initiated during her tenure as LS&CO.'s in-house brand protection counsel, including about 30 opposition proceedings before the TTAB.  (Basile Dep. 1/12/99 at 25:6-14, 27:3-6, Cincone Dec. Ex. A.)[3]

In addition to her involvement in specific enforcement and brand protection matters, Ms. Basile was also closely involved in the formulation of Company policies and strategies for protection of the Arcuate Trademark.  Ms. Basile was directly involved in the ongoing process of evaluating the scope of the Company's rights in the mark and in assessing and refining the Company's overall

---

[3] LS&CO. designated portions of this deposition testimony as "Confidential" pursuant to a stipulated protective order in the opposition proceeding.  LS&CO. does not believe that disclosure of the limited portions of the testimony referenced here, for purposes of this motion only, will prejudice its interests; but reserves its right to seek to file any additional evidence from the opposition proceeding under seal.

1    strategy for enforcement of those rights. (Onda Dec. ¶ 5.) Many of the policies and practices Ms.

2    Basile developed in this arena remain in place to this day. (*Id.*) Moreover, Ms. Basile personally

3    advised LS&CO. management concerning these matters, both general and specific. Although there

4    has been considerable turnover in the Company's management since Ms. Basile's departure in 1999, a

5    number of management personnel remain at the Company who received advice from Ms. Basile

6    directly or indirectly concerning matters of trademark enforcement and brand protection – including

7    LS&CO.'s current President and CEO, the President of Levi Strauss North America, and the Senior

8    Vice President of Strategy and Worldwide Marketing. (Onda Dec. ¶ 6.)

9         **B.    History of the Instant Litigation**

10        On December 5, 2005, Ms. Basile filed on A&F's behalf an application (Trademark

11   Application Serial Number 78/766,368) to register the stitching design that is at issue in this litigation.

12   (Cincone Dec. Ex. B.) The application was filed on an "intent to use" basis under 15 U.S.C. §

13   1051(b), and did not state that the stitching design was already in use. The application described

14   A&F's mark as "a miscellaneous mirror image stitching design" for use on "clothing, namely, jeans,

15   skirts, shorts, pants and jackets." The application, which was electronically signed by Reid Wilson,

16   A&F's in-house trademark counsel, also stated that "no other person, firm, corporation, or association

17   has the right to use the mark in commerce, either in the identical form thereof or in such near

18   resemblance thereto as to be likely, when used on or in connection with the goods/services of such

19   other person, to cause confusion, or to cause mistake, or to deceive." (*Id.*) Ms. Basile was identified

20   as the attorney of record and correspondent for the application. (*Id.*)[4]

21        In late January 2006, LS&CO. became aware of A&F's application (through a watch notice)

22   and of Ms. Basile's role as filing attorney representing A&F in the prosecution of the application with

23   the Patent and Trademark Office. Thomas Onda, LS&CO.'s successor to Ms. Basile as in-house brand

24   protection counsel, immediately called Ms. Basile to express the Company's concern over her having

25

26   [4] Ms. Basile thus certified that to the best of her knowledge, information and belief, the legal
     contentions in the application were warranted and the factual allegations had evidentiary support. *See*
27   37 C.F.R. § 10.19(b).

28

1  filed the application. (Onda Dec. ¶¶ 7-8.) Mr. Onda told Ms. Basile he was surprised to see she had

2  filed the application for A&F's stitching design, and said he was certain Ms. Basile would have

3  objected to the design during her employment at LS&CO. Ms. Basile responded that she did not think

4  the design was a problem, and that because she had been away from LS&CO. for over six years, she

5  had no knowledge of LS&CO.'s current brand protection strategies. Mr. Onda indicated that six years

6  could be considered a long time, but that in view of the historic nature of the Arcuate Trademark, it

7  should come as no surprise that LS&CO.'s brand protection policies had remained relatively consistent

8  over time. (*Id.*)

9      The A&F application published in the Official Gazette on January 16, 2007, and LS&CO.

10 opposed the application on February 9, 2007. Howrey filed an answer to the Notice of Opposition on

11 March 21, 2007, on A&F's behalf. In July 2007, LS&CO. obtained a pair of A&F's Ruehl brand jeans

12 bearing the design at issue and determined that in its view, use of the design violated LS&CO.'s rights

13 in its Arcuate Trademark. (Onda Dec. ¶ 10.) Accordingly, LS&CO. prepared its complaint in the

14 instant action, and filed the complaint on July 20, 2007. The same day that the complaint was filed,

15 counsel for LS&CO. sent Howrey a letter informing Howrey that the complaint had been filed and

16 setting forth its concerns over Howrey's representation of A&F in the litigation. (Cincone Dec. Ex.

17 C.) Counsel for LS&CO. also spoke by telephone with Ms. Basile that day to inform her that

18 LS&CO. intended to move to disqualify Howrey if Howrey continued to represent A&F. (Cincone

19 Dec. ¶ 10.) The parties' counsel continued to correspond about the conflict issue, but could not reach

20 any resolution. Out of a desire to avoid this motion, the parties made efforts to resolve the dispute.

21 On September 7, 2007, Mr. Onda met in person with Reid Wilson, A&F's in-house Intellectual

22 Property Counsel, to discuss both Howrey's conflict and the possibility of settling the underlying

23 infringement dispute. Mr. Onda and Mr. Wilson were not able to reach a resolution on either issue.

24 (Onda Dec. ¶ 11.)[5]

25

26 [5] A&F has stated it will oppose this motion on grounds of delay. As a consequence, the parties agreed
   that the purported "delay" would be tolled during the few weeks it took to arrange the meeting. A&F
27 terminated this tolling on September 12, 2007. (Cincone Dec. ¶ 11.)

28

1

### C.     A&F's Discovery Requests

2    The conflict became particularly acute in June 2007, when A&F served extensive discovery

3 requests on LS&CO. which attached a number of pocket stitching designs used and registered by third

4 parties, and asked LS&CO. for admissions and information concerning LS&CO.'s enforcement

5 decisions regarding those designs.  Specifically, A&F's Requests for Admission attached a number of

6 trademark registrations for stitching designs, and asked LS&CO. to admit that it had not attempted to

7 cancel those registrations.  A&F's Interrogatories attached a number of images of stitching designs in

8 use by other jeans makers, and asked LS&CO. to identify any action taken or correspondence directed

9 to any person regarding "any perceived likelihood of confusion" between those designs and the

10 Arcuate Trademark.[6]

11    A number of A&F's requests implicate enforcement decisions that Ms. Basile made personally

12 while she was employed at LS&CO. as its in-house counsel in charge of brand protection.  They

13 include both stitching designs that Ms. Basile decided to challenge, and designs she decided not to

14 challenge.  They include designs that are the subject of settlement agreements that Ms. Basile

15 approved.  These matters were handled either by Ms. Basile personally, or by outside counsel under

16 her supervision – the same outside counsel that currently represents LS&CO. in trademark

17 enforcement matters, including this action.  (Onda Dec. ¶ 9.)[7]

18
### III.     UNDER CALIFORNIA LAW, THE HOWREY FIRM MUST BE DISQUALIFIED FROM ANY FURTHER REPRESENTATION OF A&F IN THIS LITIGATION
19

#### A.     Standards on Motion for Disqualification
20

##### 1.     General Standards
21

22    This Court has held that "[m]otions to disqualify counsel are decided under state law."

23    _____

24 [6] Copies of A&F's discovery requests, without the voluminous exhibits, are attached to the Cincone Declaration as Exhibits D and E.

25 [7] A&F's answer to the complaint in this action alleges third party use as affirmative defenses to
LS&CO.'s claims.  *See* Answer to Complaint ¶¶ 56 ("LS&CO.'s mark or marks confusingly similar to
26 LS&Co.'s mark are in common use by third parties unrelated to A&F."), 57 ("Pocket stitching designs
similar to and confusingly similar to LS&CO.'s marks are in common use by third parties unrelated to
27 A&F.").

28

1   *Hitachi, Ltd. v. Tatung Co.*, 419 F. Supp. 2d 1158, 1160 (N.D. Cal. 2006); *see* Civil L.R. 11-4(a)(1)

2   (attorneys practicing before this Court must "[b]e familiar and comply with the standards of

3   professional conduct required of members of the State Bar of California").  California Rule of

4   Professional Conduct 3-310(E) provides as follows:

5           A member shall not, without the informed written consent of the client
            or former client, accept employment adverse to the client or former
6           client where, by reason of the representation of the client or former
            client, the member has obtained confidential information material to the
7           employment.

8           The California Supreme Court has expressed the strong public interest in the rigorous

9   enforcement of ethical rules:

10          The paramount concern must be to preserve public trust in the
            scrupulous administration of justice and the integrity of the bar.  The
11          important right to counsel of one's choice must yield to ethical
            considerations that affect the fundamental principles of our judicial
12          process.

13  *People ex rel. Department of Corporations v. SpeeDee Oil Change Systems, Inc.*, 20 Cal. 4th 1135,

14  1145 (1999) (hereinafter "*SpeeDee Oil*"); *see also Adams v. Aerojet-General Corp.*, 86 Cal. App. 4th

15  1324, 1339-40 (2001) ("rule 3-310(E) must be vigorously applied to protect a former client's

16  legitimate expectations of loyalty and trust").  One federal court in California has noted that it "must

17  not hesitate to disqualify an attorney when it is satisfactorily established that he or she wrongfully

18  acquired an unfair advantage that undermines the integrity of the judicial process and will have a

19  continuing effect on the proceedings before the court." *Huston v. Imperial Credit Commercial*

20  *Mortgage Investment Corp.*, 179 F. Supp. 2d 1157, 1168 (C.D. Cal. 2001) (citation omitted); *see also*

21  *United States v. Clarkson*, 567 F.2d 270, 273 n.3 (4th Cir. 1977) ("In determining whether to

22  disqualify counsel for conflict of interest, the trial court is not to weigh the circumstances 'with hair-

23  splitting nicety' but, in the proper exercise of its supervisory power over the members of the bar and

24  with a view of preventing 'the appearance of impropriety,' it is to resolve all doubts in favor of

25  disqualification.") (citations omitted).

26          **2.      The "Substantial Relationship" Test**

27          California law applies the "substantial relationship" test to determine whether confidential

28  information is presumed to have been imparted in the course of a prior adverse representation.  Under

1   this test, the former client need not prove "actual possession of confidential information" in order to

2   disqualify his or her former counsel:

3           It is enough to show a "substantial relationship" between the former and
        current representation. If the former client can establish the existence of
4           a substantial relationship between representations, the courts will
        *conclusively presume* the attorney possesses confidential information
5           adverse to the former client.

6   *H.F. Ahmanson & Co. v. Salomon Brothers, Inc.*, 229 Cal. App. 3d 1445, 1452 (1991) (emphasis

7   added); *see also Adams*, 86 Cal. App. 4th at 1331 ("Disqualification of an attorney from undertaking

8   representation adverse to a former client does not require proof that the attorney actually possesses

9   confidential information."); *Global Van Lines, Inc. v. Superior Court*, 144 Cal. App. 3d 483, 489

10  (1983) (when substantial relationship is shown between former and current representation, attorney's

11  knowledge of confidential information is presumed). "When a substantial relationship between the

12  two representations is established, the attorney is *automatically disqualified* from representing the

13  second client." *City and County of San Francisco v. Cobra Solutions, Inc.*, 38 Cal. 4th 839, 847

14  (2006) (emphasis added); *see also Flatt v. Superior Court*, 9 Cal. 4th 275, 283 (1994) ("[w]here the

15  requisite substantial relationship between the subjects of the prior and the current representations can

16  be demonstrated, access to confidential information by the attorney in the course of the first

17  representation (relevant, by definition, to the second representation) is presumed and *disqualification*

18  *of the attorney's representation of the second client is mandatory*") (emphasis added).

19          The California courts have explained the reasons behind this conclusive presumption:

20          This is the rule by necessity, for it is not within the power of the former
        client to prove what is in the mind of the attorney. Nor should the
21          attorney have to "engage in a subtle evaluation of the extent to which he
        acquired relevant information in the first representation and of the actual
22          use of that knowledge and information in the subsequent
        representation."
23

24  *Global Van Lines*, 114 Cal. App. 3d at 489 (citation omitted). In other words, the subsequent

25  representation is prohibited simply because it "places the attorney in a situation where he or she *could*

26  breach the duty of confidentiality to the former client." *H.F. Ahmanson*, 229 Cal. App. 3d at 1452

27  (emphasis added); *see also Trone v. Smith*, 621 F.2d 994, 999 (9th Cir. 1980) ("It is the possibility of

28  the breach of confidence, not the fact of the breach, that triggers disqualification.").

1    Moreover, the risks posed by such a conflict include not only improper *disclosure* of

2  confidential information, but improper *use* of such information:

3         Adverse use of confidential information is not limited to disclosure. It
          includes knowing what to ask for in discovery, which witnesses to seek
4         to depose, what questions to ask them, what lines of attack to abandon
          and what lines to pursue, what settlements to accept and what offers to
5         reject, and innumerable other uses. The rule concerns itself with the
          unfair advantage that a lawyer can take of his former client in using
6         adversely to that client information communicated in confidence in the
          course of the representation.
7

8  *Ullrich v. The Hearst Corp.*, 809 F. Supp. 229, 236 (S.D.N.Y. 1992). And the risk is not simply that

9  the attorney will act maliciously or in bad faith. Prophylactic measures are necessary "because even

10  counsel proceeding in utmost good faith may unconsciously make improper use of information:"

11         Even the most rigorous self-discipline might not prevent a lawyer from
           unconsciously using or manipulating a confidence acquired in the earlier
12         representation and transforming it to telling advantage in the subsequent
           litigation. . . . The dynamics of litigation are far too subtle, the
13         attorney's role in that process is far too critical, and the public's interest
           in the outcome is far too great to leave room for even the slightest doubt
14         concerning the ethical propriety of a lawyer's representation in a given
           case.
15

16  *Employers Insurance of Wausau v. Albert D. Seeno Construction Co.*, 692 F. Supp. 1150, 1163 (N.D.

17  Cal. 1988) (citations omitted).

18    In short, the substantial relationship test avoids any need to balance the interests of the former

19  client against those of the current client: "The court does not engage in a 'balancing of equities'

20  between the former and current clients. *The rights and interests of the former client will prevail*."

21  *H.F. Ahmanson*, 229 Cal. App. 3d at 1451 (emphasis added); *see also River West, Inc. v. Nickel*, 188

22  Cal. App. 3d 1297, 1304 (1987) (purpose of substantial relationship test is to avoid "weighing

23  process" between rights of former client and those of new client). The test also avoids any need to

24  "disclos[e] the former client's confidences and secrets through an inquiry into the actual state of the

25  lawyer's knowledge." *H.F. Ahmanson*, 229 Cal. App. 3d at 1453. This Court has noted that without

26  the test, "A former client would be forced to disclose confidential information in order to prove what

27  the law firm knows best -- what its attorneys actually know." *Elan Transdermal, Ltd. v. Cygnus*

28  *Therapeutic Systems*, 809 F. Supp. 1383, 1388 (N.D. Cal. 1992).

### 3.   What Is A "Substantial Relationship"?

In applying the "substantial relationship" test, courts look at the "practical consequences" of the former representation and ask "whether confidential information material to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation." *H.F. Ahmanson*, 229 Cal. App. 3d at 1454.

If the attorney "had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation," then the attorney is presumed to possess confidential information. *City and County of San Francisco*, 38 Cal. 4th at 847. If the attorney's relationship to the client was not "direct," then the court looks at both the relationship between the attorney and the client, and the relationship between the two representations. "If the subjects of the prior representation are such as to 'make it likely the attorney acquired confidential information' that is relevant and material to the present representation, then the two representations are substantially related" and the attorney is disqualified. *Id.* Factors include "the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases." *H.F. Ahmanson*, 229 Cal. App. 3d at 1455. Courts also look at the amount of time spent by the attorney on the former representation, the type of work performed, and the attorney's "'possible exposure to formulation of policy or strategy' in matters relating to the current dispute." *Adams*, 86 Cal. App. 4th at 1340.

### B.   Ms. Basile's Former Representation Of LS&CO. Is "Substantially Related" To Her Representation of A&F, And Her Disqualification Is Therefore Mandatory

Under any formulation of the "substantial relationship" test, it is clear that Ms. Basile's representation of LS&CO. as its Chief Intellectual Property Counsel in charge of brand protection in the United States is substantially related to her representation of A&F in this stitching design dispute. A major part of Ms. Basile's job responsibility was enforcement of LS&CO.'s rights in its trademarks, including the same mark that is at issue here. Ms. Basile was directly involved in the formulation of Company policies regarding enforcement of the Arcuate Trademark and in the ongoing process of evaluating the scope of the Company's rights in the mark. She decided when to pursue enforcement

1  matters against jeans manufacturers who were infringing the Arcuate Trademark, through cease and

2  desist efforts and/or litigation, and decided when and on what terms to resolve those disputes

3  (hundreds of times). Thus, she was directly and personally involved both in the development of

4  overall strategy for enforcement of the Arcuate Trademark and in specific strategic decisions

5  regarding particular infringers and particular stitching designs. Moreover, Ms. Basile personally

6  advised LS&CO. management concerning all of these matters, both general and specific. It is not

7  merely likely, but virtually certain that Ms. Basile acquired confidential information during her

8  employment at LS&CO. that is relevant and material to the representation of A&F.

9       A&F has already put Ms. Basile's inside knowledge at issue, by propounding discovery

10  requests concerning specific stitching designs that were the subject of discussions and decisions

11  during her employment at LS&CO. As noted above, A&F has asked LS&CO. for information and

12  admissions concerning a number of enforcement matters that Ms. Basile either handled personally or

13  supervised in her capacity as LS&CO.'s principal in-house brand protection counsel. Certainly A&F

14  cannot now argue that Ms. Basile's representation of LS&CO. is not substantially related to Howrey's

15  representation of A&F, since A&F apparently considers enforcement decisions made during Ms.

16  Basile's tenure to be directly relevant to the issues in this litigation. *See Miroglio, S.p.A. v. Morgan*

17  *Fabrics Corp.*, 340 F. Supp. 2d 510, 513-14 (S.D.N.Y. 2004) (disqualifying plaintiff's attorneys in

18  copyright infringement action, where attorneys had represented defendant in three prior copyright

19  infringement matters involving similar issues).

20       In comparable circumstances, courts have not hesitated to disqualify former in-house counsel

21  who moved into private practice and sued their former employers over related matters. For example,

22  *Global Van Lines, supra*, involved a contract dispute between the plaintiff V.I.P. Movers, Inc. and two

23  defendants, Global Van Lines, Inc. and U.C. Moving Services, Inc. V.I.P. claimed that Global had

24  violated a contract that appointed V.I.P. as Global's "domestic agent" for Santa Clara County and that

25  there was a unity of interest between Global and U.C. Global moved to disqualify V.I.P.'s counsel,

26  Farano, who had been Global's general counsel for 16 years, had handled Global's acquisition of

27  U.C.'s stock, and was familiar with Global's standard agency agreement. Farano submitted a

28  declaration in opposition, stating that he had no personal knowledge of the current dispute and no

1  recollection of anything material to the dispute. The court granted the motion to disqualify, noting

2  that (1) the current dispute had arisen while Farano was still at Global, and even though he had no

3  present recollection of it, any complaint at the time would logically have been brought to his attention;

4  (2) the Global-U.C. relationship was relevant to the current dispute, and Farano was instrumental in

5  the inception of that relationship; and (3) Global had raised an antitrust defense that involved policies

6  and practices of Global's management during Farano's tenure there. *See* 144 Cal. App. 3d at 488-89.

7        An even closer case on its facts is *Franzoni v. Hart Schaffner & Marx*, 312 Ill. App. 3d 394

8  (2000). The defendants in a retaliatory discharge action, Hart Schaffner & Marx ("HSM") and its

9  parent company Hartmarx Corp. ("HC"), moved to disqualify the plaintiff's counsel, Carey Stein.

10  Stein had served for 14 years as in-house counsel for HC and its affiliates, and had become HC's

11  general counsel before leaving. The court applied a "substantial relationship" test similar to

12  California's and granted the motion to disqualify. The appellate court upheld the disqualification,

13  finding that Stein's previous representation of HSM "involved extensive confidential employment-

14  related matters," Stein had confidential information about HSM's employment policies and practices

15  relating to the plaintiff's claims, he was "privy to the manner in which HC and its subsidiaries make

16  employment decisions like those at issue here and the respective roles of HC and subsidiary

17  executives and human resource professionals in such decisions," and had been directly involved in

18  employment matters relating to the plaintiff. *Id.* at 401-02; *see also Webb v. E.I. Du Pont de Nemours*

19  *& Co., Inc.*, 811 F. Supp. 158, 162 (D. Del. 1992) (disqualifying plaintiff's attorney in ERISA action

20  where attorney was previously employed in-house at DuPont and advised DuPont on ERISA benefit

21  matters); *Ullrich*, 809 F. Supp. at 235-36 (disqualifying plaintiffs' attorney in employment-related

22  cases where attorney previously worked in-house at Hearst as staff attorney principally responsible for

23  labor and employment issues, "advis[ed] management on the broad areas of the very types of

24  employment matters that are raised in these lawsuits" and thus had access to confidential information

25  and policies related to current representations); *Stitz v. Bethlehem Steel Corp.*, 650 F. Supp. 914, 917

26  (D. Md. 1987) (disqualifying plaintiff's attorney in age discrimination suit where attorney previously

27  worked in-house for Bethlehem as corporate labor attorney and labor relations representative, and

28  therefore was familiar with Bethlehem's personnel policies and procedures).

1    Moreover, the court in the *Franzoni* case also rejected the plaintiff's argument that the length

2    of time between Stein's employment at HC and the filing of the plaintiff's complaint -- four years --

3    negated the inference that confidential information had been imparted to Stein, because

> the persons who had made the decisions of which plaintiff now
> complains were the same persons that Stein had advised about similar
> decisions while he was HC's general counsel; Stein's former advisees
> were applying employment policies and practices for which Stein had
> been responsible; and those advisees applied those policies and practices
> to an employee whose relationship with HC and HSM Stein had helped
> to shape.

8    *Franzoni*, 312 Ill. App. 3d at 403.  The appellate court quoted the trial judge:  "When you're general

9    counsel and you're involved in the policy making decisions and those policies then carry into the

10   future [and] subsequently, a lawsuit is involved in the application of those policies [and] you represent

11   the plaintiff -- *I think then you might have a conflict for a long time.*"  *Id.* (ellipses omitted, emphasis

12   added).  This is particularly true in cases involving intellectual property rights, because those rights

13   can persist for many years -- and especially in a case involving a trademark as long-lived as LS&CO.'s

14   Arcuate Trademark.  *See, e.g., Asyst Technologies, Inc. v. Empak, Inc.*, 962 F. Supp. 1241 (N.D. Cal.

15   1997) (disqualifying defense counsel in patent validity action where two of the law firm's partners had

16   prosecuted the patent some nine years before); *see also Emle Industries, Inc. v. Patentex, Inc.*, 478

17   F.2d 562 (2d Cir. 1973) (disqualifying plaintiff's attorney in patent action where attorney had

18   represented defendant in similar action 11 years before); 3 R. Mallen & J. Smith, *Legal Malpractice* §

19   23:26 at 626 (2007 ed.) ("The long life of the patent, trademark or copyright extends the time for

20   avoiding adverse representation.").  Thus, the fact that Ms. Basile left LS&CO. in 1999 does not

21   mitigate the conflict: where the trademark, the Company's enforcement policies, and many of the

22   Company's top managers remain the same, the adverse representation is prohibited.

23      **C.    Because Ms. Basile's Disqualification Is Required, Howrey's Disqualification Is
24             Also Required**

25      Under California law, where disqualification of an individual attorney is required,

26   disqualification of the attorney's firm is also required.  *SpeeDee Oil*, 20 Cal. 4th at 1146 ("a

27   presumption that an attorney has access to privileged and confidential matters relevant to a subsequent

28   representation extends the attorney's disqualification vicariously to the attorney's entire firm"); *Flatt*, 9

1  Cal. 4th at 283 (mandatory disqualification "extends vicariously to the entire firm").

2            When attorneys presumptively share access to privileged and
3  confidential matters because they practice together in a firm, the
   disqualification of one attorney extends vicariously to the entire firm.
4  The vicarious disqualification rule recognizes the everyday reality that
   attorneys, working together and practicing law in a professional
5  association, share each other's, and their clients' confidential
   information.

6  *SpeeDee Oil*, 20 Cal. 4th at 1153-54 (citations omitted); *see Trone*, 621 F.2d at 999 ("Confidential

7  information possessed by one attorney may or may not have been shared with other members of the

8  firm, but the firm as a whole is disqualified whether or not its other members were actually exposed to

9  the information."). Thus, vicarious disqualification involves a double layer of irrebuttable

10  presumption:

11            There are two conclusive presumptions in this area of California law . . .
   . [T]he presumption that if there is a substantial relationship between
12  the current and former representation, confidential information related to
   the current representation "has passed to the prior attorney" is
13  conclusive. Following the "imputed knowledge theory," the
   presumption that the prior attorney's firm possesses confidential
14  information is also "conclusive."

15  *Elan*, 809 F. Supp. at 1390 n.11 (citations omitted); *see also City and County of San Francisco*, 38

16  Cal. 4th at 847-48 ("[n]ormally, an attorney's conflict is imputed to the law firm as a whole") (citing

17  *SpeeDee Oil*, 20 Cal. 4th at 1153-54).

18      This Court also has followed the vicarious disqualification rule. In *Hitachi, Ltd. v. Tatung Co.*,

19  419 F. Supp. 2d 1158 (N.D. Cal. 2006) (Breyer, J.), this Court addressed a patent infringement

20  plaintiff's motion to disqualify defense counsel (Greenberg Traurig) because an associate at plaintiff's

21  counsel's firm had represented Hitachi in a prior infringement action involving the same patents before

22  moving to Greenberg. The Court disqualified both the associate and the Greenberg firm even though

23  the firm had screened the associate from the current litigation: "[A]s a matter of California law, the

24  Court finds that Greenberg's ethical screening procedures cannot prevent vicarious disqualification

25  and Greenberg is disqualified from representing Tatung in this matter." *Id.* at 1164. Two recent

26  unpublished decisions in this Court also held that ethical walls did not foreclose the need for vicarious

27  disqualification. *See Lappert's Ice Cream, Inc. v. Lappert's, Inc.*, No. C 06-1296 SC, 2007 U.S. Dist.

28  LEXIS 21349 at *11 (N.D. Cal. Mar. 6, 2007) (imputed disqualification necessary in light of "various

1  direct interactions" between law firm employees who worked on prior representation and attorneys

2  working on current representation, even though employees submitted declarations stating that they did

3  not remember receiving or sharing confidential information) (Conti, J.); *I-Enterprise Co. LLC v.*

4  *Draper Fisher Jurvetson Mgmt. Co. V, LLC*, No. C 03-1561 MMC, 2005 U.S. Dist. LEXIS 45190 at

5  *24 (N.D. Cal. Apr. 4, 2005) ("[t]he Court has located no Ninth Circuit or California case approving

6  use of an ethical wall in lieu of disqualification" in a case where non-government counsel moved from

7  one firm to another) (Chesney, J.); *see also Lucent Technologies Inc. v. Gateway, Inc.*, No.

8  03CV1108-B (CAB), 2007 U.S. Dist. LEXIS 35502 at *22 (S.D. Cal. May 15, 2007) ("California

9  courts generally have not allowed a law firm to avoid vicarious disqualification by implementing a

10  screening procedure").  Accordingly, under California law and governing authority of this Court, the

11  entire Howrey firm must be disqualified.[8]

12  **D.    LS&CO. Has Not Waived its Objection to Howrey's Representation of A&F**

13      LS&CO. expects A&F to argue that Howrey is not required to fulfill its ethical obligations,

14  because LS&CO. waived any objection to Howrey's continued representation by waiting until now to

15  file this motion.  This argument is not supported by California law or the circumstances of this case.

16      California law recognizes a "*narrow exception*" to the rule that substantial relationship equals

17  automatic disqualification "if the present client, by way of opposition, offers prima facie evidence of

18  _____

19  [8] In any event, any "ethical wall" Howrey may now have put in place is, by definition, insufficient.
   Ms. Basile was the attorney of record and correspondent on A&F's application to register the stitching
20  design at issue, so obviously, any wall could not have been instituted until after the conflict had
   already arisen, the damage was done, and LS&CO. had brought the conflict to Howrey's attention.
21  Howrey did not take any measures to wall Ms. Basile off before that point, even though it was well
   aware of -- indeed, highlighted on its website -- Ms. Basile's prior experience as LS&CO.'s "associate
22  general counsel responsible for all aspects of brand protection." (Cincone Dec. Ex. F.)  Under these
   circumstances, the only remedy is to preclude Howrey from any further representation of A&F in this
23  matter. *See Lucent Technologies*, 2007 U.S. Dist. LEXIS 35502 at *28 (rejecting ethical wall that was
   not instituted until after plaintiff notified defendant's counsel of conflict); *I-Enterprise*, 2005 U.S. Dist.
24  LEXIS 45190 at *19-20 (rejecting ethical wall where experience of attorney who had previously done
   work for defendant was highlighted on plaintiff's counsel's website, yet plaintiff's counsel did not wall
25  him off until after motion to disqualify was filed).

26  Interestingly, Howrey has recently removed the specific references to LS&CO. and to Ms. Basile's
   responsibilities as LS&CO.'s associate general counsel from its website.  (*Compare* Cincone Dec. Ex.
27  F *with* Cincone Dec. Ex. G.)

28

1    an unreasonable delay by the former client in making the motion and resulting prejudice to the current

2    client." *River West*, 188 Cal. App. 3d at 1309 (emphasis added).  The exception is narrow because of

3    the important policies underlying the conflict of interest rules:

4           Since . . . disqualification is in the public interest, the court cannot act
            contrary to that interest by permitting a party's delay in moving for
5           disqualification to justify the continuance of a breach of the Code of
            Professional Responsibility.  Accordingly, "the Court's duty and power
6           to regulate the conduct of attorneys practicing before it, in accordance
            with the Canons [of professional ethics], cannot be defeated by the
7           laches of a private party or complainant."

8    *Emle*, 478 F.2d at 574 (citations omitted).

9           If the party opposing disqualification can make a prima facie showing of unreasonable delay,

10   the burden then shifts to the former client to justify the delay by addressing "(1) how long it has

11   known of the potential conflict; (2) whether it has been represented by counsel since it has known of

12   the potential conflict; (3) whether anyone prevented the moving party from making the motion earlier,

13   and if so, under what circumstances; and (4) whether an earlier motion to disqualify would have been

14   inappropriate or futile and why." *River West*, 188 Cal. App. 3d at 1309.  The cases make clear that

15   "mere delay" is not a sufficient basis to deny a motion for disqualification on grounds of laches:  "The

16   delay must be *extreme in terms of time and consequence*." *Id.* at 1311 (emphasis added); *see also*

17   *Forrest v. Baeza*, 58 Cal. App. 4th 65, 79 (1997) (finding of laches must be based on "extreme time

18   delay or extreme prejudice").

19          This Court has adopted a similar formulation.  In a case where the defendant Kodak moved to

20   disqualify plaintiffs' counsel Coudert, this Court held, "In order to successfully claim laches as a

21   defense to this motion, plaintiffs must establish (a) Kodak long ago had notice of the adverse

22   representation, (b) Kodak intentionally delayed moving for Coudert's disqualification, (c) plaintiffs are

23   *severely burdened* by the delay, and (d) the extreme and intentional delay allowed Kodak to obtain a

24   tactical advantage." *Image Technical Services, Inc. v. Eastman Kodak Co.*, 820 F. Supp. 1212, 1217

25   (N.D. Cal. 1993).  The court found no evidence of any of those factors. *Id.* at 1218.

26          Similarly, none of these factors is present here.  It is true that LS&CO. did not lightly take the

27   step of accusing its former colleague of ethical misjudgment.  But LS&CO. objected to Ms. Basile's

28   representation of A&F in connection with the pending trademark application as soon as it became

1   aware of her role as filing attorney.  At that point, the PTO had not even published the mark for

2   opposition, and it was unclear whether any adversarial opposition ever would be necessary.  Howrey

3   itself was not adverse to LS&CO. until March 21, 2007, when Howrey filed A&F's answer to

4   LS&CO.'s Notice of Opposition.  The fact that LS&CO. did not immediately move to disqualify

5   Howrey before the TTAB does not constitute a waiver; and in any event, failure to object before the

6   TTAB would not constitute a waiver of LS&CO.'s right to move to disqualify Howrey in this Court.

7   *See Ullrich*, 809 F. Supp. at 236 (where matter "was in preliminary stages before an administrative

8   agency and was not a lawsuit seeking judgment," defendant may have decided "there was not enough

9   in controversy to warrant the expense and embarrassment of litigating an order of disqualification,"

10  and "may also have been reluctant to submit this issue to be judged by an administrative agency rather

11  than a court").  LS&CO. notified Howrey of its position on the conflict literally the same day LS&CO.

12  filed its complaint in this Court.  Even then, LS&CO. was not certain until August 21, 2007, when

13  Howrey filed A&F's answer in this litigation, whether a motion would be necessary.  In the ensuing

14  month, LS&CO. and A&F have engaged in settlement discussions, as well as attempting to resolve the

15  disqualification issue.  None of these "delays" can be considered so "extreme" as to warrant a finding

16  of waiver, nor has LS&CO. gained any tactical advantage whatsoever by waiting.

17      Moreover, A&F will not be prejudiced by disqualification of its counsel at this initial stage of

18  the litigation.  The opposition proceeding has been stayed (before discovery was completed) until the

19  civil action concludes.  No discovery or other proceedings have yet been conducted in this action.

20  Under similar circumstances, courts have refused to hold that the party moving for disqualification

21  waived its right to do so.  *See, e.g., Ultimax Cement Manufacturing Corp. v. CTS Cement*

22  *Manufacturing Corp.*, No. SACV 02-578 AHS (ANx), 2007 U.S. Dist. LEXIS 44096 at *19-22 (C.D.

23  Cal. May 7, 2007) (5-month delay not unreasonable); *Miller v. Alagna*, 138 F. Supp. 2d 1252, 1259

24  (C.D. Cal. 2000) (6-month delay did not preclude motion for disqualification); *Western Continental*

25  *Operating Co. v. Natural Gas Corp. of California*, 212 Cal. App. 3d 752, 763-64 (1989) (11-month

26  delay not extreme or unreasonable where case was still in its early stages); *see also Emle,* 478 F.2d at

27  574 (3-year delay not extraordinary and did not cause any prejudice); *Integrated Health Services v.*

28  *THCI Co. LLC*, 327 B.R. 200, 204 n.3 (D. Del. 2005) (4-month delay not unreasonable where case

1   was in early stages, noting waiver generally found only where delay was significant and/or motion

2   was filed shortly before trial); *Colorpix Systems of America v. Broan Manufacturing Co., Inc.*, 131 F.

3   Supp. 2d 331, 340 (D. Conn. 2001) (no waiver where motion filed one and a half years after moving

4   party was on notice of conflict and over six months before trial); *Buckley v. Airshield Corp.*, 908 F.

5   Supp. 299, 307-08 (D. Md. 1995) (no waiver where plaintiff raised objection within two months of

6   filing suit, no trial had been set and no discovery had taken place, noting "the mere length of delay is

7   not dispositive and the Court should not deny a motion to disqualify based on delay alone"); *Ullrich*,

8   809 F. Supp. at 237 (no waiver where, although defendant could have raised disqualification issue

9   earlier than it did, it "did not delay for so long a time as to harm plaintiff['s] interests" and litigation

10  was still in "incipient stages").[9]  In any event, A&F should not be permitted to argue prejudice when

11  Howrey's conflict has been evident since the time Ms. Basile filed the trademark application on A&F's

12  behalf.  *See Personalized Mass Media Corp. v. The Weather Channel, Inc.*, 899 F. Supp. 239, 245

13  (E.D. Va. 1995) (disqualifying Howrey & Simon from representing plaintiff in patent infringement

14  action on ground that Howrey partner could be a witness and offer testimony prejudicial to plaintiff;

15  plaintiff could not argue it would suffer substantial hardship from disqualification where from the

16  outset, plaintiff and Howrey "knew of the possibility of disqualification" and "reasonably could have

17  expected a challenge" to Howrey's participation in patent infringement litigation).

---

[9] The circumstances here contrast sharply with cases in which courts applying California law have
held objections to conflicts of interest waived by virtue of the objecting party's delay.  For example, in
*River West, supra*, the moving party knew of the conflict for over three years before he moved to
disqualify; in the meantime, the plaintiffs' attorneys had devoted over 3,000 hours to the litigation.
The court found "the delay in making the disqualification motion so unreasonable and the resulting
prejudice so great, that the law must assume an implied waiver of the right to disqualify" the attorney.
188 Cal. App. 3d at 1313.  In *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85 (9th Cir.
1983), counsel for the plaintiff in a wrongful death action had been notified of the conflict by the
defendant's counsel, who previously had represented the deceased in several matters.  Plaintiff's
counsel told defendant's counsel that they would review the file and contact them if they had an
objection to the representation.  Plaintiff's counsel kept the file for two and a half years without
communicating any objection, then filed a motion to disqualify 33 days before the scheduled trial date
when virtually all discovery and trial preparation had already been completed.  The Ninth Circuit held
that plaintiff's "failure to object within a reasonable time, coupled with the long delay in filing a
motion to disqualify, constitute[d] a *de facto* consent" to the representation "and a waiver of its right to
object."  *Id.* at 88.  These cases clearly are distinguishable on their facts.

1      LS&CO. hoped that Howrey would conclude on its own that it should allow other counsel to

2  defend this case.  It never sought any tactical advantage from the conflict and regrets the need to file a

3  motion against its former employee.  Surely, LS&CO. should not be penalized for waiting to do so

4  until absolutely necessary.

5  **IV.  CONCLUSION**

6      For the reasons discussed above, Levi Strauss & Co. respectfully requests that this Court

7  disqualify Howrey LLP from any further representation of Abercrombie & Fitch Trading Co. in this

8  litigation.

9

10  DATED:  September 21, 2007     Respectfully submitted,

11

12  By: _____

Gia L. Cincone
TOWNSEND AND TOWNSEND AND CREW LLP
Two Embarcadero Center, Eighth Floor
San Francisco, California 94111
Telephone: (415) 576-0200
Facsimile: (415) 576-0300

Attorneys for Plaintiff
LEVI STRAUSS & CO.

61150568 v1