Benjamin Riley (SBN 112007)
E-mail: RileyB@howrey.com
**HOWREY LLP**
525 Market Street, Suite 3600
San Francisco, CA 94105-2708
Telephone: (415) 848-4900
Facsimile: (415) 848-4999

David G. Meyer (SBN: 116591)
E-mail: Meyerd@howrey.com
Stephanie M. Byerly (SBN: 199223)
E-mail: Byerlys@howrey.com
**HOWREY LLP**
550 South Hope Street, Suite 1100
Los Angeles, California 90071
Telephone: (213) 892-1800
Facsimile: (213) 892-2300

Attorneys for Defendant
Abercrombie & Fitch Trading Co.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO

| | |
|---|---|
| LEVI STRAUSS & CO, | Case No. 07-cv-03752-JWS |
| Plaintiff, | **DECLARATION OF KATHERINE M. BASILE IN SUPPORT OF ABERCROMBIE & FITCH TRADING CO.'S OPPOSITION TO LEVI STRAUSS & CO.'S MOTION TO DISQUALIFY HOWREY LLP** |
| v. | |
| ABERCROMBIE & FITCH TRADING CO., | |
| Defendant. | |

Date:      October 26, 2007
Time:      9:00 a.m.
Place:     Courtroom 2
Judge:     Honorable Jeffrey S. White

# **DECLARATION OF KATHERINE M. BASILE**

I, KATHERINE M. BASILE, state and declare as follows:

1.    I am a partner in the law firm of Howrey LLP.  I have personal knowledge of the matters stated below.

2.    I am licensed in the State of California and have been practicing law since 1987.  I started working for Howrey LLP in June 2000 as a partner of the firm.  I work on matters involving the creation, clearance, prosecution and enforcement of trademarks and brands, both in the United States and worldwide.  I have broad experience in trademark litigation and proceedings before the Trademark Trial and Appeal Board.  I also have counseled many clients on their internal intellectual property policies and practices.

3.    Between approximately March 1988 and April 1994, I worked as a litigation associate at Heller Ehrman, LLP.  Gia Cincone also was an associate at Heller during at least some of this time and Greg Gilchrest was a partner with Heller Ehrman during at least some of this time.  Since I left Heller Ehrman, I have maintained a relationship with Ms. Cincone and Mr. Gilchrest, who are both attorneys at Townsend and Townsend and Crew, LLP.  I understand that they represent Levi Strauss & Co. ("LS&CO") in certain matters, including the trademark infringement lawsuit that is the subject of LS&CO's Motion to Disqualify Howrey LLP.

## Employment at Levi Strauss & Co.

4.    For exactly five years, from April 27, 1994 to April 27, 1999, I worked in-house at LS&CO, first as an assistant general counsel and then as an associate general counsel in the legal department.  During much of that time, I worked with two other attorneys handling brand protection matters, Sandrine Besnard-Corblet and Wai Zee.  Sandrine handled trademark matters for Europe.  Wai handled trademark matters for Asia Pacific.  I handled trademark matters for the America's.

5.    During most of my time at LS&CO, the three of us reported to Ruth Meyler who reported to the General Counsel, first Thomas Bauch and then Albert Moreno.  When Ruth Meyler left LS&CO at the end of 1998, I reported to Seth Jaffe, who reported to the General Counsel Albert Moreno.  Ruth Meyler, Seth Jaffe, Alberto Moreno and Tom Bauch are no longer with LS&CO.  In

HOWREY LLP

DM_US:20798708_1

1    fact, it is my understanding that none of the attorneys with whom I worked closely at LS&CO's United

2    States headquarters are still with the company at headquarters. It is my understanding from Sandrine

3    and Wai that they now head the regional legal departments in their respective regions, Europe and

4    Asia, respectively.

5          6.     My primary responsibilities at LS&CO included handling specific enforcement and

6    protection matters for LS&CO trademarks and brands, including the Arcuate Trademark, within the

7    United States and in other jurisdictions around the world. During the time I was at LS&CO, the

8    company's trademark enforcement strategy and policies were directed by in-house counsel and senior

9    business leaders. I made decisions regarding brand protection and trademark enforcement by myself

10   or with the legal team and then-current business leaders for the LEVI's brand, depending on the

11   circumstances. I also directed the enforcement strategy employed by LS&CO for the Arcuate

12   Trademark during my tenure. I played a key role in directing LS&CO's trademark enforcement and

13   brand protection strategy.

14         7.     While at LS&CO, I also handled enforcement matters and brand protection issues

15   related to the DOCKERS® brands. At the time, the DOCKERS® brand was managed by a different

16   division than the division managing the LEVI's brand and associated marks.

17         8.     When I was at LS&CO, there were several senior managers who were involved in

18   decisions regarding the strategy and implementation for enforcing the LEVI's brand marks. During

19   the time I was at LS&CO, the primary business leaders with whom I worked on U.S. LEVI's brand

20   enforcement matters were Bob Rockey, Pete Jacobi, Steve Goldstein and one other gentleman whose

21   name I cannot recall. None of these individuals works at LS&CO any longer.

22         9.     On one occasion, I discussed with Bob Haas, LS&CO's former Chief Executive

23   Officer, a high-level policy issue related to trademark enforcement overseas. I did not advise Mr. Haas

24   on daily trademark enforcement issues related to the Arcuate Trademark in the U.S. or elsewhere. Mr.

25   Haas is no longer CEO of LS&CO.

26

27

28

DECLARATION OF KATHERINE M. BASILE
CASE NO. 07-cv-03752-JWS

HOWREY, LLP

DM_US:20798708_1

10.    I do not recall well my interactions with John Anderson, LS&CO's current CEO. To the extent we did work together, it would have been on brand protection matters outside of the United States, which is where he was based.

11.    When I was at LS&CO, Robert Hanson, current President of Levi North America, was in the Dockers division. Consequently, I never worked with him on matters related to the Arcuate Trademark, although I did work with Mr. Hanson on trademark issues and brand protection related to the DOCKERS® brand.

12.    I do not recognize the names of any other current members of LS&CO's executive management team. Certainly, none of those individuals worked closely with me on trademark enforcement or brand protection at LS&CO.

### Employment Post-LS&CO

13.    After I left LS&CO at the end of April 1999, LS&CO hired Tom Onda as one of its inside legal counsel. Mr. Onda never worked in-house at LS&CO while I was there. Early on, when I was at LS&CO, he was an associate attorney with a firm who acted as outside counsel for LS&CO. I supervised some specific trademark enforcement matters that Mr. Onda's prior firm worked on. I did not work with Mr. Onda to develop any of LS&CO's trademark enforcement or brand protection strategies or policies.

14.    I left LS&CO at the end of April 1999. After that, I worked for Intel Corporation as a trademark attorney in its legal department. In June 2000, I left Intel to become a partner at Howrey LLP in its Menlo Park office. Because of my relationship with Messrs. Onda and Gilchrist and Ms. Cincone, I made them aware of my move to Howrey.

15.    Although I have maintained contact with Messrs. Onda and Gilchrest and Ms. Cincone since I left LS&CO, I never discussed LS&CO's trademark enforcement practices or brand protection policies with any of them after leaving the company. In fact, I do not believe that any one of them would ever discuss LS&CO issues of a privileged and confidential nature with me.

16.    I am in rare contact with my former legal department colleagues from LS&CO, Ms. Besnard-Corblet and Mr. Zee, and have maintained a friendship with Tracy Whiteman, who became a

1   paralegal in our group while I was at LS&CO. I have not discussed with any of them LS&CO's

2   trademark enforcement practices or brand protection policies since I left LS&CO. I have not had any

3   contact with LS&CO business leaders who have been making the trademark enforcement and brand

4   protection decisions for the past eight years since I left LS&CO. Other than what I learn from public

5   sources, I have no independent knowledge of LS&CO's current trademark or brand enforcement or

6   protection strategy.

7        17.    The only "knowledge" I have regarding LS&CO's enforcement strategy over the

8   Arcuate Stitching Design mark is from public records. In 2007, the New York Times published an

9   article disclosing LS&CO's new, aggressive enforcement strategy beginning in 2001, approximately

10  two years after I left LS&CO. A true and correct copy of the New York Times article is attached

11  hereto as Exhibit "A." The article states that LS&CO initiated over 100 lawsuits since 2001.

12  According to the article, this change in strategy made LS&CO one of the most litigious companies in

13  the United States.

14                              The Current Litigation

15       18.    Although I have been involved in Abercrombie & Fitch trademark matters handled by

16  Howrey, I have not played a substantive role in the prosecution of the RUEHL Women's Pocket

17  Design Trademark, and have not been involved from the beginning. I was generally aware that

18  Howrey had filed an intent to use trademark application for the RUEHL Women's Pocket Design

19  Trademark, but do not recall ever having seen the application itself. I did not prepare, sign or file the

20  application. I have been informed that my name is listed as one of the Howrey attorneys who

21  represents A&F and as the corresponding attorney for the United States Patent and Trademark Office

22  ("PTO").

23       19.    It is standard practice within Howrey's trademark practice group to list a group of

24  trademark partners on any trademark application, even if they do not work on the matter. Usually, the

25  first attorney on the list will be listed as the corresponding attorney with Howrey's D.C. office address

26  for mailing purposes. The e-mail address for Howrey's IP Docketing department, which is located in

27  Virginia, is provided for any electronic communication by the PTO. Once correspondence arrives in

28

DECLARATION OF KATHERINE M. BASILE
CASE NO. 07-cv-03752-JWS

1    D.C. or Virginia, the IP Docketing group takes responsibility for distributing the mail to the attorney

2    and paralegal identified as the action persons for the matter. I have not been identified as an action

3    person on the RUEHL Women's Pocket Design trademark application. I have never received any

4    substantive correspondence from the PTO or internally from other attorneys or paralegals handling the

5    matter. The only information I have received regarding this matter is in relation to this Motion to

6    Disqualify.

7        20.    In fact, I have not billed any time to the RUEHL Women's Pocket Design trademark

8    matters. I have not prepared or reviewed any pleading, document, correspondence, or other item

9    related to these matters.

10       21.    Sometime during the week of January 23, 2006, I received a call from Tom Onda. He

11   informed me that he had just learned about RUEHL Women's Pocket Design ITU Trademark

12   Application. Tom expressed several things he did not like about the design because he thought they

13   were too similar to LS&CO's Arcuate Trademark. Tom also told me that he was surprised to see my

14   name on the application and he was uncomfortable speaking with me regarding it, because I had

15   worked in-house at LS&CO. I reminded Tom that it had been almost seven years since I worked at

16   LS&CO, and that I had no idea about their trademark strategies anymore. Because it was such a long

17   time, I also told him that I did not see a problem with my name listed as correspondent on the

18   application. Tom agreed that seven years was a long time. He told me that he was not sure whether

19   outside counsel would feel the same way.

20       22.    Until I received the telephone call from Ms. Cincone in July 2007, discussed below, I

21   believed that my telephone discussion with Mr. Onda was the end of his concern regarding Howrey's

22   involvement in the RUEHL Women's Pocket Design trademark application.

23       23.    I have read Mr. Onda's declaration regarding this telephone discussion with me. In

24   paragraph 8, he states that he "indicated that six years could be considered a long time, but that in view

25   of the historic nature of the Arcuate Trademark, it should come as no surprise that LS&CO's brand

26   protection policies had remained relatively consistent over time." I do not recall Mr. Onda telling me

27   that LS&CO's brand protection policies had remained consistent over time. I would be surprised and

28

HOWREY, LLP

DM_US:20798708_1

1  would have remembered if Mr. Onda would have shared confidential information with me at the same

2  time that he was contacting me to express his concerns about my firm's involvement in a trademark

3  matter on behalf of a company which LS&CO might challenge.  Mr. Onda has never discussed

4  LS&CO's current brand protection policies with me.

5       24.    In addition, I never evaluated an enforcement action regarding the RUEHL Women's

6  Pocket Design trademark when I was at LS&CO.  Whether I would have initiated enforcement

7  activities then would have depended on myriad of factors existing at that time, including LS&CO's

8  then-current business management's thinking regarding such issues, other pending enforcement

9  matters, budgetary considerations, etc.

10      25.    Sometime shortly before July 20, 2007, I contacted Tom Onda to inquire if he would

11  participate on a panel discussing famous marks and dilution during the August 2007 American Bar

12  Association Annual Meeting in San Francisco.  Mr. Onda returned that call after Ms. Cincone's call

13  (below).  He declined to be on the panel as he would be unavailable, and then told me that he was sorry

14  about the motion to disqualify Howrey.  He assured me that he did not have any concern that I had or

15  would actually divulge confidential information, and that he hoped that the matter could be resolved.  I

16  told Mr. Onda that I too hoped that the matter could be resolved; that the implication that I would do

17  anything improper was very disturbing to me; and that if Tom did not believe that I had or would

18  divulge confidential information, then this must be a litigation tactic and I would have thought that my

19  long relationship with him and with his outside attorneys would not have lead to this occurring.

                            Howrey's Ethical Screen

21      26.    On January 30, 2006, I informed the A&F team about Mr. Onda's January 23, 2006

22  telephone call.

23      27.    Although I had never received any correspondence on the matter before Mr. Onda's

24  call, after the call, I was formally barred from receiving any information regarding the RUEHL

25  Women's Pocket Design matters.

26      28.    On March 24, 2006, the firm withdrew my name from the trademark application.

27

28

DECLARATION OF KATHERINE M. BASILE
CASE NO. 07-cv-03752-JWS

HOWREY, LLP

DM_US:20798708_1

29.    My name never was and is not on any e-mail or other distribution list for the RUEHL Women's Pocket Design matters.

30.    I have never seen the files on these matters. I have never discussed the RUEHL Women's Pocket Design matters with the A&F team.

31.    I have never been on a team conference call or at a meeting discussing the RUEHL Women's Pocket Design trademark matters. Because I am located in the East Palo Alto, California office and the active members on the team are located in Howrey's D.C. office, it is virtually impossible for me to inadvertently walk into any meeting regarding this matter.

32.    In addition, I believe that my physical distance from the A&F team decreases the possibility that anyone on the team might inadvertently disclose confidential information to me regarding these matters, or to seek my input.

33.    If anyone ever asked me anything about LS&CO in connection with this or any other matter, I would advise them that I am unable to discuss anything I learned when I was in-house at LS&CO.

34.    Other than communicating the content of Mr. Onda's telephone call to the client, I have never discussed the RUEHL Women's Pocket Design matters with A&F.

35.    On February 22, 2007, Howrey also circulated a formal memo to the entire firm worldwide regarding the ethical wall walling me off from the Abercrombie & Fitch Women's Pocket Design matters (00863.0216.00000; 00863.0216.TMCA00; 00863.0216.TMGB00; 00863.0216.TMUS00; 00863.0216.TMUS01; 00863.0216.TMWO00; 00863.0216.WOEM00; 00863.0216.WOJP00). A true and correct copy of the memo is attached hereto as Exhibit "B."

36.    On July 20, 2007, I received a phone call from Gia Cincone who told me that she was calling with regard to the action LS&CO had against A&F. I immediately told Ms. Cincone that she needed to contact my partner Susan Kayser in our Washington DC office because she is handling the matter and that I was not involved. Ms. Cincone said that she knew that and had spoken to Ms. Kayser in the past, but that she was calling to talk to me personally to tell me that LS&CO was going to move

DECLARATION OF KATHERINE M. BASILE
CASE NO. 07-cv-03752-JWS

HOWREY, LLP

DM_US:20798708_1

1  to disqualify Howrey based upon my in-house employment by LS&CO. I informed the A&F team that

2  I had received a call from Ms. Cincone.

3      37.    I have had multiple conversations with Stephanie Byerly, a senior associate in

4  Howrey's Irvine, California office, to prepare for Howrey's Opposition to the Motion to Disqualify. I

5  am not allowed to discuss and have not discussed this opposition with the RUEHL Women's Pocket

6  Design trademark team.

7  __Other__

8      38.    I have read LS&CO's Motion to Disqualify and its supporting declarations by Mr.

9  Onda and Ms. Cincone. I reviewed Exhibit A to Ms. Cincone's declaration, an excerpt from my

10  deposition transcript in the *Levi Strauss & Co. v. Vivat Holdings PLC* matter; Exhibit F, a copy of my

11  biography published on the Howrey website until around August 15, 2007, and Exhibit G, a copy of

12  my updated biography published on the Howrey website sometime after August 15, 2007. I was not

13  provided with and have never reviewed any of the other exhibits attached to Ms. Cincone's

14  declaration.

15      39.    Exhibits F and G to Ms. Cincone's declaration are two versions of my biography from

16  Howrey's website. In the Motion to Disqualify, LS&CO notes of the timing of the change in

17  description of my past employment at LS&CO. LS&CO implies that I intentionally revised my

18  biography to minimize my in-house role at LS&CO. This is not true. The firm revised my biography

19  in or around August 15, 2007 as a part of a firm-wide marketing effort to standardize and to improve

20  the appearance of all attorney biographies on the website. The new marketing policy does not allow

21  reference to clients, specific trademarks, or firm names in the narrative. A true and correct copy of the

22  August 15, 2007 e-mail I received from Kimberly Coffee, Regional Marketing Director, is attached

23  hereto as Exhibit "C."

24      I declare under the penalty of perjury that the above statements are truthful to the best of my

25  knowledge.

26      Executed this 5th day of October, 2007.

27

28                        KATHERINE M. BASILE

DECLARATION OF KATHERINE M. BASILE
CASE NO. 07-cv-03752-JWS