1  TOWNSEND AND TOWNSEND AND CREW LLP
   GREGORY S. GILCHRIST (State Bar No. 111536)
2  GIA L. CINCONE (State Bar No. 141668)
   Two Embarcadero Center, Eighth Floor
3  San Francisco, California  94111
   Telephone: (415) 576-0200
4  Facsimile: (415) 576-0300
   Email:  gsgilchrist@townsend.com; glcincone@townsend.com
5
   Attorneys for Plaintiff
6  LEVI STRAUSS & CO.

7

8                     UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  LEVI STRAUSS & CO.,                    Case No.    C 07-3752 JSW

12                  Plaintiff,             PLAINTIFF LEVI STRAUSS & CO.'S
                                           REPLY BRIEF IN SUPPORT OF
13            v.                           MOTION TO DISQUALIFY
                                           HOWREY LLP AS COUNSEL FOR
14  ABERCROMBIE & FITCH TRADING CO.,       DEFENDANT ABERCROMBIE &
                                           FITCH TRADING CO.
15                  Defendant.
                                           DATE:  October 26, 2007
16                                         TIME:   9:00 a.m.
                                           COURTROOM:  2
17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................................................... 1

II.     ARGUMENT ................................................................................................................. 2

       A.      There Is A Direct And Substantial Relationship Between Ms. Basile's
Former Work Enforcing LS&CO.'s Arcuate Trademark And The
Defense Of LS&CO.'s Claims In This Action............................................................ 2

               1.      Ms. Basile's Former Representation of LS&CO. ....................................... 2

               2.      Howrey's Current Representation of A&F ................................................... 4

               3.      Case Law, Undistinguished By Howrey, Shows a Substantial
Relationship ............................................................................................... 5

       B.      Howrey's Implementation Of An Ethical Wall In February Of This
Year Has Not And Cannot "Cure" The Conflict ....................................................... 7

       C.      LS&CO.'s "Delay" Is Vastly Mischaracterized, And Insufficient To
Waive Howrey's Conflict ...................................................................................... 10

III.    CONCLUSION ........................................................................................................... 12

1

## TABLE OF AUTHORITIES

2
<u>Page</u>

3

4 *Adams v. Aerojet-General Corp.*,
    86 Cal. App. 4th 1324 (2001) ............................................................................................ 9

5

6 *Blue Marlin Corp. v. VF Jeanswear Limited Partnership*,
    No. C 02-5096 MJJ (N.D. Cal. Jan. 17, 2003) ................................................................ 3

7 *Brand v. 20th Century Insurance Co.*,
    124 Cal. App. 4th 594 (2004) ....................................................................................... 5, 6

8

9 *City and County of San Francisco v. Cobra Solutions, Inc.*,
    38 Cal. 4th 839 (2006) ...................................................................................................... 9

10 *Employers Insurance of Wausau v. Albert D. Seeno Construction Co.*,
    692 F. Supp. 1150 (N.D. Cal. 1988) ............................................................................ 7, 12

11

12 *Farris v. Fireman's Fund Insurance Co.*,
    119 Cal. App. 4th 671 (2004) ........................................................................................... 7

13 *Franzoni v. Hart Schaffner & Marx*,
    312 Ill. App. 3d 394 (2000) .............................................................................................. 7

14

15 *Friskit, Inc. v. RealNetworks, Inc.*,
    No. C 03-05085 WWS, 2007 U.S. Dist. LEXIS 51770 (N.D. Cal. July 5, 2007) ......... 8-9

16 *Gabriel Basin Water Quality Authority v. Aerojet-General Corp.*,
    105 F. Supp. 2d 1095 (C.D. Cal. 2000) ........................................................................... 8

17

18 *H.F. Ahmanson & Co. v. Salomon Brothers, Inc.*,
    229 Cal. App. 3d 1445 (1991) ....................................................................................... 4, 5

19 *Hitachi, Ltd. v. Tatung Co.*,
    419 F. Supp. 2d 1158 (N.D. Cal. 2006) ........................................................................ 8, 9

20

21 *I-Enterprise Co. LLC v. Draper Fisher Jurvetson Mgmt. Co. V, LLC*,
    No. C 03-1561 MMC, 2005 U.S. Dist. LEXIS 45190 (N.D. Cal. Apr. 4, 2005) .............. 8

22 *In re County of Los Angeles*,
    223 F.3d 990 (9th Cir. 2000) ............................................................................................ 9

23

24 *Jessen v. Hartford Casualty Insurance Co.*,
    111 Cal. App. 4th 698 (2003) ....................................................................................... 5, 6

25 *Lappert's Ice Cream, Inc. v. Lappert's, Inc.*,
    No. C 06-1296 SC, 2007 U.S. Dist. LEXIS 21349 (N.D. Cal. Mar. 6, 2007) .................. 8

26

27 *Lucent Technologies Inc. v. Gateway, Inc.*,
    No. 03CV1108-B (CAB), 2007 U.S. Dist. LEXIS 35502 (S.D. Cal. May 15, 2007) .......... 8, 9

28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3    *Mahtesian v. Snow*,
        No. 03-5372 MMC, 2004 U.S. Dist. LEXIS 25656 (N.D. Cal. Dec. 14, 2004)................................ 12

4

    *MMCA Group, Ltd. v. Hewlett-Packard Co.*,
5        No. C 06-7067 MMC, 2007 WL 607659 (N.D. Cal. Feb. 23, 2007) .................................................. 6

6    *Nichols Institute Diagnostics, Inc. v. Scantibodies Clinical Laboratory, Inc.*,
        No. 02CV9946-B (LAB) (S.D. Cal. Mar. 21, 2002) .......................................................................... 8

7

    *Ullrich v. The Hearst Corp.*,
8        809 F. Supp. 229 (S.D.N.Y. 1992) .................................................................................................... 11

9    *William H. Raley Co., Inc. v. Superior Court*,
        149 Cal. App. 3d 1042 (1983)............................................................................................................ 11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I.    INTRODUCTION

2      A&F's opposition rests primarily on the notion that LS&CO.'s concerns over Howrey's

3  conflict are merely some sort of strategic ploy.  The reality is that disqualification serves no strategic

4  purpose whatsoever for LS&CO., other than to remove the troubling prospect of litigating this

5  trademark case against its own former in-house trademark lawyer.  LS&CO. assumes that Howrey will

6  be replaced by equally prominent and capable counsel who will defend this action vigorously, and that

7  no advantage -- other than elimination of the conflict -- will be secured.

8      Apart from impugning LS&CO.'s motives for challenging its conduct, Howrey's grounds for

9  opposing the motion are unavailing, for several reasons.  <u>First</u>, there is an unavoidable and substantial

10  relationship between Ms. Basile's prior work enforcing LS&CO.'s rights in the Arcuate Trademark in

11  hundreds of matters, and defending against claims of infringement and dilution of that same mark.

12  <u>Second</u>, under California law, Howrey did not and cannot "cure" the conflict by erecting an ethical

13  wall -- particularly *after* the matter had already ripened into an adversary proceeding.  <u>Third</u>, LS&CO.

14  did not unreasonably delay before making absolutely clear that it objected to Howrey's representation

15  of A&F in this litigation.

16      A&F's opposition ignores many ingredients to the conflict, while highlighting others.  Howrey

17  pointedly ignores A&F's own affirmative defenses in this action, which directly implicate third party

18  uses (including by brands Ms. Basile dealt with during her tenure) as well as LS&CO.'s past and

19  present enforcement practices.  It also ignores the fact that Ms. Basile, working to enforce LS&CO.'s

20  trademarks, both *received* privileged and confidential advice – from the same outside counsel now

21  advising LS&CO. in this lawsuit – and *gave* privileged and confidential advice to Company

22  management.  At the same time, Howrey highlights the tension between the two representations by

23  offering to compromise A&F's discovery requests that addressed specific matters in which Ms. Basile

24  was personally involved, asserting now that the requests are "undoubtedly objectionable" (as if their

25  overbreadth and not the underlying former representation has caused the conflict).  If Howrey is

26  allowed to continue its representation, it will be obliged to defend this action on any and all grounds at

27  A&F's disposal.  These defenses inevitably will include issues -- unaddressed by the opposition -- as

28  to which Ms. Basile received confidential information in the course of her prior representation.

1    **II.    ARGUMENT**

2        **A.    There Is A Direct And Substantial Relationship Between Ms. Basile's Former
             Work Enforcing LS&CO.'s Arcuate Trademark And The Defense Of LS&CO.'s
3            Claims In This Action**

4            **1.    Ms. Basile's Former Representation of LS&CO.**

5        Ms. Basile's declaration, submitted in opposition to this motion, makes the following

6    admissions concerning her role at LS&CO.:

7            My primary responsibilities at LS&CO. included handling specific
             enforcement and protection matters for LS&CO. trademarks and brands,
8            including the Arcuate Trademark, within the United States and in other
             jurisdictions around the world.  During the time I was at LS&CO., the
9            company's trademark enforcement strategy and policies were directed
             by in-house counsel and senior business leaders.  I made decisions
10           regarding brand protection and trademark enforcement by myself or
             with the legal team and then-current business leaders for the LEVI's
11           brand, depending on the circumstances.  I also directed the enforcement
             strategy employed by LS&CO. for the Arcuate Trademark during my
12           tenure.  I played a key role in directing LS&CO.'s trademark
             enforcement and brand protection strategy.

13

14   (Basile Dec. ¶ 6.)  Thus, Ms. Basile concedes that she was intimately involved in all aspects, both

15   general and specific, of enforcement of the Arcuate Trademark -- the same mark, of course, that is at

16   issue in this action.

17        Moreover, Howrey does not challenge Ms. Basile's own prior testimony that some 200

18   enforcement actions involving the Arcuate Trademark were initiated during her tenure at LS&CO.

19   (Basile Dep. 1/12/99 at 26:22-27:7, Cincone Reply Dec. Ex. A.)  Of those, over 60 were litigation

20   matters.  (*Id*.)  Instead, Howrey cites the *New York Times* as "evidence" that LS&CO. adopted a "new,

21   aggressive enforcement strategy beginning in 2001."  (Basile Dec. ¶ 17 & Ex. A; Opp. at 11.)  Putting

22   aside that the article is hearsay -- and fails to say that LS&CO.'s enforcement strategy has changed[1] --

23   the article claims only that LS&CO. has filed "nearly 100" lawsuits since 2001, to enforce all of the

24   _____

25   [1] To the contrary, the article points out, "As far back as the 1970s, [LS&CO.] sued the firm that made
     Wrangler jeans over the use of identifying tabs on clothing.  'We protected our trademarks when
26   business has been terrific and when it's been difficult,' said Mr. Hanson."  (Basile Dec. Ex. A.)  "Mr.
     Hanson" is Robert Hanson, the President of Levi Strauss North America, who worked with Ms. Basile
27   on trademark issues while she was employed at the Company.  (Onda Dec. ¶ 6; Basile Dec. ¶ 11.)

28

1    Company's apparel trademarks.  If anything, this reflects a strategy that is wholly consistent with the

2    60 lawsuits Ms. Basile filed to enforce the Arcuate Trademark during her five years at LS&CO.

3    (Onda Reply Dec. ¶ 9.)

4           Howrey takes a crabbed view of Ms. Basile's role at LS&CO., and vastly overstates any

5    change in LS&CO.'s enforcement policies and practices that would matter to A&F's defenses.  No

6    doubt, Ms. Basile worked with some people within LS&CO. who have since left the Company.  But

7    Ms. Basile's function, now part of Mr. Onda's duties, and its impact on the scope of LS&CO.'s

8    proprietary marks has changed very little.  Within the context of policies that she helped design and

9    implement, Ms. Basile operated, as she testified, somewhat autonomously in executing the Company's

10   enforcement strategy through cease and desist efforts, federal court lawsuits, and oppositions within

11   the PTO.  She worked with the same outside counsel as Mr. Onda to develop litigation and settlement

12   strategies that would accommodate the Company's interests in its marks within a feasible legal budget.

13   In addition to enforcing LS&CO.'s marks, Ms. Basile trained and educated sales and marketing

14   personnel and corporate management about trademark policies and enforcement efforts -- including

15   many of the personnel whom LS&CO. designates as witnesses in these trademark cases, several of

16   whom Ms. Basile admits to working with during her tenure as their lawyer.[2]  Nothing material has

17   happened within LS&CO. or with its outside counsel that would permit Ms. Basile to assume --

18   without any evidence in support -- that the enforcement strategies she practiced are now obsolete.

19   (Basile Dec. ¶¶ 3-11; Onda Dec. ¶¶ 4-6; Onda Reply Dec. ¶ 3-11.)

20          One reason LS&CO. tries to ensure consistency in its approach is that defendants in trademark

21   cases involving LS&CO.'s iconic marks routinely offer common defenses to LS&CO.'s claims.

22

23   _____

24   [2]  Should Howrey continue its representation, at least some of LS&CO.'s witnesses in this action
     would face the prospect of litigation against their former advisor.  *See Blue Marlin Corp. v. VF*

25   *Jeanswear Limited Partnership*, No. C 02-5096 MJJ (N.D. Cal. Jan. 17, 2003) (Cincone Reply Dec.
     Ex. B), in which Howrey's client successfully disqualified Morrison & Foerster on the eve of

26   preliminary injunction briefing on grounds that a tax matter was "substantially related" to a trademark
     matter.  In granting disqualification, this Court specifically noted that it would be awkward for a

27   witness to be cross-examined in the trademark matter by lawyers from the same firm with whom she
     worked on the tax matter.  Slip op. at 8-9.

28

1   Howrey does not disappoint in this regard, and its affirmative defenses and allegations (*e.g.*, third

2   party use and lack of strength or fame) and discovery to date suggest that it is trying to exploit the

3   same purported weaknesses in LS&CO.'s claims as have been asserted by defendants since Ms.

4   Basile's tenure at LS&CO. began.  LS&CO.'s responses to these allegations, due to their very nature,

5   may depend in part on how they were addressed during Ms. Basile's tenure.

### 2.    Howrey's Current Representation of A&F

7         The factual overlap between Ms. Basile's former representation of LS&CO., and Howrey's

8   current representation of A&F, is extensive.  The strength and fame of LS&CO.'s Arcuate Trademark

9   will involve factual issues that have not changed since, or are directly implicated by events in, 1999

10  and before (such as the impact on consumers of LS&CO.'s longstanding sales and advertising of

11  products bearing the mark, the import of other parties' uses, LS&CO.'s efforts to police the market

12  and enforce the mark, and the degree of consumer recognition of the mark).  In the context of

13  enforcing a trademark that has been in use for 134 years, the factual and legal landscape over the past

14  several years is highly likely to be relevant.[3]

15        In order to minimize the overlap between this case and Ms. Basile's prior duties for LS&CO.,

16  Howrey oversimplifies the issues.  Howrey portrays this case as involving no more than a mechanistic

17  application of the *Sleekcraft* likelihood of confusion factors.  (Opp. at 10.)  But, Howrey itself has

18  already put other legal and factual issues into play.  In the opposition proceeding (which also involved

19  claims of likelihood of confusion and dilution), Howrey propounded discovery requests regarding

20  specific stitching designs -- including some still in current use in today's market -- that Ms. Basile

21  addressed during her employment as LS&CO.'s trademark counsel.  These discovery requests cover a

---

[3] Howrey mischaracterizes the relevant time period that has elapsed since Ms. Basile departed from LS&CO.  Although A&F filed an intent to use application in December 2005, it since has claimed use since February 2005 (Cincone Reply Dec. Ex. F) -- a little more than five years, not eight years, after Ms. Basile left LS&CO.  At the same time, Howrey exaggerates the reach of LS&CO.'s argument, asserting that it would preclude adverse representation by any attorney who has enforced the Arcuate Trademark at any time since 1873.  (*See* Opp. at 10.)  Even if all those attorneys were alive and practicing law today, LS&CO. would readily concede that intervening events (such as passage of the Lanham Act) may have changed the context.

1   number of brands that settled stitching design cases as to which Ms. Basile was the primary or

2   exclusive decision-maker.  (Onda Dec. ¶ 9.)

3        Howrey attempts to avoid the obvious implications of this discovery:  that Ms. Basile has

4   confidential information relevant to the current dispute, and may even be a witness to these matters.  It

5   argues that its requests were "undoubtedly objectionable" and would have been negotiated to cover

6   only a time frame after Ms. Basile left LS&CO.'s employment.  (Opp. at 12 n.7.)   Even if such

7   compromises were an appropriate way to avoid an ethical conflict, it is impossible to predict that any

8   such compromise or objection would cure the problem.  Any decision Ms. Basile may have made

9   about a third party's stitching design in 1999 or earlier, if the design appeared in the market in 2005 or

10  continues to appear now, may become contested.  Indeed, defendants in other trademark infringement

11  actions brought by LS&CO. have frequently invoked past third party uses and registrations in defense

12  of LS&CO.'s claims, and sought discovery on those subjects.  (Cincone Reply Dec. ¶ 11.)[4]  Absent a

13  wholesale waiver by A&F of its defenses and an admission that LS&CO.'s mark is strong and famous,

14  there is no guarantee that Ms. Basile will not be a witness for or against her current and former clients.

15  California law does not allow litigation to proceed in the face of such a conflict.

16        **3.    Case Law, Undistinguished By Howrey, Shows a Substantial Relationship**

17        Howrey relies on two principal arguments in asserting the absence of a substantial relationship

18  between Ms. Basile's tenure at LS&CO. and this trademark infringement matter.  It notes the passage

19  of time since Ms. Basile worked at LS&CO., and it notes that the particular A&F design at issue did

20  not exist when Ms. Basile worked at LS&CO.  Neither fact justifies Ms. Basile's representation of

21  both clients.  The subject matter of the two representations is plainly "linked," *Jessen v. Hartford*

22  *Casualty Insurance Co.*, 111 Cal. App. 4th 698, 711 (2003), and the test for a conflict is whether

23  confidential information that would be useful to A&F in this dispute "could have been" imparted to

24

25

26  [4] LS&CO. is not required, as Howrey suggests, to identify particular matters that Ms. Basile handled
    in which purported weaknesses in its case were exposed.  Maintaining that kind of confidentiality is
    the very reason for the substantial relationship test.  *See H.F. Ahmanson & Co. v. Salomon Brothers,*
27  *Inc.*, 229 Cal. App. 3d 1445, 1453 (1991).

28

1  Ms. Basile. *See Brand v. 20th Century Insurance Co.*, 124 Cal. App. 4th 594, 603 (2004) ("if the

2  nature of the representation is such that confidences *could have* been exchanged between the lawyer

3  and the client, courts will conclusively presume they *were* exchanged, and disqualification will be

4  required") (emphasis in original); *Jessen*, 111 Cal. App. 4th at 711-12; *H.F. Ahmanson & Co. v.*

5  *Salomon Brothers, Inc.*, 229 Cal. App. 3d 1445, 1454 (1991).

6        Underscoring the weakness of its argument, Howrey suggests that LS&CO. has undergone

7  such a dramatic change in management that the relationship between prior and current trademark

8  infringement actions has been eliminated. It cites Judge Chesney's decision in *MMCA Group, Ltd. v.*

9  *Hewlett-Packard Co.*, No. C 06-7067 MMC, 2007 WL 607659 (N.D. Cal. Feb. 23, 2007). Judge

10  Chesney, however, squarely held that information learned in remote prior representations still

11  supported disqualification. MMCA was an investigative firm specializing in trademark and copyright

12  counterfeiting. MMCA had done substantial work for Hewlett-Packard, and sued HP for breach of

13  contract and related claims. MMCA's counsel had previously served as HP's outside counsel and

14  acted as HP's liaison with MMCA. This Court found that the attorney had obtained material

15  confidential information in the course of his work for HP, and granted HP's motion to disqualify. The

16  Court expressly *rejected* MMCA's arguments that the attorney need not be disqualified because he

17  had worked with HP "*as long as ten years ago*" and had not kept any files relating to his

18  representation of HP. *Id.* at *4 (emphasis added); *see also Brand*, 124 Cal. App. 4th at 607

19  (disqualifying attorney who previously represented defendant from offering expert testimony for

20  plaintiff, noting, "The passage of 12 years between the two engagements did not neutralize [the

21  attorney's] representation in the first case.").[5]

22        The fact that the A&F design was created after Ms. Basile left LS&CO. also is immaterial.

23  California courts caution against interpreting a lawyer's representations too narrowly: "Our concern is

---

25  [5] Howrey also relies on factual errors to make its "reorganization" charge. In fact, there has been
substantial continuity among the Company's managers and sales and financial personnel who assist in
26  brand protection efforts. This includes Bob Haas, the CEO of the Company during Ms. Basile's
tenure, who -- far from "retiring" as Howrey alleges (Opp. at 2) -- is the Chair of LS&CO.'s Board and
27  still works with Mr. Onda on important trademark issues. (Onda Reply Dec. ¶ 11.)

that limiting the comparison of the two representations to their precise legal and factual issues might operate unrealistically to the detriment of the first client." *Jessen*, 111 Cal. App. 4th at 712. In other words, even if the *particular* transaction (or design) at issue has changed, the nature of the confidential information may still render it useful in the second representation -- thus requiring disqualification. *See Farris v. Fireman's Fund Insurance Co.*, 119 Cal. App. 4th 671, 682-83 (2004) (disqualifying attorney who represented client insurer in coverage matters and later sued insurer for bad faith and breach of a coverage contract, finding lawyer's arguments "disingenuous at worst and naïve at best").[6]

Other cases cited by LS&CO. in its opening brief are ignored or misinterpreted in Howrey's opposition. For example, Howrey claims that the dispositive fact in *Franzoni v. Hart Schaffner & Marx*, 312 Ill. App. 3d 394 (2000), was that the plaintiff's attorney had obtained confidential information about the plaintiff's employment while employed in-house by the defendant. (Opp. at 12.) But Howrey ignores the court's extensive discussion of, and reliance on, the fact that the attorney -- like Ms. Basile -- had helped to formulate general policies and practices that were still in place and still relevant. *See id.* at 402-03. And Howrey does not even attempt to distinguish the other cases relied on by LS&CO. in its opening brief. (*See* Motion at 14-15.)

### B.    Howrey's Implementation Of An Ethical Wall In February Of This Year Has Not And Cannot "Cure" The Conflict

Howrey asserts that the motion to disqualify should be denied because Ms. Basile has been "walled off" from the Howrey attorneys responsible for this matter. (Opp. at 13.) Howrey goes to great lengths to explain that -- despite the fact that Ms. Basile's name appears as filing attorney and correspondent on A&F's application -- Ms. Basile had no involvement in, or even knowledge of, the application. (Renne Dec. ¶¶ 3-16; Basile Dec. ¶¶ 18-20; Smith Dec. ¶ 4.) Other than the reasonable

---

[6] Although Howrey has presented evidence that Ms. Basile was not involved in the clearance or prosecution of this particular stitching design, it is silent on the question whether Ms. Basile ever advised A&F generally concerning its many pocket stitching design registrations. In any event, California law conclusively presumes that confidential information was shared. (*See* Motion at 15-17, citing cases).

surmises it made from its first contact with Ms. Basile,[7] LS&CO. admittedly has no evidence to the contrary regarding Ms. Basile's involvement in the preparation and filing of the A&F trademark application.  But as a matter of California law, this does not eliminate the conflict, or the need to disqualify Howrey.

As set forth in LS&CO.'s opening brief, California law does not recognize ethical walls where two representations are substantially related.  Recent decisions to this effect, including several opinions from this Court, are neither cited nor discussed by Howrey in its opposition.  *See Lucent Technologies Inc. v. Gateway, Inc.*, No. 03CV1108-B (CAB), 2007 U.S. Dist. LEXIS 35502 at *22 (S.D. Cal. May 15, 2007); *Lappert's Ice Cream, Inc. v. Lappert's, Inc.*, No. C 06-1296 SC, 2007 U.S. Dist. LEXIS 21349 at *11 (N.D. Cal. Mar. 6, 2007); *Hitachi, Ltd. v. Tatung Co.*, 419 F. Supp. 2d 1158, 1164 (N.D. Cal. 2006); *I-Enterprise Co. LLC v. Draper Fisher Jurvetson Mgmt. Co. V, LLC*, No. C 03-1561 MMC, 2005 U.S. Dist. LEXIS 45190 at *24 (N.D. Cal. Apr. 4, 2005).

The slip opinion cited and submitted by Howrey on this point, *Nichols Institute Diagnostics, Inc. v. Scantibodies Clinical Laboratory, Inc.*, No. 02CV9946-B (LAB) (S.D. Cal. Mar. 21, 2002), does not conflict with these authorities.  In that case, the court found that there was never an attorney-client relationship between the plaintiff's counsel and the defendants, and therefore that Rule 3-310(E) did not even apply.  Slip op. at 9.  The court did find that the attorney owed the defendants a duty of confidentiality, and held that erection of an ethical screen cured any need for vicarious disqualification of the attorney's firm.  *Id*. at 10.  Previous cases also have approved the use of ethical walls where disqualification was based not on a prior attorney-client relationship, but on the attorney's general duty to protect confidential information.  *See, e.g., San Gabriel Basin Water Quality Authority v. Aerojet-General Corp.*, 105 F. Supp. 2d 1095, 1103 (C.D. Cal. 2000) (denying disqualification in absence of attorney-client relationship, noting, "Vicarious disqualification of a firm is required only where an attorney is disqualified because he represented the adverse party."); *Friskit, Inc. v. RealNetworks, Inc.*,

---

[7] Ms. Basile knew what Mr. Onda was calling her about in January 2006, and was at least familiar enough with the application to be able to express her opinion in response to his call that she "did not think the design was a problem."  (Onda Dec. ¶ 8.)

1    No. C 03-05085 WWS, 2007 U.S. Dist. LEXIS 51770 at *5 (N.D. Cal. July 5, 2007) (denying

2    disqualification of Howrey in absence of attorney-client relationship, noting, "Ethical screens have

3    repeatedly been held to provide sufficient protection in cases involving the duty of confidentiality,

4    rather than the duty of loyalty.").  But that is not the situation here.  Ms. Basile was a party to, and

5    indeed had principal responsibility for, attorney-client relationships both within LS&CO. and with

6    LS&CO.'s outside litigation counsel for an extended period of time.  Howrey's attempt to extrapolate

7    from *Nichols* or other cases that ethical walls are an antidote in California to the need for vicarious

8    disqualification depends on strained inferences and pure dicta.[8]

9          In any event, as pointed out in LS&CO.'s opening brief, the "wall" erected by Howrey could

10   not solve the problem here.  Howrey has submitted evidence that after Mr. Onda called Ms. Basile in

11   January 2006, its team was orally instructed not to communicate with Ms. Basile concerning the A&F

12   trademark application.  (Froemming Dec. ¶ 6.)  Even then, it did not remove Ms. Basile from her role

13   as correspondent on A&F's application for another two months.  A formal ethical wall was not erected

14   until February of 2007, almost a year later and *after* LS&CO. filed its Notice of Opposition.  (Renne

15   Dec. ¶ 14 & Ex. B.)  The belated use of an ethical screen, even if it had legal effect, will not cure an

16   otherwise conflicted relationship.  *See Lucent Technologies*, 2007 U.S. Dist. LEXIS 35502 at *28

17   (rejecting screening procedure implemented after attorneys had already noticed their appearance).

18   The fact is that Howrey could have sought a waiver from LS&CO. when it was retained by A&F to

19   handle trademark matters, including the prosecution of stitching design applications; if it had done so,

20   a true ethical wall could have been erected that would have, if with LS&CO.'s informed consent,

21

22   _____

23   [8] Howrey cites *In re County of Los Angeles*, 223 F.3d 990 (9th Cir. 2000), for the proposition that
     under California law, the use of a wall may rebut the presumption of shared confidences; but since the
24   Ninth Circuit decided that case, the California Supreme Court has reaffirmed that the presumption is
     conclusive, and this Court has followed its lead.  *See City and County of San Francisco v. Cobra*
25   *Solutions, Inc.*, 38 Cal. 4th 839, 847-48 (2006); *see also Hitachi, Ltd. v. Tatung Co.*, 419 F. Supp. 2d
     1158, 1164 (N.D. Cal. 2006).  Howrey's quotation from *Adams v. Aerojet-General Corp.*, 86 Cal.
26   App. 4th 1324 (2001), likewise includes only dicta.  The *Adams* court went on to explain that
     vicarious disqualification is necessary because "[n]o amount of assurances *or screening procedures*,
27   no 'cone of silence,' could ever convince the opposing party that the confidences would not be used to
     its disadvantage."  *Id.* at 1334 (citation omitted, emphasis added).

28

1   prevented any use of LS&CO.'s confidential information on A&F's behalf.  That was not done, and as

2   a result, the only possible remedy at this point is to disqualify Howrey from representing A&F in this

3   stitching design litigation.

4        **C.    LS&CO.'s "Delay" Is Vastly Mischaracterized, And Insufficient To Waive**
             **Howrey's Conflict**
5

6        Howrey argues at length that because LS&CO. did not file its motion sooner, it has waived the

7   ethical conflict.  Howrey entirely mischaracterizes the circumstances and timing of the parties' dispute.

8        •    A&F filed its trademark application on December 5, 2005.  (Cincone Dec. Ex. B.)

9        •    Mr. Onda and Ms. Basile spoke regarding the application in late January, 2006.  (Onda
10   Dec. ¶¶ 7-8.)

11       •    On March 24, 2006, Howrey revoked Ms. Basile's power of attorney as to the A&F
     application.  (Renne Dec. ¶ 16 & Ex. C.)
12

13       •    On June 13, 2006, the PTO issued an Office Action as to the A&F application, noting
     that "registration may be refused" on grounds that the stitching design is merely ornamental.
14   (Cincone Reply Dec. Ex. C.)

15       •    On October 30, 2006, Howrey responded to the Office Action by splitting the
     trademark application.  (Cincone Reply Dec. Ex. D.)  The application which includes jeans,
16   Serial Number 78/977,782, remains pending at the PTO.  An Office Action issued as to this
     application on June 15, 2007, refusing registration on grounds that the stitching design is
17   merely ornamental.  (Cincone Reply Dec. Ex. E.)  These are the only actions that Howrey had
     to take regarding the application during the entire time before it was published, and they had
18   nothing to do with LS&CO.

19
         •    On January 16, 2007, the parent application (which now includes only jackets)
20   published in the Official Gazette. The PTO – even after publication – reserved the right to
     refuse registration on grounds that the design is merely ornamental.  (Cincone Reply Dec. Ex.
21   C.)

22       •    On February 9, 2007, LS&CO. opposed the application.

23
         •    On February 22, 2007, Howrey walled Ms. Basile off from this matter.  (Renne Dec. ¶
24   14 & Ex. B.)

25       •    On March 21, 2007, Howrey answered the Notice of Opposition, and LS&CO. learned
     for the first time that Howrey would represent A&F in adversarial proceedings between the
26   parties.

27

28

1

• The parties exchanged discovery requests in May and June, 2007. LS&CO. learned that the design was in use on jeans from A&F's responses. (Cincone Reply Dec. Ex. F.)

2

3

• On July 20, 2007, LS&CO. filed this action, moved to suspend the opposition proceeding, and notified Howrey that it objected to Howrey's representation of A&F in the litigation. (Cincone Dec. Ex. C.)

4

5 As this chronology makes apparent, there simply was no reason for LS&CO. to move for

6 disqualification sooner. (Onda Reply Dec. ¶ 12.) The A&F application was pending at the PTO for

7 over a year, and a portion of it remains pending (and has been refused registration without requiring

8 any intervention by LS&CO.). Rather than jumping to file a motion against its former employee,

9 LS&CO. chose to wait and see how the PTO responded to A&F's "intent to use" application, and

10 whether Howrey would enter an appearance on A&F's behalf if the proceedings became adversarial.

11 Indeed, Howrey also apparently chose to "wait and see," since it did not formally wall Ms. Basile off

12 until *after* the application had published and LS&CO. had filed its opposition. The conflict did not

13 ripen until March 2007, when Howrey filed A&F's answer. Thus LS&CO.'s "delay" amounted to, at

14 most, four months -- not nearly enough, under the case law cited in LS&CO.'s opening brief but

15 ignored in Howrey's opposition, to warrant a finding of waiver. (Motion at 17-20.)[9]

16 Howrey asserts that LS&CO. was obligated to file a motion to disqualify as soon as it became

17 aware of the conflict (Opp. at 7), but the case law does not support that proposition. Rather, the law in

18 California is that *extreme* delay, motivated by tactical reasons, can constitute a waiver. That simply is

19 not the case here. LS&CO. exercised reasonable judgment in determining that there was little to be

20 gained from moving to disqualify Howrey in the PTO. (Onda Reply Dec. ¶ 12.) The only prejudice

21 identified by Howrey is having to hire new counsel, which by definition is not "extreme." *See, e.g.,*

22 *William H. Raley Co., Inc. v. Superior Court*, 149 Cal. App. 3d 1042, 1049 (1983) (granting vicarious

23

24 [9] Howrey also ignores *Ullrich v. The Hearst Corp.*, 809 F. Supp. 229 (S.D.N.Y. 1992), in which the plaintiff argued that the Hearst Corporation had waived its right to disqualify plaintiff's counsel because it had not moved to do so previously before an administrative agency. The court rejected that argument, noting that because the matter "was in preliminary stages before an administrative agency and was not a lawsuit seeking judgment, Hearst may have decided that there was not enough in controversy to warrant the expense and embarrassment of litigating an order of disqualification. Hearst may also have been reluctant to submit this issue to be judged by an administrative agency rather than a court." *Id*. at 236.

25

26

27

28

1    disqualification against Gray, Cary, noting "[t]here has been no showing Gray Cary is uniquely suited

2    to represent [plaintiff], or that other counsel is unavailable," and costs of substituting new counsel at

3    early stage of litigation "should be minimal").[10]  LS&CO.'s brief delay, and Howrey's production of a

4    few documents in the opposition proceeding involving a proposed registration for jackets, does not

5    waive Howrey's conflict in this federal infringement lawsuit involving jeans that are currently for sale.

6    Neither the "delay," nor the "prejudice" alleged by Howrey, is sufficiently extreme to constitute a

7    waiver.[11]

8    **III.    CONCLUSION**

9        For the reasons discussed above and in its opening memorandum and supporting documents,

10   Levi Strauss & Co. respectfully requests that this Court disqualify Howrey LLP from any further

11   representation of Abercrombie & Fitch Trading Co. in this litigation.

12   DATED:  October 12, 2007              Respectfully submitted,

13

14                                    By:  /s/ Gia L. Cincone
                                          Gia L. Cincone
15                                        TOWNSEND AND TOWNSEND AND CREW LLP

16                                        Attorneys for Plaintiff
                                          LEVI STRAUSS & CO.

17

18

19   _____

20   [10] Howrey claims the existence of a "long-standing" attorney-client relationship is a "significant
     factor" (Opp. at 14), but two years is hardly "long-standing" -- particularly compared to the five years
     Ms. Basile worked at LS&CO.  The case on which Howrey relies, *Travelers Casualty and Surety Co.*
21   *v. Claude E. Atkins Enterprises, Inc.*, No. CV-F-05-0852 REC LJO, 2006 U.S. Dist. LEXIS 93189
     (E.D. Cal. Dec. 11, 2006), involved a ten-year attorney-client relationship.  In any event, that was not
22   the reason for the denial of disqualification; rather, the court found that under the circumstances,
     confidential information material to the litigation would not have been disclosed to the attorneys
23   whose disqualification was sought.  *Id.*

24   [11] The cases cited by Howrey (Opp. at 9 n.4) are distinguishable.  In *Employers Insurance of Wausau*
     *v. Albert D. Seeno Construction Co.*, 692 F. Supp. 1150, 1165-66 (N.D. Cal. 1988), this Court held
25   that a delay of "well over a year," without any "sound reason" and to the defendant's "considerable
     prejudice and hardship," constituted a waiver.  Here, LS&CO. had sound reasons for refraining, and
26   the prejudice to A&F is minimal.  In *Mahtesian v. Snow*, No. 03-5372 MMC, 2004 U.S. Dist. LEXIS
     25656 (N.D. Cal. Dec. 14, 2004), the defendant raised the conflict in the context of a request for
27   attorneys' fees, after the case was already over.

28