TOWNSEND AND TOWNSEND AND CREW LLP
GREGORY S. GILCHRIST (State Bar No. 111536)
GIA L. CINCONE (Bar # 141668)
Two Embarcadero Center, Eighth Floor
San Francisco, California 94111
Telephone: (415) 576-0200
Facsimile: (415) 576-0300
Email: gsgilchrist@townsend.com; glcincone@townsend.com

Attorneys for Plaintiff
LEVI STRAUSS & CO.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEVI STRAUSS & CO.,<br><br>         Plaintiff,<br><br>v.<br><br>ABERCROMBIE & FITCH TRADING CO.,<br><br>         Defendant. | Case No.   C 07-3752 JSW<br><br>**REPLY DECLARATION OF THOMAS M. ONDA IN SUPPORT OF PLAINTIFF'S MOTION TO DISQUALIFY HOWREY LLP AND IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE**<br><br>DATE:  October 26, 2007<br>TIME:  9:00 a.m.<br>COURTROOM: 2 |

I, Thomas M. Onda, hereby declare as follows:

1. I am currently employed by Levi Strauss & Co. ("LS&CO."), the plaintiff in this action, as Global Intellectual Property Counsel. I submit this Reply Declaration in support of LS&CO.'s motion to disqualify the firm of Howrey LLP from representing the defendant, Abercrombie & Fitch Trading Co. ("A&F").

2. Over the course of my employment with LS&CO. I have had, and continue to have, access to or custody of LS&CO.'s regular and established business records. All of the matters in this Reply Declaration, and in the original Declaration I submitted in support of LS&CO.'s motion to disqualify, are based on my own personal knowledge and/or the regular and established business records of LS&CO.

3. I received my J.D. in 1990. From 1993 to 1996, I was an associate with the law firm of Schlemmer and Associates, located in San Francisco. Schlemmer and Associates was a small firm that specialized in intellectual property transactional and litigation matters. At that time, the firm served as outside counsel to Levi Strauss & Co. on a number of trademark-related matters.

4. Beginning in April 1994, our principal client contact at Levi Strauss & Co. was Katy Basile. I consulted with Ms. Basile regularly regarding trademark and brand protection policies and specific enforcement matters, and was generally aware of the nature of her responsibilities as LS&CO.'s in-house Intellectual Property Counsel.

5. Beginning in 1994, Schlemmer and Associates transitioned a number of LS&CO.'s trademark enforcement matters to Legal Strategies Group, a law firm then located in Emeryville, California. Legal Strategies Group, some of whose attorneys had worked closely with LS&CO. on other litigation matters for many years before that, subsequently became LS&CO.'s sole outside counsel in matters involving trademark and brand protection. Among the attorneys who worked on these matters at Legal Strategies Group were Gregory Gilchrist, Gia Cincone, Tim Cahn and Leigh Kirmsse. Except for Ms. Kirmsse, who is now a partner of Ms. Basile at Howrey, those attorneys are now affiliated with the law firm of Townsend and Townsend and Crew in San Francisco and continue to represent LS&CO. in trademark and brand protection matters, including this litigation.

6. When I first joined LS&CO. in 1999 as in-house trademark counsel, one of my first

orders of business was to familiarize myself with the Company's current trademark protection policies, in order to ensure that I implemented those policies in an appropriate manner consistent with the Company's past practices. A vital part of my position at LS&CO., as it was of my predecessor Ms. Basile, is to effectuate consistency in the Company's brand protection and trademark enforcement policies and in the application and implementation of those policies. It is impossible for me to do my job effectively without being familiar with, and building on, the policies and practices of my predecessors, including Ms. Basile.

7. In order to achieve these objectives, I have reviewed over the years, and continue to review regularly, documents and business records of LS&CO. relating to general brand protection policies as well as specific enforcement matters. In the course of this ongoing review, I have become aware that, as I testified in my previous declaration, Ms. Basile was directly involved in the formulation and implementation of policies and strategies for the protection of the Arcuate Trademark, many of which remain in place today. In particular, she worked closely with the same outside counsel I use today to develop litigation and settlement strategies that would accommodate LS&CO.'s interests in its trademarks within a feasible legal budget.

8. During the years of my employment at LS&CO. from 1999 to the present, I have also reviewed on a regular basis the Company's files and records concerning specific trademark enforcement matters dating from Ms. Basile's tenure. The purposes of such reviews may include determining the appropriate strategy towards a third party who has infringed LS&CO.'s trademarks before, deciding whether particular enforcement matters should be settled and on what terms, and on occasion, testifying regarding third party use in trademark lawsuits brought by LS&CO. I have discussed many of these specific matters with outside counsel and Company management. As a result of my review of the files and records, I am familiar with Ms. Basile's involvement in a number of specific trademark enforcement matters, including settlement agreements that she negotiated or approved, particular stitching designs that she decided to challenge or not to challenge, and particular lawsuits that she decided to file or not to file.

9. Based on LS&CO. files and records, which I have reviewed and continue to review in the course of my regular job responsibilities, I believe that the rates at which LS&CO. challenges

infringements of its trademarks, and initiates litigation over such infringements, have remained generally consistent since the mid-1990's. In particular, I do not believe that the Company's enforcement strategies have become more aggressive since 2001.

10. One of my ongoing job responsibilities is to consult with Company management concerning trademark and brand protection issues, both general and specific, and to educate the Company's managers, sales force, and finance personnel concerning the importance of the Company's trademarks and various methods of protecting and enforcing those marks. For example, I periodically give presentations to LS&CO.'s CEO, Chairman of the Board and executive worldwide management team concerning global brand protection efforts. My understanding, developed over the course of my employment at LS&CO. as a result of my ongoing communications with LS&CO. personnel and review of the Company's business records, is that Ms. Basile also communicated regularly with LS&CO.'s sales and marketing personnel and corporate management to train and educate them concerning LS&CO.'s trademark policies and enforcement efforts.

11. While there has been some turnover in LS&CO.'s management since 1999, it is also true, as I testified previously, that a number of management, sales and marketing personnel remain at the Company who were employed there during Ms. Basile's tenure, who have participated over the years in the Company's brand protection efforts, and/or who received training, education and legal advice from Ms. Basile. These include some individuals -- such as Robert Hanson, the President of Levi Strauss North America; Larry Ruff, the Senior Vice President of Strategy and Worldwide Marketing; Loreen Zakem, the President of Levi's Brand Wholesale; Tracy King, the Director of Community and Corporate Citizenship and former Vice President of Sales; and Lynn Downey, the Company Archivist -- who LS&CO. has previously used and continues to identify as witnesses in its trademark infringement actions. Moreover, Bob Haas, who was CEO of the Company during Ms. Basile's tenure, is now the Chair of LS&CO.'s Board and continues to work with me on important trademark issues.

12. I was aware that the trademark application for the Abercrombie & Fitch stitching design was pending in the Patent and Trademark Office for approximately one year after my telephone conversation with Ms. Basile. I believed there was little value to be added in moving to disqualify

1 | Howrey while the application was pending in the PTO. Howrey was not required to take any action
2 | that involved LS&CO. concerning the application, and I hoped that in the event an adverse opposition
3 | proceeding became necessary, Howrey would not represent A&F.

4 |     13.    In my judgment, LS&CO. will not gain any tactical advantage from disqualifying
5 | Howrey in this litigation. I fully expect Abercrombie & Fitch to hire well-qualified trademark counsel
6 | to replace Howrey, and to defend this action vigorously. The offer that was extended in Ms. Cincone's
7 | letter to Mr. Froemming dated August 16, 2007, for LS&CO. and A&F to discuss their underlying
8 | dispute directly in order to see whether they could reach a settlement, was made not for tactical
9 | advantage, but in an attempt to reach an amicable resolution of the dispute that would have obviated
10 | the need for LS&CO. to move to disqualify Ms. Basile and her firm.

11 |     I declare under penalty of perjury under the laws of the United States that the foregoing
12 | statements are true and correct.

13 |     Executed at San Francisco, California, on this 12th day of October, 2007.

_____
Thomas M. Onda