1 | TOWNSEND AND TOWNSEND AND CREW LLP
GREGORY S. GILCHRIST (State Bar No. 111536)
2 | GIA L. CINCONE (Bar # 141668)
Two Embarcadero Center, Eighth Floor
3 | San Francisco, California 94111
Telephone: (415) 576-0200
4 | Facsimile: (415) 576-0300
Email: gsgilchrist@townsend.com; glcincone@townsend.com
5
Attorneys for Plaintiff
6 | LEVI STRAUSS & CO.

7

8 | UNITED STATES DISTRICT COURT

9 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 | LEVI STRAUSS & CO.,                        Case No.    C 07-3752 JSW

12 |                    Plaintiff,             **REPLY DECLARATION OF GIA L.
                                               CINCONE IN SUPPORT OF**
13 |             v.                            **PLAINTIFF LEVI STRAUSS & CO.'S
                                               MOTION TO DISQUALIFY**
14 | ABERCROMBIE & FITCH TRADING CO.,          **HOWREY LLP AS COUNSEL FOR
                                               DEFENDANT ABERCROMBIE &**
15 |                    Defendant.             **FITCH TRADING CO.**

16 |                                           **DATE:  October 26, 2007
                                               TIME:   9:00 a.m.**
17 |                                           **COURTROOM: 2**

18

19

20 |         I, Gia L. Cincone, hereby declare as follows:

21 |         1.      I am an attorney admitted to practice in the State of California and before this Court.  I

22 | am affiliated with the law firm of Townsend and Townsend and Crew LLP, attorneys of record for

23 | plaintiff Levi Strauss & Co. ("LS&CO.") in this proceeding.  I make this declaration based on my

24 | personal knowledge and, if called as a witness, I could and would be competent to testify to the

25 | matters set forth below.

26 |         2.      I submit this Reply Declaration in support of LS&CO.'s motion to disqualify the firm

27 | of Howrey LLP from representing the defendant, Abercrombie & Fitch Trading Co. ("A&F"), in this

28 | action.

-1-

1   3.  Attached hereto as Exhibit A are true and correct copies of pages from the transcript of

2 a deposition testimony given by Katherine Basile on January 12, 1999, in an opposition proceeding

3 before the Trademark Trial and Appeal Board of the United States Patent and Trademark Office, *Levi*

4 *Strauss & Co. v. Vivat Holdings PLC*, Opposition Nos. 105,453 and 105,667.

5   4.  Attached hereto as Exhibit B is a true and correct copy of the Order Granting

6 Defendant's Motion to Disqualify Morrison & Foerster in *Blue Marlin Corp. v. VF Jeanswear Limited*

7 *Partnership*, No. C 02-5096 MJJ (N.D. Cal. Jan. 17, 2003).

8   5.  Attached hereto as Exhibit C is a true and correct copy of an Office Action from the

9 United States Patent and Trademark Office dated June 13, 2006, in connection with Trademark

10 Application Serial Number 78/766,368.

11   8.  Attached hereto as Exhibit D is a true and correct copy of the applicant's response to

12 the above-referenced Office Action, dated October 30, 2006.

13   9.  Attached hereto as Exhibit E is a true and correct copy of an Office Action from the

14 United States Patent and Trademark Office dated June 15, 2007, in connection with Trademark

15 Application Serial Number 78/977,782.

16   10.  Attached hereto as Exhibit F is a true and correct copy of A&F's responses to LS&CO's

17 First Set of Interrogatories in *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, Opposition No.

18 91175601, which was served on LS&CO. by mail on June 19, 2007.  On page 4, A&F's response to

19 Interrogatory No. 6 claims a first use date of February 2005.

20   11.  I have represented LS&CO. in many trademark infringement lawsuits involving the

21 Arcuate Trademark as well as other marks.  The defendants in such lawsuits have frequently invoked

22 past third party uses and registrations in defense of LS&CO.'s claims.  In a number of these actions,

23 LS&CO. has produced documents and discovery responses relating to past enforcement matters,

24 including matters handled by Ms. Basile while she was LS&CO.'s in-house trademark counsel.

25 ///

26 ///

27 ///

28 ///

1        I declare under penalty of perjury under the laws of the United States that the foregoing

2    statements are true and correct.

3        Executed at San Francisco, California, on this 12th day of October, 2007.

4

5    Gia L. Cincone

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY CINCONE DEC. ISO
PL.'S MOTION TO DISQUALIFY

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*
Case No. C 07-3752 JSW

# EXHIBIT A

U.S. PATENT AND TRADEMARK OFFICE

BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

- - -

LEVI STRAUSS & CO.,          )
                             )        ORIGINAL
              Opposer,       )
                             )
      vs.                    )    Nos.  105,453
                             )          105,667
VITAT HOLDINGS PLC,          )
                             )
              Applicant.     )
- - - - - - - - - - - - - - - -

DEPOSITION OF

KATY BASILE

SAN FRANCISCO, CALIFORNIA

JANUARY 12, 1999

ATKINSON-BAKER, INC.
CERTIFIED COURT REPORTERS
5 Third Street, Suite 625
San Francisco, California  94103
(415) 421-3021

REPORTED BY LYNN E. DARLING, CSR NO. 6825

FILE NO.:  9900206

1

Katy Basile

1        A.   Then we can come up with the total number.

2                  (Interruption in proceedings)

3        A.   I'm trying to think here.   I believe so.   Maybe

4   I was -- maybe the 200 did include the oppositions.   I

5   think that there were around -- somewhere around 60 or 80

6   cases that we've resolved that were cease and desist

7   matters or litigation.   I believe we still have about 40

8   pending that are either cease and desist or litigation.

9   I believe we have about 40 oppositions -- no, maybe

10  that's too many.   Maybe there are only about 30,

11  somewhere between 30 and 40 oppositions of which I think

12  there are only four or five left pending.   I think

13  everything else was resolved.   I'm sorry to be so vague.

14       MS. CINCONE:   Q.   That's all right.   I imagine

15  it's hard to keep track.

16       If I add those up, I get in the neighborhood of

17  200 total enforcement actions, I believe.

18       A.   Then that's -- then that was my first answer and

19  I stick with it.

20       MR. FLETCHER:   Excuse me.   Off the record.

21                  (Discussion held.)

22       MS. CINCONE:   Q.   Ms. Basile, we had a little

23  bit of confusion about the numbers here so let's try that

24  again.   Can you estimate for us the number of enforcement

25  actions involving the arcuate trademark that the company

Katy Basile

1  has taken since you assumed responsibility for this area?

2      A.   I can, and 200 was the number I was looking for.

3  There have been around 100 cease and desist actions, a

4  little over 60 litigation actions and about 30 actions in

5  front of the trademark trial -- well, opposition

6  proceedings under the Trademark Trial and Board of

7  Appeal.  Out of that 200, 136 of the matters have been

8  resolved to our satisfaction.

9      Q.   What constitutes a resolution to your

10  satisfaction?

11     A.   That the infringing stitching design is ceased

12  or -- well, it's ceased.  They changed to a new design

13  but the infringement ceases.

14          To state it more effectively, is that the

15  infringer agrees to cease using the infringing stitching

16  design.

17     Q.   Does that mean that the enforcement actions that

18  you've been responsible for have taken at least 136

19  stitching designs off the market that you consider to be

20  infringing?

21     A.   Taken at least that many.  Some of these cases

22  involve multiple stitching designs, so there have been

23  more than 136 infringing stitching designs that have been

24  taken off the market.

25     Q.   Have any of these enforcement actions resulted

# EXHIBIT B

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8                  IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   BLUE MARLIN CORPORATION,              No. C 02-5096 MJJ

12              Plaintiff,

13        v.                                **ORDER GRANTING DEFENDANT'S
                                            MOTION TO DISQUALIFY MORRISON
14   VF JEANSWEAR LIMITED PARTNERSHIP,      & FOERSTER**

15              Defendant.
                                    /
16 _____

17

18                          **INTRODUCTION**

19        Before the Court is defendant VF Jeanswear's ("VF") Motion to Disqualify Morrison & Foerster

20   As Counsel of Record for plaintiff Blue Marlin Corp.  This motion has been heard on a expedited basis,

21   and after considering the moving papers and the arguments of counsel, the motion to disqualify Morrison &

22   Foerster ("Morrison") is GRANTED.

23                       **FACTUAL BACKGROUND**

24        Plaintiff Blue Marlin Corp., represented by Morrison, is currently engaged in a trademark

25   infringement suit against VF, concerning VF's alleged infringement of Blue Marlin's FIVE STAR

26   trademark.  VF recently discovered that not only was Morrison litigating the suit against them, but the firm,

27   through its New York tax department, was also currently representing VF in tax matters in New York and

28   Missouri.  This discovery led VF to demand that Morrison withdraw from the trademark suit, which it

     refused to do, and subsequently, resulted in the filing of the present motion to disqualify.

1    Morrison maintains that it had previously secured VF's informed consent to the dual representation

2    through an engagement letter that VF signed when Morrison first began tax work on VF's behalf in 1997.

3    Thus, in Morrison's opinion, the conflict of interest had been waived, and its representation of Blue Marlin

4    is therefore permissible.

5    The engagement letter contains the following waiver of future conflicts.

6    Our conflicts check has been completed and the firm's Business Review Committee has
     agreed that we can help you in any way we can. This is the Morrison & Foerster Engagement

7    Letter which sets forth the firm's basic terms for our working with you on tax matters.
                                                      ***

8    Although our conflicts search disclosed no problems, it is possible that due to our size and
     our many offices an attorney in one of our other offices or departments (or a local co-counsel,

9    if one or more is ever needed for a jurisdiction in which there is no Morrison & Foerster office) may
     now have (or in the future have) a client with a matter adverse to your company or to an affiliate of

10   your company. Therefore, I have been requested by Morrison & Foerster to advise that our
     representation of clients in tax matters is conditioned upon the understanding that there will be no

11   objection to a matter adverse to your company or an affiliate as long as (1) that matter is
     substantially unrelated to our matter and (2) if appropriate, an "ethical wall" is created to separate

12   the other matter from our matter. In this connection, it should be noted that when we complete the
     services for this engagement, we will consider the attorney-client relationship for that matter

13   terminated. If you later retain us to perform further or additional services, our attorney-client
     relationship will be revived subject to these terms of engagement, or as supplemented at that time.

14   Please send me a signed copy of this letter so I can advise our conflicts group that this is not a
     problem.

15

16   (Declaration of Craig B. Fields In Opposition To VF Jeanswear's Motion To Disqualify ("Fields Decl."),

17   Ex. A.)  The letter was signed by Richard Lipinski, VF's Assistant Vice-President for Taxes, and returned

18   to Morrison. (*See* id.)  Morrison's representation of VF in the New York tax matters began after this

19   engagement letter was signed, and continued until April, 1998. (*See* Declaration of Joseph McGraw In

20   Support Of Motion To Disqualify ("McGraw Decl."), ¶ 2.)

21   Morrison was later re-hired by VF in August 1999 for a second contested tax matter in New

22   York, representation that later expanded to representation for ongoing tax claims in Missouri as well. (Id. at

23   ¶¶ 2-6.)  VF's employment of Morrison for tax matters continues through the present time. (Id. at ¶ 10.)

                                    **ANALYSIS**

24   Lawyers are not permitted to engage in simultaneous representation of clients whose interests are

25   adverse.  In such a case, disqualification is automatic, with few exceptions. *Flatt v. Superior Court*, 9

26   Cal.4th 275, 284 (1994) (discussing California Rule of Professional Conduct 3-310; *see id.* at 282).  One

27   such exception is where a client waives the conflict of interest.  "[M]ost courts thus permit an attorney to

28   continue the simultaneous representation of clients whose interests are adverse as to unrelated matters

2

**United States District Court**
For the Northern District of California

1   provided full disclosure is made and both agree in writing to waive the conflict. But this class of cases is a

2   rare occurrence, typically involving corporate clients, and overcoming the presumption of 'prima facie

3   impropriety' is not easily accomplished." *Id.* at 285, n.4 (citations omitted). The reason for such a strict

4   rule is found in the importance of an attorney's duty of loyalty to the client and the deleterious effect that

5   simultaneous representation of conflicting interests would have upon the lawyer-client relationship.

6        In contrast, in the concurrent representation context, the principle precluding representing an
           interest adverse to those of a current client is based not on any concern with the confidential
7       relationship between attorney and client but rather on the need to assure the attorney's undivided
           loyalty and commitment to the client....If this duty of undivided loyalty is violated, public confidence
8       in the legal profession and the judicial process is undermined.

9   *Truck Insurance Exchange v. Fireman's Fund Insurance Co.*, 6 Cal.App.4th 1050, 1056 (1992)

10  (quotations omitted). Under California and ABA Rules of Professional Conduct, a lawyer owes her client

11  the "highest level of undivided loyalty." *Image Technical Services, Inc. v. Eastman Kodak Co.*, 820

12  F.Supp 1212, 1217 (N.D.Cal. 1993).

13       In the present case, neither side disputes that the interests of Blue Marlin and VF, the two clients

14  simultaneously represented by Morrison, are adverse in the trademark litigation, or that Morrison, is, in fact

15  currently representing both clients.

16       The key to resolution of this motion, and the focus of the parties' arguments, concerns whether the

17  waiver of future conflicts found in the engagement letter is sufficient to trigger the exception to automatic

18  disqualification. A related issue concerns whether the simultaneous representation has resulted in

19  Morrison's access to confidential information relevant to the trademark infringement case, thereby affording

20  VF a basis to object to Morrison's concurrent representation consistent with the terms of the waiver.

21       Morrison's entire opposition to the motion to disqualify is predicated on the validity of a

22  prospective waiver of any conflicts of interest that VF signed in 1997. This waiver was part of the

23  engagement letter that VF signed when it secured Morrison as counsel for various tax matters in New York

24  State in 1997.

25       There are multiple problems with Morrison's position. First, the entirely generic nature of the

26  waiver is insufficient to qualify as "informed consent." Second, while VF is a sophisticated consumer of

27  legal services, VF raises doubt that the person who signed the engagement letter on its behalf understood it

28  as a waiver of conflicts in representation for *all legal matters*, or just as a waiver of conflicts in Morrison's

1   representation in tax issues. The lack of detail in the waiver fails to put the signatory, sophisticated or

2   otherwise, on notice of potential conflicts. Finally, there is a significant question whether information

3   obtained during the course of Morrison's tax work would be relevant to the trademark litigation, thus

4   making the two matters *not* "substantially unrelated."

5   1)   <u>Morrison's Authorities Do Not Support the Validity of the Waiver</u>

6        Morrison argues that case law and other legal authority hold that prospective waivers are valid and

7   enforceable in California. It is correct. However, waivers of future conflict that are as sparse and devoid

8   of detail as the one at issue in this case are not sufficient. The authorities on which Morrison itself relies

9   demonstrate this.

10        The New York County Lawyers' Association Ethics Opinion No. 724 (Declaration of Marshall L.

11   Small in Support of Plaintiff's Opposition ("Small Decl."), Ex. A) does permit the use of prospective

12   conflict waivers, but it also describes the minimum requirements such waivers must have, such as: (1) the

13   types of future adverse representations that the lawyer envisions, (2) the types of clients or matters that may

14   present such conflicts, and (3) what preventative measures the lawyer will take to minimize the effects of

15   such conflicts. While Morrison's waiver contains the last element, there is utterly no mention of the first two

16   requirements.

17        The Restatement (Third) of Law Governing Law (Id., Ex. D) states that future waiver is subject to

18   special scrutiny, and that open-ended consent to waive normally should be presumed ineffective unless a

19   sophisticated client had the opportunity for independent legal advice regarding the waiver. Its illustration of

20   a valid prospective waiver also contains more information than Morrison's.[1]

21        The ABA Formal Opinion 93-372 (Id., Ex. E) finds it unlikely that a prospective waiver would be

22   valid without identification of potential opposing parties, or at least a class of potentially opposing clients.

23   The Opinion also suggests that an analysis of the potential effects of such future conflicts may also be

24   necessary. In the words of the opinion, a lawyer seeking a prospective waiver has a "substantial burden" to

25   overcome. (Id.)

26   —————————————

27      [1]The Restatement also discusses revocation of validly given future consent in the event of materially
changed circumstances. "For example, in the absence of an agreement to the contrary, the consent of a client

28   to be represented concurrently with another normally presumes that the co-clients will not develop seriously
antagonistic positions. If such antagonism develops, it might warrant revoking consent." (Small Decl., Ex. D.)

4

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    The ABA Model Rule 1.7 and Commentary [22] (Id., Ex. F) permits prospective waiver, but the

2    more informed the client is about the risks involved, the more likely the waiver will be acceptable. "The

3    more comprehensive the explanation of the types of future representations that might arise and the actual

4    and reasonably foreseeable adverse consequences of those representation, the greater the likelihood that

5    the client will have the requisite understanding.... If the consent is general and open-ended, then consent

6    ordinarily will be ineffective, because it is not reasonably likely that the client will have understood the

7    material risks involved." The Commentary continues to discuss sophisticated clients and the possibility of

8    valid consent with them. "On the other hand, if the client is an experienced user of legal services, *and is*

9    *reasonably informed regarding the risk that a conflict may arise*, such consent is more likely to be

10   effective...." (Id. (emphasis added).) An examination of the engagement letter reveals utterly no mention of

11   any risk inherent in such a future waiver, in terms of potential adverse parties, practice areas in which

12   Morrison might represent clients with adverse interests, types of adverse representations, or any other

13   indication of risk. (*See* Fields Decl., Ex. A.)

14        Morrison relies upon several California authorities in support of its argument, but those cases, upon

15   close scrutiny, undermine, rather than support, Morrison's position. For example, the court in *Zador*

16   *Corp. v. Kwan*, 31 Cal.App.4th 1285, 1289-90 (1995), permitted a prospective waiver to stand, but the

17   waiver at issue contained considerably more detail than Morrison's: (1) It held a specific reference to

18   potential adversity from the interest of co-defendants in the action in which the lawyer was engaged; (2) it

19   contained an appraisal of the risks of the waiver and multiple representation and the consequent divided

20   loyalty; (3) it discussed the waiver of attorney-client privilege (because of the co-defendant situation) in any

21   future litigation between the co-defendants; (4) it addressed the possibility of attorney disqualification in the

22   event of conflict; (5) it contained a projection of where the attorney's prime loyalty will lie in the event of a

23   future conflict; (6) it contained a request for consent to continued representation of specific clients; and (7)

24   it encouraged the client to seek independent counsel regarding the consequences of his consent. Although

25   Morrison directs the Court's attention to this case, none of these elements was present in the waiver signed

26   by VF.

27        Morrison's reliance on *General Cigar Holdings, Inc. v. Altadis*, 144 F.Supp.2d 1334 (S.D.Fla.

28   2001), is also misplaced. In *General Cigar*, the court upheld a prospective waiver, the waiver in that case

**United States District Court**
For the Northern District of California

1    held considerably more detail than the one in the present case. (1) Outside counsel were consulted and

2    reviewed the waiver prior to signing it; (2) the law firm seeking the waiver provided a list of clients whose

3    interests might be adverse to the client from whom waiver was sought; (3) lawyers for the firm had no

4    access to the client's confidential information; and (4) the interactions of the firm's lawyers with client

5    employees were always supervised by in house counsel. *See id.* at 1336-37.

6    2)    Analysis of the Waiver: Breadth, Scope, and Specificity

7        In confronting a prospective waiver such as the one at issue here, there are several factors the

8    Court must consider in determining whether informed consent has been given to it, including the following:

9    (1) the breadth, temporal scope, and specificity of the waiver; (2) the sophistication of the client; and (3)

10   the nature of the conflict of interest.

11       The waiver in the engagement letter is entirely too broad. Its central weakness is that there is no

12   context offered for potential adversity, which is the minimum required in other cases. The lack of context is

13   evident in Lipinski's belief that the waiver only applied to Morrison's representation of other *tax* clients.

14   (*See* Declaration of Richard Lipinski In Support Of Motion To Disqualify ("Lipinski Decl."), ¶ 6 ("[I]t was

15   may belief that I was consenting to the law firm's potential future representation of other companies in tax

16   matters and acknowledging that at times, such firms might be required to take positions that were different

17   from the positions the firm had taken on behalf of the VF Companies before various taxing authorities.")[2])

18   The scope of the waiver is also problematic, as it purports to be, and in argument, counsel implied it would

19   be, valid *ad infinitum* for all purposes whatsoever. This sweeping scope is especially troubling given the

20   lack of any context for the waiver. The waiver is entirely generic; there is no specificity as to the type of

21   conflicts that might arise, the type of adverse representation Morrison might engage in against VF's interest,

22   or the particular clients, or class of clients, Morrison either represents or might represent in the future. In

23   short, the waiver does nothing to inform VF of the nature of any possible conflict, the parties on whose

24   Morrison might represent in matters adverse to it, or the consequences such conflict might raise. While

25   "California law does not require that every possible consequence of a conflict be disclosed for a consent to

26

27       [2]Although Lipinski states that he does not recall signing the engagement letter, he declares that this was
     his understanding whenever signing any prospective waiver such as the one at issue here, and it would have
28   been particularly true with the Morrison waiver, given the other language in the letter. (*See* Lipiniski Decl., ¶
     6.)

6

**United States District Court**
For the Northern District of California

1    be valid," *Zador*, 31 Cal.App.4th 1301, prospective waivers that have been upheld by courts all have

2    *some* discussion of consequences, with varying degrees of detail. None have been as barren as

3    Morrison's.

4      The Court is not insensitive to the needs of large law firms, with hundreds of lawyers scattered

5    throughout the country and grouped into dozens of practice groups. As the cases have indicated, these

6    firms need to be able to use prospective waivers in order to ensure that they can remain in business and not

7    be conflicted out of representing any new clients. However, as the authorities also indicate, these waivers

8    must include more than a mere blanket waiver of any possible conflicts that might arise, for all time. In

9    order for a client to render informed consent in waiving future conflicts of interest, the client must be

10   informed about the possible dimensions of such conflicts and the risks and consequences of waiving

11   objections to those conflicts. While the court in *Zador* is correct that not everything need be disclosed,

12   the client must be given *something*. Because the waiver in the engagement letter is both too broad and too

13   generic, VF was effectively given nothing. Therefore, any consent to the waiver of future conflicts of

14   interest VF may have given in signing the engagement letter is insufficient to be considered "informed."

15   3)    <u>VF's Understanding of the Waiver</u>

16      For a prospective waiver to be valid, the client must be aware of the conflicts it is waiving. The

17   sophistication of the consumer is an important factor, and waivers signed by large corporations with in-

18   house legal departments are more likely to be upheld than those signed by single lay-persons. *See*

19   Restatement (Third) of Law Governing Law (Small Decl., Ex. D); ABA Model Rule 1.7 and Commentary

20   [22] (Id., Ex. F); *and* ABA Formal Opinion 93-372 (Id., Ex. E). While VF can certainly be considered to

21   be a sophisticated consumer of legal services, in its papers, VF raises the issue of whether the person who

22   signed the engagement letter understood the document to be a waiver of all future conflicts, for all future

23   legal matters, or simply a consent to waive any conflict in *tax matters*. As shown in the discussion above,

24   Lipinski claims that he would not have understood the engagement letter to be the broad waiver of all future

25   conflicts that Morrison maintains it is. In the hearing, Morrison did not overtly contest the credibility of

26   Lipinski's assertion, but rather countered that to most sophisticated clients, the engagement letter would be

27   interpreted to be the sweeping waiver it intends it to be. However, the generic and non-contextual nature

28   of the waiver would fail to trigger the understanding of the waiver Morrison seeks in any client, no matter

1    how sophisticated.

2    4)    The Nature of the Conflict Between the Interests

3    Finally, the Court turns to the nature of the conflict of interest, specifically, whether information

4    obtained by Morrison during its representation of VF in the tax matters would be substantially related to the

5    trademark litigation. "For a matter to be substantially related, the matters need only be akin to the present

6    action in a way reasonable people would understand as important to the issues involved." *General Cigar*,

7    144 F.Supp.2d at 1340 (quotations omitted). If the tax matters are substantially related to the trademark

8    suit, then whatever waiver VF signed, valid or not, would not be in effect, for the prospective waiver in the

9    engagement letter applied only to matters "substantially unrelated" to the tax matter: "...there will be no

10   objection to a matter adverse to your company or an affiliate as long as (1) that matter is substantially

11   unrelated to our matter and (2) if appropriate, an "ethical wall" is created to separate the other matter from

12   our matter." (Fields Decl., Ex. A.)[3]

13   VF argues that by virtue of its role as counsel for the tax matters, Morrison gained access to

14   considerable information regarding its trademark licensing agreements, revenue from these agreements,

15   royalty information, and detailed sales information from WRANGLER products, a division of which are at

16   issue in the current litigation. (*See* Supplemental Declaration of Joseph McGraw In Support Of Motion To

17   Disqualify ("McGraw Supp. Decl."), ¶ 6. Further, VF declares that Helen Winslow, the Assistant General

18   Counsel of the Wrangler Apparel Group, has been actively involved in the Missouri tax action Morrison is

19   directing for VF. (McGraw Decl. ¶ 5.) Among her other duties, Ms. Winslow is responsible for trademark

20   prosecution for the Wrangler Apparel Group, and she has been active in meetings, teleconferences, and

21   other communications with Morrison attorneys. (Id.) Most notably, she is the target of a deposition next

22   week by Morrison as it prepares for a preliminary injunction motion for Blue Marlin in the trademark suit.

23   _____

24   [3]As a related matter, the issue of the "ethical wall" raises an interesting issue for possible revocation of
     whatever waiver was granted by VF in the engagement letter. When Morrison began the representation of Blue
25   Marlin in the trademark suit, it identified the possibility of conflict with VF. While Morrison contends that it
     believed the waiver to be effective as to VF, it also notified Blue Marlin of the possibility of conflict and
26   obtained its consent. (Declaration of Stafford Matthews In Opposition To Motion To Disqualify, ¶¶ 5-6.)
     However, no ethical wall was created until January 6, 2003, when VF learned of the conflict and demanded
27   that Morrison withdraw. (Fields Decl. ¶ 12.) If the erection of the wall was "appropriate" after January 6,
     2003, why was it not appropriate at the beginning of Morrison's representation? Apparently the only change
28   was VF's discovery of the conflict. If the ethical wall was appropriate prior to January 6, 2003, then the failure
     of Morrison to create one prior to that time can be viewed as another reason the waiver should not be in effect.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1    (Id.)

2    It is quite conceivable that information regarding sales, trademark licensing revenues, and royalty

3    payments will all be highly relevant to Blue Marlin's trademark infringement claims, and the merest

4    possibility, regardless of internal precautions, that Morrison could use information gained while acting as

5    VF's attorney on behalf of another client who is suing VF is precisely the type of situation that could

6    undermine public confidence in the legal profession and the judicial process. *See Truck Ins. Exchange*, 6

7    Cal.App.4th at 1056.  Such a circumstance does little to evidence the "highest level of undivided loyalty."

8    owed by the lawyer to the client. *Image Technical*, 820 F.Supp at 1217.

9        The reason for such a rule [of automatic disqualification] is evident, even (or perhaps especially) to
    the nonattorney.  A client who learns that his or her lawyer is also representing an litigation

10        adversary, even with respect to a matter *wholly unrealted* to the one for which counsel was
    retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one

11        of the foundations of the professional relationship.

12    *Flatt*, 9 Cal.4th at 285 (emphasis original).  The possibility of Ms. Winslow facing a deposition conducted

13    by lawyers from the very same firm of those she is working with on the tax matters is consistent with the

14    fear expressed by the California Supreme Court in *Flatt*.  The warning in that case rings even more clearly

15    when the two issues are related, as they appear to be in this case.

16    Morrison does not contest the fact that it had access to revenue amounts, sales figures, and

17    trademark information; nor does it deny that it intends to take Ms. Winslow's deposition.  Rather, it

18    contends that it had no access to any information regarding the specific FIVE STAR trademark at issue in

19    this litigation.  At argument, however, counsel for Morrison conceded that revenue information, sales

20    amounts, and data regarding trademark licensing would be relevant to the issue of damages in the FIVE

21    STAR case.  The Court agrees, and it finds that because of the access Morrison had to information and

22    witnesses relevant to the current trademark dispute, the tax matters and the Blue Marlin case are not

23    substantially unrelated, and the waiver therefore does not apply.

## CONCLUSION

25    The Court grants the motion to disqualify Morrison & Foerster for two reasons: the inadequacy of

26    the waiver in the engagement letter and the fact that the two matters are substantially related.  Because the

27    waiver is so devoid of detail and fails to put VF on notice of what it is surrendering in waiving any future

28    conflicts of interest, and because, by its own terms, it would not apply to the present case, VF has not

9

1   consented to Morrison's representation of Blue Marlin.  Morrison is simultaneously representing two clients

2   whose interests are materially adverse, and  disqualification is therefore automatic.  In the absence of

3   informed consent to waive the conflict created by the concurrent representation, there is no exception

4   applicable to this automatic disqualification.  The motion to disqualify Morrison & Foerster is therefore

5   GRANTED.

6

7        **IT IS SO ORDERED.**

8

Dated: January 17, 2003

9                                                                    /s/
                                                            MARTIN J. JENKINS
10                                                          UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

| | |
|---|---|
| **To:** | Abercrombie & Fitch Trading Co. (ipdocketing@howrey.com) |
| **Subject:** | TRADEMARK APPLICATION NO. 78766368 - 00863.0216.T |
| **Sent:** | 6/13/2006 5:16:47 PM |
| **Sent As:** | ECOM110@USPTO.GOV |
| **Attachments:** | |

## UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO:**    78/766368

**APPLICANT:**    Abercrombie & Fitch Trading Co.

**\*78766368\***

**CORRESPONDENT ADDRESS:**
  Caroline C. Smith
  Howrey LLP
  Suites 200 and 300
  2941 Fairview Park Drive
  Falls Church VA 22042

**RETURN ADDRESS:**
Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451

**MARK:**

**CORRESPONDENT'S REFERENCE/DOCKET NO:**   00863.0216.T

**CORRESPONDENT EMAIL ADDRESS:**
  ipdocketing@howrey.com

Please provide in all correspondence:

1. Filing date, serial number, mark and applicant's name.
2. Date of this Office Action.
3. Examining Attorney's name and Law Office number.
4. Your telephone number and e-mail address.

## OFFICE ACTION

**RESPONSE TIME LIMIT**:  TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE MAILING OR E-MAILING DATE.

**MAILING/E-MAILING DATE INFORMATION**:  If the mailing or e-mailing date of this Office action does not appear above, this information can be obtained by visiting the USPTO website at http://tarr.uspto.gov/, inserting the application serial number, and viewing the prosecution history for the mailing date of the most recently issued Office communication.

Serial Number  78/766368

The assigned examining attorney has reviewed the referenced application and determined the following.

## POSSIBLE ORNAMENTAL REFUSAL

In view of the nature of the proposed mark, applicant is advised that, upon the trademark examining attorney's consideration of an amendment to allege use or statement of use, registration may be refused under Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§1051, 1052 and 1127, on the ground that the proposed mark is merely ornamental and, thus, does not function as a trademark.

In determining whether the public would perceive the proposed mark as a trademark, i.e., an indicator of the source of the goods, or merely as a decorative or ornamental feature, the trademark examining attorney will consider the commercial impression created by the display of the subject matter on the specimen, any prior registrations of the same or similar matter for similar goods, promotion of the subject mark as a trademark, and the practice of the relevant trade.  *See* TMEP §§1202.03 *et seq.*

## SEARCH OF THE OFFICE RECORDS

The examining attorney has searched the Office records and has found no similar registered or pending mark which would bar registration under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d).  TMEP section 704.02.

/Caroline E. Wood/

Trademark Examining Attorney

Law Office 110

(571) 272-9243

**HOW TO RESPOND TO THIS OFFICE ACTION:**
- ONLINE RESPONSE:  You may respond using the Office's Trademark Electronic Application System (TEAS) Response to Office action form available on our website at http://www.uspto.gov/teas/index.html.  If the Office action issued via e-mail, you must wait 72 hours after receipt of the Office action to respond via TEAS.  **NOTE:  Do not respond by e-mail.  THE USPTO WILL NOT ACCEPT AN E-MAILED RESPONSE.**
-

**NOTE:  The filing date of the response will be the *date of receipt in the Office*,** not the postmarked date. To ensure your response is timely, use a certificate of mailing.  37 C.F.R. §2.197.

**STATUS OF APPLICATION:** To check the status of your application, visit the Office's Trademark Applications and Registrations Retrieval (TARR) system at http://tarr.uspto.gov.

**VIEW APPLICATION DOCUMENTS ONLINE:** Documents in the electronic file for pending applications can be viewed and downloaded online at http://portal.uspto.gov/external/portal/tow.

**GENERAL TRADEMARK INFORMATION:** For general information about trademarks, please visit the Office's website at http://www.uspto.gov/main/trademarks.htm

**FOR INQUIRIES OR QUESTIONS ABOUT THIS OFFICE ACTION, PLEASE CONTACT THE ASSIGNED EXAMINING ATTORNEY SPECIFIED ABOVE.**

# EXHIBIT D

 

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
T 202.783.0800
F 202.383.6610
www.howrey.com

October 30, 2006                                              FILE:  00863.0216.TMUS00

**VIA HAND DELIVERY**

Commissioner for Trademarks
Trademark Assistance Center
James Madison Building – East Wing
Concourse Level
600 Dulany Street
Alexandria, Virginia  22313-1451

> Re:   *Request to Divide and Amendment to Allege Use Under §2.76 in*
> *regard to Application Serial No. 78/766,368 for Mark:*
> *Miscellaneous Design in Class 25*

Dear Sir or Madam:

We enclose for appropriate action by the United States Patent and Trademark Office the
following documents for Application Serial No. 78/766,368 for the mark Design (Miscellaneous
Design :

> 1.   Transmittal Letter (in duplicate);
>
> 2.   Request to Divide Application  § 2.87;
>
> 3.   Amendment to Allege Use Under § 2.76; and
>
> 4.   A postcard to evidence receipt of the above items.

We respectfully request that the attached postcard be stamped with the date of filing of the above
documents, and that it be returned to our courier.

We hereby authorize the Patent and Trademark Office to charge $475 to the deposit account of
the undersigned firm, Howrey Simon Arnold & White, LLP, Deposit Account No. 08-3038,
Order No. 00863.0216.TMUS00/SMK to cover any fees required.  A duplicate copy of this letter
is enclosed for billing purposes, if necessary.

Respectfully submitted,

Susan M. Kayser

Enclosures

10-30-2006
U.S. Patent & TMOfc/TM Mail Rcpt Dt #34

DM NO. 8405555

Please charge the $475 filing fees to the deposit account of the undersigned firm, Howrey LLP, Deposit Account Number 083038.[2]  We believe that this amount is accurate but if it is insufficient for this filing, please charge any additional fees required to our Deposit Account No. 083038.

ABERCROMBIE & FITCH TRADING CO.

Dated: _Oct 30, 2006_

By: _____
Kelly R. McCarty
Susan M. Kayser
Attorneys for Applicant
Howrey LLP
2941 Fairview Park Drive
Falls Church, VA 22042-4522
202.783.0800

---

[2] $100 fee for Request to Divide and $375 filing fee for the "child" application covering one class.

Docket No. 00863.0216.TMUS00

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of                          )
                                              )
ABERCROMBIE & FITCH TRADING CO.               )
                                              )
Serial No.   78/766,368                       )
                                              )
Filed:       December 5, 2005                 )
                                              )
Mark:        Ruehl Pocket Design (Design only) )
                                              )

REQUEST TO DIVIDE APPLICATION

Honorable Commissioner for Trademarks
P.O. Box 1451
Arlington, Virginia  22313-1451

Madam:

        In accordance with Rule 2.87 of the *Trademark Rules of Practice*, Applicant requests that the above-captioned application be divided and a separate application, designated as the "child" application, with the same filing date, be created for the following goods:

        Clothing, namely, jeans, skirts, shorts, and pants in International Class 25.

        Applicant further requests that the following goods and services remain in this application, Serial No. 78/766,368, designated as the "parent" application:

        Clothing, namely, jackets in International Class 25.

        An Amendment to Allege Use is being filed concurrently herewith which applies to the goods in the "child" application.[1]

---

[1] A copy of the Amendment to Allege Use is attached hereto as Appendix I

DM_US\8387466.v1

Docket No. 00863.0216.TMUS00

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of                              )
                                                  )
ABERCROMBIE & FITCH TRADING CO.                   )
                                                  )
Serial No.   78/766,368                           )
                                                  )
Filed:       December 5, 2005                     )
                                                  )
Mark:        Ruehl Pocket Design (Design only)    )
                                                  )

<u>REQUEST TO DIVIDE APPLICATION</u>

Honorable Commissioner for Trademarks
P.O. Box 1451
Arlington, Virginia  22313-1451

Madam:

      In accordance with Rule 2.87 of the *Trademark Rules of Practice*, Applicant requests that the above-captioned application be divided and a separate application, designated as the "child" application, with the same filing date, be created for the following goods:

      Clothing, namely, jeans, skirts, shorts, and pants in International Class 25.

      Applicant further requests that the following goods and services remain in this application, Serial No. 78/766,368, designated as the "parent" application:

      Clothing, namely, jackets in International Class 25.

      An Amendment to Allege Use is being filed concurrently herewith which applies to the goods in the "child" application.[1]

---

[1] A copy of the Amendment to Allege Use is attached hereto as Appendix I

DM_US\8387466.v1

Appendix A

Please charge the $475 filing fees to the deposit account of the undersigned firm, Howrey LLP, Deposit Account Number 083038.[2] We believe that this amount is accurate but if it is insufficient for this filing, please charge any additional fees required to our Deposit Account No. 083038.

ABERCROMBIE & FITCH TRADING CO.

Dated: _Oct 30, 2006_

By: _____
Kelly R. McCarty
Susan M. Kayser
Attorneys for Applicant
Howrey LLP
2941 Fairview Park Drive
Falls Church, VA 22042-4522
202.783.0800

---

[2] $100 fee for Request to Divide and $375 filing fee for the "child" application covering one class.

# EXHIBIT E

| To: | Abercrombie & Fitch Trading Co. (ipdocketing@howrey.com) |
| Subject: | TRADEMARK APPLICATION NO. 78977782 - 00863.0216.T |
| Sent: | 6/15/2007 10:38:39 AM |
| Sent As: | ECOM110@USPTO.GOV |
| Attachments: | |

# UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO**:     78/977782

**MARK**:

# *78977782*

**CORRESPONDENT ADDRESS**:
Caroline C. Smith
Howrey LLP
Suites 200 and 300
2941 Fairview Park Drive
Falls Church VA 22042

**RESPOND TO THIS ACTION:**
**http://www.uspto.gov/teas/eTEASpageD.htm**

**GENERAL TRADEMARK INFORMATION:**
**http://www.uspto.gov/main/trademarks.htm**

**APPLICANT**:     Abercrombie & Fitch Trading Co.

**CORRESPONDENT'S REFERENCE/DOCKET NO**:
00863.0216.T
**CORRESPONDENT E-MAIL ADDRESS**:
ipdocketing@howrey.com

# OFFICE ACTION

TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE ISSUE/MAILING DATE.

**ISSUE/MAILING DATE: 6/15/2007**

This letter is in response to applicant's amendment to allege use received October 30, 2007.

ORNAMENTAL REFUSAL

Registration is refused on the Principal Register because the proposed mark, as used on the specimen of record, is merely a decorative or ornamental feature of the goods; it does not function as a trademark to identify and distinguish applicant's

goods from those of others and to indicate their source.  Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§1051-1052 and 1127; *see In re Owens-Corning Fiberglass Corp.*, 774 F.2d 1116, 227 USPQ 417 (Fed. Cir. 1985); *In re David Crystal, Inc.*, 296 F.2d 771, 132 USPQ 1 (C.C.P.A. 1961); *In re Villeroy & Boch S.A.R.L.*, 5 USPQ2d 1451 (TTAB 1987); TMEP §§1202.03 *et seq.*

The proposed mark, as used on the specimen, is merely ornamental because the mark is shown on pants pockets and appears as a merely decorative or ornamental feature of the goods.

Applicant may respond to the stated ornamental refusal by satisfying one of the following, as appropriate:

    (1)  Claiming *acquired distinctiveness* by submitting *evidence* that the proposed mark has become distinctive of applicant's goods in commerce.  15 U.S.C. §1052(f).  Evidence may consist of examples of advertising and promotional materials that specifically promote, as a trademark, the mark for which registration is sought; dollar figures for advertising devoted to such promotion; dealer and consumer statements of recognition of the proposed mark as a trademark; and any other evidence that establishes recognition of the proposed mark as a trademark for the goods.  TMEP §1212.06 *et seq*;

    (2)  Submitting evidence that the proposed mark is an *indicator of secondary source* or sponsorship for the identified goods.  *Univ. Book Store v. Univ. of Wis. Bd. of Regents*, 33 USPQ2d 1385, 1405 (TTAB 1994); *In re Olin Corp.*, 181 USPQ 182 (TTAB 1982).  That is, applicant may submit evidence showing that the proposed mark would be recognized as a trademark through applicant's use of the mark with goods or services *other* than those identified here.  *In re The Original Red Plate Co.*, 223 USPQ 836, 837 (TTAB 1984).  Applicant must establish that, as a result of this use in connection with other goods or services, the public would recognize applicant as the secondary source of, or sponsor for, the identified goods.  *See* TMEP §1202.03(c);

    (3)  Amending the application to seek registration on the *Supplemental Register*.  Trademark Act Section 23, 15 U.S.C. §1091; 37 C.F.R. §§2.47 and 2.75(a); TMEP §§801.02(b), 815 and 816 *et seq.*;

    (4)  Submitting a *substitute specimen* that shows non-ornamental trademark use, and the following statement, verified with an affidavit or signed declaration under 37 C.F.R. §2.20:  "**The substitute specimen was in use in commerce at least as early as the application filing date.**"  37 C.F.R. §2.59(a).  If submitting a substitute specimen requires amendment to the dates of use, applicant must also verify the amended dates.  37 C.F.R. §2.71(c).

If applicant cannot satisfy one of the above, applicant may amend the Section 1(a) filing basis (use in commerce) to Section 1(b) (intent to use), and the refusal will be withdrawn.  However, should applicant amend the basis to Section 1(b), registration cannot be granted until applicant later amends the application back to use in commerce by filing an acceptable allegation of use with a proper specimen.  15 U.S.C. §1051(c); 37 C.F.R. §§2.76, 2.88; TMEP Chapter 1100.  If the same specimen is submitted with an allegation of use, the same refusal will issue.

In order to amend to Section 1(b), applicant must submit the following statement, verified with an affidavit or a signed declaration under 37 C.F.R. §2.20:  "**Applicant has had a bona fide intention to use the mark in commerce on or in connection with the goods or services listed in the application as of the filing date of the application.**"  15 U.S.C. §1051(b); 37 C.F.R. §§2.34(a)(2) and 2.35(b)(1); TMEP §806.01(b).

/Caroline E. Wood/

Trademark Examining Attorney

Law Office 110

(571) 272-9243

**RESPOND TO THIS ACTION:** If there are any questions about the Office action, please contact the assigned examining attorney. A response to this Office Action should be filed using the Office's Response to Office action form available at http://www.uspto.gov/teas/eTEASpageD.htm. If notification of this Office action was received via e-mail, no response using this form may be filed for 72 hours after receipt of the notification. **Do not attempt to respond by e-mail as the USPTO does not accept e-mailed responses.**

If responding by paper mail, please include the following information: the application serial number, the mark, the filing date and the name, title/position, telephone number and e-mail address of the person signing the response. Please use the following address: Commissioner for Trademarks, P.O. Box 1451, Alexandria, VA 22313-1451.

**STATUS CHECK:** Check the status of the application at least once every six months from the initial filing date using the USPTO Trademark Applications and Registrations Retrieval (TARR) online system at http://tarr.uspto.gov. When conducting an online status check, print and maintain a copy of the complete TARR screen. If the status of your application has not changed for more than six months, please contact the assigned examining attorney.

| | |
|---|---|
| **To:** | Abercrombie & Fitch Trading Co. (ipdocketing@howrey.com) |
| **Subject:** | TRADEMARK APPLICATION NO. 78977782 - 00863.0216.T |
| **Sent:** | 6/15/2007 10:38:42 AM |
| **Sent As:** | ECOM110@USPTO.GOV |
| **Attachments:** | |

# IMPORTANT NOTICE
## USPTO OFFICE ACTION HAS ISSUED ON 6/15/2007 FOR APPLICATION SERIAL NO. 78977782

Please follow the instructions below to continue the prosecution of your application:

**VIEW OFFICE ACTION:** Click on this link **http://portal.uspto.gov/external/portal/tow?DDA=Y&serial_number=78977782&doc_type=OOA&mail_date=2007061** (or copy and paste this URL into the address field of your browser), or visit **http://portal.uspto.gov/external/portal/tow** and enter the application serial number to **access** the Office action.

**PLEASE NOTE**: The Office action may not be immediately available but will be viewable within 24 hours of this notification.

**RESPONSE MAY BE REQUIRED:** You should carefully review the Office action to determine (1) if a response is required; (2) how to respond; and (3) the applicable **response time period**. Your response deadline will be calculated from **6/15/2007.**

**Do NOT hit "Reply" to this e-mail notification, or otherwise attempt to e-mail your response, as the USPTO does NOT accept e-mailed responses. Instead, the USPTO recommends that you respond online using the Trademark Electronic Application System response form at http://www.uspto.gov/teas/eTEASpageD.htm.**

**HELP:** For *technical* assistance in accessing the Office action, please e-mail **TDR@uspto.gov**. Please contact the assigned examining attorney with questions about the Office action.

# WARNING
**1. The USPTO will NOT send a separate e-mail with the Office action attached.**

**2. Failure to file any required response by the applicable deadline will result in the ABANDONMENT of your application.**

# EXHIBIT F

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| Levi Strauss & Co., | |
| Opposer, | Opposition No. 91175601 |
| v. | Application SN 78766368 |
| Abercrombie & Fitch Trading Co., | |
| Applicant. | |

## APPLICANT'S RESPONSES TO OPPOSER LEVI STRAUSS & CO.'S FIRST SET OF INTERROGATORIES

Applicant, Abercrombie & Fitch Trading Co., responds as follows to Opposer's interrogatories. The following answers are submitted to the extent that Opposer's interrogatories are understood and are based on information available at the present time. Applicant reserves the right to supplement its answers at such time as additional information, documents and facts come to its attention as a result of further case investigation, discovery or otherwise.

### GENERAL OBJECTIONS

Applicant asserts the following general objections in addition to the specific objections stated in response to particular interrogatories:

1.       By supplying information responsive to each interrogatory, Applicant does not concede the relevance, materiality, or admissibility of such documents or information, and reserves all objections thereto.

2.       Applicant objects to each interrogatory to the extent that they purport to require the disclosure of communications, documents or information prepared in anticipation of litigation, protected by the work product doctrine or subject to a claim of privilege, including, without limitation, the attorney-client privilege. Applicant hereby claims such privileges and protections to the extent implicated by each interrogatory and excludes privileged and protected information from its responses to each interrogatory. Any disclosure of such protected or

1

privileged information is inadvertent and is not intended to waive those privileges and protections.

     3.     Applicant objects to the interrogatories to the extent they seek the disclosure of documents containing confidential, proprietary or highly sensitive business information. Such documents will be produced after a mutually agreeable protective order is in place.

     4.     Applicant objects to the request for information from "any jurisdiction" to the extent that it refers to jurisdiction outside the United States.

<strong>RESPONSE TO INTERROGATORIES</strong>

<u>**INTERROGATORY NO. 1**</u>:

     IDENTIFY any PERSON furnishing information for YOUR responses to these interrogatories, designating the number of the interrogatory for which that PERSON furnished information.

<u>**RESPONSE TO INTERROGATORY NO. 1:**</u>

     Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and on grounds that it seeks information protected by the attorney-client or work product privileges, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence. Subject to and without waiving the above objections, Applicant responds as follows: Reid M. Wilson, Senior Director - Intellectual Property Counsel for Abercrombie & Fitch, and Jackie Buday, Trademark Manager.

<u>**INTERROGATORY NO. 2:**</u>

     IDENTIFY the APPLICANT, including any entities or associations (whether incorporated or unincorporated) under or through which APPLICANT does business.

<u>**RESPONSE TO INTERROGATORY NO. 2:**</u>

     Applicant objects to this interrogatory on the grounds that it is vague, ambiguous and overly broad, and to the extent that it calls for information that is neither relevant nor reasonably

2

likely to lead to the discovery of admissible evidence. Subject to and without waiving the above objections, and to the extent this interrogatory is understood, Applicant will supplement this answer with responsive information specific to the Ruehl brand.

**INTERROGATORY NO. 3:**

IDENTIFY any PERSON who was, is, or will be in charge of or responsible for the manufacture, production, advertising, sale and/or marketing of goods bearing the A&F MARK.

**RESPONSE TO INTERROGATORY NO. 3:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence. Applicant further objects to this interrogatory as it fails to identify a reasonable time period. Subject to and without waiving the above objections, Applicant will supplement this answer with responsive information specific to the Ruehl brand.

**INTERROGATORY NO. 4:**

For each PERSON IDENTIFIED in YOUR response to Interrogatory No. 3, describe the extent of his or her responsibilities with regard to the manufacture, production, advertising, sale, and/or marketing of goods bearing the A&F MARK.

**RESPONSE TO INTERROGATORY NO. 4:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and on grounds that it seeks confidential business information, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence. Applicant further objects to this interrogatory as it fails to identify a reasonable time period. Subject to and without waiving the above objections, Applicant will supplement this answer with responsive information specific to the Ruehl brand.

**INTERROGATORY NO. 5:**

IDENTIFY any states in which YOU have sold, distributed, advertised or marketed goods bearing the A&F MARK.

**RESPONSE TO INTERROGATORY NO. 5:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.   Applicant further objects to this interrogatory as it fails to identify a reasonable time period.  Subject to and without waiving the above objections, Applicant responds as follows: California, Florida, Hawaii, Illinois, Michigan, New Jersey, New York, Ohio, Texas and Virginia.

**INTERROGATORY NO. 6:**

For each state IDENTIFIED in YOUR response to Interrogatory No. 5, state the period of time over which YOU have sold, distributed, advertised or marketed goods bearing the A&F MARK.

**RESPONSE TO INTERROGATORY NO. 6:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.  Applicant further objects to this interrogatory as it fails to identify a reasonable time period.  Subject to and without waiving the above objections, Applicant responds as follows: February 2005 to present.

**INTERROGATORY NO. 7:**

IDENTIFY any MARKS, names, symbols or designs that YOU ever considered as alternatives to the selection, adoption, acquisition or use of the A&F MARK.

**RESPONSE TO INTERROGATORY NO. 7:**

Applicant objects to this interrogatory on the grounds that it seeks confidential business information or information protected by the attorney-client or work product privileges, and to the

DM_US:20519542_1

extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.  Applicant further objects to this interrogatory as it fails to identify a reasonable time period.

**INTERROGATORY NO. 8:**

IDENTIFY any PERSON who has knowledge of any facts stated in YOUR response to Interrogatory No. 7.

**RESPONSE TO INTERROGATORY NO. 8:**

Applicant objects to this interrogatory on the grounds that it seeks confidential business information or information protected by the attorney-client or work product privileges, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.   Applicant further objects to this interrogatory as it fails to identify a reasonable time period.

**INTERROGATORY NO. 9:**

IDENTIFY any stitching designs other than the A&F MARK that YOU have used on products.

**RESPONSE TO INTERROGATORY NO. 9:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.  Applicant further objects to this interrogatory as it fails to identify a reasonable time period.

**INTERROGATORY NO. 10:**

IDENTIFY any PERSON who has knowledge of any facts stated in YOUR response to Interrogatory No. 9.

**RESPONSE TO INTERROGATORY NO. 10:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and to the extent that it calls for information that is neither relevant nor reasonably

likely to lead to the discovery of admissible evidence.  Applicant further objects to this interrogatory as it fails to identify a reasonable time period.

**INTERROGATORY NO. 11:**

IDENTIFY any PERSON who has rendered services to YOU or on YOUR behalf in connection with the advertising or promotion of goods bearing the A&F MARK.

**RESPONSE TO INTERROGATORY NO. 11:**

Applicant objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad, unduly burdensome and on grounds that it seeks confidential business information, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.   Applicant further objects to this interrogatory as it fails to identify a reasonable time period.

**INTERROGATORY NO. 12:**

For each PERSON IDENTIFIED in YOUR response to Interrogatory No. 11, describe the type of services rendered, costs associated with such services, and the dates such services were rendered.

**RESPONSE TO INTERROGATORY NO. 12:**

Applicant objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad, unduly burdensome and on grounds that it seeks confidential business information, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.  Applicant further objects to this interrogatory as it fails to identify a reasonable time period.

**INTERROGATORY NO. 13:**

IDENTIFY any product, thing and/or service in conjunction with which YOU have used the A&F MARK.

**RESPONSE TO INTERROGATORY NO. 13:**

Applicant objects to this interrogatory on the grounds that it is overly broad and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence. Applicant further objects to this interrogatory as it fails to identify a reasonable time period. Subject to and without waiving the above objections, Applicant responds as follows: jeans, skirts, shorts and pants.

**INTERROGATORY NO. 14:**

For each product, thing and/or service IDENTIFIED in YOUR response to Interrogatory No. 13, IDENTIFY all retailers, online retailers, wholesalers and/or distributors that sell or have ever sold the product, thing and/or service.

**RESPONSE TO INTERROGATORY NO. 14:**

Applicant objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence. Applicant further objects to this interrogatory as it fails to identify a reasonable time period. Subject to and without waiving the above objections, and to the extent this interrogatory is understood, Applicant responds as follows: Ruehl No. 925 stores for all products identified in Applicant's response to Interrogatory No. 13.

**INTERROGATORY NO. 15:**

For each product, thing and/or service IDENTIFIED in YOUR response to Interrogatory No. 13, describe the past, current and anticipated geographic areas of distribution of the product, thing and/or service.

**RESPONSE TO INTERROGATORY NO. 15:**

Applicant objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad, unduly burdensome and on grounds that it seeks confidential business information, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence. Applicant further objects to this interrogatory as it fails to

7

identify a reasonable time period.  Subject to and without waiving the above objections, and to the extent this interrogatory is understood, Applicant responds as follows: Ruehl No. 925 stores for all products identified in Applicant's response to Interrogatory No. 13.

**INTERROGATORY NO 16:**

For each product, thing and/or service IDENTIFIED in YOUR response to Interrogatory No. 13, state the date that the product, thing and/or service was first sold.

**RESPONSE TO INTERROGATORY NO. 16:**

Applicant objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad, unduly burdensome and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.  Applicant further objects to this interrogatory as it fails to identify a reasonable time period.  Subject to and without waiving the above objections, and to the extent this interrogatory is understood, Applicant responds as follows: February 2005 for jeans, skirts, shorts and pants.

**INTERROGATORY NO. 17:**

For each product, thing and/or service IDENTIFIED in YOUR response to Interrogatory No. 13, state the quantity of the product, thing and/or service sold per calendar or fiscal year, from the date of YOUR first sale to the present.

**RESPONSE TO INTERROGATORY NO. 17:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and on grounds that it seeks confidential business information, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 18:**

For each product, thing and/or service IDENTIFIED in YOUR response to Interrogatory No. 13, state the total dollar amount of sales of the product, thing and/or service per calendar or fiscal year, from the date of YOUR first sale to the present.

DM_US:20519542_1

**RESPONSE TO INTERROGATORY NO. 18:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and on grounds that it seeks confidential business information, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 19:**

For each product, thing and/or service IDENTIFIED in YOUR response to Interrogatory No. 13, state all costs that YOU incurred from the date of YOUR first sale of the product, thing and/or service to the present, which YOU contend should be accounted for in calculating YOUR profits from such sale.

**RESPONSE TO INTERROGATORY NO. 19:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and on grounds that it seeks confidential business information or information protected by the attorney-client or work product privileges, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence. Applicant further objects to this interrogatory as it fails to identify a reasonable time period.

**INTERROGATORY NO. 20:**

Describe any advertisement or promotion, or planned advertisement or promotion, including without limitation in print, on the Internet, television or other media, for any of the products, things and/or services IDENTIFIED in YOUR response to Interrogatory No. 13, including the media outlet, the inclusive dates that the advertisement or promotion ran or will run, the geographical distribution of the advertisement or promotion, and the total dollar amount per year that YOU spent or anticipate spending for such advertisement or promotion.

**RESPONSE TO INTERROGATORY NO. 20:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and on grounds that it seeks confidential business information or information protected by the attorney-client or work product privileges, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence. Applicant further objects to this interrogatory as it fails to identify a reasonable time period. Subject to and without waiving the above objections, Applicant will supplement this response.

**INTERROGATORY NO. 21:**

IDENTIFY any PERSON who participated in the design, creation, selection, adoption, and/or approval of the A&F MARK.

**RESPONSE TO INTERROGATORY NO. 21:**

Applicant objects to this interrogatory on grounds that it seeks confidential business information or information protected by the attorney-client or work product privileges. Applicant further objects to this interrogatory as it fails to identify a reasonable time period. Subject to and without waiving the above objections, Applicant will supplement this response.

**INTERROGATORY NO. 22:**

Describe the circumstances under which YOU first became aware of the ARCUATE TRADEMARK.

**RESPONSE TO INTERROGATORY NO. 22:**

Applicant objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad and unduly burdensome.

**INTERROGATORY NO. 23:**

IDENTIFY any PERSON with knowledge of any facts stated in YOUR response to Interrogatory No. 22.

**RESPONSE TO INTERROGATORY NO. 23:**

Applicant objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad, unduly burdensome.

**INTERROGATORY NO. 24:**

IDENTIFY any COMMUNICATIONS RELATING TO any inquiries about whether YOUR products are manufactured by, associated with, sponsored by, or in any manner connected with LS&CO. or any of LS&CO.'s products.

**RESPONSE TO INTERROGATORY NO. 24:**

Applicant objects to this interrogatory on grounds that it seeks information protected by the attorney-client or work product privileges. Subject to and without waiving the above objections, Applicant responds as follows: There are no responsive communications.

**INTERROGATORY NO. 25:**

IDENTIFY any PERSON with knowledge of any facts stated in YOUR response to Interrogatory No. 24.

**RESPONSE TO INTERROGATORY NO. 25:**

Applicant objects to this interrogatory on grounds that it seeks information protected by the attorney-client or work product privileges. Subject to and without waiving the above objections, Applicant responds as follows: None. See response to Interrogatory No. 24.

**INTERROGATORY NO. 26:**

IDENTIFY any PERSON responsible for conducting trademark searches for YOU in the period beginning one year prior to YOUR first use of or first application to register the A&F MARK to the present.

**RESPONSE TO INTERROGATORY NO. 26:**

Applicant objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad and on grounds that it seeks information protected by the attorney-client or work product

11

privileges, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 27:**

IDENTIFY any COMMUNICATIONS with any PERSON other than LS&CO. in which it was asserted that there was confusion or a likelihood of confusion of products bearing the A&F MARK with products bearing any TRADEMARK, including without limitation the ARCUATE TRADEMARK.

**RESPONSE TO INTERROGATORY NO. 27:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and on grounds that it seeks confidential business information or information protected by the attorney-client or work product privileges, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence. Applicant further objects to this interrogatory as it fails to identify a reasonable time period.

**INTERROGATORY NO. 28:**

State all facts that support YOUR denials in YOUR Answer to LS&CO.'s Notice of Opposition.

**RESPONSE TO INTERROGATORY NO. 28:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and on grounds that it seeks confidential business information.

**INTERROGATORY NO. 29:**

IDENTIFY any PERSON with knowledge of any facts stated in YOUR response to Interrogatory No. 28.

**RESPONSE TO INTERROGATORY NO. 29:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and on grounds that it seeks confidential business information.

DM_US:20519542_1

**INTERROGATORY NO. 30:**

IDENTIFY any stitching designs other than the A&F MARK which YOU have applied to register as a TRADEMARK.

**RESPONSE TO INTERROGATORY NO. 30:**

Applicant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and to the extent that it calls for information that is neither relevant nor reasonably likely to lead to the discovery of admissible evidence. Applicant further objects to this interrogatory as it fails to identify a reasonable time period. Subject to and without waiving the above objections, Applicant responds as follows: All marks which Applicant has applied to register as a trademark on the federal register are a matter of public record and are available on the USPTO website.

DATED: June 19, 2007

ABERCROMBIE & FITCH TRADING CO.

By: _Caroline C. Smith_____
        Susan M. Kayser
        Caroline C. Smith
        Kelly R. McCarty
        Attorneys for Applicant
        Howrey LLP
        1299 Pennsylvania Avenue, N.W.
        Washington, DC 20004-2402
        202.783.0800

## <u>VERIFICATION</u>

I, Reid M. Wilson, am Senior Director - Intellectual Property Counsel of Abercrombie & Fitch, Applicant's related company.  I hereby verify that I have read the foregoing answers to interrogatories, and that the foregoing answers are true and correct based on my own corporate knowledge of Applicant.

*I verify under penalty of perjury that the foregoing is true and correct.*

Dated: June 19, 2007

Reid M. Wilson
Senior Director - Intellectual Property Counsel
Abercrombie & Fitch

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 19th day of June, 2007 a copy of the foregoing "Applicant's Responses to Opposer Levi Strauss & Co.'s First Set of Interrogatories" was mailed by First Class mail, postage prepaid, to Gia L. Cincone, Townsend and Townsend and Crew LLP, 2 Embarcadero Center, 8th Floor, San Francisco, California 94111.


_____
Joy Lynne Clay


14