United States District Court
For the Northern District of California

**NOT FOR CITATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEVI STRAUSS & COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br> ABERCROMBIE & FITCH TRADING COMPANY,<br><br>    Defendant. | No. C 07-03752 JSW<br><br>**ORDER GRANTING MOTION TO DISQUALIFY HOWREY LLP AS COUNSEL FOR DEFENDANT ABERCROMBIE & FITCH TRADING CO.** |

This matter comes before the Court upon consideration of the Motion to Disqualify Howrey LLP as Counsel for Defendant Abercrombie & Fitch Trading Company ("A&F"), filed by Plaintiff Levi Strauss & Company ("LS&CO"). The Court has considered the parties' papers, relevant legal authority, and the record in this case and has had the benefit of oral argument. For the reasons set forth in the remainder of this Order, the Court GRANTS LS&CO's motion.[1]

**BACKGROUND**

LS&CO is the owner of the Arcuate Stitching Design Trademark ("the Arcuate Trademark"). (*See* Complaint ¶¶ 8-9, Ex. A.) From April 27, 1994 through April 27, 1999,

---

[1] A&F's objections to the Declaration of Thomas N. Onda are OVERRULED. A&F's motion to strike the excess pages in LS&CO's opening brief also is DENIED. However, all parties are HEREBY ADVISED that failure to comply with this Court's Standing Orders in the future may result in sanctions.

Katherine M. Basile, Esq. worked as in-house counsel for LS&CO (Declaration of Katherine M. Basile, Esq. ("Basile Decl."), ¶ 4.) According to Ms. Basile, her primary responsibilities

> included handling specific enforcement and protection matters for LS&CO trademarks and brands, including the Arcuate Trademark, within the United States.... I made decisions regarding brand protection and trademark enforcement by myself or with the legal team and then-current business leaders for the LEVI's brand[.] I also directed the enforcement strategy employed by LS&CO for the Arcuate Trademark during my tenure. I played a key role in directing LS&CO's trademark enforcement and brand protection strategy.

(Basile Decl., ¶ 6; *see also* Declaration of Gia Cincone ("Cincone Decl."), ¶ 3, Ex. A (deposition testimony by Ms. Basile outlining her responsibilities and duties as counsel for LS&CO).) LS&CO asserts that many of its policies and strategies, with respect to enforcement of the Arcuate Trademark, were developed by Ms. Basile and remain unchanged to date. (Declaration of Thomas Onda in Support of Motion to Disqualify ("Onda Decl."), ¶5; Reply Declaration of Thomas Onda ("Onda Reply Decl."), ¶¶ 2-10.)

In June 2000, Ms. Basile joined Howrey LLP ("Howrey") as a partner in its Menlo Park Office. (Basile Decl., ¶ 14.) In March 2005, A&F retained Howrey to handle a trademark enforcement matter. (Declaration of John Froemming ("Froemming Decl."), ¶ 2; Declaration of Reid M. Wilson ("Wilson Decl."), ¶ 3.) Howrey has handled A&F's trademark prosecution and brand enforcement matters since July 2005. (Froemming Decl., ¶ 2; Wilson Decl., ¶ 3.) A&F's trademark team is based in Howrey's Washington D.C. office, but Ms. Basile has worked on some of A&F's trademark matters. (Froemming Decl., ¶ 2; Basile Decl., ¶ 18.)

On December 5, 2005, A&F asked Howrey to file a trademark application with the United States Patent and Trademark Office ("USPTO") for a trademark described as "a miscellaneous mirror image stitching design," which was to be used on "[c]lothing, namely, jeans, skirts, shorts, pants and jackets," and specifically on A&F's RUEHL brand jeans ("the RUEHL mark"). (Froemming Decl., ¶ 3; Wilson Decl., ¶ 4; Cincone Decl., Ex. B.) Although Ms. Basile attests that she has not been involved in the prosecution of the RUEHL mark and has not played a "substantive role" in its prosecution, she was listed on the application as one of the attorneys prosecuting the mark. (Basile Decl., ¶¶ 18-20; Cincone Decl., Ex. B.) Howrey attests

that Ms. Basile was included in the application based on Howrey's "standard procedures for preparing all new applications for A&F at that time." (Declaration of H. Michelle Renne, ¶ 5.)

LS&CO contends that it became aware of the fact that Ms. Basile was listed on the application in "late January 2006," and that Mr. Onda called Ms. Basile to discuss his concerns with her at that time. (Onda Decl., ¶¶ 7-8; Basile Decl., ¶ 12.) Ms. Basile advised Mr. Froemming of this phone call and an informal ethical wall was instituted in which the Howrey team prosecuting the RUEHL mark was precluded from sharing any information about the matter with Ms. Basile. (Basile Decl., ¶¶ 26-27; Froemming Decl., ¶¶ 5-7.)

In March 2006, LS&CO's outside counsel apparently called Howrey to voice LS&CO's objections to A&F's attempts to register the RUEHL mark. Counsel for A&F asserts both that he advised counsel for LS&CO that A&F was not inclined to withdraw the application and that counsel for LS&CO never raised the conflict issue during these discussions. (Froemming Decl., ¶¶ 8-11, Exs. A-C.)

According to the record, on June 13, 2006, the USPTO issued an Office Action, in which it noted that the registration might be refused on the ground that the stitching design was merely ornamental. A&F responded by splitting its application. An application pertaining to use of the RUEHL mark on jeans remains pending.[2] The USPTO published the parent application, which includes only jackets, on January 16, 2007. LS&CO opposed the application on February 13, 2007. (*See* Reply Declaration of Gia L. Cincone ("Cincone Reply Decl."), ¶¶ 5, 9, Exs. C, E; Declaration of Caroline C. Smith ("Smith Decl."), ¶¶ 6-7.)

On or about February 22, 2007, Howrey instituted a formal ethical wall isolating Ms. Basile from matters relating to the RUEHL mark. (Basile Decl., ¶35, Ex. B.) Howrey filed A&F's answer to the opposition on March 21, 2007, and began to prepare discovery pertaining to the opposition proceeding. (*Id.*, ¶¶ 8-14.) Those discovery requests were served in June 2007. (Cincone Decl., ¶¶ 6-7, Exs. D-E.)

---

[2]  The USPTO apparently has issued an Office Action refusing registration of this application on the grounds that the stitching design is ornamental.

3

1  On July 20, 2007, LS&CO, through counsel, advised A&F that it would be filing the
2 complaint in this action and, based on Ms. Basile's prior representation of LS&CO, that it
3 objected to Howrey's continued representation of A&F.  (Cincone Decl., ¶ 5, Ex. C.)
4 According to the record, apart from Mr. Onda's initial phone call with Ms. Basile, the is the
5 first time the issue of a conflict of interest was raised with A&F.
6  On July 20, 2007, LS&CO instituted this action, but it did not file the instant motion
7 until September 19, 2007.  LS&CO contends that the delay in filing was to enable the parties to
8 attempt to resolve the matter informally.  (Onda Reply Decl., ¶ 13.)

## ANALYSIS

### A. Legal Standards Applicable to Motions to Disqualify.

The standard for determining whether disqualification must be decided under California law.  Further, "the decision to disqualify counsel for conflict of interest is within the court's discretion."  *Hitachi, Ltd. v. Tatung Co.*, 419 F. Supp. 2d 1158, 1160 (N.D. Cal. 2006) (citing *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir. 1980)).  A court should examine a motion to disqualify counsel carefully "to ensure that literalism does not deny the parties substantial justice."  *People ex rel Dept. of Corporations v. Speedee Oil Change Systs., Inc.*, 20 Cal. 4th 1135, 1144 (1999) ("*Speedee Oil*").  Thus, a court must balance such varied interests as a party's right to chosen counsel, the interest in representing a client, the burden placed on a client to find new counsel, and the possibility that "tactical abuse underlies the disqualification motion."  *Id.* at 1145.  "Ultimately, however, a court must maintain ethical standards of professional responsibility."  *Hitachi*, 419 F. Supp. 2d at 1161 (citing *Speedee Oil*, 20 Cal. 4th at 1145).

At issue in this case is California Rule of Professional Conduct 3-310, which precludes an attorney from, without the informed written consent of each client, accepting employment adverse to a former client, where by reason of the representation of the former client, the lawyer has obtained confidential information material to the employment.  When, as here, the alleged conflict of interest arises from successive representation of clients with potentially adverse interests, the principal question is whether there is a "substantial relationship" between the

4

1  subjects of the former and current relationships. *Flatt v. Superior Court*, 9 Cal. 4th 275, 283
2  (1994).

3    The determination whether a "substantial relationship" exists requires an inquiry into the
4  similarities between the two factual situations, the legal questions posed, and the nature and
5  extent of the attorney's involvement. *Morrison Knudsen Corp. v. Hancock, Rothert &*
6  *Bunshoft*, 69 Cal. App. 4th 223, 234 (1999) (citing *H.F. Ahmanson & Co. v. Salomon Brothers,*
7  *Inc.*, 229 Cal. App. 3d 1445, 1455 (1991)). In addition, it must be shown that the information
8  from the prior representation is material to the current employment. *Morrison*, 69 Cal. App. 4th
9  at 234 (citing Rule 3-310(E)). As part of its review, the court should examine the time spent by
10 the attorney on the earlier case, the type of work performed, and the attorney's possible
11 exposure to formulation of policy or strategy. *Morrison*, 69 Cal. App. 4th at 234 (citing *H.F.*
12 *Ahmanson*, 229 Cal. App. 3d at 1455).

13   Successive representations are substantially related where the facts support a "rational
14 conclusion that information material to the evaluation, prosecution, settlement or
15 accomplishment of the former representation given its factual and legal issues is also material to
16 the evaluation, prosecution, settlement or accomplishment of the current representation given its
17 factual and legal issues." *Jessen v. Hartford Casualty Ins. Co.*, 111 Cal. App. 4th 698, 713
18 (2003) (citations omitted); *see also Trone*, 621 F.2d at 998 ("Substantiality is present if the
19 factual contexts of the two representations are similar or related.")

20   Where the requisite substantial relationship exists, "access to confidential information
21 by the attorney in the course of the first representation (relevant, by definition, to the second
22 representation) is *presumed* and disqualification of the attorney's representation of the second
23 client is mandatory; indeed, the disqualification extends vicariously to the entire firm." *Flatt*, 9
24 Cal. 4th at 283; *see also Hitachi*, 419 F. Supp. 2d at 1161.

25 **B.    There is a Substantial Relationship Between Ms. Basile's Prior Representation of
        LS&CO and the Instant Litigation.**
26

27   There is no dispute that Ms. Basile had an attorney-client relationship with LS&CO and
28 that the relationship extended to infringement actions, such as this case, pertaining to the

5

Arcuate Trademark. Given the factual and legal issues involved in this case, and LS&CO's assertion that its trademark enforcement policies and strategies have remained largely unchanged since Ms. Basile's tenure and, the Court finds that LS&CO has met its burden to show that Ms. Basile possesses information that is material to the "evaluation, prosecution, settlement or accomplishment of the current representation."[3]

A&F also argues that because the RUEHL mark was not in existence at the time, LS&CO cannot demonstrate that a substantial relationship exists between this litigation and Ms. Basile's prior representation of LS&CO. Although that may be the case, it is undisputed that the advice Ms. Basile provided to LS&CO related to similar factual situations, namely whether another stitching design mark infringed upon the Arcuate Trademark. Further, the legal questions posed in this are similar to the advice she undisputedly provided LS&CO during her tenure as in-house counsel. Finally, as set forth above, the record discloses that during that time, she had extensive involvement with the prosecution and enforcement process.

Therefore, the Court concludes that LS&CO has met its burden to show that there is a substantial relationship between Ms. Basile's prior representation of LS&CO and the current litigation and, therefore, that a conflict exists. In light of the Court's finding on this point, the Court also concludes that the conflict must be imputed to the entire Howrey firm. *See Flatt*, 9 Cal. 4th at 283; *see also Hitachi*, 419 F. Supp. 2d at 1161*; compare Friskitt, Inc. v. RealNetworks, Inc.*, 2007 U.S. Dist. LEXIS 51770 at * 5 (N.D. Cal. July 5, 2007) ("Where, as here, the issue arises because of the attorney's receipt of confidential information, *and not a prior representation*, State and Federal Courts in California have held that disqualification of a firm is required only where it is the only way to insure that lawyers will honor their duty of confidentiality. ... Ethical screens have repeatedly been held to provide sufficient protection in cases involving the duty of confidentiality, rather than the duty of loyalty.") (citations omitted, emphasis added).

//

---

[3] The only evidence that A&F has submitted in response to this assertion is a *New York Times* article that states LS&CO has become more litigious with respect to the Arcuate Trademark in recent years. (Basile Decl., ¶ 17, Ex. A.)

6

**C.     A&F Has Not Established that Equitable Considerations Should Preclude Disqualification.**

Even if a court concludes that a conflict of interest exists, a former client may expressly or impliedly consent to the representation and thereby waive the conflict of interest. *See Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983) (finding waiver when former client was advised of potential conflict over two years before motion to disqualify was filed and where motion filed on eve of trial); *River West, Inc. v. Nickel*, 188 Cal. App. 3d 1297 (1987) (finding waiver where motion to disqualify was not filed until 47 months after answer filed). A&F argues that LS&CO, through its inaction, impliedly waived the conflict.

In *River West*, the court determined that in "past representation" cases, "a narrow exception should apply if the present client, by way of opposition [to a motion to disqualify], offers prima facie evidence of an unreasonable delay by the former client in making the motion *and* resulting prejudice to the current client." *River West*, 188 Cal. App. 3d at 1309. "'[M]ere delay' in making a disqualification motion is not dispositive. The delay must be *extreme* in terms of time *and* consequence." *Id.* at 1311 (emphasis added). If the present client presents such evidence, "the burden shifts back to the moving party to justify the delay," and at that point the party should address: "(1) how long the moving party has known of the potential conflict; (2) whether it has been represented by counsel since it has known of the potential conflict; (3) whether anyone prevented the moving party from making the motion earlier; and (4) whether an earlier motion to disqualify would have been inappropriate or futile and why." *Id.* at 1309.

To make a prima facie case supporting waiver, A&F must establish that any delay in filing the instant motion also caused it prejudice. The only evidence before the Court on this point is Mr. Wilson's declaration, in which he attests that "[s]hould the Court grant [the] motion to disqualify Howrey LLP, A&F would be required to hire a new law firm essentially to redo everything Howrey has already done. It would take considerable time, effort, and expense to get the new law firm up to speed on the pocket design matters at issue in this case." (Wilson Decl., ¶ 7.) There is no evidence in the record as to the number of hours expended by Howrey

7

on this matter. Nor is there any evidence of the expenses incurred. *See, e.g., River West*, 188 Cal. App. 3d at 1313 (plaintiffs counsel engaged in over 3000 hours of litigation, incurred $387,000 in costs, and fruits of discovery shared by plaintiffs' counsel). Moreover, *this* case is in its early stages and proceedings in the USPTO have been stayed pending the outcome of this matter. Thus, this is not a situation where LS&CO raised the conflict on the eve of trial or several years after an answer was filed. *Id.*, 188 Cal. App. 3d at 1312 (motion filed 47 months after answer filed).[4]

Thus, even if the Court assumes that the clock should have started in January 2006, it concludes that A&F has not established the type of extreme prejudice that would warrant denying LS&CO's motion. *See, e.g., In re Complex Asbestos Litigation*, 232 Cal. App. 3d 572, 599-600 (1991) (denying motion to disqualify filed on eve of a trial where "the only prejudice cited by the Harrison firm is that their clients lost the services of knowledgeable counsel of their choice, and were forced to retain new counsel" and noting that "this is not the type of prejudice contemplated by" our prior decisions.)

**CONCLUSION**

For the reasons set forth herein, LS&CO's motion is GRANTED and Howrey, LLP is disqualified from representing A&F on this matter. Howrey also is prohibited from communicating or forwarding to successor counsel any work product created in the course of this action or in matters related to this action that is based upon or derived from LS&CO confidential information possessed by Ms. Basile. The Court shall set this matter down for a further case management conference on November 30, 2007 at 1:30 p.m. If A&F requires additional time to obtain new counsel, it may seek a continuation of this case management

//
//
//
//

---

[4] The Court also notes that although neither party appeared to handle this issue in the most ideal fashion, Howrey could have attempted to mitigate any prejudice by seeking a waiver from LS&CO at the time Mr. Onda raised the issue with Ms. Basile.

conference. All further proceedings in this Court are STAYED until new counsel has filed an appearance.

**IT IS SO ORDERED.**

Dated: October 29, 2007

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE