Michael J. Bettinger, (State Bar No. 122196)
Rachel R. Davidson, (State Bar No. 215517)
K&L GATES
55 Second Street, Suite 1700
San Francisco, California 94105-3493
Telephone: (415) 882-8200
Facsimile: (415) 882-8220

J. MICHAEL KEYES (*Pro Hac Vice*)
K&L GATES
601 West Riverside Avenue, Suite 1400
Spokane, WA 99201
Telephone: (509) 624-2100
Facsimile: (509) 456-0146
mike.keyes@klgates.com

Attorneys for Defendants
ABERCROMBIE & FITCH TRADING CO.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LEVI STRAUSS & CO., | Case No. C 07-03752 JSW |
| Plaintiff, | **ABERCROMBIE & FITCH TRADING CO.'S AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** |
| v. | |
| ABERCROMBIE & FITCH TRADING CO., | |
| Defendant. | **JURY TRIAL DEMANDED** |

Defendant Abercrombie & Fitch Trading Co. ("A&F") answers the Complaint of Plaintiff

Levi Strauss & Co. ("LS&Co. ") and asserts Affirmative Defenses and Counterclaims as follows:

**JURISDICTION, VENUE AND INTRA-DISTRICT ASSIGNMENT**

1.    The allegations contained in Paragraph 1 are conclusions of law requiring no response

from A&F, and therefore none is made.

2.    A&F admits that it transacts business in the district, but is without sufficient

information to admit or deny the remaining allegations in Paragraph 2, and therefore denies the

same.

3.    The allegations contained in Paragraph 3 relate to the Court's procedures regarding assignment of cases requiring no response from A&F, and therefore none is made.

## PARTIES

4.    A&F is without sufficient information to admit or deny the allegations contained in Paragraph 4, and therefore denies the same.

5.    A&F admits the allegations contained in sentences one and two of Paragraph 5. A&F denies the allegations contained in the third sentence of Paragraph 5.

## FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS

6.    A&F is without sufficient information to admit or deny the allegations contained in Paragraph 6, and therefore denies the same.

7.    A&F is without sufficient information to admit or deny the allegations contained in Paragraph 7, and therefore denies the same.

8.    A&F is without sufficient information to admit or deny the allegations contained in Paragraph 8, and therefore denies the same.

9.    A&F admits only that the exhibits attached to the complaint as Exhibit B purport to be copies of the specified registrations; A&F is without sufficient information to admit or deny all other allegations in Paragraph 9, and therefore denies the same.

10.    A&F is without sufficient information to admit or deny the allegations contained in Paragraph 10, and therefore denies the same.

11.    Denied.

12.    Admit.

13.    A&F admits only that through related companies, it has manufactured, marketed and sold products bearing the A&F stitching design.  All other allegations in Paragraph 13 are denied.

14.    Denied.

15.    Denied.

1

2

## FIRST CLAIM
## FEDERAL TRADEMARK INFRINGEMENT
### (15 U.S.C. §§ 1114-1117; Lanham Act § 32)

3

4

5

      16.     The allegations in Paragraph 16 require no separate answer from A&F, however, A&F incorporates herein by reference its responses to each of the allegations contained in Paragraphs 1 through 15 of this Complaint.

6

      17.     Denied.

7

      18.     Denied.

8

      19.     Denied.

9

      20.     Denied.

10

11

## SECOND CLAIM
## FEDERAL UNFAIR COMPETITION
### (False Designation of Origin and False Description)

12

13

14

      21.     The allegations in Paragraph 21 require no separate answer from A&F, however, A&F incorporates herein by reference its responses to each of the allegations contained in Paragraphs 1 through 20 of this Complaint.

15

16

      22.     Denied.

      23.     Denied.

17

18

## THIRD CLAIM
## FEDERAL DILUTION OF FAMOUS MARK
### (Federal Trademark Dilution Act of 1995)

19

20

21

22

      24.     The allegations in Paragraph 24 require no separate answer from A&F, however, A&F incorporates herein by reference its responses to each of the allegations contained in Paragraphs 1 through 23 of this Complaint.

23

      25.     Denied.

24

      26.     Denied.

25

      27.     Denied.

26

      28.     Denied.

27

28

1
2

**FOURTH CLAIM**
**CALIFORNIA DILUTION AND TRADEMARK INFRINGEMENT**

3    29.    The allegations in Paragraph 29 require no separate answer from A&F, however,

4    A&F incorporates herein by reference its responses to each of the allegations contained in

5    Paragraphs 1 through 28 of this Complaint.

6    30.    Denied.

7    31.    Denied.

8    32.    Denied.

9    33.    Denied.

10
11

**FIFTH CLAIM**
**CALIFORNIA UNFAIR COMPETITION**

12    34.    The allegations in Paragraph 34 require no separate answer from A&F, however,

13    A&F incorporates herein by reference its responses to each of the allegations contained in

14    Paragraphs 1 through 33 of this Complaint.

15    35.    Denied.

16    36.    Denied.

17    **PRAYER FOR JUDGMENT**

18    37. – 49.    The balance of LS&Co.'s Complaint consists of prayers for relief to which no

19    specific answer is required, and A&F denies that LS&Co. is entitled to any of the relief requested in

20    Paragraphs 37 - 49.

21    **AFFIRMATIVE DEFENSES**

22

23    50.    LS&Co.'s Complaint fails to state a claim upon which relief may be granted.

24    51.    LS&Co.'s claims for relief are barred by the doctrine of waiver.

25    52.    LS&Co.'s claims for relief are barred by the doctrine of estoppel.

26    53.    LS&Co.'s claims for relief are barred by the doctrines of laches and acquiescence.

27

28

ABERCROMBIE & FITCH TRADING CO.'S
AMENDED ANSWER, AFFIRMATIVE DEFENSES,
AND COUNTERCLAIMS                    4                    Printed on Recycled Paper
Case No. C 07-03752 JSW

54.     LS&Co.'s claims for relief are barred on the ground that LS&Co. has consented to the acts alleged to have been performed by A&F.

55.     There is no likelihood of confusion between LS&Co.'s mark and A&F's mark as a matter of law.

56.     Pocket stitching designs similar to LS&Co.'s marks are in common use by third parties unrelated to A&F.

57.     LS&Co. has unclean hands as more specifically set forth in Defendant's factual averments in support of its Counterclaims for cancellation.

58.     LS&Co., as shown by its judicial admissions, statements, and other conduct has abandoned its arcuate trademark

59.     LS&Co. has engaged in trademark misuse as more fully described and set forth herein.

## A&F'S COUNTERCLAIM

1.     Although a recent high-profile news article characterizes LS&Co.'s 21st Century trademark litigiousness as a "case study in missed opportunities" and the "last resort of a poor loser", *see* "Levi's Turns to Suing Its Rivals", New York Times, January 27, 2007, attached as Exhibit A, the reality of LS&Co.'s trademark enforcement assault is far more complex.

2.     For more than two decades, LS&Co. has embarked on a campaign of trademark enforcement that is grounded in a strategy of: (i) making fraudulent misrepresentations to the Trademark Office, and perpetuating that fraud in the courts, on A&F and other adverse parties; (ii) using its federally-registered and state-registered trademarks to allege outrageous claims of supposed trademark infringement (typically against much smaller companies) for no apparent purpose other than to stifle and snuff out otherwise legitimate competition in the marketplace for denim products; and (iii) taking wholly inconsistent and contradictory positions regarding the scope of LS&Co.'s so-called "arcuate trademark" thereby letting some "infringers" continue to  "infringe" while forcing

1    others (who have engaged in virtually identical conduct) to stop their supposedly "infringing" ways.

2    As a result of this conduct, and as more specifically set forth below, all of LS&Co.'s arcuate

3    trademark registrations should be cancelled.

4         **A.    LS&Co.'s Fraudulent  Misrepresentations.**

5         3.    A&F hereby incorporates by reference the above paragraphs as though they were

6    fully set forth herein.

7         4.    In 1985, LS&Co. was engaged in two related and hotly-contested federal lawsuits

8    over the validity and enforceability of the LS&Co. Trademark Registrations Nos.  404,248  (the

9    "'248 Registration") and 1,139,254 (the "'254 Registration") that covered the "arcuate trademark."

10   The names of those federal actions were *Lois Sportswear v. Levi Strauss Company,* 82 Civ. 8326

11   (S.D.N.Y.) and *Levi Strauss & Company v. Textiles Confecciones Europeas*, 83 Civ. 4338

12   (S.D.N.Y.).  The Complaint, Answer and Counterclaims, and Plaintiff's Answer to Counterclaims

13   are attached hereto as Exhibit B.  These cases were ultimately consolidated.

14        5.    As clearly and unambiguously set forth in Lois Sportswear's Answer to

15   Counterclaims, Lois challenged LS&Co.'s claim of ownership to the arcuate trademark, LS&Co.'s

16   right to register this mark, and LS&Co.'s  right to keep the mark on the Trademark Register

17   maintained by the U.S. Trademark Office.  For example, Lois Sportswear asserted in that action that

18   LS&Co.'s "'double arcuate mark' never functioned as a designation of source or origin and was and

19   is, therefore, not susceptible of appropriation or protection as a trademark."  *See* Answer to

20   Plaintiff's Counterclaims, ¶ 15.  Lois Sportswear also alleged that even if LS&Co.'s "'double

21   arcuate mark' performed a trademark function at some time, it has become so diluted by reason of

22   the widespread use by others, on jeans and similar garments, of the same or a similar design that it

23   has lost whatever distinctiveness it otherwise possessed and no longer functions as a designation of

24   source or origin."  *Id*. at ¶ 16.  Lois Sportswear further claimed that LS&Co.'s "arcuate trademark"

25   had been abandoned and was unenforceable due to LS&Co.'s "failure to police adequately use by

26   others, on jeans and similar garments, of the 'double arcuate mark."  *Id.* at ¶ 17.

27

28

6.      Pursuant to 15 U.S.C. § 1065 a trademark registration issued by the U.S. Trademark Office can become "incontestable" (and thereby subject to narrower grounds for attacking its validity) only if the owner of the trademark files with the U.S. Trademark Office what is referred to as a "Section 8 and 15" affidavit.[1]  This affidavit can only be filed at the end of the fifth year after registration of the trademark was obtained and must contain the following statements: (1) that there has been no final decision adverse to the registrant's claim of ownership of such mark for such goods and services, or to the registrant's right to register the same or to keep the same on the register; and (2) there is no proceeding involving said rights pending in the Patent and Trademark Office or in a court and not finally disposed of; and (3) that the mark in question has been in continuous use over the last five years.  *See* 15 U.S.C. § 1065.  In this Circuit, a false Section 8 and 15 affidavit not only effects the trademark registration's "incontestability" status, but it also effects the validity of the underlying registration itself.

7.      LS&Co. knowingly filed two materially false affidavits with the U.S. Trademark Office.  This was done by LS&Co. during the pendency of the Lois Sportswear case.  On May 14, 1985, LS&Co.'s Vice President and Corporate Secretary, Ms. Katherine B. Durgin, executed a Section 8 and 15 affidavit regarding the '254 Registration.  A true and correct copy of this affidavit is set forth in Exhibit C.  Ms. Durgin's affidavit acknowledged that "willful false statements may jeopardize the validity of this document."  Pursuant to 15 U.S.C. § 1065(2), Ms. Durgin testified that, "there is no proceeding involving said rights pending and not disposed of either in the Patent and Trademark Office or in the courts."  *Id.* (emphasis supplied).  The "said rights" referred to by Ms. Durgin were LS&Co.'s claim of ownership, LS&Co.'s right to register the mark, and LS&Co.'s right to keep the registrations on the record at the U.S. Trademark Office—all of which were being challenged by the parties in the *Lois Sportswear* matter that was pending when Ms. Durgin filed her affidavit.

---

[1] Section 8 and 15 refers to the two pertinent sections in the Lanham Act that set forth the contents of the affidavit. *See* 15 U.S.C. § 1058 (Section 8) and 15 U.S.C. § 1065 (Section 15).

8.     Consequently, Ms. Durgin's sworn statement constituted a knowingly false statement as the *Lois Sportswear* and *Textiles Confecciones Europeas* claims were pending at the time this affidavit was submitted to the Trademark Office.   Ms. Durgin knew or—by virtue of her position within LS&Co. and her voluntary execution of a sworn statement—should have known that her statement was false.

9.     Ms. Durgin's affidavit was rejected by the Trademark Office because "it was executed before the beginning of the fifth year following the date of registration."  A true and correct copy of the Trademark Office's rejection of this purported Section 8 & 15 affidavit is attached hereto as Exhibit D.

10.     The timing of the filing of this first fraudulent affidavit suggests that LS&Co. was attempting to gain an unfair advantage over Lois Sportswear and  Textiles Confecciones Europeas. As noted above, Durgin's affidavit was filed on May 15, 1985.  This was merely two weeks before LS&Co. filed its motion for summary judgment in the case involving  Lois Sportswear and  Textiles Confecciones Europeas.  Attached hereto as Exhibit E is a true and correct copy of the cover page to LS&Co.'s motion for summary judgment filed with the Southern District of New York on May 28, 1985.

11.     The Southern District of New York granted LS&Co.'s motion for summary judgment and Lois Sportswear and Textiles Confecciones Europeas both appealed the decision in that consolidated action.  Attached hereto as Exhibit F is a true and correct copy of the notice of appeal filed with the Southern District of New York.  Specifically, Lois Sportswear and Textiles Confecciones Europeas both appealed the dismissal of their claims.  As noted above, their claims included allegations that LS&Co. lost its trademark rights to the trademark registrations at issue in that case, i.e., two of the same trademark registrations that form the basis of LS&Co.'s claims here.

12.     While that appeal was pending, but before the Second Circuit issued its opinion, LS&Co., through its Assistant Corporate Secretary, Ms. Jean Fowler, filed a second materially false 8 and 15 affidavit with the U.S. Trademark Office regarding the '254 Registration.  On January 2,

1986, Ms. Fowler executed an affidavit that stated, "there is no proceeding involving said rights

pending and not disposed of either in the Patent and Trademark Office or in the courts."  A true and

correct copy of this affidavit is attached hereto as Exhibit G.  This affidavit was received and filed

by the U.S. Trademark Office on January 16, 1986.  Just like Ms. Durgin's statement in her affidavit,

Ms. Fowler's statement was also false because Lois Sportswear's and Textiles Confecciones

Europeas's appeal to the Second Circuit Court of Appeals was still pending.  In fact, the Second

Circuit did not issue its decision until nearly eight months *after* Ms. Fowler filed the second false

affidavit.  Ms. Fowler knew or—by virtue of her position within LS&Co. and her voluntary

execution of a sworn statement—should have known that her statement was false.

13.    For many years after filing these false affidavits, LS&Co. has filed scores of lawsuits

over its alleged "arcuate trademark" alleging in each of those actions that the '254 Registration was

"incontestable."  In so doing, LS&Co. continues to this day to perpetuate the original fraud

committed on the U.S. Trademark Office.

**B.    LS&Co.'s Consistent Use of Its Trademark Registrations to Stifle and Snuff Out Legitimate Competition.**

14.    A&F hereby incorporates by reference the above paragraphs as though fully set forth

herein.

15.    For many years, LS&Co. has used its trademark registrations to force companies into

not using a variety of different back pocket stitching designs on their denim products supposedly

because these back pocket designs were somehow "infringing" on LS&Co.'s arcuate trademark.

Many of these so-called "infringing" designs could not have possibly been said to cause a

"likelihood of confusion" in the marketplace.  Nonetheless, because of LS&CO.'s financial prowess,

coupled with its overly-aggressive enforcement tactics, the companies that manufactured and

distributed these purportedly "infringing" designs could not afford to challenge LS&Co.'s

outrageous allegations.  Being left with no choice, these companies invariably agreed to refrain from

the continued manufacture and distribution of these designs.  A true and correct copy of just some of

these "allegedly-infringing" designs are set forth in Exhibit H. LS&Co.'s conduct in this and other ways as detailed in this Answer constitutes trademark misuse.

### C.    LS&Co.'s Wholly Inconsistent And Contradictory Allegations Regarding Its So-Called Arcuate Trademark.

16.    A&F hereby incorporates by reference the above paragraphs as though fully set forth herein.

17.    LS&Co.'s trademark enforcement regime does not simply represent the conduct of a company actively policing its trademark against suspected infringers. Quite the contrary, LS&Co.'s trademark enforcement strategy represents overreaching, haphazard, and inconsistent approaches to trademark enforcement, which is designed in large measure to stifle legitimate competition in the marketplace for denim products.

18.    For example, in the 1970s and early 1980s, LS&Co. developed various lines of casual slacks and denim pants that were marketed and sold under different names including Levi's® "Action Slacks" and Levi's® "Fashion Jeans." Some of these pants had back pocket stitching designs that appeared as follows:

   

(Abandoned Design No. 1)    (Abandoned Design No. 2)

19.    On information and belief, none of these back pocket stitching designs are being used by LS&Co. These designs are referred to as the "Abandoned Designs."

20.    Selected advertisements showing these "Action Slacks, "Fashion Jeans", and related items with the Abandoned Designs sold by LS&Co. are set forth in Exhibit I.

/ / /

1    21.    Notwithstanding LS&Co.'s abandonment of these back pocket stitching designs used

2    back in the 1970s and 1980s, LS&Co. has used its "arcuate trademark" registrations to effectively

3    prohibit the use of these same designs that LS&Co. abandoned long ago.

4    22.    For example, the LS&Co. Abandoned Design No. 1 has not been used by LS&Co

5    since the 1980s.  Nevertheless, LC&Co. sued a company in 2003 alleging that the defendant's use of

6    a virtually identical design as the Abandoned Design No. 1 constituted an infringement of LS&CO.'s

7    arcuate trademark.

8    23.    In another case that was filed that same year by LS&Co. against Federal Jeans, Inc.,

9    CV-03-4606, Federal Jeans, Inc. was using a design that was indistinguishable from the Abandoned

10   Design No. 1.  Attached hereto as Exhibit J is a true and correct copy of the Complaint in that matter

11   with Exhibit M thereto displaying the Federal Jeans' design that was indistinguishable from the

12   Abandoned Design No. 1.  Yet, in that case LS&Co. did not allege that the Federal Jeans design was

13   infringing on the LS&Co. arcuate trademark.  Thus, either LS&Co. was overreaching and engaging

14   in trademark misuse with the first company by attempting to enforce its right in a trademark that

15   LS&Co. had abandoned long ago, or LS&Co. knowingly allowed Federal Jeans, Inc. to use a design

16   that LS&Co. knew was infringing on LS&Co.'s arcuate trademark, or both.

17   24.    LS&Co. has not used the Abandoned Stitching Design No. 2 for many years.

18   Notwithstanding this long period of non-use, LS&Co. has used its "arcuate trademark" registrations

19   to effectively prohibit the use of  designs that are highly similar to Abandoned Design No. 2.  For

20   example, LS&Co. sued For What Its Worth, Inc. and Moonshadow S.P.A. over designs that are very

21   similar to Abandoned Design No. 2.   Attached hereto as Exhibit K is a true and correct copy of the

22   For What Its Worth, Inc., Complaint.  Attached hereto as Exhibit L is a true and correct copy of the

23   Moonshadow S.P.A. Complaint.  Yet, for a very significant amount of time, at least one other

24   company has been using a stitching design that is virtually indistinguishable from the Abandoned

25   Design No. 2.  On information and belief, LS&CO. has not undertaken any action against this

26   company.  Thus, LS&Co has either been overreaching and engaging in trademark misuse by

27

28

---

1  attempting to enforce trademark rights against For What It's Worth and Moonshadow S.P.A., or

2  LS&Co. has knowingly allowed this other party to use a design that LS&Co. knows is infringing on

3  LS&Co.'s arcuate trademark, or both.

4      25.    In 2004, LS&Co. sued RP55, Inc. for its manufacturing and selling of various denim

5  jeans with back pocket stitching designs that supposedly infringed the arcuate trademark.  A true and

6  correct copy of the Complaint in that matter is attached hereto as Exhibit M.   A true and correct

7  copy of the RP55 designs is attached hereto as Exhibit N.   According to the allegations in the

8  Complaint, RP55's back pocket stitching design was a "willful" and "intentional" act of

9  infringement. RP55 Complaint, ¶¶ 33, 40.  RP55's conduct was also alleged to be "wanton" and

10  "fraudulent."  *Id.*  at ¶ 44.  LS&Co. produced an expert report in that case claming that RP55's back

11  pocket stitching design was likely to cause confusion in the marketplace.  Attached hereto as Exhibit

12  O is a true and correct copy of that expert report.  Notwithstanding these allegations of "intentional"

13  and "willful" infringement, and LS&Co.'s expert opinion that PR55's stitching designs caused

14  confusion, LS&Co. dismissed its case "with prejudice."  Attached hereto as Exhibit P is a true and

15  correct copy of the Court's order dismissing that case.  LS&Co.'s dismissal of the claims against

16  RP55 is either: (i) an admission by LS&CO. that RP55's design is not infringing the arcuate

17  trademark; or (ii) another example of how LS&Co. is allowing other supposedly infringing designs

18  to be used with LS&Co.'s express permission.

19      26.    In light of the fact that LS&Co. dismissed its claims against RP55 "with prejudice",

20  LS&Co. is precluded from enforcing its supposed arcuate trademark against third parties, including

21  A&F.

22  ### COUNTERCLAIMS FOR CANCELLATION OF LS&CO.'S REGISTERED
23  ### TRADEMARKS

24      27.    A&F hereby incorporates by reference the above paragraphs as though fully set forth

25  herein.

26  / / /

27

28

1        28.    The aforementioned conduct alleged with particularity above constitutes fraud on the

2   U.S. Trademark Office with respect to the '254 Registration.  As a result of LS&Co. perpetrating

3   this fraud on the U.S. Trademark Office, the '254 Registration should be canceled under 15 U.S.C. §

4   1064(3).  Pursuant to 15 U.S.C. § 1119, this Court should certify to the Director of the U.S.

5   Trademark Office that the '254 Registration be permanently removed from the records of the U.S.

6   Trademark Office.

7        29.    The aforementioned conduct alleged with specificity above constitutes a sufficient

8   basis for the Court to cancel the '248 Registration, '254 Registration, and Trademark Registrations

9   Nos. 2,791,156 (the "'156 Registration") and 2,794,649 (the "'649 Registration") under 15 U.S.C. §

10  1064(3).  Specifically, LS&Co.'s (i) inconsistent and contradictory enforcement of its arcuate

11  trademark; (ii) its failure to adequately police and/or control  uses of same; and (iii) its own

12  inconsistent use of its own trademark, constitute "abandonment" as that term has been defined in this

13  Circuit.  Pursuant to 15 U.S.C. § 1119, this Court should certify to the Director of the U.S.

14  Trademark Office that the '254 Registration, the '248 Registration, the '156 Registration, and the

15  '649 Registration be permanently removed from the records of the U.S. Trademark Office.

16       30.    The aforementioned conduct alleged with specificity above constitutes a sufficient

17  basis for the Court to cancel the California Trademark Registration No. 088399 under Ca. Bus. &

18  Prof. Code § 14230 and A&F hereby seeks an order from this Court ordering cancellation of same.

19  <u>**PRAYER FOR RELIEF**</u>

20

21      WHEREFORE, Abercrombie & Fitch Trading Co. prays for the following relief:

22       1.    That LS&Co.'s Complaint be dismissed with prejudice and that LS&Co. take

23  nothing;

24       2.    That each of the above-mentioned trademark registrations be cancelled;

25       3.    That A&F be awarded its attorneys' fees and costs for having to defend this

26  oppressive and burdensome lawsuit;

27

28

1       4.     For any further relief that this Court deems equitable and just.

2      Abercrombie & Fitch Trading Co. hereby demands a trial by jury on all issues so triable.

3

4 DATED:  February 6, 2008              KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP

5

6                       By_____/s/_____

7                          Michael J. Bettinger
                          J. Michael Keyes

8                          Rachel R. Davidson
                          Attorneys for Defendants
                          ABERCROMBIE & FITCH TRADING CO.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28