# Exhibit  O

1    TOWNSEND AND TOWNSEND AND CREW LLP
     GREGORY S. GILCHRIST (Bar No. 111536)
2    GIA L. CINCONE (Bar No. 141668)
     Two Embarcadero Center, 8th Floor
3    San Francisco, California 94111
     Telephone: 415-576-0200
4    Facsimile: 415-576-0200

5    Attorneys for Plaintiff
     LEVI STRAUSS & CO.

6

7

8                        UNITED STATES DISTRICT COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10                          SAN FRANCISCO DIVISION

11   LEVI STRAUSS & CO.,                    Case No.  C 04 0468 SI

12                   Plaintiff,             DECLARATION OF CAROL SCOTT IN
                                            SUPPORT OF PLAINTIFF LEVI
13           v.                             STRAUSS & CO.'S MOTION FOR
                                            SUMMARY JUDGMENT
14   RP55, INC., et al.,
                                            Date:       May 6, 2005
15                   Defendants.            Time:       9:00 a.m.
                                            Courtroom:  10
16

17

18

19           I, CAROL SCOTT, hereby declare:

20           1.      I am a Professor of Marketing at the Anderson Graduate School of Management of the

21   University of California, Los Angeles.  I was retained by Levi Strauss & Co. ("LS&CO."), the

22   plaintiff in this action, to provide various opinions regarding LS&CO.'s Arcuate Trademark and the

23   stitching that appears on Indigo Red jeans.  In connection with that engagement, I conducted a survey

24   and submitted an Expert Report on December 17, 2004, which was amended on February 11, 2005; a

25   copy of that amended report is attached as Exhibit A.  I also submitted a Rebuttal Report on February

26   25, 2005, a copy of which is attached as Exhibit B.  I am submitting this declaration in support of

27   LS&CO.'s motion for summary judgment.

28           2.      I believe my survey results may reflect some level of "noise."  That is, some number of

1   the respondents who saw and correctly identified LEVIS® jeans may have done so because they were

2   guessing, or describe all jeans with a top-of-mind brand name. However, those respondents who

3   correctly identified the LEVIS® jeans and called out some specific identifying factor -- whether

4   pocket design, stitching, or some other specific element that allowed them correctly to identify the

5   brand -- cannot be attributed to "noise."

6       3.     At the same time, consumers who do not recognize the Arcuate Trademark and

7   associate the mark with LS&CO. and the LEVIS® brand, will not be confused by another stitching

8   design -- even if the second design is highly similar to or even a counterfeit of LS&CO.'s design. The

9   only consumers capable of being confused by the Indigo Red stitching design are those who know

10   LS&CO.'s mark.

11       4.     In order to eliminate any survey "noise," while taking a conservative approach to the

12   question of likelihood of confusion, one may use the "baseline" population of 58% of consumers who

13   were able correctly to identify the LEVIS® brand. This proportion of consumers may include any

14   number who correctly identified the jeans but were guessing, or correctly identified the jeans but did

15   so for reasons other than the trademark at issue. Given the sample size, it is reasonable to assume that

16   this baseline population also existed within the group that saw Indigo Red jeans.

17       5.     Taking 58% of the 242 respondents who were shown Indigo Red jeans -- that is, the

18   subset that may have correctly identified LEVIS® jeans by reference to the pocket stitching -- the

19   baseline population is 140 respondents. As I indicated, this is a conservative approach because it

20   includes any "noise" from respondents who were guessing or otherwise not relying on the trademark.

21       6.     Of this baseline population of 140 respondents, 54 identified the Indigo Red jeans as

22   LEVIS® jeans. Of those 54, 34 cited pocket stitching, pocket design, or stitching as the source of

23   their brand identification. If this group of 34 (the conservative number that has been stripped of noise)

24   is compared to the 140 respondents who might correctly have identified the LEVIS® jeans from the

25   stitching design, the relevant confusion rate is 24%.

26       7.     Even without accounting for the fact that the entire population could not be expected to

27   be familiar with the pocket stitching on LEVIS® jeans, 14% of the total survey population identified

28   Indigo Red jeans as LEVIS® jeans *and* attributed their confusion to stitching.

1    I declare under the penalty of perjury under the laws of the United States that the foregoing

2   statements are true and correct.

3        Executed at Palo Alto, California, this 1st day of April, 2005.

4

5

6                                    _Carol A. Scott_
                          _____
7                                    Carol A. Scott

8   60456509 v1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 3:04-cv-00468-SI     Document 67     Filed 04/02/2005     Page 4 of 56

**Exhibit A**

# AMENDED EXPERT REPORT OF

# PROFESSOR CAROL A. SCOTT

## February 11, 2005

Exhibit O
Page 5

I am submitting this Amended Report to update my first Expert Report, dated December 17, 2004 ("First Scott Report"). This Amended Report updates and corrects certain figures and results of a consumer survey I have conducted for this matter. As a result of this update, I have not altered the conclusions or my opinions contained in the First Scott Report. I have included in this report updated Summary of Opinions, Basis of Opinions, and Conclusion sections in their entirety.

I am continuing my review and analysis. I may refine or expand my opinions as further information and materials come to my attention, and I reserve the right to supplement this report to the extent that additional information becomes available which may affect my opinions.

I. Summary of Opinions

Having reviewed and analyzed the evidence available to me at this time, I have determined the following:

1. LS&CO.'s jeans products historically have been and are today highly recognized. In a survey of 478 consumers that I conducted in December, 2004, 58% correctly identified LS&CO.'s jeans based upon seeing a photograph of the back of the jean including LS&CO.'s trademark back pocket stitching.

2. LS&CO.'s pocket stitching is a source identifier for LS&CO.'s jeans products. Consumers recognize the back pocket stitching as a trademark on LS&CO.'s products and associated it exclusively with LS&CO.'s products.

3. Based on the results of the study I conducted, it is likely that consumers will confuse the Indigo Red jeans with LS&Co.'s "LEVI's®" jeans. My analysis

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                                    2

indicates that 22% of consumers incorrectly identified the Indigo Red jeans as "LEVI's®" jeans. Approximately 26% of consumers in the primary market targeted by Indigo Red, i.e., males 15 to 34 years of age, incorrectly identified the Indigo Red jeans as "LEVI's®".

4. A competitor's use of similar back pocket stitching, such as that used by Indigo Red, will erode the significance and value of LS&CO.'s trademark pocket stitching and the "LEVI's®" brand in the marketplace.

I am continuing my review and analysis. I may refine or expand my opinions as further information and materials come to my attention, and I reserve the right to supplement this report to the extent that additional information becomes available which may affect my opinions.

## II. Basis of Opinions

My opinions are based on a jeans recognition and jean confusion survey conducted under my supervision in December, 2004, as well as other surveys I have conducted regarding brand recognition, confusion and brand dilution and my professional expertise in this area. In addition, I have reviewed articles on brand awareness and brand equity.

### A. Background

Levi Strauss & Co. is the world's largest brand-name apparel manufacturer. The company designs, manufactures and markets branded jeans and casual sportswear for men, women and children. Products include jeans, shirts, jackets and skirts, primarily

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                                    3

marketed under the "LEVI's®" brand.

Since its inception in 1850 in San Francisco, LS&CO. has grown into a worldwide leader in branded apparel. With total revenues of $4.09 billion in the fiscal year ending November 30, 2003, it is listed as one of the Fortune 500 largest U.S. companies.[1]

Over the past 128 years, LS&CO. has invested time, resources and money in developing, promoting and advertising the "LEVI's®" trademark, and specific features of the "LEVI's®" jeans, all of which create and stimulate the awareness and goodwill of the "LEVI's®" brand.

"LEVI's®" is one of the most recognized brand names in the world. In brand awareness studies I have reviewed, "LEVI's®" has a high ranking. Interbrand, a leading international branding consulting firm, in conjunction with *BusinessWeek* magazine recently determined the "world's most valuable brands".[2] "LEVI's®" was ranked among the top 100 brands in the world.

LS&CO. has been so successful in creating and stimulating awareness of the "LEVI's®" trademark that "LEVI's®" has become clearly identifiable with jeans. LS&CO. has also successfully created awareness of specific features of "LEVI's®" jeans, such as the double row of stitching on the back pocket, known as the Arcuate stitching design, so that consumers identify these features exclusively with "LEVI's®" products. These features have become synonymous with the "LEVI's®" brand, and consumers recognize the quality and reliability of LS&CO. products.

---

[1] www.levistrauss.com, and Fortune, April 5, 2004.
[2] Business Week, August 2, 2004.

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                    4

sponsor of the survey or knew that the survey was in any way connected to this litigation.

I developed the questionnaire and interview methodology, and an experienced field supervisor, who I trained, instructed and supervised all of the interviewers. A copy of the questionnaire is provided in Exhibit 5 of the First Scott Report, and a copy of the Instructions to Interviewers is in Exhibit 6 of the First Scott Report.

Each survey participant was asked to look at four colored photographs of different brands of jeans. Pictures were presented to the participants on a computer monitor. Each photograph pictured the jeans in the same position to show the back pocket stitching. Each participant was instructed to take as long as he needed to look at the picture, just as if he were shopping for a pair of jeans on the Internet.

For approximately half of the participants (236), the photograph of the "LEVI's®" jeans was included in the set of four to be seen. The other half of the participants (242) were presented with a photograph of Indigo-Red jeans. To disguise the survey sponsor and eliminate biases such as false positive responses, each participant was asked to identify the three other brands of jeans shown in the set of four. The other photographs were of Ecko, Azzure, and Wrangler jeans. To avoid order bias, the sequence of the four different brands was randomized. Copies of the photographs are in Exhibit 7 of the First Scott Report.

Survey participants observed each photograph separately. After observing each photograph, participants were asked to identify the brand of jeans and to identify those feature(s) of the jeans that indicated its brand identity. All responses from participants were open-ended. That is, participants were not prompted with responses or given choices. Interviewers entered the responses online.

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                                    6

B. Survey Methodology

The level of recognition of "LEVI's®" and other branded jeans was demonstrated in a Jeans Recognition Survey that I conducted in December, 2004. Four hundred and seventy-eight males, ages 15 to 50, who are representative of the target market were interviewed.

To be eligible for the survey, all 478 consumers were screened to have purchased jeans that cost $30 or more within the past 12 months. Survey participants were also screened for an intention to purchase jeans that cost $30 or more in the next 12 months. Participants must have shopped in at least one department or specialty shop of the type that carries Indigo Red jeans. Many of these stores also carry "LEVI's®" jeans. Participants were limited to those who had not participated in other marketing research in the past six months and to those who passed the standard security screen that neither participants nor members of their families work for a clothing manufacturer, a market research company or an advertising agency.

Interviews were conducted on a one-on-one basis by experienced interviewers in professional interviewing facilities in Atlanta, Baltimore, Chicago, Dallas, Los Angeles and New York. Approximately 80 interviews were conducted in each of the cities. Participants were recruited in shopping malls. A list of the malls is provided in Exhibit 3 of the First Scott Report. A copy of the screen used to recruit participants in the malls is in Exhibit 4 of the First Scott Report.

The survey was conducted on a double-blind basis, meaning that the survey was designed to ensure that neither the interviewer nor the interviewee knew the purpose or

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                    5

### C. Summary of Research Findings

Of the 236 consumers who were shown the photograph of the "LEVI's®" jeans, 138 (58%) correctly identified the jeans as a product of LS&CO. With minor variations, a high rate of recognition was maintained across age categories and locations. Although several other brand names were given, no other single brand had a significant number of respondents. As evidenced by this survey and our prior consumer surveys, "LEVI's®" jeans have maintained a high level of recognition over time.

Of participants who correctly identified the photograph of the "LEVI's®" jeans, the pocket stitching or pocket design was mentioned by 70 (51%) as the source of brand identification. If the respondents who mentioned "stitching" are included, along with those who mentioned specifically pocket stitching or pocket design, this number increases to 80, or 58%. This confirms our findings from prior surveys that consumers rely on the pocket stitching to help them identify LS&CO. products.

I also found that consumers do not identify all jeans as "LEVI's®" brand. Notably, the photograph of the Wrangler jeans was identified correctly by 51% of all respondents. By the same token, only 14% of participants viewing the Ecko jeans, 16% viewing Wrangler jeans, and 16% viewing Azzure jeans misidentified these products as "LEVI's®" jeans. The difference between this level of incorrect identification and that for the Indigo Red jean is significant.[3] Summary Tables are provided in Exhibit 8.

My analysis indicated that 54 (22.3%) of the 242 participants who saw the Indigo Red jean incorrectly identified it as an LS&CO. product, thus demonstrating the degree

---

[3] T-statistics and significance levels for Indigo Red vs. Ecko, Wrangler, and Azzure are t = 2.81, p < ~.01, t = 1.96, p < ~.05, and t = 1.96, p < ~.05, respectively, two-tailed tests.

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                                    7

of association between the stitching and the "LEVI's®" brand. This rate of association was higher for participants in Indigo Red's primary target market (i.e., males between the ages of 15 and 34), with 31 (26% incorrectly identifying the Indigo Red jeans as "LEVI's®". By city, the rates of association varied slightly across five of the locations with Atlanta consumers showing 30%, New York consumers showing 20%, Los Angeles showing 31%, and Baltimore and Chicago showing 21%. Only the Dallas market indicated an atypically lower rate of association at 12%.

Of the 54 people who called the Indigo Red jean a "LEVI's®" jeans, 22 (41%) cited the pocket stitching or pocket design as the source identifier. Another 12 (23%) indicated that something about the "stitching" was the reason for their identification. Consistent with my previous surveys, I found that consumers look for the pocket stitching to help them identify the brand of jeans.

D. Dilution.

Brand equity has been defined as "a set of brand assets and liabilities linked to a brand, its name, and symbol that add to or subtract from the value provided by the product or service to the firm and/or to the firm's customers."[4] From the findings of the survey described in this report and prior consumer surveys that I have conducted for LS&CO., I find considerable evidence for dilution of LS&CO.'s brand equity should other firms be allowed to use its trademarks or symbols that are associated or confused with its marks.

---

[4] David A. Aaker, *Managing Brand Equity*, 1991, The Free Press

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                                    8

consumers most frequently use to identify different brands. In my study, 319 consumers (67%) of all 478 consumers in the study, and 68% of the 472 consumers who identified a brand and gave a reason for their identification, cited pocket design or pocket stitching as the reason for their brand identification. An additional 50 consumers cited "stitching" as the element which led to their brand identification. Consumers often observe a mark, such as pocket stitching, outside of the actual retail environment (brick and mortar store or Internet store) where the jeans were purchased. In fact, they observe the stitching by glancing at someone else wearing it. At a distance, as someone walks by on the street, the consumer may not be able to discern the fine print of the manufacturer's name. The consumer then looks for another cue, that of the pocket stitching.

Because the "LEVI's®" jeans back pocket Arcuate stitching design is so distinctive and unique to "LEVI's®" jeans, consumers who see similar stitching on other products may be confused initially as to the source of the product, and, if such stitching appears on other manufacturers' jeans, they learn that they cannot rely on the Arcuate pocket stitching design to identify a true "LEVI's®" product.

If Indigo Red or others are allowed to use a pocket stitching similar to the Arcuate design, "LEVI's®" brand equity in general and the value of its Arcuate trademark in particular are eroded because consumers who encounter such a jean no longer fully trust the Arcuate pocket stitching as a cue for the "LEVI's®" brand. Over time, the cumulative effect will be that consumers stop using the Arcuate pocket stitching design to differentiate "LEVI's®" jeans from other brands. The "LEVI's®" Arcuate pocket stitching will no longer be an effective trademark symbolizing the quality, reliability, and distinctiveness of LS&CO. If consumers observe similar marks on jeans produced by

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                    10

The Lanham Act defines dilution as:

> "The lessening of the capacity of a famous mark to identify and distinguish goods
> or services, regardless of the presence or absence of (1) competition between the
> owner of the famous mark and other parties, or (2) likelihood of confusion,
> mistake, or deception."

For example, McDonald's would suffer brand dilution if other retail outlets, even

those not in the fast food business, were suddenly to begin to use the Golden Arches

outside their stores.  In this case, consumers could no longer reliably depend upon the

sight of the Golden Arches to help them uniquely identify and locate a McDonald's

restaurant.  In this case, McDonald's, having invested a large sum of money in order to

create secondary meaning[5] in the Golden Arches symbol, would find that the use of a

similar symbol by others would weaken the ability of its symbol "to function as a

trademark, that is, as a unique source identifier."[6]

The double row of stitching on the back pockets of "LEVI's®" jeans, known as

the Arcuate stitching design, is a famous, distinctive and valuable asset to both LS&CO.

and consumers, who rely on the "LEVI's®" trademark to designate the quality and

reliability associated with LS&CO jeans.  Respondents from my survey conducted for

LS&CO. recognize the pocket stitching as a brand identifier for "LEVI's®" jeans and

associate the Arcuate design with LS&CO.  In the mind of the consumer, the Arcuate

stitching design on the back pocket is unique to "LEVI's®" jeans.

The Arcuate design pocket stitching is particularly significant in regards to the

issue of dilution because pocket design or pocket stitching is the design element that

---

[5] Secondary meaning is said to exist "when a word or designation of some kind which was not originally distinctive, but was of a descriptive nature in its use on a product or service, has come, through exclusive use, to indicate to the buyers of that product or service a single product or service coming from a single source." (J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, section 15.02 [3,4])
[6] Phyllis Welter, Trademark Surveys, 24A-2.

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                                                    9

Indigo Red, the Arcuate stitching will lose its uniqueness, and the value of the stitching as "LEVI's®" trademark will diminish to a point where it will have little or no significance to LS&CO.

III.   **Conclusion**

1.  Based on a survey of 478 consumers conducted in December, 2004, I have shown that "LEVI's®" Arcuate pocket stitching design is a well known trademark that consumers use to identify "LEVI's®" jeans. My analysis indicated that 58% of participants correctly identified the LS&CO. jean. Approximately 58% of these participants cited the pocket design or pocket stitching or stitching as the reason for this brand identification.

2.  Pocket stitching is an important brand identifier. Over 78% of all consumers who provided a brand identification cited pocket design, pocket stitching, or stitching as the reason for their identification.

3.  Consumers are likely to be confused as to the origin of the Indigo Red jean due to the use of the similar pocket stitching design.

4.  A competitor's use of a similar back pocket stitching will erode the significance and value of LS&CO.'s trademark Arcuate stitching design and the "LEVI's®" brand in the marketplace.

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                    11

Feb 11 05 01:40p                                                                P.2

My understanding is that some of this testimony is covered by protective orders.

Date:  2/11/05                          _Carol A. Scott_
                                        Carol A. Scott

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                    12

## Exhibit 8:  Brand Identifications

Q5 (A): "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Indigo Red

| | Total # | Total % | ATL # | ATL % | BAL # | BAL % | CHI # | CHI % | DAL # | DAL % | LA # | LA % | NY # | NY % | 16-24 # | 16-24 % | 25-34 # | 25-34 % | 35-50 # | 35-50 % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Don't Know | 73 | 30% | 14 | 35% | 16 | 36% | 6 | 16% | 13 | 31% | 15 | 36% | 10 | 25% | 30 | 26% | 22 | 28% | 21 | 48% |
| Azzure | 2 | 1% | 2 | 5% | | | | | | | | | 4 | 10% | 1 | 1% | 2 | 3% | 1 | 2% |
| Ecko | 12 | 6% | 2 | 5% | 2 | 5% | 3 | 8% | 1 | 2% | | | 8 | 20% | 9 | 8% | | | 1 | 2% |
| Levi's | 54 | 22.3% | 12 | 30% | 9 | 21% | 8 | 21% | 6 | 12% | 12 | 31% | 8 | 20% | 31 | 26% | 19 | 24% | 4 | 9% |
| Wranglers | 20 | 8% | 2 | 5% | 1 | 2% | 6 | 16% | 6 | 14% | 4 | 10% | 1 | 3% | 7 | 6% | 7 | 9% | 6 | 14% |
| Aéropostale | 1 | 0% | | | | | 1 | 3% | | | | | | | 1 | 1% | | | | |
| American Eagle | 1 | 0% | | | | | | | 1 | 2% | | | | | 1 | 1% | | | | |
| Arizona | 1 | 0% | | | 1 | 2% | | | | | | | | | | | 1 | 1% | | |
| Bugle Boy | 1 | 0% | | | | | | | | | 1 | 3% | | | | | 1 | 4% | | |
| Calvin Klein | 7 | 3% | | | 2 | 5% | 4 | 10% | | | 1 | 3% | | | 1 | 1% | 3 | 4% | 3 | 7% |
| Diesel | 1 | 0% | | | | | | | | | 1 | 3% | | | | | 1 | 1% | | |
| Dillards | 1 | 0% | | | | | | | 1 | 2% | | | | | 1 | 1% | | | | |
| Eddie Bauer | 1 | 0% | | | 1 | 2% | | | | | | | | | 1 | 1% | | | | |
| Enyce | 5 | 2% | 2 | 5% | 1 | 2% | 1 | 3% | | | 1 | 3% | 2 | 5% | 4 | 3% | 1 | 1% | | |
| Express | 3 | 1% | | | 1 | 2% | | | | | | | | | 1 | 1% | 2 | 3% | | |
| FUBU | 2 | 1% | 1 | 3% | | | 2 | 5% | | | 1 | 3% | 1 | 3% | 3 | 2% | 2 | 3% | | |
| GAP | 5 | 2% | | | | | | | 3 | 7% | | | 3 | 8% | 3 | 3% | 2 | 3% | | |
| Guess | 5 | 2% | | | | | | | 2 | 5% | | | 3 | 8% | 3 | 3% | 2 | 3% | | |
| Indigo Red | 1 | 0% | | | | | 1 | 3% | | | | | | | 1 | 1% | | | | |
| JC Penny | 4 | 2% | 2 | 5% | 1 | 2% | | | 1 | 2% | | | 2 | 5% | 1 | 1% | | | 1 | 2% |
| Jordache | 4 | 2% | | | 1 | 2% | 1 | 3% | | | | | 1 | 3% | 3 | 3% | | | 1 | 2% |
| Lee | 8 | 3% | | | 2 | 5% | 4 | 10% | 3 | 7% | | | | | 6 | 4% | 3 | 4% | 3 | 7% |
| Lucky | 3 | 1% | | | | | | | | | | | | | 1 | 1% | | | | |
| Mecca | 1 | 0% | 1 | 3% | | | | | | | | | | | 1 | 1% | | | | |
| Old Navy | 13 | 5% | 1 | 3% | 6 | 12% | 1 | 3% | 1 | 2% | 2 | 5% | 1 | 3% | 4 | 3% | 8 | 8% | 1 | 2% |
| Other | 3 | 1% | 2 | 5% | 1 | 2% | | | 2 | 5% | | | | | 2 | 2% | 1 | 1% | | |
| Phat Farm | 1 | 0% | | | | | | | | | 1 | 3% | | | | | | | | |
| Quick Silver | 1 | 0% | | | | | 1 | 3% | | | 1 | 3% | | | 1 | 1% | | | | |
| Rocawear | 6 | 2% | 3 | 8% | | | | | | | | | 2 | 5% | 3 | 3% | 1 | 1% | | |
| Sasoon | 1 | 0% | | | | | 1 | 3% | | | | | | | | | 1 | 1% | | |
| Sean John | 5 | 2% | 2 | 5% | 1 | 2% | 1 | 3% | | | 1 | 3% | 1 | 3% | 4 | 3% | 1 | 1% | | |

## Exhibit 8: Brand Identifications

Q6 (A): "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Indigo Red

| | Total | | ATL | | BAL | | CHI | | DAL | | LA | | NY | | 15-24 | | 25-34 | | 35-60 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Sergio Valente | 4 | 2% | 1 | 3% | | | | | | | 2 | 5% | 2 | 5% | | | 3 | 4% | 1 | 2% |
| South Pole | 1 | 0% | | | | | | | 1 | 2% | | | | | 1 | 1% | | | | |
| Tommy Hilfiger | 1 | 0% | | | | | | | | | | | | | | | 1 | 1% | | |
| Vibe | 1 | 0% | | | 1 | 2% | | | | | | | | | 1 | 1% | | | | |
| Walmart | 1 | 0% | | | | | | | 1 | 2% | | | | | 1 | 1% | | | | |
| Webb | 1 | 0% | 1 | 3% | | | | | | | | | | | 1 | 1% | | | | |
| | 254 | 242 | 46 | 40 | 43 | 42 | 40 | 39 | 43 | 42 | 42 | 39 | 41 | 40 | 123 | 118 | 65 | 60 | 46 | 44 |

Respondents could provide more than one brand name. The first total in each column is the total number of brand responses. The second total is the total number of respondents who saw this jean. Thus, 254 brand responses were received from 242 respondents who were shown the Indigo Red jean and asked "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

**Exhibit 8: Brand Identifications**

Q5 (B): "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Levi's

| | Total | | ATL | | BAL | | -CHI | | DAL | | LA | | NY | | 15 - 24 | | 25 - 34 | | 35 - 50 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Don't Know | 32 | 14% | 7 | 19% | 5 | 13% | 2 | 5% | 8 | 29% | 8 | 12% | 4 | 10% | 19 | 14% | 12 | 14% | 6 | 11% |
| Azzure | 2 | 1% | 2 | 5% | | | | | | | | | | | 2 | 2% | | | | |
| Levi's | 188 | 59% | 26 | 65% | 24 | 60% | 23 | 55% | 14 | 40% | 39 | 75% | 21 | 53% | 81 | 49% | 54 | 61% | 33 | 76% |
| Wranglers | 24 | 10% | 3 | 8% | 3 | 8% | 8 | 20% | 7 | 20% | 2 | 5% | 1 | 3% | 14 | 13% | 8 | 9% | 2 | 5% |
| American Eagle | 1 | 0% | | | | | | | 1 | 3% | | | | | 1 | 1% | | | | |
| Arizona | 1 | 0% | | | | | | | | | | | 1 | 3% | | | 1 | 1% | | |
| Bugle Boy | 1 | 0% | | | 1 | 3% | | | | | | | 2 | 5% | | | 1 | 1% | | |
| Calvin Klein | 3 | 1% | | | | | 1 | 3% | | | | | | | 2 | 2% | 1 | 1% | | |
| Diesel | 1 | 0% | | | | | | | | | 1 | 3% | | | 1 | 1% | | | | |
| DKNY | 1 | 0% | | | | | | | | | | | 1 | 3% | 1 | 1% | | | | |
| Dockers | 1 | 0% | | | | | 1 | | | | | | | | 1 | 1% | | | | |
| Express | 1 | 0% | | | | | | | | | | | | | 1 | 1% | | | | |
| FUBU | 7 | 3% | | | 1 | 3% | 1 | 3% | | | 2 | 5% | | | 2 | 2% | 3 | 3% | 2 | 5% |
| GAP | 7 | 3% | | | 1 | 3% | 1 | 3% | 1 | 3% | | | 2 | 5% | | | | | | |
| Gitano | 1 | 0% | | | | | 1 | | | | | | 1 | 3% | 1 | 1% | 1 | 1% | | |
| Guess | 2 | 1% | | | | | | | | | 1 | 2% | | | | | | | | |
| JC Penny | 1 | 0% | | | | | | | 1 | 3% | | | | | 1 | 1% | | | | |
| Jordache | 3 | 1% | 1 | 3% | | | | | | | | | 2 | 5% | | | 2 | 2% | 1 | 2% |

## Exhibit 8: Brand Identifications

Q5 (B): "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Levi's

| | Total # | % | ATL # | % | BAL # | % | CHI # | % | DAL # | % | LA # | % | NY # | % | 16-24 # | % | 25-34 # | % | 35-50 # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K-Mart | 1 | 0% | | | 1 | 3% | | | | | | | | | | | 1 | 1% | 1 | 1% |
| Lee | 10 | 4% | 1 | 3% | 3 | 6% | 2 | 6% | | | 2 | 5% | 3 | 8% | 2 | 2% | 8 | 9% | | |
| LEI | 1 | 0% | | | 1 | 3% | | | | | | | | | | | 1 | 1% | | |
| Lucky | 2 | 1% | | | | | | | 1 | 3% | 1 | 2% | | | 2 | 2% | | | | |
| Macy's | 1 | 0% | | | | | | | | | 1 | 2% | | | | | | | | |
| Old Navy | 2 | 1% | 1 | 3% | | | | | | | 1 | 2% | | | 2 | 2% | 2 | 2% | | |
| Other | 10 | 4% | | | 2 | 5% | 6 | 15% | 1 | 3% | 1 | 2% | | | 7 | 7% | | | 2 | 2% |
| Silver Tab | 1 | 0% | | | | | | | | | 1 | 2% | 1 | 3% | 1 | 1% | | | 1 | 2% |
| Tommy Hilfiger | 1 | 0% | | | | | | | | | | | | | 1 | 1% | | | | |
| Vibe | 1 | 0% | | | 1 | 3% | | | | | | | | | 1 | 1% | | | | |
| | 281 | 236 | 41 | 40 | 43 | 40 | 45 | 40 | 38 | 35 | 46 | 41 | 41 | 40 | 111 | 104 | 99 | 88 | 44 | 44 |

Respondents could provide more than one brand name. The first total in each column is the total number of brand responses. The second total is the total number of respondents who saw this jean. Thus, 281 brand responses were received from 236 respondents who were shown the Levi's jean and asked "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

**Exhibit 3: Brand Identifications**

Q1: "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Ecko

| | Total | | ATL | | BAL | | CHI | | DAL | | LA | | NY | | 15-24 | | 25-34 | | 35-50 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Don't Know | 166 | 33% | 33 | 41% | 32 | 39% | 17 | 22% | 28 | 34% | 31 | 39% | 17 | 21% | 58 | 26% | 60 | 38% | 38 | 43% |
| Azzure | 3 | 1% | | | 1 | 1% | 1 | 1% | | | | | 1 | 1% | 1 | 0% | 2 | 1% | | |
| Ecko | 28 | 5% | 3 | 4% | 1 | 1% | 6 | 8% | 6 | 8% | 3 | 4% | 4 | 5% | 10 | 7% | 2 | 4% | 14 | 16% |
| Levi's | 85 | 16% | 12 | 15% | 10 | 12% | 16 | 19% | 12 | 16% | 0 | 0% | 9 | 13% | 25 | 11% | 28 | 15% | 2 | 2% |
| Wranglers | 17 | 4% | 2 | 3% | 2 | 2% | 3 | 4% | 6 | 8% | 1 | 1% | 3 | 4% | 13 | 6% | 2 | 1% | | |
| Abadandos | 6 | 1% | 1 | 1% | | | 1 | 1% | | | 1 | 1% | 2 | 3% | 1 | 0% | 1 | 1% | | |
| American Eagle | 1 | 0% | | | | | | | 1 | 1% | | | | | 1 | 0% | | | | |
| Anchor Blue | 2 | 0% | | | | | | | | | | | 2 | 3% | 1 | 1% | | | | |
| Arizona | 2 | 0% | | | | | | | 1 | 1% | 1 | 1% | | | 1 | 0% | 1 | 1% | | |
| Buckle | 1 | 0% | | | 4 | 5% | | | 1 | 1% | | | 1 | 1% | | | 6 | 4% | 7 | 8% |
| Calvin Klein | 17 | 4% | 1 | 1% | 1 | 1% | 4 | 5% | 3 | 4% | 1 | 1% | 4 | 5% | 2 | 2% | | | 1 | 1% |
| Demo | 1 | 0% | | | | | | | | | 1 | 1% | | | | | | | | |
| Dickies | 1 | 0% | | | | | | | | | | | | | 2 | 1% | 1 | 1% | | |
| Diesel | 2 | 0% | | | 1 | 1% | | | 3 | 3% | | | 1 | 1% | | | 1 | 1% | | |
| Dillards | 1 | 0% | | | | | | | 2 | | | | | | | | | | | |
| DKNY | 1 | 0% | | | | | | | 1 | 1% | | | | | | | | | | |
| Dockers | 3 | 1% | | | | | 1 | 1% | | | | | | | 2 | 0% | 3 | 2% | | |
| Enyce | 3 | 1% | 3 | 4% | 1 | 2% | | | | | | | 1 | 1% | 2 | 1% | 1 | 1% | | |
| Express | 28 | 5% | 7 | 9% | 2 | 2% | 7 | 9% | 8 | 10% | 6 | 8% | 1 | 1% | 19 | 9% | 8 | 5% | 2 | 2% |
| FUBU | 28 | 5% | 7 | 9% | 2 | 2% | 4 | 5% | | | 3 | 4% | 3 | 4% | 6 | 3% | 4 | 2% | 3 | 3% |
| GAP | 13 | 3% | 1 | 1% | | | 1 | 1% | | | | | | | | | 1 | 1% | | |
| Girbaud | 1 | 0% | | | 2 | 2% | | | 1 | 1% | 6 | 8% | 3 | 4% | 7 | 3% | 4 | 2% | 2 | 2% |
| Guess | 13 | 3% | 1 | 1% | | | 1 | 1% | 1 | 1% | 1 | 1% | | | 1 | 0% | | | 1 | 1% |
| JC Penny | 2 | 0% | | | | | | | | | | | 1 | 1% | 1 | 1% | | | | |
| Jimmy Jazz | 6 | 1% | | | 1 | 1% | | | 1 | 1% | | | 4 | 4% | 1 | 0% | 2 | 2% | 2 | 2% |
| Jordache | 1 | 0% | | | 1 | 1% | | | | | | | | | | | 3 | 3% | | |
| Lee | 9 | 2% | 2 | 3% | 1 | 1% | 2 | 3% | 1 | 1% | | | 3 | 4% | 1 | 0% | 5 | 3% | 3 | 3% |
| Lee Cooper | 1 | 0% | | | 1 | 1% | | | | | | | | | | | | | | |
| LEI | 1 | 0% | | | 1 | 1% | | | | | | | | | | | 1 | 1% | | |

## Exhibit 8: Brand Identifications

Ecko

Q1: "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

| | Total | | ATL | | BAL | | CHI | | DAL | | LA | | NY | | 16-24 | | 25-34 | | 35-60 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Lucky's | 1 | 0% | | | | | | | | | | | | | | | 1 | 1% | | |
| Macy's | 1 | 0% | | | | | | | | | | | | | | | | | | |
| Mecca | 4 | 1% | 1 | 1% | 1 | 1% | | | | | 2 | 3% | 1 | 1% | 4 | 2% | | | | |
| Nautica | 1 | 0% | 1 | 1% | | | | | | | | | 1 | 1% | 1 | 0% | | | | |
| Nordica | 1 | 0% | | | | | | | | | | | | | 1 | 0% | | | | |
| Old Navy | 3 | 1% | | | | | 2 | 3% | 1 | 1% | 1 | 1% | | | 1 | 1% | 1 | 1% | | |
| Other | 28 | 6% | 1 | 1% | 9 | 11% | 9 | 11% | 4 | 3% | 1 | 1% | 4 | 5% | 11 | 5% | 9 | 5% | 6 | 7% |
| Pepe | 2 | 0% | | | 1 | 1% | | | 2 | 3% | | | | | 2 | 1% | | | | |
| Phat Farm | 11 | 2% | 2 | 3% | 1 | 1% | 3 | 4% | 1 | 1% | 3 | 3% | 3 | 3% | 7 | 3% | 4 | 2% | | |
| Polo | 9 | 2% | 1 | 1% | 1 | 1% | 3 | 3% | 1 | 1% | 1 | 1% | 2 | 3% | 6 | 2% | 1 | 1% | 1 | 1% |
| Ralph Lauren | 6 | 1% | | | 1 | 1% | | | | | | | 1 | 1% | 6 | 2% | | | | |
| Roccawear | 13 | 3% | 4 | 5% | 1 | 1% | 1 | 1% | | | 4 | 5% | 4 | 5% | 11 | 4% | 3 | 2% | 1 | 1% |
| Rocdies | 2 | 0% | | | 1 | 1% | | | | | | | | | | | | | 4 | 5% |
| Sean John | 20 | 4% | 4 | 5% | 4 | 5% | 1 | 1% | 2 | 3% | 5 | 6% | 4 | 5% | 11 | 5% | 3 | 3% | | |
| Silver Tab | 1 | 0% | | | 1 | 1% | | | | | | | | | | | 1 | 1% | | |
| South Pole | 3 | 1% | | | | | | | | | 3 | 4% | 1 | 1% | 1 | 0% | 2 | 1% | | |
| Timberland | 3 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | | | 1 | 1% | 1 | 1% | | | 1 | 1% | 3 | 3% |
| Tommy Hilfiger | 4 | 1% | | | 1 | 1% | 1 | 1% | | | 1 | 1% | 1 | 1% | | | 1 | 1% | 3 | 3% |
| Union Bay | 2 | 0% | 1 | 1% | | | 1 | 1% | | | | | | | | | 2 | 1% | | |
| Walmart | 1 | 0% | 1 | 1% | | | 1 | 1% | | | 1 | 1% | | | 2 | 1% | | | 1 | 1% |
| Webb | 2 | 0% | 1 | 1% | 1 | 1% | | | | | | | | | | | | | | |
| | 500 478 | | 84 | | 85 82 | | 84 79 | | 81 77 | | 85 80 | | 81 80 | | 283 222 | | 175 168 | | 92 88 | |
| | | | | | | | | | | | | | | | 46% | | 35% | | 18% | |

Respondents could provide more than one brand name. The first total in each column is the total number of brand responses. The second total is the total number of respondents who saw this jean. Thus, 500 brand responses were received from 478 respondents who were shown the Ecko jean and asked "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

## Exhibit 8: Brand Identifications

Q3: "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Azzure

| | Total # | Total % | ATL # | ATL % | BAL # | BAL % | CHI # | CHI % | DAL # | DAL % | LA # | LA % | NY # | NY % | 16-24 # | 16-24 % | 25-34 # | 25-34 % | 35-50 # | 35-50 % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Don't Know | 198 | 33% | 34 | 43% | 31 | 38% | 16 | 20% | 35 | 45% | 25 | 35% | 19 | 24% | 60 | 30% | 65 | 33% | 37 | 43% |
| Azzure | 26 | 4% | 5 | 6% | 2 | 2% | 3 | 4% | | | 3 | 4% | 7 | 9% | 11 | 6% | 8 | 5% | 1 | 1% |
| Ecko | 7 | 1% | | | | | 4 | 5% | 2 | 3% | | | 1 | 1% | 5 | 2% | 2 | 1% | | |
| Levi's | 77 | 16% | 10 | 13% | 13 | 16% | 13 | 16% | 7 | 9% | 19 | 26% | 15 | 19% | 28 | 12% | 33 | 20% | 16 | 20% |
| Wrangler | 16 | 4% | | | 5 | 6% | 8 | 10% | 1 | 1% | 2 | 3% | 2 | 3% | 7 | 3% | 8 | 5% | 3 | 3% |
| Abercrombie | 1 | 0% | | | | | | | | | | | 1 | 1% | 1 | 0% | | | | |
| American Eagle | 4 | 1% | | | | | | | 1 | 1% | | | | | 3 | 1% | 1 | 1% | | |
| Anchor Blue | 4 | 1% | | | | | 1 | 1% | 1 | 1% | 3 | 4% | 1 | 1% | 3 | 1% | | | 1 | 1% |
| Arizona | 3 | 1% | | | | | | | 1 | 1% | 1 | 1% | | | 2 | 1% | | | 1 | 1% |
| Buckle | 4 | 1% | | | | | | | 1 | 1% | | | 1 | 0% | 1 | 0% | 4 | 2% | | |
| Bugle Boy | 17 | 4% | 3 | 4% | 1 | 1% | 3 | 4% | | | 5 | 6% | 1 | 1% | 5 | 2% | 5 | 3% | 7 | 6% |
| Calvin Klein | 4 | 1% | | | 2 | 2% | 7 | 9% | | | 2 | 3% | 3 | 3% | 3 | 1% | 1 | 1% | | |
| Donno | 2 | 0% | | | | | | | 1 | 1% | 1 | 1% | 2 | 1% | 2 | 1% | | | | |
| Dickies | 2 | 0% | | | 1 | 1% | | | | | 1 | 1% | 1 | 1% | 1 | 0% | | | 1 | 1% |
| Diesel | 1 | 0% | | | | | | | 1 | 1% | | | | | 1 | 0% | | | | |
| Dillards | 1 | 0% | 1 | 1% | | | | | | | 1 | 1% | | | 3 | 1% | | | | |
| DKNY | 4 | 1% | 3 | 4% | | | 3 | 4% | | | 2 | 3% | 1 | 1% | 7 | 3% | 2 | 1% | | |
| Enyce | 9 | 2% | | | | | | | | | | | 1 | 1% | 2 | 1% | 2 | 1% | | |
| Express | 2 | 0% | | | | | | | 2 | 3% | | | 1 | 1% | 2 | 1% | | | | |
| Foley's | 2 | 0% | | | | | 4 | 5% | 3 | 4% | 4 | 5% | 2 | 3% | 6 | 3% | 3 | 2% | 2 | 2% |
| FUBU | 16 | 3% | 2 | 3% | | | 3 | 4% | 3 | 4% | 5 | 5% | 3 | 4% | 8 | 4% | 9 | 3% | | |
| GAP | 15 | 3% | | | | | | | | | 4 | 5% | 3 | 4% | | | 1 | 1% | 2 | 2% |
| Girbaud | 7 | 1% | 1 | 1% | | | 1 | 1% | 1 | 1% | 1 | 1% | 3 | 4% | 3 | 1% | 2 | 1% | | |
| Guess | 2 | 0% | | | 1 | 1% | | | | | | | 3 | 3% | 1 | 1% | | | 2 | 2% |
| Indigo Red | 1 | 0% | 2 | 3% | 1 | 1% | | | 1 | 1% | | | | | 1 | 0% | 4 | 2% | | |
| JC Penny | 2 | 0% | | | 2 | 2% | | | | | | | | | 2 | 1% | | | 2 | 2% |
| Jordache | 6 | 1% | | | | | 1 | 1% | | | 1 | 1% | | | 3 | 1% | 1 | 1% | 5 | 6% |
| K-Mart | 1 | 0% | 1 | 1% | | | | | | | | | | | | | | | | |
| Lee | 7 | 1% | | | 9 | 4% | 1 | 1% | | | | | 2 | 3% | 3 | 1% | 1 | 1% | 4 | 4% |
| Lee Cooper | 1 | 0% | | | | | | | | | | | | | | | | | 2 | 2% |
| LEI | 3 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | | | 0 | 0% | 1 | 1% | 2 | 2% |

# Exhibit 3: Brand Identifications

Q3: "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Azzura

| | Total # | Total % | ATL # | ATL % | BAL # | BAL % | CHI # | CHI % | DAL # | DAL % | LA # | LA % | NY # | NY % | 18-24 # | 18-24 % | 25-34 # | 25-34 % | 35-50 # | 35-50 % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lucky | 5 | 1% | | | | | | | 4 | 5% | 1 | 1% | | | 2 | 1% | 3 | 2% | | |
| Macy's | 1 | 0% | 1 | 1% | | | | | | | | | | | | | 1 | 1% | | |
| Mecca | 3 | 1% | 2 | 3% | 1 | 1% | | | | | | | | | | | 1 | 1% | | |
| Nautica | 1 | 0% | | | 1 | 1% | | | | | | | | | 1 | 1% | | | | |
| Old Navy | 2 | 0% | | | | | | | 1 | 1% | | | 1 | 1% | 2 | 1% | | | | |
| Other | 33 | 7% | 2 | 3% | 10 | 12% | 9 | 11% | 3 | 4% | 4 | 5% | 4 | 5% | 14 | 6% | 11 | 7% | 7 | 8% |
| Pepe | 1 | 0% | | | | | | | | | | | 1 | 1% | | | 1 | 1% | | |
| Phat Farm | 3 | 1% | 1 | 1% | 1 | 1% | 2 | 3% | | | | | | | 1 | 0% | 2 | 1% | | |
| Polo | 7 | 1% | | | 1 | 1% | | | 1 | 1% | 1 | 1% | 6 | 6% | 1 | 0% | 3 | 2% | 1 | 1% |
| Quick Silver | 3 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | | | | | 3 | 1% | 1 | 1% | 1 | 1% |
| Ralph Lauren | 4 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | | | 1 | 1% | 1 | 1% | 1 | 1% | 1 | 1% |
| Rocawear | 10 | 2% | 3 | 4% | 1 | 1% | 2 | 3% | | | 3 | 3% | 1 | 1% | 6 | 3% | 4 | 2% | 1 | 1% |
| Rocka G9 | 1 | 0% | | | | | | | | | 1 | 1% | 1 | 1% | | | 1 | 1% | | |
| Sasson | 2 | 0% | | | 1 | 1% | | | | | | | | | 1 | 0% | | | 1 | 1% |
| Sean John | 16 | 3% | 4 | 5% | 3 | 4% | 3 | 4% | | | 2 | 3% | 3 | 4% | 11 | 5% | 2 | 1% | 2 | 2% |
| Sergio Valente | 3 | 1% | | | 1 | 1% | | | | | 1 | 1% | 1 | 1% | 2 | 1% | | | 1 | 1% |
| Seven | | | | | | | | | | | | | 1 | 1% | 1 | 0% | | | | |
| Silver Tab | 10 | 2% | 1 | 1% | 3 | 4% | | | 5 | 6% | 2 | 3% | | | 8 | 4% | 1 | 1% | 1 | 1% |
| South Pole | 7 | 1% | 1 | 1% | | | 1 | 1% | 2 | 3% | 1 | 1% | 1 | 1% | 6 | 2% | 1 | 1% | | |
| Tommy Hilfiger | 1 | 0% | 1 | 1% | | | | | | | | | | | 1 | 0% | | | | |
| Vibe | 3 | 1% | 1 | 1% | 2 | 2% | | | | | | | | | 3 | 1% | 1 | 1% | | |
| Walmart | 1 | 0% | | | | | | | 1 | 1% | | | | | 1 | 0% | | | | |
| | 506  478 | | 81  80 | | 89  82 | | 86  79 | | 82  77 | | 86  80 | | 82  80 | | 238  222 | | 175  168 | | 93  88 | |

Respondents could provide more than one brand name. The first total in each column is the total number of brand responses. The second total is the total number of respondents who saw this jean. Thus, 506 brand responses were received from 478 respondents who were shown the Azzura jean and asked "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

**Exhibit B**

REBUTTAL REPORT OF

PROFESSOR CAROL A. SCOTT

February 25, 2005

REBUTTAL REPORT OF PROF. CAROL A. SCOTT

Exhibit O
Page 26

## I.    QUALIFICATIONS

I am a Professor of Marketing at the Anderson Graduate School of Management of the University of California at Los Angeles. I have a B.S. degree in business and history education from the University of Texas at Austin, an M.S. degree in Management from Northwestern University, and a Ph.D. from Northwestern University in marketing and social psychology. I served variously as the Chairman of the Faculty, Associate Dean, and Assistant Dean of the Anderson Graduate School of Management from 1985 through 1994, and I currently am the faculty director of the Anderson School Executive Program. I also have published numerous journal articles, research reports and book chapters on marketing issues. I have, over the past 15 years, served as a consultant or expert witness on marketing issues, including cases involving intellectual property. My curriculum vitae is attached as Exhibit 1. I have served on the editorial boards of the *Journal of Marketing Research*, the *Journal of Marketing*, and the *Journal of Consumer Research*. I have been a member of the board of directors for Sizzler International and A-Fem Medical Corporation, Inc., and currently am a member of the board of directors of United Online.

I have been retained by Townsend and Townsend and Crew as an independent expert witness to testify on behalf of LS&CO ("Plaintiff").

## II.    THE ISSUES FOR WHICH I WILL GIVE AN OPINION

I have been asked by counsel for Plaintiff to review a report submitted by Mr. Walter McCullough[1] ("McCullough Report") on behalf of defendant Indigo Red.

---

[1] McCullough, Walter, "Report on a Test of Post-Sales Source Confusion For RP55 Jeans," December 2004.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                    2

### III. SUMMARY OF OPINIONS

Having reviewed and analyzed Mr. McCullough's report, it is my opinion that the consumer study which he conducted does not provide a fair test of the likelihood that the stitching on the Indigo Red jeans at issue in this case would cause consumers to incorrectly identify the Indigo Red jeans as being manufactured, licensed by, or associated with Levi's® jeans. The findings of this survey provide no reliable evidence regarding this issue.

My conclusions are based upon data that is available to me at this time. I am continuing my review and analysis. I may refine or expand my opinions as further information and materials come to my attention, and I reserve the right to supplement this report to the extent that additional information becomes available which may affect my opinions. In particular, I understand that a transcript of Mr. McCullough's deposition in this case will be made available for my review.

### IV. STATEMENT OF OPINIONS AND BASES FOR OPINIONS

A.    The study conducted by Mr. McCullough does not provide a test of confusion caused by the stitching at issue.

There are numerous indications that the survey conducted by Mr. McCullough incorrectly addresses the issue of confusion caused by the pocket stitching. In particular, I have identified the following issues with Mr. McCullough's survey:

1.    Mr. McCullough's survey does not represent a typical post-sale environment.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                      3

In Mr. McCullough's survey, participants are first shown three pieces of apparel (i.e., a pair of socks, a t-shirt, and a pair of either Indigo Red or Calvin Klein jeans) and asked to examine each item as if they "saw someone wearing it and were deciding whether to buy it."[2] Participants were allowed to pick up the garments and to examine them in any way they wished. In a typical post-sale environment where a consumer sees someone else wearing a pair of jeans, however, it is highly unlikely that he/she could pick the product up, examine it inside and out, touch and feel it, etc. A more typical post-sale environment is one in which a person observes someone else wearing a pair of jeans at some distance, with no opportunity to examine them in such detail.

In Mr. McCullough's survey, allowing the participants to pick up the jeans and handle them potentially exposed the participants to many more cues as to the identity of the product than would be the case in a typical post-sale environment. Specifically, one could, for example, read brand names written prominently on the product and other logo identifiers, see that the Indigo Red jeans had a bright red lining of the waistline and/or pockets, examine the leather patches on the back waistline with different designs on them, and the like. In this context, the stitching on the back pocket of the jeans may be overwhelmed by these other vivid cues that ordinarily might be hidden from a casual observer's view. Indeed, the presence of these other cues may have been enough for the respondent to decide if he/she wanted to buy them or not (e.g., "I always/never buy Indigo Red jeans"); pocket stitching may or may not have been attended to at all.

    2. Mr. McCullough's survey does not take into account the role of the other brand identifiers that were present on the jeans.

---

[2] McCullough report, p. 8.

In Mr. McCullough's survey, all of the regular brand identifying marks were left on the jeans, including brand names, patches, tabs, and the like. The results of his study, therefore, may be due to these other cues, and not to the pocket stitching itself. When deciding whether one pair of jeans is related to another pair, consumers may simply look at the most obvious cue, e.g., a largely written brand name, and scarcely attend to others. The fact that a largely written brand name may take precedence over other cues such as pocket stitching does not mean that the stitching, when viewed without these other cues, would be not confusing or result in misidentification of the products.

In addition, participants may have used the pocket stitching in combination with other cues. That is, participants may have thought that the Indigo Red pocket stitching looked like stitching usually found on Levi's®, but then saw the Indigo Red brand name and the absence of Levi's® traditional leather patch. Because the Indigo Red jeans had different versions of the other traditional indicators of Levi's®, these respondents may have answered "No", or "I don't know" to the subsequent questions asking whether the Levi's® jeans were the same jeans or made by the same company, associated with the first jeans, or whether the first jeans manufacturer had permission from the second jeans manufacturer, even though they were confused by the pocket stitching.

Ruling out the influence of these other brand identifiers is particularly important because they are often unobservable in a typical post-sale environment. Men often wear a belt, for example, obscuring the writing on the leather patch. Jeans may be observed at a distance which makes reading any brand name difficult. Instead, what the casual observer may see is a brief glance at the stitching on the back pockets.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                      5

Finally, brand dilution may occur even if consumers saw an exact copy of Levi's®
back pocket stitching on another brand, but because of a prominently placed brand name
or logo, correctly identified it as not being Levi's®. In this case, the unique association of
the pocket stitching with the Levi's® brand would be destroyed. For this reason, it is
important to isolate the effect of the pocket stitching apart from other brand identifiers.

It is unclear why the brand identifiers were left on all of the brands of jeans tested.
The tags on the t-shirts that would identify the brands were either cut away or taped over
so that respondents could not see them. The socks had no tags that would identify their
source, but instead were almost identical white athletic crew socks, with different logos
on the two different brands the only cue as to their brand identity. In contrast, all brand
identifiers were left intact on the pairs of jeans.

        3. The procedures of Mr. McCullough's survey are designed to test
             participants' memories rather than their confusion.

In Mr. McCullough's survey, participants are first shown three products — a pair
of socks, a t-shirt, and a pair of jeans. They are not told that any of the products is of
particular interest. In this study, the jeans in this first display are always a pair of Indigo
Red jeans or Indigo Red shorts. Once participants examined all three products, which
presumably were presented in some way to allow for simultaneous viewing, they were all
removed from sight. Next, participants were asked a series of three possible questions
about socks and three possible questions about the t-shirts before they were shown a
second Levi's® pair of jeans. As Mr. McCullough states, "the tee shirt and crew socks

REBUTTAL REPORT OF PROF. CAROL A. SCOTT            6

Exhibit O
Page 31

added some time between the respondents' examination of the test or control jeans"[3] and

the presentation of the Levi's® jeans. Only after these two series of questions is the

participant shown the Levi's® pair of jeans and asked a series of three questions about its

relationship to the first pair of jeans shown. By this time, it is unclear what the

participants might remember about the first pair of jeans. The questions about the socks

and the t-shirts may act as a memory clearing device, interfering with recollection of all

but the most intrusive characteristics of the first pair of jeans. If respondents cannot

remember the first jean they saw and/or its pocket stitching, then it is understandable that

few respondents answered affirmatively the questions regarding a relationship between

the first and second jeans shown. Again, an "I don't know" response could be an

indicator of confusion.

    4.    It is unclear whether the participants in Mr. McCullough's survey

           saw the pocket stitching on the rear pockets of the Levi's® jeans or

           not.

    According to the instructions given to the interviewers, the Levi's® jeans were to

be handed to the respondent "back first." How this was to be done exactly was not

specified. Interviewers could have handed the jeans to the respondent in a variety of

ways, not all of which would have provided a clear view of the rear pocket stitching. In

addition, the most logical thing for a respondent to do when asked whether these jeans are

the same as the first pair they saw is to turn them around to the front to look at them.

This may be particularly true when the earlier context has been set as "deciding whether

to buy them." The lack of control in the procedure and stimuli shown to respondents in

---

[3] McCullough report, p. 7.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT         7

Mr. McCullough's survey makes it difficult at best to attribute the findings to respondents' perceptions of the rear pocket stitching.

B. The product stimuli used by Mr. McCullough are likely to have biased the results and insured that respondents would not perceive the two pairs of jeans they saw as related.

The Indigo Red shorts and jeans that were compared with the Levi's® jeans exhibited differences on almost all relevant dimensions except pocket stitching. In fact, one pair of Indigo Red "jeans", i.e., the Roland jeans, was a pair of shorts. It is not clear what a participant would think, then, when asked if the Levi's® jeans were the same as the "jeans" he/she saw first. Such a question is likely to prompt the respondent to answer with a "no" in response to the compound question of whether the "jeans you saw earlier are the same as *these* jeans, or are put out by the same company as *these* jeans."[4]

Both the "Roland" and the "Stanley" versions of the Indigo Red jeans had the brand name visible in several different places, including on a leather patch on the back at the waistline. They had a bright red lining on the inside of the waistband, and they had a different "wash" or color finish than the Levi's® jeans. Given that the brand names were readily apparent and that another traditional Levi's® brand identifier (e.g., the leather patch with the Levi's® name) was clearly different from those on the Indigo Red products, it is surprising that any level of confusion was evident at all.

Finally, since the Indigo Red jeans obviously were not "the same" as the Levi's® ones, the questions about other relationships between the two become questions of

---

[4] McCullough report, p. M5, bolding added.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                    8

whether the respondent thinks the two *companies* have any relationship rather than the jeans themselves. That is, the respondent may think that the pocket stitching on the two jeans shown are very similar, but he/she might know that Indigo Red is not a subsidiary of Levi's®, they may believe that two different brands must be made by, or in, different manufacturing plants, etc. Indeed, the survey questions are phrased specifically about the companies, and not about the jeans.[2]

In contrast to the "test" Indigo Red jeans, the "control" Calvin Klein jeans were as similar as possible to the Levi's® jeans. These jeans were full length, as were the Levi's® jeans, and they had a similar color or "wash". Further, it is my understanding that they had a pocket stitching design that Levi's® itself has used on jeans it has offered in the marketplace. These factors alone may result in a higher than typical degree of confusion regarding the relationship between the Calvin Klein and the Levi's® jeans, despite the fact that the Calvin Klein brand name was shown on a small leather patch at the waist on the back of the jeans and on tags inside the waistband.

By showing Indigo Red jeans/shorts that were maximally different from Levi's® and "control" Calvin Klein brand jeans that were maximally similar to Levi's®, it is no wonder that the difference in responses between the Indigo Red products and the "control" products was relatively small.

_____

[2] For example, question 5o states: Please tell me whether or not you believe that the company that puts out the jeans you saw earlier is in some way affiliated with or connected with the company that puts out *these jeans*?", McCullough report, December 2004, p. M5.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT .                    9

C.  The quality of the data presented by Mr. McCullough is inherently
unreliable because of insufficient training, supervising, and instructing of
interviewers.

The data that Mr. McCullough presents is inherently unreliable because of a
failure to adequately train and supervise the interviewers who conducted the study.

1.  The training of supervisors was done only through written instructions,
and the training of interviewers, in turn, was done by the field
company supervisors.  Neither Mr. McCullough nor any of his
representatives provided any personal instruction or training.

As noted in the McCullough report, the design of this study was fairly
complicated, with eight different products (two t-shirts, two pairs of socks, and four pairs
of jeans) and 36 versions of the questionnaire to accommodate a rotation of the products
to be shown and the order in which they were presented.  Written instructions were sent
to each interviewing facility regarding how to conduct the interviews, but neither Mr.
McCullough nor any of his representatives were present to insure that all supervisors and
interviewers were properly trained in how to implement the survey.  Thus, there can be
no assurance that the instructions were followed as they were intended.

For example, instructions to interviewers state that the initial garment display
must be such that the jeans were completely unfolded, zipped, buttoned, and with the
back of the jeans facing the respondent.  The interviewer is to "arrange the garments to
use for Q.1 in front of the respondents as indicated by the main questionnaire."[6]  The
main questionnaire, however, says only to "arrange the garments to use for Q.1 in front of

---

[6] McCullough report, Interviewer Instructions, p. 3

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                    10

the respondent as shown below."[7] The only additional information "shown below" is the number of the specific garments to be shown and where each should be placed, from the left to the right-hand side of the respondent.   This leaves open a number of possibilities of how the garments were actually displayed.  Were they already laid out upon the table when the respondent entered the interviewing room?  Were they selected out of a box, one at a time, after the respondent entered the room?  How did the interviewer find the specific product to be displayed, i.e., did they pull out several garments before they came to the correct one, was the respondent aware that the interviewer was searching through other garments, etc.?  With several different interviewers at each of 12 research sites, it is almost certain that, in the absence of personal, specific training, there was no consistent presentation of the garments.

Presentation of the Levi's® jeans is similarly ambiguous.  For Q.5a, in which the respondent is asked to examine the Levi's® jeans, the interviewer is directed to hand the jeans to the respondent with the back of the jeans facing the respondent.[8]  It is unclear which of many ways of presenting the product were used.  For example, the interviewer could have handed the jeans to the respondent using one hand on the waist of the jeans, in which case they may have been folded over such that the pocket stitching was less visible.  Or, they may have held them up with both hands such that the entire back side of the jeans was visible.  With no personal and specific training, this crucial part of the study was left up to the interpretation of many different interviewers.

---

[7] McCullough report, Version 2 Clothing Survey Main Questionnaire, p. M1.
[8] McCullough report, Interviewer Instructions, p. 3.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                    11

2.  The questioning procedure was unclear and thus subject to interviewer
discretion and interpretation.

In several key instances, the instructions to the interviewers as they worked
through the survey were unclear. For example, for question 3a, the interviewer is to say,
"Now, here's the first product. Please tell me whether or not you believe that the tee shirt
you saw earlier is the same one, or is put out by the same company, as *this* tee shirt?"
Directly below the question four possible answers are written out, including words in
italics as was done in the question itself, e.g., "Yes, I believe that the tee shirt I saw
earlier is the same one, or is put out by the same company, as *this* tee shirt." The
specificity of the possible answers and the italics for emphasis suggest that the
interviewer would read the answers to the respondent, but there are no specific
instructions whether to do so or not. Thus, some interviewers may have read these
answers and some may not. Since no one from Mr. McCullough's organization trained or
observed the interviewers, there was no way to know about this potential confusion, no
way to train the interviewers regarding the potential bias that might result from different
intonations and emphases placed on words, etc.

3.  The quality of the interviewers conducting the study is uncertain.

The quality of interviewers at mall research facilities varies greatly. Some
interviewers are very quick to understand what is asked of them, some establish good
rapport with respondents, and some mispronounce sentences, are not quick to pick up on
problems, etc. Neither Mr. McCullough nor anyone on his staff directly observed any of
the interviewers, and thus cannot state with certainty that the interviews were done

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                    12

correctly. The interviewers were required to fill out a practice survey, but this is not a substitute for knowing exactly how the interviewer is performing his/her job.

In addition, in my experience doing mall surveys it has sometimes been the case that interviewers may be rotated around various assignments in the facilities. Due to illness, staff shortages, tight deadlines, or other reasons, interviewers may be pulled on short notice to work on a particular assignment. In these situations, the supervisors may or may not take the time to train the interviewer or observe them. For this reason, I insist that only interviewers who have been trained by me or my associates conduct my surveys.

A review of the 624 questionnaires and screens from Mr. McCullough's survey shows a high number of inaccuracies. Examples of these problems include 32 questionnaires with blank questions (questions not asked or unanswered) or with incorrect questions asked, and 4 respondents who should have been disqualified because they did not answer screen questions appropriately. Further, interviewers were asked to note specific times for the screen's completion, the start of the questionnaire, and the conclusion of the questionnaire. In a random sample of 100 questionnaires, ten percent were found to have irregularities and inconsistencies in the times noted. Some stated that the questionnaire was completed before the screen. Another stated that the questionnaire was completed before it began. Finally, when asked why he/she thought that the maker of the second pair of jeans has permission from the company that puts out the first jeans, respondent #841 stated "Because Levi would sew I-Red if I-Red didn't have permission." This respondent, however, was in the 'control' cell, and should not have seen any Indigo Red products. His/her response seems to suggest that the interviewer may have

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                    13

incorrectly shown the Indigo Red jean instead of the control Calvin Klein jean. Clearly, the interviewers required greater supervision and instruction to conduct the survey properly.

      **D. The conclusions drawn from the survey data are not consistent with the data.**

      Mr. McCullough concludes that "net" level of post-sale confusion between the RP55 "Roland" jeans (shorts) and the Levi's® jeans is only 3%, and that the "net" level of confusion between the RP55 "Stanley" jeans was zero. These conclusions are not warranted based upon the data presented because the "net" methodology is flawed, the control jeans used in its calculation were inappropriate, and because Mr. McCullough has used an inappropriate and narrow measure of confusion.

          1. Mr. McCullough does not count respondents who incorrectly identified the first jeans they saw as Levi's® in his tally of confused respondents.

      Mr. McCullough counts as "confused" only those respondents who said stated that there was some association between the Indigo Red jeans and the Levi's® jeans (i.e., the same jeans or put out by the same company, the companies were affiliated in some way, or the first company had permission from the second company) AND gave a reason for their response that made explicit reference to the design or stitching or tag on the back pockets.[9]  By this standard, only 11 respondents who viewed the Indigo Red Roland

---

[9] McCullough report, p. 10.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT           14

jeans/shorts, and only 5 respondents who saw the Indigo Red Stanley jeans were confused.

Several other respondents, however, gave reasons that indicate they could have been influenced by the pocket stitching. For example, respondent 521 answered "yes" to the question of whether the jeans were the same or put out by the same company. This person's "reason" was "They are put out by the same company, but weren't the same jeans." This is a logical answer to the question of why a person answered "yes" to the compound question, and it is entirely possible that the respondent thought they were put out by the same company because of the similar pocket stitching. Without a follow up question from the interviewer, the answer was left incomplete for purposes of this litigation.

Similarly, several respondents answered "yes" to the question of whether the first jean (i.e., Indigo Red) had permission from the second company (i.e., Levi's®), but were not counted as being confused. Several of these answers are illustrative of the narrowness of Mr. McCullough's definition of confusion:

#150:  "Because they need permission because there are copyright laws"

#383   "The people who made the pants would sue whoever put the sign on the pants if they didn't have permission"

#165:  "If they use their product, they have to have permission to use it."

#256:  "They can't use their logo."

None of these respondents was included in Mr. McCullough's count of "confused" consumers. While it is true that none of the respondents spontaneously and explicitly

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                    15

used words such a pocket stitching or pocket design, it is entirely possible that the pocket stitching played a role in their answer.

> 2. In this survey, a "Don't Know" response is ambiguous and may indicate confusion on the part of the respondent, perhaps due to the pocket stitching.

In this survey respondents were asked various questions about the relationship between two pairs of jeans and/or two companies that manufacture jeans. In this situation, a "don't know" response may indicate confusion, i.e., "I don't know whether there is a relationship or not", but Mr. McCullough does not acknowledge this possibility in his findings. For example, a respondent may see that one pair of jeans is the Indigo Red brand and has different versions of Levi's® traditional brand identifiers such as the leather patch, while the other jean is the Levi's® brand with its typical brand identifiers. Thus, they appear to be different brands, but the person may also perceive that they share the same or similar stitching on the back pocket. Because this pocket stitching design is so closely associated with the Levi's® brand, the respondent then becomes confused as to the relationship. The respondent doesn't know that there is a relationship between Indigo Red and Levi's®, but he/she doesn't know that there isn't, either. Unfortunately, these respondents were not asked why they didn't know, i.e., the source of their confusion.[10]

---

[10] In contrast, in a survey I conducted, a "don't know" response is an unambiguous indicator that the respondent cannot identify the Indigo Red jeans as Levi's® based on the picture they were shown which included a clear view of the pocket stitching. This type of question is a very conservative approach to confusion in that it asks for more than simply a judgment of similarity of one pocket stitching to another. A respondent may perceive the two designs to be very similar, and in fact, almost identical, but he/she may be one of the people in the sample who cannot connect the design to Levi's.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                    16

3. The "net" methodology, and the particular control jean used to
calculate a "net" confusion score, is flawed.

Mr. McCullough arrives at a "net" confusion level in two steps. First, he
calculates the number of participants who saw the Indigo Red "Roland" jeans/shorts, the
Indigo Red "Stanley" jeans, and the Calvin Klein jeans, and who answered "yes" to any
of the questions regarding a relationship between these jeans and the Levi's® jeans (or the
two companies) AND who mentioned a reason for their answer that explicitly made
reference to "the design or stitching or tag" on the back pockets.[11] Next, he subtracts the
percentage obtained for the control, Calvin Klein jeans from the percentage obtained for
each Indigo Red product. This "net" figure is, therefore, claimed to be the "true" level of
confusion "net" of any noise or general confusion in the marketplace.

This procedure is invalid for a number of reasons. First, it is highly dependent
upon the particular jeans that are chosen for "control" purposes. Mr. McCullough
provides no rationale in his report as to why he selected this particular pair of Calvin
Klein jeans as his control. However, I note that these jeans are very similar to the
Levi's® jeans in color and style. In addition, it is my understanding that they use a pocket
stitching design that Levi's® has used before. Thus, Mr. McCullough's "control" level of
confusion is arbitrary at best, and may be highly inflated. A different "net" confusion
level could be obtained simply by selecting a different "control" jean.

Second, a simple subtraction does not take into account any potential sampling
error. That is, it does not take into account the statistical probability that the proportions
for the populations represented by the subsamples of the survey (i.e., the "Roland"

---

[11] McCullough report, p. 10.

participants, the "Stanley" participants, and the Calvin Klein participants) are the same or different from each other.

Third, this procedure assumes that all of the affirmative responses for the "control" jeans represent "noise" in the environment, or a benchmark for general confusion that exists apart from any particular brand identifier. It is important, however, to carefully define what is meant by noise. Because Levi's® is such a well known brand and may even be considered synonymous with the jeans category, it is possible that a respondent might think that any blue jean is a "levi's" product (small case intended). It is this type of indiscriminate confusion that should be considered "noise" and that should be accounted for in analyzing the results of any confusion survey. This is different, however, from real confusion that might exist between Levi's® and brands other than those of interest in this particular litigation. That is, a respondent may see the pocket stitching on another brand of jeans and genuinely believe that this is the type used by Levi's®. Similarity of one pocket stitching design to another is likely to be a matter of degree rather than a yes/no phenomenon. The fact that there are other jeans on the market that are also confusing to some extent to some consumers should not offset or negate the confusion caused by the pocket stitching on the back pocket of the Indigo Red jeans.

Ironically, Mr. McCullough seeks to exclude precisely those control jeans responses that are likely to indicate true confusion due to pocket stitching. That is, he subtracts from the Indigo Red responses all of the responses from those who saw Calvin Klein jeans and thought they had some relationship to the Levi's® jeans specifically because of the pocket stitching.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                    18

E.   The survey methods, procedures, and questions are flawed and do not provide a fair test of the likelihood consumers would be confused by the Indigo Red pocket stitching.

The method in which Mr. McCullough's survey was conducted and the questions that were asked are likely to have been biased against finding any confusion between the Indigo Red and Levi's® jeans.

1.   Intervening tasks are presented between the time of exposure to the first and second jeans that were likely to bias the answers to questions regarding the relationship between the first and second pairs of jeans shown.

In Mr. McCullough's survey, respondents are asked a series of questions about t-shirts and socks before they are asked questions about the possible relationship between the first and second pair of jeans shown. That is, after being shown a pair of socks, a t-shirt, and a pair of either Indigo Red or Calvin Klein jeans, the respondents were shown a second pair of socks and asked questions about its relationship to the first pair; a second t-shirt and asked questions about its relationship to the first one shown; and then finally, a pair of Levi's® jeans and asked about its relationship to the first jeans shown. Mr. McCullough states that the questions about socks and t-shirts 'trained' respondents about the types of questions asked. Unfortunately, this 'training' was very likely to bias the respondents' answers to the final series of questions about jeans.

In Mr. McCullough's survey design, the second pair of socks and the second t-shirt could be the same as the first one shown or different. It appears from an analysis of the data submitted that each respondent saw the same (different) socks and the different

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                    19

(same) t-shirts, such that each respondent saw an example of 'same' products and 'different' products. When the products were the same, however, they actually were the exact same pair of socks or the exact same t-shirt, complete with the same identifying number tag and whatever dirt, stains, or other marks they had acquired through their use in the survey. Thus, respondents would be 'trained' that, in this survey, 'same' means the exact same item. When viewing the Indigo Red jeans or the Calvin Klein jeans and then the Levi's® jeans, these would obviously not be the 'same' jeans in the way that the socks or the t-shirts had been the 'same'.

>    2. Potential bias was created by not rotating the order of presentation of
>    the Indigo Red, Calvin Klein, and Levi's® jeans.

In Mr. McCullough's survey, the first jeans that the respondents saw was always either Indigo Red or Calvin Klein. The Levi's® jeans always appeared second. Given the effort that was made to vary the order and placement of the three products presented first, and the order of the second socks and t-shirts, it is unclear why the order of presentation of the jeans brands would not also be varied. And, given that Levi's® is much more widely distributed and sold than Indigo Red, it seems likely that in most typical situations, the consumer will first see the Levi's® jeans, and then only later, if at all, see the Indigo Red product. Presenting Levi's® second always makes the Indigo Red or Calvin Klein jeans the benchmark product, which is to say, is the Levi's® jean the same as the first jean or made by the same company as the first jean? Asking whether a clearly identifiable Levi's® jean is made by the company that makes Indigo Red has a different connotation than asking whether a clearly identifiable Indigo Red jean is made by the same company as Levi's®. Levi's®, as an old, established brand is likely not be to

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                              20

perceived as being made by a newer, lesser known company, but the newer, lesser known jean might well be perceived as being made by Levi's®.

> 3.  None of the three relationship questions provides a valid indicator of whether the respondents were confused about the origin or source of Indigo Red jeans.

In Mr. McCullough's sequence of questions about each product category – socks, t-shirts, and jeans – the respondent is first asked whether he/she believes "that the jeans you saw earlier are the same as *these* jeans, or are put out by the same company, as *these* jeans?" This question is a compound question, i.e., it asks two questions at once, and a basic tenant of good survey design is that compound questions should be avoided.[12] Since they clearly are not the same jeans, and in particular are not the "same jeans" in the same way that the socks or t-shirts were "the same", the respondent may be biased toward providing a negative answer. The second question may or may not be heard or attended to.

The second relationship question asked is: "Please tell me whether or not you believe that the company that puts out the jeans you saw earlier is in some way affiliated with or connected with the company that puts out *these* jeans?" Given that the respondent has clearly seen who "puts out the jeans" by virtue of the clearly displayed brand names, this question becomes whether the respondent believes there is any connection or relationship between Indigo Red and Levi's®, or between Calvin Klein and Levi's®, and may not necessarily refer to any relationship between the two pairs of jeans.

---

[12] See Payne, Stanley, The Art of Asking Questions (Princeton, NJ:  Princeton University Press, 1951)

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                      21

The respondent may think that the pocket stitching is confusing, but he/she may not believe that Indigo Red is somehow affiliated with Levi's®.

Finally, the third questions asks "Please tell me whether or not you believe that the company that puts out the jeans you saw earlier has permission to do so from the company that puts out *these* jeans?"[13]  A respondent may answer 'no' to this question for a variety of reasons including the belief that Levi's® would not give permission to others to use its trademarks, i.e., "no, they do not have permission, even though they should have it."  The verbatim responses that were given in answer to the question about why a respondent thought that the first company has permission from the second show that respondents were often confused about what was being asked.  Sample 'reasons' for believing that the first company had permission from the second are:

#526:    "Yes . . . It's different.  These are Levi's and the other ones are Calvin Klein"

#627    "Yes . . . A lot of companies make pants"

#664    "Yes . . . Different brands"

#565    "Yes . . . Because I can't see a reason why one jeans company can't give permission for another company to put out jeans.

V.  CONCLUSION

Given the numerous problems I have identified with the survey reported by Mr. McCullough, I conclude that it does not provide a test of the likelihood that the pocket

---

[13] This is the question that is given on the "Version 2 Clothing Survey Main Questionnaire" contained in the McCullough report, p. M6.  The tables reporting this specific findings give a different version "Q. 5R  Reasons Why the Maker of the 2nd Jeans Has Permission From the Company That Puts Out the 1st Jeans".  These are very different questions.  I assume for purposes of my report that the version shown on the Main Questionnaire is the one that was actually used in conducting the survey.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                    22

Exhibit O
Page 47

SENT BY: SCOTT/PEASE;                    650 473 8208;        FEB-25-05 18:11;            PAGE 2/2

stitching on the Indigo Red jeans may cause consumers to be confused as to the source or
identity of the jeans. In particular, it does not provide reliable evidence of whether or not
consumers are likely to confuse the pocket stitching on the Indigo Red jeans with that of
Levi's® jeans. Similarly, it provides no evidence regarding the issue of likely dilution of
the value of Levi's® trademarked pocket stitching.


My understanding is that some of this testimony is covered by protective orders.



Date:  February 25, 2005                    _Carol A. Scott_____
                                            Carol A. Scott




REBUTTAL REPORT OF PROF. CAROL A. SCOTT                              23

# Exhibit 1

Exhibit 1

CAROL A. SCOTT

Anderson Graduate School of Management
University of California
Los Angeles, California 90024
(310) 825-4458
(310) 206-2019 (fax)

1834 Park Blvd.
Palo Alto, CA   94306
(650) 473-9297
(650) 473-9298 (fax)

## EDUCATION

| | |
|---|---|
| Ph. D. | Northwestern University, June 1975<br>Major Field:  Marketing<br>Minor Field:  Social Psychology |
| M.S. | Northwestern University, August 1972<br>Major:  Management |
| B.S. | University of Texas at Austin, December 1970<br>Major:  Business and history education<br>Graduated with highest honors |

## TEACHING EXPERIENCE

| | | |
|---|---|---|
| 1977 - | University of California, Los Angeles | |
| | 1989- | Professor of Marketing |
| | 1980-89 | Associate Professor of Marketing |
| | 1979-80 | Acting Associate Professor of Marketing |
| | 1978-79 | Assistant Professor of Marketing |
| | 1977-78 | Visiting Assistant Professor of Marketing<br>(on leave from The Ohio State University) |
| 1985 - 1986 | Harvard Business School<br>Visiting Associate Professor, Business Administration | |
| 1974 - 1978 | The Ohio State University<br>Assistant Professor of Marketing | |

-2-

## ACADEMIC ADMINISTRATIVE EXPERIENCE

1990 - 94    Chairman of the Faculty, Department (School) of Management
Responsible for all matters pertaining to the approximately
100 faculty FTE in the Anderson Graduate School of Management,
a single department school, including: recruiting, retention,
promotions, salary adjustments, scheduling and staffing of courses,
and student and peer evaluation of teaching. Manage budget and
process all appointments for temporary faculty.

1987 - 91    Associate Dean, Academic Affairs
1993 - 94    Act for the dean in his absence. Responsible for all academic
degree programs and support services including: full-time, Fully
Employed and Executive MBA Programs, Ph.D. and M.S.
Programs, Management Communications Program, Management
Field Studies Office, Computing Services Center, and all
interdisciplinary study centers (e.g., Entrepreneurial Studies
Center, Finance and Real Estate, International Business, etc.).

1986 - 87    Assistant Dean, MBA Curriculum & Policy
Responsible for all academic policies pertaining to the full-time
MBA Program. Coordinated a review of this program which
resulted in revised core curriculum; implemented computerized
bidding system for course enrollment.

## JOURNAL ARTICLES PUBLISHED

Robert A. Hansen and Carol A. Scott. Comments on attribution theory and advertiser
credibility. *Journal of Marketing Research*, 13, May 1976.

Carol A. Scott. Effects of trial and incentives on repeat purchase behavior. *Journal of
Marketing Research*, 13, August 1976.

Carol A. Scott. Modifying socially-conscious behavior: The foot-in-the-door technique.
*Journal of Consumer Research*, 4, December 1977.

Carol A. Scott and Richard F. Yalch. A test of the self-perception explanation of the
effects of rewards on intrinsic interest. *Journal of Experimental Social
Psychology*, 14, January, 1978.

Carol A. Scott and Richard F. Yalch. Consumer response to initial product trial: A
Bayesian analysis. *Journal of Consumer Research*, 7, June 1980.

-3-

Alice M. Tybout and Carol A. Scott. Availability of well-defined internal knowledge and the attitude formation process: Information aggregation versus self-perception. *Journal of Personality and Social Psychology, 44*, March 1983.

Deborah Roedder John, Carol A. Scott, and James R. Bettman. Sampling data for covariation assessment: The effect of prior beliefs on search patterns. *Journal of Consumer Research, 13*, June 1986.

James R. Bettman, Deborah Roedder John, and Carol A. Scott. Covariation assessment by consumers. *Journal of Consumer Research, 13*, December, 1986.

James R. Bettman, Elizabeth H. Creyer, Deborah Roedder John, and Carol A. Scott. Covariation assessment in rank order data. *Behavioral Decision Making, 1*, October-December, 1988, 239-254.

## REPORTS, PRESENTATIONS, CHAPTERS IN BOOKS

Carol A. Scott, Decade of the Executive Woman, New York: Korn/Ferry, International, 1993.

Vicky L. Crittenden, Carol A. Scott, and Rowland T. Moriarty. The effects of prior product experience on organizational buying behavior. In Paul Anderson and Melanie Wallendorf eds.). *Advances In Consumer Research*, vol. 14, 1986.

James R. Bettman, Deborah Roedder, and Carol A. Scott. Consumers' assessment of covariation. In T. Kinnear (ed.), *Advances In Consumer Research*, vol. 11, 1983.

Carol A. Scott and Alice M. Tybout. Some indirect effects of case vs. base rate data on information processing strategies. In R. Bagozzi and A. M. Tybout (eds.), *Advances in Consumer Research*, 10, Association for Consumer Research, 1982. (Abstract).

Carol A. Scott. On using attribution theory to understand advertising effects. In A. Mitchell (ed), *Advances in Consumer Research*, 9, Association for Consumer Research, 1981.

Carol A. Scott. Speculations on the role of marketing and corporate communications: Some implications for practice and issues for research. In S. A. Greyser (ed.), Proceedings of the MSI Workshop on Corporate Communications, Marketing Science Institute, forthcoming.

Carol A. Scott and Alice M. Tybout. Theoretical perspectives on the impact of negative information: Does valence matter? Abstract published in K. Monroe (ed.), *Advances in Consumer Research*, 8, Association for Consumer Research, 1980

-4-

Carol A. Scott. Consumer satisfaction: Perspectives from self-perception theory. Paper presented at the American Psychological Association conference, Montreal, Canada, September, 1980.

Carol A. Scott. Forming beliefs from experience: Evidence from self-perception theory. In H. H. Kassarjian and T. S. Robertson (eds.), *Perspectives In Consumer Behavior*, 3rd edition, Scott, Foresman, 1981.

Alice M. Tybout and Carol A. Scott. Extending the self-perception explanation: The effect of cue salience on behavior. In W. L. Wilkie (ed.), *Advances in Consumer Research*, 6, Association for Consumer Research, 1979.

Carol A. Scott. Attribution theory in consumer research: Scope, issues, and contributions. Proceedings, American Marketing Association Fall Educators' Conference, S. Jain (ed.), 1978.

Carol A. Scott. The role of self-perception processes in consumer behavior: Interpreting one's own experiences. In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research.

Robert A. Hansen and Carol A Scott. Alternative approaches to assessing the quality of self-report data. In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research, 1978.

Robert A. Hansen and Carol A. Scott. Improving the representativeness of survey research: Some issues and unanswered questions. Proceedings, American Marketing Association Fall Educators' Conference, 1977.

Richard F. Yalch and Carol A. Scott. Effect of initial trial of a new product on attitude-behavior consistency. In W. D. Perreault, Jr. (ed.), *Advances in Consumer Research*, 4, Association for Consumer Research, 1977.

Carol A. Scott. Researching the broadened concept of consumer behavior. In G. Zaltman and B. Sternthal (eds.), *Broadening the Concept of Consumer Behavior*. Association for Consumer Research monograph, 1975.

Brian Sternthal, Carol A. Scott, and Ruby Roy. Self-perception as a means of personal influence: The foot-in-the-door technique. In B. Anderson (ed.), *Advances in Consumer Research*, 3, Association for Consumer Research, 1975.

Carol A. Scott. Hendley distributors. Consumer behavior research case in Gerald Zaltman, Philip C. Borger, and Randall L. Schultz, *Cases in Marketing Research*, New York: Dryden Press, 1975.

-5-

## AWARDS

1984      Outstanding Teacher of the Year, presented by MBA students at the
Graduate School of Management, UCLA.

## GRANTS RECEIVED (non-university)

New Roles for Corporate Communications. Grant received from the Marketing Science
Institute (with James R. Bettman, Richard J. Lutz, and Barton A. Weitz),
December 1980 – May 1981.

## SELECTED PROFESSIONAL ACTIVITIES

Academic Advisory Council, Marketing Science Institute, 1987 to 1990

Editorial Boards:
Journal of Marketing Research, December 1975 to July 1985
Journal of Marketing, July 1978 to July 1986; January 1991 – August 1993
Journal of Consumer Research, December 1980 –

Occasional reviewer, Journal of Personality and Social Psychology and Journal of
Applied Psychology

Distinguished lecturer at University of Pennsylvania (1978), University of Washington
(1979), University of Florida (1979), Berkeley/Stanford (1980), University of
California, Santa Barbara (1982)

AMA Doctoral Dissertation Competition chairperson, 1985

Consumer Behavior Track chairperson, American Marketing Association Special
Conference on Marketing Theory, February 1982

Consumer Behavior Track chairperson, American Marketing Association Fall
Educators' Conference, 1980

Treasurer, Association for Consumer Research, 1980-81

Resident Faculty Member, American Marketing Association Doctoral Consortium,
1979, 1980, 1983. Consortium speaker 1984, 1985, 1986

Program Committee, 1979 Annual Conference, Association for Consumer
Research, Prof. Jerry Olson, chairman

Consulting projects for a number of profit, not-for-profit, and governmental
organizations in Ohio and California.

Exhibit O
Page 54

-6-

Assignments have included strategic marketing audits, development of strategic marketing plans, advertising planning consultation, marketing research analysis and interpretation, and expert witness testimony preparation.

## PROFESSIONAL MEMBERSHIPS

Association for Consumer Research

## COURSES TAUGHT

Undergraduate (primarily at The Ohio State University)
    Consumer Behavior; Advertising
Masters' (primarily at UCLA)
    Consumer Behavior; Introductory Marketing; Advanced Marketing Management;
    Management of Distribution Channels; Global Marketing Management; Market
    Assessment; Marketing Strategy and Policy (Executive MBA Program)
Ph.D. (UCLA, Harvard, and Ohio State)
    Consumer Behavior Theory and Research
    Attribution Theory Research in Marketing
    Doctoral research paper supervision

## THESIS ADVISING

Chair, Ph.D. Thesis Committee 6 students
Member, Ph.D. Thesis Committee - 9 students
Member, Masters Examining Committee (Ohio State) - 3 students

## RECENT COMMITTEE ASSIGNMENTS (UCLA only)

Task Force on Women at Anderson, 2001 --
University Committee on Research, 1999-2001
    Chair, Faculty Grants Program
Dean Search Committee, 1997-1999
Executive Education Advisory Committee 1997 -- 1999
MBA Admissions Committee 1997-99
Academic Staffing Committee 1997-98
Faculty Executive Committee, 1993 - 1997
Professional Educational Task Force (University), 1993-94
UCLA Child Care Services Advisory Board, 1990 - present; Chair, 1991 - 1993

## PERSONAL DATA

Exhibit O
Page 55

-7-

Born:  September 13, 1949
       Dallas, Texas

Married to Christian G. Pease; one daughter, Camille Rose, born January 14, 1991

Exhibit O
Page 56

1  TOWNSEND AND TOWNSEND AND CREW LLP
   GREGORY S. GILCHRIST (Bar No. 111536)
2  GIA L. CINCONE (Bar No. 141668)
   TIMOTHY R. CAHN (Bar No. 162136)
3  Two Embarcadero Center, 8th Floor
   San Francisco, California 94111
4  Telephone: 415-576-0200
   Facsimile: 415-576-0300
5  gsgilchrist@townsend.com; glcincone@townsend.com; trcahn@townsend.com

6  Attorneys for Plaintiff
   LEVI STRAUSS & CO.

7

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12  LEVI STRAUSS & CO.,              Case No. C 04 0468 SI

13                    Plaintiff,     REPLY DECLARATION OF CAROL
                                     SCOTT IN SUPPORT OF PLAINTIFF
14            v.                     LEVI STRAUSS & CO.'S MOTION FOR
                                     SUMMARY JUDGMENT
15  RP55, INC., et al.,
                                     Date:      May 6, 2005
16                    Defendants.    Time:      9:00 a.m.
                                     Courtroom: 10
17

18

19

20

21

22

23

24

25

26

27

28

REPLY DECL. OF CAROL SCOTT                    Levi Strauss & Co. v. RP55, Inc., et al.
ISO PL.'S MOTION FOR SUMMARY JUDGMENT              CASE NO. C 04-0468 SI

                                                           Exhibit O
                                                           Page 57

1    I, Carol Scott, declare and state as follows:

2    1.    I am not, as RP55 has stated, Levi Strauss & Co.'s "in house" marketing expert. I am a

3    Professor of Marketing at the University of California, Los Angeles. As I reported in my CV and in

4    my deposition, I teach a variety of classes at UCLA's Anderson Graduate School of Management

5    where I have been Assistant and Associate Dean, as well as Chair of the Faculty. My duties at UCLA

6    have required me, throughout my career, to research and apply basic and sophisticated principles of

7    experimental design and analysis. I consult on litigation matters part time and generally work only on

8    a few matters each year on which I can concentrate my attention. Levi Strauss & Co. is but one of

9    many clients I have had over the past 30 years of my career. I can assure the Court that I bring

10    objectivity and independence to any opinions or reports of data that I have collected for purposes of

11    any litigation.

12    2.    I have reviewed the Declaration of Walter McCullough in opposition to Levi Strauss's

13    motion for summary judgment and his rebuttal report. I have also reviewed parts of RP55's

14    memorandum in opposition to Levi Strauss's summary judgment motion, as well as Levi Strauss's

15    motion to strike Mr. McCullough's report and RP55's opposition to that motion. I have noted the

16    many criticisms that have been leveled against my report and conclusions. I disagree with them. In

17    particular, I disagree with Mr. McCullough's suggestion that my survey reflects no appreciable level

18    of confusion. In my opinion, the data supports my conclusion that I have reported a conservative

19    estimate of actual and likely consumer confusion.

20    3.    The criticisms of the reported levels of confusion in my declaration (and my report) are

21    misguided. To address concerns about survey "noise," I provided a calculation in my report that

22    deducted or discounted the aggregate level of confusion reflected by Indigo Red respondents (that is,

23    the sample that saw the Indigo Red jeans) by more than one-third of the total who misidentified the

24    jeans as LEVI'S jeans. My report of 14% confusion among all Indigo Red respondents depended only

25    on the respondents who confused the Indigo Red jeans with LEVI'S® jeans *and* attributed their

26    confusion to the stitching. This may have been overly conservative. Respondents who identified the

27    Indigo Red jeans as LEVI'S® jeans may well have identified them by the stitching but, for whatever

28    reason in a survey context, failed to mention stitching as the reason.

REPLY DECL. OF CAROL SCOTT                    - 1 -                 Levi Strauss & Co. v. RP55, Inc., et al.
ISO PL.'S MOTION FOR SUMMARY JUDGMENT                              CASE NO. C 04 0468 SI

Exhibit O
Page 58

4.     Mr. McCullough suggests that some of the respondents who specifically stated that the Indigo Red jeans were LEVI'S® jeans due to the stitching may nonetheless have been guessing. McCullough Decl. ¶ 8. He supposes that respondents will want to appear "rational" and that the stitching provides an obvious vehicle. This is not a conclusion that can be drawn from "experience," as Mr. McCullough suggests. If someone is guessing, it is just as likely or more likely that the respondent will be non-specific about his response or refer to a generic feature of the jean. There is no reason to assume that respondents who specifically mention the stitching are guessing and then reporting that the guess was based on the stitching in order to appear rational. When a respondent reports that the pocket design is the reason for his answer, it is certainly reasonable to conclude that the pocket design is contributing in some way to his identification of the jean. It is every bit as likely, if not more so, that other respondents who identify the jean from the stitching are not being counted in this group. Respondents might know a jeans brand from its stitching, but -- based on an overall impression of the jean -- not report that or attribute the belief to another feature. Accordingly, the 14% overall confusion rate, after I deducted those who did not attribute their confusion to stitching, is, in my opinion, the most conservative measure that would be appropriate.

5.     I reported in my declaration another calculation that comes from the data submitted with my expert report. This calculation recognizes that, even though it is extremely well known by consumers, not every consumer will be familiar with the LEVI'S® Arcuate stitching design. To determine how many respondents are candidates to express an opinion about similarities between the designs, one may consider only the population that recognizes the Arcuate. In determining the population that recognizes the Arcuate, I used the entire 58% who correctly identified the LEVI'S® jean. I called this conservative in my declaration because some number of respondents have likely correctly identified the jean as LEVI'S® but nonetheless are not familiar with the Arcuate. Approximately 33% of the total LEVI'S® respondents specifically attributed their identification of the LEVI'S® jean to the stitching. I felt it might be overly aggressive to limit the calculation to the group that specifically expressed familiarity with the Arcuate because significantly more of the 58% who correctly identified the LEVI'S® jean likely are familiar with the Arcuate. Other surveys I have conducted for Levi Strauss, as referred to in my report, show high levels of recognition of LEVI'S®

REPLY DECL. OF CAROL SCOTT
ISO PL'S MOTION FOR SUMMARY JUDGMENT

- 2 -

Levi Strauss & Co. v. RPSS, Inc., et al.
CASE NO. C 04 0468 SI

Exhibit O
Page 59

1   jeans. Accordingly, I felt it would not be appropriate to assume that only 33% of the Indigo Red

2   population was familiar with the Arcuate when I was calculating how much of that population had

3   misidentified the Indigo Red jeans as LEVI'S® jeans due to stitching.

4       6.    Mr. McCullough's survey, by pairing the stitching design (to the extent respondents

5   perceived it at all) with the LEVI'S® branding that appeared on the jeans, essentially creates or

6   reinforces his respondents' familiarity with the LEVI'S® jean whether it existed before or not. He

7   states this in his declaration (¶ 9 ["My test did not reply upon consumers having prior knowledge of

8   LS&CO.'s mark"]). It is unclear, therefore, why he is critical of the calculation made in my

9   declaration which mirrors this condition. He says that it is inappropriate to use the proportion of the

10  population (58%) that accurately recognized the LEVI'S® brand by assuming that a similar

11  proportion of the Indigo Red respondents would exhibit this familiarity. He is simply wrong about

12  this. It is entirely reasonable as a matter of statistics and social science research to believe that the

13  Indigo Red respondents would be aware of LEVI'S® jeans and their marks at a similar rate to the

14  LEVI'S® respondents. Respondents in my study were randomly assigned to see either the group of

15  jeans including the LEVI'S® jeans or the group including the Indigo Red jeans. The technique of

16  "random assignment to treatments" is a basic principle of experimental design, and been used in any

17  variety of research contexts for decades. See Exhibit A.

18      7.    Looking at the data in this way affords a useful comparison without forcing the

19  respondents to engage in a side-by-side comparison as occurs in the McCullough survey. The side-by-

20  side comparison in McCullough's survey, while leaving no question about the brands, allows

21  respondents who perceive the differences between the designs to "correct" their confusion, if it exists,

22  before they register it in response to any questions. By applying the reasonable assumption that the

23  same proportion of one survey population would recognize the LEVI'S® jeans as would the other

24  population, one is able to assess perceptions of similarity between the designs without engaging in this

25  side-by-side presentation. The Indigo Red respondents are effectively able to tell us whether they

26  view the designs as sufficiently similar to call up their pre-existing association of the Arcuate with

27  LEVI'S® jeans. This is a much truer measure than to distort the outcome by allowing the respondents

28  to look at both jeans. As I stated in my declaration in support of Levi Strauss's summary judgment

1  motion, 24% of respondents who are familiar with the Arcuate are likely to be confused by Indigo

2  Red's design if they simply observe it in the marketplace.

3      8.    As I understand it, Mr. McCullough further criticizes the measure of confusion that I

4  just described because it is not the same as that discussed in a case involving Brunckhorst cold meats

5  and Weinhard's beer.  As I understand the survey in that case, respondents were asked on the

6  telephone whether they were aware of the company that produced the allegedly infringing mark,

7  "Boar's Head Red."  Those who answered "no" were excluded from the population in which confusion

8  was measured.  Although RP55 has said that it is inappropriate to use the LEVI'S® sample in looking

9  at the Indigo Red results, RP55 proceeds to determine how many of the LEVI'S® respondents formed

10 a belief as to the manufacturer of the jeans and applies that proportion to the Indigo Red population.

11 (Opposition to Levi Strauss's Summary Judgment Motion at 10.)  In this case, I agree that it is

12 inappropriate to use the LEVI'S® population – at least if one is making a parallel calculation to that in

13 the Brunckhorst case.  The population in my survey that saw the allegedly infringing mark, "Boar's

14 Head Red" in the Brunckhorst case, was the sample who saw Indigo Red jeans.  Accordingly, those

15 among the Indigo Red population who formed a belief as to the brand or manufacturer is the

16 comparable population.  If that population is considered (the 70% of the total Indigo Red population

17 who named a brand, excluding those who said they did not know – see Exh. 8 to my Supplemental

18 Report), the percentage of Indigo Red respondents who called the jeans LEVI'S® *and* attributed their

19 confusion to stitching is 21%.  This is also a useful way to screen the data, as it eliminates from

20 consideration respondents who perceived no cues that helped them identify a brand when they looked

21 at the Indigo Red jeans.

22     9.    Mr. McCullough makes one more criticism of these calculations in which he poses a

23 hypothetical outcome where the sample is reduced to two respondents who are aware of the Arcuate

24 trademark, and one Indigo Red respondent who is confused by the stitching.  The resulting 50%

25 confusion rate, he finds to be "the epitome of junk statistics."  McCullough Decl. ¶ 12.  First, this

26 reduction in the sample to two would essentially negate the survey's usefulness by creating too small a

27

28

1    sample.[1] Second, there is no reason -- *provided that the sample remains large enough* -- why one

2    would summarily disregard a high confusion rate among those aware of the senior mark. It shows a

3    high degree of perceived similarity in the marks which reflects likely confusion. Even if large

4    percentages of the population are unaware of the design trademark at issue, it is useful to assess

5    consumer perceptions as to the similarity of the designs, as that perception bears on a consumer's

6    ability accurately to associate a design with its source.

7        10.    The declaration that I earlier submitted was not any kind of new opinion. I submitted

8    all of the data that I have relied on in electronic form for RP55 to consider. In fact, all of the

9    calculations from my declaration were taken directly from the data discussed in the text of my report,

10   as are the calculations in this declaration.

11       11.    I have reported in my expert reports my opinions about "noise" in the survey results,

12   and have been available to answer any questions regarding those opinions. I sat through two

13   depositions with Mr. Goettsch. In the first deposition, he asked no questions about how I would

14   analyze the data to account for any purported noise. I had previously reported my findings -- just as I

15   later did in my declaration -- that while 22% of the Indigo Red respondents identified the jeans as

16   LEVI'S® (more for a younger set), 14% of the Indigo Red respondents attributed their confusion to

17   stitching or pocket stitching. This data helps to gauge whether the expressed confusion is related to

18   the involved trademark.  The survey also tested other jeans that operate as a check against mere

19   "guessing" or top-of-mind awareness of a popular brand. As I stated in my expert report, many

20   respondents accurately identified other jeans and the results from the Indigo Red respondents were

21   significantly higher than for other brands.

22       12.    My rebuttal report discussed and critiqued Mr. McCullough's treatment of noise, and

23   its principles are applicable to his criticisms or concerns about noise in my data. As I explained, it is

24

25   ─────────────────────────

26   [1] The application of the survey results to make useful adjustments to the population in order to test
     relevant propositions, as I have suggested, in essence has the same effect as "screening" the

27   respondents -- a technique that both surveys used. If a tiny sample results, however, the survey is less
     meaningful.

28

1   not appropriate simply to deduct uncritically all confusion reported in a "control" cell. There is

2   nothing "classic" about this approach, as suggested by Mr. McCullough. This approach puts too much

3   emphasis on the selection of the control. As I stated in my rebuttal report, the control jean that RP55's

4   counsel selected emphasized its similarity with the LEVI'S® jean that was tested. In opposition to the

5   motion to strike, RP55 suggested that this was deliberate on its part, and that control stimuli are

6   required to approximate closely the product bearing the senior mark, here LEVI'S® jeans.

7   (Opposition to Levi Strauss' Motion to Strike at 11.) I cannot speak to the legal issues, but it makes no

8   sense from an experimental design perspective for the control to emulate the senior product. The

9   survey should, instead, minimize differences between the control product and the *test* jean, *except for*

10  *the variable being tested*, here pocket designs. Otherwise, the "control" will tend to overstate

11  confusion relative to the test jean, for reasons unrelated to the proposition being "controlled."

12      13.    The last significant issue relates to his criticism of my survey as not reflecting post sale

13  conditions. I disagree. I asked people to look at the jeans in the survey as if they might be buying

14  them, not to replicate point of sale conditions, but to assure reasonable care in observation from

15  respondents who otherwise would not know or have any context for looking at the jeans at all. I used

16  pictures that displayed the marks in a manner where the pocket design might be seen in the post sale

17  context, to facilitate control over the stimuli. There are disadvantages to photos in some cases, but I

18  believe those are outweighed in this case by the degree of control, uniformity and potential for

19  repetition they provide.[2] Actual products may not be displayed in a constant manner and it may be

20  difficult to isolate the appropriate stimuli under a test that uses actual products.

21

22

23

24

25  [2] The photos that were used in most cases in my survey, including of the Indigo Red jean, were actual

26  screen shots from Internet selling sites. They were "enlarged" photos which contained no point of sale data such as brand, price or store. I chose these photos to avoid any claim that the product was

27  arranged by me in any misleading way. They show the jeans pockets much like they might be observed on people wearing the jeans, either live or in magazines.

28

REPLY DECL. OF CAROL SCOTT                    - 6 -                    Levi Strauss & Co. v. RP55, Inc., et al.
ISO PL'S MOTION FOR SUMMARY JUDGMENT                                   CASE NO. C 04 0468 SI

1     I declare under penalty of perjury under the laws of the United States that the foregoing is true

2 and correct.

3     Executed at Las Vegas, Nevada, this 22nd day of April, 2005.

4

5                         /s/ Carol Scott

6                         Carol Scott

7 60473232 v1

8

9

10

11

12

13

14

15

16

17

18 ·· ··

19

20

21

22

23

24

25

26

27

28

REPLY DECL. OF CAROL SCOTT
ISO PL.'S MOTION FOR SUMMARY JUDGMENT

- 7 -

Levi Strauss & Co. v. RPSS, Inc., et al.
CASE NO. C 04 0468 SI

# EXHIBIT A

# DESIGN AND ANALYSIS
## A Researcher's Handbook

**GEOFFREY KEPPEL**
*Department of Psychology*
*University of California, Berkeley*

1973

PRENTICE-HALL, INC., *Englewood Cliffs, New Jersey*

Exhibit O
Page 66

24    SINGLE-FACTOR EXPERIMENTS

*reduces* the variation of the room temperature. An uncontrolled room would be subjected to a wider range of temperatures during the course of an experiment than a controlled room, but a variation will still be present. This variation may be sufficiently small to allow us to view the temperature as constant. Even with these features controlled, however, many variables remain uncontrolled that might influence the behavior we are studying.

We have not mentioned yet a major source of uncontrolled variability present in any experiment, namely, the differences in performance among subjects. One obvious way to hold subject differences constant is to use the *same* subject in each treatment condition—a sort of biological analogue of absolute physical control. Unfortunately, even the same subject is not the same person each time he is tested. Moreover, there are potentially serious carry-over effects from one treatment to another, owing to the successive administration of the different treatments to the same subjects. To avoid this problem, we could try to *match* sets of subjects on important characteristics and then assign one member of each matched set to a different treatment, but matching would never be exact. Thus, neither attempt to control for individual differences among subjects guarantees that the treatment groups will contain subjects of the same average ability.

CONTROL BY RANDOMIZATION

This leads us to a third method, one which represents control of a different sort. Specifically, it consists of an elimination of *systematic* differences among the treatment conditions by means of *randomization*. Consider again the control of room temperature. What might we do about controlling the temperature if the room were *not* equipped with a thermostat? We could try to match sets of subjects arriving at different times for the experiment, but for whom the temperature of the room is the same, and then run one of the subjects in one group, one in another group, and so on. But this is an unrealistic and cumbersome procedure. Suppose, instead, that we decide which of the different treatments a subject will receive by some random means at the time of his arrival for the experiment and that we continue to use this method until we have obtained the number of subjects we planned to run in each of the treatment conditions. What happens to the different room temperatures in this case? In a sense, the different temperatures of the experimental room have an equally likely "chance" at the start of each testing session of being assigned to *any one of the treatment levels.* If we follow this procedure with enough subjects, statistical theory tells us that the *average* room temperatures for the treatment groups will be equal. Under these circumstances, then, we will have effected a control of room temperature.

That is fine for temperature, but what about other features of the testing environment which also change from session to session? It may not be



An uncontrolled room would be
ring the course of an experiment
l still be present. This variation
ie temperature as constant. Even
y variables remain uncontrolled
lying.

rce of uncontrolled variability
erences in performance among
ifferences constant is to use the
. sort of biological analogue of
n the same subject is not the
or, there are potentially serious
other, owing to the successive
ie same subjects. To avoid this
its on important characteristics
set to a different treatment, but
ttempt to control for individual
treatment groups will contain

sents control of a different sort.
*tematic* differences among the
n. Consider again the control
it controlling the temperature
t? We could try to match sets
xperiment, but for whom the
run one of the subjects in one
t is an unrealistic and cumber-
eoide which of the different
om means at the time of his
e to use this method until we
to run in each of the treatment
n temperatures in this case?
mental room have an equally
t of being assigned to *any one*
iure with enough subjects,
mperatures for the treatment
, then, we will have effected

other features of the testing
to session? It may not be

immediately apparent, but once we have controlled *one* environmental feature by randomization, we have controlled *all* other environmental differences as well. Suppose we list some of the characteristics of the testing session present during the very first session in the experiment. The room will be at a certain temperature; there will be a certain humidity; the room illumination will be at a particular level; the noise from the outside filtering into the room will be of a certain intensity; the experiment will be given at a particular time of day, on a particular day, and by a particular experimenter; and so on.

When the experimenter is about to begin, he chooses a particular experimental treatment for the first subject in some random fashion. What this means is that at this point each of the treatment conditions has an equally likely chance of being the one chosen for that particular experimental session. The implication is that the total composite of features which happens to be present at that time has an equally likely chance of being "assigned" to each of the experimental treatments. We come next to the second experimental session. The total composite of features present at the second session will be different than the one present at the first. The room will be at a different temperature, the noise level may not be the same, the session will be at a different time of day, and so on. Before the start of the session, the experimenter again chooses randomly which treatment he will present. As with the first session, the composite of features present this time have an equally likely chance of being associated with each of the treatments.

Suppose this argument is continued until all of the subjects have been assigned to treatment conditions in the experiment. Then each and every feature of the experimental situation, which varies from session to session, has been assigned randomly to the different treatment conditions. There was no systematic bias leading to the running of one condition at the same time of day or only in warm rooms or only when the lights were bright, or whatever. The assignment of the testing sessions to the experimental conditions in a random fashion eliminates from the experiment the possibility of systematic biases involving any of these factors.

Subject differences are also "controlled" by randomization. The subjects who are chosen to participate in an experiment will differ widely on a whole host of characteristics. Some of these will affect the behavior being studied and, hence, must be controlled. Suppose we could give each of our subjects a number which represents his general ability to perform on the sort of task being studied. This number will be a composite score, reflecting the influence of his intelligence, his emotionality, his attitude, his background and training, and so on. Now suppose that we assign the subjects to the different treatment conditions randomly. Subjects with high composite scores are just as likely to be assigned to one of the treatments as to any of the others. The same is true for subjects with low and with medium composite scores. Thus, random assignment of subjects to treatments will ensure in the long run that there will be an equivalence of subjects across the different treatments.

Exhibit O
Page 68

**26    SINGLE-FACTOR EXPERIMENTS**

Suppose we take one final step in this argument. Somehow we select the first subject who will be run in the experiment; he may be the first subject who shows up as a volunteer for the experiment, or he may be the rat in the first cage that we come to. When we randomly assign this subject to one of the treatment conditions, we are essentially assigning *jointly* the subject *and* the environmental factors. By assigning him randomly to the treatment conditions, then, we are assigning randomly *all* of the ability and environmental factors as well—whatever the combination of ability and environmental factors may be for this subject. Therefore, randomization of subjects in the assignment to conditions is an indispensable method of guaranteeing that in the long run the treatment conditions will be matched on all environmental factors and subject abilities.

A serious problem presented by this argument has undoubtedly occurred to you. Specifically, we *never* run a sufficiently large number of subjects in our experiment to qualify for the statistician's definition of the "long run." In practice, we are operating in the "short run," meaning that we have no guarantee that our groups will be equivalent with regard to differences in environmental features or to differences in the abilities of subjects. We will return to this problem in a moment.

*Methods of Randomization*

Because of the fundamental importance of randomization to the design and analysis of experiments, we will consider in detail methods by which randomization may be accomplished. Whatever method we use, we must be able to argue that *all* factors not involved in the manipulation of the independent variable have been neutralized by randomization. As an example, suppose we conduct an experiment with three treatment conditions and we plan to run a total of 30 subjects in the experiment. For the first subject who shows up, we will determine which treatment he receives by some random process.[1] The treatment given to the second subject is determined in the same manner. This procedure is followed until all 30 subjects have served in the experiment. Note that *each subject* is randomly assigned to a treatment and *each testing session* is randomly assigned to a treatment. The critical feature of the random assignment, then, is that each *subject-session combination* is *equally likely* to be

---

[1] If there were only two treatment conditions, the treatment selected could be determined by the flip of a coin. If more than two conditions are included in the experiment, we usually give each condition a different number and then refer to tables of random numbers which provide a source of random sequences of digits. Such tables may be found in many statistics texts and in experimental psychology texts. There are also books of random numbers available, such as Moser and Oakford (1963) and a book published by the RAND Corporation (1955). The tables published in Moser and Oakford are especially useful, since they include random permutations of number sets of different sizes. For example, if there are 30 things that we want to randomize, it is far easier to use a random ordering of the numbers 1–30, and to select from that ordering the numbers 1–30, than it is to work through a random sequence of digits, two at a time, searching for the first occurrence of each one of these numbers.

assigned to any one of the ment conditions . . . whatever other uncontro testing.

In actual practice, we w procedure of assigning tr number of subjects at eac considered in Chapter 5.) V of their own convenience, is to make the random assi run again until all of the o is a procedure of *samplin* decide randomly which of t For the second subject, we remaining treatments. For remaining treatment, since This completes a *block* of r fourth subject is decided by i.e., three; the treatment randomly from the remain

It is generally advisable t did in the last paragraph. T We can think of two gener any experiment: those wh session and those which do of variables—even if we ru subjects in another treatme at each testing session by de ization to control the secon haphazardly.

We are usually unable t fluctuation will be; howeve example, subjects volunteer flow of participants. There volunteers early in the sch reflect differences in abiliti curious or smarter—who kr time of day or of noise leve in small blocks "helps" this say, representing each treat different in temperature. O more likely to have the sam three subjects who did not.

The Logic of Hypothesis Testing     27

omehow we select the first
he first subject who shows
s rat in the first cage that
t to one of the treatment
ject *and* the environmental
t conditions, then, we are
ntal factors as well—what-
l factors may be for this
assignment to conditions
he long run the treatment
ctors and subject abilities.
ise undoubtedly occurred
number of subjects in our
on of the "long run." In
that we have no guarantee
ferences in environmental
ts. We will return to this

mization to the design and
thods by which randomiza-
o, we must be able to argue
f the independent variable
mple, suppose we conduct
l we plan to run a total of
of who shows up, we will
ndom process,[1] The treat-
in the same manner. This
ed in the experiment. Note
ent and *each testing session*
ature of the random assign-
tion is *equally likely* to be

assigned to any one of the three treatments. In other words, each of the treat-
ment conditions is equally likely to be assigned to a given subject and to
whatever other uncontrolled factors might be present during that period of
testing.

In actual practice, we would probably place a *restriction* on this random
procedure of assigning treatments to subjects in order to ensure an *equal
number* of subjects at each treatment level. (Reasons for this decision are
considered in Chapter 5.) When human subjects are appearing in the laboratory
at their own convenience, i.e., at a time that they choose, a typical approach
is to make the random assignments so that any given treatment selected is not
run again until all of the other treatments are represented once. In effect, this
is a procedure of *sampling without replacement.* In the example, we would
decide randomly which of the three treatments to administer to the first subject.
For the second subject, we would randomly select the treatment from the two
remaining treatments. For the third subject, we must administer the final
remaining treatment, since there are only three treatments in the experiment.
This completes a *block* of randomized treatments. The treatment given to the
fourth subject is decided by selecting randomly from the *total pool* of treatments,
i.e., three; the treatment given to the fifth subject is decided by selecting
randomly from the remaining two treatments; and so on.

It is generally advisable to work with the smallest possible block, just as we
did in the last paragraph. There is a good reason for following such a procedure.
We can think of two general classes of variables which must be controlled in
any experiment: those which really do fluctuate randomly from session to
session and those which do not. We do not have to worry about the first class
of variables—even if we run all the subjects in one treatment first and all the
subjects in another treatment second, the particular values of these variables
at each testing session by definition occur randomly. Thus, we turn to random-
ization to control the second class of variables, variables which do not fluctuate
haphazardly.

We are usually unable to specify ahead of time exactly what the cycles of
fluctuation will be; however, we merely assume that they will be present. For
example, subjects volunteering for an experiment do not represent a random
flow of participants. There are undoubtedly different reasons why a subject
volunteers early in the school term rather than late, and these reasons may
reflect differences in abilities. The first subjects may be overly anxious or
curious or smarter—who knows? The point is that we cannot assume that the
flow of volunteers is random. Nor is the fluctuation of room temperature or of
time of day or of noise level outside the testing room random. Randomizing
in small blocks "helps" this control by assuring that a block of three subjects,
say, representing each treatment once, will not be placed in a room that is too
different in temperature. Or, three subjects appearing one after the other are
more likely to have the same reason for volunteering at that time than would
three subjects who did not.

l released could be determined by
n the experiment, we usually give
andom numbers which provides a
nd in many statistics texts and in
numbers available, such as Moses
operation (1955). The tables pub-
include random permutations of
gs that we want to randomize, it is
nd to select from that ordering the
digits, two at a time, searching for

Exhibit O
Page 70

28    SINGLE-FACTOR EXPERIMENTS

It is not sufficient, however, just to introduce some sort of randomization in the testing order. To make the randomization "work," we must choose a method which guarantees that features of the experimental situation and differences in the abilities of the subjects are not allowed to exert a *systematic* influence in the experiment. Any factor which does not vary randomly in its "natural state" must be subjected to a process of *neutralization*, consisting in essence of the superimposition of a random process upon the assignment of testing sessions and subjects to the treatment conditions. That is, variables which fluctuate in a systematic fashion during the course of the experiment are transformed into variables which now fluctuate *unsystematically* with respect to their association with the treatment conditions.

### Random Assignment Versus Random Sampling

We should say a few words about the distinction between the *random assignment* of subjects to conditions and the *random sampling* of subjects from a known population.

Random sampling requires the specification of a population of subjects and then the assurance that each member of the population has an equally likely chance of being selected for the experiment. If these conditions are met, we will be able to *generalize* the results of our experiment to the population. It should be noted that even if we are able to obtain our subjects by randomly sampling from a population, we will still have to turn to randomization procedures in the assignment of treatments to subjects and to testing sessions. That is, even randomly selected subjects will come to the experiment one at a time and then be given one of the treatment conditions. Who receives which treatment must be determined by chance; otherwise, a systematic bias may result, and this bias will be damaging to any experiment whether the subjects are selected randomly from a population or not.

What about random sampling? Public opinion polls, voter preference polls, marketing research, and television ratings all depend upon random sampling from a known population. Any findings from the sample are then extended to the population. Only rarely will we see random sampling in an experiment, however. And when we do, the population from which the sample was drawn may be so restricted as to be uninteresting in itself, e.g., the rats in a laboratory animal colony, the students at a university taking a course in introductory psychology, or third-grade children in a particular school system. Almost invariably, our subjects are selected out of *convenience*, rather than at random. The failure to sample randomly from a known population means that we are not justified *statistically* in extending our results beyond the bounds of the experiment itself.

Since most researchers accept this "myopic" view of the results of an experiment, how can we ever discover results that *are* generalizable to a meaningful population of organisms? One answer is that past research in a number of

laboratories with subjects c...
stocks, different suppliers ...
different schools in differe...
differences are relatively u...
Knowing this, an investigat...
its results beyond the singl...

The distinction, then, is t...
upon random sampling, an...
upon knowledge of a part...
make this point quite clear:
statistics is applied, the infer...
has two parts, only the firs...
*Drosophila* will usually invo...
statistically based conclusion...
will usually, and often wise...
(b) all *Drosophila*, or (c) a la...
implicit or explicit, but it is ...
In short, the generaliza...
statistical considerations, su...
subjects (or conditions for t...
considerations, i.e., what is ...
*appropriateness* of certain 'ge...
tions. The availability of this...
ment of the research area an...
particular subjects tested ha...

### AN INDEX FOR THE EV...
### OF TREATMENT EFFECT...

We now return to our ear...
control by randomization w...
small numbers of subjects i...
statistical theory are based ...
than those used in any experi...
with the "short run," where ...
are in fact matched on all rel...
how can we determine whet...
are due either to the experim...
to both?

Let us consider, in gener...
problem.