1   MICHAEL J. BETTINGER (State Bar No. 122196)
    RACHEL R. DAVIDSON (State Bar No. 215517)
2   KIRKPATRICK & LOCKHART
    PRESTON GATES ELLIS LLP
3   55 Second Street, Suite 1700
    San Francisco, CA 94105
4   Phone:  415-882-8200
    Facsimile:  415- 882-8220
5
    J. MICHAEL KEYES(Pro Hac Vice)
6   KIRKPATRICK & LOCKHART
    PRESTON GATES ELLIS LLP
7   618 West Riverside Avenue, Suite 300
    Spokane WA  99201-0602
8   Phone:  509-624-2100
    Facsimile:  509-456-0146
9
    Attorneys for Defendant
10  ABERCROMBIE & FITCH TRADING CO.

11

12                    UNITED STATES DISTRICT COURT
13
                    NORTHERN DISTRICT OF CALIFORNIA
14

15  LEVI STRAUSS & CO.,                          No. CV-07-3752 JSW

16                           Plaintiff,          **DEFENDANT ABERCROMBIE &
                                                 FITCH'S MEMORANDUM IN
17       v.                                      OPPOSITION TO LEVI STRAUSS &
                                                 CO.'S MOTION TO DISMISS
18  ABERCROMBIE & FITCH TRADING CO.,             COUNTERCLAIMS FOR
                                                 CANCELLATION**
19                           Defendant.
                                                 Date:        April 25, 2008
20  _____             Time:        9:00 a.m.
                                                 Courtroom:   2
21  ABERCROMBIE & FITCH TRADING CO.,

22                           Counter-Claimant,

23       v.

24  LEVI STRAUSS & CO.,

25                           Counter-Defendant.

26  _____

---

ABERCROMBIE & FITCH'S MEMORANDUM IN OPPOSITION TO
LEVIS STRAUSS & CO.'S MOTION TO DISMISS COUNTERCLAIMS
Case No. 03:07-CV-3752-JSW                          Printed on Recycled Paper

1

## TABLE OF CONTENTS

2

Page

3    I.    INTRODUCTION & SUMMARY OF THE ARGUMENT ....................................... 1

4    II.   FACTUAL ALLEGATIONS SET FORTH IN ABERCROMBIE'S
            COUNTERCLAIMS FOR RELIEF. ............................................................... 1

5
            A.    LS&Co.'s Fraud on the PTO................................................................ 1
6
                  1.    Abercrombie's Counterclaims allege the Plaintiff in *Lois
7                         Sportswear U.S.A., Inc. v. Levi Strauss & Co.* claimed
                          throughout that litigation that LS&Co. lost its trademark rights
8                         in the arcuate design. ............................................................... 1

9                 2.    Abercrombie's Counterclaims also allege that LS&Co.
                          knowingly filed its first materially false affidavit with the PTO
10                        claiming that there was no proceeding involving LS&Co.'s
                          rights to the arcuate trademark pending in federal court....................... 3
11
                  3.    Abercrombie's Counterclaims further allege that LS&Co.
12                        knowingly filed a second materially false affidavit with the PTO
                          claiming, once again, that there was no proceeding involving
13                        LS&Co.'s rights to the arcuate trademark pending in federal
                          court................................................................................... 4
14
            B.    LS&Co.'s Abandonment of its "arcuate" trademark. ......................................... 5
15
     III.  LAW & ARGUMENT ............................................................................................. 7
16
            A.    The Legal Standards Governing Motions To Dismiss Under F.R.C.P.
17                  12(b)(6). .......................................................................................... 7

18          B.    LS&Co.'s claim that it "did not misrepresent anything" to the PTO
                  should be rejected because it is premised on a patently incorrect and
19                tortured "interpretation" of the Lanham Act. ..................................................... 7

20                1.    LS&Co.'s "counterclaim" argument disregards the plain
                          meaning of 15 U.S.C. § 1065.................................................... 8
21
                  2.    LS&Co's "counterclaim" argument directly conflicts with
22                        federal court interpretations of 15 U.S.C. § 1065—
                          interpretations that LS&Co. fails to even reference in its motion........ 10
23
                  3.    LS&Co.'s "counterclaim" argument based upon the text of the
24                        Trademark Manual of Examination Procedures—a reference
                          manual that does not even purport to be an interpretation of the

25

26

statute—conflicts with federal interpretations of the Lanham Act, and is inapplicable by its own terms in any event. ....................... 12

    4.    LS&Co.'s "counterclaim" argument is not supported by either one of the two "case law" decisions cited in its motion. ....................... 15

C.    LS&Co.'s false statements were material because the registrant attesting that there is no proceeding involving the trademark in a court is a statutory prerequisite to obtaining an "incontestable" registration. ........... 17

D.    LS&Co.'s motion to dismiss Abercrombie's abandonment counterclaim should be denied because LS&Co. ignores facts establishing this claim and relies on case law that is easily distinguishable on both procedural and substantive grounds. .......................... 19

    1.    Abercrombie properly alleged a claim of trademark abandonment because LS&Co. knowingly consented to other third-party infringing uses of its "arcuate" trademark. ...................... 20

    2.    The most that LS&Co.'s legal authority provides is the standard of proof that Abercrombie will ultimately have to meet on its abandonment claim—a standard that is wholly inapplicable when testing the sufficiency of a claim for relief under Rule 12(b)(6). ......................................................................................... 22

IV.    CONCLUSION ................................................................................... 245

1

## **TABLE OF AUTHORITIES**

2

Page

3    ***Federal Cases***

4    *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161 (11th Cir. 1994)........................... 24

5    *Board of Regents of Univ. System of Georgia v. Buzas Baseball, Inc.*, 176 F. Supp. 2d
       1338 (N.D. Ga. 2001)..................................................................................................... 24
6
     *Citibank, N.A v. City Bank of San Francisco*, 206 U.S.P.Q. 997 (N.D. Cal.1980)............ 22, 23
7
     *Constellation Brands, Inc. v. Arbor Hill Associates, Inc.*, ___ F.3d ____ No. 02-CV-
8      6498 CJS, 2008 WL 515028 (W.D.N.Y. 2008) .................................................................. 10

9    *De La Cruz v. Tormey*, 582 F.2d 45 (9th Cir. 1978) .................................................................. 7

10   *Electro Source, LLc. v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931 (9th Cir.
       2006) .............................................................................................................................. 23
11
     *Estefan Enterprises, Inc. v. Coco Bongo Grill and Bar, Inc.*, No. 6:06-cv-742-Orl-
12     31KRS, 2007 WL 1602341 (M.D. Fla. June 04, 2007) ................................................ 11, 12

13   *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070 (5th Cir. 1997) ................................... 24

14   *FirstHealth of Carolinas, Inc. v. CareFirst of Maryland, Inc.*,  479 F.3d 825
       (Fed. Cir. 2007) ............................................................................................................. 21
15
     *Fort James Corp. v. Kimberly-Clark Tissue Co.*,  1999 WL 966144 (N.D. Ill. Oct. 8,
16     1999) ........................................................................................................................... 24, 25

17   *Gilligan v. Jamco Development Corp.*, 108 F.3d 246 (9th Cir. 1997)........................................ 7

18   *Halo Management, LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019 (N.D. Cal. 2003).............. 10

19   *In re First Draft, Inc.*, 76 U.S.P.Q.2d 1183, 2005 WL 2451658 (T.T.A.B. 2005)................. 14

20   *In re Houbigant Inc.*, 914 F. Supp. 964 (S.D.N.Y. 1995)........................................................ 25

21   *In re Wine Society of America Inc.*, 12 U.S.P.Q.2d 1139, 1989 WL 274373 (T.T.A.B.
       1989) ............................................................................................................................... 13
22
     *Iowa Health System v. Trinity Health Corp.*, 177 F. Supp. 2d 897 (N.D. Iowa 2001) ........... 25
23
     *Jonathan Browning, Inc. v. Venetian Casino Resort, LLC*,  2007 WL 4532214 (N.D.
24     Cal. 2007)......................................................................................................................... 7

25   *Kinark Corp. v. Camelot, Inc.*, 548 F. Supp. 429 (D. N.J. 1982)........................................... 24

26

*Lois Sportswear v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986) ................................... 5, 6

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735 (S.D.N.Y. 1985) ......... 2

*National Business Systems, Inc. v. AM International, Inc.*, 743 F.2d 1227 (7th Cir. 1984) ................................................................................................................... 18

*Parrino v. FHP, Inc.*, 146 F.3d 699 (9th Cir. 1998) ................................................... 2

*Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522 (4th Cir. 1984) ................................................ 9

*Playboy Enterprises, Inc. v. P.K. Sorren Export Co. Inc. of Fla.*, 546 F. Supp. 987 (S.D. Fla. 1982) ............................................................................................................ 24

*Sanders v. Kennedy*, 794 F.2d 478 (9th Cir. 1986) ................................................................ 7

*Shelby v. Ford Motor Co.*, 43 U.S.P.Q. 2d 1692, 1693 1997 WL 689456 (C.D. Cal. Mar. 21 1997) .................................................................................................................. 24

*Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529 (11th Cir. 1986) ...................................................................................................................... 11

*STX Inc. v. Bauer USA Inc.*, 43 U.S.P.Q. 2d 1492 1997 WL 337578 (N.D. Cal. Jun. 5, 1997) .............................................................................................................. 21, 22, 24

*Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322 (Fed. Cir. 1999) ...................... 17, 18

*Transgo v. Ajac Transmission Parts Corp.*, 768 F.2d 1001 (9th Cir. 1985) ........................... 24

*Visa Intern. Service Ass'n v. Bankcard Holders of America*, 211 U.S.P.Q. 28 (N.D. Cal. 1981) ........................................................................................................ 22, 23, 24

*W. Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122 (Fed. Cir. 1994) ................................ 13

*Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755 (Cust. & Pat.App. 1982) ........................................................................................................... 21, 24


### *Federal Statutes*

15 U.S.C. § 1058(a)(b) ...................................................................................... 4, 5, 6

15 U.S.C. § 1064 ....................................................................................................... 9

15 U.S.C. § 1064(3) .............................................................................................. 9, 21

15 U.S.C. § 1065 ............................................................................................... passim

15 U.S.C. § 1065(1) .................................................................................................. 8

15 U.S.C. § 1065(2) .......................................................................................... passim

15 U.S.C. § 1115 .................................................................................................. 9

15 U.S.C. § 1115(a) ............................................................................................. 9

15 U.S.C. § 1115(b)(2) ........................................................................................ 9

15 U.S.C. § 1127 ...................................................................................... 9, 10, 21

15 U.S.C. §§1058 ................................................................................................. 4


*Other Authorities*

LS&Co.'s U.S. Trademark Registration Nos. 404,248 ..................................... 2, 3

3 McCarthy § 19:129 ........................................................................................ 13

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION & SUMMARY OF THE ARGUMENT**

3      Abercrombie & Fitch Trading Co. ("Abercrombie") respectfully submits this

4  memorandum in opposition to Levi Strauss & Co.'s ("LS&Co.") motion to dismiss

5  Abercrombie's counterclaims for cancellation of LS&Co.'s federally-registered "arcuate"

6  trademarks based on "fraud on the PTO" and "abandonment."

7      As set forth herein, the Court should deny LS&Co.'s motion to dismiss Abercrombie's

8  fraud claim because Abercrombie has more than sufficiently alleged facts showing that

9  LS&Co. submitted materially false statements to the PTO.   LS&Co.'s arguments to the

10 contrary lack any sound legal support and are void of common sense.   Likewise, the Court

11 should deny LS&Co.'s motion to dismiss Abercrombie's abandonment claim because its

12 allegations set forth several examples of how LS&Co. knowingly allowed third parties to

13 infringe on its arcuate trademark and that this has caused the arcuate mark to lose significance

14 as a mark.    LS&Co.'s contrary argument ignores these allegations and is based on legal

15 authority that is simply not germane to the limited inquiry before this Court.

16

**II.   FACTUAL ALLEGATIONS SET FORTH IN ABERCROMBIE'S
COUNTERCLAIMS FOR RELIEF.**

17

A.    LS&Co.'s Fraud on the PTO.

18

19      Abercrombie has alleged numerous facts detailing that LS&Co. submitted two

materially false affidavits to the PTO.

20

21      1.    Abercrombie's Counterclaims allege the Plaintiff in *Lois Sportswear
U.S.A., Inc. v. Levi Strauss & Co.* claimed throughout that litigation
that LS&Co. lost its trademark rights in the arcuate design.

22

23      On December 13, 1982, Lois Sportswear U.S.A., Inc., ("Lois Sportswear") filed a

declaratory judgment action against Levi Strauss & Co. in the U.S. District Court for the

24

Southern District of New York.  *See* Lois Sportswear's Complaint, attached as Exhibit B to

25

26

Abercrombie's Amended Answer, Affirmative Defenses, Counterclaims ("Abercrombie Counterclaims"), filed February 6, 2008.[1]  Among other allegations, the Lois Sportswear Complaint alleged that Lois Sportswear's back pocket stitching design used on its denim jeans did not infringe on LS&Co.'s "stitched pocket design." *See id.*, ¶ 18.  LS&Co. asserted counterclaims against Lois Sportswear claiming that it infringed on LS&Co.'s U.S. Trademark Registration Nos. 404,248 (the "'248") and 1,139,254 (the "'254"), the "arcuate" registrations.  *See* LS&Co.'s Answer and Counterclaims, attached as Exhibit B to the Abercrombie Counterclaims.

Incredibly, LS&Co. asserts in its present motion that Lois Sportswear did not "ask for a declaration that the mark was invalid."[2]  *See* LS&Co. Motion, p. 3, line 25.  Not only did Lois Sportswear deny all allegations of infringement in that case, but it also asserted in numerous ways that LS&Co.'s "arcuate" trademark was invalid.  For example, in its Answer to Counterclaims, Lois Sportswear alleged that:

> • The arcuate trademark does not serve "as a means of designating origin with the defendant, and that the public recognizes that design as an indication that defendant is the source of the garments upon which it

---

[1] Approximately seven months after Lois Sportswear initiated suit against LS&Co., LS&Co. commenced a separate action in the S.D.N.Y. against Textiles Confecciones Europas, the supplier of Lois jeans to Lois Sportswear.  The two actions were ultimately consolidated.

[2] LS&Co. also leads this Court to believe that Lois Sportswear "conceded" before the District Court that LS&Co.'s arcuate trademark was incontestable.  *See* LS&Co.'s motion pg. 4 (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 740 (S.D.N.Y. 1985).  LS&Co. is wrong.  Lois Sportswear moved for summary judgment on non-infringement.  As Lois Sportswear's brief made abundantly clear, for purposes of its motion only, Lois Sportswear was not challenging the validity of LS&Co.'s "arcuate" trademark.  *See* Lois Sportswear's Memorandum of Law in Support of Motion Summary Judgment attached, p. 5 ("[f]or purposes of this motion for summary judgment only, Lois and Textiles do not dispute the validity of Levi's registered trademark(s) covering the Levi back pocket stitching design."), attached as Exhibit A to the Declaration of J. Michael Keyes.  Because Abercrombie's Counterclaims reference the fact that Lois Sportswear moved for summary judgment, *see* Abercrombie's Counterclaims, ¶ 10, Exhibit E pg. 1, Exhibit F pg. 1, this Court can consider Lois Sportswear's summary judgment brief on a motion to dismiss.  *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir. 1998) ("A district court ruling on a motion to dismiss may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading").

---

appears;" *See* Lois Sportswear's Answer to Counterclaims, ¶ 4, attached as Exhibit B to Abercrombie's Counterclaims.

- The arcuate trademark "never functioned as a designation of source or origin and was and is, therefore, not susceptible of appropriation or protection as a trademark." *Id.* at ¶ 15.

- The arcuate trademark "has become so diluted by reason of widespread use by others, on jeans and similar garments, of the same or a similar design that it has lost whatever distinctiveness it otherwise possessed and no longer functions as a designation of source or origin with the defendant." *Id.* at ¶ 16.

- LS&Co.'s conduct "has resulted in a loss by defendant of any trademark rights it otherwise possessed in that mark." *Id.* at ¶ 17.

2. <u>Abercrombie's Counterclaims also allege that LS&Co. knowingly filed its first materially false affidavit with the PTO claiming that there was no proceeding involving LS&Co.'s rights to the arcuate trademark pending in federal court.</u>

On May 14, 1985—during the pendency of *Lois Sportswear* in federal district court—LS&Co.'s Vice President and Corporate Secretary, Ms. Katherine Durgin, attempted to file a "Section 8 & 15" affidavit with the PTO in order for the '254 Registration to become "incontestable." *See* Combined Affidavit under Section 8 & 15 of Katherine Durgin, attached as Exhibit C to Abercrombie's Counterclaims. In her affidavit, Ms. Durgin testifies that "there is no proceeding involving said rights pending and not disposed of either in the Patent and Trademark Office or in the courts." *Id.* The statement was made to the PTO notwithstanding the fact that *Lois Sportswear v. Levi Strauss & Co.* was pending in federal court and that Lois had continuously alleged in that proceeding that LS&Co. <u>lost</u> "any trademark rights it otherwise possessed" in the in arcuate mark. *See* Lois Sportswear's Answer to Counterclaims, ¶ 17. Abercrombie specifically alleges that Ms. Durgin "knew or—by virtue of her position within LS&Co. and her voluntary execution of a sworn statement—should have known that her statement was false." Abercrombie Counterclaims, ¶ 8. Abercrombie

1  also specifically alleges that this affidavit was "materially" false.  *See* Abercrombie's

2  Counterclaim, ¶ 7.

3      The PTO received LS&Co.'s affidavit but notified it that Ms. Durgin's affidavit was

4  filed too early.  *See* Exhibit D to Abercrombie Counterclaims.  Under the Lanham Act, an "8

5  & 15" affidavit can be filed only between the fifth and sixth year after the date of issuance of

6  the registration.  *See* Abercrombie's Counterclaims, ¶ 6; *see also* 15 U.S.C. § 1058(a)(b).[3]

7  Since LS&Co.'s '254 Registration did not issue until September 2, 1980, the earliest possible

8  date upon which LS&Co. could have filed its "8 & 15" affidavit was September 2, 1985.

9  Thus, as set forth in Abercrombie's Counterclaims, LS&Co.'s early submission was not just a

10  few days or weeks premature—it was submitted nearly four months too soon.  *See*

11  Abercrombie's Counterclaim, ¶ 10.

12      3.  <u>Abercrombie's Counterclaims further allege that LS&Co. knowingly</u>

13      <u>filed a second materially false affidavit with the PTO claiming, once</u>
        <u>again, that there was no proceeding involving LS&Co.'s rights to the</u>

14      <u>arcuate trademark pending in federal court.</u>

15      After the first "8 & 15" affidavit was submitted to the PTO, LS&Co.'s Assistant

16  Corporate Secretary, Ms. Jean Fowler, submitted a second "8 & 15" affidavit to the PTO on

17  January 2, 1986.  *See* Combined Affidavit under Section 8 & 15 of Jean Fowler, attached as

18  Exhibit G to Abercrombie's Counterclaims.  Like the first affidavit, this one too claimed that

19  "there is no proceeding involving said rights pending and not disposed of either in the Patent

20  and Trademark Office or in the courts."  *Id.*  LS&Co. submitted this affidavit even though at

21  the time *Lois Sportswear v. Levi Strauss & Co.* was, in fact, pending in the U.S. Court of

22  Appeals for the Second Circuit as Lois Sportswear had appealed the denial of its motion for

23

24  ---
    [3] This affidavit is referred to as the "8 and 15" affidavit because the requirements for the contents of this
25  affidavit are set forth in Sections 8 and 15 of the Lanham Act, or 15 U.S.C. §§1058, 1065 respectively.  *See*
    Abercrombie Counterclaims, ¶ 6.

26

summary judgment and the granting of LS&Co.'s motion for summary judgment.  *See* Lois Sportswear's Notice of Appeal, filed December 3, 1985, attached as Exhibit F to Abercrombie's Counterclaims.  Abercrombie specifically alleges that Ms. Fowler "knew or— by virtue of her position within LS&Co. and her voluntary execution of a sworn statement— should have known that her statement was false."  *See* Abercrombie Counterclaims, ¶ 12. Abercrombie also specifically alleges that this affidavit was "materially" false.  *See id.* at ¶ 7.

It would be more than 8 months after LS&Co. submitted its second false affidavit to the PTO that a divided panel of the U.S. Court of Appeals for the Second Circuit affirmed the trial court's decision over a vocal dissent by Judge Miner.  Abercrombie's Counterclaims, ¶ 12; *see also Lois Sportswear v. Levi Strauss & Co.*, 799 F.2d 867, 877 (2d Cir. 1986) (Miner, J. dissenting) (dissenting because the "district judge improperly undertook to decide disputed factual matters and that summary judgment in favor of Levi therefore was unwarranted.").

B.    LS&Co.'s Abandonment of its "arcuate" trademark.

Abercrombie's Counterclaims have alleged several instances of how LS&Co. knowingly failed to adequately police its "arcuate" trademark against third party use, and how LS&Co.'s failure resulted in the "arcuate" losing its significance as a trademark.

First, Abercrombie alleges that in 2003, LS&Co. sued a company claiming that it infringed on LS&Co.'s "arcuate" trademark.  *See* Abercrombie's Counterclaims, ¶ 22.  Yet, that same year in a separate lawsuit LS&Co. sued a company by the name of Federal Jeans. *Id.* at ¶ 23.  Although Federal Jeans was also using a stitching design that was very similar to the design used by the other company sued by LS&Co. in 2003, LS&Co. "knowing allowed" Federal Jeans to continue to using the infringing design.  *Id.*.

1

2      Second, Abercrombie alleged that in 2003 LS&Co. sued a company by the name of

3  "For What It's Worth" claiming that its back pocket stitching design was an infringement of

4  the "arcuate" trademark.  *Id.* at ¶ 24.  As Abercrombie further alleges, for a very significant

5  amount of time at least one other company had been using a stitching design that was very

6  similar to the "infringing" design used by For What It's Worth.   Yet, "LS& Co. has

7  knowingly allowed this other party to use a design that LS&Co. knows is infringing on

8  LS&Co.'s arcuate trademark."  *Id.*.

9      Third, Abercrombie alleges that in 2004, LS&Co. sued a company by the name of

10  RP55 for its alleged "willful infringement" of the arcuate trademark.   Abercrombie's

11  Counterclaims, ¶ 25.  LS&Co. even produced an expert report in that case claiming that

12  "RP55's back pocket stitching design was likely to cause confusion in the marketplace" with

13  the arcuate trademark.  *Id.*.  Yet, despite LS&Co.'s claims of "willful infringement" against

14  RP55 and its use of an expert report supporting that allegation, LS&Co. "dismissed its case

15  'with prejudice'" against RP55.  As Abercrombie specifically alleges, LS&Co.'s release of

16  RP55 is "another example of how LS&Co. is allowing other supposedly infringing designs to

17  be used with LS&Co.'s express permission." *Id.*.

18      As set forth in Abercrombie's Counterclaims, all of these examples of LS&Co.

19  knowingly permitting infringing uses constitute "abandonment." *Id.* at ¶ 29.

20

21

22

23

24

25

26

1

## III.    LAW & ARGUMENT

2    A.    The Legal Standards Governing Motions To Dismiss Under F.R.C.P. 12(b)(6).

3           A motion to dismiss is proper under Fed. R. Civ. P. 12(b)(6) only where the pleadings

4    "fail to state a claim upon which relief can be granted."   Fed.R.Civ.P. 12(b)(6).   Such a

5    motion should be denied "unless it appears beyond a doubt that a plaintiff can show no set of

6    facts supporting his or her claim."  *Jonathan Browning, Inc. v. Venetian Casino Resort, LLC*,

7    2007 WL 4532214, * 7 (N.D.Cal. 2007) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78

8    S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also De La Cruz v. Tormey,* 582 F.2d 45, 48 (9th Cir.

9    1978). In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint is

10   construed in the light most favorable to the non-moving party and all material allegations in

11   the complaint are taken to be true.  *Sanders v. Kennedy,* 794 F.2d 478, 481 (9th Cir. 1986).

12

13          The issue on a motion to dismiss for failure to state a claim is "not whether the

14   claimant will ultimately prevail but whether the claimant is entitled to offer evidence to

15   support the claims asserted." *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th

16   Cir. 1997) (demand that claimants establish each element necessary to survive a motion for

17   summary judgment asked far more of them than federal rules require at pleading stage).  The

18   Ninth Circuit has repeatedly cautioned that the pleading standard set forth in Rule 8

19   establishes "a powerful presumption against rejecting pleadings for failure to state a claim."

20   *Id*. (citations omitted).

21

22   B.    LS&Co.'s claim that it "did not misrepresent anything" to the PTO should be
           rejected because it is premised on a patently incorrect and tortured
23         "interpretation" of the Lanham Act.

24          LS&Co. incorrectly argues that "disclosure of the pending *Lois Sportswear* lawsuit

25   was not required because Lois Sportswear did not file a counterclaim" for cancellation of

26

---

LS&Co.'s trademark registration in that proceeding.  *See* LS&Co.'s Motion, p. 7.    For numerous reasons, LS&Co.'s assertion is flatly wrong.

> 1.    LS&Co.'s "counterclaim" argument disregards the plain meaning of 15 U.S.C. § 1065.

LS&Co.'s argument that it did not need to disclose the *Lois Sportswear* litigation is contrary to the plain meaning of the applicable statute.  15 U.S.C. § 1065 provides that in order to obtain an "incontestable" trademark registration, the registrant must file an affidavit with the PTO attesting that:

> (1)    there has been no final decision adverse to registrant's claim of ownership of such mark for such goods or services, or to registrant's right to register the same or to keep the same on the register; and

> (2)    there is *no proceeding involving said rights pending in the Patent and Trademark Office or in a court and not finally disposed of*;

> 15 U.S.C. § 1065 (emphasis supplied).

The statute does not state (or even imply) that a "proceeding" only means a "proceeding involving counterclaims for cancellation" as LS&Co. suggests.  Rather, subparagraph (2) of the statute unambiguously states that it applies to <u>any</u> "proceeding" involving the registrant's "said rights" to the trademark.  This "said rights" language means the "registrant's right to register the same or to keep the same on the register."  *See* 15 U.S.C. § 1065(1).

LS&Co.'s argument ignores the legal reality that the Lanham Act expressly provides that the "said rights" referred to in 15 U.S.C. § 1065(2) can be challenged either by way of "defense" or by way of "counterclaim."  For example, 15 U.S.C. § 1115(a) provides that a trademark registration constitutes "prima facie evidence of validity" but that it "shall not preclude another person from providing any legal or equitable ***defense*** or defect including

---

1    those set forth in subsection (b) of this section." *Id.* (emphasis supplied). One of the

2    enumerated defenses listed in subsection (b) is that "the mark has been abandoned by the

3    registrant." 15 U.S.C. § 1115(b)(2). Additionally, the Lanham Act provides that a trademark

4    registration may be attacked by filing a "petition to cancel" the registration. *See* 15 U.S.C.

5    § 1064. One of the enumerated grounds for filing a petition to cancel is if the registered mark

6    has been "abandoned." *See* 15 U.S.C. § 1064(3).

7    As these statutory provisions make clear, a claim that a registered trademark has been

8    "abandoned" can be asserted either as a defense under 15 U.S.C. § 1115, or as a counterclaim

9    under 15 U.S.C. § 1064. Either way, such a claim would be a challenge to the "said rights" of

10    the trademark owner to enforce the trademark. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522,

11    1529 (4th Cir. 1984) (observing that "the presumption which registration thus gives the mark,

12    though, does not preclude one charged with infringement from collaterally attack[ing] in an

13    infringement action, either by way of an affirmative defense or by way of a counterclaim

14    seeking cancellation of the registration").

15    In applying the plain meaning of 15 U.S.C. § 1065 to the facts as alleged by

16    Abercrombie in its Counterclaims, it is undisputed that Lois Sportswear challenged LS&Co.'s

17    right to enforce its trademark. A trademark is deemed abandoned when it has "los[t] its

18    significance as a mark", *see* 15 U.S.C. § 1127, which is a loss of trademark rights as "against

19    the world." *Halo Management, LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1029 (N.D. Cal.

20    2003). As Abercrombie's Counterclaim explicitly alleges, the Lois Sportswear case involved

21    claims that LS&Co. had "abandoned" its arcuate trademark. *See* Abercrombie Counterclaims,

22    Exhibit B (Lois claiming (i) LS&Co. lost "any trademark rights it otherwise possessed." *Id. at*

23    ¶ 17; (ii) the arcuate trademark did not serve "as a means of designating origin with the

24    defendant, and that the public recognizes that design as an indication that defendant is the

25    source of the garments upon which it appears." *Id*. at ¶ 4; (iii) the arcuate trademark "never

26

1   functioned as a designation of source or origin and was and is, therefore, not susceptible of

2   appropriation or protection as a trademark." *Id.* at ¶ 15; (iv) the arcuate trademark "has

3   become so diluted by reason of widespread use by others, on jeans and similar garments, of

4   the same or a similar design that it has lost whatever distinctive it other possessed and no

5   longer functions as a designation of source or origin with the defendant." *Id.* at ¶ 16;

6   (v) LS&Co.'s conduct "has resulted in a loss by defendant of any trademark rights it

7   otherwise possessed in that mark." *Id.* at ¶ 17). These factual allegations make it crystal clear

8   that Lois Sportswear was attacking the validity of the arcuate trademark and, therefore, that

9   lawsuit was undeniably a "proceeding" involving LS&CO.'s "said rights" in the arcuate.

10          2.      LS&Co's "counterclaim" argument directly conflicts with federal court
                    interpretations of 15 U.S.C. § 1065—interpretations that LS&Co. fails
11                  to even reference in its motion.

12          No fewer than three federal courts have interpreted "proceeding involving said rights"

13   in 15 U.S.C. § 1065 to include a proceeding where the trademark owner's right to enforce the

14   trademark was challenged, even when there was no counterclaim for cancellation of the

15   trademark registration. *See e.g., Constellation Brands, Inc. v. Arbor Hill Associates, Inc.*, ___

16   F.3d ____, No. 02-CV-6498 CJS, 2008 WL 515028, at *11 (W.D.N.Y. 2008) (defendant

17   asserting counterclaims against trademark registrant for "trademark infringement, unfair

18   competition, and false advertising" is a "proceeding involving said rights" under 15 U.S.C.

19   § 1065(2)); *see also Estefan Enterprises, Inc. v. Coco Bongo Grill and Bar, Inc.*, No. 6:06-cv-

20   742-Orl-31KRS, 2007 WL 1602341, *3 (M.D. Fla. June 04, 2007); *Sizzler Family Steak*

21   *Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1541 (11th Cir. 1986) (plaintiff's

22   federal complaint for trademark and servicemark infringement against defendant for its use of

23   its federal trademark registration "Sizzlin'" constituted a "proceeding" involving defendant's

24   "said rights" to its trademark). Not surprisingly, LS&Co. fails to cite to any of these cases in

25

26

1  its motion to dismiss.  Even a cursory review of just one of them showcases how LS&Co.'s

2  "counterclaim" argument is deeply flawed.

3        For example, in *Estefan Enterprises*, *Inc.*, the trademark registrant, EEI, brought suit

4  against an alleged trademark infringer.  The defendant denied the allegations of infringement

5  and asserted four affirmative defenses including both estoppel and laches.  *See* Coco Bongo

6  Grill and Bar's Answer to Complaint, p. 4, Affirmative Defense III, filed July 17, 2006 in the

7  U.S. District Court for the Middle District of Florida (alleging "t[o] the extent that Plaintiff

8  has any rights to enforce Plaintiff is barred and estopped from enforcing those rights by the

9  failure to actively pursue infringement claims and the doctrine of laches.") (available through

10 PACER).    The defendant in Estefan did ***not*** assert a counterclaim for cancellation of

11 Plaintiff's registration.

12       During the pendancy of the suit, EEI timely filed its "incontestability" affidavit with

13 the PTO and then moved for summary judgment on infringement and claimed that its

14 registration was "incontestable."   The Court disagreed that the mark was incontestable and

15 noted that:

16            EEI's "incontestable" argument fails. Section 1065 requires
             that, for a mark to be classified as incontestable, EEI must file
17            an affidavit within a year after five years of continuous use of
             the mark and that there must be 'no proceeding involving said
18            rights pending ... in a court not finally disposed of.' EEI's mark
             was registered with the USPTO on September 18, 2001. EEI
19            timely filed an affidavit of incontestability in January of 2007.
20            However, EEI filed the complaint for the instant case, which is
             still pending, on May 31, 2006. Therefore, when EEI filed for
21            incontestability, there was a "proceeding involving said rights
             pending ... in a court and not finally disposed of," and § 1065(2)
22            prevents EEI's mark from being classified as incontestable.

23 *Estefan Enterprises, Inc.*, 2007 WL 1602341, at *3 (internal citations omitted).

24

25

26

1       *Estefan Enterprises'* interpretation of the statute confirms that any lawsuit involving a

2   challenge to a trademark owner's purported right to enforce its trademark against another

3   party constitutes a "proceeding involving said rights" under 15 U.S.C. § 1065.   Its

4   interpretation is wholly consistent with the plain meaning of the statute and this Court should

5   embrace it, and reject LS&Co.'s argument that ignores the plain meaning of the statute and

6   the judicial interpretations thereof.

7           3.   <u>LS&Co.'s "counterclaim" argument based upon the text of the</u>

8   <u>Trademark Manual of Examination Procedures—a reference manual that does not even purport to be an interpretation of the statute—conflicts with federal interpretations of the Lanham Act, and is</u>

9   <u>inapplicable by its own terms in any event.</u>

10      LS&Co. asserts that as a matter of law the Trademark Manual of Examination

11  Procedures (the "TMEP") is somehow a definitive "interpretation" of 15 U.S.C. § 1065 and

12  that it precludes Abercrombie's fraud claim.  *See* LS&Co. Motion, pp. 7-8. Based upon this

13  "definitive" source, LS&Co. claims that it had no obligation to disclose *Lois Sportswear*

14  because the TMEP only requires disclosures of cases involving a "counterclaim for

15  cancellation" of a registration.  This argument is demonstrably flawed for numerous reasons.

16      First, the TMEP by its own terms is not an interpretation of the statute[4], and is not

17  binding on the Trademark Trial and Appeal Board (the "TTAB"), much less a federal court.

18  *See W. Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 1127 n.8 (Fed. Cir. 1994)

19  (observing that TMEP "does not have the force and effect of law, it sets forth the guidelines

20  and procedures followed by the examining attorneys at the PTO"). At best, the TMEP can be

21  considered "good evidence" of what the examination procedures are at the PTO.  *See* 3

22  McCarthy § 19:129 ("While the TMEP is good evidence of the practices followed by the

---

[4] *See* Foreword to TMEP, September 2007.  The Foreword provides, in pertinent part, that "[t]he Manual contains guidelines for Examining Attorneys and ***materials in the nature of information and interpretation***, and outlines the procedures which Examining Attorneys are required or authorized to follow in the examination of trademark applications."  *See id.* (emphasis supplied).

1  Patent and Trademark Office, it is not binding on the Trademark Board or a court as to the

2  meaning of the statute or federal regulations.").   The "examination procedures" followed at

3  the PTO are, quite simply, irrelevant to Abercrombie's counterclaim for fraud.  Abercrombie

4  has alleged that LS&Co. violated the provisions of a statute passed by Congress, not a

5  procedural manual drafted by some unidentified individual at a federal agency.

6         Second, even if the TMEP could be considered an interpretation of the statute (which

7  it is decidedly not), the TTAB has noted that when the TMEP conflicts with judicial

8  interpretations of the Lanham Act, the TMEP obviously needs to give way.  *See In re Wine*

9  *Society of America Inc.*, 12 U.S.P.Q.2d 1139, 1989 WL 274373, at *1 (T.T.A.B. 1989)

10  (holding that "to the extent that the language of Section 807.14(a) of the Trademark Manual

11  of Examining Procedure (to which applicant has directed our attention) describes a standard

12  of 'material alteration' different from that described in the cases to which we have referred,

13  that section of the manual should be revised"); *see also In re First Draft, Inc.*, 76 U.S.P.Q.2d

14  1183, 2005 WL 2451658, at *6 (T.T.A.B. 2005) (affirming refusal of registration under the

15  Lanham Act and applicable case law, despite TMEP section cited by applicant).   As noted

16  above, none of the federal courts interpreting 15 U.S.C. § 1065(2) have held that a

17  "counterclaim for cancellation" must first be asserted before federal litigation is considered a

18  "proceeding involving said rights" in the trademark.  For this reason as well, this Court should

19  reject LS&Co.'s argument that the TMEP precludes Abercrombie's fraud claim.

20         Third, even if the text of the TMEP could somehow be considered a "persuasive"

21  interpretation of 15 U.S.C. § 1065(2) (which, again, it is not), it simply does not apply here.

22  The TMEP provision provides that:

23              The USPTO does not consider a proceeding involving the mark
              in which the owner is the plaintiff, where there is no
24              counterclaim involving the owner's rights in the mark, to be a
              "proceeding involving these rights" that would preclude the
25              filing or acknowledgment of a § 15 affidavit.

26

LS&Co. casually glosses over the reality that this text applies only when the trademark owner is the **plaintiff** in the proceeding and there is no counterclaim for cancellation. In *Lois Sportswear*, LS&Co. was the **defendant**, not the plaintiff. *See* Abercrombie Counterclaims, ¶ B. Thus, this TMEP provision by its own terms cannot be read to exempt the *Lois Sportswear* proceeding from the disclosure obligation embodied in 15 U.S.C. § 1065(2). The Court should jettison LS&Co.'s wayward argument to the contrary.

Fourth, LS&Co.'s motion also conveniently ignores the fact that at the time it filed its first false affidavit with the PTO, the text of the TMEP did not contain this "counterclaim" language relied upon by LS&Co. in support of its motion to dismiss. Instead, the pertinent text of § 1604.03 of the TMEP provided that the "8 & 15" affidavit:

> must also state that there is no proceeding involving said rights pending in the Patent and Trademark Office or in a court and not finally disposed of, and "proceeding" **has been interpreted to mean registrant being in position either of plaintiff or defendant.**

*See* TMEP § 1604.03 (1st Edition, Rev. 6, 1983) (emphasis supplied).[5] Thus, even if the current text of the TMEP cited by LS&Co. could be considered a correct, binding, or an otherwise persuasive interpretation of the federal statute, the text could only be applicable to the second false affidavit and not the first affidavit filed by LS&Co.[6]

For all of these reasons, the Court should reject LS&Co.'s erroneous assertion that the TMEP somehow insulates LS&Co. from liability for filing two false affidavits with the PTO.

---

[5] The next revision of the TMEP did not take effect until January 1, 1986.

[6] At the time LS&Co. filed its second false affidavit with the PTO, the pertinent text of TMEP provided that a "proceeding involving the mark in which the registrant is the plaintiff, and there is no counterclaim involving registrant's rights in the mark, does not preclude acceptance of a Section 15 affidavit." TMEP § 1604.03 (1st Edition, Rev. 7, 1986).

---

1

      4.      <u>LS&Co.'s "counterclaim" argument is not supported by either one of the two "case law" decisions cited in its motion.</u>

2

3

LS&Co. cites "case law" (actually one "opinion" from the Patent Commissioner and one Federal Circuit case) that does not support LS&Co.'s arguments on any level.  *See* LS&Co.'s Motion, pp. 7-8.

4

5

Contrary to LS&Co.'s characterization, *In re Trademark Registration of McDonald's Corp.* ("*In re McDonald's*") did not hold that a counterclaim must first be asserted before a proceeding constitutes a "proceeding involving said rights" in a trademark.  In that case, McDonald's obtained a federal registration for "McChicken."  *In re McDonald's*, 1984 Commr. Pat. LEXIS 10 (Comm'er of Patents and Trademarks Apr. 10, 1984).  Five years thereafter, McDonald's filed its Sections "8 & 15" affidavit, but the Section 15 portion was not accepted because the trademark examiner observed that the McChicken mark was "involved in a civil proceeding."  *Id*. at *2. McDonald's petitioned the Commissioner to accept McDonald's Section 15 affidavit for filing because "the civil action involving this registration does not raise any question with respect to its rights as contemplated by Section 15."  *Id*. at *1-2.

6

7

8

9

10

11

12

13

14

15

16

In assessing McDonald's position, the Commissioner simply noted that no counterclaim had been filed by the opposer.  *Id*. at *2.  The Commissioner further noted that it had been "office practice" to withhold stamping of Section 15 affidavits "if the registration is involved in any civil proceeding, without looking to the nature of the proceeding to determine if it involves the rights contemplated by Section 15." *Id*.  The Commissioner observed that this "practice" was "stricter than the requirements set forth in Section 15."  *Id*.  Accordingly, the Commissioner ordered that:

17

18

19

20

21

22

> The current office practice on Section 15 affidavits is hereby ordered changed.  **The Search Library copies of a registration may be stamped with an appropriate Section 15**

23

24

25

26

1

**notation if the registration is not involved in a proceeding
which challenges the rights indicated in Section 15**."

2

*In re McDonald's* at *2-3 (emphasis supplied).

3

4       As this expert indicates (an excerpt that LS&Co. conveniently omits from its block

5 quotation on pg. 8 of its motion), the Commissioner did not state that a counterclaim for

6 cancellation must first be asserted before a proceeding constitutes a "proceeding involving

said rights" in a trademark.  Quite the contrary, the relevant inquiry is whether the registration

7 "is involved in a proceeding which challenges the rights indicated in Section 15."  As noted

8 above, such a "challenge" can be asserted as either a "defense" or a "counterclaim."  *See*

9 *supra* at p. 9.    Thus, LS&Co. is incorrect that *In re McDonald's* somehow precludes

10 Abercrombie's claim for fraud.   If anything, the Commissioner's directive is actually

11 consistent with the plain meaning of the statute and the judicial interpretations thereof.

12       Finally, LS&Co. cites to *Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322,

13 1327 (Fed. Cir. 1999), but fails to offer any explanation as to how it supports LS&Co.'s

14 "interpretation" of the statute.  In fact, *Sunrise Jewelry* does not support LS&Co.'s position.

15 In that case, the trademark registrant, Fred, was involved in federal litigation and a

16 cancellation proceeding before the PTO involving its trademark.  *Id*. at 1323.  The litigation

17 and the PTO proceeding were resolved through settlement and, thereafter, Fred timely filed its

18 "incontestability" affidavit.  *Id*. The affidavit actually mentioned the settlement and noted that

19 "a withdrawal of the cancellation proceeding had been filed."  *Id*.  After the incontestability

20 affidavit was filed with the PTO, a counterclaim for cancellation of Fred's registration was

21 asserted in an unrelated federal court action.  *Id*. at 1324.

22       Thereafter, the Plaintiff in *Sunrise Jewelry* alleged that Fred committed fraud on the

23 PTO by filing its incontestability affidavit.  *Sunrise Jewelry Mfg. Corp.*, 175 F.3d at 1324.

24 This claim was rejected because "at the time Fred filed the affidavit it would have been

25

26

1  reasonable to believe that no proceeding was pending in view of the previously filed

2  withdrawal of the cancellation proceeding." *Id*. at 1327. The court also noted that at the time

3  the counterclaim for cancellation was filed, Fred had already filed his affidavit, and "the

4  Lanham Act imposes no continuing duty to update a § 15 affidavit." *Id.*

5      The facts set forth in Abercrombie's counterclaim are completely different from the

6  facts in *Sunrise Jewelry*. In *Sunrise Jewelry*, at the time the affidavit was filed, the

7  proceedings had been settled and a notice of withdrawal had been filed. By contrast, at the

8  time LS&Co. filed both affidavits, *Lois Sportswear* was still very much alive and Lois

9  Sportswear was unquestionably challenging LS&Co.'s rights to the arcuate trademark.

10  Moreover, in *Sunrise Jewelry*, the affidavit submitted to the PTO actually referenced the

11  litigation and disclosed that it had been resolved through settlement. Neither one of

12  LS&Co.'s affidavits made any mention whatsoever of the *Lois Sportswear* matter. Finally, in

13  *Sunrise Jewelry*, the counterclaim that sought cancellation of Fred's trademark was filed after

14  Fred submitted the Section 15 affidavit. *See Sunrise Jewelry Mfg. Corp.*, 175 F.3d at 1324.

15  Not so in *Lois Sportswear v. LS&Co.* Lois Sportswear alleged from the outset of the litigation

16  that LS&Co did not have an enforceable trademark. *Sunrise Jewelry* is inapposite.

17  C.    LS&Co.'s false statements were material because the registrant attesting that
        there is no proceeding involving the trademark in a court is a statutory
18      prerequisite to obtaining an "incontestable" registration.

19      LS&Co.'s argument on materiality is equally unsound. LS&Co. claims that because it

20  ultimately prevailed in the *Lois Sportswear* litigation, the false statements it made to the PTO

21  many months prior to the Second Circuit decision could not be "material." This argument

22  should be rejected on its face for both legal and policy reasons.

23      First, whether a statement is "material" is assessed at the time the statement was made

24  to the PTO. *See, e.g., Orient Express Trading Co.*, 842 F.2d at 653 ("knowing misstatement

25  must have been with respect to a material fact -- one that would have affected the PTO's

26

1   action on the applications.") (citations omitted); *Crown Wallcovering Corp.*, 188 U.S.P.Q. at

2   143 (material information or facts are those "which, if transmitted and disclosed to the

3   examiner, would have resulted in the disallowance of the registration sought."); *National*

4   *Business Systems, Inc. v. AM International, Inc.*, 743 F.2d 1227, 1239 (7th Cir. 1984)

5   ("To support a finding of fraud, the court 'must determine not only that the undisclosed art or

6   information was material, but that the one charged with non-disclosure knew or should have

7   known of its materiality at the time.'" (citations omitted)); *Duffy-Mott Co., Inc.*, 424 F.2d at

8   1099 (noting that court needs to consider "the purpose for which the false affidavit was filed

9   in order to determine the importance of the untrue allegations").

10        The purpose for which LS&Co. submitted the "8 and 15" affidavit was to obtain

11   "incontestability," a "new right" that is not granted with the original registration. *Crown*

12   *Wallcovering Corp.,* 188 U.S.P.Q. at 144. The <u>only</u> way for a trademark registrant to obtain

13   this "new right" is to submit an incontestability affidavit to the PTO satisfying the

14   requirements set forth in 15 U.S.C. § 1065 at the time the registrant files the affidavit. One of

15   those statutory requirements is that the registrant must attest that there "is no proceeding

16   involving said rights pending in the Patent and Trademark Office or in a court and not finally

17   disposed." 15 U.S.C. § 1065(2). Without providing that statement, a trademark registrant

18   would be ineligible to obtain an "incontestable" trademark. Thus, as a matter of law,

19   LS&Co.'s affidavits that testified to the supposed "non-existence" of a court proceeding

20   involving its rights to the trademark are unquestionably "material" under 15 U.S.C. § 1065(2)

21   because those statements go to the heart of whether LS&Co. would have been entitled to an

22   incontestable trademark at the time it filed its affidavits. *See Orient Express Trading Co.*, 842

23   F.2d at 653 (statement of continuous use required for Section 8 and 15 affidavit, which

24   registrant made falsely, constituted material misstatement of fact).

25

26

1    Second, as a matter of policy, interpreting "materiality" the way LS&Co. suggests

2  would create a safe haven for those that submit false affidavits to the PTO.  Under LS&Co.'s

3  theory of "materiality", a trademark owner could file a false statement (or in LS&Co.'s case,

4  two false statements) with the PTO regarding pending litigation involving the trademark.

5  Under LS&Co.'s definition of "materiality", so long as that registrant ultimately prevailed in

6  the litigation that was secreted from the PTO, it would not matter how outrageous or deceitful

7  the statement was because it was "immaterial."  Such an absurd result is not supported by the

8  text of the statute, the Lanham Act, judicial interpretations, or common sense.  Moreover, this

9  argument tacitly (if not overtly) seeks this Court's imprimatur on false filings before a federal

10  agency and it should be rejected on that basis as well.

11    For all of the aforementioned reasons, the Court should deny LS&Co.'s motion to

12  dismiss Abercrombie's counterclaim for fraud on the PTO.[7]

13  D.    LS&Co.'s motion to dismiss Abercrombie's abandonment counterclaim should
be denied because LS&Co. ignores facts establishing this claim and relies on
14    case law that is easily distinguishable on both procedural and substantive
grounds.

15    This Court should also reject LS&Co.'s argument that Abercrombie has failed to

16  allege sufficient facts to state a claim for "abandonment."  The reasons are twofold.  First,

17  Abercrombie has specifically alleged—and this Court must accept as true—that LS&Co.

18  knowingly consented to third party infringements of LS&Co.'s "arcuate" trademark.  Such

19  knowing consent can constitute an abandonment of a trademark, as LS&Co.'s own legal

20  authority indicates.  *See* LS&Co. Motion, pp. 10-11.  For this reason alone, LS&Co.'s motion

21  fails.  Second, LS&Co. relies on legal authority that is simply inapplicable at this stage of the

22

23  _____

24  [7] In fact, it is Abercrombie's position that LS&Co.'s submission of two materially false affidavits is undisputed
as a matter of law.  Abercrombie filed a motion for summary adjudication on this exact issue on March 21, 2008,
25  but took this motion off-calendar so that it could be combined with Abercrombie's motion for summary
judgment of non-infringement, which will be filed with the Court at a future date.

26

1    proceeding.  The only issue before this Court is whether Abercrombie has alleged sufficient

2    facts to establish a claim of abandonment.  None of LS&Co.'s authority discusses the relevant

3    pleading standard; rather, all of these cases involved either preliminary injunctions, summary

4    judgment motions, or a trial where the abandonment claims were analyzed against the

5    evidence produced.  Thus, other than articulating the legal standard that Abercrombie will

6    ultimately have to meet to support its claim of abandonment, LS&Co.'s cited legal authority

7    fails to support its argument and certainly cannot be read to suggest that Abercrombie has

8    failed to allege sufficient facts to support its abandonment claim.

9           1.    <u>Abercrombie properly alleged a claim of trademark abandonment
                  because LS&Co. knowingly consented to other third-party infringing</u>
10                <u>uses of its "arcuate" trademark.</u>

11          The Lanham Act provides that a trademark registration may be cancelled when the

12   trademark has been "abandoned." 15 U.S.C. § 1064(3). "Abandonment" is defined to include

13   any act or omission by the registrant which causes the trademark "to lose its significance as a

14   mark." 15 U.S.C. § 1127.  Whether a trademark has lost is significance as an indication of

15   origin is a question of fact.  *FirstHealth of Carolinas, Inc. v. CareFirst of Maryland, Inc.*,

16   479 F.3d 825, 830 (C.A.Fed. 2007).

17          A trademark can lose its significance as a mark when the trademark owner allows

18   third parties to use its trademark.  As one Court has observed:

19                   Without question, distinctiveness can be lost by failing to take
                     action against infringers. If there are numerous products in the
20                   marketplace bearing the alleged mark, purchasers may learn to
                     ignore the "mark" as a source identification. When that occurs,
21                   the conduct of the former owner, by failing to police its mark,
                     can be said to have caused the mark to lose its significance as a
22                   mark.  *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*,
23                   680 F.2d 755, 766 (Cust. & Pat.App. 1982).

24   Even LS&Co.'s own legal authority acknowledges that abandonment can occur when the

25   trademark owner consents to third party infringing uses of its trademark.  *See* LS&Co.

26

---

1   Motion, p. 10 (citing *STX, Inc. v. Bauer USA, Inc.*, 43 U.S.P.Q.2d 1492,

2   1502 (N.D.Cal.1997)). For example, in *STX* the court noted that "[t]he existence of third

3   party infringers does not constitute an abandonment of a mark where the trademark owner

4   does not consent to the use of the mark by these others but rather, vigorously pursues these

5   third party infringers." *Id.*; *see also Citibank, N.A v. City Bank of San Francisco,* 206

6   U.S.P.Q. 997, 1011 (N.D.Cal.1980) (same); *Visa Intern. Service Ass'n v. Bankcard Holders of*

7   *America*, 211 U.S.P.Q. 28, 41 (N.D.Cal.1981) (same). *STX* went on to observe that that the

8   defendant failed to establish its abandonment claim because it "has not presented evidence to

9   the effect that plaintiff consents to any of the allegedly infringing third party use but merely

10  that plaintiff is aware of such use." *STX, Inc.*, 43 U.S.P.Q.2d at 1502.

11      In sharp contrast to the facts in *STX*, Abercrombie has alleged numerous facts (and

12  already presented evidence in the attachments to the Counterclaims) showing that LS&Co.

13  has knowingly consented to allegedly infringing third party uses of its "arcuate" trademark.

14      For example, Abercrombie alleges that in 2003, LS&Co. sued a company claiming

15  that it infringed on LS&Co.'s "arcuate" trademark. Abercrombie's Counterclaims, ¶ 22. Yet,

16  that same year in a separate lawsuit LS&Co. sued a company by the name of Federal Jeans.

17  *Id.* at ¶ 23. Although Federal Jeans was also using a stitching design that was very similar to

18  the design used by the other company sued by LS&Co. in 2003, LS&Co. "knowing allowed"

19  Federal Jeans to continue to using the infringing design. *Id.*.

20      In another example of LS&Co. knowingly consenting to infringing use of its "arcuate

21  trademark", Abercrombie alleged that in 2003, LS&Co. sued a company by the name of "For

22  What It's Worth" claiming that its back pocket stitching design was an infringement of the

23  "arcuate" trademark. *Id.* at ¶ 24. As Abercrombie further alleges, for a very significant

24  amount of time at least one other company had been using a stitching design that was very

25  similar to the "infringing" design used by For What It's Worth. Yet, "LS& Co. has

26

knowingly allowed this other party to use a design that LS&Co. knows is infringing on LS&Co.'s arcuate trademark." *Id.*.

Additionally, Abercrombie alleges that in 2004, LS&Co. sued a company by the name of RP55 for its alleged "willful infringement" of the arcuate trademark. *Id.* at ¶ 25. LS&Co. even produced an expert report in that case claiming that "RP55's back pocket stitching design was likely to cause confusion in the marketplace" with the arcuate trademark. *Id.* at ¶ 25. Yet, despite LS&Co.'s claims of "willful infringement" against RP55 and its use of an expert report supporting that allegation, LS&Co. "dismissed its case with prejudice" against RP55. As Abercrombie specifically alleges in its Counterclaim, LS&Co.'s release of RP55 is "another example of how LS&Co. is allowing other supposedly infringing designs to be used with LS&Co.'s express permission." *Id.*.

As Abercrombie alleges, all of these examples of LS&Co. knowingly permitting infringing uses constitutes "abandonment." *Id.* at ¶ 29. These facts are sufficient to state a claim for abandonment and, therefore, LS&Co.'s motion to dismiss should be denied on this basis alone.

> 2. The most that LS&Co.'s legal authority provides is the standard of proof that Abercrombie will ultimately have to meet on its abandonment claim—a standard that is wholly inapplicable when testing the sufficiency of a claim for relief under Rule 12(b)(6).

LS&Co.'s legal authority does not support its motion to dismiss. Notably, not *one* of LS&Co.'s cited cases involved a motion to dismiss a claim of trademark abandonment. Instead, all of these cases involved preliminary injunctions, summary judgment motions, and trial—proceedings that require a court to determine whether sufficient evidence exists to support a claim. *See Electro Source, LLc. v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 941 (9th Cir. 2006) (failure of proof to support summary judgment); *Citibank, N.A. v. The City Bank of San Francisco*, 206 U.S.P.Q. 997, 1011, 1980 WL 30239 (N.D. Cal. Mar. 23,

1980) (preliminary injunction granted due to failure to meet "strict burden of proof" of
abandonment); *Visa Int'l Service Assn. v. Bankcard Holders of America*, 211 U.S.P.Q. 28,
1981 WL 40539 at *43 (N.D. Cal. Feb. 26, 1981) (preliminary injunction granted after
evaluation of evidence); *STX Inc. v. Bauer USA Inc.*, 43 U.S.P.Q. 1492, 1500, 1997 WL
337578 (N.D. Cal. Jun. 5, 1997) (failure to meet "high burden of proof" on summary
judgment); *Transgo v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1009 (9th Cir. 1985)
(appeal from jury verdict and judgment); *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d
1070, 1081 (5th Cir. 1997) (summary judgment on naked license defense); *Babbit
Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1165 (11th Cir. 1994) (appeal from
plaintiff's hearing on notice of foreign law); *Sweetheart Plastics, Inc.*, 743 F.2d at 1041
(appeal from judgment entered on jury verdict); *Wallpaper Mfrs., Ltd. v. Crown Wallcovering
Corp.*, 680 F.2d 755, 757 (appeal from T.T.A.B. decision granting petition to cancel
trademark registration); *Board of Regents of Univ. System of Georgia v. Buzas Baseball, Inc.*,
176 F. Supp. 2d 1338, 1344 (N.D. Ga. 2001) (motions for summary judgment); *Shelby v.
Ford Motor Co.*, 43 U.S.P.Q. 2d 1692, 1693 1997 WL 689456 (C.D. Cal. Mar. 21 1997)
(declaratory judgment action based on stipulated findings of fact and conclusions of law);
*Kinark Corp. v. Camelot, Inc.*, 548 F. Supp. 429, 431-32 (D. N.J. 1982) (opinion after bench
trial); *Playboy Enterprises, Inc. v. P.K. Sorren Export Co. Inc. of Fla.*, 546 F. Supp. 987, 989
(S.D. Fla. 1982) (opinion after bench trial). As such, they do not stand for the proposition that
Abercrombie has failed to sufficiently plead a claim of abandonment.

A case that is much more procedurally on point than any of the cases cited by LS&Co.
is *Fort James Corp. v. Kimberly-Clark Tissue Co.*, 1999 WL 966144 (N.D. Ill. 1999). There,
the defendant was sued for trademark infringement and alleged several affirmative defenses,
including that the plaintiff had "abandoned" its trademark, as well as a counterclaim for
cancellation based on abandonment. The defendant's abandonment allegation provided that

1  the "widespread third-party use of similar designs, unpoliced by Fort James, has undermined

2  consumer perception that a single source exists for the goods that bear the trademarked

3  design." *Id.* at *4.  The plaintiff moved to dismiss this affirmative defense and the

4  counterclaim based on abandonment.  The court denied the motion observing that this

5  pleading provided a "plausible scenario of abandonment" and the court emphasized that

6  "ultimate success of the defense is not our concern at this stage of the case" *Id.* at *5.  Other

7  cases have similarly rejected motions to dismiss counterclaims based on abandonment

8  theories.  *Iowa Health System v. Trinity Health Corp.*, 177 F. Supp. 2d 897, 923 (N.D. Iowa

9  2001) (noting that "for purposes of the present motion to dismiss, the Trinity Iowa Plaintiffs

10  'improper tacking' claim does state a claim upon which relief can be granted, because there is

11  a set of facts that could be proved consistent with the allegations of improper tacking" that

12  would constitute "abandonment."); *In re Houbigant Inc.*, 914 F. Supp. 964, 994 (S.D.N.Y.

13  1995) (claim of abandonment not dismissed on Rule 12 motion).

14      If the limited factual allegations in *Fort James* were sufficient to survive a motion to

15  dismiss, then certainly the pleading in this case—a pleading that details several instances

16  where LS&Co. knowingly allowed third parties to engage in infringement of the "arcuate"

17  mark thereby causing it to lose its significance as a mark—is more than sufficient to state a

18  claim for abandonment.

19

20              IV.    **CONCLUSION**

21      For the reasons set forth herein, LS&Co.'s motion to dismiss should be denied.[8]

22

23

24  _____
[8] Should the Court grant the motion, though, Abercrombie respectfully requests it be granted leave to amend it
25  Counterclaims to clarify its allegations.  *See Daw Indus. v. Proteor Holdings, S.A.*, 2008 U.S. Dist. LEXIS 6736,
*9-10 (S.D. Cal. Jan. 29, 2008)( "A court may dismiss a complaint without granting leave to amend only if it
26  appears with certainty that the plaintiff cannot state a claim and any amendment would be futile").

1    Dated:    March 28, 2008                    Respectfully submitted,

2                                               **KIRKPATRICK & LOCKHART**
3                                               **PRESTON GATES ELLIS LLP**

4                                               By:_____/s/_____
                                                Michael J. Bettinger
5                                               Rachel R. Davidson
                                                J. Michael Keyes
6
                                                Attorneys for Defendant
7                                               ABERCROMBIE & FITCH TRADING CO.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26