**EXHIBIT B**

A-919

eb                                                                                    1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ---------------------------------x

3   LOIS SPORTSWEAR U.S.A. INC.,

4                    Plaintiff,

5              v.                                    82 Civ 8326

6   LEVI STRAUSS & COMPANY,

7                    Defendant.

8   ---------------------------------x

9   LEVI STRAUSS & COMPANY,

10                   Plaintiff,

11             v.                                    83 Civ 4338

11  TEXTILES CONFECCIONES EUROPA, S.A.

12                   Defendant.

13  ---------------------------------x

14

15                                           July 12, 1985
                                             10:00 a.m.

16
    Before:
17
                    HON. ROBERT W. SWEET
18
                                             District Judge
19

20                   APPEARANCES

21  WHITMAN and RANSOM
           Attorneys for Lois and Textiles
22  MAX F. SCHUTZMAN of Counsel
    THOMAS G. BAILEY of Counsel
23
    MILGRIM, THOMOJON, JACOBS & LEE
24         Attorneys for Levi
    ALFRED T. LEE of Counsel
25  GERALYN DOBESH or Counsel

**A-920**

eb

1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------x

3    LOIS SPORTSWEAR U.S.A. INC.,

4                  Plaintiff,

5              v.                    82 Civ 8326

6    LEVI STRAUSS & COMPANY,

7                  Defendant.
     -------------------------------x
8
     LEVI STRAUSS & COMPANY,
9
                  Plaintiff,
10             v.                    83 Civ 4338

11   TEXTILES CONFECCIONES EUROPA, S.A.

12                Defendant.

13   -------------------------------x

14
                              July 12, 1985
15                            10:00 a.m.

16

17   Before:

18           HON. ROBERT W. SWEET

                              District Judge
19

20                  APPEARANCES

21   WHITMAN and RANSOM
          Attorneys for Lois and Textiles
22   MAX F. SCHUTZMAN of Counsel
     THOMAS G. BAILEY of Counsel
23
     MILGRIM, THOMOJON, JACOBS & LEE
24        Attorneys for Levi
     ALFRED T. LEE of Counsel
25   GERALYN DOBESH or Counsel
```

# A-921

eb

2

1          (Case called)

2          THE COURT:  I want to thank counsel for their

3     clear presentation.  For that I'm very grateful.  How do

4     you all want to proceed?  Have you worked that out or do

5     you need my wisdom, such as it is.

6          MR. SCHUTZMAN:  We're the moving parties so

7     we'll start.

8          THE COURT:  All right.

9          MR. SCHUTZMAN:  I don't know how much time your

10    calendar has set aside for this.  We would request 30

11    minutes, saving five of those minutes for rebuttal.

12         THE COURT:  Sounds fine to me.

13         MR. BAILEY:  At the outset, your Honor, it's

14    appropriate to place before you the two items which have

15    supplied the subject matter of this rather lengthy

16    proceeding.

17         THE COURT:  What size are these?

18         MR. BAILEY:  They may fit.

19         At the outset we'd simply like to note that you

20    are quite well versed, you seem to have been exposed to a

21    number of relatively similar trademark disputes and it's

22    not our purpose to tell you what the law is.  It is the

23    purpose of Lois and Textiles in bringing this motion to

24    show to the court that at this stage there remain no

25    questions of triable fact.

# A-922

3

eb

1    THE COURT:  Let me ask you this.  Do I

2  understand correctly that sometime in the recent past you

3  were stopped from importing for a period and then you

4  resumed?

5    MR. BAILEY:  That's correct.

6    THE COURT:  When did you resume?

7    MR. BAILEY:  I believe the resumption of

8  importation occurred in early 1983.

9    THE COURT:  Okay.

10    MR. BAILEY:  That was with the entry of an

11  injunction order by Judge Newman at the Court of

12  International Trade.

13    THE COURT:  Excuse the interruption.

14    MR. BAILEY:  Your Honor, although we intend this

15  morning to go through each of the so-called Polaroid

16  factors with the court, we believe that the focus should be

17  on the crux of those tests which is the likelihood of

18  actual confusion among prudent purchasers and I would note

19  at the outset that the prevailing language in this circuit

20  and indeed in the United States emanates from and is most

21  often quoted from the Mushroom Makers case, Second Circuit,

22  1978.  The test is that the person claiming the

23  infringement must show that there exists a likelihood that

24  an appreciable number of ordinarily prudent purchasers will

25  be mislead or simply confused as to the source of the goods

A-923

eb

4

1    in question.

2              As the court can see from the two examples

3    before it, these goods are exceedingly well labled with a

4    number of indicia in each case as to the source of

5    manufacture.  These labels include both permanently affixed

6    matters and also a number of cardboard tags or hang tags as

7    they've come to be called but the Lois Jeans are marked not

8    only to display the Lois brand name; the use of a

9    distinctive bull logo is also employed.  On the interior

10   waistband, the jeans have to be open to display it, is a

11   manufacturer's statement from Textiles and in the papers

12   submitted we've noted the number of occasions on each jean

13   where in such places like the button or various pocket tabs

14   the author of the goods is well indicated.

15             The same is true of Levi's.  Levi's has employed

16   a number of indicia of its source of origin.  I think what

17   we're here to discuss is about their fourth or fifth string

18   origin-indicating indicia.  Behind their well known name

19   they've also employed and have remarked on in their papers

20   the pocket tab which is affixed to the pocket and there's a

21   9th Circuit case discussing that very issue.  There's also

22   the waistband tab which is more or less permanently affixed

23   employing the so-called two horse brand.  There is the

24   corporate logo which these tabs I believe are, this is in

25   the shape of, which is also used.  And finally we get to

**A-924**

eb

1    the Arcuate which at this point is covered but on the other

2    pocket I believe is visible.

3         In attempting to measure the likelihood of

4    actual confusion, the court looks first to see if there are

5    any instances of actual confusion.  There are two

6    interrogatories attached to our papers indicating there

7    have been no incidents of actual confusion to date, no

8    misdirected purchase orders or phone calls or any consumer

9    reports of actual confusion.

10         The next step in the analysis is to look to any

11   other evidence of likelihood of confusion and in the

12   original moving papers Levi's attached a discussion of a

13   survey conducted by JCPenny.  In the reply papers they've

14   conceded that that survey is not introduced for the purpose

15   of showing likelihood of confusion.  It was introduced for

16   other purposes.  Levi's's counsel also noted that the

17   survey was flawed in several ways.

18         Our position is that this survey is not of any

19   importance to the court at this stage.  56(e), Federal

20   Rules, clearly sets forth the qualifications of matters

21   that may be brought before the court at a summary judgment

22   stage by way of affidavit or by way of introduction of

23   other evidence and one of those requirements is that the

24   evidence be likely to be admissible at trial and we think

25   it can be readily seen, the survey of JCPenny is not in any

A-925

6

1   way going to be admissible at trial and in fact on page 19

2   I believe opposing counsel has admitted that except for

3   some unusual purpose which they claim it might have some

4   bearing on, basically it's not probative as to likelihood

5   of actual confusion.

6           Levi's also concedes in their reply brief that a

7   purchaser of Lois Jeans will know that he's purchasing Lois

8   Jeans at point of sale.  That directly tracks the statement

9   of Mushroom Makers and effectively ends the question before

10  us.

11          In the footnote on page 16, I believe this is

12  the product of a typo, but there's a sentence that starts

13  true enough:  The purchaser of Lois Jeans will come to know

14  that it is the brand being purchased.  But the likelihood

15  of an association with Levi Strauss exists.

16          Simply it's my point that the Mushroom Makers

17  test and the one that's been adopted throughout the Second

18  Circuit and the United States is the measurement of the

19  likelihood that an appreciable number of ordinarily prudent

20  purchasers will be mislead as to the source of the goods.

21  We believe that the well-labled, well-marked,

22  well-designated goods, as they appear before the court and

23  as they appear in marketplace conditions in the store --

24          THE COURT:  Let me see if I understand your view

25  of it.  Let's assume just for the sake of the argument that

**A-926**

1   Lois' mark or Lois' design on the pocket of the jeans is

2   precisely the same as Levi's.  I recognize that's not the

3   case.  You would still argue that all the other facts of

4   the case being the same, you would still argue that no

5   injunction should issue.

6          MR. BAILEY:  Your Honor, that's a difficult

7   question to answer.

8          THE COURT:  Well, that's the thrust of what

9   you're telling me.

10          MR. BAILEY:  I believe your Honor the point I

11   was trying to make was that given the exact marketplace

12   appearance, Levi's has conceded that someone purchasing

13   Lois Jeans will know they've purchased Lois Jeans when they

14   buy them in a store.

15          THE COURT:  Even though the markings on the back

16   are exactly the same.

17          MR. BAILEY:  I don't think they were intending

18   to concede that and I don't mean to take advantage of such

19   a concession.  Now back to the direct response to your

20   question, however.  I think that you've been presented with

21   several cases that very closely considered this and it

22   would be a very difficult uphill case for us if it were

23   solely the manufacturer's name that differentiated the

24   products but we don't feel that it is.

25          THE COURT:  Well, it's the name, maybe the

# A-927

eb

1   stitching.  What else?

2            MR. BAILEY:  There are the tags; the excessive

3   both permanent and temporary labeling on the jeans; there's

4   the fact that the jeans are found in different types of

5   outlets; they're sold at tremendously different price

6   ranges; they're not competitive in our view.

7            THE COURT:  Assume all those things and assume

8   that the pocket, the design on the pocket is precisely the

9   same.  Injunction or no?  You would say no.

10           MR. BAILEY:  We would argue no and the greatest

11  point militating in our favor would be the prominent

12  labeling, the prominent mention of the manufacturer.

13           THE COURT:  Is there any circumstance of which

14  you're aware where the designs have been held to be the

15  same but the injunction has not issued on the grounds that

16  there was, in fact, no confusion because of some other

17  factor other than the design itself?

18           MR. BAILEY:  I believe, your Honor, that I would

19  have to look through our papers but I think that one or two

20  of the cases we cited in our initial brief included a

21  concession at the trial stage that the marks were virtually

22  similar.  And I believe the Mushroom Makers case is one of

23  those in which case various other market factors

24  differentiated.

25           Your Honor, perhaps taking my argument a bit out

9

eb

1    of order, perhaps it is important to go to the next stage

2    and that is how strong is the mark that we're considering,

3    how worthy is the Levi's mark of protection.  And I think

4    the court has seen in the papers submitted by both parties

5    that there is, from our point of view, a great deal of

6    evidence that these marks are or back pocket stitching is

7    so prevalent on jeans, has been so prevalent on jeans since

8    sometime in the 70's, that it's thoroughly diluted and

9    weakened any strength that the Levi's mark might have once

10   had or been entitled to.

11               THE COURT:  I understand Levi's practice but the

12   competitors, did that start in the 70's?  It's not clear to

13   me from my recollection of the papers that there's a time

14   frame established.  Is there?

15               MR. BAILEY:  For purposes of summary judgment

16   what we do know and what we've stated in our papers is --

17   Cassandra Flipper used in her deposition testimony the

18   phrase that the late 70's and early 80's were the heyday of

19   the designer jean craze.  Whether it started long before

20   that or not, I know that both Lois and Levi's had long used

21   stitching on their designs.  Lois dating from 1959.  Levi's

22   purportedly from 1873.

23               As to the total evidence of other jeans in the

24   market before say 1979, I don't think I'm prepared to say

25   and I don't know that I have solid evidence on that.

**A-929**

eb

1    I would like to place before you at this time

2    just a few examples of items that we have picked up by

3    people in our office who have gone to look through the

4    stores casually and see what goods were available.  I place

5    before you now Exhibits A and B to the DeLuca affidavit.

6    And would note that these jeans, here's a pair of 36, your

7    Honor.

8            THE COURT:  Good.

9            MR. BAILEY:  Continuing on with the DeLuca

10    exhibits.  This is Exhibit D and Exhibit C and Exhibit E.

11    This was from the brief shopping trip Ms. DeLuca made in

12    June.  At an earlier shopping trip, Miss Rauzi of our

13    office had gone out and made a similar sweep of a few

14    stores to see what was there and at that time she came up

15    with these items we'd like to call to your attention.  A

16    Gloria Vanderbilt jean.  That's Rauzi number 1.  An Apache

17    jean, that's Rauzi 2.  And Rauzi Exhibits A 6 and 8.

18            While Levi's has made a great deal of verbeage

19    about the policing efforts they undertook in this case,

20    what we have before the court at this stage is that there

21    were some 200 files for US protest letters that Levi's made

22    available to Lois pursuant to an interrogatory.

23            THE COURT:  Any of these now before me the

24    subject of those letters?

25            MR. BAILEY:  I don't believe so, your Honor.

**A-930**

eb

1    There are depictions of the trademarks in question from

2    about 60 of the pairs of jeans represented by those letters

3    that are attached in the Lois papers either to my own

4    affirmation or to Mr. Cohen's affirmation.  And those are

5    simply attached by way of description of what was in a

6    number of the files.

7           Our point is is really doesn't matter how well

8    Levi's believes they have policed these matters.  I believe

9    in the affidavit of Ann Rio that's furnished here in reply,

10   she goes through and speaks to a number of these jeans as

11   to what steps were taken.  A glance through there will show

12   that some of those items have been contested from a prior

13   time.  But nonetheless the jeans are still out there.

14   They're everywhere.

15          Maybe we're not here to contest whether or not

16   they've done a good job, fair job or terrible job policing.

17   There are jeans all over the market that have long since

18   diluted any distinctive quality that the Levi's mark might

19   have had.  There are two types of designs, your Honor.  One

20   is the designs we've placed before you, the relatively

21   simplified double arc or double line type designs.  We've

22   also placed pictures in our moving papers and we have other

23   jeans here today with us that use the so-called Arcuate as

24   the central design feature and they've embellished it

25   slightly.

eb

12

1    In those instances and I think in Miss Rio's

2    affidavit before the court Levi's determines whether or not

3    they believe the mark closely infringes.  If they don't

4    believe it does they don't police it.

5    Our point is simply that everybody uses an

6    Arcuate.  Some go further and embellish it so the Levi's

7    people leave them alone.  Other people continue to put them

8    on the market believing as Lois does apparently that these

9    are not infringing marks.  It's simply the case and our

10   cases reveal this by citing from deposition transcripts

11   that there is a back pocket design on every pair of jeans

12   that you see walking around.  The possible exception is the

13   Penney's plain pocket jeans.

14   In our papers we reveal that there are three

15   separate markets for jeans.  A basic or durable quality, in

16   direct competition with Lee and Wrangler and other makes.

17   These sell in the $20 range.

18   There is a so-called designer level of jeans

19   which sell in the $40 range.  Those would be Calvin Klein,

20   Sergio Valente; a number of the well advertised foreign

21   brands fall into the designer level.

22   Then there's a so-called fashion level.  It's at

23   the fashion level, or $60 price range and up, that Lois

24   competes.  It's competition is almost exclusively other

25   European imports, including brands known as Ball, Guess and

A-932                                    13

eb

1    NewMan.

2              The advertising of Levi Strauss, as well

3    exemplified in the numerous portions of ad copy in their

4    papers, has depictions of cowboys, emphasize durable and

5    tough, in many cases children --

6              THE COURT:  Forgive me.  Which affidavit is that?

7              MR. BAILEY:  I believe it is in affidavit,

8    Exhibit 7 and 8

9              By contrast, the Lois mark has attempted to make

10   itself a fashion statement.  They make no bones about the

11   fact that the goods they sell are high-priced.  They

12   believe them to be of higher quality than Levi's.  For

13   purposes of this proceeding, Levi's has conceded that the

14   quality is more or less equal so I don't think quality is

15   an issue.  I simply point it out to the court for the

16   purpose of in part justifying the high price and the

17   different market the goods are pitched in.

18             Because the advertising, exemplary advertising

19   that we presented to the court was folded up, I've unfolded

20   a couple of these.  I would like to put several of these,

21   one of the posters used promptly was a large picture of

22   Bjorn Borg, who I'm distressed to say that my secretary had

23   never heard of.  But it says, "The World's Greatest Tennis

24   Player with the leading European jeans brand; " Lois with a

25   picture of the bull.  This is the market to which Lois has

## A-933

1    attempted to sell its goods.

2           I've also brought forward one piece of media

3    advertising used by Lois indicating that it's goods are

4    only for the filthy rich.  This is simply not the market to

5    which Levi's is primarily selling its goods.

6           The point is that much of what the court is

7    going to hear and has already read in the papers relates to

8    the broad popularity of jeans generally.  As Levi's would

9    have it, their proud and well-known name.

10          Really very little of the advertising they've

11   shown to the court and very little of this case relates to

12   the strength of their own stitch design.  It has to do with

13   how well known Levi's jeans are.  In fact Levi's is

14   perilously close to having achieved a generic name, so well

15   known is it.  That's a problem for another day for Mr. Lee.

16          THE COURT:  It's not a problem for me, right?

17          MR. BAILEY:  No, your Honor, it's not.  The

18   point is simply that we're not here to discuss how well

19   jeans have done and how tremendously important they've

20   become as a factor of life among many people over the last

21   ten years or so.  We concede that jeans are a popular form

22   of clothing.  Our purpose is simply to further show that

23   Lois has no intentions to trade on whatever acquired good

24   will Levi's has.  We suffer by comparison because we are

25   attempting to say that this is a better, higher quality

A-934

15

1  fashion statement.

2          THE COURT:  Then why wouldn't it be in your

3  interest as well as mine to say nothing of Levi's to change

4  the design?

5          MR. BAILEY:  Perhaps, your Honor, if we were to

6  use the old Longley case from the 6th Circuit as a

7  guideline, where the mark was almost identical to the one

8  Lois used except that it extended to the bottom of the

9  pocket, perhaps your Honor is correct.  We could apparently

10  use that mark with impugnity.

11          THE COURT:  You think you could extend the arcs

12  further down and escape an injunction?

13          MR. BAILEY:  Yes, your Honor.

14          THE COURT:  On the design alone, leaving

15  everything else aside?

16          MR. BAILEY:  That's correct.  And I really said

17  that for three reasons.  One, although I can't go into it,

18  the parties have explored the possibilities of arriving at

19  some resolution such as that.  And we haven't been able to

20  enter into one.  But it has not escaped our attention

21  either.

22          The second thing is we do have the Longley

23  precedent where once extended the mark was not contested.

24          From the protest files and I think from Miss Rio's

25  affidavit, once Levi has been satisfied that a mark is

**A-935**

1    sufficiently differentiated from its own, it views these as

2    non-infringing.  I can't say with candor whether or not any

3    of the file pictures that we placed in front of the court

4    consisted of exactly the same item that came all the way to

5    the bottom of the pocket and whether or not in that file

6    Levi's had decided to further protest such use.  I believe

7    there are instances like that and I think it's fair to say

8    that some modification would take us further from the realm

9    of the possibility of confusing the public.

10         I think that it is important to note that a

11   number of the jeans that we are discussing that I refer to

12   as complex designs really have an Arcuate at the center of

13   them and the reason there may be an embellishment or

14   curliques or something else added to it may well have

15   emanated from earlier protest made by Levi's.

16         One of the critical factors that is before the

17   court at this stage is Levi's counsel has indicated that

18   there should be a so-called fleeting view test or a post

19   sale simulated context in which the court should view

20   whether or not there is a confusing similarity as between

21   the stitch designs.  That view simply lacks any support in

22   this circuit.  I think that this court and the Second

23   Circuit have repeatedly and particularly since 1978 or 1979

24   looked at cases and determined in those cases when evidence

25   was probative as to confusing similarity and have

**A-936**

17

eb

1    established a very bright line opinion that unless evidence

2    and particularly survey evidence is presented in a

3    marketplace context, that that evidence is not probative

4    and may be inadmissible to prove likelihood of confusion or

5    to prove secondary meaning. We don't feel that there's any

6    justification in this circuit for taking a mark out of

7    context, whether it's the back pocket of a jeans or the

8    question of whether that's a Buick or a Dodge car driving

9    by because you only see one car door and you can't tell.

10   We don't feel that there's any justification for this post

11   sale simulation.

12          The Mushroom Makers test indicates that we are

13   trying to prevent confusion at the source of purchase and

14   that is effectively done by all of the labeling and the

15   prominent use of the manufacturer's name and whatever

16   fleeting glimpse someone might have on the street of a

17   stitch design — it's our feeling first of all that all

18   these jeans have stitch design -- you still have to go in

19   the store and buy it, find what you think it was and once

20   you do find it things are going to be well labled and

21   marked.

22          We've cited in our papers, there are a number of

23   cases wherein survey evidence was presented or other

24   evidence thought to be probative and it was totally

25   discarded because in attempting to measure the confusion

eb

1    aspect of the marks, someone had changed the marks so that

2    they were now taken in an artificial context, either by

3    changing the trade dress or putting them in a manner that

4    they're not seen in the stores.

5           I would cite the Mennen versus Gillette case,

6    decided by Judge Pollack, where the issue was the colored

7    stripes on Mennen Speed Stick Deodorant.  A survey was

8    attempted to be introduced for the purpose of showing both

9    secondary meaning and confusion and all markings have been

10   taken off but those stripes and Judge Pollack accorded the

11   surveys no weight on the basis that they were presented in

12   an artificial context.  The goods to be viewed have to be

13   in shelf condition according to lengthy precedence.

14          THE COURT:  Is there safe for me to assume that

15   there is a difference in the way in which the somewhat

16   similar designs are presented and the way in which you

17   presented them?  I just note that there is an absence of

18   the kind of identification on some of these that is

19   contained on yours.  I take it these were all purchased

20   from the shelf the way they're sold.

21          MR. BAILEY:  That's right, your Honor.  And I

22   believe that while there is in the moving papers of both

23   sides some mention of how the goods were actually displayed,

24   particularly when we look at Lois and Levi's jeans in

25   stores, the context in which they're shown is how they're

eb

A-938

19

1    in the stores as to those pairs of jeans.  The store owners

2    have ultimate control, obviously, but that's the way we

3    purchased them.

4            THE COURT:  There's no question in your mind but

5    that the way in which the Lois jean is presented to the

6    merchandiser is the way it's presented here?

7            MR. BAILEY:  I believe that to be the case.

8            THE COURT:  Of course obviously the merchandiser

9    can do anything he wants.

10           MR. BAILEY:  I think, your Honor, that you lead

11   into another point and that is that this post-sale test

12   that Levi's counsel advocates, the purchaser can also do

13   anything that he wants with the jeans once he wears them.

14   Once he strips the jeans of some of its permanent indicia

15   or pulls the threads out or whatever he does is beyond our

16   control.  We can't follow the goods that far into the

17   marketplace.

18           I would quickly hit a couple of the Polaroid

19   factors to note that in Levi's moving papers they indicate

20   that there is some inclination on the part of Levi's to

21   indicate several lines of clothing that will bridge the gap

22   between these two goods.  While Levi's mentioned I believe

23   three or four separate lines, it didn't indicate any

24   intention to use the Arcuate on any of those four lines,

25   reminding us again that the protection conferred to

eb

A-939

20

1    trademark is limited to the items on which it uses and

2    competes with and I don't think that the introduction of

3    other lines which have no present, presently don't carry

4    the Arcuate, really relates to bridgeing the gap.

5          I would also note that as I've said before that

6    the quality is not really at issue.  We claim a higher

7    quality and obviously Levi's has been producing their item

8    for a number of years and they believe those to be very

9    tough and rugged as well.

10          In terms of just a moment for the good faith of

11    Lois in using this mark, Lois jean was born under the name

12    Texan and subsequently the model name was changed to Dylan

13    and finally to Lois.  It was born in 1961.  It has been the

14    same model ever since.  As we presented in the deposition

15    transcript of Joaquin Saez Merino, these items were used

16    from 1959 on, the same stitching design, the same bull logo

17    that Lois employs was used at about the same time.

18          THE COURT:  But it's correct, is it not, that

19    the record is barren of any explanation from the designer,

20    whose name escapes me at the moment, as to how he hit upon

21    that design?

22          MR. BAILEY:  That is correct, your Honor.  The

23    record is not barren, however, of the fact that Levi's

24    jeans were apparently not sold or introduced into Spain

25    where the designer was located until 1967 or 1968.  That

**A-940**                                          21

eb

1    appears both in a New Yorker article that was in the

2    exhibits, I believe Exhibit 1, but it was also the

3    testimony I believe of Mr. Saez Merino that he had not

4    heard of Levi's until such time as they came into use in

5    1967 or 1968.  As the decision maker of the company, while

6    we cannot speak for Mr. Del Arbol, who is the designer, who

7    has been gone from the company for some time, the decision

8    makers were not aware of the existence of the Levi's mark,

9    had been using it for eight or nine years before they

10   became even aware of Levi's name and had been employed

11   exactly 20 years before Levi's protested in 1979 to Lois to

12   discontinue the use.  In essence, --

13          THE COURT:  That's a fascinating twist on good

14   faith.  Let's assume for the moment that the designer

15   copied it.  That's very interesting.

16          MR. BAILEY:  Well, I think we're measuring the

17   good faith of the companies before the court.

18          THE COURT:  I understand.

19          MR. BAILEY:  And our point is simply that Lois

20   is a greater factor in the worldwide market than perhaps it

21   is in the United States market alone.

22          THE COURT:  Is that what is really at the base

23   of this litigation?  Otherwise it doesn't make a great deal

24   of sense, right?  Given your sales here in this country and

25   the situation with Murjani and all of that, this really

## A-941

eb

22

1    doesn't make up sense unless it's a worldwide issue.  I

2    take it that's the point, is that right?

3              MR. BAILEY:  I think you're right.  That's very

4    much at the bottom.

5              THE COURT:  I see.

6              MR. BAILEY:  Nonetheless, Lois has used this

7    mark continuously on its own goods sold through its own

8    markets, essentially without competing with Levi's goods on

9    a worldwide basis for many, many years and it does not

10   behoof Lois to copy Levi's because the last thing they want

11   to do is to be associated with the durable quality jeans

12   that Levi's is well known for.

13             A final statement, your Honor, about the Bruno

14   and Ridgway survey which has been presented also ostensibly

15   to show likelihood of confusion.  We have the classic case

16   here of an item that we believe will be inadmissible under

17   trial standards and is inadmissible for purposes of this

18   proceeding under Rule 56(e).

19             THE COURT:  You don't have quarrel with the

20   statements relative to the way in which it was done or what

21   was done.  Your quarrel is you think it's by design an

22   inappropriate index of confusion because it doesn't

23   simulate the marketplace.  Is that your view?

24             MR. BAILEY:  Yes, your Honor.

25             THE COURT:  I take it you don't challenge any of

A-942

eb

1     the assertions as to how it was done or the market or

2     anything like that.

3          MR. BAILEY:  We challenge very many of those,

4     your Honor.  Not for purposes of this proceeding at this

5     stage.  We're prepared to discuss them with you.  We simply

6     look at the most glaring reason for its inadmissability.

7          THE COURT:  Since this is presented to me in a

8     summary judgment context, what am I going to say about the

9     survey?  Just assume that I wanted to use it either one way

10    or the other.  You would say it's not admissible, not

11    because of quarrel about any of the facts as to how it was

12    prepared, but that those facts reveal its inadmissability.

13    You have no factual quarrel with it, your quarrel is as to

14    whether the facts establishing the survey make it

15    admissible because you would say it's not a market, a

16    proper market survey.

17         MR. BAILEY:  I would like to agree with your

18    statement.  We do have, even at the lower level, some

19    quarrel with the way in which the survey was conducted.

20         THE COURT:  Tell me about that.

21         MR. BAILEY:  We had not put those in our papers.

22    One major flaw is that the surveys were conducted in six

23    mall intercept surveys.

24         THE COURT:  Quick and dirty as they say in the

25    trade.

**A-943**

24

1          MR. BAILEY:  Yes, your Honor.  We don't have any

2   reason to believe that the Lois Jeans were exposed in some

3   of the areas where the surveys were conducted.  But that

4   aside --

5          THE COURT:  Would that make a difference?

6          MR. BAILEY:  I think a close reading of several

7   of the recent cases would say that, yes, the proper test is

8   that you have to be exposed to a name before a survey does

9   you any good and for Levi's to --

10          THE COURT:  Of course it's not the name.  It's

11   the thrust of the survey.  It's not the name.

12          MR. BAILEY:  Some ability to identify the brand.

13          THE COURT:  But it's the mark they're after.

14          MR. BAILEY:  Yes, your Honor.

15          THE COURT:  Anything else that's wrong with the

16   survey, a factual quarrel that you have with the survey?

17   By the way, you don't  have a quarrel with that; you just

18   simply say it hasn't been established fact.

19          MR. BAILEY:  I think that's correct.

20          THE COURT:  You would say it's inadmissible

21   because the survey on its face doesn't establish that it

22   was a competitive market at the mall where the survey was

23   taken.

24          MR. BAILEY:  That's correct.

25          THE COURT:  Any other quarrels with the survey?

A-944

eb

1    MR. BAILEY:  I think the remaining quarrel of

2  note is the failure to replicate market conditions.

3    THE COURT:  I understand that.

4    MR. BAILEY:  As to whether or not Mr. Bruno

5  added his numbers correctly once he measured them, we have

6  no quarrel with that.  It's the question of what he was

7  attempting to measure.

8    We simply think that because of the failure to

9  duplicate market conditions, because of very prominent

10  precedents in this circuit that it is evident to this court

11  at this stage at a summary level this item is not going to

12  be admissible and that in effect we now have at this stage,

13  Levi's has not produced any evidence and has admitted there

14  is no evidence of actual confusion and it has not put in

15  before this court at the summary judgment level any

16  meaningful statements or evidence which controverts the

17  likelihood of confusion that 56(e) passes upon it at this

18  time.

19    I think that concludes our remarks now other

20  than to await the potential rebuttal of Mr. Lee.

21    THE COURT:  Fine.  Thank you.

22    MR. SCHUTZMAN:  Judge Sweet, you know how

23  difficult it is for a lawyer to sit here and keep his mouth

24  shut.  If I may, I would just like to address one of the

25  court's questions which was earlier on posed because I

### A-945

1    think it's important.  That was your Honor's question

2    concerning the issuance of an injunction if the Arcuates or

3    pocket designs were identical.  Consistent with our

4    position in this case, our view is that even if the

5    Arcuates were identical, no injunction should issue.

6              THE COURT:  That's what I figured.

7              MR. SCHUTZMAN:  And I recognize that in order to

8    distill the various cases which have dealt with the

9    manufacturer's names and indicia, etc., as tending to

10   ameliorate the likelihood of confusion, you've got to

11   really go through those cases with a fine toothcomb.  At

12   first blush many of them are seemingly inconsistent.  But I

13   think the crux depends upon the nature and strength of the

14   mark which is claimed to be infringed.  And if you look at

15   the various cases which have dealt with the issue, it

16   becomes somewhat apparent.

17             For example, the Cross Pen case in the Second

18   Circuit; the little black tip on at the top of the pen.

19   The fact that the defendant manufacturer's name was

20   attached to a hang tag did not serve in the view of the

21   Second Circuit to ameliorate likelihood of confusion

22   because that black tip was so well known and had achieved

23   such fame that all persons viewing it would naturally

24   assume it to be a Cross Pen.

25             The same, I suppose, could be true of the

A-946

eb

1    Aris-Isotoner case which your Honor decided.  The

2    plaintiff's gloves, the design coupled with the chevron on

3    the back of the glove, the entire glove look had achieved a

4    celebrity such that the duplication by the defendant even

5    though the defendant's name was attached to the hang tags

6    or labels did not serve to ameliorate confusion.

7          On the other hand, you look at the Bose Speaker

8    case in which the Second Circuit said yes, the name is

9    plastered all over this thing.  That ameliorates likelihood

10   of confusion.  Why?  Because the design in issue in that

11   case had not achieved the name or celebrity which the black

12   tip in the Cross Pen case or the design of the gloves in

13   the Aris-Isotoner case had achieved.  And the same with the

14   Levi Longley case decided in the 6th circuit.

15         What Levi's position is here is simply by reason

16   of the stitching design, which, of course, is not identical,

17   simply by reason of that design, people will be confused.

18   Our position is that the Arcuate design is just not strong

19   enough to invoke that principle.

20         We look at all these jeans, your Honor.  We see

21   this Arcuate used time and time and time again.  Every time

22   we point it out to the plaintiff the plaintiff goes out and

23   shops.

24         I will concede that that red tag is truly a

25   famous trademark and that if the Lois Jeans had that red

eb

28

1  tag or a white tag, we'd be in big trouble.  But it doesn't.

2  And we say simply by reason of that stitching design, you

3  cannot escape the principle which we've talked about.

4          Thank you, your Honor.

5          THE COURT:  Thank you.

6          MR. LEE:  Good morning, your Honor.  I must

7  first address the point made by Mr. Schutzman a few moments

8  ago which frankly is a breathtaking argument respecting

9  trademark law, trademark protection and that is one which

10  would render our trademark registration totally pointless

11  and useless, a dead piece of paper, on the simple argument

12  that it may be reproduced, replicated, if you will, by

13  anyone, provided only that they apply their own name to it.

14          That is simply not the law.  The cases cited in

15  the briefs demonstrate it not to be the law and I don't

16  believe it appropriate nor do I think we have time to go

17  into all of the case law on the subject.  Your Honor's own

18  writings in this field touch virtually every point of

19  trademark law and I wouldn't presume to discuss those in

20  detail other than to refer the court to the briefs which

21  discuss the controlling cases the most important of which,

22  incidentally, is the very recent decision of the Second

23  Circuit in the Sportsac case which bears remarkable

24  similarity to the issues in this case and the type of entry

25  that we principally rely upon.

A-948

29

eb

1      Your Honor asked the question whether or not.

2  Infringments that were found in the Levi's's policing files

3  were later found to be on the market.  We have discussed

4  that in our reply brief.  The fact of the matter is only

5  one of those from the files that were culled and closely

6  examined was later found on the market.

7      Interestingly, of the two sweeps of Manhattan

8  stores made by Lois, one in January and one in June, the

9  June sweep found only one of those that was available in

10  January.  And when we checked a few weeks later most of

11  those were gone anyway.

12      The interesting thing is this:  of the jeans

13  before your Honor, which were picked up in that sweep, I

14  think all but possibly two are of French origin.  Our reply

15  affidavit submitted in the name of Ann Rio shows that just

16  last year in France we had obtained injunctive decrees and

17  damages against two of them.  The Exhibit A Biscote and the

18  exhibit, my exhibit number may be wrong, but it's the Big

19  Star, another one of the jeans in front of you.

20      In both cases a French court clearly held that

21  the use by that company of a simulation of the Arcuate was

22  a counterfeit, much more than that a simulation, a

23  counterfeit.  A third of those jeans is the subject of a

24  worldwide covenant executed last year by that manufacturer

25  not to simulate the Levi Arcuate.

eb

**A-949**

1    The two decrees I mentioned your Honor are 1984

2    and we've already offered to you in earlier papers a

3    judgment of an English court, a judgment of a Netherlands

4    court and still another judgment of a French court.  All

5    consistently for the same proposition; and that is

6    simulation of the Arcuate is unlawful.  And in different

7    contexts the courts dealt with aspects of the same problem.

8    Other markings doesn't count.  Post-sales confusion is

9    relevant.

10    THE COURT:  But, am I not right, I don't mean to

11    present it in an adversarial way, but it seems to me that

12    if the marks were exactly the same -- let's just assume for

13    a second that there was nothing about the mark that was

14    unusual; it was a circle or a straight line.  I suppose

15    either one of those might do it.  But let's assume that the

16    mark is a very weak mark.  How can you get a weak mark, by

17    the way?

18    MR. LEE:  Well, the mark may suffer from

19    weakness for two reasons, your Honor.  One, because it has

20    not been exploited.  So no one knows it.

21    THE COURT:  Right.

22    MR. LEE:  It may be weak --

23    THE COURT:  It's copied and nobody does anything

24    about it.

25    MR. LEE:  Or it has no innate singularity.  It

**A-950**

eb

1    doesn't hit you in the eye.  But the simplest of designs

2    are among the most powerful.  What is generally regarded as

3    one of the most powerful design trademarks are the golden

4    arches of MacDonald's.  Two very simple arches.

5              You're probably familiar with the white dot on

6    the pen that signifies Schaeffer.  Registered trademark.

7    Mr. Schutzman mentioned the black top of Cross Pens given

8    the improbable name of a frusto conical top.  Yet that was

9    held to be an infringment on the same grounds; that is that

10   the person who purchased the defendant's pen, a cheap pen,

11   knew it was not a Cross Pen.

12             THE COURT:  Suppose I look at jeans as speakers;

13   in other words, that there isn't anything really so

14   different or remarkable about the design and that they are

15   properly identified so that anyone going into the point of

16   purchase looking at them would recognize that this is Lois

17   and that is Levi, that there is no confusion.

18             MR. LEE:  There is no confusion of that precise

19   kind.  That is, that one would pick up in the sense of

20   overt passing off; that is that one would pick up one

21   thinking it to be the other.

22             THE COURT:  Yes.

23             MR. LEE:  We will look at the exhibits as they

24   are before you and do note that they bear labels showing

25   the name Lois in the one instance, Levi in the other.

### A-951

1    THE COURT:  That's not your claim.

2    MR. LEE:  That is not.  Although we do point out

3    to the court one very curious incident that is disclosed in

4    the Dobesh affidavit.  That is for reasons that are unknown,

5    puzzling and I think your Honor touched on it before when

6    you said you don't know what the distributor might elect to

7    do with it, in one instance Levi jeans were found in a well

8    known store without any labeling on it.  The paper labeling

9    had been removed.  There's no accounting for what a vast

10   number of retailers will do.

11        THE COURT:  Your claim really isn't confusion,

12   is it?  Because of the state of the law you're sort of

13   forced into that position, I think, perhaps.  But that's

14   really not the claim.

15        MR. LEE:  I would say yes in this respect, your

16   Honor.  Confusion in the sense of misunderstanding, of

17   connection or sponsorship.  One might see what appears to

18   be an Arcuate on the Lois Jeans and recognize that it's

19   another brand.  But the public is generally familiar with

20   cross licensing arrangements and other similar

21   distributional arrangements and the consumer at that point,

22   limiting our focus to the point of sale, the consumer there

23   could well believe that there is some relationship between

24   these companies by way of sponsorship --

25        THE COURT:  The real complaint is in effect the

eb

33

1    stealing of whatever good will you say attaches to that

2    design.

3              MR. LEE:  It gives to their product a

4    familiarity it has not earned.  Our product is recognizable

5    at a glance, our jeans, by anyone walking past who knows

6    anything about jeans.

7              THE COURT:  The easy way to me to get out of

8    this mess is to simply say they're different markets.

9    That's the easiest way to get out of it.  Why can't I do

10   that?

11             MR. LEE:  Your Honor, under other circumstances

12   I appreciate the conventional wisdom is that with a showing

13   as massive as that is in front of you, just on a sheer

14   poundage basis, it must contain a material issue of fact.

15   I am encouraged, however, by my own knowledge with the fact

16   that you were overwhelmed in the Nintendo case with

17   documents and exhibits and nevertheless cut through to the

18   core.

19             THE COURT:  You misunderstood me.  What I'm

20   saying is suppose I were to say Levi operates in the

21   workclothes marketplace and Lois operates at the designer

22   level or I guess at the fashion level and therefore I don't

23   have to worry about it.

24             MR. LEE:  Not so on the undisputed facts.

25             THE COURT:  You mean because of the fact that

A-953

34

1   they get knocked down, seconds, whatever.

2             MR. LEE:  On a number of respects.  Levi jeans

3   are far more than workclothes.  We will show you some

4   commercials where perhaps 17 or 18 years ago the essential

5   thrust of Levi's --

6             THE COURT:  Suppose I just, I don't get into the

7   esoterica of it all and the fact that presidents wear jeans

8   and all of that, but suppose I just go on price.

9             MR. LEE:  The price issue, your Honor, is one

10  you need not decide.  And I wouldn't want it to be an issue

11  of fact for you to decide.  That is, do their jeans in fact

12  sell at $60, do their jeans in fact sell at $12.  Because

13  the proofs before you, which are undisputed, indicate that

14  as with everything else in a chaotic marketplace, there is

15  no saying that any prescribed set of distributional facts

16  ever applies consistently.  We have shown to your Honor

17  that the Lois Jeans have been found on sale for 12.99.

18            Just recently in one of the premier, long

19  standing retail outlets in Manhattan of Lois, they were

20  selling Lois Jeans for $35.  The Murjani acquisition

21  announcement stated that Murjani intends to reduce the

22  price of Lois Jeans.

23            We've made that point and it has not been

24  responded to by Lois.  They have not denied it.  They have

25  simply ignored it.  They have the exclusive knowledge of

A-954                                                35

eb

(

1    what the pricing is.  For all I know, next week Murjani

2    will be selling Lois Jeans at $25.

3              THE COURT:  If I went to Arby's, which is my

4    jeans store, if I went there and bought these, how much

5    would I pay for them?

6              MR. LEE:  Somewhere, I would say, 20 to $25,

7    $26.

8              THE COURT:  How about the bridging the gap

9    problem.  Your brother tells me that you have not

10   determined, that there's no allegation that if you go into

11   the higher priced market you're going to use the Arcuate.

12             MR. LEE:  True, your Honor.  These are new

13   ventures, high style sporting goods, new ventures Levi

14   Strauss innaugurated the last year or so involving jeans in

15   some instances.  The decision to use the Arcuate has not

16   been made, may never been made.  And we openly admit that

17   the new lines do not bear the Arcuate.  But we, by no means

18   as a company, are confined to jeans of a certain price

19   category or certain dimension or even a certain brand.

20             THE COURT:  Forgive me.  There are Levi's on the

21   market at the higher ranges that do not bear the Arcuate,

22   is that correct?

23             MR. LEE:  Yes.  That's exactly right, your Honor.

24   And there have been some Levi jeans sold in the past

25   without the Arcuate.  These are fashion type jeans that

A-955

eb

1    have been sold.  But as our papers reveal, the sales in a

2    recent twelve year period more or less were close to

3    900,000,000 pairs.  Three pairs per individual of the

4    United States of America.  I think that the papers have so

5    elaborately discussed all of the factors in the case that I

6    won't take time and detail it but just hit the essential

7    highlights.

8        We do have a valid trademark and a valid

9    registration.  There is no attack on that.

10       We do additionally have an incontestable

11   registration which under the statute creates an exclusive

12   presumption of our exclusive right of use in connection

13   with jeans.  We have developed that point in our first

14   brief.

15       The singularity and recognizability and

16   memorability to the public of the Levi Arcuate is

17   demonstrated in some of the most extraordinary ways in our

18   papers.  The book entitled Quintesence, for example,

19   singles out some very few things in America which have

20   remained memorable over decades.  The Coca Cola bottle for

21   one.  The Volkswagen beatle for another.  The Levi's

22   Arcuate for still another.

23       The yearbooks that we produce are extraordinary

24   in what they convey by way of the relationship that these

25   young students felt and could identify best by showing the

A-956                                    37

eb

1   rear pocket of the Levi jeans displaying the Arcuate.  When

2   you back away from it a moment, your Honor, it's an

3   astonishing evidence at such a momentous time in their

4   young lives that they sum up their early years by the back

5   pocket of a pair of jeans, displaying most particularly the

6   Arcuate.

7        The JCPenny plain pockets campaign depended

8   entirely upon the ability of the public readily to

9   understand that the jeans to the left with the Arcuate were

10  Levi jeans.  The survey, as we do note, we didn't do and we

11  don't vouch for its technical compliance with what is

12  required for a survey to be admissible in evidence.  It's

13  good enough for JCPenny to bet a lot of money on the plain

14  pockets campaign and they did it for a lot of years.

15       The cover of Newsweek talking about the jeans

16  craze some years ago tried to epitomize the essence of

17  their story graphically and they did it by showing the back

18  pocket of Levi jeans with the Arcuate.

19       We did mention in our papers and showed you

20  reduce size exhibits of certain signs that we displayed in

21  the Gap stores, one of the largest chains specializing in

22  jeans around the country.  Just to give you a better idea

23  geographically of what we're talking about, your Honor,

24  these signs are indeed this size in the windows, posted

25  throughout the stores and at the Gap's own expense.  They

## A-957

1    identify the product by its rear pocket with the very

2    prominent Arcuate shown.

3         The reverse side shows corduroys which do not

4    have the Arcuate.  Here's Levi's again.  The one on the

5    right being the corduroy without the Arcuate.  The one on

6    the left clearly showing the Arcuate.  The reverse, two

7    pairs of Levi's jeans with the Arcuate.  These are

8    discernible at a glance from a distance, your Honor.  And

9    intended to have that visual impact and recognizability.

10   This is the kind of thing that is out there wholly apart

11   from efforts of the Levi Strauss Company.

12        Your Honor, having read your opening sentence in

13   Nintendo, I thought you might find not only some interest

14   but relevant matter in certain commercials of Levi Strauss

15   which we've brought in.  We'll play them in just a moment.

16   I would just introduce them in this way.

17        You will notice a certain theme of the earlier

18   commercials, the first one incidentally was 1967.  It was

19   in the context of durability, quality, workclothes.  The

20   advertising evolved over the years in terms of style and

21   design.  The commercials we will be showing are those which

22   display the Arcuate either directly on the garments

23   themselves in one fashion or another or which corroborate

24   the point made in the second Flath affidavit concerning the

25   Levi logo.

# A-958

eb

(

1          Your Honor, if you have had an opportunity to

2    read that affidavit, which was only filed yesterday, you

3    will appreciate that Levi Strauss adopted a form of

4    corporate logo back in the 60's at some point which it has

5    used to an extraordinary extent ever since as a symbol of

6    the company.  The logo itself was an adaptation of the

7    upper half of the back pocket through the point of the

8    Arcuate which is about centered in the pocket.

9          As we see the commercials, your Honor, you will

10   see not only how the logo is consistently used but indeed

11   in some of them, you will see the logo emerging directly

12   from the back pocket with the camera focusing on the logo

13   as a memorable part of which is the lower border forming

14   the Arcuate.  With your permission, your Honor, I'd ask

15   Miss Dobesh to do the honors of turning on this machine.

16          MR. SCHUTZMAN:  Before we get to this, just for

17   the record I'd like to note my objection to this.  I do not

18   believe that the papers submitted by Levi's authenticate in

19   any manner what your Honor is about to see.  There is no

20   indication of when these commercials were made, who made

21   them, were they shown, where they were shown, if they were

22   shown, etc.  I have viewed these commercials in Mr. Lee's

23   office.  I did that yesterday morning.  But the fact

24   remains that I do not believe for purposes of Rule 56.

25          THE COURT:  They have been properly

**A-959**

eb

1   authenticated?

2           MR. LEE:  I would say a couple of things to that.

3   The existence of these commercials and our reliance on them

4   was made plain to Mr. Schutzman months and months ago, with

5   the opportunity to see them and to inquire concerning them.

6   Additionally, the Flath affidavit does indeed authenticate

7   these as commercials which were actually shown, were used

8   and which would be displayed to the court as I propose to

9   do right now.

10          THE COURT:  Is there anything in the Flath

11  affidavit that indicates the extent of the distribution.

12          MR. LEE:  Not specifically, no.  All of these

13  bear little titles.

14          THE COURT:  Well, I'll take them and overrule

15  the objection.  To the extent, I suppose, that they

16  represent an effort to establish good well and common

17  understanding of the matters contained in the commercials,

18  I would suppose it would be necessary to have a further

19  step, namely when were they shown, for how long, etc.  But

20  that's something that you could supply at a later time if

21  you felt it was desirable.

22          MR. LEE:  We will be happy to do so, your Honor.

23  I will, for your own sense of chronology, I will simply

24  indicate what the tape as supplied to me by the advertising

25  agency reveals to be the title of the commercial and the

**A-960**

1    year during which it was telecast.

2              The first one, your Honor, is probably one, if

3    not the earliest one of the very earliest Levi national

4    television commercials.  It sets the theme of durability,

5    quality and all of that and I show it principally to

6    demonstrate the continuum of the advertising and how it has

7    evolved.  But it also shows at that early date how the logo

8    was employed.

9              THE COURT:  All right.

10             (Tape played)

11             MR. LEE:  You notice, your Honor, that this is

12   the waistband patch.  You will notice that the words

13   original riveted appear in somewhat a reminescent form to

14   the Arcuate design.

15             (Tape played)

16             MR. LEE:  There, your Honor, is the logo which

17   generally simulates the upper half of the rear pocket.

18   That was a color reversal, red on white.  Typically it's

19   white on red.

20             (Tape played)

21             MR. LEE:  This one, your Honor, is 1974.

22           . (Tape played)

23             MR. LEE:  Your Honor, that, too, is an earlier

24   vintage emphasizing the durability, qualities, contributing

25   to the image.  It's a mystique, if you will.  And although

A-961

42

eb

1   the Arcuate itself did not appear in that commercial, I

2   think it's a gem of creativity, but apart from that it does

3   illustrate how Levi has constructed the special mystique

4   that surrounds its jeans.

5              This is an entirely different presentation

6              (Tape played)

7              MR. SCHUTZMAN:  Your Honor, if I may.  I think

8   it's important, if your Honor is going to view the

9   commercials as we are, to see the commercial run without

10  stopping it, in order to appreciate if the Arcuate is

11  featured, how long it's featured if at all.

12             THE COURT:  Mr. Lee may run into trouble as a

13  result of my decision in this case and want to develop a

14  new career as a television commentator.  And I think we

15  ought to encourage him.  I'll permit the interruptions.

16             (Tape played)

17             MR. LEE:  This is a 1977 commercial, your Honor.

18             (Tape played)

19             MR. LEE:  Those last two ran the same year.  One

20  would have been more style and the other was the durability

21  but they were companion commercials running the same year.

22             (Tape played)

23             MR. LEE:  Your Honor will notice how the logo

24  forms right within the pocket and then projects out.

25             (Tape played)

A-962

eb

1    MR. LEE:  Your Honor, those are not by any means

2    complete, all of the different Levi commercials, but they

3    do show a range of different mood, style, appeal extending

4    over a period of many years.  In these, the Levi Arcuate

5    either did appear and was visible on the very pocket or was

6    emphasized by the prominence of the Levi logo.

7        A point has been made that Levi Strauss has not

8    considered the Levi Arcuate to be of sufficient importance

9    to claim it and to be a trademark publically in any of its

10   advertising or promotion materials.  Attached to the recent

11   reply affidavit of Miss Flath is an exhibit which shows the

12   rear pocket paper label that is used on the 501 style and

13   which does not, indeed, contain the statement that the

14   pocket tab and Arcuate designs are means by which, perhaps

15   I'd better read it, the colored tab and stitched pocket

16   designs are registered trademarks to help you identify

17   garments made only by Levi Strauss.  That does appear right

18   on the label and the interesting thing is, right on the

19   label, which is designed to fit in conformity with the

20   Arcuate, there is a printed version of the very stitching

21   of the Arcuate and there are two such labels that were

22   offered to the court.

23       We have a rather singular little video to show

24   you which probably runs about 90 seconds or so.  This is

25   the occasion of a corporate-wide picnic in 1982 of Levi

**A-963**

eb

1    Strauss Company.  The then executive vice-president,

2    presently president and chief executive officer of Levi

3    Strauss, Robert Haas, was one of those called upon to give

4    a bit of a performance.  I think this might be the more

5    interesting part of my argument.

6              MR. SCHUTZMAN:  Note my objection.

7              THE COURT:  I'll take it for its entertainment

8    value if nothing else.

9              (Tape played)

10             MR. LEE:  The year of that, your Honor, was

11   1982.  While we have the machine heated up, your Honor, I

12   would like to show the video segments that we used in the

13   Bruno and Ridgway survey.  I first note, your Honor, that

14   there were separate cassettes with these various sequences.

15   As Mr. Bruno noted there was the A cassette, the B cassette,

16   the D, E and F.  They're divided into two groups.  A, B and

17   C are the Lois stitching design with the Wrangler and the

18   diamond design.  In three sequences, that is one first and

19   then they rotated and the next, the next, the next.

20             The second three segments are virtually the

21   identical except that they had the Levi jeans.

22             One further observation, your Honor.  Since the

23   objective was to test the recognizability of the Arcuate

24   apart from other markings, the video focused on the pocket

25   which bore the Arcuate only.  In the case of Levi, the left

**A-964**

eb

1    rear pocket, when worn, has no adornment on it other than

2    the Levi Arcuate.

3            The situation is the same with Wrangler and it

4    was simulated with the diamond design which is the JCPenny

5    jeans.  In the case of Lois, it is just the opposite and

6    that is the righthand pocket is unadorned after purchase

7    because the sewn on label appears only on the left.  So for

8    that reason, as you will see, the Levi jeans were depicted

9    from the left rear prospective as one might be seen walking

10   in the street and the Lois Jeans were seen from a righthand

11   perspective as they would similarly be seen by somebody

12   walking down the street.  They are repetitive and as such

13   point as you feel you've seen enough of them you can just

14   tell us.  This would be segment -- the first three of these

15   are what the first of the respondents would have seen.

16           (Tape played)

17           MR. LEE:  It was more than a fleeting glance

18   you'll see but by no means was it a prolonged one.

19           (Tape played)

20           MR. LEE:  As the Bruno affidavit reveals, your

21   Honor, 40 percent of the people that saw those sequences

22   responded Levi respecting the Lois Jeans.  Now I'll show

23   you sequence D which would be the Levi Arcuate in the same

24   rotation, three segments as we already saw for the first

25   one.

A-965

46

eb

1          THE COURT:  I think I get the drift of it.

2          MR. LEE:  Respecting that survey, your Honor, I

3     point out that it involved, I believe, 600 people in six

4     widely disparate sections of the country; far west, midwest,

5     east and south, representative areas and markets into which

6     Lois has sold its products and certainly has the

7     opportunity to and more likely than not will sell them with

8     the Murjani sales organization behind them.

9               I was taken by the statement respecting the good

10    faith of the Textiles organization, years ago in Spain,

11    when they adopted this design.  We made every effort to

12    determine how the design came about and to find out who did

13    the design and even to locate that individual and were

14    unsuccessful.

15              But, it's interesting that in contrast with the

16    statement of Mr. Saez Merino, that he never heard of Levi's,

17    he nonetheless named his jeans Texan.  He surely was aware

18    of the popularity of jeans in the United States and their

19    association, at that time, at least with the west and with

20    Texas.

21              I think, your Honor, that the arguments

22    respecting other labeling must fail.  The Second Circuit

23    has in a series of cases which we have addressed in our

24    briefs, found likelihood of confusion in post-sale contexts

25    and as in LeSportsac that's exactly what the Bruno and

A-966

47

eb

1   Ridgway survey shows here.  And in that case that

2   conclusion was drawn without the benefit of positive proof

3   such as are before you.

4          I respectfully submit, your Honor, that despite

5   the bulk of affidavits, the multitude of precedence called

6   to your attention, the copious exhibits that are before you,

7   that stripped to its essentials, the case made by Levi

8   Strauss for infringement is in a posture now for final

9   determination on every aspect; the validity of the mark,

10  its widespread popularity and appeal, the use of a similar

11  mark by a competitor under circumstances which the Bruno

12  and Ridgway survey reveal will produce very significant

13  levels of confusion.

14         I see no point in prolonging this already

15  protracted case, your Honor, in as much as Lois has failed

16  in any significant way to highlight an issue of fact which

17  should deter this court from entering summary judgment for

18  Levi Strauss.

19         Thank you, your Honor.

20         THE COURT:  Thank you, sir.

21         MR. SCHUTZMAN:  If I may have just five minutes,

22  your Honor.

23         THE COURT:  Sure.

24         MR. SCHUTZMAN:  Mr. Lee stated at the outset of

25  his argument that if I was correct on my discussion of the

**A-967**

eb

48

1  various cases which have dealt with names and tags, then

2  the Levi registration would be rendered nugatory. And of

3  course that's not true at all. We're not suggesting that

4  the registration is null and void. The mere fact that one

5  has a registration and a registered trademark as your Honor

6  well knows does not mean that they have a complete

7  monopolistic right to utilize that particular mark. The

8  test is and always has been likelihood of confusion and

9  that's the test in this case. And of course, as an aside I

10  point out again, that the stitching designs we're dealing

11  with are not identical.

12          Again, we take no issue with the fact that Levi

13  has attempted to police this mark. That is not the point.

14  The point is regardless of how successful or unsuccessful

15  those attempts have been, the jeans are still in the market

16  bearing the same or similar designs and that's the precise

17  point we make, your Honor. It's not a question of adequate

18  policing. They are still there.

19          Mr. Lee has also mentioned the assumption that

20  the public is familiar with cross-licensing and that

21  although the public is likely to believe that these are

22  Lois jeans and not Levi jeans at the point of sale, it's

23  possible that the public could conceive of an affiliation

24  between Lois and Levi and indeed that's Levi's case; not

25  that a prospective purchaser looking at a pair of Lois

**A-968**

eb

1    Jeans will think that these are Levi's but will merely

2    think or believe that by reason of that nonidentical

3    stitches design, there is an affiliation between the

4    parties here, between Lois and Levi.  And I suggest, your

5    Honor, that if that's the position and it is, this court

6    cannot grant an injunction against Lois.  That is not

7    likelihood of confusion under the case law in this circuit.

8          Mr. Lee also mentioned that the use of that

9    nonidentical stitching design by Lois provides the company

10   with a familiarity it has not earned and I just point out,

11   your Honor, that Lois sportswear spent well over $3,000,000

12   on advertising the last four years on gross sales of just

13   over 34,000,000.  Now, if Lois was hell bent on trading off

14   the good will of Levi by reason of that nonidentical

15   stitching design, I doubt it would have spent almost 75

16   percent of its gross sales on advertising.

17         As far as the incontestability issue, Mr. Lee

18   has stated that the statute provides a conclusive

19   presumption of Levi's exclusive right to use that mark.  I

20   say so what.  I don't dispute that it's incontestable.  I

21   dispute that the use by Lois of that nonidentical stitching

22   design constitutes likelihood of confusing.  The issue of

23   incontestability has no bearing whatsoever on that

24   particular issue.

25         We pointed this out in our memoranda, your Honor.

eb

50

1    These signs which were referred to by Mr. Lee, you will

2    note a space across the center for a price point.  Indeed,

3    when these are displayed in the store, there is a bar

4    roughly three to four inches in width which completely

5    covers the Arcuate.

6           Two final points, your Honor.  One.  In terms of

7    the survey and in particular the videotape demonstration

8    which we've just seen, I would just like to note two things.

9    First, note how faint the Arcuate design on the Lois brand

10   was vis a vis the Wrangler and the control triangle.  It

11   was much more difficult to perceive.

12          Number 2.  Note the difference in the jeans

13   themselves between the Lois which looked beaten up or I

14   think they refer to it as prewashed and the other two which

15   were in a completely different condition, very dark blue.

16   How that particular aspect or aspects, how those aspects

17   influenced the persons responding to the survey, of course,

18   we don't know.  But I submit that it certainly could have

19   had an influence, your Honor.

20          Finally on the good faith of Textiles, Mr. Lee

21   mentioned Mr. Saez Merino having named the predecessor

22   jeans Texan.  And if your Honor would refer to the

23   deposition excerpt which is attached to my affidavit of

24   Mr. Saez Merino's deposition, he knows that that came to

25   Spain from South America.  It does not indicate at all that

# A-970

1  he was aware of Levi and indeed his deposition testimony

2  controverts that fact.

3              I thank you for your time, your Honor.

4              THE COURT:  Thank you all, very much.

5              MR. LEE:  20 seconds, your Honor, no more.

6              THE COURT:  Yes.

7              MR. LEE:  Firstly on these, your Honor.  I just

8  point out that Mr. Schutzman apparently tries to make a

9  virtue out of adversity.  There is one of these runners

10  missing off here.  You can see there are two to slide a

11  price sticker in there.  Quite obviously with a runner like

12  that covered like this the Gap felt that the Arcuate, by

13  virtue of what remained of it, even though mutilated to a

14  degree would still be recognized.  There is no such

15  obstruction, however, in the other sign.

16              Finally, your Honor, I do think it terribly

17  unfair, after all of this time in his argument, for Mr.

18  Schutzman to wait until his rebuttal argument on this

19  motion to raise criticisms regarding the survey which were

20  not previously suggested.  Mr. Bruno was examined in

21  enormous great detail.  Papers before your Honor not only

22  include that transcript but the very narrow limited

23  objections of Lois to it.  I think it's too late in the day

24  for Mr. Schutzman to raise such an objection and for this

25  court to give it the least credence.  The fact of the

**A-971**

52

1    matter is, those jeans were shown precisely as they were

2    purchased in the store.  And if the Lois Arcuate was not

3    very visible as a consequence of its prewashed condition,

4    it tended to favor a nonconfusing response because people

5    couldn't see it.  Apparently they saw enough to make the

6    confusing response.  I thank you very much, your Honor.

7              THE COURT:  Thank you all.  Very much.  I'm

8    going to re___ve my decision.

9              (Court adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25