1  MICHAEL J. BETTINGER (State Bar No. 122196)
   RACHEL R. DAVIDSON (State Bar No. 215517)
2  K&L GATES LLP
   55 Second Street, Suite 1700
3  San Francisco, CA 94105
   Phone:  415-882-8200
4  Facsimile:  415- 882-8220

5  J. MICHAEL KEYES (PRO HAC VICE)
   K&L GATES LLP
6  618 West Riverside Avenue, Suite 300
   Spokane WA  99201-0602
7  Phone:  509-624-2100
   Facsimile:  509-456-0146

8
   Attorneys for Defendant
9  ABERCROMBIE & FITCH TRADING CO.

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13

14  LEVI STRAUSS & CO.,

15                              Plaintiff,          No. CV-07-3752-JSW

16        v.                                        **DEFENDANT ABERCROMBIE &
                                                    FITCH TRADING CO.'S MOTION
17  ABERCROMBIE & FITCH TRADING CO.,                FOR SUMMARY JUDGMENT**

18                              Defendant.          **DATE: September 26, 2008
   ─────────────────────────────────               TIME:  9:00 a.m.
19                                                  COURTROOM:  2**

20  ABERCROMBIE & FITCH TRADING CO.,

                                Counter-Claimant,
21        v.

22  LEVI STRAUSS & CO.,

23                              Counter-Defendant.

24  ─────────────────────────────────

25                  REDACTED PUBLIC VERSION

26

   ABERCROMBIE & FITCH'S MOTION FOR
   SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.    **INTRODUCTION & SUMMARY OF THE ARGUMENT** ...............................viii

II.   **THE UNDISPUTED FACTS ENTITLE ABERCROMBIE
TO SUMMARY JUDGMENT** ................................................................................. 1

III.  **LAW & ARGUMENT** ........................................................................................... 4

      A.    The Summary Judgment Standard .................................................................. 4

      B.    Abercrombie is Entitled to Summary Judgment on Both The Trademark
Infringement and Unfair Competition Claims Because LS&Co. Failed
to Establish That *Any* Consumers—Much Less An Appreciable Number
of Them—Are Likely to Be Confused By Abercrombie's RUEHL
Stitching Design ............................................................................................. 4

           1.    LS&Co.'s "Double Arcuate" Design Has Lost Significance as a
Mark and is Commercially Weak Due to Numerous Third-Party
Uses of Similar Designs on Similar Goods ......................................... 5

           2.    LS&CO.'s "Double Arcuate" Design Looks Nothing Like the
RUEHL Design .................................................................................... 9

           3.    Any Proximity Between the Parties' Goods is Substantially
Outweighed By Other Factors, Including the Completely
Divergent Marketing Channels of LS&Co. and RUEHL
Products ............................................................................................. 11

           4.    It is Undisputed that There is No Significant Overlap of
Abercrombie and LS&Co.'s Marketing Channels ............................. 12

           5.    LS&Co. Has Failed to Produce Any Meaningful Evidence of
Actual Confusion Despite Ample Opportunity To Do So ................. 14

                a.    LS&Co. has not presented a shred of evidence showing
a single customer has been confused by the RUEHL
design ..................................................................................... 14

                b.    LS&Co.'s consumer survey purportedly showing
"confusion" is so riddled with flaws that it cannot be
relied upon by this Court or a jury and should, therefore,
be excluded ........................................................................... 15

                c.    Abercrombie's consumer survey established there is no
likelihood of confusion between the RUEHL and arcuate
designs ................................................................................... 16

6.     Jeans Purchasers are Sophisticated Consumers Who are Presumed to Exercise a High Degree of Care in Their Purchases ...... 17

7.     The Undisputed Facts Show that Abercrombie Adopted the RUEHL Design to Create its Own Distinctive Look Different Than Any Other Company in the Marketplace—Not to Copy LS&Co. ............................................................................................. 18

C.     Abercrombie is Entitled to Summary Judgment on LS&Co.'s Trademark Dilution Claim Because The Double Arcuate Is Not Famous, Lacks Distinctiveness, and No Credible Evidence Establishes a Likelihood of Dilution ................................................................. 20

1.     The Undisputed Evidence Indicates that LS&Co.'s Double Arcuate is Not Prominent or Renowned But Is, In Fact, Commercially Anemic ........................................................................ 20

2.     LS&Co. Has Failed to Present Any Credible Evidence that Suggests There Is a Likelihood of Dilution Being Caused by the RUEHL Design .................................................................... 21

a.     The double arcuate and RUEHL designs are wholly dissimilar .................................................................................. 22

b.     LS&Co.'s double arcuate mark is commercially weak ........... 22

c.     LS&Co. has not engaged in substantially exclusive use of its double arcuate stitching design as demonstrated by numerous third parties' uses of similar designs ....................... 22

d.     LS&Co.'s double arcuate is not recognized in any meaningful way by the consuming public ............................... 23

e.     LS&Co. has not a single piece of evidence to suggest Abercrombie intended to dilute LS&CO.'s arcuate design ..................................................................................... 23

f.     LS&Co. failed to produce any credible evidence of actual dilution ......................................................................... 23

IV.     **CONCLUSION** ........................................................................................... 25

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

Page

**Cases**

*Accuride International, Inc. v. Accuride Corp.*,
     871 F.2d 1531 (9th Cir. 1989) ...................................................................... 12, 13

*AMF Inc. v. Sleekcraft Boats*,
     599 F.2d 341 (9th Cir. 1979) .............................................................. 4, 11, 17, 18

*Blue Bell, Inc. v. Jaymar-Ruby, Inc.*,
     497 F.2d 433 (2d Cir. 1974) .................................................................................. 18

*Board of Regents, University of Texas System ex rel. University of Texas at Austin v.
     KST Elec., Ltd.*,
     550 F. Supp. 2d 657 (W.D. Tex.  2008) ............................................................... 21

*Brockmeyer v. Hearst Corp.*,
     248 F. Supp. 2d 281, 298 (S.D.N.Y. 2003) .......................................................... 14

*Cairns v. Franklin Mint Co.*,
     24 F. Supp. 2d 1013 (C.D. Cal. 1998) ................................................................. 16

*Carter-Wallace, Inc. v. Procter & Gamble Co.*,
     434 F.2d 794 (9th Cir. 1970) .................................................................................. 4

*Cumberland Packing Corp. v. Monsanto Co.*,
     140 F. Supp. 2d 241 (E.D.N.Y. 2001) .................................................................. 14

*D.M. & Antique Import Corp. v. Royal Saxe Corp.*,
     311 F. Supp. 1261 (S.D.N.Y. 1970) ...................................................................... 11

*Entrepreneur Media, Inc. v. Smith*,
     279 F.3d 1135 (9th Cir. 2002) ................................................................................ 4

*Estee Lauder, Inc. v. The Gap, Inc.*,
     108 F.3d 1503 (2d Cir. 1997) ......................................................................... 12, 13

*Excelligence Learning Corp. v. Oriental Trading Co.*,
     No. C-03-4947-JF, 2004 U.S. Dist. LEXIS 30370 (N.D. Cal. Dec. 20, 2004) .................... 16

*Fruit of Loom, Inc. v. Girouard*,
     994 F.2d 1359 (9th Cir. 1993) ............................................................................... 12

*GoTo.com, Inc. v. Walt Disney Co.*,
     202 F.3d 1199 (9th Cir. 2000) ................................................................................. 5

*Halo Management, LLC v. Interland, Inc.*,
     308 F. Supp. 2d 1019 (N.D. Cal. 2003).................................................................. 6

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

*HBP, Inc. v. Am. Marine Holdings, Inc.*,
  290 F. Supp. 2d 1320 (M.D. Fla. 2003) ............................................................................ 20

*HMH Publishing Co. v Lambert*,
  482 F.2d 595 (9th Cir. 1973) ............................................................................................. 4

*IDV North America, Inc. v. S&M Brands, Inc.*,
  26 F. Supp. 2d 815 (E.D. Va. 1998) ................................................................................ 13

*Jarritos, Inc. v. Los Jarritos*,
  No. C 05-02380-JSW, 2007 WL 1302506 (N.D. Cal. May 2, 2007) .................................. 4

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*,
  478 F. Supp. 2d 340 (E.D.N.Y. 2007) .............................................................................. 11

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
  988 F.2d 1117 (Fed. Cir. 1993) ....................................................................................... 13

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*,
  548 F. Supp. 2d 811 (N.D. Cal. 2008) ............................................................................... 3

*Lindy Pen Co. v. Pic Pen Corp.*,
  725 F.2d 1240 (9th Cir. 1984) ........................................................................................... 9

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 576 (S.D.N.Y. 2007) ............................................................................. 24

*M2 Software, Inc. v. M2 Communs., Inc.*,
  450 F.3d 1378 (Fed. Cir. 2006) ......................................................................................... 9

*M2 Software, Inc., v. Madacy Entertainment*,
  421 F.3d 1073 (9th Cir. 2005) ................................................................................ 9, 11, 12, 15

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*,
  290 F. Supp. 2d 1083 (C.D. Cal. 2003) ....................................................................... 5, 14

*Mattel, Inc. v. MCA Records, Inc.*,
  28 F. Supp. 2d 1120 (C.D. Cal. 1998) ............................................................................. 16

*Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*,
  856 F.2d 1445 (9th Cir. 1988) ........................................................................................... 5

*Mushroom Makers, Inc. v. R. G. Barry Corp.*,
  441 F.Supp. 1220 (D.C.N.Y. 1977) ................................................................................. 10

*Newport Pac. Corp. v. Moe's Southwest Grill, LLC*,
  No. 05-995-KI, 2006 U.S. Dist. LEXIS 74481 (D. Or. Sept. 28, 2006) ........................... 16

*Nissan Motor Co. v. Nissan Computer Corp.*,
  378 F.3d 1002 (9th Cir. 2004) ......................................................................................... 21

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

*Oxford Industries, Inc. v. JBJ Fabrics, Inc.*,
  6 U.S.P.Q.2d 1756 (S.D.N.Y. 1988) ................................................................. 5

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
  86 F. Supp. 2d 305 (S.D.N.Y. 2000) ................................................................ 13

*Pebble Beach Co. v. Laub Am. Corp.*,
  No. C-84-2012: RPA-SJ, 1985 U.S. Dist. LEXIS 23876 (N.D. Cal. Dec. 27, 1985) .......... 16

*Perfumebay.com Inc. v. EBAY, Inc.*,
  506 F.3d 1165 (9th Cir. 2007) ......................................................................... 20

*Playboy Enters. v. Netscape Communs. Corp.*,
  55 F. Supp. 2d 1070 (C.D. Cal. 1999) .............................................................. 24

*Rodeo Collection, Ltd. v. West Seventh*,
  812 F.2d 1215 (9th Cir. 1987) ........................................................................... 4

*Skechers U.S.A., Inc. v. Vans, Inc.*,
  No. CV 07-01703, 2007 WL 4181677 (N.D. Nov. 20, 2007).......................... 6, 7

*Spraying Systems Co. v. Delavan, Inc.*,
  975 F.2d 387 (7th Cir. 1992) .............................................................................. 8

*Surfvivor Media, Inc. v. Survivor Prods.*,
  406 F.3d 625, 629 (9th Cir. 2005) .................................................................... 16

*Swedish Beer Exp. Co. v. Can. Dry Corp.*,
  469 F.2d 1096 (C.C.P.A. 1972) ........................................................................ 10

*Switchmusic.com., Inc. v. U.S. Music Corp.*,
  416 F. Supp. 2d 812 (C.D. Cal. 2006) ................................................... 4, 12, 17

*Thane Int'l., Inc. v. Trek Bicycle Corp.*,
  305 F.3d 894 (9th Cir. 2001) ........................................................................... 22

*Vitarroz Corp. v. Borden, Inc.*,
  644 F.2d 960 (2d Cir. 1981) ...................................................................... 12, 13

*Volkswagenwerk Aktiengesellschaft v. Church*,
  411 F.2d 350 (9th Cir. 1969) ........................................................................... 17

*Zippo Mfg. Co. v. Rogers Imports, Inc.*,
  216 F. Supp. 670 (S.D.N.Y. 1963) ..................................................................... 8

## Statutes

Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125(c)(2) .................................. 20, 21

**Rules**

Fed. R. Civ. P. 56(a), (b) ............................................................................................ 4

**Other Authorities**

J. Thomas McCarthy, *McCarthy on Trademarks* (rev. ed. 2008) .................................. 5, 7, 24

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

1

## NOTICE OF MOTION AND MOTION

2      Please take notice that on September 26, 2008, at 9:00 a.m., or as soon thereafter as

3  the parties may be heard, in Courtroom 2 of the above-referenced Court, located at 450

4  Golden Gate Avenue, San Francisco, California  94102, Defendant Abercrombie & Fitch

5  Trading Co. will move the Court for an order of summary judgment dismissing each of

6  Plaintiff Levi Strauss & Co.'s claims.

7      The motion will be based on this Notice of Motion and Motion and the Memorandum

8  of Points and Authorities and [Proposed] Order filed herewith, on all of the files and records

9  of this action, and on any additional material that may be elicited at the hearing of this motion.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

1    ## I.    **INTRODUCTION & SUMMARY OF THE ARGUMENT**

2       Abercrombie & Fitch Trading Co. ("Abercrombie") is entitled to summary judgment

3    on all of Levi Strauss & Co.'s ("LS&Co.") claims.  Mr. Mark Breitbard, the President of

4    LS&Co.'s U.S. Brand Retail, captured the fundamental weakness of LS&Co.'s case best

5    when he testified that LS&Co.'s trademark infringement action against Abercrombie was not

6    fair, and that he did not think Abercrombie's "RUEHL" stitching design looked like

7    LS&Co.'s "double arcuate" design in any respect.  The undisputed facts confirm that LS&Co.

8    has failed to establish its claims for trademark infringement and unfair competition as a matter

9    of law.   As detailed herein, the pertinent *Sleekcraft* factors overwhelmingly demonstrate that

10   a jury could not find any consumers (let alone an *appreciable* amount of them) likely to be

11   confused between LS&Co.'s "double arcuate" stitching design and Abercrombie's accused

12   RUEHL stitching design.  Therefore, Abercrombie is entitled to summary judgment on both

13   the infringement and unfair competition claims.

14      LS&Co.'s dilution claims are equally infirm.  To prevail, LS&Co. had to produce facts

15   demonstrating that the double arcuate is highly distinctive *and* recognized by a significant

16   portion of the consuming U.S. public.  LS&Co. failed to do so.  Moreover, LS&Co. has no

17   credible evidence to establish that the RUEHL design is likely to cause *any* dilution of

18   LS&Co.'s double arcuate design.  Consequently, these dilution claims fail as a matter of law.

19

20

21

22

23

24

25

26

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## II.    THE UNDISPUTED FACTS ENTITLE ABERCROMBIE TO SUMMARY JUDGMENT

In 1892, David T. Abercrombie established "Abercrombie Co." and opened a small waterfront shop in downtown Manhattan, offering a modest selection of sporting and excursion goods. *See* Declaration of Michael Doty ("Doty Dec."), ¶ 3. A few years after Abercrombie Co. opened its doors, Mr. Ezra Fitch, a successful lawyer from Kingston, NY and a regular customer, invested in the fledging company. *Id.* at ¶ 4. By 1904, the two men established "Abercrombie & Fitch", which went on to ultimately outfit and equip many explorers and outdoor enthusiasts alike, including U.S. Presidents Theodore Roosevelt, Herbert Hoover, Dwight Eisenhower, and John F. Kennedy; Ernest Hemmingway and Howard Hughes, among many others. *Id.* at ¶ 5. Today, "Abercrombie & Fitch" is one of the most successful apparel companies in the country with hundreds of stores throughout the U.S, Canada, and Great Britain. *Id*. at ¶ 6.

In 2004, Abercrombie launched its fourth clothing brand under the name "RUEHL No. 925."[1]  Doty Dec., ¶ 8. The name "RUEHL" is the surname of a fictional German family that immigrated to Greenwich Village in the 1850s and opened a leather goods shop. *Id*. at ¶ 9. "No. 925" signifies the address of the brownstone on Greenwich Street where the RUEHL family opened its first store. *Id*. at ¶ 10. The "RUEHL No. 925" brand (hereinafter "RUEHL") offers men's and women's casual apparel and related accessories designed to appeal to post-collegiate men and women in the their early 20s to early 30s. *Id*. at ¶ 11. RUEHL apparel is offered for sale only at the 24 RUEHL stores and, as of January 2008, through the ruehl.com website. Besides RUHEL, no other clothing brands are sold either on the RUEHL website or at the RUEHL stores. *Id*. at ¶ 12. The RUEHL brand is not advertised through traditional media. Doty Dec., ¶ 13. Instead, RUEHL is advertised primarily through

---

[1] The other brands are "Abercrombie & Fitch", "abercrombie", and "Hollister." In January 2008, Abercrombie launched its fifth brand, "Gily Hicks." *See* Doty Dec., ¶ 8.

1   in-store marketing initiatives and by "word of mouth" from satisfied customers. *Id.*  The vast

2   majority of sales of RUEHL products have been through its "brick and mortar" stores, with

3   the ruehl.com website having limited amounts of sales to date. *Id*. at ¶ 14.

4        One of the RUEHL brand items offered for sale is a line of RUEHL women's jeans.

5   Initially, these jeans were emblazoned with an "R" on the corner of one of the back pockets

6   that appeared as follows:

7

8



9        *See* Deposition of Kevin Cothren ("Cothren Depo."), pp. 11:6-13:3, Exh. C to

10  Declaration of J. Michael Keyes ("Keyes Dec.").  But because letters, like the letter "R", can

11  be used by a variety of different manufacturers on various products, Abercrombie believed the

12  RUEHL brand needed a more iconic stitch. *Id.* at 28:17-29:14.  Consequently, in Fall 2005,

13  Abercrombie's CEO, Mr. Mike Jeffries challenged the RUEHL denim design team to create

14  an "iconic" back pocket stitching design that would be identified exclusively with RUEHL,

15  just like the stitching designs used in Abercrombie's other brands. *Id*. at 28:17-29:25.

16       The RUEHL design team set to work.  The individuals responsible for the design of

17  the new RUEHL jeans had no intention of using a stitching design owned by another

18  company.  *See* Cothren Depo, pp. 45:9-47:9; Deposition of Mark Breitbard ("Breitbard

19  Depo."), pp. 76:18-78:23; 81:19-83:25; 92:14-94:23, Exh. A to Declaration of Michael J.

20  Bettinger in Support of Abercrombie's Motion for Summary Judgment ("Bettinger Dec.").

21  Their task was to create an "iconic" design that would be identified exclusively with

22  RUEHL—one that would be unique and original and distinguish RUEHL products from

23  competitors' products.  *See* Cothren Depo, pp. 28:17-29:25; Bretibard Depo, pp. 74:13-17;

24  78:20-79:6.  The team considered several possible designs but ultimately chose to invert the

25  "R" and extend the legs so they would reach the outer edges of the pockets as follows:

26

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6



*See* Cothren Depo, pp. 46:24-48:24.

7    Mr. Mark Brietbard, the person ultimately responsible for the RUEHL brand at the

8 time—and who is now the President of LS&Co. U.S. Brand Retail—"loved" the new design

9 and "never thought of Levi's" when he reviewed the design. *See* Brietbard Depo, pp. 93:22-

10 92:10; 93:5-94:23.  This new design was thought of a as an "upside down variation" of the

11 "R" design. *Id*. at 76:11-14.  He approved it and ultimately Mr. Jeffries signed off on the new

12 stitching design.  *Id*. at 69:18-21; Cothren Depo, p. 34:12-21.  The RUEHL jeans with the

13 new design (hereinafter the "RUEHL design") were made available for purchase at the

14 beginning of 2006 at a retail price in the $90 to $120 range.    Deposition of Stacie Beaver

15 ("Beaver Depo"), p. 82:18-21, Exh. D to Keyes Dec.

16    In July 2007, LS&Co. sued Abercrombie alleging that the RUEHL design violated

17 LS&Co.'s trademark rights in its federally-registered "double arcuate" stitching design.  *See*

18 Complaint, ¶ 17 and Exh. A thereto.  In February 2008, Abercrombie filed an Amended

19 Answer and Counterclaims denying all allegations and seeking cancellation of LS&Co.'s

20 trademark registrations based on abandonment and fraud.  *See* Amended Answer &

21 Counterclaims.  LS&Co. moved to dismiss Abercrombie's counterclaims.  On April 22, 2008,

22 this Court granted in part and denied in part LS&Co.'s motion.  *See Levi Strauss & Co. v.*

23 *Abercrombie & Fitch Trading Co*., 548 F. Supp. 2d 811, 812 (N.D. Cal. 2008).

24
25
26

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

### III.    LAW & ARGUMENT

### A.    The Summary Judgment Standard.

Abercrombie is entitled to summary judgment because as demonstrated below there are no triable issues of material fact as to LS&Co.'s trademark infringement, unfair competition, and dilution claims. Fed. R. Civ. P. 56(a), (b). *Switchmusic.com., Inc. v. U.S. Music Corp.*, 416 F. Supp. 2d 812, 816-817 (C.D. Cal. 2006) (citation omitted).

### B.    Abercrombie is Entitled to Summary Judgment on Both The Trademark Infringement and Unfair Competition Claims Because LS&Co. Failed to Establish That *Any* Consumers—Much Less An Appreciable Number of Them—Are Likely to Be Confused By Abercrombie's RUEHL Stitching Design.

To prevail on both its trademark infringement and unfair competition claims, LS&Co. must set forth credible evidence that an "appreciable amount" of consumers are likely to be confused by the RUEHL stitching. *See Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1151 (9th Cir. 2002) (infringement exists only when a mark is likely to "confuse an *appreciable* number of people as to the source of the product") (emphasis in original); *HMH Publishing Co. v Lambert*, 482 F.2d 595, 599 n.5 (9th Cir. 1973). LS&co. must prove that confusion is "probable"; it is insufficient to show that confusion is merely "possible." *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 804 (9th Cir. 1970); *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987). The "likelihood of confusion" test applies to LS&Co.'s claims for trademark infringement and unfair competition. *See Jarritos, Inc. v. Los Jarritos*, No. C 05-02380-JSW, 2007 WL 1302506, *2 (N.D. Cal. May 2, 2007).

In assessing whether the likelihood of confusion exists, the Ninth Circuit applies the *Sleekcraft* factors. Those factors are:  (1) strength of plaintiff's mark; (2) similarity of the marks; (3) proximity of the goods; (4) evidence of actual confusion; (5) marketing channels used; (6) degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark.[2]   *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)

---

[2] The eighth *Sleekcraft* factor, the "likelihood of expansion of the product lines", is not

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

(abrogated in part on other grounds). As demonstrated below, the undisputed evidence overwhelming favors Abercrombie on all of these factors.

1. <u>LS&Co.'s "Double Arcuate" Design Has Lost Significance as a Mark and is Commercially Weak Due to Numerous Third-Party Uses of Similar Designs on Similar Goods.</u>

The strength of a mark is judged by its "conceptual strength" and its "commercial strength." J. Thomas McCarthy, *McCarthy on Trademarks*, § 11:83 (rev. ed. 2008); *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). "Conceptual strength" classifies the mark along a spectrum of increasing distinctiveness, from strongest to weakest—generic, descriptive, suggestive, and arbitrary or fanciful. "Commercial strength" measures the marketplace recognition of the mark. Significantly, a "mark can be conceptually strong (by being arbitrary or fanciful) and at the same time be commercially weak if the mark lacks significance in the marketplace by identifying the origin of the goods." *Oxford Industries, Inc. v. JBJ Fabrics, Inc.*, 6 U.S.P.Q.2d 1756, 1760 (S.D.N.Y. 1988). "The ultimate test of relative strength is the distinctiveness of a mark in the mind and perception of the relevant customer group." 2 McCarthy § 11:85.

The Ninth Circuit has made clear that even if a mark is conceptually strong, it will be classified as "weak" where there has been extensive third-party use of similar marks on similar goods. This is known as the "crowded field doctrine", which states as follows:

> [A] mark that is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive'. It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.

*Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) (abrogated in part on other grounds); *see also, Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha,* 290 F. Supp. 2d 1083, 1091 (C.D. Cal. 2003) (extensive third party use relevant here.

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

weakens even an arbitrary mark); *Halo Management, LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1034 (N.D. Cal. 2003) (same); *Skechers U.S.A., Inc. v. Vans, Inc.*, No. CV 07-01703, 2007 WL 4181677, *5 (N.D. Nov. 20, 2007).

In this regard, the *Skechers* case is instructive. There, Vans sued Skechers for trademark infringement of its checkerboard design on the toe vamp of Vans' shoes. *Skechers U.S.A., Inc.*, 2007 WL 41816777 at *1. Vans had an "incontestable" federal trademark registration for this checkerboard design and the court found that the design was "arbitrary" and, therefore, "conceptually strong." *Id.* at *4. Nonetheless, the court found that the checkerboard design was commercially weak given extensive third-party use of similar designs on similar goods. Specifically, Skechers submitted evidence of at least thirteen shoe manufacturers' use of checkerboard patterns on their shoes and also submitted evidence of a number of shoe manufacturers with registered trademarks incorporating checkerboard patterns. *Id.* at *5. This evidence showed a crowded field which had "significantly diminishe[d] the likelihood of trademark infringement." *Id.*; *see also Halo Management, LLC*, 308 F. Supp. 2d at 1034 (finding that the relevant trademark field was "crowded" where the word "halo" was popular and appeared "in dozens of places, many in a field which at least broadly would include or be related to plaintiff's business") (internal quotation omitted).

The facts of *Skechers* parallel the facts here. Just like the checkerboard design in *Skechers*, LS&Co.'s double arcuate design is "hemmed in on all sides" by a market saturated with similar designs on similar or identical goods, namely denim jeans. There are at least twenty-six (26) third-party back pocket stitching designs on the market similar to the "arcuate," *i.e.*, stitching designs with downward sloping arches that meet at a point in the middle of the pocket, or some similar variation thereof. *See* Exhs. B – E-25 to Bettinger Dec.; Exhs. F – P to Keyes Dec. Several of these designs are currently being sold and have been sold on the marketplace for quite some time. *Id.*; *see also* Declaration of Nicole Sanger, ¶ 5.

There are at least twenty-nine (29) similar third-party stitching designs that are federally registered trademarks, either on the principal or supplemental register; another similar design is pending registration. Exhs. F – X to Bettinger Dec. Given this saturated market, LS&Co.'s arcuate design is commercially weak, which "significantly diminishes the likelihood of trademark infringement." *Skechers U.S.A., Inc.*, 2007 WL 41816777 at *5.

LS&Co.'s *own* consumer surveys actually confirm the weakness of the double arcuate design as consumer recognition of the arcuate has plummeted over the last 24 years. Indeed, the level of recognition has dropped to levels that would be insufficient to establish secondary meaning. 2 McCarthy § 11:82. ("When determining the commercial or marketplace strength of a mark the courts look to the same kind of evidence of real world recognition of the mark as is used to decide the presence or absence of secondary meaning to determine whether a non-inherently distinctive designation is or is not a valid mark."). For example, in *Lois Sportswear v. Levi Strauss & Co.*, LS&Co. conducted a consumer survey in 1984 showing that "79%" of those surveyed recognized the "double arcuate" design. *See* Affidavit of Spencer Bruno, pp. 7-8, Exhibit Y to Bettinger Dec. In 1997, Dr. Carol Scott—whom LS&Co. has retained as an expert in several of its infringement cases—conducted a jeans recognition survey. *See* Exh. Z to Bettinger Dec. Dr. Scott opined that this survey showed that of those identifying Levi's jeans as an LS&Co. product, 72% identified the arcuate trademark as a source identifier and associated the arcuate trademark with LS&Co. *See id.* at p. 5. But in a subsequent survey conducted by Dr. Scott in 2001, the "recognition" of the double arcuate dropped by about 20%, down to 55.4%.[3] *See* Exh. AA to Bettinger Dec. at p. 8. Thereafter, a survey conducted by Dr. Scott in *Levi Strauss v. RP55*, showed that only

---

[3] Dr. Scott opined pocket stitching was the source of brand identification for 48.7% of all participants who correctly identified Levi's jeans. An additional 4.3% mentioned "pocket design," and an additional 2.4% mentioned "stitching."

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

33.89% of those surveyed recognized the "arcuate" stitching design.[4]    However, once, the 33.89% is properly adjusted to account for "noise", the actual recognition of the double arcuate design amounts to less than 20%, or approximately 17.89%.[5]  *See* Exh. BB to Bettinger Dec. at Exh. A, p. 7.  This level of recognition shows that the arcuate design is anemic in the eyes of the consuming public and has lost significance as a mark.[6]  *See, e.g.*, *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992) ("a figure in the thirties can be considered only marginal" to establish secondary meaning); *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670, 689-90 (S.D.N.Y. 1963) (25% consumer recognition insufficient to establish secondary meaning).  Dr. Sood's "jeans recognition survey" is so riddled with flaws that its results are meaningless.  *See* Motion to Exclude Dr. Sood's Report.

The undisputed evidence shows that the double arcuate exists in a crowded field and lacks recognition in the marketplace.  Accordingly, LS&Co. has failed to create an issue of material fact as to the strength of this arcuate design.  It is fatally weak.

---

[4] Carol Scott reported that in a December 2004 survey of 236 males, aged 15 to 50 (target market for RP55's Indigo Red product) who were shown photo of Levi's jeans, 138 (58%) correctly identified them as product of Levi.  80 of those 138 mentioned pocket stitching design or "stitching" as the source of brand identification.  Thus, 33.89% (80 of 236 who were shown Levi's jeans) correctly recognized Levi's jeans as a product of Levi based, at least in part, on the back pocket stitching design or "stitching."  *See* Exh. BB to Bettinger Dec. at Exh. A, p. 7.

[5] Scott admitted that her percentage of confusion for the RP55 design may include "noise," *i.e.* those who are guessing or correctly identified the jeans as Levi's, but for reasons other than the trademark at issue.  Exhibit 8 to Carol Scott's Declaration (page 23) reveals that 16% of survey respondents viewing Azzure jeans (a non-Levi jean), thought that Levi manufactured, licensed or was associated with the jean.  This 16% accounts for the "noise" that Dr. Scott admitted was present in the survey and should be deducted from the 33.38% pocket stitching recognition.

[6]

**REDACTED**

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

2.    LS&Co.'s "Double Arcuate" Design Looks Nothing Like the RUEHL Design.

The "similarity of marks" factor under *Sleekcraft* "has always been considered a critical question in the likelihood-of-confusion analysis."    *M2 Software, Inc., v. Madacy Entertainment*, 421 F.3d 1073, 1082 (9th Cir. 2005).  Similarity of marks is assessed "in terms of their sight, sound and meaning" and "must be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase of the [products]."    *Id.* (quoting *Lindy Pen Co. v. Pic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984)).  The relevant inquiry on similarity is whether the two marks create an overall similar commercial impression.  *M2 Software, Inc. v. M2 Communs.*, *Inc.*, 450 F.3d 1378, 1384 (Fed. Cir. 2006).  The unmistakable differences between the double arcuate design and the RUEHL design preclude a finding of likelihood of confusion.

First, a simple visual comparison reveals that the double arcuate and accused design are wholly dissimilar.  *Compare* Exh. CC to Bettinger Dec. *with* Exh. DD to Bettinger Dec. The accused design does not resemble what LS&Co. describes as its symmetrical, double arc stitching design that meets in the middle.  Deposition of Robert Hanson ("Hanson Depo"), 77:18-22, Exh. B to Keyes Dec.    Unlike LS&Co.'s design, the accused design is an asymmetrical, inverted "R" with its legs extended to the sides of the pocket.  The RUEHL design creates a "mirror image" where one side of the pocket stitch is a "mirror image" of the other side.  *See* Exh. DD to Bettinger Dec.  In his deposition, Mr. Breitbard, LS&Co.'s current President of US Retail Brand, and Abercombie's former General Manger and Vice President of RUEHL Brand, testified that the RUEHL stitching design was  formed to be an upside down "R" modeled after Abercrombie's earlier RUEHL stitching design, referred to as the– "R".  Breitbard Depo, p. 76:11-14. Moreover, the RUEHL design  does not have a double arc, is not symmetrical, has a completely different stitching pattern, and a unique "swooping loop" in the middle.  When evaluated as the two marks appear in the marketplace, the marks are

unmistakably different.  As noted above, Abercrombie's RUEHL design only appears on clothing labeled as a RUEHL product and is sold exclusively in RUEHL stores or on the RUEHL website, both of which carry nothing other than RUEHL brands.  Doty Dec., ¶¶ 16, 17.  The dissimilarities between the two—both as they appear in a side-by-side comparison and in the marketplace—are manifest.

Second, LS&Co. itself cannot now credibly take the position that the RUEHL design is confusingly similar to the "double arcuate" design as LS&Co. has allowed other designs similar to the RUEHL design to co-exist in the marketplace.  *See Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1231 (D.C.N.Y. 1977) (MUSHROOMS for footwear was asserted against MUSHROOM for sportswear; held, no likelihood of confusion in part because plaintiff had previously entered an agreement with a third party permitting the third party to use MUSHROOM HUNTER for shoes; "Thus, [plaintiff's] contention of likelihood of confusion is undermined by its own action;"); *Swedish Beer Exp. Co. v. Can. Dry Corp.*, 469 F.2d 1096, 1098 (C.C.P.A. 1972) (no likelihood of confusion in part because third party, owner of SKOL for vodka, had previously consented to opposer's mark SKOL for beer).

Notably, in 2004, LS&Co. sued a competing jean company, RP55, Inc. for willful trademark infringement for using the following back pocket stitching design:



**REDACTED**

*

*

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

1

**REDACTED**

2

\*

3

\*

4

\*

5　　　Third, although a USPTO trademark examiner's decision is not binding on this court

6　or on a jury, it is one factor that is instructive.  *See Jewish Sephardic Yellow Pages, Ltd. v.*

7　*DAG Media, Inc.*, 478 F. Supp. 2d 340, 366-367 (E.D.N.Y. 2007) ("Although the examiner's

8　conclusion obviously is not dispositive, courts 'nevertheless accord weight to the initial

9　conclusions of the Trademark Office.'") (citations omitted); *see also D.M. & Antique Import*

10　*Corp. v. Royal Saxe Corp.*, 311 F. Supp. 1261, 1274 (S.D.N.Y. 1970) ("[T]he expertise of the

11　 trademark examiners does entitle their views to respectful consideration.").   In 2005,

12　Abercrombie applied for a federal trademark registration for the RUEHL design.  Although

13　the examiner denied Abercrombie's application based on an "ornamental" objection, it did not

14　did not cite the double arcuate design as a basis for denying the RUEHL design.  In fact, the

15　examiner expressly indicated that it "has searched the Office records and *has found no similar*

16　*registered or pending mark* which would bar registration under the Trademark Act Section

17　2(d)."　*See* Exh. FF to Bettinger Dec.  The examiner's determination in this regard simply

18　reinforces what the undisputed facts indicate: that the double arcuate and RUEHL designs are

19　wholly dissimilar.

20　　　In short, the "similarity of the marks" factor tips sharply in favor of Abercrombie.

21　　　3.　　Any Proximity Between the Parties' Goods is Substantially Outweighed By
22　　　　　Other Factors, Including the Completely Divergent Marketing Channels of
　　　　　　LS&Co. and RUEHL Products.

23　　　When dealing with the "proximity" factor, the courts assess whether the goods are

24　related or complementary.  *M2 Software, Inc.*, 421 F.3d at 1081-82.  Good are proximate if

25　they are similar in use and function.  *Id.* (citing *Sleekcraft*, 599 F.2d at 350).  But even where

26

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

the products at issue are proximate or related, other factors may mitigate against finding likelihood of confusion. In particular, courts have found that where related products are sold through different marketing or sales channels, the possibility that consumers will mistakenly assume there is an association between the producers of similar goods is diminished. *Fruit of Loom, Inc. v. Girouard*, 994 F.2d 1359, 1363 (9th Cir. 1993) (injunction against alleged infringement denied, in part, because there was no present proximity of goods and the market channels of the two products were different, except for small overlap in department stores); *Accuride International, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989) (products were not sold by the same retailers or displayed in adjacent areas, a factor supporting holding of no likelihood of confusion); *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir. 1981) (fact that plaintiff's product was sold primarily in specialty stores that did not carry any of defendant's products gave weight to holding of no likelihood of confusion).

In this case, although both parties sell denim jeans, the possibility that consumers may mistakenly associate LS&Co.'s and Abercrombie's products and conclude that the products come from the same source is diminished significantly by the fact Abercrombie's products bearing the accused design are only sold through its own RUEHL retail locations and on its recently-created January 2008 website. Both of these channels only sell RUEHL product under the RUEHL brand name. Doty Dec., ¶ 17. As set forth in the following section, the difference between LS&Co.'s products and the RUEHL products bearing the accused design is perhaps "nowhere greater than with respect to the channels of trade through which they [are] distributed." *See Estee Lauder, Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1507 (2d Cir. 1997).

4.     It is Undisputed that There is No Significant Overlap of Abercrombie and LS&Co.'s Marketing Channels.

A lack of any significant overlap in advertising markets, "weighs heavily in the ultimate assessment that there is no triable issue of the likelihood of confusion." *M2*

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

1    *Software, Inc.*, 421 F.3d at 1083-84 (no significant overlap in advertising markets, other than

2    presence of both products on website Amazon.com); *see also Switchmusic.com., Inc.*, 416 F.

3    Supp. 2d at 824.  This factor also weighs in Abercrombie's favor.

4      LS&Co. advertises its products in television, magazines, newspapers, cinema previews

5    and on-line, including Google, Yahoo and Levi's.com websites.  Mitchell Depo, pp. 40:10-

6    45:1; 47:3-7.  Unlike LS&Co., Abercrombie does not use traditional advertising media.

7    Beaver Depo, p. 39:17-40:3 ("We don't do any advertising in this company, in general, so it's

8    all word of mouth and branding through the stores.").  Instead, Abercrombie relies on its

9    employees, customers, and the customers' in-store experiences as its main form of marketing.

10   Doty Dec., ¶ 7.  Again, other than on its website and in the RUEHL No. 925 stores

11   themselves, Abercrombie does not advertise any product bearing the accused design.  *Id*. at

12   ¶ 17.  Moreover, unlike LS&Co., Abercrombie sells RUEHL products exclusively in its retail

13   outlets, and it does not sell its clothing line in third-party retail outlets.  *Id*. at ¶ 18; Hanson

14   Depo, 134:10-142:20.  These differences are significant, and weigh in favor of no likelihood

15   of confusion.  *See Estee Lauder, Inc.*, 108 F.3d at 1511 (no likelihood of confusion where

16   plaintiff sold its personal care products only through prestige retail stores while defendant

17   sold its less expensive competing products only in defendant's own "Gap Old Navy" stores

18   aimed at a younger market; a typical plaintiff's product cost more and was sold in upscale

19   stores); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1134 (Fed. Cir. 1993) (fact

20   that shoes moved in different retail channels weighed against likelihood of confusion);

21   *Accuride International*, 871 F.2d at 1537 (products were not sold by the same retailers or

22   displayed in adjacent areas, a factor supporting holding of no likelihood of confusion);

23   *Vitarroz Corp.*, 644 F.2d at 967 (fact that plaintiff's product was sold primarily in specialty

24   stores that did not carry any of defendant's products gave weight to holding of no likelihood

25   of confusion); *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 316-17

26

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

(S.D.N.Y. 2000) (finding "significant competitive distance" between products sold in different stores); *IDV North America, Inc. v. S&M Brands, Inc.*, 26 F. Supp. 2d 815, 828 (E.D. Va. 1998) (insignificant overlap in the channels of commerce weighed strongly against the likelihood of confusion between two marks).

5.    LS&Co. Has Failed to Produce Any Meaningful Evidence of Actual Confusion Despite Ample Opportunity To Do So.

Actual confusion can be established by either: (i) producing the testimony of consumers that have been confused; or (ii) producing a consumer survey that shows consumers are actually confused.  LS&CO. has failed to do either.

a.    LS&Co. has not presented a shred of  evidence showing a single customer has been confused by the RUEHL design.

The Ninth Circuit has held that a "lack of evidence about actual confusion after an ample opportunity for confusion can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Matrix Motor Co., Inc.*, 290 F. Supp. 2d at 1093. The RUEHL stitching design has been on the market for over 2½ years.   LS&Co., however, has not produced a *single piece* of evidence showing actual confusion by one customer, much less confusion by an "appreciable" number of them.  *See* LS&Co.'s Response to Abercrombie's Interrogatories, Set One, Int. No. 1, Exh. GG to Bettinger Dec.; Deposition of Thomas Onda ("Onda Depo"), p. 196:20-24, Exh. A to Keyes Dec.   Two and a half years is ample time for LS&Co. to provide at least one instance of actual consumer confusion.  LS&Co.'s inability to provide any evidence of actual confusion in the relevant market underscores the fact that there is no likelihood of confusion. *See Cumberland Packing Corp. v. Monsanto Co.*, 140 F. Supp. 2d 241, 254 (E.D.N.Y. 2001) (weakness of survey as evidence of actual confusion was highlighted by the fact that plaintiff presented no evidence of actual confusion in the marketplace despite both products having been on the market for approximately 3½ years, which is "ample time for at least a single occurrence of consumer

confusion to surface"; court may infer from the absence of such evidence that there is minimal, if any, likelihood of confusion); *Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 298 (S.D.N.Y. 2003) (given the widespread distribution of the defendants' magazine for over two years, the plaintiff had ample opportunity to come forward with evidence of actual confusion if there had been such confusion; absence of such confusion weighs against the plaintiff).

                b.    <u>LS&Co.'s consumer survey purportedly showing "confusion" is so riddled with flaws that it cannot be relied upon by this Court or a jury and should, therefore, be excluded.</u>

Having failed at showing *actual* confusion, LS&Co. resorts to its survey performed by Associate Professor Sanjay Sood to purportedly show actual confusion. LS&Co.'s attempt fails. Dr. Sood's survey results should be excluded because the survey was not conducted in accordance with generally accepted survey principles. *M2 Software, Inc.*, 421 F.3d at 1087 (survey should be excluded when the survey's proponent fails to show that the survey was conducted in accordance with generally accepted survey principles). Dr. Sood's failure to abide by generally accepted survey principles, are relevant to the admissibility rather than the weight of the survey. *See id.* As set forth fully in Abercrombie's Motion to Exclude Dr. Sood's Report, Dr. Sood's surveys cannot withstand judicial scrutiny and are so fundamentally flawed that they should be excluded.

Even if Dr. Sood's opinion and survey evidence is admissible, which it is not, Dr. Sood's survey confirms that that the level of purported "confusion" is insufficient as a matter of law to demonstrate the likelihood of confusion. Dr. Sood concludes that 16% of consumers associated the RUEHL jeans with Levi's based on the stitching design and/or pocket. Expert Report of Professor Sanjay Sood ("Sood Report"), p. 11, Exh. HH to Bettinger Dec. Dr. Sood reached that number, however, without taking into account the level of confusion demonstrated by the other third-party designs he tested in his survey. For

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

example, Citizens jeans, one of the other designs Dr. Sood tested in his survey, produced a 7% rate of confusion based on the stitching design and/or pocket. *Id.* Thus, if Citizens is used as a control, which it should have been, and was appropriately accounted for by computing the difference between the alleged RUEHL confusion rate and the Citizens confusion rate, Dr. Sood's survey demonstrates only a 9% rate of confusion between the RUEHL stitching design and LS&Co.'s arcuate. *See id.* As a matter of law, this degree of "confusion" is insufficient to demonstrate the likelihood of confusion. *See Newport Pac. Corp. v. Moe's Southwest Grill, LLC*, No. 05-995-KI, 2006 U.S. Dist. LEXIS 74481 (D. Or. Sept. 28, 2006) ("Confusion survey results below 10% are evidence that confusion is not likely"). Court holdings in the Ninth Circuit are consistent with this principle. *See, e.g.*, *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 629, 633 (9th Cir. 2005) (2% confusion insufficient); *Excelligence Learning Corp. v. Oriental Trading Co.*, No. C-03-4947-JF, 2004 U.S. Dist. LEXIS 30370 (N.D. Cal. Dec. 20, 2004) (1% percent survey results affirmatively demonstrated absence of customer confusion); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1040 (C.D. Cal. 1998) (survey evidence "clearly favors the defendant when it demonstrates a level of confusion much below ten percent"; 6.9% survey results suggested little likelihood of confusion) (quotation omitted); *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1149 (C.D. Cal. 1998) (4% survey results supported summary judgment for defendant); *Pebble Beach Co. v. Laub Am. Corp.*, No. C-84-2012: RPA-SJ, 1985 U.S. Dist. LEXIS 23876 (N.D. Cal. Dec. 27, 1985) (7.8% figure would not be sufficient to establish appreciable likelihood of confusion that would entitle plaintiff to injunctive relief, especially given a 7% margin of error in the survey results).

    c.    <u>Abercrombie's consumer survey established there is no likelihood of confusion between the RUEHL and arcuate designs</u>.

Abercrombie's expert, Dr. Gerald L. Ford—a renowned expert in the area of Lanahm Act consumer surveys—designed and implemented a consumer survey which included 975

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

females aged thirteen (13) years of age or older.    The survey was designed to measure the degree, if any, to which the stitching design on the pocket of the RUEHL jeans is likely to cause confusion with respect to source, authorization/approval of, or business affiliation/connection with the source LS&Co.  *See* Declaration and Rule 26 Report of Dr. Gerald L. Ford ("Ford Report") ¶¶ 2-9, Exh. II to Bettinger Dec.  The results of that survey demonstrate that when non-trademark confusion[7] is accounted for, there is **<u>zero confusion</u>** attributable to the RUEHL design.  *Id.*  Based on the undisputed evidence, there is no question that this "actual confusion" factor tips strongly in Abercrombie's favor.

> 6.    <u>Jeans Purchasers are Sophisticated Consumers Who are Presumed to Exercise a High Degree of Care in Their Purchases.</u>

A reasonably prudent purchaser is expected to exercise that degree of "care, caution, and power of perception" as to trademarks appropriate to the kind of choice he or she faces in the marketplace.    *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir. 1969).    Confusion is less likely where consumers are more likely to exercise care.  *Switchmusic.com., Inc.*, 416 F. Supp. 2d at 825.  For at least two reasons, the undisputed facts demonstrate that jeans purchasers are sophisticated consumers.    First, LS&Co. has acknowledged during the course of this litigation that it has been "working the hardest to build more relevancy [sic] toward" "progressive consumers" or "modern progressives" whose tastes are more "<u>sophisticated</u>."  *See* Hanson Depo, 61:1-12; 89:2-15 (emphasis supplied).

Second, the more expensive the product, the higher the degree of care exercised by consumers.  *See Sleekcraft*, 599 F.2d at 353 ("when the goods are expensive, the buyer can be expected to exercise greater care in his purchases"); *Switchmusic.com., Inc.*, 416 F. Supp. 2d at 825 ("it is reasonable to assume that when customers are dealing with expensive products, they are more likely to exercise care, thus making confusion less likely"; sophistication of

---

[7] For example, the tendency or predisposition of some consumers to attribute the source of any pair of jeans to Levi, the tendency or predisposition of some consumers to attribute the source of any pair of jeans with pocket stitching to Levi.

guitar purchasers weighed in favor of no confusion).  The price range for LS&Co.'s premium jeans line, Capital E, range anywhere between $158 to about $250, with some products sold up to $501 to $1,000 a pair.  Hanson Depo, 55:2-16.  LS&Co. has a vintage line in the $250 range and higher, a "better price point" denim lines ranging in price typically between $40 and $85, and an opening price range typically around $30 to $35.  Hanson Depo, 58:24-59:25. The retail price point of women's RUEHL denim products is $98, with fashion items up to $120 and shorts and skirts in the range of $69 to $79.  Beaver Depo, 45:1-15.  Purchasers at these price points are not "casual" or "impulse" buyers.  *See Blue Bell, Inc. v. Jaymar-Ruby, Inc.*, 497 F.2d 433, 435-436 n.5 (2d Cir. 1974) (expensive price range and fairly detailed purchasing process reduce likelihood consumers will be misled; purchases, which involved personal examination and fitting of sportswear, were not "casual").

As explained above, the accused design and arcuate design are not visually similar. Even assuming LS&Co. could show some similarity between the RUEHL and LS&Co. back pocket stitching designs, reasonably prudent purchasers visiting RUEHL stores or the RUEHL website, which sell nothing other than merchandise under the RUEHL brand name, are unlikely to mistake RUEHL jeans for LS&Co. jeans.  Likewise, a reasonably prudent consumer visiting stores or websites where LS&Co. jeans are sold is unlikely to confuse LS&Co. jeans with RUEHL jeans given that RUEHL products are only sold in RUEHL stores and the RUEHL website.   The fact remains that reasonably prudent consumers are unlikely to be confused here, and "sophisticated consumers" are even less likely to be confused.

       7.    <u>The Undisputed Facts Show that Abercrombie Adopted the RUEHL Design to Create its Own Distinctive Look Different Than Any Other Company in the Marketplace—Not to Copy LS&Co.</u>

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354.  No such presumption exists here.  In fact, the

undisputed evidence establishes the *exact opposite* proposition: Abercrombie acted in good faith at all times in selecting its RUEHL design in order to create its own iconic brand.  The most telling evidence on this issue is the testimony of LS&Co.'s own President of Retail U.S., Mark Breitbard, and Abercombie's former Senior Vice President and General Manager of RUEHL.   Mr. Breitbard was intimately involved in the RUEHL design process and responsible for approving the accused RUEHL design.  Mr. Breitbard testified:

- that he does not believe Abercrombie intentionally infringed LS&Co.'s arcuate design.  Breitbard Depo, pp. 83:6-11; 85:10-18

-  the accused RUEHL design is supposed to be an upside down variation of the earlier little "R" design in the bottom corner of the pocket.  *Id*. at 76:11-14.

- Abercrombie wanted the RUEHL design to be unique and original and LS&Co.'s arcuate design never came up or was considered at all in the design process.  *Id*. at 74:7-17; 78:20-79:6.

-  the arcuate design never crossed Mr. Breitbard's mind in reviewing the accused RUEHL design.  *Id*. at 78:10-14.

- Mr. Breitbard does not believe that the accused RUEHL design looked like LS&Co.'s arcuate design in any respect and does not believe that the accused design would be confused with the arcuate design.  *Id*. at 77:4-78:3.

Mr. Breitbard summed up it all up when he testified that he does not believe that LS&Co.'s charge of trademark infringement against Abercrombie is a fair charge.  *Id*. at 82:2-12.

LS&Co. has no other evidence of Abercrombie's alleged intent to confuse.  Testimony by both LS&Co.'s President of Levi Strauss Americas and LS&Co.'s Chief Intellectual Property Counsel confirm this.  *See* Hanson Depo, 42:7-15 ("the specific answer, I suppose, would therefore be no."); 45:1-21 (no evidence of willfulness other than the alleged infringement itself); Onda Depo, p. 195:8-19 (no evidence of intent but instead relying on

1    vague, self-serving assertions such as the RUEHL design "bring[s] to mind one of the oldest

2    stitching designs in the apparel industry."). Given Mr. Breitbard's testimony and LS&Co.'s

3    lack of any other evidence of intent this factor weighs strongly in favor of Abercrombie.

4        In sum, all of the *Sleekcraft* factors weigh in favor of Abercrombie and demonstrate

5    that no reasonable jury could find that Abercrombie's RUEHL stitching design is likely to

6    cause confusion among an appreciable number of consumers. Thus, Abercrombie is entitled

7    to summary judgment on LS&Co.'s claims of trademark infringement and unfair competition.

8    **C.**    **Abercrombie is Entitled to Summary Judgment on LS&Co.'s Trademark Dilution Claim Because The Double Arcuate Is Not Famous, Lacks**

9    **Distinctiveness, and No Credible Evidence Establishes a Likelihood of Dilution.**

10       "Dilution is a cause of action invented and reserved for a select class of marks-those

11   marks with such powerful consumer associations that even non-competing uses can impinge

12   their value." *Perfumebay.com Inc. v. EBAY, Inc.*, 506 F.3d 1165, 1180 (9th Cir. 2007).

13   Accordingly, a plaintiff is able to maintain a claim for dilution only if it satisfies the following

14   criteria: (1) the plaintiff's mark is famous; and (2) the plaintiff presents credible evidence that

15   there is a "likelihood of dilution" as a result of defendant's conduct. "California's dilution

16   cause of action is substantially similar, providing relief if the plaintiff can demonstrate a

17   likelihood of injury to business reputation or of dilution of the distinctive quality of a mark

18   notwithstanding the absence of competition between the parties or the absence of confusion as

19   to the source of goods or services." *Id.* As set forth below, the undisputed facts all weigh

20   strongly in favor of Abercrombie and, therefore, it is entitled judgment as a matter of law.

21       1.    The Undisputed Evidence Indicates that LS&Co.'s Double Arcuate is Not Prominent or Renowned But Is, In Fact, Commercially Anemic.

22

23       Two fundamental prerequisites are necessary for a mark to be considered "famous" for

24   purposes of dilution. First, the mark must be highly distinctive. *See HBP, Inc. v. Am. Marine*

25   *Holdings, Inc.*, 290 F. Supp. 2d 1320, 1338 (M.D. Fla. 2003) (noting that for dilution the

26   mark "must have a degree of distinctiveness and strength beyond that needed to serve as a

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

trademark; it must be 'truly prominent and renowned'").  Second, as a result of the Trademark Dilution Revision Act of 2006 (the "TDRA"), it is now required that the plaintiff's mark must be "widely recognized *by the general consuming public* of the United States." 15 U.S.C. § 1125(c)(2)(A); *see also Board of Regents, University of Texas System ex rel. University of Texas at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 678 (W.D. Tex.. 2008). Accordingly, "[d]ilution is a cause of action invented and reserved for a select class of marks-those marks with such powerful consumer associations that even non-competing uses can impinge on their value. *Id.* at 674.

Here, the undisputed evidence underscores the fundamental weakness of the arcuate design.  There is extensive third-party use of similar designs and LS&Co.'s own survey evidence shows a tremendous drop in consumer recognition of the double arcuate.  Moreover, even if this Court were to consider Dr. Sood's supposed "recognition survey" as evidence of fame, it was not a survey of general consumers of the United States, but only a subset of them. *See* Sood Report, p. 5.  Thus, as a matter of law the arcuate cannot be deemed "famous" for purposes of dilution.  On this basis alone, LS&Co.'s dilution claim cannot stand.

    2.    <u>LS&Co. Has Failed to Present Any Credible Evidence that Suggests There Is a Likelihood of Dilution Being Caused by the RUEHL Design.</u>

The TDRA delineates the following factors in determining whether a mark or trade name is likely to cause dilution:  (1) The degree of similarity between the mark or trade name and the famous mark; (2) The degree of inherent or acquired distinctiveness of the purportedly famous mark; (3) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (4) The degree of recognition of the famous mark; (5) Whether the user of the mark or trade name intended to create an association with the famous mark; (6) Any actual association between the mark or trade name and the famous mark.  The undisputed facts overwhelming favor Abercrombie.

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

1          a.      The double arcuate and RUEHL designs are wholly dissimilar.

2          "The mark used by the alleged diluter must be identical, or nearly identical, to the

3    protected mark for a dilution claim to succeed." *Nissan Motor Co. v. Nissan Computer Corp.,*

4    378 F.3d 1002, 1011 (9th Cir. 2004) (citation, alteration, and internal quotation marks

5    omitted). "For marks to be nearly identical to one another, they must be similar enough that a

6    significant segment of the target group of customers sees the two marks as essentially the

7    same." *Thane Int'l., Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 906 (9th Cir. 2001) (citation

8    and internal quotation marks omitted).

9          Here, as noted above, the dissimilarities are bountiful between LS&Co.'s double

10   arcuate and the RUEHL stitching design.  LS&Co. has no evidence to suggest that a

11   "significant segment of the target group of customers sees the two marks as the same."

12   Therefore, the dilution claims fails on this basis as well.

13          b.      LS&Co.'s double arcuate design is commercially weak.

14          As noted previously, LS&Co.'s double arcuate design is hemmed in on all sides and is

15   inherently weak.  As such, this factor favors Abercrombie.

16          c.      LS&Co. has not engaged in substantially exclusive use of its double
            arcuate stitching design as demonstrated by numerous third parties'
17          uses of similar designs.

18          LS&CO.'s double arcuate design is hemmed in on all sides by others.  Mr. Hanson

19   describes LS&Co.'s mark as "a downward-sloping arc that meets in the middle of the

20   back pocket."  Hanson Depo, 77:19-22.  Mr. Hanson's view is that, because the RUEHL

21   design is "predominantly a downward-sloping arc that meets a point in the middle of the

22   back pocket, I think that to a consumer it would be confusing and, therefore, would

23   confuse the consumer as to whether or not this was a Levi's jean or not."  Hanson Depo,

24   79:7-22.  But LS&Co. cannot by any means establish exclusive use of stitching designs

25   with downward sloping arcs that meet in the middle of a back pocket.  **REDACTED**

26

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

**REDACTED**

\*          Numerous other third-party companies are currently using similar designs and several of them are on the PTO's principal register. *See* Bettinger Dec. ¶¶ 3-25 and Exhs. B – X to Bettinger Dec.

           d.      LS&Co.'s double arcuate is not recognized in any meaningful way by the consuming public.

No credible evidence establishes that there is any meaningful recognition of the arcuate design. In fact, the undisputed evidence indicates that, at best, consumer recognition of the arcuate mark is only about 17.89%. *See, supra*, Section III(B)(1). This factor unmistakably favors Abercrombie.

           e.      LS&Co. has not a single piece of evidence to suggest Abercrombie intended to dilute LS&CO.'s arcuate design.

No evidence exists showing Abercrombie intended to cause dilution. In fact, the only evidence shows just the opposite. This factor also strongly favors Abercrombie.

           f.      LS&Co. failed to produce any credible evidence of actual dilution.

The only supposed "evidence" of actual dilution produced by LS&Co. is Dr. Sood's expert report. For three reasons, this report is insufficient as a matter of law to establish actual dilution. First, the report is fundamentally flawed because it was not conducted according to generally accepted principles.

Second, even if this Court considers Dr. Sood's report, his opinion regarding the supposed "erosion in distinctiveness" is not rationally based on his survey results or evidence. Dr. Sood's questionnaire never asked *any* of the respondents if they associated the RUEHL jeans with LS&Co's jeans. *See* Exh. 11 to Sood Report. Moreover, Dr. Sood's report fails to offer any empirical evidence that the so-called "erosion in distinctiveness" is, or could be, the result of the RUEHL pocket stitching as opposed to the myriad of other pocket stitching designs existing in the marketplace. In particular, Dr. Sood provides no empirical evidence

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

that there has, in fact, been any "erosion in distinctiveness" of the arcuate stitching design, and if it has occurred, whether it is attributable in any way to the RUEHL jeans.  Ford Rebuttal, ¶ 33, Exh. JJ to Bettinger Dec.  Thus, Dr. Sood's conclusion is not rationally based on or connected to his survey results or other empirical evidence.

Third, dilution is "not intended to serve as a mere fallback protection for trademark owners unable to prove trademark infringement." *Playboy Enters. v. Netscape Communs. Corp.*, 55 F. Supp. 2d 1070, 1075 (C.D. Cal. 1999) (quotation omitted).  LS&Co.'s only "evidence" to support its actual dilution claim is Dr. Sood's opinions regarding *likelihood of confusion*.  The law is clear that evidence of "actual confusion" cannot be used to establish "actual dilution."  As succinctly noted by one court recently:

> "Infringement by a likelihood of confusion and dilution can coexist as legal findings only if it is proven that a significant number of customers are likely to be confused and that among a significant number of other customers who are not confused, the defendant's use will illegally dilute by blurring or tarnishment, but **one state of mind does not overlap with the other in one person**."

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 576, 599 (S.D.N.Y. 2007) (citing McCarthy, § 24.72) (emphasis supplied).

Dr. Sood's opinion regarding dilution, however, is based entirely on the supposed "confusion" experienced by customers.  As noted by Dr. Sood in his deposition:  "I based my opinion of the likelihood of dilution on the Confusion survey."  Deposition of Sanjay Sood ("Sood Depo"), p. 95:17-22, Exh. LL to Bettinger Dec.  As further explained by Dr. Sood, "[i]f there is confusion between the Levi's pocket stitching and the RUEHL pocket stitching, then just by the nature of the confusion, that would lead to dilution of the Levi's brand."  *Id.* at 93:13-20; *see also* Sood Report, p. 13.  Dr. Sood's report and deposition testimony showcases a fundamental misunderstanding of what dilution means and how it must be established.

ABERCROMBIE & FITCH TRADING CO.'S
MOTION FOR SUMMARY JUDGMENT

1

## IV.    <u>CONCLUSION</u>

For the reasons set forth herein, Abercrombie respectfully requests this Court find that Abercrombie is entitled to summary judgment as to each of LS&Co.'s causes of action in its Complaint.  Even if this Court finds there are issues of fact precluding summary judgment, it is respectfully requested that this Court enter partial summary judgment that Abercrombie did not act with willfulness, malice, wantonness and in conscious disregard of LS&Co.'s welfare and rights as there is no such evidence to support such spurious claims.


Dated:    August 15, 2008                    Respectfully submitted,

**K&L Gates LLP**


By:_____/s/_____
Michael J. Bettinger
Rachel R. Davidson
J. Michael Keyes


Attorneys for Defendant
ABERCROMBIE & FITCH TRADING CO.