# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


LEVI STRAUSS & CO.,            )
                              )
            Plaintiff,         )
                              )
vs.                            )    No. C07-03752-JSW
                              )
ABERCROMBIE & FITCH TRADING    )
CO.,                           )
                              )
            Defendant.         )
_____)
AND RELATED CROSS-ACTIONS.     )
_____)



VIDEOTAPED DEPOSITION OF

MARK BREITBARD

Friday, July 25, 2008




REPORTED BY:  TINA MARIE VELASQUEZ
              C.S.R. NO. 10072



BONNIE L. WAGNER & ASSOCIATES
COURT REPORTING SERVICES
41 SUTTER STREET
SAN FRANCISCO, CALIFORNIA  94104
(415) 982-4849

1                              I N D E X

2

3    VIDEOTAPED DEPOSITION OF:  MARK BREITBARD

4    Friday, July 25, 2008

5

6                                                         PAGE

7    EXAMINATION BY:

8        Ms. Davidson                                      6

9        Mr. Gilchrist                                    97

10

11                         E X H I B I T S

12                                                        PAGE

13   DEFENDANT'S

14     1   E-mail string; 2 pgs.                          88
           [0804- 0805]
15

16                          ---oOo---

17

18

19

20

21

22

23

24

25

e8ab75e6-5f28-4c4b-bbce-ac6b7f92d8c2

1      BE IT REMEMBERED that pursuant to Notice of

2   Taking Deposition, and on Friday, July 25, 2008,

3   commencing at the hour of 9:31 a.m., thereof, at the Law

4   Offices of K&L Gates, 55 Second Street, Suite 1700, San

5   Francisco, California 94105-3493, before me, TINA MARIE

6   VELASQUEZ, a Certified Shorthand Reporter in and for the

7   State of California, personally appeared

8                          MARK BREITBARD,

9   called as a witness by the Defendant, who, having been

10  first duly sworn, was thereupon examined and testified as

11  is hereinafter set forth.

12                        ---oOo---

13  APPEARANCES:

14      Law Offices of TOWNSEND AND TOWNSEND AND CREW,

15  LLP, Two Embarcadero Center, 8th floor, San Francisco,

16  California 94111-3834, represented by GREGORY S.

17  GILCHRIST, Attorney at Law, appeared as counsel on behalf

18  of the Plaintiff.

19      K&L GATES, 55 Second Street, Suite 1700, San

20  Francisco, California 94105-3493, represented by RACHEL R.

21  DAVIDSON, Attorney at Law, appeared as counsel on behalf

22  of the Defendant.

23      Also present:  Thomas Onda

24                      Michael Tunick, Videographer
                        Tunick Videography
25                      707-792-2488

1    witness.  You haven't established any foundation that he's

2    an adverse witness, particularly with respect to

3    discussions in what he was doing when he was at

4    Abercrombie.  So I will make my objections.

5              MS. DAVIDSON:  Thanks for your objection.

6              THE WITNESS:  Can you repeat the question?

7              MS. DAVIDSON:  Can you read it back?

8              THE REPORTER:  Question:  "Did you select design

9    teams?"

10             THE WITNESS:  I interviewed and hired designers

11   and helped decide which designers would work on which

12   products, yes.

13             MS. DAVIDSON:  Q.  Were you involved in the

14   design process of the Ruehl women's jeans pocket stitching

15   design?

16       A.    Yes.

17       Q.    Did you pick the design team for that design?

18       A.    Yes.

19       Q.    Do you remember who was on that design team

20   there?

21       A.    Lee Holman was the director of design.

22       Q.    Did you interact with Lee Holman on a daily

23   basis?

24       A.    More or less.  Maybe weekly, but daily at times.

25       Q.    Who else was on the design team?

e8ab75e6-5f28-4c4b-bbce-ac6b7f92d8c2

1        A.    Yes.

2        Q.    During the design process, was there any

3   particular model that served as a benchmark for the

4   creation of the Ruehl pocket stitching design?

5              MR. GILCHRIST:  That's vague and leading.

6              THE WITNESS:  No, not really.

7              MS. DAVIDSON:  Q.  In selecting a design, did

8   you want to select a design that was distinct and

9   original?

10             MR. GILCHRIST:  It's vague and leading and

11  argumentative.

12             THE WITNESS:  Yes.

13             MS. DAVIDSON:  Q.  I think you testified earlier

14  that one of the purposes of having a trademark in pocket

15  stitching design was to distinguish a product from another

16  competitor's product; is that correct?

17       A.    Correct.

18       Q.    Are you aware of what in this litigation has been

19  referred to, I think, as the little R Ruehl stitching

20  design that was, I think, the prior design to the design at

21  issue in this litigation?

22       A.    Yes.

23       Q.    Were you involved in that process --

24       A.    I was.

25       Q.    -- the design?

1  I believe, right?

2      A.   It was -- yes, I was involved, but not as

3  directly involved, yes.

4      Q.   My following question was whether you were aware

5  of the idea that the design that's at issue in this

6  litigation was based on or was partly spawned from the idea

7  that it was to be an upside down version of the little R?

8           MR. GILCHRIST:  Objection; leading and lacks

9  foundation.

10           THE WITNESS:  Yes, I'm aware.

11           MS. DAVIDSON:  Q.  And do you know if it was

12  based on the little R as an upside down version of the

13  little R?

14      A.   Yes, it was.

15           MR. GILCHRIST:  Objection; leading and lacks

16  foundation.

17           MS. DAVIDSON:  How does that lack foundation?

18      Q.   During the design process of the Ruehl design at

19  issue in this litigation, did the arcuate stitching design

20  come up?  Was it discussed?

21      A.   Yes.

22      Q.   What was discussed about it?

23           MR. GILCHRIST:  I caution the witness to make

24  sure -- based on my prior discussions with him, this may

25  tread into areas that he feels are privileged.

1          THE WITNESS:  This is --

2          MS. DAVIDSON:  Thank you, thank you.  Let me --

3    that's a good point.

4      Q.    I am -- again, as Greg started this deposition, I

5    am not interested in hearing about anything that was

6    discussed between you and counsel for Abercrombie, in-house

7    counsel, outside counsel.  My question -- I should have

8    asked a better question.  In the design process, excluding

9    your conversations with counsel at Abercrombie, did the

10   arcuate mark come up amongst the designers in that process,

11   excluding counsel and you and your design team?

12     A.    No.

13     Q.    At all?

14     A.    Not that I recall.

15     Q.    Did anyone ever raise any concerns in the design

16   process that the stitching mark, the Ruehl stitching mark

17   that's currently being used today, may be confused with the

18   arcuate mark?

19         MR. GILCHRIST:  Objection; leading.

20         MS. DAVIDSON:  Q.  Excluding testimony -- sorry.

21   Excluding conversations with the lawyers.

22     A.    No.

23     Q.    And when you reviewed the Ruehl stitching design

24   that was approved, that you approved, that's currently

25   being used today that's subject to this litigation, did you

1  think it looked like the arcuate mark in any respect?

2          MR. GILCHRIST:  Objection; leading.

3          THE WITNESS:  No.

4          MR. GILCHRIST:  And lacks foundation.

5          MS. DAVIDSON:  Q.  You testified earlier that

6  you knew about the arcuate mark since your employment at

7  Gap, and you've had Levi's jeans when you were a kid; is

8  that right?

9      A.   Yes.

10     Q.   When you reviewed the Ruehl stitching design that

11 was approved by you, did you -- did Levi's arcuate mark

12 even cross your mind?

13         MR. GILCHRIST:  Objection; leading.

14         THE WITNESS:  I don't recall, but -- no.

15         MS. DAVIDSON:  Q.  Were you happy with the Ruehl

16 design that is currently being used today?

17     A.   Was I happy with it?

18     Q.   Yeah.

19     A.   Yes.

20     Q.   Did you think a lot of thought went into creating

21 the design?

22         MR. GILCHRIST:  Objection; leading, lacks

23 foundation.

24         THE WITNESS:  Yes.

25         MS. DAVIDSON:  Q.  Did you think it was

1    original?

2              MR. GILCHRIST:  Objection; leading.

3              THE WITNESS:  Yes.

4              MS. DAVIDSON:  Q.  Did you think it was unique?

5              MR. GILCHRIST:  Same objection.

6              THE WITNESS:  Yes.

7              MS. DAVIDSON:  Q.  At some point during your

8    tenure at Abercrombie, did you learn that Levi's was

9    challenging the Ruehl stitching design?

10        A.   No.

11        Q.   Do you remember what year -- and if you can be as

12   precise as possible and give me a month when the Ruehl

13   stitching design that's at issue in this litigation was --

14   or the jean that contains the Ruehl stitching design was

15   marketed?

16        A.   I believe it was probably -- I think it was maybe

17   April or May of '96.

18              MR. GILCHRIST:  2006?

19              THE WITNESS:  I mean of 2006.

20              MS. DAVIDSON:  Pretty good memory.

21        Q.   So while you were employed at Abercrombie, you

22   weren't aware at all that Levi's had some concern over the

23   Ruehl stitching design?

24        A.   No, I was not.

25        Q.   When you started employment at Levi and left

1    be dragged right into the middle of it and that I was on

2    both sides.

3        Q.    When you say that you were on both sides, what do

4    you mean?

5        A.    Meaning, I'm an employee, an officer or whatever

6    I am, technically, of Levi's, but I was at Abercrombie at

7    the time that this was developed.

8        Q.    So you -- is it fair to say you felt sort of a

9    divided loyalty or ....

10       A.    I don't think it's divided loyalty.  It's just

11   actually, technically, privilege for both sides, having

12   privileged information from both sides potentially.

13       Q.    Other than your communications with counsel at

14   Levi's, did you tell anybody that you thought, for example,

15   that the suit was unfounded or lacked merit?

16           MR. GILCHRIST:  I'll object that it's misleading;

17   it assumes a fact.

18           THE WITNESS:  No.

19           MS. DAVIDSON:  Q.  In light of your testimony,

20   Mr. Breitbard, that Levi's arcuate mark didn't come up in

21   the design process, it didn't cross your mind when you

22   approved the design, do you think that its charge of

23   trademark infringement against Abercrombie is a fair

24   charge?

25           MR. GILCHRIST:  Objection; leading, calls for a

1   legal conclusion, it's vague.

2           THE WITNESS:  Can you repeat the question,

3   please?

4           MS. DAVIDSON:  Can you read it back, please?

5           THE REPORTER:  Question:  "In light of your

6   testimony, Mr. Breitbard, that Levi's arcuate mark didn't

7   come up in the design process, it didn't cross your mind

8   when you approved the design, do you think that its charge

9   of trademark infringement against Abercrombie is a fair

10  charge?"

11          MR. GILCHRIST:  Same objections.

12          THE WITNESS:  I don't, no.

13          MS. DAVIDSON:  Q.  Are you aware that part of

14  the -- or one of the allegations in Levi's Complaint

15  against Abercrombie, dealing with the Ruehl design, is

16  that it intended to infringe on the arcuate trademark?

17  Are you aware of that?

18      A.  No.

19      Q.  Have you read the Complaint in this matter?

20      A.  No.

21      Q.  Do you agree that Abercrombie intended to

22  infringe the arcuate trademark?

23          MR. GILCHRIST:  I'll object to your

24  mischaracterizing exactly what's said in the Complaint.  It

25  also calls for a legal conclusion, and the question is

1    leading and vague.

2              You can answer if you want.

3              MS. DAVIDSON:   Q.   Did you understand the

4    question?

5         A.   Yes.   Can you repeat the question, though?

6         Q.   Sure.   I asked you whether you are aware that one

7    of the allegations in Levi's trademark infringement

8    Complaint against Abercrombie, dealing with the Ruehl

9    design, was that Abercrombie intended to infringe on Levi's

10   arcuate mark.   Do you agree with that allegation?

11        A.   No.

12        Q.   Do you realize -- strike that.

13             Are you aware that one of the allegations in

14   Levi's Complaint against Abercrombie, involving the Ruehl

15   pocket stitching design, is that Abercrombie acted with

16   willfulness, wantonness, malice and conscious indifference

17   to the rights and welfare of Levi?   Are you aware of that?

18        A.   No.

19        Q.   Do you agree with that allegation?

20             MR. GILCHRIST:   Objection.   It's leading.

21             THE WITNESS:   No.

22             MS. DAVIDSON:   Q.   You testified earlier that

23   you weren't aware while you were at Abercrombie that Levi

24   had challenged the Ruehl stitching design; is that right?

25        A.   That's correct.

1      Q.    Did you feel like -- well, as you sit here today,

2    did you feel that maybe you had an obligation to tell

3    somebody at Levi that you thought the suit was unfounded?

4           MR. GILCHRIST:  Calls for a conclusion.  It's

5    leading.

6           THE WITNESS:  Will you clarify?  Will you just

7    clarify the question?

8           MS. DAVIDSON:  Q.  Sure.

9      A.    Okay.

10      Q.    I don't mean to mischaracterize your testimony,

11    but I understood your testimony to be that you didn't think

12    it was fair -- you did not think that the allegations of

13    infringement against Abercrombie that Levi has brought in

14    its Complaint was fair.  And I understood your testimony to

15    believe that Levi's allegations that Abercrombie willfully

16    or intended to infringe the arcuate trademark, you didn't

17    agree with those, correct?

18      A.    Correct.

19           MR. GILCHRIST:  Leading.  Go ahead.

20           MS. DAVIDSON:  Q.  In light of those -- in light

21    of your testimony, do you feel like maybe you had an

22    obligation to tell somebody at Levi that you thought that

23    the Complaint was unfounded prior to filing -- prior to

24    Levi filing the suit?

25           MR. GILCHRIST:  Objection; leading and it calls

1   was asserted in Columbus and whether or not there's been a

2   waiver.  So proceed as you wish, but I've made my position

3   clear on several occasions already.

4           MS. DAVIDSON:  Q.  You have two pages of this

5   e-mail?

6       A.   I have two pages, yes.

7       Q.   Is the second page 0805?

8       A.   Yes.

9       Q.   I asked you if you recognized this document.

10      A.   Yes.

11      Q.   It shows that you are both an author and a

12  recipient of this e-mail chain; is that correct?

13      A.   Correct.

14      Q.   Do you recognize this document to be

15  correspondence between Mr. Wilson and Kevin Cothren and

16  yourself?

17      A.   Yes.

18      Q.   Does this document, Mr. Breitbard, refresh your

19  recollection that there was a possible challenge by Levi

20  during your tenure at Abercrombie?

21      A.   Yes.

22      Q.   If you can turn to the second page of the e-mail,

23  sir, do you know who Reid Wilson is?

24      A.   Yes, I do.

25      Q.   Who do you understand him to be?

1     A.   The attorney for Abercrombie & Fitch, trademark

2   counsel.

3     Q.   Again, I'm not interested in your conversations

4   with Mr. Wilson.  I'm going to read some of the factual

5   statements that Mr. Wilson has said in his e-mail to you.

6   He starts his e-mail off by saying, "Can you confirm" --

7   "Mark, can you confirm whether we are still interested in

8   the Ruehl women's pocket stitching design as we were when

9   we decided to move forward with it?"

10      Do you see that?

11     A.   Uh-huh.  Yes.

12     Q.   Then he asks you also, "Can you tell me if we're

13   using this pock stitching design" -- "or pocket design" —

14   excuse me — "yet?  Any chance I could get a sample?"

15      Do you see that?

16     A.   Yes.

17     Q.   If you turn to the first page, sir, you see it

18   sort of carries over.  You see the subject line says,

19   "possible challenge of the new Ruehl women's pocket

20   design"?

21     A.   Yes.

22     Q.   Is that the first time you understood that Levi

23   may be challenging the Ruehl pocket stitching design?

24     A.   I don't recall, but I think so.

25     Q.   Mr. Wilson asked whether we were still interested

1    in the Ruehl -- new Ruehl stitching design.  Do you see

2    your response was, in part, "we love it and we're using

3    it"?

4            Did I read that correctly?

5       A.   Yes, you did.

6       Q.   What did you love about it?

7       A.   That it was unique and -- I thought it was an

8    interesting back pocket stitch that was unique and sort of

9    elevating -- that it looked expensive, made the jean look

10   expensive.

11      Q.   And then it goes on to say, "And we're using it."

12      A.   Uh-huh.

13      Q.   So it looks -- if you see the date of that

14   correspondence, it says -- it looks of March 06, 2006.  So

15   looks as of March 2006, Abercrombie was using the design,

16   right?

17      A.   Yes, I think, but it doesn't necessarily mean it

18   was in stores.  It meant we were using it -- we could have

19   been in production with it.  But yes, we were going -- we

20   were using it for that.

21      Q.   Oh, you're saying that the products might not

22   have been sold with the design on it?

23      A.   Correct.  I could say we're using it, meaning

24   we've put it into production.  That doesn't necessarily

25   mean that it's been already produced and shipped and sold

1    in stores.

2         Q.    Got it.

3         A.    But it could be, but I'm just saying that it's

4    not specific.

5         Q.    You see, after the correspondence that I just

6    read, you subsequently have a discussion with Kevin

7    Cothren?  You see that?

8         A.    Yes.

9         Q.    He writes:  "I passed a sample to Reid.  Thanks,

10   Kevin."  To which you respond, "no problem.  One often

11   can't predict such things.  I didn't even consider Levi's

12   in looking at the stitch."  You see that?

13        A.    Uh-huh.  Yes.

14        Q.    So I direct your attention to the sentence, "I

15   didn't even consider Levi's when looking at the stitch."

16   Would it be fair to say that's consistent with your prior

17   testimony that Levi's didn't come up in the design process?

18             MR. GILCHRIST:  Objection; mischaracterizes his

19   testimony and it's leading.

20             MS. DAVIDSON:  Well, okay.

21        Q.    Is it fair to say that this sentence by you is

22   consistent with your prior testimony — I don't want to

23   mischaracterize your testimony — that the arcuate mark, in

24   your understanding, didn't come up in the design process of

25   the Ruehl selection and your testimony that when you

1  approved the Ruehl stitching design, any Levi's arcuate

2  mark didn't cross your mind?

3          MR. GILCHRIST:  I'll object that it's leading and

4  it's inconsistent with his prior testimony, because my

5  recollection of his prior testimony is that the Levi

6  Strauss & Co. arcuate did not come up in the design

7  process, excluding conversations with counsel.

8          So other than that objection, you can go ahead

9  and answer.

10          MS. DAVIDSON:  Q.  I mean, is that your

11  testimony?  Am I mischaracterizing your testimony that the

12  arcuate design didn't come up in the selection process of

13  the Ruehl design?

14          MR. GILCHRIST:  Objection; leading.  And again,

15  that question has already been asked.

16          MS. DAVIDSON:  I'm going to ask it again.

17      Q.    Is that consistent with your testimony?

18      A.    Yes.

19      Q.    When you say you didn't even consider Levi's when

20  looking at the stitch, would it be fair to say that the

21  arcuate mark didn't cross your mind?

22          MR. GILCHRIST:  Objection; leading.

23          THE WITNESS:  Yes.

24          MS. DAVIDSON:  Q.  You said that you loved the

25  Ruehl design.  The word "love" is a pretty strong emotion

1               DEPOSITION OFFICER'S CERTIFICATE

2

3    STATE OF CALIFORNIA       )
                              ) ss.
4    COUNTY OF SAN FRANCISCO )

5

6            I, TINA MARIE VELASQUEZ, CSR, hereby certify:

7            I am a duly qualified Certified Shorthand Reporter
     in the State of California, holder of Certificate Number
8    10072 issued by the Court Reporters Board of California
     and which is in full force and effect  (Fed. R. Civ. P.
9    28(a)).

10           I am authorized to administer oaths or
     affirmations pursuant to California Code of Civil
11   Procedure, Section 2093(b); and prior to being examined,
     the deponent was first duly sworn by me.  (Fed. R. Civ. P.
12   28(a), 30(f)(1)).

13           I am not a relative or employee or attorney or
     counsel of any of the parties, nor am I a relative or
14   employee of such attorney or counsel, nor am I financially
     interested in this action.  (Fed. R. Civ. P. 28).

15

16           I am the deposition officer that stenographically
     recorded the testimony in the foregoing deposition and the
     foregoing transcript is a true record of the testimony
17   given by the deponent.  (Fed. R. Civ. P. 30(f)(1)).

18           Before completion of the deposition, review of the
     transcript [   ] was [ X ] was not requested.  If
19   requested, any changes made by the deponent (and provided
     to the reporter) during the period allowed, are appended
20   hereto.  (Fed. R. Civ. P. 30(e)).

21           Dated:

22

23                          _____

                            TINA MARIE VELASQUEZ, CSR
24                          State of California
                            CSR License No. 10072

25

# EXHIBIT B





# EXHIBIT C

 



# EXHIBIT D



