# EXHIBIT BB

1 | TOWNSEND AND TOWNSEND AND CREW LLP
GREGORY S. GILCHRIST (Bar No. 111536)
2 | GIA L. CINCONE (Bar No. 141668)
Two Embarcadero Center, 8th Floor
3 | San Francisco, California 94111
Telephone: 415-576-0200
4 | Facsimile: 415-576-0200

5 | Attorneys for Plaintiff
LEVI STRAUSS & CO.

6

7

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | SAN FRANCISCO DIVISION

11 | LEVI STRAUSS & CO.,                    Case No.  C 04 0468 SI

12 |                    Plaintiff,          **DECLARATION OF CAROL SCOTT IN SUPPORT OF PLAINTIFF LEVI**
13 |         v.                             **STRAUSS & CO.'S MOTION FOR SUMMARY JUDGMENT**
14 | RP55, INC., et al.,
                                            **Date:        May 6, 2005**
15 |                    Defendants.         **Time:        9:00 a.m.**
                                            **Courtroom:   10**
16

17 | _____

18

19 |         I, CAROL SCOTT, hereby declare:

20 |         1.      I am a Professor of Marketing at the Anderson Graduate School of Management of the

21 | University of California, Los Angeles.  I was retained by Levi Strauss & Co. ("LS&CO."), the

22 | plaintiff in this action, to provide various opinions regarding LS&CO.'s Arcuate Trademark and the

23 | stitching that appears on Indigo Red jeans.  In connection with that engagement, I conducted a survey

24 | and submitted an Expert Report on December 17, 2004, which was amended on February 11, 2005; a

25 | copy of that amended report is attached as Exhibit A.  I also submitted a Rebuttal Report on February

26 | 25, 2005, a copy of which is attached as Exhibit B.  I am submitting this declaration in support of

27 | LS&CO.'s motion for summary judgment.

28 |         2.      I believe my survey results may reflect some level of "noise."  That is, some number of

1   the respondents who saw and correctly identified LEVI'S® jeans may have done so because they were

2   guessing, or describe all jeans with a top-of-mind brand name. However, those respondents who

3   correctly identified the LEVI'S® jeans and called out some specific identifying factor -- whether

4   pocket design, stitching, or some other specific element that allowed them correctly to identify the

5   brand -- cannot be attributed to "noise."

6       3.    At the same time, consumers who do not recognize the Arcuate Trademark and

7   associate the mark with LS&CO. and the LEVI'S® brand, will not be confused by another stitching

8   design -- even if the second design is highly similar to or even a counterfeit of LS&CO.'s design. The

9   only consumers capable of being confused by the Indigo Red stitching design are those who know

10  LS&CO.'s mark.

11      4.    In order to eliminate any survey "noise," while taking a conservative approach to the

12  question of likelihood of confusion, one may use the "baseline" population of 58% of consumers who

13  were able correctly to identify the LEVI'S® brand. This proportion of consumers may include any

14  number who correctly identified the jeans but were guessing, or correctly identified the jeans but did

15  so for reasons other than the trademark at issue. Given the sample size, it is reasonable to assume that

16  this baseline population also existed within the group that saw Indigo Red jeans.

17      5.    Taking 58% of the 242 respondents who were shown Indigo Red jeans -- that is, the

18  subset that may have correctly identified LEVI'S® jeans by reference to the pocket stitching -- the

19  baseline population is 140 respondents. As I indicated, this is a conservative approach because it

20  includes any "noise" from respondents who were guessing or otherwise not relying on the trademark.

21      6.    Of this baseline population of 140 respondents, 54 identified the Indigo Red jeans as

22  LEVI'S® jeans. Of those 54, 34 cited pocket stitching, pocket design, or stitching as the source of

23  their brand identification. If this group of 34 (the conservative number that has been stripped of noise)

24  is compared to the 140 respondents who might correctly have identified the LEVI'S® jeans from the

25  stitching design, the relevant confusion rate is 24%.

26      7.    Even without accounting for the fact that the entire population could not be expected to

27  be familiar with the pocket stitching on LEVI'S® jeans, 14% of the total survey population identified

28  Indigo Red jeans as LEVI'S® jeans *and* attributed their confusion to stitching.

1      I declare under the penalty of perjury under the laws of the United States that the foregoing

2  statements are true and correct.

3      Executed at Palo Alto, California, this 1st day of April, 2005.

*Carol A. Scott*

Carol A. Scott

60456509 v1

SCOTT DEC. IN SUPPORT OF PL.'S
MOTION FOR SUMMARY JUDGMENT

- 3 -

Levi Strauss & Co. v. RP55, Inc., et al.
CASE NO. C 04 0468 SI

# Exhibit A

# AMENDED EXPERT REPORT OF

# PROFESSOR CAROL A. SCOTT

## February 11, 2005

I am submitting this Amended Report to update my first Expert Report, dated December 17, 2004 ("First Scott Report"). This Amended Report updates and corrects certain figures and results of a consumer survey I have conducted for this matter. As a result of this update, I have not altered the conclusions or my opinions contained in the First Scott Report. I have included in this report updated Summary of Opinions, Basis of Opinions, and Conclusion sections in their entirety.

I am continuing my review and analysis. I may refine or expand my opinions as further information and materials come to my attention, and I reserve the right to supplement this report to the extent that additional information becomes available which may affect my opinions.

## I. Summary of Opinions

Having reviewed and analyzed the evidence available to me at this time, I have determined the following:

1. LS&CO.'s jeans products historically have been and are today highly recognized. In a survey of 478 consumers that I conducted in December, 2004, 58% correctly identified LS&CO.'s jeans based upon seeing a photograph of the back of the jean including LS&CO.'s trademark back pocket stitching.

2. LS&CO.'s pocket stitching is a source identifier for LS&CO.'s jeans products. Consumers recognize the back pocket stitching as a trademark on LS&CO.'s products and associated it exclusively with LS&CO.'s products.

3. Based on the results of the study I conducted, it is likely that consumers will confuse the Indigo Red jeans with LS&Co.'s "LEVI's®" jeans. My analysis

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                                    2

indicates that 22% of consumers incorrectly identified the Indigo Red jeans as "LEVI's®" jeans. Approximately 26% of consumers in the primary market targeted by Indigo Red, i.e., males 15 to 34 years of age, incorrectly identified the Indigo Red jeans as "LEVI's®".

4. A competitor's use of similar back pocket stitching, such as that used by Indigo Red, will erode the significance and value of LS&CO.'s trademark pocket stitching and the "LEVI's®" brand in the marketplace.

I am continuing my review and analysis. I may refine or expand my opinions as further information and materials come to my attention, and I reserve the right to supplement this report to the extent that additional information becomes available which may affect my opinions.

## II. Basis of Opinions

My opinions are based on a jeans recognition and jean confusion survey conducted under my supervision in December, 2004, as well as other surveys I have conducted regarding brand recognition, confusion and brand dilution and my professional expertise in this area. In addition, I have reviewed articles on brand awareness and brand equity.

### A. Background

Levi Strauss & Co. is the world's largest brand-name apparel manufacturer. The company designs, manufactures and markets branded jeans and casual sportswear for men, women and children. Products include jeans, shirts, jackets and skirts, primarily

marketed under the "LEVI's®" brand.

Since its inception in 1850 in San Francisco, LS&CO. has grown into a worldwide leader in branded apparel. With total revenues of $4.09 billion in the fiscal year ending November 30, 2003, it is listed as one of the Fortune 500 largest U.S. companies. [1]

Over the past 128 years, LS&CO. has invested time, resources and money in developing, promoting and advertising the "LEVI's®" trademark, and specific features of the "LEVI's®" jeans, all of which create and stimulate the awareness and goodwill of the "LEVI's®" brand.

"LEVI's®" is one of the most recognized brand names in the world. In brand awareness studies I have reviewed, "LEVI's®" has a high ranking. Interbrand, a leading international branding consulting firm, in conjunction with *BusinessWeek* magazine recently determined the "world's most valuable brands". [2] "LEVI's®" was ranked among the top 100 brands in the world.

LS&CO. has been so successful in creating and stimulating awareness of the "LEVI's®" trademark that "LEVI's®" has become clearly identifiable with jeans. LS&CO. has also successfully created awareness of specific features of "LEVI's®" jeans, such as the double row of stitching on the back pocket, known as the Arcuate stitching design, so that consumers identify these features exclusively with "LEVI's®" products. These features have become synonymous with the "LEVI's®" brand, and consumers recognize the quality and reliability of LS&CO. products.

---

[1] www.levistrauss.com, and Fortune, April 5, 2004.
[2] Business Week, August 2, 2004.

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                    4

**B.  Survey Methodology**

The level of recognition of "LEVI's®" and other branded jeans was demonstrated in a Jeans Recognition Survey that I conducted in December, 2004.  Four hundred and seventy-eight males, ages 15 to 50, who are representative of the target market were interviewed.

To be eligible for the survey, all 478 consumers were screened to have purchased jeans that cost $30 or more within the past 12 months.  Survey participants were also screened for an intention to purchase jeans that cost $30 or more in the next 12 months. Participants must have shopped in at least one department or specialty shop of the type that carries Indigo Red jeans.  Many of these stores also carry "LEVI's®" jeans. Participants were limited to those who had not participated in other marketing research in the past six months and to those who passed the standard security screen that neither participants nor members of their families work for a clothing manufacturer, a market research company or an advertising agency.

Interviews were conducted on a one-on-one basis by experienced interviewers in professional interviewing facilities in Atlanta, Baltimore, Chicago, Dallas, Los Angeles and New York.  Approximately 80 interviews were conducted in each of the cities. Participants were recruited in shopping malls.  A list of the malls is provided in Exhibit 3 of the First Scott Report. A copy of the screen used to recruit participants in the malls is in Exhibit 4 of the First Scott Report.

The survey was conducted on a double-blind basis, meaning that the survey was designed to ensure that neither the interviewer nor the interviewees knew the purpose or

**AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT**          5

sponsor of the survey or knew that the survey was in any way connected to this litigation.

I developed the questionnaire and interview methodology, and an experienced field supervisor, who I trained, instructed and supervised all of the interviewers. A copy of the questionnaire is provided in Exhibit 5 of the First Scott Report, and a copy of the Instructions to Interviewers is in Exhibit 6 of the First Scott Report.

Each survey participant was asked to look at four colored photographs of different brands of jeans. Pictures were presented to the participants on a computer monitor. Each photograph pictured the jeans in the same position to show the back pocket stitching. Each participant was instructed to take as long as he needed to look at the picture, just as if he were shopping for a pair of jeans on the Internet.

For approximately half of the participants (236), the photograph of the "LEVI's®" jeans was included in the set of four to be seen. The other half of the participants (242) were presented with a photograph of Indigo-Red jeans. To disguise the survey sponsor and eliminate biases such as false positive responses, each participant was asked to identify the three other brands of jeans shown in the set of four. The other photographs were of Ecko, Azzure, and Wrangler jeans. To avoid order bias, the sequence of the four different brands was randomized. Copies of the photographs are in Exhibit 7 of the First Scott Report.

Survey participants observed each photograph separately. After observing each photograph, participants were asked to identify the brand of jeans and to identify those feature(s) of the jeans that indicated its brand identity. All responses from participants were open-ended. That is, participants were not prompted with responses or given choices. Interviewers entered the responses online.

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                                    6

## C. Summary of Research Findings

Of the 236 consumers who were shown the photograph of the "LEVI's®" jeans, 138 (58%) correctly identified the jeans as a product of LS&CO. With minor variations, a high rate of recognition was maintained across age categories and locations. Although several other brand names were given, no other single brand had a significant number of respondents. As evidenced by this survey and our prior consumer surveys, "LEVI's®" jeans have maintained a high level of recognition over time.

Of participants who correctly identified the photograph of the "LEVI's®" jeans, the pocket stitching or pocket design was mentioned by 70 (51%) as the source of brand identification. If the respondents who mentioned "stitching" are included, along with those who mentioned specifically pocket stitching or pocket design, this number increases to 80, or 58%. This confirms our findings from prior surveys that consumers rely on the pocket stitching to help them identify LS&CO. products.

I also found that consumers do not identify all jeans as "LEVI's®" brand. Notably, the photograph of the Wrangler jeans was identified correctly by 51% of all respondents. By the same token, only 14% of participants viewing the Ecko jeans, 16% viewing Wrangler jeans, and 16% viewing Azzure jeans misidentified these products as "LEVI's®" jeans. The difference between this level of incorrect identification and that for the Indigo Red jean is significant.[3]  Summary Tables are provided in Exhibit 8.

My analysis indicated that 54 (22.3%) of the 242 participants who saw the Indigo Red jean incorrectly identified it as an LS&CO. product, thus demonstrating the degree

---

[3] T-statistics and significance levels for Indigo Red vs. Ecko, Wrangler, and Azzure are t = 2.81, p < ~.01, t = 1.96, p < ~.05, and t = 1.96, p < ~.05, respectively, two-tailed tests.

**AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT**                    7

of association between the stitching and the "LEVI's®" brand. This rate of association was higher for participants in Indigo Red's primary target market (i.e., males between the ages of 15 and 34), with 31 (26% incorrectly identifying the Indigo Red jeans as "LEVI's®". By city, the rates of association varied slightly across five of the locations with Atlanta consumers showing 30%, New York consumers showing 20%, Los Angeles showing 31%, and Baltimore and Chicago showing 21%. Only the Dallas market indicated an atypically lower rate of association at 12%,.

Of the 54 people who called the Indigo Red jean a "LEVI's®" jeans, 22 (41%) cited the pocket stitching or pocket design as the source identifier. Another 12 (23%) indicated that something about the "stitching" was the reason for their identification. Consistent with my previous surveys, I found that consumers look for the pocket stitching to help them identify the brand of jeans.

### D. Dilution

Brand equity has been defined as "a set of brand assets and liabilities linked to a brand, its name, and symbol that add to or subtract from the value provided by the product or service to the firm and/or to the firm's customers."[4] From the findings of the survey described in this report and prior consumer surveys that I have conducted for LS&CO., I find considerable evidence for dilution of LS&CO.'s brand equity should other firms be allowed to use its trademarks or symbols that are associated or confused with its marks.

---

[4] David A. Aaker, *Managing Brand Equity*, 1991, The Free Press

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                                    8

consumers most frequently use to identify different brands.  In my study, 319 consumers

(67%) of all 478 consumers in the study, and 68% of the 472 consumers who identified a

brand and gave a reason for their identification, cited pocket design or pocket stitching as

the reason for their brand identification.  An additional 50 consumers cited "stitching" as

the element which led to their brand identification.  Consumers often observe a mark,

such as pocket stitching, outside of the actual retail environment (brick and mortar store

or Internet store) where the jeans were purchased. In fact, they observe the stitching by

glancing at someone else wearing it.  At a distance, as someone walks by on the street,

the consumer may not be able to discern the fine print of the manufacturer's name.  The

consumer then looks for another cue, that of the pocket stitching.

Because the "LEVI's®" jeans back pocket Arcuate stitching design is so

distinctive and unique to "LEVI's®" jeans, consumers who see similar stitching on other

products may be confused initially as to the source of the product, and, if such stitching

appears on other manufacturers' jeans, they learn that they cannot rely on the Arcuate

pocket stitching design to identify a true "LEVI's®" product.

If Indigo Red or others are allowed to use a pocket stitching similar to the Arcuate

design, "LEVI's®" brand equity in general and the value of its Arcuate trademark in

particular are eroded because consumers who encounter such a jean no longer fully trust

the Arcuate pocket stitching as a que for the "LEVI's®" brand.  Over time, the

cumulative effect will be that consumers stop using the Arcuate pocket stitching design to

differentiate "LEVI's®" jeans from other brands.   The "LEVI's®" Arcuate pocket

stitching will no longer be an effective trademark symbolizing the quality, reliability, and

distinctiveness of LS&CO. If consumers observe similar marks on jeans produced by

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                                              10

The Lanham Act defines dilution as:

> "The lessening of the capacity of a famous mark to identify and distinguish goods
> or services, regardless of the presence or absence of (1) competition between the
> owner of the famous mark and other parties, or (2) likelihood of confusion,
> mistake, or deception."

For example, McDonald's would suffer brand dilution if other retail outlets, even

those not in the fast food business, were suddenly to begin to use the Golden Arches

outside their stores. In this case, consumers could no longer reliably depend upon the

sight of the Golden Arches to help them uniquely identify and locate a McDonald's

restaurant. In this case, McDonald's, having invested a large sum of money in order to

create secondary meaning[5] in the Golden Arches symbol, would find that the use of a

similar symbol by others would weaken the ability of its symbol "to function as a

trademark, that is, as a unique source identifier."[6]

The double row of stitching on the back pockets of "LEVI's®" jeans, known as

the Arcuate stitching design, is a famous, distinctive and valuable asset to both LS&CO.

and consumers, who rely on the "LEVI's®" trademark to designate the quality and

reliability associated with LS&CO jeans. Respondents from my survey conducted for

LS&CO. recognize the pocket stitching as a brand identifier for "LEVI's®" jeans and

associate the Arcuate design with LS&CO. In the mind of the consumer, the Arcuate

stitching design on the back pocket is unique to "LEVI's®" jeans.

The Arcuate design pocket stitching is particularly significant in regards to the

issue of dilution because pocket design or pocket stitching is the design element that

---

[5] Secondary meaning is said to exist "when a word or designation of some kind which was not originally
distinctive, but was of a descriptive nature in its use on a product or service, has come, through exclusive
use, to indicate to the buyers of that product or service a single product or service coming from a single
source." (J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, section 15.02 [3,4])
[6] Phyllis Welter, Trademark Surveys, 24A-2.

**AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT**                                    9

Indigo Red, the Arcuate stitching will lose its uniqueness, and the value of the stitching as "LEVI's®" trademark will diminish to a point where it will have little or no significance to LS&CO.

## III.   Conclusion

1. Based on a survey of 478 consumers conducted in December, 2004, I have shown that "LEVI's®" Arcuate pocket stitching design is a well known trademark that consumers use to identify "LEVI's®" jeans. My analysis indicated that 58% of participants correctly·identified the LS&CO. jean. Approximately 58% of these participants cited the pocket design or pocket stitching or stitching as the reason for this brand identification.

2. Pocket stitching is an important brand identifier. Over 78% of all consumers who provided a brand identification cited pocket design, pocket stitching, or stitching as the reason for their identification.

3. Consumers are likely to be confused as to the origin of the Indigo Red jean due to the use of the similar pocket stitching design.

4. A competitor's use of a similar back pocket stitching will erode the significance and value of LS&CO.'s trademark Arcuate stitching design and the "LEVI's®" brand in the marketplace.

AMENDED EXPERT REPORT OF PROF. CAROL A. SCOTT                    11

Feb 11 05 01:40p                                                        p.2

My understanding is that some of this testimony is covered by protective orders.

Date: _2/11/05_                              _Carol A. Scott_

                                             Carol A. Scott

**Exhibit 8: Brand Identifications**

Q5 (A): "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Indigo Red

| | Total # | Total % | ATL # | ATL % | BAL # | BAL % | CHI # | CHI % | DAL # | DAL % | LA # | LA % | NY # | NY % | 15-24 # | 15-24 % | 25-34 # | 25-34 % | 35-50 # | 35-50 % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Don't Know | 73 | 30% | 14 | 35% | 16 | 36% | 6 | 15% | 13 | 31% | 16 | 38% | 10 | 25% | 30 | 25% | 22 | 28% | 21 | 48% |
| Azzure | 2 | 1% | 2 | 5% | | | | | | | | | | | 1 | 1% | | | 1 | 2% |
| Ecko | 12 | 5% | 2 | 5% | 2 | 5% | 3 | 8% | 1 | 2% | | | 4 | 10% | 9 | 8% | 2 | 3% | 1 | 2% |
| Levi's | 54 | 22.3% | 12 | 30% | 9 | 21% | 8 | 21% | 5 | 12% | 12 | 31% | 8 | 20% | 31 | 26% | 19 | 24% | 4 | 9% |
| Wranglers | 20 | 8% | 2 | 5% | 1 | 2% | 6 | 15% | 6 | 14% | 4 | 10% | 1 | 3% | 7 | 6% | 7 | 9% | 6 | 14% |
| Akademics | 1 | 0% | | | | | 1 | 3% | | | | | | | 1 | 1% | | | | |
| American Eagle | 1 | 0% | | | | | | | | | | | | | 1 | 1% | | | | |
| Arizona | 1 | 0% | | | 1 | 2% | | | | | | | | | | | 1 | 1% | | |
| Bugle Boy | 1 | 0% | | | | | | | | | 1 | 3% | | | | | 1 | 1% | | |
| Calvin Klein | 7 | 3% | | | 2 | 5% | 4 | 10% | | | 1 | 3% | | | 1 | 1% | 3 | 4% | 3 | 7% |
| Diesel | 1 | 0% | | | | | | | | | 1 | 3% | | | | | 1 | 1% | | |
| Dillards | 1 | 0% | | | | | | | 1 | 2% | | | | | 1 | 1% | | | | |
| Eddie Bauer | 1 | 0% | | | 1 | 2% | | | | | | | | | | | 1 | 1% | | |
| Enyce | 5 | 2% | 2 | 5% | 1 | 2% | 1 | 3% | | | 1 | 3% | | | 4 | 3% | 1 | 1% | | |
| Express | 3 | 1% | | | 1 | 2% | | | | | | | 2 | 5% | 1 | 1% | 2 | 3% | | |
| FUBU | 4 | 2% | 1 | 3% | | | 2 | 5% | 1 | 2% | | | | | 2 | 2% | 2 | 3% | | |
| GAP | 5 | 2% | | | | | | | 3 | 7% | 1 | 3% | 1 | 3% | 3 | 3% | 2 | 3% | | |
| Guess | 5 | 2% | | | | | | | 2 | 5% | | | 3 | 8% | 3 | 3% | 2 | 3% | | |
| Indigo Red | 1 | 0% | | | | | | | | | | | 1 | 3% | 1 | 1% | | | | |
| JC Penny | | 0% | | | | | 1 | 3% | | | | | | | | | | | 1 | 2% |
| Jordache | 4 | 2% | | | 1 | 2% | 1 | 3% | 1 | 2% | | | 2 | 5% | | | 3 | 4% | 1 | 2% |
| Lee | 8 | 3% | | | 2 | 5% | 4 | 10% | 3 | 7% | | | 1 | 3% | 5 | 4% | | | 3 | 7% |
| Lucky | 3 | 1% | | | | | | | | | | | | | 3 | 3% | | | | |
| Mecca | 1 | 0% | 1 | 3% | | | | | | | | | | | 1 | 1% | | | | |
| Old Navy | 1 | 0% | | | | | | | 1 | 2% | | | | | 1 | 1% | | | | |
| Other | 13 | 5% | 1 | 3% | 5 | 12% | 1 | 3% | 2 | 5% | 2 | 5% | 2 | 5% | 4 | 3% | 6 | 8% | 3 | 7% |
| Phat Farm | 3 | 1% | 2 | 5% | | | | | | | | | 1 | 3% | 2 | 2% | 1 | 1% | | |
| Quick Silver | 1 | 0% | | | | | | | | | 1 | 3% | | | | | | | 1 | 2% |
| Rocawear | 6 | 2% | 3 | 8% | | | | | | | 1 | 3% | 2 | 5% | 3 | 3% | 3 | 4% | | |
| Sasson | 1 | 0% | | | | | 1 | 3% | | | | | | | | | 1 | 1% | | |
| Sean John | 5 | 2% | 2 | 5% | 1 | 2% | 1 | 3% | | | 1 | 3% | 1 | 3% | 4 | 3% | 1 | 1% | | |

# Exhibit 8: Brand Identifications

Q5 (A): "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Indigo Red

| | Total | | ATL | | BAL | | CHI | | DAL | | LA | | NY | | 15 - 24 | | 25 - 34 | | 35 - 50 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Sergio Valente | 4 | 2% | | | | | | | | | 2 | 5% | 2 | 5% | | | 3 | 4% | 1 | 2% |
| South Pole | 1 | 0% | 1 | 3% | | | | | | | | | | | 1 | 1% | | | | |
| Tommy Hilfiger | 1 | 0% | | | | | | | 1 | 2% | | | | | | | 1 | 1% | | |
| Vibe | 1 | 0% | | | 1 | 2% | | | | | | | | | 1 | 1% | | | | |
| Walmart | 1 | 0% | | | | | | | 1 | 2% | | | | | 1 | 1% | | | | |
| Webb | 1 | 0% | 1 | 3% | | | | | | | | | | | 1 | 1% | | | | |
| | 254 | 242 | 46 | 40 | 43 | 42 | 40 | 39 | 42 | 42 | 42 | 39 | 41 | 40 | 123 | 118 | 85 | 80 | 46 | 44 |

Respondents could provide more than one brand name. The first total in each column is the total number of brand responses. The second total is the total number of respondents who saw this jean. Thus, 254 brand responses were received from 242 respondents who were shown the Indigo Red jean and asked "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

# Exhibit 8: Brand Identifications

Q5 (B): "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Levi's

| | Total | | ATL | | BAL | | CHI | | DAL | | LA | | NY | | 15 - 24 | | 25 - 34 | | 35 - 50 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Don't Know | 32 | 14% | 7 | 18% | 5 | 13% | 2 | 5% | 9 | 26% | 5 | 12% | 4 | 10% | 15 | 14% | 12 | 14% | 5 | 11% |
| Azzure | 2 | 1% | 2 | 5% | | | | | | | | | | | 2 | 2% | | | | |
| Levi's | 138 | 58% | 28 | 65% | 24 | 60% | 23 | 58% | 14 | 40% | 30 | 73% | 21 | 53% | 51 | 49% | 54 | 61% | 33 | 75% |
| Wranglers | 24 | 10% | 3 | 8% | 3 | 8% | 8 | 20% | 7 | 20% | 2 | 5% | 1 | 3% | 14 | 13% | 8 | 9% | 2 | 5% |
| American Eagle | 1 | 0% | | | | | | | 1 | 3% | | | | | 1 | 1% | | | | |
| Arizona | 1 | 0% | | | | | | | | | | | 1 | 3% | 1 | 1% | | | | |
| Bugle Boy | 1 | 0% | | | | | | | | | | | | | | | 1 | 1% | | |
| Calvin Klein | 3 | 1% | | | 1 | 3% | | | | | | | 2 | 5% | 2 | 2% | 1 | 1% | | |
| Diesel | 1 | 0% | | | | | | | | | | | 1 | 3% | | | 1 | 1% | | |
| DKNY | 1 | 0% | | | | | | | | | | | 1 | 3% | 1 | 1% | | | | |
| Dockers | 1 | 0% | | | | | | | | | | | 1 | 3% | 1 | 1% | | | | |
| Express | 1 | 0% | | | | | 1 | 3% | | | | | | | 1 | 1% | | | | |
| FUBU | 1 | 0% | | | | | | | | | | | | | 1 | 1% | | | | |
| GAP | 7 | 3% | | | 1 | 3% | 1 | 3% | 1 | 3% | 2 | 5% | 2 | 5% | 2 | 2% | 3 | 3% | 2 | 5% |
| Girbaud | 1 | 0% | | | | | 1 | 3% | 1 | 3% | | | | | 1 | 1% | | | | |
| Guess | 2 | 1% | | | | | | | | | | | 1 | 3% | 1 | 1% | 1 | 1% | | |
| JC Penny | 1 | 0% | | | | | | | | | | | | | 1 | 1% | | | | |
| Jordache | 3 | 1% | 1 | 3% | | | | | | | 1 | 2% | 2 | 5% | | | 2 | 2% | 1 | 2% |

# Exhibit 8: Brand Identifications

Q5 (B): "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Levi's

| | Total | | ATL | | BAL | | CHI | | DAL | | LA | | NY | | 15 - 24 | | 25 - 34 | | 35 - 50 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| K-Mart | 1 | 0% | | | 1 | 3% | | | | | | | | | | | 1 | 1% | | |
| Lee | 10 | 4% | | | 3 | 8% | 2 | 5% | | | 2 | 5% | 3 | 8% | 2 | 2% | 8 | 9% | | |
| LEI | 1 | 0% | 1 | 3% | | | | | | | | | | | | | 1 | 1% | | |
| Lucky | 2 | 1% | | | 1 | 3% | | | 1 | 3% | | | | | 2 | 2% | | | | |
| Macy's | 1 | 0% | | | | | | | | | 1 | 2% | | | | | 1 | 1% | | |
| Old Navy | 2 | 1% | 1 | 3% | | | | | | | 1 | 2% | | | 2 | 2% | | | | |
| Other | 10 | 4% | | | 2 | 5% | 6 | 15% | 1 | 3% | 1 | 2% | | | 7 | 7% | 2 | 2% | 1 | 2% |
| Silver Tab | 1 | 0% | | | | | | | | | 1 | 2% | | | 1 | 1% | | | | |
| Tommy Hilfiger | 1 | 0% | | | | | | | | | | | 1 | 3% | 1 | 1% | | | | |
| Vibe | 1 | 0% | | | 1 | 3% | | | | | | | | | 1 | 1% | | | | |
| | 251 | 236 | 41 | 40 | 42 | 40 | 45 | 40 | 39 | 35 | 46 | 41 | 41 | 40 | 111 | 104 | 96 | 88 | 44 | 44 |

Respondents could provide more than one brand name. The first total in each column is the total number of brand responses. The second total is the total number of respondents who saw this jean. Thus, 251 brand responses were received from 235 respondents who were shown the Levi's jean and asked "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

## Exhibit 8:  Brand Identifications

Q1: "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Ecko

| | Total # | Total % | ATL # | ATL % | BAL # | BAL % | CHI # | CHI % | DAL # | DAL % | LA # | LA % | NY # | NY % | 15-24 # | 15-24 % | 25-34 # | 25-34 % | 35-50 # | 35-50 % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Don't Know | 166 | 33% | 33 | 41% | 32 | 39% | 17 | 22% | 28 | 34% | 31 | 39% | 17 | 21% | 58 | 26% | 60 | 36% | 38 | 43% |
| Azzure | 3 | 1% | | | 1 | 1% | 1 | 1% | | | | | 1 | 1% | 1 | 0% | 2 | 1% | | |
| Ecko | 23 | 5% | 3 | 4% | 1 | 1% | 6 | 8% | 6 | 8% | 3 | 4% | 4 | 5% | 16 | 7% | 7 | 4% | | |
| Levi's | 65 | 14% | 12 | 15% | 10 | 12% | 15 | 19% | 12 | 16% | 6 | 8% | 10 | 13% | 25 | 11% | 26 | 15% | 14 | 16% |
| Wranglers | 17 | 4% | 2 | 3% | 2 | 2% | 3 | 4% | 6 | 8% | 1 | 1% | 3 | 4% | 13 | 6% | 2 | 1% | 2 | 2% |
| Akademics | 5 | 1% | 1 | 1% | | | 1 | 1% | | | 1 | 1% | 2 | 3% | 4 | 2% | 1 | 1% | | |
| American Eagle | 1 | 0% | | | | | | | 1 | 1% | | | | | | | | | | |
| Anchor Blue | 2 | 0% | | | | | | | | | 2 | 3% | | | 1 | 0% | 1 | 1% | | |
| Arizona | 2 | 0% | | | | | | | 1 | 1% | | | 1 | 1% | 2 | 1% | | | | |
| Buckle | 1 | 0% | | | | | | | 1 | 1% | | | | | 1 | 0% | | | | |
| Calvin Klein | 17 | 4% | 1 | 1% | 4 | 5% | 4 | 5% | 3 | 4% | 1 | 1% | 4 | 5% | 4 | 2% | 6 | 4% | 7 | 8% |
| Demo | 1 | 0% | | | 1 | 1% | | | | | | | | | 1 | 0% | | | | |
| Dickies | 1 | 0% | | | | | | | | | 1 | 1% | | | | | | | 1 | 1% |
| Diesel | 1 | 0% | | | 1 | 1% | | | | | | | | | | | 1 | 1% | | |
| Dillards | 2 | 0% | | | | | | | 2 | 3% | | | | | 2 | 1% | | | | |
| DKNY | 1 | 0% | | | | | | | | | | | 1 | 1% | | | 1 | 1% | | |
| Dockers | 1 | 0% | | | | | 1 | 1% | 1 | 1% | | | | | 1 | 0% | | | | |
| Enyce | 5 | 1% | 3 | 4% | 1 | 1% | | | | | | | 1 | 1% | 2 | 1% | 3 | 2% | | |
| Express | 3 | 1% | | | 2 | 2% | | | | | | | 1 | 1% | 2 | 1% | 1 | 1% | | |
| FUBU | 29 | 6% | 7 | 9% | | | 7 | 9% | 8 | 10% | 6 | 8% | 1 | 1% | 19 | 9% | 8 | 5% | 2 | 2% |
| GAP | 13 | 3% | 1 | 1% | 2 | 2% | 4 | 5% | | | 3 | 4% | 3 | 4% | 6 | 3% | 4 | 2% | 3 | 3% |
| Girbaud | 1 | 0% | | | | | 1 | 1% | | | | | | | | | 1 | 1% | | |
| Guess | 13 | 3% | 1 | 1% | 2 | 2% | | | 1 | 1% | 6 | 8% | 3 | 4% | 7 | 3% | 4 | 2% | 2 | 2% |
| JC Penny | 2 | 0% | | | | | | | 1 | 1% | 1 | 1% | | | 1 | 0% | | | 1 | 1% |
| Jimmy Jazz | 1 | 0% | | | | | | | | | | | 1 | 1% | 1 | 0% | | | | |
| Jordache | 6 | 1% | | | 1 | 1% | | | 1 | 1% | 1 | 1% | 3 | 4% | 1 | 0% | 3 | 2% | 2 | 2% |
| Lee | 9 | 2% | 2 | 3% | 1 | 1% | 2 | 3% | 1 | 1% | | | 3 | 4% | | | 5 | 3% | 3 | 3% |
| Lee Cooper | 1 | 0% | | | 1 | 1% | | | | | | | | | | | 1 | 1% | | |
| LEI | 1 | 0% | | | 1 | 1% | | | | | | | | | | | 1 | 1% | | |

## Exhibit 8: Brand Identifications

Q1: "What company or companies, if any, do you think manufacture, license or are associated with this Jean?"

Ecko

| | Total # | Total % | ATL # | ATL % | BAL # | BAL % | CHI # | CHI % | DAL # | DAL % | LA # | LA % | NY # | NY % | 15 - 24 # | 15 - 24 % | 25 - 34 # | 25 - 34 % | 35 - 50 # | 35 - 50 % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lucky | 1 | 0% | | | | | | | | | | | | | | | 1 | 1% | | |
| Macy's | 1 | 0% | 1 | 1% | | | | | | | | | | | | | 1 | 1% | | |
| Mecca | 4 | 1% | 1 | 1% | | | | | | | 2 | 3% | | | 4 | 2% | | | | |
| Nautica | 1 | 0% | | | | | | | | | | | 1 | 1% | 1 | 0% | | | | |
| Nordica | 1 | 0% | | | | | | | | | | | 1 | 1% | 1 | 0% | | | | |
| Old Navy | 3 | 1% | | | | | 2 | 3% | 1 | 1% | 1 | 1% | | | 2 | 1% | 1 | 1% | | |
| Other | 26 | 5% | 1 | 1% | 9 | 11% | 9 | 11% | 2 | 3% | | | 4 | 5% | 11 | 5% | 9 | 5% | 6 | 7% |
| Pepe | 2 | 0% | | | | | | | 1 | 1% | 1 | 1% | | | | | 2 | 1% | | |
| Phat Farm | 11 | 2% | 2 | 3% | 1 | 1% | 3 | 4% | 1 | 1% | 2 | 3% | 2 | 3% | 7 | 3% | 4 | 2% | | |
| Polo | 8 | 2% | 1 | 1% | 1 | 1% | 2 | 3% | 1 | 1% | 1 | 1% | 2 | 3% | 6 | 3% | 2 | 1% | | |
| Ralph Lauren | 6 | 1% | 1 | 1% | | | 2 | 3% | 1 | 1% | | | 2 | 3% | 5 | 2% | 1 | 1% | | |
| Rocawear | 13 | 3% | 4 | 5% | 1 | 1% | | | | | 4 | 5% | 4 | 5% | 9 | 4% | 3 | 2% | 1 | 1% |
| Rustlers | 2 | 0% | | | 1 | 1% | | | | | | | 1 | 1% | 1 | 0% | | | 1 | 1% |
| Sean John | 20 | 4% | 4 | 5% | 4 | 5% | 1 | 1% | 2 | 3% | 5 | 6% | 4 | 5% | 11 | 5% | 5 | 3% | 4 | 5% |
| Silver Tab | 1 | 0% | | | 1 | 1% | | | | | | | | | | | 1 | 1% | | |
| South Pole | 3 | 1% | | | | | | | | | 3 | 4% | | | 1 | 0% | 2 | 1% | | |
| Timberland | 3 | 1% | 1 | 1% | | | | | | | 1 | 1% | 1 | 1% | 2 | 1% | | | 1 | 1% |
| Tommy Hilfiger | 4 | 1% | | | 1 | 1% | 1 | 1% | | | 1 | 1% | 1 | 1% | | | 1 | 1% | 3 | 3% |
| Union Bay | 2 | 0% | | | 1 | 1% | 1 | 1% | | | | | | | | | 2 | 1% | | |
| Walmart | 3 | 1% | 1 | 1% | | | | | | | 1 | 1% | | | | | 2 | 1% | 1 | 1% |
| Webb | 2 | 0% | 1 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | | | | | 2 | 1% | | | | |
| | 500 | 478 | 84 | 80 | 85 | 82 | 84 | 79 | 81 | 77 | 85 | 80 | 81 | 80 | 233 | 222 | 175 | 168 | 92 | 88 |
| | | | | | | | | | | | | | | | | 46% | | 35% | | 18% |

Respondents could provide more than one brand name. The first total in each column is the total number of brand responses. The second total is the total number of respondents who saw this jean. Thus, 500 brand responses were received from 478 respondents who were shown the Ecko jean and asked "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

## Exhibit 8: Brand Identifications

Q3: "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Azure

| | Total # | Total % | ATL # | ATL % | BAL # | BAL % | CHI # | CHI % | DAL # | DAL % | LA # | LA % | NY # | NY % | 15-24 # | 15-24 % | 25-34 # | 25-34 % | 35-50 # | 35-50 % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Don't Know | 168 | 33% | 34 | 43% | 31 | 38% | 16 | 20% | 36 | 45% | 23 | 29% | 19 | 24% | 66 | 30% | 55 | 33% | 37 | 42% |
| Azure | 20 | 4% | 5 | 6% | 2 | 2% | 3 | 4% | | | 3 | 4% | 7 | 9% | 11 | 5% | 8 | 5% | 1 | 1% |
| Ecko | 7 | 1% | | | | | 4 | 5% | 2 | 3% | | | 1 | 1% | 5 | 2% | 2 | 1% | | |
| Levi's | 77 | 16% | 10 | 13% | 13 | 16% | 13 | 16% | 7 | 9% | 19 | 24% | 15 | 19% | 26 | 12% | 33 | 20% | 18 | 20% |
| Wranglers | 18 | 4% | | | 5 | 6% | 8 | 10% | 1 | 1% | 2 | 3% | 2 | 3% | 7 | 3% | 8 | 5% | 3 | 3% |
| Akademics | 1 | 0% | | | | | | | | | | | 1 | 1% | 1 | 0% | | | | |
| American Eagle | 1 | 0% | | | | | | | | | | | | | 1 | 0% | | | | |
| Anchor Blue | 4 | 1% | | | | | | | 1 | 1% | 3 | 4% | | | 3 | 1% | | | 1 | 1% |
| Arizona | 3 | 1% | | | | | | 1% | 1 | 1% | 1 | 1% | 1 | 1% | 2 | 1% | | | 1 | 1% |
| Buckle | 1 | 0% | | | | | | | | 1% | | | | | | | | | | |
| Bugle Boy | 4 | 1% | | | | | 3 | 4% | 1 | 1% | | | | | | | 4 | 2% | | |
| Calvin Klein | 17 | 4% | 3 | 4% | 1 | 1% | 7 | 9% | | | 5 | 6% | 1 | 1% | 5 | 2% | 5 | 3% | 7 | 8% |
| Demo | 4 | 1% | | | 2 | 2% | | | | | 2 | 3% | | | 3 | 1% | 1 | 1% | | |
| Dickies | 2 | 0% | | | | | | | 1 | 1% | 1 | 1% | | | 2 | 1% | | | | |
| Diesel | 2 | 0% | | | 1 | 1% | | | | | 1 | 1% | | | 1 | 0% | 1 | 1% | | |
| Dillards | 1 | 0% | | | | | | | 1 | 1% | | | | | 1 | 0% | | | | |
| DKNY | 4 | 1% | 1 | 1% | | | | | 1 | 1% | 1 | 1% | 1 | 1% | 3 | 1% | 1 | 1% | | |
| Enyce | 9 | 2% | 3 | 4% | | | 3 | 4% | 1 | 1% | 2 | 3% | 1 | 1% | 7 | 3% | 2 | 1% | | |
| Express | 2 | 0% | | | | | | | 1 | 1% | | | 1 | 1% | 2 | 1% | 1 | 1% | | |
| Foley's | 2 | 0% | | | | | | | 2 | 3% | | | | | | 1% | | | | |
| FUBU | 9 | 2% | | | | | 4 | 5% | 2 | 4% | 4 | 5% | 2 | 3% | 6 | 3% | 3 | 2% | | |
| GAP | 15 | 3% | 2 | 3% | | | 3 | 4% | 3 | 4% | 4 | 5% | 3 | 4% | 8 | 4% | 5 | 3% | 2 | 2% |
| Girbaud | 1 | 0% | | | | | | | | | 1 | 1% | | | | | 1 | 1% | | |
| Guess | 7 | 1% | 1 | 1% | | | 1 | 1% | 1 | 1% | 1 | 1% | 3 | 4% | 3 | 1% | 2 | 1% | 2 | 2% |
| Indigo Red | 1 | 0% | | | | | | | | | | | 1 | 1% | | | 1 | 1% | | |
| JC Penny | 2 | 0% | 1 | 1% | 1 | 1% | | | | | | | | | 1 | 0% | 1 | 1% | | |
| Jordache | 6 | 1% | 2 | 3% | 2 | 2% | | | | | | | 2 | 3% | | | 4 | 2% | 2 | 2% |
| K-Mart | 1 | 0% | | | | | | | | | 1 | 1% | | | | | 1 | 1% | | |
| Lee | 7 | 1% | 1 | 1% | 3 | 4% | 1 | 1% | | | | | 2 | 3% | 3 | 1% | | | 4 | 5% |
| Lee Cooper | 1 | 0% | | | 1 | 1% | | | | | | | | | | | 1 | 1% | | |
| LEI | 3 | 1% | 1 | 1% | | | | | 1 | 1% | 1 | 1% | | | 1 | 0% | | | 2 | 2% |

**Exhibit 8: Brand Identifications**

Q3: "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

Azzure

| | Total # | Total % | ATL # | ATL % | BAL # | BAL % | CHI # | CHI % | DAL # | DAL % | LA # | LA % | NY # | NY % | 15-24 # | 15-24 % | 25-34 # | 25-34 % | 35-50 # | 35-50 % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lucky | 5 | 1% | | | | | | | 4 | 5% | 1 | 1% | | | 2 | 1% | 3 | 2% | | |
| Macy's | 1 | 0% | 1 | 1% | | | | | | | | | | | | | 1 | 1% | | |
| Mecca | 3 | 1% | 2 | 3% | 1 | 1% | | | | | | | | | 3 | 1% | 1 | 1% | | |
| Nautica | 1 | 0% | | | 1 | 1% | | | | | | | | | | | 1 | 1% | | |
| Old Navy | 2 | 0% | | | | | | | 1 | 1% | | | 1 | 1% | 2 | 1% | | | | |
| Other | 32 | 7% | 2 | 3% | 10 | 12% | 9 | 11% | 3 | 4% | 4 | 5% | 4 | 5% | 14 | 6% | 11 | 7% | 7 | 8% |
| Pepe | 1 | 0% | | | | | | | | | | | 1 | 1% | | | | | 1 | 1% |
| Phat Farm | 3 | 1% | 1 | 1% | | | 2 | 3% | | | | | | | 1 | 0% | 2 | 1% | | |
| Polo | 7 | 1% | | | 1 | 1% | | | | | | | 5 | 6% | 6 | 3% | 1 | 1% | 1 | 1% |
| Quick Silver | 3 | 1% | | | 1 | 1% | 1 | 1% | | | | | | | 1 | 0% | 2 | 1% | 2 | 2% |
| Ralph Lauren | 4 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | | | 3 | 1% | 1 | 1% | | |
| Rocawear | 10 | 2% | 3 | 4% | 1 | 1% | 2 | 3% | 1 | 1% | 2 | 3% | 1 | 1% | 6 | 3% | 4 | 2% | 1 | 1% |
| Route 66 | 1 | 0% | | | | | | | | | 1 | 1% | | | | | | | 1 | 1% |
| Sasson | 2 | 0% | | | 1 | 1% | | | | | | | 1 | 1% | | | 1 | 1% | 1 | 1% |
| Sean John | 16 | 3% | 4 | 5% | 3 | 4% | 3 | 4% | | | 2 | 3% | 3 | 4% | 11 | 5% | 2 | 1% | 2 | 2% |
| Sergio Valente | 3 | 1% | | | 1 | 1% | | | | | 1 | 1% | 1 | 1% | | | 2 | 1% | 1 | 1% |
| Seven | 1 | 0% | | | | | | | | | | | 1 | 1% | 1 | 0% | | | | |
| Silver Tab | 10 | 2% | | | 3 | 4% | | | 5 | 6% | 2 | 3% | | | 9 | 4% | 1 | 1% | | |
| South Pole | 7 | 1% | 1 | 1% | 1 | 1% | 1 | 1% | 2 | 3% | 1 | 1% | 1 | 1% | 5 | 2% | 2 | 1% | | |
| Tommy Hilfiger | 1 | 0% | 1 | 1% | | | | | | | | | | | | | 1 | 1% | | |
| Vibe | 3 | 1% | 1 | 1% | 2 | 2% | | | | | | | | | 3 | 1% | | | | |
| Walmart | 1 | 0% | | | | | | | 1 | 1% | | | | | 1 | 0% | | | | |
| | 506 | 478 | 81 | 80 | 89 | 82 | 86 | 79 | 82 | 77 | 86 | 80 | 82 | 80 | 238 | 222 | 175 | 168 | 93 | 88 |

Respondents could provide more than one brand name. The first total in each column is the total number of brand responses. The second total is the total number of respondents who saw this jean. Thus, 506 brand responses were received from 478 respondents who were shown the Azzure jean and asked "What company or companies, if any, do you think manufacture, license or are associated with this jean?"

**Exhibit B**

# REBUTTAL REPORT OF

# PROFESSOR CAROL A. SCOTT

## February 25, 2005

## I.    QUALIFICATIONS

I am a Professor of Marketing at the Anderson Graduate School of Management of the University of California at Los Angeles. I have a B.S. degree in business and history education from the University of Texas at Austin, an M.S. degree in Management from Northwestern University, and a Ph.D. from Northwestern University in marketing and social psychology. I served variously as the Chairman of the Faculty, Associate Dean, and Assistant Dean of the Anderson Graduate School of Management from 1985 through 1994, and I currently am the faculty director of the Anderson School Executive Program. I also have published numerous journal articles, research reports and book chapters on marketing issues. I have, over the past 15 years, served as a consultant or expert witness on marketing issues, including cases involving intellectual property. My curriculum vitae is attached as Exhibit 1. I have served on the editorial boards of the *Journal of Marketing Research*, the *Journal of Marketing*, and the *Journal of Consumer Research*. I have been a member of the board of directors for Sizzler International and A-Fem Medical Corporation, Inc., and currently am a member of the board of directors of United Online.

I have been retained by Townsend and Townsend and Crew as an independent expert witness to testify on behalf of LS&CO ("Plaintiff").

## II.    THE ISSUES FOR WHICH I WILL GIVE AN OPINION

I have been asked by counsel for Plaintiff to review a report submitted by Mr. Walter McCullough[1] ("McCullough Report") on behalf of defendant Indigo Red.

---

[1] McCullough, Walter, "Report on a Test of Post-Sales Source Confusion For RP55 Jeans," December 2004.

**REBUTTAL REPORT OF PROF. CAROL A. SCOTT**                                    **2**

### III. SUMMARY OF OPINIONS

Having reviewed and analyzed Mr. McCullough's report, it is my opinion that the consumer study which he conducted does not provide a fair test of the likelihood that the stitching on the Indigo Red jeans at issue in this case would cause consumers to incorrectly identify the Indigo Red jeans as being manufactured, licensed by, or associated with Levi's® jeans. The findings of this survey provide no reliable evidence regarding this issue.

My conclusions are based upon data that is available to me at this time. I am continuing my review and analysis. I may refine or expand my opinions as further information and materials come to my attention, and I reserve the right to supplement this report to the extent that additional information becomes available which may affect my opinions. In particular, I understand that a transcript of Mr. McCullough's deposition in this case will be made available for my review.

### IV.    STATEMENT OF OPINIONS AND BASES FOR OPINIONS

**A.    The study conducted by Mr. McCullough does not provide a test of confusion caused by the stitching at issue.**

There are numerous indications that the survey conducted by Mr. McCullough incorrectly addresses the issue of confusion caused by the pocket stitching. In particular, I have identified the following issues with Mr. McCullough's survey:

1. Mr. McCullough's survey does not represent a typical post-sale environment.

In Mr. McCullough's survey, participants are first shown three pieces of apparel (i.e., a pair of socks, a t-shirt, and a pair of either Indigo Red or Calvin Klein jeans) and asked to examine each item as if they "saw someone wearing it and were deciding whether to buy it."[2] Participants were allowed to pick up the garments and to examine them in any way they wished. In a typical post-sale environment where a consumer sees someone else wearing a pair of jeans, however, it is highly unlikely that he/she could pick the product up, examine it inside and out, touch and feel it, etc. A more typical post-sale environment is one in which a person observes someone else wearing a pair of jeans at some distance, with no opportunity to examine them in such detail.

In Mr. McCullough's survey, allowing the participants to pick up the jeans and handle them potentially exposed the participants to many more cues as to the identity of the product than would be the case in a typical post-sale environment. Specifically, one could, for example, read brand names written prominently on the product and other logo identifiers, see that the Indigo Red jeans had a bright red lining of the waistline and/or pockets, examine the leather patches on the back waistline with different designs on them, and the like. In this context, the stitching on the back pocket of the jeans may be overwhelmed by these other vivid cues that ordinarily might be hidden from a casual observer's view. Indeed, the presence of these other cues may have been enough for the respondent to decide if he/she wanted to buy them or not (e.g., "I always/never buy Indigo Red jeans"); pocket stitching may or may not have been attended to at all.

      2. Mr. McCullough's survey does not take into account the role of the
          other brand identifiers that were present on the jeans.

---

[2] McCullough report, p. 8.

In Mr. McCullough's survey, all of the regular brand identifying marks were left on the jeans, including brand names, patches, tabs, and the like. The results of his study, therefore, may be due to these other cues, and not to the pocket stitching itself. When deciding whether one pair of jeans is related to another pair, consumers may simply look at the most obvious cue, e.g., a largely written brand name, and scarcely attend to others. The fact that a largely written brand name may take precedence over other cues such as pocket stitching does not mean that the stitching, when viewed without these other cues, would be not confusing or result in misidentification of the products.

In addition, participants may have used the pocket stitching in combination with other cues. That is, participants may have thought that the Indigo Red pocket stitching looked like stitching usually found on Levi's®, but then saw the Indigo Red brand name and the absence of Levi's® traditional leather patch. Because the Indigo Red jeans had different versions of the other traditional indicators of Levi's®, these respondents may have answered "No", or "I don't know" to the subsequent questions asking whether the Levi's® jeans were the same jeans or made by the same company, associated with the first jeans, or whether the first jeans manufacturer had permission from the second jeans manufacturer, even though they were confused by the pocket stitching.

Ruling out the influence of these other brand identifiers is particularly important because they are often unobservable in a typical post-sale environment. Men often wear a belt, for example, obscuring the writing on the leather patch. Jeans may be observed at a distance which makes reading any brand name difficult. Instead, what the casual observer may see is a brief glance at the stitching on the back pockets.

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                                5

Finally, brand dilution may occur even if consumers saw an exact copy of Levi's®
back pocket stitching on another brand, but because of a prominently placed brand name
or logo, correctly identified it as not being Levi's®. In this case, the unique association of
the pocket stitching with the Levi's® brand would be destroyed. For this reason, it is
important to isolate the effect of the pocket stitching apart from other brand identifiers.

It is unclear why the brand identifiers were left on all of the brands of jeans tested.
The tags on the t-shirts that would identify the brands were either cut away or taped over
so that respondents could not see them. The socks had no tags that would identify their
source, but instead were almost identical white athletic crew socks, with different logos
on the two different brands the only cue as to their brand identity. In contrast, all brand
identifiers were left intact on the pairs of jeans.

>    3. The procedures of Mr. McCullough's survey are designed to test
>       participants' memories rather than their confusion.

In Mr. McCullough's survey, participants are first shown three products – a pair
of socks, a t-shirt, and a pair of jeans. They are not told that any of the products is of
particular interest. In this study, the jeans in this first display are always a pair of Indigo
Red jeans or Indigo Red shorts. Once participants examined all three products, which
presumably were presented in some way to allow for simultaneous viewing, they were all
removed from sight. Next, participants were asked a series of three possible questions
about socks and three possible questions about the t-shirts before they were shown a
second Levi's® pair of jeans. As Mr. McCullough states, "the tee shirt and crew socks

added some time between the respondents' examination of the test or control jeans"[3] and

the presentation of the Levi's® jeans. Only after these two series of questions is the

participant shown the Levi's® pair of jeans and asked a series of three questions about its

relationship to the first pair of jeans shown. By this time, it is unclear what the

participants might remember about the first pair of jeans. The questions about the socks

and the t-shirts may act as a memory clearing device, interfering with recollection of all

but the most intrusive characteristics of the first pair of jeans. If respondents cannot

remember the first jean they saw and/or its pocket stitching, then it is understandable that

few respondents answered affirmatively the questions regarding a relationship between

the first and second jeans shown. Again, an "I don't know" response could be an

indicator of confusion.

> 4.  It is unclear whether the participants in Mr. McCullough's survey
>     saw the pocket stitching on the rear pockets of the Levi's® jeans or
>     not.

According to the instructions given to the interviewers, the Levi's® jeans were to

be handed to the respondent "back first." How this was to be done exactly was not

specified. Interviewers could have handed the jeans to the respondent in a variety of

ways, not all of which would have provided a clear view of the rear pocket stitching. In

addition, the most logical thing for a respondent to do when asked whether these jeans are

the same as the first pair they saw is to turn them around to the front to look at them.

This may be particularly true when the earlier context has been set as "deciding whether

to buy them." The lack of control in the procedure and stimuli shown to respondents in

---

[3] McCullough report, p. 7.

Mr. McCullough's survey makes it difficult at best to attribute the findings to respondents' perceptions of the rear pocket stitching.

   **B. The product stimuli used by Mr. McCullough are likely to have biased the results and insured that respondents would not perceive the two pairs of jeans they saw as related.**

   The Indigo Red shorts and jeans that were compared with the Levi's® jeans exhibited differences on almost all relevant dimensions except pocket stitching. In fact, one pair of Indigo Red "jeans", i.e., the Roland jeans, was a pair of shorts. It is not clear what a participant would think, then, when asked if the Levi's® jeans were the same as the "jeans" he/she saw first. Such a question is likely to prompt the respondent to answer with a "no" in response to the compound question of whether the "jeans you saw earlier are the same as *these* jeans, or are put out by the same company as *these* jeans."[4]

   Both the "Roland" and the "Stanley" versions of the Indigo Red jeans had the brand name visible in several different places, including on a leather patch on the back at the waistline. They had a bright red lining on the inside of the waistband, and they had a different "wash" or color finish than the Levi'® jeans. Given that the brand names were readily apparent and that another traditional Levi's® brand identifier (e.g., the leather patch with the Levi's® name) was clearly different from those on the Indigo Red products, it is surprising that any level of confusion was evident at all.

   Finally, since the Indigo Red jeans obviously were not "the same" as the Levi's® ones, the questions about other relationships between the two become questions of

---

[4] McCullough report, p. M5, bolding added.

**REBUTTAL REPORT OF PROF. CAROL A. SCOTT**       **8**

whether the respondent thinks the two *companies* have any relationship rather than the jeans themselves. That is, the respondent may think that the pocket stitching on the two jeans shown are very similar, but he/she might know that Indigo Red is not a subsidiary of Levi's®, they may believe that two different brands must be made by, or in, different manufacturing plants, etc. Indeed, the survey questions are phrased specifically about the companies, and not about the jeans.[5]

In contrast to the "test" Indigo Red jeans, the "control" Calvin Klein jeans were as similar as possible to the Levi's® jeans. These jeans were full length, as were the Levi's® jeans, and they had a similar color or "wash". Further, it is my understanding that they had a pocket stitching design that Levi's® itself has used on jeans it has offered in the marketplace. These factors alone may result in a higher than typical degree of confusion regarding the relationship between the Calvin Klein and the Levi's® jeans, despite the fact that the Calvin Klein brand name was shown on a small leather patch at the waist on the back of the jeans and on tags inside the waistband.

By showing Indigo Red jeans/shorts that were maximally different from Levi's® and "control" Calvin Klein brand jeans that were maximally similar to Levi's®, it is no wonder that the difference in responses between the Indigo Red products and the "control" products was relatively small.

---

[2] For example, question 5c states: Please tell me whether or not you believe that the company that puts out the jeans you saw earlier is in some way affiliated with or connected with the company that puts out *these* jeans?", McCullough report, December 2004, p. M5.

**C. The quality of the data presented by Mr. McCullough is inherently unreliable because of insufficient training, supervising, and instructing of interviewers.**

The data that Mr. McCullough presents is inherently unreliable because of a failure to adequately train and supervise the interviewers who conducted the study.

1. The training of supervisors was done only through written instructions, and the training of interviewers, in turn, was done by the field company supervisors. Neither Mr. McCullough nor any of his representatives provided any personal instruction or training.

As noted in the McCullough report, the design of this study was fairly complicated, with eight different products (two t-shirts, two pairs of socks, and four pairs of jeans) and 36 versions of the questionnaire to accommodate a rotation of the products to be shown and the order in which they were presented. Written instructions were sent to each interviewing facility regarding how to conduct the interviews, but neither Mr. McCullough nor any of his representatives were present to insure that all supervisors and interviewers were properly trained in how to implement the survey. Thus, there can be no assurance that the instructions were followed as they were intended.

For example, instructions to interviewers state that the initial garment display must be such that the jeans were completely unfolded, zipped, buttoned, and with the back of the jeans facing the respondent. The interviewer is to "arrange the garments to use for Q.1 in front of the respondents as indicated by the main questionnaire."[6] The main questionnaire, however, says only to "arrange the garments to use for Q.1 in front of

---

[6] McCullough report, Interviewer Instructions, p. 3

**REBUTTAL REPORT OF PROF. CAROL A. SCOTT**                                    10

the respondent as shown below."[7]    The only additional information "shown below" is the
number of the specific garments to be shown and where each should be placed, from the
left to the right-hand side of the respondent.    This leaves open a number of possibilities
of how the garments were actually displayed.    Were they already laid out upon the table
when the respondent entered the interviewing room?    Were they selected out of a box,
one at a time, after the respondent entered the room?    How did the interviewer find the
specific product to be displayed, i.e., did they pull out several garments before they came
to the correct one, was the respondent aware that the interviewer was searching through
other garments, etc.?    With several different interviewers at each of 12 research sites, it is
almost certain that, in the absence of personal, specific training, there was no consistent
presentation of the garments.

Presentation of the Levi's® jeans is similarly ambiguous.    For Q.5a, in which the
respondent is asked to examine the Levi's® jeans, the interviewer is directed to hand the
jeans to the respondent with the back of the jeans facing the respondent.[8]    It is unclear
which of many ways of presenting the product were used.    For example, the interviewer
could have handed the jeans to the respondent using one hand on the waist of the jeans, in
which case they may have been folded over such that the pocket stitching was less
visible.    Or, they may have held them up with both hands such that the entire back side of
the jeans was visible.    With no personal and specific training, this crucial part of the study
was left up to the interpretation of many different interviewers.

---

[7] McCullough report, Version 2 Clothing Survey Main Questionnaire, p. M1.
[8] McCullough report, Interviewer Instructions, p. 3.

2.  The questioning procedure was unclear and thus subject to interviewer

discretion and interpretation.

In several key instances, the instructions to the interviewers as they worked

through the survey were unclear.  For example, for question 3a, the interviewer is to say,

"Now, here's the first product. Please tell me whether or not you believe that the tee shirt

you saw earlier is the same one, or is put out by the same company, as *this* tee shirt?"

Directly below the question four possible answers are written out, including words in

italics as was done in the question itself, e.g., "Yes, I believe that the tee shirt I saw

earlier is the same one, or is put out by the same company, as *this* tee shirt."  The

specificity of the possible answers and the italics for emphasis suggest that the

interviewer would read the answers to the respondent, but there are no specific

instructions whether to do so or not.  Thus, some interviewers may have read these

answers and some may not.  Since no one from Mr. McCullough's organization trained or

observed the interviewers, there was no way to know about this potential confusion, no

way to train the interviewers regarding the potential bias that might result from different

intonations and emphases placed on words, etc.

3.  The quality of the interviewers conducting the study is uncertain.

The quality of interviewers at mall research facilities varies greatly.  Some

interviewers are very quick to understand what is asked of them, some establish good

rapport with respondents, and some mispronounce sentences, are not quick to pick up on

problems, etc.  Neither Mr. McCullough nor anyone on his staff directly observed any of

the interviewers, and thus cannot state with certainty that the interviews were done

correctly. The interviewers were required to fill out a practice survey, but this is not a
substitute for knowing exactly how the interviewer is performing his/her job.

In addition, in my experience doing mall surveys it has sometimes been the case
that interviewers may be rotated around various assignments in the facilities. Due to
illness, staff shortages, tight deadlines, or other reasons, interviewers may be pulled on
short notice to work on a particular assignment. In these situations, the supervisors may
or may not take the time to train the interviewer or observe them. For this reason, I insist
that only interviewers who have been trained by me or my associates conduct my
surveys.

A review of the 624 questionnaires and screens from Mr. McCullough's
survey shows a high number of inaccuracies. Examples of these problems include 32
questionnaires with blank questions (questions not asked or unanswered) or with
incorrect questions asked, and 4 respondents who should have been disqualified because
they did not answer screen questions appropriately. Further, interviewers were asked to
note specific times for the screen's completion, the start of the questionnaire, and the
conclusion of the questionnaire. In a random sample of 100 questionnaires, ten percent
were found to have irregularities and inconsistencies in the times noted. Some stated that
the questionnaire was completed before the screen. Another stated that the questionnaire
was completed before it began. Finally, when asked why he/she thought that the maker
of the second pair of jeans has permission from the company that puts out the first jeans,
respondent #841 stated "Because Levi would sew I-Red if I-Red didn't have permission."
This respondent, however, was in the 'control' cell, and should not have seen any Indigo
Red products. His/her response seems to suggest that the interviewer may have

**REBUTTAL REPORT OF PROF. CAROL A. SCOTT**                                    13

incorrectly shown the Indigo Red jean instead of the control Calvin Klein jean. Clearly,

the interviewers required greater supervision and instruction to conduct the survey

properly.

### D. The conclusions drawn from the survey data are not consistent with the data.

Mr. McCullough concludes that "net" level of post-sale confusion between the

RP55 "Roland" jeans (shorts) and the Levi's® jeans is only 3%, and that the "net" level of

confusion between the RP55 "Stanley" jeans was zero. These conclusions are not

warranted based upon the data presented because the "net" methodology is flawed, the

control jeans used in its calculation were inappropriate, and because Mr. McCullough has

used an inappropriate and narrow measure of confusion.

> 1. Mr. McCullough does not count respondents who incorrectly identified the first jeans they saw as Levi's® in his tally of confused respondents.

Mr. McCullough counts as "confused" only those respondents who said stated

that there was some association between the Indigo Red jeans and the Levi's® jeans (i.e.,

the same jeans or put out by the same company, the companies were affiliated in some

way, or the first company had permission from the second company) AND gave a reason

for their response that made explicit reference to the design or stitching or tag on the back

pockets.[9] By this standard, only 11 respondents who viewed the Indigo Red Roland

---

[9] McCullough report, p. 10.

**REBUTTAL REPORT OF PROF. CAROL A. SCOTT**                                            14

jeans/shorts, and only 5 respondents who saw the Indigo Red Stanley jeans were confused.

Several other respondents, however, gave reasons that indicate they could have been influenced by the pocket stitching. For example, respondent 521 answered "yes" to the question of whether the jeans were the same or put out by the same company. This person's "reason" was "They are put out by the same company, but weren't the same jeans." This is a logical answer to the question of why a person answered "yes" to the compound question, and it is entirely possible that the respondent thought they were put out by the same company because of the similar pocket stitching. Without a follow up question from the interviewer, the answer was left incomplete for purposes of this litigation.

Similarly, several respondents answered "yes" to the question of whether the first jean (i.e., Indigo Red) had permission from the second company (i.e., Levi's®), but were not counted as being confused. Several of these answers are illustrative of the narrowness of Mr. McCullough's definition of confusion:

    #150: "Because they need permission because there are copyright laws"

    #383   "The people who made the pants would sue whoever put the sign on the pants if they didn't have permission"

    #165: "If they use their product, they have to have permission to use it."

    #256: "They can't use their logo."

None of these respondents was included in Mr. McCullough's count of "confused" consumers. While it is true that none of the respondents spontaneously and explicitly

used words such a pocket stitching or pocket design, it is entirely possible that the pocket
stitching played a role in their answer.

    2.   In this survey, a "Don't Know" response is ambiguous and may

         indicate confusion on the part of the respondent, perhaps due to the

         pocket stitching.

    In this survey respondents were asked various questions about the relationship

between two pairs of jeans and/or two companies that manufacture jeans.  In this

situation, a "don't know" response may indicate confusion, i.e., "I don't know whether

there is a relationship or not", but Mr. McCullough does not acknowledge this possibility

in his findings.  For example, a respondent may see that one pair of jeans is the Indigo

Red brand and has different versions of Levi's® traditional brand identifiers such as the

leather patch, while the other jean is the Levi's® brand with its typical brand identifiers.

Thus, they appear to be different brands, but the person may also perceive that they share

the same or similar stitching on the back pocket.  Because this pocket stitching design is

so closely associated with the Levi's® brand, the respondent then becomes confused as to

the relationship.  The respondent doesn't know that there is a relationship between Indigo

Red and Levi's®, but he/she doesn't know that there isn't, either.  Unfortunately, these

respondents were not asked why they didn't know, i.e., the source of their confusion.[10]

---

[10] In contrast, in a survey I conducted, a "don't know" response is an unambiguous
indicator that the respondent cannot identify the Indigo Red jeans as Levi's® based on the
picture they were shown which included a clear view of the pocket stitching.  This type
of question is a very conservative approach to confusion in that it asks for more than
simply a judgment of similarity of one pocket stitching to another.  A respondent may
perceive the two designs to be very similar, and in fact, almost identical, but he/she may
be one of the people in the sample who cannot connect the design to Levi's.®

3. The "net" methodology, and the particular control jean used to
calculate a "net" confusion score, is flawed.

Mr. McCullough arrives at a "net" confusion level in two steps. First, he
calculates the number of participants who saw the Indigo Red "Roland" jeans/shorts, the
Indigo Red "Stanley" jeans, and the Calvin Klein jeans, and who answered "yes" to any
of the questions regarding a relationship between these jeans and the Levi'® jeans (or the
two companies) AND who mentioned a reason for their answer that explicitly made
reference to "the design or stitching or tag" on the back pockets.[11] Next, he subtracts the
percentage obtained for the control, Calvin Klein jeans from the percentage obtained for
each Indigo Red product. This "net" figure is, therefore, claimed to be the "true" level of
confusion "net" of any noise or general confusion in the marketplace.

This procedure is invalid for a number of reasons. First, it is highly dependent
upon the particular jeans that are chosen for "control" purposes. Mr. McCullough
provides no rationale in his report as to why he selected this particular pair of Calvin
Klein jeans as his control. However, I note that these jeans are very similar to the
Levi's® jeans in color and style. In addition, it is my understanding that they use a pocket
stitching design that Levi's® has used before. Thus, Mr. McCullough's "control" level of
confusion is arbitrary at best, and may be highly inflated. A different "net" confusion
level could be obtained simply by selecting a different "control" jean.

Second, a simple subtraction does not take into account any potential sampling
error. That is, it does not take into account the statistical probability that the proportions
for the populations represented by the subsamples of the survey (i.e., the "Roland"

---

[11] McCullough report, p. 10.

participants, the "Stanley" participants, and the Calvin Klein participants) are the same or different from each other.

Third, this procedure assumes that all of the affirmative responses for the "control" jeans represent "noise" in the environment, or a benchmark for general confusion that exists apart from any particular brand identifier. It is important, however, to carefully define what is meant by noise. Because Levi's® is such a well known brand and may even be considered synonymous with the jeans category, it is possible that a respondent might think that any blue jean is a "levi's" product (small case intended). It is this type of indiscriminate confusion that should be considered "noise" and that should be accounted for in analyzing the results of any confusion survey. This is different, however, from real confusion that might exist between Levi's® and brands other than those of interest in this particular litigation. That is, a respondent may see the pocket stitching on another brand of jeans and genuinely believe that this is the type used by Levi's®. Similarity of one pocket stitching design to another is likely to be a matter of degree rather than a yes/no phenomenon. The fact that there are other jeans on the market that are also confusing to some extent to some consumers should not offset or negate the confusion caused by the pocket stitching on the back pocket of the Indigo Red jeans.

Ironically, Mr. McCullough seeks to exclude precisely those control jeans responses that are likely to indicate true confusion due to pocket stitching. That is, he subtracts from the Indigo Red responses all of the response from those who saw Calvin Klein jeans and thought they had some relationship to the Levi's® jeans specifically because of the pocket stitching.

**REBUTTAL REPORT OF PROF. CAROL A. SCOTT**                                    18

E.  **The survey methods, procedures, and questions are flawed and do not provide a fair test of the likelihood consumers would be confused by the Indigo Red pocket stitching.**

The method in which Mr. McCullough's survey was conducted and the questions that were asked are likely to have been biased against finding any confusion between the Indigo Red and Levi's® jeans.

1.  Intervening tasks are presented between the time of exposure to the first and second jeans that were likely to bias the answers to questions regarding the relationship between the first and second pairs of jeans shown.

In Mr. McCullough's survey, respondents are asked a series of questions about t-shirts and socks before they are asked questions about the possible relationship between the first and second pair of jeans shown. That is, after being shown a pair of socks, a t-shirt, and a pair of either Indigo Red or Calvin Klein jeans, the respondents were shown a second pair of socks and asked questions about its relationship to the first pair; a second t-shirt and asked questions about its relationship to the first one shown; and then finally, a pair of Levi'® jeans and asked about its relationship to the first jeans shown. Mr. McCullough states that the questions about socks and t-shirts 'trained' respondents about the types of questions asked. Unfortunately, this 'training' was very likely to bias the respondents' answers to the final series of questions about jeans.

In Mr. McCullough's survey design, the second pair of socks and the second t-shirt could be the same as the first one shown or different. It appears from an analysis of the data submitted that each respondent saw the same (different) socks and the different

REBUTTAL REPORT OF PROF. CAROL A. SCOTT                                      19

(same) t-shirts, such that each respondent saw an example of 'same' products and 'different' products. When the products were the same, however, they actually were the exact same pair of socks or the exact same t-shirt, complete with the same identifying number tag and whatever dirt, stains, or other marks they had acquired through their use in the survey. Thus, respondents would be 'trained' that, in this survey, 'same' means the exact same item. When viewing the Indigo Red jeans or the Calvin Klein jeans and then the Levi's® jeans, these would obviously not be the 'same' jeans in the way that the socks or the t-shirts had been the 'same'.

      2.  Potential bias was created by not rotating the order of presentation of the Indigo Red, Calvin Klein, and Levi's® jeans.

In Mr. McCullough's survey, the first jeans that the respondents saw was always either Indigo Red or Calvin Klein. The Levi's® jeans always appeared second. Given the effort that was made to vary the order and placement of the three products presented first, and the order of the second socks and t-shirts, it is unclear why the order of presentation of the jeans brands would not also be varied. And, given that Levi's® is much more widely distributed and sold than Indigo Red, it seems likely that in most typical situations, the consumer will first see the Levi's® jeans, and then only later, if at all, see the Indigo Red product. Presenting Levi's® second always makes the Indigo Red or Calvin Klein jeans the benchmark product, which is to say, is the Levi's® jean the same as the first jean or made by the same company as the first jean? Asking whether a clearly identifiable Levi's® jean is made by the company that makes Indigo Red has a different connotation than asking whether a clearly identifiable Indigo Red jean is made by the same company as Levi's®. Levi's®, as an old, established brand is likely not be to

perceived as being made by a newer, lesser known company, but the newer, lesser known jean might well be perceived as being made by Levi's®.

> 3.  None of the three relationship questions provides a valid indicator of whether the respondents were confused about the origin or source of Indigo Red jeans.

In Mr. McCullough's sequence of questions about each product category – socks, t-shirts, and jeans – the respondent is first asked whether he/she believes "that the jeans you saw earlier are the same as *these* jeans, or are put out by the same company, as *these* jeans?" This question is a compound question, i.e., it asks two questions at once, and a basic tenant of good survey design is that compound questions should be avoided.[12] Since they clearly are not the same jeans, and in particular are not the 'same jeans' in the same way that the socks or t-shirts were 'the same', the respondent may be biased toward providing a negative answer. The second question may or may not be heard or attended to.

The second relationship question asked is: "Please tell me whether or not you believe that the company that puts out the jeans you saw earlier is in some way affiliated with or connected with the company that puts out *these* jeans?" Given that the respondent has clearly seen who "puts out the jeans" by virtue of the clearly displayed brand names, this question becomes whether the respondent believes there is any connection or relationship between Indigo Red and Levi's®, or between Calvin Klein and Levi's®, and may not necessarily refer to any relationship between the two pairs of jeans.

---

[12] See Payne, Stanley, **The Art of Asking Questions** (Princeton, NJ:  Princeton University Press, 1951)

The respondent may think that the pocket stitching is confusing, but he/she may not believe that Indigo Red is somehow affiliated with Levi's®.

Finally, the third questions asks "Please tell me whether or not you believe that the company that puts out the jeans you saw earlier has permission to do so from the company that puts out *these* jeans?"[13] A respondent may answer 'no' to this question for a variety of reasons including the belief that Levi's® would not give permission to others to use its trademarks, i.e., "no, they do not have permission, even though they should have it." The verbatim responses that were given in answer to the question about why a respondent thought that the first company has permission from the second show that respondents were often confused about what was being asked. Sample 'reasons' for believing that the first company had permission from the second are:

     #526:    "Yes . . . It's different. These are Levi's and the other ones are Calvin Klein"

     #627    "Yes . . . A lot of companies make pants"

     #664    "Yes . .. Different brands"

     #565    "Yes . . . Because I can't see a reason why one jeans company can't give permission for another company to put out jeans.

## V. CONCLUSION

Given the numerous problems I have identified with the survey reported by Mr. McCullough, I conclude that it does not provide a test of the likelihood that the pocket

---

[13] This is the question that is given on the "Version 2 Clothing Survey Main Questionnaire" contained in the McCullough report, p. M6. The tables reporting the specific findings give a different version: "Q. 5f: Reasons Why the Maker of the 2nd Jeans Has Permission From the Company That Puts Out the 1st Jeans". These are very different questions. I assume for purposes of my report that the version shown on the Main Questionnaire is the one that was actually used in conducting the survey.

SENT BY: SCOTT/PEASE;                     650 473 9298;         FEB-25-05 13:11;              PAGE 2/2

stitching on the Indigo Red jeans may cause consumers to be confused as to the source or

identity of the jeans. In particular, it does not provide reliable evidence of whether or not

consumers are likely to confuse the pocket stitching on the Indigo Red jeans with that of

Levi's® jeans. Similarly, it provides no evidence regarding the issue of likely dilution of

the value of Levi's® trademarked pocket stitching.

My understanding is that some of this testimony is covered by protective orders.

Date: February 25, 2005                          *Carol A. Scott*

                                                 Carol A. Scott

**Exhibit 1**

**Exhibit 1**

## CAROL A. SCOTT

Anderson Graduate School of Management
University of California
Los Angeles, California 90024
(310) 825-4458
(310) 206-2019 (fax)

1834 Park Blvd.
Palo Alto, CA  94306
(650) 473-9297
(650) 473-9298 (fax)

### EDUCATION

| | |
|---|---|
| Ph. D. | Northwestern University, June 1975<br>Major Field: Marketing<br>Minor Field: Social Psychology |
| M.S. | Northwestern University, August 1972<br>Major: Management |
| B.S. | University of Texas at Austin, December 1970<br>Major: Business and history education<br>Graduated with highest honors |

### TEACHING EXPERIENCE

| | |
|---|---|
| 1977 - | **University of California, Los Angeles** |
| | 1989-      Professor of Marketing |
| | 1980-89    Associate Professor of Marketing |
| | 1979-80    Acting Associate Professor of Marketing |
| | 1978-79    Assistant Professor of Marketing |
| | 1977-78    Visiting Assistant Professor of Marketing<br>(on leave from The Ohio State University) |
| 1985 - 1986 | **Harvard Business School**<br>Visiting Associate Professor, Business Administration |
| 1974 - 1978 | **The Ohio State University**<br>Assistant Professor of Marketing |

-2-

## ACADEMIC ADMINISTRATIVE EXPERIENCE

1990 - 94      Chairman of the Faculty, Department (School) of Management
Responsible for all matters pertaining to the approximately
100 faculty FTE in the Anderson Graduate School of Management,
a single department school, including: recruiting, retention,
promotions, salary adjustments, scheduling and staffing of courses,
and student and peer evaluation of teaching.  Manage budget and
process all appointments for temporary faculty.

1987 - 91      Associate Dean, Academic Affairs
1993 - 94      Act for the dean in his absence.  Responsible for all academic
degree programs and support services including: full-time, Fully
Employed and Executive MBA Programs,  Ph.D. and M.S.
Programs, Management Communications Program, Management
Field Studies Office, Computing Services Center, and all
interdisciplinary study centers (e.g., Entrepreneurial Studies
Center, Finance and Real Estate, International Business, etc.).

1986 - 87      Assistant Dean, MBA Curriculum & Policy
Responsible for all academic policies pertaining to the full- time
MBA Program.  Coordinated a review of this program which
resulted in revised core curriculum;  implemented computerized
bidding system for course enrollment.

## JOURNAL ARTICLES PUBLISHED

Robert A. Hansen and Carol A. Scott.  Comments on attribution theory and advertiser
credibility.  *Journal of Marketing Research*, *13*, May 1976.

Carol A. Scott.  Effects of trial and incentives on repeat purchase behavior.  *Journal of
Marketing Research*, *13*, August 1976.

Carol A. Scott.  Modifying socially-conscious behavior:  The foot-in-the-door technique.
*Journal of Consumer Research*, *4*, December 1977.

Carol A. Scott and Richard F. Yalch.  A test of the self-perception explanation of the
effects of rewards on intrinsic interest.  *Journal of Experimental Social
Psychology*, *14*, January, 1978.

Carol A. Scott and Richard F. Yalch.  Consumer response to initial product trial:  A
Bayesian analysis.  *Journal of Consumer Research*, *7*, June 1980.

-3-

Alice M. Tybout and Carol A. Scott. Availability of well-defined internal knowledge and the attitude formation process: Information aggregation versus self-perception. *Journal of Personality and Social Psychology*, *44*, March 1983.

Deborah Roedder John, Carol A. Scott, and James R. Bettman. Sampling data for covariation assessment: The effect of prior beliefs on search patterns. *Journal of Consumer Research*, *13*, June 1986.

James R. Bettman, Deborah Roedder John, and Carol A. Scott. Covariation assessment by consumers. *Journal of Consumer Research, 13*, December, 1986.

James R. Bettman, Elizabeth H. Creyer, Deborah Roedder John, and Carol A. Scott. Covariation assessment in rank order data. *Behavioral Decision Making, 1*, October-December, 1988, 239-254.

## REPORTS, PRESENTATIONS, CHAPTERS IN BOOKS

Carol A. Scott, Decade of the Executive Woman, New York: Korn/Ferry, International, 1993.

Vicky L. Crittenden, Carol A. Scott, and Rowland T. Moriarty. The effects of prior product experience on organizational buying behavior. In Paul Anderson and Melanie Wallendorf eds.) *Advances In Consumer Research*, vol. 14, 1986.

James R. Bettman, Deborah Roedder, and Carol A. Scott. Consumers' assessment of covariation. In T. Kinnear (ed.), *Advances In Consumer Research*, vol. 11, 1983.

Carol A. Scott and Alice M. Tybout. Some indirect effects of case vs. base rate data on information processing strategies. In R. Bagozzi and A. M. Tybout (eds.), *Advances in Consumer Research*, 10, Association for Consumer Research, 1982. (Abstract).

Carol A. Scott. On using attribution theory to understand advertising effects. In A. Mitchell (ed), *Advances in Consumer Research*, 9, Association for Consumer Research, 1981.

Carol A. Scott. Speculations on the role of marketing and corporate communications: Some implications for practice and issues for research. In S. A. Greyser (ed.), Proceedings of the MSI Workshop on Corporate Communications, Marketing Science Institute, forthcoming.

Carol A. Scott and Alice M. Tybout. Theoretical perspectives on the impact of negative information: Does valence matter? Abstract published in K. Monroe (ed.), *Advances in Consumer Research*, 8, Association for Consumer Research, 1980

-4-

Carol A. Scott. Consumer satisfaction: Perspectives from self-perception theory. Paper presented at the American Psychological Association conference, Montreal, Canada, September, 1980.

Carol A. Scott. Forming beliefs from experience: Evidence from self-perception theory. In H. H. Kassarjian and T. S. Robertson (eds.), *Perspectives In Consumer Behavior*, 3rd edition, Scott, Foresman, 1981.

Alice M. Tybout and Carol A. Scott. Extending the self-perception explanation: The effect of cue salience on behavior. In W. L. Wilkie (ed.), *Advances in Consumer Research*, 6, Association for Consumer Research, 1979.

Carol A. Scott. Attribution theory in consumer research: Scope, issues, and contributions. Proceedings, American Marketing Association Fall Educators' Conference, S. Jain (ed.), 1978.

Carol A. Scott. The role of self-perception processes in consumer behavior: Interpreting one's own experiences. In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research.

Robert A. Hansen and Carol A Scott. Alternative approaches to assessing the quality of self-report data. In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research, 1978.

Robert A. Hansen and Carol A. Scott. Improving the representativeness of survey research: Some issues and unanswered questions. Proceedings, American Marketing Association Fall Educators' Conference, 1977.

Richard F. Yalch and Carol A. Scott. Effect of initial trial of a new product on attitude-behavior consistency. In W. D. Perreault, Jr. (ed.), *Advances in Consumer Research*, 4,   Association for Consumer Research, 1977.

Carol A. Scott, Researching the broadened concept of consumer behavior. In G. Zaltman and B. Sternthal (eds.), *Broadening the Concept of Consumer Behavior*. Association for Consumer Research monograph, 1975.

Brian Sternthal, Carol A. Scott, and Ruby Roy. Self-perception as a means of personal influence: The foot-in-the-door technique. In B. Anderson (ed.), *Advances in Consumer Research*, 3, Association for Consumer Research, 1975.

Carol A. Scott. Hendley distributors. Consumer behavior research case in Gerald Zaltman, Philip C. Burger, and Randall L. Schultz, *Cases in Marketing Research*, New York: Dryden Press, 1975.

-5-

## AWARDS

1984        Outstanding Teacher of the Year, presented by MBA students at the
            Graduate School of Management, UCLA.


## GRANTS RECEIVED (non-university)

New Roles for Corporate Communications.  Grant received from the Marketing Science
        Institute (with James R. Bettman, Richard J. Lutz, and Barton A. Weitz),
        December 1980 - May 1981.


## SELECTED PROFESSIONAL ACTIVITIES

Academic Advisory Council, Marketing Science Institute, 1987 to 1990

Editorial Boards:
        Journal of Marketing Research, December 1975 to July 1985
        Journal of Marketing, July 1978 to July 1986; January 1991 - August 1993
        Journal of Consumer Research, December 1980 -

Occasional reviewer, Journal of Personality and Social Psychology and Journal of
        Applied Psychology

Distinguished lecturer at University of Pennsylvania (1978), University of Washington
        (1979), University of Florida (1979), Berkeley/Stanford (1980), University of
        California, Santa Barbara (1982)

AMA Doctoral Dissertation Competition chairperson, 1985

Consumer Behavior Track chairperson, American Marketing Association Special
        Conference on Marketing Theory, February 1982

Consumer Behavior Track chairperson, American Marketing Association Fall
        Educators' Conference, 1980

Treasurer, Association for Consumer Research, 1980-81

Resident Faculty Member, American Marketing Association Doctoral Consortium,
        1979, 1980, 1983.  Consortium speaker 1984, 1985, 1986

Program Committee, 1979 Annual Conference, Association for Consumer
        Research, Prof. Jerry Olson, chairman


**Consulting projects** for a number of profit, not-for-profit, and governmental
organizations in Ohio and California.

-6-

Assignments have included strategic marketing audits, development of strategic
marketing plans, advertising planning consultation, marketing research analysis
and interpretation, and expert witness testimony preparation.

## PROFESSIONAL MEMBERSHIPS

Association for Consumer Research

## COURSES TAUGHT

Undergraduate (primarily at The Ohio State University)
    Consumer Behavior; Advertising
Masters' (primarily at UCLA)
    Consumer Behavior; Introductory Marketing; Advanced Marketing Management;
    Management of Distribution Channels; Global Marketing Management; Market
    Assessment; Marketing Strategy and Policy (Executive MBA Program)
Ph.D. (UCLA, Harvard, and Ohio State)
    Consumer Behavior Theory and Research
    Attribution Theory Research in Marketing
    Doctoral research paper supervision

## THESIS ADVISING

Chair, Ph.D. Thesis Committee 6 students
Member, Ph.D. Thesis Committee - 9 students
Member, Masters Examining Committee (Ohio State) - 3 students

## RECENT COMMITTEE ASSIGNMENTS (UCLA only)

Task Force on Women at Anderson, 2001 –
University Committee on Research, 1999-2001
    Chair, Faculty Grants Program
Dean Search Committee, 1997-1999
Executive Education Advisory Committee 1997 – 1999
MBA Admissions Committee 1997-99
Academic Staffing Committee 1997-98
Faculty Executive Committee, 1993 - 1997
Professional Educational Task Force (University), 1993-94
UCLA Child Care Services Advisory Board, 1990 - present; Chair, 1991 - 1993

## PERSONAL DATA

-7-

Born:   September 13, 1949
        Dallas, Texas

Married to Christian G. Pease; one daughter, Camille Rose, born January 14, 1991