# EXHIBIT II

1  MICHAEL J. BETTINGER (State Bar No. 122196)
   RACHEL R. DAVIDSON (State Bar No. 215517)
2  KIRKPATRICK & LOCKHART
   PRESTON GATES ELLIS LLP
3  55 Second Street, Suite 1700
   San Francisco, California  94105
4  Telephone:  415-882-8200
   Facsimile:  415-882-8220
5
   J. MICHAEL KEYES (Pro Hac Vice)
6  KIRKPATRICK & LOCKHART
   PRESTON GATES ELLIS LLP
7  618 West Riverside Avenue, Suite 300
   Spokane, Washington  99201
8  Telephone:  509-624-2100
   Facsimile:  509-456-0146
9
   Attorneys for Defendant
10 ABERCROMBIE & FITCH TRADING CO.

11                 UNITED STATES DISTRICT COURT
12              NORTHERN DISTRICT OF CALIFORNIA
13
14 LEVI STRAUSS & CO.,              )  No. CV-07-3752
                                    )
15        Plaintiff,                )  Declaration and Rule 26
                                    )  Report of Dr. Gerald L.
16    v.                            )  Ford
                                    )
17 ABERCROMBIE & FITCH TRADING CO., )
                                    )
18        Defendant.                )
   _____)
19

20        I, Dr. Gerald L. Ford, hereby declare as follows:

21                      INTRODUCTION

22        1.   I am a partner in the marketing research and

23 consulting firm of Ford Bubala & Associates, located in

24 Huntington Beach, California, where I have been engaged in

25 commercial marketing research and consulting for the past thirty-

26 three years.  I am also an emeritus faculty member of the School

27 of Business Administration, California State University, Long

28 Beach, where I held a full-time teaching position for twenty-five

Declaration and Rule 26 Report
of Dr. Gerald L. Ford

1  years, prior to my retirement in 1994.  My professional

2  experience is further summarized below in paragraphs 63 through

3  73.

4         2.   In the instant matter, at the request of

5  Kirkpatrick & Lockhart Preston Gates Ellis LLP counsel for

6  Defendant, Abercrombie & Fitch Trading Co. ("A&F"), I designed

7  and caused to be conducted a survey to address the issue of post-

8  sale likelihood of confusion.  Specifically, this survey was

9  designed to measure the degree, if any, to which the stitching

10  design on the pocket of the Ruehl brand jeans being sold by

11  Defendant, A&F, is likely to cause confusion with respect to the

12  source, authorization/approval of, or business affiliation/

13  connection of Defendant's jeans with the source Levi Strauss &

14  Co. ("LS&CO") due to the stitching design on the pocket of the

15  Ruehl brand jeans.

16         3.   The likelihood of confusion survey conducted in

17  this matter employed a scientific experimental survey design

18  consisting of three cells:  (1) a test or experimental survey

19  cell designed to measure the degree, if any, to which the

20  stitching design on the pocket of Defendant's jeans is likely to

21  cause confusion as to the source, authorization/approval of, or

22  business affiliation/connection of Defendant's jeans with the

23  source LS&CO; and (2) two control survey cells designed to

24  measure the extent to which non-trademark confusion exists in the

25  likelihood of confusion test cell survey results.

26         4.   In the test cell, survey respondents were shown a

27  photograph of a pair of Defendant's Ruehl jeans showing the back

28  pocket with the allegedly infringing pocket stitching design.  In

1   the first control cell, survey respondents were shown a

2   photograph of a pair of Lucky jeans showing the back pocket with

3   a pocket stitching design which I understand is not alleged to

4   infringe the LS&CO Arcuate design.  In the second control cell,

5   survey respondents were shown a photograph of a pair of Indigo

6   Red jeans showing the back pocket with a pocket stitching design

7   which I also understand is not alleged to infringe the LS&CO

8   Arcuate design.

9           5.    The universe for this survey was comprised of

10  females thirteen (13) years of age and older who reported that

11  within the next twelve (12) months they were likely to purchase a

12  pair of jeans for themselves.

13          6.    Respondents in the survey were interviewed by

14  interviewers employed by professional interviewing services at

15  shopping centers in metropolitan markets in nine (9) states

16  (i.e., Arizona, California, Georgia, Illinois, Massachusetts,

17  Minnesota, New York, Tennessee, and Texas), located in each of

18  the nine (9) U.S. Census Divisions.

19          7.    In total approximately one thousand (975)

20  interviews were conducted in this survey among females thirteen

21  (13) years of age or older.

22          8.    Six hundred fifty-one (651) interviews were

23  conducted in this survey among female adults eighteen (18) years

24  of age or older:  two hundred sixteen (216) interviews were

25  conducted in the test cell, two hundred eighteen (218) interviews

26  were conducted in the first control cell, and two hundred

27  seventeen (217) interviews were conducted in the second control

28  cell.

1    9.    Additionally, three hundred twenty-four (324)
2  interviews were conducted in this survey among female teenagers
3  thirteen (13) to seventeen (17) years of age:  one hundred eight
4  (108) interviews were conducted in the test cell, one hundred
5  eight (108) interviews were conducted in the first control cell,
6  and one hundred eight (108) interviews were conducted in the
7  second control cell.

8    10.    The survey results do not evidence any trademark
9  confusion attributable to the pocket stitching on Defendant's
10  Ruehl jeans.  Specifically, the survey results evidence that when
11  non-trademark confusion is accounted for (e.g., the tendency or
12  predisposition of some consumers to attribute the source of any
13  pair of jeans to Levi, the tendency or predisposition of some
14  consumers to attribute the source of any pair of jeans with
15  pocket stitching to Levi, etc.), there is no confusion
16  attributable to the stitching design present on the pocket of the
17  Ruehl jeans.

18    11.    It is my opinion that the results of the survey
19  conducted in this matter clearly support a finding of no
20  likelihood of confusion as to the source, authorization/approval
21  of, or business affiliation/connection of Defendant's jeans with
22  the source LS&CO due to the stitching design on the pocket of the
23  Ruehl brand jeans.

24                        SURVEY BACKGROUND

25    12.    Attached hereto, as Exhibit A, Volumes I, II, and
26  III, are the results of the survey which addressed the issue of
27  likelihood of confusion, if any, with respect to the source,
28  authorization/approval of, or business affiliation/connection of

1  Defendant's Ruehl brand jeans due to the stitching design on the

2  pocket.  Exhibit A, Volumes I & II, provide a synopsis of the

3  survey methodology, photographs of the survey exhibits, the

4  survey screeners and questionnaires, response frequencies for the

5  survey questions, and a listing of respondents' verbatim

6  responses to the survey.  Exhibit A, Volume III, contains a

7  sequential listing of the survey responses and copies of the

8  Supervisor and Interviewer Instructions, which provide additional

9  details of the survey protocols, and other survey-related

10  background materials.

11       13.  The sample selection, questions, questionnaire

12  design, and interviewing procedures employed in this survey were

13  designed in accordance with the generally accepted standards and

14  procedures in the field of surveys and were designed to meet the

15  criteria for survey trustworthiness detailed in the Federal

16  Judicial Center's Manual for Complex Litigation, Fourth.[1]

17       14.  I was responsible for the design of the survey,

18  the survey's questionnaires, and the instructions given to the

19  survey's supervisors and interviewers, as well as for the

20  procedures to be followed in conducting the interviews.

21  Interviewing, data gathering, and response recordation were

22  _____

23       [1]    For the proffered poll or survey, "...Relevant factors
    include whether:  the population was properly chosen and defined;
24  the sample chosen was representative of that population; the data
    gathered were accurately reported; and the data were analyzed in
25  accordance with accepted statistical principles...In addition, in
    assessing the validity of a survey, the judge should take into
26  account the following factors:  whether the questions asked were
    clear and not leading; whether the survey was conducted by
27  qualified persons following proper interview procedures; and
    whether the process was conducted so as to ensure objectivity..."
28  See Federal Judicial Center, Manual for Complex Litigation,
    Fourth, Section 11.493, @ 102-104 (2004).

Declaration and Rule 26 Report              - 5 -
of Dr. Gerald L. Ford

1  carried out, under the direction of Ford Bubala & Associates, by

2  interviewers employed by independent interviewing organizations.

3  Supervisors working on this survey were personally trained by

4  Ford Bubala & Associates with respect to the design, procedures,

5  and related protocols for the survey; and daily shipments of

6  completed interviews from each professional interviewing service

7  were reviewed by Ford Bubala & Associates to confirm that the

8  questionnaires were being properly executed.  In addition,

9  approximately sixty-eight percent (67.90%) of the survey

10  interviews were validated, in person, by the survey supervisors

11  personally meeting the survey respondents and confirming their

12  qualification and participation in the survey.  Ford Bubala &

13  Associates conducted validations of approximately twenty percent

14  (20.31%) of the interviews by recontacting, by telephone, survey

15  respondents to confirm their qualification and participation in

16  the survey.  Net nonduplicated validations totaled approximately

17  seventy-four percent (73.74%) of all survey interviews.[2]  None

18  of the interviews failed to validate.

19       15.  The survey conducted in this matter was

20  administered under a double-blind protocol.  Specifically, not

21  only were the respondents not informed as to the purpose or

22  sponsor of the survey, but similarly, both the survey's

23  supervisors and interviewers were not informed as to the purpose

24  or sponsor of the survey.

25  ///

26  ///

27  _____

28  [2]     This level of validation exceeds industry standards of 10% to 15%.

Declaration and Rule 26 Report
of Dr. Gerald L. Ford                    - 6 -

1 | SURVEY STRUCTURE

2 | 16. As noted earlier, the likelihood of confusion

3 survey conducted in this matter employed a scientific

4 experimental survey design consisting of three cells: (1) a test

5 or experimental survey cell designed to measure the degree, if

6 any, to which the stitching design on the pocket of Defendant's

7 jeans is likely to cause confusion as to the source,

8 authorization/approval of, or business affiliation/connection of

9 Defendant's jeans; and (2) two control survey cells designed to

10 measure the extent to which non-trademark confusion exists in the

11 likelihood of confusion test cell survey results.

12 | 17. In the test cell, survey respondents were shown a

13 photograph of a pair of Ruehl jeans. The Barrow Skinny model of

14 Ruehl jeans was used as the survey stimulus. It is my

15 understanding that the Barrow Skinny model of Ruehl jeans

16 represents one of the most popular models of Ruehl jeans. The

17 photograph depicted the back right half of the jeans showing the

18 back right pocket. The jeans were folded in a manner so that a

19 respondent could not see if there was anything attached to the

20 left seam of the right back pocket.[3][4]  In addition, the waist

21 patch was digitally made unreadable. See Exhibit A, Volumes I &

22 II, page 6 and page 226. Respondents were asked to look at the

23 jeans in the photograph as they would if they saw someone wearing

24 the jeans. Respondents were then asked questions regarding their

25

26 | [3]    The left seam of the right back pocket is where LS&CO
typically attaches the red pocket tab to Levi jeans.

27

28 | [4]    This stimulus exposure was patterned after the
photographic presentation of survey stimuli employed in the
survey LS&CO offered in the RP55 matter.

1  state of mind with respect to the source, authorization/approval

2  of, or business affiliation/connection of the Ruehl jeans in the

3  photograph.  See Exhibit A, Volumes I & II, pages 9-12 and

4  pages 229-232.

5         18.  In the first control cell, survey respondents were

6  shown a photograph of a pair of Lucky jeans.  It is my

7  understanding the LS&CO does not consider the stitching design on

8  the pocket of the Lucky jeans to infringe the LS&CO Arcuate

9  trademark.  Thus, any Levi response with respect to the source,

10 authorization/approval of, or business affiliation/connection of

11 the Lucky jeans could not be attributable to an allegedly

12 infringing stitching design on the pocket of the Lucky jeans but

13 would be due to other factors such as simply the presence of a

14 stitching design on the back pocket of a pair of jeans or the

15 market share or brand popularity of Levi jeans.

16        19.  The Lucky jeans were folded in the same manner as

17 the Ruehl jeans and the waist patch was again digitally made

18 unreadable.  See Exhibit A, Volumes I & II, page 77 and page 277.

19 Again, respondents were asked to look at the jeans in the

20 photograph as they would if they saw someone wearing the jeans.

21 Respondents were then asked the same questions regarding their

22 state of mind with respect to the source, authorization/approval

23 of, or business affiliation/connection of the Lucky jeans in the

24 photograph.  See Exhibit A, Volumes I & II, pages 80-83 and

25 pages 280-283.

26        20.  In the second control cell, survey respondents

27 were shown a photograph of a pair of Indigo Red jeans.  It is my

28 understanding the LS&CO does not consider the stitching design on

1   the pocket of the Indigo Red jeans to infringe the LS&CO Arcuate

2   trademark.   Thus, again, any Levi response with respect to the

3   source, authorization/approval of, or business affiliation/

4   connection of the Indigo Red jeans could not be attributable to

5   an allegedly infringing stitching design on the pocket of the

6   Indigo Red jeans but would be due to other factors such as simply

7   the presence of a stitching design on the back pocket of a pair

8   of jeans or the market share or brand popularity of Levi jeans.

9          21.   The Indigo Red jeans were also folded in the same

10  manner as the Ruehl and Lucky jeans and the waist patch was again

11  digitally made unreadable.   See Exhibit A, Volumes I & II, page

12  149 and page 330.   Again, respondents were asked to look at the

13  jeans in the photograph as they would if they saw someone wearing

14  the jeans.   Respondents were then asked the same questions

15  regarding their state of mind with respect to the source,

16  authorization/approval of, or business affiliation/connection of

17  the Indigo Red jeans in the photograph.   See Exhibit A, Volumes I

18  & II, pages 152-155 and pages 333-336.

19         22.   The control survey cells provide a measure of the

20  extent to which non-trademark confusion exists in the test survey

21  cell results which is not reflective of a likelihood of confusion

22  due to the stitching design on the pocket of Defendant's jeans.

23  Specifically, the control survey cells function as a baseline and

24  provide a measure of the degree to which respondents are likely

25  to give the answer "Levi" not as a result of the stitching design

26  on the pocket of Defendant's jeans but because of other factors,

27  such as the survey's questions, the survey's procedures, the

28  nature of the product, or some other potential influence on a

1  respondent's answer such as simply the presence of a stitching

2  design on the back pocket of a pair of jeans or the market share

3  or brand popularity of Levi jeans.

4      23.  In addition to the control survey cells, the

5  likelihood of confusion survey conducted in this matter also

6  employed the use of questions (i.e., "Why do you say that?" and

7  "What else, if anything, makes you say that?") to provide an

8  indication of the basis for the beliefs expressed in response to

9  the survey's source, authorization/approval of, and business

10 affiliation/connection questions.

11      24.  As noted earlier, in total approximately one

12 thousand (975) interviews were conducted in this survey among

13 females thirteen (13) years of age or older.

14      25.  Again, six hundred fifty-one (651) interviews were

15 conducted in this survey among female adults eighteen (18) years

16 of age or older:  two hundred sixteen (216) interviews were

17 conducted in the test cell, two hundred eighteen (218) interviews

18 were conducted in the first control cell, and two hundred

19 seventeen (217) interviews were conducted in the second control

20 cell.

21      26.  Finally, an additional three hundred twenty-four

22 (324) interviews were conducted in this survey among female

23 teenagers thirteen (13) to seventeen (17) years of age:  one

24 hundred eight (108) interviews were conducted in the test cell,

25 one hundred eight (108) interviews were conducted in the first

26 control cell, and one hundred eight (108) interviews were

27 conducted in the second control cell.

28 ///

Declaration and Rule 26 Report          - 10 -
of Dr. Gerald L. Ford

1    27.  Although the survey in this matter consisted of

2  three cells (i.e., a test cell and two control cells), any single

3  respondent participated in only one of the three cells.

4    28.  As noted earlier, this survey employed a shopping

5  center intercept methodology.  Respondents in the survey were

6  interviewed by interviewers employed by professional interviewing

7  services at shopping centers in metropolitan markets in nine (9)

8  states (i.e., Arizona, California, Georgia, Illinois,

9  Massachusetts, Minnesota, New York, Tennessee, and Texas),

10 located in each of the nine (9) U.S. Census Divisions.

11   29.  The relevant universe for both the test cell and

12 the control cells was the same and was defined as females,

13 thirteen years of age or older, who reported that within the next

14 twelve months they were likely to purchase a pair of jeans for

15 themselves.[5]

16   30.  The respondent selection procedure employed for

17 adults in the survey is referred to as a quota sampling method.

18 This method provided a respondent base that is generally

19 representative of the age distribution of female adult purchasers

20 of jeans for themselves.  This age distribution was based upon an

21 Opinion Research Corporation survey conducted May 2-5 and

22  _____

23   [5]   Additionally, the likelihood of confusion survey
   universe was also restricted as follows:  (1) to respondents who
24 did not, nor did anyone else in their home, work for an
   advertising agency or marketing research firm, or a retail store
25 or company that makes, sells, or distributes any clothing; (2) to
   respondents who, during the preceding three months, had not
26 participated in any marketing research surveys, including online
   surveys, other than a political poll; (3) to respondents who,
27 during the preceding month, had not heard anything about the
   subject of any of the interviews being conducted at the mall; and
28 (4) to respondents who, if they wore contact lenses or eyeglasses
   would wear them during the remainder of the interview.

1  May 8-11, 2008, among a nationally representative telephone

2  sample of one thousand (1,000) female adult respondents eighteen

3  years of age or older across the United States.

4        31.  A second group of thirteen (13) to seventeen (17)

5  year old females was also sampled.

6                    SURVEY PROCEDURES AND QUESTIONS

7        32.  Initially, a potential survey respondent was

8  stopped by an interviewer in the public area of a shopping mall

9  and screened (i.e., asked questions) to determine if the

10  potential respondent met the criteria to be included in the

11  survey universe (i.e., within the next twelve months was likely

12  to purchase a pair of jeans for themselves, etc.).  See Exhibit

13  A, Volumes I & II, pages 7-8 and pages 227-228.[6]

14        33.  If a potential respondent fulfilled the screening

15  criteria, or survey universe definition, she was then invited to

16  return with the interviewer to the professional interviewing

17  service facility located within the shopping mall to complete the

18  interview.  See Exhibit A, Volumes I & II, pages 9-12 and pages

19  229-232.[7]  The interviewer then escorted the survey respondent

20  into a private interviewing area.  In the private interviewing

21  area, the respondent was told:

22        In a moment, I am going to show you a picture of a
          pair of jeans, then I will ask you a couple of
23        questions.

24        Please understand that we are only interested in
          your opinions; and if you don't have an opinion or
25        don't know the answer to a question, that is an
          acceptable answer.

26

27  _____

          [6]   Also see pages 78-79, 150-151, 278-279, and 331-331.
28
          [7]   Also see pages 80-83, 152-155, 280-283, and 333-336.

Declaration and Rule 26 Report              - 12 -
of Dr. Gerald L. Ford

1  The interviewer then handed the respondent a photograph of either

2  the test cell jeans or one of the control cell jeans, and the

3  respondent was then told:

4      Would you please look at the jeans in this picture
       as you would if you saw someone wearing these jeans.
5      Please take as much time as you like, and let me know
       when you are ready to continue.
6

7  When the respondent indicated that she was ready to continue, she

8  was asked:[8]

9      5.0  Who do you believe makes or puts out these jeans?

10 For respondents who indicated a belief as to the source of the

11 jeans in the photograph they were shown, the interviewer asked

12 the basis for that belief with the question:

13     5.1  Why do you say that?[9]

14 Respondents who provided a reason for their belief as to the

15 source of the jeans were then asked:

16     5.2  What else, if anything, makes you say that?[10]

17 ///

18 ///

19

20     ───────────────

21  [8]    The first principal survey questions (i.e., question
    series 5.0/5.1/5.2) were designed to address the issue of
22  likelihood of confusion as to source or origin and were patterned
    after similar accepted questions.  See Union Carbide Corp. v.
23  Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976), cert. denied, 429
    U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91 (1976); E. & J. Gallo
24  Winery v. Gallo Cattle Co., 12 USPQ2d 1657, 1674 (E.D. Cal.
    1989), aff'd, 967 F.2d (9th Cir. 1992); and J. Thomas McCarthy,
25  McCarthy on Trademarks and Unfair Competition, Vol. 6 §32:174 @
    32-339, Rel. #42, 5/2007.

26  [9]    Respondents who did not indicate a belief as to who put
    out the jeans in the photograph they were shown were not asked
27  question 5.1.

28  [10]   Respondents who provided a "don't know" response to
    question 5.1 were not asked question 5.2.

Declaration and Rule 26 Report          - 13 -
of Dr. Gerald L. Ford

1  Next, respondents were told:

2        6.0  Now, I am going to ask you a question that has
            three choices.  After I am done, if you want me to
3            read the question again, just ask me.

4  and then asked:[11]

5        Do you believe that these jeans...
            • one, <u>are</u> being put out with the authorization
6            or approval of any other company or
            companies;
7            • two, are <u>not</u> being put out with the
            authorization or approval of any other
8            company or companies;[12]  or
            • three, don't know or have no opinion?
9

10 Respondents who indicated the belief that the jeans were put out

11 with the authorization/approval of any other company or companies

12 were then asked:

13       6.1  What other company or companies?[13]

14 If the respondent provided a company's name or companies' names,

15 she was asked the basis for the belief with the question:

16       6.2  Why do you say that?

17 ///

18 ///

19

20 ──────────────────

21        [11]    The principal survey questions designed to address
   likelihood of confusion as to authorization/approval or business
   affiliation/connection (i.e., question series 6.0/6.1/6.2/6.3 and
22 7.0/7.1/7.2/7.3) were also patterned after similar accepted
   questions.  See J. Thomas McCarthy, <u>McCarthy on Trademarks and</u>
23 <u>Unfair Competition</u>, Vol. 6 §32:175 @ 32-341, Rel.#42, 5/2007.

24        [12]    To guard against any order bias, the first two
   alternatives in this list were rotated (i.e., approximately one-
25 half of the respondents were read the list with the first
   alternative being "...<u>are</u> being put out with the authorization or
26 approval..." and approximately one-half of the respondents were
   read the list with the first alternative being "...are <u>not</u> being
27 put out with the authorization or approval...").

28        [13]    Respondents who did not identify a company or companies
   in response to this question were not asked question 6.2 or 6.3.

1  Respondents who provided a reason for their belief were then

2  asked:

3      6.3  What else, if anything, makes you say that?[14]

4  Respondents were asked this same series of questions with regard

5  to business affiliation or business connection.  Specifically,

6  respondents were told:

7      7.0  Now, I am going to ask you another question that
          has three choices.  Again, after I am done, if you
8          want me to read the question again, just ask me.

9  Subsequently, respondents were asked:

10          Do you believe that the company that puts out
            these jeans...
11          • one, has a business affiliation or
              business connection with any other
12            company or companies;
            • two, does not have a business
13            affiliation or business connection with
              any other company or companies;[15] or
14          • three, don't know or have no opinion?

15  ///

16  ///

17  ///

18

19  _____

     [14]  Respondents who provided a "don't know" response to
20  question 6.2 were not asked question 6.3.

21      [15]  Again, to guard against any order bias, the first two
     alternatives in this list were rotated (i.e., approximately one-
22  half of the respondents were read the list with the first
     alternative being "...has a business affiliation or business
23  connection..." and approximately one-half of the respondents were
     read the list with the first alternative being "...does not have
24  a business affiliation or business connection...").
            As an additional guard against order bias,
25  approximately one-half of the respondents were queried in
     question 6.0 regarding authorization/approval, and approximately
26  one-half of the respondents were queried in question 6.0
     regarding business affiliation/connection.  Similarly,
27  approximately one-half of the respondents were queried in
     question 7.0 regarding authorization/approval, and approximately
28  one-half of the respondents were queried in question 7.0
     regarding business affiliation/connection.

1  Respondents who indicated the belief that the company that puts

2  out the jeans had a business affiliation/connection with another

3  company were asked:

4      7.1  What other company or companies?[16]

5  If the respondent provided a company's name or companies' names,

6  she was asked the basis for the belief with the question:

7      7.2  Why do you say that?

8  Respondents who provided a reason for their belief were then

9  asked:

10      7.3  What else, if anything, makes you say that?[17]

11  Finally, the photograph of the jeans was removed from sight.

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25

26

---

27  [16]  Respondents who did not identify a company or companies in response to this question were not asked questions 7.2 or 7.3.

28  [17]  Respondents who provided a "don't know" response to question 7.2 were not asked this question.

1    <u>SURVEY RESULTS - ADULT FEMALES</u>

2    <u>Test Cell - Survey Results</u>

3          34.    Approximately fifteen percent (14.81%) of the

4    adult females survey respondents who saw the Ruehl jeans, in the

5    test cell, reported that they believed that the Ruehl jeans were

6    made or put out by Levi.    See Exhibit A, Volume I, Table 1,

7    page 13.

8    

TABLE 1[18]
TEST CELL
ADULT FEMALES

Q5.0  Who do you believe makes or puts out these jeans?
Q5.1  Why do you say that?
Q5.2  What else, if anything, makes you say that?

| Response Categories | Response Distribution | |
| --- | --- | --- |
|  | Number | Percent (n=216) |
| 1. Levi - pocket/stitching | 8 | 3.70 |
| 2. Levi | 24 | 11.11 |
| Subtotal | 32 | 14.81 |
| 3. Levi and Other | -- | --- |
| 4. Ruehl | 1 | 0.46 |
| 5. Other | 74 | 34.26 |
| 6. Don't know | 109 | 50.46 |
| Total | 216 | 100.00 |

21    ///

22    ///

23    ///

24    ///

25    ///

---

27          [18]    Table numbers in this declaration and Rule 26 report
28    correspond to the table numbers in Exhibit A, Volumes I & II, and
     therefore may not be sequential.

1          35. An additional approximate two percent (1.39% +

2  0.93% = 2.32%) of the survey respondents reported that they

3  believed that the Ruehl jeans were being put out with the

4  authorization/approval of (1.39%) or had a business

5  affiliation/connection (0.93%) with Levi.  See Exhibit A,

6  Volume I, Table 2, page 32 and Table 3, page 52.

7

8                                 TABLE 2
                                 TEST CELL
                         ADULT FEMALES

9

10 6.0   Do you believe that these jeans...
        one, <u>are</u> being put out with the authorization or approval
        of any other company or companies;

11         two, are <u>not</u> being put out with the authorization or
        approval of any other company or companies; or

12         three, don't know or have no opinion?
Q6.1  What other company or companies?

13 Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?

14

| Response Categories | Response Distribution | | Unduplicated | |
|---|---|---|---|---|
| | Number | Percent (n=216) | Number | Percent (n=216) |
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | 1 | 0.46 | | |
| • Levi | 3 | 1.39 | | |
| Subtotal | 4 | 1.85 | 3 | 1.39 |
| • Levi and Other | -- | --- | | |
| • Ruehl | -- | --- | | |
| • Other | 26 | 12.04 | | |
| • Don't know | 17 | 7.87 | | |
| Subtotal | 47 | 21.76 | | |
| 2. Not put out with approval | 37 | 17.13 | | |
| 3. Don't know/No opinion | 132 | 61.11 | | |
| Total | 216 | 100.00 | | |

26

27 ///

28 ///

```
                              TABLE 3
                            TEST CELL
                          ADULT FEMALES

Q7.0  Do you believe that the company that puts out these
      jeans...
          one, has a business affiliation or business connection
          with any other company or companies;
          two, does not have a business affiliation or business
          connection with any other company or companies; or
          three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?
```

| Response Categories | Response Distribution | | Unduplicated | |
|---|---|---|---|---|
| | Number | Percent (n=216) | Number | Percent (n=216) |
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 2 | 0.93 | | |
| Subtotal | 2 | 0.93 | 2 | 0.93 |
| • Levi and Other | 1 | 0.46 | | |
| • Ruehl | -- | --- | | |
| • Other | 24 | 11.11 | | |
| • Don't know | 29 | 13.43 | | |
| Subtotal | 56 | 25.93 | | |
| 2. Does not have business affiliation or connection | 44 | 20.37 | | |
| 3. Don't know/No opinion | 116 | 53.70 | | |
| Total | 216 | 100.00 | | |

///
///
///
///
///
///
///

1    36.  As noted earlier, the likelihood of confusion
2  survey conducted in this matter also employed the use of
3  questions (i.e., "Why do you say that?" and "What else, if
4  anything, makes you say that?") to provide an indication of the
5  basis for the respondents' beliefs expressed in response to the
6  survey's source, authorization/approval of, and business
7  affiliation/connection questions.  A review of the responses to
8  these questions, for respondents who gave a Levi response to any
9  of the survey questions in the test cell, indicates that in total
10  approximately four percent (4.17%) of respondents made specific
11  reference to the pocket and/or stitching on the Ruehl jeans.  See
12  Exhibit A, Volume I, Table 17, page 224, and Volume III,
13  Appendix E, page E-1.
14  <u>Control Cell 1 - Survey Results</u>
15    37.  As noted earlier, this study employed two separate
16  control cells to provide a measure of the extent to which non-
17  trademark confusion exists in the test cell survey results which
18  are not reflective of a likelihood of confusion due to the
19  stitching design on the Ruehl jeans.  The control survey cells
20  function as a baseline and provide a measure of the degree to
21  which respondents are likely to give the answer "Levi," not as a
22  result of the stitching design on the pocket of Defendant's jeans
23  but because of other factors, such as the survey's questions, the
24  survey's procedures, the nature of the product, or some other
25  potential influence on a respondent's answer such as simply the
26  presence of a stitching design on the back pocket of a pair of
27  jeans or the market share or brand popularity of Levi jeans.
28  ///

1    38.  Approximately forty-three percent (43.12%) of the

2  survey respondents who saw the Lucky jeans, in the first control

3  cell, reported that they believed that the Lucky jeans were made

4  or put out by Levi.  See Exhibit A, Volume I, Table 6, page 84.

5

6

7

8

9

```
TABLE 6
CONTROL CELL 1
ADULT FEMALES

Q5.0  Who do you believe makes or puts out these jeans?
Q5.1  Why do you say that?
Q5.2  What else, if anything, makes you say that?
```

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=218) |
| 1. Levi - pocket/stitching | 41 | 18.81 |
| 2. Levi | 53 | 24.31 |
| Subtotal | 94 | 43.12 |
| 3. Levi and Other | 5 | 2.29 |
| 4. Lucky | 3 | 1.38 |
| 5. Other | 46 | 21.10 |
| 6. Don't know | 70 | 32.11 |
| Total | 218 | 100.00 |

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1        39.  An additional approximate five percent (1.38% +

2  3.21% = 4.59%) of the survey respondents reported that they

3  believed that the Lucky jeans were being put out with the

4  authorization/approval of (1.38%) or had a business affiliation/

5  connection (3.21%) with Levi.  See Exhibit A, Volume I, Table 7,

6  page 104 and Table 8, page 125.

7

```
                              TABLE 7
8                          CONTROL CELL 1
                           ADULT FEMALES
9
Q6.0  Do you believe that these jeans...
10          one, are being put out with the authorization or approval
            of any other company or companies;
11          two, are not being put out with the authorization or
            approval of any other company or companies; or
12          three, don't know or have no opinion?
Q6.1  What other company or companies?
13 Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?
```

14

| | Response Distribution | | | |
|---|---|---|---|---|
| Response Categories | Number | Percent (n=218) | Number | Unduplicated Percent (n=218) |
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 8 | 3.67 | | |
| Subtotal | 8 | 3.67 | 3 | 1.38 |
| • Levi and Other | 1 | 0.46 | | |
| • Lucky | 1 | 0.46 | | |
| • Other | 23 | 10.55 | | |
| • Don't know | 30 | 13.76 | | |
| Subtotal | 63 | 28.90 | | |
| 2. Not put out with approval | 22 | 10.09 | | |
| 3. Don't know/No opinion | 133 | 61.01 | | |
| Total | 218 | 100.00 | | |

27 ///

28 ///

```
TABLE 8
CONTROL CELL 1
ADULT FEMALES
```

Q7.0  Do you believe that the company that puts out these jeans...
  one, has a business affiliation or business connection with any other company or companies;
  two, does not have a business affiliation or business connection with any other company or companies; or
  three, don't know or have no opinion?

Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?

| Response Categories | Number | Percent (n=218) | Unduplicated Number | Percent (n=218) |
|---|---|---|---|---|
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | 3 | 1.38 | | |
| • Levi | 6 | 2.75 | | |
| Subtotal | 9 | 4.13 | 7 | 3.21 |
| • Levi and Other | -- | --- | | |
| • Lucky | -- | --- | | |
| • Other | 18 | 8.26 | | |
| • Don't know | 34 | 15.60 | | |
| Subtotal | 61 | 27.98 | | |
| 2. Does not have business affiliation/connection | 22 | 10.09 | | |
| 3. Don't know/No opinion | 135 | 61.93 | | |
| Total | 218 | 100.00 | | |

/// 
/// 
/// 
/// 
/// 
/// 
///

1    40.    The first control cell also employed the use of
2  questions (i.e., "Why do you say that?" and "What else, if
3  anything, makes you say that?") to provide an indication of the
4  basis for the respondents' beliefs expressed in response to the
5  survey's source, authorization/approval of, and business
6  affiliation/connection questions.    A review of the responses to
7  these questions, for respondents who gave a Levi response to any
8  of the survey questions in the first control cell, indicates that
9  in total approximately twenty percent (20.18%) of respondents
10  made specific reference to the pocket and/or stitching on the
11  Lucky jeans.    See Exhibit A, Volume I, Table 17, page 224, and
12  Volume III, Appendix E, page E-1.
13  ///
14  ///
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

1 | Control Cell 2 - Survey Results

2 |      41.  Approximately twenty-nine percent (28.57%) of the

3 | survey respondents who saw the Indigo Red jeans, in the second

4 | control cell, reported that they believed that the Indigo Red

5 | jeans were made or put out by Levi.  See Exhibit A, Volume I,

6 | Table 11, page 156.

TABLE 11
CONTROL CELL 2
ADULT FEMALES

Q5.0  Who do you believe makes or puts out these jeans?
Q5.1  Why do you say that?
Q5.2  What else, if anything, makes you say that?

| Response Categories | Response Distribution | |
|---|---|---|
| | Number | Percent (n=217) |
| 1. Levi - pocket/stitching | 29 | 13.36 |
| 2. Levi | 33 | 15.21 |
| Subtotal | 62 | 28.57 |
| 3. Levi and Other | 6 | 2.77 |
| 4. Indigo Red | -- | --- |
| 5. Other | 75 | 34.56 |
| 6. Don't know | 74 | 34.10 |
| Total | 217 | 100.00 |

20 | ///
21 | ///
22 | ///
23 | ///
24 | ///
25 | ///
26 | ///
27 | ///
28 | ///

1        42.  An additional approximate five percent (2.30% +

2    2.30% = 4.60%) of the survey respondents reported that they

3    believed that the Indigo Red jeans were being put out with the

4    authorization/approval of (2.30%) or had a business

5    affiliation/connection (2.30%) with Levi.  See Exhibit A,

6    Volume I, Table 12, page 177 and Table 13, page 198.

7
8
9
10
11
12
13
14

TABLE 12
CONTROL CELL 2
ADULT FEMALES

Q6.0  Do you believe that these jeans...
        one, are being put out with the authorization or approval
        of any other company or companies;
        two, are not being put out with the authorization or
        approval of any other company or companies; or
        three, don't know or have no opinion?
Q6.1  What other company or companies?
Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?

| Response Categories | Response Distribution | | Unduplicated | |
|---|---|---|---|---|
| | Number | Percent (n=217) | Number | Percent (n=217) |
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | 3 | 1.38 | | |
| • Levi | 5 | 2.30 | | |
| Subtotal | 8 | 3.68 | 5 | 2.30 |
| • Levi and Other | 1 | 0.46 | | |
| • Indigo Red | -- | --- | | |
| • Other | 20 | 9.22 | | |
| • Don't know | 32 | 14.75 | | |
| Subtotal | 61 | 28.11 | | |
| 2. Not put out with approval | 23 | 10.60 | | |
| 3. Don't know/No opinion | 133 | 61.29 | | |
| Total | 217 | 100.00 | | |

27    ///

28    ///

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

**TABLE 13**
**CONTROL CELL 2**
**ADULT FEMALES**

Q7.0  Do you believe that the company that puts out these jeans...
one, <u>has</u> a business affiliation or business connection with any other company or companies;
two, does <u>not</u> have a business affiliation or business connection with any other company or companies; or
three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?

| Response Categories | Number | Percent (n=217) | Unduplicated Number | Percent (n=217) |
|---|---|---|---|---|
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | 2 | 0.92 | | |
| • Levi | 8 | 3.69 | | |
| Subtotal | 10 | 4.61 | 5 | 2.30 |
| • Levi and Other | -- | -- | | |
| • Indigo Red | -- | --- | | |
| • Other | 30 | 13.82 | | |
| • Don't know | 41 | 18.89 | | |
| Subtotal | 81 | 37.33 | | |
| 2. Does not have business affiliation/connection | 24 | 11.06 | | |
| 3. Don't know/No opinion | 112 | 51.61 | | |
| Total | 217 | 100.00 | | |

43.  The second control cell also employed the use of questions (i.e., "Why do you say that?" and "What else, if anything, makes you say that?") to provide an indication of the basis for the respondents' beliefs expressed in response to the survey's source, authorization/approval of, and business affiliation/connection questions.  A review of the responses to these questions, for respondents who gave a Levi response to any

1  of the survey questions in the second control cell, indicates

2  that in total approximately fifteen percent (14.75%) of

3  respondents made specific reference to the pocket and/or

4  stitching on the Indigo Red jeans.  See Exhibit A, Volume I,

5  Table 17, page 224, and Volume III, Appendix E, page E-1.

6  Summary of Results - Adult Females

7      44.  The results of the likelihood of confusion survey among

8  adult females, on a net basis after adjusting the survey data for

9  non-trademark related confusion, do not evidence any trademark

10  confusion attributable to the pocket stitching on the Ruehl

11  jeans.  Specifically, the survey results evidence that when non-

12  trademark confusion is accounted for (e.g., the tendency or

13  predisposition of some consumers to attribute the source of any

14  pair of jeans to Levi, the tendency or predisposition of some

15  consumers to attribute the source of any pair of jeans with

16  pocket stitching to Levi, etc.), there is no confusion

17  attributable to the stitching design present on the pocket of the

18  Ruehl jeans.

19      45.  The adjustment for non-trademark related confusion

20  is accomplished by reducing the percent of Levi responses in the

21  test cell by the percent of Levi responses in the control cells.

22  In this case, 17.13% of the survey respondents in the test cell

23  indicated they believed that Levi was the source, authorized/

24  approved of, or had a business affiliation/connection with

25  Defendant's jeans.  In control cell one, 47.71% of the survey

26  respondents indicated that they believed that Levi was the

27  source, authorized/approved of, or had a business affiliation/

28  connection with the first control jeans, the Lucky jeans that are

1  not alleged to infringe.  Thus, the likelihood of confusion
2  level, based on the first control cell, would be calculated as
3  17.13% - 47.71% = -30.58% or simply no likelihood of confusion
4  attributable to the stitching design on the pocket of the Ruehl
5  jeans.  In control cell two, 33.17% of the survey respondents
6  indicated that they believed that Levi was the source,
7  authorized/approved of, or had a business affiliation/connection
8  with the second control jeans, the Indigo Red jeans that are not
9  alleged to infringe.  Thus, the likelihood of confusion level,
10 based on the second control cell, would be calculated as 17.13% -
11 33.17% = -16.04%, again, simply no likelihood of confusion
12 attributable to the stitching design on the pocket of the Ruehl
13 jeans.  See Exhibit A, Volume I, Table 16, page 223.

TABLE 16
TEST AND CONTROL CELLS
ADULT FEMALES

Composite Response Analysis
Net Unduplicated Levi Responses

| Response Categories | Unduplicated Response Distribution | | |
| | Test Cell 1 Percent (n=216) | Control Cell 1 Percent (n=218) | Control Cell 2 Percent (n=217) |
|---|---|---|---|
| Total - Levi | 17.13 | 47.71 | 33.17 |

23        46.  The results of the likelihood of confusion survey
24 among adult females, on a net basis after adjusting the survey
25 data for non-trademark related confusion based upon the "Why do
26 you say that?" and "What else, if anything, makes you say that?"
27 questions, do not evidence any trademark confusion attributable
28 to the pocket stitching on the Ruehl jeans.

1          47.  The adjustment for non-trademark related confusion
2 based upon pocket and/or stitching responses to the "Why do you
3 say that?" and "What else, if anything, makes you say that?"
4 questions is accomplished by reducing the percent of Levi -
5 pocket/stitching responses in the test cell by the percent of
6 Levi - pocket/stitching responses in the control cells.  In this
7 case, 4.17% of the survey respondents in the test cell indicated
8 they believed that Levi was the source, authorized/approved of,
9 or had a business affiliation/connection with Defendant's jeans
10 and when asked why they held that belief provided a Levi -
11 pocket/stitching response.  In control cell one, 20.18% of the
12 survey respondents indicated that they believed that Levi was the
13 source, authorized/approved of, or had a business affiliation/
14 connection with the first control jeans, the Lucky jeans that are
15 not alleged to infringe, and when asked why they held that belief
16 provided a Levi - pocket/stitching response.  Thus, the
17 likelihood of confusion level, based on the first control cell,
18 would be calculated as 4.17% - 20.18% = -16.01%, simply no
19 likelihood of confusion attributable to the stitching design on
20 the pocket of the Ruehl jeans.  In control cell two, 14.75% of
21 the survey respondents indicated that they believed that Levi was
22 the source, authorized/approved of, or had a business
23 affiliation/connection with the second control jeans, the Indigo
24 Red jeans that are not alleged to infringe, and when asked why
25 they held that belief provided a Levi - pocket/stitching
26 response.  Thus, the likelihood of confusion level, based on the
27 second control cell, would be calculated as 4.17% - 14.75% = -
28 10.58%, again, simply no likelihood of confusion attributable to

Declaration and Rule 26 Report      - 30 -
of Dr. Gerald L. Ford

1  the stitching design on the pocket of the Ruehl jeans.  See

2  Exhibit A, Volume I, Table 17, page 224.

3

| TABLE 17 TEST AND CONTROL CELLS ADULT FEMALES | | | |
|---|---|---|---|
| Composite Response Analysis Net Unduplicated Levi-Pocket/Stitching Responses | | | |
| | Unduplicated Response Distribution | | |
| Response Categories | Test Cell 1 Percent (n=216) | Control Cell 1 Percent (n=218) | Control Cell 2 Percent (n=217) |
| Total - Levi-pocket/stitching | 4.17 | 20.18 | 14.75 |

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1  <u>SURVEY RESULTS - 13 TO 17 YEAR OLD FEMALES</u>

2  <u>Test Cell - Survey Results</u>

3          48.   Approximately seventeen percent (16.67%) of the 13

4  to 17 year old female survey respondents who saw the Ruehl jeans,

5  in the test cell, reported that they believed that the Ruehl

6  jeans were made or put out by Levi.  See Exhibit A, Volume II,

7  Table 18, page 233.

8

9                            TABLE 18
                             TEST CELL
                  13 TO 17 YEAR OLD FEMALES

10
    Q5.0   Who do you believe makes or puts out these jeans?
11  Q5.1   Why do you say that?
    Q5.2   What else, if anything, makes you say that?

12
                                          Response Distribution
13  Response Categories                   Number      Percent
                                                      (n=108)
14
       1. Levi - pocket/stitching            3          2.78
15     2. Levi                              15         13.89

16        Subtotal                         18         16.67

17     3. Levi and Other                     1          0.93
       4. Ruehl                              1          0.93
18     5. Other                            35         32.41
       6. Don't know                       53         49.07
19
          Total                           108        100.00
20

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1        49.  No additional 13 to 17 year old female survey

2   respondents reported that they believed that the Ruehl jeans were

3   being put out with the authorization/approval of or had a

4   business affiliation/connection with Levi.  See Exhibit A,

5   Volume II, Table 19, page 247 and Table 20, page 261.

6

7                          TABLE 19
                          TEST CELL
              13 TO 17 YEAR OLD FEMALES

8

Q6.0  Do you believe that these jeans...
9         one, are being put out with the authorization or approval
          of any other company or companies;
10        two, are not being put out with the authorization or
          approval of any other company or companies; or
11        three, don't know or have no opinion?
Q6.1  What other company or companies?
12  Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?

13

| | Response Distribution | | | |
|---|---|---|---|---|
| Response Categories | Number | Percent (n=108) | Unduplicated Number | Percent (n=108) |
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 1 | 0.93 | | |
| Subtotal | 1 | 0.93 | -- | --- |
| • Levi and Other | -- | --- | | |
| • Ruehl | -- | --- | | |
| • Other | 14 | 12.96 | | |
| • Don't know | 22 | 20.37 | | |
| Subtotal | 37 | 34.26 | | |
| 2. Not put out with approval | 11 | 10.19 | | |
| 3. Don't know/No opinion | 60 | 55.56 | | |
| Total | 108 | 100.00 | | |

25

26  ///

27  ///

28  ///

Declaration and Rule 26 Report              - 33 -
of Dr. Gerald L. Ford

```
                              TABLE 20
                             TEST CELL
                    13 TO 17 YEAR OLD FEMALES
```

Q7.0  Do you believe that the company that puts out these
      jeans...
          one, <u>has</u> a business affiliation or business connection
          with any other company or companies;
          two, does <u>not</u> have a business affiliation or business
          connection with any other company or companies; or
          three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?

| Response Categories | Number | Percent (n=108) | Unduplicated Number | Percent (n=108) |
|---|---|---|---|---|
| 1. Has business affiliation or connection | | | | |
| • Levi – pocket/stitching | -- | --- | | |
| • Levi | 1 | 0.93 | | |
| Subtotal | 1 | 0.93 | -- | --- |
| • Levi and Other | -- | --- | | |
| • Ruehl | -- | --- | | |
| • Other | 15 | 13.89 | | |
| • Don't know | 14 | 12.96 | | |
| Subtotal | 30 | 27.78 | | |
| 2. Does not have business affiliation or connection | 14 | 12.96 | | |
| 3. Don't know/No opinion | 64 | 59.26 | | |
| Total | 108 | 100.00 | | |

        50.  As noted earlier, the likelihood of confusion

survey conducted among 13 to 17 year old females in this matter

also employed the use of questions (i.e., "Why do you say that?"

and "What else, if anything, makes you say that?") to provide an

indication of the basis for the respondents' beliefs expressed in

response to the survey's source, authorization/approval of, and

business affiliation/connection questions.  A review of the

1  responses to these questions, for respondents who gave a Levi
2  response to any of the survey questions in the test cell,
3  indicates that in total approximately three percent (2.78%) of
4  respondents made specific reference to the pocket and/or
5  stitching on the Ruehl jeans.  See Exhibit A, Volume II,
6  Table 34, page 383, and Volume III, Appendix E, page E-2.
7  Control Cell 1 - Survey Results

8          51.  The survey among 13 to 17 year old females also
9  employed two separate control cells to provide a measure of the
10  extent to which non-trademark confusion exists in the test cell
11  survey results which are not reflective of a likelihood of
12  confusion due to the stitching design on the Ruehl jeans.  The
13  control survey cells function as a baseline and provide a measure
14  of the degree to which respondents are likely to give the answer
15  "Levi," not as a result of the stitching design on the pocket of
16  Defendant's jeans but because of other factors, such as the
17  survey's questions, the survey's procedures, the nature of the
18  product, or some other potential influence on a respondent's
19  answer such as simply the presence of a stitching design on the
20  back pocket of a pair of jeans or the market share or brand
21  popularity of Levi jeans.
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

1        52.  Among the 13 to 17 year old female respondents,

2    approximately thirty-nine percent (38.89%) who saw the Lucky

3    jeans, in the first control cell, reported that they believed

4    that the Lucky jeans were made or put out by Levi.  See

5    Exhibit A, Volume II, Table 23, page 284.

6

7                        TABLE 23
                      CONTROL CELL 1
8             13 TO 17 YEAR OLD FEMALES

9    Q5.0  Who do you believe makes or puts out these jeans?
     Q5.1  Why do you say that?
10   Q5.2  What else, if anything, makes you say that?

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=108) |
| 1. Levi - pocket/stitching | 12 | 11.11 |
| 2. Levi | 30 | 27.78 |
|     Subtotal | 42 | 38.89 |
| 3. Levi and Other | 3 | 2.78 |
| 4. Lucky | 2 | 1.85 |
| 5. Other | 24 | 22.22 |
| 6. Don't know | 37 | 34.26 |
|     Total | 108 | 100.00 |

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

1        53.  No additional 13 to 17 year old female survey

2  respondents reported that they believed that the Lucky jeans were

3  being put out with the authorization/approval of or had a

4  business affiliation/connection with Levi.  See Exhibit A,

5  Volume II, Table 24, page 298 and Table 25, page 313.

6

```
                              TABLE 24
                           CONTROL CELL 1
                     13 TO 17 YEAR OLD FEMALES
```

Q6.0  Do you believe that these jeans...
      one, <u>are</u> being put out with the authorization or approval
      of any other company or companies;
      two, are <u>not</u> being put out with the authorization or
      approval of any other company or companies; or
      three, don't know or have no opinion?
Q6.1  What other company or companies?
Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?

| Response Categories | Response Distribution | | Unduplicated | |
|---|---|---|---|---|
| | Number | Percent (n=108) | Number | Percent (n=108) |
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 1 | 0.93 | | |
|     Subtotal | 1 | 0.93 | -- | --- |
| • Levi and Other | 3 | 2.78 | | |
| • Lucky | -- | --- | | |
| • Other | 10 | 9.26 | | |
| • Don't know | 20 | 18.52 | | |
|     Subtotal | 34 | 31.48 | | |
| 2. Not put out with approval | 8 | 7.41 | | |
| 3. Don't know/No opinion | 66 | 61.11 | | |
|     Total | 108 | 100.00 | | |

26  ///

27  ///

28  ///

```
                              TABLE 25
                         CONTROL CELL 1
                    13 TO 17 YEAR OLD FEMALES
```

Q7.0  Do you believe that the company that puts out these
      jeans...
         one, <u>has</u> a business affiliation or business connection
         with any other company or companies;
         two, does <u>not</u> have a business affiliation or business
         connection with any other company or companies; or
         three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?

| Response Categories | Number | Percent (n=108) | Unduplicated Number | Percent (n=108) |
|---|---|---|---|---|
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | -- | --- | | |
| Subtotal | -- | --- | -- | --- |
| • Levi and Other | 2 | 1.85 | | |
| • Lucky | -- | --- | | |
| • Other | 12 | 11.11 | | |
| • Don't know | 20 | 18.52 | | |
| Subtotal | 34 | 31.48 | | |
| 2. Does not have business affiliation or connection | 14 | 12.96 | | |
| 3. Don't know/No opinion | 60 | 55.56 | | |
| Total | 108 | 100.00 | | |

54.  The first control cell conducted among 13 to 17
year old females in this matter also employed the use of
questions (i.e., "Why do you say that?" and "What else, if
anything, makes you say that?") to provide an indication of the
basis for the respondents' beliefs expressed in response to the
survey's source, authorization/approval of, and business
affiliation/connection questions.  A review of the responses to

Case 3:07-cv-03752-JSW    Document 104-22    Filed 08/15/2008    Page 40 of 51

these questions, for respondents who gave a Levi response to any

of the survey questions in the first control cell, indicates that

in total approximately eleven percent (11.11%) of respondents

made specific reference to the pocket and/or stitching on the

Lucky jeans.  See Exhibit A, Volume II, Table 34, page 383, and

Volume III, Appendix E, page E-2.

Control Cell 2 - Survey Results

     55.  Among the 13 to 17 year old female respondents,

approximately twenty-nine percent (28.70%) who saw the Indigo Red

jeans, in the second control cell, reported that they believed

that the Indigo Red jeans were made or put out by Levi.  See

Exhibit A, Volume II, Table 28, page 337.

---

**TABLE 28**
**CONTROL CELL 2**
**13 TO 17 YEAR OLD FEMALES**

Q5.0   Who do you believe makes or puts out these jeans?
Q5.1   Why do you say that?
Q5.2   What else, if anything, makes you say that?

| Response Categories | Response Distribution Number | Percent (n=108) |
|---|---|---|
| 1. Levi - pocket/stitching | 10 | 9.26 |
| 2. Levi | 21 | 19.44 |
| Subtotal | 31 | 28.70 |
| 3. Levi and Other | 2 | 1.85 |
| 4. Indigo Red | -- | --- |
| 5. Other | 25 | 23.15 |
| 6. Don't know | 50 | 46.30 |
| Total | 108 | 100.00 |

///

///

///

Declaration and Rule 26 Report
of Dr. Gerald L. Ford                    - 39 -

1        56.  An additional approximate two percent (1.85%) of

2  the 13 to 17 year old female survey respondents reported that

3  they believed that the company that put out the Indigo Red jeans

4  had a business affiliation/connection (1.85%) with Levi.  See

5  Exhibit A, Volume II, Table 29, page 351 and Table 30, page 306.

6

7
TABLE 29
CONTROL CELL 2
13 TO 17 YEAR OLD FEMALES

8

Q6.0  Do you believe that these jeans...

9         one, are being put out with the authorization or approval
          of any other company or companies;

10        two, are not being put out with the authorization or
          approval of any other company or companies; or

11        three, don't know or have no opinion?

Q6.1  What other company or companies?

12  Q6.2  Why do you say that?

Q6.3  What else, if anything, makes you say that?

13

| Response Categories | Response Distribution | | | |
|---|---|---|---|---|
| | | | Unduplicated | |
| | Number | Percent (n=108) | Number | Percent (n=108) |
| 1. Put out with authorization or approval | | | | |
|   &bull; Levi - pocket/stitching | -- | --- | | |
|   &bull; Levi | -- | --- | | |
|     Subtotal | -- | --- | -- | --- |
|   &bull; Levi and Other | -- | --- | | |
|   &bull; Indigo Red | -- | --- | | |
|   &bull; Other | 13 | 12.04 | | |
|   &bull; Don't know | 29 | 26.85 | | |
|     Subtotal | 42 | 38.89 | | |
| 2. Not put out with approval | 13 | 12.04 | | |
| 3. Don't know/No opinion | 53 | 49.07 | | |
|     Total | 108 | 100.00 | | |

25

26  ///

27  ///

28  ///

```
 1
 2                              TABLE 30
                            CONTROL CELL 2
 3                     13 TO 17 YEAR OLD FEMALES

     Q7.0   Do you believe that the company that puts out these
 4          jeans...
               one, has a business affiliation or business connection
 5             with any other company or companies;
               two, does not have a business affiliation or business
 6             connection with any other company or companies; or
               three, don't know or have no opinion?
 7   Q7.1   What other company or companies?
     Q7.2   Why do you say that?
 8   Q7.3   What else, if anything, makes you say that?
```

|  |  |  | Response Distribution | |
| --- | --- | --- | --- | --- |
|  |  |  | Unduplicated | |
| Response Categories | Number | Percent (n=108) | Number | Percent (n=108) |
| 1. Has business affiliation or connection |  |  |  |  |
|   • Levi - pocket/stitching | -- | --- |  |  |
|   • Levi | 2 | 1.85 |  |  |
|   Subtotal | 2 | 1.85 | 2 | 1.85 |
|   • Levi and Other | 2 | 1.85 |  |  |
|   • Indigo Red | -- | --- |  |  |
|   • Other | 5 | 4.63 |  |  |
|   • Don't know | 22 | 20.37 |  |  |
|   Subtotal | 31 | 28.70 |  |  |
| 2. Does not have business affiliation/connection | 18 | 16.67 |  |  |
| 3. Don't know/No opinion | 59 | 54.63 |  |  |
|   Total | 108 | 100.00 |  |  |

57.  The second control cell conducted among 13 to 17
year old females in this matter also employed the use of
questions (i.e., "Why do you say that?" and "What else, if
anything, makes you say that?") to provide an indication of the
basis for the respondents' beliefs expressed in response to the
survey's source, authorization/approval of, and business
affiliation/connection questions.  A review of the responses to

1  these questions, for respondents who gave a Levi response to any
2  of the survey questions in the second control cell, indicates
3  that in total approximately nine percent (9.26%) of respondents
4  made specific reference to the pocket and/or stitching on the
5  Indigo Red jeans.  See Exhibit A, Volume II, Table 34, page 383,
6  and Volume III, Appendix E, page E-2.

7  Summary of Results - 13 to 17 Year Old Females

8     58.  The results of the likelihood of confusion survey among
9  13 to 17 year old females, on a net basis after adjusting the
10  survey data for non-trademark related confusion, do not evidence
11  any trademark confusion attributable to the pocket stitching on
12  the Ruehl jeans.  Specifically, the survey results evidence that
13  when non-trademark confusion is accounted for (e.g., the tendency
14  or predisposition of some consumers to attribute the source of
15  any pair of jeans to Levi, the tendency or predisposition of some
16  consumers to attribute the source of any pair of jeans with
17  pocket stitching to Levi, etc.), there is no confusion
18  attributable to the stitching design present on the pocket of the
19  Ruehl jeans.

20     59.  The adjustment for non-trademark related confusion
21  is accomplished by reducing the percent of Levi responses in the
22  test cell by the percent of Levi responses in the control cells.
23  In this case, approximately eighteen percent (17.59%) of the 13
24  to 17 year old female survey respondents in the test cell
25  indicated they believed that Levi was the source,
26  authorized/approved of, or had a business affiliation/connection
27  with Defendant's jeans.  In control cell one, approximately
28  thirty-nine percent (38.89%) of the 13 to 17 year old survey

1   respondents indicated that they believed that Levi was the
2   source, authorized/approved of, or had a business affiliation/
3   connection with the first control jeans, the Lucky jeans that are
4   not alleged to infringe.  Thus, the likelihood of confusion
5   level, based on the first control cell, would be calculated as
6   17.59% - 38.89% = -21.30%, simply no likelihood of confusion
7   attributable to the stitching design on the pocket of the Ruehl
8   jeans.  In control cell two, approximately thirty-one percent
9   (30.56%) of the survey respondents indicated that they believed
10  that Levi was the source, authorized/approved of, or had a
11  business affiliation/connection with the second control jeans,
12  the Indigo Red jeans that are not alleged to infringe.  Thus, the
13  likelihood of confusion level, based on the second control cell,
14  would be calculated as 17.59% - 30.56% = -12.97%, again, simply
15  no likelihood of confusion attributable to the stitching design
16  on the pocket of the Ruehl jeans.  See Exhibit A, Volume II,
17  Table 33, page 382.

18
19
20
21

TABLE 33
TEST AND CONTROL CELLS
13 TO 17 YEAR OLD FEMALES

Composite Response Analysis
Net Unduplicated Levi Responses

| Response Categories | Unduplicated Response Distribution | | |
| --- | --- | --- | --- |
| | Test Cell 1 Percent (n=108) | Control Cell 1 Percent (n=108) | Control Cell 2 Percent (n=108) |
| Total - Levi | 17.59 | 38.89 | 30.56 |

27        60.  The results of the likelihood of confusion survey
28  among 13 to 17 year old females, on a net basis after adjusting

1    the survey data for non-trademark related confusion based upon

2    the "Why do you say that?" and "What else, if anything, makes you

3    say that?" questions, do not evidence any trademark confusion

4    attributable to the pocket stitching on the Ruehl jeans.

5            61.   The adjustment for non-trademark related confusion

6    based upon pocket and/or stitching responses to the "Why do you

7    say that?" and "What else, if anything, makes you say that?"

8    questions is accomplished by reducing the percent of Levi -

9    pocket/stitching responses in the test cell by the percent of

10   Levi - pocket/stitching responses in the control cells.  In this

11   case, approximately three percent (2.78%) of the survey

12   respondents in the test cell indicated they believed that Levi

13   was the source, authorized/approved of, or had a business

14   affiliation/connection with Defendant's jeans and when asked why

15   they held that belief provided a Levi - pocket/stitching

16   response.  In control cell one, approximately eleven percent

17   (11.11%) of the survey respondents indicated that they believed

18   that Levi was the source, authorized/approved of, or had a

19   business affiliation/connection with the first control jeans, the

20   Lucky jeans that are not alleged to infringe, and when asked why

21   they held that belief provided a Levi - pocket/stitching

22   response.  Thus, the likelihood of confusion level, based on the

23   first control cell, would be calculated as 2.78% - 11.11% =

24   -8.33%, simply no likelihood of confusion attributable to the

25   stitching design on the pocket of the Ruehl jeans.  In control

26   cell two, approximately nine percent (9.26%)% of the survey

27   respondents indicated that they believed that Levi was the

28   source, authorized/approved of, or had a business affiliation/

1  connection with the second control jeans, the Indigo Red jeans

2  that are not alleged to infringe, and when asked why they held

3  that belief provided a Levi - pocket/stitching response.  Thus,

4  the likelihood of confusion level, based on the second control

5  cell, would be calculated as 2.78% - 9.26% =

6  -6.48%, again, simply no likelihood of confusion attributable to

7  the stitching design on the pocket of the Ruehl jeans.  See

8  Exhibit A, Volume II, Table 34, page 383.

9

TABLE 34
TEST AND CONTROL CELLS
13 TO 17 YEAR OLD FEMALES

Composite Response Analysis
Net Unduplicated Levi-Pocket/Stitching Responses

|  | Unduplicated Response Distribution | | |
|---|---|---|---|
| Response Categories | Test Cell 1 Percent (n=108) | Control Cell 1 Percent (n=108) | Control Cell 2 Percent (n=108) |
| Total - Levi-pocket/stitching | 2.78 | 11.11 | 9.26 |

18                              CONCLUSION

19        62.  It is my considered opinion, based upon my

20  education, background, and professional experience, and based

21  upon my review and analysis of the survey conducted in this

22  matter, that the results of the survey conducted in this matter

23  clearly support a finding of no likelihood of confusion as to the

24  source, authorization/approval of, or business affiliation/

25  connection of Defendant's jeans with the source LS&CO due to the

26  stitching design on the pocket of the Ruehl brand jeans.

27  ///

28  ///

Declaration and Rule 26 Report          - 45 -
of Dr. Gerald L. Ford

1                           QUALIFICATIONS

2          63.   I hold a Bachelor's Degree in Advertising (B.A.)

3   from San Jose State University, a Master's Degree in Business

4   Administration (M.B.A.) from the University of Southern

5   California, and a Doctoral Degree in Business Administration

6   (D.B.A.) from the University of Southern California.

7          64.   During my twenty-five year academic appointment,

8   my teaching responsibilities included both graduate and

9   undergraduate level courses in a variety of subject areas.   My

10  teaching responsibilities included courses in marketing (e.g.,

11  marketing, marketing management, advertising, promotion, consumer

12  behavior, and marketing research) and management (e.g.,

13  principles of management; business policy and strategy; business

14  policies, operations, and organizations; and integrated

15  analysis).

16         65.   I am a member of the American Marketing

17  Association (AMA), the American Academy of Advertising (AAA), the

18  American Association of Public Opinion Research (AAPOR), the

19  Council of American Survey Research Organizations (CASRO), and

20  the International Trademark Association (INTA).

21         66.   As a partner with Ford Bubala & Associates, I have

22  been retained by a variety of firms engaged in the consumer

23  product, industrial product, and service sectors of the economy

24  to provide marketing consulting and research services.

25  Approximately one-half of Ford Bubala & Associates' consultancies

26  in which I have participated have involved the design and

27  execution of marketing research surveys.

28  ///

1    67.  As previously noted, during the past thirty-three
2  years, I have been retained in a number of litigation-related
3  consultancies involving intellectual property matters, including
4  matters before federal and state courts, the Trademark Trial and
5  Appeal Board of the U.S. Patent and Trademark Office, and the
6  International Trade Commission.  I have designed and executed
7  surveys relating to intellectual property matters, including
8  false advertising, trademark, patent, and other related matters.
9  I am familiar with the accepted principles of survey research, as
10  well as the tests for trustworthiness of properly conducted
11  surveys or polls.[19]

12    68.  During the past twenty-eight years, I have
13  addressed a variety of groups on the subject of surveys or polls
14  and their use in the measurement of the state of mind of
15  consumers, with respect to Lanham Act matters.  Specifically, I
16  have spoken at meetings of the American Bar Association, the
17  American Intellectual Property Law Association, the American
18  Marketing Association, the International Trademark Association,
19  the Marketing Research Association, the Intellectual Property Law
20  Institute of Canada, and the Practising Law Institute.

21    69.  I have also written on the subject of the design
22  and execution of litigation-related surveys in intellectual
23  property matters.  Attached hereto as Exhibit B is a list of
24  papers I have written since 1987.

25    70.  Since 1998 I have served as a member of the
26  Editorial Board of The Trademark Reporter, the scholarly legal

27

28    ──────────────
      [19]    Supra note 2.

Declaration and Rule 26 Report          - 47 -
of Dr. Gerald L. Ford

1  journal on the subject of trademarks, published by the

2  International Trademark Association.

3          71.   I have been qualified and accepted as an expert in

4  marketing and marketing research in more than fifty (50) trials

5  before federal and state courts and administrative government

6  agencies.

7          72.   Attached hereto as Exhibit C is a list of cases in

8  which I have provided trial and/or deposition testimony since

9  1992.

10         73.   Attached hereto as Exhibit D is a copy of my

11 professional history, describing my qualifications and

12 professional background.

13                        MATERIAL CONSIDERED

14         74.   Materials considered, in the instant matter,

15 include:  the Complaint; the Answer, Affirmative Defenses, and

16 Counterclaims; Abercrombie & Fitch Trading Co.'s Amended Answer,

17 Affirmative Defenses, and Counterclaims; Exhibits to Amended

18 Answer, Affirmative Defenses, and Counterclaims; Stipulated

19 Protective Order; Scheduling Order; deposition transcript of

20 Carol Scott, February 17, 2005, in the Levi Strauss v. RP55, Inc.

21 matter; deposition transcript of Carol Scott, March 9, 2005, in

22 the Levi Strauss v. RP55, Inc. matter; and documents bearing

23 document control numbers LS-A&F009526 through LS-A&F009621 and

24 LS-A&F009627 through LS-A&F009665.

25                          COMPENSATION

26         75.   Ford Bubala & Associates' fees for this engagement

27 consist of billable time and expenses.  Standard time is billed

28 at the rate of $500.00 per hour for the services of a Partner and

1 | $250.00 per hour for the services of a Research Associate.
2 | Deposition and trial time are billed at the rate of $600.00 per
3 | hour plus expenses.

4 |      I declare under penalty of perjury under the laws of
5 | the United States of America that the foregoing is true and
6 | correct. Executed this 25th day of June, 2008, in Huntington
7 | Beach, California.

8
9                 _____
10              Dr. Gerald L. Ford

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of June, 2008, I caused a true and correct copy

of the Declaration and Rule 26 Report of Dr. Gerald L. Ford to be served to the following:

| | |
|---|---|
| _____ HAND DELIVERY | Gregory S. Gilchrist |
| ___✓___ U.S. MAIL | Gia L. Cincone |
| _____ OVERNIGHT MAIL | Townsend & Townsend and Crew LLP |
| _____ FAX TRANSMISSION | Two Embarcadero Center, Eighth Floor |
| _____ EMAIL | San Francisco, CA  94111-3834 |
| | fax 415.576.0300 |
| | gsfilchrist@townsend.com |
| | glcincone@townsend.com |