# EXHIBIT JJ

1  MICHAEL J. BETTINGER (State Bar No. 122196)
   RACHEL R. DAVIDSON (State Bar No. 215517)
2  KIRKPATRICK & LOCKHART
   PRESTON GATES ELLIS LLP
3  55 Second Street, Suite 1700
   San Francisco, California  94105
4  Telephone:  415-882-8200
   Facsimile:  415-882-8220
5
   J. MICHAEL KEYES (Pro Hac Vice)
6  KIRKPATRICK & LOCKHART
   PRESTON GATES ELLIS LLP
7  618 West Riverside Avenue, Suite 300
   Spokane, Washington  99201
8  Telephone:  509-624-2100
   Facsimile:  509-456-0146
9
   Attorneys for Defendant
10 ABERCROMBIE & FITCH TRADING CO.

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13

14 LEVI STRAUSS & CO.,                )    No. CV-07-3752
                                      )
15          Plaintiff,                )    Rebuttal Declaration
                                      )    of Dr. Gerald L. Ford
16      v.                            )
                                      )
17 ABERCROMBIE & FITCH TRADING CO.,   )
                                      )
18          Defendant.                )
   _____)
19

20        I, Dr. Gerald L. Ford, hereby declare as follows:

21                        INTRODUCTION

22        1.   I am a partner in the marketing research and

23 consulting firm of Ford Bubala & Associates, located in

24 Huntington Beach, California, where I have been engaged in

25 commercial marketing research and consulting for the past thirty-

26 three years.  I am also an emeritus faculty member of the School

27 of Business Administration, California State University, Long

28 ///

1  Beach, where I held a full-time teaching position for twenty-five

2  years, prior to my retirement in 1994.

3          2.    I am the same Gerald L. Ford who previously filed

4  a Declaration and Rule 26 Report detailing the results of a

5  likelihood of confusion survey that I designed and caused to be

6  conducted in this matter.  For the convenience of the court, my

7  professional experience is summarized below in paragraphs 34

8  through 44.

9          3.    In the instant matter, at the request of

10  Kirkpatrick & Lockhart Preston Gates Ellis LLP, counsel for

11  Defendant, Abercrombie & Fitch Trading Co. ("A&F"), I have been

12  asked to review and comment on two surveys designed by Associate

13  Professor Sanjay Sood ("Sood") on behalf of Plaintiff Levi

14  Strauss & Company ("LS&CO").  One survey was purportedly designed

15  to measure post-sale likelihood of confusion with respect to the

16  stitching design on the back pockets of the Ruehl brand jeans

17  being sold by Defendant, A&F.  The other survey was purportedly

18  designed to measure the degree of recognition of the stitching

19  design on the back pockets of Levi jeans.

20          4.    The Sood survey, which was purportedly designed to

21  measure likelihood of confusion, was not conducted according to

22  generally accepted principles in a number of respects.  The Sood

23  likelihood of confusion survey is riddled with flaws which render

24  the results meaningless with respect to the conclusions Sood

25  draws from the survey results.  Specifically, the Sood likelihood

26  of confusion survey suffers from leading questions and procedures

27  that suffered from demand effects, lack of a control,

28  ///

1  underinclusive universe, lack of marketplace conditions, order

2  bias, and lack of an explicit "don't know" alternative.

3       5.   The Sood survey, which was purportedly designed to

4  measure the recognition of the stitching design on the back

5  pockets of Levi jeans, was also not conducted according to

6  generally accepted principles in a number of respects.  The Sood

7  recognition survey is also riddled with flaws which render the

8  survey results meaningless with respect to the conclusions Sood

9  draws from the survey results.  Specifically, the Sood

10  recognition survey suffers from spurious recognition, ambiguous

11  questions, order bias, and lack of a control.

12            SOOD - LIKELIHOOD OF CONFUSION SURVEY

13       6.   In an attempt to offer evidence of a likelihood of

14  confusion, Sood offers a survey design that has been repeatedly

15  rejected by courts.  See National Distillers Products Co., LLC v.

16  Refreshment Brands, Inc, 198 F. Supp. 2d 474 (S.D.N.Y. 2002);

17  Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 452 F. Supp. 2d

18  772 (W.D. Mich. 2006); Kargo Global, Inc. v. Advance Magazine

19  Publishers, Inc., 2007 U.S. Dist. LEXIS 57320 (S.D.N.Y 2007); and

20  Simon Property Group L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033

21  (S.D. Ind. 2000).

22       7.   In the Sood likelihood of confusion survey,

23  respondents were initially shown a photograph of someone wearing

24  a pair of Levi jeans (the photograph showed the stitching design

25  on the left rear pocket as well as part of the left leg of the

26  Levi jeans).  After a respondent was finished viewing the

27  photograph, it was put away in an envelope and removed from

28  sight.  Subsequently, respondents were shown four photographs.

1  One showed someone wearing a pair of Ruehl jeans, one showed

2  someone wearing a pair of Citizens jeans, one showed someone

3  wearing a pair of Seven jeans, and one showed someone wearing a

4  pair of True Religion jeans (these photographs also showed the

5  stitching design on the left rear pocket of each pair of jeans as

6  well as part of the leg of each of the jeans).  Each of these

7  four photographs was then pinned to a wall side-by-side.  While

8  viewing these four photographs, respondents were asked:

9       Do you think that any of these jeans are made,
        sponsored or endorsed by the same company that made the
10      jeans you saw in the first picture?

11      Or,

12      Do you think that none of these jeans are made,
        sponsored or endorsed by the same company that made the
13      jeans you saw in the first picture?

14  Leading Questions and Procedures

15        8.    Surveys which employ leading or suggestive

16  questions do not provide an appropriate measurement for

17  likelihood of confusion in Lanham Act matters.  In the instant

18  matter, the Sood survey was clearly suggestive.  Survey

19  respondents were first shown the Levi pocket design and then were

20  shown, simultaneously, the pocket design of four brands of jeans,

21  including Defendant's Ruehl pocket design.  Respondents were then

22  asked if any of the jeans in the four photographs were made,

23  sponsored or endorsed by the same company that made the jeans in

24  the first photograph.  This procedure not only suggested that

25  survey respondents should find a connection between the Levi

26  jeans and one of the four pairs of jeans in the photographs but

27  also, because there were no word marks on the jeans, improperly

28  suggested that respondents find a connection specifically with

1 | one of the pairs of jeans with the closest similarity to one they

2 | had seen earlier.  The Sood question is akin to the well-known

3 | "Where's Waldo?" game where here respondents are challenged to

4 | find the picture which most closely matches the Levi pocket

5 | design they were shown first.

6 |      9.    There was simply no reason to show survey

7 | respondents the Levi jeans.  I understand that Plaintiff claims

8 | that its pocket design is famous for dilution purposes and, as

9 | such, it was unnecessary to show the Levi pocket stitching prior

10 | to a lineup of pocket stitching on other brands of jeans.[1]  The

11 | use of a traditional likelihood of confusion survey format would

12 | have provided a reliable indication of likelihood of confusion,

13 | to the extent that such likelihood of confusion exists.  Under a

14 | traditional format survey, respondents would have been simply

15 | shown the pocket design on the Ruehl jeans and asked questions

16 | with respect to the source, authorization/approval of, or

17 | business affiliation/connection of the jeans, along with a

18 | control cell to measure the extent to which non-trademark

19 | confusion exists in the survey results.  See Leelanau, 452 F.

20 | Supp. 2d 772, at 787; and Powerhouse Marks LLC v. Chi Hsin Impex,

21 | Inc., 2006 U.S. Dist. LEXIS 16454, at *12 (E.D. Mich. 2006).  Yet

22 | Sood chose not to employ the traditional or standard likelihood

23 | of confusion survey format even though the traditional or

24 |

25 | _____

26 |     [1]    For his survey, Sood used what is oftentimes referred
to as a Squirt design (i.e., show a respondent plaintiff's
trademark and then show a respondent defendant's trademark).  It

27 | has been suggested that this survey design can be used for weak
marks under certain conditions.  See Jerre B. Swann, "Likelihood

28 | of Confusion Studies and the Straitened Scope of Squirt," 98 TMR
739 (2008).

1  standard format has been previously employed and relied upon by

2  LS&CO's prior expert in numerous other litigations.  See

3  documents bearing document control numbers LS-A&F009526 through

4  LS-A&F009621 and LS-A&F009627 through LS-A&F009665.

5  <u>Demand Effects</u>

6         10.   Rather than measuring any actual likelihood of

7  confusion, the Sood survey questions and procedures generated

8  "demand effects" by suggesting to the survey respondents the

9  existence of a connection between the jeans in the first

10  photograph and one of the jeans in the set of four photographs by

11  suggesting to the survey respondents the existence of a

12  connection that the survey respondents would not have made on

13  their own.  Specifically, a question that asks survey respondents

14  whether or not products are put out by the same or related

15  sources is likely to generate demand effects by suggesting to

16  survey respondents, at least implicitly, that they should believe

17  that there is some sort of relationship between one or more of

18  the products when the possibility might not have occurred to

19  consumers who encounter the alleged infringing product by itself.

20  See <u>Kargo</u>, 2007 U.S. Dist. LEXIS 57320, at *24; and <u>Simon</u>

21  <u>Property Group</u>, 104 F. Supp. 2d 1033, at 1048.

22         The response alternative in a closed-ended question may
        remind respondents of options that they would not
23        otherwise consider.
        Shari Seidman Diamond "Reference Guide on Survey Research,"
24        in the Federal Judicial Center's <u>Reference Manual on</u>
        <u>Scientific Evidence, Second</u>, page 252.
25

26         11.   A number of courts faced with survey questions

27  suffering from demand effects, similar to the question employed

28  by Sood, have dismissed the results as biased overestimates of a

1 | likelihood of confusion.  See <u>Simon Property</u>, 104 F. Supp. 2d,

2 | 1033, at 1048 ("The question about whether the two items are put

3 | out by the same or related source is likely to generate so-called

4 | 'demand effects' that bias the survey by suggesting to

5 | respondents, at least implicitly, that they should believe there

6 | is at least some sort of relationship between the different items

7 | when the possibility might not even have occurred to the vast

8 | majority of consumers who see the items."); also see <u>Gov't</u>

9 | <u>Employees Ins. Co. v. Google, Inc.</u>, 2005 U.S. Dist. LEXIS 18642,

10 | at *23 (E.D. Va. 2005) ("[D]emand effect results when the

11 | interviewer's question or other elements of the survey design

12 | influence participants' responses by suggesting what the

13 | 'correct' answers might be or by implying associations that might

14 | not otherwise occur to participants."); also see <u>Kargo</u>, 2007 U.S.

15 | Dist. LEXIS 57320, at *25 ("In other words, the mere putting of a

16 | question creates the impression of a relationship.")

17 |        12.   Similarly, other courts have also found questions

18 | similar to the Sood question inappropriate and biased.  See <u>Wuv's</u>

19 | <u>International, Inc. v. Love's Enterprises, Inc.</u>, 1980 U.S. Dist.

20 | LEXIS 16512, at *65 (D. Colo. 1980); <u>Beneficial Corporation v.</u>

21 | <u>Beneficial Capital Corporation</u>, 529 F. Supp. 445, at 450

22 | (S.D.N.Y. 1982); and <u>Riviana Foods, Inc. v. Societe des Produits</u>

23 | <u>Nestle, S.A. and Nestle Food Company</u>, 1994 U.S. Dist. LEXIS

24 | 20267, at *9-*10 (S.D. Tex. 1994).

25 | ///

26 | ///

27 | ///

28 | ///

1  Lack of a Control Cell

2       13.  The Sood survey design did not employ a control

3  cell.  As noted by Professor Diamond:

4          Every measure of opinion or belief in a survey
        reflect some degree of error.  Control groups and [in-
5       treatment] control questions are the most reliable
        means for assessing response levels against the
6       baseline level of error associated with a particular
        question.
7       Shari Seidman Diamond "Reference Guide on Survey
        Research," in the Federal Judicial Center's Reference
8       Manual on Scientific Evidence, Second, page 260.

9       14.  Today, most Lanham Act surveys designed to address

10 the issue of likelihood of confusion employ a traditional

11 scientific experimental survey design consisting of two survey

12 cells:  (1) a test or experimental survey cell designed to

13 measure the likelihood of confusion, if any, with respect to the

14 source, approval of, or a business affiliation/connection of a

15 product or service bearing an allegedly infringing mark; and, (2)

16 a control survey cell.

17      15.  A control survey cell provides a measure of the

18 extent to which non-trademark confusion exists in the survey

19 results.  That is, a control survey cell functions as a baseline

20 and provides a measure of the degree to which respondents'

21 answers are not a result of likelihood of confusion but a result

22 of other factors, such as the survey's questions, the survey's

23 procedures, the nature of the product, or some other potential

24 influence on a respondent's answer.  Again, as Professor Diamond

25 notes:

26 ///

27 ///

28 ///

Rebuttal Declaration
of Dr. Gerald L. Ford        - 8 -

1          It is possible to adjust many survey designs so
2    that causal inferences about the effect of a trademark
     or an allegedly deceptive commercial become clear and
     unambiguous.  By adding an appropriate control group,
3    the survey expert can test directly the influence of
     the stimulus...Respondents in both the experimental and
4    control groups answer the same set of questions.  The
     effect of the allegedly deceptive message [or the
5    allegedly confusing trademark] is evaluated by
     comparing the responses made by the experimental group
6    members with those of the control group members...Both
     preexisting beliefs and other background noise should
7    have produced similar response levels in the
     experimental and control groups.  In addition, if
8    respondents who viewed the allegedly deceptive
     commercial [or the allegedly infringing trademark]
9    respond differently than respondents who viewed the
     control commercial [control trademark], the difference
10   cannot be the result of a leading question, because
     both groups answered the same question...
11   Shari Seidman Diamond "Reference Guide on Survey Research,"
     in the Federal Judicial Center's Reference Manual on
12   Scientific Evidence, Second, pages 257-258.

13          16.  Without an appropriate control cell, the degree of

14   error in the Sood likelihood of confusion survey results cannot

15   be estimated.  See Simon Property Group, 104 F. Supp. 2d 1033, at

16   1048.

17   Underinclusive Universe

18          17.  The Sood survey universe is clearly

19   underinclusive.  Sood claims that his survey was designed to test

20   for likelihood of confusion in a post-sale environment.  As such,

21   the appropriate survey universe would be a fair sampling of those

22   potential purchasers who are likely to be exposed to the alleged

23   infringing mark in the post-sale marketplace, specifically,

24   females who are likely to purchase jeans for themselves.  This

25   would include a representative sample of all females thirteen

26   (13) years of age or older or alternatively all females eighteen

27   (18) years of age or older who are likely to purchase jeans for

28   themselves.

1    18.   Instead, Sood's survey universe was limited to

2    females twenty (20) to forty-five (45) years of age who reported

3    that they had purchased a pair of jeans in the past six months

4    that cost seventy-five dollars ($75.00) or more or were likely to

5    purchase jeans in the next six months that cost seventy-five

6    dollars ($75.00) or more.  By excluding females who had not

7    purchased jeans which cost seventy-five dollars ($75.00) or more

8    in the past six months or who were not likely to purchase jeans

9    which cost seventy-five dollars ($75.00) or more in the next six

10   months, Sood's survey universe definition excludes approximately

11   eighty percent (80%) of female jean purchasers and, thus, the

12   Sood survey universe is grossly underinclusive.  See

13   LS-A&F040233.

14        19.   Sood offers no empirical evidence that only

15   females twenty (20) to forty-five (45) years of age who in the

16   past six months purchased jeans which cost seventy-five dollars

17   ($75.00) or more or were likely to purchase jeans which cost

18   seventy-five dollars (75.00) or more in the next six months are

19   likely to notice the pocket stitching on the Ruehl jeans in a

20   post-sale environment.[2]

21   Lack of Marketplace Conditions

22        20.   It is my understanding that there are literally

23   hundreds of brands of jeans with pocket stitching on the back

24   pockets.  The probability that a person would see only the left

25   rear pocket of a pair of Levi jeans and then seconds later

26   encounter simultaneously four females with one wearing a pair of

27

28        [2]   In a post-sale environment, one would not know that an
     unknown brand of jeans costs $75.00 or more.

Rebuttal Declaration
of Dr. Gerald L. Ford                - 10 -

1    Ruehl jeans, one wearing a pair of Citizens jeans, one wearing a

2    pair of Seven jeans, and one wearing a pair of True Religion

3    jeans is beyond remote.  Sood created an imaginary world in which

4    consumers would see the Levi pocket stitching and then the Levi

5    pocket stitching would be hidden and moments later would see

6    side-by-side the left rear pocket of a pair of Ruehl, Citizens,

7    Seven, and True Religion jeans, and then be asked a leading

8    question.  Simply, the Sood survey design does not match how the

9    Ruehl jeans are likely to be encountered in the post-sale

10   marketplace.

11          21.   Sood offers no empirical evidence that his survey

12   design, in any way, represents the manner in which the alleged

13   infringing pocket design is likely to be encountered in the post-

14   sale marketplace.  Overall, the Sood survey was a meaningless

15   exercise that had nothing to do with what would likely happen in

16   the actual marketplace.  As such, the Sood survey shows nothing

17   about likelihood of confusion in the post-sale marketplace.

18   <u>Order Bias</u>

19          22.   Finally, the Sood likelihood of confusion survey

20   questions appear to suffer from order bias.

21          The order in which questions are asked on a survey
             and the order in which response alternatives are
22           provided in a closed-ended question can influence the
             answers...
23           To control for order effects, the order of the
             questions and the order of the response choices in a
24           survey should be rotated...
             Shari Seidman Diamond "Reference Guide on Survey Research,"
25           in the Federal Judicial Center's <u>Reference Manual on
             Scientific Evidence, Second</u>, pages 254-255.
26

27   While Sood acknowledges the potential impact of order bias (see

28   Sood report, page 10) it does not appear that he took this

Rebuttal Declaration                - 11 -
of Dr. Gerald L. Ford

1  admonition to heart with respect to the closed-ended question

2  Sood poses to respondents.  Specifically, it appears that Sood

3  did not rotate the alternatives to the survey's critical

4  question.  See <u>Winning Ways, Inc. v. Holloway Sportswear, Inc.</u>,

5  913 F. Supp. 1454, at 1467 (D. Kan. 1996).

6  <u>Lack of an Explicit "Don't Know" Alternative</u>

7        23.  Additionally, it does not appear that respondents

8  were offered an explicit don't know/no opinion alternative to the

9  closed-ended critical question.

10        ...the survey can use a quasi-filter question to
       reduce guessing by providing "don't know" or "no
11       opinion" options as part of the question...By signaling
       to the respondent that it is appropriate not to have an
12       opinion, the question reduces the demand for an answer
       and, as a result, the inclination to hazard a guess
13       just to comply.  Respondents are more likely to choose
       a "no opinion" option if it is mentioned explicitly by
14       the interviewer than if it is merely accepted when the
       respondent spontaneously offers it as a response.  The
15       consequence of this change in format is substantial.
       Shari Seidman Diamond "Reference Guide on Survey Research,"
16       in the Federal Judicial Center's <u>Reference Manual on</u>
       <u>Scientific Evidence, Second</u>, page 250.  Also see Jerre B.
17       Swann, "Likelihood of Confusion Studies and the Straitened
       Scope of Squirt," 98 TMR at 742, Note 16 (2008).
18

19        24.  Thus, without a control cell, which is absent in

20  the Sood likelihood of confusion survey, there is no way to

21  estimate the level of error resulting from the order bias in the

22  survey questions and the lack of an explicit "don't know"

23  alternative to the survey's critical closed-ended question.

24  <u>Conclusion</u>

25        25.  The Sood survey, which was purportedly designed to

26  measure likelihood of confusion, was not conducted according to

27  generally accepted principles in a number of respects.  The Sood

28  likelihood of confusion survey is riddled with flaws which render

1  the results meaningless with respect to the conclusions Sood

2  draws from the survey results.

3                     SOOD - RECOGNITION SURVEY

4            26.  In the Sood recognition survey, respondents were

5  shown three photographs, each showing the pocket stitching on a

6  brand of jeans:  Levi jeans, Lee jeans, and Lucky jeans.[3]  For

7  each photograph, respondents were asked:

8       1.   Have you seen jeans with this style of pocket
            stitching before?
9

10 If respondents answered "no," they were shown the next photograph

11 of a pocket on a pair of jeans and were questioned with regard to

12 that pocket.  Respondents who said "yes" or "don't know"[4] if

13 they had seen jeans with the style of pocket stitching they were

14 shown, were asked:

15      2.   Do you associate jeans with this style of pocket
            stitching with (read the options to respondent and
16           show respondent the card with answers):  one brand
            or company, more than one brand or company, or
17           don't know?

18 It appears that all respondents who answered question two were

19 asked:

20      3.   What is the name of the brand(s) or companies that
            you associate with this product?
21

22 _____

23      [3]    Sood claims that Lee and Lucky jeans were selected as
   benchmarks "...because these brands (and their associated pocket
24 stitching) have been in the marketplace for many years, implying
   that consumers would likely have seen the distinctive pocket
25 stitching over time."  See Sood report, page 6.

26      [4]    Sood does not explain why respondents who reported that
   they did not know if they had "seen jeans with this style of
27 pocket stitching before" could reliably answer the second
   question "Do you associate jeans with this style of pocket
28 stitching with one brand or company, more than one brand or
   company, or don't know?"

Spurious Recognition

27.   Sood completely ignores the well-known problem of spurious recognition.  As noted by Professor Keller:

> Any research measure must consider the issue of consumers making up responses or guessing.  That problem may be especially evident with certain types of aided awareness or recognition measures for the brand. Spurious awareness occurs when consumers erroneously claim they recall something that they really don't and that maybe doesn't even exist.
> Kevin Lane Keller, Strategic Brand Management:  Building, Measuring, and Managing Brand Equity, Third Edition, Pearson Prentice Hall, 2008, page 378.

Thus, a control for guessing is necessary for a question like Sood's question one.  Professor Keller suggests that to provide a more sensitive test of recognition "...it is often useful to include decoys or lures - items that consumers could not possibly have seen."  See Kevin Lane Keller, Strategic Brand Management, at 374.

Ambiguous Questions

28.   In the first question, Sood asked respondents, "Have you seen jeans with this style of pocket stitching before?" There is no way to determine what respondents understood by "style of pocket stitching."  For example, (1) was it just the idea of stitching running through the middle of the pocket; (2) was it the stitching on the sides, top, and bottom only; or (3) was it all the stitching on the pocket, including the stitching on the sides, top, and bottom and the stitching running through the middle of the pocket.  Regardless of what respondents may or may not have understood by "style of pocket stitching," it is clear that no respondent was ever asked if he/she had seen the specific design of pocket stitching shown on the Levi jeans

1 running through the middle of the pocket in the photograph. It
2 is my understanding that it is this specific design to which
3 LS&CO is claiming rights.

4          29.   After asking respondents, in question one, "Have
5 you seen jeans with this <u>style of pocket stitching</u> before?"
6 [emphasis added] and asking respondents in question two, "Do you
7 associate jeans with this <u>style of pocket stitching</u> with:   one
8 brand or company, more than one brand or company, or don't know?"
9 [emphasis added] respondents were asked question three, "What is
10 the name of the brand(s) or companies that you associate with
11 this <u>product</u>?" [emphasis added].   Notably, question three is
12 directed away from pocket stitching and directed, instead, to the
13 product itself.   Clearly, this question does not measure the
14 degree of recognition and association of the Levi pocket
15 stitching design with LS&CO.

16 <u>Order Bias</u>

17          30.   Further, the Sood recognition survey also appears
18 to suffer from order bias.   Again, while Sood acknowledges the
19 potential impact of order bias (see Sood report, page 10), it
20 does not appear that he took this admonition to heart with
21 respect to Sood's closed-ended question two that was posed to
22 respondents.   Specifically, it appears that Sood did not rotate
23 the alternatives to question two. See <u>Winning Ways</u>, 913 F. Supp.
24 1454, at 1467 (D. Kan. 1996).   Also see Shari Seidman Diamond
25 "Reference Guide on Survey Research," in the Federal Judicial
26 Center's <u>Reference Manual on Scientific Evidence, Second</u>, pages
27 254-255.

28 ///

Rebuttal Declaration
of Dr. Gerald L. Ford                    - 15 -

1  Lack of a Control Cell

2          31.  Again, without an appropriate control cell[5] or an

3  in-treatment control, which is absent in the Sood recognition

4  survey, there is no way to estimate the level of error resulting

5  from spurious recognition, ambiguous questions, and order bias in

6  Sood's survey questions.

7  Conclusion

8          32.  The Sood survey, which was purportedly designed to

9  measure the recognition of the stitching design on the back

10 pockets of Levi jeans, was also not conducted according to

11 generally accepted principles in a number of respects.  The Sood

12 recognition is also riddled with flaws which render the survey

13 results meaningless with respect to the conclusions Sood draws

14 from the survey results.

15                    EROSION OF DISTINCTIVENESS

16         33.  Based upon his likelihood of confusion survey,

17 Sood opines that:

18         ...31% of participants incorrectly associated Ruehl
           jeans with jeans by LS&CO.  In view of this high degree
19         of incorrect association, it is reasonable to conclude
           that LS&CO has suffered harm to its brand due to the
20         erosion in distinctiveness of the LS&CO's trademark
           pocket stitching.  See Sood report, page 3.
21

22 As an initial matter, Sood never asked any survey respondents if

23 they associated Ruehl jeans with jeans by LS&CO.  Additionally,

24 to the degree to which LS&CO has suffered harm to its brand, due

25 to the erosion in distinctiveness of the Levi pocket stitching,

26 there is no empirical evidence offered by Sood that this is, or

27

28
      _____
           [5]    Also see paragraphs 13 through 16.

Rebuttal Declaration              - 16 -
of Dr. Gerald L. Ford

1  in the future could be, the result of the pocket stitching on the

2  Ruehl jeans as opposed to the myriad of other pocket stitching

3  designs which are present in the marketplace.  Specifically, Sood

4  offers no empirical evidence that there has been any diminution

5  in the distinctiveness of the LS&CO pocket stitching design, and,

6  in particular, if such diminution has indeed happened, that it

7  was caused by or is attributable in any way to the Ruehl jeans

8  pocket stitching design.

9                           QUALIFICATIONS

10         34.  I hold a Bachelor's Degree in Advertising (B.A.)

11 from San Jose State University, a Master's Degree in Business

12 Administration (M.B.A.) from the University of Southern

13 California, and a Doctoral Degree in Business Administration

14 (D.B.A.) from the University of Southern California.

15         35.  During my twenty-five year academic appointment,

16 my teaching responsibilities included both graduate and

17 undergraduate level courses in a variety of subject areas.  My

18 teaching responsibilities included courses in marketing (e.g.,

19 marketing, marketing management, advertising, promotion, consumer

20 behavior, and marketing research) and management (e.g.,

21 principles of management; business policy and strategy; business

22 policies, operations, and organizations; and integrated

23 analysis).

24         36.  I am a member of the American Marketing

25 Association (AMA), the American Academy of Advertising (AAA), the

26 American Association of Public Opinion Research (AAPOR), the

27 Council of American Survey Research Organizations (CASRO), and

28 the International Trademark Association (INTA).

Rebuttal Declaration
of Dr. Gerald L. Ford                    - 17 -

1        37.  As a partner with Ford Bubala & Associates, I have

2 been retained by a variety of firms engaged in the consumer

3 product, industrial product, and service sectors of the economy

4 to provide marketing consulting and research services.

5 Approximately one-half of Ford Bubala & Associates' consultancies

6 in which I have participated have involved the design and

7 execution of marketing research surveys.

8        38.  As previously noted, during the past thirty-three

9 years, I have been retained in a number of litigation-related

10 consultancies involving intellectual property matters, including

11 matters before federal and state courts, the Trademark Trial and

12 Appeal Board of the U.S. Patent and Trademark Office, and the

13 International Trade Commission.  I have designed and executed

14 surveys relating to intellectual property matters, including

15 false advertising, trademark, patent, and other related matters.

16 I am familiar with the accepted principles of survey research, as

17 well as the tests for trustworthiness of properly conducted

18 surveys or polls.

19        39.  During the past twenty-eight years, I have

20 addressed a variety of groups on the subject of surveys or polls

21 and their use in the measurement of the state of mind of

22 consumers, with respect to Lanham Act matters.  Specifically, I

23 have spoken at meetings of the American Bar Association, the

24 American Intellectual Property Law Association, the American

25 Marketing Association, the International Trademark Association,

26 the Marketing Research Association, the Intellectual Property Law

27 Institute of Canada, and the Practising Law Institute.

28 ///

Rebuttal Declaration
of Dr. Gerald L. Ford        - 18 -

1        40.   I have also written on the subject of the design

2    and execution of litigation-related surveys in intellectual

3    property matters.   Attached hereto as Exhibit A is a list of

4    papers I have written since 1987.

5        41.   Since 1998 I have served as a member of the

6    Editorial Board of <u>The Trademark Reporter</u>, the scholarly legal

7    journal on the subject of trademarks, published by the

8    International Trademark Association.

9        42.   I have been qualified and accepted as an expert in

10   marketing and marketing research in more than fifty (50) trials

11   before federal and state courts and administrative government

12   agencies.

13       43.   Attached hereto as Exhibit B is a list of cases in

14   which I have provided trial and/or deposition testimony since

15   1992.

16       44.   Attached hereto as Exhibit C is a copy of my

17   professional history, describing my qualifications and

18   professional background.

19       I declare under penalty of perjury under the laws of

20   the United States of America that the foregoing is true and

21   correct.   Executed this 18th day of July, 2008, in Huntington

22   Beach, California.

23

24   _____

25       Dr. Gerald L. Ford

26

27

28

# Exhibit A

Articles
By Dr. Gerald L. Ford

These articles are available @ www.fordbubala.com/articles

"Trademark Surveys:  Universe, Questions, and Future Approaches"
was published in the Summer 1987 edition of New Matter, the
journal of the Intellectual Property Section of the California
State Bar.  This paper was subsequently reprinted in the 1992
International Trademark Association 114th Annual Meeting
proceedings.

"Responding to Trademark Surveys" was published in the Spring
1993 proceedings of the American Bar Association's Patent,
Trademark, and Copyright Law:  Litigation and Corporate Practice
course materials.  This paper was reprinted in the International
Trademark Association's "Successful Strategies in Trademark
Litigation" Forum, Tokyo, Japan, 1993.

"Dilution Surveys - New Challenges" was published in the 1997
Practising Law Institute course handbook, Litigating Copyright,
Trademark and Unfair Competition Cases for the Experienced
Practitioner.  This paper was reprinted in the International
Trademark Association's course materials for a seminar, Dilution
and Famous Marks for Advanced Trademark Practitioners, 1998.

"Dilution Surveys Update 1998" was published in the Practising
Law Institute course handbook, Litigating Copyright, Trademark
and Unfair Competition Cases for the Experienced Practitioner.

"Lanham Act Related Surveys, The Year in Review & Emerging
Issues" was published in the 1999 Practising Law Institute course
handbook, Litigating Copyright, Trademark and Unfair Competition
Cases for the Experienced Practitioner.  An edited version of
this paper, "Lanham Act Surveys - The Year in Review," was
reprinted in the NAD/International Trademark Association's False
Advertising Forum, course materials, 2000.

"Lanham Act Surveys:  Two Years in Review" was published in the
International Trademark Association 122nd Annual Meeting
proceedings.

"Lanham Act Surveys:  2000" was published in the 2000 Practising
Law Institute course handbook Litigating Copyright, Trademark and
Unfair Competition Cases for the Experienced Practitioner.

"Lanham Act Surveys:  2001" was published in the 2001 Practising
Law Institute course handbook Strategies for Litigating
Copyright, Trademark & Unfair Competition Cases.

Articles
Page 2

"Lanham Act Surveys:  2002" was published in the 2002 Practising
Law Institute course handbook Strategies for Litigating
Copyright, Trademark & Unfair Competition Cases.

"Survey Evidence – Successful Challenges Since Daubert" was
published in 2003 in the International Trademark  Association
125th Annual Meeting proceedings.

"Lanham Act Surveys:  2003" was published in 2003 in the American
Intellectual Property Law Association annual proceedings.  This
paper, "Lanham Act Surveys:  2003," was reprinted in the 78th
Intellectual Property Institute of Canada proceedings, 2004.

"Lanham Act Surveys: 2004" was published in the Law Education
Institute National CLE Conference proceedings, 2005.

"Lanham Act Surveys: 2005" was presented at a meeting of the
Intellectual Property Law Section of the State Bar of Georgia,
2006. This paper, "Lanham Act Surveys: 2005" was reprinted in the
NAD Annual Conference proceedings, 2006, and in the Law Education
Institute National CLE Conference proceedings, 2007.

"Intellectual Property Surveys: 2006" was electronically
published on the members-only section of the INTA website, 2007.

# Exhibit B

DR. GERALD L. FORD

TRIAL TESTIMONY 1992 - 2008

2008

Google Inc. v. Nikolaus Gubernator
    Trademark Trial and Appeal Board

adidas American, Inc. and adidas AG v. Payless ShoeSource,
Inc.
    U.S. District Court, District of Oregon

2007

Nissan Motor Co. Ltd. and Nissan North America, Inc. v.
Nissan Computer Corporation and the Internet Center
    U.S. District Court, Central District of California

2006

Phillips-Van Heusen Corp., Calvin Klein, Inc., and Calvin
Klein Trademark Trust v. Calvin Clothing Company, Inc. and
Star Ride Kids, Inc.
    U.S. District Court, Southern District of New York

Joel D. Wallach v. Longevity Network, Ltd.
    U.S. District Court, Central District of California,
    Western District

2005

General Motors Corporation v. Chevy Duty, Inc.
    U.S. District Court, Eastern District of Michigan,
    Southern Division

2004

A&W Food Services of Canada Inc. and A&W Trade Marks Inc. v.
McDonald's Restaurants of Canada Limited.
    Federal Court, Toronto, Canada

Callaway Golf Company v. Dunlop Slazenger Group Americas,
Inc.
    U.S. District Court for the District of Delaware

Nova Development v. Individual Software, Inc.
    Arbitration (JAMS)

The PE Corporation and Roche Molecular Systems, Inc. v. MJ
Research Incorporated and Michael and John Finney
    U.S. District Court, District of Connecticut

Trial Testimony continued

2002

      Sara Lee Corporation v. Kayser-Roth Corporation
          Trademark Trial and Appeal Board

      Kirkbi AG and Lego Canada Inc. v. Ritvik Holdings
      Inc./Gestions Ritvik Inc. and Ritvik Toys Inc./Jouets Ritvik
      Inc.
          Federal Court of Canada, Toronto, Ontario

2001

      Harrods Limited v. Sixty Internet Domain Names
          U.S. District Court, Eastern District of Virginia

      The State of California Acting in a Higher Education
      Capacity by and through The Board of Trustees of the
      California State University v. Bello's Sporting Goods
          State of California, Superior Court, San Luis Obispo

2000

      Rally Accessories, Inc. d/b/a/ Rally Manufacturing, Inc., v.
      Quest Industries, Inc.
          U.S. District Court, Southern District of Florida

      Jack Daniel's Properties, Inc. v. Quest Associates, Ltd.
          Trademark Trial and Appeal Board

1999

      Daimler Chrysler Corporation v. Ted L. Vanzant, dba Country
      Craft
          U.S. District Court, Central District of California

      Hewlett-Packard Company v. Nu-kote International, Inc.
          U.S. District Court, Northern District of California

1998

      Nexxus Products Company v. Russ Kalvin, Inc., et al.
          Superior Court of California, County of Santa Barbara

      1-800-FLOWERS, Inc. v. Michael Segura, d/b/a FLOWER STAR,
      et al.
          U.S. District Court, Eastern District of New York

      Haverly Systems, Inc. v. Omni Flow Computers, Inc.
          Trademark Trial and Appeal Board

Trial Testimony continued

1997

    Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery
        U.S. District Court, Northern District of California

    Leonard Studio Equipment, Inc. v. Desmar Corporation and
    Meccanica Italiana Srl.
        U.S. District Court, District of New Jersey

1996

    Black & Decker (U.S.) Inc. v. GSL Engineering Ltd., GSL
    Consumer Products Ltd., GSL Rechargeable Products Ltd., et
    al.
        U.S. District Court, Eastern District of Virginia

1995

    Berner International Corporation v. Mars Sales Company
        U.S. District Court, Western District of Pennsylvania

    Mavrides, et al. v. Hammond, et al.
        U.S. District Court, Northern District of California

    Peter Morton, et al. v. Rank Organization, et al.
        Arbitration, Los Angeles

1994

    The Princeton Review Management Corp. v. Stanley H. Kaplan
    Educational Center, Ltd.
        Arbitration, New York

    Al-Site Corp. v. The Bonneau Company
        U.S. District Court, Central District of California

1993

    American Professional Testing Service, Inc. v. Harcourt
    Brace Jovanovich Legal and Professional Publications, Inc.
        U.S. District Court, Central District of California

    Devon Industries, Inc. v. American Medical Manufacturing,
    Inc., et al.
        U.S. District Court, Central District of California

    United Services of America Federal Credit Union dba USA
    Federal Credit Union v. USA Federal Credit Union
        U.S. District Court, Southern District of California

    In re:  Circuit Breaker Litigation
        U.S. District Court, Central District of California

Trial Testimony continued - 1993

      P. Leiner Nutritional Products v. Pharmavite Corporation
          U.S. District Court, Central District of California

      Mouldings, Inc. v. Kellogg Company
          U.S. District Court, District of Utah, Central Division

1992

      Adray, et al. v. Adry-Mart, et al.
          U.S. District Court, Central District of California

      Mag Instrument, Inc. v. Martin Heller et al.
          Superior Court of California, County of San Bernardino

      Baldwin Corporation v. Frank Su Enterprise Corporation,
      Frank Su, and Decorators Accessories, Ltd.
          U.S. District Court, Central District of California

      Mag Instrument Inc. v. Vermont American Corporation
          Trademark Trial and Appeal Board

      Better Carpet Care, Inc., dba A-1 Carpet Care v. A-1 Carpet
      Market
          Superior Court of California, County of Orange

DEPOSITION TESTIMONY 1992 - 2008

2008

Dayals (Fiji) Artesian Waters Limited v. Fiji Water Company
LLC; Paramount International Expert, Ltd.; and Roll
International Corporation
    U.S. District Court, Central District of California

adidas American, Inc. and adidas AG v. Wal-Mart Stores, Inc.
    U.S. District Court, District of Oregon

2007

HomeLife Communities Group v. HomeLife Realty Services, Inc.
and HomeLife Securities, Inc.
    U.S. District Court, Northern District of Georgia

Luppen Holdings, Inc. v. Pitney Bowes, Inc. & Staples, Inc.
    U.S. District Court, Central District of California

E.& J. Gallo Winery v. Cantine Rallo, S.p.A.
    U.S. District Court, Eastern District of California

adidas American, Inc. and adidas AG v. Kmart Corporation
and Footstar, Inc.
    U.S. District Court, District of Oregon

2006

NFL Properties LLC v. AllAuthentic Corporation
    U.S. District Court, Southern District of New York

The Board of Trustees of the University of Alabama v. New
Life Art, Inc. and Daniel A. Moore
    U.S. District Court, Northern District of Alabama

2005

Children's Medical Center of Dallas v. Columbia Hospital at
Medical City Dallas Subsidary, L.P.
    U.S. District Court, Northern District of Texas

Board of Supervisors of the Louisiana State University and
Agricultural and Mechanical College, Board of Regents of the
University of Oklahoma, Ohio State University, University of
Southern California, Pasadena Tournament of Roses, and The
Collegiate Licensing Company v. Smack Apparel Company and
Wayne Curtiss
    U.S. District Court for the Eastern District of
    Louisiana

Deposition Testimony continued - 2005

    The Boyds Collection, Ltd. v. The Bearington Collection
        U.S. District Court, Middle District of Pennsylvania

    Mag Instrument, Inc. v. Dollar Tree Stores, Inc. and
    Dollar Tree Distribution, Inc.
        U.S. District Court, Central District of California

2004

    Nissan North America and Nissan Jidosha Kabushiki Kaisha dba
    Nissan Motor Co., Ltd v. Europacific Parts International,
    Inc. dba Service & Value Expeditors, and Interstate
    Automotive Distributors dba Genuine Parts Advantage and
    Metro Automotive
        U.S. District Court, Central District of California

2003

    Guthy-Renker Corporation v. University Medical Products/USA,
    Inc.
        U.S. District Court, Central District of California

    The Iams Company v. Kal Kan Foods, Inc.
        U.S. District Court, Southern District of Ohio

    XtraPlus Corporation v. Google, Inc.
        U.S. District Court, Northern District of California

    The Iams Company v. Nutro Products, Inc.
        U.S. District Court, Southern District of Ohio

    adidas America, Inc. and adidas-Salomon AG v. Steve
    Madden, Ltd., and Steve Madden Retail, Inc.
        U.S. District Court, District of Oregon

2002

    Masterfoods USA, a division of Mars, Incorporated v.
    Arcor USA, Incorporated, and Arcor S.A.I.C.
        U.S. District Court, Western District of New York

    Dioptics Medical Products, Inc. v. The Cooper Companies,
    Inc.
        U.S. District Court, Northern District of California

2001

    Manufacture des Montres Jaguar, S.A., Manufacturas de
    Montres Jaguar, S.L., and Festina, U.S.A., Inc. v. Jaguar
    Cars Limited, The Jaguar Collection Limited and Jaguar Cars,
    a division of Ford Motor Company
        U.S. District Court, Southern District of New York

Deposition Testimony continued- 2001

> Magnivision, Inc. v. The Bonneau Company
>> U.S. District Court, Central District of California

2000

> Kelly Blue Book Company, Inc. v. Primedia Intertec National
> Market Reports, Primedia Intertec Inc., & Primedia Inc.
>> U.S. District Court, Central District of California

> JMYZ, Inc. v. The Gap, Inc. and Old Navy, Inc.
>> U.S. District Court, Southern District of Florida

1999

> In re:  Certain Two-Handle Centerset Faucets and Escutcheons
> and Components Thereof
>> U.S. International Trade Commission, Washington, D.C.

> TriStar Pictures, Inc. and Zorro Productions, Inc. v. Del
> Taco, Inc. and Wongdoody
>> U.S. District Court, Southern District of California

1998

> Iomega Corporation v. SyQuest Technology, Inc.
>> U.S. District Court, District of Delaware

1997

> Summit Bottling, Inc. v. Water Star Bottling, Inc. et al.
>> U.S. District Court, District of Utah, Northern
>> Division

> Kellogg Company v. Exxon Corporation
>> U.S. District Court, Western District of Tennessee

> Galen Rowell and Richard Johnson v. Price/Costco
>> U.S. District Court, Northern District of California

1996

> Saban Entertainment, Inc. and Saban International, N.V. v.
> Rubie's Costumes Co., Inc.
>> U.S. District Court, Eastern District of New York

> Breath Asure, Inc. v. Merlin Offshore International, Inc. et
> al.
>> U.S. District Court, Central District of California

> Men's Wearhouse, Inc. v. T.H.C., Inc.
>> U.S. District Court, Eastern District of Michigan

Deposition Testimony continued

1995

      Hugo Boss Fashions Inc., et al. v. Brookhurst, Inc., et al.
          U.S. District Court, Southern District of New York

      Wilden Pump & Engineering Co. v. Charles Horvath (PTE), et al.
          U.S. District Court, Central District of California

      Barbara Arner v. Sharper Image Corporation, Remington Products, et al.
          U.S. District Court, Central District of California

1993

      The Famous Amos Chocolate Chip Cookie Corporation v. Wally Amos
          U.S. District Court, Northern District of California

      Atari Games Corporation & Tengen, Inc. v. Nintendo of America
          U.S. District Court, Northern District of California

      Calgene, Inc. v. Enzo Biochem, Inc.
          U.S. District Court, Eastern District of California

      Health Net v. U.S.A. Healthnet Inc.
          U.S. District court, Central District of California

July 18, 2008

# Exhibit C

PROFESSIONAL HISTORY

Dr. Gerald L. Ford
**Ford Bubala & Associates**
Peter's Landing, Suite 211
16400 Pacific Coast Highway
Huntington Beach, California 92649
Telephone (562) 592-4581
Facsimile (562) 592-3867



EDUCATION

Doctor of Business Administration (D.B.A.)
University of Southern California, 1977

Master of Business Administration (M.B.A.)
University of Southern California, 1969

Bachelor of Arts (B.A.)
San Jose State University, 1967

PROFESSIONAL AFFILIATIONS

American Academy of Advertising
American Marketing Association
American Association for Public Opinion Research
Council of American Survey Research Organizations
International Trademark Association

PROFESSIONAL EXPERIENCE

Ford Bubala & Associates (Principal), 1975 – Present

Ford Bubala & Associates is a marketing and management consulting firm which
provides a variety of consulting services in the areas of marketing management,
marketing research, marketing planning, competitive evaluation, economic analysis,
and strategy development.

Ford Bubala & Associates has been retained to provide consulting assistance for a
diverse base of companies in consumer products, industrial products, and service
sectors of the economy.

PRIOR EXPERIENCE

1970 – 1994

Emeritus faculty member, School of Business Administration, California State
University, Long Beach. Teaching responsibilities included both graduate and
undergraduate level courses. Courses taught covered a variety of subject areas,
including marketing (e.g., marketing, marketing management, advertising,
promotion, consumer behavior and marketing research) and management
(e.g., principles of management; business policy and strategy; business policies,
operations, and organizations; and integrated analysis).