MICHAEL J. BETTINGER (STATE BAR NO. 122196)
RACHEL R. DAVIDSON (STATE BAR NO. 215517)
K&L GATES LLP
55 Second Street, Suite 1700
San Francisco, CA 94105
Phone:  415-882-8200
Facsimile:  415- 882-8220

J. MICHAEL KEYES (PRO HAC VICE)
K&L GATES LLP
618 West Riverside Avenue, Suite 300
Spokane WA  99201-0602
Phone:  509-624-2100
Facsimile:  509-456-0146

Attorneys for Defendant and Cross-Complainant
ABERCROMBIE & FITCH TRADING CO.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEVI STRAUSS & CO., | No. CV-07-3752 -JSW |
| Plaintiff, | **DEFENDANT ABERCROMBIE & FITCH TRADING CO.'S MOTION TO EXCLUDE REPORT, TESTIMONY AND SURVEY EVIDENCE OF DR. SANJAY SOOD** |
| v. | |
| ABERCROMBIE & FITCH TRADING CO., | |
| Defendant. | **DATE: September 26, 2008** |
| | **TIME:  9:00 a.m.** |
| ABERCROMBIE & FITCH TRADING CO., | **COURTROOM:  2** |
| Counter-Claimant, | |
| v. | |
| LEVI STRAUSS & CO., | |
| Counter-Defendant. | |

ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD

Case No. 03:07-CV-3752-JSW

Printed on Recycled Paper

# TABLE OF CONTENTS

**Page**

I.     **INTRODUCTION & SUMMARY OF THE ARGUMENT** ....................................v

II.    **FACTS IN SUPPORT OF MOTION TO EXCLUDE** .........................................1

III.   **LAW AND ARGUMENT** .........................................................................................2

    A.   Dr. Sood's opinions based on his "likelihood of confusion survey" should be excluded because it was not conducted according to generally accepted principles in a number of important respects.....................2

        1.   The confusion survey used improper leading questions that completely undermine the legitimacy of the survey.............................2

        2.   The survey suffers from "demand effects" making its results inherently unreliable. ............................................................4

        3.   The survey lacks a proper control, which is the only way to measure causality...................................................................5

        4.   Dr. Sood's survey universe is underinclusive, undermining further its reliability. ............................................................8

        5.   The survey lacks marketplace conditions..............................................9

        6.   The survey suffers from order bias......................................................10

        7.   The survey lacks an explicit "don't know" alternative. ......................10

    B.   Dr. Sood's "jeans recognition survey" was not conducted according to generally accepted principles and is, thus, inherently unreliable and should be excluded. .........................................................................................11

        1.   Dr. Sood ignores the problem of "spurious recognition."...................11

        2.   Dr. Sood employed ambiguous questions, the responses to which cannot serve as a basis for Dr. Sood's opinions regarding the extent of recognition of the arcuate stitching design...................12

        3.   The recognition survey also suffers from order bias. ..........................14

        4.   The recognition survey lacks a control cell, and even if the Lee and Lucky jeans served as controls, Dr. Sood failed to account for them. .........................................................................................14

IV.    **CONCLUSION** ......................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Beneficial Corp. v. Beneficial Capital Corp.,*
   529 F. Supp. 445 (S.D.N.Y. 1982) ....................................................................3

*Gov't Employees Ins. co. v. Google, Inc.,*
   No. 1:04 CV 507, 2005 U.S. Dist. LEXIS 18642 (E.D. Va. Aug. 8, 2005) .........................4

*Hodgdon Powder Co., Inc. v. Alliant Techsystems, Inc.,*
   512 F.Supp.2d 1178 (D. Kan. 2007) .....................................................................8

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.,*
   No. 06 Civ. 550, 2007 U.S. Dist. LEXIS 57320 (S.D.N.Y. Aug. 6, 2007)...........................4

*Lanphere Enterprises, Inc. v. Jiffy Lube Int'l, Inc.,*
   No. CV 01-1168-BR, 2003 U.S. Dist. LEXIS 16205 (D. Or. Jul. 9, 2003) ........................12

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,*
   525 F. Supp. 2d 576 (S.D.N.Y. 2007) ..............................................................5, 7

*Marshall Field & Co. v. Mrs. Field's Cookies,*
   25 U.S.P.Q.2d 1321 (T.T.A.B. 1992) ....................................................................3

*Mattel, Inc. v. MCA Records, Inc.,* 28 F. Supp. 2d 1120 (C.D. Cal. 1998) ...............................3

*Quality Inns Int'l, Inc. v. McDonald's Corp.,* 695 F. Supp. 198 (D. Md. 1988).........................3

*Riviana Foods Inc. v. Societe Des Produits Nestle S.A.,*
   33 U.S.P.Q.2d 1669 (S.D. Tex. 1994) ....................................................................3

*Simon Property Group L.P. v. mySimon, Inc.,*
   104 F. Supp. 2d 1033 (S.D. Ind. 2000) ..............................................................4, 6

*Universal City Studios, Inc. v. Nintendo Co., Ltd.,*
   746 F.2d 112 (2d Cir. 1984) ................................................................................2

*Winning Ways, Inc. v. Holloway Sportswear, Inc.,*
   913 F. Supp. 1454 (D. Kan. 1996) .............................................................7, 10, 14

**Statutes**

Federal Trademark Dilution Act, 15 U.S.C. § 1125(c)(2)........................................................1

**Other Authority**

Diamond, Shari Seidman, "Reference Guide on Survey Research," 33-SE 6 Reference
   Manual on Scientific Evidence § IV (2008).........................................................10

ABERCROMBIE & FITCH TRADING CO.'S
MOTION TO EXCLUDE REPORT, TESTIMONY
& SURVEY EVIDENCE OF DR. SANJAY SOOD

1

Keller, K.L., *Strategic Brand Management:  Building, Measuring, and Managing Brand Equity*, 3d Ed. Pearson Prentice Hall (2008) ........................................................................ 11

Swann, Jerre B., "Likelihood of Confusion Studies and the Straitened Scope of *Squirt*," 98 Trademark Rep. 739 (2008) ............................................................................................ 11

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ABERCROMBIE & FITCH TRADING CO.'S
MOTION TO EXCLUDE REPORT, TESTIMONY
& SURVEY EVIDENCE OF DR. SANJAY SOOD

1

## NOTICE OF MOTION AND MOTION

2    Please take notice that on September 26, 2008, at 9:00 a.m., or as soon thereafter as

3    the parties may be heard, in Courtroom 2 of the above-entitled Court, located at 450 Golden

4    Gate Avenue, San Francisco, California  94102, Defendant Abercrombie & Fitch Trading Co.

5    ("Abercrombie") will move the Court for an order excluding the report, testimony or other

6    survey evidence of Plaintiff Levi Strauss & Co.'s ("LS&Co.") designated expert witness,

7    Dr. Sanjay Sood.

8    The motion will be based on this Notice of Motion, Motion and the Memorandum of

9    Points and Authorities, the accompanying Declaration, and [Proposed] Order filed herewith,

10   on all of the files and records of this action, and on any additional material that may be

11   elicited at the hearing of this motion.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   ABERCROMBIE & FITCH TRADING CO.'S
     MOTION TO EXCLUDE REPORT, TESTIMONY
     & SURVEY EVIDENCE OF DR. SANJAY SOOD

## I.     <u>INTRODUCTION & SUMMARY OF THE ARGUMENT</u>

Abercrombie & Fitch Trading Co. ("Abercrombie") respectfully submits this memorandum in support of its motion to exclude the "expert" report and testimony of Associate Professor Dr. Sanjay Sood offered by Levi Strauss & Co. ("LS&Co."). Dr. Sood purported to conduct two consumer surveys. The first survey, a "jeans recognition" survey, measured the supposed "recognition" of LS&Co.'s "double arcuate" stitching design amongst a subset of consumers. The second survey, the "likelihood of confusion survey" supposedly measured whether: (i) consumers were "likely to be confused" between LS&Co.'s arcuate stitching design and the RUEHL stitching design; and (ii) the RUEHL stitching design was "likely to be dilute" LS&Co.'s arcuate stitching design.

Dr. Sood's "likelihood of confusion" survey is riddled with flaws because it was not conducted according to generally accepted survey principles. Specifically, this survey: (1) suffers from leading questions; (2) creates "demand effects"; (3) lacks a proper control; (4) has an underinclusive universe; (5) lacks marketplace conditions; (6) suffers from "order bias"; and (7) lacks an explicit "don't know" alternative to the survey's critical questions. Dr. Sood's "recognition survey" is equally infirm. Specifically, the survey: (1) ignores the problem of "spurious recognition"; (2) employs ambiguous questions; (3) suffers from order bias; and (4) lacks a control cell, a vital component for measuring any consumer response.

All of these flaws are not the type of flaws that go to the "weight" of Dr. Sood's opinion. Quite the contrary, these errors (and Dr. Sood's "opinions" based thereon) are so fundamental in nature that they render the results *meaningless*. Accordingly, the Court should exclude the report and testimony of Dr. Sood, as well as all evidence relating to either of the surveys he performed in this case.

ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD

1

## II.    FACTS IN SUPPORT OF MOTION TO EXCLUDE

2          Dr. Sanjay Sood ("Dr. Sood") is a total stranger to the world of trademark litigation

3    surveys.    *See* Deposition of Dr. Sanjay Sood ("Sood Depo"), pp. 11:11-22, Exh. A to

4    Declaration of Michael J. Bettinger in Support of Motion to Exclude Dr. Sood's Report

5    ("Bettinger Dec.").    Although he testified that surveys in cases such as these are "not that

6    complicated", Dr. Sood was unfamiliar with any treatise on trademark law other than a

7    "handbook" that he browsed for "a half hour or so" and the name of which he could not even

8    recall.    *Id*. at 25:4-26:9.    He is unfamiliar with any Ninth Circuit or federal district court

9    opinions on trademark surveys, or any treatises regarding consumer surveys in the context of

10   a trademark dispute.    *Id*. at 27:3-18.    He has never even heard of Professor Shari Diamond, a

11   well-known authority on consumer surveys and the author of the Federal Judicial Center's

12   *Reference Guide on Survey Research.*    *Id*. at 40:14-25.    Dr. Sood did not review any of

13   Professor McCarthy's treatises on trademarks, has never heard of the Ninth Circuit's

14   *Sleekcraft* factors for likelihood of confusion, and has never read the Lanham Act.    *Id*. at 41:1-

15   15; 42:20-25.    He has no understanding of the meaning of "dilution by tarnishment" or

16   "dilution by blurring," the two actionable theories of dilution under the Federal Trademark

17   Dilution Act, 15 U.S.C. § 1125(c)(2).    Sood Depo, pp. 94:22-95:15.    Dr. Sood admits that, in

18   the process of formulating his survey, he "didn't consult anything." *Id*. at 28:19-25.

19          Dr. Sood is not a member of any survey and market research organizations, and has

20   not even heard of several of them.    *See id*. at 12:21-14:2.    He has never qualified as an expert

21   in court before.    *Id*. at 20:19-21:4.    He has not written any books or articles on likelihood of

22   confusion.    *Id*. at 21:14-19.    Nor has he written any books or articles on dilution or the

23   likelihood of dilution.    Sood Depo, pp. 22:24-23:6.    Although he purported to conduct a

24   survey on consumer recognition of the arcuate design, Dr. Sood has never written any books

25

26   ABERCROMBIE & FITCH TRADING CO.'S MOTION
     TO EXCLUDE REPORT, TESTIMONY &
     SURVEY EVIDENCE OF DR. SANJAY SOOD

or articles on surveys designed to assess whether consumers recognize a trademark. *Id*. at 73:12-19. Prior to this case, Dr. Sood had never conducted a survey that had been used in a legal matter and admitted incorporating portions of reports by Carol Scott, LS&Co.'s expert witness in prior infringement matters, to structure his own report in this case. *Id*. at 86:8-91:10.

In sharp contrast to Dr. Sood, Abercrombie retained Dr. Gerald Ford—a renowned expert in this arena—who conducted a thorough survey and concluded that there is absolutely no confusion that can be attributed to the RUEHL stitching design. *See* Dr. Ford's Expert and Rebuttal Reports, Exhs. B and C, respectively, to Bettinger Dec. As set forth below and in Dr. Ford's Rebuttal Report, Dr. Sood's report and any testimony based thereon should be excluded because his surveys were not conducted according to generally accepted survey principles and are, therefore, inherently unreliable and prejudicial.

### III.    LAW AND ARGUMENT

**A.    Dr. Sood's opinions based on his "likelihood of confusion survey" should be excluded because it was not conducted according to generally accepted principles in a number of important respects.**

> **1.    The confusion survey used improper leading questions that completely undermine the legitimacy of the survey**.

Dr. Sood's survey is inherently unreliable because it contains leading questions that severely prejudice the results of the survey. "A survey question which begs its answer cannot be a true indicator of the likelihood of consumer confusion." *Universal City Studios, Inc. v. Nintendo Co., Ltd*., 746 F.2d 112, 118 (2d Cir. 1984) (rejecting the question "[t]o the best of your knowledge was Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?" because it presented survey respondents with a suggestive association, whereas in response to question "As far as you know, who makes

ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD

Donkey Kong?", no one responded with plaintiff's name). Put another way, responses to questions which suggest an association are likewise of little probative value in measuring likely confusion. *Riviana Foods Inc. v. Societe Des Produits Nestle S.A.,* 33 U.S.P.Q.2d 1669 (S.D. Tex. 1994) (concluding that the question "Do you think the weight loss product 'Sweet Success' and 'Success Rice' are more likely made by the same company or more likely made by different companies?" was leading and improperly suggestive); *Beneficial Corp. v. Beneficial Capital Corp.,* 529 F. Supp. 445, 450 (S.D.N.Y. 1982) (finding unreliable a 31% survey response to the question "Do you think there may or may not be a business relationship between Beneficial Capital Corporation and the Beneficial Finance System Companies?" because the question as framed had a leading quality, not well-suited to eliciting an uninfluenced reaction); *Marshall Field & Co. v. Mrs. Field's Cookies,* 25 U.S.P.Q.2d 1321, 1334 (T.T.A.B. 1992). These types of questions provide "fuel for the next question as to who owns or sponsors" a particular mark, and, therefore, the presence of such questions in a survey render its results doubtful. *Quality Inns Int'l, Inc. v. McDonald's Corp.,* 695 F. Supp. 198, 218 (D. Md. 1988); *see also Mattel, Inc. v. MCA Records, Inc.*, 28 F.Supp.2d 1120, 1132 -1133 (C.D. Cal. 1998) (survey at issue included a number of questions that courts have found to be inherently leading or biased).

Here, Dr. Sood's survey participants were first shown a photograph of a person wearing Levi's jeans featuring the back pocket double arcuate stitching design. *See* Dr. Sood's Expert Report ("Sood Report"), p. 9, Exh. D to Bettinger Dec. That photograph was then taken away and the participant was shown four photographs of someone wearing RUEHL, Citizens, Seven for All Mankind and True Religion jeans, again featuring the back pocket stitching design. All four photographs were pinned to the wall side-by-side. *Id*. at pp. 9-10. After the participant had looked at all four jeans together on the wall, she was asked:

1

2

Do you think that any of these jeans are made, sponsored or endorsed by the same company that the made the jeans you saw in the first picture?

3

Or, do you think that none of these jeans are made, sponsored or endorsed by the same company that made the jeans you saw in the first picture? *Id.* at p. 10.

4

5     These types of questions are the exact type routinely rejected as creating inherently unreliable

6     results. *See supra.* This Court should reject Dr. Sood's confusion survey on this basis alone.

7

8

**2.      The survey suffers from "demand effects" making its results inherently unreliable**.

9          Dr. Sood's survey also suffers from "demand effects" because it suggests to the survey

10    respondents the existence of a connection between the jeans in the first photograph (Levi's)

11    and one of the jeans in the set of four photographs.  As Dr. Ford points out:

12

13

14

15

16

A question that asks survey respondents whether or not products are put out by the same or related sources is likely to generate demand effects by suggesting to survey respondents, at least implicitly, that they should believe that there is some sort of relationship between one or more of the products when the possibility might not have occurred to consumers who encounter the alleged infringing product by itself.

17    Ford Rebuttal, ¶ 10 (citing *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06

18    Civ. 550, 2007 U.S. Dist. LEXIS 57320, *25 (S.D.N.Y. Aug. 6, 2007) ("the mere putting of a

19    question creates the impression of a relationship"); *Simon Property Group L.P. v. mySimon,*

20    *Inc.*, 104 F. Supp. 2d 1033, 1048 (S.D. Ind. 2000) ("The question about whether the two items

21    are put out by the same or related source is likely to generate so-called 'demand effects' that

22    bias the survey by suggesting to respondents, at least implicitly, that they should believe there

23    is at least some sort of relationship between the different items when the possibility might not

24    even have occurred to the vast majority of consumers who see the items."); *Gov't Employees*

25

26    ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD

*Ins. co. v. Google, Inc.*, No. 1:04 CV 507, 2005 U.S. Dist. LEXIS 18642, *23 (E.D. Va. Aug. 8, 2005) 2005 U.S. Dist. LEXIS 18642 at *23 (E.D. Va. 2005) ("[D]emand effect results when the interviewer's question or other elements of the survey design influence participants' responses by suggesting what the 'correct' answers might be or by implying associations that might not otherwise occur to participants.")).

Indeed, Dr. Sood concedes that if a respondent is shown two products and is asked if they are related, that can create demand effects, that is, it could lead the person to believe there is a relation between the products. Sood Depo, pp. 229:23-230:5. He also admits that simply not showing the first photograph and the second group of photographs simultaneously (*e.g.*, removing the Levi's jeans photograph from view before showing the jeans in the second group of photographs), does not eliminate completely the bias. *See id.* at 230:20-231:5.

### 3.   <u>The survey lacks a proper control, which is the only way to measure causality</u>.

"A control stimulus is used in trademark surveys to sufficiently account for factors legally irrelevant to the requisite confusion...such as background noise generated by the befuddlement that is part of the human condition." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 576, 595 (S.D.N.Y. 2007) (quotation omitted). Thus, courts require controls "in order to filter out this background confusion." *Id.* (quotation omitted). A control product is one that cannot be considered infringing but which must be similar to the product being tested. *Id.* (expert made a flawed choice of a control bag because it was quite dissimilar in shape and pattern to the defendant's bags shown to the test groups, whereas a control stimulus closer in design to the plaintiff's monogram multicolor mark "would have gone far towards isolating the amount of confusion attributable to the similarities" in the parties' marks, "rather than to the similarities in the 'look' of their bags"). A control stimulus

ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD

that has little in common with the products at issue likely results in underreporting of background "noise."  *Id*. at 596 (although poor choice of control may not be dispositive on issue of admissibility, it is an "important factor" in the cumulative effect of all the flaws in a survey that cuts toward exclusion of the survey).  Having no control at all is even worse.  *See id*. (a poor control is not a very good "noise" reducer, but is better than no control at all).

Dr. Sood's confusion survey failed to employ a control cell.  Ford Rebuttal, ¶13; *see also* Sood Report, pp. 7-11 (failing to employ any control cell in his survey).  Failure to employ a control cell in his survey flies in the face of conventional survey methodology.  *See* Ford Rebuttal, ¶14 (noting that most current Lanham Act surveys designed to address the issue of likelihood of confusion employ a traditional scientific experimental survey design consisting of two survey cells: 1) a test or experimental survey cell designed to measure the likelihood of confusion, if any, with respect to the source, approval of, or a business affiliation/connection of a product or service bearing an allegedly infringing mark; and 2) a control survey cell).  As Dr. Ford notes, "[a] control survey cell provides a measure of the extent to which non-trademark confusion exists in the survey results."  Ford Rebuttal, ¶ 15.  "Without an appropriate control cell, the degree of error in the Dr. Sood likelihood of confusion survey results cannot be estimated."  *Id*. at ¶ 16 (citing *Simon Property Group*, 104 F. Supp. 2d at 1048).

Dr. Sood did purport to measure the likelihood of confusion between LS&Co.'s arcuate design, on the one hand, and the back pocket stitching designs of Citizens of Humanity ("Citizens"), Seven for All Mankind ("Sevens") and True Religion jeans.  *See* Sood Report, pp. 9-10.  Although he does not refer to them as "controls" in his report, when questioned in deposition, Dr. Sood apparently believes these were controls and that controls are used to "get a sense for some level of guessing or is there something about the procedure

that's requiring people to answer in a certain way."  Sood Depo, p. 215:12-16.  Dr. Sood opines that 31% of 299 female consumers surveyed incorrectly associated RUEHL jeans with jeans by LS&Co.  Sood Report, p. 3.  But it is apparent that Dr. Sood failed entirely to account for how the confusion rates he obtained for the Citizens, Sevens and True Religion jeans impacted his alleged 31% rate of confusion between the accused RUEHL design and the arcuate design.  Instead, Dr. Sood simply lists the survey results for the Citizens, Sevens, True Religion and RUEHL jeans but does not adjust the alleged 31% confusion rate for RUEHL jeans to rule out any non-trademark confusion evidenced by his "controls."  *See id*. at p. 11.

Moreover, even if the Citizens, Sevens and True Religions jeans could be considered "controls," they were improper because the back pocket stitching designs on those jeans bear no resemblance to the arcuate design whatsoever.  *See* Exh. 14 to Sood Report.  Dr. Sood selected these "control" jeans because they were identified as RUEHL competitors and broadly represent the premium jeans category.  Sood Report, p. 9; Sood Depo, pp. 143:24-144:6.  But whether the control products compete with the accused product is not the criteria for selecting a proper control to filter the background noise or guessing that, as Dr. Sood admits, exists in surveys.  Sood Depo, pp. 149:20-150:6.  Because the Citizens, Sevens and True Religion back pocket stitching designs bear little, if any, resemblance to the arcuate and RUEHL designs at issue, they do little or nothing to filter any background "noise" or account for non-trademark confusion in Dr. Sood's survey.  *See Louis Vuitton Matellier*, 525 F. Supp. 2d at 596.  Dr. Sood's failure to use proper controls provides an additional reason to exclude his report.

ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD

**4.    Dr. Sood's survey universe is underinclusive, undermining further its reliability**.

Consumer surveys based upon an "underinclusive" universe are not conducted according to generally accepted principles and are, therefore, inherently unreliable. *See Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1468 (D. Kan. 1996) (excluding survey because the survey it was "severely underinclusive as to be unreliable for the proposition it is proffered to support."); *Hodgdon Powder Co., Inc. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007) (finding that survey was "not conducted according to generally accepted survey principles" for several reasons including that "the survey universe is underinclusive.").

Dr. Sood claims that his survey was designed to test for likelihood of confusion in a post-sale environment.    Sood Report, p. 9.    But his survey universe was severely underinclusive.  A proper universe would be a sampling of those potential purchasers who are likely to be exposed to the alleged infringing mark in the post-sale marketplace, specifically, those in Dr. Ford's survey universe:  females who are likely to purchase jeans for themselves. This would include a representative sample of all females aged 13 or older, or, alternatively, all females aged 18 or older who are likely to purchase jeans for themselves.  Ford Report, ¶¶ 24-26.  In contrast, Dr. Sood's survey universe included only females aged 20 to 45 years of age who reported that they had purchased a pair of jeans in the past six months that cost $75.00 or more or were likely to purchase jeans in the next six months that cost $75.00 or more.  Sood Report p. 8.  Dr. Sood's decision to narrow the universe in this manner was an arbitrary or artificial limitation.  Ford Rebuttal, ¶¶ 17, 18.  Dr. Sood concedes that people between ages 13 and 17, and older than 65 (let alone, older than 45) are part of the general consuming population.  Sood Depo, p. 113:10-114:17.  As Dr. Sood testified, "they are part of the consumer population…I had to make a start point and a stop point, so those were just the

ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD

1    ones that I chose, but you're right, people younger than 18 and people older than 65 are also

2    part of the general population." Sood Depo, p. 114:10-17. Dr. Sood also admitted that he had

3    no empirical data that people under 18 and older than 65 (or older than 45 for that matter)

4    would not be likely to be making decisions about jeans purchases. *Id*. at 113:20-114:6;

5    115:15-18.

6         Moreover, Dr. Sood overlooks the critical fact that, in a post-sale environment, for

7    example where a consumer on the street is viewing another person wearing an unknown pair

8    of jeans, one would not know that the unknown brand of jeans costs $75.00 or more. Ford

9    Rebuttal, ¶ 18. Dr. Sood concedes that, "it would be hard to exactly know how much a pair of

10   jeans costs in a post sale environment." Sood Depo, p. 137:11-19. Thus, this universe

11   limitation likewise excludes unnecessarily relevant consumers. In fact, Dr. Sood's survey

12   excludes approximately 80% of relevant jeans purchasers, *i.e.* those who had not purchased

13   jeans costing $75.00 or more or were not likely to purchase such jeans in the next six months

14   or more. Ford Rebuttal, ¶ 18. For these reasons, Dr. Sood's survey universe is grossly

15   underinclusive, inherently unreliable, and his testimony and report should be excluded.

16              **5.    The survey lacks marketplace conditions**.

17        Dr. Sood's survey has no connection to the reality of marketplace conditions. Instead,

18   he created an imaginary world where a consumer would see only the left rear pocket of a pair

19   of Levi jeans, which would then be hidden, and then seconds later see side-by-side the left

20   rear pocket of a pair of RUEHL, Citizens, Sevens and True Religion jeans. Sood Report, p. 9.

21   As Dr. Ford notes, such an occurrence is "beyond remote." Ford Rebuttal, ¶ 20. Dr. Sood

22   admits that he has no empirical evidence that his survey design represents the manner in

23   which the accused RUEHL pocket design is likely to be encountered in the post-sale

24

25

26   ABERCROMBIE & FITCH TRADING CO.'S MOTION
     TO EXCLUDE REPORT, TESTIMONY &
     SURVEY EVIDENCE OF DR. SANJAY SOOD

1  marketplace.  Sood Depo, p. 157:8-24.  His survey is thereby rendered meaningless.  Ford

2  Rebuttal, ¶ 21.

3            **6.    The survey suffers from order bias**.

4       As Professor Diamond explains, "[t]he order in which questions are asked on a survey

5  and the order in which response alternatives are provided in a closed-ended question can

6  influence the answers."  Shari Seidman Diamond, "Reference Guide on Survey Research,"

7  33-SE 6 Reference Manual on Scientific Evidence § IV(E) (2008).  Thus, to avoid such "order

8  bias," the order of the questions and the order of the response choices in a survey should be

9  rotated.  *Id*.; *see also* Ford Rebuttal, ¶ 22; *Winning Ways, Inc.*, 913 F. Supp. at 1467 ("'[T]to

10  control for order effects, the order of the questions and the order of the response choices

11  should be rotated.'") (quoting Reference Manual on Scientific Evidence, 249 (1994)).

12       Dr. Sood's first question to respondents in the confusion survey was:  "Do you think

13  that any of these jeans are made, sponsored or endorsed by the same company that made the

14  jeans you saw in the first picture? or Do you think that none of these jeans are made,

15  sponsored or endorsed by the same company that made the jeans you saw in the first picture?"

16  Exh. 11 to Sood Report.  Dr. Sood admits that he did not rotate the alternatives to this critical,

17  closed-ended question and that he had no basis to suggest that people would have been

18  confused by rotating the order; it was "just a choice [he] made in the survey design."  Sood

19  Depo, p. 234:2-18; *see also* Ford Rebuttal, ¶ 22.  Accordingly, Dr. Sood's likelihood of

20  confusion survey suffers from order bias and should be excluded.

21            **7.    The survey lacks an explicit "don't know" alternative**.

22       Furthermore, Dr. Sood's survey did not offer respondents an explicit "don't know" or

23  "not sure" alternative to the closed-ended critical question.  *See* Exh. 11 to Sood Report.  As

24  noted, that question was:  Do you think that any of these jeans are made, sponsored or

25

26  ABERCROMBIE & FITCH TRADING CO.'S MOTION
    TO EXCLUDE REPORT, TESTIMONY &
    SURVEY EVIDENCE OF DR. SANJAY SOOD

endorsed by the same company that made the jeans you saw in the first picture? or Do you think that none of these jeans are made, sponsored or endorsed by the same company that made the jeans you saw in the first picture?" *Id*. The interviewers were apparently instructed to record any "don't know/not sure" responses, but the "don't know" alternative was not expressly provided in the question posed to respondents. *See id*; Sood Depo, pp. 211:23-212:2.

By providing an explicit "don't know" or "no opinion" option as part of the question, the survey can reduce guessing. Ford Rebuttal, ¶¶ 22-23 (citing Diamond, *supra*; Jerre B. Swann, "Likelihood of Confusion Studies and the Straitened Scope of *Squirt*," 98 Trademark Rep. 739, 740, n.16 (2008). As Dr. Ford explains, without a control cell, Dr. Sood had no way to estimate the level of error resulting from order bias in the survey questions and the lack of an explicit "don't know" alternative to the critical closed-ended question. Ford Rebuttal, ¶ 24.

**B. Dr. Sood's "jeans recognition survey" was not conducted according to generally accepted principles and is, thus, inherently unreliable and should be excluded.**

**1. Dr. Sood ignores the problem of "spurious recognition."**

In Dr. Sood's own words, in a survey designed to determine whether consumers recognize a particular mark, "spurious recognition would be that people are essentially guessing and they don't know the exact answer, but they're trying to guess as to what the answer might be." Sood Depo, p. 99:11-18. As noted by Professor Keller, whom Dr. Sood admits is one of the "foremost authorities on brand management" (Sood Depo, p. 99:22-100:1):

> "Any research measure must consider the issue of consumers making up responses or guessing. That problem may be especially evident with certain types of aided awareness or recognition measures for the brand. Spurious awareness occurs when consumers erroneously claim they recall

ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD

something that they don't recall and that maybe doesn't even exist." *See* Ford Rebuttal, ¶ 27 (quoting K.L. Keller, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, 3d Ed., Pearson Prentice Hall, p. 378 (2008)).

Dr. Sood agrees with that statement and admits that his jeans recognition survey is an aided awareness survey. Sood Depo, pp. 99:19-21. But Dr. Sood does not follow Professor Keller's guidance that to provide a more sensitive test of recognition, the survey should include "decoys or lures – items that consumers could not possibly have seen." *Keller*, *supra*, at 374. Dr. Sood's survey completely ignores the problem of spurious recognition and fails to include any fictitious stitching design to control for the respondents' guessing or erroneous claims that they recall the "style of stitching" when they do not. *See* Sood Report, pp. 4-6; Sood Depo, p. 104:7-10; Ford Rebuttal, ¶ 27.

**2.    Dr. Sood employed ambiguous questions, the responses to which cannot serve as a basis for Dr. Sood's opinions regarding the extent of recognition of the arcuate stitching design.**

An expert's "opinion" based on "leaps of logic" is inherently unreliable. *Lanphere Enterprises, Inc. v. Jiffy Lube Int'l, Inc.*, No. 01-1168-BR, 2003 U.S. Dist. LEXIS 16205, *16 (D. Or. Jul. 9, 2003) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Here, Dr. Sood's opinions are only connected by "leaps of logic" that are not supported by the actual survey results. Dr. Sood opines that approximately 77% of the people that were surveyed in his recognition survey "recognized the pocket stitching and 53% correctly identified the stitching as being associated with the LEVI's brand." Sood Report, p. 3. But Dr. Sood did not ask survey respondents if they recognized the pocket stitching or associated the pocket stitching with a particular brand. Instead, respondents were asked, "Have you seen jeans *with this style* of pocket stitching before?" Exh. 5 to Sood Report (emphasis supplied).

ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD

The question is ambiguous and requires Dr. Sood to make "leaps of logic" in his opinions, which are not supported by his survey results. Dr. Sood's opinions assume that each survey respondent understood "style of pocket stitching" to mean the arcuate stitching design on the Levi's jeans. But there is no way to determine whether survey respondents who stated that they recognized the "style of pocket stitching" were in fact referring to the arcuate design, the color of the stitching, or something else. Ford Rebuttal, ¶ 28. Dr. Sood admitted in deposition that "there could be some people who interpret it in the way that you are suggesting, that the style of the pocket could refer to the color or something" and that "people could interpret it in multiple ways." Sood Depo, pp. 98:15-99:10. Regardless of what respondents may or may not have understood by "style of pocket stitching," it is apparent that no respondent was ever asked if he/she had seen the specific design of pocket stitching shown on the Levi jeans running through the middle of the pocket in the photograph. Ford Rebuttal, ¶ 28.

After asking respondents in question one, "have you seen jeans *with this style* of pocket stitching before?" (emphasis supplied) and asking respondents in question two, "Do you associate jeans *with this style* of pocket stitching with: one brand or company, more than one brand or company, [or] don't know?" (emphasis supplied), respondents were asked question three: "What is the name of the brand(s) or companies that you associate with this product?" (emphasis supplied). Exh. 5 to Sood Report. As Dr. Ford notes, "question three is directed away from pocket stitching and directed, instead, to the product itself." Dr. Sood even concedes that some people may not interpret question three as specifically asking about the pocket stitching design. Sood Depo, pp. 164:17-165:1. Thus, the question does not measure the degree of recognition and association of the arcuate stitching design with LS&Co. Ford Rebuttal, ¶ 29. Therefore, these survey results cannot serve as a basis for

ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD

1 Dr. Sood's opinions regarding the percentage of recognition of the pocket stitching on Levi's
2 jeans and Dr. Sood's opinions and testimony regarding recognition of the arcuate design
3 should be excluded.

**3.    The recognition survey also suffers from order bias.**

5 Like the confusion survey, Dr. Sood's recognition survey suffers from order bias.
6 Specifically, he did not rotate the alternatives to the closed-ended question two.   Ford
7 Rebuttal, ¶ 30.   Again, failure to do so results in order bias that can influence the respondents'
8 answers. *See Winning Ways*, 913 F. Supp. at 1467; Diamond, *supra*, pp. 254-55.

**4.    The recognition survey lacks a control cell, and even if the Lee and Lucky jeans served as controls, Dr. Sood failed to account for them.**

11 Dr. Sood believes that the purpose of a control in a recognition survey is to provide a
12 "benchmark or a standard of comparison for…the Levi's arcuate and how famous it is versus
13 other brands."  Sood Depo, p. 103:20-104:6.  He believes controls are benchmarks "in terms
14 of how well known those marks are, and benchmarks as to what level of guessing, or you
15 know, estimation that consumers might be doing in response to these questions."  *Id.*  But an
16 appropriate control is absent from Dr. Sood's recognition survey, and as such, "there is no
17 way to estimate the level of error resulting from spurious recognition, ambiguous questions,
18 and order bias in Dr. Sood's survey questions."  Ford Rebuttal, ¶ 31.

19 Dr. Sood did attempt to measure the recognition of Lee and Lucky brand stitching
20 designs in the recognition survey to serve as his "benchmarks."  Sood Report, p. 6; Sood
21 Depo, pp. 103:20-104:6.  Dr. Sood concludes that 77% (234 out of 302) of respondents
22 indicated that they had seen the Levi's back pocket stitching before, compared to 50% of
23 respondents who reported having previously seen the Lee pocket stitching and 47% who
24 reported having previously seen the Lucky pocket stitching.  Sood Report, pp. 6-7.  But

26 ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD

Dr. Sood never uses the Lee and Lucky recognition results to account for the level of error in his 77% rate of recognition of the arcuate mark.  In particular, although he admits that the Lee and Lucky jeans, as "benchmarks," should account for the level of guessing or estimation by consumers in response to his questions, Dr. Sood never even attempts to account for that error in his opinions.  *Id*. at pp. 4-7.  This error is just another in a parade of errors in Dr. Sood's report.

**IV.    <u>CONCLUSION</u>**

For the reasons set forth herein, Abercrombie respectfully requests this Court exclude the report, testimony and any other survey evidence of LS&Co.'s expert, Dr. Sanjay Sood.

Dated:    August 15, 2008                                Respectfully submitted,

**K&L Gates LLP**

By:_____/s/_____
Michael J. Bettinger
Rachel R. Davidson
J. Michael Keyes
Attorneys for Defendant and Cross-Complainant
ABERCROMBIE & FITCH TRADING CO.

ABERCROMBIE & FITCH TRADING CO.'S MOTION
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD