# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


LEVI STRAUSS & CO.,            )
                              )
            Plaintiff,         )
                              )
     vs.                      ) No. CV-07-3752
                              )
ABERCROMBIE & FITCH TRADING CO., )
                              )
            Defendant.         )
_____)




DEPOSITION OF SANJAY SOOD, Ph.D.

Los Angeles, California

Thursday, July 24, 2008




Reported by:
NANCY L. COLLIER
CSR No. 5819
JOB No. 929020

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3

4    LEVI STRAUSS & CO.,                    )
                                            )
5              Plaintiff,                    )
                                            )
6         vs.                               )  No. CV-07-3752
                                            )
7    ABERCROMBIE & FITCH TRADING CO.,  )
                                            )
8              Defendant.                    )
     _____)

9

10

11

12

13

14

15         Deposition of SANJAY SOOD, Ph.D., taken on

16    behalf of Defendants, at 10100 Santa Monica

17    Boulevard, 7th Floor, Los Angeles, California,

18    beginning at 9:04 A.M. and ending at 4:44 P.M. on

19    Thursday, July 24, 2008, before NANCY L. COLLIER,

20    Certified Shorthand Reporter No. 5819.

21

22

23

24

25

```
 1      APPEARANCES:
 2      For Plaintiff:
 3      TOWNSEND TOWNSEND & CREW
        BY:  GREGORY GILCHRIST
 4      Attorney at Law
        2 Embarcadero Center
 5      San Francisco, California  94111
        (415) 273-7564
 6

        LEVI STRAUSS & CO.
 7      BY:  THOMAS ONDA (In-house counsel)
        Attorney at Law
 8      1155 Battery Street
        San Francisco, California  94111
 9      (415) 501-2372
10      For Defendant:
11        K&L GATES
        BY:  J. MICHAEL KEYES
12      Attorney at Law
        618 West Riverside Avenue, Suite 300
13      Spokane, Washington  99201-0602
        (509) 241-1527
14
        Videotaping:
15
        ESQUIRE DEPOSITION SERVICES
16      BY:  MITCH LERMAN
        523 West Sixth Street, 10th Floor
17      Los Angeles, California  90014
        (800) 640-2461
18
        Also Present:
19
        DR. GERALD L. FORD
20
21
22
23
24
25
```

1    A    Yes.

2    Q    What did you do after that?

3    A    I took a position as assistant professor at

4    Rice University in Houston.

00:21    5    Q    How long were you at Rice?

6    A    I was there until -- let's see, I was there

7    for three years, and then I moved to UCLA in 2001.

8    Q    And you joined UCLA as an associate

9    professor or assistant professor, I guess?

00:22    10    A    Assistant professor.

11    Q    And then are you currently an associate

12    professor?

13    A    Yes.

14    Q    And when were you promoted to associate

00:22    15    professorship?

16    A    2006.

17    Q    What courses are you currently teaching?

18    A    I teach marketing management and

19    entertainment management at UCLA.

00:22    20    Q    Tell me about the latter first.  What's

21    entertainment management?

22    A    Entertainment marketing, sorry.

23    Q    Okay.

24    A    Yes.  So I discuss how marketing is

00:22    25    conducted primarily in the film industry.

1       Q    What about the other course that you teach?

2       A    Marketing management is the intro course

3    that all MBA's take.

4       Q    Do you, as part of the curriculum

00:22    5    associated with that course, do you deal with

6    consumer surveys?

7       A    Yes, part of the curriculum deals with

8    consumer surveys, yes.

9       Q    And what do you teach about consumer

10    surveys?

11       A    Just we teach about conducting research and

12    primary research methods versus secondary research

13    methods, and looking at strengths and weaknesses of

14    any research design whether it be quantitative or

00:23    15    qualitative in nature.

16       Q    Is part of the coursework or the curriculum

17    that's covered in that course, does it deal with

18    consumer surveys in the context of a trademark

19    litigation matter, for example?

00:23    20       A    No.

21       Q    Are you familiar with the organization that

22    goes by the name of Council of American Survey

23    Research -- or the Council of American Research

24    Survey Organization, CASRO?

00:23    25       A    No.

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1        Q    So you're not a member of CASRO?

2        A    No.

3        Q    What about the Council for Marketing

4   Opinion Research, have you heard of this

00:23   5   organization?

6        A    No.

7        Q    So I take it you're not a member of that?

8        A    No.

9        Q    What about the American Association for

00:23   10  Public Opinion Research, have you heard of this

11  organization?

12       A    I think so.  Is that related to like the

13  Gallup Organization?

14       Q    Well, are you a member of that

00:23   15  organization?

16       A    No.

17       Q    What about the Marketing Research

18  Association?

19       A    I've heard of the Marketing Research

00:24   20  Association.

21       Q    Are you a member of that group?

22       A    No.

23       Q    Why not?

24       A    Just the professional organizations that I

00:24   25  belong to are more academic in nature, so I belong

1    to the Association for Consumer Research and the

2    kind of academic centric organizations.

3        Q    Prior to today have you ever had your

4    deposition taken?

00:24    5        A    Yes.

6        Q    In what matter?

7        A    There was one -- it was a suit involving

8    Playmakers.  It was against ESPN.

9        Q    There was a suit involving Playmakers?

00:24    10        A    Uh-huh.

11        Q    What's Playmakers?

12        A    Playmakers was a television show that ESPN

13    had produced, and Playmakers was also part of a

14    talent agency that was trying to recruit athletes

00:25    15    into their talent agency, and so the Playmakers

16    Talent Agency was claiming damage by the Playmakers

17    television show produced by ESPN.

18        Q    And so were you an expert in that?

19        A    Yes.

00:25    20        Q    Was that a case that was filed in federal

21    court?

22        A    I don't know.  That was my one and only

23    deposition.

24        Q    Okay.  When was that?

00:25    25        A    I want to say 2004, in that time frame.

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1       Q    Why do you say there's numerous ways to

2  measure dilution?

3            MR. GILCHRIST:   The question is vague.

4  BY MR. KEYES:

00:31   5       Q    What are you basing that statement on?

6       A    Well, as I said, dilution to me is the

7  distinctiveness of a mark, and any mark is going to

8  have a certain level of familiarity, a certain

9  attitude engendered in the respondent, come with a

00:32   10  certain set of associations of who typically uses

11  that product, how much you typically pay for that

12  product, so tapping into any one of those

13  dimensions could represent dilution for the brand

14  that's the owner of the mark.

00:32   15       Q    In this Playmakers case that you mentioned,

16  were you qualified as an expert by the court that

17  was presiding over that particular matter?

18       A    I'm not sure what that means.

19       Q    Did you ever testify in court?

00:32   20       A    No.

21       Q    Other than your deposition, did you provide

22  any sort of testimony in that matter?

23       A    Other than my deposition, no.

24       Q    Okay.  So there's no written declaration or

00:32   25  affidavit that you submitted to the court?

1          A    No.

2          Q    Has a court ever relied on your expert

3    opinion in rendering a decision?

4          A    Not that I'm aware of.

00:33    5          Q    Has a court ever cited to any of your

6    publications for any reason?

7          A    It's possible.  Not in a case that I've

8    been involved with, but it's possible that -- I

9    mean, I do work in branding, so it's possible that

00:33    10    others are citing my work in their testimony.

11          Q    But you're not aware of any court case that

12    has cited any of your articles, for example?

13          A    No, I'm not aware.

14          Q    Have you ever written any books involving

00:33    15    the likelihood of confusion?

16          A    No.

17          Q    Have you ever written any articles on the

18    likelihood of confusion?

19          A    No.

00:33    20          Q    Have you ever presented any speeches on the

21    likelihood of confusion?

22          A    I'm sure that in class I've mentioned, you

23    know, or I've spoken on confusion, what is a mark

24    and how can it be protected, but I don't think I've

00:34    25    highlighted any specific legal case and referred to

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1    legal court documents.

2        Q    Is that a part of your standard practice in

3    class that you would talk to your students about

4    likelihood of confusion?

00:34  5        A    I...I have used it in class before, so if

6    it comes up.  I mean, it depends if there's lawyers

7    who are part of the student body, they tend to ask

8    more questions related to protection.

9        Q    So what have you told your students in your

00:34  10   classes about likelihood of confusion?

11       A    Well, one example that often comes up is

12   when a brand is so closely related to a category,

13   like take Xerox for example and photocopying, that

14   Xerox as a company would want to emphasize that

00:35  15   they are -- that you should not call it Xerox

16   copies, you should call it photocopies, because

17   they would lose control of their mark if Xerox

18   copies becomes a standard term, so that's an

19   example that often comes up in class.

00:35  20       Q    They would abandon their mark?

21       A    Yes.

22       Q    By genericide?

23       A    Yes.  I don't use quite those terms.

24       Q    Have you ever written any books on

00:35  25   dilution?

| | | | |
|---|---|---|---|
| | 1 | A | No. |
| | 2 | Q | Or on the likelihood of dilution? |
| | 3 | A | No. |
| | 4 | Q | Have you ever written any articles on the |
| 00:35 | 5 | | likelihood of dilution? |
| | 6 | A | No, not in the legal sense. |
| | 7 | Q | What do you mean "in the legal sense"? |
| | 8 | A | Well, I do work on what I call feedback |
| | 9 | | effects, so when a brand extends into a new |
| 00:35 | 10 | | category, what's the likelihood that there's going |
| | 11 | | to be feedback effects to the parent brand, so for |
| | 12 | | example, if Pepsi were to launch a new orange |
| | 13 | | juice, what is the likelihood that there's going to |
| | 14 | | be some sort of feedback effect to Pepsi as a |
| 00:36 | 15 | | brand, and so sometimes in the academic world we |
| | 16 | | call that dilution. |
| | 17 | Q | And a feedback effect, I take it that has a |
| | 18 | | negative connotation? |
| | 19 | A | It can be positive or negative, but usually |
| 00:36 | 20 | | in research we're looking for negative examples. |
| | 21 | Q | So in the academic world that can be called |
| | 22 | | dilution? |
| | 23 | A | Yes. |
| | 24 | Q | Because it affects the brand equity? |
| 00:36 | 25 | A | Yeah, affects the brand attitudes is what |

ESQUIRE DEPOSITION SERVICES
(800) 640-2461

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1    categories, and as it gets to be associated with

2    more and more categories, there may be greater

3    likelihood of dilution for the Pepsi brand.

4        Q    Dr. Sood, are you familiar with any

00:38   5    treatises on trademark law?

6        A    What do you mean by "treatise"?

7        Q    Treatise, you know, like an exposition of

8    that particular area of law, like an in-depth

9    treatment of it?

00:38   10       A    Yes.

11       Q    Treatise I think in the same sense that you

12   would refer to a treatise in the academic world?

13       A    Yes, there is a handbook on trademark law

14   that I've browsed over.

00:38   15       Q    And who is the author of that handbook?

16       A    You know, I'm forgetting the name.  It's a

17   big book, I remember that.

18       Q    Is it a single volume?

19       A    I couldn't even tell you that.  It's thick,

00:38   20   big.

21       Q    Are you aware of any multi-volume treatises

22   on trademark law?

23       A    I'm sure there are.  I couldn't tell you

24   their names.

00:39   25       Q    This one treatise that you referenced that

1    you thumbed through or paged through, when did you

2    do that?

3         A    This would be several months ago when I was

4    considering becoming an expert in another case, not

00:39    5    this case.

6         Q    How much time did you spend reading that

7    particular treatise?

8         A    I browsed through it for like, you know, a

9    half hour or so.

00:39    10        Q    And was that -- I take it that was not with

11    the Playmakers case?

12        A    No.

13        Q    It was another matter?

14        A    Yes.

00:39    15        Q    Were you ultimately retained in that

16    matter?

17        A    No.

18        Q    Are you familiar with any -- well, let me

19    ask this:  Are you familiar with what the Ninth

00:39    20    Circuit Court of Appeals is?

21        A    Sure.

22        Q    What's your understanding of the Ninth

23    Circuit Court of Appeals?

24        A    I have a very basic understanding of

00:40    25    there's, you know, the district courts that you go

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1    to, and then there's an appeal court system.

2    That's about all I know.

3         Q    Gotch you.  Are you familiar with any Ninth

4    Circuit Appellate Court decisions on trademark law?

00:40    5         A    No, I'm not an expert on the law.

6         Q    Are you familiar with any federal district

7    court opinions on trademark law?

8         A    Not specific cases, no

9         Q    Have you ever read a Ninth Circuit Court of

00:40    10   Appeals decision involving trademarks?

11        A    No.

12        Q    Have you ever read a trial court decision

13   involving trademarks?

14        A    No.

00:40    15        Q    Are you familiar with any treatises that

16   give treatment to consumer surveys in the context

17   of a trademark dispute?

18        A    No.

19        Q    So I take it then that you wouldn't consult

00:41    20   or look to a particular treatise or any work to

21   decide how to design and execute a consumer survey

22   in a trademark case, would you?

23             MR. GILCHRIST:  Could you read that back

24   for me?

25             (Record read:  So I take it then

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1          that you wouldn't consult or look

2          to a particular treatise or any

3          work to decide how to design and

4          execute a consumer survey in a

00:41    5          trademark case, would you?)

6                MR. GILCHRIST:  That misstates the prior

7    evidence, but go ahead.

8                THE WITNESS:  No, that wouldn't be the

9    first place I would go.

00:41   10   BY MR. KEYES:

11        Q    Where would you go?

12        A    Well, in this particular case what I was

13   asked to do was to study the likelihood of

14   confusion, and I've designed surveys -- that's what

00:41   15   I do for a living -- so I can rely, I guess, on my

16   own experience of designing surveys about how I

17   would go about testing whether or not two marks

18   were likely to be confused.

19        Q    So in the process of formulating your

00:42   20   questions, did it ever come up either in your

21   discussions with counsel or during your own thought

22   process that you should consult any trial court or

23   appellate court decisions in deciding whether your

24   methodology was appropriate?

00:42   25        A    No, I didn't consult anything.

1    extend to conducting surveys in the context of a

2    trademark litigation, does it?

3        A    In terms of what I've done previously, but

4    I'm fully capable of designing an experiment that

00:56    5    tests.

6        Q    Okay.  So other than the -- you testified

7    about your experience at Northridge.

8        A    Yes.

9        Q    You testified about your kind of prior

00:56    10    background and experience in conducting these 80 to

11    90 surveys.  Anything else that you relied upon in

12    fashioning the surveys in this case?

13        A    Nothing that I can think of.

14        Q    Are you familiar with Professor Shari

00:57    15    Diamond?

16        A    No.

17        Q    Have you heard of that name before?

18        A    Not that I can recall.

19        Q    Have you ever heard of the treatise "The

00:57    20    Reference Guide on Survey Research"?

21        A    I don't think so.

22        Q    So I take it then you didn't consult that

23    manual in designing or executing your surveys in

24    this case?

00:57    25        A    No, I did not.

1     Q    Before you -- during the process of

2    designing your survey, did you ever pick up Thomas

3    McCarthy's treatise on trademarks and review it?

4     A    No.

00:57    5     Q    Have you ever heard of the Sleekcraft

6    factors?

7     A    Pardon me?

8     Q    Have you ever heard of the Sleekcraft

9    factors?

00:58   10     A    No, I have not.

11     Q    So you're not aware that the Sleekcraft

12    factors are the factors that the Ninth Circuit

13    Court of Appeals looks to to determine if there's

14    likelihood of confusion in a particular matter?

00:58   15     A    No.

16     Q    Do you have an understanding as to what is

17    termed "initial interest confusion"?

18     A    No, I do not.

19     Q    Do you have any understanding as to what is

00:59   20    meant by "point of sale confusion"?

21     A    From a legal sense or just a general sense?

22    I mean, point of sale confusion --

23     Q    Let's do both.  Do you have an

24    understanding as to what that means in a legal

00:59   25    sense, "point of sale confusion"?

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1          A     In a legal sense, no.

2                MR. GILCHRIST:  I'll object that it has a

3     sense in the legal sense that's any different, but

4     go ahead.

00:59   5                THE WITNESS:  From a legal sense I'm not

6     certain as to what that definition might be, but

7     from a general sense I could estimate what that

8     would be.

9     BY MR. KEYES:

00:59   10          Q     What's your general understanding of that?

11          A     That at the point of sale there might be or

12     may not be confusion between two marks.

13          Q     "Point of sale" meaning what?

14          A     At retail or wherever people buy the

00:59   15     product.

16          Q     What about "post sale confusion," are you

17     familiar with this terminology?

18          A     Yes.  Again, "post sale confusion" would be

19     outside of the store where the product was bought.

01:00   20          Q     Have you ever heard of the Lanham Act?

21          A     I saw it referenced, but I do not know what

22     the Lanham Act states.

23          Q     So I take it you've never read the Lanham

24     Act?

01:00   25          A     Have not.

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

Page 73

1      Q     Did anyone ever indicate as to why Levi

2   Strauss was waiting until May to conduct the

3   survey?

4      A     Waiting till May?

01:50   5      Q     Right.  Well, this litigation was actually

6   filed back in July of 2007.

7      A     Oh.

8      Q     So did anyone indicate why it wasn't until

9   May that a survey was going to be conducted?

01:50   10     A     No, I didn't even know about that time

11  period.

12     Q     Have you ever written any books

13  specifically on consumer surveys designed to assess

14  whether consumers recognize a trademark?

01:51   15     A     No.

16     Q     Have you ever written any articles to

17  assess whether consumers have ever recognized a

18  particular trademark?

19     A     Not in the legal sense.

01:51   20     Q     Have you ever given any speeches about

21  surveys that are designed to assess whether

22  consumers recognize a particular trademark?

23     A     I mean, all of my branding research speaks

24  to that issue about brand recognition and the

01:51   25  ability to leverage brands and what constitutes an

Page 86

1      A      No.

2      Q      Did you copy any portions of your report

3  from anything?

4      A      No.  I don't have -- no.

02:09   5      Q      Are you sure?

6      A      I don't have anything to copy from.  Like I

7  said, this is my first report with a study.

8      Q      Did you not look at some of Carol Scott's

9  prior reports in putting this together?

02:10  10      A      Yes, so in the section that's about Levi's

11  generally and how they're a well-known brand.

12      Q      So you did copy portions of Miss Scott's

13  report?

14      A      I didn't copy her words exactly, but yeah,

02:10  15  I'm familiar with.

16      Q      So there are portions that you took from

17  Miss Scott's report and maybe added some words or

18  stated it slightly differently?

19      A      Yes.

02:10  20      Q      So in addition to Miss Scott's reports, did

21  you look at or borrow from anyone else's work in

22  drafting your report?

23      A      Well, I had discussed what kinds of pieces

24  of information normally go into a report with the

02:10  25  surveys, and so the kind of basic structure of what

Page 87

1       we have here of describing the methodology,

2       describing the results, forming a basis of

3       conclusion, that general type of outline.

4           Q    We've gone for another hour.  Why don't we

02:11   5       take a break for a minute and resume.

6           A    Okay.

7                VIDEOGRAPHER:  Off the record.  The time is

8       11:00 A.M.  This is the end of Tape 1.

9                (Recess taken.)

02:23   10               VIDEOGRAPHER:  Back on the record.  The

11      time is 11:12 A.M.  This is the beginning of

12      Tape 2.

13      BY MR. KEYES:

14          Q    Dr. Sood, before the break we were talking

02:24   15      about drafts of your report.  We were also talking

16      about how you had looked at Dr. Scott's reports and

17      incorporated some of her reports into your report.

18      How many of Dr. Scott's reports, her expert

19      reports, did you review?

02:24   20          A    I saw the methodology that was used in the

21      Brighton case, and I have seen a previous report

22      that she had done for Levi's.

23          Q    What report was that?

24          A    I don't -- I want to say it's an Indigo Red

02:24   25      report, but I'm not exactly certain of that, if

Page 88

1    that's the plaintiff's name or not, or the

2    defendant's name.

3        Q    Did you review her report in the Indigo Red

4    matter?

02:24    5        A    I wouldn't say review, but I had read it

6    over.

7        Q    In your review of her report do you have

8    any criticisms of her methodology?

9        A    I wasn't really thinking about it in terms

02:25   10    of criticizing.  I mean, every methodology has its

11    strengths and weaknesses, but I wasn't really

12    looking at it to criticize what she had done.

13        Q    Did you notice any weaknesses with her

14    methodology from your review of the Indigo Red

02:25   15    report?

16        A    Not that stick in my mind.

17        Q    Any other reports that you reviewed of

18    hers?

19        A    I don't recall any other reports that I

02:25   20    had.

21        Q    You may have had some, you just don't

22    recall?

23        A    It's possible.  I mean, when I was getting

24    interested in potentially doing expert cases, I had

02:26   25    some previous work that Carol had done to give me

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

Page 89

1    an idea of what these cases are like.

2        Q    So I take it she must have given you her

3    report on the Indigo Red matter?

4        A    Yeah, either she gave it to me or maybe

02:26   5    Harriet gave it to me, but one of the two of them.

6        Q    Did she -- or did one of them give it to

7    you as kind of a go-by, kind of what a particular

8    report should look like?

9        A    Yes.  So I had mentioned I had never --

02:26  10    prior to this case, I have never put together a

11    survey myself that's been used in a legal matter,

12    and I had asked them many questions about, you

13    know, what is the process, what is this like, and

14    so that was part of, you know, the material that

02:26  15    they provided to me to make me feel more

16    comfortable with the process.

17        Q    Could you turn to Exhibit 2 of your report,

18    please?  This is a list of documents that you

19    reviewed in support of your report; correct?

02:27  20        A    Yes.

21        Q    Is there any reason why Dr. Scott's Indigo

22    Red report is not listed here?

23        A    I guess that would be my mistake.  I guess

24    I'm not citing her report directly which is

02:27  25    customary in academic work.  When we cite

1    something, we include it in a list of documents, so

2    it's just an overview -- or mistake on my part.

3        Q    You don't cite Miss Beaver's deposition

4    testimony, do you?

02:27    5        A    In this report?

6        Q    Yes.

7        A    I did review Miss Beaver's deposition.

8        Q    Right, but you didn't cite to her in your

9    report, did you?

02:28    10        A    No, you're correct.

11        Q    But you put her down or you put her

12    deposition testimony?

13        A    Yes.

14        Q    So you would agree with me that you should

02:28    15    have listed Miss or Dr. Scott's report?

16        MR. GILCHRIST:  Well, his report on page 2

17    says the documents he relied on for this report,

18    not what you asked him about, so I think your

19    questions are misleading, so I'll object on that

02:28    20    basis.  You're mischaracterizing what he stated in

21    his report in your questions.

22    BY MR. KEYES:

23        Q    Well, Dr. Sood, in light of your counsel's

24    objection let me ask you this:  You relied on

02:28    25    portions of Miss Scott's report, did you not?

1        A    I did use part of Miss Scott's report as a

2    basis for how I structured this document, yes.

3        Q    So you relied on her report in drafting

4    your report; correct?

02:28    5        A    "Relied on" is a specific term I take it?

6    Yes, I suppose so if...

7        Q    So in light of that, you would agree with

8    me that you should have listed Dr. Scott's report

9    in Exhibit 2?

02:29   10        A    Yes.

11        Q    The draft of the questionnaires you sent to

12    counsel, did you retain those drafts?

13        A    I don't think so.  I think I was just

14    working off of one document for all of this

02:29   15    material.  There wasn't really -- I mean, we were

16    working so quickly.

17        Q    So the draft of the questionnaires that you

18    faxed to counsel --

19        MR. GILCHRIST:  He didn't say he faxed

02:29   20    them, so quit mischaracterizing.  In fact, he said

21    he didn't, so go ahead.

22    BY MR. KEYES:

23        Q    Well, I guess we can be super-

24    hypertechnical here.  The drafts of the reports

02:29   25    that were faxed to counsel, that you know were

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1   support your opinion that the likelihood of

2   confusion can also mean likelihood of dilution?

3           A    No.  As I said, I'm not an expert in case

4   law.

02:33   5       Q    So do you believe that the same consumers

6   that are confused can also be the same consumers

7   that would be diluted?

8           A    Yes, so for example --

9                MR. GILCHRIST:  I think the question is

02:33   10  vague, but sounds like you have an answer, so go

11  ahead.

12               THE WITNESS:  For example, in this study,

13  if somebody is confused between the Ruehl pocket

14  stitching and the Levi's pocket stitching, they may

02:33   15  make mistaken inferences about who the likely user

16  of a Ruehl jean or a Levi's jean, or they may be

17  interested in buying one versus the other and go

18  into -- get interested in the mistaken brand that

19  they're confused for, so that would be one type of

02:34   20  dilution.

21  BY MR. KEYES:

22          Q    Do you have an understanding as to what is

23  meant by "dilution by tarnishment"?

24          A    No.

02:34   25      Q    Do you have an understanding as to what is

1    meant by "dilution by blurring"?

2         A    No.

3         Q    So are you -- I take it you aren't aware of

4    how one would go about measuring for dilution by

02:34    5    tarnishment?

6              MR. GILCHRIST:  Since he is not aware of

7    how you're using that term or how it's used in a

8    legal sense, I don't think he can answer that

9    question.

02:34    10    BY MR. KEYES:

11         Q    Can you answer that question?

12              MR. GILCHRIST:  It's misleading and

13    argumentative.  Go ahead.

14              THE WITNESS:  I don't know what

02:34    15    "tarnishment" stands for.

16    BY MR. KEYES:

17         Q    Other than your Likelihood of Confusion

18    survey, do you have any facts that would support

19    your opinion that there's a likelihood of dilution

02:35    20    in this matter?

21         A    I based my opinion of the likelihood of

22    dilution on the Confusion survey.

23         Q    I understand that.  I'm asking if there's

24    anything in addition to the Likelihood of Confusion

02:35    25    survey that supports your opinion that there's a

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1    recognize the back pocket stitching.

2    BY MR. KEYES:

3        Q    Will you turn to Exhibit 5?  Will you

4    read -- this is the questionnaire on your Jeans

02:38    5    Recognition survey; correct?

6        A    Yes.

7        Q    Can you read Question No. 1?

8        A    "Have you seen jeans with this style of

9    pocket stitching before?"

02:38    10        Q    By "this style" what did you mean?

11        A    The back pocket stitching.

12        Q    But as you sit here today, you don't know

13    if people interpret that to mean the color of the

14    back pocket stitching, do you?

02:38    15        A    Are you referring to the word "style"?

16        Q    Correct.

17        A    I suppose certainly with any question, any

18    survey, you never know quite for sure how people

19    are going to interpret it, and there could be some

02:38    20    people who interpret it in the way that you are

21    suggesting, that the style of the pocket could

22    refer to the color or something, but we did not

23    seem to have that sort of issue.

24            I mean, one thing that we try and do -- try

02:39    25    to do to protect against would be to say the style

| | 1 | of the pocket stitching, then associating a brand |
|---|---|---|
| | 2 | of jeans with the pocket stitching, and then the |
| | 3 | third question calling out the brand that they |
| | 4 | would identify, so if it was just a color or |
| 02:39 | 5 | something that does not identify a brand readily, |
| | 6 | we would have had, you know, many people saying |
| | 7 | that they don't recognize it or -- so I mean, I |
| | 8 | guess technically you're correct that people could |
| | 9 | interpret it in multiple ways, but this seems like |
| 02:39 | 10 | a natural way to ask the question. |
| | 11 | Q    Are you familiar with the concept of |
| | 12 | spurious recognition? |
| | 13 | A    Yes. |
| | 14 | Q    Tell me about that. |
| 02:40 | 15 | A    Spurious recognition would be that people |
| | 16 | are essentially guessing and that they don't know |
| | 17 | the exact answer, but they're trying to guess as to |
| | 18 | what that answer might be. |
| | 19 | Q    Your Jeans Recognition survey is an aided |
| 02:40 | 20 | awareness survey, is it not? |
| | 21 | A    Yes. |
| | 22 | Q    And I believe you testified previously that |
| | 23 | Dr. Keller, one of your co-authors, is one of the |
| | 24 | foremost authorities on brand management; is that |
| 02:40 | 25 | correct? |

Page 100

1       A    Yes.

2       Q    And are you familiar with his recent work

3   that came out earlier this year where he actually

4   talks about spurious recognition?

02:40   5       A    I read the citation in Dr. Ford's report.

6       Q    And so you're aware that Mr. Keller, this

7   foremost authority, actually says that in the

8   context of an aided awareness design that you

9   should incorporate some sort of fictitious design

02:41   10  to see if people are guessing?

11          MR. GILCHRIST:  I'll object that it's out

12  of context.  Go ahead.  It's not a full

13  hypothetical.

14          THE WITNESS:  Yes, I'm aware of that

02:41   15  passage from Dr. Keller.

16  BY MR. KEYES:

17      Q    Let me see if you agree this.  This is an

18  actual quote from Professor Keller and it states,

19  "Any research measure must consider the issue of

02:41   20  consumers making up responses or guessing.  That

21  problem may be especially evident with certain

22  types of spurious awareness" -- "with certain types

23  of aided awareness or recognition measures for the

24  brand.  Spurious awareness occurs when consumers

02:41   25  erroneously claim they recall something that they

1     that you would ask that is not of central interest,

2     but it's testing the overall methodology to make

3     sure that the methodology itself is not adding some

4     bias to the responses.

02:44    5         Q    So how do you go about factoring into your

6     opinion what the responses have been to a

7     particular control?

8         A    I'm not sure I understand what you're

9     asking.

02:45   10         Q    Well, as I understand the purpose of a

11     control, that's to test whether -- to go about

12     testing if you have a particular design that you're

13     testing, for example, let's take your Levi's

14     arcuate design; right?

02:45   15         A    Yes.

16         Q    You'd want to use a control potentially to

17     see if people -- how they respond to that

18     particular stimulus as well; is that correct?

19         A    Yes.

02:45   20         Q    Okay.  And what's the purpose of doing

21     that?

22         A    It provides a benchmark or a standard of

23     comparison for, in that case, the Levi's arcuate

24     and how famous it is versus other brands, so I

02:45   25     picked Lee and Lucky in the Fame study to provide

Page 104

1    benchmarks.

2        Q    Benchmarks in what sense?

3        A    Benchmarks in terms of how well known those

4    marks are, and benchmarks as to what level of

02:46    5    guessing or, you know, estimation that consumers

6    might be doing in response to these questions.

7        Q    So you agree with me that you did not

8    create a fictitious pocket design for your Jeans

9    Recognition survey; correct?

02:46    10        A    Yes.

11        Q    Prior to your Jeans Recognition survey in

12    this case, had you conducted any other surveys to

13    determine recognition of a particular trademark by

14    consumers?

02:47    15        A    No.

16        Q    Would you turn to page 5 of your report?

17    Actually before we get there let me -- I know that

18    in the Exhibit 2 you reference it here in

19    Footnote 1 that you reviewed the Complaint in this

02:47    20    matter, the Levi Strauss Complaint against

21    Abercrombie.

22        A    Yes.

23        Q    Did you review any of the other pleadings

24    in this matter?

02:48    25        A    What are the other pleadings?

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

Page 113

1      A    Well, we had talked about San Francisco as
2   a possibility, and we had talked about going to
3   Houston as another possible location.  These are
4   the ones that were finally selected.
02:58  5      Q    Was that based on availability?
6      A    I can't recall exactly, but yes.  I mean,
7   availability -- we were in the field rather
8   quickly.
9      Q    Page 5, the first full sentence indicates,
02:58  10  "The sample represented a cross-section from the
11  general population of consumers."  What's your
12  basis for that statement?
13     A    We took the U.S. census and we tried to
14  approximate the survey population to represent a
02:58  15  cross-section of the general population.
16     Q    And this was just for females, or was this
17  for both males and females?
18     A    No, the Fame survey that we're talking
19  about here is both males and females.
02:59  20     Q    So males and females between the ages of 13
21  and 17, are then not part of the general consuming
22  population of the U.S.?
23     A    No, they are.
24     Q    Is there any reason why they weren't
02:59  25  included?

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

Page 114

1      A    We focused on adults as they would be the

2    ones likely to be making the decisions about jeans.

3      Q    What's your empirical data for that?

4      A    I don't have any.  We could have included

02:59    5    younger people, or older people for that matter.  I

6    mean, you have to make a judgment somewhere.

7      Q    And so why -- so the people that were at

8    the top end were 64 years of age?

9      A    Yes.

02:59   10      Q    So are people 65 years and older not part

11    of the consumer population of the U.S.?

12      A    No, they are part of the consumer

13    population.  So as I said, I had to make a start

14    point and a stop point, so those were just the ones

02:59   15    that I chose, but you're right, people younger than

16    18 and people older than 65 are also part of the

17    general population.

18      Q    So would you agree with me then that the

19    artificial limitation there is somewhat arbitrary?

03:00   20      A    I wouldn't call it an artificial

21    limitation.  It's just a choice.  As, you know, as

22    a researcher, you have to make choices.

23      Q    Why would you need to make choices to

24    exclude people over 64 years of age?

03:00   25      A    I mean, you have to make a choice to stop

1    at some age group.  Why would you choose to not

2    survey people under the age of 13?  I mean,

3    there's -- I mean, every researcher has to make a

4    choice.

03:00    5         Q    My understanding, and I could be incorrect

6    on that, but aren't there certain ethical

7    guidelines that indicate that you shouldn't survey

8    people younger than 13 years of age?

9         A    I'm sure with adult approval, parent

03:00    10    approval, you can.

11         Q    So I can understand that, but I guess I

12    still don't understand why you would necessarily

13    cut out the teenagers age 13 to 17?

14         A    Again, it's just a choice I made.

03:00    15         Q    Do you have any empirical data or knowledge

16    or facts to suggest that people over the age of 65

17    do not purchase jeans?

18         A    No, I don't have any empirical evidence.

19         Q    Do you know what percentage of the U.S.

03:01    20    population is older than 65?

21         A    Not exactly.

22         Q    Do you have a rough estimation?

23         A    I'd say probably 15 percent.

24         Q    So you would agree with me that in your

03:01    25    sample population here, 15 percent of the consuming

Page 137

1    points, but I was looking at kind of the way the

2    jeans are displayed.

3        Q    So did you see that the jeans are

4    advertised for $98?

04:51    5        A    I don't recall the price points.

6        Q    Were you ever told that Reuhl jeans were

7    advertised for $75?

8        A    I was told in the initial meeting that I

9    mentioned with counsel that the price points were

04:52    10    in that range, the $75 and more.

11        Q    Would you agree with me -- well, let me ask

12    you this way:  Do you have anything to suggest,

13    either empirical data or otherwise, to suggest in a

14    post sale environment consumers are going to know

04:52    15    how much a pair of jeans cost?

16        A    Well, there's some inferences that you

17    could draw from the quality of the denim, but no,

18    it would be hard to exactly know how much a pair of

19    jean costs in a post sale environment.

04:52    20        Q    One of the other criteria that you listed

21    here in your report is you had to make sure or the

22    interviewer was screening people to make sure that

23    the potential respondents had not heard about the

24    topic or subject of any interview being conducted

04:53    25    in the mall; is that correct?

1    A    Yes, I thought about having the jeans

2    there.  I thought about having the jeans actually

3    being worn by somebody.

4    Q    And you ultimately decided to not go with

05:00    5    either of those two; correct?

6    A    That's correct.

7    Q    Why is that?

8    A    Because I felt like this provided better

9    experimental control in terms of not introducing

05:00    10    other factors that are extraneous to what I'm

11    trying to exam.

12    Q    You indicated here on page 9 that you

13    used -- there are various photographs in what you

14    call the Group B set which include Seven For All

05:01    15    Mankind, Citizens of Humanity and True Religion;

16    correct?

17    A    Correct.

18    Q    That was in addition to the Levi's and the

19    Reuhl design; correct?

05:01    20    A    Well, in Group B Levi's was not there.

21    Q    Right, right.

22    A    In Group B it's the Reuhl and the rest of

23    them.

24    Q    Right.  So how did you arrive at using

05:01    25    Seven, Citizens and True Religion?

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1           A    In the initial meeting with counsel I was

2    told that these were the types of competitive jeans

3    that were part of the Reuhl competitive target set,

4    and also these were the brands that were identified

05:01    5    on the jeans market overview that I cited in this

6    document.

7           Q    Okay.  I don't have that -- copies of that.

8    I don't need to make it an exhibit, I suppose,

9    but...

05:02    10           Dr. Sood, I'll show you this.  It's

11    referenced in your report.  It's a document Bates

12    labeled LSC v. A&F 26A -- or excuse me, Control

13    2358.  Can you take a look at that for me?

14           MR. GILCHRIST:  You're showing him a

05:03    15    particular page?

16           MR. KEYES:  Yes, 2353.

17           MR. GILCHRIST:  I'm sorry, Mike, he's

18    looking at 2358.

19           MR. KEYES:  Maybe that's the page I meant.

05:03    20    I did mean 2358.  Greg screwed me up.

21           MR. GILCHRIST:  Yes.

22    BY MR. KEYES:

23           Q    Do you see that column on the left-hand

24    side, Dr. Sood?

05:03    25           A    Yes.

Page 149

1    brand that was a popular style.  Those are the

2    criteria I wanted to meet.

3         Q    Was there any criteria that you used in

4    terms of assessing the stitching design of these

05:07    5    what you're calling controls?

6         A    Just as long as they were popular styles.

7         Q    It didn't matter what the stitching looked

8    like?

9         A    Well, I wanted it to be something that was,

05:08    10    you know, available, you know, that people would

11    buy and people would see on the streets, so not

12    something too unusual or more of a niche product

13    for that particular brand.

14         Q    Why would that be important for people

05:08    15    to be able to -- for you to choose one of these

16    brands that people would see on the street?

17         A    That just is consistent with a post sale

18    environment that they are likely to see on the

19    street.

05:08    20         Q    But if you're using them as a control, why

21    would that be important?

22         A    Because again, the control, what we're

23    trying to do is just make sure that there's nothing

24    about the methodology that we're adding noise.

05:08    25    There's going to be a certain level of guessing as

Page 150

1   you've already established in every survey design,

2   and so I don't want to give something that was too

3   unusual of one of these brands so that people would

4   start thinking something -- they would start to

05:09   5   think something unusual is going on in the actual

6   survey.

7        Q    So to your way of thinking, Dr. Sood, would

8   one of the -- well, would a control jean have to

9   have a stitching on it?

05:09   10       A    I chose control jeans that all had

11  stitching on it, but I guess -- I mean, you could

12  have control jeans that do not have stitching on

13  it.   That's a choice I didn't make.

14       Q    So it would be legitimate in your mind to

05:09   15  have a control with no stitching on it?

16       A    Well, it would be a little hard to say that

17  the stitching is a basis, you know, of confusion.

18       Q    It would be difficult to say that why?

19       A    Well, if there's no stitching on the

05:09   20  pocket, then there's, you know, no reason to ask

21  the question is the stitching a basis for

22  confusion.

23            MR. KEYES:  Would you mark that, please?

24            (Deposition Exhibit 2 was marked for

05:10   25            identification by the court reporter.)

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1      Q    And you indicated that the reason you

2    engaged in this particular methodology is because,

3    and I'll paraphrase you here, that it simulates the

4    post sale context?

05:17    5      A    Yes.

6      Q    Post sale environment?

7      A    Yes.

8      Q    Do you have any empirical data to suggest

9    that anyone in a post sale context would be exposed

05:17    10   to Levi's and then immediately right thereafter be

11   shown four different pockets of different jean

12   manufacturers?

13     A    No, I don't have any empirical evidence to

14   suggest that, but the spirit of what I'm trying to

05:18    15   accomplish in this particular design is that

16   respondents -- all of us are exposed to people

17   wearing jeans on the street, right, let's say, so

18   you're going to be exposed to these jeans, and it's

19   not unusual to see a group of people standing

05:18    20   together wearing a pair of jeans, not those

21   specific jeans that you're pointing out, that

22   particular combination may not be so typical, but

23   that experience of just looking over at people and

24   seeing what jeans they may have on, that's typical.

05:18    25     Q    Paragraph -- or excuse me, Footnote 8 of

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

Page 164

1     Q    Now I note that in Question No. 1 we

2    already talked about that you asked about this

3    style of pocket stitching before?

4    A    Yes.

05:28   5    Q    And No. 2 asked, "Do you associate jeans

6    with this style of pocket stitching with," and then

7    you would ask "one brand or company," "more than

8    one brand or company" or "don't know"; correct?

9    A    Correct.

05:29  10    Q    And then No. 3, No. 3 doesn't ask about the

11    pocket stitching, does it?

12    A    No, it does not.

13    Q    It actually asks, "What is the name of the

14    brand or company that you associate with this

05:29  15    product?"; correct?

16    A    Correct.

17    Q    So do you know as you sit here today if

18    when people heard that if people knew that you were

19    asking specifically about the pocket stitching

05:29  20    design?

21    A    Well, the pocket stitching follows from

22    Question 1 and 2, so I think a natural inference

23    that you would draw is that in Question 3 they're

24    basing their judgment based on the pocket

05:30  25    stitching, but I suppose that some people may not

1    interpret the question that way.

2         Q     Turn to Exhibit 6.  So this is the

3    instructions that were given by the field

4    supervisors to the interviewers; is that correct,

05:30    5    Dr. Sood?

6         A     Yes.

7         Q     And we talked a little bit about this

8    already, but I want to talk to you about some of

9    the specific provisions.  Do you see paragraph 4

05:30    10   under "Preparations" "To conduct each interview,

11   you need the online access to the questionnaire"?

12        A     Yes.

13        Q     So how -- explain the mechanics for me, if

14   you would.  This was done online?

05:31    15        A     The interviewers were filling in the

16   answers online.

17        Q     So the interviewers -- let me see if I

18   understand this correctly.  The interviewers would

19   be out in the mall.  They would intercept people,

05:31    20   invite them to come back to the interviewing room;

21   correct?

22        A     I don't know if it was the interviewer

23   intercepting the people in the mall, but yes, they

24   would be taken back to a room.

05:31    25        Q     Who else would it be if it wasn't the

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1    company that made the jeans you saw in the first

2    picture?  Or, Do you think that none of the jeans

3    are made, sponsored or endorsed by the same company

4    that made the jeans you saw in the first picture?"

07:00    5    Question No. 1 provides two alternatives; right?

6         A    Correct.

7         Q    Were those two alternatives rotated during

8    the questioning?

9         A    No.

07:00    10        Q    And when respondents were asked, were they

11    explicitly given a "don't know" or "I'm not sure"?

12             MR. GILCHRIST:  In connection with this

13    particular question?

14             MR. KEYES:  Yes.

07:01    15            MR. GILCHRIST:  Or ever?

16             MR. KEYES:  Well, in connection with this

17    particular question.

18             THE WITNESS:  With this question, no, but

19    for the instructions they're explicitly told if you

07:01    20    don't know or don't have an answer, please let me

21    know.

22    BY MR. KEYES:

23        Q    Right, and I saw that, but at least when

24    the interviewers were reading Question No. 1, they

07:01    25    didn't explicitly give a "don't know" or "not sure"

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

Page 212

1    option to the respondents, did they?

2        A    That's correct.

3        Q    You previously testified that one of the

4    important aspects of choosing a control was the

07:01    5    same color of jean; is that correct?

6        A    Yeah, we tried make the colors as close as

7    possible, tried to make the pose as similar as

8    possible in the photograph.

9        Q    Was that important both in the Fame survey

07:01    10    and the Likelihood of Confusion survey?

11        A    It's more important in the Likelihood of

12    Confusion survey since that is explicitly related

13    to the pocket stitching, but it's important in

14    both.

07:02    15        Q    Okay.  Would you turn to the photographs?

16    I believe you have color photographs there --

17        A    Yes.

18        Q    -- in your report of the Lee design --

19    excuse me, of the Fame jeans?

07:02    20        A    Yes.

21        Q    Looking specifically at the Lee jean and

22    the Levi jean, you would agree with me, wouldn't

23    you, that the Lee jean is darker than the Levi

24    jean?

07:02    25        A    Yes, it is slightly darker.

Page 215

1    important for purposes of a control that you should

2    have chosen a control as that was as close as

3    possible, or to use Professor Diamond's words here,

4    you should have chosen a pocket stitch that shares

07:06    5    as many characteristics as possible with the

6    stimulus that was being tested?

7    MR. GILCHRIST:  I'll object that you're

8    misquoting what Professor Diamond said and putting

9    in your own interpretation of what she means, so I

07:06    10    think the question is argumentative and misleading,

11    but go ahead and answer if you want.

12    THE WITNESS:  As I've mentioned earlier,

13    the purpose of the control is to try and get a

14    sense for some level of guessing or is there

07:06    15    something about the procedure that's requiring

16    people to answer in a certain way.  So in this case

17    when you're choosing the control jeans, I chose

18    jeans that were of rough same color and same pose

19    to try and control for those facets where we could

07:07    20    more confidently say it was something due -- if

21    somebody says they're confused, we can comfortably

22    say that it's something related to the pocket

23    stitching.  So that's the -- so when you mention

24    that quote of -- Diamond quote -- would you mind

07:07    25    repeating it?

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

1       sort of hypothetical.  I'm asking if you agree with

2       that statement?

3               MR. GILCHRIST:  The statement that you've

4       given doesn't give enough information in order to

07:23  5       agree or not agree with it in my view, but you can

6       answer.

7               THE WITNESS:  I think there is bias

8       introduced by many questions, the way that you ask

9       it, so that's why we try to have the control

07:23  10      conditions so that we minimize the bias and try to

11      test the phenomenon of interest.

12      BY MR. KEYES:

13         Q    Do you agree with that statement that I

14      read?

07:23  15              MR. GILCHRIST:  Same objection.

16              THE WITNESS:  It's speaking to two

17      products, so if you just show only two products,

18      that may introduce a bias, yes.

19      BY MR. KEYES:

07:23  20         Q    What's a "demand effect"?

21         A    "Demand effect" is where a respondent gives

22      you an answer that they think that you want.

23         Q    And so you're saying that when you just

24      show two items to someone and you ask if Item A is

07:24  25      related to Item B, you're saying that that can

Page 230

1    create demand effects?

2         A    Yes.  If I show you two products and I ask

3    you are they related, that could lead some people

4    to answer affirmatively even if they don't believe

07:24    5    it because they think you want that answer, yes.

6         Q    Okay.  So let's say instead of two items, I

7    have three items, Item A, B and C, and I ask are

8    Items B and C -- do you think there's any relation

9    between Items B and C and Item A, okay?  You don't

07:24    10    think the same phenomenon of a potential demand

11    effect is present with respect to two stimuli?

12        A    What I was referring to with two products

13    is you're showing the two products simultaneously,

14    so when you have three products and one of them is

07:24    15    not present as in the way that you just described,

16    I think it reduces the level of bias, but again,

17    with any question there is going to be some level

18    of bias which is why you introduce the extra

19    brands.

07:25    20        Q    What do you mean by "not present"?

21        A    So in the way that I described it, you have

22    two products, A and B, and you're asking people is

23    there some relationship between these two products,

24    or that's, I believe, also in the same spirit of

07:25    25    the quote that you read to me.  So if by not being

Page 231

1    simultaneously presented one is now not there and

2    you're asking about a relationship between B and C

3    as you described and something, A, that's no longer

4    present, I think it reduces the bias. Probably

07:25    5    doesn't eliminate bias completely.

6        Q    Exhibit No. 5, I know you've seen this

7    before?

8        A    Yes.

9        Q    Did you read it before your deposition

07:26    10    today?

11        A    Yes.

12        Q    What is this document, if you know?

13        A    This is Mr. Ford's rebuttal of my report.

14        Q    Do you take issue with any of the

07:26    15    criticisms Dr. Ford sets forth in his rebuttal

16    declaration?

17            MR. GILCHRIST:  It's overbroad, vague,

18    compound.  Go ahead.

19            THE WITNESS:  Well, as I mentioned,

07:26    20    Dr. Ford is listing some cases that I'm not

21    familiar with, so I can't even comment on those

22    specific cases because I'm not familiar with them.

23    BY MR. KEYES:

24        Q    Okay.  Well, then why don't we just take

07:26    25    them specifically, the individual criticisms.  Look

ESQUIRE DEPOSITION SERVICES
(800) 640-2461

Page 234

1        A    That's right. .

2        Q    Do you agree with Dr. Ford's criticisms

3    that you should have rotated the order or switched

4    the order of the questions?

07:30    5        A    I think often questions are rotated in a

6    survey design, that's correct.  I didn't rotate

7    them here because it's -- in kind of a natural

8    conversation of language, it's more common to hear

9    "do you think that any," and then followed by "do

07:31   10    you think that none."  If you start out with "do

11    you that none" followed up by "do you that any,"

12    it's not as natural in terms of common

13    conversation.

14        Q    Do you have anything to suggest that

07:31   15    people would have been confused by rotating the

16    order?

17        A    No, that's just a choice I made in the

18    survey design.

19            (Deposition Exhibit 6 was marked for

07:31   20            identification by the court reporter.)

21    BY MR. KEYES:

22        Q    This is Exhibit 6 to your deposition.  Have

23    you seen this document before?

24        A    No.

07:32   25        Q    These were not a complete set, but these

Page 249

1

2

3

4

5

6

7

8

9         I, SANJAY SOOD, Ph.D., do hereby declare

10    under penalty of perjury that I have read the

11    foregoing transcript; that I have made such

12    corrections as noted herein, in ink, initialed by

13    me, or attached hereto; that my testimony as

14    contained herein, as corrected, is true and

15    correct.

16

17         EXECUTED this _____ day of _____,

18    20____, at _____,_____.
                        (City)                  (State)

19

20

21         _____

22                   SANJAY SOOD, Ph.D.

23

24

25

bd2a5e33-4454-4e23-9e44-eb7eeeaa7415

Page 250

1

2

3          I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby

5    certify:

6          That the foregoing proceedings were taken

7    before me at the time and place herein set forth;

8    that any witnesses in the foregoing proceedings,

9    prior to testifying, were placed under oath; that a

10   verbatim record of the proceedings was made by me

11   using machine shorthand which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is an accurate transcription thereof.

14         I further certify that I am neither

15   financially interested in the action nor a relative

16   or employee of any attorney of any of the parties.

17         IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated:  _____

21

22

23         _____
                   NANCY L. COLLIER
24                 CSR No. 5819

25