# EXHIBIT B

1 | MICHAEL J. BETTINGER (State Bar No. 122196)
RACHEL R. DAVIDSON (State Bar No. 215517)
2 | KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
3 | 55 Second Street, Suite 1700
San Francisco, California  94105
4 | Telephone:  415-882-8200
Facsimile:  415-882-8220
5 |
J. MICHAEL KEYES (Pro Hac Vice)
6 | KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
7 | 618 West Riverside Avenue, Suite 300
Spokane, Washington  99201
8 | Telephone:  509-624-2100
Facsimile:  509-456-0146
9 |
Attorneys for Defendant
10 | ABERCROMBIE & FITCH TRADING CO.

11 |

**UNITED STATES DISTRICT COURT**

12 |

**NORTHERN DISTRICT OF CALIFORNIA**

13 |

14 | LEVI STRAUSS & CO.,                )      No. CV-07-3752
                                       )
15 |          Plaintiff,               )      Declaration and Rule 26
                                       )      Report of Dr. Gerald L.
16 |     v.                            )      Ford
                                       )
17 | ABERCROMBIE & FITCH TRADING CO.,   )
                                       )
18 |          Defendant.               )
   |_____)

19 |

20 |          I, Dr. Gerald L. Ford, hereby declare as follows:

21 |                        <u>INTRODUCTION</u>

22 |          1.   I am a partner in the marketing research and

23 | consulting firm of Ford Bubala & Associates, located in

24 | Huntington Beach, California, where I have been engaged in

25 | commercial marketing research and consulting for the past thirty-

26 | three years.  I am also an emeritus faculty member of the School

27 | of Business Administration, California State University, Long

28 | Beach, where I held a full-time teaching position for twenty-five

Declaration and Rule 26 Report
of Dr. Gerald L. Ford

1 | years, prior to my retirement in 1994.  My professional

2 | experience is further summarized below in paragraphs 63 through

3 | 73.

4 |        2.    In the instant matter, at the request of

5 | Kirkpatrick & Lockhart Preston Gates Ellis LLP counsel for

6 | Defendant, Abercrombie & Fitch Trading Co. ("A&F"), I designed

7 | and caused to be conducted a survey to address the issue of post-

8 | sale likelihood of confusion.  Specifically, this survey was

9 | designed to measure the degree, if any, to which the stitching

10 | design on the pocket of the Ruehl brand jeans being sold by

11 | Defendant, A&F, is likely to cause confusion with respect to the

12 | source, authorization/approval of, or business affiliation/

13 | connection of Defendant's jeans with the source Levi Strauss &

14 | Co. ("LS&CO") due to the stitching design on the pocket of the

15 | Ruehl brand jeans.

16 |        3.    The likelihood of confusion survey conducted in

17 | this matter employed a scientific experimental survey design

18 | consisting of three cells:  (1) a test or experimental survey

19 | cell designed to measure the degree, if any, to which the

20 | stitching design on the pocket of Defendant's jeans is likely to

21 | cause confusion as to the source, authorization/approval of, or

22 | business affiliation/connection of Defendant's jeans with the

23 | source LS&CO; and (2) two control survey cells designed to

24 | measure the extent to which non-trademark confusion exists in the

25 | likelihood of confusion test cell survey results.

26 |        4.    In the test cell, survey respondents were shown a

27 | photograph of a pair of Defendant's Ruehl jeans showing the back

28 | pocket with the allegedly infringing pocket stitching design.  In

1  the first control cell, survey respondents were shown a

2  photograph of a pair of Lucky jeans showing the back pocket with

3  a pocket stitching design which I understand is not alleged to

4  infringe the LS&CO Arcuate design.  In the second control cell,

5  survey respondents were shown a photograph of a pair of Indigo

6  Red jeans showing the back pocket with a pocket stitching design

7  which I also understand is not alleged to infringe the LS&CO

8  Arcuate design.

9      5.   The universe for this survey was comprised of

10  females thirteen (13) years of age and older who reported that

11  within the next twelve (12) months they were likely to purchase a

12  pair of jeans for themselves.

13      6.   Respondents in the survey were interviewed by

14  interviewers employed by professional interviewing services at

15  shopping centers in metropolitan markets in nine (9) states

16  (i.e., Arizona, California, Georgia, Illinois, Massachusetts,

17  Minnesota, New York, Tennessee, and Texas), located in each of

18  the nine (9) U.S. Census Divisions.

19      7.   In total approximately one thousand (975)

20  interviews were conducted in this survey among females thirteen

21  (13) years of age or older.

22      8.   Six hundred fifty-one (651) interviews were

23  conducted in this survey among female adults eighteen (18) years

24  of age or older:  two hundred sixteen (216) interviews were

25  conducted in the test cell, two hundred eighteen (218) interviews

26  were conducted in the first control cell, and two hundred

27  seventeen (217) interviews were conducted in the second control

28  cell.

9.    Additionally, three hundred twenty-four (324) interviews were conducted in this survey among female teenagers thirteen (13) to seventeen (17) years of age:  one hundred eight (108) interviews were conducted in the test cell, one hundred eight (108) interviews were conducted in the first control cell, and one hundred eight (108) interviews were conducted in the second control cell.

10.    The survey results do not evidence any trademark confusion attributable to the pocket stitching on Defendant's Ruehl jeans.  Specifically, the survey results evidence that when non-trademark confusion is accounted for (e.g., the tendency or predisposition of some consumers to attribute the source of any pair of jeans to Levi, the tendency or predisposition of some consumers to attribute the source of any pair of jeans with pocket stitching to Levi, etc.), there is no confusion attributable to the stitching design present on the pocket of the Ruehl jeans.

11.    It is my opinion that the results of the survey conducted in this matter clearly support a finding of no likelihood of confusion as to the source, authorization/approval of, or business affiliation/connection of Defendant's jeans with the source LS&CO due to the stitching design on the pocket of the Ruehl brand jeans.

### SURVEY BACKGROUND

12.    Attached hereto, as Exhibit A, Volumes I, II, and III, are the results of the survey which addressed the issue of likelihood of confusion, if any, with respect to the source, authorization/approval of, or business affiliation/connection of

1  Defendant's Ruehl brand jeans due to the stitching design on the

2  pocket.  Exhibit A, Volumes I & II, provide a synopsis of the

3  survey methodology, photographs of the survey exhibits, the

4  survey screeners and questionnaires, response frequencies for the

5  survey questions, and a listing of respondents' verbatim

6  responses to the survey.  Exhibit A, Volume III, contains a

7  sequential listing of the survey responses and copies of the

8  Supervisor and Interviewer Instructions, which provide additional

9  details of the survey protocols, and other survey-related

10 background materials.

11       13.  The sample selection, questions, questionnaire

12 design, and interviewing procedures employed in this survey were

13 designed in accordance with the generally accepted standards and

14 procedures in the field of surveys and were designed to meet the

15 criteria for survey trustworthiness detailed in the Federal

16 Judicial Center's Manual for Complex Litigation, Fourth,[1]

17       14.  I was responsible for the design of the survey,

18 the survey's questionnaires, and the instructions given to the

19 survey's supervisors and interviewers, as well as for the

20 procedures to be followed in conducting the interviews.

21 Interviewing, data gathering, and response recordation were

22 

23     [1]  For the proffered poll or survey, "...Relevant factors
include whether:  the population was properly chosen and defined;
24 the sample chosen was representative of that population; the data
gathered were accurately reported; and the data were analyzed in
25 accordance with accepted statistical principles...In addition, in
assessing the validity of a survey, the judge should take into
26 account the following factors:  whether the questions asked were
clear and not leading; whether the survey was conducted by
27 qualified persons following proper interview procedures; and
whether the process was conducted so as to ensure objectivity..."
28 See Federal Judicial Center, Manual for Complex Litigation,
Fourth, Section 11.493, @ 102-104 (2004).

1  carried out, under the direction of Ford Bubala & Associates, by

2  interviewers employed by independent interviewing organizations.

3  Supervisors working on this survey were personally trained by

4  Ford Bubala & Associates with respect to the design, procedures,

5  and related protocols for the survey; and daily shipments of

6  completed interviews from each professional interviewing service

7  were reviewed by Ford Bubala & Associates to confirm that the

8  questionnaires were being properly executed.  In addition,

9  approximately sixty-eight percent (67.90%) of the survey

10  interviews were validated, in person, by the survey supervisors

11  personally meeting the survey respondents and confirming their

12  qualification and participation in the survey.  Ford Bubala &

13  Associates conducted validations of approximately twenty percent

14  (20.31%) of the interviews by recontacting, by telephone, survey

15  respondents to confirm their qualification and participation in

16  the survey.  Net nonduplicated validations totaled approximately

17  seventy-four percent (73.74%) of all survey interviews.[2]  None

18  of the interviews failed to validate.

19           15.  The survey conducted in this matter was

20  administered under a double-blind protocol.  Specifically, not

21  only were the respondents not informed as to the purpose or

22  sponsor of the survey, but similarly, both the survey's

23  supervisors and interviewers were not informed as to the purpose

24  or sponsor of the survey.

25  ///

26  ///

27  _____

28      [2]    This level of validation exceeds industry standards of
10% to 15%.

Declaration and Rule 26 Report                - 6 -
of Dr. Gerald L. Ford

## SURVEY STRUCTURE

16.  As noted earlier, the likelihood of confusion survey conducted in this matter employed a scientific experimental survey design consisting of three cells:  (1) a test or experimental survey cell designed to measure the degree, if any, to which the stitching design on the pocket of Defendant's jeans is likely to cause confusion as to the source, authorization/approval of, or business affiliation/connection of Defendant's jeans; and (2) two control survey cells designed to measure the extent to which non-trademark confusion exists in the likelihood of confusion test cell survey results.

17.  In the test cell, survey respondents were shown a photograph of a pair of Ruehl jeans.  The Barrow Skinny model of Ruehl jeans was used as the survey stimulus.  It is my understanding that the Barrow Skinny model of Ruehl jeans represents one of the most popular models of Ruehl jeans.  The photograph depicted the back right half of the jeans showing the back right pocket.  The jeans were folded in a manner so that a respondent could not see if there was anything attached to the left seam of the right back pocket.[3][4]  In addition, the waist patch was digitally made unreadable.  See Exhibit A, Volumes I & II, page 6 and page 226.  Respondents were asked to look at the jeans in the photograph as they would if they saw someone wearing the jeans.  Respondents were then asked questions regarding their

---

[3]    The left seam of the right back pocket is where LS&CO typically attaches the red pocket tab to Levi jeans.

[4]    This stimulus exposure was patterned after the photographic presentation of survey stimuli employed in the survey LS&CO offered in the RP55 matter.

1 state of mind with respect to the source, authorization/approval

2 of, or business affiliation/connection of the Ruehl jeans in the

3 photograph.  See Exhibit A, Volumes I & II, pages 9-12 and

4 pages 229-232.

5       18.  In the first control cell, survey respondents were

6 shown a photograph of a pair of Lucky jeans.  It is my

7 understanding the LS&CO does not consider the stitching design on

8 the pocket of the Lucky jeans to infringe the LS&CO Arcuate

9 trademark.  Thus, any Levi response with respect to the source,

10 authorization/approval of, or business affiliation/connection of

11 the Lucky jeans could not be attributable to an allegedly

12 infringing stitching design on the pocket of the Lucky jeans but

13 would be due to other factors such as simply the presence of a

14 stitching design on the back pocket of a pair of jeans or the

15 market share or brand popularity of Levi jeans.

16       19.  The Lucky jeans were folded in the same manner as

17 the Ruehl jeans and the waist patch was again digitally made

18 unreadable.  See Exhibit A, Volumes I & II, page 77 and page 277.

19 Again, respondents were asked to look at the jeans in the

20 photograph as they would if they saw someone wearing the jeans.

21 Respondents were then asked the same questions regarding their

22 state of mind with respect to the source, authorization/approval

23 of, or business affiliation/connection of the Lucky jeans in the

24 photograph.  See Exhibit A, Volumes I & II, pages 80-83 and

25 pages 280-283.

26       20.  In the second control cell, survey respondents

27 were shown a photograph of a pair of Indigo Red jeans.  It is my

28 understanding the LS&CO does not consider the stitching design on

1 | the pocket of the Indigo Red jeans to infringe the LS&CO Arcuate
2 | trademark.  Thus, again, any Levi response with respect to the
3 | source, authorization/approval of, or business affiliation/
4 | connection of the Indigo Red jeans could not be attributable to
5 | an allegedly infringing stitching design on the pocket of the
6 | Indigo Red jeans but would be due to other factors such as simply
7 | the presence of a stitching design on the back pocket of a pair
8 | of jeans or the market share or brand popularity of Levi jeans.

9 |     21.  The Indigo Red jeans were also folded in the same
10 | manner as the Ruehl and Lucky jeans and the waist patch was again
11 | digitally made unreadable.  See Exhibit A, Volumes I & II, page
12 | 149 and page 330.  Again, respondents were asked to look at the
13 | jeans in the photograph as they would if they saw someone wearing
14 | the jeans.  Respondents were then asked the same questions
15 | regarding their state of mind with respect to the source,
16 | authorization/approval of, or business affiliation/connection of
17 | the Indigo Red jeans in the photograph.  See Exhibit A, Volumes I
18 | & II, pages 152-155 and pages 333-336.

19 |     22.  The control survey cells provide a measure of the
20 | extent to which non-trademark confusion exists in the test survey
21 | cell results which is not reflective of a likelihood of confusion
22 | due to the stitching design on the pocket of Defendant's jeans.
23 | Specifically, the control survey cells function as a baseline and
24 | provide a measure of the degree to which respondents are likely
25 | to give the answer "Levi" not as a result of the stitching design
26 | on the pocket of Defendant's jeans but because of other factors,
27 | such as the survey's questions, the survey's procedures, the
28 | nature of the product, or some other potential influence on a

1  respondent's answer such as simply the presence of a stitching

2  design on the back pocket of a pair of jeans or the market share

3  or brand popularity of Levi jeans.

4          23.   In addition to the control survey cells, the

5  likelihood of confusion survey conducted in this matter also

6  employed the use of questions (i.e., "Why do you say that?" and

7  "What else, if anything, makes you say that?") to provide an

8  indication of the basis for the beliefs expressed in response to

9  the survey's source, authorization/approval of, and business

10  affiliation/connection questions.

11          24.   As noted earlier, in total approximately one

12  thousand (975) interviews were conducted in this survey among

13  females thirteen (13) years of age or older.

14          25.   Again, six hundred fifty-one (651) interviews were

15  conducted in this survey among female adults eighteen (18) years

16  of age or older:  two hundred sixteen (216) interviews were

17  conducted in the test cell, two hundred eighteen (218) interviews

18  were conducted in the first control cell, and two hundred

19  seventeen (217) interviews were conducted in the second control

20  cell.

21          26.   Finally, an additional three hundred twenty-four

22  (324) interviews were conducted in this survey among female

23  teenagers thirteen (13) to seventeen (17) years of age:  one

24  hundred eight (108) interviews were conducted in the test cell,

25  one hundred eight (108) interviews were conducted in the first

26  control cell, and one hundred eight (108) interviews were

27  conducted in the second control cell.

28  ///

Declaration and Rule 26 Report            - 10 -
of Dr. Gerald L. Ford

1      27.  Although the survey in this matter consisted of

2  three cells (i.e., a test cell and two control cells), any single

3  respondent participated in only one of the three cells.

4      28.  As noted earlier, this survey employed a shopping

5  center intercept methodology.  Respondents in the survey were

6  interviewed by interviewers employed by professional interviewing

7  services at shopping centers in metropolitan markets in nine (9)

8  states (i.e., Arizona, California, Georgia, Illinois,

9  Massachusetts, Minnesota, New York, Tennessee, and Texas),

10  located in each of the nine (9) U.S. Census Divisions.

11      29.  The relevant universe for both the test cell and

12  the control cells was the same and was defined as females,

13  thirteen years of age or older, who reported that within the next

14  twelve months they were likely to purchase a pair of jeans for

15  themselves.[5]

16      30.  The respondent selection procedure employed for

17  adults in the survey is referred to as a quota sampling method.

18  This method provided a respondent base that is generally

19  representative of the age distribution of female adult purchasers

20  of jeans for themselves.  This age distribution was based upon an

21  Opinion Research Corporation survey conducted May 2-5 and

22  _____

23      [5]  Additionally, the likelihood of confusion survey
   universe was also restricted as follows:  (1) to respondents who
24  did not, nor did anyone else in their home, work for an
   advertising agency or marketing research firm, or a retail store
25  or company that makes, sells, or distributes any clothing; (2) to
   respondents who, during the preceding three months, had not
26  participated in any marketing research surveys, including online
   surveys, other than a political poll; (3) to respondents who,
27  during the preceding month, had not heard anything about the
   subject of any of the interviews being conducted at the mall; and
28  (4) to respondents who, if they wore contact lenses or eyeglasses
   would wear them during the remainder of the interview.

Declaration and Rule 26 Report          - 11 -
of Dr. Gerald L. Ford

1   May 8-11, 2008, among a nationally representative telephone

2   sample of one thousand (1,000) female adult respondents eighteen

3   years of age or older across the United States.

4        31.   A second group of thirteen (13) to seventeen (17)

5   year old females was also sampled.

6   SURVEY PROCEDURES AND QUESTIONS

7        32.   Initially, a potential survey respondent was

8   stopped by an interviewer in the public area of a shopping mall

9   and screened (i.e., asked questions) to determine if the

10  potential respondent met the criteria to be included in the

11  survey universe (i.e., within the next twelve months was likely

12  to purchase a pair of jeans for themselves, etc.).  See Exhibit

13  A, Volumes I & II, pages 7-8 and pages 227-228.[6]

14       33.   If a potential respondent fulfilled the screening

15  criteria, or survey universe definition, she was then invited to

16  return with the interviewer to the professional interviewing

17  service facility located within the shopping mall to complete the

18  interview.  See Exhibit A, Volumes I & II, pages 9-12 and pages

19  229-232.[7]  The interviewer then escorted the survey respondent

20  into a private interviewing area.  In the private interviewing

21  area, the respondent was told:

22       In a moment, I am going to show you a picture of a
     pair of jeans, then I will ask you a couple of

23       questions.

24       Please understand that we are only interested in
     your opinions; and if you don't have an opinion or

25       don't know the answer to a question, that is an
     acceptable answer.

26

27  _____

    [6]   Also see pages 78-79, 150-151, 278-279, and 331-331.

28      [7]   Also see pages 80-83, 152-155, 280-283, and 333-336.

1 | The interviewer then handed the respondent a photograph of either
2 | the test cell jeans or one of the control cell jeans, and the
3 | respondent was then told:

4 |          Would you please look at the jeans in this picture
          as you would if you saw someone wearing these jeans.
5 |          Please take as much time as you like, and let me know
          when you are ready to continue.
6 |

7 | When the respondent indicated that she was ready to continue, she
8 | was asked:[8]

9 |     5.0   Who do you believe makes or puts out these jeans?
10 | For respondents who indicated a belief as to the source of the
11 | jeans in the photograph they were shown, the interviewer asked
12 | the basis for that belief with the question:

13 |     5.1   Why do you say that?[9]
14 | Respondents who provided a reason for their belief as to the
15 | source of the jeans were then asked:

16 |     5.2   What else, if anything, makes you say that?[10]

17 | ///
18 | ///

19 |

20 |     [8]   The first principal survey questions (i.e., question
21 | series 5.0/5.1/5.2) were designed to address the issue of
likelihood of confusion as to source or origin and were patterned
22 | after similar accepted questions.  See Union Carbide Corp. v.
Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976); cert. denied, 429
23 | U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91 (1976); E. & J. Gallo
Winery v. Gallo Cattle Co., 12 USPQ2d 1657, 1674 (E.D. Cal.
24 | 1989), aff'd, 967 F.2d 1280 (9th Cir. 1992); and J. Thomas McCarthy,
McCarthy on Trademarks and Unfair Competition, Vol. 6 §32:174 @
25 | 32-339, Rel. #42, 5/2007.

26 |     [9]   Respondents who did not indicate a belief as to who put
out the jeans in the photograph they were shown were not asked
27 | question 5.1.

28 |     [10]   Respondents who provided a "don't know" response to
question 5.1 were not asked question 5.2.

1  Next, respondents were told:

2      6.0   Now, I am going to ask you a question that has
             three choices. After I am done, if you want me to
3            read the question again, just ask me.

4  and then asked:[11]

5          Do you believe that these jeans...
            • one, are being put out with the authorization
6              or approval of any other company or
               companies;
7            • two, are not being put out with the
               authorization or approval of any other
8              company or companies;[12]  or
             • three, don't know or have no opinion?
9

10  Respondents who indicated the belief that the jeans were put out

11  with the authorization/approval of any other company or companies

12  were then asked:

13      6.1   What other company or companies?[13]

14  If the respondent provided a company's name or companies' names,

15  she was asked the basis for the belief with the question:

16      6.2   Why do you say that?

17  ///

18  ///

19

20  ─────────────────────

21      [11]   The principal survey questions designed to address
    likelihood of confusion as to authorization/approval or business
    affiliation/connection (i.e., question series 6.0/6.1/6.2/6.3 and
22  7.0/7.1/7.2/7.3) were also patterned after similar accepted
    questions. See J. Thomas McCarthy, McCarthy on Trademarks and
23  Unfair Competition, Vol. 6 §32:175 @ 32-341, Rel.#42, 5/2007.

24      [12]   To guard against any order bias, the first two
    alternatives in this list were rotated (i.e., approximately one-
25  half of the respondents were read the list with the first
    alternative being "...are being put out with the authorization or
26  approval..." and approximately one-half of the respondents were
    read the list with the first alternative being "...are not being
27  put out with the authorization or approval...").

        [13]   Respondents who did not identify a company or companies
28  in response to this question were not asked question 6.2 or 6.3.

1  Respondents who provided a reason for their belief were then

2  asked:

3       6.3  What else, if anything, makes you say that?[14]

4  Respondents were asked this same series of questions with regard

5  to business affiliation or business connection.  Specifically,

6  respondents were told:

7       7.0  Now, I am going to ask you another question that
             has three choices.  Again, after I am done, if you

8            want me to read the question again, just ask me.

9  Subsequently, respondents were asked:

10            Do you believe that the company that puts out
              these jeans...

11            • one, has a business affiliation or
                business connection with any other

12              company or companies;
              • two, does not have a business

13              affiliation or business connection with
                any other company or companies;[15] or

14            • three, don't know or have no opinion?

15  ///

16  ///

17  ///

18

---

19       [14]     Respondents who provided a "don't know" response to

20  question 6.2 were not asked question 6.3.

21       [15]     Again, to guard against any order bias, the first two
    alternatives in this list were rotated (i.e., approximately one-

22  half of the respondents were read the list with the first
    alternative being "...has a business affiliation or business

23  connection..." and approximately one-half of the respondents were
    read the list with the first alternative being "...does not have

24  a business affiliation or business connection...").
             As an additional guard against order bias,

25  approximately one-half of the respondents were queried in
    question 6.0 regarding authorization/approval, and approximately

26  one-half of the respondents were queried in question 6.0
    regarding business affiliation/connection.  Similarly,

27  approximately one-half of the respondents were queried in
    question 7.0 regarding authorization/approval, and approximately

28  one-half of the respondents were queried in question 7.0
    regarding business affiliation/connection.

Respondents who indicated the belief that the company that puts out the jeans had a business affiliation/connection with another company were asked:

    7.1    What other company or companies?[16]

If the respondent provided a company's name or companies' names, she was asked the basis for the belief with the question:

    7.2    Why do you say that?

Respondents who provided a reason for their belief were then asked:

    7.3    What else, if anything, makes you say that?[17]

Finally, the photograph of the jeans was removed from sight.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[16]    Respondents who did not identify a company or companies in response to this question were not asked questions 7.2 or 7.3.

[17]    Respondents who provided a "don't know" response to question 7.2 were not asked this question.

1   <u>SURVEY RESULTS - ADULT FEMALES</u>

2   <u>Test Cell - Survey Results</u>

3        34.   Approximately fifteen percent (14.81%) of the

4   adult females survey respondents who saw the Ruehl jeans, in the

5   test cell, reported that they believed that the Ruehl jeans were

6   made or put out by Levi.   See Exhibit A, Volume I, Table 1,

7   page 13.

TABLE 1[18]
TEST CELL
ADULT FEMALES

Q5.0   Who do you believe makes or puts out these jeans?
Q5.1   Why do you say that?
Q5.2   What else, if anything, makes you say that?

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=216) |
| 1. Levi - pocket/stitching | 8 | 3.70 |
| 2. Levi | 24 | 11.11 |
| Subtotal | 32 | 14.81 |
| 3. Levi and Other | -- | --- |
| 4. Ruehl | 1 | 0.46 |
| 5. Other | 74 | 34.26 |
| 6. Don't know | 109 | 50.46 |
| Total | 216 | 100.00 |

21   ///

22   ///

23   ///

24   ///

25   ///

---

27        [18]   Table numbers in this declaration and Rule 26 report
28   correspond to the table numbers in Exhibit A, Volumes I & II, and
     therefore may not be sequential.

1        35.  An additional approximate two percent (1.39% +

2  0.93% = 2.32%) of the survey respondents reported that they

3  believed that the Ruehl jeans were being put out with the

4  authorization/approval of (1.39%) or had a business

5  affiliation/connection (0.93%) with Levi.  See Exhibit A,

6  Volume I, Table 2, page 32 and Table 3, page 52.

7

TABLE 2
TEST CELL
ADULT FEMALES

6.0   Do you believe that these jeans...
       one, are being put out with the authorization or approval
       of any other company or companies;
       two, are not being put out with the authorization or
       approval of any other company or companies; or
       three, don't know or have no opinion?
Q6.1  What other company or companies?
Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?

| | | Response Distribution | | |
|---|---|---|---|---|
| Response Categories | Number | Percent (n=216) | Unduplicated Number | Percent (n=216) |
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | 1 | 0.46 | | |
| • Levi | 3 | 1.39 | | |
| Subtotal | 4 | 1.85 | 3 | 1.39 |
| • Levi and Other | -- | --- | | |
| • Ruehl | -- | --- | | |
| • Other | 26 | 12.04 | | |
| • Don't know | 17 | 7.87 | | |
| Subtotal | 47 | 21.76 | | |
| 2. Not put out with approval | 37 | 17.13 | | |
| 3. Don't know/No opinion | 132 | 61.11 | | |
| Total | 216 | 100.00 | | |

27  ///

28  ///

```
                            TABLE 3
                          TEST CELL
                        ADULT FEMALES

Q7.0  Do you believe that the company that puts out these
      jeans...
        one, has a business affiliation or business connection
        with any other company or companies;
        two, does not have a business affiliation or business
        connection with any other company or companies; or
        three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?
```

| Response Categories | Number | Response Distribution Percent (n=216) | Unduplicated Number | Percent (n=216) |
|---|---|---|---|---|
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 2 | 0.93 | | |
| Subtotal | 2 | 0.93 | 2 | 0.93 |
| • Levi and Other | 1 | 0.46 | | |
| • Ruehl | -- | --- | | |
| • Other | 24 | 11.11 | | |
| • Don't know | 29 | 13.43 | | |
| Subtotal | 56 | 25.93 | | |
| 2. Does not have business affiliation or connection | 44 | 20.37 | | |
| 3. Don't know/No opinion | 116 | 53.70 | | |
| Total | 216 | 100.00 | | |

///

///

///

///

///

///

///

1      36.  As noted earlier, the likelihood of confusion

2  survey conducted in this matter also employed the use of

3  questions (i.e., "Why do you say that?" and "What else, if

4  anything, makes you say that?") to provide an indication of the

5  basis for the respondents' beliefs expressed in response to the

6  survey's source, authorization/approval of, and business

7  affiliation/connection questions.  A review of the responses to

8  these questions, for respondents who gave a Levi response to any

9  of the survey questions in the test cell, indicates that in total

10 approximately four percent (4.17%) of respondents made specific

11 reference to the pocket and/or stitching on the Ruehl jeans.  See

12 Exhibit A, Volume I, Table 17, page 224, and Volume III,

13 Appendix E, page E-1.

14 Control Cell 1 - Survey Results

15     37.  As noted earlier, this study employed two separate

16 control cells to provide a measure of the extent to which non-

17 trademark confusion exists in the test cell survey results which

18 are not reflective of a likelihood of confusion due to the

19 stitching design on the Ruehl jeans.  The control survey cells

20 function as a baseline and provide a measure of the degree to

21 which respondents are likely to give the answer "Levi," not as a

22 result of the stitching design on the pocket of Defendant's jeans

23 but because of other factors, such as the survey's questions, the

24 survey's procedures, the nature of the product, or some other

25 potential influence on a respondent's answer such as simply the

26 presence of a stitching design on the back pocket of a pair of

27 jeans or the market share or brand popularity of Levi jeans.

28 ///

Declaration and Rule 26 Report          - 20 -
of Dr. Gerald L. Ford

1        38.  Approximately forty-three percent (43.12%) of the

2  survey respondents who saw the Lucky jeans, in the first control

3  cell, reported that they believed that the Lucky jeans were made

4  or put out by Levi.  See Exhibit A, Volume I, Table 6, page 84.

5

6

**TABLE 6**
**CONTROL CELL 1**
**ADULT FEMALES**

7  Q5.0  Who do you believe makes or puts out these jeans?

8  Q5.1  Why do you say that?

    Q5.2  What else, if anything, makes you say that?

| Response Categories | Response Distribution Number | Percent (n=218) |
|---|---|---|
| 1. Levi - pocket/stitching | 41 | 18.81 |
| 2. Levi | 53 | 24.31 |
| Subtotal | 94 | 43.12 |
| 3. Levi and Other | 5 | 2.29 |
| 4. Lucky | 3 | 1.38 |
| 5. Other | 46 | 21.10 |
| 6. Don't know | 70 | 32.11 |
| Total | 218 | 100.00 |

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    39.  An additional approximate five percent (1.38% +

2  3.21% = 4.59%) of the survey respondents reported that they

3  believed that the Lucky jeans were being put out with the

4  authorization/approval of (1.38%) or had a business affiliation/

5  connection (3.21%) with Levi.  See Exhibit A, Volume I, Table 7,

6  page 104 and Table 8, page 125.

7

8                           TABLE 7
                         CONTROL CELL 1
                         ADULT FEMALES
9

10  Q6.0  Do you believe that these jeans...
           one, are being put out with the authorization or approval
           of any other company or companies;

11         two, are not being put out with the authorization or
           approval of any other company or companies; or

12         three, don't know or have no opinion?
    Q6.1  What other company or companies?

13  Q6.2  Why do you say that?
    Q6.3  What else, if anything, makes you say that?

14

15                                            Response Distribution
                                                       Unduplicated

16  Response Categories            Number  Percent  Number  Percent
                                           (n=218)          (n=218)

17  1. Put out with authorization
      or approval
      • Levi - pocket/stitching       --      ---

18    • Levi                           8     3.67

19      Subtotal                       8     3.67      3     1.38

20    • Levi and Other                 1     0.46
      • Lucky                          1     0.46

21    • Other                         23    10.55
      • Don't know                    30    13.76

22      Subtotal                      63    28.90

23  2. Not put out with approval      22    10.09

24  3. Don't know/No opinion         133    61.01

25      Total                        218   100.00

26

27  ///

28  ///

```
TABLE 8
CONTROL CELL 1
ADULT FEMALES
```

Q7.0  Do you believe that the company that puts out these
jeans...
    one, has a business affiliation or business connection
    with any other company or companies;
    two, does not have a business affiliation or business
    connection with any other company or companies; or
    three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?

| | Response Distribution | | | |
|---|---|---|---|---|
| Response Categories | Number | Percent (n=218) | Unduplicated Number | Percent (n=218) |
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | 3 | 1.38 | | |
| • Levi | 6 | 2.75 | | |
| Subtotal | 9 | 4.13 | 7 | 3.21 |
| • Levi and Other | -- | --- | | |
| • Lucky | -- | --- | | |
| • Other | 18 | 8.26 | | |
| • Don't know | 34 | 15.60 | | |
| Subtotal | 61 | 27.98 | | |
| 2. Does not have business affiliation/connection | 22 | 10.09 | | |
| 3. Don't know/No opinion | 135 | 61.93 | | |
| Total | 218 | 100.00 | | |

///
///
///
///
///
///
///

1    40.    The first control cell also employed the use of
2  questions (i.e., "Why do you say that?" and "What else, if
3  anything, makes you say that?") to provide an indication of the
4  basis for the respondents' beliefs expressed in response to the
5  survey's source, authorization/approval of, and business
6  affiliation/connection questions.    A review of the responses to
7  these questions, for respondents who gave a Levi response to any
8  of the survey questions in the first control cell, indicates that
9  in total approximately twenty percent (20.18%) of respondents
10  made specific reference to the pocket and/or stitching on the
11  Lucky jeans.    See Exhibit A, Volume I, Table 17, page 224, and
12  Volume III, Appendix E, page E-1.
13  ///
14  ///
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

Declaration and Rule 26 Report          - 24 -
of Dr. Gerald L. Ford

1  <u>Control Cell 2 - Survey Results</u>

2       41.  Approximately twenty-nine percent (28.57%) of the

3  survey respondents who saw the Indigo Red jeans, in the second

4  control cell, reported that they believed that the Indigo Red

5  jeans were made or put out by Levi.  See Exhibit A, Volume I,

6  Table 11, page 156.

7

8  
**TABLE 11**
**CONTROL CELL 2**
**ADULT FEMALES**

9
10  Q5.0  Who do you believe makes or puts out these jeans?
    Q5.1  Why do you say that?
    Q5.2  What else, if anything, makes you say that?

11
12  

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=217) |
| 1. Levi - pocket/stitching | 29 | 13.36 |
| 2. Levi | 33 | 15.21 |
| Subtotal | 62 | 28.57 |
| 3. Levi and Other | 6 | 2.77 |
| 4. Indigo Red | -- | --- |
| 5. Other | 75 | 34.56 |
| 6. Don't know | 74 | 34.10 |
| Total | 217 | 100.00 |

20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

1    42. An additional approximate five percent (2.30% +

2    2.30% = 4.60%) of the survey respondents reported that they

3    believed that the Indigo Red jeans were being put out with the

4    authorization/approval of (2.30%) or had a business

5    affiliation/connection (2.30%) with Levi.  See Exhibit A,

6    Volume I, Table 12, page 177 and Table 13, page 198.

7

8

TABLE 12
CONTROL CELL 2
ADULT FEMALES

9

10   Q6.0  Do you believe that these jeans...
           one, are being put out with the authorization or approval
           of any other company or companies;

11         two, are not being put out with the authorization or
           approval of any other company or companies; or

12         three, don't know or have no opinion?
     Q6.1  What other company or companies?

13   Q6.2  Why do you say that?
     Q6.3  What else, if anything, makes you say that?

14

| Response Categories | Response Distribution | | | |
| | Number | Percent (n=217) | Unduplicated Number | Percent (n=217) |
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | 3 | 1.38 | | |
| • Levi | 5 | 2.30 | | |
| Subtotal | 8 | 3.68 | 5 | 2.30 |
| • Levi and Other | 1 | 0.46 | | |
| • Indigo Red | -- | --- | | |
| • Other | 20 | 9.22 | | |
| • Don't know | 32 | 14.75 | | |
| Subtotal | 61 | 28.11 | | |
| 2. Not put out with approval | 23 | 10.60 | | |
| 3. Don't know/No opinion | 133 | 61.29 | | |
| Total | 217 | 100.00 | | |

26

27   ///

28   ///

```
==================================================================
                            TABLE 13
                        CONTROL CELL 2
                        ADULT FEMALES

Q7.0  Do you believe that the company that puts out these
      jeans...
        one, has a business affiliation or business connection
        with any other company or companies;
        two, does not have a business affiliation or business
        connection with any other company or companies; or
        three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?
```

| | Response Distribution | | | |
|---|---|---|---|---|
| Response Categories | Number | Percent (n=217) | Unduplicated Number | Percent (n=217) |
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | 2 | 0.92 | | |
| • Levi | 8 | 3.69 | | |
| Subtotal | 10 | 4.61 | 5 | 2.30 |
| • Levi and Other | -- | -- | | |
| • Indigo Red | -- | --- | | |
| • Other | 30 | 13.82 | | |
| • Don't know | 41 | 18.89 | | |
| Subtotal | 81 | 37.33 | | |
| 2. Does not have business affiliation/connection | 24 | 11.06 | | |
| 3. Don't know/No opinion | 112 | 51.61 | | |
| Total | 217 | 100.00 | | |

        43.   The second control cell also employed the use of

questions (i.e., "Why do you say that?" and "What else, if

anything, makes you say that?") to provide an indication of the

basis for the respondents' beliefs expressed in response to the

survey's source, authorization/approval of, and business

affiliation/connection questions.  A review of the responses to

these questions, for respondents who gave a Levi response to any

1  of the survey questions in the second control cell, indicates

2  that in total approximately fifteen percent (14.75%) of

3  respondents made specific reference to the pocket and/or

4  stitching on the Indigo Red jeans.  See Exhibit A, Volume I,

5  Table 17, page 224, and Volume III, Appendix E, page E-1.

6  <u>Summary of Results - Adult Females</u>

7      44.  The results of the likelihood of confusion survey among

8  adult females, on a net basis after adjusting the survey data for

9  non-trademark related confusion, do not evidence any trademark

10  confusion attributable to the pocket stitching on the Ruehl

11  jeans.  Specifically, the survey results evidence that when non-

12  trademark confusion is accounted for (e.g., the tendency or

13  predisposition of some consumers to attribute the source of any

14  pair of jeans to Levi, the tendency or predisposition of some

15  consumers to attribute the source of any pair of jeans with

16  pocket stitching to Levi, etc.), there is no confusion

17  attributable to the stitching design present on the pocket of the

18  Ruehl jeans.

19      45.  The adjustment for non-trademark related confusion

20  is accomplished by reducing the percent of Levi responses in the

21  test cell by the percent of Levi responses in the control cells.

22  In this case, 17.13% of the survey respondents in the test cell

23  indicated they believed that Levi was the source, authorized/

24  approved of, or had a business affiliation/connection with

25  Defendant's jeans.  In control cell one, 47.71% of the survey

26  respondents indicated that they believed that Levi was the

27  source, authorized/approved of, or had a business affiliation/

28  connection with the first control jeans, the Lucky jeans that are

1  not alleged to infringe.  Thus, the likelihood of confusion

2  level, based on the first control cell, would be calculated as

3  17.13% - 47.71% = -30.58% or simply no likelihood of confusion

4  attributable to the stitching design on the pocket of the Ruehl

5  jeans.  In control cell two, 33.17% of the survey respondents

6  indicated that they believed that Levi was the source,

7  authorized/approved of, or had a business affiliation/connection

8  with the second control jeans, the Indigo Red jeans that are not

9  alleged to infringe.  Thus, the likelihood of confusion level,

10  based on the second control cell, would be calculated as 17.13% -

11  33.17% = -16.04%, again, simply no likelihood of confusion

12  attributable to the stitching design on the pocket of the Ruehl

13  jeans.  See Exhibit A, Volume I, Table 16, page 223.

| TABLE 16 TEST AND CONTROL CELLS ADULT FEMALES Composite Response Analysis Net Unduplicated Levi Responses | | |
|---|---|---|
| | Unduplicated Response Distribution | |
| Response Categories | Test Cell 1 Percent (n=216) | Control Cell 1 Percent (n=218) | Control Cell 2 Percent (n=217) |
| Total - Levi | 17.13 | 47.71 | 33.17 |

23      46.  The results of the likelihood of confusion survey

24  among adult females, on a net basis after adjusting the survey

25  data for non-trademark related confusion based upon the "Why do

26  you say that?" and "What else, if anything, makes you say that?"

27  questions, do not evidence any trademark confusion attributable

28  to the pocket stitching on the Ruehl jeans.

1        47.  The adjustment for non-trademark related confusion

2    based upon pocket and/or stitching responses to the "Why do you

3    say that?" and "What else, if anything, makes you say that?"

4    questions is accomplished by reducing the percent of Levi -

5    pocket/stitching responses in the test cell by the percent of

6    Levi - pocket/stitching responses in the control cells.  In this

7    case, 4.17% of the survey respondents in the test cell indicated

8    they believed that Levi was the source, authorized/approved of,

9    or had a business affiliation/connection with Defendant's jeans

10   and when asked why they held that belief provided a Levi -

11   pocket/stitching response.  In control cell one, 20.18% of the

12   survey respondents indicated that they believed that Levi was the

13   source, authorized/approved of, or had a business affiliation/

14   connection with the first control jeans, the Lucky jeans that are

15   not alleged to infringe, and when asked why they held that belief

16   provided a Levi - pocket/stitching response.  Thus, the

17   likelihood of confusion level, based on the first control cell,

18   would be calculated as 4.17% - 20.18% = -16.01%, simply no

19   likelihood of confusion attributable to the stitching design on

20   the pocket of the Ruehl jeans.  In control cell two, 14.75% of

21   the survey respondents indicated that they believed that Levi was

22   the source, authorized/approved of, or had a business

23   affiliation/connection with the second control jeans, the Indigo

24   Red jeans that are not alleged to infringe, and when asked why

25   they held that belief provided a Levi - pocket/stitching

26   response.  Thus, the likelihood of confusion level, based on the

27   second control cell, would be calculated as 4.17% - 14.75% = -

28   10.58%, again, simply no likelihood of confusion attributable to

1  the stitching design on the pocket of the Ruehl jeans.  See

2  Exhibit A, Volume I, Table 17, page 224.

3

4

5

6

7

8

9

10

11

### TABLE 17
### TEST AND CONTROL CELLS
### ADULT FEMALES

#### Composite Response Analysis
#### Net Unduplicated Levi-Pocket/Stitching Responses

| Response Categories | Unduplicated Response Distribution | | |
| | Test Cell 1 Percent (n=216) | Control Cell 1 Percent (n=218) | Control Cell 2 Percent (n=217) |
|---|---|---|---|
| Total - Levi-pocket/stitching | 4.17 | 20.18 | 14.75 |

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1 | ## SURVEY RESULTS - 13 TO 17 YEAR OLD FEMALES

2 | **Test Cell - Survey Results**

3 |      48.  Approximately seventeen percent (16.67%) of the 13

4 | to 17 year old female survey respondents who saw the Ruehl jeans,

5 | in the test cell, reported that they believed that the Ruehl

6 | jeans were made or put out by Levi.  See Exhibit A, Volume II,

7 | Table 18, page 233.

TABLE 18
TEST CELL
13 TO 17 YEAR OLD FEMALES

Q5.0  Who do you believe makes or puts out these jeans?
Q5.1  Why do you say that?
Q5.2  What else, if anything, makes you say that?

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=108) |
| 1. Levi - pocket/stitching | 3 | 2.78 |
| 2. Levi | 15 | 13.89 |
| Subtotal | 18 | 16.67 |
| 3. Levi and Other | 1 | 0.93 |
| 4. Ruehl | 1 | 0.93 |
| 5. Other | 35 | 32.41 |
| 6. Don't know | 53 | 49.07 |
| Total | 108 | 100.00 |

21 | ///

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///

1        49.  No additional 13 to 17 year old female survey

2 respondents reported that they believed that the Ruehl jeans were

3 being put out with the authorization/approval of or had a

4 business affiliation/connection with Levi.  See Exhibit A,

5 Volume II, Table 19, page 247 and Table 20, page 261.

6

7 TABLE 19
                    TEST CELL
        13 TO 17 YEAR OLD FEMALES

8

9 Q6.0  Do you believe that these jeans...
        one, are being put out with the authorization or approval
        of any other company or companies;

10         two, are not being put out with the authorization or
        approval of any other company or companies; or

11         three, don't know or have no opinion?
Q6.1  What other company or companies?

12 Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?

| Response Categories | Response Distribution | | | |
|---|---|---|---|---|
| | Number | Percent (n=108) | Unduplicated Number | Percent (n=108) |
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 1 | 0.93 | | |
| Subtotal | 1 | 0.93 | -- | --- |
| • Levi and Other | -- | --- | | |
| • Ruehl | -- | --- | | |
| • Other | 14 | 12.96 | | |
| • Don't know | 22 | 20.37 | | |
| Subtotal | 37 | 34.26 | | |
| 2. Not put out with approval | 11 | 10.19 | | |
| 3. Don't know/No opinion | 60 | 55.56 | | |
| Total | 108 | 100.00 | | |

26 ///

27 ///

28 ///

```
================================================================
                          TABLE 20
                         TEST CELL
                13 TO 17 YEAR OLD FEMALES
```

Q7.0  Do you believe that the company that puts out these
      jeans...
          one, <u>has</u> a business affiliation or business connection
          with any other company or companies;
          two, does <u>not</u> have a business affiliation or business
          connection with any other company or companies; or
          three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?

| Response Categories | Response Distribution | | | |
| --- | --- | --- | --- | --- |
| | Number | Percent (n=108) | Unduplicated Number | Percent (n=108) |
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 1 | 0.93 | | |
| Subtotal | 1 | 0.93 | -- | --- |
| • Levi and Other | -- | --- | | |
| • Ruehl | -- | --- | | |
| • Other | 15 | 13.89 | | |
| • Don't know | 14 | 12.96 | | |
| Subtotal | 30 | 27.78 | | |
| 2. Does not have business affiliation or connection | 14 | 12.96 | | |
| 3. Don't know/No opinion | 64 | 59.26 | | |
| Total | 108 | 100.00 | | |

50.  As noted earlier, the likelihood of confusion
survey conducted among 13 to 17 year old females in this matter
also employed the use of questions (i.e., "Why do you say that?"
and "What else, if anything, makes you say that?") to provide an
indication of the basis for the respondents' beliefs expressed in
response to the survey's source, authorization/approval of, and
business affiliation/connection questions.  A review of the

1 │ responses to these questions, for respondents who gave a Levi

2 │ response to any of the survey questions in the test cell,

3 │ indicates that in total approximately three percent (2.78%) of

4 │ respondents made specific reference to the pocket and/or

5 │ stitching on the Ruehl jeans.  See Exhibit A, Volume II,

6 │ Table 34, page 383, and Volume III, Appendix E, page E-2.

7 │ Control Cell 1 - Survey Results

8 │       51.   The survey among 13 to 17 year old females also

9 │ employed two separate control cells to provide a measure of the

10 │ extent to which non-trademark confusion exists in the test cell

11 │ survey results which are not reflective of a likelihood of

12 │ confusion due to the stitching design on the Ruehl jeans.  The

13 │ control survey cells function as a baseline and provide a measure

14 │ of the degree to which respondents are likely to give the answer

15 │ "Levi," not as a result of the stitching design on the pocket of

16 │ Defendant's jeans but because of other factors, such as the

17 │ survey's questions, the survey's procedures, the nature of the

18 │ product, or some other potential influence on a respondent's

19 │ answer such as simply the presence of a stitching design on the

20 │ back pocket of a pair of jeans or the market share or brand

21 │ popularity of Levi jeans.

22 │ ///

23 │ ///

24 │ ///

25 │ ///

26 │ ///

27 │ ///

28 │ ///

1          52.   Among the 13 to 17 year old female respondents,

2    approximately thirty-nine percent (38.89%) who saw the Lucky

3    jeans, in the first control cell, reported that they believed

4    that the Lucky jeans were made or put out by Levi.   See

5    Exhibit A, Volume II, Table 23, page 284.

6

7                              TABLE 23
                            CONTROL CELL 1
                      13 TO 17 YEAR OLD FEMALES

8    Q5.0   Who do you believe makes or puts out these jeans?
9    Q5.1   Why do you say that?
     Q5.2   What else, if anything, makes you say that?

10

| Response Categories | Response Distribution | |
|---|---|---|
| | Number | Percent (n=108) |
| 1. Levi - pocket/stitching | 12 | 11.11 |
| 2. Levi | 30 | 27.78 |
| Subtotal | 42 | 38.89 |
| 3. Levi and Other | 3 | 2.78 |
| 4. Lucky | 2 | 1.85 |
| 5. Other | 24 | 22.22 |
| 6. Don't know | 37 | 34.26 |
| Total | 108 | 100.00 |

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1    53.  No additional 13 to 17 year old female survey
2 respondents reported that they believed that the Lucky jeans were
3 being put out with the authorization/approval of or had a
4 business affiliation/connection with Levi.  See Exhibit A,
5 Volume II, Table 24, page 298 and Table 25, page 313.

TABLE 24
CONTROL CELL 1
13 TO 17 YEAR OLD FEMALES

Q6.0  Do you believe that these jeans...
        one, <u>are</u> being put out with the authorization or approval
        of any other company or companies;
        two, are <u>not</u> being put out with the authorization or
        approval of any other company or companies; or
        three, don't know or have no opinion?
Q6.1  What other company or companies?
Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?

| | Response Distribution | | | |
| Response Categories | Number | Percent (n=108) | Unduplicated Number | Percent (n=108) |
|---|---|---|---|---|
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 1 | 0.93 | | |
| Subtotal | 1 | 0.93 | -- | --- |
| • Levi and Other | 3 | 2.78 | | |
| • Lucky | -- | --- | | |
| • Other | 10 | 9.26 | | |
| • Don't know | 20 | 18.52 | | |
| Subtotal | 34 | 31.48 | | |
| 2. Not put out with approval | 8 | 7.41 | | |
| 3. Don't know/No opinion | 66 | 61.11 | | |
| Total | 108 | 100.00 | | |

26 ///
27 ///
28 ///

TABLE 25
CONTROL CELL 1
13 TO 17 YEAR OLD FEMALES

Q7.0 Do you believe that the company that puts out these
     jeans...
         one, <u>has</u> a business affiliation or business connection
         with any other company or companies;
         two, does <u>not</u> have a business affiliation or business
         connection with any other company or companies; or
         three, don't know or have no opinion?
Q7.1 What other company or companies?
Q7.2 Why do you say that?
Q7.3 What else, if anything, makes you say that?

| Response Categories | Response Distribution | | Unduplicated | |
|---|---|---|---|---|
| | Number | Percent (n=108) | Number | Percent (n=108) |
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | -- | --- | | |
| Subtotal | -- | --- | -- | --- |
| • Levi and Other | 2 | 1.85 | | |
| • Lucky | -- | --- | | |
| • Other | 12 | 11.11 | | |
| • Don't know | 20 | 18.52 | | |
| Subtotal | 34 | 31.48 | | |
| 2. Does not have business affiliation or connection | 14 | 12.96 | | |
| 3. Don't know/No opinion | 60 | 55.56 | | |
| Total | 108 | 100.00 | | |

54.   The first control cell conducted among 13 to 17
year old females in this matter also employed the use of
questions (i.e., "Why do you say that?" and "What else, if
anything, makes you say that?") to provide an indication of the
basis for the respondents' beliefs expressed in response to the
survey's source, authorization/approval of, and business
affiliation/connection questions.  A review of the responses to

1 | these questions, for respondents who gave a Levi response to any

2 | of the survey questions in the first control cell, indicates that

3 | in total approximately eleven percent (11.11%) of respondents

4 | made specific reference to the pocket and/or stitching on the

5 | Lucky jeans.  See Exhibit A, Volume II, Table 34, page 383, and

6 | Volume III, Appendix E, page E-2.

7 | <u>Control Cell 2 - Survey Results</u>

8 |     55.  Among the 13 to 17 year old female respondents,

9 | approximately twenty-nine percent (28.70%) who saw the Indigo Red

10 | jeans, in the second control cell, reported that they believed

11 | that the Indigo Red jeans were made or put out by Levi.  See

12 | Exhibit A, Volume II, Table 28, page 337.

**TABLE 28**
**CONTROL CELL 2**
**13 TO 17 YEAR OLD FEMALES**

Q5.0  Who do you believe makes or puts out these jeans?
Q5.1  Why do you say that?
Q5.2  What else, if anything, makes you say that?

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=108) |
| 1. Levi - pocket/stitching | 10 | 9.26 |
| 2. Levi | 21 | 19.44 |
| Subtotal | 31 | 28.70 |
| 3. Levi and Other | 2 | 1.85 |
| 4. Indigo Red | -- | --- |
| 5. Other | 25 | 23.15 |
| 6. Don't know | 50 | 46.30 |
| Total | 108 | 100.00 |

26 | ///

27 | ///

28 | ///

1     56.  An additional approximate two percent (1.85%) of

2   the 13 to 17 year old female survey respondents reported that

3   they believed that the company that put out the Indigo Red jeans

4   had a business affiliation/connection (1.85%) with Levi.  See

5   Exhibit A, Volume II, Table 29, page 351 and Table 30, page 306.

```
                        TABLE 29
                     CONTROL CELL 2
                 13 TO 17 YEAR OLD FEMALES

Q6.0  Do you believe that these jeans...
         one, are being put out with the authorization or approval
         of any other company or companies;
         two, are not being put out with the authorization or
         approval of any other company or companies; or
         three, don't know or have no opinion?
Q6.1  What other company or companies?
Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?
```

| | Response Distribution | | | |
|---|---|---|---|---|
| | | | Unduplicated | |
| Response Categories | Number | Percent (n=108) | Number | Percent (n=108) |
| 1. Put out with authorization or approval | | | | |
|   • Levi - pocket/stitching | -- | --- | | |
|   • Levi | -- | --- | | |
|     Subtotal | -- | --- | -- | --- |
|   • Levi and Other | -- | --- | | |
|   • Indigo Red | -- | --- | | |
|   • Other | 13 | 12.04 | | |
|   • Don't know | 29 | 26.85 | | |
|     Subtotal | 42 | 38.89 | | |
| 2. Not put out with approval | 13 | 12.04 | | |
| 3. Don't know/No opinion | 53 | 49.07 | | |
|     Total | 108 | 100.00 | | |

26   ///

27   ///

28   ///

```
                          TABLE 30
                      CONTROL CELL 2
               13 TO 17 YEAR OLD FEMALES

Q7.0  Do you believe that the company that puts out these
      jeans...
         one, has a business affiliation or business connection
         with any other company or companies;
         two, does not have a business affiliation or business
         connection with any other company or companies; or
         three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?
```

|  | | Response Distribution | | |
| | | | Unduplicated | |
| Response Categories | Number | Percent (n=108) | Number | Percent (n=108) |
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 2 | 1.85 | | |
| Subtotal | 2 | 1.85 | 2 | 1.85 |
| • Levi and Other | 2 | 1.85 | | |
| • Indigo Red | -- | --- | | |
| • Other | 5 | 4.63 | | |
| • Don't know | 22 | 20.37 | | |
| Subtotal | 31 | 28.70 | | |
| 2. Does not have business affiliation/connection | 18 | 16.67 | | |
| 3. Don't know/No opinion | 59 | 54.63 | | |
| Total | 108 | 100.00 | | |

57.   The second control cell conducted among 13 to 17
year old females in this matter also employed the use of
questions (i.e., "Why do you say that?" and "What else, if
anything, makes you say that?") to provide an indication of the
basis for the respondents' beliefs expressed in response to the
survey's source, authorization/approval of, and business
affiliation/connection questions.  A review of the responses to

1 these questions, for respondents who gave a Levi response to any

2 of the survey questions in the second control cell, indicates

3 that in total approximately nine percent (9.26%) of respondents

4 made specific reference to the pocket and/or stitching on the

5 Indigo Red jeans. See Exhibit A, Volume II, Table 34, page 383,

6 and Volume III, Appendix E, page E-2.

7 Summary of Results - 13 to 17 Year Old Females

8       58.   The results of the likelihood of confusion survey among

9 13 to 17 year old females, on a net basis after adjusting the

10 survey data for non-trademark related confusion, do not evidence

11 any trademark confusion attributable to the pocket stitching on

12 the Ruehl jeans.  Specifically, the survey results evidence that

13 when non-trademark confusion is accounted for (e.g., the tendency

14 or predisposition of some consumers to attribute the source of

15 any pair of jeans to Levi, the tendency or predisposition of some

16 consumers to attribute the source of any pair of jeans with

17 pocket stitching to Levi, etc.), there is no confusion

18 attributable to the stitching design present on the pocket of the

19 Ruehl jeans.

20       59.   The adjustment for non-trademark related confusion

21 is accomplished by reducing the percent of Levi responses in the

22 test cell by the percent of Levi responses in the control cells.

23 In this case, approximately eighteen percent (17.59%) of the 13

24 to 17 year old female survey respondents in the test cell

25 indicated they believed that Levi was the source,

26 authorized/approved of, or had a business affiliation/connection

27 with Defendant's jeans.  In control cell one, approximately

28 thirty-nine percent (38.89%) of the 13 to 17 year old survey

1  respondents indicated that they believed that Levi was the

2  source, authorized/approved of, or had a business affiliation/

3  connection with the first control jeans, the Lucky jeans that are

4  not alleged to infringe.  Thus, the likelihood of confusion

5  level, based on the first control cell, would be calculated as

6  17.59% - 38.89% = -21.30%, simply no likelihood of confusion

7  attributable to the stitching design on the pocket of the Ruehl

8  jeans.  In control cell two, approximately thirty-one percent

9  (30.56%) of the survey respondents indicated that they believed

10  that Levi was the source, authorized/approved of, or had a

11  business affiliation/connection with the second control jeans,

12  the Indigo Red jeans that are not alleged to infringe.  Thus, the

13  likelihood of confusion level, based on the second control cell,

14  would be calculated as 17.59% - 30.56% = -12.97%, again, simply

15  no likelihood of confusion attributable to the stitching design

16  on the pocket of the Ruehl jeans.  See Exhibit A, Volume II,

17  Table 33, page 382.

| TABLE 33 TEST AND CONTROL CELLS 13 TO 17 YEAR OLD FEMALES Composite Response Analysis Net Unduplicated Levi Responses | | |
|---|---|---|
| | Unduplicated Response Distribution | |
| Response Categories | Test Cell 1 Percent (n=108) | Control Cell 1 Percent (n=108) | Control Cell 2 Percent (n=108) |
| Total - Levi | 17.59 | 38.89 | 30.56 |

27      60.  The results of the likelihood of confusion survey

28  among 13 to 17 year old females, on a net basis after adjusting

1 the survey data for non-trademark related confusion based upon

2 the "Why do you say that?" and "What else, if anything, makes you

3 say that?" questions, do not evidence any trademark confusion

4 attributable to the pocket stitching on the Ruehl jeans.

5       61.  The adjustment for non-trademark related confusion

6 based upon pocket and/or stitching responses to the "Why do you

7 say that?" and "What else, if anything, makes you say that?"

8 questions is accomplished by reducing the percent of Levi -

9 pocket/stitching responses in the test cell by the percent of

10 Levi - pocket/stitching responses in the control cells.  In this

11 case, approximately three percent (2.78%) of the survey

12 respondents in the test cell indicated they believed that Levi

13 was the source, authorized/approved of, or had a business

14 affiliation/connection with Defendant's jeans and when asked why

15 they held that belief provided a Levi - pocket/stitching

16 response.  In control cell one, approximately eleven percent

17 (11.11%) of the survey respondents indicated that they believed

18 that Levi was the source, authorized/approved of, or had a

19 business affiliation/connection with the first control jeans, the

20 Lucky jeans that are not alleged to infringe, and when asked why

21 they held that belief provided a Levi - pocket/stitching

22 response.  Thus, the likelihood of confusion level, based on the

23 first control cell, would be calculated as 2.78% - 11.11% =

24 -8.33%, simply no likelihood of confusion attributable to the

25 stitching design on the pocket of the Ruehl jeans.  In control

26 cell two, approximately nine percent (9.26%)% of the survey

27 respondents indicated that they believed that Levi was the

28 source, authorized/approved of, or had a business affiliation/

1 | connection with the second control jeans, the Indigo Red jeans

2 | that are not alleged to infringe, and when asked why they held

3 | that belief provided a Levi - pocket/stitching response.  Thus,

4 | the likelihood of confusion level, based on the second control

5 | cell, would be calculated as 2.78% - 9.26% =

6 | -6.48%, again, simply no likelihood of confusion attributable to

7 | the stitching design on the pocket of the Ruehl jeans.  See

8 | Exhibit A, Volume II, Table 34, page 383.

9

TABLE 34
TEST AND CONTROL CELLS
13 TO 17 YEAR OLD FEMALES

Composite Response Analysis
Net Unduplicated Levi-Pocket/Stitching Responses

| | Unduplicated Response Distribution | | |
| Response Categories | Test Cell 1 Percent (n=108) | Control Cell 1 Percent (n=108) | Control Cell 2 Percent (n=108) |
| --- | --- | --- | --- |
| Total - Levi-pocket/stitching | 2.78 | 11.11 | 9.26 |

## CONCLUSION

62.  It is my considered opinion, based upon my education, background, and professional experience, and based upon my review and analysis of the survey conducted in this matter, that the results of the survey conducted in this matter clearly support a finding of no likelihood of confusion as to the source, authorization/approval of, or business affiliation/ connection of Defendant's jeans with the source LS&CO due to the stitching design on the pocket of the Ruehl brand jeans.

///
///

1 | <u>QUALIFICATIONS</u>

2 |     63.  I hold a Bachelor's Degree in Advertising (B.A.)

3 | from San Jose State University, a Master's Degree in Business

4 | Administration (M.B.A.) from the University of Southern

5 | California, and a Doctoral Degree in Business Administration

6 | (D.B.A.) from the University of Southern California.

7 |     64.  During my twenty-five year academic appointment,

8 | my teaching responsibilities included both graduate and

9 | undergraduate level courses in a variety of subject areas.  My

10 | teaching responsibilities included courses in marketing (e.g.,

11 | marketing, marketing management, advertising, promotion, consumer

12 | behavior, and marketing research) and management (e.g.,

13 | principles of management; business policy and strategy; business

14 | policies, operations, and organizations; and integrated

15 | analysis).

16 |     65.  I am a member of the American Marketing

17 | Association (AMA), the American Academy of Advertising (AAA), the

18 | American Association of Public Opinion Research (AAPOR), the

19 | Council of American Survey Research Organizations (CASRO), and

20 | the International Trademark Association (INTA).

21 |     66.  As a partner with Ford Bubala & Associates, I have

22 | been retained by a variety of firms engaged in the consumer

23 | product, industrial product, and service sectors of the economy

24 | to provide marketing consulting and research services.

25 | Approximately one-half of Ford Bubala & Associates' consultancies

26 | in which I have participated have involved the design and

27 | execution of marketing research surveys.

28 | ///

1     67.  As previously noted, during the past thirty-three
2  years, I have been retained in a number of litigation-related
3  consultancies involving intellectual property matters, including
4  matters before federal and state courts, the Trademark Trial and
5  Appeal Board of the U.S. Patent and Trademark Office, and the
6  International Trade Commission.  I have designed and executed
7  surveys relating to intellectual property matters, including
8  false advertising, trademark, patent, and other related matters.
9  I am familiar with the accepted principles of survey research, as
10  well as the tests for trustworthiness of properly conducted
11  surveys or polls.[19]

12     68.  During the past twenty-eight years, I have
13  addressed a variety of groups on the subject of surveys or polls
14  and their use in the measurement of the state of mind of
15  consumers, with respect to Lanham Act matters.  Specifically, I
16  have spoken at meetings of the American Bar Association, the
17  American Intellectual Property Law Association, the American
18  Marketing Association, the International Trademark Association,
19  the Marketing Research Association, the Intellectual Property Law
20  Institute of Canada, and the Practising Law Institute.

21     69.  I have also written on the subject of the design
22  and execution of litigation-related surveys in intellectual
23  property matters.  Attached hereto as Exhibit B is a list of
24  papers I have written since 1987.

25     70.  Since 1998 I have served as a member of the
26  Editorial Board of <u>The Trademark Reporter</u>, the scholarly legal

27

28     [19]    Supra note 2.

1 | journal on the subject of trademarks, published by the

2 | International Trademark Association.

3 |     71.  I have been qualified and accepted as an expert in

4 | marketing and marketing research in more than fifty (50) trials

5 | before federal and state courts and administrative government

6 | agencies.

7 |     72.  Attached hereto as Exhibit C is a list of cases in

8 | which I have provided trial and/or deposition testimony since

9 | 1992.

10 |     73.  Attached hereto as Exhibit D is a copy of my

11 | professional history, describing my qualifications and

12 | professional background.

13 | <u>MATERIAL CONSIDERED</u>

14 |     74.  Materials considered, in the instant matter,

15 | include:  the Complaint; the Answer, Affirmative Defenses, and

16 | Counterclaims; Abercrombie & Fitch Trading Co.'s Amended Answer,

17 | Affirmative Defenses, and Counterclaims; Exhibits to Amended

18 | Answer, Affirmative Defenses, and Counterclaims; Stipulated

19 | Protective Order; Scheduling Order; deposition transcript of

20 | Carol Scott, February 17, 2005, in the Levi Strauss v. RP55, Inc.

21 | matter; deposition transcript of Carol Scott, March 9, 2005, in

22 | the Levi Strauss v. RP55, Inc. matter; and documents bearing

23 | document control numbers LS-A&F009526 through LS-A&F009621 and

24 | LS-A&F009627 through LS-A&F009665.

25 | <u>COMPENSATION</u>

26 |     75.  Ford Bubala & Associates' fees for this engagement

27 | consist of billable time and expenses.  Standard time is billed

28 | at the rate of $500.00 per hour for the services of a Partner and

1 | $250.00 per hour for the services of a Research Associate.

2 | Deposition and trial time are billed at the rate of $600.00 per

3 | hour plus expenses.

4 |         I declare under penalty of perjury under the laws of

5 | the United States of America that the foregoing is true and

6 | correct.  Executed this 25th day of June, 2008, in Huntington

7 | Beach, California.

8 |

9 |                                      _____

10 |                                      Dr. Gerald L. Ford

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of June, 2008, I caused a true and correct copy

of the Declaration and Rule 26 Report of Dr. Gerald L. Ford to be served to the following:

| | |
|---|---|
| _____ HAND DELIVERY | Gregory S. Gilchrist |
| ___✓___ U.S. MAIL | Gia L. Cincone |
| _____ OVERNIGHT MAIL | Townsend & Townsend and Crew LLP |
| _____ FAX TRANSMISSION | Two Embarcadero Center, Eighth Floor |
| _____ EMAIL | San Francisco, CA 94111-3834 |
| | fax 415.576.0300 |
| | gsfilchrist@townsend.com |
| | glcincone@townsend.com |