EXHIBIT C

1 MICHAEL J. BETTINGER (State Bar No. 122196)
  RACHEL R. DAVIDSON (State Bar No. 215517)
2 KIRKPATRICK & LOCKHART
  PRESTON GATES ELLIS LLP
3 55 Second Street, Suite 1700
  San Francisco, California  94105
4 Telephone:  415-882-8200
  Facsimile:  415-882-8220
5
  J. MICHAEL KEYES (Pro Hac Vice)
6 KIRKPATRICK & LOCKHART
  PRESTON GATES ELLIS LLP
7 618 West Riverside Avenue, Suite 300
  Spokane, Washington  99201
8 Telephone:  509-624-2100
  Facsimile:  509-456-0146
9
  Attorneys for Defendant
10 ABERCROMBIE & FITCH TRADING CO.

11

                  UNITED STATES DISTRICT COURT
12
                 NORTHERN DISTRICT OF CALIFORNIA
13

14 LEVI STRAUSS & CO.,                )      No. CV-07-3752
                                      )
15          Plaintiff,                )      Rebuttal Declaration
                                      )      of Dr. Gerald L. Ford
16      v.                            )
                                      )
17 ABERCROMBIE & FITCH TRADING CO.,   )
                                      )
18          Defendant.                )
                                      )
19 _____)

20        I, Dr. Gerald L. Ford, hereby declare as follows:

21                         INTRODUCTION

22        1.   I am a partner in the marketing research and

23 consulting firm of Ford Bubala & Associates, located in

24 Huntington Beach, California, where I have been engaged in

25 commercial marketing research and consulting for the past thirty-

26 three years.  I am also an emeritus faculty member of the School

27 of Business Administration, California State University, Long

28 ///

1  Beach, where I held a full-time teaching position for twenty-five
2  years, prior to my retirement in 1994.

3      2.   I am the same Gerald L. Ford who previously filed
4  a Declaration and Rule 26 Report detailing the results of a
5  likelihood of confusion survey that I designed and caused to be
6  conducted in this matter.  For the convenience of the court, my
7  professional experience is summarized below in paragraphs 34
8  through 44.

9      3.   In the instant matter, at the request of
10 Kirkpatrick & Lockhart Preston Gates Ellis LLP, counsel for
11 Defendant, Abercrombie & Fitch Trading Co. ("A&F"), I have been
12 asked to review and comment on two surveys designed by Associate
13 Professor Sanjay Sood ("Sood") on behalf of Plaintiff Levi
14 Strauss & Company ("LS&CO").  One survey was purportedly designed
15 to measure post-sale likelihood of confusion with respect to the
16 stitching design on the back pockets of the Ruehl brand jeans
17 being sold by Defendant, A&F.  The other survey was purportedly
18 designed to measure the degree of recognition of the stitching
19 design on the back pockets of Levi jeans.

20     4.   The Sood survey, which was purportedly designed to
21 measure likelihood of confusion, was not conducted according to
22 generally accepted principles in a number of respects.  The Sood
23 likelihood of confusion survey is riddled with flaws which render
24 the results meaningless with respect to the conclusions Sood
25 draws from the survey results.  Specifically, the Sood likelihood
26 of confusion survey suffers from leading questions and procedures
27 that suffered from demand effects, lack of a control,
28 ///

1  underinclusive universe, lack of marketplace conditions, order

2  bias, and lack of an explicit "don't know" alternative.

3      5.   The Sood survey, which was purportedly designed to

4  measure the recognition of the stitching design on the back

5  pockets of Levi jeans, was also not conducted according to

6  generally accepted principles in a number of respects.  The Sood

7  recognition survey is also riddled with flaws which render the

8  survey results meaningless with respect to the conclusions Sood

9  draws from the survey results.  Specifically, the Sood

10 recognition survey suffers from spurious recognition, ambiguous

11 questions, order bias, and lack of a control.

12              SOOD - LIKELIHOOD OF CONFUSION SURVEY

13     6.   In an attempt to offer evidence of a likelihood of

14 confusion, Sood offers a survey design that has been repeatedly

15 rejected by courts.  See National Distillers Products Co., LLC v.

16 Refreshment Brands, Inc, 198 F. Supp. 2d 474 (S.D.N.Y. 2002);

17 Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 452 F. Supp. 2d

18 772 (W.D. Mich. 2006); Kargo Global, Inc. v. Advance Magazine

19 Publishers, Inc., 2007 U.S. Dist. LEXIS 57320 (S.D.N.Y 2007); and

20 Simon Property Group L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033

21 (S.D. Ind. 2000).

22     7.   In the Sood likelihood of confusion survey,

23 respondents were initially shown a photograph of someone wearing

24 a pair of Levi jeans (the photograph showed the stitching design

25 on the left rear pocket as well as part of the left leg of the

26 Levi jeans).  After a respondent was finished viewing the

27 photograph, it was put away in an envelope and removed from

28 sight.  Subsequently, respondents were shown four photographs.

Rebuttal Declaration                - 3 -
of Dr. Gerald L. Ford

1    One showed someone wearing a pair of Ruehl jeans, one showed

2    someone wearing a pair of Citizens jeans, one showed someone

3    wearing a pair of Seven jeans, and one showed someone wearing a

4    pair of True Religion jeans (these photographs also showed the

5    stitching design on the left rear pocket of each pair of jeans as

6    well as part of the leg of each of the jeans).  Each of these

7    four photographs was then pinned to a wall side-by-side.  While

8    viewing these four photographs, respondents were asked:

9        Do you think that any of these jeans are made,
         sponsored or endorsed by the same company that made the
10       jeans you saw in the first picture?

11       Or,

12       Do you think that none of these jeans are made,
         sponsored or endorsed by the same company that made the
13       jeans you saw in the first picture?

14   Leading Questions and Procedures

15       8.    Surveys which employ leading or suggestive

16   questions do not provide an appropriate measurement for

17   likelihood of confusion in Lanham Act matters.  In the instant

18   matter, the Sood survey was clearly suggestive.  Survey

19   respondents were first shown the Levi pocket design and then were

20   shown, simultaneously, the pocket design of four brands of jeans,

21   including Defendant's Ruehl pocket design.  Respondents were then

22   asked if any of the jeans in the four photographs were made,

23   sponsored or endorsed by the same company that made the jeans in

24   the first photograph.  This procedure not only suggested that

25   survey respondents should find a connection between the Levi

26   jeans and one of the four pairs of jeans in the photographs but

27   also, because there were no word marks on the jeans, improperly

28   suggested that respondents find a connection specifically with

Rebuttal Declaration              - 4 -
of Dr. Gerald L. Ford

1  one of the pairs of jeans with the closest similarity to one they

2  had seen earlier.  The Sood question is akin to the well-known

3  "Where's Waldo?" game where here respondents are challenged to

4  find the picture which most closely matches the Levi pocket

5  design they were shown first.

6        9.    There was simply no reason to show survey

7  respondents the Levi jeans.  I understand that Plaintiff claims

8  that its pocket design is famous for dilution purposes and, as

9  such, it was unnecessary to show the Levi pocket stitching prior

10 to a lineup of pocket stitching on other brands of jeans.[1]  The

11 use of a traditional likelihood of confusion survey format would

12 have provided a reliable indication of likelihood of confusion,

13 to the extent that such likelihood of confusion exists.  Under a

14 traditional format survey, respondents would have been simply

15 shown the pocket design on the Ruehl jeans and asked questions

16 with respect to the source, authorization/approval of, or

17 business affiliation/connection of the jeans, along with a

18 control cell to measure the extent to which non-trademark

19 confusion exists in the survey results.  See Leelanau, 452 F.

20 Supp. 2d 772, at 787; and Powerhouse Marks LLC v. Chi Hsin Impex,

21 Inc., 2006 U.S. Dist. LEXIS 16454, at *12 (E.D. Mich. 2006).  Yet

22 Sood chose not to employ the traditional or standard likelihood

23 of confusion survey format even though the traditional or

24

25 _____

26      [1]    For his survey, Sood used what is oftentimes referred
   to as a Squirt design (i.e., show a respondent plaintiff's
   trademark and then show a respondent defendant's trademark).  It
27 has been suggested that this survey design can be used for weak
   marks under certain conditions.  See Jerre B. Swann, "Likelihood
28 of Confusion Studies and the Straitened Scope of Squirt," 98 TMR
   739 (2008).

Rebuttal Declaration                    - 5 -
of Dr. Gerald L. Ford

1 | standard format has been previously employed and relied upon by
2 | LS&CO's prior expert in numerous other litigations.   See
3 | documents bearing document control numbers LS-A&F009526 through
4 | LS-A&F009621 and LS-A&F009627 through LS-A&F009665.

5 | <u>Demand Effects</u>

6 |      10.   Rather than measuring any actual likelihood of
7 | confusion, the Sood survey questions and procedures generated
8 | "demand effects" by suggesting to the survey respondents the
9 | existence of a connection between the jeans in the first
10 | photograph and one of the jeans in the set of four photographs by
11 | suggesting to the survey respondents the existence of a
12 | connection that the survey respondents would not have made on
13 | their own.   Specifically, a question that asks survey respondents
14 | whether or not products are put out by the same or related
15 | sources is likely to generate demand effects by suggesting to
16 | survey respondents, at least implicitly, that they should believe
17 | that there is some sort of relationship between one or more of
18 | the products when the possibility might not have occurred to
19 | consumers who encounter the alleged infringing product by itself.
20 | See <u>Kargo</u>, 2007 U.S. Dist. LEXIS 57320, at *24; and <u>Simon</u>
21 | <u>Property Group</u>, 104 F. Supp. 2d 1033, at 1048.

22 |     The response alternative in a closed-ended question may
    remind respondents of options that they would not
23 |     otherwise consider.
    Shari Seidman Diamond "Reference Guide on Survey Research,"
24 |     in the Federal Judicial Center's <u>Reference Manual on</u>
    <u>Scientific Evidence, Second</u>, page 252.
25 |

26 |      11.   A number of courts faced with survey questions
27 | suffering from demand effects, similar to the question employed
28 | by Sood, have dismissed the results as biased overestimates of a

1  likelihood of confusion.  See <u>Simon Property</u>, 104 F. Supp. 2d,

2  1033, at 1048 ("The question about whether the two items are put

3  out by the same or related source is likely to generate so-called

4  'demand effects' that bias the survey by suggesting to

5  respondents, at least implicitly, that they should believe there

6  is at least some sort of relationship between the different items

7  when the possibility might not even have occurred to the vast

8  majority of consumers who see the items."); also see <u>Gov't</u>

9  <u>Employees Ins. Co. v. Google, Inc.</u>, 2005 U.S. Dist. LEXIS 18642,

10  at *23 (E.D. Va. 2005) ("[D]emand effect results when the

11  interviewer's question or other elements of the survey design

12  influence participants' responses by suggesting what the

13  'correct' answers might be or by implying associations that might

14  not otherwise occur to participants."); also see <u>Kargo</u>, 2007 U.S.

15  Dist. LEXIS 57320, at *25 ("In other words, the mere putting of a

16  question creates the impression of a relationship.")

17       12.  Similarly, other courts have also found questions

18  similar to the Sood question inappropriate and biased.  See <u>Wuv's</u>

19  <u>International, Inc. v. Love's Enterprises, Inc.</u>, 1980 U.S. Dist.

20  LEXIS 16512, at *65 (D. Colo. 1980); <u>Beneficial Corporation v.</u>

21  <u>Beneficial Capital Corporation</u>, 529 F. Supp. 445, at 450

22  (S.D.N.Y. 1982); and <u>Riviana Foods, Inc. v. Societe des Produits</u>

23  <u>Nestle, S.A. and Nestle Food Company</u>, 1994 U.S. Dist. LEXIS

24  20267, at *9-*10 (S.D. Tex. 1994).

25  ///

26  ///

27  ///

28  ///

1 | <u>Lack of a Control Cell</u>

2       13.  The Sood survey design did not employ a control

3 | cell.  As noted by Professor Diamond:

4       Every measure of opinion or belief in a survey
  reflect some degree of error.  Control groups and [in-
5   treatment] control questions are the most reliable
  means for assessing response levels against the
6   baseline level of error associated with a particular
  question.
7   Shari Seidman Diamond "Reference Guide on Survey
  Research," in the Federal Judicial Center's <u>Reference</u>
8   <u>Manual on Scientific Evidence, Second</u>, page 260.

9       14.  Today, most Lanham Act surveys designed to address

10 | the issue of likelihood of confusion employ a traditional

11 | scientific experimental survey design consisting of two survey

12 | cells:  (1) a test or experimental survey cell designed to

13 | measure the likelihood of confusion, if any, with respect to the

14 | source, approval of, or a business affiliation/connection of a

15 | product or service bearing an allegedly infringing mark; and, (2)

16 | a control survey cell.

17       15.  A control survey cell provides a measure of the

18 | extent to which non-trademark confusion exists in the survey

19 | results.  That is, a control survey cell functions as a baseline

20 | and provides a measure of the degree to which respondents'

21 | answers are not a result of likelihood of confusion but a result

22 | of other factors, such as the survey's questions, the survey's

23 | procedures, the nature of the product, or some other potential

24 | influence on a respondent's answer.  Again, as Professor Diamond

25 | notes:

26 | ///

27 | ///

28 | ///

1    It is possible to adjust many survey designs so
2  that causal inferences about the effect of a trademark
   or an allegedly deceptive commercial become clear and
   unambiguous.  By adding an appropriate control group,
3  the survey expert can test directly the influence of
   the stimulus...Respondents in both the experimental and
4  control groups answer the same set of questions.  The
   effect of the allegedly deceptive message [or the
5  allegedly confusing trademark] is evaluated by
   comparing the responses made by the experimental group
6  members with those of the control group members...Both
   preexisting beliefs and other background noise should
7  have produced similar response levels in the
   experimental and control groups.  In addition, if
8  respondents who viewed the allegedly deceptive
   commercial [or the allegedly infringing trademark]
9  respond differently than respondents who viewed the
   control commercial [control trademark], the difference
10 cannot be the result of a leading question, because
   both groups answered the same question...
11 Shari Seidman Diamond "Reference Guide on Survey Research,"
   in the Federal Judicial Center's Reference Manual on
12 Scientific Evidence, Second, pages 257-258.

13    16.   Without an appropriate control cell, the degree of

14 error in the Sood likelihood of confusion survey results cannot

15 be estimated.  See Simon Property Group, 104 F. Supp. 2d 1033, at

16 1048.

17 Underinclusive Universe

18    17.   The Sood survey universe is clearly

19 underinclusive.  Sood claims that his survey was designed to test

20 for likelihood of confusion in a post-sale environment.  As such,

21 the appropriate survey universe would be a fair sampling of those

22 potential purchasers who are likely to be exposed to the alleged

23 infringing mark in the post-sale marketplace, specifically,

24 females who are likely to purchase jeans for themselves.  This

25 would include a representative sample of all females thirteen

26 (13) years of age or older or alternatively all females eighteen

27 (18) years of age or older who are likely to purchase jeans for

28 themselves.

Rebuttal Declaration                    - 9 -
of Dr. Gerald L. Ford

1    18.    Instead, Sood's survey universe was limited to

2   females twenty (20) to forty-five (45) years of age who reported

3   that they had purchased a pair of jeans in the past six months

4   that cost seventy-five dollars ($75.00) or more or were likely to

5   purchase jeans in the next six months that cost seventy-five

6   dollars ($75.00) or more.  By excluding females who had not

7   purchased jeans which cost seventy-five dollars ($75.00) or more

8   in the past six months or who were not likely to purchase jeans

9   which cost seventy-five dollars ($75.00) or more in the next six

10  months, Sood's survey universe definition excludes approximately

11  eighty percent (80%) of female jean purchasers and, thus, the

12  Sood survey universe is grossly underinclusive.  See

13  LS-A&F040233.

14    19.    Sood offers no empirical evidence that only

15  females twenty (20) to forty-five (45) years of age who in the

16  past six months purchased jeans which cost seventy-five dollars

17  ($75.00) or more or were likely to purchase jeans which cost

18  seventy-five dollars (75.00) or more in the next six months are

19  likely to notice the pocket stitching on the Ruehl jeans in a

20  post-sale environment.[2]

21  Lack of Marketplace Conditions

22    20.    It is my understanding that there are literally

23  hundreds of brands of jeans with pocket stitching on the back

24  pockets.  The probability that a person would see only the left

25  rear pocket of a pair of Levi jeans and then seconds later

26  encounter simultaneously four females with one wearing a pair of

27  _____

28    [2]    In a post-sale environment, one would not know that an
unknown brand of jeans costs $75.00 or more.

Rebuttal Declaration                    - 10 -
of Dr. Gerald L. Ford

1 | Ruehl jeans, one wearing a pair of Citizens jeans, one wearing a
2 | pair of Seven jeans, and one wearing a pair of True Religion
3 | jeans is beyond remote.  Sood created an imaginary world in which
4 | consumers would see the Levi pocket stitching and then the Levi
5 | pocket stitching would be hidden and moments later would see
6 | side-by-side the left rear pocket of a pair of Ruehl, Citizens,
7 | Seven, and True Religion jeans, and then be asked a leading
8 | question.  Simply, the Sood survey design does not match how the
9 | Ruehl jeans are likely to be encountered in the post-sale
10 | marketplace.

11 |         21.  Sood offers no empirical evidence that his survey
12 | design, in any way, represents the manner in which the alleged
13 | infringing pocket design is likely to be encountered in the post-
14 | sale marketplace.  Overall, the Sood survey was a meaningless
15 | exercise that had nothing to do with what would likely happen in
16 | the actual marketplace. As such, the Sood survey shows nothing
17 | about likelihood of confusion in the post-sale marketplace.

18 | Order Bias

19 |         22.  Finally, the Sood likelihood of confusion survey
20 | questions appear to suffer from order bias.

21 |         The order in which questions are asked on a survey
   |         and the order in which response alternatives are
22 |         provided in a closed-ended question can influence the
   |         answers...
23 |         To control for order effects, the order of the
   |         questions and the order of the response choices in a
24 |         survey should be rotated...
   |         Shari Seidman Diamond "Reference Guide on Survey Research,"
25 |         in the Federal Judicial Center's Reference Manual on
   |         Scientific Evidence, Second, pages 254-255.
26 |

27 | While Sood acknowledges the potential impact of order bias (see
28 | Sood report, page 10) it does not appear that he took this

1  admonition to heart with respect to the closed-ended question

2  Sood poses to respondents.  Specifically, it appears that Sood

3  did not rotate the alternatives to the survey's critical

4  question.  See <u>Winning Ways, Inc. v. Holloway Sportswear, Inc.</u>,

5  913 F. Supp. 1454, at 1467 (D. Kan. 1996).

6  <u>Lack of an Explicit "Don't Know" Alternative</u>

7         23.    Additionally, it does not appear that respondents

8  were offered an explicit don't know/no opinion alternative to the

9  closed-ended critical question.

10         ...the survey can use a quasi-filter question to
      reduce guessing by providing "don't know" or "no
11         opinion" options as part of the question...By signaling
      to the respondent that it is appropriate not to have an
12         opinion, the question reduces the demand for an answer
      and, as a result, the inclination to hazard a guess
13         just to comply.  Respondents are more likely to choose
      a "no opinion" option if it is mentioned explicitly by
14         the interviewer than if it is merely accepted when the
      respondent spontaneously offers it as a response.  The
15         consequence of this change in format is substantial.
      Shari Seidman Diamond "Reference Guide on Survey Research,"
16         in the Federal Judicial Center's <u>Reference Manual on</u>
      <u>Scientific Evidence, Second</u>, page 250.  Also see Jerre B.
17         Swann, "Likelihood of Confusion Studies and the Straitened
      Scope of Squirt," 98 TMR at 742, Note 16 (2008).

18

19         24.    Thus, without a control cell, which is absent in

20  the Sood likelihood of confusion survey, there is no way to

21  estimate the level of error resulting from the order bias in the

22  survey questions and the lack of an explicit "don't know"

23  alternative to the survey's critical closed-ended question.

24  <u>Conclusion</u>

25         25.    The Sood survey, which was purportedly designed to

26  measure likelihood of confusion, was not conducted according to

27  generally accepted principles in a number of respects.  The Sood

28  likelihood of confusion survey is riddled with flaws which render

1  the results meaningless with respect to the conclusions Sood

2  draws from the survey results.

3                    SOOD - RECOGNITION SURVEY

4         26.   In the Sood recognition survey, respondents were

5  shown three photographs, each showing the pocket stitching on a

6  brand of jeans:  Levi jeans, Lee jeans, and Lucky jeans.[3]  For

7  each photograph, respondents were asked:

8         1.   Have you seen jeans with this style of pocket
              stitching before?
9

10 If respondents answered "no," they were shown the next photograph

11 of a pocket on a pair of jeans and were questioned with regard to

12 that pocket.  Respondents who said "yes" or "don't know"[4] if

13 they had seen jeans with the style of pocket stitching they were

14 shown, were asked:

15        2.   Do you associate jeans with this style of pocket
              stitching with (read the options to respondent and
16            show respondent the card with answers):  one brand
              or company, more than one brand or company, or
17            don't know?

18 It appears that all respondents who answered question two were

19 asked:

20        3.   What is the name of the brand(s) or companies that
              you associate with this product?
21

22

   _____

23     [3]    Sood claims that Lee and Lucky jeans were selected as
   benchmarks "...because these brands (and their associated pocket
24 stitching) have been in the marketplace for many years, implying
   that consumers would likely have seen the distinctive pocket
25 stitching over time."  See Sood report, page 6.

26     [4]    Sood does not explain why respondents who reported that
   they did not know if they had "seen jeans with this style of
27 pocket stitching before" could reliably answer the second
   question "Do you associate jeans with this style of pocket
28 stitching with one brand or company, more than one brand or
   company, or don't know?"

Rebuttal Declaration                - 13 -
of Dr. Gerald L. Ford

1 | Spurious Recognition

2         27.   Sood completely ignores the well-known problem of

3 | spurious recognition.   As noted by Professor Keller:

4          Any research measure must consider the issue of
consumers making up responses or guessing.   That
5      problem may be especially evident with certain types of
aided awareness or recognition measures for the brand.
6      Spurious awareness occurs when consumers erroneously
claim they recall something that they really don't and
7      that maybe doesn't even exist.
Kevin Lane Keller, Strategic Brand Management:   Building,
8      Measuring, and Managing Brand Equity, Third Edition, Pearson
Prentice Hall, 2008, page 378.
9

10 | Thus, a control for guessing is necessary for a question like

11 | Sood's question one.   Professor Keller suggests that to provide a

12 | more sensitive test of recognition "...it is often useful to

13 | include decoys or lures - items that consumers could not possibly

14 | have seen."   See Kevin Lane Keller, Strategic Brand Management,

15 | at 374.

16 | Ambiguous Questions

17         28.   In the first question, Sood asked respondents,

18 | "Have you seen jeans with this style of pocket stitching before?"

19 | There is no way to determine what respondents understood by

20 | "style of pocket stitching."   For example, (1) was it just the

21 | idea of stitching running through the middle of the pocket; (2)

22 | was it the stitching on the sides, top, and bottom only; or (3)

23 | was it all the stitching on the pocket, including the stitching

24 | on the sides, top, and bottom and the stitching running through

25 | the middle of the pocket.   Regardless of what respondents may or

26 | may not have understood by "style of pocket stitching," it is

27 | clear that no respondent was ever asked if he/she had seen the

28 | specific design of pocket stitching shown on the Levi jeans

1  running through the middle of the pocket in the photograph.  It

2  is my understanding that it is this specific design to which

3  LS&CO is claiming rights.

4      29.  After asking respondents, in question one, "Have

5  you seen jeans with this style of pocket stitching before?"

6  [emphasis added] and asking respondents in question two, "Do you

7  associate jeans with this style of pocket stitching with:  one

8  brand or company, more than one brand or company, or don't know?"

9  [emphasis added] respondents were asked question three, "What is

10 the name of the brand(s) or companies that you associate with

11 this product?" [emphasis added].  Notably, question three is

12 directed away from pocket stitching and directed, instead, to the

13 product itself.  Clearly, this question does not measure the

14 degree of recognition and association of the Levi pocket

15 stitching design with LS&CO.

16 Order Bias

17     30.  Further, the Sood recognition survey also appears

18 to suffer from order bias.  Again, while Sood acknowledges the

19 potential impact of order bias (see Sood report, page 10), it

20 does not appear that he took this admonition to heart with

21 respect to Sood's closed-ended question two that was posed to

22 respondents.  Specifically, it appears that Sood did not rotate

23 the alternatives to question two. See Winning Ways, 913 F. Supp.

24 1454, at 1467 (D. Kan. 1996).  Also see Shari Seidman Diamond

25 "Reference Guide on Survey Research," in the Federal Judicial

26 Center's Reference Manual on Scientific Evidence, Second, pages

27 254-255.

28 ///

1  Lack of a Control Cell

2          31.  Again, without an appropriate control cell[5] or an

3  in-treatment control, which is absent in the Sood recognition

4  survey, there is no way to estimate the level of error resulting

5  from spurious recognition, ambiguous questions, and order bias in

6  Sood's survey questions.

7  Conclusion

8          32.  The Sood survey, which was purportedly designed to

9  measure the recognition of the stitching design on the back

10  pockets of Levi jeans, was also not conducted according to

11  generally accepted principles in a number of respects.  The Sood

12  recognition is also riddled with flaws which render the survey

13  results meaningless with respect to the conclusions Sood draws

14  from the survey results.

15                    EROSION OF DISTINCTIVENESS

16          33.  Based upon his likelihood of confusion survey,

17  Sood opines that:

18          ...31% of participants incorrectly associated Ruehl
            jeans with jeans by LS&CO.  In view of this high degree
19          of incorrect association, it is reasonable to conclude
            that LS&CO has suffered harm to its brand due to the
20          erosion in distinctiveness of the LS&CO's trademark
            pocket stitching.  See Sood report, page 3.
21

22  As an initial matter, Sood never asked any survey respondents if

23  they associated Ruehl jeans with jeans by LS&CO.  Additionally,

24  to the degree to which LS&CO has suffered harm to its brand, due

25  to the erosion in distinctiveness of the Levi pocket stitching,

26  there is no empirical evidence offered by Sood that this is, or

27

28
        [5]    Also see paragraphs 13 through 16.

1  in the future could be, the result of the pocket stitching on the

2  Ruehl jeans as opposed to the myriad of other pocket stitching

3  designs which are present in the marketplace.  Specifically, Sood

4  offers no empirical evidence that there has been any diminution

5  in the distinctiveness of the LS&CO pocket stitching design, and,

6  in particular, if such diminution has indeed happened, that it

7  was caused by or is attributable in any way to the Ruehl jeans

8  pocket stitching design.

9                            QUALIFICATIONS

10        34.  I hold a Bachelor's Degree in Advertising (B.A.)

11  from San Jose State University, a Master's Degree in Business

12  Administration (M.B.A.) from the University of Southern

13  California, and a Doctoral Degree in Business Administration

14  (D.B.A.) from the University of Southern California.

15        35.  During my twenty-five year academic appointment,

16  my teaching responsibilities included both graduate and

17  undergraduate level courses in a variety of subject areas.  My

18  teaching responsibilities included courses in marketing (e.g.,

19  marketing, marketing management, advertising, promotion, consumer

20  behavior, and marketing research) and management (e.g.,

21  principles of management; business policy and strategy; business

22  policies, operations, and organizations; and integrated

23  analysis).

24        36.  I am a member of the American Marketing

25  Association (AMA), the American Academy of Advertising (AAA), the

26  American Association of Public Opinion Research (AAPOR), the

27  Council of American Survey Research Organizations (CASRO), and

28  the International Trademark Association (INTA).

1     37.  As a partner with Ford Bubala & Associates, I have
2 been retained by a variety of firms engaged in the consumer
3 product, industrial product, and service sectors of the economy
4 to provide marketing consulting and research services.
5 Approximately one-half of Ford Bubala & Associates' consultancies
6 in which I have participated have involved the design and
7 execution of marketing research surveys.

8     38.  As previously noted, during the past thirty-three
9 years, I have been retained in a number of litigation-related
10 consultancies involving intellectual property matters, including
11 matters before federal and state courts, the Trademark Trial and
12 Appeal Board of the U.S. Patent and Trademark Office, and the
13 International Trade Commission.  I have designed and executed
14 surveys relating to intellectual property matters, including
15 false advertising, trademark, patent, and other related matters.
16 I am familiar with the accepted principles of survey research, as
17 well as the tests for trustworthiness of properly conducted
18 surveys or polls.

19     39.  During the past twenty-eight years, I have
20 addressed a variety of groups on the subject of surveys or polls
21 and their use in the measurement of the state of mind of
22 consumers, with respect to Lanham Act matters.  Specifically, I
23 have spoken at meetings of the American Bar Association, the
24 American Intellectual Property Law Association, the American
25 Marketing Association, the International Trademark Association,
26 the Marketing Research Association, the Intellectual Property Law
27 Institute of Canada, and the Practising Law Institute.
28 ///

Rebuttal Declaration
of Dr. Gerald L. Ford

1       40.  I have also written on the subject of the design

2 and execution of litigation-related surveys in intellectual

3 property matters.  Attached hereto as Exhibit A is a list of

4 papers I have written since 1987.

5       41.  Since 1998 I have served as a member of the

6 Editorial Board of <u>The Trademark Reporter</u>, the scholarly legal

7 journal on the subject of trademarks, published by the

8 International Trademark Association.

9       42.  I have been qualified and accepted as an expert in

10 marketing and marketing research in more than fifty (50) trials

11 before federal and state courts and administrative government

12 agencies.

13       43.  Attached hereto as Exhibit B is a list of cases in

14 which I have provided trial and/or deposition testimony since

15 1992.

16       44.  Attached hereto as Exhibit C is a copy of my

17 professional history, describing my qualifications and

18 professional background.

19       I declare under penalty of perjury under the laws of

20 the United States of America that the foregoing is true and

21 correct.  Executed this 18th day of July, 2008, in Huntington

22 Beach, California.

23

24                         _____

25                     Dr. Gerald L. Ford

26

27

28

# Exhibit A

Articles
By Dr. Gerald L. Ford

These articles are available @ www.fordbubala.com/articles

"Trademark Surveys:  Universe, Questions, and Future Approaches"
was published in the Summer 1987 edition of New Matter, the
journal of the Intellectual Property Section of the California
State Bar.  This paper was subsequently reprinted in the 1992
International Trademark Association 114th Annual Meeting
proceedings.

"Responding to Trademark Surveys" was published in the Spring
1993 proceedings of the American Bar Association's Patent,
Trademark, and Copyright Law:  Litigation and Corporate Practice
course materials.  This paper was reprinted in the International
Trademark Association's "Successful Strategies in Trademark
Litigation" Forum, Tokyo, Japan, 1993.

"Dilution Surveys - New Challenges" was published in the 1997
Practising Law Institute course handbook, Litigating Copyright,
Trademark and Unfair Competition Cases for the Experienced
Practitioner.  This paper was reprinted in the International
Trademark Association's course materials for a seminar, Dilution
and Famous Marks for Advanced Trademark Practitioners, 1998.

"Dilution Surveys Update 1998" was published in the Practising
Law Institute course handbook, Litigating Copyright, Trademark
and Unfair Competition Cases for the Experienced Practitioner.

"Lanham Act Related Surveys, The Year in Review & Emerging
Issues" was published in the 1999 Practising Law Institute course
handbook, Litigating Copyright, Trademark and Unfair Competition
Cases for the Experienced Practitioner.  An edited version of
this paper, "Lanham Act Surveys - The Year in Review," was
reprinted in the NAD/International Trademark Association's False
Advertising Forum, course materials, 2000.

"Lanham Act Surveys:  Two Years in Review" was published in the
International Trademark Association 122nd Annual Meeting
proceedings.

"Lanham Act Surveys:  2000" was published in the 2000 Practising
Law Institute course handbook Litigating Copyright, Trademark and
Unfair Competition Cases for the Experienced Practitioner.

"Lanham Act Surveys:  2001" was published in the 2001 Practising
Law Institute course handbook Strategies for Litigating
Copyright, Trademark & Unfair Competition Cases.

Articles
Page 2


"Lanham Act Surveys:  2002" was published in the 2002 Practising
Law Institute course handbook <u>Strategies for Litigating
Copyright, Trademark & Unfair Competition Cases</u>.

"Survey Evidence - Successful Challenges Since Daubert" was
published in 2003 in the <u>International Trademark  Association
125th Annual Meeting</u> proceedings.

"Lanham Act Surveys:  2003" was published in 2003 in the <u>American
Intellectual Property Law Association</u> annual proceedings.  This
paper, "Lanham Act Surveys:  2003," was reprinted in the <u>78th
Intellectual Property Institute of Canada</u> proceedings, 2004.

"Lanham Act Surveys: 2004" was published in the <u>Law Education
Institute National CLE Conference</u> proceedings, 2005.

"Lanham Act Surveys: 2005" was presented at a meeting of the
Intellectual Property Law Section of the State Bar of Georgia,
2006. This paper, "Lanham Act Surveys: 2005" was reprinted in the
<u>NAD Annual Conference</u> proceedings, 2006, and in the <u>Law Education
Institute National CLE Conference</u> proceedings, 2007.

"Intellectual Property Surveys: 2006" was electronically
published on the members-only section of the INTA website, 2007.

# Exhibit B

DR. GERALD L. FORD

TRIAL TESTIMONY 1992 - 2008

2008

Google Inc. v. Nikolaus Gubernator
    Trademark Trial and Appeal Board

adidas American, Inc. and adidas AG v. Payless ShoeSource,
Inc.
    U.S. District Court, District of Oregon

2007

Nissan Motor Co. Ltd. and Nissan North America, Inc. v.
Nissan Computer Corporation and the Internet Center
    U.S. District Court, Central District of California

2006

Phillips-Van Heusen Corp., Calvin Klein, Inc., and Calvin
Klein Trademark Trust v. Calvin Clothing Company, Inc. and
Star Ride Kids, Inc.
    U.S. District Court, Southern District of New York

Joel D. Wallach v. Longevity Network, Ltd.
    U.S. District Court, Central District of California,
    Western District

2005

General Motors Corporation v. Chevy Duty, Inc.
    U.S. District Court, Eastern District of Michigan,
    Southern Division

2004

A&W Food Services of Canada Inc. and A&W Trade Marks Inc. v.
McDonald's Restaurants of Canada Limited.
    Federal Court, Toronto, Canada

Callaway Golf Company v. Dunlop Slazenger Group Americas,
Inc.
    U.S. District Court for the District of Delaware

Nova Development v. Individual Software, Inc.
    Arbitration (JAMS)

The PE Corporation and Roche Molecular Systems, Inc. v. MJ
Research Incorporated and Michael and John Finney
    U.S. District Court, District of Connecticut

July 18, 2008

- 1 -

Trial Testimony continued

2002

> Sara Lee Corporation v. Kayser-Roth Corporation
> > Trademark Trial and Appeal Board
>
> Kirkbi AG and Lego Canada Inc. v. Ritvik Holdings
> Inc./Gestions Ritvik Inc. and Ritvik Toys Inc./Jouets Ritvik
> Inc.
> > Federal Court of Canada, Toronto, Ontario

2001

> Harrods Limited v. Sixty Internet Domain Names
> > U.S. District Court, Eastern District of Virginia
>
> The State of California Acting in a Higher Education
> Capacity by and through The Board of Trustees of the
> California State University v. Bello's Sporting Goods
> > State of California, Superior Court, San Luis Obispo

2000

> Rally Accessories, Inc. d/b/a/ Rally Manufacturing, Inc., v.
> Quest Industries, Inc.
> > U.S. District Court, Southern District of Florida
>
> Jack Daniel's Properties, Inc. v. Quest Associates, Ltd.
> > Trademark Trial and Appeal Board

1999

> Daimler Chrysler Corporation v. Ted L. Vanzant, dba Country
> Craft
> > U.S. District Court, Central District of California
>
> Hewlett-Packard Company v. Nu-kote International, Inc.
> > U.S. District Court, Northern District of California

1998

> Nexxus Products Company v. Russ Kalvin, Inc., et al.
> > Superior Court of California, County of Santa Barbara
>
> 1-800-FLOWERS, Inc. v. Michael Segura, d/b/a FLOWER STAR,
> et al.
> > U.S. District Court, Eastern District of New York
>
> Haverly Systems, Inc. v. Omni Flow Computers, Inc.
> > Trademark Trial and Appeal Board

July 18, 2008

Trial Testimony continued

1997

      Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery
          U.S. District Court, Northern District of California

      Leonard Studio Equipment, Inc. v. Desmar Corporation and
      Meccanica Italiana Srl.
          U.S. District Court, District of New Jersey

1996

      Black & Decker (U.S.) Inc. v. GSL Engineering Ltd., GSL
      Consumer Products Ltd., GSL Rechargeable Products Ltd., et
      al.
          U.S. District Court, Eastern District of Virginia

1995

      Berner International Corporation v. Mars Sales Company
          U.S. District Court, Western District of Pennsylvania

      Mavrides, et al. v. Hammond, et al.
          U.S. District Court, Northern District of California

      Peter Morton, et al. v. Rank Organization, et al.
          Arbitration, Los Angeles

1994

      The Princeton Review Management Corp. v. Stanley H. Kaplan
      Educational Center, Ltd.
          Arbitration, New York

      Al-Site Corp. v. The Bonneau Company
          U.S. District Court, Central District of California

1993

      American Professional Testing Service, Inc. v. Harcourt
      Brace Jovanovich Legal and Professional Publications, Inc.
          U.S. District Court, Central District of California

      Devon Industries, Inc. v. American Medical Manufacturing,
      Inc., et al.
          U.S. District Court, Central District of California

      United Services of America Federal Credit Union dba USA
      Federal Credit Union v. USA Federal Credit Union
          U.S. District Court, Southern District of California

      In re:  Circuit Breaker Litigation
          U.S. District Court, Central District of California

Trial Testimony continued – 1993

     P. Leiner Nutritional Products v. Pharmavite Corporation
         U.S. District Court, Central District of California

     Mouldings, Inc. v. Kellogg Company
         U.S. District Court, District of Utah, Central Division

1992

     Adray, et al. v. Adry-Mart, et al.
         U.S. District Court, Central District of California

     Mag Instrument, Inc. v. Martin Heller et al.
         Superior Court of California, County of San Bernardino

     Baldwin Corporation v. Frank Su Enterprise Corporation,
     Frank Su, and Decorators Accessories, Ltd.
         U.S. District Court, Central District of California

     Mag Instrument Inc. v. Vermont American Corporation
         Trademark Trial and Appeal Board

     Better Carpet Care, Inc., dba A-1 Carpet Care v. A-1 Carpet
     Market
         Superior Court of California, County of Orange

DEPOSITION TESTIMONY 1992 - 2008

2008

Dayals (Fiji) Artesian Waters Limited v. Fiji Water Company LLC; Paramount International Expert, Ltd.; and Roll International Corporation
        U.S. District Court, Central District of California

adidas American, Inc. and adidas AG v. Wal-Mart Stores, Inc.
        U.S. District Court, District of Oregon

2007

HomeLife Communities Group v. HomeLife Realty Services, Inc. and HomeLife Securities, Inc.
        U.S. District Court, Northern District of Georgia

Luppen Holdings, Inc. v. Pitney Bowes, Inc. & Staples, Inc.
        U.S. District Court, Central District of California

E. & J. Gallo Winery v. Cantine Rallo, S.p.A.
        U.S. District Court, Eastern District of California

adidas American, Inc. and adidas AG v. Kmart Corporation and Footstar, Inc.
        U.S. District Court, District of Oregon

2006

NFL Properties LLC v. AllAuthentic Corporation
        U.S. District Court, Southern District of New York

The Board of Trustees of the University of Alabama v. New Life Art, Inc. and Daniel A. Moore
        U.S. District Court, Northern District of Alabama

2005

Children's Medical Center of Dallas v. Columbia Hospital at Medical City Dallas Subsidiary, L.P.
        U.S. District Court, Northern District of Texas

Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College, Board of Regents of the University of Oklahoma, Ohio State University, University of Southern California, Pasadena Tournament of Roses, and The Collegiate Licensing Company v. Smack Apparel Company and Wayne Curtiss
        U.S. District Court for the Eastern District of Louisiana

July 18, 2008

Deposition Testimony continued - 2005

>   The Boyds Collection, Ltd. v. The Bearington Collection
>       U.S. District Court, Middle District of Pennsylvania
>
>   Mag Instrument, Inc. v. Dollar Tree Stores, Inc. and
>   Dollar Tree Distribution, Inc.
>       U.S. District Court, Central District of California

2004

>   Nissan North America and Nissan Jidosha Kabushiki Kaisha dba
>   Nissan Motor Co., Ltd v. Europacific Parts International,
>   Inc. dba Service & Value Expeditors, and Interstate
>   Automotive Distributors dba Genuine Parts Advantage and
>   Metro Automotive
>       U.S. District Court, Central District of California

2003

>   Guthy-Renker Corporation v. University Medical Products/USA,
>   Inc.
>       U.S. District Court, Central District of California
>
>   The Iams Company v. Kal Kan Foods, Inc.
>       U.S. District Court, Southern District of Ohio
>
>   XtraPlus Corporation v. Google, Inc.
>       U.S. District Court, Northern District of California
>
>   The Iams Company v. Nutro Products, Inc.
>       U.S. District Court, Southern District of Ohio
>
>   adidas America, Inc. and adidas-Salomon AG v. Steve
>   Madden, Ltd., and Steve Madden Retail, Inc.
>       U.S. District Court, District of Oregon

2002

>   Masterfoods USA, a division of Mars, Incorporated v.
>   Arcor USA, Incorporated, and Arcor S.A.I.C.
>       U.S. District Court, Western District of New York
>
>   Dioptics Medical Products, Inc. v. The Cooper Companies,
>   Inc.
>       U.S. District Court, Northern District of California

2001

>   Manufacture des Montres Jaguar, S.A., Manufacturas de
>   Montres Jaguar, S.L., and Festina, U.S.A., Inc. v. Jaguar
>   Cars Limited, The Jaguar Collection Limited and Jaguar Cars,
>   a division of Ford Motor Company
>       U.S. District Court, Southern District of New York

July 18, 2008

Deposition Testimony continued- 2001

> Magnivision, Inc. v. The Bonneau Company
> > U.S. District Court, Central District of California

2000

> Kelly Blue Book Company, Inc. v. Primedia Intertec National
> Market Reports, Primedia Intertec Inc., & Primedia Inc.
> > U.S. District Court, Central District of California
>
> JMYZ, Inc. v. The Gap, Inc. and Old Navy, Inc.
> > U.S. District Court, Southern District of Florida

1999

> In re:  Certain Two-Handle Centerset Faucets and Escutcheons
> and Components Thereof
> > U.S. International Trade Commission, Washington, D.C.
>
> TriStar Pictures, Inc. and Zorro Productions, Inc. v. Del
> Taco, Inc. and Wongdoody
> > U.S. District Court, Southern District of California

1998

> Iomega Corporation v. SyQuest Technology, Inc.
> > U.S. District Court, District of Delaware

1997

> Summit Bottling, Inc. v. Water Star Bottling, Inc. et al.
> > U.S. District Court, District of Utah, Northern
> > Division
>
> Kellogg Company v. Exxon Corporation
> > U.S. District Court, Western District of Tennessee
>
> Galen Rowell and Richard Johnson v. Price/Costco
> > U.S. District Court, Northern District of California

1996

> Saban Entertainment, Inc. and Saban International, N.V. v.
> Rubie's Costumes Co., Inc.
> > U.S. District Court, Eastern District of New York
>
> Breath Asure, Inc. v. Merlin Offshore International, Inc. et
> al.
> > U.S. District Court, Central District of California
>
> Men's Wearhouse, Inc. v. T.H.C., Inc.
> > U.S. District Court, Eastern District of Michigan

July 18, 2008

Deposition Testimony continued

1995

      Hugo Boss Fashions Inc., et al. v. Brookhurst, Inc., et al.
          U.S. District Court, Southern District of New York

      Wilden Pump & Engineering Co. v. Charles Horvath (PTE), et al.
          U.S. District Court, Central District of California

      Barbara Arner v. Sharper Image Corporation, Remington Products, et al.
          U.S. District Court, Central District of California

1993

      The Famous Amos Chocolate Chip Cookie Corporation v. Wally Amos
          U.S. District Court, Northern District of California

      Atari Games Corporation & Tengen, Inc. v. Nintendo of America
          U.S. District Court, Northern District of California

      Calgene, Inc. v. Enzo Biochem, Inc.
          U.S. District Court, Eastern District of California

      Health Net v. U.S.A. Healthnet Inc.
          U.S. District court, Central District of California

# Exhibit C

PROFESSIONAL HISTORY

Dr. Gerald L. Ford
**Ford Bubala & Associates**
Peter's Landing, Suite 211
16400 Pacific Coast Highway
Huntington Beach, California 92649
Telephone (562) 592-4581
Facsimile (562) 592-3867

## EDUCATION

Doctor of Business Administration (D.B.A.)
University of Southern California, 1977

Master of Business Administration (M.B.A.)
University of Southern California, 1969

Bachelor of Arts (B.A.)
San Jose State University, 1967

## PROFESSIONAL AFFILIATIONS

American Academy of Advertising
American Marketing Association
American Association for Public Opinion Research
Council of American Survey Research Organizations
International Trademark Association

## PROFESSIONAL EXPERIENCE

Ford Bubala & Associates (Principal), 1975 – Present

Ford Bubala & Associates is a marketing and management consulting firm which
provides a variety of consulting services in the areas of marketing management,
marketing research, marketing planning, competitive evaluation, economic analysis,
and strategy development.

Ford Bubala & Associates has been retained to provide consulting assistance for a
diverse base of companies in consumer products, industrial products, and service
sectors of the economy.

## PRIOR EXPERIENCE

1970 – 1994

Emeritus faculty member, School of Business Administration, California State
University, Long Beach. Teaching responsibilities included both graduate and
undergraduate level courses. Courses taught covered a variety of subject areas,
including marketing (e.g., marketing, marketing management, advertising,
promotion, consumer behavior and marketing research) and management
(e.g., principles of management; business policy and strategy; business policies,
operations, and organizations; and integrated analysis).