1  TOWNSEND AND TOWNSEND AND CREW LLP
   GREGORY S. GILCHRIST (Bar # 111536)
2  GIA L. CINCONE (Bar # 141668)
   RAQUEL PACHECO (State Bar No. 245328)
3  Two Embarcadero Center, 8th Floor
   San Francisco, California 94111
4  Telephone: (415) 576-0200
   Facsimile: (415) 576-0300
5  Email: gsgilchrist@townsend.com, glcincone@townsend.com

6  Attorneys for Plaintiff
   LEVI STRAUSS & CO.
7

8              UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 LEVI STRAUSS & CO.,                    Case No. C 07-03752 JSW

12              Plaintiff/Counterdefendant,    **PLAINTIFF'S MEMORANDUM OF**
                                               **POINTS AND AUTHORITIES IN**
13        v.                                   **SUPPORT OF MOTION FOR**
                                               **SUMMARY JUDGMENT ON**
14 ABERCROMBIE & FITCH TRADING CO.,           **DEFENDANT'S COUNTERCLAIMS**
                                               **AND SELECTED AFFIRMATIVE**
15              Defendant/Counterclaimant.     **DEFENSES, AND FOR PARTIAL**
                                               **SUMMARY JUDGMENT ON**
16                                             **PLAINTIFF'S CLAIM OF**
                                               **TRADEMARK DILUTION**
17

18

19 ABERCROMBIE & FITCH TRADING CO.,          **DATE: September 26, 2008**
                                             **TIME: 9:00 a.m.**
20              Defendant/Counterclaimant,    **COURTROOM: 2**

21        v.

22 LEVI STRAUSS & CO.,

23              Plaintiff/Counterdefendant.

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ - 1 -

II.   ARGUMENT ........................................................................................ - 1 -

A.    Standard For Grant Of Summary Judgment Or Adjudication ........................ - 1 -

B.    LS&CO. Is Entitled To Summary Judgment On A&F's Fraud
      Counterclaim ...................................................................................... - 2 -

      1.    Undisputed Facts Relating To The Fraud Counterclaim ................... - 2 -

      2.    A Party Alleging Trademark Fraud Bears A "Heavy Burden Of
            Proof" ........................................................................................ - 6 -

      3.    There Was No Misrepresentation In LS&CO.'s Section 15
            Affidavit ..................................................................................... - 7 -

      4.    A&F Cannot Prove That Any Omission By LS&CO. Was
            Made With Fraudulent Intent ........................................................ - 11 -

      5.    A&F Offers No Evidence In Support Of Its Fraud
            Counterclaim ............................................................................... - 14 -

C.    LS&CO. Is Entitled To Summary Judgment On A&F's Abandonment
      Counterclaim ...................................................................................... - 14 -

      1.    Undisputed Facts Showing No Abandonment ................................. - 14 -

      2.    In Order To Be Deemed Abandoned, A Mark Must Have Lost
            All Trademark Significance .......................................................... - 17 -

D.    LS&CO. Is Entitled To Summary Judgment On A&F's Affirmative
      Defenses Of Waiver, Estoppel, Laches, Acquiescence, Consent,
      Unclean Hands, Judicial Estoppel And "Trademark Misuse" ....................... - 18 -

      1.    The Undisputed Facts Concerning A&F's Affirmative
            Defenses ..................................................................................... - 19 -

      2.    LS&CO. Is Entitled To Summary Judgment On These
            Defenses ..................................................................................... - 19 -

E.    LS&CO.'s Arcuate Trademark Is Famous Within The Meaning Of The
      Dilution Statute ................................................................................... - 21 -

      1.    The Duration, Extent, And Geographic Reach Of Advertising
            And Publicity Of The Mark ........................................................... - 22 -

      2.    The Amount, Volume, And Geographic Extent Of Sales Of
            Goods Or Services Offered Under The Mark .................................... - 23 -

# TABLE OF CONTENTS(con't)

Page

3. The Extent Of Actual Recognition Of The Mark ........................................... - 24 -

4. Whether the Mark Is Registered ..................................................................... - 25 -

III. CONCLUSION ................................................................................................... - 25 -

**TABLE OF AUTHORITIES**

Page

**Cases**

*800JR Cigar, Inc. v. GoTo.com, Inc.*,
 437 F. Supp. 2d 273 (D.N.J. 2006)..........................................................22-25

*A&M Records, Inc. v. Napster, Inc.*,
 239 F.3d 1004 (9th Cir. 2001) ..................................................................... 20

*Adidas America, Inc. v. Payless Shoesource, Inc.*,
 546 F. Supp. 2d 1029 (D. Or. 2008) ..............................................10, 18, 20-21

*Aromatique, Inc. v. Gold Seal*,
 28 F.3d 863 (8th Cir. 1994) ....................................................................... 11

*Audi AG v. D'Amato*,
 469 F.3d 534 (6th Cir. 2006) .................................................................22-23

*Badger Meter, Inc. v. Vintage Water Works Supply, Inc.*,
 341 F. Supp. 2d 1115 (N.D. Cal. 2004)............................................................. 2

*BankAmerica Pension Plan v. McMath*,
 206 F.3d 821 (9th Cir.), *cert. denied*, 531 U.S. 952 (2000) ................................. 5

*Brother Records, Inc. v. Jardine*,
 318 F.3d 900 (9th Cir.), *cert. denied*, 540 U.S. 824 (2003). ............................... 20

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) .................................................................................. 2

*Coufal Abogados v. AT&T, Inc.*,
 223 F.3d 932 (9th Cir. 2000) ....................................................................... 5

*CPI Plastics, Inc. v. USX Corp.*,
 22 F. Supp. 2d 1373 (N.D. Ga. 1998), *aff'd mem.*, 212 F.3d 599 (11th Cir. 2000) ........ 11

*eCash Technologies, Inc. v. Guagliardo*,
 210 F. Supp. 2d 1138 (C.D. Cal. 2000).......................................................6 , 11

*Electro Source, LLC v. BrandessKaltAetna Group, Inc.*,
 458 F.3d 931 (9th Cir. 2006) ..................................................................... 17

*Exxon Corp. v. Oxxford Clothes, Inc.*,
 109 F.3d 1070 (5th Cir. 1997)..................................................................... 18

*Far Out Productions, Inc. v. Oskar*,
 247 F.3d 986 (9th Cir. 2001) ..................................................................... 12

*Fila Sport, S.p.A. v. Diadora America, Inc.*,
 141 F.R.D. 74 (N.D. Ill. 1991) ................................................................... 20

**TABLE OF AUTHORITIES (con't)**

Page

*FlavORich, Inc. v. Rawson Food Services, Inc.,*
  846 F.2d 1343 (11th Cir. 1988) .................................................................. 10

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,*
  826 F.2d 837 (9th Cir. 1987) .................................................................... 21

*Golden Gate Restaurant Ass'n v. City and County of San Francisco,*
  535 F. Supp. 2d 968 (N.D. Cal. 2007) ..................................................... 1-2

*Hellauer v. NAFCO Holding Co., LLC,*
  1998 U.S. Dist. LEXIS 12029 (E.D. Pa. 1998) ......................................... 11

*In re Trademark Registration of McDonald's Corp.,*
  *Reg. No. 1,065,885*, 1984 Commr. Pat. LEXIS 10
  (Comm'er of Patents and Trademarks Apr. 10, 1984) ................................. 8

*Jada Toys, Inc. v. Mattel, Inc.,*
  518 F.3d 628 (9th Cir. 2008) .................................................................... 23

*Jordan Int'l, Inc. v. United Industries Sales Org., Inc.,*
  699 F. Supp. 268 (S.D. Fla. 1988) ........................................................... 10

*Keenan v. Allan,*
  91 F.3d 1275 (9th Cir. 1996) ...................................................................... 2

*KP Permanent MakeUp, Inc. v. Lasting Impression I, Inc.,*
  408 F.3d 596 (9th Cir. 2005) .................................................................... 10

*Kraft Foods Holdings, Inc. v. Helm,*
  205 F. Supp. 2d 942 (N.D. Ill. 2002) ....................................................... 22

*Levi Strauss & Co. v. Vivat Holdings PLC,*
  2000 TTAB LEXIS 817 (TTAB 2000) ...................................................... 16

*Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.,*
  799 F.2d 867 (2d Cir. 1986) ............................................................... passim

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
  631 F. Supp. 735 (S.D.N.Y. 1985) ...................................................... passim

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,*
  2008 U.S. Dist. LEXIS 42787 (S.D.N.Y. 2008) .................................... 22-23

*Machinery Corp. of America v. Gullfiber AB,*
  774 F.2d 467 (Fed. Cir. 1985) .................................................................. 13

*McLaughlin v. Richland Shoe Co.,*
  486 U.S. 128 (1988) ................................................................................. 12

*Metro Traffic Control v. Shadow Network,*
  104 F.3d 336 (Fed. Cir. 1997) .................................................................. 12

**TABLE OF AUTHORITIES (con't)**

Page

*Money Store v. Harriscorp Finance, Inc.*,
    689 F.2d 666 (7th Cir. 1982) ........................................................................... 7

*Nabisco, Inc. v. PF Brands, Inc.*,
    50 F. Supp. 2d 188 (S.D.N.Y.), *aff'd*, 191 F.3d 208 (2d Cir. 1999) ............... 23-25

*National Steel Corp. v. Golden Eagle Insurance Co.*,
    121 F.3d 496 (9th Cir. 1997) ........................................................................... 6

*Nissan Fire & Marine Insurance Co. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ......................................................................... 2

*Nissan Motor Co. Ltd. v. Nissan Computer Corp.*,
    2007 U.S. Dist. LEXIS 90487 (C.D. Cal. 2007) ....................................... 22-23, 25

*Pilates, Inc. v. Current Concepts, Inc.*,
    120 F. Supp. 2d 286 (S.D.N.Y. 2000) .............................................................. 6

*Plumtree Software, Inc. v. Katamize, LLC*,
    2003 U.S. Dist. LEXIS 26948 (N.D. Cal. 2003) ............................................... 10

*Ramada Franchise Systems, Inc. v. Royal Vale Hospitality of Cincinnati, Inc.*,
    2005 U.S. Dist. LEXIS 8367 (N.D. Ill. 2005) .................................................. 11

*Stash, Inc. v. Palmgard Int'l*,
    937 F. Supp. 531 (D. Md. 1996) ...................................................................... 10

*STX, Inc. v. Bauer USA*,
    43 U.S.P.Q.2d (BNA) 1492 (N.D. Cal. 1997) .................................................. 17

*Sunrise Jewelry Manufacturing Corp. v. Fred S.A.*,
    175 F.3d 1322 (Fed. Cir. 1999) .................................................................... 9, 13

*Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*,
    743 F.2d 1039 (4th Cir. 1984) ........................................................................ 18

*Switchmusic.com, Inc. v. U.S. Music Corp.*,
    416 F. Supp. 2d 812 (C.D. Cal. 2006) ............................................................ 10

*Symbol Technologies, Inc. v. Opticon, Inc.*,
    935 F.2d 1569 (Fed. Cir. 1991) ...................................................................... 13

*Tobinick v. Scripps Clinic Medical Group*,
    2002 U.S. Dist. LEXIS 9042 (C.D. Cal. 2002), *aff'd*, 2003 U.S. App. LEXIS
    23647 (9th Cir. 2003) ..................................................................................... 10

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
    768 F.2d 1001 (9th Cir. 1985), *cert. denied*, 474 U.S. 1059 (1986) ............... 18

**TABLE OF AUTHORITIES (con't)**

Page

*United States v. Cyr,*
  2004 U.S. Dist. LEXIS 15578 (D. Me. 2004) .................................................. 11

*United States v. King Features Entertainment, Inc.,*
  843 F.2d 394 (9th Cir. 1988) ..................................................................... 20

*Visa International Service Ass'n v.*
  *Bankcard Holders of America,*
  211 U.S.P.Q. (BNA) 28 (N.D. Cal. 1981) ...................................................... 17

*Zivkovic v. Southern California Edison Co.,*
  302 F.3d 1080 (9th Cir. 2002) .................................................................... 10

**Statutes**

15 U.S.C. § 1125(c) ................................................................................... 21

15 U.S.C. § 1127 ...................................................................................... 17

**Other Authorities**

6 *McCarthy on Trademarks and Unfair Competition* (4th ed. 2008) .................. 3 , 11

6A *Moore's Federal Practice* § 57.62[2][d]) ................................................. 10

Prosser & Keeton, *The Law of Torts* (4th ed. 1984) ....................................... 13

**Rules**

Federal Rules of Civil Procedure 12(b)(6) ...................................................... 6

Trademark Manual of Examining Procedure § 1605 ...................................... 7-9

I.    **INTRODUCTION AND SUMMARY OF ARGUMENT**

Levi Strauss & Co.'s ("LS&CO.") Arcuate Trademark has been used on LEVI'S® jeans since 1873 and is a genuine cultural icon.  The mark has enormous value to LS&CO., which has devoted vast resources to promoting the mark and to guarding its rights in the mark against infringers. Consumers recognize the mark in vast numbers and courts have, in strong language, sustained the mark's significance in enforcement proceedings.

When LS&CO. learned in early 2006 that Abercrombie & Fitch ("A&F") intended to use a stitching design on its Ruehl jeans that is similar to LS&CO.'s mark, LS&CO. engaged in ordinary enforcement efforts to protect its rights.  LS&CO. has been greeted with a barrage of attacks by A&F against the company and its trademark rights.  These attacks include claims that LS&CO. defrauded the PTO 25 years ago and, despite using the mark annually on hundreds of millions of garments, has abandoned its rights.  When stripped to the evidence, these claims involve nothing but criticism of a few settlement agreements (out of hundreds entered into by LS&CO. over the years), and LS&CO.'s good faith and entirely reasonable interpretation of its disclosure obligations to the PTO – an interpretation that was wholly supported by authorities that existed at the time, and is still supported today.  The same grounds are repeated as the basis for a host of affirmative defenses that either don't make sense or plainly conflict with the undisputed evidence.

LS&CO. now moves to restore this action to the core issues in dispute.  The undisputed evidence supports only one conclusion:  that LS&CO. owns a venerated and famous trademark.  The mark has not been abandoned, and LS&CO. engaged in no fraudulent communications with the PTO. LS&CO. has no unclean hands, did not waive or sit on its rights, and has done nothing to stop A&F from fairly competing.  LS&CO. shows below that these claims and defenses -- and A&F's denial that LS&CO.'s Arcuate Trademark is famous -- all summarily should be adjudged against A&F.

II.    **ARGUMENT**

A.    **Standard For Grant Of Summary Judgment Or Adjudication**

"A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims."  *Golden Gate Restaurant Ass'n v. City and County of San Francisco,*

1   535 F. Supp. 2d 968, 971 (N.D. Cal. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

2   (1986)).

3       A&F bears the burden of proof on its counterclaims and affirmative defenses.  LS&CO., as the

4   moving party on those claims and selected defenses, "must produce either evidence negating an

5   essential element of the nonmoving party's claim or defense or show that the nonmoving party does

6   not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial" in

7   order to warrant a grant of summary judgment.  *Nissan Fire & Marine Insurance Co. v. Fritz Cos.*,

8   210 F.3d 1099, 1102 (9th Cir. 2000).

9       To meet its burden to show the Arcuate Trademark's fame, LS&CO. must "produc[e] evidence

10   which would entitle it to a directed verdict if the evidence were uncontroverted at trial."  *Badger*

11   *Meter, Inc. v. Vintage Water Works Supply, Inc.*, 341 F. Supp. 2d 1115, 1119 (N.D. Cal. 2004).  A&F

12   then must "go beyond the pleadings and . . . 'identify with reasonable particularity the evidence that

13   precludes summary judgment'" in order to defeat the motion.  *Golden Gate*, 535 F. Supp. 2d at 972

14   (citation omitted).  It is not the Court's obligation "to scour the record in search of a genuine issue of

15   triable fact."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted).

16   **B.**     **LS&CO. Is Entitled To Summary Judgment On A&F's Fraud Counterclaim**

17       **1.**     **Undisputed Facts Relating To The Fraud Counterclaim**

18             **a)**     **LS&CO.'s Registrations for its Arcuate Trademark**

19       LS&CO. has used its Arcuate Trademark on LEVI'S® jeans and a variety of other products

20   since 1873.  Downey Dec. ¶ 4.  The mark was registered in 1943 (U.S. Registration No. 404,248) for

21   use on "waistband type overalls" (*i.e.*, jeans).  This registration became incontestable in 1953.  Onda

22   Dec. Ex. G.  LS&CO. obtained a registration in 1980 for the Arcuate Trademark for pants, jackets,

23   skirts, dresses and shorts (U.S. Registration No. 1,139,254).  Onda Dec. Ex. H.  This registration

24   became incontestable in 1986, following LS&CO.'s filing of the affidavit at issue here.

25       LS&CO. has additional registrations for the mark (U.S. Registration Nos. 2,791,156, registered

26   on December 9, 2003, and 2,794,649, registered on December 16, 2003, Onda Dec. Exs. I & J) which

27

28

1    are referenced in LS&CO.'s complaint in this action.[1]

2              b)    The *Lois* Litigation

3          In the early 1980's, LS&CO. enforced its Arcuate Trademark against an apparel distributor

4    called Lois Sportswear, U.S.A., Inc. ("Lois"), which was selling jeans with a stitching design that

5    infringed LS&CO.'s mark.  In December 1982, Lois brought a declaratory relief action against

6    LS&CO. in the Southern District of New York.  Cincone Dec. Ex. A.  Lois sought declarations that its

7    stitching design did not infringe LS&CO.'s mark under the Lanham Act or New York state law and

8    that LS&CO.'s infringement claims were barred by laches.  It also requested an order enjoining

9    LS&CO. from interfering with Lois's use of its stitching design.  *Id.* at 8.  Lois did *not* seek

10   cancellation of the Arcuate Trademark or ask for any other relief that would challenge LS&CO.'s

11   registration.  *Id.*

12         LS&CO. answered Lois's complaint in January 1983 and counterclaimed for infringement,

13   dilution, unfair competition, and deceptive practices under the Lanham Act and New York law.

14   Cincone Dec. Ex. B.  LS&CO. also filed a separate action against Textiles y Confecciones Europeas,

15   S.A. ("Textiles"), the Spanish company that manufactured the Lois jeans at issue, asserting identical

16   claims.  Cincone Dec. Ex. C.  Lois answered LS&CO.'s counterclaims and asserted various

17   affirmative defenses, including an allegation denominated as an "affirmative defense" that the Arcuate

18   Trademark did not function as a designation of source or origin.  Cincone Dec. Ex. D.  Lois sought the

19   same relief set forth in its declaratory relief complaint which, as noted above, did *not* include

20   _____

21   [1] This case almost entirely involves jeans.  A&F's fraud counterclaim – even if proved – would not
22   affect the registrations for jeans, or in any way the outcome of this litigation.  LS&CO. retains
     longstanding common law rights in its Arcuate Trademark regardless or whether any or all of its
23   registrations are cancelled.  *See* 6 *McCarthy on Trademarks and Unfair Competition* § 31.60 (4th ed.
     2008) ("It is difficult to understand why defendants in many trademark infringement suits expend so
24   much time, effort and money in vigorously pursuing the claim that plaintiff's federal registration was
     obtained by fraud. . . .  [E]ven if defendant succeeds in proving that the plaintiff's registration was
25   fraudulently obtained, plaintiff's common law rights in the mark continue unabated and are sufficient
     to require an injunction against an infringing defendant.").
26
     McCarthy offers one answer to his own rhetorical question, "[W]hy is fraud so vigorously pursued
27   by those charged with infringement?  Perhaps the explanation is based on the feeling that the best
     defensive strategy is to go on the offensive and accuse plaintiff of being a liar."  *Id.*
28

1   cancellation of LS&CO.'s mark. *Id.* at 5-6. Textiles made identical allegations in its answer to

2   LS&CO.'s complaint. Cincone Dec. Ex. E. The Lois and Textiles actions were subsequently

3   consolidated. Although LS&CO. was technically the counterclaimant in one action and the plaintiff in

4   the other, no party ever sought realignment. Lois and Textiles were represented by the same counsel

5   and filed joint pleadings throughout the litigation.

6       Lois and Textiles never requested cancellation of the Arcuate Trademark -- by affirmative

7   claim, counterclaim, cross-claim, request for declaratory relief, or otherwise -- either in their initial

8   pleadings or in any subsequent pleadings. To the contrary, as the lawsuit progressed, Lois and

9   Textiles expressly *disclaimed* any implication that they were seeking any finding related to the validity

10  of LS&CO.'s mark or registration.

11      The parties filed cross-motions for summary judgment. Lois and Textiles stated (for purposes

12  of their motion) that they did not dispute the validity of LS&CO.'s mark. Cincone Dec. Ex. F at 5.

13  Rather, Lois and Textiles moved solely on grounds that the Lois stitching design created no likelihood

14  of confusion. *Id.* In opposition to LS&CO.'s motion, Lois and Textiles admitted (for purposes of the

15  motion) that the Arcuate Trademark was incontestable, and therefore valid. Cincone Dec. Ex. G at 2.

16  Lois and Textiles again made clear that their defenses related only to the strength of LS&CO.'s mark

17  and the likelihood of confusion – not to any defect in the mark or registration.

18      At the hearing on the cross-motions, the attorney for Lois and Textiles, Mr. Schutzman,

19  confirmed -- without qualification -- that Lois and Textiles were raising no challenge to the validity of

20  LS&CO.'s mark or to any of its registrations. Mr. Schutzman made no reservation that his clients

21  would make such a claim at any time:

22          MR. SCHUTZMAN: . . . *We're not suggesting that the registration is
            null and void.* . . . The test is and always has been likelihood of
23          confusion and that's the test in this case. . . .

24              As far as the incontestability issue, Mr. Lee has stated that the statute
            provides a conclusive presumption of Levi's exclusive right to use that
25          mark. I say so what. *I don't dispute that it's incontestable.* I dispute
            that the use by Lois of that nonidentical stitching design constitutes
26          likelihood of [confusion].

27  Cincone Dec. Ex. H at 47-49 (emphasis added).

28

1    In September 1985, the district court granted LS&CO.'s motion and denied the cross-motions

2  of Lois and Textiles. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735 (S.D.N.Y.

3  1985). The court cited LS&CO.'s registrations for the Arcuate Trademark as well as other

4  registrations that displayed the Arcuate design, and noted:

5           *As Lois concedes*, Levi's registration of its arcuate mark has become
          incontestable under 15 U.S.C. § 1065 and constitutes conclusive
6           evidence under 15 U.S.C. § 1115(b) of the exclusive right of Levi to its
          use. Incontestability bars any defense against that registration other than
7           those set forth in 15 U.S.C. § 1115(b)(1)-(7) . . . *none of which has been
          asserted by Lois.*

8

9  *Id* at 740 (emphasis added). The court went on to find that the Arcuate Trademark "is a strong mark

10  that qualifies for a high degree of protection." *Id* at 741.

11    On January 16, 1986, LS&CO. submitted its incontestability affidavit regarding U.S.

12  Trademark Registration 1,139,254, signed by Jean Fowler, LS&CO.'s Assistant Corporate Secretary,

13  to the PTO.[2] Pursuant to Section 15 of the Lanham Act, the affidavit included the affirmation that no

14  proceeding was pending involving LS&CO.'s ownership of the mark or its rights to register the mark

15  or keep the mark on the register. Cincone Dec. Ex. I. Lois's and Textiles's notice of appeal of the

16  summary judgment order had been filed several weeks earlier. The notice identified no grounds

17  challenging LS&CO.'s mark or registration. Cincone Dec. Ex. J.

18    Lois's and Textiles's opening brief to the Second Circuit was filed on January 22, 1986. In

19  that brief, Lois and Textiles again stated that they conceded the incontestability of LS&CO.'s mark

20  ("for purposes of this motion [sic] only"). Cincone Dec. Ex. K at 42. Lois and Textiles were

21  precluded at that point, in any event, from raising any challenge to the registrations in light of their

22  prior waivers. *See, e.g., Coufal Abogados v. AT&T, Inc.*, 223 F.3d 932, 937 (9th Cir. 2000) (argument

23  waived on appeal where not offered in opposition to summary judgment motion); *BankAmerica*

24  *Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir.), *cert. denied*, 531 U.S. 952 (2000) (same);

25  _____

26  [2] LS&CO. had submitted a Section 15 affidavit in connection with the same registration on May 15,
   1985; the PTO rejected that affidavit because it was submitted prematurely. Accordingly, this Court
27  has already dismissed A&F's fraud counterclaim to the extent it relates to that first affidavit. Order,
   April 22, 2008 (Docket No. 88).

28

1    *National Steel Corp. v. Golden Eagle Insurance Co.*, 121 F.3d 496, 500 (9th Cir. 1997) (same).

2        The Second Circuit affirmed the grant of summary judgment for LS&CO. in August 1986,

3  emphasizing again the undisputed strength of the mark. *Lois Sportswear U.S.A., Inc. v. Levi Strauss*

4  *& Co.*, 799 F.2d 867, 869, 873 (2d Cir. 1986).

5                  **c)    This Court's Order Regarding A&F's Counterclaim**

6        On March 7, 2008, LS&CO. moved to dismiss A&F's counterclaims pursuant to Fed. R. Civ.

7  P. 12(b)(6). On April 22, 2008, this Court granted LS&CO.'s motion in part and denied it in part.

8  The Court dismissed A&F's counterclaim to the extent it related to LS&CO.'s May 1985

9  incontestability affidavit, which had been rejected by the PTO as premature. Order (Docket No. 88) at

10  3. The Court declined to dismiss A&F's allegations as to the second affidavit, noting that LS&CO.

11  was not the plaintiff in the *Lois* litigation. The Court held that depending on the allegations in Lois's

12  declaratory relief action, this case might be distinguished from case law holding that there was no duty

13  to disclose ordinary infringement litigation in the absence of a counterclaim:

14            *If* LS&CO. had been the plaintiff in the *Lois* litigation, the Court would
          not hesitate to find the *Sunrise Jewelry* case controlling. However,

15            given the difference in the procedural posture between parties in this
          case and the parties in the infringement action in the *Sunrise Jewelry*

16            case, and although LS&CO. would have had the burden of proof to
          show the plaintiff in the *Lois* litigation infringed its marks, the Court

17            cannot say *as a matter of law*, based on TMEP § 1604.03, that LS&CO.
          had no duty to disclose the *Lois* litigation.

18

19  Order at 5 (emphasis added). Although it held the pleading was sufficient, the Court observed that

20  "Abercrombie may be facing an uphill battle" on its fraud claim. *Id.*

21           **2.    A Party Alleging Trademark Fraud Bears A "Heavy Burden Of Proof"**

22        Trademark fraud is a "disfavored defense," and "the party alleging fraud bears a 'heavy'

23  burden of proof." *eCash Technologies, Inc. v. Guagliardo*, 210 F. Supp. 2d 1138, 1149 (C.D. Cal.

24  2000). "Fraud in a trademark cancellation is something that must be 'proved to the hilt' with little or

25  no room for speculation or surmise; considerable room for honest mistake, inadvertence, erroneous

26  conception of rights, and negligent omission; and any doubts resolved against the charging party."

27  *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 313 (S.D.N.Y. 2000). Moreover, "[f]raud

28  must be shown by clear and convincing evidence in order to provide a basis for either cancellation or

PL.'S MOTION FOR SJ
AND FOR PARTIAL SJ AS TO DILUTION       - 6 -   *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*
                                           Case No. C 07-03752 JSW

1    damages." *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 670 (7th Cir. 1982) (citing cases).

2             **3.     There Was No Misrepresentation In LS&CO.'s Section 15 Affidavit**

3                   **a)     Disclosure Of The Pending *Lois* Lawsuit Was Not Required Because**

4                                  **Lois Did Not Seek Cancellation Of LS&CO.'s Mark**

5         Section 15 of the Lanham Act, 15 U.S.C. § 1065, provides that a trademark can become

6    incontestable five years after it has registered provided the owner files an affidavit with the PTO

7    stating, *inter alia*, that "(1) there has been no final decision adverse to registrant's *claim of ownership*

8    of such mark for such goods or services, or to registrant's *right to register* the same or to *keep the*

9    *same on the register*; and (2) there is no proceeding *involving said rights* pending in the Patent and

10   Trademark Office or in a court and not finally disposed of."  (Emphasis added.)

11        Nothing in Section 15 suggests that all infringement litigation necessarily "involves" the

12   registrant's rights to own, register, or maintain registration of the mark – even though all such

13   litigation inherently requires the trademark owner to establish the validity of its mark.  If Section 15

14   were intended to require disclosure of *all* pending infringement litigation, it would not have been

15   necessary to specify only those proceedings that "involve" the enumerated rights.  Accordingly, the

16   PTO has construed Section 15 to require disclosure only of affirmative claims involving the owner's

17   rights:

18             The USPTO does not consider a proceeding involving the mark in
          which the owner is the plaintiff, *where there is no counterclaim*

19             *involving the owner's rights in the mark*, to be a "proceeding involving
          these rights" that would preclude the filing or acknowledgment of a §15

20             affidavit.

21   *Trademark Manual of Examining Procedure* ("TMEP") § 1605.04 (5th ed. 2007) (emphasis added),

22   Cincone Dec. Ex. L.  This rule is specifically intended to provide guidance to trademark applicants

23   and registrants about how the trademark laws and rules should be understood.  *See* TMEP, Foreward

24   to the Fifth Edition ("The Manual is published to provide trademark examining attorneys in the

25   USPTO, trademark applicants, and attorneys and representatives for trademark applicants, with a

26   reference work on the practices and procedures relative to prosecution of applications to register

27

28

1   marks in the USPTO.").[3]

2       The TMEP's current guidelines concerning Section 15 affidavits were implemented in January

3   1986, *before* LS&CO.'s affidavit was filed. The guidelines were revised at that time to reflect the

4   mandate of the Commissioner of Trademarks issued in 1984 in *In re Trademark Registration of*

5   *McDonald's Corp., Reg. No. 1,065,885*, 1984 Commr. Pat. LEXIS 10 (Comm'er of Patents and

6   Trademarks Apr. 10, 1984) ("*McDonald's*"). In that case, McDonald's Section 15 affidavit was not

7   accepted by the PTO "based on the examiner's observation that a civil action was pending and not

8   finally disposed of." *Id.* McDonald's argued that disclosure was not required because only an

9   ordinary infringement action was pending and the defendant had not filed a counterclaim challenging

10  McDonald's rights to the registration. *Id.*

11      The Commissioner agreed that the matter need not have been disclosed:

12          [I]t has been office practice to withhold stamping the Search Library
            copies [of a Section 15 affidavit] if the registration is involved in any
13          civil proceeding, without looking to the nature of the proceeding to
            determine if it involves the rights contemplated by Section 15.
14

15          *I believe this practice is inappropriate since it is stricter than the
            requirements set forth in Section 15. Also, the practice penalizes those
            registrants who are attempting to protect their acquired rights by
16          bringing suit against alleged infringers.*

17          Therefore, the current office practice on Section 15 affidavits is hereby
            ordered changed. The Search Library copies of a registration may be
18          stamped with the appropriate Section 15 notation if the registration is
            not involved in a proceeding which *challenges* the rights indicated in
19          Section 15.

20  *Id.* (emphasis added). Following the Commissioner's directive, the TMEP was revised as quoted

21  above to reflect the Commissioner's interpretation of Section 15 – that infringement actions need not

22  be disclosed unless the proceeding affirmatively challenges the rights enumerated in the statute.[4]

23      The only federal court decision (to LS&CO.'s knowledge) to apply the PTO's rule regarding

24  _____

25  [3] If a defective Section 15 affidavit is submitted, the PTO does not cancel the mark. Rather, it simply
    refuses to acknowledge receipt of the affidavit, and sends the owner a written notice. The owner has
26  the option of filing a new affidavit, but is not required to do so. TMEP § 1605.

27  [4] The relevant section of the 1986 TMEP was § 1604.03. Cincone Dec. Ex. M. The current provision,
    which is substantively identical, is TMEP § 1605.04. Cincone Dec. Ex. L.

28

1    the proper scope of disclosure under Section 15 is *Sunrise Jewelry Manufacturing Corp. v. Fred S.A.*,

2    175 F.3d 1322, 1327 (Fed. Cir. 1999) -- a case that confirms that LS&CO. was not fraudulent in

3    omitting the *Lois* litigation from its Section 15 affidavit. *Sunrise* involved a registration obtained by

4    the defendant, Fred S.A., in 1990.  In April 1995, Fred brought an action for infringement of its mark.

5    Also in April 1995, a separate action that included a petition to cancel Fred's mark was dismissed

6    pursuant to settlement.  After the petition to cancel was withdrawn (but before the cancellation

7    proceeding was terminated), Fred filed its Section 15 affidavit without disclosing the still pending

8    cancellation proceeding or the infringement action. *Id.* at 1327.  Shortly after Fred submitted its

9    affidavit, the infringement defendants in the April 1995 action filed a counterclaim challenging the

10   validity of Fred's mark.  Sunrise subsequently petitioned to cancel Fred's registration on grounds of

11   fraud.

12        The TTAB rejected the fraud petition, and the Federal Circuit affirmed.  As to the first

13   cancellation proceeding, the court held that -- even though the proceeding had not been terminated as

14   of the time the affidavit was filed -- a withdrawal already had been filed and therefore "it would have

15   been reasonable to believe that no proceeding was pending." *Id.* at 1327.  As to the second

16   proceeding, even though a trademark infringement action was pending at the time the Section 15

17   affidavit was filed, the court held that the affidavit was not fraudulent because the second cancellation

18   claim was not yet pending at the time the affidavit was submitted. *Id.*

19        As the Court anticipated in its order on LS&CO.'s motion to dismiss, Lois as the plaintiff

20   might have asserted challenges to the registrations that made a difference under these authorities.  But

21   the undisputed evidence shows that in fact, no allegation in the *Lois* declaratory relief action raised

22   any challenge to LS&CO.'s rights in its mark.  Absent such allegations, nothing in *Sunrise* or the

23   PTO's rule suggests that the question whether *Lois* was a "proceeding involving said rights" under

24   Section 15 should be affected by the fact that, technically, one of the parties would have been a "cross-

25   claimant" rather than "counterclaimant" if it had chosen to challenge LS&CO.'s mark.  Numerous

26   federal courts have held that a trademark owner facing a declaratory relief action retains the burden of

27   proof and is naturally aligned as the "plaintiff," as TMEP § 1605.04 assumes. *See Plumtree Software,*

28   *Inc. v. Katamize, LLC*, 2003 U.S. Dist. LEXIS 26948 at *11 (N.D. Cal. 2003) (where defendant in

1   declaratory relief action filed cross-claims for patent infringement, that party was the "natural

2   plaintiff" with the burden of proof both on its counterclaim and in the declaratory relief action); *see*

3   *also Switchmusic.com, Inc. v. U.S. Music Corp.*, 416 F. Supp. 812, 820 (C.D. Cal. 2006) ("In

4   trademark cases . . . any role reversal occasioned by declaratory relief should not shift the burden of

5   proof from the manner in which it would be assigned in a coercive infringement suit.") (citing 6A

6   *Moore's Federal Practice* § 57.62[2][d]); *see also Stash, Inc. v. Palmgard Int'l*, 937 F. Supp. 531, 534

7   (D. Md. 1996) (same); *Jordan Int'l, Inc. v. United Industries Sales Org., Inc.*, 699 F. Supp. 268, 270

8   n.1 (S.D. Fla. 1988) (same).  The undisputed evidence establishes that the substantive positions of

9   Lois and Textiles did not differ as a result of the different procedural postures of the two cases – in

10  fact, they did not differ at all.  *A&F's own expert* conceded that LS&CO. was in the position of the

11  plaintiff for purposes of the consolidated cases.  Cincone Dec. Ex. N at 43:15-24.

12                          **b)      The "Affirmative Defense" Does Not Affect The Analysis**

13          A&F's reliance on Lois's and Textiles's affirmative defense is misguided.  The "affirmative

14  defense" that LS&CO.'s Arcuate Trademark did not serve as a mark was not actually a defense at all,

15  and added nothing to the contested issues involved in LS&CO.'s infringement action.[5]  The validity of

16  the plaintiff's trademark is always at issue in a trademark infringement action, because it is an element

17  of the plaintiff's claim.  *See, e.g., KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d

18  596, 602 (9th Cir. 2005) ("Before infringement can be shown, the trademark holder must demonstrate

19  that it owns a valid mark, and thus a protectable interest.").

20  _____

21  [5] "A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative
    defense." *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002); *see also*
22  *Flav-O-Rich, Inc. v. Rawson Food Services, Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense
    which points out a defect in the plaintiff's prima facie case is not an affirmative defense.").  All Lois's
23  affirmative defenses sought to do was negate the validity of LS&CO.'s mark, which is not the function
    of an affirmative defense.  *See Tobinick v. Scripps Clinic Medical Group*, 2002 U.S. Dist. LEXIS
24  9042 at *37-38 (C.D. Cal. 2002) ("The validity of Plaintiffs' mark is an element of their claim for
    infringement; *it is not an affirmative defense or counterclaim to be raised by Defendant.*") (emphasis
25  added), *aff'd*, 2003 U.S. App. LEXIS 23647 (9th Cir. 2003); *see also Adidas America, Inc. v. Payless*
    *Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1077 (D. Or. 2008) ("To the extent that Payless alleges
26  adidas' rights have been weakened or diluted by third-party uses (but not to the point of losing all
    trademark significance), this is not an affirmative defense, but rather a part of the likelihood of
27  confusion analysis.").

28

1    Even if Lois and Textiles had included a genuine affirmative defense, the distinction between

2  affirmative defenses and counterclaims is significant.  "Counterclaims . . . are readily distinguishable

3  from affirmative defenses in that they seek affirmative relief on behalf of a defendant."  *CPI Plastics,*

4  *Inc. v. USX Corp.*, 22 F. Supp. 2d 1373, 1377 (N.D. Ga. 1998), *aff'd mem.*, 212 F.3d 599 (11th Cir.

5  2000); *see also Ramada Franchise Systems, Inc. v. Royal Vale Hospitality of Cincinnati, Inc.*, 2005

6  U.S. Dist. LEXIS 8367 at *37 (N.D. Ill. 2005) ("Counterclaims and affirmative defenses are different

7  in that a counterclaim seeks affirmative relief whereas an affirmative defense only attempts to defeat a

8  plaintiff's cause of action.");  *United States v. Cyr*, 2004 U.S. Dist. LEXIS 15578 at *2 n.1 (D. Me.

9  2004) (same, quoting *Black's Law Dictionary* (8th ed. 2004)); *Hellauer v. NAFCO Holding Co., LLC*,

10  1998 U.S. Dist. LEXIS 12029 at *11-12 (E.D. Pa. 1998) ("the counterclaims are bases on which a jury

11  can award damages while the affirmative defenses are merely ways in which defendant can avoid

12  liability").  If a defendant counterclaims for cancellation, the court must rule one way or another

13  whether the mark should be cancelled.  But if the defendant merely argues (as Lois did) that the mark

14  has been inadequately policed or has become diluted due to third party use, but does not affirmatively

15  seek cancellation, the court need only decide whether the plaintiff has met its burden to prove a valid

16  mark as an element of its infringement claim.  *See, e.g., Harley-Davidson, Inc. v. Grottanelli*, 91 F.

17  Supp. 2d 544, 547 (W.D.N.Y. 2000) (denying request to cancel plaintiff's mark: "[G]iven the

18  permissive language of the statute, and the fact that *the defendant never interposed a counterclaim for*

19  *cancellation of the trademarks*, raising the issue only after the case was remanded from the Second

20  Circuit, the court declines defendant's invitation to cancel the . . . registrations.  The defendant can

21  make such application to the United States Patent and Trademark Office.") (emphasis added).

22      **4.**    **A&F Cannot Prove That Any Omission By LS&CO. Was Made With**
    **Fraudulent Intent**

23

24    "A statement in an application or representation to the PTO may be 'false,' without being

25  'fraudulent.'  Statements of honest, but perhaps incorrect belief or innocently made inaccurate

26  statements of fact do not constitute 'fraud.'  Fraud arises only when the party making a false statement

27  of fact knows that the fact is false. . . ."  *eCash*, 210 F. Supp. 2d at 1149 (quoting *McCarthy, supra*, §

28  31.66 at 31-117 and 31-118); *see also Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 877 (8th Cir. 1994)

1 ("In order to show that an applicant defrauded the PTO the party seeking to invalidate a mark must

2 show that the applicant *intended to mislead the PTO*.") (emphasis added).

3      The importance of the intent requirement was emphasized by the Ninth Circuit in *Far Out*

4 *Productions, Inc. v. Oskar*, 247 F.3d 986 (9th Cir. 2001).  Far Out was accused of fraud because it

5 submitted a Section 15 affidavit to the PTO that did not disclose that a judgment had been issued in

6 Florida state court concluding that Far Out's trademark had been procured by fraud.  The court held

7 that because the Florida judgment had been vacated by agreement, Far Out did not commit fraud by

8 failing to disclose it.  More importantly, the court noted:

9         Even if the Florida judgment were a final adverse decision, Goldstein
[the affiant] can only be adjudicated to have filed a fraudulent oath if he
acted with scienter.  If Goldstein had a *good faith belief* that the Florida
10         judgment was irrelevant, he cannot be found to have submitted a false
affidavit.  The appellants did not present any evidence, either on appeal
11         or, apparently, in the district court, that Goldstein acted in bad faith or
with knowledge that he should have disclosed the Florida judgment.
12         Since the appellants did not present any evidence of Goldstein's state of
mind, they did not even meet their initial burden in moving for summary
13         judgment.

14

15 *Id.* at 996 (emphasis added).

16      In applying this standard in the context of A&F's claim, it is important to recognize that the

17 purported disclosure requirement does not cover only matters of mere fact, such as the date of first

18 use.  Rather, it requires a registrant to determine whether there is a pending proceeding "*involving*" the

19 registrant's right to own or register its mark or maintain the mark on the register.  *See* 15 U.S.C. §

20 1065.  Whether such a legal requirement fraudulently has been violated requires at least a showing of

21 recklessness, from an objective standpoint, in assessing the legal scope of the disclosure obligation.

22 *Cf. McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 n.13 (1988) (where an employer acts

23 "unreasonably, but not recklessly, in determining its legal obligation," its conduct is not willful).  If

24 the issue is one about which reasonable minds may differ, that is dispositive of any claim of fraud.

25 *See, e.g., Metro Traffic Control v. Shadow Network*, 104 F.3d 336, 341 (Fed. Cir. 1997) (no error in

26 TTAB's finding that false statements in declaration to PTO were not fraudulent where declarant had

27

28

1    "an unclear understanding of the legal implications of his statement" but no intent to mislead).[6]

2    Even if LS&CO.'s interpretation of the statute – an interpretation that is entirely consistent

3    with the PTO's and the *Sunrise* court's conclusion that no disclosure was required – were wrong, there

4    is no evidence that LS&CO. was reckless or acted in bad faith or with fraudulent intent in construing

5    the statute, or with knowledge that it should have disclosed the *Lois* appeal then pending.[7]  Instead, the

6    most reasonable interpretation of Section 15 would convey that no disclosure was required.  Certainly

7    there was no manifest bad faith in an interpretation that – except for immaterial procedural distinctions

8    – was on all fours with PTO rules and case law.

9    Finally, even if LS&CO. had assumed that Lois's form "affirmative defenses" required

10   disclosure when they were pending, the district court action had terminated and Lois and Textiles had

11   waived any assertions regarding the validity of the mark as of the time LS&CO. filed its affidavit.

12   Although they had filed their appeal, that proceeding could not have involved any invalidity challenge,

13   even if Lois and Textiles had tried to make one.  Even if the Second Circuit had resurrected the *Lois*

14   case and Lois subsequently had challenged LS&CO.'s mark, LS&CO.'s affidavit would have

15   remained operative.  *See Sunrise*, 175 F.3d at 1327 (no continuing duty to update a Section 15

16   affidavit even where counterclaim challenging validity is subsequently filed).

17   LS&CO. acted in complete good faith in concluding that no disclosure was necessary.  The

18   absence of any evidence that LS&CO. acted with fraudulent intent or in reckless disregard of its legal

19   obligations is dispositive of A&F's fraud claim.  *See Sunrise*, 175 F.3d at 1327 ("reasonable belief"

20

21   [6] A&F's expert testified that gross negligence is sufficient for a finding of trademark fraud.  Cincone

22   Dec. Ex. N at 35:20-36:3.  This is not precisely true; the Federal Circuit has held, even in the patent
     context, that "a finding of gross negligence 'does not of itself justify an inference of intent to deceive;

23   the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith,
     must indicate sufficient culpability to require a finding of intent to deceive.'" *Symbol Technologies,*

24   *Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1582 (Fed. Cir. 1991) (citation omitted).  In any event,
     LS&CO.'s conduct does not amount to gross negligence, which requires "willful, wanton, or reckless

25   misconduct, or evidence of 'utter lack of all care.'" *Machinery Corp. of America v. Gullfiber AB*, 774
     F.2d 467, 473 (Fed. Cir. 1985) (citing Prosser & Keeton, *The Law of Torts* § 34 (4th ed. 1984)).

26   [7] LS&CO.'s expert, Rany Simms -- a TTAB Judge for many years -- opined without contradiction that

27   there is no question that LS&CO.'s interpretation is a fair and good faith assessment of the disclosure
     requirement.  Simms Dec. Ex. A at 9.

28

1  that proceeding involving challenge to mark was terminated is sufficient to avoid any fraud).

2  ### 5.    A&F Offers No Evidence In Support Of Its Fraud Counterclaim

3  A&F has no evidence to offer in support of its counterclaim.  A&F dodged LS&CO.'s request

4  that it identify the specific allegations made in the *Lois* litigation that "involved" LS&CO.'s right to

5  register the Arcuate Trademark or keep the mark on the register.  Cincone Dec. Ex. O.  A&F's

6  response referenced its entire withdrawn motion for summary adjudication of its fraud counterclaim

7  and its brief in opposition to LS&CO.'s motion to dismiss, neither of which refers to any evidence that

8  has not been addressed above.

9  A&F has produced an expert report from David J. Kera, an attorney in private practice who

10  served as a TTAB administrative judge from 1975 to 1981.  Cincone Dec. Ex. P.  LS&CO. does not

11  believe that Mr. Kera's report will assist the Court in deciding this issue, because Mr. Kera simply

12  analyzes the law just as the Court will do – or, more accurately, Mr. Kera's report analyzes what he

13  believes the law *should* be.  Mr. Kera testified that the *McDonald's* decision, the TMEP rule codifying

14  that decision, and the Federal Circuit's opinion in the *Sunrise* case all misinterpreted Section 15.

15  Cincone Dec. Ex. N at 62:17-63:1, 67:16-70:7.  Even if Mr. Kera were correct and all of the governing

16  law were wrong, this would not alter the fact that LS&CO.'s interpretation of that governing law was

17  entirely reasonable and therefore dispositive on the absence of fraudulent intent.

18  ### C.    LS&CO. Is Entitled To Summary Judgment On A&F's Abandonment
19  ### Counterclaim

20  A mark still in use is abandoned only if it has lost *all* trademark significance.  The undisputed

21  evidence establishes that – far from having lost its trademark significance – LS&CO.'s mark is widely

22  recognized among consumers as an identifier of the LEVI'S® brand and is famous within the meaning

23  of the dilution provisions of the Lanham Act.  *See* Section E, below.

24  ### 1.    Undisputed Facts Showing No Abandonment

25  A&F's abandonment counterclaim rests on isolated instances of allegedly inadequate or

26  inconsistent policing of LS&CO.'s mark:  two cases in which A&F contends that LS&CO. should

27  have sued for infringement but did not, and one case in which LS&CO. sued for infringement and then

28  settled with the defendant.  A&F asserts that all of LS&CO.'s registrations for its mark should be

1    cancelled because "LS&CO.'s (i) inconsistent and contradictory enforcement of its arcuate trademark;

2    (ii) its failure to adequately police and/or control uses of same; and (iii) its own inconsistent use of its

3    own trademark, constitute 'abandonment' as that term has been defined in this Circuit."

4    (Counterclaims ¶ 29.)[8]

5        The truth regarding LS&CO.'s efforts to enforce its Arcuate Trademark are strikingly different

6    from A&F's account.  Over the last decade and a half alone, LS&CO. has initiated some 450

7    enforcement actions related to the Arcuate Trademark, including about 150 lawsuits in federal court.

8    These actions have involved at least 250 different infringers and over 500 infringing stitching designs.

9    Onda Dec. ¶ 4.  Virtually all of these enforcement actions resulted in the infringing designs being

10   pulled off the market and kept off the trademark register.  *Id.*

11       Courts in previous cases have held (contrary to A&F's allegation) that the Arcuate Trademark

12   is a strong indicator of source.  As already noted, the district court in the *Lois* litigation granted

13   summary judgment to LS&CO. and emphasized the strength of LS&CO.'s mark.  *Lois Sportswear*,

14   631 F. Supp. at  740.  In affirming the grant of summary judgment, the Second Circuit again described

15   LS&CO.'s mark as an exceedingly effective brand identifier:

16           In many ways the back pocket stitching pattern has become the
             embodiment of Levi Jeans in the minds of jeans buyers.  The record is
17           replete with undisputed examples of the intimate association between
             the stitching pattern and appellee's products in the buying public's
18           mind. . . .  [A]ppellee's back pocket stitching pattern is a fanciful
             registered trademark with a very strong secondary meaning.  *Virtually
19           all jeans consumers associate the stitching pattern with appellee's
             products.*  We agree with the district court that the evidence indicates as
20           a matter of law that appellee's stitching pattern is a very strong mark.

21   *Lois Sportswear, U.S.A, Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 869, 873 (2d Cir. 1986) (emphasis

22   added) .

23       The TTAB also has confirmed that the Arcuate Trademark is a strong mark.  In sustaining

24   _____

25   [8] In response to LS&CO.'s interrogatory asking A&F to state whether it believed LS&CO. had
     abandoned its rights in the Arcuate Trademark, A&F merely referenced "A&F's Summary
26   Adjudication Motion, its initial and supplemental disclosures, LS&CO.'s enforcement documents
     including documents relating to third-party litigation, and LS&CO.'s enforcement efforts."  Cincone
27   Dec. Ex. R.  These are the only assertions A&F makes in those documents.

28

1  LS&CO.'s opposition to an application to register a pocket stitching design, the TTAB held,

2  "[LS&CO.] has clearly demonstrated that its [Arcuate Trademark] is very strong and well-known for

3  clothing, especially jeans." *Levi Strauss & Co. v. Vivat Holdings PLC*, 2000 TTAB LEXIS 817 at *17

4  (TTAB 2000). The evidence confirms that the conditions relied on by these courts continue to prevail.

5  Since these decisions issued, billions of dollars more of LEVI'S® products bearing the mark have

6  been sold, and hundreds of millions of dollars more of the company's resources have been spent to

7  reinforce the association between the mark and the LEVI'S® brand. Mitchell Dec. ¶¶ 3-6; Hanson

8  Dec. ¶¶ 9-10.

9      A recent survey confirms the high degree of consumer recognition of LS&CO.'s mark. Sood

10  Dec. Ex. A. Dr. Sanjay Sood, Associate Professor of Marketing at UCLA's Anderson Graduate

11  School of Management and an expert on marketing and brand management issues, conducted a survey

12  at LS&CO.'s request. The survey asked 302 survey participants to look at three color photographs

13  depicting the back pockets of three different brands of jeans: LEVI'S®, LEE®, and LUCKY®. The

14  latter two brands were chosen as controls because these brands, and their distinctive pocket stitching

15  designs, have been in the marketplace for many years. *Id*. at 6. Participants were then asked if they

16  had seen each style of pocket stitching before; if they associated the style of pocket stitching with one

17  brand or company or more than one; and if they could name the brand(s) or company(ies) they

18  associated with that product. *Id*.

19      Of the approximately 300 participants, 77% said they had seen the LEVI'S® pocket stitching

20  before (as compared with 50% and 47% for Lee and Lucky respectively), 54% said they associated the

21  stitching with one brand or company (as compared with 26% and 23% for Lee and Lucky), and *over*

22  *half* of the participants – 159 out of 302, or 53% – correctly identified LEVI'S® jeans from the

23  photograph of the back pocket stitching. This compares with 48 participants who correctly identified

24  the Lee jeans, and only six who correctly identified the Lucky jeans. *Id*. at 6-7.

25      Based on these findings, Dr. Sood opined that "LS&CO.'s jeans are highly recognized"; that

26  "LS&CO.'s pocket stitching is a source identifier for LS&CO.'s jeans products"; and that

27  "[c]onsumers recognize the back pocket stitching as a trademark on LS&CO.'s products and associate

28  it exclusively with LS&CO.'s products." *Id*. at 3-4. A&F offered no contrary survey or evidence

1  from its expert in support of its abandonment counterclaim. Cincone Dec. Ex. R.

2         **2.**     **In Order To Be Deemed Abandoned, A Mark Must Have Lost All**
3                  **Trademark Significance**

4         The Lanham Act states that a mark "shall be deemed to be 'abandoned' . . . [w]hen any course

5  of conduct of the owner, including acts of omission as well as commission, causes the mark to become

6  the generic name for the goods or services on or in connection with which it is used or otherwise to

7  lose its significance as a mark." 15 U.S.C. § 1127.[9]  The challenger must show "strict proof" of

8  abandonment. *Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 935 n.2 (9th

9  Cir. 2006) (citing cases).

10         A&F alleges abandonment based on LS&CO.'s supposedly inconsistent enforcement of its

11  rights in the mark. This is not true, as demonstrated by LS&CO.'s overwhelming showing of its

12  enforcement. But even if it were, numerous courts – including this Court -- have explicitly rejected

13  the contention that inconsistent enforcement constitutes abandonment where the trademark retains any

14  significance as a source indicator. For example, in 1981, this Court rejected an abandonment defense

15  that was based on third party use, stating, "The existence of others engaged in the same acts of

16  trademark infringement and unfair competition is irrelevant and is no defense against the trademark

17  proprietor's suit against a particular infringer." *Visa International Service Ass'n v. Bankcard Holders*

18  *of America*, 211 U.S.P.Q. (BNA) 28, 35 (N.D. Cal. 1981).

19         More recently, a defendant argued that the plaintiff had abandoned its mark because it was

20  "aware of widespread, unlicensed, infringing use . . . by third parties but [had] taken no action against

21  such use." *STX, Inc. v. Bauer USA*, 43 U.S.P.Q.2d (BNA) 1492 (N.D. Cal. 1997). This Court rejected

22  the abandonment defense, stating that "evidence of other potential infringers is 'irrelevant' to a suit

23  against a particular infringer." *Id.* (quoting *Visa International, supra*). In another case, the Ninth

24  Circuit affirmed a jury's determination that there was insufficient evidence of abandonment and

25

26  [9] Abandonment also consists of non-use of the mark with intent not to resume use. 15 U.S.C. § 1127.
27  This provision obviously is inapplicable here, as LS&CO.'s use of the Arcuate Trademark remains
   extensive. *See generally* Mitchell Dec.; Hanson Dec.

28

1    concluded, "An owner is not required to act immediately against every possible infringing use to avoid

2    a holding of abandonment.  Such a requirement would unnecessarily clutter the courts." *Transgo, Inc.*

3    *v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1018 n.1 (9th Cir. 1985) (citations omitted), *cert.*

4    *denied*, 474 U.S. 1059 (1986); *see also Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1080

5    (5th Cir. 1997) ("absent an ultimate showing of loss of trade significance, [abandonment] is not

6    available as a defense against an infringement suit"); *Sweetheart Plastics, Inc. v. Detroit Forming,*

7    *Inc.*, 743 F.2d 1039, 1048 (4th Cir. 1984) ("Evidence of a trademark owner's failure to prosecute

8    infringers is relevant to a determination of the defense of abandonment only where such failure

9    amounts to the mark's losing significance as an indication of source.").

10        Most recently, the district court in the *Adidas* trademark infringement litigation held that

11    Payless's abandonment defense – alleging that Adidas had abandoned its "three-stripe" trademark

12    rights by permitting third parties to use infringing designs – "is not a cognizable defense or

13    counterclaim. . . .  To the extent that Payless alleges adidas' rights have been weakened or diluted by

14    third-party uses (but not to the point of losing all trademark significance), this is not an affirmative

15    defense, but rather a part of the likelihood of confusion analysis." *Adidas America, Inc. v. Payless*

16    *Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1077 (D. Or. 2008).  Because the Arcuate Trademark

17    undeniably continues to function as a trademark and has done so continuously for 135 years, LS&CO.

18    has not abandoned its mark under the law, and LS&CO. is entitled to summary judgment on this

19    counterclaim.[10]

20        **D.    LS&CO. Is Entitled To Summary Judgment On A&F's Affirmative Defenses Of**
              **Waiver, Estoppel, Laches, Acquiescence, Consent, Unclean Hands And**
21            **"Trademark Misuse"**

22        In its Amended Answer, A&F asserted affirmative defenses of waiver (¶ 51), estoppel (¶ 52),

23    laches and acquiescence (¶ 53), consent (¶ 54), unclean hands (¶ 57), and "trademark misuse" (¶ 60).

24    All of these purported defenses rely on the same set of allegations as LS&CO.'s fraud and

25    abandonment counterclaims, and LS&CO. is entitled to summary judgment on all of them.

26    _____

27    [10] The affirmative defense of abandonment, Amended Answer ¶ 58, also should be dismissed for the
      same reasons.

28

**1.    The Undisputed Facts Concerning A&F's Affirmative Defenses**

A&F filed its intent to use application with the PTO to register its infringing stitching design on December 5, 2005. Cincone Dec. Ex. S. As early as January 2006, LS&CO.'s in-house counsel informed then-counsel for A&F that LS&CO. objected to the design. Onda Dec. ¶ 16. As of early March 2006, A&F's in-house counsel was discussing with A&F employees a "Possible Levi challenge of new Ruehl women's pocket design." Cincone Dec. Ex. T. From that point on, A&F proceeded with notice that LS&CO. believed the design was infringing.

On January 16, 2007, A&F's application (now including only jackets) published in the Official Gazette; LS&CO. opposed the application on February 9, 2007. Cincone Dec. Ex. U. The parties exchanged discovery requests in the PTO proceeding in May and June, 2007. From A&F's discovery responses, LS&CO. learned that the design was in use on Ruehl, not Abercrombie, jeans. Cincone Dec. Ex. V. LS&CO. filed this lawsuit in July, 2007.

**2.    LS&CO. Is Entitled To Summary Judgment On These Defenses**

LS&CO. asked A&F to state all facts supporting its claims of waiver, estoppel, laches and acquiescence, and consent. In response to each of these discovery requests, A&F set forth exactly the same argumentative responses, which essentially duplicate the allegations in A&F's counterclaims – asserting that LS&CO. engaged in fraud; made "outrageous" claims of infringement in order to "stifle and snuff out" competition in the jeans market; and took inconsistent positions in its infringement claims. A&F also stated that LS&CO. was aware of A&F's intent to use its infringing stitching design in December 2005, but did not file this action until July 2007 and did not notify the PTO that it "planned to object to A&F's intent to use" the infringing design. Cincone Dec. Ex. P at 4-9. With regard to the unclean hands and "misuse" defenses, A&F merely references the factual allegations in support of its counterclaims for cancellation. Amended Answer ¶¶ 57, 60.

There is no evidence to support any of these defenses. LS&CO. became aware of A&F's application even before the PTO published the mark, by means of a watch notice. It promptly called A&F's counsel to register its objections. Onda Dec. ¶ 16. LS&CO. opposed A&F's application as soon as it published. At that time, a federal court action did not appear permissible as the application only stated an intent to use. *See Fila Sport, S.p.A. v. Diadora America, Inc.*, 141 F.R.D. 74, 75 (N.D.

1    Ill. 1991) ("The mere filing of an intent-to-use application . . . does not confer jurisdiction on the

2    federal courts."). LS&CO. filed this case promptly after it became aware that the design was being

3    used on jeans. Cincone Dec. Ex. V.

4        The Ninth Circuit "applie[s] laches to bar infringement claims 'only where the trademark

5    holder *knowingly* allowed the infringing mark to be used without objection *for a lengthy period of*

6    *time.*'" *Brother Records, Inc. v. Jardine*, 318 F.3d 900, 909 (9th Cir.) (emphasis added), *cert. denied*,

7    540 U.S. 824 (2003). Laches requires a showing of both unreasonable delay and prejudice. *Adidas*,

8    546 F. Supp. 2d at 1069. A&F could not reasonably have relied or suffered any prejudice based on

9    any assumption that LS&CO. agreed to its use of the infringing design, as LS&CO. made its

10   objections to the design clear at every juncture: discovery of the application, publication of the

11   application, and discovery of A&F's use.

12       A&F also offers no evidence identifying how LS&CO.'s repeated challenges to A&F's

13   stitching possibly could support estoppel, as A&F was well aware of LS&CO.'s repeated challenges

14   to its design. *See United States v. King Features Entertainment, Inc.*, 843 F.2d 394, 399 (9th Cir.

15   1988) (defendant alleging estoppel must be "ignorant of the true facts"); *see also Brother Records*,

16   318 F.3d at 909 (rejecting estoppel defense where defendant could not show that he used mark without

17   knowing that plaintiff objected to his use). Waiver would be even more onerous for A&F to prove.

18   "Waiver is the intentional relinquishment of a known right with knowledge of its existence and the

19   intent to relinquish it." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001). It

20   must be manifested by "clear, decisive and unequivocal" conduct. *Adidas*, 546 F. Supp. 2d at 1074.

21   A&F has not, and cannot, point to any conduct by LS&CO. that would indicate any intent to

22   relinquish its rights in the Arcuate Trademark.[11]

23       A&F's unclean hands defense requires a showing that the "plaintiff's conduct is inequitable

24   _____

25   [11] A&F also states an "affirmative defense" that LS&CO., "as shown by its judicial admissions,
     statements, and conduct has allowed its mark to be used so as to misrepresent the source of the goods
26   or services on or in connection with which the mark is used." Amended Answer ¶ 59. The import of
     this purported defense is unclear; A&F appears to be alleging some sort of judicial estoppel, but has
27   offered no explanation or evidence in support. Accordingly, LS&CO. requests summary judgment
     against this defense as well.

28

1    and that the conduct relates to the subject matter of its claims." *Fuddruckers, Inc. v. Doc's B.R.*

2    *Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987). Even if A&F could succeed on its "fraud"

3    counterclaim, there is no evidence that LS&CO. acted inequitably toward A&F or with respect to any

4    claims asserted here.

5          Finally, A&F's purported defense of "trademark misuse" must be rejected. Courts recognize

6    this defense only in the context of allegations of anti-competitive activity. *See Adidas*, 546 F. Supp.

7    2d at 1078. Other than a conclusory and unsupported allegation that LS&CO. is attempting to "stifle

8    and snuff out" competition in the jeans market, Amended Answer ¶ 62, A&F has no evidence to

9    support such a claim. LS&CO. therefore is entitled to summary judgment on this defense as well.

10   **E.    LS&CO.'s Arcuate Trademark Is Famous Within The Meaning Of The Dilution**
11         **Statute**

12         Under the Trademark Dilution Revision Act ("TDRA"), "a mark is famous if it is widely

13   recognized by the general consuming public of the United States as a designation of source of the

14   goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). The following factors determine

15   whether a mark is famous:

16             (i) The duration, extent, and geographic reach of advertising and
17             publicity of the mark, whether advertised or publicized by the owner or
               third parties.

18             (ii) The amount, volume, and geographic extent of sales of goods or
19             services offered under the mark.

20             (iii) The extent of actual recognition of the mark.

               (iv) Whether the mark was registered under the Act of March 3, 1881, or
21             the Act of February 20, 1905, or on the principal register.

22   *Id.*

23         The undisputed evidence shows that LS&CO.'s Arcuate Trademark is famous by these

24   measures. The Arcuate Trademark is a federally registered mark that has been used continuously for

25   135 years. It has been extensively advertised and publicized for over 100 years, reaching consumers

26   throughout the world. LS&CO. has spent billions of dollars advertising products bearing the mark,

27   and annually sells millions of such products totaling billions of dollars in sales. The Arcuate

28   Trademark is reinforced to the public when these jeans are worn – in huge numbers -- in everyday life.

PL.'S MOTION FOR SJ
AND FOR PARTIAL SJ AS TO DILUTION    - 21 -  *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*
    Case No. C 07-03752 JSW

1   When far less is shown, courts conclude that marks are famous as a matter of law.  *See, e.g., Louis*

2   *Vuitton Malletier v. Dooney &Bourke, Inc.*, 2008 U.S. Dist. LEXIS 42787 at *57-58 (S.D.N.Y. 2008)

3   (mark met the standard for fame as a matter of law); *Audi AG v. D'Amato*, 469 F.3d 534, 547 (6th Cir.

4   2006) (affirmed decision granting summary judgment on claim of trademark dilution).

5         **1.    The Duration, Extent, And Geographic Reach Of Advertising And Publicity Of The Mark**

6

7         Lengthy and widespread advertising has convinced courts that other marks are famous.  For

8   example, several million dollars in advertising over a decade or more "unquestionably" shows fame.

9   *See, e.g., Nissan Motor Co. Ltd. v. Nissan Computer Corp.*, 2007 U.S. Dist. LEXIS 90487 at *32-33

10  (C.D. Cal. 2007) (mark famous where it "had been widely advertised and publicized for at least a

11  decade . . . and such advertising and publicity reached consumers throughout the United States"); *800-*

12  *JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 294 (D.N.J. 2006) (mark famous where

13  company was "[o]ver thirty years old and [had] spent millions of dollars on promotion"); *Kraft Foods*

14  *Holdings, Inc. v. Helm*, 205 F. Supp. 2d 942, 946 (N.D. Ill. 2002) (mark famous where company had

15  "spent millions of dollars advertising, marketing and promoting its product through television, radio,

16  print and Internet advertising").

17        LS&CO. has been advertising products displaying the Arcuate Trademark continuously for

18  over 100 years.  Downey Dec. ¶ 12 & Exs. E1-E30.  LS&CO. advertises and promotes its products

19  worldwide, and has spent billions of dollars advertising and promoting products with the Arcuate

20  Trademark -- between $65 million and $175 million annually over the past 20+ years alone.  Mitchell

21  Dec. ¶ 6.  The Arcuate Trademark is almost always prominently featured in advertising for the

22  LEVI'S® brand.   Hanson Dec. ¶¶ 9-23.

23        LS&CO. advertises across a wide range of media including television, print, the Internet, and

24  cinema.  *Id.* ¶¶ 9-23.  LS&CO.'s television advertising has run on all the major network channels (*e.g.*,

25  ABC, Fox, NBC, UPN and WB) and cable channels such as MTV, E!, USA, TNT, and The Discovery

26  Channel, among many others.  *Id.* ¶ 20.  These commercials reach a significant audience and often

27  achieve hundreds of millions of consumer impressions.  *Id.* ¶ 19.  The Arcuate Trademark also appears

28

1  in television and film, making prominent appearances in the film *Sisterhood of the Traveling Pants*

2  and the latest Indiana Jones movie, among many others. *Id.* ¶ 22.

3       LS&CO. advertises extensively in print media as well. LS&CO.'s print advertisements

4  include ads in magazines such as *Cosmopolitan, Entertainment Weekly, Elle, Glamour, Life and Style,*

5  *People, Oprah, Self, Lucky, Marie Claire, Seventeen*, and *Vanity Fair. Id.* ¶ 14. The company also

6  spends enormous resources on point of sale materials for use at retail locations as well as other brand

7  imagery intended to create visibility for the LEVI'S® brand, all of which reinforce the Arcuate

8  Trademark. *Id.* ¶¶ 9, 11-12, 16.

9       This level of advertising is more than enough to show fame as a matter of law. *See, e.g., Louis*

10  *Vuitton*, 2008 U.S. Dist. LEXIS 42787 at *57-58; *Audi AG*, 469 F.3d 534 at 547.

11            **2.    The Amount, Volume, And Geographic Extent Of Sales Of Goods Or**
              **Services Offered Under The Mark**
12

13       Courts have found a mark famous when millions of products displaying the mark were sold

14  throughout the country and served as "moving billboards." *Nissan Motor*, 2007 U.S. Dist. LEXIS

15  90487 at *33-34; *see also Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635 (9th Cir. 2008) (mark

16  famous because "three billion HOT WHEELS units have been sold since the inception of the mark;

17  and HOT WHEELS are sold in all fifty states and throughout the world"); *800-JR Cigar,* 437 F. Supp.

18  2d at 294 (mark famous where company "only had nine retail locations and ha[d] been selling on the

19  Internet, at the time of briefing, for two years," but had "earned more than a billion dollars in

20  revenues"); *Louis Vuitton*, 2008 U.S. Dist. LEXIS 42787 at *57-58 (mark famous based on a few

21  hundred thousand products and almost $145 million in total sales); *Nabisco, Inc. v. PF Brands, Inc.,*

22  50 F. Supp. 2d 188, 203 (S.D.N.Y.), *aff'd*, 191 F.3d 208 (2d Cir. 1999).

23

24

25

26

27

28

1    The Arcuate Trademark unquestionably satisfies this factor as well. LS&CO. started

2  manufacturing and selling products bearing the Arcuate Trademark in 1873. Downey Dec. ¶ 4. The

3  oldest pair of jeans in the world is a pair of LEVI'S® jeans that have been dated to 1879. *Id.* These

4  jeans still bear visible traces of the Arcuate Trademark. Other archive samples of jeans display the

5  Arcuate Trademark from as far back as 1890. *Id.* ¶ 7.

6    LS&CO. sells products bearing the Arcuate Trademark all over the world. In the United States

7  alone, for the period 1980 through 2007, total sales for products that display the Arcuate Trademark

8  averaged approximately 107 million net units per year, for a total of almost three billion net units.

9  Mitchell Dec. ¶ 2. During this same period of time, total net sales in the United States of products

10  displaying the Arcuate Trademark averaged approximately $1.69 billion per year, for total net sales of

11  approximately $47 billion.[12] *Id.*

12    LEVI'S® brand products bearing the Arcuate Trademark are available in thousands of retail

13  stores covering every channel of retail distribution and every corner of the country, including chain,

14  specialty and department stores, as well as LS&CO.'s own retail stores and website. Hanson Dec. ¶

15  24. The duration, breadth and magnitude of LS&CO.'s sales indisputably support a finding that the

16  Arcuate Trademark is famous.

17    **3.    The Extent Of Actual Recognition Of The Mark**

18    Courts have found a mark famous based on evidence of "unsolicited third-party recognition in

19  the form of news articles and awards." *800-JR Cigar*, 437 F. Supp. 2d at 294; *Nabisco*, 50 F. Supp. 2d

20  at 204. There are numerous such examples regarding the Arcuate Trademark. Onda Dec. ¶ 8 & Exs.

21  D1-D9. For example, the *New York Times* observed that "The signature inverted peak stitched on a

22  pair of Levi's is as recognizable to most Americans as the name itself." *Id.* Ex. D-2. Another

23  publication stated, "The orange double-arc design on the back pockets is more hallowed than the

24  golden arches of McDonald's." *Id.* Ex. D-1. Many other unsolicited references make similar

25  observations, commenting on the Arcuate Trademark as "one of the oldest apparel trademarks still in

26  ───────────────────

27  [12] Products displaying the Arcuate Trademark make up approximately 90-95% of LEVI'S® brand
products. Hanson Dec. ¶ 25.

28

1    use" (*id*. Ex.D-6), recounting the war time painting of the marks (*id*. Ex. D-3), and even hypothesizing

2    that Levi Strauss himself would still recognize the jeans from the Arcuate Trademark (*id*. Ex. D-4).

3    High schools have asked permission to use the mark on their yearbooks. *Id*. Ex.D-5.

4    As discussed above, Dr. Sanjay Sood conducted a recent survey to determine the level of

5    recognition of the Arcuate Trademark. Sood Dec. Ex. A. From a cross-section of the general

6    population, Dr. Sood found that approximately 77% recognized the pocket stitching and 53% correctly

7    identified jeans with the Arcuate Trademark as a LEVI'S® product. *Id*. at 6-7. This further confirms

8    the extent of consumer recognition of the Arcuate Trademark. *E.g., Nissan Motor*, 2007 U.S. Dist.

9    LEXIS 90487 at *34.

10    **4.    Whether the Mark Is Registered**

11    LS&CO. owns several federal registrations for its mark. Onda Dec. Exs. G-J. This factor also

12    weighs in favor of LS&CO. *See 800-JR Cigar*, 437 F. Supp. 2d at 294 (several trademark

13    registrations, including two incontestable registrations, supported finding of fame); *Nabisco*, 50 F.

14    Supp. 2d at 205.

15                          *        *        *

16    Because every factor strongly shows the mark's fame, summary judgment on the issue is

17    warranted and appropriate.

18    **III.    CONCLUSION**

19    For the reasons set forth, LS&CO. respectfully asks the Court to enter summary judgment in

20    LS&CO.'s favor on A&F's counterclaims and specified affirmative defenses, and to find that

21    LS&CO.'s Arcuate Trademark is famous within the meaning of the Lanham Act.

22    DATED:  August 15, 2008              Respectfully submitted,

23                              By:    */s/ Gregory S. Gilchrist*
                                   Gregory S. Gilchrist
24                                 TOWNSEND AND TOWNSEND AND CREW LLP

25                                 Attorneys for Plaintiff/Counterclaim Defendant
                                   LEVI STRAUSS & CO.

26    61466572 v1

27

28