# EXHIBIT Q

MICHAEL J BETTINGER (State Bar No. 122196)
RACHEL R. DAVIDSON (State Bar No. 215517)
K&L GATES
55 Second Street, Suite 1700
San Francisco, California 94105-3493
Telephone:  (415) 882-8200
Facsimile:  (415) 882-8220

J. MICHAEL KEYES (*Pro Hac Vice*)
K&L GATES
601 West Riverside Avenue, Suite 300
Spokane, WA 99201
Telephone:  (509) 624-2100
Facsimile:  (509) 456-0146
mike.keyes@klgates.com

Attorneys for Defendants
ABERCROMBIE & FITCH TRADING CO.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEVI STRAUSS & CO., | Case No. C 07-93752 JSW |
| Plaintiff, | **ABERCROMBIE & FITCH TRADING CO.'S SUPPLEMENTAL RESPONSES TO LEVI STRAUSS & CO.'S FIRST SET OF INTERROGATORIES** |
| v. | |
| ABERCROMBIE & FITCH TRADING CO., | |
| Defendant. | |

PROPOUNDING PARTY:    Plaintiff, LEVI STRAUSS & CO.

RESPONDING PARTY:    Defendant, ABERCROMBIE & FITCH TRADING CO.

SET NO.:            One (Supplemental Responses)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Abercrombie & Fitch Trading Co. ("A&F") hereby submits its supplemental responses to Levi Strauss & Co. ("LS&CO.") Interrogatories, Set No. One, as follows:

Printed on Recycled Paper

## PRELIMINARY STATEMENT

A&F's counsel met with counsel for LS&CO. on April 11, 2008 to resolve concerns relating to A&F's responses to LS&CO.'s Requests for Production. The following supplemental responses reflect A&F's meet-and-confer efforts relating to LS&CO.'s discovery concerns.

As a preface to each and every Response herein, responding party A&F qualifies its response by stating that it has not yet completed its investigation of the facts relating to this matter, has not completed discovery and has not completed its preparation for trial. Consequently, A&F's responses are based on information known to it at the time of these responses. A&F may discover additional information, documents or facts that will add meaning to the facts already known, or establish new factual contentions or legal conclusions. As a result, A&F expressly reserves its right to rely on all facts, information and documents developed in discovery or otherwise to supplement, amend and/or correct any or all of its responses to LS&CO.'s interrogatories.

By making these responses, A&F does not concede that the information given is properly discoverable or admissible, and A&F reserves its right to object to the introduction of these Responses into evidence for any purpose.

## GENERAL OBJECTIONS

A&F makes the following General Objections, and expressly incorporates them into each specific response as set forth below. The failure to refer specifically to a General Objection should not be construed as a waiver of that General Objection.

1.    A&F incorporates all of its initial objections to LS&CO.'s First Set of Interrogatories by reference.

2.    A&F objects to the Interrogatories to the extent that they call for the disclosure of attorney-client communications, information obtained in anticipation of litigation, attorney work product, or information which is otherwise privileged, immune from, or outside the scope of discovery.

ABERCROMBIE & FITCH TRADING CO.'S
SUPPLEMENTAL RESPONSES TO LEVI STRAUSS & CO.'S
FIRST SET OF INTERROGATORIES                          2
Case No. C 07-93752 JSW

Printed on Recycled Paper

3.    A&F objects to the Interrogatories to the extent that they seek to impose upon A&F, requirements in excess of those imposed by Rules 26 and 33 of the Federal Rules of Civil Procedure.

4.    A&F objects to the Interrogatories to the extent that they seek information that is neither relevant to LS&CO.'s claims or defenses in this action, nor reasonably calculated to lead to the discovery of admissible evidence.

5.    A&F objects to the Interrogatories to the extent that they seek information beyond the limitations on discovery imposed by Rule 26(b)(2)(i), (ii) and (iii).

6.    A&F objects to the Interrogatories to the extent that they seek information without reference or limitation to any relevant time period.

7.    A&F objects to the Interrogatories to the extent that they seek confidential information, commercial information, or other competitively sensitive information concerning A&F or those with whom A&F does business, did business, or contemplated doing business.

8.    A&F objects to the Interrogatories to the extent they seek information or documents that are neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

9.    A&F generally objects to the Interrogatories to the extent that they purport to require A&F to provide information not in its possession, custody or control.

10.    A&F objects to the Interrogatories to the extent that they are vague, ambiguous, overly broad and/or unduly burdensome.

11.    A&F objects to the Interrogatories to the extent that they purport to impose upon A&F the burden of furnishing information that is not available to A&F or that is equally or more readily available to LS&CO..

12.    A&F is not making any incidental or implied admissions in its responses, except for explicit facts admitted herein. The fact that A&F has answered or objected to any interrogatory or part thereof should not be taken as an admission that A&F accepts or admits the existence of any facts set forth or assumed by the interrogatories, or that such answer or objection constitutes

1  admissible evidence. The fact that A&F has answered all or part of any interrogatory is not intended

2  and shall not be construed to be a waiver of any objection.

3      13.     These responses are subject to additional knowledge of facts that may result from

4  discovery or further investigation by A&F. Such investigation, discovery and other pretrial

5  preparation may develop additional or different information with respect to certain interrogatories

6  and, accordingly, A&F expressly reserves the right to correct, clarify, amend and supplement the

7  information contained in these responses if and when A&F obtains other, or more accurate,

8  information.

9      Without waiving the foregoing objections and incorporating said objections into each

10  specific response below, as well as the additional objections set forth herein, A&F responds to

11  LS&CO.'s First Set of Interrogatories as follows:

12                      **SUPPLEMENTAL RESPONSES**

13  **INTERROGATORY NO. 1:**

14      IDENTIFY all PERSONS furnishing information for the responses to these interrogatories

15  on YOUR behalf, designating the number of the interrogatory for which that PERSON furnished

16  information.

17  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

18      A&F incorporates the entirety of its General Objections as though fully set forth herein.

19  A&F objects to this interrogatory on the ground that it is overbroad.

20      Subject to and without waiving the foregoing objections, A&F identifies the following

21  individuals:

22      Tiffany Andras-Finance department

23      Donna Johnson-VP of internet management

24      John Urbano-Director of internet management

25      Ryan Scott- Film and photographer, internet

26      David Chanpong-Ecommerce designer, internet

27

28

1     <u>Jenny Shields</u>-Program coordinator, brand protection

2     <u>Rob Thompson</u>-Planning Director for outlet/clearance

3     <u>Diane Holz</u>-Senior Manager Lease Administration, real estate

4     <u>Stacy Beaver</u>-Manager, female denim, merchandise

5     <u>Gia Ha</u>-Merchant female denim, merchandise

6     <u>Octavio Tisnado</u>-Senior merchant female denim, merchandise

7 **INTERROGATORY NO. 2:**

8     IDENTIFY all products on which YOU have used the A&F DESIGN.

9 **RESPONSE TO INTERROGATORY NO. 2:**

10     A&F incorporates the entirety of its General Objections as though fully set forth herein.

11 Subject to and without waiving the foregoing objections, A&F responds that the A&F DESIGN is

12 only used on A&F's "RUEHL No. 925" jeans, denim skirts and jackets. (collectively referred to as

13 "A&F RUEHL No. 925 products.")

14 **INTERROGATORY NO. 3:**

15     With respect to each of the products identified in YOUR response to Interrogatory No. 2,

16 IDENTIFY all retailers, online retailers, wholesalers or other distributors that sell or have ever sold

17 the product.

18 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

19     A&F incorporates the entirety of its General Objections as though fully set forth herein.

20 Subject to and without waiving the foregoing objections, A&F responds that A&F's RUEHL No.

21 925 products are sold only by A&F in its RUEHL No. 925 stores, and on its RUEHL web-site. A&F

22 is aware of one instance where jeans possibly bearing the accused design were sold to a third-party

23 distributor in Turkey for re-sale. To the extent that is the case, A&F will produce documents

24 sufficient to identify this information.

25

26     ///

27

28

**INTERROGATORY NO. 4:**

With respect to each of the products identified in YOUR response to Interrogatory No. 2, describe the past, current and anticipated geographic areas of distribution of the product.

**SUPPLEMENTAL TO INTERROGATORY NO. 4:**

A&F incorporates the entirety of its General Objections as though fully set forth herein. Subject to and without waiving the foregoing objections, A&F responds that A&F's RUEHL No. 925 products are sold only in A&F's RUEHL No. 925 stores which are located in the following states: Maryland, Massachusetts, New Jersey, New York, Illinois, Michigan, Ohio, California, Hawaii, Nevada, Florida, Texas, Virginia and Oregon. At this time, the only anticipated future location for a RUEHL No. 925 store is Minnesota.

**INTERROGATORY NO. 5:**

With respect to each of the products identified in YOUR response to Interrogatory No. 2, state the quantity of the product sold per calendar or fiscal year, from the date of YOUR first sale of such product to the present.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

A&F incorporates the entirety of its General Objections as though fully set forth herein. A&F objects to this interrogatory as overly broad, and unduly burdensome. A&F objects to this interrogatory because it seeks information that is irrelevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, A&F further responds that A&F will be producing documents which identify information responsive to this interrogatory as part of its responses to LS&CO.'s document requests relating to A&F's sales and financial information. This financial information will be produced pursuant to the protective order entered in this case. However, the information A&F will produce does not differentiate between sales of RUEHL denim with the accused denim and sales of RUEHL denim bearing the "R" design. A&F reserves the right to supplement this response when the information becomes available.

1    **INTERROGATORY NO. 6:**

2         With respect to each of the products identified in YOUR response to Interrogatory No. 2,

3    state the total dollar amount of sales of the product per calendar or fiscal year, from the date of

4    YOUR first sale of such product to the present.

5    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

6         A&F incorporates the entirety of its General Objections as though fully set forth herein.

7    A&F objects to this interrogatory as overly broad, and unduly burdensome.  A&F objects to this

8    interrogatory because it seeks information that is irrelevant and/or not reasonably calculated to lead

9    to the discovery of admissible evidence.  A&F objects to this interrogatory to the extent it is

10    duplicative of Interrogatory No. 5.

11         Subject to and without waiving the foregoing objections, A&F further responds that A&F

12    will be producing documents which identify information responsive to this interrogatory as part of

13    its responses to LS&CO.'s document requests relating to A&F's sales and financial information.

14    This financial information will be produced pursuant to the protective order entered in this case.

15    However, the information A&F will produce does not differentiate between sales of RUEHL denim

16    with the accused denim and sales of RUEHL denim bearing the "R" design.  A&F reserves the right

17    to supplement this response when the information becomes available.

18    **INTERROGATORY NO. 6:**

19         With respect to each of the products identified in YOUR response to Interrogatory No. 2,

20    state all costs that YOU incurred from the date of first sale to the present, which YOU contend

21    should be accounted for in calculating YOUR profits from the sale of the product.

22    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

23         A&F incorporates the entirety of its General Objections as though fully set forth herein.

24    A&F objects to this interrogatory as overly broad, and unduly burdensome.  A&F objects to this

25    interrogatory because it seeks information that is irrelevant and/or not reasonably calculated to lead

26    to the discovery of admissible evidence.

27

28

1    Subject to and without waiving the foregoing objections, A&F further responds that A&F

2  will be producing documents which identify information responsive to this interrogatory as part of

3  its responses to LS&CO.'s document requests relating to A&F's sales and financial information.

4  This financial information will be produced pursuant to the protective order entered in this case.

5  However, the information A&F will produce does not differentiate between sales of RUEHL denim

6  with the accused denim and sales of RUEHL denim bearing the "R" design.  A&F reserves the right

7  to supplement this response when the information becomes available.

8  **INTERROGATORY NO. 7:**

9    With respect to each of the products identified in YOUR response to Interrogatory No. 2,

10 IDENTIFY each PERSON who was, is, or will be in charge of or responsible for the manufacture,

11 production advertising, sale and/or marketing of the product.

12 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

13    A&F incorporates the entirety of its General Objections as though fully set forth herein.

14 A&F objects to the terms "responsible," "in charge," and "manufacture" as vague and ambiguous in

15 the context of this interrogatory, and therefore the interrogatory is overbroad and unclear.  A&F

16 objects to this interrogatory as compound on the ground that it includes three different subject

17 matters, each of which require a separate interrogatory.  A&F objects to this interrogatory because it

18 seeks information that is irrelevant and/or not reasonably calculated to lead to the discovery of

19 admissible evidence.

20    Subject to and without waiving the foregoing objections, A&F maintains its objection to this

21 interrogatory on the grounds that individuals who were, are, or will be in charge of or responsible

22 manufacturing are irrelevant to this litigation.  With respect individuals who were, are, or will be in

23 charge of or responsible for sales, A&F maintains its objection to this interrogatory on the grounds

24 that it is unreasonable and overbroad as it potentially encompasses every RUEHL store employee

25 involved in selling or offering for sale any RUEHL No. 925 product bearing the A&F DESIGN.

26 With respect to advertising and marketing, A&F does not advertise or market any product visibly

27

28

1   bearing the A&F DESIGN other than in its RUEHL No. 925 stores and on its recently-created

2   RUEHL website.

3   **INTERROGATORY NO. 9**

4        Describe any advertisement or promotion, or planned advertisement or promotion, in print,

5   web, television or other media, for any of the products identified in your response to Interrogatory

6   No. 2, including the media outlet, the inclusive dates that the ad or promotion ran or will run, the

7   costs of the ad or promotion, and the geographical distribution of the ad or promotion.

8   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

9        A&F incorporates the entirety of its General Objections as though fully set forth herein.

10   A&F objects to this interrogatory as compound on the ground that it includes multiple subjects, each

11   of which, require a separate interrogatory.  A&F objects to this interrogatory because it seeks

12   information that is irrelevant and/or not reasonably calculated to lead to the discovery of admissible

13   evidence.

14        Subject to and without waiving the foregoing objections, A&F further responds that A&F

15   does not advertise or market any product visibly bearing the A&F DESIGN other than in its RUEHL

16   No. 925 stores and on its recently-created RUEHL website.

17   **INTERROGATORY NO. 10:**

18        IDENTIFY all PERSONS who have rendered services to YOU or on YOUR behalf in

19   connection with the advertising or promotion of goods bearing the A&F DESIGN.

20   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

21        A&F incorporates the entirety of its General Objections as though fully set forth herein.

22   A&F objects to the term "in connection," as vague and ambiguous in the context of this request, thus

23   the request is overly broad.  A&F objects to this interrogatory because it seeks information that is

24   irrelevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

25   ///

26

27

28

1   Subject to and without waiving the foregoing objections, A&F further responds that A&F

2 does not advertise or market any product visibly bearing the A&F DESIGN other than in its RUEHL

3 No. 925 stores and on its recently-created RUEHL website.

4 **INTERROGATORY NO. 11:**

5   For each PERSON IDENTIFIED in YOUR response to Interrogatory No. 10, describe the

6 type of services rendered, costs associated with such services, and the dates such services were

7 rendered.

8 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**

9   Subject to and without waiving the foregoing objections, A&F further responds that A&F

10 does not advertise or market any product visibly bearing the A&F DESIGN other than in its RUEHL

11 No. 925 stores and on its recently-created RUEHL website.

12 **INTERROGATORY NO. 12:**

13   IDENTIFY all PERSONS who participated in the design, creation, selection, adoption,

14 approval or use of the A&F DESIGN.

15 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

16   A&F incorporates the entirety of its General Objections as though fully set forth herein.

17 A&f objects to the terms "participated," as vague and ambiguous, and therefore, the interrogatory is

18 overly broad.  A&F objects to this interrogatory as compound on the ground that it includes multiple

19 subjects, each of which, require a separate interrogatory.  A&F objects to this interrogatory because

20 it seeks information that is irrelevant and/or not reasonably calculated to lead to the discovery of

21 admissible evidence.

22   Subject to and without waiving the foregoing objections, A&F identifies Lee Holman, Joe

23 Kramar, Mark Breitbard, and Kevin Cothren.

24 **INTERROGATORY NO. 13:**

25   State whether YOU believe LS&CO. has abandoned its rights in the Arcuate Trademark.

26

27

28

1   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

2          A&F incorporates the entirety of its General Objections as though fully set forth herein.

3   A&F. A&F objects to this interrogatory in its entirety on the ground that it calls for a legal

4   conclusion, as it specifically ask A&F construe the legal doctrine of abandonment. A&F objects to

5   this interrogatory to the extent that it is construed to seek information that is protected by the

6   attorney-client privilege, the attorney work product doctrine or other applicable privilege.

7          Subject to and without waiving the foregoing objections, A&F further responds by referring

8   LS&CO. to A&F's Summary Adjudication Motion, its initial and supplemental disclosures,

9   LS&CO.'s enforcement documents, including documents relating to third-party litigation, and

10  LS&CO.'s enforcement efforts. A&F's discovery and investigation in this case is on-going. This

11  response is subject to additional knowledge of facts that may result from discovery or further

12  investigation by A&F. Such investigation, discovery and other pretrial preparation may develop

13  additional or different responsive information and, accordingly, A&F expressly reserves the right to

14  correct, clarify, amend and supplement the information contained in this response.

15  **INTERROGATORY NO. 14:**

16          IDENTIFY all DOCUMENTS that YOU claim support YOUR response to Interrogatory No.

17  13.

18  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

19          A&F incorporates the entirety of its General Objections as though fully set forth herein.

20  A&F objects to this interrogatory because it is explicitly seek information that is protected by the

21  attorney-client privilege, the attorney work product doctrine or other applicable privilege. A&F

22  objects to this interrogatory on the ground that it calls for a legal conclusion and improperly requests

23  A&F to construe the legal significance of documents. A&F objects to this request as overly broad

24  and unduly burdensome.

25          Subject to and without waiving the foregoing objections, A&F further responds by referring

26  LS&CO. to A&F's Summary Adjudication Motion, its initial and supplemental disclosures,

27

28

1   LS&CO.'s enforcement documents, including documents relating to third-party litigation, and

2   LS&CO.'s enforcement efforts. A&F's discovery and investigation in this case is on-going. This

3   response is subject to additional knowledge of facts that may result from discovery or further

4   investigation by A&F. Such investigation, discovery and other pretrial preparation may develop

5   additional or different responsive information and, accordingly, A&F expressly reserves the right to

6   correct, clarify, amend and supplement the information contained in this response.

7   **INTERROGATORY NO 15:**

8       State all facts that YOU claim support YOUR response to Interrogatory No. 13.

9   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:**

10      A&F incorporates the entirety of its General Objections as though fully set forth herein.

11  A&F objects to this interrogatory to the extent that it is construed to seek information that is

12  protected by the attorney-client privilege, the attorney work product doctrine or other applicable

13  privilege. A&F objects to this interrogatory on the ground that it calls for a legal conclusion. The

14  interrogatory is also overly broad, and premature, as discovery has just begun.

15      Subject to and without waiving the foregoing objections, A&F further responds by referring

16  LS&CO. to A&F's Summary Adjudication Motion, its initial and supplemental disclosures,

17  LS&CO.'s enforcement documents, including documents relating to third-party litigation, and

18  LS&CO.'s enforcement efforts. A&F's discovery and investigation in this case is on-going. This

19  response is subject to additional knowledge of facts that may result from discovery or further

20  investigation by A&F. Such investigation, discovery and other pretrial preparation may develop

21  additional or different responsive information and, accordingly, A&F expressly reserves the right to

22  correct, clarify, amend and supplement the information contained in this response.

23  **INTERROGATORY NO 16:**

24      IDENTIFY all PERSONS with knowledge of the facts stated in YOUR response to

25  Interrogatory No. 15.

26

27

28

1    <u>**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:**</u>

2          A&F incorporates the entirety of its General Objections as though fully set forth herein.

3    A&F objects to this interrogatory to the extent that it is construed to seek information that is

4    protected by the attorney-client privilege, the attorney work product doctrine or other applicable

5    privilege. A&F incorporates its response to Interrogatory No. 15 by reference.

6          Subject to and without waiving the foregoing objections, A&F further responds by referring

7    LS&CO. to those individuals identified in A&F's initial and supplemental disclosures.

8

9

10   DATED:  April 21, 2008                 KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP

11                                          By_____
                                               Rachel R. Davidson
12                                             Attorneys for Defendants
                                               ABERCROMBIE & FITCH TRADING CO.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action; my business address is 55 Second Street, Suite 1700, San Francisco, CA 94105.

On April 21, 2008, I served the foregoing document(s) described as:

**ABERCROMBIE & FITCH TRADING CO.'S SUPPLEMENTAL RESPONSES TO LEVI STRAUSS & CO.'S FIRST SET OF INTERROGATORIES**

on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as set forth below by the method described below:

Gregory S. Gilchrist, Esq.
Gia L. Cincone, Esq.
Townsend and Townsend
Two Embarcadero Center, 8th Floor
San Francisco, CA 94111
Tel: (415) 576-0200
Fax: (415) 576-0300

[ X ]  **BY PERSONAL SERVICE**) I caused to be delivered such envelope(s) by hand to the offices of the addressee.

[ X ]  **(BY ELECTRONIC MEANS)** I transmitted such document(s) by electronic mail to the offices of the addressee.

[]  **(BY OVERNIGHT DELIVERY)** I caused such envelope(s) to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served in accordance with ordinary business practices. I am "readily familiar" with the firm's practice of collection and processing correspondence for express mailing. Under that practice it would be deposited with Federal Express on that same day with delivery fees fully prepaid at San Francisco, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the mailing date is more than one day after date of deposit for mailing in affidavit.

[]  **(BY U.S. MAIL)** I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at San Francisco, California in accordance with ordinary business practices. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at San Francisco, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on April 21, 2008, at San Francisco, California.

I declare that I am employed in the office of a member of the bar of this Court at whose direction this service was made.

*Kimberly Flores*

Kimberly Flores

Printed on Recycled Paper

CERTIFICATE OF SERVICE
Case No. C 07-3752-JSW

# EXHIBIT R

1 | MICHAEL J. BETTINGER (State Bar No. 122196)
RACHEL R. DAVIDSON (State Bar No. 215517)
2 | KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
3 | 55 Second Street, Suite 1700
San Francisco, California  94105
4 | Telephone:  415-882-8200
Facsimile:  415-882-8220
5 |
J. MICHAEL KEYES (Pro Hac Vice)
6 | KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
7 | 618 West Riverside Avenue, Suite 300
Spokane, Washington  99201
8 | Telephone:  509-624-2100
Facsimile:  509-456-0146
9 |
Attorneys for Defendant
10 | ABERCROMBIE & FITCH TRADING CO.

11 |

12 | **UNITED STATES DISTRICT COURT**

13 | **NORTHERN DISTRICT OF CALIFORNIA**

14 | LEVI STRAUSS & CO.,                       )    No. CV-07-3752
                                          )
15 |        Plaintiff,                       )    Declaration and Rule 26
                                          )    Report of Dr. Gerald L.
16 |    v.                                   )    Ford
                                          )
17 | ABERCROMBIE & FITCH TRADING CO.,          )
                                          )
18 |        Defendant.                       )
     _____)
19 |

20 |        I, Dr. Gerald L. Ford, hereby declare as follows:

21 |                       INTRODUCTION

22 |        1.    I am a partner in the marketing research and

23 | consulting firm of Ford Bubala & Associates, located in

24 | Huntington Beach, California, where I have been engaged in

25 | commercial marketing research and consulting for the past thirty-

26 | three years.  I am also an emeritus faculty member of the School

27 | of Business Administration, California State University, Long

28 | Beach, where I held a full-time teaching position for twenty-five

1   years, prior to my retirement in 1994.  My professional

2   experience is further summarized below in paragraphs 63 through

3   73.

4        2.    In the instant matter, at the request of

5   Kirkpatrick & Lockhart Preston Gates Ellis LLP counsel for

6   Defendant, Abercrombie & Fitch Trading Co. ("A&F"), I designed

7   and caused to be conducted a survey to address the issue of post-

8   sale likelihood of confusion.  Specifically, this survey was

9   designed to measure the degree, if any, to which the stitching

10  design on the pocket of the Ruehl brand jeans being sold by

11  Defendant, A&F, is likely to cause confusion with respect to the

12  source, authorization/approval of, or business affiliation/

13  connection of Defendant's jeans with the source Levi Strauss &

14  Co. ("LS&CO") due to the stitching design on the pocket of the

15  Ruehl brand jeans.

16       3.    The likelihood of confusion survey conducted in

17  this matter employed a scientific experimental survey design

18  consisting of three cells:  (1) a test or experimental survey

19  cell designed to measure the degree, if any, to which the

20  stitching design on the pocket of Defendant's jeans is likely to

21  cause confusion as to the source, authorization/approval of, or

22  business affiliation/connection of Defendant's jeans with the

23  source LS&CO; and (2) two control survey cells designed to

24  measure the extent to which non-trademark confusion exists in the

25  likelihood of confusion test cell survey results.

26       4.    In the test cell, survey respondents were shown a

27  photograph of a pair of Defendant's Ruehl jeans showing the back

28  pocket with the allegedly infringing pocket stitching design.  In

1 the first control cell, survey respondents were shown a

2 photograph of a pair of Lucky jeans showing the back pocket with

3 a pocket stitching design which I understand is not alleged to

4 infringe the LS&CO Arcuate design.  In the second control cell,

5 survey respondents were shown a photograph of a pair of Indigo

6 Red jeans showing the back pocket with a pocket stitching design

7 which I also understand is not alleged to infringe the LS&CO

8 Arcuate design.

9       5.    The universe for this survey was comprised of

10 females thirteen (13) years of age and older who reported that

11 within the next twelve (12) months they were likely to purchase a

12 pair of jeans for themselves.

13       6.    Respondents in the survey were interviewed by

14 interviewers employed by professional interviewing services at

15 shopping centers in metropolitan markets in nine (9) states

16 (i.e., Arizona, California, Georgia, Illinois, Massachusetts,

17 Minnesota, New York, Tennessee, and Texas), located in each of

18 the nine (9) U.S. Census Divisions.

19       7.    In total approximately one thousand (975)

20 interviews were conducted in this survey among females thirteen

21 (13) years of age or older.

22       8.    Six hundred fifty-one (651) interviews were

23 conducted in this survey among female adults eighteen (18) years

24 of age or older:  two hundred sixteen (216) interviews were

25 conducted in the test cell, two hundred eighteen (218) interviews

26 were conducted in the first control cell, and two hundred

27 seventeen (217) interviews were conducted in the second control

28 cell.

1           9.    Additionally, three hundred twenty-four (324)

2 interviews were conducted in this survey among female teenagers

3 thirteen (13) to seventeen (17) years of age:  one hundred eight

4 (108) interviews were conducted in the test cell, one hundred

5 eight (108) interviews were conducted in the first control cell,

6 and one hundred eight (108) interviews were conducted in the

7 second control cell.

8           10.   The survey results do not evidence any trademark

9 confusion attributable to the pocket stitching on Defendant's

10 Ruehl jeans.  Specifically, the survey results evidence that when

11 non-trademark confusion is accounted for (e.g., the tendency or

12 predisposition of some consumers to attribute the source of any

13 pair of jeans to Levi, the tendency or predisposition of some

14 consumers to attribute the source of any pair of jeans with

15 pocket stitching to Levi, etc.), there is no confusion

16 attributable to the stitching design present on the pocket of the

17 Ruehl jeans.

18           11.   It is my opinion that the results of the survey

19 conducted in this matter clearly support a finding of no

20 likelihood of confusion as to the source, authorization/approval

21 of, or business affiliation/connection of Defendant's jeans with

22 the source LS&CO due to the stitching design on the pocket of the

23 Ruehl brand jeans.

24                            SURVEY BACKGROUND

25           12.   Attached hereto, as Exhibit A, Volumes I, II, and

26 III, are the results of the survey which addressed the issue of

27 likelihood of confusion, if any, with respect to the source,

28 authorization/approval of, or business affiliation/connection of

1  Defendant's Ruehl brand jeans due to the stitching design on the

2  pocket.   Exhibit A, Volumes I & II, provide a synopsis of the

3  survey methodology, photographs of the survey exhibits, the

4  survey screeners and questionnaires, response frequencies for the

5  survey questions, and a listing of respondents' verbatim

6  responses to the survey.   Exhibit A, Volume III, contains a

7  sequential listing of the survey responses and copies of the

8  Supervisor and Interviewer Instructions, which provide additional

9  details of the survey protocols, and other survey-related

10 background materials.

11      13.   The sample selection, questions, questionnaire

12 design, and interviewing procedures employed in this survey were

13 designed in accordance with the generally accepted standards and

14 procedures in the field of surveys and were designed to meet the

15 criteria for survey trustworthiness detailed in the Federal

16 Judicial Center's <u>Manual for Complex Litigation, Fourth</u>.[1]

17      14.   I was responsible for the design of the survey,

18 the survey's questionnaires, and the instructions given to the

19 survey's supervisors and interviewers, as well as for the

20 procedures to be followed in conducting the interviews.

21 Interviewing, data gathering, and response recordation were

22 _____

23      [1]    For the proffered poll or survey, "...Relevant factors
   include whether:  the population was properly chosen and defined;
24 the sample chosen was representative of that population; the data
   gathered were accurately reported; and the data were analyzed in
25 accordance with accepted statistical principles...In addition, in
   assessing the validity of a survey, the judge should take into
26 account the following factors:  whether the questions asked were
   clear and not leading; whether the survey was conducted by
27 qualified persons following proper interview procedures; and
   whether the process was conducted so as to ensure objectivity..."
28 See Federal Judicial Center, <u>Manual for Complex Litigation,
   Fourth</u>, Section 11.493, @ 102-104 (2004).

1    carried out, under the direction of Ford Bubala & Associates, by

2    interviewers employed by independent interviewing organizations.

3    Supervisors working on this survey were personally trained by

4    Ford Bubala & Associates with respect to the design, procedures,

5    and related protocols for the survey; and daily shipments of

6    completed interviews from each professional interviewing service

7    were reviewed by Ford Bubala & Associates to confirm that the

8    questionnaires were being properly executed.  In addition,

9    approximately sixty-eight percent (67.90%) of the survey

10   interviews were validated, in person, by the survey supervisors

11   personally meeting the survey respondents and confirming their

12   qualification and participation in the survey.  Ford Bubala &

13   Associates conducted validations of approximately twenty percent

14   (20.31%) of the interviews by recontacting, by telephone, survey

15   respondents to confirm their qualification and participation in

16   the survey.  Net nonduplicated validations totaled approximately

17   seventy-four percent (73.74%) of all survey interviews.[2]  None

18   of the interviews failed to validate.

19        15.  The survey conducted in this matter was

20   administered under a double-blind protocol.  Specifically, not

21   only were the respondents not informed as to the purpose or

22   sponsor of the survey, but similarly, both the survey's

23   supervisors and interviewers were not informed as to the purpose

24   or sponsor of the survey.

25   ///

26   ///

27   _____

28        [2]    This level of validation exceeds industry standards of
     10% to 15%.

Declaration and Rule 26 Report          - 6 -
of Dr. Gerald L. Ford

1

## SURVEY STRUCTURE

2      16.   As noted earlier, the likelihood of confusion

3  survey conducted in this matter employed a scientific

4  experimental survey design consisting of three cells:   (1) a test

5  or experimental survey cell designed to measure the degree, if

6  any, to which the stitching design on the pocket of Defendant's

7  jeans is likely to cause confusion as to the source,

8  authorization/approval of, or business affiliation/connection of

9  Defendant's jeans; and (2) two control survey cells designed to

10  measure the extent to which non-trademark confusion exists in the

11  likelihood of confusion test cell survey results.

12      17.   In the test cell, survey respondents were shown a

13  photograph of a pair of Ruehl jeans.   The Barrow Skinny model of

14  Ruehl jeans was used as the survey stimulus.   It is my

15  understanding that the Barrow Skinny model of Ruehl jeans

16  represents one of the most popular models of Ruehl jeans.   The

17  photograph depicted the back right half of the jeans showing the

18  back right pocket.   The jeans were folded in a manner so that a

19  respondent could not see if there was anything attached to the

20  left seam of the right back pocket.[3] [4]   In addition, the waist

21  patch was digitally made unreadable.   See Exhibit A, Volumes I &

22  II, page 6 and page 226.   Respondents were asked to look at the

23  jeans in the photograph as they would if they saw someone wearing

24  the jeans.   Respondents were then asked questions regarding their

25

26      [3]      The left seam of the right back pocket is where LS&CO
typically attaches the red pocket tab to Levi jeans.

27
      [4]      This stimulus exposure was patterned after the
28  photographic presentation of survey stimuli employed in the
survey LS&CO offered in the RP55 matter.

1  state of mind with respect to the source, authorization/approval

2  of, or business affiliation/connection of the Ruehl jeans in the

3  photograph.  See Exhibit A, Volumes I & II, pages 9-12 and

4  pages 229-232.

5       18.  In the first control cell, survey respondents were

6  shown a photograph of a pair of Lucky jeans.  It is my

7  understanding the LS&CO does not consider the stitching design on

8  the pocket of the Lucky jeans to infringe the LS&CO Arcuate

9  trademark.  Thus, any Levi response with respect to the source,

10 authorization/approval of, or business affiliation/connection of

11 the Lucky jeans could not be attributable to an allegedly

12 infringing stitching design on the pocket of the Lucky jeans but

13 would be due to other factors such as simply the presence of a

14 stitching design on the back pocket of a pair of jeans or the

15 market share or brand popularity of Levi jeans.

16      19.  The Lucky jeans were folded in the same manner as

17 the Ruehl jeans and the waist patch was again digitally made

18 unreadable.  See Exhibit A, Volumes I & II, page 77 and page 277.

19 Again, respondents were asked to look at the jeans in the

20 photograph as they would if they saw someone wearing the jeans.

21 Respondents were then asked the same questions regarding their

22 state of mind with respect to the source, authorization/approval

23 of, or business affiliation/connection of the Lucky jeans in the

24 photograph.  See Exhibit A, Volumes I & II, pages 80-83 and

25 pages 280-283.

26      20.  In the second control cell, survey respondents

27 were shown a photograph of a pair of Indigo Red jeans.  It is my

28 understanding the LS&CO does not consider the stitching design on

1  the pocket of the Indigo Red jeans to infringe the LS&CO Arcuate

2  trademark.  Thus, again, any Levi response with respect to the

3  source, authorization/approval of, or business affiliation/

4  connection of the Indigo Red jeans could not be attributable to

5  an allegedly infringing stitching design on the pocket of the

6  Indigo Red jeans but would be due to other factors such as simply

7  the presence of a stitching design on the back pocket of a pair

8  of jeans or the market share or brand popularity of Levi jeans.

9      21.  The Indigo Red jeans were also folded in the same

10  manner as the Ruehl and Lucky jeans and the waist patch was again

11  digitally made unreadable.  See Exhibit A, Volumes I & II, page

12  149 and page 330.  Again, respondents were asked to look at the

13  jeans in the photograph as they would if they saw someone wearing

14  the jeans.  Respondents were then asked the same questions

15  regarding their state of mind with respect to the source,

16  authorization/approval of, or business affiliation/connection of

17  the Indigo Red jeans in the photograph.  See Exhibit A, Volumes I

18  & II, pages 152-155 and pages 333-336.

19      22.  The control survey cells provide a measure of the

20  extent to which non-trademark confusion exists in the test survey

21  cell results which is not reflective of a likelihood of confusion

22  due to the stitching design on the pocket of Defendant's jeans.

23  Specifically, the control survey cells function as a baseline and

24  provide a measure of the degree to which respondents are likely

25  to give the answer "Levi" not as a result of the stitching design

26  on the pocket of Defendant's jeans but because of other factors,

27  such as the survey's questions, the survey's procedures, the

28  nature of the product, or some other potential influence on a

1  respondent's answer such as simply the presence of a stitching

2  design on the back pocket of a pair of jeans or the market share

3  or brand popularity of Levi jeans.

4      23.  In addition to the control survey cells, the

5  likelihood of confusion survey conducted in this matter also

6  employed the use of questions (i.e., "Why do you say that?" and

7  "What else, if anything, makes you say that?") to provide an

8  indication of the basis for the beliefs expressed in response to

9  the survey's source, authorization/approval of, and business

10  affiliation/connection questions.

11      24.  As noted earlier, in total approximately one

12  thousand (975) interviews were conducted in this survey among

13  females thirteen (13) years of age or older.

14      25.  Again, six hundred fifty-one (651) interviews were

15  conducted in this survey among female adults eighteen (18) years

16  of age or older:  two hundred sixteen (216) interviews were

17  conducted in the test cell, two hundred eighteen (218) interviews

18  were conducted in the first control cell, and two hundred

19  seventeen (217) interviews were conducted in the second control

20  cell.

21      26.  Finally, an additional three hundred twenty-four

22  (324) interviews were conducted in this survey among female

23  teenagers thirteen (13) to seventeen (17) years of age:  one

24  hundred eight (108) interviews were conducted in the test cell,

25  one hundred eight (108) interviews were conducted in the first

26  control cell, and one hundred eight (108) interviews were

27  conducted in the second control cell.

28  ///

1        27.  Although the survey in this matter consisted of
2    three cells (i.e., a test cell and two control cells), any single
3    respondent participated in only one of the three cells.

4        28.  As noted earlier, this survey employed a shopping
5    center intercept methodology.  Respondents in the survey were
6    interviewed by interviewers employed by professional interviewing
7    services at shopping centers in metropolitan markets in nine (9)
8    states (i.e., Arizona, California, Georgia, Illinois,
9    Massachusetts, Minnesota, New York, Tennessee, and Texas),
10   located in each of the nine (9) U.S. Census Divisions.

11       29.  The relevant universe for both the test cell and
12   the control cells was the same and was defined as females,
13   thirteen years of age or older, who reported that within the next
14   twelve months they were likely to purchase a pair of jeans for
15   themselves.[5]

16       30.  The respondent selection procedure employed for
17   adults in the survey is referred to as a quota sampling method.
18   This method provided a respondent base that is generally
19   representative of the age distribution of female adult purchasers
20   of jeans for themselves.  This age distribution was based upon an
21   Opinion Research Corporation survey conducted May 2-5 and

22   _____

23       [5]  Additionally, the likelihood of confusion survey
     universe was also restricted as follows:  (1) to respondents who
24   did not, nor did anyone else in their home, work for an
     advertising agency or marketing research firm, or a retail store
25   or company that makes, sells, or distributes any clothing; (2) to
     respondents who, during the preceding three months, had not
26   participated in any marketing research surveys, including online
     surveys, other than a political poll; (3) to respondents who,
27   during the preceding month, had not heard anything about the
     subject of any of the interviews being conducted at the mall; and
28   (4) to respondents who, if they wore contact lenses or eyeglasses
     would wear them during the remainder of the interview.

1  May 8-11, 2008, among a nationally representative telephone

2  sample of one thousand (1,000) female adult respondents eighteen

3  years of age or older across the United States.

4      31.  A second group of thirteen (13) to seventeen (17)

5  year old females was also sampled.

6                    SURVEY PROCEDURES AND QUESTIONS

7      32.  Initially, a potential survey respondent was

8  stopped by an interviewer in the public area of a shopping mall

9  and screened (i.e., asked questions) to determine if the

10 potential respondent met the criteria to be included in the

11 survey universe (i.e., within the next twelve months was likely

12 to purchase a pair of jeans for themselves, etc.).  See Exhibit

13 A, Volumes I & II, pages 7-8 and pages 227-228.[6]

14     33.  If a potential respondent fulfilled the screening

15 criteria, or survey universe definition, she was then invited to

16 return with the interviewer to the professional interviewing

17 service facility located within the shopping mall to complete the

18 interview.  See Exhibit A, Volumes I & II, pages 9-12 and pages

19 229-232.[7]  The interviewer then escorted the survey respondent

20 into a private interviewing area.  In the private interviewing

21 area, the respondent was told:

22         In a moment, I am going to show you a picture of a
           pair of jeans, then I will ask you a couple of
23         questions.

24         Please understand that we are only interested in
           your opinions; and if you don't have an opinion or
25         don't know the answer to a question, that is an
           acceptable answer.

26

27 _____

        [6]   Also see pages 78-79, 150-151, 278-279, and 331-331.
28
        [7]   Also see pages 80-83, 152-155, 280-283, and 333-336.

Declaration and Rule 26 Report                - 12 -
of Dr. Gerald L. Ford

1  The interviewer then handed the respondent a photograph of either

2  the test cell jeans or one of the control cell jeans, and the

3  respondent was then told:

4           Would you please look at the jeans in this picture
          as you would if you saw someone wearing these jeans.
5         Please take as much time as you like, and let me know
          when you are ready to continue.
6

7  When the respondent indicated that she was ready to continue, she

8  was asked:[8]

9      5.0   Who do you believe makes or puts out these jeans?

10 For respondents who indicated a belief as to the source of the

11 jeans in the photograph they were shown, the interviewer asked

12 the basis for that belief with the question:

13     5.1   Why do you say that?[9]

14 Respondents who provided a reason for their belief as to the

15 source of the jeans were then asked:

16     5.2   What else, if anything, makes you say that?[10]

17 ///

18 ///

19

20 _____

       [8]    The first principal survey questions (i.e., question
21 series 5.0/5.1/5.2) were designed to address the issue of
   likelihood of confusion as to source or origin and were patterned
22 after similar accepted questions.  See Union Carbide Corp. v.
   Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976), cert. denied, 429
23 U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91 (1976); E. & J. Gallo
   Winery v. Gallo Cattle Co., 12 USPQ2d 1657, 1674 (E.D. Cal.
24 1989), aff'd, 967 F.2d (9th Cir. 1992); and J. Thomas McCarthy,
   McCarthy on Trademarks and Unfair Competition, Vol. 6 §32:174 @
25 32-339, Rel. #42, 5/2007.

26     [9]    Respondents who did not indicate a belief as to who put
   out the jeans in the photograph they were shown were not asked
27 question 5.1.

28     [10]    Respondents who provided a "don't know" response to
   question 5.1 were not asked question 5.2.

1 | Next, respondents were told:

2 |      6.0  Now, I am going to ask you a question that has
    |          three choices.  After I am done, if you want me to
3 |          read the question again, just ask me.

4 | and then asked:[11]

5 |          Do you believe that these jeans...
    |          • one, <u>are</u> being put out with the authorization
6 |            or approval of any other company or
    |            companies;
7 |          • two, are <u>not</u> being put out with the
    |            authorization or approval of any other
8 |            company or companies;[12]  or
    |          • three, don't know or have no opinion?

9 |

10 | Respondents who indicated the belief that the jeans were put out

11 | with the authorization/approval of any other company or companies

12 | were then asked:

13 |      6.1  What other company or companies?[13]

14 | If the respondent provided a company's name or companies' names,

15 | she was asked the basis for the belief with the question:

16 |      6.2  Why do you say that?

17 | ///

18 | ///

19 |

20 | _____

      [11]   The principal survey questions designed to address
21 | likelihood of confusion as to authorization/approval or business
    | affiliation/connection (i.e., question series 6.0/6.1/6.2/6.3 and
22 | 7.0/7.1/7.2/7.3) were also patterned after similar accepted
    | questions.  See J. Thomas McCarthy, <u>McCarthy on Trademarks and</u>
23 | <u>Unfair Competition</u>, Vol. 6 §32:175 @ 32-341, Rel.#42, 5/2007.

24 |      [12]   To guard against any order bias, the first two
    | alternatives in this list were rotated (i.e., approximately one-
25 | half of the respondents were read the list with the first
    | alternative being "...<u>are</u> being put out with the authorization or
26 | approval..." and approximately one-half of the respondents were
    | read the list with the first alternative being "...are <u>not</u> being
27 | put out with the authorization or approval...").

28 |      [13]   Respondents who did not identify a company or companies
    | in response to this question were not asked question 6.2 or 6.3.

1  Respondents who provided a reason for their belief were then

2  asked:

3      6.3  What else, if anything, makes you say that?[14]

4  Respondents were asked this same series of questions with regard

5  to business affiliation or business connection.  Specifically,

6  respondents were told:

7      7.0  Now, I am going to ask you another question that
           has three choices.  Again, after I am done, if you
8          want me to read the question again, just ask me.

9  Subsequently, respondents were asked:

10         Do you believe that the company that puts out
           these jeans...
11         • one, <u>has</u> a business affiliation or
             business connection with any other
12           company or companies;
           • two, does <u>not</u> have a business
13           affiliation or business connection with
             any other company or companies;[15] or
14         • three, don't know or have no opinion?

15  ///

16  ///

17  ///

18

19  ──────────────

       [14]   Respondents who provided a "don't know" response to
20  question 6.2 were not asked question 6.3.

21     [15]   Again, to guard against any order bias, the first two
    alternatives in this list were rotated (i.e., approximately one-
22  half of the respondents were read the list with the first
    alternative being "...<u>has</u> a business affiliation or business
23  connection..." and approximately one-half of the respondents were
    read the list with the first alternative being "...does <u>not</u> have
24  a business affiliation or business connection...").
           As an additional guard against order bias,
25  approximately one-half of the respondents were queried in
    question 6.0 regarding authorization/approval, and approximately
26  one-half of the respondents were queried in question 6.0
    regarding business affiliation/connection.  Similarly,
27  approximately one-half of the respondents were queried in
    question 7.0 regarding authorization/approval, and approximately
28  one-half of the respondents were queried in question 7.0
    regarding business affiliation/connection.

1   Respondents who indicated the belief that the company that puts

2   out the jeans had a business affiliation/connection with another

3   company were asked:

4       7.1   What other company or companies?[16]

5   If the respondent provided a company's name or companies' names,

6   she was asked the basis for the belief with the question:

7       7.2   Why do you say that?

8   Respondents who provided a reason for their belief were then

9   asked:

10      7.3   What else, if anything, makes you say that?[17]

11  Finally, the photograph of the jeans was removed from sight.

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25

26      [16]    Respondents who did not identify a company or companies

27  in response to this question were not asked questions 7.2 or 7.3.

28      [17]    Respondents who provided a "don't know" response to
    question 7.2 were not asked this question.

1     <u>SURVEY RESULTS - ADULT FEMALES</u>

2     <u>Test Cell - Survey Results</u>

3         34. Approximately fifteen percent (14.81%) of the

4 adult females survey respondents who saw the Ruehl jeans, in the

5 test cell, reported that they believed that the Ruehl jeans were

6 made or put out by Levi. See Exhibit A, Volume I, Table 1,

7 page 13.

TABLE 1[18]
TEST CELL
ADULT FEMALES

Q5.0  Who do you believe makes or puts out these jeans?
Q5.1  Why do you say that?
Q5.2  What else, if anything, makes you say that?

| Response Categories | Response Distribution Number | Percent (n=216) |
|---|---|---|
| 1. Levi - pocket/stitching | 8 | 3.70 |
| 2. Levi | 24 | 11.11 |
|      Subtotal | 32 | 14.81 |
| 3. Levi and Other | -- | --- |
| 4. Ruehl | 1 | 0.46 |
| 5. Other | 74 | 34.26 |
| 6. Don't know | 109 | 50.46 |
|      Total | 216 | 100.00 |

21 ///

22 ///

23 ///

24 ///

25 ///

---

[18]    Table numbers in this declaration and Rule 26 report correspond to the table numbers in Exhibit A, Volumes I & II, and therefore may not be sequential.

1         35.  An additional approximate two percent (1.39% +

2    0.93% = 2.32%) of the survey respondents reported that they

3    believed that the Ruehl jeans were being put out with the

4    authorization/approval of (1.39%) or had a business

5    affiliation/connection (0.93%) with Levi.  See Exhibit A,

6    Volume I, Table 2, page 32 and Table 3, page 52.

7

                                     TABLE 2

8                                 TEST CELL

                       ADULT FEMALES

9

6.0  Do you believe that these jeans...

10        one, <u>are</u> being put out with the authorization or approval
     of any other company or companies;

11        two, are <u>not</u> being put out with the authorization or
     approval of any other company or companies; or

12        three, don't know or have no opinion?
Q6.1  What other company or companies?

13   Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?

14

| Response Categories | Number | Response Distribution | Unduplicated | |
|---|---|---|---|---|
| | | Percent (n=216) | Number | Percent (n=216) |
| 1. Put out with authorization or approval | | | | |
|   • Levi - pocket/stitching | 1 | 0.46 | | |
|   • Levi | 3 | 1.39 | | |
|     Subtotal | 4 | 1.85 | 3 | 1.39 |
|   • Levi and Other | -- | --- | | |
|   • Ruehl | -- | --- | | |
|   • Other | 26 | 12.04 | | |
|   • Don't know | 17 | 7.87 | | |
|     Subtotal | 47 | 21.76 | | |
| 2. Not put out with approval | 37 | 17.13 | | |
| 3. Don't know/No opinion | 132 | 61.11 | | |
|     Total | 216 | 100.00 | | |

27   ///

28   ///

```
TABLE 3
TEST CELL
ADULT FEMALES
```

Q7.0  Do you believe that the company that puts out these
      jeans...
         one, has a business affiliation or business connection
         with any other company or companies;
         two, does not have a business affiliation or business
         connection with any other company or companies; or
         three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?

| Response Categories | Number | Percent (n=216) | Unduplicated Number | Percent (n=216) |
|---|---|---|---|---|
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 2 | 0.93 | | |
| Subtotal | 2 | 0.93 | 2 | 0.93 |
| • Levi and Other | 1 | 0.46 | | |
| • Ruehl | -- | --- | | |
| • Other | 24 | 11.11 | | |
| • Don't know | 29 | 13.43 | | |
| Subtotal | 56 | 25.93 | | |
| 2. Does not have business affiliation or connection | 44 | 20.37 | | |
| 3. Don't know/No opinion | 116 | 53.70 | | |
| Total | 216 | 100.00 | | |

///

///

///

///

///

///

///

1    36.  As noted earlier, the likelihood of confusion

2  survey conducted in this matter also employed the use of

3  questions (i.e., "Why do you say that?" and "What else, if

4  anything, makes you say that?") to provide an indication of the

5  basis for the respondents' beliefs expressed in response to the

6  survey's source, authorization/approval of, and business

7  affiliation/connection questions.  A review of the responses to

8  these questions, for respondents who gave a Levi response to any

9  of the survey questions in the test cell, indicates that in total

10  approximately four percent (4.17%) of respondents made specific

11  reference to the pocket and/or stitching on the Ruehl jeans.  See

12  Exhibit A, Volume I, Table 17, page 224, and Volume III,

13  Appendix E, page E-1.

14  Control Cell 1 - Survey Results

15    37.  As noted earlier, this study employed two separate

16  control cells to provide a measure of the extent to which non-

17  trademark confusion exists in the test cell survey results which

18  are not reflective of a likelihood of confusion due to the

19  stitching design on the Ruehl jeans.  The control survey cells

20  function as a baseline and provide a measure of the degree to

21  which respondents are likely to give the answer "Levi," not as a

22  result of the stitching design on the pocket of Defendant's jeans

23  but because of other factors, such as the survey's questions, the

24  survey's procedures, the nature of the product, or some other

25  potential influence on a respondent's answer such as simply the

26  presence of a stitching design on the back pocket of a pair of

27  jeans or the market share or brand popularity of Levi jeans.

28  ///

1          38.  Approximately forty-three percent (43.12%) of the

2    survey respondents who saw the Lucky jeans, in the first control

3    cell, reported that they believed that the Lucky jeans were made

4    or put out by Levi.  See Exhibit A, Volume I, Table 6, page 84.

TABLE 6
CONTROL CELL 1
ADULT FEMALES

Q5.0  Who do you believe makes or puts out these jeans?
Q5.1  Why do you say that?
Q5.2  What else, if anything, makes you say that?

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=218) |
| 1. Levi - pocket/stitching | 41 | 18.81 |
| 2. Levi | 53 | 24.31 |
| Subtotal | 94 | 43.12 |
| 3. Levi and Other | 5 | 2.29 |
| 4. Lucky | 3 | 1.38 |
| 5. Other | 46 | 21.10 |
| 6. Don't know | 70 | 32.11 |
| Total | 218 | 100.00 |

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

1          39.    An additional approximate five percent (1.38% +

2    3.21% = 4.59%) of the survey respondents reported that they

3    believed that the Lucky jeans were being put out with the

4    authorization/approval of (1.38%) or had a business affiliation/

5    connection (3.21%) with Levi.  See Exhibit A, Volume I, Table 7,

6    page 104 and Table 8, page 125.

7

TABLE 7
CONTROL CELL 1
ADULT FEMALES

Q6.0   Do you believe that these jeans...
           one, <u>are</u> being put out with the authorization or approval
           of any other company or companies;
           two, are <u>not</u> being put out with the authorization or
           approval of any other company or companies; or
           three, don't know or have no opinion?
Q6.1   What other company or companies?
Q6.2   Why do you say that?
Q6.3   What else, if anything, makes you say that?

|  | Response Distribution | | | |
|---|---|---|---|---|
|  | | | Unduplicated | |
| Response Categories | Number | Percent | Number | Percent |
|  | | (n=218) | | (n=218) |
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 8 | 3.67 | | |
| Subtotal | 8 | 3.67 | 3 | 1.38 |
| • Levi and Other | 1 | 0.46 | | |
| • Lucky | 1 | 0.46 | | |
| • Other | 23 | 10.55 | | |
| • Don't know | 30 | 13.76 | | |
| Subtotal | 63 | 28.90 | | |
| 2. Not put out with approval | 22 | 10.09 | | |
| 3. Don't know/No opinion | 133 | 61.01 | | |
| Total | 218 | 100.00 | | |

27   ///

28   ///

```
                          TABLE 8
                      CONTROL CELL 1
                      ADULT FEMALES
```

Q7.0  Do you believe that the company that puts out these
      jeans...
          one, has a business affiliation or business connection
          with any other company or companies;
          two, does not have a business affiliation or business
          connection with any other company or companies; or
          three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?

| Response Categories | Response Distribution | | | |
| | Number | Percent (n=218) | Unduplicated Number | Percent (n=218) |
|---|---|---|---|---|
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | 3 | 1.38 | | |
| • Levi | 6 | 2.75 | | |
| Subtotal | 9 | 4.13 | 7 | 3.21 |
| • Levi and Other | -- | --- | | |
| • Lucky | -- | --- | | |
| • Other | 18 | 8.26 | | |
| • Don't know | 34 | 15.60 | | |
| Subtotal | 61 | 27.98 | | |
| 2. Does not have business affiliation/connection | 22 | 10.09 | | |
| 3. Don't know/No opinion | 135 | 61.93 | | |
| Total | 218 | 100.00 | | |

///
///
///
///
///
///
///

1         40.   The first control cell also employed the use of

2 questions (i.e., "Why do you say that?" and "What else, if

3 anything, makes you say that?") to provide an indication of the

4 basis for the respondents' beliefs expressed in response to the

5 survey's source, authorization/approval of, and business

6 affiliation/connection questions.   A review of the responses to

7 these questions, for respondents who gave a Levi response to any

8 of the survey questions in the first control cell, indicates that

9 in total approximately twenty percent (20.18%) of respondents

10 made specific reference to the pocket and/or stitching on the

11 Lucky jeans.   See Exhibit A, Volume I, Table 17, page 224, and

12 Volume III, Appendix E, page E-1.

13 ///

14 ///

15 ///

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1 | Control Cell 2 - Survey Results

2 |   41.   Approximately twenty-nine percent (28.57%) of the

3 | survey respondents who saw the Indigo Red jeans, in the second

4 | control cell, reported that they believed that the Indigo Red

5 | jeans were made or put out by Levi.  See Exhibit A, Volume I,

6 | Table 11, page 156.

7 |

8 | TABLE 11
CONTROL CELL 2
ADULT FEMALES

9 |

Q5.0  Who do you believe makes or puts out these jeans?
10 | Q5.1  Why do you say that?
Q5.2  What else, if anything, makes you say that?

11 |

| Response Categories | Response Distribution | |
|---|---|---|
| | Number | Percent (n=217) |
| 1. Levi - pocket/stitching | 29 | 13.36 |
| 2. Levi | 33 | 15.21 |
| Subtotal | 62 | 28.57 |
| 3. Levi and Other | 6 | 2.77 |
| 4. Indigo Red | -- | --- |
| 5. Other | 75 | 34.56 |
| 6. Don't know | 74 | 34.10 |
| Total | 217 | 100.00 |

20 | ///

21 | ///

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///

Declaration and Rule 26 Report
of Dr. Gerald L. Ford                    - 25 -

1    42.  An additional approximate five percent (2.30% +

2   2.30% = 4.60%) of the survey respondents reported that they

3   believed that the Indigo Red jeans were being put out with the

4   authorization/approval of (2.30%) or had a business

5   affiliation/connection (2.30%) with Levi.  See Exhibit A,

6   Volume I, Table 12, page 177 and Table 13, page 198.

7

8   TABLE 12
    CONTROL CELL 2
    ADULT FEMALES

9

Q6.0  Do you believe that these jeans...
10        one, <u>are</u> being put out with the authorization or approval
          of any other company or companies;
11        two, are <u>not</u> being put out with the authorization or
          approval of any other company or companies; or
12        three, don't know or have no opinion?
    Q6.1  What other company or companies?
13  Q6.2  Why do you say that?
    Q6.3  What else, if anything, makes you say that?

14

15                                          Response Distribution
                                                    Unduplicated
    Response Categories       Number  Percent  Number  Percent
16                                    (n=217)          (n=217)
    1. Put out with authorization
17     or approval
       • Levi - pocket/stitching     3    1.38
18     • Levi                        5    2.30

19       Subtotal                    8    3.68      5    2.30

20     • Levi and Other              1    0.46
       • Indigo Red                 --    ---
21     • Other                      20    9.22
       • Don't know                 32   14.75
22
         Subtotal                   61   28.11
23
    2. Not put out with approval    23   10.60
24  3. Don't know/No opinion       133   61.29

25       Total                     217  100.00

26

27  ///

28  ///

```
                              TABLE 13
                          CONTROL CELL 2
                          ADULT FEMALES

Q7.0   Do you believe that the company that puts out these
       jeans...
         one, has a business affiliation or business connection
       with any other company or companies;
         two, does not have a business affiliation or business
       connection with any other company or companies; or
         three, don't know or have no opinion?
Q7.1   What other company or companies?
Q7.2   Why do you say that?
Q7.3   What else, if anything, makes you say that?
```

|  | | Response Distribution | | |
| --- | --- | --- | --- | --- |
| | | | Unduplicated | |
| Response Categories | Number | Percent (n=217) | Number | Percent (n=217) |
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | 2 | 0.92 | | |
| • Levi | 8 | 3.69 | | |
| Subtotal | 10 | 4.61 | 5 | 2.30 |
| • Levi and Other | -- | -- | | |
| • Indigo Red | -- | --- | | |
| • Other | 30 | 13.82 | | |
| • Don't know | 41 | 18.89 | | |
| Subtotal | 81 | 37.33 | | |
| 2. Does not have business affiliation/connection | 24 | 11.06 | | |
| 3. Don't know/No opinion | 112 | 51.61 | | |
| Total | 217 | 100.00 | | |

43.   The second control cell also employed the use of
questions (i.e., "Why do you say that?" and "What else, if
anything, makes you say that?") to provide an indication of the
basis for the respondents' beliefs expressed in response to the
survey's source, authorization/approval of, and business
affiliation/connection questions.   A review of the responses to
these questions, for respondents who gave a Levi response to any

1  of the survey questions in the second control cell, indicates

2  that in total approximately fifteen percent (14.75%) of

3  respondents made specific reference to the pocket and/or

4  stitching on the Indigo Red jeans.  See Exhibit A, Volume I,

5  Table 17, page 224, and Volume III, Appendix E, page E-1.

6  <u>Summary of Results - Adult Females</u>

7      44.  The results of the likelihood of confusion survey among

8  adult females, on a net basis after adjusting the survey data for

9  non-trademark related confusion, do not evidence any trademark

10  confusion attributable to the pocket stitching on the Ruehl

11  jeans.  Specifically, the survey results evidence that when non-

12  trademark confusion is accounted for (e.g., the tendency or

13  predisposition of some consumers to attribute the source of any

14  pair of jeans to Levi, the tendency or predisposition of some

15  consumers to attribute the source of any pair of jeans with

16  pocket stitching to Levi, etc.), there is no confusion

17  attributable to the stitching design present on the pocket of the

18  Ruehl jeans.

19      45.  The adjustment for non-trademark related confusion

20  is accomplished by reducing the percent of Levi responses in the

21  test cell by the percent of Levi responses in the control cells.

22  In this case, 17.13% of the survey respondents in the test cell

23  indicated they believed that Levi was the source, authorized/

24  approved of, or had a business affiliation/connection with

25  Defendant's jeans.  In control cell one, 47.71% of the survey

26  respondents indicated that they believed that Levi was the

27  source, authorized/approved of, or had a business affiliation/

28  connection with the first control jeans, the Lucky jeans that are

1  not alleged to infringe.  Thus, the likelihood of confusion

2  level, based on the first control cell, would be calculated as

3  17.13% - 47.71% = -30.58% or simply no likelihood of confusion

4  attributable to the stitching design on the pocket of the Ruehl

5  jeans.  In control cell two, 33.17% of the survey respondents

6  indicated that they believed that Levi was the source,

7  authorized/approved of, or had a business affiliation/connection

8  with the second control jeans, the Indigo Red jeans that are not

9  alleged to infringe.  Thus, the likelihood of confusion level,

10  based on the second control cell, would be calculated as 17.13% -

11  33.17% = -16.04%, again, simply no likelihood of confusion

12  attributable to the stitching design on the pocket of the Ruehl

13  jeans.  See Exhibit A, Volume I, Table 16, page 223.

|  | TABLE 16<br>TEST AND CONTROL CELLS<br>ADULT FEMALES | | |
|---|---|---|---|
|  | Composite Response Analysis<br>Net Unduplicated Levi Responses | | |
|  |  | Unduplicated<br>Response Distribution | | |
| Response Categories | Test<br>Cell 1<br>Percent<br>(n=216) | Control<br>Cell 1<br>Percent<br>(n=218) | Control<br>Cell 2<br>Percent<br>(n=217) |
| Total - Levi | 17.13 | 47.71 | 33.17 |

23      46.  The results of the likelihood of confusion survey

24  among adult females, on a net basis after adjusting the survey

25  data for non-trademark related confusion based upon the "Why do

26  you say that?" and "What else, if anything, makes you say that?"

27  questions, do not evidence any trademark confusion attributable

28  to the pocket stitching on the Ruehl jeans.

1          47.   The adjustment for non-trademark related confusion

2 based upon pocket and/or stitching responses to the "Why do you

3 say that?" and "What else, if anything, makes you say that?"

4 questions is accomplished by reducing the percent of Levi -

5 pocket/stitching responses in the test cell by the percent of

6 Levi - pocket/stitching responses in the control cells. In this

7 case, 4.17% of the survey respondents in the test cell indicated

8 they believed that Levi was the source, authorized/approved of,

9 or had a business affiliation/connection with Defendant's jeans

10 and when asked why they held that belief provided a Levi -

11 pocket/stitching response. In control cell one, 20.18% of the

12 survey respondents indicated that they believed that Levi was the

13 source, authorized/approved of, or had a business affiliation/

14 connection with the first control jeans, the Lucky jeans that are

15 not alleged to infringe, and when asked why they held that belief

16 provided a Levi - pocket/stitching response. Thus, the

17 likelihood of confusion level, based on the first control cell,

18 would be calculated as 4.17% - 20.18% = -16.01%, simply no

19 likelihood of confusion attributable to the stitching design on

20 the pocket of the Ruehl jeans. In control cell two, 14.75% of

21 the survey respondents indicated that they believed that Levi was

22 the source, authorized/approved of, or had a business

23 affiliation/connection with the second control jeans, the Indigo

24 Red jeans that are not alleged to infringe, and when asked why

25 they held that belief provided a Levi - pocket/stitching

26 response. Thus, the likelihood of confusion level, based on the

27 second control cell, would be calculated as 4.17% - 14.75% = -

28 10.58%, again, simply no likelihood of confusion attributable to

1 | the stitching design on the pocket of the Ruehl jeans.   See

2 | Exhibit A, Volume I, Table 17, page 224.

3

### TABLE 17
### TEST AND CONTROL CELLS
### ADULT FEMALES

### Composite Response Analysis
### Net Unduplicated Levi-Pocket/Stitching Responses

| Response Categories | Unduplicated Response Distribution | | |
|---|---|---|---|
| | Test Cell 1 Percent (n=216) | Control Cell 1 Percent (n=218) | Control Cell 2 Percent (n=217) |
| Total - Levi-pocket/stitching | 4.17 | 20.18 | 14.75 |

12 | ///

13 | ///

14 | ///

15 | ///

16 | ///

17 | ///

18 | ///

19 | ///

20 | ///

21 | ///

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///

1    SURVEY RESULTS - 13 TO 17 YEAR OLD FEMALES

2    Test Cell - Survey Results

3        48.   Approximately seventeen percent (16.67%) of the 13

4    to 17 year old female survey respondents who saw the Ruehl jeans,

5    in the test cell, reported that they believed that the Ruehl

6    jeans were made or put out by Levi.  See Exhibit A, Volume II,

7    Table 18, page 233.

8

TABLE 18
9                              TEST CELL
                    13 TO 17 YEAR OLD FEMALES
10
Q5.0  Who do you believe makes or puts out these jeans?
11   Q5.1  Why do you say that?
     Q5.2  What else, if anything, makes you say that?
12

| Response Categories | Response Distribution | |
|---|---|---|
| | Number | Percent (n=108) |
| 1. Levi - pocket/stitching | 3 | 2.78 |
| 2. Levi | 15 | 13.89 |
| Subtotal | 18 | 16.67 |
| 3. Levi and Other | 1 | 0.93 |
| 4. Ruehl | 1 | 0.93 |
| 5. Other | 35 | 32.41 |
| 6. Don't know | 53 | 49.07 |
| Total | 108 | 100.00 |

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1          49.   No additional 13 to 17 year old female survey

2    respondents reported that they believed that the Ruehl jeans were

3    being put out with the authorization/approval of or had a

4    business affiliation/connection with Levi.  See Exhibit A,

5    Volume II, Table 19, page 247 and Table 20, page 261.

---

### TABLE 19
### TEST CELL
### 13 TO 17 YEAR OLD FEMALES

Q6.0  Do you believe that these jeans...
      one, are being put out with the authorization or approval
      of any other company or companies;
      two, are not being put out with the authorization or
      approval of any other company or companies; or
      three, don't know or have no opinion?
Q6.1  What other company or companies?
Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?

---

| Response Categories | Number | Percent (n=108) | Unduplicated Number | Percent (n=108) |
|---|---|---|---|---|
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 1 | 0.93 | | |
| Subtotal | 1 | 0.93 | -- | --- |
| • Levi and Other | -- | --- | | |
| • Ruehl | -- | --- | | |
| • Other | 14 | 12.96 | | |
| • Don't know | 22 | 20.37 | | |
| Subtotal | 37 | 34.26 | | |
| 2. Not put out with approval | 11 | 10.19 | | |
| 3. Don't know/No opinion | 60 | 55.56 | | |
| Total | 108 | 100.00 | | |

---

26  ///

27  ///

28  ///

1

```
                              TABLE 20
                             TEST CELL
                   13 TO 17 YEAR OLD FEMALES
```

Q7.0  Do you believe that the company that puts out these
      jeans...
          one, has a business affiliation or business connection
          with any other company or companies;
          two, does not have a business affiliation or business
          connection with any other company or companies; or
          three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?

| Response Categories | Response Distribution | | Unduplicated | |
|---|---|---|---|---|
| | Number | Percent (n=108) | Number | Percent (n=108) |
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 1 | 0.93 | | |
| Subtotal | 1 | 0.93 | -- | --- |
| • Levi and Other | -- | --- | | |
| • Ruehl | -- | --- | | |
| • Other | 15 | 13.89 | | |
| • Don't know | 14 | 12.96 | | |
| Subtotal | 30 | 27.78 | | |
| 2. Does not have business affiliation or connection | 14 | 12.96 | | |
| 3. Don't know/No opinion | 64 | 59.26 | | |
| Total | 108 | 100.00 | | |

50.  As noted earlier, the likelihood of confusion

survey conducted among 13 to 17 year old females in this matter

also employed the use of questions (i.e., "Why do you say that?"

and "What else, if anything, makes you say that?") to provide an

indication of the basis for the respondents' beliefs expressed in

response to the survey's source, authorization/approval of, and

business affiliation/connection questions.  A review of the

1   responses to these questions, for respondents who gave a Levi

2   response to any of the survey questions in the test cell,

3   indicates that in total approximately three percent (2.78%) of

4   respondents made specific reference to the pocket and/or

5   stitching on the Ruehl jeans.  See Exhibit A, Volume II,

6   Table 34, page 383, and Volume III, Appendix E, page E-2.

7   <u>Control Cell 1 - Survey Results</u>

8          51.   The survey among 13 to 17 year old females also

9   employed two separate control cells to provide a measure of the

10  extent to which non-trademark confusion exists in the test cell

11  survey results which are not reflective of a likelihood of

12  confusion due to the stitching design on the Ruehl jeans.  The

13  control survey cells function as a baseline and provide a measure

14  of the degree to which respondents are likely to give the answer

15  "Levi," not as a result of the stitching design on the pocket of

16  Defendant's jeans but because of other factors, such as the

17  survey's questions, the survey's procedures, the nature of the

18  product, or some other potential influence on a respondent's

19  answer such as simply the presence of a stitching design on the

20  back pocket of a pair of jeans or the market share or brand

21  popularity of Levi jeans.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    52.  Among the 13 to 17 year old female respondents,

2  approximately thirty-nine percent (38.89%) who saw the Lucky

3  jeans, in the first control cell, reported that they believed

4  that the Lucky jeans were made or put out by Levi.  See

5  Exhibit A, Volume II, Table 23, page 284.

6

7
TABLE 23
CONTROL CELL 1
13 TO 17 YEAR OLD FEMALES

8

Q5.0  Who do you believe makes or puts out these jeans?
9  Q5.1  Why do you say that?
Q5.2  What else, if anything, makes you say that?

10

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=108) |
| 1. Levi - pocket/stitching | 12 | 11.11 |
| 2. Levi | 30 | 27.78 |
| Subtotal | 42 | 38.89 |
| 3. Levi and Other | 3 | 2.78 |
| 4. Lucky | 2 | 1.85 |
| 5. Other | 24 | 22.22 |
| 6. Don't know | 37 | 34.26 |
| Total | 108 | 100.00 |

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    53.   No additional 13 to 17 year old female survey

2  respondents reported that they believed that the Lucky jeans were

3  being put out with the authorization/approval of or had a

4  business affiliation/connection with Levi.  See Exhibit A,

5  Volume II, Table 24, page 298 and Table 25, page 313.

---

```
                          TABLE 24
                       CONTROL CELL 1
                  13 TO 17 YEAR OLD FEMALES
```

Q6.0  Do you believe that these jeans...
      one, are being put out with the authorization or approval
      of any other company or companies;
      two, are not being put out with the authorization or
      approval of any other company or companies; or
      three, don't know or have no opinion?
Q6.1  What other company or companies?
Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?

| Response Categories | Response Distribution | | Unduplicated | |
|---|---|---|---|---|
| | Number | Percent (n=108) | Number | Percent (n=108) |
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 1 | 0.93 | | |
| Subtotal | 1 | 0.93 | -- | --- |
| • Levi and Other | 3 | 2.78 | | |
| • Lucky | -- | --- | | |
| • Other | 10 | 9.26 | | |
| • Don't know | 20 | 18.52 | | |
| Subtotal | 34 | 31.48 | | |
| 2. Not put out with approval | 8 | 7.41 | | |
| 3. Don't know/No opinion | 66 | 61.11 | | |
| Total | 108 | 100.00 | | |

26  ///

27  ///

28  ///

```
                            TABLE 25
                        CONTROL CELL 1
                    13 TO 17 YEAR OLD FEMALES
```

Q7.0  Do you believe that the company that puts out these
      jeans...
          one, <u>has</u> a business affiliation or business connection
          with any other company or companies;
          two, does <u>not</u> have a business affiliation or business
          connection with any other company or companies; or
          three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?

| Response Categories | Response Distribution | | | |
| | Number | Percent (n=108) | Unduplicated Number | Percent (n=108) |
|---|---|---|---|---|
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | -- | --- | | |
| Subtotal | -- | --- | -- | --- |
| • Levi and Other | 2 | 1.85 | | |
| • Lucky | -- | --- | | |
| • Other | 12 | 11.11 | | |
| • Don't know | 20 | 18.52 | | |
| Subtotal | 34 | 31.48 | | |
| 2. Does not have business affiliation or connection | 14 | 12.96 | | |
| 3. Don't know/No opinion | 60 | 55.56 | | |
| Total | 108 | 100.00 | | |

54.   The first control cell conducted among 13 to 17

year old females in this matter also employed the use of

questions (i.e., "Why do you say that?" and "What else, if

anything, makes you say that?") to provide an indication of the

basis for the respondents' beliefs expressed in response to the

survey's source, authorization/approval of, and business

affiliation/connection questions.  A review of the responses to

1  these questions, for respondents who gave a Levi response to any

2  of the survey questions in the first control cell, indicates that

3  in total approximately eleven percent (11.11%) of respondents

4  made specific reference to the pocket and/or stitching on the

5  Lucky jeans.  See Exhibit A, Volume II, Table 34, page 383, and

6  Volume III, Appendix E, page E-2.

7  <u>Control Cell 2 - Survey Results</u>

8         55.  Among the 13 to 17 year old female respondents,

9  approximately twenty-nine percent (28.70%) who saw the Indigo Red

10 jeans, in the second control cell, reported that they believed

11 that the Indigo Red jeans were made or put out by Levi.  See

12 Exhibit A, Volume II, Table 28, page 337.

13

```
                          TABLE 28
                     CONTROL CELL 2
                 13 TO 17 YEAR OLD FEMALES

Q5.0  Who do you believe makes or puts out these jeans?
Q5.1  Why do you say that?
Q5.2  What else, if anything, makes you say that?
```

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Number | Percent (n=108) |
| 1. Levi - pocket/stitching | 10 | 9.26 |
| 2. Levi | 21 | 19.44 |
| Subtotal | 31 | 28.70 |
| 3. Levi and Other | 2 | 1.85 |
| 4. Indigo Red | -- | --- |
| 5. Other | 25 | 23.15 |
| 6. Don't know | 50 | 46.30 |
| Total | 108 | 100.00 |

26 ///

27 ///

28 ///

1        56.  An additional approximate two percent (1.85%) of

2  the 13 to 17 year old female survey respondents reported that

3  they believed that the company that put out the Indigo Red jeans

4  had a business affiliation/connection (1.85%) with Levi.  See

5  Exhibit A, Volume II, Table 29, page 351 and Table 30, page 306.

### TABLE 29
### CONTROL CELL 2
### 13 TO 17 YEAR OLD FEMALES

Q6.0  Do you believe that these jeans...
      one, are being put out with the authorization or approval
      of any other company or companies;
      two, are not being put out with the authorization or
      approval of any other company or companies; or
      three, don't know or have no opinion?
Q6.1  What other company or companies?
Q6.2  Why do you say that?
Q6.3  What else, if anything, makes you say that?

| | | Response Distribution | | |
| | | | Unduplicated | |
| Response Categories | Number | Percent (n=108) | Number | Percent (n=108) |
|---|---|---|---|---|
| 1. Put out with authorization or approval | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | -- | --- | | |
| Subtotal | -- | --- | -- | --- |
| • Levi and Other | -- | --- | | |
| • Indigo Red | -- | --- | | |
| • Other | 13 | 12.04 | | |
| • Don't know | 29 | 26.85 | | |
| Subtotal | 42 | 38.89 | | |
| 2. Not put out with approval | 13 | 12.04 | | |
| 3. Don't know/No opinion | 53 | 49.07 | | |
| Total | 108 | 100.00 | | |

25

26  ///

27  ///

28  ///

```
                            TABLE 30
                         CONTROL CELL 2
                   13 TO 17 YEAR OLD FEMALES

Q7.0  Do you believe that the company that puts out these
      jeans...
         one, has a business affiliation or business connection
         with any other company or companies;
         two, does not have a business affiliation or business
         connection with any other company or companies; or
         three, don't know or have no opinion?
Q7.1  What other company or companies?
Q7.2  Why do you say that?
Q7.3  What else, if anything, makes you say that?
```

| | Response Distribution | | | |
|---|---|---|---|---|
| | | | Unduplicated | |
| Response Categories | Number | Percent (n=108) | Number | Percent (n=108) |
| 1. Has business affiliation or connection | | | | |
| • Levi - pocket/stitching | -- | --- | | |
| • Levi | 2 | 1.85 | | |
| Subtotal | 2 | 1.85 | 2 | 1.85 |
| • Levi and Other | 2 | 1.85 | | |
| • Indigo Red | -- | --- | | |
| • Other | 5 | 4.63 | | |
| • Don't know | 22 | 20.37 | | |
| Subtotal | 31 | 28.70 | | |
| 2. Does not have business affiliation/connection | 18 | 16.67 | | |
| 3. Don't know/No opinion | 59 | 54.63 | | |
| Total | 108 | 100.00 | | |

57.    The second control cell conducted among 13 to 17 year old females in this matter also employed the use of questions (i.e., "Why do you say that?" and "What else, if anything, makes you say that?") to provide an indication of the basis for the respondents' beliefs expressed in response to the survey's source, authorization/approval of, and business affiliation/connection questions.  A review of the responses to

1  these questions, for respondents who gave a Levi response to any

2  of the survey questions in the second control cell, indicates

3  that in total approximately nine percent (9.26%) of respondents

4  made specific reference to the pocket and/or stitching on the

5  Indigo Red jeans.  See Exhibit A, Volume II, Table 34, page 383,

6  and Volume III, Appendix E, page E-2.

7  Summary of Results - 13 to 17 Year Old Females

8      58.  The results of the likelihood of confusion survey among

9  13 to 17 year old females, on a net basis after adjusting the

10  survey data for non-trademark related confusion, do not evidence

11  any trademark confusion attributable to the pocket stitching on

12  the Ruehl jeans.  Specifically, the survey results evidence that

13  when non-trademark confusion is accounted for (e.g., the tendency

14  or predisposition of some consumers to attribute the source of

15  any pair of jeans to Levi, the tendency or predisposition of some

16  consumers to attribute the source of any pair of jeans with

17  pocket stitching to Levi, etc.), there is no confusion

18  attributable to the stitching design present on the pocket of the

19  Ruehl jeans.

20      59.  The adjustment for non-trademark related confusion

21  is accomplished by reducing the percent of Levi responses in the

22  test cell by the percent of Levi responses in the control cells.

23  In this case, approximately eighteen percent (17.59%) of the 13

24  to 17 year old female survey respondents in the test cell

25  indicated they believed that Levi was the source,

26  authorized/approved of, or had a business affiliation/connection

27  with Defendant's jeans.  In control cell one, approximately

28  thirty-nine percent (38.89%) of the 13 to 17 year old survey

1  respondents indicated that they believed that Levi was the

2  source, authorized/approved of, or had a business affiliation/

3  connection with the first control jeans, the Lucky jeans that are

4  not alleged to infringe.  Thus, the likelihood of confusion

5  level, based on the first control cell, would be calculated as

6  17.59% - 38.89% = -21.30%, simply no likelihood of confusion

7  attributable to the stitching design on the pocket of the Ruehl

8  jeans.  In control cell two, approximately thirty-one percent

9  (30.56%) of the survey respondents indicated that they believed

10  that Levi was the source, authorized/approved of, or had a

11  business affiliation/connection with the second control jeans,

12  the Indigo Red jeans that are not alleged to infringe.  Thus, the

13  likelihood of confusion level, based on the second control cell,

14  would be calculated as 17.59% - 30.56% = -12.97%, again, simply

15  no likelihood of confusion attributable to the stitching design

16  on the pocket of the Ruehl jeans.  See Exhibit A, Volume II,

17  Table 33, page 382.

| TABLE 33 TEST AND CONTROL CELLS 13 TO 17 YEAR OLD FEMALES Composite Response Analysis Net Unduplicated Levi Responses | | |
|---|---|---|
| | Unduplicated Response Distribution | | |
| Response Categories | Test Cell 1 Percent (n=108) | Control Cell 1 Percent (n=108) | Control Cell 2 Percent (n=108) |
| Total - Levi | 17.59 | 38.89 | 30.56 |

27       60.  The results of the likelihood of confusion survey

28  among 13 to 17 year old females, on a net basis after adjusting

1  the survey data for non-trademark related confusion based upon
2  the "Why do you say that?" and "What else, if anything, makes you
3  say that?" questions, do not evidence any trademark confusion
4  attributable to the pocket stitching on the Ruehl jeans.

5       61.  The adjustment for non-trademark related confusion
6  based upon pocket and/or stitching responses to the "Why do you
7  say that?" and "What else, if anything, makes you say that?"
8  questions is accomplished by reducing the percent of Levi -
9  pocket/stitching responses in the test cell by the percent of
10 Levi - pocket/stitching responses in the control cells.  In this
11 case, approximately three percent (2.78%) of the survey
12 respondents in the test cell indicated they believed that Levi
13 was the source, authorized/approved of, or had a business
14 affiliation/connection with Defendant's jeans and when asked why
15 they held that belief provided a Levi - pocket/stitching
16 response.  In control cell one, approximately eleven percent
17 (11.11%) of the survey respondents indicated that they believed
18 that Levi was the source, authorized/approved of, or had a
19 business affiliation/connection with the first control jeans, the
20 Lucky jeans that are not alleged to infringe, and when asked why
21 they held that belief provided a Levi - pocket/stitching
22 response.  Thus, the likelihood of confusion level, based on the
23 first control cell, would be calculated as 2.78% - 11.11% =
24 -8.33%, simply no likelihood of confusion attributable to the
25 stitching design on the pocket of the Ruehl jeans.  In control
26 cell two, approximately nine percent (9.26%)% of the survey
27 respondents indicated that they believed that Levi was the
28 source, authorized/approved of, or had a business affiliation/

1   connection with the second control jeans, the Indigo Red jeans
2   that are not alleged to infringe, and when asked why they held
3   that belief provided a Levi - pocket/stitching response.  Thus,
4   the likelihood of confusion level, based on the second control
5   cell, would be calculated as 2.78% - 9.26% =
6   -6.48%, again, simply no likelihood of confusion attributable to
7   the stitching design on the pocket of the Ruehl jeans.  See
8   Exhibit A, Volume II, Table 34, page 383.

<br>

TABLE 34
TEST AND CONTROL CELLS
13 TO 17 YEAR OLD FEMALES

Composite Response Analysis
Net Unduplicated Levi-Pocket/Stitching Responses

| | Unduplicated Response Distribution | | |
| --- | --- | --- | --- |
| Response Categories | Test Cell 1 Percent (n=108) | Control Cell 1 Percent (n=108) | Control Cell 2 Percent (n=108) |
| Total - Levi-pocket/stitching | 2.78 | 11.11 | 9.26 |

18                                 CONCLUSION

19          62.   It is my considered opinion, based upon my
20   education, background, and professional experience, and based
21   upon my review and analysis of the survey conducted in this
22   matter, that the results of the survey conducted in this matter
23   clearly support a finding of no likelihood of confusion as to the
24   source, authorization/approval of, or business affiliation/
25   connection of Defendant's jeans with the source LS&CO due to the
26   stitching design on the pocket of the Ruehl brand jeans.
27   ///
28   ///

1

<u>QUALIFICATIONS</u>

2    63.  I hold a Bachelor's Degree in Advertising (B.A.)

3  from San Jose State University, a Master's Degree in Business

4  Administration (M.B.A.) from the University of Southern

5  California, and a Doctoral Degree in Business Administration

6  (D.B.A.) from the University of Southern California.

7    64.  During my twenty-five year academic appointment,

8  my teaching responsibilities included both graduate and

9  undergraduate level courses in a variety of subject areas.  My

10  teaching responsibilities included courses in marketing (e.g.,

11  marketing, marketing management, advertising, promotion, consumer

12  behavior, and marketing research) and management (e.g.,

13  principles of management; business policy and strategy; business

14  policies, operations, and organizations; and integrated

15  analysis).

16    65.  I am a member of the American Marketing

17  Association (AMA), the American Academy of Advertising (AAA), the

18  American Association of Public Opinion Research (AAPOR), the

19  Council of American Survey Research Organizations (CASRO), and

20  the International Trademark Association (INTA).

21    66.  As a partner with Ford Bubala & Associates, I have

22  been retained by a variety of firms engaged in the consumer

23  product, industrial product, and service sectors of the economy

24  to provide marketing consulting and research services.

25  Approximately one-half of Ford Bubala & Associates' consultancies

26  in which I have participated have involved the design and

27  execution of marketing research surveys.

28  ///

1    67.  As previously noted, during the past thirty-three

2  years, I have been retained in a number of litigation-related

3  consultancies involving intellectual property matters, including

4  matters before federal and state courts, the Trademark Trial and

5  Appeal Board of the U.S. Patent and Trademark Office, and the

6  International Trade Commission.  I have designed and executed

7  surveys relating to intellectual property matters, including

8  false advertising, trademark, patent, and other related matters.

9  I am familiar with the accepted principles of survey research, as

10  well as the tests for trustworthiness of properly conducted

11  surveys or polls.[19]

12    68.  During the past twenty-eight years, I have

13  addressed a variety of groups on the subject of surveys or polls

14  and their use in the measurement of the state of mind of

15  consumers, with respect to Lanham Act matters.  Specifically, I

16  have spoken at meetings of the American Bar Association, the

17  American Intellectual Property Law Association, the American

18  Marketing Association, the International Trademark Association,

19  the Marketing Research Association, the Intellectual Property Law

20  Institute of Canada, and the Practising Law Institute.

21    69.  I have also written on the subject of the design

22  and execution of litigation-related surveys in intellectual

23  property matters.  Attached hereto as Exhibit B is a list of

24  papers I have written since 1987.

25    70.  Since 1998 I have served as a member of the

26  Editorial Board of <u>The Trademark Reporter</u>, the scholarly legal

27

28    [19]    Supra note 2.

1 | journal on the subject of trademarks, published by the

2 | International Trademark Association.

3 |     71.  I have been qualified and accepted as an expert in

4 | marketing and marketing research in more than fifty (50) trials

5 | before federal and state courts and administrative government

6 | agencies.

7 |     72.  Attached hereto as Exhibit C is a list of cases in

8 | which I have provided trial and/or deposition testimony since

9 | 1992.

10 |     73.  Attached hereto as Exhibit D is a copy of my

11 | professional history, describing my qualifications and

12 | professional background.

13 | MATERIAL CONSIDERED

14 |     74.  Materials considered, in the instant matter,

15 | include:  the Complaint; the Answer, Affirmative Defenses, and

16 | Counterclaims; Abercrombie & Fitch Trading Co.'s Amended Answer,

17 | Affirmative Defenses, and Counterclaims; Exhibits to Amended

18 | Answer, Affirmative Defenses, and Counterclaims; Stipulated

19 | Protective Order; Scheduling Order; deposition transcript of

20 | Carol Scott, February 17, 2005, in the Levi Strauss v. RP55, Inc.

21 | matter; deposition transcript of Carol Scott, March 9, 2005, in

22 | the Levi Strauss v. RP55, Inc. matter; and documents bearing

23 | document control numbers LS-A&F009526 through LS-A&F009621 and

24 | LS-A&F009627 through LS-A&F009665.

25 | COMPENSATION

26 |     75.  Ford Bubala & Associates' fees for this engagement

27 | consist of billable time and expenses.  Standard time is billed

28 | at the rate of $500.00 per hour for the services of a Partner and

1 | $250.00 per hour for the services of a Research Associate.

2 | Deposition and trial time are billed at the rate of $600.00 per

3 | hour plus expenses.

4 |     I declare under penalty of perjury under the laws of

5 | the United States of America that the foregoing is true and

6 | correct.  Executed this 25th day of June, 2008, in Huntington

7 | Beach, California.

8

9 |                 Dr. Gerald L. Ford

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of June, 2008, I caused a true and correct copy

of the Declaration and Rule 26 Report of Dr. Gerald L. Ford to be served to the following:

| | | |
|---|---|---|
| _____ | HAND DELIVERY | Gregory S. Gilchrist |
| ✓ | U.S. MAIL | Gia L. Cincone |
| _____ | OVERNIGHT MAIL | Townsend & Townsend and Crew LLP |
| _____ | FAX TRANSMISSION | Two Embarcadero Center, Eighth Floor |
| _____ | EMAIL | San Francisco, CA  94111-3834 |

fax 415.576.0300
gsfilchrist@townsend.com
glcincone@townsend.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


LEVI STRAUSS & CO.,                     )

                Plaintiff,      ) Case No. CV-07-3752

      VS.                               )

ABERCROMBIE & FITCH TRADING    ) Pages 1-191

CO.,                                    )

             Defendant.      )

_____ )


# CERTIFIED COPY


VIDEOTAPED DEPOSITION OF:

      GERALD L. FORD, D.B.A.

      WEDNESDAY, JULY 23, 2008

      10:09 A.M.


Reported by:    LINDA NICKERSON

      CSR No. 8746

**MERRILL  LEGAL  SOLUTIONS**

135 Main Street, 4th Floor                              415.357.4300 Tel
www.merrillcorp.com/law   San Francisco, CA 94105

GERALD L. FORD, D.B.A.        July 23, 2008

| | | |
|---|---|---|
| 10:29:52 | 1 | A    For the past four years, yes, and I believe that |
| 10:29:55 | 2 | that rule came into effect sometime in the 1990s for the |
| 10:30:13 | 3 | first time, and so the exhibit that you have that was |
| 10:30:17 | 4 | attached to -- can I borrow this for a minute? |
| 10:30:19 | 5 | Q    Yeah. |
| 10:30:27 | 6 | A    Thank you.  Maybe we should mark it. |
| 10:30:34 | 7 | MR. GILCHRIST:  This is Exhibit 1.  You can give that |
| 10:30:36 | 8 | one to Mike because that's his copy.  I'm sure he's got |
| 10:30:39 | 9 | about 17 of them already. |
| | 10 | (The document referred to was marked by the |
| | 11 | Reporter as Plaintiff's Exhibit 1 for identification and |
| | 12 | is attached hereto.) |
| 10:31:00 | 13 | THE WITNESS:  Exhibit C to my declaration and Rule 26 |
| 10:31:02 | 14 | report -- ah, here it is -- provided a list of all cases |
| 10:31:10 | 15 | in which I have either given trial or deposition |
| 10:31:12 | 16 | testimony since 1992.  So we've just added to that list. |
| 10:31:19 | 17 | We've never limited the list to four years.  We've -- |
| 10:31:25 | 18 | BY MR. GILCHRIST: |
| 10:31:25 | 19 | Q    So since the rule came into effect, you've been |
| 10:31:27 | 20 | keeping track of the matters in which you've given |
| 10:31:30 | 21 | deposition or trial testimony and you just give that out |
| 10:31:33 | 22 | as of the date your reports are submitted? |
| 10:31:35 | 23 | A    That's correct, and they're not duplicative.  If |
| 10:31:38 | 24 | a matter -- if I was deposed in a matter and then that |
| 10:31:46 | 25 | matter went to trial, then that would appear on the trial |

18

# EXHIBIT S

# Trademark/Service Mark Application, Principal Register

**Serial Number: 78766368**
**Filing Date: 12/05/2005**

---

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **MARK SECTION** | |
| MARK FILE NAME | \\TICRS\EXPORT8\IMAGEOUT8 \787\663\78766368\xml1\AP P0002.JPG |
| STANDARD CHARACTERS | NO |
| USPTO-GENERATED IMAGE | NO |
| COLOR MARK | NO |
| DESCRIPTION OF THE MARK (and Color Location, if applicable) | The mark consists of a miscellaneous mirror image stitching design. The dotted lines around the mark represents the shapes of the pockets, which are not claimed as features of the mark. |
| PIXEL COUNT ACCEPTABLE | YES |
| PIXEL COUNT | 944 x 458 |
| **OWNER SECTION** | |
| NAME | Abercrombie & Fitch Trading Co. |
| STREET | 6301 Fitch Path |
| CITY | New Albany |
| STATE | Ohio |
| ZIP/POSTAL CODE | 43054 |
| COUNTRY | United States |
| AUTHORIZED EMAIL COMMUNICATION | No |
| **LEGAL ENTITY SECTION** | |
| TYPE | CORPORATION |
| STATE/COUNTRY OF INCORPORATION | Ohio |
| **GOODS AND/OR SERVICES SECTION** | |
| INTERNATIONAL CLASS | 025 |
| DESCRIPTION | Clothing, namely, jeans, skirts, shorts, pants and jackets |
| FILING BASIS | Section 1(b) |
| **SIGNATURE SECTION** | |
| SIGNATURE | /Reid M. Wilson/ |
| SIGNATORY NAME | Reid M. Wilson |
| SIGNATORY DATE | 12/05/2005 |
| SIGNATORY POSITION | Trademark Counsel and Assistant Secretary |
| **PAYMENT SECTION** | |
| NUMBER OF CLASSES | 1 |
| NUMBER OF CLASSES PAID | 1 |
| SUBTOTAL AMOUNT | 325 |
| TOTAL AMOUNT | 325 |

| PAYMENT METHOD | DA |
|---|---|

## ATTORNEY

| NAME | Katherine M. Basile |
|---|---|
| FIRM NAME | HOWREY LLP |
| STREET | 1299 Pennsylvania Avenue, NW |
| CITY | Washington |
| STATE | District of Columbia |
| ZIP/POSTAL CODE | 20004-2402 |
| COUNTRY | United States |
| PHONE | 202-783-0800 |
| FAX | 202-383-7195 |
| EMAIL | ipdocketing@howrey.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| ATTORNEY DOCKET NUMBER | 00863.____.TMUS00 |
| OTHER APPOINTED ATTORNEY(S) | Susan M. Kayser, Caroline C. Smith, Allison G. Olmsted, Mike M. Yaghmai, Jessica D. Bradley, and others of the firm |

## CORRESPONDENCE SECTION

| NAME | Katherine M. Basile |
|---|---|
| FIRM NAME | HOWREY LLP |
| STREET | 1299 Pennsylvania Avenue, NW |
| CITY | Washington |
| STATE | District of Columbia |
| ZIP/POSTAL CODE | 20004-2402 |
| COUNTRY | United States |
| PHONE | 202-783-0800 |
| FAX | 202-383-7195 |
| EMAIL | ipdocketing@howrey.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |

## FILING INFORMATION

| SUBMIT DATE | Mon Dec 05 10:48:10 EST 2005 |
|---|---|
| TEAS STAMP | USPTO/BAS-198147515-20051 205104810045160-78766368-20066bb1fa3f445e89e87f828 d18ddc9-DA-1206-200512051 01939879244 |

PTO Form 1478 (Rev 6/2005)
OMB No. 0651-0009 (Exp xx/xx/xxxx)

## Trademark/Service Mark Application, Principal Register

### Serial Number: 78766368
### Filing Date: 12/05/2005

**To the Commissioner for Trademarks:**

**MARK:** (Stylized and/or Design, see mark)

The mark consists of a contour of a back pocket imposed over the dotted lines would (horizontal) present the shape of the pockets, which are not claimed as features of the mark.

The applicant, Abercrombie & Fitch Trading Co., a corporation of Ohio, residing at 6301 Fitch Path, New Albany, Ohio, United States, 43054, requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended.

Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

     International Class 025: Clothing, namely, jeans, skirts, shorts, pants and jackets

The applicant hereby appoints Katherine M. Basile and Susan M. Kayser, Caroline C. Smith, Allison G. Olmsted, Mike M. Yaghmai, Jessica D. Bradley, and others of the firm of HOWREY LLP, 1299 Pennsylvania Avenue, NW, Washington, District of Columbia, United States, 20004-2402 to submit this application on behalf of the applicant. The attorney docket/reference number is 00863.____.TMUS00.

The USPTO is authorized to communicate with the applicant or its representative at the following email address: ipdocketing@howrey.com.

A fee payment in the amount of $325 will be submitted with the application, representing payment for 1 class(es).

**Declaration**

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.


Signature: /Reid M. Wilson/   Date: 12/05/2005
Signatory's Name: Reid M. Wilson
Signatory's Position: Trademark Counsel and Assistant Secretary


Mailing Address:
     Katherine M. Basile
     1299 Pennsylvania Avenue, NW
     Washington, District of Columbia 20004-2402

RAM Sale Number: 1206
RAM Accounting Date: 12/05/2005

Serial Number: 78766368
Internet Transmission Date: Mon Dec 05 10:48:10 EST 2005
TEAS Stamp: USPTO/BAS-198147515-20051205104810045160
-78766368-20066bb1fa3f445e89e87f828d18dd
c9-DA-1206-20051205101939879244



# EXHIBIT T

Mark Breitbard/Abercrombie    To  Kevin Cothren/Abercrombie@Abercrombie
03/07/2006 08:25 AM           cc
                              bcc
                         Subject  Re: Possible Levi challenge of new Ruehl women's pocket
                                  design

no problem. one often can't predict such things. I didn't even consider levi's when looking at the stitch.
M

Kevin Cothren/Abercrombie

            Kevin Cothren/Abercrombie
            03/06/2006 08:21 PM       To  Mark Breitbard/Abercrombie@Abercrombie
                                      cc
                                 Subject  Re: Possible Levi challenge of new Ruehl women's pocket
                                          design

Hi Mark,

I passed the sample to Reid.            *Redacted for*
                                        *Privilege*

Thanks,
Kevin


Mark Breitbard/Abercrombie

            Mark Breitbard/Abercrombie
            03/06/2006 04:17 PM       To  Reid Wilson/Abercrombie@Abercrombie
                                      cc  Lee Holman/Abercrombie@Abercrombie, Kevin
                                          Cothren/Abercrombie@Abercrombie
                                 Subject  Re: Possible Levi challenge of new Ruehl women's pocket
                                          design


We love it and are using it. I will make sure that Kevin gets a sample to you.
Thanks,
Mark

Reid Wilson/Abercrombie

            Reid Wilson/Abercrombie
            03/06/2006 01:38 PM       To  Mark Breitbard/Abercrombie@Abercrombie
                                      cc  Chad Kessler/Abercrombie@Abercrombie
                                 Subject  Possible Levi challenge of new Ruehl women's pocket
                                          design

Mark,

Can you confirm whether we are still as interested in the new Ruehl women's pocket design as we were when we decided to move forward with it. **Redacted for Privilege**

Also, can you tell me if we are using this pocket design yet?  Any chance I could get a sample?

Thanks.

Reid

Reid M. Wilson
Trademark Counsel
Abercrombie & Fitch
614.283.6131
614.283.8695 (fax)
reid_wilson@abercrombie.com

A&F RFP#1
0805