1   MICHAEL J. BETTINGER (STATE BAR NO. 122196)
    RACHEL R. DAVIDSON (State Bar No. 215517)
2   K&L GATES LLP
    55 Second Street, Suite 1700
3   San Francisco, CA 94105
    Phone:  415-882-8200
4   Facsimile:  415- 882-8220

5   J. MICHAEL KEYES (PRO HAC VICE)
    KJIRSTIN J. GRAHAM (State Bar No. 239485)
6   K&L GATES LLP
    618 West Riverside Avenue, Suite 300
7   Spokane WA  99201-0602
    Phone:  509-624-2100
8   Facsimile:  509-456-0146

9   Attorneys for Defendant
    ABERCROMBIE & FITCH TRADING CO.

10

11              **UNITED STATES DISTRICT COURT**

12              **NORTHERN DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| 14   LEVI STRAUSS & CO.,                                Plaintiff, | No. CV-07-3752 -JSW |
| 15 | **DEFENDANT ABERCROMBIE &** |
| 16        v. | **FITCH'S OPPOSITION TO PLAINTIFF'S MOTION FOR** |
| 17   ABERCROMBIE & FITCH TRADING CO.,            Defendant. | **SUMMARY JUDGMENT ON COUNTERCLAIMS AND SELECTED AFFIRMATIVE** |
| 18 | **DEFENSES AND PARTIAL SUMMARY JUDGMENT ON** |
| 19   ABERCROMBIE & FITCH TRADING CO.,            Counter-Claimant, | **PLAINTIFF'S CLAIM OF TRADEMARK DILUTION** |
| 20        v. | **DATE: September 26, 2008** |
| 21   LEVI STRAUSS & CO.,                            Counter-Defendant. | **TIME:  9:00 a.m.**<br>**COURTROOM:  2** |

22

23

24

25              REDACTED PUBLIC VERSION

26

1

# TABLE OF CONTENTS

2

Page

3    I.     INTRODUCTION & SUMMARY OF THE ARGUMENT............................................vi

4    II.    FACTS IN OPPOSITION TO LS&CO.'S MOTION FOR SUMMARY
            JUDGMENT............................................................................................................1

5

6          A.    The Facts Pertaining to Abercrombie's Counterclaim for Fraud. .....................1

7          B.    The Facts Pertaining to Abercrombie's Claim of Abandonment. .....................3

8                1.    LS&Co. Has Consented to Numerous Third-Party Uses of
                       Similar Designs. ...............................................................................3

9                2.    Numerous Third-Party Designs Similar to the Arcuate Exist on
10                     the Market.........................................................................................5

11               3.    Recognition of the Arcuate Design in The Marketplace Has
                       Plummeted. .......................................................................................5

12   III.   LAW & ARGUMENT ...........................................................................................6

13         A.    Abercrombie's Fraud Counterclaim Presents Numerous Factual Issues
                 Which Preclude Summary Judgment. .............................................................6

14

15               1.    LS&Co.'s Incontestability Affidavit by Ms. Fowler Was False
                       Because Lois Sportswear Alleged the Arcuate Trademark Was
16                     Invalid and Unenforceable. ................................................................7

17               2.    LS&Co.'s claim that the Fowler affidavit was "truthful" has no
                       basis in fact or law. ...........................................................................9

18               3.    LS&Co. undertook no investigation before filing either 8 & 15
19                     affidavit...........................................................................................11

20         B.    Abercrombie Has Presented Sufficient Facts to Establish that
                 LS&Co.'s Arcuate Design Has Lost All Significance as a Trademark...........15

21               1.    LS&Co. Has Affirmatively Consented to No Less Than
                       Thirteen Uses of Similar Designs and Effectively Granted a
22                     "Naked License" to Third-Parties By Consenting to Their
                       Uncontrolled Use of Accused Designs...............................................16

23               2.    The Prevalence of Similar Third-Party Designs in the
24                     Marketplace and on the Trademark Register Further Supports
                       Abercrombie's Abandonment Claim...................................................17

25               3.    Consumer Recognition of the Arcuate Mark Has Experienced a
26                     Fatal Drop........................................................................................18

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

C.   LS&Co. Is Not Entitled to Summary Judgment On Abercrombie's
     Affirmative Defenses......................................................................................19

D.   LS&Co. Is Not Entitled to Partial Summary Judgment On Its Dilution
     Claim Because the Evidence Shows that the Arcuate Mark is Not
     Famous. .........................................................................................................23

IV.  CONCLUSION .........................................................................................................255

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adidas Am., Inc. v. Payless Shoesource, Inc.,*
546 F. Supp. 1029 (D. Or. 2008) .................................................................................23

*Albert v. Kevex Corp.,*
729 F.2d 757 (Fed. Cir.), *aff'd on reh'g,* 741 F.2d 396, 223 U.S.P.Q. 1 (Fed. Cir.
1984)...........................................................................................................................11

*Audi AG v. D'Amato,*
469 F.3d 534 (6th Cir. 2006) .....................................................................................24

*Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.,*
289 F.3d 589 (9th Cir. 2002) .....................................................................................17

*Brother Records v. Jardine,*
318 F.3d 900 (9th Cir. 2003) .....................................................................................22

*Citibank, N.A v. City Bank of San Francisco,*
206 U.S.P.Q. 997 (N.D. Cal.1980)..............................................................................16

*Clinton E. Worden & Co. v. California Fig Syrup Co.,*
187 U.S. 516, 23 S. Ct. 161, 47 L. Ed. 282 (1903) ....................................................23

*Constellation Brands, Inc. v. Arbor Hill Associates, Inc.,*
535 F.3d 347 (W.D.N.Y. 2008).....................................................................................8

*Copelands' Enterprises, Inc. v. CNV, Inc.,*
945 F.2d 1563 (Fed. Cir. 1991) ..................................................................................11

*Country Floors, Inc. v. Gepner,* 930 F.2d 1056 (3d Cir. 1991) ................................................19

*CPI Plastics, Inc. v. USX Corp.,*
22 F. Supp. 2d 1373 (N.D. Ga. 1995) .........................................................................10

*Crown Wallcovering Corp. v. Wallpapers Manufacturers Limited,*
188 U.S.P.Q. 141 (1975) ...............................................................................................7

*Dawn Donut Co. v. Hart's Food Stores, Inc.,*
267 F.2d 358 (2d Cir. 1959) .......................................................................................17

*Duffy-Mott Co., Inc. v. Cumberland Packing Co.,*
424 F.2d 1095, 57 CCPA 1046 (1970)..................................................................7, 22

*E. & J. Gallo Winery v. Pasatiempos Gallo, S.A.,*
905 F. Supp. 1403 (E.D. Cal. 1994)............................................................................21

*Electrical Information Publications, Inc. v. C-M Periodicals, Inc.,*
163 U.S.P.Q. 624 (N.D. Ill. 1969)...............................................................................22

*Eliminator Custom Boats v. Am. Marine Holdings, Inc.,*
No. ED CV 06-15, 2007 U.S. Dist. LEXIS 96414  (C.D. Cal. Nov. 5, 2007) .....................22

*Estee Lauder, Inc. v. Fragrance Counter, Inc.,*
189 F.R.D. 269 (S.D.N.Y. 1999)..................................................................................22

1   *Estefan Enterprises, Inc. v. Coco Bongo Grill and Bar, Inc.,*
2       No. 6:06-cv-742-Orl-31KRS, 2007 WL 1602341 (M.D. Fla. Jun. 4, 2007)..........................8

    *Far Out Productions, Inc. v. Oskar,*
3       247 F. 3d 986 (9th Cir. 2001) .................................................................................14

4   *Fila Sport, S.P.A. v. Diadora America, Inc.,*
        141 F.R.D. 74 (N.D. Ill 1991) .................................................................................20

5   *First Interstate Bancorp v. Stenquist,|*
        No. C-89-4106, 1990 U.S. Dist. LEXIS 19426 (N.D. Cal. Jul. 13, 1990) ..........................17

6   *FirstHealth of Carolinas, Inc. v. CareFirst of Maryland, Inc.,*
7       479 F.3d 825 (Fed. Cir. 2007) ...............................................................................15

    *Fossil Inc. v. Fossil Group,*
8       49 U.S.P.Q. 2d 1451 (T.T.A.B. 1998)........................................................................24

9   *General Mills, Inc. v. Health Valley Foods,*
        24 U.S.P.Q.2d 1270 (T.T.A.B. 1992) ......................................................................24

10  *Halo Mgmt., LLC v. Interland, Inc.,*
        308 F. Supp. 2d 1019 (N.D. Cal. 2003).......................................................................17

11  *Harley-Davidson, Inc. v. Grottanelli,*
        91 F. Supp. 2d 544 (W.D.N.Y. 2000) ....................................................................9, 11

12  *Juno Online Servs., L.P. v. Juno Lighting,*
13      979 F. Supp. 684 (N.D. Ill. 1997)...........................................................................23

    *KangaROOS U.S.A., Inc. v. Caldor, Inc.,*
14      778 F.2d 1571 (Fed. Cir. 1985) ..............................................................................11

15  *Le Sportsac, Inc. v. Dockside Research, Inc.,*
        478 F. Supp. 602 (S.D.N.Y. 1979) ..........................................................................20

16  *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,*
        548 F. Supp. 2d 811 (N.D. Cal. 2008).........................................................................7

17  *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,*
18      No. 04 Civ. 2990, 2008 U.S. Dist. LEXIS 42787 (S.D.N.Y. May 28, 2008) ......................23

    *Marshak v. Treadwell,*
19      58 F. Supp. 2d 551 (D.N.J. 1999).............................................................................11

20  *Medinol Ltd. v. Neuro Vasz, Inc.,*
        67 U.S.P.Q.2d 1205 (T.T.A.B. 2003)....................................................................11, 12

21  *Nina Ricci, S.A.R.L. v. Gemcraft, Ltd.,*
        612 F. Supp. 1520 (S.D.N.Y. 1985) ..........................................................................20
22
    *Pizzeria Uno Corp. v. Temple,*
23      747 F.2d 1522 (4th Cir. 1984).................................................................................8

    *Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy*
24      *P.C.,*
        314 F.3d 62 (2d Cir. N.Y. 2002) .............................................................................21
25
    *Raber v. Pittway Corp.,*
26      No. C 92-2581, 1994 U.S. Dist. LEXIS 9646 (N.D. Cal. Jul. 7, 1994) ...............................21

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

*Ramada Franchise Sys. v. Royal Vale Hospitality of Cincinnati, Inc.*,
   No. 02 C 1941, 2005 U.S. Dist. LEXIS 8367 (N.D. Ill. Feb. 16, 2005) ............................... 10

*Robi v. Five Platters, Inc.*,
   918 F.2d 1439 (9th Cir. 1990) ......................................................................................... 7

*Saverslak v. Davis-Cleaver Produce, Co.*,
   606 F.2d 208 (7th Cir. 1979) ......................................................................................... 22

*Siegel v. Chicken Delight, Inc.*,
   448 F.2d 43 (9th Cir. 1971) ......................................................................................... 17

*Spraying Systems Co. v. Delavan, Inc.*,
   975 F.2d 387 (7th Cir. 1992) ......................................................................................... 18

*Standard Knitting, Ltd. v. Toyota Jidosha Kabushiki Kaisha*,
   No. 91116242, 2006 TTAB LEXIS 9 (T.T.A.B. Jan. 10, 2006) ............................ 11, 12, 14

*STX, Inc. v. Bauer USA, Inc.*,
   43 U.S.P.Q.2d 1492 (N.D. Cal. 1997) ......................................................................... 16

*Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*,
   743 F.2d 1039 (4th Cir. 1984) ......................................................................................... 19

*T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*,
   809 F.2d 626 (9th Cir. 1987) ......................................................................................... 15

*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*,
   465 F.3d 1102 (9th Cir. 2006) ......................................................................................... 19

*Torres v. Cantine Torresella S.r.1.*,
   808 F.2d 46, U.S.P.Q. 2d 1483 (Fed. Cir. 1986) .......................................................... 11

*United States v. Cyr*,
   No. CV-03-97-B-W, 2004 U.S. Dist. LEXIS 15578 (D. Me. Aug. 6, 2004) ...................... 10

*Visa Intern. Service Ass'n v. Bankcard Holders of America*,
   211 U.S.P.Q. 28 (N.D. Cal.1981) ................................................................................. 16

*Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*,
   680 F.2d 755 (Cust. & Pat. App. 1982) ....................................................................... 18

*Whittaker Corp. v. Execuair Corp.*,
   736 F.2d 1341 (9th Cir. Cal. 1984) .............................................................................. 20

*Zippo Mfg. Co. v. Rogers Imports, Inc.*,
   216 F. Supp. 670 (S.D.N.Y. 1963) ................................................................................. 18

**Federal Statutes**

15 U.S.C. § 1064 ................................................................................. 6, 7, 8, 15

15 U.S.C. § 1065 ................................................................................................. 7

15 U.S.C. § 1114 ............................................................................................... 20

15 U.S.C. § 1115 ................................................................................................. 7

15 U.S.C. § 1119 ................................................................................................. 9

15 U.S.C. § 1127 ............................................................................................... 15

I.    **INTRODUCTION & SUMMARY OF THE ARGUMENT**

Levi Strauss & Co.'s ("LS&Co.") Motion for Summary Judgment on Abercrombie & Fitch's ("Abercrombie") Counterclaims and Selected Affirmative Defenses and for Partial Summary Judgment on LS&Co.'s Claim of Trademark Dilution should be denied entirely.

Abercrombie's counterclaim for fraud on the U.S. Patent and Trademark Office ("PTO") easily withstands LS&Co.'s motion.  The undisputed facts show that in *Lois Sportswear v. Levi Strauss & Co.*, Lois Sportswear made numerous allegations that LS&Co.'s "arcuate" had been "abandoned."  During the pendency of that case, LS&Co. submitted an affidavit to the PTO claiming there was no pending proceeding involving LS&Co.'s rights to its arcuate mark.  This representation was not only materially false, the undisputed evidence shows an utter lack of "good faith" on LS&Co.'s part.  Consequently, LS&Co.'s motion for summary judgment on this claim should be denied.

The Court should likewise deny LS&Co.'s motion for summary judgment on the counterclaim for cancellation based on abandonment of the arcuate design.  LS&Co.'s own evidence confirms that consumer "recognition" of the arcuate design has plummeted over the last decade and LS&Co. has *expressly* consented to allegedly-infringing designs and numerous other similar designs remaining on the marketplace and on the PTO registers. These facts are certainly sufficient for a jury to assess whether the arcuate has lost its significance as a trademark.  LS&Co.'s self-serving claims to the contrary should be rejected.

Additionally, as set forth herein, Abercrombie has presented sufficient evidence to support each of its affirmative defenses to LS&Co.'s Complaint.

Lastly, LS&Co.'s claim that its arcuate is "famous" should be summarily denied.  The facts show that the arcuate is not famous at all; rather, it has lost significance as a mark. Consequently, LS&Co.'s "fame" argument fails.

## II.     FACTS IN OPPOSITION TO LS&CO.'S MOTION FOR SUMMARY JUDGMENT

### A.     The Facts Pertaining to Abercrombie's Counterclaim for Fraud.

On December 13, 1982, Lois Sportswear U.S.A., Inc., ("Lois Sportswear") filed a declaratory judgment action against LS&Co. in the U.S. District Court for the Southern District of New York. *See* Exh. A to Declaration of Rachel R. Davidson ("Davidson Dec.").[1] The Lois Sportswear Complaint alleged that Lois Sportswear's back pocket stitching design used on its denim jeans did not infringe on LS&Co.'s "back pocket stitching" design. *See id.*, ¶ 18. LS&Co. asserted counterclaims against Lois Sportswear claiming that it infringed on LS&Co.'s U.S. Trademark Registration Nos. 404,248 (the "'248") and 1,139,254 (the "'254"), the "arcuate" registrations. *See* Exh. B to Davidson Dec.[2]

Not only did Lois Sportswear deny all allegations of infringement in that case, but it asserted on numerous occasions throughout the litigation that LS&Co.'s "arcuate" trademark was invalid. For example, in its Answer to Counterclaims, Lois Sportswear alleged that:

- The arcuate trademark "has become so diluted by reason of widespread use by others, on jeans and similar garments, of the same or a similar design that it has lost whatever distinctiveness it otherwise possessed and no longer functions as a designation of source or origin with the defendant." Lois Sportswear's Answer to Counterclaims, ¶ 16, Exh. D to Davidson Dec.

- LS&Co.'s conduct "has resulted in a loss by defendant of any trademark rights it otherwise possessed in that mark." *Id.* at ¶ 17.

In Lois Sportswear's pre-trial brief dated April 10, 1985, Lois asserted that:

- "[t]he Levi stitching design does not function as a trademark" and that "the mark must be deemed to be ***abandoned***." *See* Lois Sportswear's Pre-Trial Brief, pp. 21-22, Exh. E to Davidson Dec. (emphasis supplied).

---

[1] Approximately seven months after Lois Sportswear initiated suit against LS&Co., LS&Co. commenced a separate action in the S.D.N.Y. against Textiles Confecciones Europas, the supplier of Lois jeans to Lois Sportswear. The two actions were ultimately consolidated.

[2] The '248 registration merely covered a "double arcuate design" of orange color displayed on the hip pockets of "overalls." *See* Exh. C to Davidson Dec. The '254 registration was for a "double arcuate design" for "pants, jackets, dresses, and shorts." *See id.*

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

In response to LS&Co.'s cross motion for summary judgment, Lois Sportswear asserted that the arcuate mark was "fatally weak" and "lacks distinction" (Exh. F to Davidson Dec., pp. 31-33), and that "any distinctive aspect" of the arcuate trademark had been "lost entirely." *See* Affidavit of Jeffrey Cohen, ¶ 11, Exh. G to Davidson Dec. Even LS&Co.'s Associate General Counsel acknowledged that Lois Sportswear was claiming that the arcuate mark was "infirm." *See* Affidavit of Cassandra Flipper, ¶ 11, Exh. H to Davidson Dec.

On May 14, 1985—while *Lois Sportswear* was pending in federal district court—LS&Co.'s Vice President and Corporate Secretary, Katherine Durgin, filed a "Section 8 & 15" affidavit with the PTO in order for the '254 Registration to become "incontestable," right at the summary judgment portion of the case. Exh. I to Davidson Dec. LS&Co.'s "legal department" sent the transmittal letter accompanying Ms. Durgin's affidavit to the PTO and requested that the PTO rush back to LS&Co. the enclosed postcard acknowledging the filing of the affidavit "as soon as you receive these applications." *See* Exh. J to Davidson Dec. In her affidavit, Ms. Durgin testified that "there is no proceeding involving said rights pending and not disposed of either in the Patent and Trademark Office or in the courts." Exh. I to Davidson Dec. Ms. Durgin admitted that at the time she signed the affidavit, she had done nothing to verify whether there was, in fact, a proceeding pending involving LS&Co.'s rights to the arcuate design. *See* Deposition of Katherine Durgin ("Durgin Depo"), p. 48:7-19, Exh. P to Davidson Dec. LS&Co. has not produced any evidence that shows anyone at LS&Co. undertook an investigation to determine the accuracy of the averments made in the Durgin affidavit. The PTO rejected Ms. Durgin's affidavit because it was filed four months premature. Exh. K to Davidson Dec.[3]

---

[3] There are at least 15 other federal trademark registrations owned by LS&Co. dealing with various aspects of "Levi's jeans." *See* Exh. L to Davidson Dec. Not a single one of the "8 & 15" affidavits filed in connection with any of these registrations was ever filed early—not even by one day. *See id.*

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1    On January 2, 1986, LS&Co.'s Assistant Corporate Secretary, Ms. Jean Fowler,

2  submitted a second "8 & 15" affidavit to the PTO. Exh. M to Davidson Dec.  Like the first

3  affidavit, this one also claimed that "there is no proceeding involving said rights pending and

4  not disposed of either in the Patent and Trademark Office or in the courts." *Id.*  Ms. Fowler

5  admitted that she did not do any investigation to determine the accuracy of her statements

6  before signing the affidavit.  Deposition of Jean Fowler ("Fowler Depo"), pp. 26:15-21;

7  28:18-30:20; 32:25-33:3, Exh. Q to Davidson Dec.  LS&Co. has not produced any evidence

8  that shows anyone at LS&Co. undertook an investigation to determine the accuracy of the

9  averments made in the Fowler affidavit

10    LS&Co. submitted this affidavit even though at the time *Lois Sportswear v. Levi*

11  *Strauss & Co.* was pending in the U.S. Court of Appeals for the Second Circuit as Lois

12  Sportswear had appealed the denial of its motion for summary judgment and the granting of

13  LS&Co.'s motion for summary judgment. *See* Exh. N to Davidson Dec.  In that appeal, Lois

14  Sportswear continued to challenge the validity and enforceability of LS&Co.'s "arcuate"

15  design.  As Lois argued to the Court of Appeals, "the prolific use by other jean vendors of

16  back pocket stitching designs same or similar to that mark of Levi so seriously diluted the

17  distinctiveness of Levi's mark as to *undermine its ability to serve as an identifier of source*."

18  Petition For Rehearing En Banc, p. 3 (emphasis supplied), Exh. O to Davidson Dec.  Lois

19  Sportswear also argued on appeal that "any distinctiveness of the Levi design and most other

20  back pocket designs has been diminished or lost entirely since the 1970's." *Id.* at p. 3, ¶ 2.

21  **B.    The Facts Pertaining to Abercrombie's Claim of Abandonment.**

22    1.    LS&Co. Has Consented to Numerous Third-Party Uses of Similar Designs.

23    LS&Co. has asserted claims against several third-parties alleging that their stitching

24  designs infringed its arcuate design, but, in settlements of those claims, LS&Co. has

25  affirmatively consented to the uncontrolled use of no less than thirteen (13) similar third-party

26  stitching designs.    **REDACTED**

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**REDACTED**

1
2
3
**REDACTED**
4
5
6
7
8    2.    <u>Numerous Third-Party Designs Similar to the Arcuate Exist on the Market.</u>

9    Currently, there are at least twenty-six (26) third-party back pocket stitching designs

10  on the market similar to the "arcuate," *i.e.* stitching designs with "a downward-sloping arc

11  that meets in the middle of the back pocket" (Exh. B to Keyes Dec. at 77:19-22), or some

12  similar variation thereof. *See* Exhs. B – E-25 to Declaration of Michael J. Bettinger in

13  Support of Abercrombie's Motion for Summary Judgment ("Bettinger Dec."); Exhs. F – P to

14  Keyes Dec. Many of these designs have been sold on the marketplace for several years and,

15  of those, at least four have been around for about ten years or more and five have been on the

16  market since the 1980's. *See* Declaration of Nicole Sanger, ¶ 5. In addition, there are at least

17  twenty-nine (29) similar third-party stitching designs that are federally registered trademarks,

18  either on the principal or supplemental register; another similar design is pending registration.

19  Exhs. F – X to Bettinger Dec.

20    3.    <u>Recognition of the Arcuate Design in The Marketplace Has Plummeted.</u>

21    LS&Co.'s own consumer surveys from prior litigation demonstrate that consumer

22  recognition of the arcuate has plummeted over the last 24 years. For example, in *Lois*

23  *Sportswear v. Levi Strauss & Co.*, LS&Co. conducted a consumer survey in 1984 showing

24  that "79%" of those surveyed recognized the "double arcuate" design. *See* Affidavit of

25  Spencer Bruno, pp. 7-8, Exh. Y to Bettinger Dec. In 1997, Dr. Carol Scott—whom LS&Co.

26  has retained as an expert in several of its infringement cases—conducted a jeans recognition

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1   survey. *See* Exh. Z to Bettinger Dec. Dr. Scott opined that this survey showed that of those

2   identifying Levi's jeans as an LS&Co. product, 72% identified the arcuate trademark as a

3   source identifier and associated the arcuate trademark with LS&Co. *See id.* at p. 5. But in a

4   subsequent survey conducted by Dr. Scott in 2001, the "recognition" of the double arcuate

5   dropped by about 20%, down to 55.4%.[4] *See* Exh. AA to Bettinger Dec. at p. 8. Thereafter, a

6   survey conducted by Dr. Scott in *Levi Strauss v. RP55*, showed that only 33.89% of those

7   surveyed recognized the "arcuate" stitching design.[5] However, once, the 33.89% is properly

8   adjusted to account for "noise", the actual recognition of the double arcuate design amounts to

9   less than 20%, or approximately 17.89%.[6] *See* Exh. BB to Bettinger Dec. at Exh. A, p. 7.

### III.   LAW & ARGUMENT

**A.   Abercrombie's Fraud Counterclaim Presents Numerous Factual Issues Which Preclude Summary Judgment.**

A party may seek cancellation of a registered trademark on the basis of fraud under 15 U.S.C. § 1064(3) by proving "a false representation regarding a material fact, the registrant's knowledge or belief that the representation is false, the intent to induce reliance upon the misrepresentation and reasonable reliance thereon, and damages proximately resulting from

---

[4] Dr. Scott opined pocket stitching was the source of brand identification for 48.7% of all participants who correctly identified Levi's jeans. An additional 4.3% mentioned "pocket design," and an additional 2.4% mentioned "stitching."

[5] In Ms. Scott's December 2004 survey of 236 males, aged 15 to 50 (target market of RP55's Indigo Red product) who were shown a photo of Levi's jeans, 138 (58%) correctly identified them as a Levi product. 80 of those 138 mentioned pocket stitching design or "stitching" as the source of brand identification. Thus, 33.89% (80 of 236 who were shown Levi's jeans) correctly recognized Levi's jeans as a Levi product based, at least in part, on the back pocket stitching design or "stitching." *See* Exh. BB to Bettinger Dec. at Exh. A, p. 7.

[6] Scott admitted that her percentage of confusion for the RP55 design may include "noise," *i.e.* those who are guessing or correctly identified the jeans as Levi's, but for reasons other than the trademark at issue. Exhibit 8 to Carol Scott's Declaration (page 23) reveals that 16% of survey respondents viewing Azure jeans (a non-Levi jean), thought that Levi manufactured, licensed or was associated with the jean. This 16% accounts for the "noise" that Dr. Scott admitted was present in the survey and should be deducted from the 33.38% pocket stitching recognition.

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

the reliance." *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 548 F. Supp. 2d 811, 813 (N.D. Cal. 2008) (citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990). "Any false statements made in an incontestability affidavit may jeopardize not only the incontestability claim, but also the underlying registration." *Robi*, 918 F.2d at 1444 (citing *Crown Wallcovering Corp. v. Wallpapers Manufacturers Limited*, 188 U.S.P.Q. 141, 143-44 (1975)); *Duffy-Mott Co., Inc. v. Cumberland Packing Co.*, 424 F.2d 1095, 57 CCPA 1046 (1970). In particular, filing a fraudulent incontestability affidavit provides a basis for canceling the registration itself. *Crown Wallcovering*, 188 U.S.P.Q. at 144. Contrary to LS&Co.'s argument, Abercrombie has presented more than sufficient evidence to show LS&CO. made a materially false statement to the PTO and did so with the requisite intent.

      1.    <u>LS&Co.'s Incontestability Affidavit by Ms. Fowler Was False Because Lois Sportswear Alleged the Arcuate Trademark Was Invalid and Unenforceable.</u>

      In order to obtain an "incontestable" trademark registration after 5 years of continuous use, the registrant must file an affidavit with the PTO attesting, among other things, that "there is *<u>no proceeding involving said rights pending in the Patent and Trademark Office or in a court and not finally disposed of</u>*" 15 U.S.C. § 1065(2) (emphasis supplied). This "said rights" language in 15 U.S.C. § 1065(2) is referring to the "registrant's right to register the same or to keep the same on the register." *See* 15 U.S.C. § 1065(1). The Lanham Act specifically provides that a trademark registration can be challenged either by way of "defense" or by way of "counterclaim." *See, e.g.*, 15 U.S.C. § 1115(a) (trademark registration "shall not preclude another person from proving any legal or equitable *<u>defense</u>* or defect") (emphasis supplied); 15 U.S.C. § 1115(b) (an incontestable registration "shall be subject to the following defenses or defects"); 15 U.S.C. § 1064 (setting forth procedures for cancellation of registration). Thus, any proceeding "involving" a challenge to the registrant's "right to register or keep the same on the register"—whether that challenge be mounted as a as a defense as contemplated by 15 U.S.C. §§ 1115(a) and (b) or as a counterclaim as

contemplated by 15 U.S.C. § 1064—constitutes a "proceeding" involving the registrant's "said rights" in the mark. *See Constellation Brands, Inc. v. Arbor Hill Associates, Inc.*, 535 F.3d 347, 353-55 (W.D.N.Y. 2008) (defendant asserting counterclaims against registrant for "trademark infringement, unfair competition, and false advertising" analyzed as constituting a "proceeding involving said rights" under 15 U.S.C. § 1065(2)); *Estefan Enterprises, Inc. v. Coco Bongo Grill and Bar, Inc.*, No. 6:06-cv-742-Orl-31KRS, 2007 WL 1602341, at *3 (M.D. Fla. Jun. 4, 2007) (infringement action in which defendant asserted affirmative defenses of laches and estoppel, but *not* a counterclaim for cancellation of plaintiff's registration, was a "proceeding involving said rights" and precluded incontestability status); *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1529 (4th Cir. 1984) ("the presumption which registration thus gives the mark, though, does not preclude one charged with infringement from collaterally attack[ing] in an infringement action, either by way of an affirmative defense or by way of a counterclaim seeking cancellation of the registration").

Here, there is no dispute that Lois Sportswear attacked the validity of LS&Co.'s arcuate trademark. The record in that case is replete with allegations that LS&Co. had lost any rights in the arcuate trademark. *See supra* Section II(A). From the inception of the case, Lois Sportswear challenged the validity of the arcuate trademark and persisted to do so all the way through the appellate process.[7] Yet in her 8 & 15 affidavit, Ms. Fowler attested that there was no proceeding involving LS&Co.'s rights to the arcuate trademark. The statement was undisputedly false. LS&Co.'s insistence that the Lois Sportswear action did not raise any challenge to LS&Co.'s rights in its mark (Motion, p. 9) is not supported by the facts. For instance, a finding favorable to Lois Sportswear on its affirmative defense of trademark invalidity would have defeated LS&Co.'s infringement claims, and also would have

---

[7] LS&Co. is wrong that Lois Sportswear admitted that the arcuate mark was valid. Motion, p. 4. Lois Sportswear's briefing made it clear that it was not challenging the validity of the arcuate for purposes of the summary judgment motion *only*.

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1   established a basis for cancelling LS&Co.'s registration, either by the Court pursuant to its

2   powers under 15 U.S.C. § 1119,[8] or upon Lois Sportswear's application to the PTO. *See*

3   Expert Report of David Kera ("Kera Report"), ¶ 30, Exh. R to Davidson Dec.; *see also*

4   *Harley-Davidson, Inc. v. Grottanelli*, 91 F. Supp. 2d 544, 547 (W.D.N.Y. 2000) (upon finding

5   that plaintiff's mark was generic, court noted the defendant could apply to the PTO for

6   cancellation of plaintiff's mark).

7           2.      LS&Co.'s claim that the Fowler affidavit was "truthful" has no basis in fact or
                    law.

8

9           LS&Co. advances two arguments in an attempt to transform the Fowler affidavit from

10  false to "truthful." Both arguments are unavailing. First, this Court has already rejected

11  LS&Co.'s argument that the TMEP and the Federal Circuit's decision in *Sunrise Jewelry*

12  illustrate that LS&CO. did not file a false affidavit. *See* LS&Co.'s Motion to Dismiss, p. 8

13  (claiming that under the TMEP, LS&Co.'s affidavits "were not and could not have been

14  fraudulent"); *see also* Order (Docket No. 88) at p. 5 ("given the difference in the procedural

15  posture between parties in this case and the parties in the infringement action in the *Sunrise*

16  *Jewelry* case, and although LS&Co. would have had the burden of proof to show the plaintiff

17  in the *Lois* litigation infringed its marks, *the Court cannot say as a matter of law, based on*

18  *TMEP § 1604.03, that LS&Co. had no duty to disclose the Lois litigation*.") (emphasis

19  supplied).[9] Even if this Court were to entertain this exact same argument again, LS&Co. has

20  ────────────

[8] 15 U.S.C. § 1119 provides: In any action involving a registered mark the court may

21  determine the right to registration, order the cancellation of registrations, in whole or in part,
    restore canceled registrations, and otherwise rectify the register with respect to the

22  registrations of any party to the action.

[9] The TMEP has no force of law. David Kera, an attorney and former Administrative

23  Trademark Judge of the Trademark Trial and Appeal Board of the PTO, opined that the

24  pertinent provision of the TMEP was never intended to be anything other than a guide for
    non-lawyer examiners. Kera Report, ¶¶ 19 - 25. Moreover, in TMEP § 1604.03, as revised in

25  January 1986, and in subsequent revisions, there are no provisions to the effect that a
    trademark registrant is excused from including in an incontestability affidavit information that

26  an adverse party has, in litigation, called into question the validity of a registered mark and
    OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1  failed to present a shred of evidence that it actually reviewed, relied upon, or otherwise

2  considered the TMEP language before it submitted Fowler's affidavit to the PTO.[10]  *See*

3  Fowler Depo, pp. 26:15-21; 28:18-31:9; 32:25-33:3.

4      Second, LS&Co.'s claim that Lois's "affirmative defense does not affect the analysis"

5  on the issue of falsity is similarly unsound.  Motion, p. 10-11.  As noted above, a plaintiff's

6  trademark registration can be attacked by way of counterclaim *or* affirmative defense.

7  LS&Co.'s argument to the contrary is contradicted by the express terms of the Lanham Act.

8  The legal authority LS&Co. cites to support is argument is inapposite.  *See, e.g., CPI Plastics,*

9  *Inc. v. USX Corp.*, 22 F. Supp. 2d 1373 (N.D. Ga. 1995) (case did not even involve a

10  trademark); *Ramada Franchise Sys. v. Royal Vale Hospitality of Cincinnati, Inc.*, No. 02 C

11  1941, 2005 U.S. Dist. LEXIS 8367, at *37 (N.D. Ill. Feb. 16, 2005) (affirmative defense

12  claimed breach of an agreement for failing to provide training to a franchisee); *United States*

13  *v. Cyr*, No. CV-03-97-B-W, 2004 U.S. Dist. LEXIS 15578 (D. Me. Aug. 6, 2004) (case did

14  not involve a trademark).  Moreover, as noted above, the *Harley-Davidson* case LS&Co. cites

15  recognized that a court has statutory power to cancel a registration whether or not the

16

17  therefore the right of the registrant to maintain the mark on the register. *Id.* at ¶ 26. As Mr.
   Kera, explains, the proper procedure for LS&Co. to have followed in submitting its 8 & 15

18  affidavit would have been to disclose that litigation was pending against Lois Sportswear in
   which Lois Sportswear had pleaded that the '254 Registration had lost validity. *Id.* at ¶ 29.

19  Thus, this TMEP provision by its own terms cannot be read to exempt the Lois Sportswear
   proceeding from the disclosure obligation embodied in 15 U.S.C. § 1065(2).

20  [10] LS&Co.'s fraud expert opined that LS&Co.'s interpretation is a fair and good faith

21  assessment of the disclosure requirement, but he admitted that he was unaware of any
   evidence that suggests LS&Co. actually reviewed or relied upon the provision of the TMEP at

22  the time when it filed the Fowler affidavit. *See* Expert Report of Randy L. Simms, p. 9,
   Exh. S to Davidson Dec.; Deposition of Randy L. Simms ("Simms Depo"), pp. 29:12-30:6,

23  Exh. T to Davidson Dec. LS&Co. asserts its "complete good faith" in its brief (Motion, p.

24  13), but likewise fails to point to a shred of evidence that suggests anyone from LS&Co. ever
   looked at the TMEP. The undisputed evidence suggests that LS&CO. *never* consulted the

25  TMEP because if it had done so, it would not have filed the Durgin affidavit nearly four
   months early. Exh. K to Davidson Dec.; TMEP §§ 1604.04; 1605.03 (Sections 8 and 15

26  affidavits are to be filed in the one year period after five years from the date of registration).

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1  defendant asserts a counterclaim for cancellation. *See Harley-Davidson, Inc.*, 91 F. Supp. 2d
2  at 547 (citing 15 U.S.C. § 1119).

3         3.    LS&Co. undertook no investigation before filing either 8 & 15 affidavit.

4         Fraud on the PTO may be based on a finding that the registrant *should have known*
5  that the fact represented was not true. *Torres v. Cantine Torresella S.r.1.*, 808 F.2d 46,
6  U.S.P.Q. 2d 1483 (Fed. Cir. 1986); *Medinol Ltd. v. Neuro Vasz, Inc.*, 67 U.S.P.Q.2d 1205,
7  1209 (T.T.A.B. 2003) (fraud occurs when registrant "makes material representations of fact in
8  its declaration which it knows or should know to be false."); *Marshak v. Treadwell*, 58 F.
9  Supp. 2d 551, 567 (D.N.J. 1999).  A registrant's false representation cannot be explained
10 away by conclusory assertions of lack of intent to deceive or mislead.    *Copelands'*
11 *Enterprises, Inc. v. CNV, Inc.*, 945 F.2d 1563, 1567 (Fed. Cir. 1991).  The question of intent is
12 a factual one and "particularly unsuited to disposition on summary judgment."  *Id.* (citing
13 *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1575 (Fed. Cir. 1985))); *Albert v.*
14 *Kevex Corp.*, 729 F.2d 757, 763 (Fed. Cir.), *aff'd on reh'g*, 741 F.2d 396, 223 U.S.P.Q. 1
15 (Fed. Cir. 1984). Here, all the evidence indicates that LS&Co. had the requisite intent.

16        An affiant to the PTO is charged with knowing what is being signing and, by failing to
17 make any appropriate inquiry, the affidavit is signed with "reckless disregard for the truth."
18 *Standard Knitting, Ltd. v. Toyota Jidosha Kabushiki Kaisha*, No. 91116242, 2006 TTAB
19 LEXIS 9, at **35-37 (T.T.A.B. Jan. 10, 2006) (citing *Medinol, supra*) (cancelling registration
20 for fraud where affiant, apparel manufacturer's Chief Operating Officer, failed to make
21 appropriate inquiry as to truth of statement of use).  The specific or actual intent of the affiant
22 is not material to the question of fraud.  *Id.*  "It is important to note that the United States
23 Patent and Trademark Office relies on the thoroughness, accuracy and honesty of each
24 applicant."  *Id.* (noting that "[a]llowing registrants to be careless in their statements of use
25 would result in registrations improperly accorded legal presumptions in connection with
26 goods on which the mark is not used").  Where an affiant does not have personal knowledge

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1  of the facts to which she is attesting, she is obligated to inquire and make a thorough

2  investigation prior to signature and submission to the PTO. *Standard Knitting, Ltd.*, 2006

3  TTAB LEXIS at *35-36; *see also Medinol*, 67 U.S.P.Q. 2d 1209 ("Statements made with

4  such degree of solemnity clearly are -- or should be -- investigated thoroughly prior to

5  signature and submission to the USPTO."). Simply relying on an attorney's representations is

6  "grossly insufficient." *Standard Knitting, Ltd.*, 2006 TTAB LEXIS at *36.

7       Testimony from both affiants who signed 8 & 15 affidavits—Ms. Durgin and

8  Ms. Fowler—show that LS&Co. failed completely in its duty to make a thorough

9  investigation and had no basis to believe the veracity of the affidavits before they were signed

10  and submitted to the PTO.[11]

11       Ms. Durgin was LS&Co.'s Corporate Secretary at the time she signed the first 8 & 15

12  affidavit regarding LS&Co.'s '254 Registration. Durgin Depo, p. 19:2-15. She testified that

13  members of LS&Co.'s legal department would typically prepare documents for her to sign as

14  an officer, including trademark documents. *Id.* at 14:24-15:4; 24:15-18. Ms. Durgin further

15  testified that she "knew that signing a document was an important responsibility on behalf of

16  [LS&Co.]". *Id.* at 42:19-43:1. She had, however, no formal training regarding trademarks

17  other than one meeting with LS&Co.'s trademark lawyers and paralegals. *Id.* at 24:22-25:21.

18  She testified that before she would sign an affidavit, she would only look at the file to make

19  sure that one of the in-house attorneys approved the document for signature. *Id.* at 30:19-

20  31:9. Ms. Durgin did not know what the contents of the file were; she would just make sure

21  that the affidavit she was filing was with respect to the file in front of her. *Id.* at 45:6-25.

22

---

23  [11] Although the Court previously ruled that Ms. Durgin's affidavit could not be the basis of
24  the fraud claims because the PTO did not rely on it, A&F submits that it is still relevant to
    LS&Co.'s intent in several respects. First, Ms. Durgin's utter lack of investigation is
25  symptomatic of a pattern of "willful blindness." Second, Ms. Durgin's affidavit was
    submitted by LS&Co. four months too soon and during a time when Lois Sportswear was
26  aggressively challenging LS&Co.'s rights to the arcuate.

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1    Ms. Durgin admitted that she "did not investigate the accuracy" of her statements in the

2    Section 8&15 affidavit she submitted for the '254 Registration. *Id*. at 43:16-23; 46:21-48:19.

3    In particular, Ms. Durgin did not investigate whether there was any "proceeding involving

4    said rights pending and not disposed of either in the Patent and Trademark Office or in the

5    courts." *Id*. at 48:7-19. She could not recall which attorney had signed off on the affidavit.

6    *Id*. at 44:4-45:5. Ms. Durgin does not even understand what a Section 8&15 affidavit is.

7    Durgin Depo, p. 34:7-14. Nor did she recall ever discussing the *Lois Sportswear* litigation

8    with anyone at LS&Co. *Id*. at 40:16-19.

9         Ms. Fowler was LS&Co.'s Assistant Corporate Secretary at the time she signed the

10    January 2, 1986 8&15 affidavit that was ultimately accepted by the PTO. Fowler Depo,

11    p. 16:6-18. She would sign legal documents if an attorney brought her something that needed

12    an officer's signature. *Id*. at 17:18-18:2. She admitted that she had no job responsibilities

13    with regard to registrations for LS&Co.'s trademarks. *Id*. at 18:11-15. She never discussed

14    particular cases or litigation in which LS&Co. had been involved with LS&Co.'s counsel. *Id*.

15    at 19:2-4; 21:5-9. Ms. Fowler testified that with respect to documents she was asked to sign,

16    she "would have accepted the word of whoever presented it to me, whatever the explanation

17    was given by that person, attorney or anyone else…I would have signed it." *Id*. at 22:19-23:6.

18    She did nothing to independently verify or investigate the subject matter or accuracy of the

19    statements made in her Section 8 & 15 affidavit. *Id*. at 26:15-21; 28:18-30:20.

20         Specifically, Ms. Fowler did not conduct any investigation or verify the accuracy of

21    her sworn statement there was "no proceeding involving rights pending and not disposed of

22    either in the Patent and Trademark Office or in the courts". *Id*. at 30:8-20. Ms. Fowler relied

23    solely on her co-workers who presented her with documents to sign, but could not recall who,

24    if anyone, prepared her 8 & 15 affidavit. *Id*. at 30:21-31:9. As Ms. Fowler testified, "[T]hey

25    would tell me in a few words what I was signing, but I did not do personal outside

26    investigation… I did ask what I was signing and beyond that, I did not go further with it." *Id*.

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

at 33:1-25. LS&Co.'s in-house Deputy General Counsel in the early 1980's, who supervised LS&Co.'s paralegals and attorneys with direct involvement in its trademark portfolio, could not recall whether LS&Co. had a policy or procedure that it would follow before submitting 8&15 affidavits to the PTO. Deposition of Cassandra Flipper, p. 25:2-5, 26:22-27:10, 42:13-23, Exh. U to Davidson Dec.

The PTO, relying on the "thoroughness, accuracy and honesty" of LS&Co. through the attestation of Ms. Fowler, improperly accorded a legal presumption of "incontestability" to the '254 Registration, when, in fact the evidence shows that <u>nothing</u> was done to ensure the accuracy of the 8 & 15 affidavit.[12] Given Ms. Fowler's admitted lack of personal knowledge regarding LS&Co.'s trademark and litigation matters, her reliance on unnamed, unidentified co-workers who allegedly presented her with the affidavit to sign was "grossly insufficient." *Standard Knitting, Ltd.*, 2006 TTAB LEXIS at *36. Such evidence establishes LS&Co.'s reckless disregard for the truth—conduct sufficient to support a finding of fraud. *Id.*

LS&Co. cites no facts to rebut this. LS&Co. relies on *Far Out Productions, Inc. v. Oskar*, 247 F. 3d 986, 996 (9th Cir. 2001) for the proposition that there can be no fraud if the affiant had a "*good faith belief*" in the truth of his statements. Motion, p. 12 (emphasis added by LS&Co.).[13] But LS&Co. cites <u>no evidence</u> of its good faith belief in the truth of its statements made in its 8&15 affidavit and has identified <u>no witness</u> who made a "reasonable"

---

[12] As Mr. Kera, Abercrombie's fraud expert, explained in his deposition, Ms. Fowler was acting in her corporate capacity and is deemed to have the knowledge of the corporation. Deposition of David Kera ("Kera Depo"), p. 45:6-21, Exh. V to Davidson Dec.. Thus, Ms. Fowler's actions are imputed to LS&Co. and the evidence of LS&Co.'s corporate knowledge reveals that LS&Co. cannot point to anyone who undertook an investigation to verify the accuracy of the statements and there is no one in the corporation who made a good faith decision that *Lois Sportswear* did not have to be disclosed in the affidavit.

[13] *Far Out Productions* is easily distinguishable. There, the party claiming fraud moved for summary judgment, but did not meet its initial burden, because it presented <u>no</u> evidence of the affiant's state of mind. 247 F.3d at 990. In contrast, Ms. Fowler's deposition testimony establishes, at a minimum, a genuine issue of fact as to her reckless state of mind when she signed her 8&15 affidavit, which is all Abercrombie must show to defeat LS&Co.'s Motion.

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1  interpretation of LS&Co.'s obligation to disclose the *Lois Sportswear* litigation. Its argument
2  is supported only by conclusory assertions of no intent to deceive. *See* Motion, pp. 12-13.

3      Moreover, the early submission of Ms. Durgin's affidavit is strong circumstantial
4  evidence of LS&Co.'s fraudulent intent, because (1) LS&Co. submitted its first 8 & 15
5  affidavit by Ms. Durgin <u>four months</u> too early, while the *Lois Sportswear* litigation was
6  pending and just weeks before summary judgment proceedings; (2) LS&Co. asked that the
7  PTO rush proof of its incontestability back to LS&Co.; and 3) LS&Co. never made an early
8  submission, even by one day, of an 8 & 15 affidavit for any of its other related trademarks.
9  *See, supra*, Section II(A). At a minimum, such evidence raises inferences for the trier of fact
10 that LS&Co. was attempting to gain incontestability status for the arcuate mark to strengthen
11 its case against Lois Sportswear, which was challenging the validity of the mark. LS&Co. has
12 offered no evidence to support an alternative explanation. *See* Durgin Depo, 59:15-19 (does
13 not recall ever discussing how her affidavit came to be filed early); *see also* Response to
14 Abercrombie Interrogatory No. 6, Exh. W to Davidson Dec. Those inferences must be
15 resolved in Abercrombie's favor. *See T.W. Electrical Service, Inc. v. Pacific Electrical*
16 *Contractors Assoc.*, 809 F.2d 626, 631 (9th Cir. 1987).

17      For all of these reasons, LS&Co.'s motion should be denied.

18 **B.    Abercrombie Has Presented Sufficient Facts to Establish that LS&Co.'s Arcuate**
19 **Design Has Lost All Significance as a Trademark.**

20      The Lanham Act provides that a trademark registration may be cancelled when the
21 trademark has been "abandoned." 15 U.S.C. § 1064(3). "Abandonment" is defined to include
22 any act or omission by the registrant which causes the trademark "to lose its significance as a
23 mark." 15 U.S.C. § 1127. Whether a trademark has lost is significance as an indication of
24 origin is a question of fact. *FirstHealth of Carolinas, Inc. v. CareFirst of Maryland, Inc.*, 479
25 F.3d 825, 830 (Fed. Cir. 2007). There are more than sufficient facts for a jury to assess
26 whether LS&Co.'s conduct has caused the arcuate design to lose significance as a mark.

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1.    LS&Co. Has Affirmatively Consented to No Less Than Thirteen Uses of Similar Designs and Effectively Granted a "Naked License" to Third-Parties By Consenting to Their Uncontrolled Use of Accused Designs.

LS&Co.'s own legal authority acknowledges that abandonment can occur when the trademark owner consents to third party infringing uses of its trademark. *See* LS&Co. Motion, p. 17 (citing *STX, Inc. v. Bauer USA, Inc.*, 43 U.S.P.Q.2d 1492, 1502 (N.D. Cal. 1997)). For example, in *STX* the court noted that "[t]he existence of third party infringers does not constitute an abandonment of a mark where the trademark owner does not consent to the use of the mark by these others but rather, vigorously pursues these third party infringers." *Id.*; *see also Citibank, N.A v. City Bank of San Francisco*, 206 U.S.P.Q. 997, 1011 (N.D. Cal.1980) (same); *Visa Intern. Service Ass'n v. Bankcard Holders of America*, 211 U.S.P.Q. 28, 41 (N.D. Cal.1981) (same). *STX* went on to observe that that the defendant failed to establish its abandonment claim because it "has not presented evidence to the effect that plaintiff consents to any of the allegedly infringing third party use but merely that plaintiff is aware of such use." *STX, Inc.*, 43 U.S.P.Q.2d at 1502.

But in sharp contrast to the facts in *STX* and in LS&Co.'s other cited authorities (*see* Motion, at pp. 17-18), there are numerous facts showing that LS&Co. has knowingly consented many times to allegedly infringing third party uses of its "arcuate" design.

# REDACTED

LS&Co.'s conduct in suing third-parties for infringement and then allowing them to continue uncontrolled use of accused stitching designs is akin to a "naked license." As the Ninth Circuit has held:

> [U]ncontrolled or 'naked' licensing may result in the trademark ceasing to function as a symbol of quality and controlled source. Consequently, where the licensor fails to exercise adequate quality control over the licensee, 'a court may find that the trademark owner has abandoned the trademark, in which case

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1    the owner would be estopped from asserting rights to the
2    trademark.'" Such abandonment "is purely an 'involuntary'
     forfeiture of trademark rights," for it need not be shown that the
3    trademark owner had any subjective intent to abandon the mark.

4    *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 595-596 (9th Cir.

5    2002) (citations omitted) (cancelling trademark when owner failed to exercise quality control

6    over third party's use of the mark); *see also Halo Mgmt., LLC v. Interland, Inc.*, 308 F. Supp.

7    2d 1019, 1028 (N.D. Cal. 2003) (holding same); *Dawn Donut Co. v. Hart's Food Stores, Inc.*,

8    267 F.2d 358, 367 (2d Cir. 1959) (licensors have affirmative duty to reasonably police and

9    inspect quality of the licensee's products to prevent deceptive uses of the mark in the market

10   place). "The Ninth Circuit has recognized that some form of quality control is required to

11   show that a license is not naked." *First Interstate Bancorp v. Stenquist*, No. C-89-4106,, 1990

12   U.S. Dist. LEXIS 19426 at **6-7 (N.D. Cal. Jul. 13, 1990) (finding naked license and, thus,

13   abandonment where licensor failed to engage in any meaningful inspection or supervision of

14   licensee) (citing *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 51 (9th Cir. 1971)).

15        LS&Co.'s conduct is actually worse than a naked license, because rather than merely

16   agreeing to third-party use of the arcuate design, LS&Co. accused third-parties of infringing

17   the arcuate mark, but then allowed that purported infringement and confusion in the

18   marketplace by agreeing to the continued, uncontrolled use of allegedly infringing designs.

19   *See* Exhs. F – P to Keyes Dec., ¶¶ 7-17.  The settlement agreements with those third-parties

20   are tantamount to LS&Co.'s consent to the use of those infringing designs without any quality

21   controls or restrictions whatsoever.

22

          2.    The Prevalence of Similar Third-Party Designs in the Marketplace and on the
23              Trademark Register Further Supports Abercrombie's Abandonment Claim.

24        A trademark can lose its significance as a mark when the trademark owner allows

25   third parties to use its trademark.  As one Court has observed:

26

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1

2

3

4

5

> Without question, distinctiveness can be lost by failing to take action against infringers. If there are numerous products in the marketplace bearing the alleged mark, purchasers may learn to ignore the "mark" as a source identification. When that occurs, the conduct of the former owner, by failing to police its mark, can be said to have caused the mark to lose its significance as a mark. *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 766 (Cust. & Pat. App. 1982).

6

7

8

9

The existence of at least twenty-six similar third-party stitching designs in the marketplace and at least twenty-nine on the trademark principal and supplemental registers exemplifies LS&Co.'s haphazard and inconsistent enforcement of its arcuate trademark rights. Such evidence further supports Abercrombie's abandonment claim.

10

    3.   Consumer Recognition of the Arcuate Mark Has Experienced a Fatal Drop.

11

12

13

14

15

16

17

18

19

20

21

22

23

LS&Co.'s own consumer surveys demonstrate that recognition of the arcuate design has dropped from 79% recognition in 1984 to approximately 17.89% in 2004.[14] This level of recognition shows that the arcuate design is anemic in the eyes of the consuming public and has lost significance as a mark. *See, e.g., Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992) ("a figure in the thirties can be considered only marginal" to establish secondary meaning); *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670, 689-90 (S.D.N.Y. 1963) (25% consumer recognition insufficient to establish secondary meaning). In support of its Motion, LS&Co. cites a 1986 court opinion in the *Lois* case, but although the Second Circuit may have found that the arcuate design had "strong secondary meaning" in 1986, the evidence shows that recognition of the arcuate mark has plummeted since then. LS&Co. also relies on a consumer recognition survey by its "expert" Dr. Sanjay Sood. But Dr. Sood's "jeans recognition survey" is so riddled with flaws that its results are meaningless. *See* Motion to Exclude Dr. Sood's Report.

24

25

26

---

[14] This enormous drop in consumer recognition of the arcuate design since 1997 coincides with a similarly enormous drop in sales experienced by LS&Co. during this same time frame. *See* Abercrombie's Motion for Summary Judgment, p. 8, n. 6.

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1    LS&Co.'s failure to take action against numerous similar third-party designs and

2    LS&Co.'s effective naked license for several allegedly infringing designs has undoubtedly

3    contributed to the plummet in consumer recognition of the arcuate design, such that it no

4    longer functions as an indication of source. *See Sweetheart Plastics, Inc. v. Detroit Forming,*

5    *Inc.*, 743 F.2d 1039, 1048 (4th Cir. 1984) (failure to prosecute infringers is relevant to

6    abandonment where such failure amounts to mark's losing significance as an indication of

7    source). For these reasons, LS&Co.'s Motion on Abercrombie's abandonment claim fails.

8    **C.    LS&Co. Is Not Entitled to Summary Judgment On Abercrombie's Affirmative
        Defenses.**

9

10       Genuine issues of material fact exist as to each of Abercrombie's affirmative defenses

11   and preclude summary judgment thereon. LS&Co.'s Motion on Abercrombie's laches

12   defense fails because the evidence shows that LS&Co. unreasonably delayed in filing this

     action to Abercrombie's prejudice. *See Tillamook Country Smoker, Inc. v. Tillamook County*
13
     *Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006). The correct disposition of the
14
     equitable defense of laches "can only be made by a close scrutiny of the particular facts and
15
     balancing of the respective interests and equities of the parties" and usually requires the kind
16
     of record that can only created by full trial on the merits, not disposition on summary
17
     judgment. *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1060 (3d Cir. 1991).
18
         LS&Co. claims it first became aware of Abercrombie's use of the design on RUEHL
19
     jeans, skirts, shorts and pants by June 19, 2007. *See* Exh. V to Declaration of Gia Cincone in
20
     support of LS&Co.'s Motion. As LS&Co. admits, however, it was aware of the RUEHL
21
     design "[a]s early as January 2006." Motion, p. 19. Thus, LS&Co. was on notice of the
22
     RUEHL design at the time Abercrombie began selling products bearing the RUEHL design in
23
     February 2006. *See* Declaration of Reid Wilson ("Wilson Dec."), ¶ 3. This creates an issue of
24
     fact as to whether LS&Co. knew of Abercrombie's use of the design as early as February
25
     2006. Although LS&Co. contacted Abercrombie's counsel about the RUEHL designs—
26

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1    communications Abercrombie viewed as mere warnings, not direct challenges (Exh. Y to

2    Davidson Dec. at 171:4-15)—LS&Co. did not file its federal action until July 20, 2007.

3        LS&Co. offers no viable explanation for its failure to bring suit against Abercrombie

4    for over a year—and probably nearer to eighteen months—after LS&Co. learned of

5    Abercrombie's use of the RUEHL design.    LS&Co., as a registrant, could have filed its

6    federal infringement action against Abercrombie whether or not Abercrombie ever filed a

7    trademark application.    *See* 15 U.S.C. § 1114(1) (where infringement occurs, liability can be

8    based solely on defendants' "use in commerce" of a registered mark).    *Fila Sport, S.P.A. v.*

9    *Diadora America, Inc.*, is distinguishable and did not preclude LS&Co. from filing suit while

10   Abercrombie's intent to use application was pending.    141 F.R.D. 74, 79 (N.D. Ill 1991)

11   (court did not have subject matter jurisdiction over plaintiff's claims of trademark

12   infringement and unfair competition because *the plaintiff* did not have a registered mark or

13   use the mark in commerce—the *plaintiff's* application only stated an intent to use).

14       The facts indicate that LS&Co. waited approximately eighteen months from the time it

15   learned of Abercrombie's use of the accused RUEHL design before filing a federal action.

16   While LS&Co. delayed, Abercrombie, to its prejudice, continued to market and sell products

17   bearing the RUEHL design.    Wilson Dec. ¶ 5; *see also Whittaker Corp. v. Execuair Corp.*,

18   736 F.2d 1341, 1347 (9th Cir. 1984) (defendant prejudiced because it continued engaging in

19   its existing practices, incurring additional potential liability by reason of plaintiff's failure to

20   take prompt action).    Such delay undermines LS&Co.'s claim of likelihood of confusion and

21   its claim for injunctive relief.    *See Nina Ricci, S.A.R.L. v. Gemcraft, Ltd.*, 612 F. Supp. 1520,

22   1530-31 (S.D.N.Y. 1985) (six-week delay in suing after settlement discussions broke down

23   and further six-week delay in moving for preliminary injunction indicated that plaintiff "felt

24   there was little real likelihood that consumers would be confused between the products"); *Le*

25   *Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979) (delay of

26

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1    nearly a year suggested no irreparable injury).    Accordingly, there is a genuine issue of

2    material fact as to Abercrombie's laches defense.

3        LS&Co.'s Motion on Abercrombie's acquiescence, consent and estoppel defenses also

4    fails.  A plaintiff can acquiesce or consent by conduct that amounts to an implicit assurance

5    that plaintiff, with knowledge of the defendant's conduct, will not assert its trademark rights.

6    *See Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*,

7    314 F.3d 62, 68 (2d Cir. N.Y. 2002) (plaintiff's silence after defendant responded to

8    plaintiff's cease and desist letter created question as to whether plaintiff gave implicit

9    assurance that trademark rights would not be asserted, thereby reasonably inducing reliance

10   by the defendant) (citations omitted).  Such conduct can also constitute an estoppel.  *See E. &*

11   *J. Gallo Winery v. Pasatiempos Gallo, S.A.*, 905 F. Supp. 1403, 1414 (E.D. Cal. 1994)

12   (estoppel by acquiescence where defendant detrimentally relies on plaintiff's unreasonable

13   and inexcusable delay and affirmative conduct that induces the belief that it has abandoned its

14   claim against the alleged infringer); *Raber v. Pittway Corp.*, No. C 92-2581, 1994 U.S. Dist.

15   LEXIS 9646, at **14-15 (N.D. Cal. Jul. 7, 1994) (estoppel where defendant is materially

16   prejudiced by relying on conduct indicating that he will not be disturbed in his activities,

17   which can include inaction that "lull[s] the infringer into a sense of security in continuing his

18   activity").

19       LS&Co.'s dilatory conduct in failing to file suit for well over a year was inconsistent

20   with LS&Co.'s well-known reputation for aggressiveness in filing suit against alleged

21   infringers. This led Abercrombie to believe that LS&Co. would not challenge Abercrombie

22   in an infringement action.    Wilson Dec. ¶ 4.    The facts relied upon by LS&Co. do not

23   establish otherwise.    LS&Co. vaguely asserts that it contacted Abercrombie's counsel to

24   express its "concerns over the design," but does not specify what concerns were

25   communicated or establish whether LS&Co. ever notified Abercrombie that it believed the

26   accused design infringed the arcuate mark. *See* Declaration of Thomas Onda, ¶ 16.

1    The *Brother Records* case, cited by LS&Co., is distinguishable. There, the plaintiff

2  filed its complaint in district court five months after receiving defendant's notification of use

3  of the mark. *Brother Records v. Jardine*, 318 F.3d 900, 909 (9th Cir. Cal. 2003). LS&Co.'s

4  failure to file suit for nearly eighteen months after learning of use of the accused design is

5  sufficient to create a genuine issue of fact as to whether LS&Co. impliedly assured

6  Abercrombie that it would not assert its trademark rights against Abercrombie. Thus,

7  LS&Co.'s motion on Abercrombie's acquiescence, consent and estoppel defenses fails.

8    LS&Co.'s Motion on Abercrombie's waiver defense fails because LS&Co.'s

9  agreements not to challenge similar third-party stitching designs—particularly the RP55

10  design which shares a resemblance to the accused RUEHL design—is conduct clearly

11  inconsistent with an intent to enforce its trademark rights against the RUEHL design. *See*

12  *Eliminator Custom Boats v. Am. Marine Holdings, Inc.*, No. ED CV 06-15, 2007 U.S. Dist.

13  LEXIS 96414, at *17 (C.D. Cal. Nov. 5, 2007) ("A waiver may be found when a party either

14  expressly relinquishes the right or engages in 'conduct inconsistent with an intent to enforce

15  that right.'") (quoting *Saverslak v. Davis-Cleaver Produce, Co.*, 606 F.2d 208 (7th Cir.

16  1979)).

17    LS&Co.'s motion on Abercrombie's unclean hands defense fails because there is

18  sufficient evidence that LS&Co. committed fraud on the PTO by filing a false 8&15 affidavit

19  in order to obtain "incontestable" status of its '254 Registration—"incontestable" rights

20  LS&Co. is now asserting in this case. *See* LS&Co.'s Complaint, ¶ 9(b); *Duffy-Mott Co*, 424

21  F.2d at 1099 (filing a false sworn statement precluded opposer's reliance on its registration, in

22  accord with the principle of the equitable doctrine of unclean hands); *Electrical Information*

23  *Publications, Inc. v. C-M Periodicals, Inc.*, 163 U.S.P.Q. 624 (N.D. Ill. 1969) (plaintiff denied

24  all relief because of its unclean hands due to its procurement and maintenance of the three

25  registrations by false or fraudulent representations to the PTO); *Estee Lauder, Inc. v.*

26

1  *Fragrance Counter, Inc.*, 189 F.R.D. 269, 272 (S.D.N.Y. 1999) (defense of unclean hands

2  where there is fraud related to the matter at issue to the detriment of the other party).

3      LS&Co.'s Motion on Abercrombie's trademark misuse defense also fails.  LS&Co.

4  incorrectly asserts that trademark misuse is only recognized as a defense in the context of

5  allegations of anti-competitive activity.  *Adidas Am., Inc. v. Payless Shoesource, Inc.* does not

6  stand for that proposition.  546 F. Supp. 2d 1029, 1078-80 (D. Or. 2008) (involving express

7  "Trademark Misuse/Antitrust" defense and allegations of illegal antitrust conspiracy).  Other

8  courts have found misuse even where there was no antitrust violation. *See Juno Online Servs.,*

9  *L.P. v. Juno Lighting*, 979 F. Supp. 684, 688 (N.D. Ill. 1997) (citing *Clinton E. Worden & Co.*

10  *v. California Fig Syrup Co.*, 187 U.S. 516, 539-40, 23 S. Ct. 161, 168, 47 L. Ed. 282 (1903)).

11  Here, LS&Co. has engaged in deceptive trademark misuse with respect to its arcuate

12  trademark by asserting its fraudulently-obtained "incontestable" rights against Abercrombie in

13  this case. *See supra* Section III(A).

14

15  **D.   LS&Co. Is Not Entitled to Partial Summary Judgment On Its Dilution Claim Because the Evidence Shows that the Arcuate Mark is Not Famous.**

16      As set forth fully in Abercrombie's Motion for Summary Judgment, pp. 20-21, the

17  undisputed evidence—including extensive third-party use of similar designs and LS&Co.'s

18  own survey evidence showing a tremendous drop in consumer recognition—establishes  as a

19  matter of law that LS&Co.'s arcuate design is not famous.  Thus, Abercrombie is entitled to

20  summary judgment on LS&Co.'s dilution claim.

21      LS&Co.'s cited authority does not establish that its level of advertising shows the

22  arcuate is famous as a matter of law.  In *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,

23  No. 04 Civ. 2990, 2008 U.S. Dist. LEXIS 42787, *57-58 (S.D.N.Y. May 28, 2008), the mark

24  owner "enjoyed a deluge of unsolicited media coverage and attention," and was ranked as the

25  ninth most recognized accessory brand in the United States. *See also Audi AG v. D'Amato,*

26

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT

1  469 F.3d 534, 547 (6th Cir. 2006) (Audi's trademarks were known worldwide). LS&Co. has

2  not established comparable facts. *See* Motion, p. 22-23.

3  Furthermore, it is incumbent on LS&Co. to place its advertising figures in context, for

4  example, by showing that the product is a leading product in its category. *Fossil Inc. v. Fossil*

5  *Group*, 49 U.S.P.Q. 2d 1451, 1457 (T.T.A.B. 1998). Raw advertising figures are generally

6  not sufficient by themselves to establish that the mark is famous. *Id.* (mark not famous where

7  party failed to put its sales and advertising figures in perspective by comparing them to those

8  figures for similar products and did not even break down its sales and advertising figures for

9  its own various types of products). LS&Co. provides only raw figures and does not even

10  attempt to put its advertising figures into context with other competing products or break

11  down what portion of the total expenditures are attributable only to the arcuate design. *See*

12  Declaration of Robert Hanson in support of LS&Co.'s Motion ("Hanson Dec.") ¶¶ 9-23.

13  Moreover, LS&Co.'s advertisements display many other product features other than

14  the arcuate design, including the red pocket tab, the two-horse waistband patch, the "LEVI's"

15  word mark, as well as the wash, color and fit of the product. *See* Exhs. C-N to Hanson Dec.

16  Thus, LS&Co.'s advertising figures cannot be attributed to the arcuate design alone. As a

17  result, the Court is left to speculate as to what advertising relates only to the arcuate design

18  and the actual impact of LS&Co.'s arcuate design alone on the minds of consumers. *General*

19  *Mills, Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270, 1277 (T.T.A.B. 1992).

20  Thus, as a matter of law, the arcuate cannot be deemed "famous" for purposes of

21  dilution. On this basis alone, LS&Co.'s dilution claim cannot stand.

22  //

23  //

24

25

26

1

IV.    **CONCLUSION**

2      For the reasons set forth herein, Abercrombie respectfully requests this Court deny

3  LS&Co.'s Motion for Summary Judgment on Abercrombie's Counterclaims and Selected

4  Affirmative Defenses, and for Partial Summary Judgment on LS&Co.'s Claim of Trademark

5  Dilution.

6

7  Dated:    September 3, 2008                Respectfully submitted,

8                                            **K&L Gates LLP**

9
                                            By: /s/
10                                           J. Michael Keyes

11                                           Michael J. Bettinger
                                            Rachel R. Davidson
12                                           Kjirstin J. Graham
                                            Attorneys for Defendant and Counter-Claimant
13                                           ABERCROMBIE & FITCH TRADING CO.

14

15

16

17

18

19

20

21

22

23

24

25

26

OPPOSITION TO LS&CO.'S SUMMARY JUDGMENT