# Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
LOIS SPORTSWEAR, U.S.A. INC.,

        Plaintiff,  :  82 Civ. 8326 (RWS)

  -against-  :

LEVI STRAUSS & COMPANY  :

        Defendants.
------------------------------------
------------------------------------
LEVI STRAUSS & COMPANY,

        Plaintiff,  :

  -against-  :  83 Civ. 4338 (RWS)

TEXTILES Y CONFECCIONES EUROPEAS, S.A.,  :  AFFIDAVIT OF
        Defendant.  :  JEFFREY D. COHEN
------------------------------------x

STATE OF NEW JERSEY  )
                  : ss.:
COUNTY OF BERGEN  )

      JEFFREY D. COHEN, being duly sworn, deposes and says:

      1.  From November, 1981 until December, 1984 I was employed by Lois Sportswear, U.S.A., Inc. ("Lois"). While I was employed by Lois I served as vice president of sales from November, 1981 to April, 1983 and as vice president and general manager from April, 1983 until August, 1983. In August I was appointed president of Lois and I served in that capacity until my departure in December, 1984. My initial responsibilities at Lois included marketing and advertising of Lois brand clothing and supervision of the sales manager and other employees. As

Ex. G-1

5a

vice president and general manager, I also assumed some responsibility for the financial end of the business. As president I was responsible for the overall operation of the company, including oversight of the sales, marketing, advertising and financial aspects of Lois' operations.

2. Prior to my association with Lois, I had previously been employed in the leisure wear and jeans industry for approximately six years. From 1976 until 1978, I was employed by Faded Glory, first as a trainee and then as the company's Northeast regional sales manager. As such I was responsible for ten salesmen and $8 million in sales. In 1978 I joined MacKeen as its national sales manager and in 1980 joined Calvin Klein as its regional salesman in New Jersey. The principal product sold by each of these companies was jeans. All three of these companies were prominent in the jeans and casual clothing fields while I was with them.

3. Subsequent to my association with Lois I have continued to be active in the clothing industry. Until recently, I was employed as vice president and general manager of Philippe Monet, a manufacturer of fashion outerwear. Currently, I am self-employed with several projects involving the production and sale of clothing.

4. I am familiar with the facts and matters recited herein, except as to those matters stated to be upon information and belief and, as to those matters, I believe them to be true. The matters set forth herein are based upon my personal

Ex. G-2

knowledge, experience and information learned during the course of my employment by Lois and others in the clothing industry business.

5. From a period commencing in the mid 1970's and continuing to date, it has become a common practice for virtually all of the numerous manufacturers of jeans to place a stitching design on the right hand back pocket of their jeans. While at various times such designs may have been distinctive or noticeably different one from the other, the market has become so replete with such designs for so long that any once distinctive design characteristics of particular brands have all but lost their uniqueness.

6. Throughout such period numerous back pocket designs incorporated on jeans have featured a double arc or one or more "v" shaped designs as the central or only design feature. For instance, while there are numerous such designs which I have spoken of or viewed in the preparation for and attendance at my own depositions, the designs identified during the deposition of Cassandra Flipper, Deputy General Counsel of Levi Strauss & Co. ("Levi"), and attached hereto as Exhibit A are representative of the numerous double arc designs I have repeatedly encountered during the course of my employment in the clothing industry. The title of the file from which the arc designs included in Exhibit A were taken is provided in Exhibit A; however, the titles were established by Levi and in some cases seem to bear no relationship to the jeans identified therein.

Ex. G-3

7. Countless other back pocket designs used extensively since the 1970's have incorporated a double arc design element as a central feature of a more complex design. Representative samples would include the MacKeen, Sasson (two designs), Clouds, Jordache, Riva, Calvin Klein, Generra and Daniel Laurent designs depicted in Exhibit 14 of the Affirmation of Alfred T. Lee submitted in support of Levi's summary judgment motion.

8. In addition to the representative samples of both simple and more complex double arc designs referred to above, the jeans industry has been besieged by numerous counterfeiters who have reproduced any design that suited them, and countless smaller domestic and foreign manufacturers who flooded the market with various designs for relatively short periods of time.

9. I have read the Affirmation submitted by Ms. Flipper on behalf of Levi. Without contradicting any of her statements concerning the policing of potential infringements, no matter how effective that policing may or may not have been in causing identified offenders to cease production or sales, as is obvious from the designs previously attached and referred to, the jeans industry has been absolutely swamped by manufacturers using or incorporating a double arc design on the right hand back pocket both before and after what Ms. Flipper has referred to as the "heyday of the designer jean craze" of the late 1970's and early 1980's.

Ex. G-4

-4-

10. I am in substantial agreement with Ms. Flipper's assertions in paragraph 5 of her Affirmation wherein she states:

> 5. During my tenure with the Company, the jeans business has been characterized by ease of entry, resulting in a proliferation of companies producing jeans, mostly on a small scale with many of them remaining in business for only a short time. The intensity of competition has caused some of these companies to imitate one or more of the Levi Strauss trademarks. Some persons abroad have even resorted to blatant counterfeiting of LEVI'S jeans. These jeans have found their way into channels of trade around the world to the point where detection of the bogus garments required the Company to undertake intensive investigational efforts and to adopt a sophisticated coding system which the counterfeiters cannot match. The counterfeiting problem is, in fact, a world-wide fraud...

11. Any distinctive aspect of the Levi design and most other back pocket designs has been diminished or lost entirely since the 1970's, with the possible exception of those designs which incorporate or display the brand name as part of the design.

12. In the marketing and sale of Lois brand clothing, including jeans and trousers, Lois attempted to emphasize that its products were both imported from Europe and a "fashion statement." These two features were emphasized by Lois' sales representatives, by Lois' catalogues and brochures, Lois' media advertising and all of the point of sale tags and markings attached to Lois products. For instance, please note the "Imported From Europe" tag on Exhibit 1 to the Affidavit of Nancy A. Nelligan submitted by Levi. Representative copies of

Ex. G-5                                -5-

media advertising and catalogues emphasizing such features are attached hereto as Exhibits B, C, D, E, and F. All such items have previously been provided or identified during the course of depositions taken in this case.

13. The import and fashion statement features of Lois jeans were also supported by the suggested retail price of $60-$80 which effectively priced Lois jeans out of the domestic basic or durable jeans market.

14. Although isolated exceptions have been pointed out to me during the course of this litigation, there are only a limited number of retail outlets of which we were aware (less than 10 percent of Lois outlets through mid-1984) which have ever handled both Lois jeans and Levi jeans at the same time. In virtually all of the cases where stores may have concurrently handled both products, the Lois jeans were displayed in a different department (such as "Collections" or Fashion/Designer departments) and usually on a different floor from Levi's products (which would ordinarily have been sold in the junior departments or the bargain basement store). The limited overlap did nothing to diminish the competitive distance between the two brands.

15. Although Levi has contended in its moving papers that it is seeking to enter designer markets with new lines of clothing, the contentions specifically omit any claim that the Levi arcuate is or will be used on the new lines. The accompanying exhibits also indicate that no arcuates are

Ex. G-6

-6-

employed on any such styles. Such lines are also still priced only in the mid-level price range where they would probably compete with brands like Calvin Klein, Sergio Valente and Sasson. Neither their price range nor their American origin would permit Levi basics or the new lines to be competitive in the fashion level market which has been recently dominated by Guess, Newman, Girbaud and Lois.

16. In its moving papers Levi has implied that Lois is competitive with Levi because both producers sell to The GAP Stores. Lois does sell to The Gap a designer level trouser style anticipated to be priced in the $50.00 range by The GAP. However, the Lois stitched design does not appear on any items or styles sold by it to The Gap. Thus, there is no likelihood that Levi jeans bearing arcuates will be sold near Lois clothing bearing the Lois design in any of the more than 500 GAP stores, as was inferred by Levi in its papers.

17. As I have previously explained in my deposition testimony, because Lois competes in the fashion industry, at the end of selling seasons Lois has frequently unloaded or cleared

Ex. G-7

its warehouse of non-saleable fashion lines. Such items are sold in odd lots and sizes to salvage operations or discount houses like Dollar Bill's simply to get rid of the goods. It has been my experience that Dollar Bill's and other deep discounters generally have sold Lois jeans and trousers at half price or less (approximately $30.00). Obviously the goods which were not readily saleable (because they were "bombs" as Mr. Lee so aptly termed them at my most recent deposition) are not saleable at the salvage outlets either. While I am astonished at the information placed before this Court that some Lois items were being sold by Dollar Bill's at ridiculously low prices, even Dollar Bill's cannot be expected to keep non-saleable goods on its shelves.

18. To the best of my knowledge, Lois never sold standard denim five-pocket jean models to salvage outlets such as Dollar Bill's while I was employed there. The only type of merchandise dumped in that manner consisted of odd lots of fashion garments usually in unusual colors or unsuccesful designs which simply could not be sold by Lois in any other manner.

19. The models, styles and names of Lois jeans and trousers are changed seasonally in accordance with prevailing fashions. By contrast, Levi has stated in its moving papers that the "Levi's jeans style has scarcely been modified since the 1870's." Such statement epitomizes the contrast between the two marketing channels, price ranges and fashion implications,

Ex. G-8

-8-

as well as the consumers' desire to purchase basic, durable denim goods on the one hand or high fashion clothing of many designs, colors, styles and materials, on the other hand.

_____
Jeffrey D. Cohen

Sworn to before me this
   day of June, 1985

_____
Notary Public

2784B

MARYANN DEMPSEY
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JUNE 31, 1988

Ex. G-9

-9-