# EXHIBIT P

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LEVI STRAUSS & CO.,                )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )    No. C07-03752-JSW
                                   )
ABERCROMBIE & FITCH TRADING        )
CO.,                               )
                                   )
        Defendant.                 )
_____   )
AND RELATED CROSS-ACTIONS.         )
_____   )

DEPOSITION OF

KATHERINE DURGIN

Thursday, May 15, 2008

REPORTED BY:  TINA MARIE VELASQUEZ
              C.S.R. NO. 10072

BONNIE L. WAGNER & ASSOCIATES
COURT REPORTING SERVICES
41 SUTTER STREET
SAN FRANCISCO, CALIFORNIA  94104
(415) 982-4849

Page 2

1                            I N D E X

2

3   DEPOSITION OF:  KATHERINE DURGIN

4   Thursday, May 15, 2008

5

6                                                      PAGE

7   EXAMINATION BY:

8       Mr. Keyes                                        4

9

10                        E X H I B I T S

11                                                      PAGE

12   DEFENDANT'S

13     70   Document entitled "Affidavit Under Section 8";  26

14          2 pgs.

15     71   Document entitled "Combined Affidavits Under    32

16          Sections 8 and 15"; 2 pgs.

17     72   Document entitled "Combined Affidavit Under     40

18          Sections 8 and 15"; 2 pgs.

19     73   Document from the Patent and Trademark Office   57

20          for Registration No. 1139254; 1 pg.

21                        ---oOo---

22

23

24

25

3be5790a-522e-41d9-8541-98d1b8a6d99d

1          BE IT REMEMBERED that pursuant to Notice of

2     Taking Deposition, and on Thursday, May 15, 2008,

3     commencing at the hour of 11:06 a.m., thereof, at the Law

4     Offices of K&L Gates, 55 Second Street, Suite 1700, San

5     Francisco, California 94105-3493, before me, TINA MARIE

6     VELASQUEZ, a Certified Shorthand Reporter in and for the

7     State of California, personally appeared

8                         KATHERINE DURGIN,

9     called as a witness by the Defendant, who, being by me

10    first duly sworn, was thereupon examined and testified as

11    is hereinafter set forth.

12                        ---oOo---

13

14    APPEARANCES:

15          Law Offices of TOWNSEND AND TOWNSEND AND CREW,

16    LLP, Two Embarcadero Center, 8th floor, San Francisco,

17    California 94111-3834, represented by GIA L. CINCONE,

18    Attorney at Law, appeared as counsel on behalf of the

19    Plaintiff.

20          K&L GATES, 55 Second Street, Suite 1700, San

21    Francisco, California 94105-3493, represented by J.

22    MICHAEL KEYES and RACHEL R. DAVIDSON, Attorneys at Law,

23    appeared as counsel on behalf of the Defendant.

24          Also present:  Thomas Onda

25                        ---oOo---

3be5790a-522e-41d9-8541-98d1b8a6d99d

1      A.    Right.

2      Q.    There wasn't some other head corporate

3   secretary --

4      A.    No.

5      Q.    -- other than Mr. Kern?

6      A.    Mr. Kern.

7      Q.    Got you.  So you were elected corporate secretary

8   in 1982.  Does that mean you took Mr. Kern's position?

9      A.    Yes.  As corporate secretary, not as corporate

10  treasurer.  The jobs were split.

11     Q.    So what were your positions as -- what were your

12  job duties as corporate secretary?

13     A.    I reported to the general counsel.  My

14  responsibility was primarily to plan, prepare, implement

15  meetings of the board and all of its committees.  I was

16  responsible for the company's relationship with the stock

17  transfer agent, ensuring that proxy statements got sent

18  out, the stock transactions were completed properly.  I was

19  responsible for the company stock option plan.  I was

20  responsible for maintaining the company's registrations to

21  do business in various states.  There were annual reports

22  that had to be made and fees paid.  I signed company

23  documents.

24     Q.    What company documents did you sign?

25     A.    I signed documents that had to do with actions

1    that had been taken by the board, I signed stock

2    certificates, I signed proxy statement, I signed legal

3    documents — or — yes, prepared by the legal department.

4    I was part of the legal department.

5        Q.    So the corporate secretary was part of Levi

6    Strauss & Company's legal department?

7        A.    Yes.

8        Q.    Was the assistant corporate secretary part of

9    Levi Strauss legal department?

10       A.    Yeah, Levi Strauss -- I can't remember the

11   details, but Levi Strauss didn't have a legal department

12   per se until about 1980, 1979 -- somewhere in the late

13   '70s, early '80s.  We relied on a law firm for our general

14   counsel activities.  When I became corporate secretary, we

15   were part -- there was an internal legal department.

16       Q.    So by 1982, there was an internal -- an in-house

17   counsel of some sort?

18       A.    Yes.

19       Q.    Do you recall who the law firm was that was your

20   outside general counsel up until that point?

21       A.    Heller, Ehrman, White & McAuliffe.

22       Q.    And then was it -- did you say in 1982, the legal

23   department was established?

24       A.    It was before that, but I don't remember exactly.

25   I would say probably 1979 or 1980, somewhere in there.

1    A.    I filled half of his position.

2    Q.    So that happened in 1982?

3    A.    Yes.

4    Q.    And you filled half his position, the corporate

5    secretary half?

6    A.    Yes.

7    Q.    And so as of 1982, to whom did you report?

8    A.    Peter Jones.

9    Q.    And then after Mr. Jones left in 1984, did you

10   report to Mr. Bauch?

11   A.    Yes.

12   Q.    And you reported to Mr. Bauch for the remainder

13   of your tenure at Levi Strauss?

14   A.    No.  In 1986, I became the director of corporate

15   communications.

16   Q.    Tell me about that.  You were taken out of the

17   legal department?

18   A.    I moved from the legal department to the

19   communications department.

20   Q.    You became the director of corporate

21   communications?

22   A.    Yes.

23   Q.    What did you do in that capacity, Ms. Durgin?

24   A.    We were now a private company.  I was responsible

25   for shareholder communications, employee communications and

1    corporate ethics or --

2        A.    Corporate ethics.

3        Q.    What was discussed in those committee meetings,

4    if you recall?

5        A.    I can't remember a specific example, but it had

6    to do with the ethics of running the business.

7        Q.    Who was the head of that committee?  Do you

8    remember?

9        A.    It was a board member who chaired.  The only -- I

10   believe that it was -- there may have been more than one

11   over the period of time.  But Roger Heyns, H-e-y-n-s, is

12   the person I remember.

13       Q.    Did you say it's Robert Heyns?

14       A.    Roger.

15       Q.    Legal documents -- you mentioned as corporate

16   secretary, you signed -- well, you said, "trademark

17   registrations."

18       A.    Trademark documents.

19       Q.    Do you remember what types of trademark documents

20   you signed?

21       A.    No.

22       Q.    Before you began signing trademark documents, did

23   you receive any formal training or indoctrination with

24   respect to what a trademark was?

25       A.    I did not have any formal training.  I remember

1   having at least one meeting with the trademark lawyers and

2   the paralegals.

3          MS. CINCONE:  Just caution the witness not to

4   reveal anything that was said during any of those meetings.

5   Those are privileged communications.

6          MR. KEYES:  Q.  You remember having one meeting

7   with, you said, paralegals?

8      A.   And an attorney.  I don't remember who was

9   responsible -- which attorney was responsible.

10     Q.   Do you remember who was at that meeting?

11     A.   No.  You mean by name, individuals?

12     Q.   Yes.

13     A.   No.

14     Q.   Do you know if it would have been someone in

15   Mr. Jones' legal department?

16     A.   They were all members of the legal department.

17     Q.   Other than that one meeting, did you have any

18   other type of formalized training or indoctrination

19   regarding --

20     A.   No.

21     Q.   -- trademarks?

22          Do you recall if Levi Strauss & Company at that

23   time maintained any written documents or written procedures

24   regarding what a trademark is?

25          MS. CINCONE:  I'll object as lack of foundation.

1    were going to sign an affidavit under Section 8, you would

2    receive a file and the affidavit itself was paper-clipped

3    to the outside of the file; and if you opened up the file,

4    there was the checklist on one side and then the supporting

5    documents on the other side?

6        A.    Yes.

7        Q.    So with respect to Exhibit 70, the supporting

8    documentation would be page two of Exhibit 70?

9            MS. CINCONE:  If you're asking her about the

10   specific file, I believe she's already testified she

11   doesn't recall.

12           THE WITNESS:  I don't remember.

13           MR. KEYES:  Q.  And then tell me about the

14   checklist.

15       A.    I can't remember specifically, other than we had

16   an agreement that I needed to see the initials of the

17   preparer and the initials of the supervising attorney in

18   order to sign off -- to sign the affidavit.

19       Q.    So before you would sign an affidavit, you would

20   look at the file to make sure that one of the in-house

21   attorneys had approved --

22       A.    The document.

23       Q.    -- this for signature?

24           And there was also someone else who indicated

25   they had prepared the document?

1    A.    If the paralegal had prepared it, there would be

2    some -- there would be an initial of the paralegal or a

3    signature and then the supervising attorney would also sign

4    off.

5    Q.    And so in general, if I'm understanding

6    correctly, once you received this file and if it was

7    checked off by the attorney, you would look at the document

8    and then execute it?

9    A.    Yes.

10    Q.    What would you do after you executed the

11    document?

12    A.    I'd return it to the paralegal.

13    Q.    Anything further that you would do at that point?

14    A.    No.

15    Q.    So back to specifically with respect to Exhibit

16    No. 70, do you see at kind of the last part of the sentence

17    where this Exhibit 70 states that "the mark shown therein

18    is still in use in interstate commerce --"

19    A.    Yes.

20    Q.    "-- as evidenced by the attached specimen showing

21    the mark as currently used"?  Do you remember if you did

22    any investigation to determine whether the mark shown

23    therein is still in use in interstate commerce?

24    A.    I don't remember.

25    Q.    In general, when you would sign Section 8

1    Q.   Before you signed this document, did you review

2    it?

3    A.   I don't remember this document specifically, but

4    my process was to read the document and to look at the file

5    that was supporting it to make sure that it was signed off

6    by the preparer and the attorney, supervising attorney.

7    Q.   Do you have an understanding as to what a

8    Combined Affidavit Under Sections 8 and 15 is?

9         MS. CINCONE:  You're asking if she has an

10   understanding today?

11        MR. KEYES:  Yes.

12        THE WITNESS:  I don't.  I understand what an

13   affidavit is.  I don't understand -- I don't know Sections

14   8 and 15.

15        MR. KEYES:  Q.  Do you recall if at the time

16   when you signed this document — that being Exhibit No. 71

17   — if you had an understanding as to what a Combined

18   Affidavit Under Section 8 and 15 was?

19   A.   I don't remember.

20   Q.   I know you've testified previously that your

21   process before you would sign an affidavit was to look at

22   the file and make sure that the in-house counsel had

23   checked off of the -- or had -- what exactly did the

24   in-house counsel do?  There was a checklist and was there a

25   line on the checklist or something that said, "okay for

3be5790a-522e-41d9-8541-98d1b8a6d99d

1    Q.   When you say you recognize the case name, what do
2    you recognize about it?
3    A.   I remember the name Lois.
4    Q.   You remember that particular lawsuit?
5    A.   I remember the reference to that case -- yes, to
6    that lawsuit.
7    Q.   What do you remember about it?
8    A.   The name only.
9    Q.   And you remember that from your employment with
10   Levi Strauss back in the '80s?
11   A.   Yes.  Gia mentioned it today --
12   MS. CINCONE:  Do not reveal anything about our
13   conversation.  It's a privileged communication.
14   THE WITNESS:  When I heard the name, I recognized
15   it.
16   MR. KEYES:  Q.  Back in the 1980s, do you recall
17   discussing the Lois sportswear litigation with anyone at
18   Levi's?
19   A.   No.
20   MS. CINCONE:  You have to give me a moment.  I'll
21   object to that to the extent it calls for privileged
22   communications.
23        (Document, more particularly described in the
24        index, marked for identification as
25        Defendant's Exhibit No. 72.)

1   like so made are punishable by fine or imprisonment, or

2   both, under Section 1001 of Title 18 of the United States

3   Code and that such willful false statements may jeopardize

4   the validity of this document, declares that Levi Strauss &

5   Co., a corporation of the State of Delaware, having its

6   principal place of business at 1155 Battery Street, San

7   Francisco, California, 94111, owns the above-identified

8   registration issued September 2nd, 1980, as shown by

9   records in the Patent and Trademark Office."

10          I'll stop there.  At the very top, it says,

11   "Katherine B. Durgin, being hereby warned that willful

12   false statements and the like so made are punishable by

13   fine or imprisonment."  Who provided that warning to you?

14          MS. CINCONE:  I'll object to the extent that it

15   calls for privileged communications.  You can answer his

16   question without revealing the substance of any

17   communications if you recall who talked to you about that.

18          THE WITNESS:  I don't recall.

19          MR. KEYES:  Q.  Do you recall someone speaking

20   with you about that; you just don't recall the individual?

21          MS. CINCONE:  Same objection.

22          THE WITNESS:  I know that I took my job very

23   seriously and I knew that signing a document was an

24   important responsibility on behalf of the corporation.  I

25   don't remember specifically having a conversation about the

Page 43

1   consequences of signing a false statement.

2        MR. KEYES:  Q.  If you go down about to the

3   tenth line, where it starts off "Patent and Trademark

4   Office --"

5        A.   Yes.

6        Q.   You see where I am?  "Semicolon, that the mark

7   shown therein ...."

8        A.   Yes.

9        Q.   So continuing on, the affidavit states "That the

10  mark shown therein has been in continuous use in interstate

11  commerce for five consecutive years from the date of

12  registration or the date of publication under Section

13  12(c)(6) to the present, or in connection with each of the

14  following:  pants, jackets, skirts, and shorts which are

15  stated in the registration."

16        Before signing this affidavit, Ms. Durgin, did

17  you do any work to verify the accuracy of that statement

18  you were making?

19        A.   I verified that there was a file and that it was

20  about the same topic as this affidavit and that it had been

21  signed off by the legal, paralegals and attorney,

22  supervising attorney.  I did not investigate the accuracy

23  of this statement.

24        Q.   When you said it was signed off on by the

25  attorney, again, you're talking about the initials that the

1 attorney --

2    A.    yes.

3    Q.    -- placed in the file?

4          Do you remember who the attorney was that had

5 initialed this particular affidavit for you to sign?

6    A.    I do not.

7    Q.    Would it have been one of the individuals that

8 you mentioned earlier today?

9    A.    Probably.  I can't remember which attorney was

10 responsible for trademark.

11    Q.    Do you know -- could it have been Peter Jones?

12    A.    It's very unlikely.

13    Q.    Why is that?

14    A.    Because he didn't have direct responsibility for

15 trademark.  He had responsibility, but he wasn't the one

16 executing.

17    Q.    Could it have been -- is it possible it would

18 have been Tom Bauch?

19    A.    It could have been.

20    Q.    What about Cassandra Flipper?

21    A.    I really don't know.

22    Q.    Al Moreno?

23    A.    I don't know.

24    Q.    Ruth Meyler?

25    A.    I don't know.

1      Q.    Or Peter Phillips?

2      A.    I don't know.

3      Q.    So I guess am I understanding that the only one

4   that you could definitively rule out would be Peter Jones?

5      A.    Yes.

6      Q.    Also, during the course of your testimony today

7   regarding the process that you would follow, you said you'd

8   look at the file, there would be the checklist, and then

9   you'd also verify that the file — and I don't want to put

10  words in your mouth.  I just want to make sure I understand

11  your testimony — that you would make sure that the file

12  was in order or something, that the file that you -- the

13  affidavit that you were filing was with respect to the file

14  in front of you.

15     A.    Exactly.

16     Q.    And what do you mean by that?

17     A.    Well, in the earlier case, where we're talking

18  about super straights, that the file was about super

19  straights.

20     Q.    So you're going back to Exhibit No. 71?

21     A.    Yes.

22     Q.    So what would have been typically in a file

23  before you would sign the affidavit?

24     A.    I don't know what the contents were.  I would

25  just make sure that the subject was the same.

1  Q.  So would there be -- using Exhibit No. 71 for an

2  example, this looks like hang tags or something, the

3  specimen in Exhibit No. 71.  Would the file contain hang

4  tags, for example, indicating the goods or ....

5      MS. CINCONE:  Are you asking about that

6  particular file or --

7      MR. KEYES:  Just as a general matter.

8      MS. CINCONE:  You're asking what type of

9  documentation?

10     MR. KEYES:  Yeah.

11  Q.  What type of documentation would be in the file,

12  if you recall?

13  A.  I don't recall.

14  Q.  Back to Exhibit No. 72, Ms. Durgin.  I apologize.

15  I may have asked you this already, but I want to make sure.

16  There's a portion of this affidavit that states that the

17  mark is currently being used on "pants, jackets, skirts,

18  and shorts which are stated in the registration."

19      Do you see where I am?

20  A.  Yes.

21  Q.  Did you do anything to verify that the mark in

22  question was currently being used on pants?

23  A.  No.

24  Q.  Do you recall if there was a pair of pants in the

25  file?

1      A.   I don't recall.

2      Q.   What about with respect to jackets?

3      A.   I don't recall.

4      Q.   Did you do anything to determine whether the

5 trademark in question was still being used on jackets?

6      A.   I did not.

7      Q.   What about with respect to skirts?  Did you do

8 anything to determine whether the mark was still being used

9 on skirts?

10      A.   I did not.

11      Q.   Did you do anything to determine whether the mark

12 was actually being used on shorts?

13      A.   I did not.

14      Q.   Go down to the fourth line.  First words are

15 "currently used --"

16      A.   Yes.

17      Q.   -- you see where I am?

18      The affidavit states "That there has been no

19 final decision adverse to registrant's claim of ownership

20 of such mark for such goods or services, or to the

21 registrant's right to register the same or to keep the same

22 on the register."

23      Ms. Durgin, before you signed this affidavit, did

24 you do anything to determine the veracity of that

25 statement?

1    A.    I did not, other than what I've already described

2    in terms of process.   I did not do any personal

3    investigation.

4    Q.    The last line, about midway through where it

5    starts "that there is no --"

6    A.    Uh-huh.

7    Q.    -- you see where I am?

8          The affidavit also states "That there is no

9    proceeding involving said rights pending and not disposed

10   of either in the Patent and Trademark Office or in the

11   courts."

12         Before signing this affidavit, Ms. Durgin, did

13   you perform any investigation as to whether there was any

14   proceeding involving said rights pending and not disposed

15   of either in the Patent and Trademark Office or in the

16   courts?

17   A.    As I said earlier, I don't remember this specific

18   document.   But in general, I did not investigate -- I don't

19   remember a time investigating.

20   Q.    This document was executed -- or appears to have

21   been executed May 14th, 1985.   Do you remember who the

22   general counsel was of Levi Strauss & Company at that time?

23   A.    I believe it was Tom Bauch.

24   Q.    After you would sign these documents typically,

25   what would you do with them?

1        A.    I do.

2        Q.    I'm going to read that to you and ask you a

3    question or two.  It states, "The declaration cannot be

4    accepted for examination because it was executed before the

5    beginning of the fifth year following the date of

6    registration.  The earliest date a declaration could have

7    been executed for this registration was September 2nd,

8    1985.  A newly-executed declaration must be filed no later

9    than September 2nd, 1986, in order to avoid cancellation of

10   the registration."

11             Do you remember seeing this letter from the U.S.

12   Patent and Trademark Office?

13        A.    No.

14             MS. CINCONE:  Objection; asked and answered.

15             MR. KEYES:  Q.  Do you remember ever speaking

16   with anyone internally at Levi Strauss & Company as to how

17   your declaration was filed early with the U.S. Patent and

18   Trademark Office?

19        A.    I don't remember.

20             MR. KEYES:  Can we take a break for a moment?

21             THE WITNESS:  Uh-huh.

22             (Recess from 1:46 p.m. to 1:52 p.m.)

23             MR. KEYES:  Q.  Ms. Durgin, we spoke a few

24   moments ago about the Lois Sportswear matter.  Other than

25   the Lois sportswear matter, do you recall any other

1    CERTIFICATE OF WITNESS

2        I, KATHERINE DURGIN, hereby declare that I have

3    read the foregoing testimony, and the same is true and a

4    correct transcription of my said testimony except as I

5    have corrected.

6

7

8

9
                                    _____
10                                  Signature

11                                  _____
                                    Date
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 62

1    STATE OF CALIFORNIA          )
                                   )
2    COUNTY OF CONTRA COSTA        )

3

4         I certify that the witness in the foregoing

5    deposition was by me duly sworn to testify to the truth,

6    the whole truth and nothing but the truth in the

7    within-entitled cause; that said deposition was taken at

8    the time and place therein stated; that the testimony of

9    said witness was reported by me, Tina Marie Velasquez, a

10   Certified Shorthand Reporter in and for the State of

11   California, and disinterested person, and was thereafter

12   transcribed into typewriting.

13        And I further certify that I am not of counsel

14   or attorney for either or any of the parties to said

15   deposition, nor in any way interested in the outcome of

16   the cause named in said caption.

17        In witness whereof, I have hereunto set my hand

18   this 30th day of May 2008.

19

20

21                         _____

22                              TINA MARIE VELASQUEZ
                                    CSR #10072

23

24

25