# EXHIBIT Q

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


Levi Strauss & Co.,

        Plaintiff,

-vs-                 CASE No.  C07-03752-JSW

Abercrombie & Fitch Trading Co.,

        Defendant.
_____/




DEPOSITION OF JEAN FOWLER

Friday, May 16, 2008




REPORTED BY:  GINA L. PETERSEN
CSR No. 9447




BONNIE L. WAGNER & ASSOCIATES
41 SUTTER STREET, SUITE 1605
SAN FRANCISCO, CA  94104
(415) 982-4849

Page 2

1                  A P P E A R A N C E S:

2

3    For the Plaintiff:
                              Townsend and Townsend and Crew
4                             BY:  Gia L. Cincone
                                   Attorney at Law
5                             Two Embarcadero Center, 8th Floor
                              San Francisco, California  94111

6

7

8    For the Defendant:
                              KIRKPATRICK & LOCKHART, PRESTON,
9                             GATES, ELLIS, LLP
                              BY:   Rachel R. Davidson
10                                  Attorney at Law
                              55 Second Street
11                            Suite 1700
                              San Francisco, California   94105

12

13

     Also Present:
14                            Thomas Onda

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    E X H I B I T S

2

3     Defendant's                Description                Page

4

5        74        Section 8 and 15 Affidavit             23
                   Reg. No:    1,139,254
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1    FRIDAY, MAY 16, 2008                    11:40 O'CLOCK A.M.

2

3                              -oOo-

4                         Jean Fowler,

5        Being first duly sworn by the Certified Shorthand

6         Reporter to tell the truth, the whole truth and

7            nothing but the truth, testified as follows:

8

9                  EXAMINATION BY MS. DAVIDSON

10

11   BY MS. DAVIDSON:

12        Q. Good morning, Mrs. Fowler.

13        A. Good morning.

14        Q. I just introduced myself.  My name is Rachel

15   Davidson, and I represent Abercrombie in the litigation

16   involving Levi's.

17            Have you had your deposition taken before?

18        A. No.

19        Q. So, I'm not sure if you had a chance to sort of

20   go through the basic deposition process rules with your

21   counsel.

22            Nevertheless, I'm going to kind of give you a

23   brief summary of what those rules are so we make this

24   process go as effectively as possible.

25            The goal here today is for you and I to

1    A. On a couple of occasions when the Corporate

2    Secretary was not available.

3    Q. Do you remember what was generally discussed in

4    those meetings, general level?

5    A. I can't remember.

6    Q. So at some point, Bob Kern was the Corporate

7    Secretary?

8    A. (Witness nods head.)

9    He was Corporate Secretary when I was hired in

10   1980, and he retired, I would say, 1982 or 1983.  I don't

11   remember.

12   Q. And then Kathryn Durgin took that position?

13   A. Right.

14   Q. Was it at that time that you sort of transitioned

15   to the Assistant Corporate Secretary?

16   A. Well, Assistant Corporate Secretary was my title

17   from fairly early on in the first year, maybe within the

18   first three or four months, maybe even sooner than that.

19   Q. Okay.

20   A. I took over more of the preparation work, I

21   think, as she became Corporate Secretary.  I also took

22   over responsibility for relations with the transfer agent.

23   In fact, I did all the ground work on selecting a

24   new transfer agent.

25   Q. What is a transfer agent?

a9f385dc-07fd-4d62-bec6-23a999e7b335

1    A. Transfer agent is the organization that handles

2 all transfers of stock between and among shareholders.  If

3 you sell stock, you have to complete that transaction

4 through a transfer agent.

5    Q. Did you ever record or type board minutes?

6    A. Only on those couple of occasions when I attended

7 the meeting.

8    Q. Did I hear you correctly that you attended board

9 meetings where you typed minutes when Ms. Durgin was not

10 at the company that day for whatever reason?

11    A. You are right.  I only actually attended board

12 meetings when she was not present.  There were a couple of

13 occasions.

14    Q. Do you know if Ms. Durgin regularly attended

15 board meetings at Levi's?

16    A. Yes, she did.  I think she did.  I better back

17 off on that.  I can't swear to that.

18    Q. Okay.  Thank you.  In your capacity as Assistant

19 Corporate Secretary were you responsible for signing legal

20 documents?

21    A. If asked.

22    Q. Do you remember what kind of legal documents you

23 have been asked to sign while you were employed at Levi's?

24    A. I really don't remember.  It was generally an

25 attorney who would bring me something that needed an

1    officer's signature, generally more than one officer's

2    signature if they came to me.

3        Q. Would you sign legal documents even if Ms. Durgin

4    was present at the company?

5        A. I would if asked to.  Sometimes documents needed

6    more than one officer to be signed to sign off on.

7    Sometimes, I think some needed as many as four signatures.

8        Q. Do you remember what those type of documents

9    were?

10        A. Too many years ago.  My memory is rather dim.

11        Q. While you were employed at Levi's, do you recall

12    ever being involved in maintaining or having any sort of

13    job responsibilities with trademark registrations for

14    Levi's trademarks?

15        A. No job responsibilities in that regard.

16        Q. Did you work with Levi's legal department while

17    you were employed at Levi's?

18        A. The Corporate Secretary reported to the General

19    Counsel.  We were a subdepartment of the legal department.

20        Corporate Secretary was an independent -- is

21    separate department, but it reported to the legal

22    department, through the General Counsel.

23        Q. So did you interact with the lawyers?

24        A. I knew them personally.  I knew many of them

25    personally.  We had coffee or lunch.  We sat near each

1    other.  Our offices were near each other.

2        Q. Okay.

3        A. I didn't interact with them.  I don't remember

4    ever discussing cases with them.

5        Q. Do you remember if you ever were assigned

6    projects or any sort of duties from the legal department?

7        A. I don't recall any specific assignments that

8    wouldn't have come through my boss.  I may have but they

9    were -- they didn't come directly to me, they came through

10   the Corporate Secretary.

11       Q. Do you know what a trademark is?

12       A. Yes.

13       Q. What is your understanding what a trademark is?

14       A. Levi's is -- a trademark is something that that

15   company has developed, and it's very specific for the use

16   of that company, and it has -- frankly, I'm not clear on

17   the difference between patent and trademark but...

18       Q. No problem.

19       A. The company has exclusive use of that icon,

20   whatever it is --

21       Q. Okay.

22       A. -- or idea.

23       Q. You mentioned that you did not have any job

24   duties or responsibilities involving Levi's trademarks.

25       A. No.

1    Anne.  I don't remember her last name.

2         Q. Okay.

3         A. There were two other women attorneys whose names

4    I don't remember.  I don't remember them all.

5         Q. Do you ever remember having conversations with

6    them about particular cases or litigation that Levi's had

7    been involved with?

8         A. I don't believe we ever had those kind of

9    conversations.

10        Q. While you were employed at Levi's, did you

11   receive any sort of training in-house to sign legal

12   documents, what to look for and understand when you signed

13   a document?

14        A. I don't remember.  This is a long time ago.

15        Q. I understand.

16        A. I'm 72 years old and the brain is not as sharp as

17   it once was.

18        Q. Unfortunately, litigation doesn't yield to

19   retirement.

20             I appreciate that it's been a long time and your

21   memory may escape you.  Do you remember if you ever really

22   consulted with people at Levi's on requirements for

23   signing documents or asking people at Levi's for guidance

24   on signing particular documents in your capacity?

25        A. To be sure I understand the question, are you

1    talking general matters or are you asking for a particular

2    documents.

3         Q. General matters.

4         A. If I was asked to sign a document, I would

5    generally ask what I was signing.

6         Q. Did you generally read documents that you signed?

7         A. I don't remember.  By principle I would have

8    asked the question.  I'm sure I didn't read thick files.

9    I know I didn't read thick files.  I know that.

10         Q. Ms. Fowler, do you know what an affidavit is?

11         A. It's something you swear to as the truth.  I

12    don't know that I could define it specifically.

13         Q. Were you aware that there are certain documents

14    that the contents of which before you sign you have to

15    verify the accuracy of statements in the document under

16    oath?

17         MS. CINCONE:  You are asking if she is aware of

18    that now?

19         MS. DAVIDSON:  Is she aware there are documents

20    like that, at any time in her lifetime.

21         THE WITNESS:  Well, the only time I have been

22    under oath is when I have been as a juror in a courtroom.

23    I considered anything that was handed to me to be signed

24    at Levi's to have been well researched and well

25    documented.  It was the company culture to do one's best

1  work and to do it honestly because I wouldn't have known

2  all the details; and whatever it had been, they spent

3  months working on.  I would have accepted the word of

4  whoever presented it to me, whatever explanation was given

5  by that person, attorney or anyone else.  It was up to the

6  company standard, and I would have signed it.

7  BY MS. DAVIDSON:

8      Q. Would it be fair to say that you really trusted

9  the people that gave you the particular document to sign

10  that they did their job or investigation, whatever was

11  required to process that document?

12      A. That is a fair statement.

13      Q. Do you remember while you were employed at Levi's

14  whether you signed an affidavit before?

15      A. Before I was employed at Levi's?

16      Q. No, I'm sorry.

17      While you were employed at Levi's, do you

18  remember signing an affidavit in any capacity?

19      A. I do not remember.

20      Q. Do you remember ever seeing an affidavit?

21      A. I do not remember.

22      MS. DAVIDSON:  I think we left off on exhibits in

23  Durban's deposition at 74.

24      Let's mark this as Exhibit 74.

25                      (Whereupon, Defendants' Exhibit 74

1   "declares that Levi Strauss and Co., a corporation in the

2   State of Delaware, having its principal place of business

3   at 1155 Battery Street, San Francisco, California 94111,

4   owns the above entitled registration issued September 2nd,

5   1980, as shown by records in the Patent and Trademark

6   Office that the mark shown therein has been in continuous

7   use in interstate commerce for five consecutive years from

8   the date of registration or the date of publication under

9   section 12(C)(6) to the present."

10         Do you see that?

11      A. Yes.

12      Q. Does me reading that refresh any recollection as

13   to whether or not you recognize this document at all?

14      A. No.

15      Q. Do you know while you were employed at Levi's

16   whether or not you ever did an investigation or verified

17   whether a trademark, any trademark of Levi Strauss was in

18   continuous use for a period of time, in this case, five

19   years, in the marketplace?

20      A. I never did any personal investigation of that,

21   no.

22      Q. In fact, I thought your testimony -- I don't mean

23   to mischaracterize it -- but you never did any trademark

24   work --

25      A. No.

1  an arcuate and a red tab in the 1950s.  I don't know if

2  that counts as investigation.  Within the context of my

3  job, I did not do any investigation.

4       Q. If you go down a few words after that, if you

5  read in connection with the document it says, "There has

6  been no final decision adverse to registrant's claim of

7  ownership of such mark for such goods or services or to

8  the registrant's right to register the same or to keep the

9  same on the register."  To make sure to put this in

10  context, I just read from the affidavit that you were

11  verifying whether or not in this document that -- first,

12  whether the mark was in continuous use for five

13  consecutive years, then whether or not the registration

14  was used in connection with the items I identified, the

15  pants, jackets and shorts and now whether the mark or the

16  specimen showing the mark currently used is what I'm

17  asking you now.

18       "There has no been no final decision adverse to

19  registrant's claim of ownership of such mark for such

20  goods or services or to the registrant's right to register

21  the same or to keep the same on the register."

22       Do you remember ever conducting any investigation

23  or doing anything to verify the contents of what was being

24  said, what I just read?

25       A. I do not remember ever doing any such

1    investigation.

2        Q. Is it fair to say that at Levi's you did not

3    conduct any such investigation?

4        MS. CINCONE:  Well, I believe that

5    mischaracterizes her testimony.  She said she can't

6    remember.

7    BY MS. DAVIDSON:

8        Q. Let me rephrase that.

9        My understanding from your testimony -- if I

10   mischaracterize it, let me know -- is that you didn't do

11   any work in connection with Levi's trademark; is that

12   correct?

13       A. That is correct.

14       Q. I understand from what I read previously in this

15   document that your answer was that you did nothing, as to

16   what I read, to independently verify or investigate the

17   subject matter or accuracy of what was being said in this

18   document; is that correct?

19       A. That is correct.  It would not have been

20   practical to do so.

21       Q. That is fine.  Now, I'm asking for the same

22   question on what I just read as to whether the same is

23   true, that there was no investigation or verification was

24   taken as to the last few sentences I read that there has

25   been no final decision with regard to the registrant's

1    claim of ownership of such mark for such goods or services

2    or to the registrant's right to register the same or to

3    keep the same on the register; right?

4         A. Right.

5         Q. So the answer is "yes" you did not conduct any

6    investigation?

7         A. Yes, I did not conduct any investigation.

8         Q. We are almost getting there.  The next sentence

9    is, "There is no proceeding involving rights pending and

10   not disposed of either in the Patent and Trademark Office

11   or in the courts and that all statements made of her own

12   knowledge are true and statements made on information

13   believed to be true with respect to that there is no

14   proceedings involving said rights pending and not disposed

15   of either in the Patent and Trademark Office or in the

16   courts."

17        Did you conduct any investigation or verify the

18   accuracy of that independently before you signed the

19   document?

20        A. I did not.

21        Q. If you can remember, to the best of your

22   knowledge, was there a process -- I apologize if you

23   testified to this earlier -- if you received a document

24   you would investigate or check with people as to, you

25   know, the accuracy of the contents of the document that

Page 31

1    you were signing?

2        A. I would ask what the document was that I was

3    signing of whoever presented it to me.  I had trust in my

4    co-workers to be presenting me something that they had

5    thoroughly researched or worked on, and I didn't have any

6    reason not to trust them.

7        Q. Do you have any recollection as to who, if

8    anybody, gave you this document?

9        A. I have no recollection.

10       Q. You testified that you did not do any work with

11   Levi's trademarks or trademark registrations.

12       A. I personally did not.

13       Q. That being said, is there any reason you can

14   think of as to why you had signed a document involving or

15   which was an affidavit involving the arcuate design, which

16   is a trademark at Levi's Strauss?

17           MS. CINCONE:  I object for lack of foundation,

18   but if you have some understanding, you can testify to

19   that.

20           THE WITNESS:  I was asked to sign documents which

21   required an officer's signature.  I don't believe any of

22   the attorneys, other than the General Counsel, were

23   officers, so they would have to have the signature of

24   somebody else, some other officer of the company.

25   BY MS. DAVIDSON:

1     Q. You mentioned that you trusted people, in some

2 cases it may have been counsel, to do their part whether

3 it be an investigation or verification of documents that

4 they gave you.

5          What is the basis for that trust?

6     A. The company I considered to be extremely ethical.

7 Before I was hired, I attended a weekend seminar of all of

8 legal departments, which was on ethics.  I was being

9 considered for employment, so I was there I think for them

10 to look me over and for me to look them over.

11          I was extremely impressed with the fact that the

12 company would take its people offsite for a weekend to

13 study ethics and bring in outside professors and we read

14 such things as Sir Thomas Moore.  I can't give you the

15 curriculum for the weekend, but it was very impressive to

16 me that they went to that length to stress ethical issues,

17 the importance of ethical issues.

18          It certainly was the company culture for

19 everyone to do his or her job very thoroughly.  I knew the

20 attorneys, you know, as you know fellow employees.  I

21 don't think it was ethical for them to discuss cases,

22 frankly.  I know that is the case when you are on a jury

23 in court.  You simply cannot talk about what you just

24 heard and observed.

25          I trusted them to do their jobs, and I would ask

1    what I was signing and they would tell me in a few words

2    what I was signing, but I did not do personal outside

3    investigation.

4         Q. And you mentioned that you went to an ethics

5    seminar.  Was it prior to your actual decision to be

6    employed by Levi's?

7         A. Right.

8         Q. Do you remember any particular topics at that

9    seminar?  For example, did they discuss duties with

10   respect to signing documents or legal issues that

11   employees needed to know?

12        A. It was not a how-to seminar. It was a -- it was

13   on ethics.

14        Q. Just in general.

15        A. Just general -- as it applied to business in

16   general.  I keep going back to the company culture of

17   certainly wanting to be an ethical company.  That was

18   their reputation outside the company as well insofar as I

19   knew what the reputation was.

20            I'm sure it would have seemed to me at the time

21   that if I had gone back and done an investigation of what

22   was being put in front of me, it would be doing a

23   duplicate job, and I wasn't trained as an attorney, so I

24   trusted what was put in front of me.  I did ask what I was

25   signing and beyond that, I did not go further with it.

1    Q. You just mentioned that you thought that further

2    investigation by you, for example, in signing a document,

3    in this case it was about trademark registration, would

4    be -- in your mind would be perhaps duplicative work.

5         Have you ever witnessed or talked to anybody

6    about the actual investigations that those who gave you

7    these documents to sign, in this case this affidavit, as

8    to what the nature of those investigations are and how

9    thorough these investigations are?

10   A. I do not remember.

11   Q. Was there ever a time at Levi's when you didn't

12   feel comfortable signing the document that was given to

13   you?

14   A. I don't remember feeling uncomfortable.

15   Q. While you were employed at Levi's, I understand

16   that your memory is a little bit foggy over the years, but

17   did you ever happen to hear about a case called Lois

18   Boarsquare (phonetic)?

19   A. I don't ever recall hearing that name mentioned.

20   Q. Do you remember any cases, and I'm talking about

21   litigation cases that Levi's was involved with, that were

22   discussed at the company?

23   A. I don't remember discussing legal cases with

24   them.  Well, I may have, but I don't remember any

25   specifics.

Page 40

1   STATE OF CALIFORNIA          )

2                               )   S.S.

3   COUNTY OF SONOMA            )

4

5        I, a Certified Shorthand Reporter of the State of

6   California, hereby certify that the witness in the

7   foregoing deposition was by me duly sworn to testify the

8   truth, the whole truth, and nothing but the truth in the

9   entitled cause.

10       That said deposition was taken at the time and

11  place therein stated; that the testimony of the said

12  witness was reported by me,

13

14                   Gina Petersen,

15  a certified shorthand reporter, that the foregoing is a

16  full, true and complete record of said testimony; and that

17  the witness was given an opportunity to read and correct

18  said deposition and to subscribe the same.

19       Should the signature of the witness not be

20  affixed to the deposition, the witness shall not have

21  availed himself of the opportunity to sign or the

22  signature has been waived.

23       I further certify that I am not of counsel or

24  attorney for either or any of the parties in the foregoing

25  deposition and caption named, or in any way interested in

Page 41

1    the outcome of the cause named in said action.

2       IN WITNESS WHEREOF, I have hereunto set my hand and

3    affixed my seal of office this        day of              ,

4    2008.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25