1  TOWNSEND AND TOWNSEND AND CREW LLP
   GREGORY S. GILCHRIST (State Bar No. 111536)
2  GIA L. CINCONE (State Bar No. 141668)
   RAQUEL PACHECO (State Bar No. 245328)
3  Two Embarcadero Center, Eighth Floor
   San Francisco, California  94111
4  Telephone: (415) 576-0200
   Facsimile: (415) 576-0300
5  Email:  gsgilchrist@townsend.com,
   glcincone@townsend.com; rpacheco@townsend.com
6
   Attorneys for Plaintiff/Counterdefendant
7  LEVI STRAUSS & CO.

8

9                    UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12

13  LEVI STRAUSS & CO.,                          Case No.    C 07-03752 JSW

14              Plaintiff/Counterdefendant,      **PLAINTIFF LEVI STRAUSS & CO.'S
                                                 OPPOSITION TO DEFENDANT
15        v.                                     ABERCROMBIE & FITCH
                                                 TRADING CO.'S MOTION TO
16  ABERCROMBIE & FITCH TRADING CO.,             EXCLUDE REPORT, TESTIMONY
                                                 AND SURVEY EVIDENCE OF DR.
17              Defendant/Counterclaimant.       SANJAY SOOD**

18

19  ─────────────────────────────────────       Date:        September 26, 2008
                                                 Time:        9:00 a.m.
20  ABERCROMBIE & FITCH TRADING CO.,             Courtroom:   2, 17th Floor
                                                              Honorable Jeffrey S. White
21              Defendant/Counterclaimant,

22        v.

23  LEVI STRAUSS & CO.,

24              Plaintiff/Counterdefendant.

25

26

27

28

# TABLE OF CONTENTS

Page

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................iv

II.    DR. SOOD'S QUALIFICATIONS .........................................................................1

III.   DR. SOOD'S SURVEY IS VALUABLE AND ADMISSIBLE ........................................1

    A.    Dr. Sood's Survey Designs ..................................................................1

        1.    Confusion Survey .......................................................................2

        2.    Recognition Survey .....................................................................3

        3.    Any Criticisms Go To The Survey's Weight, Not Its
           Admissibility ...........................................................................3

    B.    Dr. Sood's Survey Methodology Is A Superior Test For Likely
      Confusion ........................................................................................4

        1.    Dr. Sood's Survey Is Not Leading And Does Not Create
           Meaningful Demand Effects..........................................................6

        2.    Dr. Sood's Confusion Survey Includes Controls ................................9

        3.    The Survey Population Was Correct ...............................................11

        4.    Dr. Sood Adequately Replicated Post-Sale Conditions Within
           a Research Context ....................................................................12

        5.    There is No Order Bias in Dr. Sood's Survey ...................................12

        6.    Respondents Were Alerted To The Option To Say I Don't
           Know .....................................................................................13

    C.    The Recognition Survey Also Is Valuable and Useful...............................13

        1.    Dr. Sood Controlled For Spurious Recognition .................................13

        2.    Dr. Sood's Questions Are Not Ambiguous ......................................14

        3.    There Is No Order Bias.................................................................15

IV.    CONCLUSION ............................................................................................15

1

## TABLE OF AUTHORITIES

2

Page

3

**Cases**

4

*Beneficial Corp. v. Beneficial Capital Corp.*,
   529 F. Supp. 445 (S.D.N.Y. 1982) ............................................................................................ 7

5

6

*Big O Tires, Inc. v. Big Foot 4x4, Inc.*,
   167 F. Supp. 2d 1216 (D. Colo. 2001) ...................................................................................... 4

7

*Clicks Billiards, Inc. v. Sixshooters Inc.*,
   251 F.3d 1252 (9th Cir. 2001) ............................................................................................... 3, 4

8

9

*Gov't Employees Insurance Co. v. Google, Inc.*,
   2005 U.S. Dist. LEXIS 18642 (E.D. Va. 2005). ...................................................................... 9

10

*Kargo Global Inc. v. Advance Magazine Publisher's Inc.*,
   2007 U.S. Dist. LEXIS 57320 (S.D.N.Y. 2007) ...................................................................... 8

11

12

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*,
   502 F.3d 504 (6th Cir. 2007) .................................................................................................. 11

13

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) .................................................................................... 10

14

15

*Marshall Field & Co. v. Mrs. Field's Cookies*,
   25 U.S.P.Q.2d (BNA) 1321 (TTAB 1992) .............................................................................. 8

16

*Mattel Inc. v. MCA Records, Inc.*,
   28 F. Supp. 2d 1120, 1134 (C.D. Cal. 1998), *aff'd*, 296 F.3d 894 (9th Cir. 2002),
   *cert. denied*, 537 U.S. 1171 (2003) ........................................................................................ 8

17

18

*Pilot Corp. of America v. Fisher-Price, Inc.*,
   344 F. Supp. 2d 349 (D. Conn. 2004) .................................................................................... 11

19

*Prudential Ins. Co. v. Gibraltar Financial Corp.*,
   694 F.2d 1150 (9th Cir. 1982), *cert. denied*, 463 U.S. 1208 (1983) ...................................... 3

20

21

*Riviana Foods Inc. v. Societe Des Produits Nestle S.A.*,
   33 U.S.P.Q.2d (BNA) 1669 (S.D. Tex. 1994)......................................................................... 7

22

*Scott Fetzer Co. v. House of Vacuums, Inc.*,
   381 F.3d 477 (5th Cir. 2004) .................................................................................................. 11

23

24

*Simon & Shuster, Inc. v. Dove Audio, Inc.*,
   970 F. Supp. 279 (S.D.N.Y. 1997) .............................................................................. 4, 6, 8, 14

25

*Simon Property Group L.P. v. mySimon, Inc.*,
   104 F. Supp. 2d 1033 (S.D. Ind. 2000)..................................................................................... 9

26

27

*Skechers U.S.A., Inc. v. Vans, Inc.*,
   2007 U.S. Dist. LEXIS 88635 (C.D. Cal. 2007) ................................................................... 10

28

1

**TABLE OF AUTHORITIES (con't)**

2

Page

3

*SquirtCo v. Seven-Up Co.,*
   628 F.2d 1086 (8th Cir. 1980) ............................................................................... 4

4

*Union Carbide Corp. v. Ever-Ready, Inc.*,
   531 F.2d 366 (7th Cir.), *cert. denied*,
   429 U.S. 830 (1976) ............................................................................................. 4

5

6

*Universal City Studios, Inc. v. Nintendo Co. Ltd.*,
   746 F.2d 112 (2d Cir. 1984) ................................................................................. 7

7

8

*Wendt v. Host Int'l, Inc.,*
   125 F.3d 806 (9th Cir. 1997), *cert. denied*, 531 U.S. 811 (2000) ....................... 3

9

*Winning Ways, Inc. v Holloway Sportswear, Inc.*,
   913 F. Supp. 1454 (D. Kan. 1996) .............................................................. 12, 15

10

11

*YKK, Inc. v. Jungwoo Zipper Co.*,
   213 F. Supp. 2d 1195 (C.D. Cal. 2002) ................................................................ 1

12

13

**Rules**

14

Federal Rule of Evidence 704 ..................................................................................... 1

15

16

**Other Materials**

17

Simonson, "The Effect Of Survey Method On Likelihood Of Confusion Estimates:
   Conceptual Analysis And Empirical Test," *The Trademark Reporter*, 83 TMR 364
   (1993) ............................................................................................................... 6, 8

18

19

Swann, "Likelihood of Confusion Surveys And The Straitened Scope of Squirt," *The
   Trademark Reporter*, 98 TMR 739 (2008) ............................................................ 7

20

21

22

23

24

25

26

27

28

1

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

2    Dr. Sood's survey, report and testimony provide valuable insights about how relevant

3 consumers perceive LS&CO.'s Arcuate Stitching Design Trademark and of their likely confusion

4 when observing A&F's design in a post-sale setting.  A&F moves to strike Dr. Sood's testimony

5 because it provides strong support for LS&CO.'s claims and necessarily defeats A&F's companion

6 summary judgment motion.  A&F overstates the purported shortcomings in Dr. Sood's survey design

7 and misapplies the case law and its own expert's views to the issues.  Even in cases where such

8 criticisms as A&F offers were valid, the courts generally did not exclude the challenged surveys but

9 merely gave them reduced significance.

10    A&F's primary criticism appears to be that Dr. Sood spends his days as a distinguished

11 professor of marketing at UCLA rather than as one of the cadre of paid litigation consultants who

12 routinely produce these surveys.  If anything, Dr. Sood's naïveté about litigation tactics reflects the

13 objectivity of his approach.  To be sure, A&F's expert, Dr. Ford, is far more experienced in the

14 gamesmanship of litigation.  His criticisms of Dr. Sood, however, are based on his own non-lawyer's

15 superficial advocacy of case law and overreaching pronouncements about Dr. Sood's survey

16 methodology.  With respect to several criticisms, Dr. Ford has made the same choices in his own work

17 in similar circumstances.

18    No survey can perfectly replicate the myriad circumstances and conditions in which consumers

19 encounter A&F's stitching design in the real world.  Even if they could, the variability in real world

20 conditions would eliminate the ability to hold conditions constant and isolate a proposition for testing.

21 Dr. Sood considered each of the issues A&F identifies as grounds for challenge and has sound reasons

22 for the choices he made.  No authority supports exclusion of expert testimony under these

23 circumstances, or discounting the weight of Dr. Sood's findings.

24

25

26

27

28

## II.     DR. SOOD'S QUALIFICATIONS

Dr. Sood is a Professor of Marketing at the Anderson School of Management at UCLA's post-graduate business school program.  Dr. Sood received his MBA from Northwestern University and his doctoral degree in marketing from Stanford University.  Supplemental Declaration of Sanjay Sood ("Supp. Sood Dec.") ¶ 1.  He has conducted dozens of consumer surveys, all for academic or business research.  Supp. Cincone Dec. Ex. L (Sood Dep.) at 36:5.  He has not conducted litigation related surveys before; his only expert work occurred several years ago and involved simply an explanation of the mechanisms for consumer confusion.  *Id*. at 15:13-16:14.

Dr. Sood's research includes consumer tests similar to those he was asked to perform in this case.  He has published several articles in leading academic journals examining how brand knowledge is stored in memory and how this knowledge affects the acceptance of new products in the marketplace.  This research requires the same kind of techniques as those he used for his work in this case to accurately measure how consumer attitudes toward products can be influenced, positively or negatively, by brand knowledge.  Supp. Sood Dec. ¶ 2.  This work often is elaborate and complicated, as it considers multiple variables and their simultaneous influences on consumers.  Supp. Cincone Dec. Ex. L at 38:10-16.

A&F takes great pains to recite Dr. Sood's lack of litigation-specific experience, but points to no requirement that expert witnesses should have such experience.  Obviously such a rule would ultimately disqualify all testifying experts before they started their work.  At any rate, legal experience or sophistication is not a requirement or even desirable in experts.  Their sole province is to aid the trier of fact by testifying within the scope of their expertise.  The Court decides legal questions, not experts. *YKK, Inc. v. Jungwoo Zipper Co.,* 213 F. Supp. 2d 1195, 1203 (C.D. Cal. 2002) ("While Fed. R. Evid. Rule 704 abolished the so-called 'ultimate issue' rule, 'in general, [expert] testimony about a legal conclusion, or the legal implications of evidence is inadmissible under Rule 704.'") (citations omitted).

## III.     DR. SOOD'S SURVEY IS VALUABLE AND ADMISSIBLE

### A.     Dr. Sood's Survey Designs

Dr. Sood directly tested the propositions at issue in this case: (i) whether consumers, upon seeing the Ruehl jeans among other jeans they are likely to see in the post-sale environment, believe

1  they are sponsored or endorsed by the same company that makes LEVI'S® jeans; and (ii) whether the

2  Arcuate Trademark is recognized by a large segment of the general population.

### 1.     Confusion Survey

4  Dr. Sood's confusion survey improved upon the conventional "Squirt" survey design to test

5  likelihood of confusion.  Dr. Sood created five photographs showing different brands as worn – in a

6  post-sale setting with all labeling removed -- by a female in a partial stride.  The jeans included

7  LEVI'S® jeans showing the Arcuate Trademark, the Ruehl jeans, and three good selling models of the

8  most popular premium women's jeans brands each showing their respective stitching designs.  The

9  survey was conducted on a double blind basis so that neither the interviewer nor respondent knew the

10  reason for the survey.  The population tested was Ruehl's market: women 20-45 who had or were

11  interested in buying premium jeans in the price range of Ruehl jeans ($75).  Sood Dec. Ex. A at 7-10.[1]

12  Dr. Sood's survey design first told the respondents: "There are no right or wrong answers.  We

13  just want your thoughts and opinions.  If you don't know or don't have an answer, please let me know

14  that."  *Id*. Ex. 11 at 1.  The respondents were then shown the photo of the LEVI'S® jeans and told to

15  look at the picture as if they were seeing the jeans as being worn on the street.  *Id*. at 9.  When the

16  respondent was done looking, the photograph of the LEVI'S® jean was removed from sight.  The other

17  four photographs were then shown, with a similar instruction.  The order in which the photos were

18  displayed was rotated to avoid any order bias.  *Id*. at 10.  The respondents were then asked if they

19  believed that "any of the [second set] of jeans were made, sponsored or endorsed by the same company

20  that made the jeans you saw in the first picture?  Or do you think that none of the jeans were made,

21  sponsored or endorsed by the same company that made [the first jeans]?"  *Id*. Ex. 11 at 2.  59% of the

22  respondents said that there was no such connection between the first jean and any of the subsequently

23  shown jeans, or they did not know of one.  *Id*. at 10.  The 41% who said "yes" were then asked which

---

[1] Dr. Sood's survey excluded others, including men, and people who worked or lived with people who worked for an advertising, public relations or market research firm, a jeans manufacturer, or a store in the mall.  The respondents were not to have participated in a poll or market research project or heard about the survey in the mall.  A&F has not challenged these limitations on the survey population.

1    one or one of the jeans were so made, sponsored or endorsed by the company that made the first jean.

2    *Id*. Ex. 11 at 2.  After recording the answers, for each jean mentioned the respondent was asked "what

3    is it about the jeans that makes you say…" it is so made or sponsored.  *Id.*  The answers were recorded

4    verbatim.  *Id.*

### 2.    Recognition Survey

6        Dr. Sood's recognition survey tested three photographs of back jean pockets, one showing the

7    Arcuate trademark, the others showing long time stitching designs belonging to Lee® jeans and

8    Lucky® jeans.  *Id.* Ex. 8.  The respondents were told: "If you don't know or don't have an answer,

9    please let me know that."  They were then asked in rotating order for each photograph if they had seen

10   the jeans "with this style of pocket stitching before."  *Id.* Ex. 6.  Those who said "no" were then asked

11   about the next picture.  Others were asked if they "associate jeans with this style of pocket stitching

12   with one brand or company, more than one brand or company or don't know."  *Id.*  (Respondents were

13   shown a card with the options before them.)  *Id.*  Last they were asked: "What is the name of the brand

14   or companies that you associate with this product?"  *Id.*

15       Results for both surveys were compiled to give relevant results for the test jeans and the control

16   jeans.  *Id.* at 6-7, 10-11, Exs. 9A-9H, 15A-15H.

### 3.    Any Criticisms Go To The Survey's Weight, Not Its Admissibility

18       Although A&F's motion devotes its attention to narrow critiques of particular survey design

19   choices or questions, the issue raised by A&F's motion is whether Dr. Sood's survey was conducted

20   using accepted principles of consumer research.  *Clicks Billiards, Inc. v. Sixshooters Inc.,* 251 F.3d

21   1252 (9th Cir. 2001) (survey admissible if "relevant and conducted according to accepted principles");

22   *Wendt v. Host Int'l, Inc.,* 125 F.3d 806, 814 (9th Cir. 1997), *cert. denied*, 531 U.S. 811 (2000)

23   ("surveys are to be admitted as long as they are conducted according to accepted principles and are

24   relevant").  In *Prudential Ins. Co. v. Gibraltar Financial Corp.,* 694 F.2d 1150, 1156 (9th Cir. 1982),

25   *cert. denied*, 463 U.S. 1208 (1983), the court held that "technical unreliability goes to the weight

26   accorded a survey, not its admissibility."  The court noted the "few cases" excluding surveys for self-

27   serving questions and failing to duplicate marketing conditions, but concluded that the majority rule

28   followed by the Ninth Circuit of admitting such surveys is "the better course."  Questions about

1   "methodology, survey design, reliability, the experience and reputation of the expert, critique of

2   conclusions and the like go to the weight of the survey rather than its admissibility." *Clicks Billiards*,

3   251 F.3d at 1263.  Dr. Sood's supplemental declaration, filed with this opposition, addresses each

4   criticism in A&F's motion and demonstrates that he made sound choices in response to each issue and

5   – at all times – comported with accepted research principles.

6       **B.      Dr. Sood's Survey Methodology Is A Superior Test For Likely Confusion**

7           Although A&F's motion turns on whether Dr. Sood's survey is so fundamentally flawed that it

8   departs from acceptable principles of consumer research, A&F's expert readily identifies it as a

9   "Squirt" survey.  Cincone Dec. Ex. M at 5.  *See SquirtCo v. Seven-Up Co.,* 628 F.2d 1086 (8th Cir.

10  1980).  In the *SquirtCo* case, the expert played audio ads for Squirt and Quirst soft drinks, the allegedly

11  confusing marks, and for Lysol disinfectant and Kraft cheese.  *Id.* at 1089.  The respondents were then

12  asked if "Squirt" and "Quirst" were put out by the same company or different companies.  *Id.*  The

13  court held that this survey format was "conventional in methodology and content."  *Id.*  It affirmed the

14  district court's finding of likely confusion, citing the survey results.  *Id.* at 1091.

15          Dr. Sood's survey design, while similar in format, improves upon the Squirt design by

16  incorporating controls and avoiding a more leading question about whether the mark at issue is

17  associated with the junior mark.  Even without these safeguards, and in the face of far more

18  pronounced concerns than those raised concerning Dr. Sood's survey or even the *Squirtco* survey itself,

19  other courts have readily accepted such a survey format.  *E.g., Big O Tires, Inc. v. Big Foot 4x4, Inc.,*

20  167 F. Supp. 2d 1216 (D. Colo. 2001) (considered survey following a modified Squirt format, despite

21  flaws); *Simon & Shuster, Inc. v. Dove Audio, Inc.,* 970 F. Supp. 279, 290 (S.D.N.Y. 1997) ("Dove

22  attacked the ["Squirt"] survey on several fronts, but we find the survey suffered from only one

23  significant flaw, the ambiguous wording of the main question designed to test for likelihood of

24  confusion").

25          The differences between Dr. Sood's "Squirt" survey and Dr. Ford's "Eveready" survey, *see*

26  *Union Carbide Corp. v.  Ever-Ready, Inc.,* 531 F.2d 366 (7th Cir.), *cert. denied,* 429 U.S. 830 (1976),

27  reflect nothing more than different choices about the better method to test for likely confusion in a

28  post-sale context.  Dr. Sood's method directly approaches the question created by A&F's stitching.  His

1  survey asks explicitly whether or not consumers believe the Ruehl design, when encountered among

2  other jeans, is made, sponsored or endorsed by the same company that makes the LEVI'S® jeans that

3  the respondents were shown.  Dr. Ford focuses the respondents on brand identification and introduces

4  additional elements:  whether consumers recall other trademarks (in this case the LEVI'S® or Ruehl

5  marks) when shown a Ruehl jean or other jeans.

6        There are two significant advantages to Dr. Sood's approach.  First, many of A&F's criticisms

7  relate to concerns that respondents will guess or provide an affirmative answer out of a belief that the

8  interviewer is seeking such a response.  But, as Dr. Ford's survey shows, consumers have a

9  demonstrated propensity to guess about branding when shown a jean in isolation and, in fact, are more

10 likely to guess there than in response to the kind of questions asked by Dr. Sood.  Thus, Dr. Ford's

11 survey tested three jeans, one each on separate respondent populations, asking consumers to call out the

12 company that puts out the jean.  Despite Dr. Ford's advisory that "I don't know" was an acceptable

13 answer, most (61% - 398/651) respondents ventured an answer despite not knowing the brand (Ruehl -

14 50%; Indigo Red - 66%; Lucky - 68%).[2]  By contrast, only 41% of Dr. Sood's respondents were

15 willing to venture an affirmative answer; 59% of the respondents surveyed either correctly said the

16 jeans were not made or sponsored by the maker of the LEVI'S® jean they were shown or said they did

17 not know.  Sood Dec. Ex. A at 10.

18       Dr. Sood's survey also controlled against guessing by asking about more than one jean, thereby

19 reducing respondent's tendency to guess based on any suggestion in the question.  Because Dr. Sood's

20 methodology asked all respondents the same questions about the same stimuli, he was able to make a

21 genuine comparison of the results.  Id.

22       Dr. Itamar Simonson, a professor of marketing at Stanford University, has studied the

23 respective approaches used by Dr. Sood and Dr. Ford and has concluded that Dr. Sood's format is an

24

25 [2] This is Dr. Ford's data in response to just his first question of each respondent.  Cincone Dec. Ex. R at 17, 22, 25.  One respondent each (less than half a percent) knew the Ruehl and Lucky jeans.  Id.

26 Accordingly, correct answers do not explain the number of respondents who answered the Ford survey, suggesting that there are considerably more respondents who responded to "demand" effects in the

27 Ford survey.

28

1    accepted approach.  "The Effect Of Survey Method On Likelihood Of Confusion Estimates:

2    Conceptual Analysis And Empirical Test," *The Trademark Reporter*, 83 TMR 364 (1993) (Supp.

3    Cincone Dec. Ex. N).  As to the Squirt format, Dr. Simonson states:

> An advantage of this format is that it represents probably the most direct
> measure of confusion short of asking people whether they are likely to
> confuse the two marks.  Although this format is different than the
> Eveready Format [Dr. Ford's approach], there are similarities between
> the two tasks.  With both formats, responses are likely to be made on the
> basis of assessments of similarity and logic.

7    *Id.* at 370.

8        Dr. Simonson identified a number of shortcomings in Dr. Ford's approach:

> In some cases, courts have found questions similar to those employed in
> the Eveready case to be leading and suggestive. [citations omitted].  A
> possible concern is that respondents who mention the maker of the senior
> mark would not have associated the junior and senior marks when
> making normal purchase decisions without being asked these questions.
> That is, the survey questions cause respondents to think of possible
> connections, which may lead them to mention (or imply) the senior mark.
> A related concern is that respondents feel they have to answer the survey
> questions given to them rather than say that they do not know, so they
> often provide guesses that are associated with low confidence.

15   *Id.*  Dr. Simonson acknowledges: "A potential limitation of the Squirt Format is that it explicitly leads

16   respondents to consideration of the association between the two marks, a question that might not have

17   occurred to them in a normal purchase situation."  *Id.*  Dr. Simonson reports, however, that the Squirt

18   format produced results that most closely correlated with the results of a simulated choice methodology

19   for testing point of sale confusion that Dr. Simonson proposed as superior to all other methods.  *Id.* at

20   385-86. Dr. Simonson's work has been cited to confirm that a Squirt format survey conforms to

21   accepted research principles.  *Simon & Shuster*, 970 F. Supp. at 289.

## 1.    Dr. Sood's Survey Is Not Leading And Does Not Create Meaningful Demand Effects

24       A&F suggests that leading questions and demand effects caused respondents to answer Dr.

25   Sood's first question affirmatively that they felt one or more of the jeans were made, sponsored or

26   endorsed by the same company (LS&CO.) that made the first jean they saw.  There is no reason to

27   believe that Dr. Sood's survey questions "beg an [affirmative] answer" or establish an "association"

28   where there was none before.  His first question about sponsorship or endorsement -- while it is close-

ended and seeks a yes or no answer -- explicitly calls out both options.  Dr. Sood asked the question in this close-ended manner so that the explicit option of giving a negative answer was included in the question.  Supp. Sood Dec. ¶ 5.  This original question is product neutral and does not require the respondent to identify the jean that has the contemplated relationship.  This question is not leading merely because it is close-ended.  *See* Swann, "Likelihood of Confusion Surveys And The Straitened Scope of Squirt," *The Trademark Reporter*, 98 TMR 739, 753 & n.72 (2008) (predicting that judicial hostility to close-ended questions will abate and noting "[a]s anyone who has taken a Scholastic Aptitude Test appreciates, a close-ended question is *not* intrinsically 'leading'").[3]  Dr. Sood's results belie any conclusion that affirmative answers were "led" or "demanded" from the questions, as 59% answered "no" or "don't know."  *Id.*; Sood Dec. Ex. A at 10.

The follow-up questions were not leading and were the important ones for determining whether the Ruehl stitching stood out from the others as being perceived as sponsored or endorsed by the maker of the first jeans (LS&CO.) that they had seen earlier.  The questions asking why a respondent felt there was a relationship between the companies were not leading, and the unprompted answers corroborate that the pocket stitching was a reason for the earlier answers.  Supp. Sood Dec. ¶ 5.  This is different from surveys which, though often held admissible, simply asked whether there was a relationship between the senior user's product and the junior user's product, specifically referring to the challenged mark in the question.  *See, e.g., Universal City Studios, Inc. v. Nintendo Co. Ltd.*, 746 F.2d 112 (2d Cir. 1984) ("was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?"); *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445 (S.D.N.Y. 1982) ("Do you think that there may or may not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?"); *Riviana Foods Inc. v. Societe Des Produits Nestle S.A.*, 33 U.S.P.Q.2d (BNA) 1669 (S.D. Tex. 1994) ("Do you think the weight loss product 'Sweet Success' and 'Success Rice' are more likely made by the same

---

[3] This article is cited in A&F's motion.  A&F Mot. to Exclude at 11.  Nothing in the article suggests that Squirt surveys do not comport with accepted scientific principles.

1    company or more likely made by different companies?"); *Mattel Inc. v. MCA Records, Inc.*, 28 F.

2    Supp. 2d 1120, 1134 (C.D. Cal. 1998), *aff'd*, 296 F.3d 894 (9th Cir. 2002), *cert. denied*, 537 U.S. 1171

3    (2003) ("Do you think the company which owns the Barbie doll brand gave its permission to use the

4    Barbie name on the music CD package?"); *Marshall Field & Co. v. Mrs. Field's Cookies*, 25

5    U.S.P.Q.2d (BNA) 1321 (TTAB 1992) ("Would you say that the store whose things come in this bag

6    [handing bag] and the store whose things come in this bag [handing bag] have a business connection or

7    a business association with one another, or not?").  No questions like this appeared in Dr. Sood's

8    survey, which never specifically referenced the mark at issue and never directed the respondents to

9    consider a potential connection or relationship specifically between the LEVI'S® jean and the Ruehl

10   jean.  *See Simon & Shuster*, 970 F. Supp. at 290 n.13 (rejecting objections that Squirt survey was

11   leading because "survey asked appropriate questions that did not suggest the answer the plaintiffs were

12   seeking").

13            Dr. Sood also took precautions in designing the survey and assessing the results to ensure that

14   there were no undue "demand effects" as A&F asserts that would color the results or conclusions.[4]

15   Respondents were shown four pairs of jeans, not just one pair.  Thus, even if the question implied a

16   relationship between the LEVI'S® product and any of the other products shown, the implication was

17   not directed toward the A&F product.  The results, even though the threshold question invited a

18   response related to any of four products, yielded a substantial majority of non-affirmative responses.

19            The demand effects that concerned the courts in the cases cited by A&F were entirely different.

20   Unlike this case, they involved non-competing goods where a leading question might suggest to the

21   respondent that the companies are producing the distinct products when they otherwise would not make

22   that assumption.  *E.g., Kargo Global Inc. v. Advance Magazine Publisher's Inc.*, 2007 U.S. Dist LEXIS

23   57320 at *26 (S.D.N.Y. 2007) ("Certainly in light of the non-competing nature of the products at issue,

24

25   _____

26   [4] Demand effects are inherent in any question directed to the proposition one is testing.  Supp. Sood Dec. ¶ 6.  This is true of Dr. Ford's survey format as well.  *See* "The Effect Of Survey Method On Likelihood Of Confusion Estimates: Conceptual Analysis And Empirical Test," *The Trademark*

27   *Reporter*, 83 TMR 364, 370 (1993), Supp. Cincone Dec. Ex. N.

28

1  the multiple choice questions that immediately followed the display of the marks implied connections

2  or associations that otherwise would not have occurred to the respondents"); *Simon Property Group*

3  *L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1049 (S.D. Ind. 2000) ("[r]espondents viewing the SPG

4  [shopping mall developer] and mySimon [online shopping information service] home pages might not

5  draw a business connection between them without suggesting the possibility of such a connection").  In

6  the *mySimon* case, the court acknowledged that the Squirt format survey was valid and accepted by

7  courts (*id.* at 1038) and that "to some extent, these potential demand effects are inherent in the *Squirtco*

8  format."  The court stated that its particular concern was not the format itself, but the plaintiff's attempt

9  to "take the *Squirtco* format a step farther than any court has taken it" by introducing an additional

10  potential basis for assuming a connection.  *Id.* at 1049.

11      In another case A&F cites, the survey did not involve a Squirt format.  There, the expert asked a

12  number of questions regarding the GEICO automobile insurance company before asking what

13  company a respondent would expect to find upon clicking a sponsored ad link for "GEICO" pulled up

14  in response to a constructed and misleading Google search.  *Gov't Employees Insurance Co. v. Google,*

15  *Inc.*, 2005 U.S. Dist. LEXIS 18642 at *19-23 (E.D. Va. 2005).  Despite noting that this structure might

16  cause "demand effects" and noting a variety of other "serious flaws," the court relied on the survey to

17  find a likelihood of confusion.  *Id.* at *26 ("Despite the many flaws in its design, the survey's results

18  were sufficient to establish a likelihood of confusion regarding those Sponsored Links in which the

19  trademark GEICO appears either in the heading or the text of the ad").

20      Dr. Sood's results are wholly inconsistent with any conclusion that Dr. Sood's survey design

21  exaggerated any potential for demand effects.  The results show that most respondents did not respond

22  to the purported "demand."  And, demand effects cannot explain why the Ruehl jean stood out in stark

23  contrast to the other jeans that were shown.  Supp. Sood Dec. ¶ 6.

24          **2.      Dr. Sood's Confusion Survey Includes Controls**

25      The primary purpose of controls is to filter out "background noise" that is not relevant to the

26  issue of likely confusion.  Supp. Sood Dec. ¶ 7.  Dr. Sood's survey included several safeguards to avoid

27  recording confusion that does not relate to the Ruehl stitching design.  The pictures used in the survey

28  depicted a person standing in roughly the same position in each photo wearing jeans that were close in

1   color and finish so that the differences in the jeans, to the extent possible, were the stitching designs.

2   *Cf. Skechers U.S.A., Inc. v. Vans, Inc.,* 2007 U.S. Dist. LEXIS 88635 (C.D. Cal. 2007) (controls used in

3   survey criticized because they were different kinds of shoes); *Louis Vuitton Malletier v. Dooney &*

4   *Bourke, Inc.,* 525 F. Supp. 2d 558, 596 (S.D.N.Y. 2007) (control stimulus "quite different in shape and

5   pattern" from test stimulus).[5]

6       Respondents were asked to explain the reasons for their affirmative responses.  Although

7   consumers may not be particularly articulate about the reasons why they mentioned a particular product

8   has a relationship (Supp. Sood Dec. ¶ 7; Supp. Cincone Dec. Ex. B at 155:13-156:1, 178:9-23), many

9   respondents focused on the pocket stitching.  Supp. Sood Dec. ¶ 7; Supp. Cincone Dec. Ex. E.

10      In addition, every respondent who thought there was sponsorship or endorsement by the

11  producer of the first pair of jeans shown to her had an opportunity to identify several jeans that were,

12  due to their popularity in the relevant market, likely to be seen in post-sale environments.  Supp. Onda

13  Dec. ¶ 9.  Each of these jeans acted as a control against guessing a relationship that was specific to

14  A&F.  Many more respondents identified Ruehl than the other controls as a product made or sponsored

15  by the maker of the LEVI'S® jeans.  Even calculated conservatively, and assuming that it is

16  appropriate to simply make wholesale subtractions of the control results, the level of confusion is

17  significant (e.g., 31% - 11%  (Citizens, the highest of the controls) = 20%.)  Other subtractions also

18  could be done to estimate a specific amount of likely confusion (e.g., 31% - 8% (average of controls) =

19  23%).[6]  Supp. Sood Dec. ¶ 7.  These are the same kind of controls that have been approved in any

---

[5] A&F makes the argument that the back pocket stitching on the controls was supposed to be similar to the Arcuate mark.  A&F Mot. to Exclude at 7.  This makes little sense, as the survey is intended to test for likely confusion between the pocket stitching on LEVI'S® and Ruehl jeans.  If similar pocket stitching is used on the "control" jeans, there is no reason to believe that the "control" demonstrates anything except the same kind of confusion that the survey is designed to detect, if it exists, by the stitching design on the Ruehl jean.  Similarity of the marks, after all, is one of the *Sleekcraft* confusion factors.  The point of the *Skechers* and *Louis Vuitton* cases -- missed by A&F though it cites them both -- is that the controls should eliminate differences in the stimuli *except for the mark.*

[6] Dr. Sood does not believe that subtraction to determine a specific rate of likely confusion is necessarily useful but concludes that there is substantial confusion however one looks at his results. Supp. Sood Dec. ¶ 7.

1   number of cases.  *See, e.g., Pilot Corp. of America v. Fisher-Price, Inc.*, 344 F. Supp. 2d 349, 359 (D.

2   Conn. 2004).

3                  **3.       The Survey Population Was Correct**

4          Dr. Sood limited respondents to those who were likely to be interested in premium denim

5   products such as Ruehl, namely females 20-45 who had or were likely to purchase jeans costing $75 or

6   more.  The defendant's consumer base is the proper population that is examined in a trademark

7   infringement case, including in many cases cited by A&F and its expert, Dr. Ford.  *E.g., Scott Fetzer*

8   *Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 487-88 (5th Cir. 2004) ("the appropriate universe should

9   include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or

10  services"); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 518 (6th Cir. 2007) ("The

11  district court correctly recognized that the study failed to limit the respondent population to those

12  person likely to purchase defendant's products.").

13         A&F – without authority – states that the proper survey population was "females who are likely

14  to purchase jeans for themselves."  A&F Mot. to Exclude at 8.  This conclusion is drawn from the fact

15  that Dr. Ford used this population to conduct his survey.  A&F's ostensible logic is that the post-sale

16  population is not limited those that are likely to purchase A&F's products.  *Id.*  Dr. Ford's population,

17  however, also excludes segments of the population that are likely to see the jeans in the post-sale

18  context, including men and non-jeans purchasers.  If confusion among the entire post-sale population is

19  relevant, there is no reason to exclude men or non-jeans purchasers who may purchase other products

20  made by the parties.

21         Perhaps even more significant than ignoring the authority that holds the defendant's market is

22  the relevant population, Dr. Ford's criticism ignores the similar position to Dr. Sood that he has taken

23  in other cases.  For example, in explaining his post-sale confusion survey relating to adidas and Payless

24  shoes, Dr. Ford responded to criticism that he only had interviewed women.  He stated that this was

25  appropriate because he understood that women were the predominant consumers at Payless Stores, the

26  defendant.  Supp. Cincone Dec. Ex. O at 50.  Neither Dr. Ford nor A&F offer any justification for his

27  shift in position in this case, as Dr. Ford apparently has forgotten having taken the contrary view.

28  Supp. Cincone Dec. Ex. B at 179:12-23.  In the absence of any principled criticism or any authority to

challenge the view that a different population should be considered, Dr. Sood should not be
disqualified -- or even criticized -- for testing the population held relevant by most courts.

### 4. Dr. Sood Adequately Replicated Post-Sale Conditions Within a Research Context

A&F offers no authority other than Dr. Ford for its challenge to Dr. Sood's attempt to simulate
post-sale observations with his photographs. Dr. Ford criticizes Dr. Sood for showing photographs of
jeans being worn and then showing photographs of other jeans from the same angle. A&F Mot. to
Exclude at 9. This criticism is difficult to understand given that Dr. Ford asked about photographs of
jeans folded and laid flat in a manner that the stitching design was not even wholly visible. Although
Dr. Ford told respondents to "look at the jeans in the photograph as they would as if they saw someone
wearing the jeans," he did not show a photograph of the jeans being worn. Supp. Cincone Dec. Ex. B
at 126:11-127:23.

Dr. Sood's rationale for conducting the survey using photographs is that the photographs
permitted him to hold the survey stimuli constant for the test (Ruehl) jeans and for the control jeans.
Had he used real life conditions in a post-sale environment, there would be no way to assure that all of
the jeans would adequately be seen or seen in a comparable manner by each respondent. Supp. Sood
Dec. ¶ 9. A&F is simply wrong that the control jeans and LEVI'S® jeans are not likely to be seen
simultaneously in a post-sale environment. Dr. Sood chose the jeans based on their popularity and
likelihood of being present in many post-sale contexts. Supp. Sood Dec. ¶ 9; Supp. Onda Dec. ¶ 9.
Any test environment will be somewhat artificial, but this is not a reason for excluding Dr. Sood's
survey.

### 5. There is No Order Bias in Dr. Sood's Survey

A&F charges that Dr. Sood's survey created order bias despite the fact that the Ruehl and
control jeans were rotated to avoid just this bias. A&F cites *Winning Ways, Inc. v Holloway
Sportswear, Inc.*, 913 F. Supp. 1454 (D. Kan. 1996), but that case involved a failure to control the order
in which the products at issue were shown to the respondent. *Id.* at 1467 ("By always handing the
Winning Ways jacket to the consumer first, Dr. Block created an order effect of undeterminable
magnitude."). This is not the case here where the product order was rotated.

Dr. Sood noted that his close-ended, threshold question did not present response choices that easily could be rotated without producing an unnatural sounding question. Supp. Sood Dec. ¶ 10. He explained that his decision not to rotate the order of clauses in his challenged question likely avoided more bias that would have resulted from the unnatural framing of the reverse question. *Id*. Asking "Do you believe that none … or do you believe that any" was a structure that would have been awkward and stilted, and likely would have introduced its own bias. *Id*. There is no authority for disqualifying testimony based on reasoned decisions about how questions are best asked.

### 6. Respondents Were Alerted To The Option To Say I Don't Know

A&F misleadlingly charges that Dr. Sood failed to provide an "I don't know" instruction. The first thing respondents were told was to say so if they did not know or did not have an answer. The threshold question followed shortly thereafter and was the only question to which "I don't know" was a likely response. Supp. Sood Dec. ¶ 11. This is not grounds for disqualifying survey evidence.

### C. The Recognition Survey Also Is Valuable and Useful

### 1. Dr. Sood Controlled For Spurious Recognition

Citing one of Dr. Sood's co-authors in academic research, A&F suggests that Dr. Sood's survey overstates the results showing recognition of LS&CO.'s Arcuate Trademark because he did not create and survey a decoy design that no consumer could have seen. A&F Mot. to Exclude at 12. Dr. Sood explained that, given the turnover and amount of stitching designs in the market, it would have been difficult to create a stitching design that reliably had not been seen by consumers. Supp. Sood Dec. ¶ 14. Dr. Ford, despite having much more reason to be concerned about guessing in light of his decision to show only one product to each of his respondents, did not create a decoy as a control either. His explanation was exactly the same as Dr. Sood's: "Primarily because there's such a myriad of designs out there … that I had no confidence necessarily of -- that we could come up with a design that hadn't been used by someone or wasn't in use." Supp. Cincone Dec. Ex. B at 132:23-133:8.

This does not mean that there is no assurance against mere guessing in Dr. Sood's recognition survey. Although Dr. Sood showed pocket stitching from two other jeans producers, Lee® and Lucky®, that had been in the market for decades, the recognition levels for LS&CO.'s Arcuate Trademark nonetheless were substantially higher. Supp. Sood Dec. ¶ 15.

1   A&F restates its "spurious recognition" challenges as a concern that there are "no controls."

2   A&F Mot. to Exclude at 14-15.  Dr. Sood, however, included a number of controls in his recognition

3   survey:  he told respondents to say "I don't know" if they did not; he included several jeans in the

4   survey to determine if respondents were comfortable saying "no" or "I don't know," and he asked

5   follow-up questions to check against guessing.  His follow up questions showed that a substantial

6   majority of the respondents who reported recognizing the Arcuate Trademark also could name the

7   LEVI'S® brand by looking at the pocket.  Even though the Lee® and Lucky® designs had been in the

8   market for a lengthy period of time, far fewer respondents identified those as LEVI'S® jeans and fewer

9   correctly identified them by company or brand.  Sood. Dec. Ex. A at 6-7.  While there may have been

10  some misrecollection built into the 77% recognition of the Arcuate Trademark, it is consistent with the

11  bulk of the evidence and Dr. Sood's results are demonstrably not the product of "uncontrolled"

12  guessing.

13              **2.    Dr. Sood's Questions Are Not Ambiguous**

14          In what can only be characterized as speculative nitpicking, A&F surmises that respondents --

15  asked about a "style of pocket stitching" when shown a full page photograph of a single back pocket

16  adorned with pocket stitching -- might assume that the question referred to the "color of stitching, or

17  something else."  A&F Mot. to Exclude at 13.  To support this dubious point, A&F tries to suggest that

18  Dr. Sood agreed with the criticism.  *Id.*  But, as Dr. Sood made clear at his deposition and confirms in

19  his declaration, he merely acknowledged that some respondents are likely to misinterpret any question.

20  Supp. Cincone Dec. Ex. L at 98:17; Supp. Sood Dec. ¶ 17.  No reasonable respondent looking at the

21  photographs would have trouble deciphering any of the questions.

22          When Dr. Sood asked his control question about what company or brand is associated with the

23  "product" in the photograph, it followed on the heels of questions about the stitching.  The stitching

24  design is the only thing that reasonably can be seen in the photo.  Sood Dec. Ex. A [Sood Report] Ex.

25  8.  A respondent would understand the questions as related to the topic of the questions and there is no

26  reason to doubt that respondents were using the stitching design as the basis for identifying the

27  company or brand.  Supp. Sood Dec. ¶ 17.

28

1    Most importantly, this kind of "ambiguity" attack, even if there are good grounds for concern,

2    does not support exclusion of the survey.  *Simon & Shuster*, 970 F. Supp. at 290 (considering survey

3    despite the severe ambiguity of asking if challenged book were "another version" of the plaintiff's

4    book when "version" was susceptible to many interpretations).  If A&F thinks this challenge is

5    credible, it can test it with the jury.

6                    **3.    There Is No Order Bias**

7    There is no order bias in the recognition survey.  The jeans photographs were rotated when

8    shown -- unlike in *Winning Ways*, A&F's authority.  There were no response choices that could

9    naturally be rotated in the question, only the choice whether to awkwardly construct the question as

10   "more than one… or one…"  This would not solve any concern of bias.  Supp. Sood Dec. ¶ 18.

11   **IV.    CONCLUSION**

12   For the reasons stated above, and in Dr. Sood's report and declarations, Dr. Sood's survey was

13   conducted using accepted principles of scientific consumer research.  When this is the case, there are

14   no grounds for excluding it.  The motion should be denied.

15

16   DATED:  September 3, 2008                     Respectfully submitted,

17                                                 TOWNSEND AND TOWNSEND AND CREW LLP

18

19                                                 By:___*/s/ Gregory S. Gilchrist*_____
                                                        Gregory S. Gilchrist
20
                                                   Attorneys for Plaintiff/Counterdefendant
21                                                 LEVI STRAUSS & CO.

22

23   61488731 v1

24

25

26

27

28