1  TOWNSEND AND TOWNSEND AND CREW LLP
   GREGORY S. GILCHRIST (State Bar No. 111536)
2  GIA L. CINCONE (State Bar No. 141668)
   RAQUEL PACHECO (State Bar No. 245328)
3  Two Embarcadero Center, 8th Floor
   San Francisco, California 94111
4  Telephone: (415) 576-0200
   Facsimile: (415) 576-0300
5  Email: gsgilchrist@townsend.com,
   glcincone@townsend.com; rpacheco@townsend.com
6
   Attorneys for Plaintiff
7  LEVI STRAUSS & CO.

8
                   UNITED STATES DISTRICT COURT
9
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
                      SAN FRANCISCO DIVISION
11

12 | LEVI STRAUSS & CO.,                  | Case No. C 07-03752 JSW
13 |         Plaintiff/Counterdefendant,  | **SUPPLEMENTAL DECLARATION OF SANJAY SOOD IN OPPOSITION TO ABERCROMBIE & FITCH TRADING CO.'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT REPORT, EVIDENCE AND SURVEY OF DR. SANJAY SOOD**
14 |         v.                           |
15 | ABERCROMBIE & FITCH TRADING CO.,     |
16 |         Defendant/Counterclaimant.   |
17 |                                      |
18 | ABERCROMBIE & FITCH TRADING CO.,     | Date:       September 26, 2008
19 |                                      | Time:       9:00 a.m.
   |                                      | Courtroom:  2, 17th Floor
20 |         Defendant/Counterclaimant,   |             Hon. Jeffrey S. White
21 |         v.                           |
22 | LEVI STRAUSS & CO.,                  |
23 |         Plaintiff/Counterdefendant.  |

SUPP. DEC. OF SANJAY SOOD IN OPPOSITION                 *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*
TO DEFENDANT'S MOTION FOR SJ AND MOTION TO EXCLUDE      Case No. C 07-03752 JSW

I, Dr. Sanjay Sood, declare as follows:

1. I am an Associate Professor of Marketing at the Anderson Graduate School of Management of the University of California, Los Angeles (UCLA). I have a Ph.D. from Stanford University in Marketing, an MBA from Northwestern University and a Bachelors of Science degree in Electrical Engineering from the University of Illinois. I have been retained by Levi Strauss & Co. (LS&CO) to design and conduct two consumer surveys and to provide my opinions on the questions whether consumers are likely to be confused by Abercrombie and Fitch's (A&F) Ruehl pocket stitching design, the degree to which LS&CO.'s Arcuate Stitching Design trademark is recognized by the general consuming public and whether they associate the mark with the LEVI'S trademark, and the potential impact on LS&CO.'s mark if A&F continues to use the Ruehl design.

2. In my work as a marketing professor, I have considerable experience investigating brand equity using experimental methodologies such as those employed in the current surveys. Using psychological principles, I have published several articles in the leading marketing academic journals examining how brand knowledge is stored in memory and how this knowledge affects the acceptance of new products in the marketplace. These articles are relevant to the LS&CO surveys as my research addresses the issue of how consumer attitudes towards new products can be influenced, positively or negatively, by brand knowledge. In the present matter, I have conducted my work from the perspective that I should use similar consumer research techniques to determine consumer perceptions regarding the questions I was asked to consider. The data yielded from the surveys I designed is highly valuable for answering these questions and my opinions are fully supported by accepted scientific research techniques.

3. I have reviewed the motion to exclude my report, testimony and survey in this matter, as well as Dr. Ford's rebuttal report on which it relies. I disagree with the criticisms (where they can be separated from rhetoric). I am not in a position to respond to the legal authorities recited in Dr. Ford's rebuttal report or in the A&F motion. I am not a lawyer and am informed by LS&CO.'s counsel that they will have an opportunity separately to address the arguments raised by A&F. I can say that I did not compromise my preferred survey methodology in order to avoid criticism of this kind.

1      4.    My report, which was attached as Exhibit A to my original declaration submitted in support of LS&CO.'s motion for partial summary judgment, fully describes my survey methods.

    5.    I do not believe that the questions presented in my confusion survey were improperly leading. I take A&F's concern to be that the questions encouraged respondents to answer in a particular way that somehow has overstated the number of respondents who felt that one or more of the jeans shown in the array were sponsored or endorsed by the same company (LS&CO.) who made the first jean they saw. I do not believe that this question is leading because respondents are given the option to answer that none of the jeans were sponsored or endorsed by the same company (LS&CO) who made the first jean they saw. Alternatively, I could have asked the question in a more open-ended manner by collapsing this question with the next question in my survey: Thus, I might have asked to the effect: "Which one or ones, if any, of the jeans I have now shown you are sponsored or endorsed by the company that puts out the first jeans you saw?" I chose the question I did because it presented the separate and explicit opportunity to say that none of the jeans were sponsored or endorsed by the producer of the first jean. Looking at the results of my survey, a majority of respondents answered that none of the jeans were so sponsored or endorsed, or they did not know. These results do not lead me to conclude that, in the context of the questions asked, respondents were encouraged to answer in a particular way. The follow up questions were not leading and were the important ones for determining whether the Ruehl stitching stood out from the others as being perceived as sponsored or endorsed by the maker of the first jeans (LS&CO) they had seen earlier. In my opinion, the questions asking why a respondent had answered the way she did was not leading and the unprompted answers corroborated my conclusion that the pocket stitching was a major reason for the earlier answers. The fact that my first question -- which explicitly gives two options -- is close-ended does not eliminate it from the range of acceptable questions available to the research community. In addition, respondents were given express instruction to inform the interviewer if they did not know an answer, further solidifying my confidence in the answers provided. As a whole, looking at the results and the opportunity for corroboration of the issues presented, there is little reason to believe that respondents were influenced to give an affirmative rather than a negative response to the first question.

SUPP. DEC. OF SANJAY SOOD IN OPPOSITION     - 2 -     *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*
TO DEFENDANT'S MOTION FOR SJ AND MOTION TO EXCLUDE     Case No. C 07-03752 JSW

6. I likewise do not believe that my confusion survey question produced undue "demand effects." Preliminarily, any question directed to the question you are examining may produce demand effects. However, in my survey I took precaution to avoid such demand effects in the context of jeans. As mentioned previously, the majority of respondents answered that none of the jeans were sponsored or endorsed, or they did not know, indicating that demand effects had been limited. In addition, respondents were shown four pairs of jeans not just one pair, hence even if there were demand effects regarding an implicit relationship between the products shown the consumer responses would not be specifically directed towards the A&F product. Finally, it is my understanding that jeans producers typically use pocket stitching to denote the source of their products and that consumers are likely to believe that the origins of a jean may be determined from the pocket stitching. Thus, in my opinion, it is unlikely that my questions were likely to "demand" an affirmative response by putting an implicit relationship in the respondent's mind by asking the survey questions.

7. As I testified at my deposition, I do not agree that my survey does not include controls. The primary purpose of controls is to filter out "background noise" that is not relevant to the current issue of confusion. My survey included several features designed to limit the extent of such background noise. First, every respondent who thought there was sponsorship or endorsement by the producer of the first (LS&CO) jeans shown to her had an opportunity to identify several jeans that were, due to their popularity in the relevant market, likely to be seen in post-sale environments. As described above, each of these jeans acted as a control against merely guessing a relationship that was specific to A&F. Second, precaution was taken in the order of presentation; the order of the control jeans and the A&F jeans was rotated across respondents. Third, the pictures used in the survey depicted the jeans being worn by a person standing in roughly the same position in each photo. This methodology helped to limit the amount of guessing that would not be related to the pocket stitching. Finally, there were open ended questions about the reasons for answers that permitted corroboration that unforeseen survey flaws were not responsible for the outcome. I gather that A&F believes that the results for these control jeans should be subtracted in some way from the results for the Ruehl jean. I note that, if so done, there remains a substantial level of confusion even calculated conservatively (e.g. 31% - 11% (Citizens, the highest of the controls) p. 11) = 20%. Other

subtractions also could be done to estimate a specific amount of likely confusion if that were desirable (e.g. 31% - 8% (average of controls) = 23%). I am not of the opinion that a complete subtraction of the control data is warranted in order to determine a specific level of confusion. Consumers may not be particularly articulate about the reasons why they mentioned a particular brand has a relationship; nevertheless, the data show that more of the respondents who mentioned Ruehl evidently focused on the pocket stitching. In addition, relatively more respondents mentioned Ruehl exclusively than the other controls as a brand sponsored by the maker of the Levi's jeans. These kinds of factors may mitigate the reasons for simple subtraction of the control data. At any rate, I do not agree that my survey has no controls or that there is no basis for analyzing their impact on likely confusion related to the Ruehl design.

8. The survey population included women likely to be in the market for Ruehl jeans. I take it that A&F does not disagree that the population of respondents in my survey fails to include most of this market. Rather, it criticizes me for not including other potential jeans purchasers on grounds that they also will see the jeans in a post-sale environment. It is true that a full range of potential and actual purchasers, as well as non-purchasers such as men or non-users of jeans, might see the design. I did not choose this population, nor did Dr. Ford as I understand it. I chose the more limited sample of respondents who were likely to purchase a Ruehl jean and who might be affected by post-sale confusion.

9. I am criticized for not duplicating marketplace conditions. I note that it is difficult to duplicate marketplace conditions within any kind of reasonable budget. I understand that the surveys conducted for Levi Strauss were budgeted to cost approximately $200,000. Also, note that marketplace conditions are not always ideal for scientific research because they introduce variables that may influence the results. For example, in this case I considered using videotapes as a stimulus, but in addition to the added expense, it is much harder to control for unnecessary background noise (e.g., the way a model walks) in video relative to a still photograph. I also decided to use popular jeans styles of the control brands to simulate opportunities for post-sale observations that a consumer may make in the ordinary course of everyday life. In my opinion, my survey much more closely resembles a post-sale context (in which research can be conducted) than an alternative survey design

in which the jeans are not worn or popular jeans styles are not used.

10.  I am criticized for order bias. I rotated the order in which important variables were introduced to the respondents, including the order in which the array of jeans was displayed. I gather I am criticized for not reversing the order of the identified options in my threshold question. In my opinion, a reversal of the order of the threshold question may introduce a bias due to the unnatural construction of the question. The formulation that I used "Do you believe that any ... or do you believe that none ..." is more natural in everyday language to the consumer than the reverse "Do you believe that none…or do you believe that any". This is different in my view than the ordinary desire to avoid primacy bias from presenting choices in an answer. Thus, "do you choose A or B," can be reversed to say "do you choose B or A" without unnaturally posing the question. In my opinion reversing the natural order in which a consumer expects to hear a question is more likely to produce a bias than the order in which the options in my question were delivered to the respondents.

11.  I am criticized for not including an "I don't know" option in my confusion survey. This is not accurate. Respondents in my confusion survey were specifically instructed to inform the interviewer if they did not know an answer [see Exhibit 11]. The respondents were a short time later asked only one question to which "I don't know" would have been an appropriate response. If they said "I don't know," that answer was recorded without challenge and the survey was terminated. A meaningful percentage of people said that they did not know the answer to this question. In my opinion, this format limited the amount of guessing as respondents could say they did not know an answer. Certainly this methodology is within the acceptable methods employed by consumer researchers.

12.  Regarding the recognition survey, I am criticized for ignoring the issue of "spurious recognition." A&F quotes from a well known marketing professor, Dr. Kevin Keller, with whom I have co-authored a number of projects. Dr. Keller writes about the problem of aided awareness studies that may invite guessing and against which steps must be taken so that the amount of guessing can be measured. A&F notes that Dr. Keller suggests including decoys in order to control for guessing.

13.  I did not ignore this issue as A&F suggests. First, my survey methodology included

additional jeans as controls in the recognition task. Any issue of spurious recognition, especially concerning top of mind brand awareness, would therefore also be evident for the controls in the recognition survey. Also, my survey included showing photographs of the jeans and asking questions about recognition on an aided basis (i.e. showing the pocket and asking if it had been recognized). The additional questions about whether the consumer associates the pocket stitching with a brand and the identity of the brand are not aided. The additional questions are therefore less likely to produce sheer guessing in this manner. Given the substantial level of recognition for the Levi's pocket stitching and the unaided identification of Levi's as the brand associated with the product, I am confident that most of the results are attributable to actual recognition of the Arcuate stitching design and association of it with the Levi's brand.

14. Dr. Keller's suggestion of using decoys was not practical in this survey. Jeans pocket stitching designs are not like word marks or other marks for which fictional decoys readily can be created. Many stitching designs are used on jeans and, as I testified at my deposition, there was no reasonable way to develop a fictional design that assuredly would not be taken to resemble a design in use.

15. Relatedly, A&F claims that I did not use adequate controls for guessing or top of mind responses. I disagree because I chose control jeans and pocket designs that people likely would have seen before. These choices served two functions. First, these designs served as a useful basis for comparison for recognition of the Levi's Arcuate design within the survey population. Second, the designs operated as controls for guessing. While it is true that measurements of a tendency to guess would be reduced for those respondents who knew the control jeans by seeing their pocket designs, the results showed that only a small percentage knew the Lucky jean by its stitching (2%) and a somewhat larger percentage (16%) for Lee. This compares to a majority (53%) who identified the Levi's jeans by its stitching.

16. It is possible that use of longstanding stitching designs may have overstated the mistaken responses that the control jean stitching designs were Levi's jeans. Because the designs have been in the market for a long time as has the Levi's brand, they may inspire a pairing in the mind of the consumer that a familiar design likely belongs to a familiar brand. This is not necessarily

1  reflective of sheer guessing, but of mistaken associations.  At any rate, the number of mistaken
2  responses identifying Levi's is only approximately 9% (Lee) and 12% (Lucky).  This suggests that the
3  amount of guessing of "Levi's" based on familiarity with the brand is not sufficiently substantial to call
4  the recognition results into question.  See Exhibit 9H of my report.  As discussed earlier, a
5  conservative attempt to specifically measure the amount of consumers' ability to recall the Levi's
6  brand from the stitching would simply involve wholesale subtraction of the wrong "Levi's" answers in
7  response to the control jeans.  Because of other potential explanations, such as those mentioned above,
8  I do not necessarily subscribe to the wisdom of this subtraction approach.

9        17.     A&F states that my questions regarding recognition are ambiguous.  I disagree.  After
10 showing a photograph of the back pocket design, respondents were asked if they had seen jeans with
11 this  "style of pocket stitching before."  As I stated earlier, it is my understanding that pocket stitching
12 is readily used by consumers to identify jeans, meaning the design that appears in the center of the
13 pocket.  A&F suggests that consumers would interpret the question as referring to the color of the
14 stitching or the functional stitching that appears along the edge of the pocket.  While I acknowledged
15 at my deposition that some consumers might misconstrue this question, this was in reference to the
16 fact that some consumers will potentially misunderstand any question.  The same is true about the
17 final question that asks what brand or companies are associated with the "product" in the photograph.
18 After asking twice about the pocket stitching and whether consumers associated the stitching with a
19 brand or company, in everyday language there is little ambiguity about the significance of pocket
20 stitching in answering this question.

21       18.     Regarding A&F's claim of order bias, I make the same observations as to the confusion
22 survey.  Asking if "one…or more than one" is the natural sequence in which a consumer would expect
23 to hear such a question.  Changing it to "more than one…or one," would likely create bias based on
24 the unnatural construction of the question posed.

25 ///
26 ///
27 ///
28 ///

1   I declare under penalty of perjury under the laws of the United States that the foregoing
2   statements are true and correct.
3   Executed on September 3, 2008, by my authorization at San Francisco, California.

      _/s/ Sanjay Sood_
      Sanjay Sood

61481134 v1