# EXHIBIT E

SCREENER - W

Hello. My name is _____, and I am with _____. We are conducting a very brief survey today and would like to include your opinions.

1.0 Within the next twelve months, are you likely to purchase a pair of jeans for yourself?
RECORD RESPONSE WITH AN 'X.'

___X___ 1. yes  CONTINUE.

_____ 2. no ⎤
_____ 3. don't know ⎦  **TERMINATE. TALLY. ERASE & REUSE.**

2.0 **RECORD GENDER:**

___X___ 1. female  CONTINUE.

2.1 So that we can get a mix of individuals in various age categories, would you tell me into which of the following categories does your age fall...
READ LIST.  RECORD RESPONSE WITH AN 'X.'

_____ 1. under 13  **TERMINATE. TALLY. ERASE & REUSE.**

_____ 2. 13 to 17 ⎤
_____ 3. 18 to 34 ⎥
___X___ 4. 35 to 54 ⎥  **CHECK QUOTA.  CONTINUE.**
_____ 5. 55 or above ⎦

_____ 6. refused  **DO NOT READ. TERMINATE. TALLY. ERASE & REUSE.**

3.0 Do you, or does anyone else in your home, work for...
READ LIST.  RECORD RESPONSES WITH AN 'X.'

|  | Yes | No |
|---|---|---|
| - an advertising agency or marketing research firm? . . . . . | 1. | X 2. |
| - a retail store or company that makes, sells, or distributes any clothing?. . . . . . . . . . | 1. | X 2. |

IF 'YES' TO EITHER, TERMINATE. TALLY. ERASE & REUSE. OTHERWISE, CONTINUE.

4.0 Other than a political poll, during the past three months, have you participated in any marketing research surveys, including online surveys?
RECORD RESPONSE WITH AN 'X.'

_____ 1. yes  **TERMINATE. TALLY. ERASE & REUSE.**

___X___ 2. no/don't recall  CONTINUE.

A&F Expert Discl. 01706

1833

4.1 During the past three months, have you heard anything about
the subject of any of the interviews we are conducting here
at the mall?
**RECORD RESPONSE WITH AN 'X.'**

~~1.~~ yes **TERMINATE. TALLY. ERASE & REUSE.**

~~2.~~ no **CONTINUE.**

5.0 Do you usually wear contact lenses or eyeglasses when you
are looking at a photograph?
**RECORD RESPONSE WITH AN 'X.'**

~~1.~~ yes **CONTINUE.**

_____2. no **GO TO --> INVITATION TO INTERVIEW.**

5.1 Do you have them with you at this time?
**RECORD RESPONSE WITH AN 'X.'**

~~1.~~ yes **CONTINUE.**

_____2. no **TERMINATE. TALLY. ERASE & REUSE.**

5.2 Will you please wear them during the rest of the interview?
**RECORD RESPONSE WITH AN 'X.'**

~~1.~~ yes, agreed **CONTINUE.**

_____2. no, refused **TERMINATE. TALLY. ERASE & REUSE.**

**INVITATION TO INTERVIEW:**

We would like to show you a picture of a pair of jeans and
ask the remainder of our questions in our interviewing facility
here at the mall. This will take only a few minutes of your
time. Will you come with me, please?
**RECORD RESPONSE WITH AN 'X.'**

~~1.~~ yes, agreed **CONTINUE.**

_____2. no, refused **TERMINATE. TALLY. ERASE & REUSE.**

A&F Expert Discl. 01707

Rotation 3

1833

QUESTIONNAIRE - W

DO <u>NOT</u> ERASE ON THE QUESTIONNAIRE.

TAKE RESPONDENT INTO INTERVIEWING ROOM.

SEAT RESPONDENT AND SEAT YOURSELF ACROSS FROM RESPONDENT.

In a moment, I am going to show you a picture of a pair of jeans, then I will ask you a couple of questions.

Please understand that we are only interested in your opinions; and if you don't have an opinion or don't know the answer to a question, that is an acceptable answer.

TAKE EXHIBIT __W__ OUT OF FILE AND HAND TO RESPONDENT.

Would you please look at the jeans in this picture as you would if you saw someone wearing these jeans. Please take as much time as you like, and let me know when you are ready to continue.

PAUSE UNTIL RESPONDENT INDICATES SHE IS READY TO CONTINUE.

5.0  Who do you believe makes or puts out these jeans?
     RECORD RESPONSE VERBATIM.

     _um... Levis_

                          IF 'DON'T KNOW,' GO TO --> Q6.0;
                                    OTHERWISE, CONTINUE.

5.1  Why do you say that?
     RECORD RESPONSE VERBATIM.

     _the stiching on the pocket_

                          IF 'DON'T KNOW,' GO TO --> Q6.0;
                                    OTHERWISE, CONTINUE.

5.2  What else, if anything, makes you say that?
     RECORD RESPONSE VERBATIM.

     _the leather tag_

                                              CONTINUE.

A&F Expert Discl. 01708

Questionnaire p. 3
location 5

1833

6.0  Now, I am going to ask you a question that has three
     choices.  **PAUSE**.  After I am done, if you want me to read
     the question again, just ask me.  **PAUSE**.

     Do you believe that the company that put out these
     jeans...**READ LIST**...

          one, <u>has</u> a business affiliation or business connection
          with any other company or companies;

          two, does <u>not</u> have a business affiliation or business
          connection with any other company or companies; or

          three, don't know or have no opinion?

     RECORD RESPONSE VERBATIM.

     _____ one _____

     _____
          IF '...HAS A BUSINESS AFFILIATION/CONNECTION...,' CONTINUE;
                              OTHERWISE, GO TO --> Q7.0.

6.1  What other company or companies?
     RECORD RESPONSE VERBATIM.

     _JC Pennys or Dillards_____

     _____
          IF 'DON'T KNOW' COMPANY/COMPANIES' NAME(S), GO TO --> Q7.0;
                              OTHERWISE, CONTINUE.

6.2  Why do you say that?
     RECORD RESPONSE VERBATIM.

     _Because those stores_____

     _carry them_____

     _____
                              IF 'DON'T KNOW,' GO TO --> Q7.0;
                              OTHERWISE, CONTINUE.

6.3  What else, if anything, makes you say that?
     RECORD RESPONSE VERBATIM.

     _the style_____

     _____

     _____
                                                        CONTINUE.

A&F Expert Discl. 01709

1833

7.0 Now, I am going to ask you another question that has three choices. **PAUSE**. After I am done, if you want me to read the question again, just ask me. **PAUSE**.

Do you believe that these jeans...READ LIST...

    one, <u>are</u> being put out with the authorization or approval of any other company or companies;

    two, are <u>not</u> being put out with the authorization or approval of any other company or companies; or

    three, don't know or have no opinion?

**RECORD RESPONSE VERBATIM.**

*One*

IF '...PUT OUT WITH AUTHORIZATION/APPROVAL...,' CONTINUE; OTHERWISE, GO TO --> Q8.0.

7.1 What other company or companies?
**RECORD RESPONSE VERBATIM.**

*JC Penny, Dillards*

IF 'DON'T KNOW' COMPANY/COMPANIES' NAME(S), GO TO --> Q8.0; OTHERWISE, CONTINUE.

7.2 Why do you say that?
**RECORD RESPONSE VERBATIM.**

*they would want to know peoples image of their store*

IF 'DON'T KNOW,' GO TO Q8.0; OTHERWISE, CONTINUE.

7.3 What else, if anything, makes you say that?
**RECORD RESPONSE VERBATIM.**

*nothing else*

CONTINUE.

8.0 Would you please tell me what letter is on the back of the photograph?
**RECORD LETTER AND CONTINUE.**

*W*

8.1 **PUT PHOTOGRAPH IN FILE, OUT OF SIGHT, AND CONTINUE.**

A&F Expert Discl. 01710

**VERIFICATION:**

Finally, may I please have your name and telephone number? This information is so that my Supervisor can verify a portion of my work. If you are contacted, it will only be to confirm that I conducted this interview and for no other reason.

Respondent Name: _____

Telephone Number: _____



Is that a daytime or evening telephone number?
RECORD RESPONSE WITH AN 'X.'

    ✗   1.  daytime telephone number

    ✗   2.  evening telephone number

**THANK RESPONDENT FOR HER TIME AND PARTICIPATION.**

---

Interviewer Certification:

I hereby certify that the information contained on this Questionnaire is a true and accurate record of this respondent's comments as they were given to me.

_____  05-12-08
Interviewer's signature (no initials)     Date

---

Supervisor Validation:

I hereby certify that I personally met this respondent and validated her participation in the survey and answers to Q1.0 through Q2.1.

_____
Supervisor's signature (no initials)

---

A&F Expert Discl. 01711

1617

5/08

SCREENER - W

Hello. My name is B.I, and I am with Q.T. We are conducting a very brief survey today and would like to include your opinions.

1.0 Within the next twelve months, are you likely to purchase a pair of jeans for yourself?
RECORD RESPONSE WITH AN 'X.'

___X_ 1. yes  CONTINUE.

_____ 2. no ────────────┐

_____ 3. don't know ─────┴── TERMINATE. TALLY. ERASE & REUSE.

2.0 RECORD GENDER:

___X_ 1. female  CONTINUE.

2.1 So that we can get a mix of individuals in various age categories, would you tell me into which of the following categories does your age fall...
READ LIST.  RECORD RESPONSE WITH AN 'X.'

_____ 1. under 13  TERMINATE. TALLY. ERASE & REUSE.

___X_ 2. 13 to 17 ──┐

_____ 3. 18 to 34   │

_____ 4. 35 to 54   ├── CHECK QUOTA.  CONTINUE.

_____ 5. 55 or above┘

_____ 6. refused  DO NOT READ. TERMINATE. TALLY. ERASE & REUSE.

3.0 Do you, or does anyone else in your home, work for...
READ LIST.  RECORD RESPONSES WITH AN 'X.'

                                        Yes        No
- an advertising agency or
  marketing research firm? . . . . . 1.     X  2.

- a retail store or company that
  makes, sells, or distributes
  any clothing?. . . . . . . . . . 1.    X  2.
                  IF 'YES' TO EITHER, TERMINATE.
                  TALLY.  ERASE & REUSE.
                  OTHERWISE, CONTINUE.

4.0 Other than a political poll, during the past three months, have you participated in any marketing research surveys, including online surveys?
RECORD RESPONSE WITH AN 'X.'

_____ 1. yes  TERMINATE. TALLY. ERASE & REUSE.

___X_ 2. no/don't recall  CONTINUE.

A&F Expert Discl. 01177

1617

4.1 During the past three months, have you heard anything about the subject of any of the interviews we are conducting here at the mall?
**RECORD RESPONSE WITH AN 'X.'**

_____ 1. yes **TERMINATE. TALLY. ERASE & REUSE.**

___X__ 2. no **CONTINUE.**


5.0 Do you usually wear contact lenses or eyeglasses when you are looking at a photograph?
**RECORD RESPONSE WITH AN 'X.'**

_____ 1. yes **CONTINUE.**

___X__ 2. no **GO TO --> INVITATION TO INTERVIEW.**


5.1 Do you have them with you at this time?
**RECORD RESPONSE WITH AN 'X.'**

_____ 1. yes **CONTINUE.**

_____ 2. no **TERMINATE. TALLY. ERASE & REUSE.**


5.2 Will you please wear them during the rest of the interview?
**RECORD RESPONSE WITH AN 'X.'**

_____ 1. yes, agreed **CONTINUE.**

_____ 2. no, refused **TERMINATE. TALLY. ERASE & REUSE.**


**INVITATION TO INTERVIEW:**

We would like to show you a picture of a pair of jeans and ask the remainder of our questions in our interviewing facility here at the mall. This will take only a few minutes of your time. Will you come with me, please?
**RECORD RESPONSE WITH AN 'X.'**

___X__ 1. yes, agreed **CONTINUE.**

_____ 2. no, refused **TERMINATE. TALLY. ERASE & REUSE.**

A&F Expert Discl 01178

Rotation 4

1617

QUESTIONNAIRE - W

DO NOT ERASE ON THE QUESTIONNAIRE.

TAKE RESPONDENT INTO INTERVIEWING ROOM.

SEAT RESPONDENT AND SEAT YOURSELF ACROSS FROM RESPONDENT.

In a moment, I am going to show you a picture of a pair of jeans, then I will ask you a couple of questions.

Please understand that we are only interested in your opinions; and if you don't have an opinion or don't know the answer to a question, that is an acceptable answer.

TAKE EXHIBIT __W__ OUT OF FILE AND HAND TO RESPONDENT.

Would you please look at the jeans in this picture as you would if you saw someone wearing these jeans. Please take as much time as you like, and let me know when you are ready to continue.

PAUSE UNTIL RESPONDENT INDICATES SHE IS READY TO CONTINUE.

5.0  Who do you believe makes or puts out these jeans?
     RECORD RESPONSE VERBATIM.

Levi

                              IF 'DON'T KNOW,' GO TO --> Q6.0;
                              OTHERWISE, CONTINUE.

5.1  Why do you say that?
     RECORD RESPONSE VERBATIM.

The sticking pattern

                              IF 'DON'T KNOW,' GO TO --> Q6.0;
                              OTHERWISE, CONTINUE.

5.2  What else, if anything, makes you say that?
     RECORD RESPONSE VERBATIM.

The cut of the pants more straight
cut

                                           CONTINUE.

A&F Expert Discl. 01179

1617

6.0  Now, I am going to ask you a question that has three
     choices.  **PAUSE.**  After I am done, if you want me to read
     the question again, just ask me.  **PAUSE.**

     Do you believe that the company that put out these
     jeans...**READ LIST**...

          one, does <u>not</u> have a business affiliation or business
          connection with any other company or companies;

          two, <u>has</u> a business affiliation or business connection
          with any other company or companies; or

          three, don't know or have no opinion?

     **RECORD RESPONSE VERBATIM.**

     Don't know
     _____

     **IF '...HAS A BUSINESS AFFILIATION/CONNECTION...,' CONTINUE;
                         OTHERWISE, GO TO --> Q7.0.**

6.1  What other company or companies?
     **RECORD RESPONSE VERBATIM.**

     _____

     **IF 'DON'T KNOW' COMPANY/COMPANIES' NAME(S), GO TO --> Q7.0;
                         OTHERWISE, CONTINUE.**

6.2  Why do you say that?
     **RECORD RESPONSE VERBATIM.**

     _____

     _____

                         **IF 'DON'T KNOW,' GO TO --> Q7.0;
                         OTHERWISE, CONTINUE.**

6.3  What else, if anything, makes you say that?
     **RECORD RESPONSE VERBATIM.**

     _____

     _____

     _____
                                             **CONTINUE.**

A&F Expert Discl. 01180

7.0   Now, I am going to ask you another question that has three
choices.   **PAUSE.**   After I am done, if you want me to read
the question again, just ask me.   **PAUSE.**

Do you believe that these jeans...**READ LIST...**

one, are <u>not</u> being put out with the authorization or
approval of any other company or companies;

two, <u>are</u> being put out with the authorization or
approval of any other company or companies; or

three, don't know or have no opinion?

**RECORD RESPONSE VERBATIM.**

_Put out with authorization_

IF '...PUT OUT WITH AUTHORIZATION/APPROVAL...,' CONTINUE;
OTHERWISE, GO TO --> Q8.0.

7.1   What other company or companies?
**RECORD RESPONSE VERBATIM.**

_Mossimo_

IF 'DON'T KNOW' COMPANY/COMPANIES' NAME(S), GO TO --> Q8.0;
OTHERWISE, CONTINUE.

7.2   Why do you say that?
**RECORD RESPONSE VERBATIM.**

_The dye color_

IF 'DON'T KNOW,' GO TO Q8.0;
OTHERWISE, CONTINUE.

7.3   What else, if anything, makes you say that?
**RECORD RESPONSE VERBATIM.**

_Also the stiching and lining_

CONTINUE.

8.0   Would you please tell me what letter is on the back of the
photograph?
**RECORD LETTER AND CONTINUE.**

_W_

8.1   PUT PHOTOGRAPH IN FILE, OUT OF SIGHT, AND CONTINUE.

**VERIFICATION:**

Finally, may I please have your name and telephone number?
This information is so that my Supervisor can verify a portion of
my work.  If you are contacted, it will only be to confirm that I
conducted this interview and for no other reason.

Respondent Name:

Telephone Number:

> **Redacted**

Is that a daytime or evening telephone number.
RECORD RESPONSE WITH AN 'X.'

   X   1.  daytime telephone number

   X   2.  evening telephone number

**THANK RESPONDENT FOR HER TIME AND PARTICIPATION.**

---

**Interviewer Certification:**

I hereby certify that the information contained on this
Questionnaire is a true and accurate record of this
respondent's comments as they were given to me.

_Brandi Ferrell_ _____    _5/13/08_
Interviewer's signature (no initials)      Date

---

**Supervisor Validation:**

I hereby certify that I personally met this respondent
and validated her participation in the survey and answers to
Q1.0 through Q2.1.

_____
Supervisor's signature (no initials)

A&F Expert Discl. 01182

1765
5/08
1430

SCREENER - W

Hello. My name is _____, and I am with _____. We are
conducting a very brief survey today and would like to include
your opinions.

1.0  Within the next twelve months, are you likely to purchase a
     pair of jeans for yourself?
     **RECORD RESPONSE WITH AN 'X.'**

     X   1.  yes  **CONTINUE.**

     ___ 2.  no  ──────────┐
                           ├── **TERMINATE.  TALLY.  ERASE & REUSE.**
     ___ 3.  don't know ───┘

2.0  **RECORD GENDER:**

     X   1.  female  **CONTINUE.**

2.1  So that we can get a mix of individuals in various age
     categories, would you tell me into which of the following
     categories does your age fall...
     **READ LIST.  RECORD RESPONSE WITH AN 'X.'**

     ___ 1.  under 13  **TERMINATE.  TALLY.  ERASE & REUSE.**

     X   2.  13 to 17 ───┐
     ___ 3.  18 to 34    │
                         ├── **CHECK QUOTA.  CONTINUE.**
     ___ 4.  35 to 54    │
     ___ 5.  55 or above ┘

     ___ 6.  refused  **DO NOT READ.  TERMINATE.  TALLY.  ERASE & REUSE.**

3.0  Do you, or does anyone else in your home, work for...
     **READ LIST.  RECORD RESPONSES WITH AN 'X.'**
                                                    Yes      No
     -  an advertising agency or
        marketing research firm? . . . . .  ___ 1.   X  2.

     -  a retail store or company that
        makes, sells, or distributes
        any clothing? . . . . . . . . . . . ___ 1.   X  2.
                              **IF 'YES' TO EITHER, TERMINATE.**
                              **TALLY.  ERASE & REUSE.**
                              **OTHERWISE, CONTINUE.**

4.0  Other than a political poll, during the past three months,
     have you participated in any marketing research surveys,
     including online surveys?
     **RECORD RESPONSE WITH AN 'X.'**

     ___ 1.  yes  **TERMINATE.  TALLY.  ERASE & REUSE.**

     X   2.  no/don't recall  **CONTINUE.**

A&F Expert Discl. 00823

1430

4.1 During the past three months, have you heard anything about the subject of any of the interviews we are conducting here at the mall?
RECORD RESPONSE WITH AN 'X.'

_____ 1.  yes  TERMINATE.  TALLY.  ERASE & REUSE.

__X__ 2.  no  CONTINUE.


5.0 Do you usually wear contact lenses or eyeglasses when you are looking at a photograph?
RECORD RESPONSE WITH AN 'X.'

_____ 1.  yes  CONTINUE.

__X__ 2.  no  GO TO --> INVITATION TO INTERVIEW.


5.1 Do you have them with you at this time?
RECORD RESPONSE WITH AN 'X.'

_____ 1.  yes  CONTINUE.

_____ 2.  no  TERMINATE.  TALLY.  ERASE & REUSE.


5.2 Will you please wear them during the rest of the interview?
RECORD RESPONSE WITH AN 'X.'

_____ 1.  yes, agreed  CONTINUE.

_____ 2.  no, refused  TERMINATE.  TALLY.  ERASE & REUSE.


INVITATION TO INTERVIEW:

We would like to show you a picture of a pair of jeans and ask the remainder of our questions in our interviewing facility here at the mall.  This will take only a few minutes of your time.  Will you come with me, please?
RECORD RESPONSE WITH AN 'X.'

__X__ 1.  yes, agreed  CONTINUE.

_____ 2.  no, refused  TERMINATE.  TALLY.  ERASE & REUSE.

A&F Expert Discl. 00824

Rotation 3

1430

QUESTIONNAIRE - W

DO **NOT** ERASE ON THE QUESTIONNAIRE.


TAKE RESPONDENT INTO INTERVIEWING ROOM.

SEAT RESPONDENT AND SEAT YOURSELF ACROSS FROM RESPONDENT.

In a moment, I am going to show you a picture of a pair of jeans, then I will ask you a couple of questions.

Please understand that we are only interested in your opinions; and if you don't have an opinion or don't know the answer to a question, that is an acceptable answer.


TAKE EXHIBIT **W** OUT OF FILE AND HAND TO RESPONDENT.

Would you please look at the jeans in this picture as you would if you saw someone wearing these jeans. Please take as much time as you like, and let me know when you are ready to continue.

PAUSE UNTIL RESPONDENT INDICATES SHE IS READY TO CONTINUE.


5.0  Who do you believe makes or puts out these jeans?
     RECORD RESPONSE VERBATIM.

     _Levi_

                         IF 'DON'T KNOW,' GO TO --> Q6.0;
                         OTHERWISE, CONTINUE.


5.1  Why do you say that?
     RECORD RESPONSE VERBATIM.

     _because as the design on the_
     _pocket_

                         IF 'DON'T KNOW,' GO TO --> Q6.0;
                         OTHERWISE, CONTINUE.


5.2  What else, if anything, makes you say that?
     RECORD RESPONSE VERBATIM.

     _they are dark colored and_
     _are straight legged and brown_
     _threading the brown patch_
                                        CONTINUE.


A&F Expert Discl. 00825

6.0   Now, I am going to ask you a question that has three
      choices.  **PAUSE.**  After I am done, if you want me to read
      the question again, just ask me.  **PAUSE.**

      Do you believe that the company that put out these
      jeans...**READ LIST**...

            one, **has** a business affiliation or business connection
            with any other company or companies;

            two, does **not** have a business affiliation or business
            connection with any other company or companies; or

            three, don't know or have no opinion?

      **RECORD RESPONSE VERBATIM.**

      _____

      _____
      IF '...HAS A BUSINESS AFFILIATION/CONNECTION...,' CONTINUE;
                              OTHERWISE, GO TO --> Q7.0.

6.1   What other company or companies?
      **RECORD RESPONSE VERBATIM.**

      _____

      _____
      IF 'DON'T KNOW' COMPANY/COMPANIES' NAME(S), GO TO --> Q7.0;
                                  OTHERWISE, CONTINUE.

6.2   Why do you say that?
      **RECORD RESPONSE VERBATIM.**

      _____

      _____
                        IF 'DON'T KNOW,' GO TO --> Q7.0;
                                  OTHERWISE, CONTINUE.

6.3   What else, if anything, makes you say that?
      **RECORD RESPONSE VERBATIM.**

      _____

      _____

      _____
                                          CONTINUE.

A&F Expert Discl. 00826

1430

7.0   Now, I am going to ask you another question that has three
      choices.   PAUSE.   After I am done, if you want me to read
      the question again, just ask me.   PAUSE.

      Do you believe that these jeans...READ LIST...

            one, are being put out with the authorization or
            approval of any other company or companies;

            two, are not being put out with the authorization or
            approval of any other company or companies; or

            three, don't know or have no opinion?

**RECORD RESPONSE VERBATIM.**

_I think they are being put out_
_while authorization_

      IF '...PUT OUT WITH AUTHORIZATION/APPROVAL....,' CONTINUE;
                                         OTHERWISE, GO TO --> Q8.0.


7.1   What other company or companies?
      **RECORD RESPONSE VERBATIM.**

_Levi_

      IF 'DON'T KNOW' COMPANY/COMPANIES' NAME(S), GO TO --> Q8.0;
                                         OTHERWISE, CONTINUE.


7.2   Why do you say that?
      **RECORD RESPONSE VERBATIM.**

_because it is a good_
_jean company_

                        IF 'DON'T KNOW,' GO TO Q8.0;
                                         OTHERWISE, CONTINUE.


7.3   What else, if anything, makes you say that?
      **RECORD RESPONSE VERBATIM.**

_Because they don't run very quickly_

                                         CONTINUE.


8.0   Would you please tell me what letter is on the back of the
      photograph?
      **RECORD LETTER AND CONTINUS.**

_W_


8.1   **PUT PHOTOGRAPH IN FILE, OUT OF SIGHT, AND CONTINUE.**


A&F Expert Discl. 00827

**VERIFICATION:**

Finally, may I please have your name and telephone number? This information is so that my Supervisor can verify a portion of my work. If you are contacted, it will only be to confirm that I conducted this interview and for no other reason.

Respondent Name: _____

Telephone Number: _____

Is that a daytime or evening telephone number
**RECORD RESPONSE WITH AN 'X.'**

    X    1.   daytime telephone number

    ✓    2.   evening telephone number

**THANK RESPONDENT FOR HER TIME AND PARTICIPATION.**

---

**Interviewer Certification:**

I hereby certify that the information contained on this Questionnaire is a true and accurate record of this respondent's comments, as they were given to me.

_____     5-13-0 ___
Interviewer's signature (no initials)     Date

---

**Supervisor Validation:**

I hereby certify that I personally met this respondent and validated her participation in the survey and answers to Q1.0 through Q2.1.

_____
Supervisor's signature (no initials)

A&F Expert Discl. 00828

# EXHIBIT F



# EXHIBIT G

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Levi Strauss & Co.,            )
Plaintiff/Counterdefendant, )
        vs.                    ) Case No.
Abercrombie & Fitch            ) C 07-03752 JSW
Trading Co.,                   )
Defendant/Counterclaimant.  )

_____

Abercrombie & Fitch            )
Trading Co.,                   )
Defendant/Counterclaimant, )
        vs.                    )
Levi Strauss & Co.,            )
Plaintiff/Counterdefendant.) CONFIDENTIAL

**ORIGINAL**

**CONFIDENTIAL**

- - -

        Videotape deposition of Nicole Sanger, a
witness herein, called by Levi Strauss & Co., for
examination under the statute, taken before me,
Valerie J. Grubaugh, Registered Professional
Reporter, Certified Realtime Reporter and Notary
Public in and for the State of Ohio, pursuant to
notice and stipulations of counsel hereinafter set
forth, at Abercrombie & Fitch Trading Co., 6301
Fitch Path, New Albany, Ohio, on Thursday, May 29,
2008, beginning at 9:30 o'clock a.m. and
concluding on the same day.

        - - -

**Transcript was not signed
by the Witness within the
statutory period, in accordance
with Federal Rule 30 (e)**

NICOLE SANGER    May 29, 2008
CONFIDENTIAL

1      Q.   Okay.  Let me show you Exhibit 228.  Have

2   you ever seen the pocket stitching that appears on

3   those jeans?

4      A.   No.

01:39   5      Q.   Okay.  Have you ever heard of the Indigo

6   Red brand?

7      A.   Uh-uh.  No.

8      Q.   I'll leave it out.  Do you have any role

9   in merchandising denim at the stores, at the

01:39   10   retailers --

11      A.   No.

12      Q.   -- at the retail stores?

13      A.   No.

14      Q.   And you don't have any role in the visual

01:40   15   planning of how the store should look?

16      A.   No.

17      Q.   Okay.  And do you have any role in

18   developing denim products at the company?

19      A.   No.

01:40   20      Q.   Let me see a few things here.

21          Who is in charge -- do you know who is in

22   charge of the department of -- of -- Do you know

23   who is in charge of making decisions about how the

24   denim products ought to be displayed in the Ruehl

01:40   25   stores at retail?

**EXHIBIT H**

REID WILSON, ESQ.   May 28, 2008
CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Levi Strauss & Co.,          )
Plaintiff/Counterdefendant,)
     vs.                     )Case No.
Abercrombie & Fitch          ) C 07-03752 JSW
Trading Co.,                 )
Defendant/Counterclaimant. )
_____

Abercrombie & Fitch          )
Trading Co.,                 )
Defendant/Counterclaimant, )
     vs.                     )   CONFIDENTIAL
Levi Strauss & Co.,          )
Plaintiff/Counterdefendant.)

                    - - -

        Videotape deposition of Reid Wilson,

Esq., a witness herein, called by Levi Strauss &

Co., for examination under the statute, taken

before me, Valerie J. Grubaugh, Registered

Professional Reporter, Certified Realtime Reporter

and Notary Public in and for the State of Ohio,

pursuant to notice and stipulations of counsel

hereinafter set forth, at Abercrombie & Fitch

Trading Co., 6301 Fitch Path, New Albany, Ohio, on

Wednesday, May 28, 2008, beginning at 9:32 o'clock

a.m. and concluding on the same day.

                    - - -

d8063847-7a1f-43a7-bf48-7fe50de2dd8b

REID WILSON, ESQ.    May 28, 2008
CONFIDENTIAL

Page 142

1    belonging to the -- to the owner of the -- of the

2    Lee jeans brand?

3        A.    I believe so.

4            MR. GILCHRIST:  Let me ask you to

5    mark 224.

6                        - - -

7            Thereupon, Exhibit No. 224 was marked

8            for purposes of identification.

9                        - - -

10   BY MR. GILCHRIST:

11       Q.    Has -- Do you know if you've seen the

12   contents of Record No. 232 that appears on

13   Exhibit 224?

14       A.    I believe so.

15       Q.    Do you see that the registrant of the

16   trademark is the H.D. Lee Company, Inc.?

17       A.    Yes.

18       Q.    Do you understand that H.D. Lee Company,

19   Inc. still owns that brand?

20       A.    Based on this document, I would think so.

21       Q.    Do you know if anywhere in the Ruehl

22   products there's any reference -- or -- or the

23   Ruehl store, for that matter -- there is any

24   reference to Abercrombie & Fitch?

25       A.    Not to my knowledge.

Merrill Legal Solutions
(800) 869-9132

d8063847-7a1f-43a7-bf48-7fe50de2dd8b

REID WILSON, ESQ.    May 28, 2008
CONFIDENTIAL

Page 143

1      Q.    Do you know if that's a deliberate
2   decision the company has made?
3      A.    I believe so.
4      Q.    Going back to Exhibit 221.  It's Bates
5   number 1131.
6      A.    Okay.
7      Q.    Did anyone in the business come to the
8   legal department and ask for clearance for that
9   design, or something similar to it?
10          MR. KEYES:  Objection.  Excuse me.
11   Objection.  Calls for attorney/client privileged
12   information.
13          MR. GILCHRIST:  It's attorney/client
14   privileged information if the legal department is
15   asked to clear this mark?
16          MR. KEYES:  Yes, if someone has -- came
17   and asked specifically for the legal department to
18   make a legal determination as to a particular
19   design, yes, that calls for revealing
20   attorney/client discussions in the communications.
21          MR. GILCHRIST:  Is that going to be --
22   the same answer going to be for all the designs
23   except for the one that's at issue?
24          MR. KEYES:  Well, I hate to speculate as
25   to what the objection is going to be, Greg, but --

Merrill Legal Solutions
(800) 869-9132

d8063847-7a1f-43a7-bf48-7fe50de2dd8b

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

– – –

Levi Strauss & Co.,                     )

    Plaintiff/                       )

    Counterdefendant,)

       vs.                        )  Case No.C07-03752 JSW

Abercrombie & Fitch                     )

Trading Co.,                            )

    Defendant/                       )

    Counterclaimant. )

_____)

Abercrombie & Fitch                     )

Trading Co.,                            )

    Defendant/                       )

    Counterclaimant, )

       vs.                        )

Levi Strauss & Co.,                     )

    Plaintiff/                       )  CONFIDENTIAL

    Counterdefendant.)

**ORIGINAL**

**CONFIDENTIAL**

Transcript was not signed
by the Witness within the
statutory period, in accordance
with Federal Rule 30 (e)

– – –

VIDEOTAPED DEPOSITION OF JOHN URBANO

– – –

TAKEN ON WEDNESDAY, MAY 28, 2008

– – –

JOHN URBANO   May 28, 2008
CONFIDENTIAL

| | | |
|---|---|---|
| 11:21 | 1 | kids fall in love with it.  Make it emotional." |
| | 2 | Q.   Are you aware that there is a video |
| | 3 | currently on YouTube that shows models in Ruehl |
| | 4 | product in a -- in a bedroom and bathroom setting? |
| 11:22 | 5 | MS. DAVIDSON:  Objection, lack of |
| | 6 | foundation. |
| | 7 | THE WITNESS:  It was brought to my |
| | 8 | attention that a film we had shot for in-house, not |
| | 9 | public use only, ended up on YouTube. |
| 11:22 | 10 | BY MS. CINCONE: |
| | 11 | Q.   Have you watched the video on YouTube? |
| | 12 | A.   I looked at maybe ten seconds of the |
| | 13 | video on YouTube. |
| | 14 | Q.   Did you recognize the video from that |
| 11:22 | 15 | ten-second viewing? |
| | 16 | A.   Of course. |
| | 17 | Q.   And what is it? |
| | 18 | MS. DAVIDSON:  Objection.  Vague and |
| | 19 | ambiguous. |
| 11:23 | 20 | BY MS. CINCONE: |
| | 21 | Q.   What did you recognize it to be? |
| | 22 | A.   I recognized it to be a denim training |
| | 23 | video that we shot for Ruehl. |
| | 24 | Q.   One of these two denim training videos |
| 11:23 | 25 | that you have discussed? |

58

# EXHIBIT J

| %CoName% | | |
|---|---|---|
| Date : 02/08/07 | Name : 75933g3 | Scale : 1.000 : 1.0 |
| Stitches : 627 | Ref : ruehl pocket 3 - Jaime P | Width : 130.28 |
| Customer : Unspecified | | Height : 43.21 |



| Threads Used | | Colour Sequence | |
|---|---|---|---|
| ▨ (1) Thread | | 1 ▨ | |
| ▨ (2) Thread | | 2 ▨ | |
| | | 1 ▨ | |

Description / Special Instructions :

A&F RFP#1
0012



**RIGHT**

LSC v. A&F 26(a)
1133



RIGHT



# EXHIBIT K

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Levi Strauss & Co.,            )
Plaintiff/Counterdefendant,)
     vs.                      )Case No.
Abercrombie & Fitch            ) C 07-03752 JSW
Trading Co.,                   )
Defendant/Counterclaimant. )

_____

Abercrombie & Fitch            )
Trading Co.,                   )
Defendant/Counterclaimant, )
     vs.                      )
Levi Strauss & Co.,            )
Plaintiff/Counterdefendant.) CONFIDENTIAL

ORIGINAL

CONFIDENTIAL

- - -

     Videotape deposition of Kevin Cothren, a
witness herein, called by Levi Strauss & Co., for
examination under the statute, taken before me,
Valerie J. Grubaugh, Registered Professional
Reporter, Certified Realtime Reporter and Notary
Public in and for the State of Ohio, pursuant to
notice and stipulations of counsel hereinafter set
forth, at Abercrombie & Fitch Trading Co., 6301
Fitch Path, New Albany, Ohio, on Friday, May 30,
2008, beginning at 10:06 o'clock a.m. and
concluding on the same day.

               - - -

Transcript was not signed
by the Witness within the
statutory period, in accordance
with Federal Rule 30 (e)

KEVIN COTHREN    May 30, 2008
CONFIDENTIAL

1    were other submissions that we then later said,

2    "No, we don't like those".

3         Q.    Okay.  I see.  Thank you for that

4    clarification.

02:06    5         A.    Okay.

6         Q.    All right.  Looking through Exhibit 221,

7    can you see any of the designs in there that

8    previously, or in this same design creation

9    effort, were submitted to legal for review?

02:07    10         A.    I believe most of these actually were

11    submitted.

12         Q.    Let me show you Exhibits 222, I hope,

13    and 225.  And my questions -- And take your time

14    and look through those if you want.

02:07    15         My -- My question is whether or not the

16    drawings in those exhibits that I've just handed

17    you are all variants of alternative stitching

18    designs that were considered in this process of

19    trying to find a stitching design in the -- in the

02:08    20    mid to late '05 time frame?

21         A.    Yeah.  I mean -- Yep.

22         Q.    Okay.  Are there any -- Are there any

23    basic forms of designs that were under

24    consideration that do not appear in any of those

02:08    25    three exhibits?

25

**EXHIBIT L**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


LEVI STRAUSS & CO.,         )
                         )
       Plaintiff,     )
                         )
     vs.               ) No. CV-07-3752
                         )
ABERCROMBIE & FITCH TRADING CO., )
                         )
       Defendant.     )
_____)


ORIGINAL


DEPOSITION OF SANJAY SOOD, Ph.D.

Los Angeles, California

Thursday, July 24, 2008


Reported by:
NANCY L. COLLIER
CSR No. 5819
JOB No. 929020

Page 1

```
 1              part of the final paper, and so we'll put together

 2              surveys that ask questions about whatever specific

 3              conceptual framework we're trying to test.

 4                   Q    Okay.  How many surveys have you conducted?

 5    00:51     A    Dozens.

 6                   Q    So more than 12?

 7              A    More than 12.

 8                   Q    More than 24?

 9              A    More than 24.

10    00:51     Q    Can you give me a ballpark estimation of

11              how many consumer surveys you've conducted?

12              A    Probably 80 to 90.

13                   Q    And out of those 80 to 90, how many of

14              those consumer surveys were calibrated to test the

15    00:51     likelihood of confusion between two trademarks?

16              A    None.  This was the first confusion study.

17                   Q    And out of those 80 to 90 consumer surveys

18              that you did, how many were calibrated to assess

19              whether a particular trademark had been diluted or

20    00:51     was likely to be diluted?

21              A    Well, as I mentioned, diluted in the

22              academic sense, I've done dilution of attitudes

23              prior to this work, but dilution in the kind of

24              legal sense or for a legal case, I have not created

25    00:52     a survey for that before.
```

Page 36

1     discussed earlier.

2          Q     Did you look at the questionnaires in that

3     case?

4          A     I'm not sure if I had the questionnaire

5  00:53  itself.  I mean, I clearly remember how that survey

6     was conducted.  I mean, these surveys are not that

7     complicated.

8          Q     Likelihood of confusion surveys aren't that

9     complicated?

10 00:53     A     In terms of, you know, how many questions

11    are asked and the -- you know, traditionally in the

12    academic research that we do we have experimental

13    designs which manipulate several factors sometimes

14    simultaneously, so these surveys are much simpler

15 00:54  in relation to the surveys that I do for my

16    academic research.

17         Q     What's your basis for saying they're much

18    more simpler?

19         A     In the academic research we're looking at

20 00:54  manipulating several factors in a survey itself, so

21    we might manipulate how a product is described, the

22    categories which a new brand goes into, the name of

23    the new brand in the categories in which it goes

24    into, so there are several treatment variables and

25 00:54  multiple treatment conditions.

Page 38

1   to put a monetary number on how much brand equity

2   is worth.

3     Q What's the basis -- well, and you came to a

4   particular opinion on whether A&F's use of its back

5  02:31 pocket stitching design was likely to cause

6   dilution; is that correct?

7     A Yes.

8     Q And what's your opinion in that regard?

9     A Based on the surveys that I conducted, it

10  02:32 does seem as though the Ruehl jean is diluting the

11   Levi's mark in the sense that it's less

12   distinctive.

13     Q Did you conduct a separate survey to

14   measure likelihood of dilution?

15  02:32   A That would be the survey.  So let me step

16   back for a second.  If there is confusion between

17   the Levi's pocket stitching and the Ruehl pocket

18   stitching, then just by the nature of the

19   confusion, that would lead to dilution of the

20  02:32 Levi's brand.

21     Q So am I understanding correctly that you're

22   relying on the Likelihood of Confusion survey to

23   show that there is a likelihood of dilution?

24     A Yes.

25  02:32   Q Are you aware of any court cases that would

Page 93

```
 1            support your opinion that the likelihood of

 2            confusion can also mean likelihood of dilution?

 3                 A    No.  As I said, I'm not an expert in case

 4            law.

 5   02:33    Q    So do you believe that the same consumers

 6            that are confused can also be the same consumers

 7            that would be diluted?

 8                 A    Yes, so for example --

 9                 MR. GILCHRIST:  I think the question is

10   02:33    vague, but sounds like you have an answer, so go

11            ahead.

12                 THE WITNESS:  For example, in this study,

13            if somebody is confused between the Ruehl pocket

14            stitching and the Levi's pocket stitching, they may

15   02:33    make mistaken inferences about who the likely user

16            of a Ruehl jean or a Levi's jean, or they may be

17            interested in buying one versus the other and go

18            into -- get interested in the mistaken brand that

19            they're confused for, so that would be one type of

20   02:34    dilution.

21            BY MR. KEYES:

22                 Q    Do you have an understanding as to what is

23            meant by "dilution by tarnishment"?

24                 A    No.

25   02:34    Q    Do you have an understanding as to what is
```

ESQUIRE DEPOSITION SERVICES
(800) 640-2461

```
 1              recognize the back pocket stitching.

 2              BY MR. KEYES:

 3                   Q    Will you turn to Exhibit 5?  Will you

 4              read -- this is the questionnaire on your Jeans

 5   02:38      Recognition survey; correct?

 6                   A    Yes.

 7                   Q    Can you read Question No. 1?

 8                   A    "Have you seen jeans with this style of

 9              pocket stitching before?"

10   02:38           Q    By "this style" what did you mean?

11                   A    The back pocket stitching.

12                   Q    But as you sit here today, you don't know

13              if people interpret that to mean the color of the

14              back pocket stitching, do you?

15   02:38           A    Are you referring to the word "style"?

16                   Q    Correct.

17                   A    I suppose certainly with any question, any

18              survey, you never know quite for sure how people

19              are going to interpret it, and there could be some

20   02:38      people who interpret it in the way that you are

21              suggesting, that the style of the pocket could

22              refer to the color or something, but we did not

23              seem to have that sort of issue.

24                        I mean, one thing that we try and do -- try

25   02:39      to do to protect against would be to say the style
```

ESQUIRE DEPOSITION SERVICES
(800) 640-2461

# EXHIBIT M

```
 1 | MICHAEL J. BETTINGER (State Bar No. 122196)
   | RACHEL R. DAVIDSON (State Bar No. 215517)
 2 | KIRKPATRICK & LOCKHART
   | PRESTON GATES ELLIS LLP
 3 | 55 Second Street, Suite 1700
   | San Francisco, California  94105
 4 | Telephone:  415-882-8200
   | Facsimile:  415-882-8220
 5 |
   | J. MICHAEL KEYES (Pro Hac Vice)
 6 | KIRKPATRICK & LOCKHART
   | PRESTON GATES ELLIS LLP
 7 | 618 West Riverside Avenue, Suite 300
   | Spokane, Washington  99201
 8 | Telephone:  509-624-2100
   | Facsimile:  509-456-0146
 9 |
   | Attorneys for Defendant
10 | ABERCROMBIE & FITCH TRADING CO.
11 |
   |           UNITED STATES DISTRICT COURT
12 |
   |          NORTHERN DISTRICT OF CALIFORNIA
13 |
14 | LEVI STRAUSS & CO.,              )   No. CV-07-3752
   |                                  )
15 |          Plaintiff,             )   Rebuttal Declaration
   |                                  )   of Dr. Gerald L. Ford
16 |      v.                          )
   |                                  )
17 | ABERCROMBIE & FITCH TRADING CO., )
   |                                  )
18 |          Defendant.             )
   | _____)
19 |
20 |          I, Dr. Gerald L. Ford, hereby declare as follows:
21 |                         INTRODUCTION
22 |          1.   I am a partner in the marketing research and
23 | consulting firm of Ford Bubala & Associates, located in
24 | Huntington Beach, California, where I have been engaged in
25 | commercial marketing research and consulting for the past thirty-
26 | three years.  I am also an emeritus faculty member of the School
27 | of Business Administration, California State University, Long
28 | ///
```

1  Beach, where I held a full-time teaching position for twenty-five

2  years, prior to my retirement in 1994.

3          2.   I am the same Gerald L. Ford who previously filed

4  a Declaration and Rule 26 Report detailing the results of a

5  likelihood of confusion survey that I designed and caused to be

6  conducted in this matter.  For the convenience of the court, my

7  professional experience is summarized below in paragraphs 34

8  through 44.

9          3.   In the instant matter, at the request of

10  Kirkpatrick & Lockhart Preston Gates Ellis LLP, counsel for

11  Defendant, Abercrombie & Fitch Trading Co. ("A&F"), I have been

12  asked to review and comment on two surveys designed by Associate

13  Professor Sanjay Sood ("Sood") on behalf of Plaintiff Levi

14  Strauss & Company ("LS&CO").  One survey was purportedly designed

15  to measure post-sale likelihood of confusion with respect to the

16  stitching design on the back pockets of the Ruehl brand jeans

17  being sold by Defendant, A&F.  The other survey was purportedly

18  designed to measure the degree of recognition of the stitching

19  design on the back pockets of Levi jeans.

20          4.   The Sood survey, which was purportedly designed to

21  measure likelihood of confusion, was not conducted according to

22  generally accepted principles in a number of respects.  The Sood

23  likelihood of confusion survey is riddled with flaws which render

24  the results meaningless with respect to the conclusions Sood

25  draws from the survey results.  Specifically, the Sood likelihood

26  of confusion survey suffers from leading questions and procedures

27  that suffered from demand effects, lack of a control,

28  ///

1   underinclusive universe, lack of marketplace conditions, order

2   bias, and lack of an explicit "don't know" alternative.

3       5.    The Sood survey, which was purportedly designed to

4   measure the recognition of the stitching design on the back

5   pockets of Levi jeans, was also not conducted according to

6   generally accepted principles in a number of respects.  The Sood

7   recognition survey is also riddled with flaws which render the

8   survey results meaningless with respect to the conclusions Sood

9   draws from the survey results.  Specifically, the Sood

10  recognition survey suffers from spurious recognition, ambiguous

11  questions, order bias, and lack of a control.

12              SOOD - LIKELIHOOD OF CONFUSION SURVEY

13      6.    In an attempt to offer evidence of a likelihood of

14  confusion, Sood offers a survey design that has been repeatedly

15  rejected by courts.  See National Distillers Products Co., LLC v.

16  Refreshment Brands, Inc, 198 F. Supp. 2d 474 (S.D.N.Y. 2002);

17  Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 452 F. Supp. 2d

18  772 (W.D. Mich. 2006); Kargo Global, Inc. v. Advance Magazine

19  Publishers, Inc., 2007 U.S. Dist. LEXIS 57320 (S.D.N.Y 2007); and

20  Simon Property Group L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033

21  (S.D. Ind. 2000).

22      7.    In the Sood likelihood of confusion survey,

23  respondents were initially shown a photograph of someone wearing

24  a pair of Levi jeans (the photograph showed the stitching design

25  on the left rear pocket as well as part of the left leg of the

26  Levi jeans).  After a respondent was finished viewing the

27  photograph, it was put away in an envelope and removed from

28  sight.  Subsequently, respondents were shown four photographs.

1   One showed someone wearing a pair of Ruehl jeans, one showed

2   someone wearing a pair of Citizens jeans, one showed someone

3   wearing a pair of Seven jeans, and one showed someone wearing a

4   pair of True Religion jeans (these photographs also showed the

5   stitching design on the left rear pocket of each pair of jeans as

6   well as part of the leg of each of the jeans).  Each of these

7   four photographs was then pinned to a wall side-by-side.  While

8   viewing these four photographs, respondents were asked:

9       Do you think that any of these jeans are made,
       sponsored or endorsed by the same company that made the
10      jeans you saw in the first picture?

11     Or,

12     Do you think that none of these jeans are made,
       sponsored or endorsed by the same company that made the
13      jeans you saw in the first picture?

14   <u>Leading Questions and Procedures</u>

15       8.   Surveys which employ leading or suggestive

16   questions do not provide an appropriate measurement for

17   likelihood of confusion in Lanham Act matters.  In the instant

18   matter, the Sood survey was clearly suggestive.  Survey

19   respondents were first shown the Levi pocket design and then were

20   shown, simultaneously, the pocket design of four brands of jeans,

21   including Defendant's Ruehl pocket design.  Respondents were then

22   asked if any of the jeans in the four photographs were made,

23   sponsored or endorsed by the same company that made the jeans in

24   the first photograph.  This procedure not only suggested that

25   survey respondents should find a connection between the Levi

26   jeans and one of the four pairs of jeans in the photographs but

27   also, because there were no word marks on the jeans, improperly

28   suggested that respondents find a connection specifically with

1    one of the pairs of jeans with the closest similarity to one they

2    had seen earlier.  The Sood question is akin to the well-known

3    "Where's Waldo?" game where here respondents are challenged to

4    find the picture which most closely matches the Levi pocket

5    design they were shown first.

6            9.    There was simply no reason to show survey

7    respondents the Levi jeans.  I understand that Plaintiff claims

8    that its pocket design is famous for dilution purposes and, as

9    such, it was unnecessary to show the Levi pocket stitching prior

10   to a lineup of pocket stitching on other brands of jeans.[1]  The

11   use of a traditional likelihood of confusion survey format would

12   have provided a reliable indication of likelihood of confusion,

13   to the extent that such likelihood of confusion exists.  Under a

14   traditional format survey, respondents would have been simply

15   shown the pocket design on the Ruehl jeans and asked questions

16   with respect to the source, authorization/approval of, or

17   business affiliation/connection of the jeans, along with a

18   control cell to measure the extent to which non-trademark

19   confusion exists in the survey results.  See Leelanau, 452 F.

20   Supp. 2d 772, at 787; and Powerhouse Marks LLC v. Chi Hsin Impex,

21   Inc., 2006 U.S. Dist. LEXIS 16454, at *12 (E.D. Mich. 2006).  Yet

22   Sood chose not to employ the traditional or standard likelihood

23   of confusion survey format even though the traditional or

24

25          [1]    For his survey, Sood used what is oftentimes referred
26   to as a Squirt design (i.e., show a respondent plaintiff's
     trademark and then show a respondent defendant's trademark).  It
27   has been suggested that this survey design can be used for weak
     marks under certain conditions.  See Jerre B. Swann, "Likelihood
28   of Confusion Studies and the Straitened Scope of Squirt," 98 TMR
     739 (2008).

1  standard format has been previously employed and relied upon by

2  LS&CO's prior expert in numerous other litigations.  See

3  documents bearing document control numbers LS-A&F009526 through

4  LS-A&F009621 and LS-A&F009627 through LS-A&F009665.

5  <u>Demand Effects</u>

6          10.  Rather than measuring any actual likelihood of

7  confusion, the Sood survey questions and procedures generated

8  "demand effects" by suggesting to the survey respondents the

9  existence of a connection between the jeans in the first

10  photograph and one of the jeans in the set of four photographs by

11  suggesting to the survey respondents the existence of a

12  connection that the survey respondents would not have made on

13  their own.  Specifically, a question that asks survey respondents

14  whether or not products are put out by the same or related

15  sources is likely to generate demand effects by suggesting to

16  survey respondents, at least implicitly, that they should believe

17  that there is some sort of relationship between one or more of

18  the products when the possibility might not have occurred to

19  consumers who encounter the alleged infringing product by itself.

20  See <u>Kargo</u>, 2007 U.S. Dist. LEXIS 57320, at *24; and <u>Simon</u>

21  <u>Property Group</u>, 104 F. Supp. 2d 1033, at 1048.

22          The response alternative in a closed-ended question may
          remind respondents of options that they would not
23          otherwise consider.
          Shari Seidman Diamond "Reference Guide on Survey Research,"
24          in the Federal Judicial Center's <u>Reference Manual on</u>
          <u>Scientific Evidence, Second</u>, page 252.

25

26          11.  A number of courts faced with survey questions

27  suffering from demand effects, similar to the question employed

28  by Sood, have dismissed the results as biased overestimates of a

1   likelihood of confusion.  See <u>Simon Property</u>, 104 F. Supp. 2d,

2   1033, at 1048 ("The question about whether the two items are put

3   out by the same or related source is likely to generate so-called

4   'demand effects' that bias the survey by suggesting to

5   respondents, at least implicitly, that they should believe there

6   is at least some sort of relationship between the different items

7   when the possibility might not even have occurred to the vast

8   majority of consumers who see the items."); also see <u>Gov't</u>

9   <u>Employees Ins. Co. v. Google, Inc.</u>, 2005 U.S. Dist. LEXIS 18642,

10  at *23 (E.D. Va. 2005) ("[D]emand effect results when the

11  interviewer's question or other elements of the survey design

12  influence participants' responses by suggesting what the

13  'correct' answers might be or by implying associations that might

14  not otherwise occur to participants."); also see <u>Kargo</u>, 2007 U.S.

15  Dist. LEXIS 57320, at *25 ("In other words, the mere putting of a

16  question creates the impression of a relationship.")

17          12.   Similarly, other courts have also found questions

18  similar to the Sood question inappropriate and biased.  See <u>Wuv's</u>

19  <u>International, Inc. v. Love's Enterprises, Inc.</u>, 1980 U.S. Dist.

20  LEXIS 16512, at *65 (D. Colo. 1980); <u>Beneficial Corporation v.</u>

21  <u>Beneficial Capital Corporation</u>, 529 F. Supp. 445, at 450

22  (S.D.N.Y. 1982); and <u>Riviana Foods, Inc. v. Societe des Produits</u>

23  <u>Nestle, S.A. and Nestle Food Company</u>, 1994 U.S. Dist. LEXIS

24  20267, at *9-*10 (S.D. Tex. 1994).

25  ///

26  ///

27  ///

28  ///

Rebuttal Declaration          - 7 -
of Dr. Gerald L. Ford

1    <u>Lack of a Control Cell</u>

2         13.   The Sood survey design did not employ a control

3    cell.  As noted by Professor Diamond:

4              Every measure of opinion or belief in a survey
               reflect some degree of error.  Control groups and [in-
5              treatment] control questions are the most reliable
               means for assessing response levels against the
6              baseline level of error associated with a particular
               question.
7         Shari Seidman Diamond "Reference Guide on Survey
          Research," in the Federal Judicial Center's <u>Reference</u>
8         <u>Manual on Scientific Evidence, Second</u>, page 260.

9         14.   Today, most Lanham Act surveys designed to address

10   the issue of likelihood of confusion employ a traditional

11   scientific experimental survey design consisting of two survey

12   cells:  (1) a test or experimental survey cell designed to

13   measure the likelihood of confusion, if any, with respect to the

14   source, approval of, or a business affiliation/connection of a

15   product or service bearing an allegedly infringing mark; and, (2)

16   a control survey cell.

17        15.   A control survey cell provides a measure of the

18   extent to which non-trademark confusion exists in the survey

19   results.  That is, a control survey cell functions as a baseline

20   and provides a measure of the degree to which respondents'

21   answers are not a result of likelihood of confusion but a result

22   of other factors, such as the survey's questions, the survey's

23   procedures, the nature of the product, or some other potential

24   influence on a respondent's answer.  Again, as Professor Diamond

25   notes:

26   ///

27   ///

28   ///

1          It is possible to adjust many survey designs so
2    that causal inferences about the effect of a trademark
     or an allegedly deceptive commercial become clear and
     unambiguous.  By adding an appropriate control group,
3    the survey expert can test directly the influence of
     the stimulus...Respondents in both the experimental and
4    control groups answer the same set of questions.  The
     effect of the allegedly deceptive message [or the
5    allegedly confusing trademark] is evaluated by
     comparing the responses made by the experimental group
6    members with those of the control group members...Both
     preexisting beliefs and other background noise should
7    have produced similar response levels in the
     experimental and control groups.  In addition, if
8    respondents who viewed the allegedly deceptive
     commercial [or the allegedly infringing trademark]
9    respond differently than respondents who viewed the
     control commercial [control trademark], the difference
10   cannot be the result of a leading question, because
     both groups answered the same question...
11   Shari Seidman Diamond "Reference Guide on Survey Research,"
     in the Federal Judicial Center's <u>Reference Manual on</u>
12   <u>Scientific Evidence, Second</u>, pages 257-258.

13        16.  Without an appropriate control cell, the degree of

14   error in the Sood likelihood of confusion survey results cannot

15   be estimated.  See <u>Simon Property Group</u>, 104 F. Supp. 2d 1033, at

16   1048.

17   <u>Underinclusive Universe</u>

18        17.  The Sood survey universe is clearly

19   underinclusive.  Sood claims that his survey was designed to test

20   for likelihood of confusion in a post-sale environment.  As such,

21   the appropriate survey universe would be a fair sampling of those

22   potential purchasers who are likely to be exposed to the alleged

23   infringing mark in the post-sale marketplace, specifically,

24   females who are likely to purchase jeans for themselves.  This

25   would include a representative sample of all females thirteen

26   (13) years of age or older or alternatively all females eighteen

27   (18) years of age or older who are likely to purchase jeans for

28   themselves.

1      18.   Instead, Sood's survey universe was limited to

2  females twenty (20) to forty-five (45) years of age who reported

3  that they had purchased a pair of jeans in the past six months

4  that cost seventy-five dollars ($75.00) or more or were likely to

5  purchase jeans in the next six months that cost seventy-five

6  dollars ($75.00) or more.  By excluding females who had not

7  purchased jeans which cost seventy-five dollars ($75.00) or more

8  in the past six months or who were not likely to purchase jeans

9  which cost seventy-five dollars ($75.00) or more in the next six

10  months, Sood's survey universe definition excludes approximately

11  eighty percent (80%) of female jean purchasers and, thus, the

12  Sood survey universe is grossly underinclusive.  See

13  LS-A&F040233.

14      19.   Sood offers no empirical evidence that only

15  females twenty (20) to forty-five (45) years of age who in the

16  past six months purchased jeans which cost seventy-five dollars

17  ($75.00) or more or were likely to purchase jeans which cost

18  seventy-five dollars (75.00) or more in the next six months are

19  likely to notice the pocket stitching on the Ruehl jeans in a

20  post-sale environment.[2]

21  Lack of Marketplace Conditions

22      20.   It is my understanding that there are literally

23  hundreds of brands of jeans with pocket stitching on the back

24  pockets.  The probability that a person would see only the left

25  rear pocket of a pair of Levi jeans and then seconds later

26  encounter simultaneously four females with one wearing a pair of

27  _____

28          [2]   In a post-sale environment, one would not know that an
unknown brand of jeans costs $75.00 or more.

Rebuttal Declaration                    - 10 -
of Dr. Gerald L. Ford

1   Ruehl jeans, one wearing a pair of Citizens jeans, one wearing a

2   pair of Seven jeans, and one wearing a pair of True Religion

3   jeans is beyond remote.  Sood created an imaginary world in which

4   consumers would see the Levi pocket stitching and then the Levi

5   pocket stitching would be hidden and moments later would see

6   side-by-side the left rear pocket of a pair of Ruehl, Citizens,

7   Seven, and True Religion jeans, and then be asked a leading

8   question.  Simply, the Sood survey design does not match how the

9   Ruehl jeans are likely to be encountered in the post-sale

10  marketplace.

11          21.  Sood offers no empirical evidence that his survey

12  design, in any way, represents the manner in which the alleged

13  infringing pocket design is likely to be encountered in the post-

14  sale marketplace.  Overall, the Sood survey was a meaningless

15  exercise that had nothing to do with what would likely happen in

16  the actual marketplace.  As such, the Sood survey shows nothing

17  about likelihood of confusion in the post-sale marketplace.

18  <u>Order Bias</u>

19          22.  Finally, the Sood likelihood of confusion survey

20  questions appear to suffer from order bias.

21          The order in which questions are asked on a survey
            and the order in which response alternatives are
22          provided in a closed-ended question can influence the
            answers...
23          To control for order effects, the order of the
            questions and the order of the response choices in a
24          survey should be rotated...
            Shari Seidman Diamond "Reference Guide on Survey Research,"
25          in the Federal Judicial Center's <u>Reference Manual on
            Scientific Evidence, Second</u>, pages 254-255.
26

27  While Sood acknowledges the potential impact of order bias (see

28  Sood report, page 10) it does not appear that he took this

1   admonition to heart with respect to the closed-ended question

2   Sood poses to respondents.  Specifically, it appears that Sood

3   did not rotate the alternatives to the survey's critical

4   question.  See <u>Winning Ways, Inc. v. Holloway Sportswear, Inc.</u>,

5   913 F. Supp. 1454, at 1467 (D. Kan. 1996).

6   <u>Lack of an Explicit "Don't Know" Alternative</u>

7           23.    Additionally, it does not appear that respondents

8   were offered an explicit don't know/no opinion alternative to the

9   closed-ended critical question.

10          ...the survey can use a quasi-filter question to
        reduce guessing by providing "don't know" or "no
11      opinion" options as part of the question...By signaling
        to the respondent that it is appropriate not to have an
12      opinion, the question reduces the demand for an answer
        and, as a result, the inclination to hazard a guess
13      just to comply.  Respondents are more likely to choose
        a "no opinion" option if it is mentioned explicitly by
14      the interviewer than if it is merely accepted when the
        respondent spontaneously offers it as a response.  The
15      consequence of this change in format is substantial.
        Shari Seidman Diamond "Reference Guide on Survey Research,"
16      in the Federal Judicial Center's <u>Reference Manual on
        Scientific Evidence, Second</u>, page 250.  Also see Jerre B.
17      Swann, "Likelihood of Confusion Studies and the Straitened
        Scope of Squirt," 98 TMR at 742, Note 16 (2008).

18

19          24.    Thus, without a control cell, which is absent in

20  the Sood likelihood of confusion survey, there is no way to

21  estimate the level of error resulting from the order bias in the

22  survey questions and the lack of an explicit "don't know"

23  alternative to the survey's critical closed-ended question.

24  <u>Conclusion</u>

25          25.    The Sood survey, which was purportedly designed to

26  measure likelihood of confusion, was not conducted according to

27  generally accepted principles in a number of respects.  The Sood

28  likelihood of confusion survey is riddled with flaws which render

1  the results meaningless with respect to the conclusions Sood

2  draws from the survey results.

3                    SOOD - RECOGNITION SURVEY

4            26.   In the Sood recognition survey, respondents were

5  shown three photographs, each showing the pocket stitching on a

6  brand of jeans:  Levi jeans, Lee jeans, and Lucky jeans.[3]  For

7  each photograph, respondents were asked:

8       1.   Have you seen jeans with this style of pocket
             stitching before?
9

10 If respondents answered "no," they were shown the next photograph

11 of a pocket on a pair of jeans and were questioned with regard to

12 that pocket.  Respondents who said "yes" or "don't know"[4] if

13 they had seen jeans with the style of pocket stitching they were

14 shown, were asked:

15      2.   Do you associate jeans with this style of pocket
             stitching with (read the options to respondent and
16           show respondent the card with answers):  one brand
             or company, more than one brand or company, or
17           don't know?

18 It appears that all respondents who answered question two were

19 asked:

20      3.   What is the name of the brand(s) or companies that
             you associate with this product?
21

22 _____

23       [3]   Sood claims that Lee and Lucky jeans were selected as
   benchmarks "...because these brands (and their associated pocket
24 stitching) have been in the marketplace for many years, implying
   that consumers would likely have seen the distinctive pocket
25 stitching over time."  See Sood report, page 6.

26       [4]   Sood does not explain why respondents who reported that
   they did not know if they had "seen jeans with this style of
27 pocket stitching before" could reliably answer the second
   question "Do you associate jeans with this style of pocket
28 stitching with one brand or company, more than one brand or
   company, or don't know?"

Rebuttal Declaration                    - 13 -
of Dr. Gerald L. Ford

1 | Spurious Recognition

2 |          27.  Sood completely ignores the well-known problem of

3 | spurious recognition.  As noted by Professor Keller:

4 |          Any research measure must consider the issue of
   |          consumers making up responses or guessing.  That
5 |          problem may be especially evident with certain types of
   |          aided awareness or recognition measures for the brand.
6 |          Spurious awareness occurs when consumers erroneously
   |          claim they recall something that they really don't and
7 |          that maybe doesn't even exist.
   |          Kevin Lane Keller, Strategic Brand Management:  Building,
8 |          Measuring, and Managing Brand Equity, Third Edition, Pearson
   |          Prentice Hall, 2008, page 378.

9 |

10 | Thus, a control for guessing is necessary for a question like

11 | Sood's question one.  Professor Keller suggests that to provide a

12 | more sensitive test of recognition "...it is often useful to

13 | include decoys or lures - items that consumers could not possibly

14 | have seen."  See Kevin Lane Keller, Strategic Brand Management,

15 | at 374.

16 | Ambiguous Questions

17 |          28.  In the first question, Sood asked respondents,

18 | "Have you seen jeans with this style of pocket stitching before?"

19 | There is no way to determine what respondents understood by

20 | "style of pocket stitching."  For example, (1) was it just the

21 | idea of stitching running through the middle of the pocket; (2)

22 | was it the stitching on the sides, top, and bottom only; or (3)

23 | was it all the stitching on the pocket, including the stitching

24 | on the sides, top, and bottom and the stitching running through

25 | the middle of the pocket.  Regardless of what respondents may or

26 | may not have understood by "style of pocket stitching," it is

27 | clear that no respondent was ever asked if he/she had seen the

28 | specific design of pocket stitching shown on the Levi jeans

1  running through the middle of the pocket in the photograph.  It

2  is my understanding that it is this specific design to which

3  LS&CO is claiming rights.

4         29.  After asking respondents, in question one, "Have

5  you seen jeans with this style of pocket stitching before?"

6  [emphasis added] and asking respondents in question two, "Do you

7  associate jeans with this style of pocket stitching with:  one

8  brand or company, more than one brand or company, or don't know?"

9  [emphasis added] respondents were asked question three, "What is

10  the name of the brand(s) or companies that you associate with

11  this product?" [emphasis added].  Notably, question three is

12  directed away from pocket stitching and directed, instead, to the

13  product itself.  Clearly, this question does not measure the

14  degree of recognition and association of the Levi pocket

15  stitching design with LS&CO.

16  Order Bias

17         30.  Further, the Sood recognition survey also appears

18  to suffer from order bias.  Again, while Sood acknowledges the

19  potential impact of order bias (see Sood report, page 10), it

20  does not appear that he took this admonition to heart with

21  respect to Sood's closed-ended question two that was posed to

22  respondents.  Specifically, it appears that Sood did not rotate

23  the alternatives to question two. See Winning Ways, 913 F. Supp.

24  1454, at 1467 (D. Kan. 1996).  Also see Shari Seidman Diamond

25  "Reference Guide on Survey Research," in the Federal Judicial

26  Center's Reference Manual on Scientific Evidence, Second, pages

27  254-255.

28  ///

1    Lack of a Control Cell

2        31.  Again, without an appropriate control cell[5] or an

3    in-treatment control, which is absent in the Sood recognition

4    survey, there is no way to estimate the level of error resulting

5    from spurious recognition, ambiguous questions, and order bias in

6    Sood's survey questions.

7    Conclusion

8        32.  The Sood survey, which was purportedly designed to

9    measure the recognition of the stitching design on the back

10   pockets of Levi jeans, was also not conducted according to

11   generally accepted principles in a number of respects.  The Sood

12   recognition is also riddled with flaws which render the survey

13   results meaningless with respect to the conclusions Sood draws

14   from the survey results.

15                 EROSION OF DISTINCTIVENESS

16       33.  Based upon his likelihood of confusion survey,

17   Sood opines that:

18       ...31% of participants incorrectly associated Ruehl
         jeans with jeans by LS&CO.  In view of this high degree
19       of incorrect association, it is reasonable to conclude
         that LS&CO has suffered harm to its brand due to the
20       erosion in distinctiveness of the LS&CO's trademark
         pocket stitching.  See Sood report, page 3.
21

22   As an initial matter, Sood never asked any survey respondents if

23   they associated Ruehl jeans with jeans by LS&CO.  Additionally,

24   to the degree to which LS&CO has suffered harm to its brand, due

25   to the erosion in distinctiveness of the Levi pocket stitching,

26   there is no empirical evidence offered by Sood that this is, or

27
     _____
28
         [5]      Also see paragraphs 13 through 16.

1    in the future could be, the result of the pocket stitching on the

2    Ruehl jeans as opposed to the myriad of other pocket stitching

3    designs which are present in the marketplace.  Specifically, Sood

4    offers no empirical evidence that there has been any diminution

5    in the distinctiveness of the LS&CO pocket stitching design, and,

6    in particular, if such diminution has indeed happened, that it

7    was caused by or is attributable in any way to the Ruehl jeans

8    pocket stitching design.

9                        <u>QUALIFICATIONS</u>

10            34.   I hold a Bachelor's Degree in Advertising (B.A.)

11   from San Jose State University, a Master's Degree in Business

12   Administration (M.B.A.) from the University of Southern

13   California, and a Doctoral Degree in Business Administration

14   (D.B.A.) from the University of Southern California.

15            35.   During my twenty-five year academic appointment,

16   my teaching responsibilities included both graduate and

17   undergraduate level courses in a variety of subject areas.  My

18   teaching responsibilities included courses in marketing (e.g.,

19   marketing, marketing management, advertising, promotion, consumer

20   behavior, and marketing research) and management (e.g.,

21   principles of management; business policy and strategy; business

22   policies, operations, and organizations; and integrated

23   analysis).

24            36.   I am a member of the American Marketing

25   Association (AMA), the American Academy of Advertising (AAA), the

26   American Association of Public Opinion Research (AAPOR), the

27   Council of American Survey Research Organizations (CASRO), and

28   the International Trademark Association (INTA).

1      37.   As a partner with Ford Bubala & Associates, I have
2   been retained by a variety of firms engaged in the consumer
3   product, industrial product, and service sectors of the economy
4   to provide marketing consulting and research services.
5   Approximately one-half of Ford Bubala & Associates' consultancies
6   in which I have participated have involved the design and
7   execution of marketing research surveys.
8      38.   As previously noted, during the past thirty-three
9   years, I have been retained in a number of litigation-related
10  consultancies involving intellectual property matters, including
11  matters before federal and state courts, the Trademark Trial and
12  Appeal Board of the U.S. Patent and Trademark Office, and the
13  International Trade Commission.  I have designed and executed
14  surveys relating to intellectual property matters, including
15  false advertising, trademark, patent, and other related matters.
16  I am familiar with the accepted principles of survey research, as
17  well as the tests for trustworthiness of properly conducted
18  surveys or polls.
19     39.   During the past twenty-eight years, I have
20  addressed a variety of groups on the subject of surveys or polls
21  and their use in the measurement of the state of mind of
22  consumers, with respect to Lanham Act matters.  Specifically, I
23  have spoken at meetings of the American Bar Association, the
24  American Intellectual Property Law Association, the American
25  Marketing Association, the International Trademark Association,
26  the Marketing Research Association, the Intellectual Property Law
27  Institute of Canada, and the Practising Law Institute.
28  ///

1         40.  I have also written on the subject of the design

2  and execution of litigation-related surveys in intellectual

3  property matters.  Attached hereto as Exhibit A is a list of

4  papers I have written since 1987.

5         41.  Since 1998 I have served as a member of the

6  Editorial Board of <u>The Trademark Reporter</u>, the scholarly legal

7  journal on the subject of trademarks, published by the

8  International Trademark Association.

9         42.  I have been qualified and accepted as an expert in

10  marketing and marketing research in more than fifty (50) trials

11  before federal and state courts and administrative government

12  agencies.

13         43.  Attached hereto as Exhibit B is a list of cases in

14  which I have provided trial and/or deposition testimony since

15  1992.

16         44.  Attached hereto as Exhibit C is a copy of my

17  professional history, describing my qualifications and

18  professional background.

19        I declare under penalty of perjury under the laws of

20  the United States of America that the foregoing is true and

21  correct.  Executed this 18th day of July, 2008, in Huntington

22  Beach, California.

23

24                                    

25                       Dr. Gerald L. Ford

26

27

28

# Exhibit A

Articles
By Dr. Gerald L. Ford

These articles are available @ www.fordbubala.com/articles

"Trademark Surveys:  Universe, Questions, and Future Approaches" was published in the Summer 1987 edition of New Matter, the journal of the Intellectual Property Section of the California State Bar.  This paper was subsequently reprinted in the 1992 International Trademark Association 114th Annual Meeting proceedings.

"Responding to Trademark Surveys" was published in the Spring 1993 proceedings of the American Bar Association's Patent, Trademark, and Copyright Law:  Litigation and Corporate Practice course materials.  This paper was reprinted in the International Trademark Association's "Successful Strategies in Trademark Litigation" Forum, Tokyo, Japan, 1993.

"Dilution Surveys - New Challenges" was published in the 1997 Practising Law Institute course handbook, Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner.  This paper was reprinted in the International Trademark Association's course materials for a seminar, Dilution and Famous Marks for Advanced Trademark Practitioners, 1998.

"Dilution Surveys Update 1998" was published in the Practising Law Institute course handbook, Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner.

"Lanham Act Related Surveys, The Year in Review & Emerging Issues" was published in the 1999 Practising Law Institute course handbook, Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner.  An edited version of this paper, "Lanham Act Surveys - The Year in Review," was reprinted in the NAD/International Trademark Association's False Advertising Forum, course materials, 2000.

"Lanham Act Surveys:  Two Years in Review" was published in the International Trademark Association 122nd Annual Meeting proceedings.

"Lanham Act Surveys:  2000" was published in the 2000 Practising Law Institute course handbook Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner.

"Lanham Act Surveys:  2001" was published in the 2001 Practising Law Institute course handbook Strategies for Litigating Copyright, Trademark & Unfair Competition Cases.

Articles
Page 2


"Lanham Act Surveys:  2002" was published in the 2002 Practising
Law Institute course handbook Strategies for Litigating
Copyright, Trademark & Unfair Competition Cases.

"Survey Evidence - Successful Challenges Since Daubert" was
published in 2003 in the International Trademark  Association
125th Annual Meeting proceedings.

"Lanham Act Surveys:  2003" was published in 2003 in the American
Intellectual Property Law Association annual proceedings.  This
paper, "Lanham Act Surveys:  2003," was reprinted in the 78th
Intellectual Property Institute of Canada proceedings, 2004.

"Lanham Act Surveys: 2004" was published in the Law Education
Institute National CLE Conference proceedings, 2005.

"Lanham Act Surveys: 2005" was presented at a meeting of the
Intellectual Property Law Section of the State Bar of Georgia,
2006. This paper, "Lanham Act Surveys: 2005" was reprinted in the
NAD Annual Conference proceedings, 2006, and in the Law Education
Institute National CLE Conference proceedings, 2007.

"Intellectual Property Surveys: 2006" was electronically
published on the members-only section of the INTA website, 2007.

# Exhibit B

DR. GERALD L. FORD

TRIAL TESTIMONY 1992 - 2008

2008

Google Inc. v. Nikolaus Gubernator
     Trademark Trial and Appeal Board

adidas American, Inc. and adidas AG v. Payless ShoeSource,
Inc.
     U.S. District Court, District of Oregon

2007

Nissan Motor Co. Ltd. and Nissan North America, Inc. v.
Nissan Computer Corporation and the Internet Center
     U.S. District Court, Central District of California

2006

Phillips-Van Heusen Corp., Calvin Klein, Inc., and Calvin
Klein Trademark Trust v. Calvin Clothing Company, Inc. and
Star Ride Kids, Inc.
     U.S. District Court, Southern District of New York

Joel D. Wallach v. Longevity Network, Ltd.
     U.S. District Court, Central District of California,
     Western District

2005

General Motors Corporation v. Chevy Duty, Inc.
     U.S. District Court, Eastern District of Michigan,
     Southern Division

2004

A&W Food Services of Canada Inc. and A&W Trade Marks Inc. v.
McDonald's Restaurants of Canada Limited.
     Federal Court, Toronto, Canada

Callaway Golf Company v. Dunlop Slazenger Group Americas,
Inc.
     U.S. District Court for the District of Delaware

Nova Development v. Individual Software, Inc.
     Arbitration (JAMS)

The PE Corporation and Roche Molecular Systems, Inc. v. MJ
Research Incorporated and Michael and John Finney
     U.S. District Court, District of Connecticut

Trial Testimony continued

2002

> Sara Lee Corporation v. Kayser-Roth Corporation
>     Trademark Trial and Appeal Board
>
> Kirkbi AG and Lego Canada Inc. v. Ritvik Holdings
> Inc./Gestions Ritvik Inc. and Ritvik Toys Inc./Jouets Ritvik
> Inc.
>     Federal Court of Canada, Toronto, Ontario

2001

> Harrods Limited v. Sixty Internet Domain Names
>     U.S. District Court, Eastern District of Virginia
>
> The State of California Acting in a Higher Education
> Capacity by and through The Board of Trustees of the
> California State University v. Bello's Sporting Goods
>     State of California, Superior Court, San Luis Obispo

2000

> Rally Accessories, Inc. d/b/a/ Rally Manufacturing, Inc., v.
> Quest Industries, Inc.
>     U.S. District Court, Southern District of Florida
>
> Jack Daniel's Properties, Inc. v. Quest Associates, Ltd.
>     Trademark Trial and Appeal Board

1999

> Daimler Chrysler Corporation v. Ted L. Vanzant, dba Country
> Craft
>     U.S. District Court, Central District of California
>
> Hewlett-Packard Company v. Nu-kote International, Inc.
>     U.S. District Court, Northern District of California

1998

> Nexxus Products Company v. Russ Kalvin, Inc., et al.
>     Superior Court of California, County of Santa Barbara
>
> 1-800-FLOWERS, Inc. v. Michael Segura, d/b/a FLOWER STAR,
> et al.
>     U.S. District Court, Eastern District of New York
>
> Haverly Systems, Inc. v. Omni Flow Computers, Inc.
>     Trademark Trial and Appeal Board

Trial Testimony continued

1997

    Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery
        U.S. District Court, Northern District of California

    Leonard Studio Equipment, Inc. v. Desmar Corporation and
    Meccanica Italiana Srl.
        U.S. District Court, District of New Jersey

1996

    Black & Decker (U.S.) Inc. v. GSL Engineering Ltd., GSL
    Consumer Products Ltd., GSL Rechargeable Products Ltd., et
    al.
        U.S. District Court, Eastern District of Virginia

1995

    Berner International Corporation v. Mars Sales Company
        U.S. District Court, Western District of Pennsylvania

    Mavrides, et al. v. Hammond, et al.
        U.S. District Court, Northern District of California

    Peter Morton, et al. v. Rank Organization, et al.
        Arbitration, Los Angeles

1994

    The Princeton Review Management Corp. v. Stanley H. Kaplan
    Educational Center, Ltd.
        Arbitration, New York

    Al-Site Corp. v. The Bonneau Company
        U.S. District Court, Central District of California

1993

    American Professional Testing Service, Inc. v. Harcourt
    Brace Jovanovich Legal and Professional Publications, Inc.
        U.S. District Court, Central District of California

    Devon Industries, Inc. v. American Medical Manufacturing,
    Inc., et al.
        U.S. District Court, Central District of California

    United Services of America Federal Credit Union dba USA
    Federal Credit Union v. USA Federal Credit Union
        U.S. District Court, Southern District of California

    In re:  Circuit Breaker Litigation
        U.S. District Court, Central District of California

Trial Testimony continued – 1993

      P. Leiner Nutritional Products v. Pharmavite Corporation
          U.S. District Court, Central District of California

      Mouldings, Inc. v. Kellogg Company
          U.S. District Court, District of Utah, Central Division

1992

      Adray, et al. v. Adry-Mart, et al.
          U.S. District Court, Central District of California

      Mag Instrument, Inc. v. Martin Heller et al.
          Superior Court of California, County of San Bernardino

      Baldwin Corporation v. Frank Su Enterprise Corporation,
      Frank Su, and Decorators Accessories, Ltd.
          U.S. District Court, Central District of California

      Mag Instrument Inc. v. Vermont American Corporation
          Trademark Trial and Appeal Board

      Better Carpet Care, Inc., dba A-1 Carpet Care v. A-1 Carpet
      Market
          Superior Court of California, County of Orange

DEPOSITION TESTIMONY 1992 – 2008

2008

Dayals (Fiji) Artesian Waters Limited v. Fiji Water Company
LLC; Paramount International Expert, Ltd.; and Roll
International Corporation
    U.S. District Court, Central District of California

adidas American, Inc. and adidas AG v. Wal-Mart Stores, Inc.
    U.S. District Court, District of Oregon

2007

HomeLife Communities Group v. HomeLife Realty Services, Inc.
and HomeLife Securities, Inc.
    U.S. District Court, Northern District of Georgia

Luppen Holdings, Inc. v. Pitney Bowes, Inc. & Staples, Inc.
    U.S. District Court, Central District of California

E.& J. Gallo Winery v. Cantine Rallo, S.p.A.
    U.S. District Court, Eastern District of California

adidas American, Inc. and adidas AG v. Kmart Corporation
and Footstar, Inc.
    U.S. District Court, District of Oregon

2006

NFL Properties LLC v. AllAuthentic Corporation
    U.S. District Court, Southern District of New York

The Board of Trustees of the University of Alabama v. New
Life Art, Inc. and Daniel A. Moore
    U.S. District Court, Northern District of Alabama

2005

Children's Medical Center of Dallas v. Columbia Hospital at
Medical City Dallas Subsidiary, L.P.
    U.S. District Court, Northern District of Texas

Board of Supervisors of the Louisiana State University and
Agricultural and Mechanical College, Board of Regents of the
University of Oklahoma, Ohio State University, University of
Southern California, Pasadena Tournament of Roses, and The
Collegiate Licensing Company v. Smack Apparel Company and
Wayne Curtiss
    U.S. District Court for the Eastern District of
    Louisiana

July 18, 2008

Deposition Testimony continued – 2005

> The Boyds Collection, Ltd. v. The Bearington Collection
> > U.S. District Court, Middle District of Pennsylvania
>
> Mag Instrument, Inc. v. Dollar Tree Stores, Inc. and
> Dollar Tree Distribution, Inc.
> > U.S. District Court, Central District of California

2004

> Nissan North America and Nissan Jidosha Kabushiki Kaisha dba
> Nissan Motor Co., Ltd v. Europacific Parts International,
> Inc. dba Service & Value Expeditors, and Interstate
> Automotive Distributors dba Genuine Parts Advantage and
> Metro Automotive
> > U.S. District Court, Central District of California

 2003

> Guthy-Renker Corporation v. University Medical Products/USA,
> Inc.
> > U.S. District Court, Central District of California
>
> The Iams Company v. Kal Kan Foods, Inc.
> > U.S. District Court, Southern District of Ohio
>
> XtraPlus Corporation v. Google, Inc.
> > U.S. District Court, Northern District of California
>
> The Iams Company v. Nutro Products, Inc.
> > U.S. District Court, Southern District of Ohio
>
> adidas America, Inc. and adidas-Salomon AG v. Steve
> Madden, Ltd., and Steve Madden Retail, Inc.
> > U.S. District Court, District of Oregon

2002

> Masterfoods USA, a division of Mars, Incorporated v.
> Arcor USA, Incorporated, and Arcor S.A.I.C.
> > U.S. District Court, Western District of New York
>
> Dioptics Medical Products, Inc. v. The Cooper Companies,
> Inc.
> > U.S. District Court, Northern District of California

2001

> Manufacture des Montres Jaguar, S.A., Manufacturas de
> Montres Jaguar, S.L., and Festina, U.S.A., Inc. v. Jaguar
> Cars Limited, The Jaguar Collection Limited and Jaguar Cars,
> a division of Ford Motor Company
> > U.S. District Court, Southern District of New York

Deposition Testimony continued- 2001

    Magnivision, Inc. v. The Bonneau Company
        U.S. District Court, Central District of California

2000

    Kelly Blue Book Company, Inc. v. Primedia Intertec National
    Market Reports, Primedia Intertec Inc., & Primedia Inc.
        U.S. District Court, Central District of California

    JMYZ, Inc. v. The Gap, Inc. and Old Navy, Inc.
        U.S. District Court, Southern District of Florida

1999

    In re:  Certain Two-Handle Centerset Faucets and Escutcheons
    and Components Thereof
        U.S. International Trade Commission, Washington, D.C.

    TriStar Pictures, Inc. and Zorro Productions, Inc. v. Del
    Taco, Inc. and Wongdoody
        U.S. District Court, Southern District of California

1998

    Iomega Corporation v. SyQuest Technology, Inc.
        U.S. District Court, District of Delaware

1997

    Summit Bottling, Inc. v. Water Star Bottling, Inc. et al.
        U.S. District Court, District of Utah, Northern
        Division

    Kellogg Company v. Exxon Corporation
        U.S. District Court, Western District of Tennessee

    Galen Rowell and Richard Johnson v. Price/Costco
        U.S. District Court, Northern District of California

1996

    Saban Entertainment, Inc. and Saban International, N.V. v.
    Rubie's Costumes Co., Inc.
        U.S. District Court, Eastern District of New York

    Breath Asure, Inc. v. Merlin Offshore International, Inc. et
    al.
        U.S. District Court, Central District of California

    Men's Wearhouse, Inc. v. T.H.C., Inc.
        U.S. District Court, Eastern District of Michigan

Deposition Testimony continued

1995

     Hugo Boss Fashions Inc., et al. v. Brookhurst, Inc., et al.
         U.S. District Court, Southern District of New York

     Wilden Pump & Engineering Co. v. Charles Horvath (PTE), et al.
         U.S. District Court, Central District of California

     Barbara Arner v. Sharper Image Corporation, Remington Products, et al.
         U.S. District Court, Central District of California

1993

     The Famous Amos Chocolate Chip Cookie Corporation v. Wally Amos
         U.S. District Court, Northern District of California

     Atari Games Corporation & Tengen, Inc. v. Nintendo of America
         U.S. District Court, Northern District of California

     Calgene, Inc. v. Enzo Biochem, Inc.
         U.S. District Court, Eastern District of California

     Health Net v. U.S.A. Healthnet Inc.
         U.S. District court, Central District of California

# Exhibit C

PROFESSIONAL HISTORY

Dr. Gerald L. Ford
**Ford Bubala & Associates**
Peter's Landing, Suite 211
16400 Pacific Coast Highway
Huntington Beach, California 92649
Telephone (562) 592-4581
Facsimile (562) 592-3867



EDUCATION _____

Doctor of Business Administration (D.B.A.)
University of Southern California, 1977

Master of Business Administration (M.B.A.)
University of Southern California, 1969

Bachelor of Arts (B.A.)
San Jose State University, 1967

PROFESSIONAL AFFILIATIONS _____

American Academy of Advertising
American Marketing Association
American Association for Public Opinion Research
Council of American Survey Research Organizations
International Trademark Association

PROFESSIONAL EXPERIENCE _____

Ford Bubala & Associates (Principal), 1975 – Present

Ford Bubala & Associates is a marketing and management consulting firm which
provides a variety of consulting services in the areas of marketing management,
marketing research, marketing planning, competitive evaluation, economic analysis,
and strategy development.

Ford Bubala & Associates has been retained to provide consulting assistance for a
diverse base of companies in consumer products, industrial products, and service
sectors of the economy.

PRIOR EXPERIENCE _____

1970 – 1994

Emeritus faculty member, School of Business Administration, California State
University, Long Beach. Teaching responsibilities included both graduate and
undergraduate level courses. Courses taught covered a variety of subject areas,
including marketing (e.g., marketing, marketing management, advertising,
promotion, consumer behavior and marketing research) and management
(e.g., principles of management; business policy and strategy; business policies,
operations, and organizations; and integrated analysis).