# EXHIBIT N

4 of 5 DOCUMENTS

Copyright © 1993, The International Trademark Association,
The Trademark Reporter

May, 1993 - June, 1993

83 TMR 364

**LENGTH:** 12156 words

THE EFFECT OF SURVEY METHOD ON LIKELIHOOD OF CONFUSION ESTIMATES: CONCEPTUAL ANALYSIS AND EMPIRICAL TEST

Itamar Simonson *


            * Associate Professor of Marketing, Graduate School of Business, Stanford University, Stanford, California.

**TEXT:**

[*364]  I.  INTRODUCTION

The test of likelihood of confusion is "the touchstone of trademark infringement." n1 Professor McCarthy suggests that, of the three main methods of proving likelihood of confusion -- "survey evidence; evidence of actual confusion; and/or argument based on a clear inference arising from a comparison of the conflicting marks and the context of their use" -- survey evidence is perhaps the best. n2 Indeed, surveys are now routinely employed to prove likelihood of confusion, and a failure to introduce a survey into evidence often leads to harsh criticism by the courts. n3

n1 2 J. Thomas McCarthy, Trademarks and Unfair Competition, 23:1 at 44 (2d ed 1984).

n2 Id § 23:1 at 45 and 54 (footnotes omitted).

n3 Lawrence E. Evans, Jr. and David M. Gunn, Trademark Surveys, 79 TMR 1 (1989); see cases cited id at 2 fn 5; Peter Weiss, The Use of Survey Evidence in Trademark Litigation: Science, Art or Confidence Game?, 80 TMR 71 (1990); see cases cited id at 72-73 fn 4.

Given their growing importance, the principles and techniques involved in conducting professional surveys have received much attention in the trademark literature. n4 The main purpose of many surveys is to examine confusion about source, that is, to test whether consumers form the mistaken belief that the junior user's goods or services originated from or are supported by the senior user. n5 Such confusion may arise if a consumer believes that the junior user's product is the senior user's product, or that the junior  [*365]  user's product is put out or approved by the maker of the senior product. n6

n4 See, eg, Jacob Jacoby, Survey and Field Experimental Evidence, in Saul M. Kassin and Lawrence S. Wrightsman, The Psychology of Evidence and Trial Procedure (Sage Publications, Beverly Hills, California 1985); John Paul Reiner, The Universe and Sample: How Good Is Good Enough?, 73 TMR 366 (1983); Robert

C. Sorensen, Survey Research Execution in Trademark Litigation: Does Practice Make Perfection?, 73 TMR 349 (1983); Evans and Gunn, supra note 3.

n5 See McCarthy, supra note 1, § 24:1 at 160; Michael J. Allen, Who Must Be Confused and When?: The Scope of Confusion Actionable Under Federal Trademark Law, 81 TMR 209 (1991).

n6 R. Bradlee Boal, Techniques for Ascertaining Likelihood of Confusion and the Meaning of Advertising Communications, 73 TMR 405 (1983).

Confusion is a complex psychological state, and while research in the psychological literature reviewed below provides some insights, there is much that we still do not know about the conditions that lead to confusion. Related to the conceptual questions, there is the practical problem of how to measure confusion. Asking consumers directly whether they (or others) are likely to confuse marks A and A' is an invalid measure, because of the likely inference that confused consumers are stupid n7 and because, in many cases, consumers are unlikely to have the self-insight necessary to answer such a question. n8 Alternatively, it might be possible to infer the existence of confusion from answers to questions that use more indirect tests.

n7 Id at 405.

n8 See, eg, Richard E. Nisbett and Timothy D. Wilson, Telling More Than We Can Know: Verbal Reports on Mental Processes, Psychological Review 84, 231 (1977).

Different techniques for ascertaining confusion have been accepted by the courts in specific cases, although no general standard has yet been established. n9 Examination of the survey techniques that have been used indicates that there are significant differences among them in terms of the respondent's task. Research on human judgment and decision making and on measurement errors in surveys suggests that consumers' responses are highly contingent on the specific task and context characteristics. n10 Often, a minor wording change can lead to very different findings. In one famous example, n11 respondents were asked, "Do you think the United States should forbid public speeches against democracy?," and 54 percent of them said yes. A second group of respondents were asked, "Do you think the United States should allow public speeches against democracy?," and 75 percent of them said no. Examination of the various techniques for surveying likelihood of confusion indicates that the differences among them are much less subtle than the wording manipulation in this example. For instance, the difference between "What is the first thing that comes to mind when you see this brand name?," and [*366] "Which company puts out this brand?," is not only in the wording; these techniques involve different tasks and might be expected to lead to different findings regarding the rate of confusion.

n9 For reviews, see Boal, supra note 6, and Evans and Gunn, supra note 3.

n10 See, eg, Paul P. Biemer, Robert M. Groves, Lars E. Lyberg, Nancy A. Mathiowetz and Seymour Sudman, Measurement Errors in Surveys (John Wiley & Sons, Inc., New York 1991); W. Payne, James R. Bettman and Eric J. Johnson, Behavioral Decision Research: A Constructive Processing Perspective, Annual Review of Psychology 43 (1992); Itamar Simonson, Get Closer to Your Customers by Understanding How They Make Choices, California Management Review (1993).

n11 D. Rugg, Experiments in Wording Questions II, 5 Public Opinion Quarterly 91 (1941).

The main purpose of the present article is to analyze and contrast some of the commonly used techniques for assessing trademark confusion. n12 These techniques are referred to hereafter as the "Exxon Format," n13 the "Eveready Format," n14 and the "Squirt Format." n15 In addition to these techniques, a new procedure for assessing confusion in which respondents' main task is to choose between the junior brand and a competing brand, is proposed. Before (or after) making a choice, respondents are asked to evaluate each alternative, and these evaluations are used to

infer whether they confused the junior brand with the senior brand.  This technique is referred to below as "simulated choice."

n12 See also Boal, supra note 6.

n13 "What comes to mind . . .?" etc.; Exxon Corp. v. Texas Motor Exchange of Houston, Inc., 628 F2d 500, 504, 208 USPQ 384, 391 (CA 5 1980).

n14 "Who puts out . . .?" etc.; Union Carbide Corp. v. Ever-Ready, Inc., 531 F3d 366, 381-82, 188 USPQ 623, 640-41 (CA 7 1976), cert denied 429 US 830, 191 USPQ 416 (1976).

n15 "Are [these brands] put out by the same or different companies?," etc.; Squirt Company v. Seven-Up Company, 207 USPQ 12, 20-21 (ED Mo 1979), affd 628 F2d 1086, 207 USPQ 897 (CA 8 1980).

When examining these techniques, it is important to remember that measuring confusion is a very difficult task and any specific estimation procedure is likely to have some flaws and is at best an approximation. n16 However, a technique with some limitations may still be the best available in a particular case.  In the following section, the advantages and limitations of each technique are discussed.  Then, an empirical study that directly contrasted these techniques is presented.  The article concludes with a discussion of the findings and the implications for likelihood of confusion surveys.

n16 McCarthy, supra note 1, § 32:51 at 779.

II.  TECHNIQUES FOR ESTIMATING LIKELIHOOD OF CONFUSION

The focus here is on four techniques, including: (1) The Exxon Format, in which respondents are asked to indicate what is the first thing that comes to mind when seeing the junior mark; (2) The Eveready Format, in which respondents are asked to name the company that they think puts out the junior mark; (3) The Squirt Format, in which respondents are asked whether the junior and senior marks are put out by the same or different companies; and (4) A procedure involving a simulated choice task, in which confusion between the junior and senior marks is determined  [*367]  based on the respondents' evaluations of the junior brand.  Each of these techniques is discussed in more detail next.

A.  What Comes to Mind?  What Makes You Say That? -- The Exxon Format

The courts had not been receptive to surveys involving word association tests n17 until the Fifth Circuit approved the survey used in the Exxon v. Texon case. n18 Briefly, n19 with the Exxon Format respondents are shown the junior mark and asked, "What is the first thing that comes to your mind when looking at [this name/sign]?" If respondents do not mention the name of a company, they are asked explicitly which company comes to mind.  The differentiating feature of the Exxon Format compared to earlier word association surveys is the follow-up question asking for explanation: "What was there about the sign that made you [say that]?"

n17 See Boal, supra note 6; Evans and Gunn, supra note 3.

n18 Supra note 13.

n19 Evans and Gunn, supra note 3 at 11-12, present the survey verbatim.

This test is based on the assumption that, if the senior mark comes to mind when seeing the junior mark, then the two marks are likely to be confused.  An argument that might be used to support this assumption is that, when asked about what comes to mind, respondents are likely to answer with the most similar name.  Indeed, the study reported

below indicates that the similarity between the names is by far the most common response to the question, "What makes you say that?" At the same time, similarity between items is positively correlated with likelihood of confusion. n20 Studies have shown that confusion errors are well predicted by mathematical models that are based on similarity. n21 A typical study examining the effect of similarity on confusion involves showing respondents items such as characters or numbers for a very short duration and asking them to identify what they saw. Since similarity affects both what comes to mind and the likelihood of confusion, one might be able to estimate likelihood of confusion by asking what comes to mind.

> n20 See McCarthy, supra note 1, § 23 at 42.

> n21 See, eg, R. Duncan Luce, Detection and Recognition, in Handbook of Mathematical Psychology 103-89 (Editors: R. Duncan Luce, R. R. Bush and Eugene Galanter, John Wiley & Sons, Inc., New York 1963); G. Keren and S. Baggen, Recognition Models of Alphanumeric Characters, 29 Perception and Psychophysics 234-46 (1981); Robert M. Nosofsky, Attention, Similarity, and the Identification-Categorization Relationship, 115 Journal of Experimental Psychology: General 39-57 (1986).

[*368]  A closer examination of this argument, however, suggests that what comes to mind is likely to be a poor predictor of confusion in the context of consumer purchase decisions.  As Professor McCarthy notes, "'Confusion' means more than that the junior user's mark merely 'calls to mind' the senior user's mark." n22 A person who is shown a brand name and asked what comes to mind is likely to retrieve from memory the most similar name, n23 which is determined primarily by the common features of the two names. n24 In contrast, a buyer is unlikely to confuse two marks unless the two are perceived as identical or the buyer is convinced that the junior mark can only be used by the company that puts out the senior mark.  For example, the name Wanasonic is likely to bring to mind the familiar brand name Panasonic.  However, the name Wanasonic has a salient distinctive feature, and consumers will probably recognize that the company that puts out Panasonic is unlikely to also use the name Wanasonic.  These arguments suggest that the Exxon Format tends to inflate confusion estimates.

> n22 McCarthy, supra note 1, § 23:1 at 47.

> n23 Joseph W. Alba, J. Wesley Hutchinson and John G. Lynch, Jr., Memory and Decision Making, in Handbook of Consumer Behavior 1-49 (Editors: Thomas S. Robertson and Harold H. Kassarjian, Prentice-Hall, Englewood Cliffs, NJ 1991) [hereinafter cited as Alba].

> n24 Amos Tversky, Features of Similarity, 84 Psychological Review 327-52 (1977).

Furthermore, as Judge Rich observed, "The very fact of calling to mind may indicate that the mind is distinguishing, rather than being confused by, two marks." n25 In other words, if the senior and junior marks are truly confused, then the junior mark is unlikely to bring to mind the correct senior mark.  For example, if asked what comes to mind when seeing the name Ever-Ready, only those respondents who distinguish between Ever-Ready and Eveready are likely to give the answer Eveready that will be regarded as reflecting confusion.  The Fifth Circuit explained the approval of the Exxon survey based on the follow-up explanation of the responses.  However, since most explanations are likely merely to mention the similarity between the marks, it is not clear how this follow-up question resolves any of the limitations of word association-based tests.

> n25 In re P. Ferrero & C. S.p.A., 479 F2d 1395, 178 USPQ 167, 168 (CCPA 1973).

*B.  Who Puts Out This Brand? -- The Eveready Format*

The Eveready Format n26 involves showing respondents the junior product (or brand name) and asking: (1) Who

83 TMR 364, *368

do you think  [*369]  puts out [this brand]?  (2) What makes you think so?  and (3) Name any other products put out by the same concern which puts out this [brand].  With this technique, unlike the Exxon Format, the questions focus more directly on the issue of confusion.  As the court observed, n27 responses naming the senior manufacturer or its products provide evidence of likelihood of confusion.  Examination of the Eveready Format suggests that it is most likely to reveal confusion between two marks if (1) respondents believe that the junior mark is the senior mark and they know the name (and/or other products) of the company that puts out the senior mark, or (2) respondents distinguish between the junior and senior marks (e.g., Holiday Out and Holiday Inn) n28 but believe the two marks are put out by the same company, in which case they can simply name the senior mark.  This technique is less likely to reveal confusion if respondents think that the junior mark is the senior mark (e.g., that Ever-Ready is Eveready) and do not know the name (or products) of the company that puts out the senior mark.

> n26 Supra note 14.

> n27 Id at 387, 188 USPQ at 643.

> n28 Holiday Inns, Inc. v. Holiday Out in America, 481 F2d 445, 178 USPQ 257 (CA 5 1973).

In some cases, courts have found questions similar to those employed in the Eveready case to be leading and suggestive. n29 A possible concern is that respondents who mention the maker of the senior mark would not have associated the junior and senior marks when making normal purchase decisions without being asked these questions.  That is, the survey questions cause respondents to think of possible connections, which may lead them to mention (or imply) the senior mark.  A related concern is that respondents feel they have to answer the survey questions given to them rather than say that they do not know, so they often provide guesses that are associated with low confidence.  If actual purchase decisions were involved, respondents would make the necessary effort to ascertain whether the junior and senior marks were indeed put out by the same company.  On the other hand, it might be argued that the mere fact that a reasonable consumer forms the hypothesis that two marks are related is sufficient evidence of likelihood of confusion; consumers do not have "to dissect and analyze trademarks in order to avoid confusion." n30

> n29 General Motors Corp. v. Cadillac Marine & Boat Co., 226 F Supp 716, 736, 140 USPQ 447, 462 (WD Mich 1964); Wuv's International, Inc. v. Love's Enterprises, Inc., 208 USPQ 736 (D Colo 1980).

> n30 McCarthy, supra note 1, § 23:27 at 127, and see fns 8-9.

A comparison of the question "who puts out this product?" with the Exxon Format question, "what comes to mind?" suggests that, in both cases, a greater similarity between the junior and  [*370]  senior marks will tend to increase confusion estimates, n31 as long as the confusion between the two marks is not so great that they are indistinguishable.  However, unlike the Exxon Format, respondents are expected to consider whether it is likely that the company that puts out the senior mark (e.g., Panasonic) will also use the junior mark (Wanasonic) before answering the question "who puts out this product?" As an example, suppose that respondents are shown the brand name Tuna of the Sea and are asked who puts it out.  In this case, although the first name that comes to mind is Chicken of the Sea, respondents may determine that it makes no sense that the makers of Chicken of the Sea will also use the name Tuna of the Sea.  The reliance on such logical considerations represents an advantage of the Eveready over the Exxon Format, although it may lead in some cases to underestimation of the likelihood of confusion.  For example, it is possible that shoppers at a supermarket would fail to notice the difference between Tuna of the Sea and Chicken of the Sea, especially if they are not displayed side by side.  In sum, whether the Eveready Format leads to accurate, over, or underestimation of the likelihood of confusion appears to depend on the specific characteristics of the marks and on consumers' familiarity with the marks and their manufacturers.

> n31 Alba, supra note 23.

*C. Are These Products Put Out By the Same or Different Companies? -- The Squirt Format*

In the Squirt v. Quirst case, n32 respondents were asked "Do you think SQUIRT and QUIRST are put out by the same company or by different companies?" The trial court relied on the survey as demonstrating "the possibility of confusion between the . . . marks." n33 An advantage of this format is that it represents probably the most direct measure of confusion short of asking people whether they are likely to confuse the two marks. Although this format is different than the Eveready Format, there are similarities between the two tasks. With both formats, responses are likely to be made on the basis of assessments of similarity and logic, as discussed above. Thus, as with the Eveready technique, the Squirt Format may lead to underestimation of the likelihood of confusion when two names are confusingly similar, yet it is illogical that the same company will use both [*371] names. One difference between the two techniques is that the Squirt Format presents the junior and senior marks side by side and thus guarantees that respondents distinguish between the two.

n32 Supra note 15. For another case where a similar format was used, see La Maur, Inc. v. Revlon, Inc., 245 F Supp 839, 842, 146 USPQ 654, 656 (D Minn 1965).

n33 628 F2d at 1089, 207 USPQ at 899.

A potential limitation of the Squirt Format is that it explicitly leads respondents to consideration of the association between the two marks, a question that might not have occurred to them in a normal purchase situation. In particular, even a consumer who is unfamiliar with the senior mark and thus could not have confused the two marks may still respond that the two marks are put out by the same company (suggesting confusion) when asked that question.

*D. Using Simulated Brand Choice to Infer Confusion*

Most of the techniques that have been used to determine likelihood of confusion focus the respondents' attention on the marks in question and their origins. For example, respondents are asked what comes to mind when seeing the mark, who puts out the mark, or whether the junior and senior marks are put out by the same or different companies. It could be argued that such tasks cause respondents to think about associations between marks that they would not have considered in normal purchase situations n34 and may thus lead to inaccurate estimates of likelihood of confusion. As an alternative to such surveys, one might try to conduct in-store experiments and infer confusion from consumer purchases. n35 An advantage of this approach is that estimates of confusion are based on actual purchase behavior in the consumer environment of interest, rather than derived from questions about trademarks. Such experiments, however, can be difficult to implement and require cooperative retailers. More importantly, it may often be difficult to determine whether confusion occurred and estimate the likelihood of confusion on the basis of consumer purchases in a store environment.

n34 See discussion in Boal, supra note 6.

n35 For examples of such experiments, see Boal, supra note 6.

A compromise approach, which is based on a task that consumers are accustomed to from everyday life and which is easy to implement, involves simulated purchase decisions. Specifically, respondents are shown the junior brand and a competing brand (not the senior brand) and are asked, assuming they needed to purchase that product, which of the two brands they would choose. Either before or after indicating their choice, respondents are asked to evaluate the brands and explain their decisions. [*372] Evaluation of considered alternatives is a very common task in everyday life, and respondents are unlikely to recognize that the real purpose of the task is to assess trademark confusion.

The specific brand evaluation questions need to be tailored to the particular case and are designed to allow the researchers to determine unambiguously whether the respondent thinks that the junior brand is or is not associated with

the senior brand. Such questions might include an evaluation of the advantages and disadvantages of each brand, what if anything respondents know about the quality of other products made by the same company, whether they had any previous experience with these brands, what they think about the quality of products made in the country where these brands are made (if relevant), what they know and think about its advertising, and so on. This information can be used to determine whether the respondent confuses the junior mark with the senior mark. For instance, to determine whether Cleo Cola is confused with Coca-Cola, respondents can be asked to choose between Cleo Cola and Pepsi-Cola and to indicate their evaluation of each brand's taste and advertising, their previous experience with each brand, where they usually buy it, and so on. Thus, a necessary condition for using simulated choice to establish confusion is that there are differentiating characteristics of the senior mark that might be captured in brand evaluations.

In order to disguise the purpose of the study and not focus too much attention on the junior brand, the respondents should be first given other choice problems involving familiar brands in different product categories. When explaining the task, it needs to be emphasized that the respondents may be unfamiliar with some of the brands they are asked to evaluate, in which case they should simply note that they do not know the brand. For example, respondents might be told that "some of the brands are only sold in certain parts of the country and may thus be unfamiliar to you." This information is designed to legitimize a response that a brand is unfamiliar, so that respondents do not feel they are expected to know every brand.

In addition to providing confusion estimates, this methodology can generate other information pertinent to the case under study. For example, it might be of interest to find out what share of the junior brand's sales is due to confusion with the senior brand. This could be calculated by examining the percentage of choices of the junior brand by respondents who confused it with the senior brand. For instance, one might find that 30 percent of the respondents chose Cleo Cola over Pepsi-Cola, 90 percent of whom confused Cleo Cola with Coca-Cola. It is also easy to estimate with simulated choice the degree of confusion and loss of sales [*373] when the junior and senior brands (as well as the competing brand) are included in the choice set side by side. Or, one may want to examine the extent to which confusion between the junior and senior marks is influenced by the price or other features of the junior brand.

Research methodologies involving simulated choice tasks have been employed extensively for predicting consumer purchase behavior by both managers and marketing researchers. n36 For example, the most commonly used technique today for predicting consumer response to new products and for estimating the importance of various product characteristics is conjoint analysis. n37 In conjoint analysis, respondents evaluate different hypothetical product profiles by choosing between pairs of alternatives or by ranking or rating alternatives in terms of preference. Research has shown that conjoint analysis provides quite accurate and valid predictions of actual purchase behavior. n38

> n36 Numerous examples of the use of simulated choice methodologies have appeared in leading marketing journals such as the Journal of Marketing Research, the Journal of Consumer Research, and Marketing Science.

> n37 See Paul E. Green and V. Srinivasan, Conjoint Analysis in Marketing Research: New Developments and Directions, 54 Journal of Marketing 3-19 (1990).

> n38 Ibid.

In sum, each of the techniques for estimating likelihood of confusion has both advantages and limitations and may lead to different estimates. A question that naturally arises is how different are the likelihood of confusion estimates derived from these techniques? If all estimates are relatively close (e.g., within plus/minus 5 percent), then the same conclusion would be reached in most cases, regardless of which method was employed. If, however, the derived estimates are significantly different, then the choice of estimation technique may determine the outcome of the investigation.

An empirical study was conducted to investigate this question by contrasting directly the various survey techniques and to improve our understanding of factors that influence consumer confusion among trademarks. This study is

83 TMR 364, *373

described next.

III.  A COMPARISON OF TECHNIQUES FOR ESTIMATING LIKELIHOOD OF CONFUSION: AN EMPIRICAL INVESTIGATION

A. *Overview*

The respondents in this study were 992 consumers.  The techniques investigated include the Exxon Format, the Eveready Format (two variations), the Squirt Format, and a preliminary  [*374]  application of simulated choice.  Twelve senior marks and twelve junior (infringing) marks were selected, thus allowing to compare the techniques across a variety of trademarks.  The simulated choice format also provided evidence regarding the effect of confusion on product choices, the effect on confusion of having the senior and junior marks side by side, and the effect of the price of the junior brand (whether it is similar to or lower than the senior brand's price) on confusion.  The focus in this research is on confusion between trade names rather than confusion associated with other aspects of the products, such as physical characteristics.  The study also examined the effect of consumer demographic characteristics and product familiarity on the likelihood of confusion estimates derived from the various techniques.

B. *Methodology*

The 992 respondents included consumers intercepted at two shopping centers (most of them approached when exiting a supermarket), visitors to a popular science museum, members of religious organizations, and PTA members. The introduction to each task illustrated the difference between a brand, a manufacturer, and a product category. Respondents were told that all brands that they would encounter were real brands; however, some of the brands were only sold in certain parts of the country and may thus be unfamiliar. n39 They then received instructions specific to their task.  On the last page of the questionnaire, respondents were asked regarding each product category included in the questionnaire whether they: (1) used that product before, (2) bought the product before, and (3) were very familiar, somewhat familiar, or not familiar with that product category.  Finally, respondents entered their age, education level, sex, and from which state they were.

n39 Whenever possible, respondents received after completing the questionnaire a debriefing sheet, which explained the purpose of the study.

The respondents were randomly assigned to one of several task versions, which are briefly described next (as well as the example in Appendix A at the end of this article). n40

n40 There was one additional task, not described here, in which respondents assessed the likelihood that the company that puts out the senior mark will also use the junior mark.  More details about the study are available from the author.

1. The Exxon Format

The task included two parts, with the same twelve (junior) brand names in both parts.  In the first part, respondents were asked: "(1) What is the first thing that comes to mind when  [*375]  looking at this brand name?  (2) What was that about the brand name that made you say that?" In the second part of the questionnaire, the same brand names were presented again, and respondents were asked: "(1) What is the first company that comes to mind when looking at this brand name?  (2) What was that about the brand name that made you say that?" It was expected and later confirmed that, in virtually all cases in which the response in the first part of the questionnaire mentioned a company name, the same name was entered in the second part.  Each brand name was preceded by the name of the product category and a brief description of the product.

In addition to the twelve junior (infringing) brand names, the questionnaire included familiar names, such as Tylenol analgesic, V-8 vegetable juice, and Sprite soft drinks. These names, which were scattered among the junior names, were designed to support the claim that all names represented real brands. Indeed, the written answers of the respondents showed that none of them questioned the fact that all brand names represented real brands. To account for the possibility that the order of the brand names in the questionnaire influenced the responses, there were two versions of the Exxon Format, with the names in the two versions appearing in reversed orders. n41

> n41 A similar order manipulation was used in all other tasks as well. In all cases, the results showed no statistically significant differences based on order.

2. The Eveready Format

Two variants of the Eveready Format were used. One version followed the standard format with the questions: "(1) Which company do you think puts out this brand? (2) What makes you think so?, (3) Name other products, if any, put out by the same company." As suggested earlier, the question about other products by the same company may lead respondents to name companies that have other familiar products. Furthermore, this question is expected to provide additional information about confusion only when respondents do not know the name of the company that puts out the senior brand but are familiar with other products put out by the same company. For many of the senior names selected for this study, however, it was expected that the question regarding other products put out by the same company would not add much useful information about the likelihood of confusion. For example, most respondents are more likely to know the names of Chicken of the Sea canned tuna, Rolex watches, or Dannon yogurt than to know other products put out by the companies that put out these brands.

[*376] As suggested earlier, with the Eveready Format, respondents may give answers about the company that puts out the brand that is associated with low confidence. Clearly, actual confusion is more likely to occur if consumers believe they know with certainty the identity of the company that puts out a particular brand than if they can only provide a low probability guess. Thus, in the second version of the Eveready Format, the third question was replaced with the question, "How confident are you about the company?" Responses were entered in percents on a 0 - 100 scale.

3. The Squirt Format

In each product category respondents were asked two questions: (1) whether they thought the junior and senior brands were put out by the same or different companies, and (2) what made them think so. For example, in the deodorant category, the first question was, "Do you think OLD SPICE deodorant and NEW SPICE deodorant are made by the same or different companies?" In each case respondents answered by circling SAME or DIFFERENT and provided an explanation.

4. Simulated Choice

Respondents made a series of choices in different product categories. Prior to making a choice, they were told to list the advantages of each brand in the choice set on the basis of the reputation and their familiarity with the brand and its manufacturer. They were instructed to indicate that they did not know a brand if they had no information about it.

The simulated choice task was designed, in addition to estimating likelihood of confusion, to examine influences on and consequences of confusion. That included:

(a) The effect of presenting the senior and junior trademarks side by side -- In the market place, senior and junior marks sometimes appear side by side, whereas in other cases, consumers are exposed to the junior mark without also seeing the senior mark. Courts have recognized that this factor may influence the likelihood of confusion. n42 As the Fifth Circuit observed: "[T]he inability to compare the products side by side and observe the precise differences in appearance may increase the likelihood of confusion, . . . [because] the consumer must rely on memory rather than a

visual comparison [of the two marks]." n43 This argument  [*377]  is tested in this study by contrasting the rate of confusion between the junior and senior brands when the choice set includes only the junior mark and a competing brand with the rate of confusion when the senior brand is also included in the choice set.

n42 See McCarthy, supra note 1, § 23:17 at 98.

n43 Sun-Fun Products, Inc. v Suntan Research & Development, Inc., 656 F2d 186, 213 USPQ 91, 96 (CA 5 1981).

(b) The price of the junior brand -- If the price of the junior brand (e.g., a Ronex watch) is lower than the price expected of the senior brand (e.g., a Rolex watch), then consumers might be less likely to confuse the two.  To investigate this question, different choice sets were used in different questionnaires, such that the price of the junior mark was either higher than or equal to the price of the competing brand.

(c) The effect of confusion on the popularity of the junior brand -- This question was examined by comparing the share of the junior brand among respondents who confused it with the senior brand and among those who did not.

(d) The rate of confusion relative to the awareness of the senior brand -- The level of awareness of the senior brand is the upper limit on the likelihood of confusion estimate and is thus relevant to the assessment of confusion.  For example, a 10 percent confusion between a junior brand and a senior brand that is recognized by only 20 percent of consumers may be regarded as significant, whereas 10 percent confusion with a senior brand that is recognized by 100 percent of consumers may be seen as negligible.  The rate of awareness of the senior brand can be determined in the same manner that confusion is estimated, on the basis of brand evaluations.  That is, in each case included in this study, there were choice sets in which the senior rather than the junior brand was included (with the same competing brand), and respondents provided brand evaluations.  For example, one group of respondents made a choice between Reo cookies and Keebler cookies, whereas a second group chose between Oreo cookies and Keebler cookies.

All together there were six different choice set versions for each product category.  Respondents either chose between the junior and a competing brand, with the junior brand priced either equal to or higher than the competing brand, or they chose between the senior (at one of two prices) and the same competing brand, or they chose among the senior, junior, and the competing brand (with the junior at one of two prices).  Each respondent chose from just one of the six choice set versions for each category, using a between-subjects experimental design. n44

n44 In a between-subjects design, there are different versions of each problem such that the differences across versions allow a test of the hypotheses.  Each respondent is randomly assigned to one version of a problem and the hypotheses are tested by comparing the responses to the different versions.  The advantage of a between-subjects design over a design in which the same respondent receives different versions of the same problem (a within-subjects design) is that it guarantees that the response to one version of the problem does not affect and is independent of the response to other versions.

[*378]  *C. Method of Analysis*

The analysis of the data gathered in this study focused on the confusion rates derived from each method.  In addition, several other analyses were conducted in order to investigate (1) the reasons provided by respondents for their answers, (2) the effect of product familiarity and demographic characteristics on confusion rate estimates derived from the various methods, and (3) the effect of confusion on the likelihood of choosing the junior brand.

With the Exxon Format, confusion estimates are based on the percentage of respondents who name the senior mark when answering the questions, "What is the first thing that comes to mind . . . ?" and "What company first comes to mind . . . ?" Since the first thing that comes to mind is often something other than a company name, the confusion

estimates derived from the question focusing explicitly on the company that comes to mind tend to be higher. With the Eveready Format, the confusion rate is based on the percentage of respondents who name the senior mark or its manufacturer. The question, "What other products, if any, are put out by the same company that puts out this brand?" (in one of the two Eveready versions included in this study) may provide additional information about confusion. With the Squirt Format, the confusion rate is based on the percentage of respondents who indicate that the senior and junior brands are made by the same companies.

With the simulated choice format, confusion is inferred from the respondents' evaluations of the junior brand prior to (or after) choosing between the junior brand and another brand. In this study's preliminary application of the simulated choice technique, brand evaluations involved a listing of the advantages of each alternative. In most cases, it was possible to determine whether the respondent confused the junior and senior marks. Specifically, the listed advantages were analyzed by two independent judges, who were unaware of the study's objectives. The judges indicated in each case whether the respondent thought that the junior brand was or was not associated with the senior mark. A few examples of brand evaluations that were coded as reflecting confusion include (1) about Oral Z toothpaste -- "I like their toothbrushes"; (2) about Reo cookies -- "I grew up with them. They have white cream in the middle and are fun to eat"; (3) about Danfree yogurt -- "I ate Dannon yogurts before and liked them"; and (4)  [*379]  about Tuna of the Sea canned tunafish -- "I like their mermaid commercials."

The judges compared their analyses of the responses and found that, in 98 percent of the cases (including cases in which they could not reach a conclusion), they made the same judgments about confusion. They reached agreement on the remaining 2 percent after discussion. In 15 percent of the cases, the judges could not determine whether confusion occurred. For example, if the respondent indicated that the junior brand had no advantages, it could not be unambiguously determined that the junior mark was not confused with the senior mark. It seems likely, however, that most of these cases represent situations in which respondents did not confuse the two brands; if they had recognized the junior brand they would have probably given an indication of that in their responses, especially because all of the senior brands were well-known. n45 This method of analysis, using two independent judges, is commonly employed for analyzing responses consisting of verbal protocols. n46

n45 A pilot study was conducted, in which 81 consumers rated the senior brands used in this study, on a 0 (very poor) to 10 (very good) scale, in terms of how well-known they were, their quality reputation, and how distinctive the names were. In all cases, the average ratings were greater than five, with an average across all brands of 8.0.

n46 See, for example, K. Anders Ericsson and Herbert A. Simon, Protocol Analysis: Verbal Reports as Data (MIT Press, Cambridge, Massachusetts 1984).

In addition to deriving confusion estimates, several additional analyses were conducted. The Exxon, Eveready, and Squirt Formats include the question, "What makes you think so?" The explanations provided were analyzed by two independent judges, as described above, who assigned the explanations into one of several reason categories. The judges (independently) assigned 87 percent of the explanations into the same categories. Disagreements were resolved by discussion.

The effects of demographic variables and product familiarity on confusion were examined using a statistical technique called logit analysis. n47 This technique allows the researcher to separate the effect of each factor on the likelihood of confusing the junior and senior brands. In addition, one could examine the rates of confusion in different groups defined by the explanatory variables. For example, one could contrast the confusion rates derived from the Exxon Format among those who were familiar with the product categories compared to unfamiliar respondents. Finally, analysis of the simulated choice data provides information about  [*380]  the effect of confusion and other factors (e.g., the junior brand's price) on the choice probability of the junior brand. n48

n47 See, eg, Daniel McFadden, Conditional Logit Analysis of Qualitative Choice Behavior, in Frontiers in Econometrics 105-42 (Editor: Paul Zarembka, Academic Press, New York 1973).

n48 More details about the method of analysis and statistical results may be obtained from the author.

*D. Results*

As can be seen in the Table, Appendix B, at the end of this article, there were large differences among the confusion estimates derived from the various techniques.  Furthermore, correlations (across the 12 cases) among the confusion estimates generated by the Exxon, Eveready, Squirt, and simulated choice formats were relatively low (between -.57 and .56), which indicates that the differences among the methods tended to be non-systematic (e.g., one method may show higher confusion in one case versus another whereas a second method shows the opposite trend).  In particular, the confusion estimates derived from the Exxon Format are negatively correlated with those derived from most other techniques.  Interestingly, the estimates generated by the Squirt and simulated choice formats, which are very different techniques, were most highly (positively) correlated ($r = .56$).  Next, the results of each method are described and are contrasted with those derived from other techniques.

1.  Exxon Format

The confusion rates in the Table were based on the question, "What is the first company that comes to mind . . .?," and the numbers in parentheses were derived from answers to the question, "What is the first thing that comes to mind . . .?" The Exxon Format generates by far the highest confusion estimates.  On average, the confusion rates derived from this format are about twice as large as those derived from other methods.

Name similarity was the most common reason given by respondents, accounting for 61 percent of the responses of those who said that the senior brand (or manufacturer) was the first thing that came to mind and 81 percent of those who said that the senior brand was the first company that came to mind.  The second most common explanation for entering the senior brand's name was the fact that the junior brand seemed like a fake or a cheap imitation of the senior brand, accounting for 20 percent of the responses of those who said that the senior brand was the first thing that came to mind.

Analysis of the demographic and product familiarity effects revealed that prior usage of the product, prior purchase of the  [*381]  product, greater stated familiarity with the product, and higher education were associated with a higher likelihood of naming the senior brand.  For example, those who used the product before (e.g., those who have used camcorders) were, on average, 21 percent more likely to name the senior brand (e.g., RCA) when shown the junior brand name (RC-CAM).  Older age, on the other hand, was associated with a lower likelihood of naming the senior brand.  In other words, according to the Exxon Format, consumers with greater product familiarity and experience and those who are better educated are more likely to confuse the junior and senior brands, whereas older consumers are less likely to be confused.

2.  Eveready Format

The confusion rates in the Table for the two Eveready versions were derived based on answers to the question, "Which company do you think puts out [the junior brand]?" One version followed the standard Eveready Format, including a question about other products put out by the same company.  In the other version, respondents were asked how confident they were about the company that put out the (junior) brand.  Generally, the Eveready Format led to confusion rate estimates that were significantly lower than those derived from the Exxon Format, but slightly higher than the Squirt and simulated choice estimates.

The confusion estimates derived from the version that includes the question about other products were higher, by an average of 7 percent, than those derived from the other Eveready version.  This difference might reflect the influence of the question about other products, which might lead respondents to enter names of companies with other known products. n49 The inclusion of the confidence question, conversely, may or may not affect the derived confusion

estimates. On the one hand, mentioning the confidence about the responses may make the possibility of an error more salient and suggest that the answers are not as obvious as they might seem, thus making respondents more cautious. On the other hand, the fact that respondents can indicate that their responses are associated with low confidence may legitimize entering mere guesses. The average confidence rating of respondents who named the senior brands (or their manufacturers) as the companies that put out the corresponding junior brands ranged between 30 percent and 70 percent; in 9 out of the 12 cases, the average confidence rating was less than 50 percent.

       n49 See Boal, supra note 6.

In this study, the question about other products did not affect the confusion estimates that were derived on the basis of answers [*382] to the first question ("Which company puts out . . ."). Respondents who did not know the name of the company that put out the junior brand also did not know other products put out by the same manufacturer. The Texon motor oil represented a special case, because more respondents associate the name Texon with Texaco than with the senior brand in this study, Exxon. Since Texaco like Exxon sells gasoline (and other products), one cannot use the answers to the question about other products to infer confusion between Texon and Exxon. The same problem, though to a much smaller extent, arose with the Packard name, where a minority of respondents associate this name with Packard Bell rather than Hewlett Packard (although in this case, Hewlett Packard sells products such as printers and calculators that Packard Bell does not offer).

The most common explanations provided by respondents for their answers about the companies that put out the junior brands were name similarity and the other products put out by these companies. Analysis of demographic and product familiarity effects (across both Eveready versions) revealed that respondents who stated that they were more familiar with the product categories were significantly more likely to name the senior brand as the company that put out the junior brand. Specifically, those who indicated they were very familiar with the products were 15 percent more likely to name the senior brands than those who indicated they were not familiar with the products. Respondents who used the products before were 12 percent more likely to name the senior brands than nonusers, and respondents under 30 years old were more likely to name the senior brands than those over 30.

   3. Squirt Format

The confusion rates derived from the Squirt Format, based on the percentage of respondents who thought the junior and senior brands were put out by the same companies, were comparable to those derived from simulated choice, and to a lesser extent, to estimates derived from the Eveready Format. There were large differences between the Squirt and simulated choice estimates for Danfree yogurt and Oral Z toothpaste, moderate differences in three cases, and small differences in five cases (the simulated choice confusion estimates for Texon and to a lesser extent Packard are inconclusive, as explained below).

The most common explanation for answers that the two brands were put out by the same company was name similarity, followed by the arguments that the junior and senior brands were logical extensions and that trademark laws would not allow [*383] another company to use that name. The lack of name similarity was the most common explanation as to why the two brands were put out by different companies, followed by the arguments that the junior brand appeared like a "copycat" or an imitation of the senior brand and that it was illogical that the senior brand would use the junior brand name. Analysis of the demographic and product familiarity effects revealed that none of these factors had a significant influence on the likelihood of indicating that the junior and senior brands were put out by the same companies.

   4. Simulated Choice

The confusion rate estimates derived from the simulated choice format are comparable to those based on the Squirt Format, and they are similar on average to the estimates derived from the confidence version of the Eveready Format. As was the case with the Squirt Format, none of the demographic and product familiarity characteristics had a

significant effect on the confusion estimates derived from simulated choice.

As indicated, in this preliminary application of the simulated choice format, confusion between the junior and senior brands was determined based on an analysis of the advantages of the junior brands that were listed by respondents. In the case of Texon motor oil, it was not possible to determine in many cases whether respondents confused Texon with Exxon or with Texaco. That is, although Exxon does have some distinctive characteristics, the similarities between Exxon and Texaco are too great and do not permit us to determine with which of the two senior brands Texon was confused. The results in the Eveready versions suggest that Texon was confused with Texaco more than twice as often as with Exxon. The same problem, though to a much lesser extent, occurred with the Packard personal computer, which some respondents associated with Packard Bell rather than Hewlett Packard. Thus, the confusion estimate for Packard in the Table, 61 percent, is somewhat (probably around 10 percent) higher than it should be.

In addition to measuring the absolute percentage of respondents who confuse the junior brand with the senior brand, it might be of interest to calculate the degree of confusion relative to the share of respondents who are aware of the senior brand. That is, the senior brand's awareness is the upper limit on the likelihood of confusion estimate. The rate of awareness of the senior brands can be estimated in the same way that confusion rates were measured, based on an analysis of the listed advantages of the senior brands in the choice set versions that included these brands (rather than the junior brands) and a competitor. For example, in [*384] one of the simulated choice versions in the cookies category, respondents chose between Oreo (rather than Reo) and the competing brand, Keebler. Analysis of the listed advantages of Oreo cookies can be used to determine whether respondents recognized that brand. As can be seen in the Table, confusion rates calculated relative to the senior brands awareness were, in most cases, just slightly higher than the absolute confusion rates. However, in some cases (e.g., in the tooth paste category), the confusion estimates are significantly higher if the (relatively low) awareness rates of the senior brands (e.g., the 62 percent awareness of Oral B) are taken into consideration.

The results in the simulated choice task were also used to evaluate the effect on confusion of (1) having the junior and senior brands side by side, and (2) the price of the junior brand relative to a competitor. As can be seen in the Table, the likelihood of confusing or associating the junior brand with the senior brand decreased significantly and was negligible in many cases when the senior brand was presented as well. With respect to price effect, the results indicate that respondents were slightly more likely to confuse the junior with the senior brand when it was priced higher rather than equal to the competing brand, but this effect did not have statistical significance.

The simulated choice results also provided information regarding the effect of confusion between the junior and senior brands on the likelihood of choosing the junior brand over a competing brand. As would be expected, confusion between the two brands significantly increased the probability of choosing the junior brand, from 9 percent to 56 percent. n50 Finally, although higher product familiarity, prior usage, and prior purchase of the products did not affect the likelihood of confusion, they were associated with a lower probability of selecting the junior brand (differences of around 10 percent).

     n50 Some respondents (included in the 9 percent) selected the junior brand because of objections to the competing brand, even though they were not familiar with the junior brand and did not confuse it with the senior brand.

## IV. DISCUSSION

The results of the present study indicate that assessments of likelihood of confusion are highly sensitive to the estimation method employed. In other words, in many cases, the choice of a survey technique may determine the outcome. Unfortunately, there is no one "correct" method that generates the most accurate likelihood of confusion estimates in all situations, and each method has some limitations. In order to select an appropriate [*385] survey

technique for a particular case, it is necessary to understand the advantages and limitations of the various methods on the basis of a careful analysis of the respondent's task.

One technique, the Exxon Format, stands out as being generally inappropriate for estimating likelihood of confusion. It tends to overestimate the likelihood of confusion, often by a significant amount. Moreover, the derived estimates were negatively correlated with those generated by most other techniques; that is, the Exxon estimates were relatively high in cases where the estimates based on other techniques were relatively low, and vice versa. For example, in the case of the junior brands Wanasonic and Ronex, the other techniques and common sense suggest low likelihood of confusion (with Panasonic and Rolex, respectively), whereas the Exxon derived estimates were 83 percent for Wanasonic and 71 percent for Ronex. In addition, the finding that the likelihood of confusion derived from the Exxon Format is higher among consumers who are better educated and have greater product familiarity raises further doubts about the validity of this method.

The underlying limitation of the Exxon Format appears to be that what comes to mind is a highly inaccurate indicator of likelihood of confusion. If confusion between two marks is such that consumers do not distinguish between them, then the Exxon Format is unlikely to capture that confusion because naming the senior mark when seeing the junior mark requires respondents to distinguish between the two. n51 If, on the other hand, there is confusion between two marks that are similar but distinguishable, then the Exxon Format may reveal that confusion. However, in answering the question on what comes to mind, respondents, unlike consumers, do not have to consider whether it is likely that the name they indicate is the manufacturer of or is associated in the market place with the provided (junior) name. Indeed, 20 percent of the respondents in the Exxon task, who named the senior brands, explicitly explained that the brand names given to them appeared to be cheap imitations of the senior marks.

　　　　n51 Supra note 25.

The Eveready Format is superior to the Exxon Format in that it directly addresses the question of confusion. In situations in which consumers do not distinguish between the junior and senior marks and know the name of the company that puts out the senior mark, or if they do not know the company but are familiar with other products put out by that company (as in the original Eveready case), this procedure provides a way to reveal confusion. An advantage of the Eveready Format compared to the Squirt  [*386]  Format is that respondents are not given both the junior and senior marks, and thus, only those who already know the senior mark and might actually confuse the two can provide responses that would be regarded as reflecting confusion. Compared to simulated choice, the Eveready Format provides an estimate of likelihood of confusion that does not require any judgments.

The Eveready Format, however, also has some limitations. One concern is that this technique tends to inflate confusion estimates, though not as much as the Exxon Format. Respondents may feel that they should give an answer and are expected to know the name of the company that puts out the junior brand. Consequently, many of the responses that identify the senior mark might be mere guesses that would not have resulted in actual confusion in the market place. Indeed, the results of the present study suggest that most responses naming the senior mark were associated with relatively low confidence. Furthermore, the finding that those who have greater familiarity with the product category are more likely to name the senior mark (i.e., greater familiarity is associated with a higher likelihood of confusion) suggests that respondents try to demonstrate their knowledge by providing the names that appear like the best guesses.

In other cases, the Eveready Format may lead to confusion estimates that are too low. For example, the Eveready estimate for Tuna of the Sea was lower than those derived from all other techniques. Apparently, many respondents realized that the maker of Chicken of the Sea would be unlikely to use the name Tuna of the Sea. However, consumers in the market place may fail to distinguish the two marks and buy Tuna of the Sea thinking they are buying Chicken of the Sea.

An apparent advantage of the Squirt Format is that, in many cases, it generated confusion estimates that were

relatively close to those derived from other formats, especially simulated choice.  It appears that respondents are often quite good at judging whether two marks are put out by the same or different companies, although it is not at all clear that they would have considered this question in a normal purchase situation.  A limitation of the Squirt Format is that, unlike most purchase situations, respondents are shown the junior and senior marks side by side.  Consequently, even respondents who are unaware of the senior mark and thus could not have confused the two in actual purchase situations, might still indicate that the two marks are put out by the same company.  This limitation can have a significant effect on confusion estimates when the awareness level of the senior mark is low.  For example, among all senior names used in the present research, Oral B had the lowest recognition  [*387]  level. n52 As shown in the Table, the Squirt confusion estimate for Oral Z was higher than those derived from other formats (excluding Exxon).  This finding suggests that some of those who indicated that Oral Z and Oral B were put out by the same company would not have thought about Oral B had it not been mentioned in the question.

n52 On the basis of a pilot study; see supra note 45.

The proposed simulated choice technique avoids many of the limitations of the other formats.  However, in order to apply simulated choice effectively, the researcher should be able to determine unambiguously, on the basis of the respondents' brand evaluations, whether confusion between the junior and senior marks occurred.  Unlike other techniques, the simulated choice task does not focus attention on possible associations of trademarks, but rather, it puts respondents in their familiar role of consumers making purchase decisions.  Consequently, this task is less likely to cause respondents to consider trademark associations that they would not have thought about and to show confusion that would not have occurred in ordinary purchase situations.

Simulated choice may also be more balanced in terms of the types of trademark confusion it can reveal.  As noted earlier, confusion estimates derived from the Exxon Format are driven by the similarity of the junior and senior names.  The Eveready and Squirt tasks, conversely, tend to focus on whether it is logical that the two marks are likely to be put out by the same company.  Thus, the Eveready and Squirt Formats tend to lead to relatively high confusion estimates when the senior and junior marks appear as logical extensions (e.g., Dannon and Danfree and RCA and RC-CAM), even though many consumers might not have thought about the senior brand had they not been asked about name associations.  These formats are expected to lead to relatively low confusion estimates when the two marks are confusingly similar, but it appears unlikely that the same company will use both names (e.g., Chicken of the Sea and Tuna of the Sea).  Compared to these techniques, simulated choice appears to offer a way to capture confusion both when the two marks are so similar that they are almost indistinguishable as well as in cases where the junior mark appears like an extension of the senior mark.  Finally, as illustrated in the present study, the simulated choice technique allows the researcher to collect other pertinent information regarding various influences on the likelihood of confusion.

The fact that with the simulated choice format confusion is inferred indirectly in the context of a choice task is a strength of  [*388]  this technique but also its main potential limitation.  With other techniques, the criterion for confusion is usually clear and unambiguous.  With the simulated choice format, on the other hand, confusion is determined on the basis of analysis of respondents' evaluations of the alternatives before or after choice.  The challenge for the researcher is to design the task such that the existence of confusion can be decided unambiguously.  As suggested earlier, the specific brand evaluation questions should be tailored to the particular case so that they maximize the likelihood of demonstrating any confusion that might exist without revealing the purpose of the study.  Such questions might include an evaluation of the advantages and disadvantages of each brand, what if anything respondents know about the quality of other products made by the same company, whether they had any previous experience with these brands, what they know and think about its advertising, and so on.  It is expected that, in most cases, the researchers conducting the study will be able to identify appropriate questions that will allow using the simulated choice format effectively.

V.  CONCLUSION

83 TMR 364, *388

This article examined the differences among a number of commonly used techniques for estimating likelihood of trademark confusion and assessed the sensitivity of confusion estimates to the methodology used.  Given the significant differences among the various techniques, it was expected that they would lead to systematically different confusion estimates.  Indeed, the empirical study showed substantial method sensitivity, with estimates derived from one technique often two to three times greater than those generated by other techniques.

Unfortunately, all methods are bound to have some flaws and no one technique is likely to provide the perfect estimates in all cases.  Researchers in the social sciences have long recognized that all methods are flawed, especially when they are designed to measure complex and unobservable constructs such as confusion.  To get around this problem, research methodology experts proposed using multiple methods, each having different strengths and weaknesses. n53

> n53 See, for example, Donald T. Campbell and Donald W. Fiske, Convergent and Discriminant Validation by the Multitrait-Multimethod Matrix, 56 Psychological Bulletin 81-105 (1959).

In the context of trademark confusion, one might be able to reduce the severity of the method sensitivity problem by using, whenever possible, two rather than just one method for estimating  [*389]  likelihood of confusion.  Attorneys may be concerned that presenting two different estimates will weaken their position.  However, one should recognize that all methods have limitations and no one estimate is precisely correct.  Different techniques therefore are expected to generate different confusion estimates.  By combining two estimates, it is possible to reach conclusions that are less method dependent and are closer to the true likelihood of confusion.

[*390]  APPENDIX A

EXAMPLE OF THE SURVEY TECHNIQUES INCLUDED IN THE STUDY

*Exxon Format*

Product Category: VCR (4-head, 30 day/4 event, on-screen program, remote, $ 259)

Brand Name: WANASONIC

(a) What is the first thing that comes to mind when looking at this brand name?

(b) What was that about the brand name that made you say that?

(c) What is the first company that comes to mind when looking at this brand name?

(d) What was that about the brand name that made you say that?

*Standard Eveready Format*

Product Category: VCR (4-head, 30 day/4 event, on-screen program, remote, $ 259)

Brand Name: WANASONIC

(a) Which company do you think puts out this brand?

(b) What makes you think so?

83 TMR 364, *390

(c) Name other products, if any, put out by the same company which puts out WANASONIC VCR:

*Eveready Format: Confidence Version*

Product Category: VCR (4-head, 30 day/4-event, on-screen program, remote, $ 259)

Brand Name: WANASONIC

(a) Which company do you think puts out this brand?

(b) How confident are you about the company (0-100%)?

(c) What makes you think so?

[*391] *Squirt Format*

Product Category: VCR (4-head, 30 day/4 event, on-screen program, remote, $ 259)

(a) Do you think "WANASONIC" VCRs and "PANASONIC" VCRs are made by the same or different companies?

SAME

DIFFERENT

(b) What makes you think so?

*Simulated Choice Format* n54

n54 In other versions of the simulated choice format (evaluated by different groups of respondents; see supra note 44) the Panasonic brand appeared instead of Wanasonic, or both Panasonic and Wanasonic (as well as Goldstar) were included in the choice set (see discussion at supra Section III.B.4).

PRODUCT CATEGORY: VCR

Imagine that you would like to buy a 4-head VCR, with on-screen programming, 1 month/4 event timer, and remote control.  At the store you have a choice between the following two brands:

WANASONIC (Price: $ 259)

GOLDSTAR (Price: $ 259)

1.  Advantages of "WANASONIC":

2.  Advantages of "GOLDSTAR":

3.  Which of these brands would you buy?

[*392]  APPENDIX B

TABLE

A COMPARISON OF LIKELIHOOD OF CONFUSION ESTIMATES DERIVED FROM DIFFERENT TECHNIQUES

| Senior Brand | Junior (Infringing) Brand | Exxon format a | Eveready format with other products question b |
|---|---|---|---|
| HOLIDAY INN | HOLIDAY OUT (campgrounds) | 73% (43%) | 20% |
| OREO | REO (cookies) | 80% (61%) | 48% |
| RCA | RC-CAM (camcorder) | 42% (15%) | 23% |
| OLD SPICE | NEW SPICE (deodorant) | 73% (64%) | 28% |
| RUBBERMAID | PLASTICMAID (food container) | 52% (22%) | 47% |
| DANNON | DANFREE (light yogurt) | 66% (34%) | 70% |
| EXXON | TEXON (motor oil) | 40% (31%) | 17% |
| HEWLETT PACKARD | PACKARD (PC) | 47% (36%) | 44% |
| ORAL B | ORAL Z (tooth paste) | 55% (33%) | 22% |
| CHICKEN OF THE SEA | TUNA OF THE SEA (tuna) | 47% (31%) | 28% |
| PANASONIC | WANASONIC (VCR) | 83% (53%) | 53% |
| ROLEX | RONEX (watch) | 71% (61%) | 26% |
| TOTAL | | 61% (40%) | 36% |

| Senior Brand | Eveready format with confidence question b | Squirt format c | Simulated choice d | Simulated choice as % of senior brand awareness e | Simulated choice with senior & junior brands side-by-side d |
|---|---|---|---|---|---|
| HOLIDAY INN | 24% | 12% | 6% | 8% | 3% |
| OREO | 37% | 12% | 21% | 22% | 3% |
| RCA | 33% | 32% | 20% | 24% | 4% |
| OLD SPICE | 23% | 31% | 33% | 37% | 17% |
| RUBBERMAID | 38% | 24% | 23% | 26% | 5% |
| DANNON | 55% | 60% | 19% | 22% | 5% |
| EXXON | 15% | 14% | | | |
| HEWLETT PACKARD | 53% | 49% | 61% | 65% | 13% |

83 TMR 364, *392

| Senior Brand | Eveready format with confidence question b | Squirt format c | Simulated choice d | Simulated choice as % of senior brand awareness e | Simulated choice with senior & junior brands side-by-side d |
|---|---|---|---|---|---|
| ORAL B | 16% | 37% | 14% | 23% | 6% |
| CHICKEN OF THE SEA | 16% | 37% | 52% | 65% | 18% |
| PANASONIC | 24% | 7% | 7% | 7% | 3% |
| ROLEX | 16% | 3% | 10% | 10% | 1% |
| TOTAL | 29% | 26% | 24% | 28% | 6% |

a The Exxon confusion estimates are based on the share of answers indicating the senior mark (or its manufacturer) in response to the question "What is the first company that comes to mind . . .?"; the numbers in parentheses are based on the question, "What is the first thing that comes to mind. . .?"

b Eveready estimates are based on answers to the question, "Which company puts out. . .?"

c Squirt estimates are based on the share of responses indicating that both brands are put out by the same company.

d Simulated choice estimates are based on the rate of confusion between the junior and senior marks in choice sets in which respondents chose between the junior and a competing brand, or (in the side by side versions) between the junior, senior, and competing brand.

e Simulated choice as percent of senior brand awareness is calculated by dividing the simulated choice confusion estimate by the percent awareness of the senior brand (as determined from evaluations of the senior brands).

# EXHIBIT O

Stephen M. Feldman, OSB No. 93267; sfeldman@perkinscoie.com
Thomas R. Johnson, OSB No. 01064; trjohnson@perkinscoie.com
PERKINS COIE LLP
PacWest Center, Suite 1500
1211 S.W. Fifth Avenue
Portland, Oregon  97204
Telephone:  (503) 727-2000
Facsimile:  (503) 727-2222

        Attorneys for Plaintiffs

Jerre B. Swann; jswann@kilpatrickstockton.com
William H. Brewster; bbrewster@kilpatrickstockton.com
R. Charles Henn Jr.; chenn@kilpatrickstockton.com
(admitted pro hac vice)
KILPATRICK STOCKTON LLP
Suite 2800
1100 Peachtree Street
Atlanta, Georgia  30309
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555

        Of Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| ADIDAS-SALOMON AG and ADIDAS AMERICA, INC., | ) ) ) | NO. CV01-1655 JE |
| Plaintiffs, | ) ) ) | DECLARATION AND SUPPLEMENTAL RULE 26 REPORT OF DR. GERALD L. FORD RE: PAYLESS SHOESOURCE, INC. |
| v. | ) ) | |
| PAYLESS SHOESOURCE, INC., | ) ) | |
| Defendant. | ) ) | |

        I, Dr. Gerald L. Ford, hereby declare as follows:

INTRODUCTION

        1.    I am a partner in the marketing research and

consulting firm of Ford Bubala & Associates, located in

Huntington Beach, California, where I have been engaged in

commercial marketing research and consulting for the past thirty-

two years.  I am also an emeritus faculty member of the School of
Business Administration, California State University, Long Beach,
where I held a full-time teaching position for twenty-five years,
prior to my retirement in 1994.  My professional experience is
further summarized below in paragraphs 96 through 106.

2.    In the instant matter, at the request of counsel
for Plaintiffs, adidas-Salomon AG and adidas America, Inc.
("adidas"), I designed and caused to be conducted a survey to
address the issue of likelihood of post-sale confusion.
Specifically, this survey was designed to measure the degree, if
any, to which the trade dress of a shoe, model #13375, being sold
by Defendant, Payless ShoeSource, Inc. ("Payless"), is likely to
cause confusion with respect to the source, authorization or
approval of Defendant's shoe.  I was also asked to review and
analyze the verbatim survey responses to determine the degree to
which survey respondents who reported that adidas was the source
of, or authorized or approved of Defendant's shoe, and when asked
the basis for their belief, attributed their belief to the
presence of the stripes on Defendant's shoe.

3.    In addition, I was asked to comment, based upon
prior surveys I have designed and caused to be conducted, as to
how these prior surveys relate to the issue of likelihood of
confusion, if any, with respect to the source, or authorization
or approval of other models of Payless shoes.  Specifically, I
have been asked to comment on whether or not, based upon prior
surveys I have designed and caused to be conducted, there is
empirical evidence that would support a finding of a likelihood

of post-sale confusion as to the source, or authorization or approval of other models of Defendant's shoes.

4.    Further, I was also asked to review the results of a survey conducted on behalf of the Defendant by Dr. Henry Ostberg ("Ostberg").  Specifically, I was asked by counsel for Plaintiffs to review the Payless survey results to determine whether or not the results would support a finding of secondary meaning or acquired distinctiveness for the trade dress of the adidas Superstar athletic shoe (i.e., a combination of elements including "...three stripes on the side of the shoe parallel to equidistant small holes, a rubber 'shell toe,' a particularly flat sole and a colored portion on the outer back heel section...").  See Amended Complaint, paragraph ¶17.  I was also asked to review and comment on the Rebuttal Report of Henry D. Ostberg Reviewing a Survey Conducted by Dr. Gerald L. Ford.

5.    Finally, I was also asked to review and comment on a study done by Mr. John Knight ("Knight").

## PAYLESS SHOE MODEL #13375



### SURVEY BACKGROUND

6.    Attached hereto, as Exhibit A, are the results of
the survey which addressed the issue of post-sale confusion
relative to Defendant's shoe.   Exhibit A, Volume I, provides a
synopsis of the survey methodology, color photocopies of the
survey exhibits, the survey screeners and questionnaires,
response frequencies for the survey questions, and a listing of
respondents' verbatim responses to the survey.   Exhibit A, Volume
II, contains a sequential listing of the survey responses and
copies of the Supervisor and Interviewer Instructions, which
provide additional details of the survey protocols, and other
survey-related background materials.

7.    The sample selection, questions, questionnaire
design, and interviewing procedures employed in this survey were
designed in accordance with the generally accepted standards and
procedures in the field of surveys and were designed to meet the

criteria for survey trustworthiness detailed in the <u>Manual for Complex Litigation, Third</u>.[1]

       8.   I was responsible for the design of the survey, the survey's questionnaire, and the instructions given to the survey's supervisors and interviewers, as well as for the procedures to be followed in conducting the interviews. Interviewing, data gathering, and response recordation were carried out, under the direction of Ford Bubala & Associates, by interviewers employed by independent interviewing organizations. Supervisors working on this survey were personally trained by Ford Bubala & Associates with respect to the design, procedures, and related protocols for the survey; and daily shipments of completed interviews from each professional interviewing service were reviewed by Ford Bubala & Associates to confirm that the questionnaires were being properly executed. In addition, approximately fifty percent (49.54%) of the survey interviews were validated, in person, by the survey supervisors personally meeting the survey respondents and confirming their qualification and participation in the survey. Ford Bubala & Associates conducted validations of approximately twenty-two percent (21.98%) of the interviews by recontacting, by telephone, survey

---

[1]    For the proffered poll or survey, "Relevant factors include whether: the population was properly chosen and defined; the sample chosen was representative of that population; the data gathered were accurately reported; and the data were analyzed in accordance with accepted statistical principles...In addition, assessment of the validity of a survey should take into account whether: the questions asked were clear and not leading; the survey was conducted by qualified persons following proper interview procedures; and the process was conducted so as to ensure objectivity..." See the Federal Judicial Center, <u>Manual for Complex Litigation, Third</u>, Section 21.493, @101 (1995).

respondents to confirm their qualification and participation in the survey. Net nonduplicated validations totaled approximately sixty-one percent (60.68%) of all survey interviews.[2] None of the interviews failed to validate.

   9.   The survey conducted in this matter was administered under a double-blind protocol. Specifically, not only were the respondents not informed as to the purpose or sponsor of the survey, but similarly, both the survey's supervisors and interviewers were not informed as to the purpose or sponsor of the survey.

SURVEY STRUCTURE

   10.   The likelihood of post-sale confusion survey conducted in this matter employed a scientific experimental survey design consisting of three cells: a test or experimental survey cell, designed to measure the degree, if any, to which the look or appearance (i.e., trade dress) of Defendant's shoe is likely to cause confusion as to the source or authorization/ approval of Defendant's shoe with the source adidas; and two control survey cells, designed to measure the extent to which mismeasurement error exists in the likelihood of post-sale confusion test cell survey results.

   11.   The control cells or surveys provide a measure of the extent that mismeasurement error exists in the survey results which is not reflective of a likelihood of confusion due to the look or appearance of Defendant's shoe. Specifically, the control cells function as a baseline and provide a measure of the

---

   [2]   This level of validation exceeds industry standards.

degree to which respondents are likely to give the answer adidas, not as a result of the look or appearance of Defendant's shoe but because of other factors, such as the survey's questions, the survey's procedures, the nature of the product, or some other potential influence on a respondent's answer such as brand popularity.

12.   In addition to the two control survey cells, the likelihood of post-sale confusion survey conducted in this matter also employed the use of control questions to assess the basis for the beliefs expressed in response to the survey's source and authorization or approval questions.

13.   In total, six hundred forty-six (646) interviews were conducted in this survey; two hundred seventeen (217) interviews were conducted in the test cell, two hundred sixteen (216) interviews were conducted in control cell 1, and two hundred thirteen (213) interviews were conducted in control cell 2.   The test and control cells were three separate surveys. Any single respondent participated in interviews in only one of the three cells.

14.   The survey exhibit (i.e., survey stimulus) for the test cell was a photograph of Defendant's shoe.   See Exhibit A, Volume I, page 6.   The survey exhibit for control cell 1 was the same photograph of Defendant's shoe with three trade dress elements digitally redacted (i.e., the parallel stripes on the shoe, the shell toe, and the flat sole).   See Exhibit A, Volume I, page 13.   The survey exhibit for control cell 2 was the same photograph of Defendant's shoe utilized in control cell 1, with

the three trade dress elements digitally redacted (i.e., the parallel stripes on the shoe, the shell toe, and the flat sole), and three non-parallel stripes added to the shoe. See Exhibit A, Volume I, page 20. The questions and procedures for the test cell and the control cells were identical with the exception of the photograph or survey stimulus shown to respondents.

15.    This survey employed a shopping mall intercept methodology. Respondents were interviewed by professional interviewing services at shopping centers located in metropolitan markets in nine (9) states (i.e., Arizona, California, Illinois, Maryland, Massachusetts, Minnesota, New York, Tennessee, and Texas), located in each of the nine (9) U.S. Census Divisions.

16.    The relevant universe, for both the test cell and the control cells, was the same and was defined as females, eighteen years of age or older, who within the next six months were likely to purchase a pair of athletic shoes for athletic or casual use.[3] [4]

---

[3]    Additionally, the likelihood of post-sale confusion survey universe was also restricted as follows:  (1) to respondents who did not, nor did anyone else in their home, work for an advertising agency or marketing research firm, or a retail store or company that makes, sells, or distributes any shoes; (2) to respondents who, during the preceding three/six/nine months, had not participated in any marketing research surveys, other than a political poll; and (3) to respondents who, during the preceding three/six/nine months, had not heard anything about the subject of any of the interviews being conducted at the mall.

[4]    Control cell 2 was conducted in two phases.  Initially, control cell 2 included interviews with approximately two hundred (217) male and female respondents.  Subsequently, approximately one hundred (108) additional interviews were conducted with female respondents.  The survey responses for the male respondents, in control cell 2, are provided in Exhibit A, Volume II, Appendix K.

17.   The respondent selection procedure employed in this survey was based upon screening for qualified respondents in proportion to the age and gender distribution of the U.S. population until the established quota for each cell was filled. This method provided a respondent base that is believed to be generally representative of the age distribution of females in the U.S. likely to purchase, within the next six months, the type of shoe being sold by Defendant.

SURVEY PROCEDURES AND QUESTIONS

18.   Initially, a potential survey respondent was stopped by an interviewer in the public area of a shopping mall and screened (i.e., asked questions) to determine if the potential respondent met the criteria to be included in the survey universe (i.e., during the next six months was likely to purchase a pair of athletic shoes for athletic or casual use, etc.).  See Exhibit A, Volume I, pages 7-8, 14-15, and 21-22.

19.   If a potential respondent fulfilled the screening criteria, or survey universe definition, she was then invited to return with the interviewer to the professional interviewing service facility located within the shopping mall to complete the interview.  See Exhibit A, Volume I, pages 9-11, 16-18, and 23-25.  The interviewer then escorted the survey respondent into a private interviewing area.  In the private interviewing area, the respondent was told:

In a moment, I am going to show you a picture of
an athletic shoe; and then I will ask you a couple of
questions.

Please understand that we are only interested in
your opinions; and if you don't have an opinion or
don't know the answer to a question, that is an
acceptable answer.

The interviewer then handed the respondent either the test cell

photograph or one of the control cell photographs, and the

respondent was then told:

Would you please look at the shoe in this picture
as you would if you saw someone wearing a pair of these
shoes.  Please take as much time as you like, and let
me know when you are ready to continue.

When the respondent indicated that she was ready to continue, she

was asked:

5.0   Who do you believe makes or puts out these
shoes?[5]

For respondents who indicated a belief as to the source of the

shoe, the interviewer asked the basis for that belief with the

questions:

5.1   Why do you say that?

and

5.2   What else, if anything, makes you say that?

Next, respondents were told:

_____

[5]     The first principal survey question (i.e., question
5.0/5.1/5.2) was designed to address the issue of likelihood of
confusion as to source or origin and was patterned after similar
accepted questions.  See Union Carbide Corp. v. Ever-Ready, Inc.,
531 F.2d 366 (7th Cir. 1976), cert. denied, 429 U.S. 830, 50 L.
Ed. 2d 94, 97 S. Ct. 91 (1976); E. & J. Gallo Winery v. Gallo
Cattle Co., 12 USPQ2d 1657, 1674 (E.D. Cal. 1989), aff'd, 967
F.2d (9th Cir. 1992); and J. Thomas McCarthy, McCarthy on
Trademarks and Unfair Competition, Vol. 6 §32:174 @ 32-339, Rel.
#39, 9/2006.

6.0   Now, I am going to ask you a question that has
      three choices.  After I am done, if you want me to
      read the question again, just ask me.

and then asked:

Do you believe that this shoe...
*   one, *is* being put out with the authorization or
    approval of any other company or companies;
*   two, is *not* being put out with the authorization
    or approval of any other company or companies;[6]
    or
*   three, don't know or have no opinion?

Respondents who indicated the belief that the shoe was put out

with the authorization or approval of any other company or

companies were asked:[7]

6.1   What other company or companies?

If the respondent provided a company's name or companies' names,

she was asked the basis for the belief and for additional

information on the company/companies with the questions:

6.2   Why do you say that?

and

6.3   What else, if anything, makes you say that?

SURVEY RESULTS

20.   As was previously noted, the survey involving the

Payless shoe consisted of a test cell and two control cells.  In

---

[6]   To guard against any order bias, the first two
alternatives in this list were rotated (i.e., approximately one-
half of the respondents were read the list with the first
alternative being "...*is* being put out with the authorization or
approval..." and approximately one-half of the respondents were
read the list with the first alternative being "...is *not* being
put out with the authorization or approval...").

[7]   The principal survey question designed to address
likelihood of confusion as to authorization/approval was also
patterned after similar accepted questions.  J. Thomas McCarthy,
McCarthy on Trademarks and Unfair Competition, Vol. 6 §32:175 @
32-340, Rel.#39, 9/2006.

the test cell, following a review of the photograph of the
Payless shoe, approximately forty-two percent (42.40%) of the
respondents expressed the belief that the Payless shoe was made
or put out by adidas.  See Exhibit A, Volume I, Table 1, page 26,
and Table 16, page 165.  In control cell 1, following a review of
the photograph of the Payless shoe with the stripes, toe, and
flat sole redacted, approximately five percent (5.09%) of the
respondents expressed the belief that the control shoe was made
or put out by adidas.  See Exhibit A, Volume I, Table 6, page 75,
and Table 16, page 165.  In control cell 2, following a review of
the photograph of the Payless shoe with the stripes, toe, and
flat sole redacted, and three non-parallel stripes added,
approximately nine percent (9.39%) of the respondents expressed
the belief that the control shoe was made or put out by adidas.
See Exhibit A, Volume I, Table 11, page 121, and Table 16, page
165.

21.  Alternatively, for the test cell control
questions, following a review of the photograph of the Payless
shoe, approximately thirty-seven percent (36.87%) of the survey
respondents expressed the belief that the Payless shoe was made
or put out by adidas, and in response to the control questions
(i.e., "Why do you say that?", "What else, if anything, makes you
say that?"), reported that the reason they held that belief was
because of the look or appearance features of the Payless shoe.
See Exhibit A, Volume I, Table 1, page 26, and Table 16, page
165. In control cell 1, approximately five percent (5.09%) of the
respondents expressed the belief that the control shoe was made

or put out by adidas and when asked why (i.e., the control
question), made reference to the look or appearance features of
Defendant's shoe as the reason for their belief.  See Exhibit A,
Volume I, Table 6, page 75, and Table 16, page 165.  In control
cell 2, approximately eight percent (7.98%) of the respondents
expressed the belief that the control shoe was made or put out by
adidas and when asked why (i.e., the control question), made
reference to the look or appearance features of Defendant's shoe
as the reason for their belief.  See Exhibit A, Volume I, Table
11, page 121, and Table 16, page 165.

### TABLE 16
### TEST CELL AND CONTROL CELL

Q5.0    Who do you believe makes or puts out these shoes?
Q5.1    Why do you say that?
Q5.2    What else, if anything, makes you say that?

| Response Categories | Response Distribution | | |
| --- | --- | --- | --- |
| | Test Cell Payless Shoe Percent (n=217) | Control Cell 1 Percent (n=216) | Control Cell 2 Percent (n=213) |
| 1. adidas – appearance | 36.87 | 5.09 | 7.98 |
| 2. adidas – other | 5.53 | -- | 1.41 |
| Subtotal | 42.40 | 5.09 | 9.39 |

     22.  Next, when respondents in the test cell for the
Payless shoe were asked if they believed the Defendant's shoe was
put out with the authorization or approval of any other company
or companies, an additional approximately five percent (5.07%)
expressed the belief that the Payless shoe was being put out with
the authorization or approval of adidas.  See Exhibit A, Volume
I, Table 2, page 49, and Table 17, page 166.  When respondents in

SUPPLEMENTAL RULE 26 REPORT        - 13 -
OF DR. GERALD L. FORD

control cell 1 were asked if they believed the control cell 1
shoe was being put out with the authorization or approval of any
other company or companies, an additional approximately one
percent (0.93%) expressed the belief that the control cell 1 shoe
was being put out with the authorization of approval of adidas.
See Exhibit A, Volume I, Table 7, page 98, and Table 17, page
166.  When respondents in control cell 2 were asked if they
believed the control cell 2 shoe was being put out with the
authorization or approval of any other company or companies, an
additional approximately one percent (0.94%) expressed the belief
that the control cell 2 shoe was being put out with the
authorization of approval of adidas.  See Exhibit A, Volume I,
Table 12, page 142, and Table 17, page 166.

        23.  Alternatively, for the test cell control
questions, following a review of the photograph of the Payless
shoe, approximately five percent (4.61%) of the survey
respondents expressed the belief that the Payless shoe was put
out with the authorization or approval of adidas and in response
to the control questions (i.e., "Why do you say that?" and "What
else, if anything, makes you say that?) reported that the reason
they held that belief was because of the look or appearance
features of the Payless shoe.  See Exhibit A, Volume I, Table 2,
page 49, and Table 17, page 166.  In control cell 1,
approximately one percent (0.93%) of the survey respondents
expressed the belief that the control cell 1 shoe was put out
with the authorization or approval of adidas and in response to
the control questions reported that they held that belief because

of the look or appearance features of the control cell 1 shoe.
See Exhibit A, Volume I, Table 7, page 98, and Table 17, page
166.  In control cell 2, approximately one-half of one percent
(0.47%) of the survey respondents expressed the belief that the
control cell 2 shoe was put out with the authorization or
approval of adidas and in response to the control questions
reported that they held that belief because of the look or
appearance features of the control cell 2 shoe.  See Exhibit A,
Volume I, Table 12, page 142, and Table 17, page 166.

TABLE 17
TEST CELL AND CONTROL CELL

Q6.0    Do you believe that this shoe...
        one, is being put out with the authorization or
        approval of any other company or companies;
        two, is not being put out with the authorization or
        approval of any other company or companies; or
        three, don't know or have no opinion?
Q6.1    What other company or companies?
Q6.2    Why do you say that?
Q6.3    What else, if anything, makes you say that?

| Response Categories | Response Distribution | | |
| --- | --- | --- | --- |
| | Test Cell Payless Shoe Percent (n=217) | Control Cell 1 Percent (n=216) | Control Cell 2 Percent (n=213) |
| 1. adidas - appearance | 4.61 | 0.93 | 0.47 |
| 2. adidas - other | 0.46 | --- | 0.47 |
| Subtotal | 5.07 | 0.93 | 0.94 |

24.  In total, on a net basis, after adjusting for
mismeasurement error based upon control cell 1, approximately
forty-one percent (47.47% - 6.02% = 41.45%) of the survey
respondents expressed the belief that the Payless shoe was either
made by adidas or was being put out with the authorization or

reason for their belief.  See Exhibit B, Table 11, page 122, and
Table 16, page 165.

### TABLE 16
### TEST CELL AND CONTROL CELL

Q5.0    Who do you believe makes or puts out these shoes?
Q5.1    Why do you say that?
Q5.2    What else, if anything, makes you say that?

| Response Categories | Response Distribution | | |
|---|---|---|---|
| | Test Cell Payless Shoe Percent (n=217) | Control Cell 1 Percent (n=216) | Control Cell 2 Percent (n=213) |
| 1. adidas/stripes | 25.35 | --- | 4.23 |
| 2. adidas | 17.05 | 5.09 | 5.16 |
| Subtotal | 42.40 | 5.09 | 9.39 |

        28.  Next, when respondents in the test cell for the
Payless shoe were asked if they believed the Defendant's shoe was
put out with the authorization or approval of any other company
or companies, an additional approximately one percent (0.92%)
expressed the belief that the Payless shoe was being put out with
the authorization or approval of adidas.  See Exhibit B, Table 2,
page 49, and Table 17, page 166.  When respondents in control
cell 2 were asked if they believed the control cell 2 shoe was
being put out with the authorization or approval of any other
company or companies, an additional approximately one-half of one
percent (0.47%) expressed the belief that the control cell 2 shoe
was being put out with the authorization of approval of adidas
and, when asked why (i.e., the control questions), made reference
to the stripes as the reason for their belief.  See Exhibit B,
Table 12, page 141, and Table 17, page 166.

**TABLE 17**
**TEST CELL AND CONTROL CELL**

Q6.0   Do you believe that this shoe...
       one, _is_ being put out with the authorization or
       approval of any other company or companies;
       two, is _not_ being put out with the authorization or
       approval of any other company or companies; or
       three, don't know or have no opinion?
Q6.1   What other company or companies?
Q6.2   Why do you say that?
Q6.3   What else, if anything, makes you say that?

| Response Categories | Response Distribution | | |
|---|---|---|---|
| | Test Cell Payless Shoe Percent (n=217) | Control Cell 1 Percent (n=216) | Control Cell 2 Percent (n=213) |
| 1. adidas/stripes | 0.92 | --- | 0.47 |
| 2. adidas | 4.15 | 0.93 | 0.47 |
| Subtotal | 5.07 | 0.93 | 0.94 |

29.   In total, on a net basis, after adjusting for
mismeasurement error in control cell 2, approximately twenty-two
percent (26.27% - 4.70% = 21.57%) of the survey respondents in
the test cell expressed the belief that the Payless shoe was
either made by adidas or was being put out with the authorization
or approval of adidas and they reported, in response to the
control questions, that they attributed their belief to the
presence of the stripes on Defendant's shoe.  See Exhibit B,
Table 18, page 167.

TABLE 18
TEST CELL AND CONTROL CELL

Composite Response Analysis
All Respondents

| | Response Distribution | | |
|---|---|---|---|
| Response Categories | Test Cell Payless Shoe Percent (n=217) | Control Cell 1 Percent (n=216) | Control Cell 2 Percent (n=213) |
| 1. adidas/stripes | 26.27 | --- | 4.70 |
| 2. adidas | 21.20 | 6.02 | 5.63 |
| Subtotal | 47.47 | 6.02 | 10.33 |

CONCLUSION

30. It is my considered opinion, based upon my education, background, and professional experience, and based upon my review and analysis of results of the survey conducted in this matter, that the results of the survey conducted in this matter support a finding of a likelihood of post-sale confusion. That is, female potential purchasers of athletic shoes, for athletic or casual use, are likely to be confused or deceived by the belief that Defendant's shoe, model #13375, either comes from or is being put out with the authorization or approval of adidas, due to the look or appearance features (i.e., trade dress) and, in particular, the stripes on Defendant's shoe, model #13375.

31. It is also my opinion that the results of the survey support a finding of initial-interest confusion when Defendant's shoe, model #13375, is displayed in a manner where the look or appearance features (i.e., trade dress) and, in particular, the stripes are clearly visible five to ten feet from potential consumers.

SUPPLEMENTAL RULE 26 REPORT
OF DR. GERALD L. FORD

- 20 -

32.  It is also my opinion that the results of the survey in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning for the trade dress of the adidas Superstar athletic shoe (i.e., a combination of elements including "...three stripes on the side of the shoe parallel to equidistant small holes, a rubber 'shell toe,' a particularly flat sole and a colored portion on the outer back heel section...").

33.  It is also my opinion that the results of the survey in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning with regard to parallel stripes and the source adidas.

<u>OTHER SURVEYS</u>

34.  As noted earlier, I was asked to comment, based upon prior surveys I have designed and caused to be conducted, as to how these prior surveys relate to the issue of likelihood of confusion, if any, as to the source, or authorization or approval of other models of Payless shoes.  Specifically, I have been asked to comment on whether or not, based upon prior surveys I have designed and caused to be conducted, there is empirical evidence that would support a finding of a likelihood of post-sale confusion as to the source, or authorization or approval of other models of Defendant's shoes.  The following section provides a description of the other surveys and the attendant findings.

<u>TARGET SHOE SURVEY</u>



35.    In December 2001, at the request of counsel for adidas, I designed and caused to be conducted a survey to address the issue of likelihood of confusion, if any, with respect to the source, or authorization or approval of the shoe emanating from E.S. Originals, Inc., and being sold by Target Corp.

36.    The Target survey results evidence that, on a net basis, after adjusting the survey data for mismeasurement error based upon a control cell (i.e., the Target shoe with no stripes and modified toe), approximately thirty-three percent (32.63%) of the relevant universe of male and female potential purchasers of athletic shoes, for athletic or casual use, expressed the belief that the Target shoe was either made or put out by adidas or was being put out with the authorization or approval of adidas, due to the stripes on the Target shoe.

37.    The Target survey results also evidence that on a net basis, after adjusting the survey data for mismeasurement error based upon the control questions ("Why do you say that?" and "What else, if anything, makes you say that?") approximately thirty-two percent (32.38%) of the relevant universe of male and female potential purchasers of athletic shoes, for athletic or

casual use, expressed the belief that the Target shoe was either made or put out by adidas or put out with the authorization or approval of adidas and, when asked the control questions, made reference to the stripes as the reason for their belief.[8]

38.  It is my opinion that the results of the Target survey support a finding of likelihood of confusion.  That is, male and female potential purchasers of athletic shoes, for athletic or casual use, are likely to be confused or deceived by the belief that the Target shoe either comes from or is being put out with the authorization or approval of adidas, due to the stripes on the Target shoe.  It is also my opinion that the results of the survey in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning with regard to parallel stripes and the source adidas.  See Declaration and Rule 26 Report of Dr. Gerald L. Ford, attached hereto as Exhibit C, without exhibits.

---

[8]     In reviewing the declaration and survey report in the Target matter, it was determined that 4 responses were improperly coded as adidas stripe responses.  Consequently, after the survey results are adjusted for the miscoding, the percentage of respondents reporting the belief that the Target shoe was either made or put out by adidas or put out with the authorization or approval of adidas and when asked the control questions made specific reference to stripes as the reason for their belief is 32.38% and not the 33.81% reported in the Target declaration and survey report.

KMART ATHLETECH SHOE SURVEY



39.   In January 2006, at the request of counsel for adidas, I designed and caused to be conducted a survey to address the issue of likelihood of confusion, if any, of the Athletech shoe, with respect to the source, or authorization or approval of the Athletech shoe emanating from Footstar, Inc., and being sold by Kmart Corp.

40.   The Athletech survey results evidence that, on a net basis, after adjusting the survey data for mismeasurement error based upon a control cell (i.e., the Athletech shoe with three non-parallel stripes), approximately fifteen percent (15.28%) of the relevant universe of male potential purchasers of athletic shoes, for athletic or casual use, expressed the belief that the Athletech shoe was either made or put out by adidas or

was being put out with the authorization or approval of adidas
due to the stripes on the Athletech shoe.[9]

41. The Athletech survey results also evidence that,
on a net basis, after adjusting the survey data for
mismeasurement error based upon the control questions ("Why do
you say that?" and "What else, if anything, makes you say
that?"), approximately twenty-four percent (23.62%) of the
relevant universe of male potential purchasers of athletic shoes,
for athletic or casual use, expressed the belief that the
Athletech shoe was either made or put out by adidas or put out
with the authorization or approval of adidas and, when asked the
control questions, made reference to the stripes as the reason
for their belief.

42. It is my opinion that the results of the Athletech
survey support a finding of likelihood of confusion. That is,
male potential purchasers of athletic shoes, for athletic or
casual use, are likely to be confused or deceived by the belief
that the Athletech shoe either comes from or is being put out
with the authorization or approval of adidas, due to the stripes

────────────

[9]    The control cell survey results, based upon the control
questions, evidence that potential purchasers of athletic shoes,
for athletic or casual use, are likely to be confused or deceived
as to the source, or authorization or approval of Defendants'
Athletech shoe for appearance or trade dress reasons, including
the toe of the Athletech shoe. As such, the adidas responses in
the control cell provide an overestimate of mismeasurement error.
Specifically, a review of the responses to the control questions
evidences that other appearance features associated with the
adidas 2G shoe (e.g., shell-like toe, etc.) led to the
misattribution of the control shoe with adidas. If the toe-only
answers are removed from the control cell, adidas answers would
be reduced to 18.98% in the control, providing for a net
likelihood of confusion of 21.76%.

on the Athletech shoe.  It is also my opinion that the results of
the survey in the instant matter, as well as the results of other
surveys I have designed and caused to be conducted in other
adidas matters, evidence secondary meaning with regard to
parallel stripes and the source adidas.  See Declaration and Rule
26 Report of Dr. Gerald L. Ford, attached hereto as Exhibit D,
without exhibits.

      43.  Further substantiation of the results obtained in
Ford Bubala & Associates' survey of the Athletech shoe are
provided by the survey results obtained by Dr. Roger Tourangeau
("Tourangeau").  In the adidas v. Kmart litigation, Tourangeau
conducted multiple internet surveys with respect to the Athletech
shoe.  The following provides the results of just three of the
surveys Tourangeau conducted among sixteen hundred (1,600)
internet survey respondents.

      44.  In one survey, Tourangeau reports the results of a
survey he characterizes as a replication of the Ford Bubala &
Associates' survey.  In this survey, Tourangeau reports that on a
net basis, after adjusting the survey for mismeasurement error,
approximately twenty-six percent (25.7%) of the survey
respondents evidenced a likelihood of confusion as to the source,
or authorization or approval of the Athletech shoe.  The results
presented by Tourangeau, for the replication survey confirm the
findings in the Ford Bubala & Associates' survey.  Specifically,
that potential purchasers, in a post-sale environment, are likely
to be confused or deceived by the belief that the Athletech shoe
is put out or authorized or approved by adidas.

45.  In another survey, Tourangeau reports the results
of a survey which generally replicates the Ford Bubala &
Associates' survey but includes a full-filter question.
Notwithstanding Tourangeau's use of the full-filter question
(i.e., "Do you happen to know who makes or puts out these
shoes?"), approximately seventeen percent (17.1%) of the
respondents likely to buy athletic shoes, for athletic or casual
use, identified adidas as the source of the Athletech shoe.
Tourangeau's results in this survey are again consistent with the
results obtained in the Ford Bubala & Associates' likelihood of
confusion survey relative to the Athletech shoe and thus provide
additional validation and further evidence of likelihood of
confusion with respect to the source.

46.  Finally, in another survey, notwithstanding
Tourangeau's use of the question "Is this shoe actually made or
put out by (ANSWER TO Q2) or by some other company" among male
respondents likely to purchase an athletic shoe, for athletic or
casual use, approximately one-third (33%) of the respondents, in
response to this question, reported that they believed that
adidas actually made or put out the Athletech shoe.  Once again
these survey results provide validation and further evidence of a
likelihood of confusion.

47.  It is my opinion that although many of
Tourangeau's surveys suffer from serious flaws in survey design,
survey questions, and survey universe, the results of each of the
Tourangeau surveys provide additional empirical evidence
confirming the likelihood of confusion evidenced in the results

obtained in the Ford Bubala & Associates' survey and provide
additional support for a finding of likelihood of confusion with
respect to the Athletech shoe.

KMART OLYMPIAN SHOE SURVEY



48.   In January 2006, at the request of counsel for
adidas, I designed and caused to be conducted a pilot survey to
address the issue of likelihood of confusion, if any, of the
Olympian shoe, with respect to the source, or authorization or
approval of the Olympian shoe emanating from Footstar, Inc., and
being sold by Kmart Corp.

49.   The Olympian survey results evidence that, on a
net basis, after adjusting the survey data for mismeasurement
error based upon a control cell (i.e., the Olympian shoe with
three non-parallel stripes, no shell toe, no mustache, and no
flat sole), approximately twenty-nine percent (28.70%) of the
relevant universe of male potential purchasers of athletic shoes,
for athletic or casual use, expressed the belief that the
Olympian shoe was either made or put out by adidas or was being
put out with the authorization or approval of adidas due to the
stripes on the Olympian shoe.

SUPPLEMENTAL RULE 26 REPORT                    - 28 -
OF DR. GERALD L. FORD

50.   The Olympian survey results also evidence that, on a net basis, after adjusting the survey data for mismeasurement error based upon the control questions ("Why do you say that?" and "What else, if anything, makes you say that?"), approximately twenty-six percent (25.92%) of the relevant universe of male potential purchasers of athletic shoes, for athletic or casual use, expressed the belief that the Olympian shoe was either made or put out by adidas or put out with the authorization or approval of adidas and, when asked the control questions, made reference to the stripes as the reason for their belief.[10]

51.   It is my opinion that the results of the Olympian survey support a finding of likelihood of confusion.  That is, male potential purchasers of athletic shoes, for athletic or casual use, are likely to be confused or deceived by the belief that the Olympian shoe either comes from or is being put out with the authorization or approval of adidas, due to the stripes on the Olympian shoe.  It is also my opinion that the results of the survey in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning with regard to parallel stripes and the source adidas.  See Declaration and Rule 26 Report of Dr. Gerald L. Ford, attached hereto as Exhibit D, without exhibits.

---

[10]    The survey results also evidence likelihood of confusion due to appearance elements in addition to stripes (e.g., flat sole, shell toe, and mustache).

SUPPLEMENTAL RULE 26 REPORT
OF DR. GERALD L. FORD                 - 29 -

FORTUNE DYNAMIC SHOE SURVEY



52.  In April, 2005, at the request of counsel for adidas, I designed and caused to be conducted a survey to address the issue of likelihood of confusion, if any, with respect to the source, or authorization or approval of the shoe being sold by Fortune Dynamic, Inc.

53.  The Fortune survey results evidence that on a net basis, after adjusting the survey data for mismeasurement error based upon the control cell (i.e., the Fortune shoe with three non-parallel stripes, no shell toe, and no flat sole), approximately twenty percent (19.90%) of the relevant universe of female potential purchasers of athletic shoes, for athletic or casual use, expressed the belief that the Fortune shoe was either made or put out by adidas or was put out with the authorization or approval of adidas due to the look or appearance features (i.e., trade dress) and, in particular, the stripes on the Fortune shoe.

54.  The Fortune survey results also evidence that on a net basis, after adjusting the survey data for mismeasurement error based upon the control questions (i.e. "Why do you say that?" and "What else, if anything, makes you say that?"),

approximately nineteen percent (19.44%) of the relevant universe
of female potential purchasers of athletic shoes, for athletic or
casual use, expressed the belief that the Fortune shoe was either
made or put out by adidas or put out with the authorization or
approval of adidas and, when asked the control questions, made
reference to the look or appearance features of the Fortune shoe
as the reason for their belief.  The majority of these
respondents identified the stripes on the Fortune shoe as the
reason for their belief.  A review of the Fortune survey results
evidences that approximately nineteen percent (18.98%) of all
survey respondents expressed the belief that the Fortune shoe was
either made or put out by adidas or put out with the
authorization or approval of adidas and, when asked the control
questions, made specific reference to the stripes on the Fortune
shoe as the reason for their belief.

      55.  It is my opinion that the results of the Fortune
survey support a finding of likelihood of confusion.  That is,
female potential purchasers of athletic shoes, for athletic or
casual use, are likely to be confused or deceived by the belief
that the Fortune shoe either comes from or is being put out with
the authorization or approval of adidas, due to the look or
appearance features of the Fortune shoe and, in particular, the
stripes on the Fortune shoe.  It is also my opinion that the
results of the survey in the instant matter, as well as the
results of other surveys I have designed and caused to be
conducted in other adidas matters, evidence secondary meaning
with regard to parallel stripes and the source adidas.  See

Declaration and Rule 26 Report of Dr. Gerald L. Ford Re:  Fortune
Dynamic, Inc., attached hereto as Exhibit E, without exhibits.

<u>BUM SHOE SURVEY</u>



56.  In December 2002, at the request of counsel for
adidas, I designed and caused to be conducted a survey to address
the issue of likelihood of confusion, if any, of the Mikal shoe,
with respect to the source, or authorization or approval of the
Mikal shoe emanating from B.U.M. International, Inc., and being
sold by Target.

57.  The Mikal survey results evidence that, on a net
basis, after adjusting the survey data for mismeasurement error
based upon a control cell (i.e., the Mikal shoe with no stripes),
approximately nineteen percent (18.99%) of the relevant universe
of male and female potential purchasers of shoes for boys one (1)
to seven (7) years of age, expressed the belief that the Mikal
shoe was either made or put out by adidas or was being put out
with the authorization or approval of adidas due to the stripes
on the Mikal shoe.

58.  The Mikal survey results also evidence that, on a
net basis, after adjusting the survey data for mismeasurement
error based upon the control questions ("Why do you say that?"

and "What else, if anything, makes you say that?"), approximately seventeen percent (16.67%) of the relevant universe of male and female potential purchasers of shoes for boys one (1) to seven (7) years of age, expressed the belief that the Mikal shoe was either made or put out by adidas or put out with the authorization or approval of adidas and, when asked the control questions, made reference to the stripes as the reason for their belief.

59. It is my opinion that the results of the Mikal survey support a finding of likelihood of confusion. That is, male and female potential purchasers of shoes for boys one (1) to seven (7) years of age, are likely to be confused or deceived by the belief that the Mikal shoe either comes from or is being put out with the authorization or approval of adidas, due to the stripes on the Mikal shoe. It is also my opinion that the results of the survey in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning with regard to parallel stripes and the source adidas. See Declaration and Rule 26 Report of Dr. Gerald L. Ford, attached hereto as Exhibit F, without exhibits.

<u>TOKYO PARK - TIM TAM KIDS SHOE #SDA311 SURVEY</u>



60.  In August 2004, at the request of counsel for
adidas, I designed and caused to be conducted a survey to address
the issue of likelihood of confusion, if any, of the Tim Tam Kids
shoe #SDA311, with respect to the source, or authorization or
approval of the Tim Tam Kids shoe #SDA311 being sold by Tokyo
Park Ltd.

61.  The Tim Tam Kids shoe #SDA311 survey results
evidence that, on a net basis, after adjusting the survey data
for mismeasurement error based upon a control cell[11] (i.e., the
Tim Tam Kids shoe #SDA311 with three non-parallel stripes),
approximately twenty-two percent (22.14%) of the relevant
universe of male and female potential purchasers of shoes for
children one (1) to five (5) years of age, expressed the belief
that the Tim Tam Kids shoe #SDA311 was either made or put out by

---

[11]   The survey was originally designed to be comprised of
216 test cell interviews and 216 control cell interviews.  After
216 test cell interviews had been completed and 90 control cell
interviews had been completed, the parties reached a settlement.
Although only 90 of the 216 control cell interviews were
completed, the control cell results are generally consistent with
the control cell results in the survey in the adidas v. Target,
E.S. Originals and B.U.M. International matter (B.U.M. children's
shoe).

adidas or was being put out with the authorization or approval of
adidas due to the stripes on the Tim Tam Kids shoe #SDA311.

62.  The Tim Tam Kids shoe #SDA311 survey results also
evidence that, on a net basis, after adjusting the survey data
for mismeasurement error based upon the control questions ("Why
do you say that?" and "What else, if anything, makes you say
that?"), approximately twenty-two percent (22.41%) of the
relevant universe of male and female potential purchasers of
shoes for children one (1) to five (5) years of age, expressed
the belief that the Tim Tam Kids shoe #SDA311 was either made or
put out by adidas or put out with the authorization or approval
of adidas and, when asked the control questions, made reference
to the stripes as the reason for their belief.

63.  It is my opinion that the results of the Tim Tam
Kids shoe #SDA311 survey support a finding of likelihood of
confusion.  That is, male and female potential purchasers of
shoes for children one (1) to five (5) years of age, are likely
to be confused or deceived by the belief that the Tim Tam Kids
shoe #SDA311 either comes from or is being put out with the
authorization or approval of adidas, due to the stripes on the
#SDA311 shoe.  It is also my opinion that the results of the
survey in the instant matter, as well as the results of other
surveys I have designed and caused to be conducted in other
adidas matters, evidence secondary meaning with regard to
parallel stripes and the source adidas.  See survey synopsis,
attached hereto as Exhibit G.

TOKYO PARK - TIM TAM KIDS SHOE #SD3318 SURVEY



64.   In September 2004, at the request of counsel for adidas, I designed and caused to be conducted a survey to address the issue of likelihood of confusion, if any, of the Tim Tam Kids shoe #SD3318, with respect to the source, or authorization or approval of the Tim Tam Kids shoe #SD3318 being sold by Tokyo Park Ltd.

65.   The Tim Tam Kids shoe #SD3318 survey results evidence that approximately forty-five percent (44.91%)[12] of the relevant universe of male and female potential purchasers of shoes for children six (6) to nine (9) years of age, expressed the belief that the Tim Tam Kids shoe #SD3318 was either made or put out by adidas or was being put out with the authorization or approval of adidas due to the stripes on the Tim Tam Kids shoe #SD3318.

---

[12]   The survey was originally designed to be comprised of 216 test cell interviews and 216 control cell interviews. After 216 test cell interviews had been completed, the parties reached a settlement. Although no control cell interviews were conducted, control cell estimates are provided by the control cell results in the adidas v. Tokyo Park (Tim Tam Kids shoe #SDA311) and the adidas v. Target, E.S. Originals and B.U.M. International (B.U.M. children's shoe) matters.

66.  The Tim Tam Kids shoe #SD3318 survey results also evidence that based upon the control questions ("Why do you say that?" and "What else, if anything, makes you say that?"), approximately twenty-nine percent (28.71%) of the relevant universe of male and female potential purchasers of shoes for children six (6) to nine (9) years of age, expressed the belief that the Tim Tam Kids shoe #SD3318 was either made or put out by adidas or put out with the authorization or approval of adidas and, when asked the control questions, made reference to the stripes[13] as the reason for their belief.

67.  It is my opinion that the results of the Tim Tam Kids shoe #SD3318 survey support a finding of likelihood of confusion.  That is, male and female potential purchasers of shoes for children six (6) to nine (9) years of age, are likely to be confused or deceived by the belief that the Tim Tam Kids shoe #SD3318 either comes from or is being put out with the authorization or approval of adidas, due to the stripes on the #SD3318 shoe.  It is also my opinion that the results of the survey in the instant matter, as well as the results of other surveys I have designed and caused to be conducted in other adidas matters, evidence secondary meaning with regard to parallel stripes and the source adidas.  See survey synopsis, attached hereto as Exhibit H.

---

[13]  The survey results also evidence likelihood of confusion due to appearance elements in addition to stripes (e.g., flat sole, shell toe, and mustache).

SUPPLEMENTAL RULE 26 REPORT
OF DR. GERALD L. FORD

<u>STEVE MADDEN SHOOTER SHOE SURVEY</u>



68.  In October 2002, at the request of counsel for adidas, I designed and caused to be conducted a survey to address the issue of likelihood of confusion, if any, with respect to the source, or authorization or approval of the Shooter shoe with four parallel stripes sold by Steve Madden.

69.  The Shooter shoe survey results evidence that on a net basis, after adjusting the survey data for mismeasurement error based upon control cell 1 (i.e., the Shooter shoe with no stripes), approximately seventeen percent (17.49%) of the relevant universe of male potential purchasers, of this type of shoe being sold by Steve Madden, expressed the belief that the Shooter shoe was either made or put out by adidas or was put out with the authorization or approval of adidas due to the stripes on the Shooter shoe.

70.  The Shooter shoe survey results also evidence that on the basis of the control questions ("Why do you say that?" and "What else, if anything, makes you say that?"), in control cell 1, approximately eighteen percent (18.43%) of the relevant universe of male potential purchasers, of this type of shoe being

sold by Madden, expressed the belief that the Shooter shoe was
either made or put out by adidas or put out with the
authorization or approval of adidas and, when asked the control
questions, made specific reference to the stripes on the Shooter
shoe as the reason for their belief.

71.   Further, the survey results evidence that on a net
basis, after adjusting the survey data for mismeasurement error
based upon control cell 2 (i.e., the Shooter shoe with three non-
parallel stripes), approximately eighteen percent (18.01%) of the
relevant universe of male potential purchasers, of this type of
shoe being sold by Madden, expressed the belief that the Shooter
shoe was either made or put out by adidas or was put out with the
authorization or approval of adidas due to the stripes on the
Shooter shoe.

72.   The Shooter shoe survey results also evidence that
on a net basis, after adjusting the survey data for
mismeasurement error based upon the control questions ("Why do
you say that?" and "What else, if anything, makes you say that?")
in control cell 2, approximately sixteen percent (15.69%) of the
relevant universe of male potential purchasers, of the type of
shoe being sold by Madden, expressed the belief that the Madden
shoe was either made or put out by adidas or put out with the
authorization or approval of adidas and, when asked the control
questions, made reference to the stripes on the Madden shoe as
the reason for their belief.

73.   It is my opinion that the results of the Shooter
shoe survey support a finding of likelihood of confusion.  That

is, male potential purchasers of this type of shoe being sold by
Madden are likely to be confused or deceived by the belief that
the Shooter shoe either comes from or is being put out with the
authorization or approval of adidas, due to the stripes on the
Shooter shoe.  It is also my opinion that the results of the
Shooter shoe survey, as well as the results of other surveys I
have designed and caused to be conducted in other adidas matters,
evidence secondary meaning with regard to parallel stripes and
the source adidas.  See Rule 26 Report of Dr. Gerald L. Ford –
Steve Madden Four Stripe Shoe, attached hereto as Exhibit I,
without exhibits; and see Rebuttal Control Survey Report of Dr.
Gerald L. Ford – Steve Madden Four Stripe Shoe, attached hereto
as Exhibit J, without exhibits.

STEVE MADDEN NANCIE AND NORTHH SHOE SURVEY





74. In August 2002, at the request of counsel for adidas, I designed and caused to be conducted two pilot surveys to address the issue of likelihood of confusion, if any, with respect to the source, or authorization or approval of two models of shoes (i.e., the Nancie, a slip-on shoe, and the Northh, a lace-up shoe), each with two parallel stripes, sold by Steve Madden.

75. The Nancie two stripe survey results, for the slip-on Madden shoe, evidence that, after adjusting the survey data for mismeasurement error based upon a control cell (i.e., the Madden two stripe slip-on shoe with no stripes), approximately twenty-two percent (21.97%) of the relevant universe of female potential purchasers, of the type of slip-on shoe being sold by Steve Madden, expressed the belief that the Nancie two stripe slip-on shoe was either made or put out by

adidas or was put out with the authorization or approval of
adidas, due to the stripes on the Nancie two stripe slip-on shoe.

76.  The survey results for the Nancie two stripe slip-
on shoe also evidence that based upon the control questions ("Why
do you say that?" and "What else, if anything, makes you say
that?") approximately twenty-three percent (22.92%) of the
relevant universe of female potential purchasers, of the type of
slip-on shoe being sold by Steve Madden, expressed the belief
that the Nancie two stripe slip-on shoe was either made or put
out by adidas or was put out with the authorization or approval
of adidas, and when asked the control questions made specific
reference to the stripes as the reason for their belief.

77.  The Northh two stripe survey results, for the
lace-up Madden shoe, after adjusting the survey data for
mismeasurement error based upon a control cell (i.e., the Madden
two stripe lace-up shoe with no stripes and no parallel lines of
holes), evidence that approximately twenty-three percent (22.92%)
of the relevant universe of female potential purchasers, of the
type of lace-up shoe being sold by Steve Madden, expressed the
belief that the Northh two stripe lace-up shoe was either made or
put out by adidas or was put out with the authorization or
approval of adidas, due to the stripes on the Northh two stripe
lace-up shoe.

78.  The survey results for the Northh two stripe lace-
up shoe also evidence that based upon the control questions ("Why
do you say that?" and "What else, if anything, makes you say
that?"), approximately twenty-two percent (21.88%) of the

relevant universe of female potential purchasers, of the type of
lace-up shoe being sold by Steve Madden, expressed the belief
that the Northh two stripe lace-up shoe was either made or put
out by adidas or was put out with the authorization or approval
of adidas, and when asked the control questions made specific
reference to the stripes as the reason for their belief.

79.  It is my opinion that the results of the Madden
two stripe shoe surveys support a finding of likelihood of
confusion.  That is, the relevant universe of female potential
purchasers, of the type of slip-on and lace-up two stripe shoes
being sold by Steve Madden, expressed the belief that the Madden
two stripe slip-on and lace-up shoes were either made or put out
by adidas or were put out with the authorization or approval of
adidas, due to the stripes on the Madden two stripe slip-on and
lace-up shoes.  It is also my opinion that the results of the
surveys in the instant matter, as well as the results of other
surveys I have designed and caused to be conducted in other
adidas matters, evidence secondary meaning with regard to
parallel stripes and the source adidas.  See Rule 26 Report of
Dr. Gerald L. Ford - Steve Madden Two Stripe Shoe, attached
hereto as Exhibit K, without exhibits.

80.  In total, eleven (11) surveys were conducted by
Ford Bubala & Associates at the request of counsel for adidas
over the approximate four-year period from December 2001 through
January 2006.  Approximately fourty-two hundred (4,246)
interviews were conducted in these eleven (11) surveys.  The
consistency in finding measured levels of likelihood of

confusion, given the differences in the shoes tested, is a
testament to the strength of the adidas Three-Stripe Mark.  The
surveys conducted in the previously discussed matters provide
consistent empirical support for the finding that two or four
parallel diagonal stripes on athletic or casual shoes, like the
shoes tested, are likely to cause confusion with respect to the
source, or authorization or approval of such shoes with adidas
due to the stripes.

<u>LIKELIHOOD OF CONFUSION WITH RESPECT TO OTHER PAYLESS SHOES</u>

81.  Based upon the prior surveys that I have caused to
be conducted on behalf of counsel for adidas, I believe that
there is empirical support for a finding of likelihood of
confusion with respect to a number of models of Payless shoes.

82.  It is my considered opinion, based upon my
education, background, and professional experience, and based
upon my review and analysis of results of the survey conducted in
this matter, as well as surveys conducted in the other matters
discussed above, that there is empirical evidence that supports a
finding of likelihood of post-sale confusion or likelihood of
initial-interest confusion with respect to the source, or
authorization or approval of a number of models of Payless shoes
with the source adidas.

83.  Based upon the results of Payless, Target, and
Kmart Olympian surveys, as well as the other surveys reported
herein, it is my considered opinion that these surveys support a
finding that potential purchasers of athletic shoes, for athletic
or casual use, are likely to be confused or deceived by the

belief that the Payless shoes shown in Exhibit L either come from
or are being put out with the authorization or approval of adidas
due to the stripes or other appearance features of these shoes.
See Exhibit L, Payless shoe model numbers: 382, 3121, 3589,
3601, 9828-PAR, 13375, 13467, 14334, 16982, 17494, 21436, 23375,
23661, 29600, 31221, 31772, 34838, 41905, 41908, 42022, 44929,
46799, 47003, and 47004.

84.    Based upon the results of the Kmart Athletech
survey, as well as the other surveys reported herein, it is my
considered opinion that these surveys support a finding that
potential purchasers of athletic shoes, for athletic or casual
use, are likely to be confused or deceived by the belief that the
Payless shoe shown in Exhibit M either comes from or is being put
out with the authorization or approval of adidas due to the
stripes on this shoe.  See Exhibit M, Payless shoe model number:
38784.

85.    Based upon the results of the Madden Shooter
survey, as well as the other surveys reported herein, it is my
considered opinion that these surveys support a finding that
potential purchasers of this type of shoe are likely to be
confused or deceived by the belief that the Payless shoe shown in
Exhibit N either comes from or is being put out with the
authorization or approval of adidas due to the stripes on this
shoe.  See Exhibit N, Payless shoe model number:  19355.

86.    Based upon the results of the Tokyo Park Tim Tam
Kids shoe #SD3318 survey and the B.U.M. shoe survey, as well as
the other surveys reported herein, it is my considered opinion

that these surveys support a finding that potential purchasers of
shoes for children are likely to be confused or deceived by the
belief that the Payless shoes shown in Exhibit O either come from
or are being put out with the authorization or approval of adidas
due to the stripes or other appearance features of these shoes.
See Exhibit O, Payless shoe model numbers:  3041, 10287(A),
10287(B), 12070, 13266, 17148, 18684, 21417, 23893, 25438, 29425,
39155, 40098, 41350, 42006, and 46661.

87.    Based upon the results of the Tokyo Park Tim Tam
Kids shoe #SDA311 survey, as well as the other surveys reported
herein, it is my considered opinion that these surveys support a
finding that potential purchasers of shoes for children are
likely to be confused or deceived by the belief that the Payless
shoes shown in Exhibit P either come from or are being put out
with the authorization or approval of adidas due to the stripes
on these shoes.  See Exhibit P, Payless shoe model numbers:
02479, 12168, 21427, 29701, 29822, 30051, 30052, 33457, 36783,
40521, 40523, 44957, and 44958.

88.    Based upon the results of the Madden Nancie and
Northh surveys, as well as the other surveys reported herein, it
is my considered opinion that these surveys support a finding
that potential purchasers of this type of shoe are likely to be
confused or deceived by the belief that the Payless shoes shown
in Exhibit Q either come from or are being put out with the
authorization or approval of adidas due to the stripes on these
shoes.  See Exhibit Q, Payless shoe model numbers:  PAR-11203,
PAR-11223, PAR-11224, PAR-11225, 22743, 23800, 24728, 26018,

26019, 26638, PAR-29510(A), PAR-29510(B), Predictions 31079, and
Predictions 31077 (Black Stripe).

### LIKELIHOOD OF CONFUSION WITH RESPECT
### TO ELEMENTS OF OTHER PAYLESS SHOES

89.   Based upon the prior surveys that I have caused to
be conducted on behalf of counsel for adidas, I believe that
there is empirical support for a finding that diagonal parallel
stripes on a number of models of Payless shoes are likely to
cause confusion with the source adidas.

90.   It is my considered opinion, based upon my
education, background, and professional experience, and based
upon my review and analysis of results of the survey conducted in
this matter, as well as surveys conducted in the other matters
discussed above, that there is empirical evidence that supports a
finding of likelihood of post-sale confusion or likelihood of
initial-interest confusion with respect to the source, or
authorization or approval based upon the stripes on a number of
models of Payless shoes.

91.   Based upon the results of the Tokyo Park Tim Tam
Kids #SDA311 and the Kmart Athletech surveys, as well as the
other surveys reported herein, it is my considered opinion that
these surveys support a finding that potential purchasers of
athletic shoes, for athletic or casual use, or potential
purchasers of children's shoes are likely to be confused or
deceived by the belief that the Payless shoes shown in Exhibit R
either come from or are being put out with the authorization or
approval of adidas due to the stripes on these shoes.  See
Exhibit R, Payless shoe model numbers:  02193, 09222, 09225,

10604, 10648, 13262, 14011, 26401, 29315, 34309, 34865, 35437, 35438, 39465, 39467, 39468, 44580, and 44581.

92.    Based upon the results of the Madden Shooter and Madden Nancie and Northh surveys, as well as the other surveys reported herein, it is my considered opinion that these surveys support a finding that potential purchasers of shoes of the type tested are likely to be confused or deceived by the belief that the Payless shoes shown in Exhibit S either come from or are being put out with the authorization or approval of adidas due to the stripes on these shoes.  See Exhibit S, Payless shoe model numbers:  19451, 19452, 19547, 21008, 21010, 21034, and 41148.

93.    Based upon the results of the Payless, Kmart, Olympian, Fortune Dynamic, Target, Tokyo Park Tim Tam Kids #SD3318, and B.U.M. surveys, as well as the other surveys reported herein, it is my considered opinion that these surveys support a finding that potential purchasers of athletic shoes, for athletic or casual use, or potential purchasers of children's shoes are likely to be confused or deceived by the belief that the Payless shoes shown in Exhibit T either come from or are being put out with the authorization or approval of adidas due to the stripes on these shoes.  See Exhibit T, Payless shoe model numbers:  3047, 3066, 03144, 03156, 07153, 12524, 12525, 13390, 13715, 14858, 16087, 18622, 20049, 20576, 20577, 20766, 20780, 22316A, 22316B, 22570, 23402, 23845, 23846, 23887, 23888, 24172, 24379, 24380, 24443, 24486, 24624, 24727, 24883, 25741, 25742, 25763, 25833, 25834, 25835, 25836, 26499, 26501, 26575, 26576, 26754, 27257, 27888, 29427, 29933, 30047, 31460, 31663, 31753,

31759, 31870, 32015, 34907, 35663, 35904, 37105, 37106, 37107, 38502, 39317, 41351, 44478, and 44980.

DR. OSTBERG

Conclusion - Dr. Ostberg

94.   It is my considered opinion, based upon my education, background, and professional experience, that although the Payless secondary meaning survey suffers from a number of serious defects, which result in an underestimate of secondary meaning for the trade dress of the adidas Superstar athletic shoe, the results of the Payless secondary meaning survey, nonetheless, clearly support a finding of secondary meaning. Specifically, the results of the Payless survey are clear and unambiguous.   Among all respondents who were asked the Payless survey's secondary meaning question, approximately sixty-three percent (63.09%) reported, after exposure to photographs of an adidas shoe bearing the claimed trade dress, that they recognized the appearance and design of the shoe as one being made by one specific company.   See Rebuttal Report of Dr. Gerald L. Ford, attached hereto as Exhibit U.   This level of recognition of the Superstar trade dress at approximately sixty-three percent

(63.09%) provides evidence that would not only support a finding of secondary meaning but also fame.[14] [15]

95.  In Ostberg's rebuttal report to the Payless survey, four criticisms are raised:

(1)  Only women were interviewed concerning the Payless athletic shoe, even though the disputed Payless shoes are sold to both men and women.

(2)  The research design of the Ford Survey created an artificial condition, failing to simulate a realistic post-sale situation, with the result that any findings concerning possible confusion of the Payless athletic shoe with the adidas Superstar may be overstated.

(3)  The research design included two so-called control cells, which were inappropriate and their implications were misinterpreted.

(4)  The data obtained by Dr. Ford were not properly tabulated and were incorrectly interpreted.

96.  Ostberg is correct that only women were interviewed in the Payless survey.  First, the shoe that was used as a stimulus was a women's shoe and, as such, was shown to women.  Second, it was my understanding that it was believed that the majority of Payless shoes bearing the tested stripes and trade dress were women's shoes.  Third, a measure of likelihood of confusion among men for shoes bearing four parallel equidistant stripes and/or similar trade dress is evidenced by

---

[14]     See Harrods Limited v. Sixty Internet Domain Names, 157 F. Supp. 2d 658, 669 (E.D. Va. 2001) (survey showing 45% of the United States public recognized the trademark supported the conclusion that the mark was famous) and Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev., 955 F. Supp. 605, 613 n.4 (E.D. Va. 1997) (survey showing that over 40% of the United States general public recognized the trademark supported the conclusion that the mark was famous).

[15]     Despite serious flaws, the surveys of Alice Passannante and Dr. Roger Tourangeau provide corroborative evidence of secondary meaning and fame for the trade dress of the adidas Superstar athletic shoe.  See the February 14, 2007, Declaration and Rebuttal Report of Dr. Gerald L. Ford in the adidas v. Kmart matter.

the prior survey results in the Target matter and subsequent
survey results in the Tokyo Park (Tim Tam Kids #SD3318), Kmart
(Olympian shoe), Madden (Shooter shoe), and Kmart (Athletech
shoe) surveys.

97.    Ostberg also argues that leaving the stimulus
photograph with the respondent in some manner biased the survey
results.[16]  In this regard, he is simply incorrect.  First, it
should be noted that what Ostberg proposes is that the survey
stimulus should have been removed from the respondent's view
before asking the critical survey questions.  This is the exact
procedure that caused a court to exclude one of Ostberg's
surveys.  This exclusion was affirmed by the Second Circuit Court
of Appeals.  See <u>Starter Corp. v. Converse Inc.</u>, 170 F.3d 286,
296-297 (2nd Cir. 1999).[17]  Second, leaving the stimulus
photograph with the respondent during the survey questions was
designed to give the respondent every opportunity to distinguish
the Payless shoe from the adidas shoe.

98.    As Dr. Pham notes in his expert report in the
adidas v. Kmart matter, the Ford Bubala & Associates' surveys
provide conservative estimates of likelihood of confusion:

> First, given that (a) the interviews are conducted face
> to face and (b) each respondent is shown a single
> picture of a shoe which is left with the respondent
> throughout the interview, attention to the stimuli in
> these studies should be relatively high.  Therefore,
> one cannot attribute the observed amount of confusion

_____

[16]    Notably, Ostberg offers no empirical evidence to
support this criticism.

[17]    Also see <u>Cumberland Packing Corp. v. Monsanto Co.</u>, 32
F. Supp. 2d 561, 578 (E.D.N.Y. 1999); and <u>Novartis v. Johnson &
Johnson-Merck</u>, 129 F. Supp. 2d 351, 366 (D.N.J. 2000).

to a lack of respondents' attention to the stimuli.  In
fact, in an actual marketplace setting (e.g., consumers
walking through a store), many consumers will be
exposed to the shoes under conditions of lower
attention than those simulated in the Ford surveys,
which conceptually should amplify the magnitude of
confusion.  Second, in the Ford surveys, respondents
report their beliefs about the manufacturer's identity
while looking at the picture of the shoe.  If a
substantial percentage of consumers can be confused
about the identity of  the shoes' manufacturer even
while having direct visual access to the shoes, it is
likely that an even greater percentage would be
confused if they have to rely on their recollection of
a previous exposure to the shoes (e.g., in memory-based
consideration set formation and evaluation).
See Expert Report of Dr. (Michel) Tuan Pham in
Opposition to Defendants' Motion for Summary Judgment
and in Support of Plaintiffs' Motion for Partial
Summary Judgment in adidas v. Kmart matter, page 33,
¶69.

        99.  Next, Ostberg argues that the two control cells

were inappropriate.[18]  Here Ostberg appears to lack an

appreciation for an appropriate control cell.  As noted by

Professor Diamond:

        It is possible to adjust many survey designs so
        that causal inferences about the effect of a trademark
        or an allegedly deceptive commercial become clear and
        unambiguous.  By adding an appropriate control group,
        the survey expert can test directly the influence of
        the stimulus...Respondents in both the experimental and
        control groups answer the same set of questions.  The
        effect of the allegedly deceptive message [or the
        allegedly confusing trademark] is evaluated by
        comparing the responses made by the experimental group
        members with those of the control group members...Both
        preexisting beliefs and other background noise should
        have produced similar response levels in the
        experimental and control groups.  In addition, if
        respondents who viewed the allegedly deceptive
        commercial [or the allegedly infringing trademark]
        respond differently than respondents who viewed the
        control commercial [control trademark], the difference
        cannot be the result of a leading question, because
        both groups answered the same question...

--------------------------------------------------

        [18]    Again, Ostberg offers no empirical evidence to support
this criticism.

Shari Seidman Diamond "Reference Guide on Survey
Research," in the Federal Judicial Center's <u>Reference
Manual on Scientific Evidence, Second</u>, pages 257-258.

As Professor Diamond also notes:

> In designing a control group study, the expert
> should select a stimulus for the control group that
> shares as many characteristics with the experimental
> stimulus as possible, with the key exception of the
> characteristic whose influence is being assessed...Nor
> should the control stimulus share with the experimental
> stimulus the feature whose impact is being assessed.
> If, for example, the control stimulus in a case of
> alleged trademark infringement is itself a likely
> source of consumer confusion, reactions to the
> experimental and control stimuli may not differ
> because both cause respondents to express the same
> level of confusion.
>
>                    ...
>
> Every measure of opinion or belief in a survey
> reflects some degree of error.  Control groups and
> control questions are the most reliable means for
> assessing response levels against the baseline level of
> error associated with a particular question.
> [footnotes omitted]
> Shari Seidman Diamond, "Reference Guide on Survey
> Research," in the Federal Judicial Center's <u>Reference
> Manual on Scientific Evidence, Second</u>, pages 258-260.

100. Finally, Ostberg argues that the survey responses
were improperly tabulated or interpreted.  This criticism appears
to have been made mute by the 9th Circuit decision in this
matter.

<u>KNIGHT</u>

101. In October and November, 2002, Mr. John Knight,
head of Global Market Research for adidas, was responsible for a
qualitative study on stripes conducted for adidas.  As I
understand it, this qualitative study included discussions with
approximately thirty (30) individuals in each of five (5) cities
(i.e., Dallas, Denver, Minneapolis, Orlando, and Phoenix).  As
Mr. Knight has testified, in adidas America, Inc., and adidas-

Salomon AG v. Steve Madden, Ltd., and Steve Madden Retail, Inc., and in adidas America, Inc., and adidas-Salomon AG v. Payless ShoeSource, Inc., the 2002 stripe study was a qualitative study, not a quantitative study, and, as such, was not designed to be representative or quantifiable.  Mr. Knight's testimony is consistent with the Qualitative Research Consultants Association:

> The results of qualitative research cannot be statistically projected across a target population. That's because the methods used to recruit participants and explore issues in qualitative research tend to be quite different, by design, from the methods that a projectable quantitative study might involve.  However, when decisions must be made that require quantification, qualitative research is often used in advance to help plan effective quantitative studies, or as a follow-up method to help interpret quantitative results or explore selected topics in greater depth.

Conclusion - Knight Study

102. It is my opinion, based upon my review of the study done by Knight, that the Knight study provides no empirical data with respect to the trademark or source identifying significance of stripes on clothing or shoes and, in particular, the Knight study does not provide any empirical data with respect to whether or not Defendant's shoes identified herein are likely to cause confusion, deception or mistake with respect to shoes emanating from the source adidas, in particular, due to the stripes or other trade dress features of Defendants' shoes.

QUALIFICATIONS

103. I hold a Bachelor's Degree in Advertising (B.A.) from San Jose State University, a Master's Degree in Business Administration (M.B.A.) from the University of Southern

California, and a Doctoral Degree in Business Administration
(D.B.A.) from the University of Southern California.

104. During my twenty-five year academic appointment,
my teaching responsibilities included both graduate and
undergraduate level courses in a variety of subject areas.  My
teaching responsibilities included courses in marketing (e.g.,
marketing, marketing management, advertising, promotion, consumer
behavior, and marketing research) and management (e.g.,
principles of management; business policy and strategy; business
policies, operations, and organizations; and integrated
analysis).

105. I am a member of the American Marketing
Association (AMA), the American Academy of Advertising (AAA), the
American Association of Public Opinion Research (AAPOR), the
Council of American Survey Research Organizations (CASRO), and
the International Trademark Association (INTA).

106. As a partner with Ford Bubala & Associates, I have
been retained by a variety of firms engaged in the consumer
product, industrial product, and service sectors of the economy
to provide marketing consulting and research services.
Approximately one-half of Ford Bubala & Associates' consultancies
in which I have participated have involved the design and
execution of marketing research surveys.

107. As previously noted, during the past thirty-two
years, I have been retained in a number of litigation-related
consultancies involving intellectual property matters, including
matters before federal and state courts, the Trademark Trial and

Appeal Board of the U.S. Patent and Trademark Office, and the International Trade Commission. I have designed and executed surveys relating to intellectual property matters, including false advertising, trademark, patent, and other related matters. I am familiar with the accepted principles of survey research, as well as the tests for trustworthiness of properly conducted surveys or polls.[19]

108. During the past twenty-seven years, I have addressed a variety of groups on the subject of surveys or polls and their use in the measurement of the state of mind of consumers, with respect to Lanham Act matters. Specifically, I have spoken at meetings of the American Bar Association, the American Intellectual Property Law Association, the American Marketing Association, the International Trademark Association, the Marketing Research Association, the Intellectual Property Law Institute of Canada, and the Practising Law Institute.

109. I have also written on the subject of the design and execution of litigation-related surveys in Lanham Act matters. Specifically, in 1987, I completed a paper entitled "Trademark Surveys: Universe, Questions, and Future Approaches," which was published in the Summer 1987 edition of New Matter, the journal of the Intellectual Property Section of the California State Bar. This paper was subsequently reprinted in the 1992 International Trademark Association 114th Annual Meeting proceedings. In 1993, I wrote a paper entitled "Responding to Trademark Surveys," which was published in the Spring 1993

---

[19] Supra note 1.

proceedings of the American Bar Association's <u>Patent, Trademark, and Copyright Law:  Litigation and Corporate Practice</u> course materials.  This paper was reprinted in the International Trademark Association's <u>"Successful Strategies in Trademark Litigation" Forum</u>, Tokyo, Japan, 1993.  In 1997, I wrote a paper entitled "Dilution Surveys - New Challenges," which was published in the 1997 Practising Law Institute course handbook, <u>Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner</u>.  This paper was reprinted in the International Trademark Association's course materials for a seminar, <u>Dilution and Famous Marks for Advanced Trademark Practitioners</u>, 1998.  In 1998, I wrote a paper entitled "Dilution Surveys Update 1998," which was published in the Practising Law Institute course handbook, <u>Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner</u>.  In 1999, I wrote a paper entitled "Lanham Act Related Surveys, The Year in Review & Emerging Issues," which was published in the 1999 Practising Law Institute course handbook, <u>Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner</u>.  An edited version of this paper, "Lanham Act Surveys - The Year in Review," was reprinted in the NAD/International Trademark Association's <u>False Advertising Forum</u>, course materials, 2000.  In 2000, I wrote a paper entitled "Lanham Act Surveys:  Two Years in Review," which was published in the <u>International Trademark Association 122nd Annual Meeting</u> proceedings.  Also, in 2000, I wrote a paper entitled "Lanham Act Surveys:  2000," which was published in the 2000 Practising Law

Institute course handbook <u>Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner</u>.   In 2001, I wrote a paper entitled "Lanham Act Surveys:  2001," which was published in the 2001 Practising Law Institute course handbook <u>Strategies for Litigating Copyright, Trademark & Unfair Competition Cases</u>.   In 2002, I wrote a paper entitled "Lanham Act Surveys:  2002," which was published in the 2002 Practising Law Institute course handbook <u>Strategies for Litigating Copyright, Trademark & Unfair Competition Cases</u>.   In 2003, I wrote a paper entitled "Survey Evidence – Successful Challenges Since Daubert" which was published in 2003 in the <u>International Trademark Association 125th Annual Meeting</u> proceedings.   Also in 2003, I wrote a paper entitled "Lanham Act Surveys:  2003," which was published in 2003 in the <u>American Intellectual Property Law Association</u> annual proceedings.   This paper, "Lanham Act Surveys:  2003," was reprinted in the <u>78th Intellectual Property Institute of Canada</u> proceedings, 2004.   In 2004, I wrote a paper entitled "Lanham Act Surveys:  2004," which was published in the <u>Law Education Institute National CLE Conference</u> proceedings, 2005.   Most recently, I wrote a paper entitled "Lanham Act Surveys:  2005," which was presented at a meeting of the Intellectual Property Law Section of the State Bar of Georgia.   This paper, "Lanham Act Surveys:  2005" was reprinted in the <u>NAD Annual Conference</u> proceedings, 2006, and in the <u>Law Education Institute National CLE Conference</u> proceedings, 2007.

      110. As noted earlier, since 1998 I have served as a member of the Editorial Board of <u>The Trademark Reporter</u>, the

scholarly legal journal on the subject of trademarks, published
by the International Trademark Association.

111. I have been qualified and accepted as an expert in
marketing and marketing research in more than fifty (50) trials
before federal and state courts and administrative government
agencies.

112. Attached hereto as Exhibit V is a list of cases in
which I have provided trial and/or deposition testimony since
1992.

113. Attached hereto as Exhibit W is a copy of my
professional history, describing my qualifications and
professional background.

<u>MATERIAL CONSIDERED</u>

114. Material considered, in the instant matter,
includes:  the Amended Complaint and Answer to Amended Complaint;
Third Amended Complaint; Answer, Affirmative Defenses, and
Counterclaims to Third Amended Complaint; Expert Report of Marian
Friestad, Ph.D.; Expert Report of Scott Galloway; Affidavit of
Henry D. Ostberg, Ph.D., and attached exhibits; Dr. Ostberg's
code sheet, tabulation specifications, validation questionnaire,
and related correspondence, supervisor instructions, data file in
electronic form; Rebuttal Report of Henry D. Ostberg Reviewing a
Survey Conducted by Dr. Gerald L. Ford; Expert Report of Dr.
Erich Joachimsthaler in Opposition to Defendants' Motion for
Summary Judgment and in Support of Plaintiffs' Motion for Partial
Summary Judgment in adidas v. Kmart matter; Expert Report of Dr.
(Michel) Tuan Pham in Opposition to Defendants' Motion for

Summary Judgment and in Support of Plaintiffs' Motion for Partial

Summary Judgment in adidas v. Kmart matter; Report of Dr. Roger

Tourangeau in adidas v. Kmart matter; Report of Alice Passannante

in adidas v. Kmart matter; "Stripes" Phase 1 Research -- Summary

of Results, a two-page report by John Knight; Deposition

Transcript of John Knight, adidas America v. Steve Madden, March

5, 2003; Deposition Transcript and Exhibits of John Knight,

adidas America v. Payless Shoesource, February 18, 2004; adidas

"Stripes" Research Video, Final Version, November 21, 2002, Wild

Matters Productions 2959, TRT:  30 minutes, VCR; adidas, 3-

Stripes Man-on-the-street Interviews, Raw footage w/timecode,

Phoenix 3-4, Dallas 5, Orlando 2, DVD; adidas, 3-Stripes Man-on-

the-street Interviews, Raw footage w/timecode, Phoenix 2, Orlando

1, DVD; adidas, 3-Stripes Man-on-the-street Interviews, Raw

footage w/timecode, Dallas 3, Phoenix 1, Denver 2, DVD; adidas,

3-Stripes Man-on-the-street Interviews, Raw footage w/timecode,

Los Angeles, DVD; adidas, 3-Stripes Man-on-the-street Interviews,

Raw footage w/timecode, Minneapolis 1-2, Minneapolis 3-4, DVD;

adidas, 3-Stripes Man-on-the-street Interviews, Raw footage

w/timecode, "Stripes" Research Video, Minneapolis 5, Denver 1,

DVD; adidas, 3-Stripes Man-on-the-street Interviews, Raw footage

w/timecode, Dallas 4, Dallas 2, Dallas 1, DVD; Findings and

Recommendation/Order by United States Magistrate Judge John

Jelderks, October 8, 2002; Order by United States District Judge

Ancer L. Haggerty, January 6, 2003: Order by United States

Magistrate Judge John Jelderks, April 11, 2003; <u>adidas America v.</u>
<u>Payless ShoeSource, Inc.</u>, 2006 U.S. App. LEXIS 170 (9th Cir.
2006).

COMPENSATION

115. Ford Bubala & Associates' fees for this engagement
consist of billable time and expenses.  Standard time is billed
at the rate of $450.00 per hour for the services of a Partner and
$200.00 per hour for the services of a Research Associate.
Deposition and trial time are billed at the rate of $600.00 per
hour plus expenses.

I declare under penalty of perjury under the laws of
the United States of America that the foregoing is true and
correct.  Executed this 12th day of March, 2007, in Huntington
Beach, California.

3/12/07
_____
Date

Dr. Gerald L. Ford

# EXHIBIT P

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Expert Rebuttal Report of**

**Carol A. Scott, Ph.D.**


**Levi Straus & Co.**
*vs.*
**Abercrombie & Fitch Trading Co.**

## I. QUALIFICATIONS

1. I am a Professor of Marketing at the Anderson Graduate School of Management of the University of California, Los Angeles ("UCLA"). I hold a Ph.D. in Marketing from Northwestern University, where my minor field of study was Social Psychology. I also received a Master of Science in Management degree from Northwestern University and a Bachelor of Science in Business and History Education degree from the University of Texas at Austin. I have served variously as the Chairman of the Faculty, Associate Dean, and Assistant Dean of the Anderson Graduate School of Management from 1985 through 1994. I am currently the faculty director of the Anderson School Executive Program. Over the past thirty years, I have taught courses on Marketing Strategy and Management, Consumer Behavior, Advertising, Distribution Strategy, International Marketing, and Medical Marketing to students in undergraduate and graduate education programs at UCLA, Harvard Business School, and Ohio State University. I also have published numerous journal articles, research reports, and book chapters on Consumer Behavior, Marketing Research and other marketing topics, a complete list of which is included in my Curriculum Vitae, attached hereto (Exhibit 1). I have served on the editorial boards of the Journal of Marketing, Journal of Marketing Research, and the Journal of Consumer Research. I have been a member of the board of directors for Sizzler International and A-Fem Medical Corporation, Inc. and currently am a member of the board of directors of United Online. Over the past 25 years I have served as a consultant and testifying expert for a variety of marketing issues. A list of my recent testimony projects is attached as Exhibit 2.

2. I have been retained by Townsend and Townsend and Crew LLP as an independent expert witness to testify on behalf of plaintiff/counter-defendant Levi Strauss & Co. ("LS&CO.").

EXPERT REBUTTAL REPORT OF CAROL A. SCOTT

## II.   THE ISSUES FOR WHICH I WILL GIVE AN OPINION

3.    I have been asked by counsel for LS&CO. to address the expert report of Dr. Gerald L. Ford, dated June 25, 2008, (the "Ford Report") and submitted on behalf of defendant/counter-claimant Abercrombie & Fitch Trading Co. ("A&F").

## III.   SUMMARY OF OPINIONS

4.    Having reviewed and analyzed Dr. Ford's report in this matter, as well as data available to me, I have concluded the following:

1. The study conducted by Dr. Ford in this case (the "Ford Survey") is flawed, and cannot be used as a reliable indicator of the degree to which consumers are likely to be confused as to the source of the A&F Ruehl jeans, based upon its pocket stitching.

2. The Ford Survey results do show, however, that a significant number of consumers are likely to be confused as to the origin or association of the Ruehl jeans.  Although the Ford Survey indicates that almost 18% of consumers identified a photograph of Ruehl jeans incorrectly as LS&CO. Levi's® jeans, Dr. Ford concludes to the contrary, *i.e.*, that there is no likelihood of confusion.  This is because consumers in the Ford Survey also evidenced a high level of confusion with two brands of "control" jeans that were themselves likely to exhibit a high level of true confusion.

3. The results of the Ford Survey therefore lead to one of two possible conclusions: either (1) consumers are likely to be confused by all three jeans shown to respondents, *i.e.*, the Ruehl jean as well as the two 'control' jeans; or (2) that the high number of Levi's® responses obtained across the three brands of jeans were caused by some combination of guessing and/or the stimuli and procedures of the study itself.

5.    I am continuing my analysis.  My opinions are based on information provided to date, and, if appropriate, I may supplement my report as additional materials or information

1    become available.  Specifically, I understand that counsel for LS&CO. received on July 15

2    and July 16, 2008, over 6,900 pages of additional documents pertaining to Dr. Ford's surveys

3    and opinions in this matter.  If appropriate, I reserve the right to supplement my opinions

4    subsequent to a complete review of this new information.

5    **IV.    BASES FOR OPINIONS**

6       **A. The Ford Survey shows that a significant number of consumers are likely to**

7       **confuse the Ruehl, Indigo Red and Lucky's jeans with Levi's®.**

8          6.    In the Ford Survey, approximately 324 respondents were shown a photograph of

9    a pair of Ruehl jeans and asked what brand of jeans they thought they were.  Further,

10   respondents were also asked if they thought that the jeans shown were being put out with the

11   authorization or approval of any other company or companies, and if they thought that the

12   company that puts out the jeans shown has a business affiliation or business connection with

13   any other company or companies.  Approximately 50 respondents, or 15.4%, of those shown

14   the Ruehl jeans thought that they were, in fact, put out by Levi's®.[1]  In addition, five

15   respondents (1.5%) thought that the Ruehl jeans were put out with authorization or approval

16   from Levi's®, and three respondents (1.0%) thought that the maker of the Ruehl jeans had a

17   business connection or association with Levi's®.[2]  Thus, a total of 56 unique respondents[3]

18   (17.3%) reported that the Ruehl jeans shown had some connection with Levi's®.[4]  This level

19   of confusion as to source, origin or affiliation, *i.e.*, almost one-fifth of the general population,

20   is high enough to be problematic for a manufacturer.[5]

21          7.    Further, according to the Ford Report, approximately 12 unique respondents, or

22   21.5% of the respondents who mentioned Levi's® in response to one of the three survey

23   questions, gave 'pocket stitching' as the reason for their belief.[6]  This number may

24   _____

[1] Results tables, Ford Report, at Appendix Vols. II, III, pp. 13, 233.

25   [2] *Id.*, Appendix Vols. II, III, pp. 32, 247, and 52, 261.

[3] Two respondents each were in two of these three categories.

26   [4] I note that Dr. Ford does not include in this figure one respondent who mentioned Levi's as well as Lee as the source for the Ruehl jeans.  Including this one respondent would raise this percentage to approximately 17.6%

27   [5] This number may underestimate the degree of confusion among members of Levi's and Ruehl's target markets or among only those who are familiar with Levi's Arcuate design.

28   [6] *Supra* at fn 1, 2.

1   underestimate the use of pocket stitching as an identifier because of the presence of other

2   elements in the photographs that may have caused confusion.  I note that approximately 12

3   respondents mentioned the brown label or patch as reasons for identifying the Ruehl jeans as

4   Levi's®.

5          8.    The confusion estimate provided by Dr. Ford, however, is likely to be a very

6   conservative one.   Specifically, to be counted as confused, respondents had to not only be

7   familiar with the look of Levi's®, *i.e.*, be aware of Levi's® trademarks, but also be able to

8   connect those trademarks with the name 'Levi's®.'  A respondent in Dr. Ford's survey, for

9   example,  may well have recognized the pocket stitching as belonging to, or as being

10  associated with, a particular brand of jeans, but simply not connect the name of that particular

11  jean with the pocket stitching.  In other words, Dr. Ford's survey question perfectly confounds

12  awareness of the trademark, the ability to name the brand that uses that trademark, and the

13  degree to which the pocket stitching used by Ruehl would be confused with that used by

14  Levi's®.

15         9.    The harshness of this particular test can be illustrated by the following example.

16  The Ford Survey results indicated that only one person in the entire adult (18 years of age or

17  older) sample indicated that the Ruehl jeans were put out by, were authorized by, or had a

18  business connection with Ruehl.  That is, only one person could connect the name Ruehl to the

19  particular pocket stitching shown.  Given Dr. Ford's criteria, no confusion could possibly be

20  found even if a second group of respondents were shown a perfect counterfeit – a jean that

21  was not just similar to the original Ruehl, but an identical twin.  This is because awareness of

22  the brand name, its connection to the trademark, and the actual degree to which the pocket

23  stitching is confusing as to source would be perfectly conflated by the questions used.

24

25

26

27

28

-5-

EXPERT REBUTTAL REPORT OF CAROL A. SCOTT

**B. Many aspects of the Ford Survey May Have Produced the Large Number of Mentions of Levi's® in Response to the Control Jeans.**

10.    Accepted marketing practice requires the inclusion of appropriate control groups to rule out alternative hypotheses that might explain the pattern of data obtained.[7] One alternative hypothesis, as noted by Dr. Ford, is that something about a study's questions, procedure or design, rather than the individual stimuli, may cause respondents to answer in a particular way.  Another important rival hypothesis to test for when studying large market share brands such as Levi's® is whether the respondents might simply respond with that name, *i.e.*, say the first brand that comes to mind, or the brand that has the highest level of awareness, large market share, etc.  Contrary to Dr. Ford's intention, neither of these hypotheses is eliminated by the Ford Survey.  In fact, several features of this particular study are likely to have increased the likelihood that respondents would mention Levi's®.

11.    Perhaps the feature of the Ford Survey that is most likely to have impacted the likelihood that respondents would mention Levi's® when viewing photos of the control jeans is the particular brands and styles of jeans that were used in these conditions.  In one control condition, respondents were shown a pair of Indigo Red jeans that use a pocket stitching design that Levi's® has contested in the past.[8]  In a prior study of jeans confusion, consumers were confused as to the source of the Indigo Red jeans.[9]  It is my understanding that LS&CO. reserved the right to challenge the design except as used by RP55, Inc., a small company selling jeans in a relatively small niche segment, *i.e.*, urban, hip-hop market.[10]  It is unlikely that Dr. Ford's sample of women aged 13 years of age-and-over contacted in suburban shopping malls would have ever seen an Indigo Red jean.  Since they would have no opportunity to learn the true brand name of the jeans, and would only be shown the confusing

---

[7] *See,* for example, Diamond, Shari S. (2000) "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence (2ed)*. Washington, D.C.: Federal Judicial Center, pp. 229-276 ("Diamond") at pp. 256-260.
[8] Other elements of the Indigo Red jeans were commonly cited as reasons why respondents incorrectly identified these jeans as Levi's® jeans.  For example, over 30 respondents in the Ford Survey cited the red label, the tab, or the patch as reasons for identifying the Indigo Red jeans as Levi's.
[9] *See* Amended Expert Report of Carol A. Scott and Expert Report of Carol A. Scott, *In re Levi's® v. RP55,* A&F Expert Discl. 06302 – 6472, at 06308.
[10] Agreement dated November 2006 and discussions with Levi's counsel, July 2008.

-6-
EXPERT REBUTTAL REPORT OF CAROL A. SCOTT

1  pocket stitching, it is no wonder that a high percentage of the respondents "guessed" Levi's®,

2  or were truly confused by the Indigo Red jean. A typical comment from respondents who saw

3  the control jeans illustrates this point. "It's the first name that came into my head."[11]

4      12.   Additionally, several respondents mentioned that the jeans in the photograph

5  might be men's jeans or that they appeared to be very large. This might further encourage

6  respondents to mention Levi's® since Levi's® has an even stronger presence among men than

7  women. Instead of measuring "noise" (the degree to which consumers would call any jean,

8  even one that is obviously not 'Levi's®', Levi's®), the Ford Survey merely confirms my own

9  previous work demonstrating confusion between the Indigo Red pocket stitching and that of

10  Levi's®.[12]

11     13.   The second control jean used in the Ford study was a style of jeans put out under

12  the Lucky brand. A search of the Lucky web site failed to show this style as currently on the

13  market, and thus it is unclear whether consumers would have had an opportunity to see this

14  jean as well. If one has never seen a jean, then, again, the best guess as to what brand it might

15  be would be a large market share brand, *i.e.*, one with the highest probability of occurrence.

16     14.   Two other features of the Lucky jeans photo, however, are also likely to prompt

17  respondents to identify it as Levi's®. First, I understand that Levi's® has also contested this

18  design in the past. As part of this dispute, Lucky's agreed to stop using four of the five pocket

19  stitching designs at issue. No agreement was reached with respect to the fifth design, the one

20  used by Ford in his study.[13] Thus, once again, rather than including a true control for general

21  "noise", *i.e.*, the probability that respondents would call any jean Levi's®, Dr. Ford has

22  included one that has already been accused of being confusing.

23     15.   Second, the photograph of the Lucky jeans used in the Ford study clearly shows

24  the presence of a leather patch on the waistband. In addition to pocket stitching, one of

25  Levi's® other trademarks, of course, is the design on the leather patch that is sewn onto the

26  [11] Ford Report, Appendix p. A-225.
27  [12] Indeed, the Ford survey finds a level of confusion for the Indigo Red jeans that is roughly twice that found in my own, more conservatively designed study.
28  [13] Settlement Agreement Between Levi Strauss & Co. and Lucky Brand Dungarees, Inc., dated May 2004.

1   waistband of its jeans. Although the Lucky jeans patch had been digitally altered so that the

2   writing on the patch could not be read, the lettering clearly appears to be similar in color to

3   that which would appear on any pair of Levi's®. Over 50 respondents in this condition, in

4   fact, mentioned the patch as a reason they identified the jeans as Levi's®. In a typical post-

5   sale environment in the real world, the presence of the patch would be obscured by a belt or by

6   an untucked shirt, or it would be visible enough for the consumer to be able to discern whether

7   it was a Levi's® patch or not. In this particular condition, Dr. Ford has tested both the leather

8   patch and the pocket stitching as means of identifying the jeans, and it is not surprising that a

9   large percentage of the respondents used one or both of these marks as reasons to identify

10  them as Levi's®.

11      16.   In summary, the two jeans chosen to be 'control' jeans were instead jeans that

12  were likely themselves to exhibit a high level of true confusion. The idea of a control

13  condition is not to show that one can find other brands of jeans that are even more confusing

14  than the accused one. Instead, it is to provide a measure of true 'noise', *i.e.,* the degree to

15  which consumers would call any jean – even one that is not similar to its design – Levi's®.

16      17.   Beyond the selection of these particular jeans to serve as 'controls', the findings

17  with respect to them also indicate that we cannot rule out another rival hypothesis for the

18  pattern of results. As Dr. Ford notes, a control is needed to show that the responses are being

19  produced by the particular stimuli, and not by some other feature of the procedure or questions

20  of the survey. Since Dr. Ford's results show confusion for all three brands of jeans shown, we

21  cannot rule out the possibility that it was his design – which is common to all three conditions

22  – that caused the respondents to mention Levi's® in response to the questions. In order to

23  show that the procedure did not produce the results, a control group is needed which follows

24  the same procedure in all respects but does not produce a significant number of Levi's®

25  responses. By selecting control jeans that are also likely to be confusing to respondents, Dr.

26  Ford has made it impossible to rule out his overall method as an explanation for his findings.

27

28

EXPERT REBUTTAL REPORT OF CAROL A. SCOTT

18.    Other features of the Ford study were also likely to result in high number of respondents identifying the control jeans as Levi's®. The first of these is the composition of the sample population surveyed in the Ford study. Specifically, Dr. Ford included in his study anyone approached in the various suburban shopping malls that was 13 years of age and over who planned to purchase a pair of jeans in the next twelve months. The respondents in this survey were not qualified by whether or not they had ever purchased, considered purchasing, or planned to purchase the premium-priced jeans used in the Ford Survey which typically retail for approximately $50 to $150. They may have planned to purchase only lower priced jeans from stores such as Sears, Mervyn's or JCPenney. Since Levi's® sells some styles of jeans at lower price points, but neither Lucky nor Indigo Red do, it is likely that this population would have higher top-of-mind awareness of the name Levi's® and thus a greater probability of guessing that brand when confronted with unfamiliar jeans. Further, I note that seven of the nine malls used in the Ford study have no high-end anchor stores such as Nordstrom's, Bloomingdales, or Neiman-Marcus, but instead have anchor stores such as JC Penny and Sears. Finally, Dr. Ford specified that 20% of the sample of adults 18 years of age and older be 55 years of age and up. No cap was placed on the age of the respondent, and thus it is possible that 20% of the sample population was over the age of the target population for almost any jeans manufacturer, *e.g.*, 70+ years of age or older.[14] Again, women over the age of 65 may be familiar with the name Levi's®, but be unfamiliar with premium-priced, designer jeans of the type used in this study.

19.    The procedure used by the Ford Survey was also likely to have encouraged a large-market share brand response rather than controlled for it. In the Ford study, respondents were told that they would be shown "a picture of a pair of jeans." If only **one** brand of jeans is to be shown, respondents may respond simply with the brand with the highest top-of-mind awareness, *e.g.*, Levi's®. In prior studies that I have conducted, I have followed standard

---

[14] Ford states that he based his age distribution quotas on a survey of jeans buyers, but it is unclear whether the survey he mentions looked merely at incidence of buying jeans or weighted responses by the frequency of buying jeans. Weighting would account for the fact that younger women are likely to buy more pairs of jeans, and thus account for a larger fraction of the market than older women.

EXPERT REBUTTAL REPORT OF CAROL A. SCOTT

1  marketing research practice which includes within-respondent controls that prevent the

2  respondent from determining which particular stimuli the researcher is interested in.   For

3  example, if several different brands of jeans are shown, a situation more typical of the real

4  post-sale environment, then the respondent may be more discriminating in his/her answer.

5  Guessing the highest market share brand is unlikely to be the correct answer.  Dr. Ford's study

6  contained no within-respondent control condition to minimize large market share brand

7  guessing.

8      **C. Several Other Features of the Ford Survey Make it an Unreliable Estimate of the**

9         **Likelihood Consumers Will Be Confused as to the Origin of the Ruehl Jeans.**

10      20.    The photograph of the Ruehl jean that was used in the Ford Survey may result in

11  a lower estimate of confusion than would exist in a real post-sale environment.  All of the

12  jeans in the Ford study were photographed as if they were lying on a surface, folded in half

13  lengthwise, with the legs slightly bent.  In a real, post-sale environment, however, the jeans

14  would be seen as worn by a person.  Seeing the jeans on a real body is particularly important

15  for the Ruehl jean because of the placement of the pocket and pocket stitching.  Specifically,

16  the Ruehl pocket stitching is placed somewhat lower on the pocket so that when the pocket is

17  curved around someone's body, the arched portion of the pocket stitching is emphasized and

18  the curled aspect of the stitching which might differentiate it from the Levi's® Arcuate is not

19  easily seen.  Using a photo of a jean being worn would be more representative of how

20  consumers would see the jeans in the real, post-sale world.  In a prior study that I conducted, I

21  used a photo of Indigo Red jeans similar to that used by Dr. Ford because the Indigo Red jeans

22  were sold on the Internet and this was the type of photo used to sell the jeans.[15]  In contrast, I

23  have seen advertising for Ruehl jeans that shows the jeans being worn by a model.

24      21.    An examination of the jeans used in photographs in the Ford Survey revealed

25  that the finish or wash of the jeans fabric varied between the Ruehl and the control jeans.

26  Specifically, the Ruehl jeans were very dark and look different than a typical denim fabric.

27

28  [15] Additionally, the image used in my prior study was created by the defendant in that matter.

-10-

EXPERT REBUTTAL REPORT OF CAROL A. SCOTT

1   The Indigo Red and Lucky jeans, however, have a lighter, rinsed finish.   This lighter finish

2   may have contributed to the higher levels of confusions shown for these two jeans.

3          22.    The questions in the survey may be confusing, especially to 13 to 17 years old

4   girls.  For example, question #6.0 asks respondents whether or not "the jeans in the

5   photograph are being put out with the authorization or approval of any other company or

6   companies", and question #7.0 asks whether or not "the company that put out these jeans has a

7   business association or a business connection with any other company or companies."  It is

8   unclear what anyone, much less a 13 year old girl, might understand a business association or

9   connection to be.  In fact, many respondents answered questions #6.0 and question #7.0 with

10  names of stores or by saying a "department store" or "clothing store", indicating a

11  misunderstanding of these questions.

12         23.    A few other details make the results of Dr. Ford's survey unreliable.  In

13  describing the procedure by which mall personnel were trained to conduct the survey, it is not

14  clear that Dr. Ford or anyone from his firm personally visited the mall sites or did any of the

15  training themselves.  It appears from his description that the materials were sent to the malls,

16  that a member of Dr. Ford's staff conducted a telephone briefing of mall supervisors, and that

17  Dr. Ford relied upon a research facility's employee(s) to train and monitor the interviewers.[16]

18  In my experience, this is not sufficient to guarantee that the work is done in accordance with

19  the researcher's intentions.  Many supervisors (who are often interviewers as well) are

20  inexperienced and/or overextended and cannot give sufficient attention to any single

21  assignment.  If no one from the client's organization is there to observe the training,

22  supervisors can and do put less experienced interviewers on a job.  In conducting mall

23  research, I or a member of my staff goes to each site and personally trains each interviewer

24  who works on the project.  I or a member of my staff observes each interviewer do several

25  interviews before we accept them to work on our project.  Many times, we encounter one or

26

27

28  [16] Ford Report.  *See also* Dr. Ford's invoice to K&L Gates in this matter, at A&F Expert Discl. 05900.

1   more interviewers who are not able to follow the survey instructions, and we instruct the

2   supervisors not to allow those individuals to conduct our interviews.

3         24.    For all of these reasons, it is my conclusion that the survey offered by Dr. Ford

4   does not provide a reliable estimate of the likelihood that consumers are likely to be confused

5   as to the source of the Ruehl jeans based upon its pocket stitching.

6   **V. EXHIBITS TO BE USED**

7         25.    I may rely on one or more of the documents identified in this report.

8         26.    I also may rely on demonstrative exhibits as well as on the testimony and trial

9   exhibits of LS&CO's and A&F's witnesses.

10         27.    Should other documents or additional deposition testimony be provided to me, I

11   may review such items.  If appropriate, I may supplement this report based on any information

12   which I later receive.

13   **VI.   COMPENSATION**

14         28.    Pursuant to my usual consulting arrangement, I am paid at an hourly rate of

15   $650, plus necessary and reasonable expenses.  I receive no other compensation for my work

16   in this action.

17   **VII.   PRIOR TESTIMONY**

18         29.    A list of cases for which I have testified as an expert at trial or by deposition

19   within the preceding four years is provided in Exhibit 2.

20         30.    My understanding is that some of this testimony is covered by protective orders.

21

22

23

24

25

26

27

28

EXPERT REBUTTAL REPORT OF CAROL A. SCOTT

1   July 18, 2008

2

3

4                                          _Carol A. Scott_

5                                          Carol A. Scott, Ph.D.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    -13-

**Exhibit 1**

# CAROL A. SCOTT

Anderson Graduate School of Management
University of California
Los Angeles, California 90024                    1834 Park Blvd.
(310)  825-4458                                   Palo Alto, CA   94306
(310)  206-2019 (fax)                             (650) 473-9297
                                                  (650) 473-9298 (fax)

## EDUCATION

| | |
|---|---|
| Ph. D. | Northwestern University, June 1975 |
| | Major Field:  Marketing |
| | Minor Field:  Social Psychology |
| M.S. | Northwestern University, August 1972 |
| | Major:  Management |
| B.S. | University of Texas at Austin, December 1970 |
| | Major:  Business and history education |
| | Graduated with highest honors |

## TEACHING EXPERIENCE

| | |
|---|---|
| 1977 - present | **University of California, Los Angeles** |
| | 1989-          Professor of Marketing |
| | 1980-89        Associate Professor of Marketing |
| | 1979-80        Acting Associate Professor of Marketing |
| | 1978-79        Assistant Professor of Marketing |
| | 1977-78        Visiting Assistant Professor of Marketing |
| |                (on leave from The Ohio State University) |
| 1985 - 1986 | **Harvard Business School** |
| | Visiting Associate Professor, Business Administration |
| 1974 - 1978 | **The Ohio State University** |
| | Assistant Professor of Marketing |

## ACADEMIC ADMINISTRATIVE EXPERIENCE

1990 - 94    Chairman of the Faculty, Department (School) of Management
Responsible for all matters pertaining to the approximately
100 faculty FTE in the Anderson Graduate School of Management,
a single department school, including:  recruiting, retention,
promotions, salary adjustments, scheduling and staffing of courses,
and student and peer evaluation of teaching.  Manage budget and
process all appointments for temporary faculty.

1987 - 91    Associate Dean, Academic Affairs
1993 - 94    Act for the dean in his absence.  Responsible for all academic
degree programs and support services including:  full-time, Fully
Employed and Executive MBA Programs,  Ph.D. and M.S.
Programs, Management Communications Program, Management
Field Studies Office, Computing Services Center, and all
interdisciplinary study centers (e.g., Entrepreneurial Studies
Center, Finance and Real Estate, International Business, etc.).

1986 - 87    Assistant Dean, MBA Curriculum & Policy
Responsible for all academic policies pertaining to the full- time
MBA Program.  Coordinated a review of this program which
resulted in revised core curriculum;  implemented computerized
bidding system for course enrollment.


## JOURNAL ARTICLES PUBLISHED

Robert A. Hansen and Carol A. Scott.  Comments on attribution theory and advertiser
credibility. ***Journal of Marketing Research***, *13*, May 1976.

Carol A. Scott.  Effects of trial and incentives on repeat purchase behavior. ***Journal of
Marketing Research***, *13*, August 1976.

Carol A. Scott.  Modifying socially-conscious behavior:  The foot-in-the-door technique.
***Journal of Consumer Research***, *4*, December 1977.

Carol A. Scott and Richard F. Yalch.  A test of the self-perception explanation of the
effects of rewards on intrinsic interest. ***Journal of Experimental Social
Psychology***, *14*, January, 1978.

Carol A. Scott and Richard F. Yalch.  Consumer response to initial product trial:  A
Bayesian analysis. ***Journal of Consumer Research***, *7*, June 1980.

Alice M. Tybout and Carol A. Scott.  Availability of well-defined internal knowledge and the attitude formation process:  Information aggregation versus self-perception. *Journal of Personality and Social Psychology*, *44*, March 1983.

Deborah Roedder John, Carol A. Scott, and James R. Bettman.  Sampling data for covariation assessment:  The effect of prior beliefs on search patterns. *Journal of Consumer Research*, *13*, June 1986.

James R. Bettman, Deborah Roedder John, and Carol A. Scott.  Covariation assessment by consumers. *Journal of Consumer Research, 13*, December, 1986.

James R. Bettman, Elizabeth H. Creyer, Deborah Roedder John, and Carol A. Scott.  Covariation assessment in rank order data. *Behavioral Decision Making*, *1*, October-December, 1988, 239-254.


## REPORTS, PRESENTATIONS, CHAPTERS IN BOOKS

Carol A. Scott, Decade of the Executive Woman, New York: Korn/Ferry, International, 1993.

Vicky L. Crittenden, Carol A. Scott, and Rowland T. Moriarty.  The effects of prior product experience on organizational buying behavior.  In Paul Anderson and Melanie Wallendorf  eds.) *Advances In Consumer Research*, vol. 14, 1986.

James R. Bettman, Deborah Roedder, and Carol A. Scott.  Consumers' assessment of covariation.  In T. Kinnear (ed.), *Advances In Consumer Research*, vol. 11, 1983.

Carol A. Scott and Alice M. Tybout.  Some indirect effects of case vs. base rate data on information processing strategies.  In R. Bagozzi and A. M. Tybout (eds.), *Advances in Consumer Research*, 10, Association for Consumer Research, 1982. (Abstract).

Carol A. Scott.  On using attribution theory to understand advertising effects.  In A. Mitchell (ed), *Advances in Consumer Research*, 9, Association for Consumer Research, 1981.

Carol A. Scott.  Speculations on the role of marketing and corporate communications: Some implications for practice and issues for research.  In S. A. Greyser (ed.), Proceedings of  the MSI Workshop on Corporate Communications, Marketing Science Institute, forthcoming.

Carol A. Scott and Alice M. Tybout.  Theoretical perspectives on the impact of negative information:  Does valence matter?  Abstract published in K. Monroe (ed.), *Advances in Consumer Research*, 8, Association for Consumer Research, 1980

Carol A. Scott.  Consumer satisfaction:  Perspectives from self-perception theory.  Paper presented at the American Psychological Association conference, Montreal, Canada, September, 1980.

Carol A. Scott.  Forming beliefs from experience:  Evidence from self-perception theory. In H. H. Kassarjian and T. S. Robertson (eds.), *Perspectives In Consumer Behavior*, 3rd edition, Scott, Foresman, 1981.

Alice M. Tybout and Carol A. Scott.  Extending the self-perception explanation:  The effect of cue salience on behavior.  In W. L. Wilkie (ed.), *Advances in Consumer Research*, 6, Association for Consumer Research, 1979.

Carol A. Scott.  Attribution theory in consumer research:  Scope, issues, and contributions.  Proceedings, American Marketing Association Fall Educators' Conference, S. Jain (ed.), 1978.

Carol A. Scott.  The role of self-perception processes in consumer behavior:  Interpreting one's own experiences.  In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research.

Robert A. Hansen and Carol A Scott.  Alternative approaches to assessing the quality of self-report data.  In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research, 1978.

Robert A. Hansen and Carol A. Scott.  Improving the representativeness of survey research:  Some issues and unanswered questions.  Proceedings, American Marketing Association Fall Educators' Conference, 1977.

Richard F. Yalch and Carol A. Scott.  Effect of initial trial of a new product on attitude-behavior consistency.  In W. D. Perreault, Jr. (ed.), *Advances in Consumer Research*, 4,   Association for Consumer Research, 1977.

Carol A. Scott, Researching the broadened concept of consumer behavior.  In G. Zaltman and B. Sternthal (eds.), *Broadening the Concept of Consumer Behavior*. Association for Consumer Research monograph, 1975.

Brian Sternthal, Carol A. Scott, and Ruby Roy.  Self-perception as a means of personal influence:  The foot-in-the-door technique.  In B. Anderson (ed.), *Advances in Consumer Research*, 3, Association for Consumer Research, 1975.

Carol A. Scott.  Hendley distributors.  Consumer behavior research case in Gerald Zaltman, Philip C. Burger, and Randall L. Schultz, *Cases in Marketing Research*, New York:  Dryden Press, 1975.

**AWARDS**

1984            Outstanding Teacher of the Year, presented by MBA students at the
                Graduate School of Management, UCLA.


**GRANTS RECEIVED (non-university)**

New Roles for Corporate Communications.  Grant received from the Marketing Science
        Institute (with James R. Bettman, Richard J. Lutz, and Barton A. Weitz),
        December 1980 - May 1981.


**SELECTED PROFESSIONAL ACTIVITIES**

Academic Advisory Council, Marketing Science Institute, 1987 to 1990

Editorial Boards:
        Journal of Marketing Research, December 1975 to July 1985
        Journal of Marketing, July 1978 to July 1986; January 1991 - August 1993
        Journal of Consumer Research, December 1980 -

Occasional reviewer, Journal of Personality and Social Psychology and Journal of
        Applied Psychology

Distinguished lecturer at University of Pennsylvania (1978), University of Washington
        (1979), University of Florida (1979), Berkeley/Stanford (1980), University of
        California, Santa Barbara (1982)

AMA Doctoral Dissertation Competition chairperson, 1985

Treasurer, Association for Consumer Research, 1980-81

Resident Faculty Member, American Marketing Association Doctoral Consortium,
        1979, 1980, 1983.  Consortium speaker 1984, 1985, 1986

Program Committee, 1979 Annual Conference, Association for Consumer
        Research, Prof. Jerry Olson, chairman


**Consulting projects** for a number of profit, not-for-profit, and governmental
organizations in Ohio and California.  Assignments have included strategic marketing
audits, development of strategic marketing plans, advertising planning consultation,
marketing research analysis and interpretation, and expert witness testimony preparation.
Member of the board of directors, Petco, Inc. (1989-1991), Sizzler International (1993-
1999), A-Fem Medical (1995-2003), and United Online, Inc., 2003 to present and

Classmates Media, 2007 to present.  Co-founder of Crossfield Associates, LLC, a firm that provides expert marketing analysis for litigation as well as marketing strategy and research consulting services.

**PROFESSIONAL MEMBERSHIPS**

Association for Consumer Research

**COURSES TAUGHT**

Undergraduate (primarily at The Ohio State University)
    Consumer Behavior; Advertising
Masters' (primarily at UCLA)
    Consumer Behavior; Introductory Marketing; Advanced Marketing Management;
    Management of Distribution Channels; Global Marketing Management; Market
    Assessment; Marketing Strategy and Policy (Executive MBA Program)
Ph.D. (UCLA, Harvard, and Ohio State)
    Consumer Behavior Theory and Research
    Attribution Theory Research in Marketing
    Doctoral research paper supervision

**THESIS ADVISING**

Chair, Ph.D. Thesis Committee 6 students
Member, Ph.D. Thesis Committee - 9 students
Member, Masters Examining Committee (Ohio State) - 3 students

**RECENT COMMITTEE ASSIGNMENTS (UCLA only)**

Task Force on Women at Anderson, 2001 –
University Committee on Research, 1999-2001
    Chair, Faculty Grants Program
Dean Search Committee, 1997-1999
Executive Education Advisory Committee 1997 – 1999
MBA Admissions Committee 1997-99
Academic Staffing Committee 1997-98
Faculty Executive Committee, 1993 - 1997
Professional Educational Task Force (University), 1993-94
UCLA Child Care Services Advisory Board, 1990 - present; Chair, 1991 - 1993

**Exhibit 2**

**Carol A. Scott**
**Summary of Recent Expert Testimony Projects***
**(Testimony, Depositions, Reports or Declarations Filed)**

1.  Brighton Collectibles, Inc. vs. Dynasty Designs – 2008
    Conduct consumer research to determine likelihood of confusion between handbags
    based on trade dress features.

2.  In re American Equity Annuity Practices and Sales Litigation – 2008
    Determine whether consumer research methods could be used to assess the
    importance of various factors in the purchase of deferred annuities
    by senior consumers and the effect that various disclosures would have on
    purchase decisions.

3.  Candela Corporation vs. Palomar Medical Technologies, Inc. – 2008
    Rebut plaintiff expert's opinions with respect to marketing issues, including
    the relevant market and demand for certain technology related to light-based
    aesthetic devices.

4.  The Board of Trustees of the Leland Stanford Junior University
    vs. Roche Molecular Systems et al. – 2008
    Rebut plaintiff's characterization of the relationship between physicians who order
    certain esoteric laboratory tests and the entities which conduct other steps in
    performance of such tests.

5.  Carter Bryant vs. Mattel, Inc. (and Consolidated Actions) – 2008
    Determine the relationship between the success of a line of fashion dolls and
    the sales of other related merchandise. Rebut counter-defendants' assessments of
    factors important to the success of certain fashion dolls and related merchandise.

6.  Vida F. Negrete et al. vs. Fidelity and Guaranty Life Insurance Company – 2008
    Determine whether consumer research methods could be used to assess the
    importance of various factors in senior consumers' purchase of deferred annuities
    and the effect that various disclosures would have on purchase decision.

7.  Brighton Collectibles, Inc. vs. Coldwater Creek, Inc. – 2008
    Conduct consumer research to determine likelihood of confusion between handbags
    based on trade dress features.

8.  Brighton Collectibles, Inc. vs. March Chantal USA, Inc. and Marc Chantal America,
    Inc. – 2008
    Conduct consumer research to determine likelihood of confusion between handbags
    based on trade dress features.

* Underlined party indicates client

9.   Robert Burton Associates, Inc. v. <u>DRL Enterprises, Inc</u>. – 2007
     Conduct research to determine the degree to which trademarks claimed By
     DRL enterprises have acquired secondary meaning.

10.  Daniel Friedman, et al. vs. 24 <u>Hour Fitness USA, Inc. et al</u>.  – 2007
     Conduct research to determine consumer perceptions of the terms of a
     membership contract

11.  Matsushita Electric Industrial Co., Ltd. Vs. <u>Mediatek, Inc</u>., Oppo Digital, Inc., and
     Micro-Star International Computer Corp. – 2007
     Rebut plaintiff's description of the market for certain large-scale integrated
     circuits and calculation of plaintiff's share of that market had the defendant not
     Sold products allegedly infringing products.

12.  <u>Educational Insights, Inc</u>. v. SAS Group, Inc., Josephy J. Wetherell, Licensing
     International, Ltd, and Hands on Toys, Inc. and SAS Group, Inc., et al. v. A. W. Faber-
     Castell USA, Inc. – 2007
     Analyze market factors to determine likelihood of confusion.

13.  <u>Ampex Corporation</u> v. Eastman Kodak Co.  – 2006
     Establish the market value of a patented feature used in digital still cameras and
     assess the importance of that feature to the strategy of the defendant.

14.  Clark and Eldred (Consumers) v. <u>Experian North America, Inc</u>. – 2006
     Conduct research to determine consumers' likelihood of confusion with respect
     to an online offer.

15.  E.S.S. Entertainment 2000, Inc., dba The Playpen v. <u>Rock Star Videos, Inc., Take-Two</u>
     <u>Interactive Software, Inc.,</u> Sony Computer Entertainment of America, Inc., and Sony
     Computer Entertainment, Inc. – 2006
     Conduct research to assess the likelihood that consumers would be confused by the
     depiction of a business in a video game.

16.  Lynn A. Carnegie on Behalf of Herself and All Others Similarly Situated v. <u>Household</u>
     <u>International Inc</u>. – 2005 – present
     Conduct research to assess the degree to which consumers were deceived as to the
     nature of a product and to determine the importance of various factors in
     their decision to use the product

17.  <u>Levi Strauss & Co</u>. v. RP55 – 2005
     Conduct research to assess the likelihood of confusion of RP55 jeans with Levi's®
     due to stitching on the rear pocket of RP55 jeans.

18.  Excelligence Learning Corp. v. <u>Oriental Trading Company, Inc</u>. – 2004-2005
     Assess marketing strategy used in the development of a new catalog, the degree to
     which plaintiff has established secondary meaning based on look and feel, and

2

consumers' likelihood of confusion between the two catalogs.

19. Nellcor vs. Masimo; Masimo v. Nellcor – 2003-2004
    Define the market for pulse oximetry products, identify the relevant competition, and determine the amount of sales that the plaintiff (defendant) would have made had the defendant (plaintiff) not sold pulse oximetry products with patent infringing features.

20. California Consumer Action Network v. Consumerinfo.com, Inc.; Homestore, Inc.; Iplace, Inc.; QSPace, Inc.; & Does 1 through 100 Inclusive – 2002- present
    Conduct research to determine consumers' likelihood of confusion with respect to an online offer.

21. Metabolife International Inc. v. Rexall Sundown, Inc. – 2002-2003
    Conduct research to determine consumers' likelihood of confusion due to product names and trade dress.

22. Consumers v. Hewlett-Packard – 2002 (and ongoing subsequent actions)
    Conduct a survey to determine the extent to which consumers considered certain factors in purchasing inkjet printers.

23. San Francisco Board of Assessors v. Transamerica Corp. – 2000-2002
    Determine the role brand equity in producing rent premiums for the Transamerica Pyramid and the cost of building that equity.

24. Levi Strauss & Co. v. Edwin International, Inc, et. al. – 2001-2002
    Conduct research to assess the strength of various Levi Strauss & Co. trademarks and the likelihood of confusion given the use of similar marks by Edwin.

25. Linear Technology Corp. v. Impala Linear Corporation, Toyoda Automatic Loom Works, Analog Devices, Inc., and Maxim Integrated Products, Inc. – 2001
    Assess the market and competition for a patented voltage regulator used in personal computers.

26. Juicy Whip v. Orange Bang – 2000
    Provide critique of consumer survey designed to assess likelihood of consumer confusion.

27. Claire Maglica v. Anthony Maglica – 1999-2000
    Assess the marketing strategy used by Mag Instruments and the importance of marketing to the success of the company.

28. Crystal Semiconductor Corporation v. OPTi, Inc. and TriTech Microelectronics International, Inc. and TriTech Microelectronics International, PTE, Ltd. – 1999
    Determine the relevant competitors for an audio chip for personal computers and the amount of defendant's sales that would have been made by the plaintiff had

3

the defendant not sold an audio chip with a patent infringing feature.

29. Revatek v. Levi Strauss – 1999
    Conduct research to determine the likelihood of confusion regarding a
    merchandising item used by Levi Strauss.

30. Utility Consumers' Action Network v. Pacific Bell – 1999
    Assess the impact of specific service representative behaviors on customer
    satisfaction with service received when calling a Pacific Bell center.

31. Cantor v. West – 1998
    Determine the importance of various features in the decision to purchase and use
    an on-line legal database.

32. Synet v. Microsoft – 1998
    Assess the degree to which the brand name Internet Explorer is generic and/or
    merely descriptive and therefore not entitled to protection as a trademark.

33. Consumers v. Paging Network  - 1998
    Conduct a survey to assess the importance of factors in decisions to purchase
    paging services.

34. Levi Strauss v. Levi's Perfume Club - 1998
    Conduct research to assess the likelihood of confusion regarding a product
    offered as "Levi's Perfume Club".

35. Visa International v. Advanta National Bank – 1997
    Conduct research to determine the extent of confusion regarding origin or
    source of a product offered by Advanta.

36. Elliott Abravanel v.Beauti-Control – 1996
    Conduct research to determine the importance of factors in decisions to purchase
    Beauti-Control products

37. Anti-Monopoly v. Hasbro – 1996
    Determine the relevant market for the board game Monopoly using existing
    data.  Assess the ease/difficulty of entry into the market for board games.

## PROOF OF SERVICE

I declare that I am employed in the City and County of San Francisco, California; I am over the age of 18 years and not a party to the within action; my business address is Two Embarcadero Center, Eighth Floor, San Francisco, California 94111. On the date set forth below, I served a true and accurate copy of the document(s) entitled: **EXPERT REBUTTAL REPORT OF CAROL A. SCOTT, Ph.D.** on the party(ies) in this action by placing said copy(ies) in a sealed envelope each addressed as follows:

| | |
|---|---|
| Rachel R. Davidson, Esq.<br>Michael J. Bettinger, Esq.<br>K&L Gates<br>55 Second Street, Suite 1700<br>San Francisco, CA 94105-3493 | |
| J. Michael Keyes, Esq.<br>K&L Gates<br>618 West Riverside Ave., Suite 300<br>Spokane, WA 99201 | |

☒    [By First Class Mail]  I am readily familiar with my employer's practice for collecting and processing documents for mailing with the United States Postal Service. On the date listed herein, following ordinary business practice, I served the within document(s) at my place of business, by placing a true copy thereof, enclosed in a sealed envelope, with postage thereon fully prepaid, for collection and mailing with the United States Postal Service where it would be deposited with the United States Postal Service that same day in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this date at San Francisco, California.

Dated: July 18, 2008          *Carol Petrich*
                              Carol Petrich

61436807 v1

# EXHIBIT Q

1                     UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3

4    LEVI STRAUSS & CO.,            )
                                    )
5            Plaintiff,             )
                                    )
6    vs.                            )        No. C07-03752-JSW
                                    )
7    ABERCROMBIE & FITCH TRADING    )
     CO.,                           )
8                                   )
             Defendant.             )
9    _____)
     AND RELATED CROSS-ACTIONS.     )
10   _____)

11

12

13                    VIDEOTAPED DEPOSITION OF

14                         MARK BREITBARD

15                     Friday, July 25, 2008

16

17

18

19   REPORTED BY:  TINA MARIE VELASQUEZ
                    C.S.R. NO. 10072
20

21

22

23                  BONNIE L. WAGNER & ASSOCIATES
                      COURT REPORTING SERVICES
24                        41 SUTTER STREET
                  SAN FRANCISCO, CALIFORNIA  94104
25                        (415) 982-4849

                                                                    1

1      Q.   By the way, why don't you agree that Abercrombie

2   intended to infringe the arcuate mark?

3           MR. GILCHRIST:  The question's vague.

4           THE WITNESS:  I don't agree because in working

5   through the process, that was not our intention.  And I

6   can't speak for anyone else, but I can speak for my

7   intention that it was not.

8           MS. DAVIDSON:  Q.  Did you ever tell anybody at

9   Levi, besides counsel, that prior to them -- prior to Levi

10  filing suit that you didn't think that they should file a

11  Complaint against Abercrombie?

12          MR. GILCHRIST:  I'll object that it's misleading.

13  And the way you phrased the question suggests that he did

14  have such a conversation with counsel, so it assumes

15  something.  I assume you mean that putting aside any

16  conversations that he had with counsel, did something

17  happen, which would still be leading, but the way you

18  phrased the question, it sounded like, did you tell someone

19  else something besides telling counsel, so --

20          MS. DAVIDSON:  Okay.  Fair.  Let me rephrase it.

21      Q.   Did you have a conversation, any conversation,

22  with anybody at Levi, excluding counsel, prior to Levi

23  filing suit against Abercrombie where you discussed that

24  you didn't think Levi should file suit against Abercrombie?

25      A.   No.

                                                          84

# EXHIBIT R

**Thank you for your request. Here are the latest results from the TARR web server.**

**This page was generated by the TARR system on** 2008-06-03 18:54:01 ET

**Serial Number:** 73336379 Assignment Information        Trademark Document Retrieval

**Registration Number:** 1273602

**Mark**



**Standard Character claim:** No

**Current Status:** This registration has been renewed.

**Date of Status:** 2004-01-09

**Filing Date:** 1981-11-09

**Transformed into a National Application:** No

**Registration Date:** 1984-04-10

**Register:** Principal

**Law Office Assigned:** (NOT AVAILABLE)

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at** TrademarkAssistanceCenter@uspto.gov

**Current Location:** 40S -Scanning On Demand

**Date In Location:** 2008-05-07

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. H. D. Lee Company, Inc., The

**Address:**
H. D. Lee Company, Inc., The
3411 Silverside Rd.
Wilmington, DE 19810
United States

LS-A&F038924

**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Delaware

---

## GOODS AND/OR SERVICES

---

**International Class:** 025
**Class Status:** Active
Outer Clothing-Namely, Jeans, Jackets, Shorts, Vests, Skirts and Pants
**Basis:** 1(a)
**First Use Date:** 1946-02-18
**First Use in Commerce Date:** 1946-02-18

---

## ADDITIONAL INFORMATION

---

**Disclaimer:** No claim is made to the exclusive right to use the representation of a pair of jeans, apart from the mark as shown.

**Description of Mark:** The mark consists of an ogee (compound) curve design displayed on the hip pockets of the goods as shown on the drawing. The matter shown by dotted lines is not a part of the mark and no claim is made to it; the dotted lines merely serve to show the position of the mark. Sec. 2 (f).

**Section 2(f)**

**Design Search Code(s):**
**09.03.02** - Coveralls; Exercise clothes, shorts; Gym shorts; Jeans; Knickers; Overalls; Pants; Shorts; Slacks; Sweatpants; Trousers
**09.03.16** - Collars (clothing); Cuffs (clothing); Embroidery on clothing pockets; Pockets; Pockets, clothing with embroidery or stitching; Sleeves (clothing); Stitching on clothing pockets; Waistband (clothing)
**26.17.02** - Bands, wavy; Bars, wavy; Lines, wavy; Wavy line(s), band(s) or bar(s)
**26.17.05** - Bands, horizontal; Bars, horizontal; Horizontal line(s), band(s) or bar(s); Lines, horizontal

---

## MADRID PROTOCOL INFORMATION

---

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

---

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2008-05-07 - Case File In TICRS

2004-01-09 - First renewal 10 year

2004-01-09 - Section 8 (10-year) accepted/ Section 9 granted

LS-A&F038925

2003-10-22 - Combined Section 8 (10-year)/Section 9 filed

2003-10-22 - TEAS Section 8 & 9 Received

1989-10-24 - Section 8 (6-year) accepted & Section 15 acknowledged

1989-09-08 - Section 8 (6-year) and Section 15 Filed

1984-04-10 - Registered - Principal Register

1984-01-17 - Published for opposition

1983-11-30 - Notice of publication

1983-11-29 - Notice of publication

1983-11-28 - Notice of publication

1983-11-25 - Notice of publication

1983-11-25 - Notice of publication

1983-11-23 - Notice of publication

1983-11-22 - Notice of publication

1983-10-06 - Approved for Pub - Principal Register (Initial exam)

1983-10-04 - Examiner's amendment mailed

1983-09-22 - Allowance/count withdrawn

1983-09-06 - Communication received from applicant

1983-08-03 - Final refusal mailed

1983-05-31 - Assigned To Examiner

1983-03-21 - Communication received from applicant

1982-11-18 - Non-final action mailed

1982-11-01 - Assigned To Examiner

---

## ATTORNEY/CORRESPONDENT INFORMATION

---

**Correspondent**
H.D. LEE COMPANY, INC., THE
3411 SILVERSIDE RD.
WILMINGTON,DE 19810

LS-A&F038926

LS-A&F038927

**Thank you for your request. Here are the latest results from the TARR web server.**

**This page was generated by the TARR system on** 2008-06-03 18:25:58 ET

**Serial Number:** 78756708 Assignment Information        Trademark Document Retrieval

**Registration Number:** 3209826

**Mark**



**Standard Character claim:** No

**Current Status:** Registered.

**Date of Status:** 2007-02-13

**Filing Date:** 2005-11-18

**Transformed into a National Application:** No

**Registration Date:** 2007-02-13

**Register:** Supplemental

**Law Office Assigned:** LAW OFFICE 109

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at TrademarkAssistanceCenter@uspto.gov**

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2007-02-13

---

### LAST APPLICANT(S)/OWNER(S) OF RECORD

---

1. TWEEN BRANDS INVESTMENT, LLC

**Address:**
TWEEN BRANDS INVESTMENT, LLC
8323 WALTON PKWY.
NEW ALBANY, OH 43054
United States

LS-A&F038928

**Legal Entity Type:** Ltd Liab Co
**State or Country Where Organized:** Ohio

---

## GOODS AND/OR SERVICES

**International Class:** 025
**Class Status:** Active
clothing, namely, jeans, pants, shorts, skirts, and jackets
**Basis:** 1(a)
**First Use Date:** 2003-03-01
**First Use in Commerce Date:** 2003-08-01

---

## ADDITIONAL INFORMATION

**Description of Mark:** The mark consists of a stitching pattern on a pocket of the goods consisting of two non-parallel curved lines that converge, twist, and diverge. One line has darker stitching at the ends. The matter shown by the dotted lines is not a part of the mark and serves only to show the position of the mark.

**Design Search Code(s):**
**09.03.16** - Collars (clothing); Cuffs (clothing); Embroidery on clothing pockets; Pockets; Pockets, clothing with embroidery or stitching; Sleeves (clothing); Stitching on clothing pockets; Waistband (clothing)

---

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2007-02-13 - Registered - Supplemental Register

2007-01-03 - Law Office Publication Review Completed

2007-01-03 - Assigned To LIE

2006-12-12 - APPROVED FOR REGISTRATION SUPPLEMENTAL REGISTER

2006-12-12 - Teas/Email Correspondence Entered

2006-12-12 - Communication received from applicant

2006-12-12 - TEAS Response to Office Action Received

2006-11-28 - Final refusal mailed

LS-A&F038929

2006-11-27 - Final Refusal Written

2006-11-27 - Previous allowance count withdrawn

2006-11-27 - Approved for Pub - Principal Register (Initial exam)

2006-11-02 - Teas/Email Correspondence Entered

2006-11-01 - Communication received from applicant

2006-11-01 - TEAS Response to Office Action Received

2006-08-02 - Automatic Update Of Assignment Of Ownership

2006-05-09 - Non-final action mailed

2006-05-09 - Non-Final Action Written

2006-05-01 - Assigned To Examiner

2005-11-24 - Notice Of Design Search Code Mailed

2005-11-23 - New Application Entered In Tram

---

## ATTORNEY/CORRESPONDENT INFORMATION

---

**Attorney of Record**
Melanie Martin-Jones

**Correspondent**
MELANIE MARTIN-JONES
PORTER WRIGHT MORRIS & ARTHUR, LLP
41 S HIGH ST STE 2800
COLUMBUS, OH 43215-6194
Phone Number: 614-227-2116
Fax Number: 614-227-2100

---

LS-A&F038930

**Thank you for your request. Here are the latest results from the <u>TARR web server</u>.**

**This page was generated by the TARR system on** 2008-06-03 18:25:26 ET

**Serial Number:** 78756709 <u>Assignment Information</u>        <u>Trademark Document Retrieval</u>

**Registration Number:** 3292455

**Mark**



**Standard Character claim:** No

**Current Status:** Registered.

**Date of Status:** 2007-09-11

**Filing Date:** 2005-11-18

**Transformed into a National Application:** No

**Registration Date:** 2007-09-11

**Register:** Supplemental

**Law Office Assigned:** LAW OFFICE 109

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at <u>TrademarkAssistanceCenter@uspto.gov</u>**

**Current Location:** 650 -Publication And Issue Section

**Date In Location:** 2007-09-11

---

### LAST APPLICANT(S)/OWNER(S) OF RECORD

---

1. TWEEN BRANDS INVESTMENT, LLC

**Address:**
TWEEN BRANDS INVESTMENT, LLC
8323 WALTON PKWY.
NEW ALBANY, OH 43054
United States

http://tarr.uspto.gov/tarr?regser=registration&entry=3292455++&action=Request+Status        6/3/2008

LS-A&F038931

**Legal Entity Type:** Ltd Liab Co
**State or Country Where Organized:** Ohio

---

## GOODS AND/OR SERVICES

**International Class:** 025
**Class Status:** Active
clothing, namely, jeans, pants, shorts, skirts, and jackets
**Basis:** 1(a)
**First Use Date:** 2003-03-01
**First Use in Commerce Date:** 2003-08-01

---

## ADDITIONAL INFORMATION

**Color(s) Claimed:** Color is not claimed as a feature of the mark.

**Description of Mark:** The mark consists of a stitching pattern on a pocket of the goods consisting of two non-parallel curved lines that converge, twist, and diverge. The top line has darker stitching at the ends. The matter shown by the dotted lines is not a part of the mark and serves only to show the position of the mark.

**Design Search Code(s):**
**09.03.16** - Collars (clothing); Cuffs (clothing); Embroidery on clothing pockets; Pockets; Pockets, clothing with embroidery or stitching; Sleeves (clothing); Stitching on clothing pockets; Waistband (clothing)

---

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2007-09-11 - Registered - Supplemental Register

2007-08-09 - Law Office Publication Review Completed

2007-08-09 - Assigned To LIE

2007-06-25 - APPROVED FOR REGISTRATION SUPPLEMENTAL REGISTER

2007-05-29 - Teas/Email Correspondence Entered

2007-05-28 - Communication received from applicant

2007-05-28 - TEAS Response to Office Action Received

LS-A&F038932

2006-11-28 - Non-final action mailed

2006-11-27 - Non-Final Action Written

2006-11-27 - Previous allowance count withdrawn

2006-11-27 - Approved for Pub - Principal Register (Initial exam)

2006-11-02 - Teas/Email Correspondence Entered

2006-11-01 - Communication received from applicant

2006-11-01 - TEAS Response to Office Action Received

2006-08-02 - Automatic Update Of Assignment Of Ownership

2006-05-09 - Non-final action mailed

2006-05-09 - Non-Final Action Written

2006-05-01 - Assigned To Examiner

2005-11-24 - Notice Of Design Search Code Mailed

2005-11-23 - New Application Entered In Tram

---

## ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**
Melanie Martin-Jones

**Correspondent**
MELANIE MARTIN-JONES
PORTER WRIGHT MORRIS & ARTHUR, LLP
41 S HIGH ST STE 2800
COLUMBUS, OH 43215-6194
Phone Number: 614-227-2116
Fax Number: 614-227-2100

---

LS-A&F038933