1  TOWNSEND AND TOWNSEND AND CREW LLP
   GREGORY S. GILCHRIST (State Bar No. 111536)
2  GIA L. CINCONE (State Bar No. 141668)
   RAQUEL PACHECO (State Bar No. 245328)
3  Two Embarcadero Center, Eighth Floor
   San Francisco, California  94111
4  Telephone: (415) 576-0200
   Facsimile: (415) 576-0300
5  Email:  gsgilchrist@townsend.com,
   glcincone@townsend.com; rpacheco@townsend.com
6
   Attorneys for Plaintiff/Counterdefendant
7  LEVI STRAUSS & CO.

8

9                       UNITED STATES DISTRICT COURT

10                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                        SAN FRANCISCO DIVISION

12

13  LEVI STRAUSS & CO.,                     Case No.    C 07-03752 JSW

14                Plaintiff/Counterdefendant,   **PLAINTIFF LEVI STRAUSS &
                                              CO.'S OPPOSITION TO**
15                                            **DEFENDANT ABERCROMBIE &**
          v.                                  **FITCH TRADING CO.'S MOTION
16                                            FOR SUMMARY JUDGMENT**
    ABERCROMBIE & FITCH TRADING CO.,
17
                  Defendant/Counterclaimant.
18  _____

19  ABERCROMBIE & FITCH TRADING CO.,        Date:       September 26, 2008
                                            Time:       9:00 a.m.
20                Defendant/Counterclaimant,   Courtroom:  2, 17th Floor
                                                         Hon. Jeffrey S. White
21        v.

22  LEVI STRAUSS & CO.,

23                Plaintiff/Counterdefendant.

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ..........................................................viii

II.  ARGUMENT ....................................................................................................................... 1

    A.   Summary Judgment Is Disfavored In Trademark Cases ...................................... 1

    B.   The Evidence Demonstrates That There Are Triable Issues Of Fact
        Concerning The *Sleekcraft* Factors........................................................................ 2

        1.   A&F's Motion Entirely Ignores The Theory Of Post-Sale
            Confusion On Which LS&CO.'s Claims Are Based................................... 2

        2.   Extensive Evidence Shows The Strength  Of The Arcuate
            Trademark................................................................................................ 4

            a)   The Arcuate Is A Famous Mark .................................................. 4

            b)   There Is No Evidence That LS&CO.'s Mark Has Been
               Weakened By A "Crowded Field" ............................................... 5

            c)   A&F's Account Of The Survey Evidence Is
               Unsupported And Clearly Disputed .............................................. 9

        3.   The Ruehl Design Is Similar To The Arcuate Trademark.................................... 11

            a)   The Overall Impression Of The Two Designs Is Similar......................... 11

            b)   One Third Party Settlement Among Hundreds Is Not
               Admissible Or Relevant On The Issue Of Similarity ................................. 13

        4.   The Parties' Goods Are Identical ................................................................. 17

        5.   The Parties' Marketing Channels Are Overlapping And Are
            Irrelevant To LS&CO.'s Claim Of Post-Sale Confusion ..................................... 17

        6.   Evidence Of Actual Confusion Is Disputed ........................................................ 18

        7.   The Consumer Care Factor Is Neutral ................................................................ 19

         8.   The Evidence Regarding A&F's Intent Is Disputed............................................. 19

    C.   The Evidence Establishes That The Arcuate Trademark Is Famous
        And There Are Triable Issues Of Material Fact Relating To The
        Likelihood Of Dilution .................................................................................... 21

        1.   The Arcuate Trademark Is Famous ..................................................................... 21

        2.   The Ruehl Stitching Design Creates A Likelihood Of Dilution............................22

            a)   The Degree Of Similarity Supports A Finding of
               Dilution....................................................................................... 22

1

**TABLE OF CONTENTS(con't)**

2

Page

3    b)    The Arcuate Trademark Is An Inherently Distinctive

4    Mark ................................................................................................... 23

5    c)    LS&CO. Is Engaging In Substantially Exclusive Use
Of The Mark ...................................................................................... 23

6    d)    Recognition........................................................................................ 24

7    e)    Intent Of A&F To Create An Association With The

8    Famous Mark...................................................................................... 24

9    f)    Actual Association.............................................................................. 24

III.    CONCLUSION ................................................................................................. 25

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Page

3

4

**Cases**

5

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
  237 F.3d 198 (3d Cir. 2000) .................................................................. 13

6

7

*Adidas America, Inc. v. Payless Shoesource, Inc.*,
  546 F. Supp. 2d 1029 (D. Or. 2008) ................................................. passim

8

*Adidas-Salomon Ag v. Target Corp.*,
  228 F. Supp. 2d 1192 (D. Or. 2002) ................................................. 4, 12

9

*Anheuser-Busch, Inc. v. Customer Co., Inc.*,
  947 F. Supp. 422 (N.D. Cal. 1996) ....................................................... 18

10

11

*Audi AG v. D'Amato*,
  469 F.3d 534 (6th Cir. 2006) ................................................................ 21

12

*Brockmeyer v. Hearst Corp.*,
  248 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................... 19

13

14

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ........................................... 11, 18, 19, 24

15

*C&C Oranization v. AGDS, Inc.*,
  676 F. Supp 204 (C.D. Cal. 1987) ........................................................ 17

16

17

*Carter-Wallace, Inc. v. Procter & Gamble Co.*,
  434 F.2d 794 (9th Cir. 1970) ................................................................ 13

18

*Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175 (9th Cir. 1988) .................................................. 5

19

*Checkpoint Systems v. Check Point Software Technologies, Inc.*,
  269 F.3d 270 (3d Cir. 2001) .................................................................. 3

20

21

*Clicks Billiards, Inc. v. Sixshooters Inc.*,
  251 F.3d 1252 (9th Cir. 2001) ................................................................ 1

22

*Cook v. Yellow Freight Sys.*,
  132 F.R.D. 548 (E.D. Cal. 1990) ......................................................... 15

23

24

*Cumberland Packing Corp. v. Monsanto Co.*,
  140 F. Supp. 2d 241 (E.D.N.Y. 2001) *aff'd mem.*,
  2002 U.S. App. LEXIS 13339 (2d Cir. 2002); ................................... 19

25

26

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*,
  109 F.3d 275 (6th Cir. 1997) .................................................................. 7

27

*Downing v. Abercrombie & Fitch*,
  265 F.3d 994 (9th Cir. 2001) .................................................................. 1

28

**TABLE OF AUTHORITIES (con't)**

Page

*Earthquake Sound Corp. v. Bumper Industries*,
    352 F.3d 1210 (9th Cir. 2003) .................................................................... 12

*Express Funding, Inc. v. Express Mortgage, Inc.*,
    894 F. Supp. 1095 (E.D. Mich. 1995) ..................................................... 6, 23

*Ferrari S.p.A. v. Roberts*,
    944 F.2d 1235 (6th Cir. 1991), *cert. denied*,
    505 U.S. 1219 (1992) ...................................................................................... 3

*First Franklin Financial Corp. v. Franklin First Financial, Ltd.*,
    356 F. Supp. 2d 1048 (N.D. Cal. 2005) ....................................................... 17

*Generation X International Corp. v. No Excuses Sportswear, Ltd.*,
    1998 U.S. Dist. LEXIS 4693 (S.D.N.Y. 1998) ............................................ 12

*Green v. Baca*,
    226 F.R.D. 624 (C.D. Cal. 2005) .................................................................. 15

*Halo Management, LLC v. Interland, Inc.*,
    308 F. Supp. 2d 1019 (N.D. Cal. 2003) .......................................................... 9

*Horphag Research Ltd. v. Garcia*,
    475 F.3d 1029 (9th Cir. 2007) ...................................................................... 21

*Hudspeth v. Commissioner of Internal Revenue Serv.*,
    914 F.2d 1207 (9th Cir. 1990) ................................................................ 14, 15

*Insty*Bit, Inc. v. Poly-Tech Industries, Inc.*,
    95 F.3d 663 (8th Cir. 1996), *cert. denied*,
    519 U.S. 1151 (1997) ...................................................................................... 3

*Interstellar Starship Services, Ltd. v. Epix, Inc.*,
    184 F.3d 1107 (9th Cir. 1999) ........................................................................ 1

*Jada Toys, Inc. v. Mattel, Inc.*,
    518 F.3d 628 (9th Cir. 2008) ................................................................... 23, 24

*Koppers Co., Inc. v. Krupp-Koppers GmbH*,
    517 F. Supp. 836 (W.D. Pa. 1981). ................................................................ 3

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
    369 F.2d 700 (3d Cir. 2004) ......................................................................... 13

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
    408 F.3d 596 (9th Cir. 2005) .......................................................................... 1

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    632 F.2d 817 (9th Cir. 1980) .................................................................... 3, 19

**TABLE OF AUTHORITIES (con't)**

Page

*Levi Strauss & Co. v. Vivat Holdings PLC*,
   2000 TTAB LEXIS 817 (TTAB 2000). ................................................. 5, 13

*Lexington Management Corp. v. Lexington Capital Partners*,
   10 F. Supp. 2d 271 (S.D.N.Y. 1998) ................................................. 6

*Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*,
   631 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*,
   799 F.2d 867 (2d Cir. 1986) ................................................. passim

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
   2008 U.S. Dist. LEXIS 42787 (S.D.N.Y. 2008) ................................................. 21

*Marketing Displays, Inc. v. Traffix Devices, Inc.*,
   200 F.3d 929 (6th Cir. 1999), *rev'd in part*
   *on other grounds*, 532 U.S. 23 (2001) ................................................. 13

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki*,
   290 F. Supp. 2d 1083 (C.D. Cal. 2003), *aff'd*,
   2005 U.S. App. LEXIS 135 (9th Cir. 2005) ................................................. 9

*Mattel, Inc. v. MCA Records*,
   296 F.3d 894 (9th Cir. 2002), *cert. denied*,
   537 U.S. 1171 (2003) ................................................. 21

*McDevitt v. Guenther*,
   522 F. Supp. 2d 1272 (D. Haw. 2007) ................................................. 14

*Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*,
   856 F.2d 1445 (9th Cir. 1988) ................................................. 9

*Mushroom Makers, Inc. v. R.G. Barry Corp.*,
   441 F. Supp. 1220 (S.D.N.Y. 1977), *aff'd*,
   580 F.2d 44 (2d Cir. 1978), *cert. denied*,
   439 U.S. 1116 (1979) ................................................. 15, 16

*Nabisco, Inc. v. PF Brands, Inc.*,
   50 F. Supp. 2d 188 (S.D.N.Y. 1999), *aff'd*,
   191 F.3d 208 (2d Cir. 1999) ................................................. 22, 23, 24

*Nike, Inc. v. Nikepal Int'l, Inc.*,
   84 U.S.P.Q.2d 1820 (E.D. Cal. 2007) ................................................. 22, 23

*Official Airline Guides, Inc. v. Goss*,
   6 F.3d 1385 (9th Cir. 1993) ................................................. 11

*Olde Tyme Foods, Inc. v. Roundy's, Inc.*,
   961 F.2d 200 (Fed. Cir. 1992) ................................................. 6, 23

*Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin*,
   396 F.3d 1369 (Fed. Cir. 2005) ................................................. 6

**TABLE OF AUTHORITIES (con't)**

Page

*Payless Shoesource, Inc. v. Reebok Int'l, Ltd.,*
998 F.2d 985 (Fed. Cir. 1993) ............................................................... 4, 18, 19

*Perfumebay.com Inc. v. eBay Inc.,*
506 F.3d 1165 (9th Cir. 2007) ................................................................. 12, 22

*Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,*
486 F. Supp. 414 (S.D.N.Y. 1980) .............................................................. 15

*Playboy Enterprises, Inc. v. Netscape Communications Corp.,*
354 F.3d 1020 (9th Cir. 2004) ........................................................... 1, 2, 7, 18

*Polo Fashions, Inc. v. Craftex, Inc.,*
816 F.2d 145 (4th Cir. 1987) ...................................................................... 4

*Powerfood, Inc. v. Sports Science Institute,*
1993 U.S. Dist. LEXIS 2191 (N.D. Cal. 1992) ............................................ 11, 17

*Scarves by Vera, Inc. v. Todo Imports, Ltd.,*
544 F.2d 1167 (2d Cir. 1976) ................................................................ 6, 9, 23

*Skechers U.S.A., Inc. v. Vans, Inc.,*
2007 U.S. Dist. LEXIS 88635 (C.D. Cal. 2007), .............................................. 8

*Smith v. Ames Department Stores,*
988 F. Supp. 827 (D.N.J. 1997), *aff'd mem.,*
172 F.3d 860 (3d Cir. 1998) ...................................................................... 12

*Starbucks Corp. v. Lundberg,*
2005 U.S. Dist. LEXIS 32660 (D. Or. 2005) .................................................. 24

*Swedish Beer Export Co. v. Canada Dry Corp.,*
469 F.2d 1096 (C.C.P.A. 1972) ................................................................. 15

*Thane International, Inc. v. Trek Bicycle Corp.,*
305 F.3d 894 (9th Cir. 2002) ...................................................................... 2

*Ultrapure Systems, Inc. v. Ham-Let Group,*
921 F. Supp. 659 (N.D. Cal. 1996).......................................................... 12, 17

*United States v. Contra Costa County Water Dist.,*
678 F.2d 90 (9th Cir. 1982) .................................................................... 14, 15

**Statutes**

15 U.S.C. § 1125(c)(1) ............................................................................ 22

15 U.S.C. § 1125(c)(2)(A) ........................................................................ 21

15 U.S.C. § 1125(c)(2)(B) ........................................................................ 22

1

**TABLE OF AUTHORITIES (con't)**

2

Page

3

 **Rules**

4

Federal Rule of Evidence 702 ............................................................................. 10

5

Federal Rule of Evidence 408 ....................................................................... 14, 15, 16

6

7

**Other Authorities**

8

McCarthy, 3 *McCarthy on Trademarks and Unfair Competition* §23.25 (2005) ................................ 12

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant Abercrombie & Fitch Trading Co. ("A&F") has moved for summary judgment on all of plaintiff Levi Strauss & Co.'s ("LS&CO.") claims.  The motion requires A&F to establish that there is no evidence from which a jury might draw a fair inference (i) that A&F's Ruehl pocket stitching design is likely to be confusing with LS&CO.'s 135 year old Arcuate Trademark, or (ii) that the Ruehl stitching design will likely dilute the Arcuate Trademark.

A&F's response to this burden ignores most of the factual record and mischaracterizes governing law.  A&F assumes away LS&CO.'s survey evidence, which itself is sufficient to defeat A&F's motion on both questions.  A&F ignores prior judicial findings and rafts of evidence showing the Arcuate Trademark's strength, while relying on third party uses for which it offers next to no evidence at all.  The strength of LS&CO.'s Arcuate Trademark, coupled with the fact that the parties' similar designs are used on identical products and sold to an entirely overlapping target consumer, raise factual questions that a jury must decide even before survey evidence is considered.

A&F's motion ignores altogether whether consumers are likely to be confused by A&F's Ruehl stitching design when they encounter the design in the post-sale environment.  In the post-sale context, many of the confusion factors relied on by A&F are explicitly irrelevant under the applicable authorities.  A&F does not contest these points, it simply ignores post-sale confusion.

One of the great puzzles in this case is how A&F can assert that its design is not likely to cause confusion or to erode the Arcuate Trademark's distinctiveness, while it simultaneously charges that less similar third party designs have reduced the mark that it is now so weak as to have been abandoned.  The very point of this lawsuit is to safeguard the Arcuate Trademark as an icon for the authentic, original blue jean.  The Lanham Act affords remedies for the very harm that A&F supposes these other jeans have caused, and A&F falls far short of showing as a matter of law that LS&CO. is not entitled to those remedies here.

## II.     ARGUMENT

### A.     Summary Judgment Is Disfavored In Trademark Cases

In deciding a motion for summary judgment, this Court must draw all reasonable inferences in LS&CO.'s favor; summary judgment "is not appropriate where the record would allow a reasonable trier of fact to find for [LS&CO]." *Adidas America, Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1044 (D. Or. 2008).

Summary judgment often is inappropriate in trademark cases because the likelihood of confusion analysis generally is fact-intensive: "Due to the factual nature of likelihood of confusion, determining whether a likelihood of confusion exists at the summary judgment stage is generally disfavored because a full record is usually required to fully assess the facts." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608 (9th Cir. 2005) (citation omitted). In particular, the Ninth Circuit will reverse a grant of summary judgment where there is conflicting evidence as to the *Sleekcraft* factors, because the trial court should not engage in the weighing of evidence on a summary judgment motion. *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 184 F.3d 1107, 1110 (9th Cir. 1999); *see also Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1008 (9th Cir. 2001) ("'The Lanham Act's likelihood of confusion standard is predominantly factual in nature.' Thus, summary judgment is inappropriate when a jury could reasonably conclude that there is a likelihood of confusion.") (citation omitted); *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1266 (9th Cir. 2001) (plaintiff presented sufficient evidence of likelihood of confusion to defeat summary judgment, noting that "[a] jury, of course, may reject such evidence or determine that the witnesses are not credible, but a court on summary judgment may not make such determinations"); *Adidas*, 546 F. Supp. 2d at 1052 (summary judgment disfavored in trademark cases).

Survey evidence showing consumer confusion alone may be sufficient to defeat a summary judgment motion. In *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020 (9th Cir. 2004), the plaintiff offered a survey conducted by A&F's own expert, Dr. Ford. Dr. Ford opined that there was a likelihood of confusion based on confusion rates of 22%. *Id*. at 1026. The defendants criticized Dr. Ford's methodology and conclusions, offered their own interpretations of his data, and moved to exclude his testimony and report. The district court denied the motion to exclude Dr. Ford's

survey but granted the defendants' summary judgment motion.  In reversing, the Ninth Circuit held:

> Defendants may have valid criticism of Dr. Ford's methods and conclusions, and their critique may justify reducing the weight eventually afforded Dr. Ford's expert report.  The district court's evidentiary ruling is not before us on appeal, however, and weighing admissible evidence at this stage is improper.  *Defendants' arguments prove the point that a genuine issue of material fact exists regarding actual confusion.*

*Id*. at 1027 (emphasis added).  The Ninth Circuit discussed both parties' evidence on other *Sleekcraft* factors but held that Dr. Ford's survey was probably enough, by itself, to preclude summary judgment. *Id*.; *see also Thane International, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 902 (9th Cir. 2002) (reversing grant of summary judgment in light of contested survey evidence: "summary judgment for Thane falters upon consideration of a single *Sleekcraft* factor, evidence of actual confusion").

A&F knows this rule, which is why it has launched an elaborate attack on LS&CO.'s survey evidence.  In so doing, A&F effectively concedes that its summary judgment motion fails if its motion to exclude also fails.  Even if that motion to exclude were granted, the conflicting evidence regarding other *Sleekcraft* factors means that summary judgment must be denied.

**B.    The Evidence Demonstrates That There Are Triable Issues Of Fact Concerning The *Sleekcraft* Factors**

**1.    A&F's Motion Entirely Ignores The Theory Of Post-Sale Confusion On Which LS&CO.'s Claims Are Based**

Although there are possibilities for confusion at point of sale, this case is also about post-sale confusion.  LS&CO. claims that consumers will see women wearing Ruehl jeans with the infringing stitching design and will be confused as to the source of the jeans.  In all of its extended discussion of the *Sleekcraft* factors, A&F nowhere mentions or analyzes post-sale confusion issues.  This omission foretells that A&F is fully aware there is no basis for determining that likely post-sale confusion is lacking as a matter of law.

It is well-settled that the Lanham Act applies not just to confusion among purchasers of a product, but also to confusion among consumers who view the product in a post-sale context.  *Adidas*, 546 F. Supp. 2d at 1058.  This application of the Act is particularly important in the case of design marks on apparel.  While such marks are important to reinforcing a consumer's positive brand association at the point of sale, their primary purpose is to identify brands for consumers in the post-sale

1    environment, when exterior labeling or branding is often removed or obscured.  Certainly this is true of

2    the Arcuate Trademark, which serves as a "walking advertisement" for the LEVI'S® brand.  Hanson

3    Dec. ¶ 8; *see* Supplemental Declaration of Gia L. Cincone ("Supp. Cincone Dec.") Ex. A.

4         The Lanham Act was specifically amended to make it clear that likely public confusion, not just

5    confusion at point of sale, was actionable.  Originally, Section 32 of the Lanham Act prohibited the use

6    of similar marks that were "likely to cause confusion or mistake or to deceive *purchasers* as to the

7    source of origin of such goods or services."  *Checkpoint Systems v. Check Point Software Technologies,*

8    *Inc.*, 269 F.3d 270, 295 (3d Cir. 2001) (citations omitted, emphasis added).  In 1962, this section was

9    amended to delete the reference to "purchasers."  A number of courts have held that this amendment

10   evidenced Congressional intent to extent the protections of the Lanham Act to post-sale confusion.  *See,*

11   *e.g.*, *Insty*Bit, Inc. v. Poly-Tech Industries, Inc.*, 95 F.3d 663, 671-72 (8th Cir. 1996), *cert. denied*, 519

12   U.S. 1151 (1997); *Ferrari S.p.A. v. Roberts*, 944 F.2d 1235, 1245 (6th Cir. 1991), *cert. denied*, 505 U.S.

13   1219 (1992); *Koppers Co., Inc. v. Krupp-Koppers GmbH*, 517 F. Supp. 836, 843 (W.D. Pa. 1981).

14        Post-sale confusion has been determinative in several cases involving LEVI'S® products.  In

15   *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817 (9th Cir. 1980), LS&CO. challenged Wrangler's use

16   on the bottom of its jeans pockets of a protruding tab that infringed LS&CO.'s Tab Trademark.  The

17   Ninth Circuit rejected Wrangler's arguments based on consumer confusion at the point of sale, holding,

18   "Wrangler's use of its projecting label is likely to cause confusion among prospective purchasers who

19   carry even an imperfect recollection of [LS&CO.'s] mark and who observe Wrangler's projecting label

20   after the point of sale."  *Id.* at 822.

21        The district court in the *Lois Sportswear* litigation granted summary judgment for LS&CO. on

22   its claims of infringement of the Arcuate Trademark, and elaborated on the importance of post-sale

23   confusion:

> [Post-sale confusion] may diminish the goodwill and sales power created
> by the Levi arcuate in that it might cause potential purchasers viewing a
> pair of Levi's from the distance to enter a store and buy Lois jeans,
> believing them to be what they had seen, or a Levi's customer to decide
> against buying Levi's based on his appraisal of Lois jeans, believing them
> to be the same. . . .  Because the mark is consistently visible to the
> purchasing public as a constant advertisement of the product on which an
> evaluation of it is affixed, the similarity of the marks in a post-sale setting
> must be taken into consideration.

*Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 747 (S.D.N.Y. 1985), *aff'd*, 799 F.2d 867 (2d Cir. 1986).

Since the *Lois* case was decided, a number of other federal courts also have recognized that the Lanham Act protects against post-sale confusion, particularly in cases involving apparel products.  For example, in denying the defendants' motion for summary judgment in a case involving Adidas' three-stripe mark on shoes, the court noted:

> Defendants' argument also ignores the doctrine of post-sale confusion. Post-sale confusion occurs "when consumers view a product outside the context in which it is originally distributed and confuse it with another, similar product."  "The law in the Ninth Circuit is clear that 'post-purchase confusion,' *i.e.* confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion under the Lanham Act."

*Adidas-Salomon Ag v. Target Corp.*, 228 F. Supp. 2d 1192, 1212 (D. Or. 2002) (citations omitted); *see also Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987); *Adidas*, 546 F. Supp. 2d at 1058; *Payless Shoesource, Inc. v. Reebok Int'l, Ltd.*, 998 F.2d 985, 989 (Fed. Cir. 1993).

A&F's likelihood of confusion discussion neglects to address the post-sale confusion doctrine. When LS&CO.'s claim of post-sale confusion is considered, it is even clearer that triable issues of fact exist.

## 2.    Extensive Evidence Shows The Strength  Of The Arcuate Trademark

### a)    The Arcuate Is A Famous Mark

In its own motion for partial summary judgment, LS&CO. submitted extensive evidence concerning the fame of the Arcuate Trademark.  This evidence also establishes that the mark is exceptionally strong.  Even if the Court disagrees about whether this evidence is dispositive of fame, at a minimum it shows that there are triable issues regarding the strength of LS&CO.'s mark.

The Arcuate Trademark "is a fanciful design which has no function other than as a source indicator," and has been held to be a "strong mark that qualifies for a high degree of protection." *Lois Sportswear*, 631 F. Supp. at 741.  The mark does not only have "conceptual" strength, as A&F appears to argue.  A&F Motion for Summary Judgment ("A&F MSJ") at 5.  LS&CO. has been in business since the 1850's, and has used the Arcuate Trademark on its products continuously since 1873.  Downey Dec.

¶¶ 4-5.  LS&CO.'s sales of LEVI'S® products bearing the mark have totaled billions of units, and billions of dollars of revenue.  Mitchell Dec. ¶ 2.  LS&CO. has been advertising products displaying the Arcuate Trademark continuously for over 100 years, and has spent billions of dollars advertising and promoting those products over a wide range of media, including television, print, and the Internet.  Downey Dec. ¶ 12; Mitchell Dec. ¶ 6; Hanson Dec. ¶¶ 9-23.  A company's "extensive advertising, length of time in business, public recognition, and uniqueness" all strengthen its trademarks.  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988).  All of these factors show the Arcuate Trademark is strong.  *See, e.g., Adidas*, 546 F. Supp. 2d at 1056 (Adidas's "substantial advertising and promotional efforts are significant evidence of the strength" of its three-stripe mark).

As documented in LS&CO.'s motion for partial summary judgment, the Arcuate Trademark is recognized by consumers in vast numbers, and is associated with the LEVI'S® brand.  Sanjay Dec. & Ex. A.  The evidence includes many examples of unsolicited media attention and recognition of the mark.  Onda Dec. ¶ 8 & Exs. D-1-D-9.  This is also important evidence of the mark's strength.  *See Adidas*, 546 F. Supp. 2d at 1057.  In light of extensive evidence showing that the mark is famous by every measure identified in the statute, it is difficult to credit A&F's conclusion that "LS&CO. has failed to create an issue of material fact as to the strength" of its mark (A&F MSJ at 8).

   **b)**  **There Is No Evidence That LS&CO.'s Mark Has Been Weakened By A "Crowded Field"**

A&F argues that the Arcuate Trademark is "fatally weak" (A&F MSJ at 8) because it exists within a "crowded field."  This argument has been made and defeated in several cases involving the Arcuate Trademark.  *See, e.g., Lois,* 631 F. Supp. at 741-42; *Levi Strauss & Co. v. Vivat Holdings PLC*, 2000 TTAB LEXIS 817 (TTAB 2000).  A&F argues that there are at least 26 third party stitching designs on the market and 29 federal trademark registrations for third party stitching designs.  A&F MSJ at 6-7.  A&F's evidence is no different than offered by these other parties, which has had no impact on other courts' assessment of the Arcuate Trademark's strength.  *Id.*

A&F's argument and its evidentiary showing flawed in several respects.  As a threshold matter, A&F has submitted virtually no evidence regarding these alleged third party uses, and without such evidence, the Court has no meaningful tools to with which to measure any impact on the Arcuate

Trademark's strength.  For example, in *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167 (2d Cir. 1976), the district court ruled after a bench trial that the defendant had not infringed the plaintiff's mark, concluding that the plaintiff's mark was weak based on evidence of third party registrations.  The Second Circuit reversed, holding, "The significance of third-party trademarks depends wholly upon their usage.  Defendant introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers." *Id*. at 1173.  Third party registrations, by themselves, are entirely irrelevant to the strength of the mark. *Olde Tyme Foods, Inc. v. Roundy's, Inc.*, 961 F.2d 200, 204 (Fed. Cir. 1992) ("As to strength of a mark . . . registration evidence may not be given *any* weight.") (emphasis original); *Express Funding, Inc. v. Express Mortgage, Inc.*, 894 F. Supp. 1095, 1101 (E.D. Mich. 1995) (evidence of third party registrations could not establish that field was crowded where "[n]othing in the record allows the Court to determine if the marks are actually in use, what services are provided by the owners of the marks, or the geographic areas in which the marks are used").

As to A&F's alleged third party uses, the significance of such uses depends entirely on their extent and the length of time they have been on the market. *See Miss Universe, Inc. v. Little Miss U.S.A., Inc.*, 212 U.S.P.Q. (BNA) 425 (N.D. Ga. 1981).  Where the evidence does not demonstrate actual third party use, "it is incompetent to diminish the strength of plaintiff's mark." *Lexington Management Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 283 (S.D.N.Y. 1998); *see also Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin*, 396 F.3d 1369, 1373 (Fed. Cir. 2005) ("The probative value of third-party trademarks depends entirely upon their usage.").  As one court explained with respect to beauty pageants:

> Unquestionably, the pageant industry is crowded.  The court acknowledges that in a market of this nature, amidst all these competing pageants, it takes a herculean effort by a promoter to establish a reputation for its pageant such that the title it bestows becomes associated solely with its pageant.  By investing enormous amounts of time and money into promoting its pageant and challenging others using similar names, the plaintiff, however, has accomplished this goal.  It stands to reason, then, that if the third-party uses introduced by the defendant are to rebut the plaintiff's claim of strength, the defendant must show that these uses tend to negative the plaintiff's legitimate claim to a strong mark.  The court, though, is not willing to infer . . . that the strength of the plaintiff's mark has ebbed.

1    *Miss Universe, supra.* In the absence of such evidence, at a minimum there is a genuine dispute whether

2    third party uses and registrations have, in fact, weakened LS&CO.'s mark. *See Daddy's Junky Music*

3    *Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 281 (6th Cir. 1997) (reversing grant of

4    summary judgment).

5      A&F's "evidence" concerning the extent of third party use is limited to the declaration of Nicole

6    Sanger, Senior Market Researcher for A&F. Ms. Sanger testified that she "recognized" four of A&F's

7    asserted third party uses as garments "that are currently being sold and have been sold on the market

8    place for quite some of time [sic]." Sanger Dec. ¶ 5. This evidence is not sufficient to establish that the

9    Arcuate Trademark has been weakened by third party stitching designs.[1]

10      A&F presented no direct evidence that third party uses and registrations have weakened

11    LS&CO's mark. Supp. Cincone Dec. Ex. B at 176:6-177:6. It offered no evidence that any third party

12    use reflects weakness of the mark, rather than competitors' attempts to convey the authenticity of their

13    jeans by imitating a mark that belongs to the original jeans brand. In the *Lois* litigation, the district court

14    held:

15           [E]ven assuming that the examples presented by Lois are infringements of
            Levi's mark, Lois has not demonstrated either the extent to which the

16           allegedly infringing designs have been used or the degree to which they
            may have diminished the effectiveness of the Levi mark as an identifying

17           source. In the particular context of this case, the fact that the Levi arcuate
            may have been to some degree duplicated by other jeans manufacturers

18           *serves more to bolster its claim of a strong mark rather than weaken it.*

19

20    *Lois*, 631 F. Supp. at 742. The Ninth Circuit also has observed that third party use may be an indication

     of a mark's strength, not its weakness. In the *Playboy Enterprises* case, the Ninth Circuit noted:

21

22           Although evidence of extensive third-party use of a mark may be useful in
            evaluating the strength of the secondary meaning of a mark, we note that

23           such evidence can cut both ways. On the one hand, extensive third-party
            use of a mark might tend to show that consumers are likely to associate

24           the mark with companies and meanings other than the markholder's.
            However, if consumers associate the mark with the markholder, and the
            markholder's secondary meaning, despite extensive third-party use, *the*

25 _____

26    [1] Except for stitching designs that LS&CO. has been investigating and may challenge, the third party

27    uses relied on by A&F are not particularly similar to the Arcuate Trademark and certainly are not as
     similar as the Ruehl stitching design. Supp. Onda Dec. ¶¶ 5-7.

28

1

*third-party uses would tend to show the strength of the association*
*created by the markholder.*

2

3    354 F.3d at 1027 n.33 (emphasis added).  In other words, the existence of third party uses may

4    demonstrate *not* that the mark is "hemmed in" and therefore weak, but rather that it is strong enough to

5    draw imitators.

6    A&F's "crowded field" argument, in any event, does not square with the evidence.  LS&CO.

7    spends enormous resources to preserve its mark and maintain a zone of protection against similar uses

8    that would erode its distinctiveness.  The Supplemental Declaration of Thomas Onda ("Supp. Onda

9    Dec."), submitted with this opposition, shows a few examples among hundreds of enforcement actions

10    taken in furtherance of this effort.  As noted above, A&F tries to have it both ways, asserting both that

11    its design is not likely to cause confusion or to erode the Arcuate Trademark's distinctiveness, and that

12    less similar third party designs have so reduced the mark that it no longer is strong, or has been

13    abandoned altogether.  A&F MSJ at 5-8; Amended Answer and Counterclaims ¶¶ 1-2, 14-26, 29-30.

14    Whatever the source of A&F's self-contradictory arguments, the evidence shows the Arcuate Trademark

15    to be a strong, well-guarded icon of LEVI'S® jeans.  Supp. Onda Dec. ¶¶ 3-8 & Ex. A.

16    None of the cases A&F cites involve claims that well-protected, historic marks have become

17    weak through unproven third party uses.  In *Skechers U.S.A., Inc. v. Vans, Inc.*, 2007 U.S. Dist. LEXIS

18    88635 (C.D. Cal. 2007), the court's analysis started with the finding that a checkerboard design on shoes

19    was "at best ambiguous," because "the inherent nature of such a design is not likely to identify a

20    particular source for goods."  *Id.* at *7.  The court concluded that Vans, the trademark owner, had not

21    established secondary meaning in the mark.  *Id* at  *8.  Given the lack of any evidence that consumers

22    associated the checkerboard design with Vans, and the widespread use of checkerboard designs by other

23    shoe brands, the court found that confusion was unlikely because "consumers would be careful to make

24    sure they were purchasing shoes from the right source."  *Id.* at *13-14.[2]

25

26    [2] The other cases relied upon by A&F are similarly distinguishable.  In *Miss World (UK) Ltd. v. Mrs.*

27    *America Pageants, Inc.*, 856 F.2d 1445 (9th Cir. 1988), the district court had found the mark not strong because its "imagination aspect" was low (*i.e.*, the amount of imagination needed by a consumer to associate the mark with the goods or services it identified) and its "need aspect" was high (*i.e.*, the extent to which the mark was needed by competitors to identify their goods and services).  *Id.* at 1449.

28    Continued on the next page

In contrast to a generic checkerboard design, LS&CO.'s mark is fanciful, has been in use since blue jeans were invented, and enjoys strong consumer recognition. In that context, it retains its significance as a highly distinctive and effective marker of the original blue jean. The Arcuate Trademark has been enforced vigorously so that the very arguments A&F makes will gain no traction. The only purpose A&F's "strength" argument serves is to remind that the Arcuate Trademark deserves a wide scope of protection to ensure that its significance -- earned over more than a century -- is not compromised.

### c)  A&F's Account Of The Survey Evidence Is Unsupported And Clearly Disputed

A&F asks the Court to believe that various consumer surveys from other cases support a conclusion that the Arcuate mark has lost significance as a result of consumer exposure to designs like the Ruehl design. A&F relies on expert reports LS&CO. submitted in different cases regarding different stitching designs. These surveys use different methodologies, address different survey populations, use different survey stimuli and, in some cases but not in others, assess post-sale confusion rather than trademark recognition.

A&F offers this argument without any foundation that its conclusions or analysis of these surveys is proper. Although A&F engaged an expert to conduct a survey and prepare an expert report, it did not ask him to analyze these reports. Supp. Cincone Dec. Ex. B at 66:19-67:2. The Ford report includes no opinions or research regarding whether consumers recognize the Arcuate mark, and Dr. Ford reported that he had not been asked to consider this question. *Id*. at 176:6-177:6. Instead, A&F relies on no more than the assumptions of counsel about the propriety of picking and choosing from and

---

Continued from the previous page

Here, by contrast, the Arcuate Trademark has already been held to be a strong, fanciful mark, *Lois Sportswear*, 631 F. Supp. at 741, and nothing in the evidence presented by A&F alters that conclusion. Similarly, in *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki*, 290 F. Supp. 2d 1083 (C.D. Cal. 2003), *aff'd*, 2005 U.S. App. LEXIS 135 (9th Cir. 2005), the court began by finding that the plaintiff's mark was descriptive. *Id*. at 1091. The court in *Halo Management, LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019 (N.D. Cal. 2003), did not even address the question; it merely noted in dicta the existence of the "crowded field" doctrine, but explicitly stated that it was not exploring the issue because it already had found that the plaintiff abandoned its mark via a naked license to the defendant. *Id*. at 1034.

1   then comparing results from these surveys.  A&F MSJ at 7-8.

2          There is a reason that Federal Rule of Evidence 702 requires experts to provide expert analysis.

3   A&F's brief misstates the survey results, makes unsupportable comparisons, and provides no account of

4   differences between the surveys.  As just one of many liberties it takes, A&F reports that Dr. Carol

5   Scott's survey in the RP55 case showed 17.89% recognition rates.  A&F MSJ at 8.  A&F gets to this

6   level through a series of mismatched arithmetic calculations and distortions about Dr. Scott's report.

7   A&F acknowledges that 58% of survey respondents correctly identified the LEVI'S® jeans they were

8   shown.  It then arbitrarily reduces this number to 33.89%, ostensibly to reflect the proportion of

9   respondents who expressly articulated that stitching was the reason they had correctly identified the

10  jeans.  A&F's expert, Dr. Ford, testified that he believes the unreduced figure in such tests is preferable.

11  Supp. Cincone Dec. Ex. B at 154:15-156:1.[3]  From this reduced proportion, A&F then subtracts 16%,

12  which represents the *total* percentage of respondents who identified one of several controls as a

13  LEVI'S® jean.  A&F MSJ at 8 & nn.5-6.  A&F does not even subtract apples from apples by using the

14  proportion of the respondents calling the control a LEVI'S® jean.  Again, A&F's own expert -- to the

15  extent he relies on these verbatim responses at all -- subtracts the same control population from the test

16  population.  Cincone Dec. Ex. R at 28-30 (comparing the subset of "stitching" answers in the test set

17  against "stitching" answers in the control set).  A&F ignores the fact that other controls had lower rates,

18  and also ignores Dr. Scott's report itself which accounts for "noise" without resorting to mere

19  subtraction.  Bettinger Dec. Ex. BB at 1-2.

20         The rest of A&F's analysis is similarly flawed and without foundation.[4]  Most importantly for

21  purposes of this motion, A&F fails to understand that, even if these other surveys were relevant, they

22

23  _____

24  [3] Dr. Ford also pointed out that respondents are not always articulate in explaining their answers.  *See*
    Supp. Cincone Dec. Ex. B at 155:13-156:1,178:9-23.

25  [4] A&F ignores that, of the five surveys submitted to the Court, four of them show recognition levels of
    79% (Bettinger Dec. Ex. Y), 71% (Bettinger Dec. Ex. Z), 74.5% (Bettinger Dec. Ex. AA), and 77%
26  (Sood Dec. Ex. A).  Only in one (Bettinger Dec. Ex. BB) did the results show "recognition" of less than
    70%, and that showed 58%.  A&F constructs its "eroding" recognition rate by applying subsets that
27  specifically called out stitching in some surveys without using the same approach for the rest of the data.

28

show widespread recognition of the Arcuate Trademark and association with the LEVI'S® brand.  No fair analysis of these surveys supports any motion for summary judgment in A&F's favor, as all of them demonstrate that the Arcuate Trademark serves as an important identifier of the LEVI'S® brand.

> ### 3.     The Ruehl Design Is Similar To The Arcuate Trademark

> #### a)     The Overall Impression Of The Two Designs Is Similar

A&F dissects the two stitching designs in an attempt to argue that they are "wholly dissimilar." A&F MSJ at 9.  Any such side-by-side comparison ignores the governing legal authorities, which hold that the proper question is whether the designs create the same overall commercial impression.  *See, e.g., Adidas*, 546 F. Supp. 2d at 1052 ("similarity of design is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features").  Similarities are weighed more heavily than differences, particularly on like products.  *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999); *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993); *Adidas*, 546 F. Supp. 2d at 1052; *Powerfood, Inc. v. Sports Science Institute*, 1993 U.S. Dist. LEXIS 2191 at *16 (N.D. Cal. 1992).

Applying these standards, and as the survey results reflect, the overall impression of the two stitching designs is similar.[5]  Both appear in the same place on identical products.  Similarity often is measured on the three dimensions of sight, sound and meaning.  *Adidas*, 546 F. Supp. 2d at 1052 ("Similarity is best adjudged by appearance, sounds, and meaning."); *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) (same).  In trademark actions involving design marks, similarity of

---

[5] Dr. Sood's survey showed that approximately 31% of survey respondents expressed a belief that the Ruehl jeans were made, sponsored or endorsed by the maker of the LEVI'S® jeans they had seen.  This compares with 11% of the highest control response and 8% of the average control response -- which in Dr. Sood's opinion should be used to inform conclusions of likely confusion, not as a tool for wholesale subtraction in order to obtain a final, specific confusion figure.  Supp. Sood Dec. ¶ 7.  Dr. Ford's survey, which involved showing Ruehl jeans to a respondent sample, reported that 14.8% identified them as LEVI'S® jeans.  Using improper controls selected by A&F's counsel (LS&CO. reserves its right to object or partially object to Dr. Ford's survey), Dr. Ford concludes that the Ruehl design is not likely to be confusing.  But the high rate of identification of the Ruehl jeans as LEVI'S® jeans, and the verbatim responses of respondents (*e.g.*, "the stitching on the pocket," "the stitching pattern," "because of the design on the pocket") certainly support a conclusion that the stitching is similar.  Supp. Cincone Dec. Ex. E.

1  appearance is controlling, "for such marks are incapable of being pronounced or of conveying any

2  inherent meaning." *Generation X International Corp. v. No Excuses Sportswear, Ltd.*, 1998 U.S. Dist.

3  LEXIS 4693 at *21 (S.D.N.Y. 1998); *see also Smith v. Ames Department Stores*, 988 F. Supp. 827, 840

4  (D.N.J. 1997), *aff'd mem.*, 172 F.3d 860 (3d Cir. 1998); McCarthy, 3 *McCarthy on Trademarks and*

5  *Unfair Competition* §23.25 at 23-83 (2005).  Thus, differences in word marks may better differentiate

6  them from other word marks because the differences along each dimension may reinforce the ability to

7  distinguish them or overcome similarity in one of these dimensions.  *Cf. Ultrapure Systems, Inc. v.*

8  *Ham-Let Group*, 921 F. Supp. 659, 663 (N.D. Cal. 1996) (GAZEL and GAZLINE marks not

9  confusingly similar because different in sight and meaning and only slightly similar in sound);

10  *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1213 (9th Cir. 2003) ("Although the

11  'Carquake' and 'Earthquake' marks are visually distinct, they have an obvious aural and connotative

12  similarity.").

13      Both the Ruehl and the Arcuate designs start at the side of the pocket and curve toward the

14  center.  The general shape is an arcing "V."  Although the Arcuate Trademark usually appears in a

15  symmetrical double line of stitching, and the Ruehl design usually appears in a slightly asymmetrical

16  single line of stitching, neither is uniformly true.  The Arcuate Trademark is sometimes stitched in a

17  single line and sometimes appears asymmetrically, while the Ruehl design sometimes appears in

18  multiple lines of stitching.  Complaint Ex. A; Supp. Cincone Dec. Exs. C & D.  The "swooping loop"

19  described by A&F (A&F MSJ at 9) is merely a small bow-like figure at the point where the arcs meet,

20  which does little to alter the overall impression of the design.  *See Adidas-Salomon*, 228 F. Supp. 2d at

21  1211 (finding four-stripe design similar to three-stripe design, noting, "the issue is whether the total

22  effect of the allegedly infringing design is likely to cause confusion in the minds of an ordinary

23  purchaser").

24      Applying these rules, the TTAB found that the asymmetrical Lee Cooper stitching design (Supp.

25  Cincone Dec. Ex. F) was confusingly similar to the Arcuate Trademark:

26          [I]n comparing the design marks in their entireties (rather than by
           comparing individual features and lines) we are of the opinion that the

27          overall commercial impression created by applicant's marks and
           opposer's mark is similar. . . .  Despite [the] minor differences, there is no

28          doubt that the overall impression and perception of both marks is that of a
           curved or arched set of two lines, and would be so perceived by

1    purchasers.

2  *Levi Strauss & Co. v. Vivat Holdings PLC*, 2000 TTAB LEXIS 817 at *12-13 (TTAB 2000).  The

3  TTAB's observations are equally true here.[6]

4    A&F ignores the import of post-sale confusion on this factor.  In the post-sale context, these

5  designs will be seen as worn by people who are moving and bending.  Consumers often will not form

6  more than a general impression of the designs in the post-sale environment.  Minor differences will be

7  difficult to perceive; rather, consumers will see arcing stitching designs in virtually identical locations,

8  on virtually identical pockets, on virtually identical products.  In the post-sale setting, the differences

9  that A&F characterizes as dispositive will likely not be noticed and certainly not reliably credited by

10  consumers to a different brand.

11                    **b)    One Third Party Settlement Among Hundreds Is Not Admissible Or
                          Relevant On The Issue Of Similarity**

12

13    A&F suggests that LS&CO. somehow has precluded itself from challenging the Ruehl stitching

14  design because of its settlement with a small purveyor of a hip-hop style of jeans, which -- due to the

15  confidentiality of the settlement -- LS&CO. will refer to as "Brand X."[7]  Preliminarily, a settlement that

16  _____

17  [6] A&F suggests that this Court should afford weight to the trademark examiner's failure to cite
    LS&CO.'s Arcuate Trademark even while rejecting A&F's application for registration.  In other words,

18  A&F suggests that the Court give "weight" to A&F's own assumptions about what the examiner did or
    did not see or consider when denying A&F's application.  The Ninth Circuit has made clear that under

19  these circumstances, the examiner's determinations as to likelihood of confusion are entitled to little or
    no weight.  *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970); *see also*

20  *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 220-21 (3d Cir. 2000) (approving
    of Ninth Circuit opinion in *Carter-Wallace*, noting that "although an initial PTO determination by an

21  examining attorney may be considered, it need not be given weight when the PTO attorney did not
    review all the evidence available to the District Court").  The record contains nothing to establish that

22  the examiner ever considered LS&CO.'s mark.  Circuit courts have expressly rejected A&F's argument
    that a trademark is entitled to a presumption against infringement because the PTO allowed registration

23  of a defendant's mark (which the examiner in this case did not in fact do), since "there is no evidence
    that the PTO considered the [plaintiff's allegedly similar] mark, and the PTO might have made a

24  mistake."  *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 200 F.3d 929, 934 (6th Cir. 1999), *rev'd in
    part on other grounds*, 532 U.S. 23 (2001); *see also Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.2d

25  700, 714-15 (3d Cir. 2004) (examiner's decision not entitled to weight when the record does not show
    that the examiner actually considered the registrability of the applicant mark over the allegedly similar

26  mark).

27  [7] LS&CO. refers the Court to Exhibit M to the Keyes Declaration, which was filed under seal.

28

permits continued third party use of a different design than the one at issue is not relevant to likely confusion from the Ruehl stitching design.  In theory, A&F could try to show (although it has presented no evidence on the question) that the presence in the market of the Brand X design renders consumers less aware of the Arcuate Trademark.  But very few people have ever seen or heard of Brand X jeans -- including Ms. Sanger, A&F's declarant on third party uses.  Supp. Cincone Dec. Ex. G at 78:1-7.  Such a showing, in any event, would have no bearing on this motion, which requires undisputed inferences from the evidence.[8]

In any event, the Brand X settlement is not admissible under Fed. R. Evid. 408.  Rule 408 provides that evidence of a party "furnishing or offering or promising to furnish – or accepting or offering or promising to accept – a valuable consideration in compromising or attempting to compromise a claim" is "not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount."  The comments to the 1972 Proposed Rules makes clear that the rule applies to settlement agreements between a party to the litigation and a third person:  "While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto.  This latter situation will not, of course, ordinarily occur except when a party to the present litigation has compromised with a third person."  Fed. R. Evid. 408 .Advisory Committee Note.

The Ninth Circuit has confirmed that Rule 408 .excludes evidence of settlement negotiations or agreements, even when the party seeking to introduce such evidence was not a party to the settled litigation or to the compromise agreement. *Hudspeth v. Commissioner of Internal Revenue Serv.*, 914 F.2d 1207, 1213-14 (9th Cir. 1990); *United States v. Contra Costa County Water Dist.*, 678 F.2d 90, 92 (9th Cir. 1982); *see also McDevitt v. Guenther*, 522 F. Supp. 2d 1272, 1284-86 (D. Haw. 2007)

---

[8] A&F makes reference to Judge Illston's summary judgment order, forgetting to mention that she *denied* the defendant's motion for summary judgment in that case.  Bettinger Dec. Ex. EE.  Although A&F badly wants the protection of the Brand X settlement, it involved a jean that catered to a different market and showed less confusion in LS&CO.'s survey than the Ruehl design.  *Compare* Bettinger Dec. Ex. BB *with* Sood Dec. Ex. A.

1   (following *Hudspeth* and *Contra Costa County Water Dist.*); *Green v. Baca*, 226 F.R.D. 624, 640-41

2   (C.D. Cal. 2005) (same); *Cook v. Yellow Freight Sys.*, 132 F.R.D. 548, 554 (E.D. Cal. 1990) (same).

3   The Ninth Circuit, and District Courts within the Circuit, all have emphasized that admitting evidence of

4   settlement agreements between a party to the litigation and a third party for the purpose of proving or

5   disproving liability for a claim or the value of a claim undermines the policies underlying Rule .408, and

6   in particular that it compromises the public policy favoring the compromise and settlement of disputes.

7   *See, e.g., Hudspeth*, 914 F.2d at 1213-14; *Contra Costa County Water Dist.*, 678 F.2d at 92; *Green*, 226

8   F.R.D. at 641; *Cook*, 132 F.R.D. at 554.  The Brand X settlement thus is inadmissible, and cannot be

9   considered in support of A&F's motion for summary judgment.

10          This rule has been applied to bar evidence of trademark settlements in exactly these

11  circumstances.  For example, a trademark defendant tried to take advantage of a settlement that Playboy

12  Enterprises had reached with the publishers of "Playgirl" magazine.  The court ruled that the settlement

13  was irrelevant:

14              To consider the terms of that settlement in this action would be improper
                and unjustified.  It is well-established that statements made for purposes
15              of settlement negotiations are inadmissible, and Rule .408 of the Federal
                Rules of Evidence extends the exclusion to completed compromises when
16              offered against the compromiser. . . .  [T]hat plaintiff settled with
                PLAYGIRL does not in fact establish what a court would have decided
17              had the parties proceeded to trial.  A host of factors may affect a litigant's
                decision to settle.  Nor should hindsight be the guide in assessing the
18              wisdom of plaintiff's settlement.  Plaintiff might have made a mistake in
                not pursuing its rights with appropriate zeal against PLAYGIRL, but this
19              does not preclude it from protecting its mark from future confusion with a
                magazine in direct competition for plaintiff's established market.

20
21  *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F. Supp. 414, 423 n.10 (S.D.N.Y.

    1980).
22
23          The cases offered by A&F, *Swedish Beer Export Co. v. Canada Dry Corp.*, 469 F.2d 1096

24  (C.C.P.A. 1972) and *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441 F. Supp. 1220 (S.D.N.Y. 1977),

25  *aff'd*, 580 F.2d 44 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116 (1979), do not alter the rule precluding

26  admission of settlement agreements such as the Brand X settlement.  They also do not stand for a

27  proposition that would allow infringers to exploit previous litigation settlements that the trademark

28  owner has reached with third parties.  Neither case involves a settlement agreement growing out of

1    litigation or any attempt to introduce such a settlement agreement into evidence.  Neither case

2    authorizes summary judgment on the question of confusion, as the consent agreements in those cases

3    were merely considered along with other factors.  Finally, neither case authorizes A&F to select one

4    settlement agreement from hundreds and give it dispositive effect.  If the Brand X settlement is to be

5    considered, then so must LS&CO.'s hundreds of other settlements.  *E.g.,* Supp. Onda Dec. Ex. A.

6         In *Swedish Beer*, a beer manufacturer registered the mark SKOL for its product after seeking and

7    receiving a consent from the makers of SKOL vodka.  The consent was relied on by the PTO in granting

8    registration of the mark.  469 F.2d at 1097.  After considering all confusion factors, the court held that

9    the plaintiff's use of the agreement in the PTO supported a finding that the mark SKOLA was not

10   confusing for use on a soft drink.  The court ostensibly reasoned that the plaintiff's rights in SKOL were

11   logically constrained by having used the absence of confusion with SKOL vodka to obtain the mark in

12   the first place.  *Mushroom Makers* suffers from the same deficiency.  The plaintiff in that case, the

13   owner of the mark MUSHROOMS as applied to women's shoes, previously had been challenged by the

14   owner of the mark MUSHROOM HUNTER, also applied to shoes.  After avoiding the challenge by

15   agreement, the plaintiff attempted to stop use of the mark MUSHROOMS for a different product,

16   namely women's sportswear.  441 F. Supp. at 1231.

17        Unlike those cases, this case involves A&F's attempt to use a settlement agreement covered by

18   Rule .408 and does not even relate to the same contested mark or a similar seller.  As A&F well knows,

19   LS&CO.'s agreement not to challenge use of the Brand X design is qualified.  The settlement is

20   personal to the manufacturer, a small jeans producer in Virginia Beach.  If the Brand X design is

21   transferred, LS&CO. has reserved its right to renew its challenge.  Keyes Dec. Ex. M.  This qualified

22   agreement – regarding a different design and a different seller – says nothing about the level of

23   confusing similarity presented by the Ruehl design, even if the agreement were admissible.[9]

24

25

26

27   [9] LS&CO. objects to admission of the agreement on the basis of Rule 408 and reserves its right to renew the objection on any grounds before trial.

28

### 4.    The Parties' Goods Are Identical

A&F devotes its analysis regarding the proximity of the parties' goods to a discussion of marketing channels (A&F MSJ at 12) – apparently in order to avoid acknowledging that the parties' goods are not merely proximate, but identical.  Where the challenged designs are displayed on similar goods, confusion is more likely, and less similarity between the designs and the plaintiff's trademark is required for a finding of infringement.  *Powerfood*, 1993 U.S. Dist. LEXIS 2191 at *17 ("Where goods are directly competitive, the degree of similarity of marks needed to give rise to a likelihood of confusion is less than in the case of dissimilar goods. In addition, goods which are reasonably interchangeable by buyers for the same purposes need not be as similar to result in a finding of likelihood of confusion.") (citations omitted); *C&C Oranization v. AGDS, Inc.*, 676 F. Supp 204, 207 (C.D. Cal. 1987) (because "the parties' goods are closely related, 'a diminished standard of similarity must be applied when comparing the two marks'") (citations omitted); *Ultrapure*, 921 F. Supp. at 663 ("Where goods are related or complementary, the danger of consumer confusion is heightened.").  Thus, this factor also weighs in LS&CO.'s favor.

### 5.    The Parties' Marketing Channels Are Overlapping And Are Irrelevant To LS&CO.'s Claim Of Post-Sale Confusion

A&F argues that there is no likelihood of confusion because the parties' advertising and marketing channels do not overlap.  A&F MSJ at 12-13.  As a factual matter, this assertion is incorrect. Both parties' products are sold and promoted on the Internet.  *See First Franklin Financial Corp. v. Franklin First Financial, Ltd.*, 356 F. Supp. 2d 1048, 1052 (N.D. Cal. 2005) ("Because both parties maintain websites and solicit business via the Internet, . . . the overlap in marketing channels weighs in plaintiff's favor.")  Moreover, nothing in the Ruehl stores indicates any affiliation whatsoever with A&F.  Supp. Cincone Dec. Ex. H at 142:21-143:2.  To a consumer looking at the Ruehl jeans on the Internet or at the point of sale, the brand could just as easily be affiliated with LS&CO. as with A&F. *See Lois*, 631 F. Supp. at 745 (consumers may apprehend that multiple brands come from one source and be confused by similar stitching as a result).  Promotional video for Ruehl jeans appears on YouTube.com alongside ads for LEVI'S® jeans.  Hanson Dec. at 21; Supp. Cincone Dec. Ex. I at 58:2-23.

1    Once again, A&F ignores the likelihood of post-sale confusion. In evaluating post-sale

2 confusion, marketing channels are irrelevant. As the *Adidas* court explained:

> Even if the Payless and Adidas' marketing channels were completely
> incongruous . . ., this factor would not necessarily favor Payless because
> channels of trade are largely irrelevant in determining the likelihood of
> *post*-sale confusion. . . . This is because "post-sale observers may be
> unaware that Payless and [adidas] shoes are sold in different stores or at
> different prices, yet their confusion may be detrimental to [adidas]."

6 546 F. Supp. 2d at 1055 (emphasis original). In the *Payless/Reebok* case, the Federal Circuit noted that

7 the nature of the parties' marketing and marketing channels were factors directed to pre-sale confusion:

8 "They are immaterial to the issue whether actionable confusion is likely to occur *after* the marked

9 product has entered the public arena." *Payless*, 998 F.2d at 989-90 (emphasis original).

### 6.    Evidence Of Actual Confusion Is Disputed

11    Proof of actual confusion is unnecessary to prevail in a trademark case. *Brookfield*, 174 F.3d at

12 1050. Because direct evidence of actual confusion, particularly in a post-sale context, is highly unlikely

13 to materialize, proof of this factor often occurs through surveys. *See Anheuser-Busch, Inc. v. Customer

14 Co., Inc.*, 947 F. Supp. 422, 425 (N.D. Cal. 1996).

15    A&F attempts to prevail on this factor by discrediting LS&CO.'s survey evidence, and has

16 moved separately to exclude Dr. Sood's survey and testimony. For the reasons discussed in Dr. Sood's

17 declaration and LS&CO.'s opposition to the motion to exclude, Dr. Sood's survey provides evidence of

18 substantial confusion and should receive full consideration by the Court.[10] Even if the Court were to

19 conclude that imperfections in consumer research should affect the weight given the evidence, A&F's

20 motion for summary judgment must be denied. Unless Dr. Sood's survey is entirely excluded, there

21 clearly is a triable issue of fact as to actual confusion. *See Playboy Enterprise*, 354 F.3d at 1027

22 (defendants' arguments concerning survey evidence "prove the point that a genuine issue of material

23 fact exists regarding actual confusion").[11]

24 _____

25 [10] LS&CO. incorporates by reference Dr. Sood's report, which was attached as Exhibit A to his
declaration submitted in support of LS&CO.'s motion for partial summary judgment.

26
[11] LS&CO. is not objecting at this point to Dr. Ford's report, because it matters little to the outcome of
27 this motion. At an appropriate time, however, LS&CO. may move to exclude Dr. Ford's report or
portions of it, and wants to be clear that its deferral of objection is not construed as any waiver.

28

1   The authorities A&F cites both involve allegations of point of sale confusion.  *See Cumberland*

2   *Packing Corp. v. Monsanto Co.*, 140 F. Supp. 2d 241, 254 (E.D.N.Y. 2001) (alleged confusion from

3   trade dress on packaging for sweeteners), *aff'd mem.*, 2002 U.S. App. LEXIS 13339 (2d Cir. 2002);

4   *Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 298 (S.D.N.Y. 2003) (alleged confusion in names of

5   magazines).  In this context, one might expect reports of consumer confusion to surface to retailers

6   selling the products.  Both decisions point out that actual confusion may be measured by surveys and is

7   not necessary to prevail on a trademark infringement claim.  *Cumberland*, 140 F. Supp. 2d at 254

8   (survey showed minimal confusion and evidence of actual confusion was lacking); *Brockmeyer*, 248 F.

9   Supp. 2d at 293, 298 (same).  Here, LS&CO. alleges post-sale confusion where, even if the mistake is

10  somehow apprehended by a confused consumer, there is no immediately obvious place for reporting it.

11  Survey evidence confirms, however, that actual confusion exists.  Sood Dec. Ex. A.

### 7.    The Consumer Care Factor Is Neutral

13  A&F argues that jeans purchasers are "sophisticated" because the goods are expensive.  A&F

14  MSJ at 17.  A&F presents no evidence to support this conclusion.  In fact, although consumers often are

15  reasonably careful about their apparel choices, a jeans purchase is not momentous for some consumers.

16  Apparel products often are used as gifts, and the purchaser may not be as versed in the differences

17  among brands as the recipient.  Sophistication in this context, if it exists, may increase confusion.

18  Sophisticated consumers may appreciate, in an era of multi-brand producers like A&F and LS&CO.,

19  that minor differences in marks can signify related brands.  *See Lois*, 631 F. Supp. at 745.  Putting aside

20  this potential for confusion, the sophistication of the purchasing consumer is otherwise irrelevant to

21  claims of post-sale confusion.  *Payless*, 998 F.2d at 889-90.

### 8.    The Evidence Regarding A&F's Intent Is Disputed

23  Evidence that a defendant has adopted a mark "with intent to capitalize upon a market previously

24  developed by competitors" weighs heavily in support of a finding of infringement.  *Blue Bell*, 632 F.2d

25  at 822.  Proof of intent is not, however, necessary to a trademark infringement claim.  *Brookfield*, 174

26  F.3d 1059.

27  A&F relies heavily on the testimony of the former head of the Ruehl brand (who now works for

28  LS&CO.), to the effect that A&F did not intend to copy the Arcuate Trademark.  This testimony is no



creating a design that is challenged as infringing rarely

g Mr. Breitbard at his word hardly ends the inquiry.  As Mr.

nyone else."  Supp. Cincone Dec. Ex. Q at 84:5-6.[12]

igner who actually created the stitching design at issue in

this designer's efforts to create a design for Ruehl jeans

.  Below are jeans bearing the registered trademarks

ns brands, LEVI'S® and Lee®, plus a design belonging to

Next to each are variations of the designs A&F created in

l design:



_____

[12] Mr. Breitbard's testimony is riddled with inadmissible opinions and responses to argumentative, leading questions.  It also rests on a selectively redacted email, previously withheld (until depositions were over), discussing topics on which A&F refused to provide testimony (until Mr. Breitbard was deposed) on grounds of privilege.  Cincone Supp. Dec. Ex. Q at 88:12-92:5.  At the appropriate time, LS&CO. will move to exclude or limit this evidence and does not, by failing to object now, waive its objections.

Supp. Cincone Dec. Ex. J, Ex. K at 25:12-21, Ex. R.  At a minimum, this evidence is sufficient to create a genuine issue of material fact as to A&F's intent in adopting the Ruehl design, and to preclude summary judgment.[13]

### C.    The Evidence Establishes That The Arcuate Trademark Is Famous And There Are Triable Issues Of Material Fact Relating To The Likelihood Of Dilution

#### 1.    The Arcuate Trademark Is Famous

As discussed above, and in detail in LS&CO.'s motion for partial summary judgment on its claim of trademark dilution, the undisputed evidence shows that LS&CO.'s Arcuate Trademark is famous by the measures set forth in the Trademark Dilution Revision Act ("TDRA"), 15 U.S.C. § 1125(c)(2)(A).  The Arcuate Trademark is a federally registered mark that has been used continuously for 135 years.  It has been extensively advertised and publicized for over 100 years, reaching consumers throughout the world.  LS&CO. has spent billions of dollars advertising products bearing the mark, and annually sells millions of units totaling billions of dollars in sales.  The Arcuate Trademark is reinforced to the public when these jeans are worn – in huge numbers -- in everyday life.  When far less is shown, courts conclude that marks are famous as a matter of law.  *See, e.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 2008 U.S. Dist. LEXIS 42787 at *57-58 (S.D.N.Y. 2008) (mark met the standard for fame as a matter of law); *Audi AG v. D'Amato*, 469 F.3d 534, 547 (6th Cir. 2006) (affirmed decision granting summary judgment on claim of trademark dilution).

A&F has provided no evidence to the contrary.  Instead of addressing any of the statutory factors, it makes a half-hearted argument that third party designs similar to its own have weakened the Arcuate Trademark to the point where it no longer is famous.  As discussed above, A&F's "analysis" of past surveys does nothing to mitigate the clear portrait of very high levels of consumer recognition of the Arcuate mark.  When every factor set forth in the statute so clearly favors a finding of fame (*see*

---

[13] A&F argues that its Ruehl design is merely an "inverted R."  A&F MSJ at 2.  This "explanation" begs as many questions about A&F's intent as it answers.  If A&F wanted to use an "R" design on its Ruehl jeans, why did it turn the "R" over and stretch it out so that it is unrecognizable?  As shown above, all of its arcing "V" shaped designs cannot be called an "R," no matter how hard one tries.  A jury is entitled to weigh A&F's explanation for how it came to adopt its design against the evidence that it was adapting others' marks.

1    LS&CO.'s Motion for Partial Summary Judgment at 21-25), there are no grounds for summary

2    judgment against LS&CO. on this element of its dilution claim.

2.      **The Ruehl Stitching Design Creates A Likelihood Of Dilution**

4         "The point of federal dilution law is to protect the owner's investment in his mark." *Adidas*, 546

5    F. Supp. 2d at 1060.  The Ninth Circuit has explained that dilution "refers to the 'whittling away of the

6    value of a trademark' when it's used to identify different products." *Mattel, Inc. v. MCA Records*, 296

7    F.3d 894, 903 (9th Cir. 2002), *cert. denied*, 537 U.S. 1171 (2003); *see also Horphag Research Ltd. v.

8    Garcia*, 475 F.3d 1029, 1035-36 (9th Cir. 2007).  Under the TDRA, an owner of a famous mark is

9    entitled to injunctive relief when a another person "commences use of a mark or trade name in

10   commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark,

11   regardless of the presence or absence of actual or likely confusion, of competition, or of actual

12   economic injury."  15 U.S.C. § 1125(c)(1).

13        The TDRA defines dilution by blurring as "association arising from the similarity between a

14   mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C.

15   § 1125(c)(2)(B).  It lists six factors to determine dilution by blurring which are each discussed below.

16   Since each of these factors weighs in favor of LS&CO., summary judgment against LS&CO. is

17   inappropriate.  *Louis Vuitton*, 2008 U.S. Dist. LEXIS 42787 at *4 (summary judgment inappropriate "if

18   there is any evidence in the record that could reasonably support a jury's verdict for the non-moving

19   party") (citations omitted); *Adidas*, 546 F. Supp. 2d at 1044.  Moreover, as noted above, analysis of

20   likelihood of dilution is factually intensive and thus summary judgment is generally disfavored.  *Adidas*,

21   546 F. Supp. 2d at 1044.

a)      **The Degree Of Similarity Supports A Finding of Dilution**

23        A&F argues that the designs are "wholly dissimilar."  At the same time, A&F argues that

24   LS&CO.'s mark already has been done great damage by similar stitching designs.  The narrow context

25   in which the marks are seen – in the exact same position, on identical products that are otherwise often

26   difficult or impossible to tell apart – enhances the likelihood that similar marks will do harm by

27   disrupting consumer associations with a mark.  *See Perfumebay*, 506 F.3d at 1180 ("the similarity

28   requirement may be less stringent in circumstances in which the senior mark is highly distinctive and

1   the junior mark is being used for a closely related product"). In the *Perfumebay* case, for example, the

2   court discounted differences between the marks when used on similar services because eBay was "a

3   famous and widely known mark, and has expended considerable resources in attaining this status." *Id.*

4       LS&CO.'s Arcuate Trademark and the Ruehl design are not identical, but as discussed earlier,

5   they are quite similar and certainly similar enough to cause confusion between the two designs. This is

6   more than sufficient to support a dilution claim. If the marks as used on identical products are likely to

7   cause confusion, they are likely to cause blurring. *See, e.g., Nabisco, Inc. v. PF Brands, Inc.*, 50 F.

8   Supp. 2d 188, 206 (S.D.N.Y. 1999), *aff'd*, 191 F.3d 208 (2d Cir. 1999) ("the similarity of the products

9   increases the likelihood of blurring").

10                      **b)       The Arcuate Trademark Is An Inherently Distinctive Mark**

11      As discussed above, the Arcuate Trademark is a fanciful design. *See* Section II(B)(2)(a), *supra*;

12  *see also Nike, Inc. v. Nikepal Int'l, Inc.*, 84 U.S.P.Q.2d 1820 (E.D. Cal. 2007) ("fanciful marks are

13  deemed inherently distinctive and are automatically entitled to trademark protection because they

14  naturally serve to identify a particular source of a product") (citations omitted); *Adidas*, 546 F. Supp. 2d

15  at 1055-56 (same). A&F does not dispute that the Arcuate Trademark is distinctive, and concedes that it

16  is "conceptually" strong. A&F MSJ at 5. Thus, this factor supports a conclusion that the Ruehl design

17  is likely to dilute the Arcuate Trademark. *See, e.g., Nike*, *supra* (this factor favored Nike Inc. because

18  NIKE was suggestive and thus inherently distinctive).

19                      **c)       LS&CO. Is Engaging In Substantially Exclusive Use Of The Mark**

20      LS&CO. addressed A&F's "crowded field" argument earlier. It vigorously has protected its

21  rights and has taken steps to stop similar uses that are adopted by others. A&F has not introduced any

22  evidence showing any meaningful intrusion against LS&CO.'s rights. Supp. Onda Dec. ¶¶ 6-7.

23  LS&CO. takes great care in its enforcement efforts, monitors the market and has almost entirely

24  eliminated designs from the market that are likely to erode the Arcuate's significance. Supp. Onda Dec.

25  ¶¶ 3-5, 8. As with infringement claims, A&F must prove substantial, actual third party use of similar

26  stitching designs – not merely that the designs exist or are registered -- in order to demonstrate that this

27  factor supports its motion. *Scarves by Vera*, 544 F.2d at 1173 ("The significance of third-party

28  trademarks depends wholly upon their usage."); *Olde Tyme Foods*, 961 F.2d at 204; *Express Funding,*

1   *Inc.*, 894 F. Supp. at 1101.

2        **d)  Recognition**

3     In its motion for partial summary judgment, LS&CO. documented numerous examples where

4   the Arcuate Trademark received unsolicited recognition in the form of news articles and awards.  Past

5   courts have recognized and held that large proportions of consumers recognize the Arcuate Trademark.

6   LS&CO.'s survey evidence shows that 77% of the respondents recognized the Arcuate Trademark and

7   53% correctly identified jeans with the Arcuate Trademark as a LEVI'S® product.  Sood Dec. Ex. A at

8   6-7; Onda Dec. ¶ 8, 12-13 & Exs. D1-D9, E.  This level of survey recognition, in combination with the

9   other factors discussed above, is more than sufficient to support a likelihood of dilution.  *See, e.g., Jada*

10  *Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635-36 (9th Cir. 2008) (finding that "a reasonable trier of fact

11  could conclude that this evidence was sufficient to establish the existence of a likelihood of dilution"

12  where "the HOT WHEELS mark had been acquiring recognition for over thirty years" and no survey

13  evidence for recognition was submitted); *Nabisco*, 50 F. Supp. 2d at 204 (finding a likelihood of

14  dilution by blurring where there was "a high degree of recognition among the trade press and within the

15  trade" and no survey evidence).

16       **e)  Intent Of A&F To Create An Association With The Famous Mark**

17    As discussed earlier, this factor is disputed.  Moreover, intent is no more logically required to

18  prove dilution than infringement.  *Brookfield*, 174 F.3d at 1059; *see also Jada Toys*, 518 F.3d at 635-36

19  (finding that "a reasonable trier of fact could conclude that evidence was sufficient to establish the

20  existence of a likelihood of dilution" with no discussion of intent).

21       **f)  Actual Association**

22    Consumers sufficiently associate the designs that they are likely to be confused.  This evidence

23  also supports LS&CO.'s likelihood of dilution claim.  *See Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d

24  208, 219 (2d Cir. 1999) ("Consumer confusion would undoubtedly dilute the distinctive selling power

25  of a trademark.").

26    Dr. Sood explained this diluting effect in his report and at his deposition.  Sood Dec. Ex. A at

27  12; Supp. Cincone Dec. Ex. L at 93:3-94:20.  It only makes sense that consumer confusion would create

28  a risk that the value and distinctiveness of a brand would be eroded.  If consumers mistakenly identify a

1  jean as produced by LS&CO. but later discover their mistake, they no longer will trust the Arcuate

2  Trademark to signify a LEVI'S® jean.  To the extent that confusion affects LS&CO.'s goodwill or sales

3  (*see* Supp. Cincone Dec. Ex. B at 181:25-182:11), it may reduce or impair positive associations of the

4  Arcuate mark.  If consumers are confused, the benefits of LS&CO.'s advertising and promotion of its

5  mark likely will be diverted in part to A&F precisely because consumers associate the marks with each

6  other.  *See, e.g., Starbucks Corp. v. Lundberg*, 2005 U.S. Dist. LEXIS 32660 at *21-22 (D. Or. 2005)

7  (survey evidence established that consumers associated defendant's mark with plaintiff's and that such

8  association "would eventually diminish the distinctiveness" of plaintiff's mark).

9  **III.    CONCLUSION**

10         For the reasons set forth above and in its own motion for partial summary judgment on its

11  dilution claim, LS&CO. respectfully asks the Court to deny A&F's motion for summary judgment.

12  DATED:  September 3, 2008                Respectfully submitted,

13                                   By:    _____*/s/ Gregory S. Gilchrist*_____

14                                          Gregory S. Gilchrist
                                            TOWNSEND AND TOWNSEND AND CREW LLP

15                                          Attorneys for Plaintiff/Counterclaim Defendant

16                                          LEVI STRAUSS & CO.

17
61471872 v3

18

19

20

21

22

23

24

25

26

27

28