1   MICHAEL J. BETTINGER (STATE BAR NO. 122196)
    RACHEL R. DAVIDSON (STATE BAR NO. 215517)
2   K&L GATES LLP
    55 Second Street, Suite 1700
3   San Francisco, CA 94105
    Phone: 415-882-8200
4   Facsimile: 415- 882-8220

5   J. MICHAEL KEYES (PRO HAC VICE)
    KJIRSTIN J. GRAHAM (State Bar No. 239485)
6   K&L GATES LLP
    618 West Riverside Avenue, Suite 300
7   Spokane WA 99201-0602
    Phone: 509-624-2100
8   Facsimile: 509-456-0146

9   Attorneys for Defendant and Cross-Complainant
    ABERCROMBIE & FITCH TRADING CO.

10

11              UNITED STATES DISTRICT COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13  LEVI STRAUSS & CO.,                          Case No. CV-07-3752 -JSW

14                          Plaintiff,           **DEFENDANT ABERCROMBIE &
                                                 FITCH TRADING CO.'S REPLY IN
15          v.                                   SUPPORT OF MOTION TO
                                                 EXCLUDE REPORT, TESTIMONY
16  ABERCROMBIE & FITCH TRADING CO.,             AND SURVEY EVIDENCE OF
                                                 DR. SANJAY SOOD**
17                          Defendant.
    _____          Date:  September 26, 2008
18                                                Time:  9:00 a.m.
    ABERCROMBIE & FITCH TRADING CO.,             Ctrm.: 2
19
                          Counter-Claimant,
20          v.

21  LEVI STRAUSS & CO.,

22                          Counter-Defendant.

23  _____

24

25

26

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION & SUMMARY OF THE ARGUMENT........................................iv

II.   LAW & ARGUMENT ........................................................................................ 1

    A.   Standards governing admissibility of consumer surveys. ................................ 1

    B.   Dr. Sood's consumer confusion survey is so fundamentally flawed that it should not be admitted into evidence at any stage of this proceeding. .......... 1

        1.   Dr. Sood's survey unquestionably suffers from demand effects........... 2

        2.   Dr. Sood's "after-the-fact" use of "controls" actually shows there is no actionable confusion. ............................................................. 2

        3.   Dr. Sood's survey population was demonstrably incorrect. .................. 4

        4.   Dr. Sood's survey did not replicate any realistic "post-sale" environment. ........................................................................................ 4

        5.   Dr. Sood failed to rotate the alternatives to the survey's critical, close-ended question. ............................................................................ 5

        6.   Dr. Sood's survey lacked an explicit "I don't know" alternative as part of the question........................................................................... 6

        7.   Dr. Sood's opinion of "dilution" based on the survey would be confusing to the jury. ........................................................................... 6

    C.   Even LS&Co.'s legal citations prove that the Squirt survey design is simply an improper means to test consumer confusion with respect to the arcuate stitching design. ........................................................................... 7

    D.   Dr. Sood's "recognition survey" is also so fundamentally flawed that it should not be admitted into evidence at any stage of this proceeding. ............ 8

        1.   The recognition survey ignores spurious recognition. ........................ 9

        2.   Dr. Sood's survey used an ambiguous question................................... 9

        3.   Dr. Sood's survey contained order bias................................................ 9

III.   CONCLUSION .................................................................................................... 10

# TABLE OF AUTHORITIES

## Federal Cases

*Big O Tires, Inc. v. Bigfoot 4X4, Inc.*,
   167 F. Supp. 2d 1216 (D.Colo. 2001) ...................................................................7

*Cairns v. Franklin Mint Co.*,
   24 F. Supp. 2d 1013 (C.D. Cal. 1998) ..................................................................3

*Citizens Banking Corp. v. Citizens First Bancorp, Inc.*,
   2007 WL 4239237 (E.D. Mich. December 3, 2007) ............................................4

*Excelligence Learning Corp. v. Oriental Trading Co.*,
   No. C-03-4947-JF, 2004 U.S. Dist. LEXIS 30370 (N.D. Cal. Dec. 20, 2004) .....3

*J & J Snack Foods, Corp. v. Earthgrains Co.*,
   220 F. Supp. 2d 358 (D.N.J. 2002)........................................................................6

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Civ. 550-JFK
   2007 WL 2258688 (S.D.N.Y. August 6, 2007)......................................................2

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 576 (S.D.N.Y. 2007) ...................................................................7

*Mattel, Inc. v. MCA Records, Inc.*,
   28 F. Supp. 2d 1120 (C.D. Cal. 1998) ..................................................................3

*Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*,
   198 F. Supp. 2d 474 (S.D.N.Y. 2002) ...................................................................2

*Newport Pac. Corp. v. Moe's Southwest Grill, LLC*,
   No. 05-995-KI, 2006 U.S. Dist. LEXIS 74481 (D. Or. Sept. 28, 2006) ...............3

*Pebble Beach Co. v. Laub Am. Corp.*,
   No. C-84-2012: RPA-SJ, 1985 U.S. Dist. LEXIS 23876 (N.D. Cal. Dec. 27,
   1985)........................................................................................................................3

*Procter & Gamble Pharmaceuticals, Inc. v. Hoffmann-LaRoche Inc.*,
   2006 WL 2588002 (S.D.N.Y. September 6, 2006) ...............................................1

*Simon & Schuster, Inc. v. Dove Audio, Inc.*,
   970 F. Supp. 279 (S.D.N.Y. 1997) ....................................................................7, 9

*Simon Property Group L.P. v. mySimon, Inc.*,
   104 F. Supp. 2d 1033 (S.D. Ind. 2000) .................................................................8

*Surfvivor Media, Inc. v. Survivor Prods.*,
   406 F.3d 625 (9th Cir. 2005)..................................................................................3

1

**Other Authorities**

2

6 *McCarthy on Trademarks and Unfair Competition* (4th ed.1996)...........................................4

3

83 Trademark Rep. 364 (1993) ................................................................................................8

4

98 Trademark Rep. 739 (2008) ................................................................................................8

5

Shari Seidman Diamond, *Reference Guide on Survey Research,*
    in the Federal Judicial Center, Reference Manual on Scientific America (2d ed.

6

    2000)..................................................................................................................................v, 1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## I.    INTRODUCTION & SUMMARY OF THE ARGUMENT

Dr. Sood's confusion and recognition surveys and his report based thereon are riddled with flaws.  Consequently, his testimony would be meaningless and would confuse the jury.

A consumer survey is admissible only if it is conducted according to generally accepted principles.  LS&Co.'s other expert in this case, Dr. Carol Scott, testified that the *Reference Guide on Survey Research* put out by the Federal Judicial Center is "a recount of standard market-research standards and practices", and that it contains practices that "most people doing good market research would follow anyway."  Dr. Sood's surveys utterly failed to comply with this treatise in a number of key respects.  Moreover, Dr. Sood's conclusion with respect to dilution is simply based on a patently misguided understanding of how dilution is defined as a matter of federal law.  LS&Co. claims that Dr. Sood's "naiveté" reflects "the objectivity of his approach."  But *Daubert* and its progeny are not concerned with whether an expert sincerely believes that his or her testimony is sound.  Were that the case, any "sincere" expert peddling gibberish as science would be allowed to testify in federal court.  Rather, the only focus for this Court in its "gate keeping" role under *Daubert* is whether the surveys that were designed and executed were done so according to generally accepted principles.  The facts as set forth in Dr. Sood's report and the law showcase the fundamentally unsound nature of both surveys and they should be excluded from consideration.

Even if this Court considers them, though, they do not establish actionable confusion.  Notably, Dr. Sood's data indicates that based on the "verbal protocols" of people that were surveyed, 9% of them were "confused."  As a matter of law, this level of "confusion" is simply insufficient to establish likelihood of confusion under the Lanham Act.

## II.    LAW & ARGUMENT

### A.    Standards governing admissibility of consumer surveys.

Consistent with Federal Rule of Evidence 703, consumer survey evidence may be admissible only when the survey is "properly designed, executed, and described."  Shari Seidman Diamond, *Reference Guide on Survey Research,* in the Federal Judicial Center, Reference Manual on Scientific America 231-32 (2d ed. 2000) (hereinafter the "Diamond Treatise").  In order for a survey to be admissible, it must be "conducted in accordance with generally accepted survey principles" and the "results [must be] used in a statistically correct way."  *Id.* at 233-34.  Thus, the "content and execution of a survey must be scrutinized." *Procter & Gamble Pharmaceuticals, Inc. v. Hoffmann-LaRoche Inc.*, 2006 WL 2588002, *21 (S.D.N.Y. September 6, 2006).  Here, Dr. Sood's surveys cannot withstand scrutiny and should be excluded.

### B.    Dr. Sood's consumer confusion survey is so fundamentally flawed that it should not be admitted into evidence at any stage of this proceeding.

LS&Co.'s other expert, Dr. Carol Scott, testified that the Diamond Treatise is "a recount of standard market-research standards and practices" and that it contains practices that "most people doing good market research would follow anyway."  *See* Deposition of Dr. Carol Scott ("Scott Depo"), pp. 72:22-23 attached as Exhibit A to the Declaration of Rachel R. Davidson in Support of Defendant Abercrombie & Fitch Trading Co.'s Reply re Its Motion to Exclude Report, Testimony and Survey Evidence of Dr. Sanjay Sood ("Davidson Dec.").  Dr. Sood had never heard of Ms. Diamond or her treatise, *see* Exhibit A to the Declaration of Michael J. Bettinger in Support of Defendant Abercrombie & Fitch Trading Co.'s Motion to Exclude Expert Report, Evidence and Survey of Dr. Sanjay Sood ("Bettinger Dec.") at 40:14-25, and so it is not surprising that his surveys failed to adhere to its "standard market-research standards and practices."

1    1.    Dr. Sood's survey unquestionably suffers from demand effects.

2    LS&Co. characterizes the demand effects created by Dr. Sood's survey as not

3    "meaningful." LS&Co. Memo., p. 6. In fact, these demand effects are significant and are one

4    of the reasons why Dr. Sood's survey is not reliable. As noted in the Diamond Treatise:

5    The response alternative in a closed-ended question may remind respondents
     of options that they would not otherwise consider.

6

7    Diamond Treatise, p. 252. Dr. Sood's question does exactly that, and that is why this design

8    has been criticized so roundly by the courts throughout the country. *See* Dr. Ford Rebuttal

     Report, ¶¶ 10-12 attached as Exhibit C to Bettinger Dec.
9

10    2.    Dr. Sood's "after-the-fact" use of "controls" actually shows there is no
           actionable confusion.

11    Dr. Sood's report did not mention his use of controls in order to account for non-

12    trademark confusion. It is standard procedure in consumer survey that "the percentage of

13    confusion occurring among participants in the control group is subtracted from the percentage

14    of confused participants in the test group…" *Kargo Global, Inc. v. Advance Magazine*

15    *Publishers, Inc.,* No. 06 Civ. 550-JFK, 2007 WL 2258688, *6 n.8 (S.D.N.Y. August 6, 2007);

16    *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.,* 198 F. Supp. 2d 474, 483 n.13

17    (S.D.N.Y. August 6, 2002). Nowhere in Dr. Sood's report does he even mention controls (he

18    refers to the others designs used in the survey as "benchmarks") or perform the necessary

19    subtraction. In fact, Dr. Sood still "does not believe that subtraction to determine a specific

20    rate of likely confusion is necessarily useful", *see* LS&Co. Memo., p. 10 n. 6., but cites to no

21    authority upon which he bases this "belief."

22    It is easy to understand why Dr. Sood does not want to "believe" the numbers from the

23    control group should be subtracted from the numbers in the test group. When this subtraction

24    is completed, the results show there is no actionable confusion whatsoever. Dr. Sood opines

25    in his report that:

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

> The verbal protocols indicate that the stitching and/or pocket were a basis for confusion between "LEVI's®" jeans and the Ruehl jeans. Of the total sample population, 16% (47 out of 299) of participants specifically mentioned that the "stitching" and/or the "pocket" was at least one of the reasons that caused them to make the association between the two brands.

Expert Report of Professor Sanjay Sood ("Sood Report"), p. 11, Exhibit D to Bettinger Dec.

He then goes onto to opine that:

> By comparison, mentions of "stitching" and/or the "pocket" for the other jeans studied were:  7% (21 out of 299) for those who selected the Citizens jeans (3% exclusively); 4% (12 out of 299) for those who selected the True Religion jeans (2% exclusively); and 1% (3 out of 299) for those who selected the Seven jeans (1% exclusively).

*Id.*  Once the 7% control figure is subtracted from the 16% test figure, the result is 9% net confusion.  As a matter of law, this is insufficient to establish actionable confusion.  *See Newport Pac. Corp. v. Moe's Southwest Grill, LLC*, No. 05-995-KI, 2006 U.S. Dist. LEXIS 74481, *37 (D. Or. Sept. 28, 2006) ("Confusion survey results below 10% are evidence that confusion is not likely"); *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 629, 633 (9th Cir. 2005) (2% confusion insufficient); *Excelligence Learning Corp. v. Oriental Trading Co.*, No. C-03-4947-JF, 2004 U.S. Dist. LEXIS 30370, *35 (N.D. Cal. Dec. 20, 2004) (1% percent survey results affirmatively demonstrated absence of customer confusion); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1040 (C.D. Cal. 1998) (survey evidence "clearly favors the defendant when it demonstrates a level of confusion much below ten percent"; 6.9% survey results suggested little likelihood of confusion) (quotation omitted); *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1149 (C.D. Cal. 1998) (4% survey results supported summary judgment for defendant); *Pebble Beach Co. v. Laub Am. Corp.*, No. C-84-2012: RPA-SJ, 1985 U.S. Dist. LEXIS 23876, *68-70 (N.D. Cal. Dec. 27, 1985) (7.8% figure would not be sufficient to establish appreciable likelihood of confusion that would entitle plaintiff to injunctive relief, especially given a 7% margin of error in the survey results).

1

        3.      Dr. Sood's survey population was demonstrably incorrect.

2

      "Identification of the proper universe is recognized uniformly as a key element in the

3

development of a survey." J. Thomas McCarthy, *6 McCarthy on Trademarks and Unfair*

4

*Competition* § 32:159 (4th ed. 1996) (citing The Federal Judicial Center's 1994 Reference

5

Manual on Scientific Evidence). Dr. Sood's survey universe was grossly underinclusive

6

because it is limited to those women who were between the ages of 20-45 and who were

7

likely to purchase jeans costing $75 or more. LS&Co.'s argument is simply wrong that the

8

proper universe was potential purchasers of Ruehl jeans. "While the appropriate universe is

9

usually drawn from the junior user's customers, this is not an absolute rule. *Where the senior*

10

*and junior user's products are of the same kind, the population of consumers is the same*."

11

*Citizens Banking Corp. v. Citizens First Bancorp, Inc.*, 2007 WL 4239237, 5 (E.D. Mich.

12

December 3,2007) (emphasis supplied). Here, both parties are selling denim jeans[1] and

13

therefore the correct universe is simply not, as LS&Co. claims, "defendant's market." *See*

14

LS&Co.'s Memo., p. 11.[2] Dr. Sood's survey is far off the mark on this "key element."

15

        4.      Dr. Sood's survey did not replicate any realistic "post-sale" environment.

16

17

      Dr. Sood offers no empirical data to suggest that in a post-sale environment consumers

18

are likely to see four different pairs of jeans simultaneously. His "rationale" for creating this

19

wholly artificial world is irrelevant. The only thing that is relevant is whether his choice

20

replicated a plausible post-sale environment and it clearly does not. *See* Ford Rebuttal, ¶ 20-

21

21. By stark contrast, Dr. Ford's survey incorporated photographs of jeans folded in the exact

22

same manner that LS&Co.'s other expert, Dr. Carol Scott, has previously used in at least one

23

---

[1] LS&Co. asserts in its opposition to A&F's motion for summary judgment that "[t]he parties'

24

goods are identical." *See* LS&Co. Memo. in Opposition to Summary Judgment, p. 17.
[2] LS&Co. attempts to show an inconsistency between Dr. Ford's survey in the *adidas* case

25

and this one. The fact of the matter is, Dr. Ford's approach in both cases—and dozens of

26

others—simply has not changed. In *adidas* Dr. Ford surveyed women who were potential
purchasers of tennis shoes just as he surveyed women in this case who were potential
purchasers of denim jeans. The positions are wholly consistent.

other consumer survey involving the arcuate design.  *See* Photographs from Dr. Gerald Ford Survey, Exhibit B to Davidson Dec.; *and compare with* Photographs from Dr. Carol Scott Survey in RP55, Exhibit C to Davidson Dec.  Dr. Scott claimed that her photographs in that survey "show the jeans pockets much like they might be observed on people wearing the jeans, either live or in magazines."  *See* April 22, 2005 Declaration of Carol Scott, ¶ 13, Exhibit D to Davidson Dec.  She also testified that her use of these photographs of the jeans (folded in the exact same manner as the photographs of jeans in Dr. Ford's survey) "displayed the marks in a manner where the pocket design might be seen in the *post-sale context*, to facilitate control over the stimuli."  *Id*. (emphasis supplied).

     5.    <u>Dr. Sood failed to rotate the alternatives to the survey's critical, close-ended question</u>.

The Diamond Treatise provides:

> The order in which questions are asked on a survey and the order in which response alternatives are provided in a closed-ended question can influence the answers . . ..  To control for order effects, the order of the questions and the order of the response choices in a survey should be rotated . . ..

Diamond Treatise, p. 254-255.

Dr. Sood states he did not rotate the order of the alternatives given because it would have been "unnatural" to do so and would have injected "more bias" into the survey.  Supp. Sood Dec., ¶ 10.  He of course cites no empirical data or facts to support his "opinion" in this regard.  Moreover, even if it could be considered "unnatural" to rotate the alternatives to the questions posed by Dr. Sood, the appropriate course of action would have been to choose questions in such a way that they could be "naturally" rotated so that the design of the question complied with generally accepted principles.  Dr. Sood's reasoning is akin to someone defending against a traffic citation for speeding by declaring "but your honor, I was late for work."  Dr. Sood's decision to use questions that simply do not comply with the Diamond Treatise is no more acceptable than the speeder's decision to speed to work because

he was late.  The more appropriate response in both situations is to make better decisions from the outset.

      6.    <u>Dr. Sood's survey lacked an explicit "I don't know" alternative as part of the question</u>.

The Diamond Treatise states:

> the survey can use a quasi-filter question to reduce guessing by providing "don't know" or "no opinion" options ***as part of the question***...  By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply.  Respondents are more likely to choose a "no opinion" option if it is mentioned explicitly by the interviewer than if it is merely accepted when the respondent spontaneously offers it as a response.

Diamond Treatise, p. 250 (emphasis supplied).

     Dr. Sood's survey did not include an explicit "I don't know" <u>as part of the question</u>.  Rather, at the very outset of the interview process, the interviewer told the respondent that "if you don't know or don't have an answer, please let me know that."  Additional information was then read to each respondent and then each was shown four different photographs and had "as much time as she want[ed] to examine after each photograph."  Then, the closed-ended, critical question was asked without an explicit "I don't know" alternative."  Dr. Sood's survey lacked this explicit requirement "*as part of the question*" and failed to comply with generally accepted principles as a result.

      7.    <u>Dr. Sood's opinion of "dilution" based on the survey would be confusing to the jury</u>.

     Surveys (or an expert's opinion based thereon) that would be confusing to the fact finder should be excluded from consideration.  *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 368 (D.N.J. 2002) (observing that "[i]f the expert report, however, is not admissible or if it would be confusing or unhelpful, the court may decline to consider the expert evidence on a motion for summary judgment").  In addition to all of the other errors in Dr. Sood's report, his conclusion regarding supposed "dilution" would be confounding to the

jury.  As a matter of law, "consumer confusion" cannot constitute "dilution."  *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 576, 599 (S.D.N.Y. 2007) (citing McCarthy, § 24.72).  But Dr. Sood's "opinion" treats these two very different concepts as if they were synonymous.  *See* Sood Depo., p. 95:17-22, Exh. LL to Bettinger Dec. (testifying that "I based my opinion of the likelihood of dilution on the Confusion survey.") and at 93:13-20 (further testifying that "[i]f there is confusion between the Levi's pocket stitching and the RUEHL pocket stitching, then just by the nature of the confusion, that would lead to dilution of the Levi's brand.").  Dr. Sood's fundamental misunderstanding of the legal concept of dilution would undoubtedly prejudice and confuse the jury.  This is yet another reason his report and the confusion survey should be excluded.

**C.    Even LS&Co.'s legal citations prove that the *Squirt* survey design is simply an improper means to test consumer confusion with respect to the arcuate stitching design.**

LS&Co's reliance on Dr. Sood's "*Squirt*" survey design is wholly misguided.  Courts have not, as LS&Co. claims, "readily accepted such a format."  Far from it.  In *Big O Tires*, the Squirt survey was presented at the preliminary injunction phase and was deemed "less probative" but not "irrelevant" for purposes of assessing whether an injunction should issue.  *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1226 (D. Colo. 2001).  In *Simon & Schuster*, the court found that the *Squirt* survey contained an ambiguity in a word of the key question and assigned it "significantly reduced weight."  *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 290-91 (S.D.N.Y. 1997).  These are hardly judicial pronouncements indicating that the *Squirt* format is a "readily accepted approach."

LS&Co. relies on Dr. Simonson's supposed "endorsement" of the *Squirt* design, but his article actually acknowledges that "[a] potential limitation of the Squirt Format is that it explicitly leads respondents to consideration of the association between the two marks, a question that might not have occurred to them in a normal purchase situation."  83 Trademark

Rep. 364, 371 (1993).  Moreover, Dr. Simonson criticized the *Squirt* format design used in *Simon Property Group* as creating "demand effects"—the same problem created by Dr. Sood's survey here.  *See Simon Property Group L.P. v. mySimon, Inc.* 104 F. Supp. 2d 1033, 1048 (S.D. Ind. 2000) (noting that "[t]he question about whether the two items are put out by the same or a related source is likely to generate so-called 'demand effects' that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items").

Lastly, LS&Co. cites to a recent article authored by Jerre Swann as a supposed endorsement of the *Squirt* design, but Mr. Swann actually concludes that the *Squirt* format may only be appropriate for "weak" mark cases.  As noted by Mr. Swann:

> Experts should thus consider the testing of weak marks as a work still in progress. Within narrow limits, however, and with a robust control cell, a *Squirt* test from a cognitive standpoint is an arguably appropriate means <u>*for adducing survey evidence of likelihood of confusion in a weak mark case*</u>.

98 Trademark Rep. 739, 756 (2008).  Here, LS&Co. is not claiming it has a "weak mark." Quite the contrary, it has moved for summary judgment on the supposed "fame" of the arcuate.  As such, the *Squirt* design is simply improper here.

**D.      Dr. Sood's "recognition survey" is also so fundamentally flawed that it should not be admitted into evidence at any stage of this proceeding.**

LS&Co. attempts to explain away the problems with Dr. Sood's recognition by simply citing to Dr. Sood's Supplemental Declaration.  Dr. Sood's Supplemental Declaration—just like his survey and his expert report—ignore the infirmities that plague the recognition survey.  These errors are not simply ones that "go to the weight" of Dr. Sood's survey, they are fundamental errors that render the survey meaningless.

1                 1.    <u>The recognition survey ignores spurious recognition</u>.

2          Dr. Sood's co-author suggests that in aided-awareness surveys (like the one performed

3    by Dr. Sood), lures or decoys should be used.  Dr. Sood's survey did not include any such

4    lures or decoys.  Dr. Sood's failure to do so undermines the reliability of his survey.  Ford

5    Rebuttal, ¶ 27.

6                 2.    <u>Dr. Sood's survey used an ambiguous question</u>.

7          Dr. Sood's survey did not ask people about whether they recognized LS&Co.'s "back

8    pocket stitching"; he asked whether they had seen "this <u>style</u> of back pocket stitching before."

9    Injecting the word "style" into the question makes it hopelessly ambiguous as there is no way

10    to decipher what people understood by "style."  Did "style" refer to the color of the stitching?

11    Did "style" refer to the idea of stitching on a back pocket?  Did "style" refer to the shape of

12    the pocket created by the stitching on the borders?  Did "style" refer to all of these?  Did

13    "style" refer to none of these?  The truth is we will never know the answer.  This ambiguity in

14    this key question is every bit as problematic as the ambiguity in the survey in *Simon &*

15    *Schuster* (cited by LS&Co.) where the Court found that the *Squirt* survey offered contained an

16    ambiguity in the word of the key question and assigned it "significantly reduced weight."

17    *Simon & Schuster,* 970 F.Supp. at 291.

18                 3.    <u>Dr. Sood's survey contained order bias</u>.

19          Just like the problem created by Dr. Sood's order bias in the confusion survey, his

20    recognition survey contains the same flaw.  Dr. Sood defends his choice based on his own

21    personal opinion that it would be "awkward" to rotate the order of the question.  He cites no

22    empirical data to support his conclusion that consumers would find this awkward, or much

23    less be confused by the question rotated in the appropriate manner.  Most notably, he cites to

24    no authority that allows a researcher to deviate from generally accepted principles simply

25

26

ABERCROMBIE & FITCH TRADING CO.'S REPLY
TO EXCLUDE REPORT, TESTIMONY &
SURVEY EVIDENCE OF DR. SANJAY SOOD
Case No. 03:07-CV-3752-JSW            -9-

1   because the question that the researcher drafted may seem awkward if these generally

2   accepted principles were followed.

3                                            III.     **CONCLUSION**

4           For the reasons set forth herein, Abercrombie respectfully requests this Court exclude

5   the report, testimony and any other survey evidence of LS&Co.'s expert, Dr. Sanjay Sood.

6

    Dated:    September 12, 2008                    Respectfully submitted,
7

8                                                   **K&L Gates LLP**

9                                                   By:    */s/Rachel R. Davidon*
                                                    Michael J. Bettinger
10                                                  Rachel R. Davidson
                                                    J. Michael Keyes
11                                                  Attorneys for Defendant and Cross-Complainant
                                                    ABERCROMBIE & FITCH TRADING CO.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26