# EXPERT REPORT OF

# PROFESSOR CAROL A. SCOTT

**December 17, 2004**

CONFIDENTIAL

LS-A&F009666
LS-A&F009666

## I.    QUALIFICATIONS

I am a Professor of Marketing at the Anderson Graduate School of Management of the University of California, Los Angeles ("UCLA"). I hold a Ph.D. in Marketing from Northwestern University, where my minor field of study was Social Psychology, and a Masters of Science degree from the University of Texas at Austin in Business and History Education. I have served variously as the Chairman of the Faculty, Associate Dean, and Assistant Dean of the Anderson Graduate School of Management from 1985 through 1994. I am currently the faculty director of the Anderson School Executive Program. Over the past thirty years, I have taught courses on Marketing Strategy and Management, Consumer Behavior, Advertising, Distribution Strategy, and International Marketing to students in undergraduate and graduate education programs at UCLA, Harvard Business School and Ohio State University. I also have published numerous journal articles, research reports and book chapters on Consumer Behavior, Marketing Research and other marketing topics, a complete list of which is included in my Curriculum Vitae, attached hereto (Exhibit 1). I have served on the editorial boards of the *Journal of Marketing*, *Journal of Marketing Research* and the *Journal of Consumer Research*. I have been a member of the board of directors for Sizzler International and A-Fem Medical Corporation, Inc. and currently am a member of the board of directors of United Online. Over the past 15 years, I have, served as a consultant and testifying expert for a variety of marketing issues. A list of my recent testimony projects is attached. (Exhibit 2).

CONFIDENTIAL

LS-A&F009667
LS-A&F009667

## II. Scope of Opinions

I have been asked by counsel for Levi Strauss & Company ("LS&CO.") to provide an opinion regarding (1) the level of recognition of the LS&CO. jeans product and the LS&CO.'s trademark, the stitching on the back pocket, (2) the likelihood that consumers would be confused by the stitching on the back pocket of the Indigo Red jeans, and (3) the likelihood of dilution of the brand equity and value of the "LEVI's®" brand and trademark as a result of Indigo Red's use of similar stitching on the back pocket of its jeans.

## III. Summary of Opinions

Having reviewed and analyzed the evidence available to me at this time, I have determined the following:

1. LS&CO.'s jeans products historically have been and are today highly recognized. In a survey of 468 consumers that I conducted in December, 2004, 58% correctly identified LS&CO.'s jeans based upon seeing a photograph of the back of the jean including LS&CO.'s trademark back pocket stitching.

2. LS&CO.'s pocket stitching is a source identifier for LS&CO.'s jeans products. Consumers recognize the back pocket stitching as a trademark on LS&CO.'s products and associated it exclusively with LS&CO.'s products.

3. Based on the results of the study I conducted, it is likely that consumers will confuse the Indigo Red jeans with LS&Co.'s "LEVI's®" jeans. My analysis

**EXPERT REPORT OF PROF. CAROL A. SCOTT**                                                    3

CONFIDENTIAL

indicates that 22% of consumers incorrectly identified the Indigo Red jeans as "LEVI's®" jeans. Approximately 26% of consumers in the primary market targeted by Indigo Red, i.e., males 15 to 34 years of age, incorrectly identified the Indigo Red jeans as "LEVI's®".

4. A competitor's use of similar back pocket stitching, such as that used by Indigo Red, will erode the significance and value of LS&CO.'s trademark pocket stitching and the "LEVI's®" brand in the marketplace.

I am continuing my review and analysis. I may refine or expand my opinions as further information and materials come to my attention, and I reserve the right to supplement this report to the extent that additional information becomes available which may affect my opinions.

## IV. Basis of Opinions

My opinions are based on a jeans recognition and jean confusion survey conducted under my supervision in December, 2004, as well as other surveys I have conducted regarding brand recognition, confusion and brand dilution and my professional expertise in this area. In addition, I have reviewed articles on brand awareness and brand equity. My opinion is based on information available at the time of this report and may be supplemented or revised if additional information becomes available prior to trial.

### A. Background

Levi Strauss & Co. is the world's largest brand-name apparel manufacturer. The company designs, manufactures and markets branded jeans and casual sportswear for

EXPERT REPORT OF PROF. CAROL A. SCOTT                                         4

CONFIDENTIAL

LS-A&F009669
LS-A&F009669

men, women and children. Products include jeans, shirts, jackets and skirts, primarily marketed under the "LEVI's®" brand.

Since its inception in 1850 in San Francisco, LS&CO. has grown into a worldwide leader in branded apparel. With total revenues of $4.09 billion in the fiscal year ending November 30, 2003, it is listed as one of the Fortune 500 largest U.S. companies.[1]

Over the past 128 years, LS&CO. has invested time, resources and money in developing, promoting and advertising the "LEVI's®" trademark, and specific features of the "LEVI's®" jeans, all of which create and stimulate the awareness and goodwill of the "LEVI's®" brand.

"LEVI's®" is one of the most recognized brand names in the world. In brand awareness studies I have reviewed, "LEVI's®" has a high ranking. Interbrand, a leading international branding consulting firm, in conjunction with *Business Week* magazine recently determined the "world's most valuable brands".[2] "LEVI's®" was ranked among the top 100 brands in the world.

LS&CO. has been so successful in creating and stimulating awareness of the "LEVI's®" trademark that "LEVI's®" has become clearly identifiable with jeans. LS&CO. has also successfully created awareness of specific features of "LEVI's®" jeans, such as the double row of stitching on the back pocket, known as the Arcuate stitching design, so that consumers identify these features exclusively with "LEVI's®" products. These features have become synonymous with the "LEVI's®" brand, and

---

[1] www.levistrauss.com, and Fortune, April 5, 2004.
[2] Business Week, August 2, 2004.

**EXPERT REPORT OF PROF. CAROL A. SCOTT**                                      5

CONFIDENTIAL

LS-A&F009670
LS-A&F009670

consumers recognize the quality and reliability of LS&CO. products.

## B. Survey Methodology

The level of recognition of "LEVI's®" and other branded jeans was demonstrated in a Jeans Recognition Survey that I conducted in December, 2004. Four hundred and sixty-eight males, ages 15 to 50, who are representative of the target market were interviewed.

To be eligible for the survey, all 468 consumers were screened to have purchased jeans that cost $30 or more within the past 12 months. Survey participants were also screened for an intention to purchase jeans that cost $30 or more in the next 12 months. Participants must have shopped in at least one department or specialty shop of the type that carries Indigo Red jeans. Many of these stores also carry "LEVI's®" jeans. Participants were limited to those who had not participated in other marketing research in the past six months and to those who passed the standard security screen that neither participants nor members of their families work for a clothing manufacturer, a market research company or an advertising agency.

Interviews were conducted on a one-on-one basis by experienced interviewers in professional interviewing facilities in Atlanta, Baltimore, Chicago, Dallas, Los Angeles and New York. Approximately 80 interviews were conducted in each of the cities, with the exception of Dallas where 67 interviews were completed. Participants were recruited in shopping malls. A list of the malls is provided in Exhibit 3. A copy of the screen used to recruit participants in the malls is in Exhibit 4.

The survey was conducted on a double-blind basis, meaning that the survey was

**EXPERT REPORT OF PROF. CAROL A. SCOTT**                                    6

CONFIDENTIAL

LS-A&F009671
LS-A&F009671

designed to ensure that neither the interviewer nor the interviewees knew the purpose or sponsor of the survey or knew that the survey was in any way connected to this litigation.

I developed the questionnaire and interview methodology, and an experienced field supervisor, who I trained, instructed and supervised all of the interviewers. A copy of the questionnaire is provided in Exhibit 5, and a copy of the Instructions to Interviewers is in Exhibit 6.

Each survey participant was asked to look at four colored photographs of different brands of jeans. Pictures were presented to the participants on a computer monitor. Each photograph pictured the jeans in the same position to show the back pocket stitching. Each participant was instructed to take as long as he needed to look at the picture, just as if he were shopping for a pair of jeans on the Internet.

For approximately half of the participants (230), the photograph of the "LEVI's®" jeans was included in the set of four to be seen. The other half of the participants (238) were presented with a photograph of Indigo-Red jeans. To disguise the survey sponsor and eliminate biases such as false positive responses, each participant was asked to identify the three other brands of jeans shown in the set of four. The other photographs were of Ecko, Azzure, and Wrangler jeans. To avoid order bias, the sequence of the four different brands was randomized. Copies of the photographs are in Exhibit 7.

Survey participants observed each photograph separately. After observing each photograph, participants were asked to identify the brand of jeans and to identify those feature(s) of the jeans that indicated its brand identity. All responses from participants were open-ended. That is, participants were not prompted with responses or given

**EXPERT REPORT OF PROF. CAROL A. SCOTT**                                        7

CONFIDENTIAL

LS-A&F009672
LS-A&F009672

choices. Interviewers entered the responses online.

## C. Summary of Research Findings

Of the 230 consumers who were shown the photograph of the "LEVI's®" jeans, 134 (58%) correctly identified the jeans as a product of LS&CO. With minor variations, a high rate of recognition was maintained across age categories and locations. Although several other brand names were given, no other single brand had a significant number of respondents. As evidenced by this survey and our prior consumer surveys, "LEVI's®" jeans have maintained a high level of recognition over time.

Of participants who correctly identified the photograph of the "LEVI's®" jeans, the pocket stitching or pocket design was mentioned by 67 (50%) as the source of brand identification. If the respondents who mentioned "stitching" are included, along with those who mentioned specifically pocket stitching or pocket design, this number increases to 77, or 57%. This confirms our findings from prior surveys that consumers rely on the pocket stitching to help them identify LS&CO. products.

I also found that consumers do not identify all jeans as "LEVI's®" brand. Notably, the photograph of the Wrangler jeans was identified correctly by 50% of all respondents. By the same token, only 13% of participants viewing the Ecko jeans, 16% viewing Wrangler jeans, and 16% viewing Azzure jeans misidentified these products as "LEVI's®" jeans. The difference between this level of incorrect identification and that for the Indigo Red jean is significant.[3] Summary Tables are provided in Exhibit 8.

My analysis indicated that 53 (22.3%) of the 238 participants who saw the Indigo

---

[3] T-statistics and significance levels for Indigo Red vs. Ecko, Wrangler, and Azzure are t = 2.80, p < .01, t = 1.89, p < .058, and t = 1.82, p < .07, respectively, two-tailed tests.

**EXPERT REPORT OF PROF. CAROL A. SCOTT**                                    8

CONFIDENTIAL

Red jean incorrectly identified it as an LS&CO. product, thus demonstrating the degree of association between the stitching and the "LEVI's®" brand. This rate of association was higher for participants in Indigo Red's primary target market (i.e., males between the ages of 15 and 34), with 30 (26%) incorrectly identifying the Indigo Red jeans as "LEVI's®". By city, the rates of association varied slightly across five of the locations with Atlanta consumers showing 28%, New York consumers showing 20%, Los Angeles showing 31%, and Baltimore and Chicago showing 21%. Only the Dallas market indicated an atypically lower rate of association at 11%.

Of the 53 people who called the Indigo Red jean a "LEVI's®" jeans, 21 (40%) cited the pocket stitching or pocket design as the source identifier. Another 14 (26%) indicated that something about the "stitching" was the reason for their identification. Consistent with my previous surveys, I found that consumers look for the pocket stitching to help them identify the brand of jeans.

### D. Dilution

Brand equity has been defined as "a set of brand assets and liabilities linked to a brand, its name, and symbol that add to or subtract from the value provided by the product or service to the firm and/or to the firm's customers."[4] From the findings of the survey described in this report and prior consumer surveys that I have conducted for LS&CO., I find considerable evidence for dilution of LS&CO.'s brand equity should other firms be allowed to use its trademarks or symbols that are associated or confused with its marks.

---

[4] David A. Aaker, *Managing Brand Equity,* 1991, The Free Press

**EXPERT REPORT OF PROF. CAROL A. SCOTT**                                    9

CONFIDENTIAL

LS-A&F009674
LS-A&F009674

The Lanham Act defines dilution as:

"The lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception."

For example, McDonald's would suffer brand dilution if other retail outlets, even those not in the fast food business, were suddenly to begin to use the Golden Arches outside their stores. In this case, consumers could no longer reliably depend upon the sight of the Golden Arches to help them uniquely identify and locate a McDonald's restaurant. In this case, McDonald's, having invested a large sum of money in order to create secondary meaning[5] in the Golden Arches symbol, would find that the use of a similar symbol by others would weaken the ability of its symbol "to function as a trademark, that is, as a unique source identifier."[6]

The double row of stitching on the back pockets of "LEVI's®" jeans, known as the Arcuate stitching design, is a famous, distinctive and valuable asset to both LS&CO. and consumers, who rely on the "LEVI's®" trademark to designate the quality and reliability associated with LS&CO jeans. Respondents from my survey conducted for LS&CO. recognize the pocket stitching as a brand identifier for "LEVI's®" jeans and associate the Arcuate design with LS&CO. In the mind of the consumer, the Arcuate stitching design on the back pocket is unique to "LEVI's®" jeans.

The Arcuate design pocket stitching is particularly significant in regards to the issue of dilution because pocket design or pocket stitching is the design element that

---

[5] Secondary meaning is said to exist "when a word or designation of some kind which was not originally distinctive, but was of a descriptive nature in its use on a product or service, has come, through exclusive use, to indicate to the buyers of that product or service a single product or service coming from a single source." (J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, section 15.02 [3,4])
[6] Phyllis Welter, Trademark Surveys, 24A-2.

**EXPERT REPORT OF PROF. CAROL A. SCOTT**                                    10

CONFIDENTIAL

LS-A&F009675
LS-A&F009675

consumers most frequently use to identify different brands. In my study, 302 consumers (65%) of all 468 consumers in the study, and 67% of the 454 consumers who identified a brand and gave a reason for their identification cited pocket design or pocket stitching as the reason for their brand identification. Further, 133 consumers cited "stitching" as the element which led to their brand identification. Consumers often observe a mark, such as pocket stitching, outside of the actual retail environment (brick and mortar store or Internet store) where the jeans were purchased. In fact, they observe the stitching by glancing at someone else wearing it. At a distance, as someone walks by on the street, the consumer may not be able to discern the fine print of the manufacturer's name. The consumer then looks for another cue, that of the pocket stitching.

Because the "LEVI's®" jeans back pocket Arcuate stitching design is so distinctive and unique to "LEVI's®" jeans, consumers who see similar stitching on other products may be confused initially as to the source of the product, and, if such stitching appears on other manufacturers' jeans, they learn that they cannot rely on the Arcuate pocket stitching design to identify a true "LEVI's®" product.

If Indigo Red or others are allowed to use a pocket stitching similar to the Arcuate design, "LEVI's®" brand equity in general and the value of its Arcuate trademark in particular are eroded because consumers who encounter such a jean no longer fully trust the Arcuate pocket stitching as a cue for the "LEVI's®" brand. Over time, the cumulative effect will be that consumers stop using the Arcuate pocket stitching design to differentiate "LEVI's®" jeans from other brands. The "LEVI's®" Arcuate pocket stitching will no longer be an effective trademark symbolizing the quality, reliability, and distinctiveness of LS&CO. If consumers observe similar marks on jeans produced by

**EXPERT REPORT OF PROF. CAROL A. SCOTT**

11

CONFIDENTIAL

Indigo Red, the Arcuate stitching will lose its uniqueness, and the value of the stitching as "LEVI's®" trademark will diminish to a point where it will have little or no significance to LS&CO.

### IV.    Conclusion

1. Based on a survey of 468 consumers conducted in December, 2004, I have shown that "LEVI's®" Arcuate pocket stitching design is a well known trademark that consumers use to identify "LEVI's®" jeans. My analysis indicated that 58% of participants correctly identified the LS&CO. jean. Approximately 57% of these participants cited the pocket design or pocket stitching or stitching as the reason for this brand identification.

2. Pocket stitching is an important brand identifier. Over 67% of all consumers who provided a brand identification cited pocket design, pocket stitching, or stitching as the reason for their identification.

3. Consumers are likely to be confused as to the origin of the Indigo Red jean due to the use of the similar pocket stitching design.

4. A competitor's use of a similar back pocket stitching will erode the significance and value of LS&CO.'s trademark Arcuate stitching design and the "LEVI's®" brand in the marketplace.

CONFIDENTIAL

LS-A&F009677
LS-A&F009677

## V. <u>Compensation</u>

I am being compensated at an hourly rate of $500.00 and for any out of pocket

expenses.


My understanding is that some of this testimony is covered by protective orders.


Date: _____    _____

Carol A. Scott


**EXPERT REPORT OF PROF. CAROL A. SCOTT**    13

CONFIDENTIAL

LS-A&F009678
LS-A&F009678

-14-

## Exhibit 1

## CAROL A. SCOTT

Anderson Graduate School of Management
University of California
Los Angeles, California 90024
(310) 825-4458
(310) 206-2019 (fax)

1834 Park Blvd.
Palo Alto, CA  94306
(650) 473-9297
(650) 473-9298 (fax)

### EDUCATION

| | |
|---|---|
| Ph. D. | Northwestern University, June 1975<br>Major Field:  Marketing<br>Minor Field:  Social Psychology |
| M.S. | Northwestern University, August 1972<br>Major:  Management |
| B.S. | University of Texas at Austin, December 1970<br>Major:  Business and history education<br>Graduated with highest honors |

### TEACHING EXPERIENCE

| | | |
|---|---|---|
| 1977 – | **University of California, Los Angeles** | |
| | 1989- | Professor of Marketing |
| | 1980-89 | Associate Professor of Marketing |
| | 1979-80 | Acting Associate Professor of Marketing |
| | 1978-79 | Assistant Professor of Marketing |
| | 1977-78 | Visiting Assistant Professor of Marketing<br>(on leave from The Ohio State University) |
| 1985 - 1986 | **Harvard Business School**<br>Visiting Associate Professor, Business Administration | |
| 1974 - 1978 | **The Ohio State University**<br>Assistant Professor of Marketing | |

**EXPERT REPORT OF PROF. CAROL A. SCOTT**                                    14

CONFIDENTIAL

LS-A&F009679
LS-A&F009679

-15-

## ACADEMIC ADMINISTRATIVE EXPERIENCE

1990 - 94    Chairman of the Faculty, Department (School) of Management
             Responsible for all matters pertaining to the approximately
             100 faculty FTE in the Anderson Graduate School of Management,
             a single department school, including: recruiting, retention,
             promotions, salary adjustments, scheduling and staffing of courses,
             and student and peer evaluation of teaching. Manage budget and
             process all appointments for temporary faculty.

1987 - 91    Associate Dean, Academic Affairs
1993 - 94    Act for the dean in his absence. Responsible for all academic
             degree programs and support services including: full-time, Fully
             Employed and Executive MBA Programs, Ph.D. and M.S.
             Programs, Management Communications Program, Management
             Field Studies Office, Computing Services Center, and all
             interdisciplinary study centers (e.g., Entrepreneurial Studies
             Center, Finance and Real Estate, International Business, etc.).

1986 - 87    Assistant Dean, MBA Curriculum & Policy
             Responsible for all academic policies pertaining to the full- time
             MBA Program. Coordinated a review of this program which
             resulted in revised core curriculum; implemented computerized
             bidding system for course enrollment.

## JOURNAL ARTICLES PUBLISHED

Robert A. Hansen and Carol A. Scott. Comments on attribution theory and advertiser
     credibility. *Journal of Marketing Research, 13*, May 1976.

Carol A. Scott. Effects of trial and incentives on repeat purchase behavior. *Journal of
     Marketing Research, 13*, August 1976.

Carol A. Scott. Modifying socially-conscious behavior: The foot-in-the-door technique.
     *Journal of Consumer Research, 4*, December 1977.

Carol A. Scott and Richard F. Yalch. A test of the self-perception explanation of the
     effects of rewards on intrinsic interest. *Journal of Experimental Social
     Psychology, 14*, January, 1978.

Carol A. Scott and Richard F. Yalch. Consumer response to initial product trial: A

**EXPERT REPORT OF PROF. CAROL A. SCOTT**                                    15

CONFIDENTIAL

-16-

Bayesian analysis. *Journal of Consumer Research, 7,* June 1980.

Alice M. Tybout and Carol A. Scott. Availability of well-defined internal knowledge and the attitude formation process: Information aggregation versus self-perception. *Journal of Personality and Social Psychology, 44,* March 1983.

Deborah Roedder John, Carol A. Scott, and James R. Bettman. Sampling data for covariation assessment: The effect of prior beliefs on search patterns. *Journal of Consumer Research, 13,* June 1986.

James R. Bettman, Deborah Roedder John, and Carol A. Scott. Covariation assessment by consumers. *Journal of Consumer Research, 13,* December, 1986.

James R. Bettman, Elizabeth H. Creyer, Deborah Roedder John, and Carol A. Scott. Covariation assessment in rank order data. *Behavioral Decision Making, 1,* October-December, 1988, 239-254.


## REPORTS, PRESENTATIONS, CHAPTERS IN BOOKS

Carol A. Scott, Decade of the Executive Woman, New York: Korn/Ferry, International, 1993.

Vicky L. Crittenden, Carol A. Scott, and Rowland T. Moriarty. The effects of prior product experience on organizational buying behavior. In Paul Anderson and Melanie Wallendorf eds.) *Advances In Consumer Research,* vol. 14, 1986.

James R. Bettman, Deborah Roedder, and Carol A. Scott. Consumers' assessment of covariation. In T. Kinnear (ed.), *Advances In Consumer Research,* vol. 11, 1983.

Carol A. Scott and Alice M. Tybout. Some indirect effects of case vs. base rate data on information processing strategies. In R. Bagozzi and A. M. Tybout (eds.), *Advances in Consumer Research,* 10, Association for Consumer Research, 1982. (Abstract).

Carol A. Scott. On using attribution theory to understand advertising effects. In A. Mitchell (ed), *Advances in Consumer Research,* 9, Association for Consumer Research, 1981.

Carol A. Scott. Speculations on the role of marketing and corporate communications: Some implications for practice and issues for research. In S. A. Greyser (ed.), Proceedings of the MSI Workshop on Corporate Communications, Marketing Science Institute, forthcoming.

CONFIDENTIAL

LS-A&F009681
LS-A&F009681

-17-

Carol A. Scott and Alice M. Tybout. Theoretical perspectives on the impact of negative information: Does valence matter? Abstract published in K. Monroe (ed.), *Advances in Consumer Research*, 8, Association for Consumer Research, 1980

Carol A. Scott. Consumer satisfaction: Perspectives from self-perception theory. Paper presented at the American Psychological Association conference, Montreal, Canada, September, 1980.

Carol A. Scott. Forming beliefs from experience: Evidence from self-perception theory. In H. H. Kassarjian and T. S. Robertson (eds.), *Perspectives In Consumer Behavior*, 3rd edition, Scott, Foresman, 1981.

Alice M. Tybout and Carol A. Scott. Extending the self-perception explanation: The effect of cue salience on behavior. In W. L. Wilkie (ed.), *Advances in Consumer Research*, 6, Association for Consumer Research, 1979.

Carol A. Scott. Attribution theory in consumer research: Scope, issues, and contributions. Proceedings, American Marketing Association Fall Educators' Conference, S. Jain (ed.), 1978.

Carol A. Scott. The role of self-perception processes in consumer behavior: Interpreting one's own experiences. In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research.

Robert A. Hansen and Carol A Scott. Alternative approaches to assessing the quality of self-report data. In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research, 1978.

Robert A. Hansen and Carol A. Scott. Improving the representativeness of survey research: Some issues and unanswered questions. Proceedings, American Marketing Association Fall Educators' Conference, 1977.

Richard F. Yalch and Carol A. Scott. Effect of initial trial of a new product on attitude-behavior consistency. In W. D. Perreault, Jr. (ed.), *Advances in Consumer Research*, 4,   Association for Consumer Research, 1977.

Carol A. Scott, Researching the broadened concept of consumer behavior. In G. Zaltman and B. Sternthal (eds.), *Broadening the Concept of Consumer Behavior*. Association for Consumer Research monograph, 1975.

Brian Sternthal, Carol A. Scott, and Ruby Roy. Self-perception as a means of personal influence: The foot-in-the-door technique. In B. Anderson (ed.), *Advances in Consumer Research*, 3, Association for Consumer Research, 1975.

Carol A. Scott. Hendley distributors. Consumer behavior research case in Gerald Zaltman, Philip C. Burger, and Randall L. Schultz, *Cases in Marketing Research*,

CONFIDENTIAL

LS-A&F009682
LS-A&F009682

-18-

New York: Dryden Press, 1975.

## AWARDS

1984          Outstanding Teacher of the Year, presented by MBA students at the
              Graduate School of Management, UCLA.

## GRANTS RECEIVED (non-university)

New Roles for Corporate Communications.  Grant received from the Marketing Science
          Institute (with James R. Bettman, Richard J. Lutz, and Barton A. Weitz),
          December 1980 - May 1981.

## SELECTED PROFESSIONAL ACTIVITIES

Academic Advisory Council, Marketing Science Institute, 1987 to 1990

Editorial Boards:
          Journal of Marketing Research, December 1975 to July 1985
          Journal of Marketing, July 1978 to July 1986; January 1991 - August 1993
          Journal of Consumer Research, December 1980 -

Occasional reviewer, Journal of Personality and Social Psychology and Journal of
          Applied Psychology

Distinguished lecturer at University of Pennsylvania (1978), University of Washington
          (1979), University of Florida (1979), Berkeley/Stanford (1980), University of
          California, Santa Barbara (1982)

AMA Doctoral Dissertation Competition chairperson, 1985

Consumer Behavior Track chairperson, American Marketing Association Special
          Conference on Marketing Theory, February 1982

Consumer Behavior Track chairperson, American Marketing Association Fall
          Educators' Conference, 1980

Treasurer, Association for Consumer Research, 1980-81

Resident Faculty Member, American Marketing Association Doctoral Consortium,
          1979, 1980, 1983.  Consortium speaker 1984, 1985, 1986

Program Committee, 1979 Annual Conference, Association for Consumer
          Research, Prof. Jerry Olson, chairman

**EXPERT REPORT OF PROF. CAROL A. SCOTT**                                    18

CONFIDENTIAL

LS-A&F009683
LS-A&F009683

-19-

**Consulting projects** for a number of profit, not-for-profit, and governmental organizations in Ohio and California.

Assignments have included strategic marketing audits, development of strategic marketing plans, advertising planning consultation, marketing research analysis and interpretation, and expert witness testimony preparation.

## PROFESSIONAL MEMBERSHIPS

Association for Consumer Research

## COURSES TAUGHT

Undergraduate (primarily at The Ohio State University)
    Consumer Behavior; Advertising
Masters' (primarily at UCLA)
    Consumer Behavior; Introductory Marketing; Advanced Marketing Management;
    Management of Distribution Channels; Global Marketing Management; Market
    Assessment; Marketing Strategy and Policy (Executive MBA Program)
Ph.D. (UCLA, Harvard, and Ohio State)
    Consumer Behavior Theory and Research
    Attribution Theory Research in Marketing
    Doctoral research paper supervision

## THESIS ADVISING

Chair, Ph.D. Thesis Committee 6 students
Member, Ph.D. Thesis Committee - 9 students
Member, Masters Examining Committee (Ohio State) - 3 students

## RECENT COMMITTEE ASSIGNMENTS (UCLA only)

Task Force on Women at Anderson, 2001 –
University Committee on Research, 1999-2001
    Chair, Faculty Grants Program
Dean Search Committee, 1997-1999
Executive Education Advisory Committee 1997 – 1999
MBA Admissions Committee 1997-99
Academic Staffing Committee 1997-98
Faculty Executive Committee, 1993 - 1997
Professional Educational Task Force (University), 1993-94
UCLA Child Care Services Advisory Board, 1990 - present; Chair, 1991 - 1993

EXPERT REPORT OF PROF. CAROL A. SCOTT                                    19

CONFIDENTIAL

LS-A&F009684
LS-A&F009684

-20-

**PERSONAL DATA**

Born:   September 13, 1949
            Dallas, Texas

Married to Christian G. Pease; one daughter, Camille Rose, born January 14, 1991

**EXPERT REPORT OF PROF. CAROL A. SCOTT**                                    20

CONFIDENTIAL

LS-A&F009685
LS-A&F009685

-21-

## Exhibit 2

## Carol A. Scott

### Summary of Recent Expert Testimony Projects*
**(Testimony or Depositions)**

1.  Excelligence Learning Corporation v. Oriental Trading Company, Inc.and Teresa Martini; Case No. C-03-04947-JF (RS) United States District Court, Northern District of California, San Jose Division, 2004.  (deposition)

    Determine the degree to which trade secrets were instrumental in the introduction and performance of a new catalog; determine the degree to which secondary meaning has been established for the look and feel of a catalog; determine the degree to which consumers are confused as to the source or origin of a catalog based on its overall look and feel.

2.  Mallinckrodt, Inc. et. al v. Masimo Corporation; Case No: CV-00-6506-MRP United States District Court, Central District of California, 2004  (trial)

    Define the market for pulse oximetry products, identify the relevant competition, and determine the amount of sales that the plaintiff (defendant) would have made had the defendant (plaintiff) not sold pulse oximetry products with patent infringing features.

4.  Visx v. Nidek-2002 (deposition)
    Assess Visx' marketing efforts with respect to Nidek's entry into the market for vision correction laser machines.

5.  Consumers vs. Hewlett-Packard – 2002 (and ongoing subsequent actions) (deposition)

    Conduct a survey to determine the extent to which consumers considered certain factors in purchasing inkjet printers.

6.  San Francisco Board of Assessors v. Transamerica Corp. – 2000-2002 (hearing testimony)

    Determine the role brand equity in producing rent premiums for the

    Transamerica Pyramid and the cost of building that equity.

7.  Levi Strauss & Co. v. Edwin International, Inc, et. al. – 2001-2002 (deposition)
    Conduct research to assess the strength of various Levi Strauss & Co. trademarks and the likelihood of confusion given the use of similar marks by

* Retained by party underlined.

CONFIDENTIAL

LS-A&F009686
LS-A&F009686

-22-

Edwin.

8.   Linear Technology Corp. v. Impala Linear Corporation, Toyoda Automatic Loom
     Works, Analog Devices, Inc., and Maxim Integrated Products, Inc. – 2001 -
     ongoing  (deposition)
     Assess the market and competition for a patented voltage regulator used in
     personal computers.

9.   Juicy Whip v. Orange Bang – 2000 (deposition)

     Provide critique of consumer survey designed to assess likelihood of consumer
     confusion.

10.  Claire Maglica v. Anthony Maglica – 1999-2000 (deposition)

     Assess the marketing strategy used by Mag Instruments and the importance of
     marketing to the success of the company.

* Retained by party underlined.

CONFIDENTIAL

LS-A&F009687
LS-A&F009687

-23-

## Exhibit 3

## Mall Locations for Jeans Survey

| | |
|---|---|
| **Atlanta** | **The Mall at Stonecrest** |
| **Baltimore** | **Towson Town Center** |
| **Chicago** | **Lincolnwood Town Center** |
| **Los Angeles** | **The Galleria at South Bay** |
| **Dallas** | **Northeast Mall** |
| **New York** | **Kings Plaza Mall** |

\* Retained by party underlined.

CONFIDENTIAL

LS-A&F009688
LS-A&F009688

-24-

**Exhibit 4**                                               ID#_____

**SCREEN FOR JEANS SURVEY – mall intercept**

Hello, I'm_____ from _____, a market research company.
Let me assure you that no one will try to sell you anything.
We are conducting market research on clothing products, and I'd like to take 1 minute of
your time to ask you a few questions.

1.  Are you 15 or older?
    ___ yes            ___no
    *If respondent answers "yes", go to question #2.*
    *If respondent answers "no", Thank you very much.*

2.  What is your age? *(Recruiter: It's not necessary to say the ages, just wait for the*
    *response and check the appropriate box. Check against quotas.)*

    | | |
    |---|---|
    | ___ *15 – 24* | *40%* |
    | ___ *25 – 34* | *40%* |
    | ___ *35 – 50* | *20%* |

3.  Have you purchased jeans that cost $30 or more in the last year?
    ___ yes            ___no
    *If respondent answers "yes", go to question #4.*
    *If respondent answers "no", Thank you very much for helping us*

4.  Do you plan to purchase jeans that cost $30 or more in the next 12 months?
    yes___   no___
    *If respondent answers "no":*   Thank you very much for helping us.
    *If respondent answers "yes":*  go to #5

5.  Have you shopped in any of the following stores in the last year? *(Rotate and read*
    *list. Circle the first store for which respondent answers "yes". Then continue with*
    *question #6.)*
        Against All Odds
        Atrium
        Bloomingdales
        Bon Marche'
        City Blue
        Cobo
        D.E.M.O.
        Dr. Jays
        Foley's
        Fred Segal
        Hecht's
        Jimmy Jazz

24

CONFIDENTIAL

LS-A&F009689
LS-A&F009689

-25-

Macy's
Man Alive
Marshall Fields
May Department
Stores
Mony
Peners
Rich's
Robinson-May
The Buckle
The Lark
Up-Against The Wall
Urban Outfitters

6. Have you participated in market research, other than a political poll, either in a focus group or one-on-one interview, in the past 6 months, or are you scheduled to participate in market research?

yes___  no___

*If respondent answers "yes":*  Thank you very much for helping us.
*If respondent answers "no":*  go to #7.

7. Do you or any one in your immediate family work for a clothing manufacturer, a market research company or an advertising agency?

yes___  no___
*If respondent answers "yes":*  Thank you very much for helping us.
*If respondent answers "no", go to question #8.*

8. Do you wear glasses or contact lenses for reading and/or looking at a computer screen?

yes___  no___
*If respondent answers "no" skip question #9 (invite respondent to participate).*
*If respondent answers "yes", go to question #9.*

9. Did you bring them with you?

yes___  no___
*If respondent answers, "no", Terminate.*
*If respondent answers "yes", please ask respondent to put them on for the interview, then say:*

We would like to invite you to participate in our research. It will take about 10 minutes of your time. Because we know that your time is valuable, we are offering $5 for you to participate. As part of our study you will be asked to look at some pictures of jeans. Then we will ask you a few simple questions about what you saw. To assure quality, some of the interviews will be monitored or observed, and a few of the people interviewed will be called to confirm their participation. No individuals will be identified, and your name will not be used for sales purposes. Can you come with me now to our office to participate?

25

CONFIDENTIAL

LS-A&F009690
LS-A&F009690

-26-

*Recruiter:  Please save this screen.  After interview is complete, return the completed
screens with the tracking sheet.  Thank you.*

*Respondent's name:*                              *Date/Time of contact:*
*Phone no:*
*Facility/city:*                                  *Screener's name:*

26

CONFIDENTIAL

LS-A&F009691
LS-A&F009691

-27-

**Exhibit 5**

| ID#: | Participant's Name: | Age: |
|---|---|---|
| Survey: | Phone Number: | Date: |
| | City: | Interviewer: |
| | | |

## I.  JEANS SURVEY

I'm going to show you several screens with pictures of jeans, and I'll ask you some questions after each picture.  You can use the same answer more than once, and if you don't know, please say that.  Take as long as you need to look at each picture, just as if you were shopping on the internet for a pair of jeans.

1.  Please look at the first picture.
What company or companies, if any, do you think manufacture, license or are associated with this jean?

*(Interviewer:  Do not read list.  Record all responses verbatim.  Do not probe.  If respondent does not know, circle "don't know".)*

1.  Azzure

2.  Calvin Klein

3.  Ecko

4.  FUBU

5.  GAP

6.  Indigo Red

7.  LEI

8.  Levi's or Levi Strauss

9.  Lucky

10. Wranglers

11. Other (Write in response) _____

12. Don't know

*(If respondent answers "don't know", skip Question 2.)*

2.  **What is it about the picture that makes you think it is _____ *(repeat name* of the brand mentioned in Question 1)?***
*(Interviewer:  Record all responses verbatim.  Do not probe.  If respondent does not know, write "don't know".)*

2
7

CONFIDENTIAL

LS-A&F009692
LS-A&F009692

-28-

_____

**Anything Else?**

_____

3.  **Now, let's look at the second picture.**
    **What company or companies, if any, do you think manufacture, license or are associated with this jean?**
    *(Interviewer: Do not read list. Record all responses verbatim. Do not probe. If respondent does not know, circle "don't know".)*

1.  Azzure

2.  Calvin Klein

3.  Ecko

4.  FUBU

5.  GAP

6.  Indigo Red

7.  LEI

8.  Levi's or Levi Strauss

9.  Lucky

10. Wranglers

11. Other (Write in response) _____

12. Don't know

*(If respondent answers "don't know", skip Question 4.)*

4.  **What is it about the picture that makes you think it is _____** *(repeat name of* **brand mentioned in Question 3)?**
    *(Interviewer: Record all responses verbatim. Do not probe. If respondent does not know, write "don't know".)*

_____

**Anything Else?**

_____

CONFIDENTIAL

LS-A&F009693
LS-A&F009693

5. Now, let's look at the third picture.
**What company or companies, if any, do you think manufacture, license or are associated with this jean?**
*(Interviewer: Do not read list. Record all responses verbatim. Do not probe. If respondent does not know, circle "don't know".)*

1. Azzure

2, Calvin Klein

3. Ecko

4. FUBU

5. GAP

6. Indigo Red

7. LEI

8. Levi's or Levi Strauss

9. Lucky

10. Wranglers

11. Other (Write in response) _____

12. Don't know

*(If respondent answers "don't know", skip Question 6.)*

6. **What is it about the picture that makes you think it is _____** *(repeat name of the* **brand mentioned in Question 5)?**
*(Interviewer: Record all responses verbatim. Do not probe. If respondent does not know, write "don't know".)*

_____

_____

**Anything Else?**

_____

_____

7. **Now, let's look at the fourth picture.**
**What company or companies, if any, do you think manufacture, license or are associated with this jean?**
*(Interviewer: Do not read list. Record all responses verbatim. Do not probe. If respondent does not know, circle "don't know".)*

1. Azzure

2. Calvin Klein

3. Ecko

2
9

CONFIDENTIAL

LS-A&F009694
LS-A&F009694

-30-

4. FUBU

5. GAP

6. Indigo Red

7. LEI

8. Levi's or Levi Strauss

9. Lucky

10. Wranglers

11. Other (Write in response) _____

12. Don't know

*(If respondent answers "don't know", skip Question 8)*

**8.  What is it about the picture that makes you think it is _____ (*repeat name of the brand mentioned in Question 7)?***
*(Interviewer:  Record all responses verbatim.  Do not probe.  If respondent does not know, write "don't know".)*

_____

**Anything Else?**
_____

_____


**Thank you very much for helping us today.**


> **This interview was completed according to instructions and all responses were recorded as given by the respondent.**
>
> **Interviewer:_____    Date:_____**


3
0

CONFIDENTIAL

LS-A&F009695
LS-A&F009695

**Exhibit 6**

## INSTRUCTIONS FOR INTERVIEWERS
## JEANS SURVEY

**Materials:**
- Interview Order Tracking Sheet to keep track of your interviews
- Website for online questionnaires
- Internet connection

**Preparations:**
- All interviewers must participate in the briefing session, including observation, with Crossfield Associates.   Those who did not participate in the briefing session may not conduct interviews.

- You will need a secure room where interviewers can have access to the materials throughout the course of the study.

- Individual interview rooms should be closed rooms.  If the room is divided, there should be a floor to ceiling room divider.  You should not be able to hear normal conversation from the other side of the room.

- To conduct each interview, you need the on-line questionnaire.  ID numbers and Survey (A or B) must follow the order on the tracking sheet.

### 1.  Screening the Respondents:
- You will be recruiting males only.  Please note the age quotas on the screen.

- **Follow the instructions on the screen exactly as they are written.  Please note that Question #5 requires rotation.  Put an arrow by the first store name you read.  Read the list slowly and distinctly.  When the respondent indicates that he has shopped in a store, circle it.  Then, proceed with the next question.  Only one store name should be circled.**

- Make sure that all questions on the screen are completed.

- Please re-screen the participant to be sure that he is qualified. If the participant, requires corrective lenses, make sure the he is wearing them for the interview.

### 2.  Conducting the Interviews:
1.  After recruiting and screening, please escort the participant into the interview room.

2.  Mark the participant's name on the tracking sheet next to the questionnaire ID # used with that participant.

*Crossfield Associates*

31

CONFIDENTIAL

LS-A&F009696
LS-A&F009696

3. Begin the first interview. Follow the instructions on the questionnaire exactly as they are written.

4. Read the script for the questionnaire slowly and distinctly. Follow the script on the questionnaire **exactly**. Do not change any of the words. Do not read or say the instructions to the participant. If the paricipant doesn't understand the question, repeat the question. Do not try to explain it.

5. Turn the monitor to face the participant so that he can view the pictures. Give the participant sufficient time to look at each picture. Turn the monitor back to you, the interviewer, to advance the screen and read the words of the questionnaire and input the responses.

6. Do not let the participant see any of the words of the questionnaire. Do not allow the participant to use the keyboard or the mouse.

7. Do not force a response from the participant. If the participant says he doesn't know, then circle "don't know". Do <u>not</u> ask the participant to guess.

8. **Please write down exactly what the participant answers.**

9. If the participant answers with a statement that he is familiar with the jeans or just bought them and knows how it looks, but does not respond with a feature or specific detail, please probe once by asking, "Is there any specific feature that makes you say that?" **Otherwise, do not probe.**

10. Only clarify if you cannot hear the participant. You may need to ask the participant to spell the word(s). Do not ask the participant what was meant by the response. Just write down the response <u>verbatim</u>.

11. Be personable, but do not comment or respond in any way to the participant's answers. Do not react positively or negatively to the participant's response. Do **not** say, "There are no right or wrong answers."

12. Escort the respondent back to the front desk.

*Any questions, please feel free to call: Harriet Cellini (650) 344-3184*

I have read the above instructions, participated in the training session, and agree to follow the instructions.

_____
_____
_____
_____

*Crossfield Associates*

CONFIDENTIAL

LS-A&F009697
LS-A&F009697

## Exhibit 7



**Levi's**

CONFIDENTIAL

LS-A&F009698
LS-A&F009698



**Indigo Red**

*Crossfield Associates*

34

CONFIDENTIAL

LS-A&F009699
LS-A&F009699



**Wrangler**

*Crossfield Associates*

35

CONFIDENTIAL

LS-A&F009700
LS-A&F009700



**Ecko**

CONFIDENTIAL

LS-A&F009701
LS-A&F009701



**Azzure**

*Crossfield Associates*

37

CONFIDENTIAL

LS-A&F009702
LS-A&F009702

## PROOF OF SERVICE

I am employed in the County of Santa Clara, State of California. I am over the age of 18 and not a party to the within action. My business address is 1834 Park Boulevard, Palo Alto, CA 94306.

On December 17, 2004, I served a true and correct copy of the document(s) described as: **EXPERT REPORT OF CAROL SCOTT** on the following counsel for interested parties in this action.

> Raymond H. Goettsch, Esq.
> Scott Murch, Esq.
> LaTorraca and Goettsch
> 211 East Ocean Blvd., Suite 400
> Long Beach, California 90801-4978
> Facsimile: (562) 436-8489

[ ] [BY US MAIL, Rule 5(b) F.R.C.P.] I caused the foregoing document(s) to be enclosed in a sealed envelope, with first class postage fully paid, for delivery as indicated herein. I am readily familiar with the firm's practice of collection and processing correspondence for mailing and know that, in the ordinary course of Townsend and Townsend and Crew LLP's business practice, the document(s) described above would be deposited with the United States Postal Service on that same day at San Francisco, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed to be invalid if the postal cancellation date, or postage meter date, is more than one day after the date of deposit for mailing set forth in this declaration.

[ ] [BY FACSIMILE, Rule 5(b) F.R.C.P.] I caused the foregoing document(s) to be transmitted by facsimile to the office(s) of the addressee(s) indicated above at the facsimile number(s) listed for each addressee served. Upon completion of said facsimile transmission, the transmitting machine issued a transmission report showing that the transmission was complete and without error.

[X] [BY OVERNIGHT DELIVERY, Rule 5(b) F.R.C.P.] I caused delivery of the document(s) listed above to be effected by overnight mail, by placing true and correct copies in separate envelopes for each addressee shown above, with the name and address of the person served shown on the envelope, and by sealing the envelope and placing it for collection. Delivery fees were paid or provided for in accordance with the ordinary business practices of Townsend and Townsend and Crew LLP.

[] [BY PERSONAL SERVICE, Rule 5(b) F.R.C.P.] I caused the foregoing document(s) to be served by hand to the addressee(s) listed above, with the name and address of the person served shown on the envelope.

*Crossfield Associates*

CONFIDENTIAL

LS-A&F009703
LS-A&F009703

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 17, 2004, at Palo Alto, California.

—

60381376 v1

_Crossfield Associates_

CONFIDENTIAL

LS-A&F009704
LS-A&F009704