Case 3:04-cv-00468-SI Document 94 Filed 04/22/2005 Page 1 of 16

TOWNSEND AND TOWNSEND AND CREW LLP
GREGORY S. GILCHRIST (Bar No. 111536)
GIA L. CINCONE (Bar No. 141668)
TIMOTHY R. CAHN (Bar No. 162136)
Two Embarcadero Center, 8th Floor
San Francisco, California 94111
Telephone: 415-576-0200
Facsimile: 415-576-0300
gsgilchrist@townsend.com; glcincone@townsend.com; trcahn@townsend.com

Attorneys for Plaintiff
LEVI STRAUSS & CO.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

LEVI STRAUSS & CO.,

Plaintiff,

v.

RP55, INC., et al.,

Defendants.

Case No. C 04 0468 SI

**REPLY DECLARATION OF CAROL SCOTT IN SUPPORT OF PLAINTIFF LEVI STRAUSS & CO.'S MOTION FOR SUMMARY JUDGMENT**

**Date:** **May 6, 2005**
**Time:** **9:00 a.m.**
**Courtroom:** **10**

I, Carol Scott, declare and state as follows:

1. I am not, as RP55 has stated, Levi Strauss & Co.'s "in house" marketing expert. I am a Professor of Marketing at the University of California, Los Angeles. As I reported in my CV and in my deposition, I teach a variety of classes at UCLA's Anderson Graduate School of Management where I have been Assistant and Associate Dean, as well as Chair of the Faculty. My duties at UCLA have required me, throughout my career, to research and apply basic and sophisticated principles of experimental design and analysis. I consult on litigation matters part time and generally work only on a few matters each year on which I can concentrate my attention. Levi Strauss & Co. is but one of many clients I have had over the past 30 years of my career. I can assure the Court that I bring objectivity and independence to any opinions or reports of data that I have collected for purposes of any litigation.

2. I have reviewed the Declaration of Walter McCullough in opposition to Levi Strauss's motion for summary judgment and his rebuttal report. I have also reviewed parts of RP55's memorandum in opposition to Levi Strauss's summary judgment motion, as well as Levi Strauss's motion to strike Mr. McCullough's report and RP55's opposition to that motion. I have noted the many criticisms that have been leveled against my report and conclusions. I disagree with them. In particular, I disagree with Mr. McCullough's suggestion that my survey reflects no appreciable level of confusion. In my opinion, the data supports my conclusion that I have reported a conservative estimate of actual and likely consumer confusion.

3. The criticisms of the reported levels of confusion in my declaration (and my report) are misguided. To address concerns about survey "noise," I provided a calculation in my report that deducted or discounted the aggregate level of confusion reflected by Indigo Red respondents (that is, the sample that saw the Indigo Red jeans) by more than one-third of the total who misidentified the jeans as LEVI'S jeans. My report of 14% confusion among all Indigo Red respondents depended only on the respondents who confused the Indigo Red jeans with LEVI'S® jeans *and* attributed their confusion to the stitching. This may have been overly conservative. Respondents who identified the Indigo Red jeans as LEVI'S® jeans may well have identified them by the stitching but, for whatever reason in a survey context, failed to mention stitching as the reason.

4. Mr. McCullough suggests that some of the respondents who specifically stated that the Indigo Red jeans were LEVI'S® jeans due to the stitching may nonetheless have been guessing. McCullough Decl. ¶ 8. He supposes that respondents will want to appear "rational" and that the stitching provides an obvious vehicle. This is not a conclusion that can be drawn from "experience," as Mr. McCullough suggests. If someone is guessing, it is just as likely or more likely that the respondent will be non-specific about his response or refer to a generic feature of the jean. There is no reason to assume that respondents who specifically mention the stitching are guessing and then reporting that the guess was based on the stitching in order to appear rational. When a respondent reports that the pocket design is the reason for his answer, it is certainly reasonable to conclude that the pocket design is contributing in some way to his identification of the jean. It is every bit as likely, if not more so, that other respondents who identify the jean from the stitching are not being counted in this group. Respondents might know a jeans brand from its stitching, but -- based on an overall impression of the jean -- not report that or attribute the belief to another feature. Accordingly, the 14% overall confusion rate, after I deducted those who did not attribute their confusion to stitching, is, in my opinion, the most conservative measure that would be appropriate.

5. I reported in my declaration another calculation that comes from the data submitted with my expert report. This calculation recognizes that, even though it is extremely well known by consumers, not every consumer will be familiar with the LEVI'S® Arcuate stitching design. To determine how many respondents are candidates to express an opinion about similarities between the designs, one may consider only the population that recognizes the Arcuate. In determining the population that recognizes the Arcuate, I used the entire 58% who correctly identified the LEVI'S® jean. I called this conservative in my declaration because some number of respondents have likely correctly identified the jean as LEVI'S® but nonetheless are not familiar with the Arcuate. Approximately 33% of the total LEVI'S® respondents specifically attributed their identification of the LEVI'S® jean to the stitching. I felt it might be overly aggressive to limit the calculation to the group that specifically expressed familiarity with the Arcuate because significantly more of the 58% who correctly identified the LEVI'S® jean likely are familiar with the Arcuate. Other surveys I have conducted for Levi Strauss, as referred to in my report, show high levels of recognition of LEVI'S®

jeans. Accordingly, I felt it would not be appropriate to assume that only 33% of the Indigo Red population was familiar with the Arcuate when I was calculating how much of that population had misidentified the Indigo Red jeans as LEVI'S® jeans due to stitching.

6. Mr. McCullough's survey, by pairing the stitching design (to the extent respondents perceived it at all) with the LEVI'S® branding that appeared on the jeans, essentially creates or reinforces his respondents' familiarity with the LEVI'S® jean whether it existed before or not. He states this in his declaration (¶ 9 ["My test did not reply upon consumers having prior knowledge of LS&CO.'s mark"]). It is unclear, therefore, why he is critical of the calculation made in my declaration which mirrors this condition. He says that it is inappropriate to use the proportion of the population (58%) that accurately recognized the LEVI'S® brand by assuming that a similar proportion of the Indigo Red respondents would exhibit this familiarity. He is simply wrong about this. It is entirely reasonable as a matter of statistics and social science research to believe that the Indigo Red respondents would be aware of LEVI'S® jeans and their marks at a similar rate to the LEVI'S® respondents. Respondents in my study were randomly assigned to see either the group of jeans including the LEVI'S® jeans or the group including the Indigo Red jeans. The technique of "random assignment to treatments" is a basic principle of experimental design, and been used in any variety of research contexts for decades. See Exhibit A.

7. Looking at the data in this way affords a useful comparison without forcing the respondents to engage in a side-by-side comparison as occurs in the McCullough survey. The side-by-side comparison in McCullough's survey, while leaving no question about the brands, allows respondents who perceive the differences between the designs to "correct" their confusion, if it exists, before they register it in response to any questions. By applying the reasonable assumption that the same proportion of one survey population would recognize the LEVI'S® jeans as would the other population, one is able to assess perceptions of similarity between the designs without engaging in this side-by-side presentation. The Indigo Red respondents are effectively able to tell us whether they view the designs as sufficiently similar to call up their pre-existing association of the Arcuate with LEVI'S® jeans. This is a much truer measure than to distort the outcome by allowing the respondents to look at both jeans. As I stated in my declaration in support of Levi Strauss's summary judgment

motion, 24% of respondents who are familiar with the Arcuate are likely to be confused by Indigo Red's design if they simply observe it in the marketplace.

8. As I understand it, Mr. McCullough further criticizes the measure of confusion that I just described because it is not the same as that discussed in a case involving Brunckhorst cold meats and Weinhard's beer. As I understand the survey in that case, respondents were asked on the telephone whether they were aware of the company that produced the allegedly infringing mark, "Boar's Head Red." Those who answered "no" were excluded from the population in which confusion was measured. Although RP55 has said that it is inappropriate to use the LEVI'S® sample in looking at the Indigo Red results, RP55 proceeds to determine how many of the LEVI'S® respondents formed a belief as to the manufacturer of the jeans and applies that proportion to the Indigo Red population. (Opposition to Levi Strauss's Summary Judgment Motion at 10.) In this case, I agree that it is inappropriate to use the LEVI'S® population – at least if one is making a parallel calculation to that in the Brunckhorst case. The population in my survey that saw the allegedly infringing mark, "Boar's Head Red" in the Brunckhorst case, was the sample who saw Indigo Red jeans. Accordingly, those among the Indigo Red population who formed a belief as to the brand or manufacturer is the comparable population. If that population is considered (the 70% of the total Indigo Red population who named a brand, excluding those who said they did not know – see Exh. 8 to my Supplemental Report), the percentage of Indigo Red respondents who called the jeans LEVI'S® *and* attributed their confusion to stitching is 21%. This is also a useful way to screen the data, as it eliminates from consideration respondents who perceived no cues that helped them identify a brand when they looked at the Indigo Red jeans.

9. Mr. McCullough makes one more criticism of these calculations in which he poses a hypothetical outcome where the sample is reduced to two respondents who are aware of the Arcuate trademark, and one Indigo Red respondent who is confused by the stitching. The resulting 50% confusion rate, he finds to be "the epitome of junk statistics." McCullough Decl. ¶ 12. First, this reduction in the sample to two would essentially negate the survey's usefulness by creating too small a

sample.[1] Second, there is no reason -- *provided that the sample remains large enough* -- why one would summarily disregard a high confusion rate among those aware of the senior mark. It shows a high degree of perceived similarity in the marks which reflects likely confusion. Even if large percentages of the population are unaware of the design trademark at issue, it is useful to assess consumer perceptions as to the similarity of the designs, as that perception bears on a consumer's ability accurately to associate a design with its source.

10. The declaration that I earlier submitted was not any kind of new opinion. I submitted all of the data that I have relied on in electronic form for RP55 to consider. In fact, all of the calculations from my declaration were taken directly from the data discussed in the text of my report, as are the calculations in this declaration.

11. I have reported in my expert reports my opinions about "noise" in the survey results, and have been available to answer any questions regarding those opinions. I sat through two depositions with Mr. Goettsch. In the first deposition, he asked no questions about how I would analyze the data to account for any purported noise. I had previously reported my findings – just as I later did in my declaration – that while 22% of the Indigo Red respondents identified the jeans as LEVI'S® (more for a younger set), 14% of the Indigo Red respondents attributed their confusion to stitching or pocket stitching. This data helps to gauge whether the expressed confusion is related to the involved trademark. The survey also tested other jeans that operate as a check against mere "guessing" or top-of-mind awareness of a popular brand. As I stated in my expert report, many respondents accurately identified other jeans and the results from the Indigo Red respondents were significantly higher than for other brands.

12. My rebuttal report discussed and critiqued Mr. McCullough's treatment of noise, and its principles are applicable to his criticisms or concerns about noise in my data. As I explained, it is

[1] The application of the survey results to make useful adjustments to the population in order to test relevant propositions, as I have suggested, in essence has the same effect as "screening" the respondents -- a technique that both surveys used. If a tiny sample results, however, the survey is less meaningful.

REPLY DECL. OF CAROL SCOTT
ISO PL.'S MOTION FOR SUMMARY JUDGMENT
- 5 -
Levi Strauss & Co. v. RP55, Inc., et al.
CASE NO. C 04 0468 SI

not appropriate simply to deduct uncritically all confusion reported in a "control" cell. There is nothing "classic" about this approach, as suggested by Mr. McCullough. This approach puts too much emphasis on the selection of the control. As I stated in my rebuttal report, the control jean that RP55's counsel selected emphasized its similarity with the LEVI'S® jean that was tested. In opposition to the motion to strike, RP55 suggested that this was deliberate on its part, and that control stimuli are required to approximate closely the product bearing the senior mark, here LEVI'S® jeans. (Opposition to Levi Strauss' Motion to Strike at 11.) I cannot speak to the legal issues, but it makes no sense from an experimental design perspective for the control to emulate the senior product. The survey should, instead, minimize differences between the control product and the *test* jean, *except for the variable being tested*, here pocket designs. Otherwise, the "control" will tend to overstate confusion relative to the test jean, for reasons unrelated to the proposition being "controlled."

13. The last significant issue relates to his criticism of my survey as not reflecting post sale conditions. I disagree. I asked people to look at the jeans in the survey as if they might be buying them, not to replicate point of sale conditions, but to assure reasonable care in observation from respondents who otherwise would not know or have any context for looking at the jeans at all. I used pictures that displayed the marks in a manner where the pocket design might be seen in the post sale context, to facilitate control over the stimuli. There are disadvantages to photos in some cases, but I believe those are outweighed in this case by the degree of control, uniformity and potential for repetition they provide.[2] Actual products may not be displayed in a constant manner and it may be difficult to isolate the appropriate stimuli under a test that uses actual products.

---

[2] The photos that were used in most cases in my survey, including of the Indigo Red jean, were actual screen shots from Internet selling sites. They were "enlarged" photos which contained no point of sale data such as brand, price or store. I chose these photos to avoid any claim that the product was arranged by me in any misleading way. They show the jeans pockets much like they might be observed on people wearing the jeans, either live or in magazines.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Las Vegas, Nevada, this 22nd day of April, 2005.

/s/ Carol Scott
Carol Scott

60475232 v1

# EXHIBIT A

# DESIGN AND ANALYSIS

## A Researcher's Handbook

GEOFFREY KEPPEL

*Department of Psychology*
*University of California, Berkeley*

1973

PRENTICE-HALL, INC., *Englewood Cliffs, New Jersey*

*reduces* the variation of the room temperature. An uncontrolled room would be subjected to a wider range of temperatures during the course of an experiment than a controlled room, but a variation will still be present. This variation may be sufficiently small to allow us to view the temperature as constant. Even with these features controlled, however, many variables remain uncontrolled that might influence the behavior we are studying.

We have not mentioned yet a major source of uncontrolled variability present in any experiment, namely, the differences in performance among subjects. One obvious way to hold subject differences constant is to use the *same* subject in each treatment condition—a sort of biological analogue of absolute physical control. Unfortunately, even the same subject is not the same person each time he is tested. Moreover, there are potentially serious carry-over effects from one treatment to another, owing to the successive administration of the different treatments to the same subjects. To avoid this problem, we could try to *match* sets of subjects on important characteristics and then assign one member of each matched set to a different treatment, but matching would never be exact. Thus, neither attempt to control for individual differences among subjects guarantees that the treatment groups will contain subjects of the same average ability.

## CONTROL BY RANDOMIZATION

This leads us to a third method, one which represents control of a different sort. Specifically, it consists of an elimination of *systematic* differences among the treatment conditions by means of *randomization*. Consider again the control of room temperature. What might we do about controlling the temperature if the room were *not* equipped with a thermostat? We could try to match sets of subjects arriving at different times for the experiment, but for whom the temperature of the room is the same, and then run one of the subjects in one group, one in another group, and so on. But this is an unrealistic and cumbersome procedure. Suppose, instead, that we decide which of the different treatments a subject will receive by some random means at the time of his arrival for the experiment and that we continue to use this method until we have obtained the number of subjects we planned to run in each of the treatment conditions. What happens to the different room temperatures in this case? In a sense, the different temperatures of the experimental room have an equally likely "chance" at the start of each testing session of being assigned to *any one of the treatment levels*. If we follow this procedure with enough subjects, statistical theory tells us that the *average* room temperatures for the treatment groups will be equal. Under these circumstances, then, we will have effected a control of room temperature.

That is fine for temperature, but what about other features of the testing environment which also change from session to session? It may not be



An uncontrolled room would be
ıring the course of an experiment
l still be present. This variation
ıe temperature as constant. Even
y variables remain uncontrolled
lying.
ırce of uncontrolled variability
erences in performance among
ifferences constant is to use the
sort of biological analogue of
ɜn the same subject is not the
ɜr, there are potentially serious
other, owing to the successive
ıe same subjects. To avoid this
ts on important characteristics
set to a different treatment, but
ttempt to control for individual
treatment groups will contain

sents control of a different sort.
*tematic* differences among the
*n.* Consider again the control
ıt controlling the temperature
t? We could try to match sets
xperiment, but for whom the
un one of the subjects in one
is an unrealistic and cumber-
ecide which of the different
om means at the time of his
to use this method until we
to run in each of the treatment
n temperatures in this case?
mental room have an equally
ı of being assigned to *any one*
dure with enough subjects,
mperatures for the treatment
, then, we will have effected

other features of the testing
to session? It may not be

immediately apparent, but once we have controlled *one* environmental feature by randomization, we have controlled *all* other environmental differences as well. Suppose we list some of the characteristics of the testing session present during the very first session in the experiment. The room will be at a certain temperature; there will be a certain humidity; the room illumination will be at a particular level; the noise from the outside filtering into the room will be of a certain intensity; the experiment will be given at a particular time of day, on a particular day, and by a particular experimenter; and so on.

When the experimenter is about to begin, he chooses a particular experimental treatment for the first subject in some random fashion. What this means is that at this point each of the treatment conditions has an equally likely chance of being the one chosen for that particular experimental session. The implication is that the total composite of features which happens to be present at that time has an equally likely chance of being "assigned" to each of the experimental treatments. We come next to the second experimental session. The total composite of features present at the second session will be different than the one present at the first. The room will be at a different temperature, the noise level may not be the same, the session will be at a different time of day, and so on. Before the start of the session, the experimenter again chooses randomly which treatment he will present. As with the first session, the composite of features present this time have an equally likely chance of being associated with each of the treatments.

Suppose this argument is continued until all of the subjects have been assigned to treatment conditions in the experiment. Then each and every feature of the experimental situation, which varies from session to session, has been assigned randomly to the different treatment conditions. There was no systematic bias leading to the running of one condition at the same time of day or only in warm rooms or only when the lights were bright, or whatever. The assignment of the testing sessions to the experimental conditions in a random fashion eliminates from the experiment the possibility of systematic biases involving any of these factors.

Subject differences are also "controlled" by randomization. The subjects who are chosen to participate in an experiment will differ widely on a whole host of characteristics. Some of these will affect the behavior being studied and, hence, must be controlled. Suppose we could give each of our subjects a number which represents his general ability to perform on the sort of task being studied. This number will be a composite score, reflecting the influence of his intelligence, his emotionality, his attitude, his background and training, and so on. Now suppose that we assign the subjects to the different treatment conditions randomly. Subjects with high composite scores are just as likely to be assigned to one of the treatments as to any of the others. The same is true for subjects with low and with medium composite scores. Thus, random assignment of subjects to treatments will ensure in the long run that there will be an equivalence of subjects across the different treatments.

Apr 19 05 11:06a p.4

Suppose we take one final step in this argument. Somehow we select the first subject who will be run in the experiment; he may be the first subject who shows up as a volunteer for the experiment, or he may be the rat in the first cage that we come to. When we randomly assign this subject to one of the treatment conditions, we are essentially assigning *jointly* the subject *and* the environmental factors. By assigning him randomly to the treatment conditions, then, we are assigning randomly *all* of the ability and environmental factors as well—whatever the combination of ability and environmental factors may be for this subject. Therefore, randomization of subjects in the assignment to conditions is an indispensable method of guaranteeing that in the long run the treatment conditions will be matched on all environmental factors and subject abilities.

A serious problem presented by this argument has undoubtedly occurred to you. Specifically, we *never* run a sufficiently large number of subjects in our experiment to qualify for the statistician's definition of the "long run." In practice, we are operating in the "short run," meaning that we have no guarantee that our groups will be equivalent with regard to differences in environmental features or to differences in the abilities of subjects. We will return to this problem in a moment.

### Methods of Randomization

Because of the fundamental importance of randomization to the design and analysis of experiments, we will consider in detail methods by which randomization may be accomplished. Whatever method we use, we must be able to argue that *all* factors not involved in the manipulation of the independent variable have been neutralized by randomization. As an example, suppose we conduct an experiment with three treatment conditions and we plan to run a total of 30 subjects in the experiment. For the first subject who shows up, we will determine which treatment he receives by some random process.[1] The treatment given to the second subject is determined in the same manner. This procedure is followed until all 30 subjects have served in the experiment. Note that *each subject* is randomly assigned to a treatment and *each testing session* is randomly assigned to a treatment. The critical feature of the random assignment, then, is that each subject-session combination is *equally likely* to be

[1] If there were only two treatment conditions, the treatment selected could be determined by the flip of a coin. If more than two conditions are included in the experiment, we usually give each condition a different number and then refer to tables of random numbers which provide a source of random sequences of digits. Such tables may be found in many statistics texts and in experimental psychology texts. There are also books of random numbers available, such as Moses and Oakford (1963) and a book published by the RAND Corporation (1955). The tables published in Moses and Oakford are especially useful, since they include random permutations of number sets of different sizes. For example, if there are 30 things that we want to randomize, it is far easier to use a random ordering of the numbers 1–50, say, and to select from that ordering the numbers 1–30, than it is to work through a random sequence of digits, two at a time, searching for the first occurrence of each one of these numbers.

assigned to any one of the
ment conditions is equall
whatever other uncontroll
testing.

In actual practice, we w
procedure of assigning tr
*number* of subjects at eac
considered in Chapter 5.) V
at their own convenience,
is to make the random assi
run again until all of the o
is a procedure of *samplin*
decide randomly which of t
For the second subject, we
remaining treatments. For
remaining treatment, since
This completes a *block* of r
fourth subject is decided by
i.e., three; the treatment
randomly from the remaini

It is generally advisable t
did in the last paragraph. T
We can think of two gener
any experiment: those wh
session and those which do
of variables—even if we ru
subjects in another treatme
at each testing session by de
ization to control the secon
haphazardly.

We are usually unable to
fluctuation will be; howeve
example, subjects volunteer
flow of participants. There
volunteers early in the sch
reflect differences in abiliti
curious or smarter—who kr
flow of volunteers is random
time of day or of noise leve
in small blocks "helps" this
say, representing each treat
different in temperature. O
more likely to have the sam
three subjects who did not.

omehow we select the first he first subject who shows e rat in the first cage that t to one of the treatment ject *and* the environmental t conditions, then, we are ital factors as well—what- l factors may be for this assignment to conditions he long run the treatment ctors and subject abilities. as undoubtedly occurred number of subjects in our on of the "long run." In that we have no guarantee fferences in environmental ts. We will return to this

mization to the design and thods by which randomiza- e, we must be able to argue f the independent variable mple, suppose we conduct I we plan to run a total of ct who shows up, we will ndom process.[1] The treat- in the same manner. This ed in the experiment. Note ent and *each testing session* ature of the random assign- tion is *equally likely* to be

selected could be determined by n the experiment, we usually give random numbers which provide a nd in many statistics texts and in numbers available, such as Moses rporation (1955). The tables pub- include random permutations of gs that we want to randomize, it is nd to select from that ordering the digits, two at a time, searching for



assigned to any one of the three treatments. In other words, each of the treatment conditions is equally likely to be assigned to a given subject and to whatever other uncontrolled factors might be present during that period of testing.

In actual practice, we would probably place a *restriction* on this random procedure of assigning treatments to subjects in order to ensure an *equal number* of subjects at each treatment level. (Reasons for this decision are considered in Chapter 5.) When human subjects are appearing in the laboratory at their own convenience, i.e., at a time that they choose, a typical approach is to make the random assignments so that any given treatment selected is not run again until all of the other treatments are represented *once*. In effect, this is a procedure of *sampling without replacement*. In the example, we would decide randomly which of the three treatments to administer to the first subject. For the second subject, we would randomly select the treatment from the two remaining treatments. For the third subject, we must administer the final remaining treatment, since there are only three treatments in the experiment. This completes a *block* of randomized treatments. The treatment given to the fourth subject is decided by selecting randomly from the *total pool* of treatments, i.e., three; the treatment given to the fifth subject is decided by selecting randomly from the remaining two treatments; and so on.

It is generally advisable to work with the smallest possible block, just as we did in the last paragraph. There is a good reason for following such a procedure. We can think of two general classes of variables which must be controlled in any experiment: those which really do fluctuate randomly from session to session and those which do not. We do not have to worry about the first class of variables—even if we run all the subjects in one treatment first and all the subjects in another treatment second, the particular values of these variables at each testing session by definition occur randomly. Thus, we turn to randomization to control the second class of variables, variables which do not fluctuate haphazardly.

We are usually unable to specify ahead of time exactly what the cycles of fluctuation will be; however, we merely assume that they will be present. For example, subjects volunteering for an experiment do not represent a random flow of participants. There are undoubtedly different reasons why a subject volunteers early in the school term rather than late, and these reasons may reflect differences in abilities. The first subjects may be overly anxious or curious or smarter—who knows? The point is that we cannot assume that the flow of volunteers is random. Nor is the fluctuation of room temperature or of time of day or of noise level outside the testing room random. Randomizing in small blocks "helps" this control by ensuring that a block of three subjects, say, representing each treatment once, will not be placed in a room that is too different in temperature. Or, three subjects appearing one after the other are more likely to have the same reason for volunteering at that time than would three subjects who did not.

p.6 Apr 19 05 11:07a

It is not sufficient, however, just to introduce some sort of randomization in the testing order. To make the randomization "work," we must choose a method which guarantees that features of the experimental situation and differences in the abilities of the subjects are not allowed to exert a *systematic* influence in the experiment. Any factor which does not vary randomly in its "natural state" must be subjected to a process of *neutralization*, consisting in essence of the superimposition of a random process upon the assignment of testing sessions and subjects to the treatment conditions. That is, variables which fluctuate in a systematic fashion during the course of the experiment are transformed into variables which now fluctuate *unsystematically* with respect to their association with the treatment conditions.

### Random Assignment Versus Random Sampling

We should say a few words about the distinction between the *random assignment* of subjects to conditions and the *random sampling* of subjects from a known population.

Random sampling requires the specification of a population of subjects and then the assurance that each member of the population has an equally likely chance of being selected for the experiment. If these conditions are met, we will be able to *generalize* the results of our experiment to the population. It should be noted that even if we are able to obtain our subjects by randomly sampling from a population, we will still have to turn to randomization procedures in the assignment of treatments to subjects and to testing sessions. That is, even randomly selected subjects will come to the experiment one at a time and then be given one of the treatment conditions. Who receives which treatment must be determined by chance; otherwise, a systematic bias may result, and this bias will be damaging to any experiment whether the subjects are selected randomly from a population or not.

What about random sampling? Public opinion polls, voter preference polls, marketing research, and television ratings all depend upon random sampling from a known population. Any findings from the sample are then extended to the population. Only rarely will we see random sampling in an experiment, however. And when we do, the population from which the sample was drawn may be so restricted as to be uninteresting in itself, e.g., the rats in a laboratory animal colony, the students at a university taking a course in introductory psychology, or third-grade children in a particular school system. Almost invariably, our subjects are selected out of *convenience*, rather than at random. The failure to sample randomly from a known population means that we are not justified *statistically* in extending our results beyond the bounds of the experiment itself.

Since most researchers accept this "myopic" view of the results of an experiment, how can we ever discover results that *are* generalizable to a meaningful population of organisms? One answer is that past research in a number of

laboratories with subjects c stocks, different suppliers different schools in differer differences are relatively u Knowing this, an investigat his results beyond the singl

The distinction, then, is t upon random sampling, ai upon knowledge of a part make this point quite clear: statistics is applied, the infe has two parts, only the firs *Drosophila* will usually invo statistically based conclusio will usually, and often wise (b) all *Drosophila*, or (c) a la implicit or explicit, but it is

In short, the generalizat statistical considerations, su experimenters, however, the subjects (or conditions for t considerations, i.e., what is *appropriateness* of certain ge tions. The availability of this ment of the research area a particular subjects tested ha

## AN INDEX FOR THE EV OF TREATMENT EFFECT

We now return to our ear control by randomization w small numbers of subjects statistical theory are based than those used in any expe with the "short run," where are in fact matched on all re how can we determine whet are due either to the experim to both?

Let us consider, in gener problem.

Apr 19 05 11:08a

some sort of randomization in n "work," we must choose a ie experimental situation and ot allowed to exert a *systematic* does not vary randomly in its ; of *neutralization*, consisting in process upon the assignment of t conditions. That is, variables g the course of the experiment fluctuate *unsystematically* with t conditions.

g

ction between the *random assign-* *ampling* of subjects from a known

n of a population of subjects and population has an equally likely . If these conditions are met, we experiment to the population. It obtain our subjects by randomly have to turn to randomization o subjects and to testing sessions. l come to the experiment one at a t conditions. Who receives which otherwise, a systematic bias may y experiment whether the subjects r not.

pinion polls, voter preference polls, all depend upon random sampling m the sample are then extended to ndom sampling in an experiment, from which the sample was drawn n itself, e.g., the rats in a laboratory ty taking a course in introductory particular school system. Almost *convenience*; rather than at random. own population means that we are r results beyond the bounds of the

opic" view of the results of an experi- at *are* generalizable to a meaningful that past research in a number of

laboratories with subjects chosen from different sources (e.g., different breeding stocks, different suppliers of laboratory animals, and human subjects from different schools in different sections of the country) have shown that these differences are relatively unimportant in the study of various phenomena. Knowing this, an investigator working in this field may feel safe in generalizing his results beyond the single experiment.

The distinction, then, is between a *statistical* generalization, which depends upon random sampling, and a *nonstatistical* generalization, which depends upon knowledge of a particular research area. Cornfield and Tukey (1956) make this point quite clear: "In almost any practical situation where analytical statistics is applied, the inference from the observations to the real conclusion has two parts, only the first of which is statistical. A genetic experiment on *Drosophila* will usually involve flies of a certain race of a certain species. The statistically based conclusions cannot extend beyond this race, yet the geneticist will usually, and often wisely, extend the conclusion to (a) the whole species, (b) all *Drosophila*, or (c) a larger group of insects. This wider extension may be implicit or explicit, but it is almost always present" (pp. 912–913).

In short, the generalizability of a given set of results is influenced by statistical considerations, such as the question of random sampling. For most experimenters, however, the extension of a set of findings to a broader class of subjects (or conditions for that matter) is dictated primarily by subject-matter considerations, i.e., what is known in a particular field of research about the *appropriateness* of certain generalizations and the "length" of these generalizations. The availability of this information will depend upon the state of development of the research area and the extent to which extrapolations beyond the particular subjects tested have been successful in the past.

## AN INDEX FOR THE EVALUATION OF TREATMENT EFFECTS

We now return to our earlier problem: What can we do about the fact that control by randomization will not be perfect when we are assigning relatively small numbers of subjects to our treatment conditions? Expectations from statistical theory are based upon extremely large sample sizes, much larger than those used in any experiment we will ever analyze. Since we are dealing with the "short run," where we have no assurance that our treatment groups are in fact matched on all relevant factors except the experimental treatments, how can we determine whether the differences we observe in the experiment are due either to the experimental treatments or to these chance differences or to both?

Let us consider, in general terms, a statistical solution to this disturbing problem.