MICHAEL J. BETTINGER (State Bar No. 122196)
RACHEL R. DAVIDSON (State Bar No. 215517)
K&L GATES LLP
55 Second Street, Suite 1700
San Francisco, CA 94105
Phone: 415-882-8200
Facsimile: 415- 882-8220

J. MICHAEL KEYES (*PRO HAC VICE*)
KJIRSTIN J. GRAHAM (State Bar No. 239485)
K&L GATES LLP
618 West Riverside Avenue, Suite 300
Spokane WA 99201-0602
Phone: 509-624-2100
Facsimile: 509-456-0146

Attorneys for Defendant
ABERCROMBIE & FITCH TRADING CO.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LEVI STRAUSS & CO.,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　v.<br><br>ABERCROMBIE & FITCH TRADING CO.,<br><br>　　　　　　　　　　　Defendant.<br>_____<br>ABERCROMBIE & FITCH TRADING CO.,<br><br>　　　　　　　　　　　Counter-Claimant,<br><br>　v.<br><br>LEVI STRAUSS & CO.,<br><br>　　　　　　　　　　　Counter-Defendant. | Case No. CV-07-3752-JSW<br><br>**REPLY IN SUPPORT OF ABERCROMBIE & FITCH TRADING CO.'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE: September 26, 2008<br>TIME: 9:00 a.m.<br>COURTROOM: 2 |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION & SUMMARY OF THE ARGUMENT ........................................ iv

II. LAW & ARGUMENT ................................................................................................ 1

    A. Dr. Sood's Survey—Even If Admissible—Is Not Sufficient to Preclude Summary Judgment on LS&Co.'s Trademark Infringement Claims. ............... 1

    B. LS&Co. Has Not Established a Genuine Issue of Fact as to Relevant Sleekcraft Factors ............................................................................................ 2

        1. LS&Co. Effectively Concedes That There is No Point-of-Sale Confusion. ............................................................................................. 2

        2. LS&Co.'s Claim That Abercrombie Ignored Post-Sale Confusion Is Baseless. ............................................................................ 2

        3. LS&Co. Has Not Established the Strength of the Arcuate Trademark. ............................................................................................ 4

        4. LS&Co.'s Assertions that the Two Designs are Similar Is Unfounded. ............................................................................................ 6

        5. Third Party Settlement Agreements Are Relevant And Admissible ............................................................................................. 8

        6. Lack of Overlap in Marketing Channels Weighs in Abercrombie's Favor. ........................................................................... 10

        7. Jeans Purchasers Are Sophisticated. .................................................... 11

        8. Evidence of Abercrombie's Lack of Intent to Capitalize on the Arcuate Design is Undisputed. ............................................................ 12

    C. Abercrombie is Entitled to Summary Judgment on LS&Co.'s Trademark Dilution Claim ............................................................................. 13

        1. As a Matter of Law, the Arcuate Mark is Not Famous. ...................... 13

        2. As a Matter of Law There is No Likelihood of Dilution. ................... 13

III. CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORIES

**Page**

**Federal Cases**

*Academy of Motion Picture Arts & Science, Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*,
  944 F.2d 1446 (9th Cir. 1991) ............................................................................................ 3

*American Intern't Group, Inc. v. London Am. Intern't*,
  664 F.2d 348 (2d Cir. 1981) ............................................................................................... 9

*Blue Bell, Inc. v. Jaymar-Ruby, Inc.*,
  497 F.2d 433 (2d Cir. 1974) ............................................................................................. 11

*Entrepreneur Media, Inc. v. Smith*,
  279 F.3d 1135 (9th Cir. 2002) ........................................................................................... 11

*Fossil Inc. v. Fossil Group*,
  49 U.S.P.Q. 2d 1451 (T.T.A.B. 1998) ........................................................................... 6, 13

*General Mills, Inc. v. Health Valley Foods*,
  24 U.S.P.Q.2d 1270 (T.T.A.B. 1992) ............................................................................ 6, 13

*Kargo Global, Inc. v. Advance Magazine Publrs., Inc.*
  2007 U.S. Dist. LEXIS 57320 (S.D.N.Y. Aug. 6, 2007) ................................................ 1, 5

*Levi Strauss & Co. v. Vivat Holdings PLC*,
  2000 TTAB LEXIS 817 (Trademark Trial & App. Bd. Dec. 19, 2000) ............................ 13

*Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*,
  631 F. Supp. 735 (S.D.N.Y. 1985) ................................................................................. 3, 4

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  525 F.Supp.2d 576 (S.D.N.Y. 2007) ........................................................................ 6, 7, 14

*M2 Software, Inc., v. Madacy Entertainment*,
  421 F.3d 1073 (9th Cir. 2005) .......................................................................................... 11

*Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*,
  856 F.2d 1445 (9th Cir. 1988) ............................................................................................ 7

*Mushroom Makers, Inc. v. R.G. Barry Corp.*,
  441 F. Supp. 1220 (S.D.N.Y. 1977) ................................................................................. 10

*Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*,
  486 F. Supp. 414 (S.D.N.Y. 1980) ................................................................................ 9, 10

*Playboy Enterprises, Inc.*,
  F.3d 1020, 1027 (9th Cir. 2004) ......................................................................................... 1

*Quill Natural Spring Water, Ltd. v. Quill Corp.*,
  1994 U.S. Dist LEXIS 14418 (N.D. Ill. 1994) ...................................................................... 9

*Richards v. Cable News Network, Inc.*,
  15 F. Supp. 2d 683 (E.D. Pa. 1998) ....................................................................................... 9

*Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*,
  748 F.2d 669 (Fed. Cir. 1984) ................................................................................................ 9

Starbucks Corp. v. Lundberg,
  2005 U.S. Dist. LEXIS 32660 (D. Or. November 29, 2005) ............................................... 14

*Swedish Beer Export Co. v. Canada Dry Corp.*,
  469 F.2d 1096 (C.C.P.A. 1972) ........................................................................................... 10

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
  295 F.3d 623 (6th Cir. 2002) ............................................................................................... 11

**Other Authorities**

4 McCarthy § 24:72 (2008) ........................................................................................................ 15

## I. INTRODUCTION & SUMMARY OF THE ARGUMENT

Levi Strauss & Co. ("LS&Co.") has failed to establish facts sufficient to defeat Abercrombie & Fitch Trading Co.'s ("Abercrombie") motion for summary judgment on all of LS&Co.'s claims. LS&Co.'s Opposition to Abercrombie's Motion is a futile attempt by a dinosaur to the denim industry to resurrect a dying trademark that, perhaps, may have been famous long ago, but has since become an obscure shadow in the marketplace. LS&Co.'s Opposition, once stripped of its trivial challenges to the undisputed evidence shows that LS&Co. has missed the proverbial boat. LS&Co. has knowingly consented and allowed third-party denim brands—many bearing back-pocket stitching designs similar to the arcuate design—to infiltrate the marketplace. In such a crowded market, the likelihood of confusion is significantly diminished.

Indeed, the undisputed facts establish that there is no likelihood of confusion in *any* context—whether point-of-sale or post-sale environments. Even if the Court were to consider LS&Co.'s inadmissible survey evidence, Dr. Sood's survey found only a 9% rate of confusion between the RUEHL and LS&Co.'s arcuate stitching designs. As a matter of law, this is insufficient. LS&Co.'s Opposition completely ignores this point.

LS&Co.'s dilution claim likewise fails. LS&Co.'s own cited legal authority—*Levi Strauss & Co. v. Vivat Holdings PLC*—rejected its claim that the arcuate mark is famous. LS&Co.'s parade of advertising submitted does not change this result. Even without the *Vivat* case, LS&Co.'s dilution claim cannot stand. Its "evidence" of fame of the arcuate design is flawed and meaningless. More fundamentally, LS&Co. continues to rely solely and impermissibly on its "evidence" of likelihood of confusion to support a finding of likelihood of dilution. This folly is fatal to its dilution claims as a matter of law.

Therefore, the Court should grant Abercrombie's Motion for Summary Judgment on all of LS&Co.'s Claims.

## II. LAW & ARGUMENT

### A. Dr. Sood's Survey—Even If Admissible—Is Not Sufficient to Preclude Summary Judgment on LS&Co.'s Trademark Infringement Claims.

LS&Co. claims *Playboy Enterprises* supports its position that even when a defendant criticizes the methodology of plaintiff's expert, who LS&Co. points out in *Playboy* is "A&F's own expert, Dr. Ford"—a survey by itself is enough to preclude summary judgment. Opposition, pp. 1-2. As an initial matter, the Dr. *Gary* Ford in *Playboy* is not the same Dr. Gerald L. Ford that Abercrombie has retained in this case.[1] Moreover, *Playboy* is readily distinguishable. There, the defendants moved to exclude plaintiff's expert's report, but the district court denied the motion. The district court's evidentiary ruling was not appealed and so the court considered it admissible evidence. *Playboy Enterprises, Inc.*, 354 F.3d 1020, 1027 (9th Cir. 2004). Moreover, the plaintiff's expert's report was "uncontradicted," thereby creating a genuine issue of fact as to likelihood of confusion. *Id*. Here, Dr. Sood's report is flatly contradicted by Dr. Ford's report showing a **zero** rate of confusion. Abercrombie's Motion to Exclude Dr. Sood's Report, also argues that the fundamental flaws in Dr. Sood's survey establish that his report is inadmissible. LS&Co. completely ignores Abercrombie's argument that even if Dr. Sood's survey results were admissible, they are insufficient to create an issue of fact. As discussed in Abercrombie's Motion, pp. 15-16, Dr. Sood's survey results show a supposed "16%" rate of confusion between the RUEHL and LS&Co. stitching designs. But once the Citizens jeans stitching design that produced a 7% rate is subtracted, Dr. Sood's report demonstrates only a 9% rate of confusion between the RUEHL and LS&Co. designs. *See Kargo Global, Inc. v. Advance Magazine Publrs., Inc.*, 2007 U.S. Dist. LEXIS 57320, *17-18, n. 8 (S.D.N.Y. Aug. 6, 2007) ("The percentage of confusion occurring among participants in the control group is subtracted from the percentage of confused participants in

---

[1] A simple review of Dr. Ford's list of Trial Testimony matters from 1992-2004 should have alerted LS&Co. to this mistake. *See* Exh. B to Rebuttal Declaration of Gerald L. Ford, Exh. C to Declaration of Michael J. Bettinger in Support of Abercrombie's Motion to Exclude Dr. Sood's Report.

the test group, pursuant to standard protocol, as noise that should be discarded.") Confusion survey results below 10% are evidence that confusion is *not* likely. Accordingly, Dr. Sood's survey does not create a genuine issue of fact as to likelihood of confusion.

**B.    LS&Co. Has Not Established a Genuine Issue of Fact as to Relevant Sleekcraft Factors.**

    **1.    LS&Co. Effectively Concedes That There is No Point-of-Sale Confusion.**

LS&Co. states that "there are possibilities for confusion at point of sale," (Opposition at p. 2) but offers no evidence to support its contention. Rather, LS&Co. devotes all its efforts on showing post-sale confusion. LS&Co. attempts to orchestrate an argument that point-of-sale confusion is possible by claiming that consumers looking at RUEHL jeans shown on the Internet "could just as easily be affiliated with LS&Co. as with A&F." Opposition p. 17. Besides offering no evidentiary support for this claim, LS&Co.'s statement is based on a confused understanding of the law. Whether RUEHL is affiliated with Abercrombie is irrelevant. In fact, the RUEHL design was created to be identified exclusively with RUEHL. Exh. C to Declaration of J. Michael Keyes in Support of Abercrombie's Motion for Summary Judgment ("Keyes Dec.") at 28:17-29:25; Exh. A to the Declaration of Michael J. Bettinger in Support of Defendant Abercrombie & Fitch's Motion for Summary Judgment ("Bettinger Dec.") at 74:13-17. The inquiry is whether the distinctive RUEHL design is likely to be confused with LS&Co.—not whether it is equally possible to be affiliated with Abercrombie. Thus, LS&Co. effectively concedes that there is no likelihood of point-of-sale confusion.

    **2.    LS&Co.'s Claim That Abercrombie Ignored Post-Sale Confusion Is Baseless.**

LS&Co. tries to argue that Abercrombie's *Sleekcraft* analysis of similarity of marks and channels of trade ignores post-sale confusion. Its claim has no basis in fact. As an overall point, LS&Co.'s needless preoccupation on post-sale confusion improperly truncates the *Sleekcraft* analysis, and fails to recognize that regardless of the type of alleged confusion at issue—point-of-sale, initial interest, or post-sale confusion—the court's likelihood of

confusion analysis is guided by an evaluation of all the *Sleekcraft* factors. *Academy of Motion Picture Arts & Science*, *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1454-55 (9th Cir. 1991) (stating in the post-sale confusion context, "the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks"). Nonetheless, Abercrombie clearly has addressed post-sale confusion. Its likelihood of confusion survey was specifically designed to simulate the post-sale environment. Ford Report, p. 7, ¶ 17 ("Respondents were asked to look at the jeans in the photograph as they would if they saw someone wearing the jeans"). Abercrombie's consumer survey showed that there was zero confusion attributable to the RUEHL design period—it is not limited to point-of-sale confusion. *See Id*. at 43, ¶ 62. LS&Co.'s claim that Abercrombie has not addressed this form of confusion is simply imaginary.

LS&Co. relies on the *Payless/Reebok* case for its claim that pre-sale factors, such as marketing channels, consumer sophistication and price-points of the products, are not relevant to this case. Opposition, pp. 17-19. LS&Co. does not practice what it preaches. In fact, LS&Co's own consumer confusion survey is based on pre-sale considerations. For example, its survey participants must "[have] purchased jeans in the last six months that costs at least $75, or planned to do so in the next six months." Sood Report, p. 8. Dr. Sood admitted that his survey was based on pre-sale considerations, testifying that "it would be hard to exactly know how much a pair of jeans costs in a post-sale environment." Sood Depo, p. 137:11-19. Moreover, LS&Co.'s survey participants included consumers that had purchased jeans in the last six months, although post-sale confusion focuses on prospective purchasers. *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 747 (S.D.N.Y. 1985) (post-sale confusion is considered to be confusion on the part of someone *other* than the purchaser). LS&Co. cannot have it both ways. LS&Co.'s claim that Abercrombie has ignored post-sale confusion amounts to a last ditch effort to resurrect a failing case. LS&Co. does not succeed.

### 3. LS&Co. Has Not Established the Strength of the Arcuate Trademark.

LS&Co. cites *Lois Sportswear* for the proposition that the arcuate is a "strong mark." But the *Lois Sportswear* opinion was issued over twenty years ago in 1985—before LS&Co. was surpassed by a surge in third-party denim brands entering the market and before the arcuate design was crowded out by similar third-party stitching designs. *See* Exhs. B to E-25 to Bettinger Dec.; Sanger Dec., ¶ 5; Exh. A to Abercrombie's Counterclaims, pp. 2-4 ("high-priced, hip-hugging jeans [have] soared in popularity" and "[e]xcutives at Levi concede that they missed important fashion trends as the denim industry ballooned over the last several years"; LS&Co. has failed to "exploit the designer denim boom in what is widely regarded as one of the biggest debacles in the American clothing business.").

LS&Co. asserts that Abercrombie's "crowded field" argument has already been made and defeated. But it cites only *Lois Sportswear*, a 1985 case that pre-dates the rise of today's crowded market. Moreover, in contrast to LS&Co.'s cited cases, Abercrombie *has* introduced evidence of third-parties' actual use and extent and length of use of the third-party designs. *See* Exhs. B to E-25 to Bettinger Dec. Many of those designs have been sold on the marketplace for several years and, of those, approximately six have been around for about ten years or more and four have been on the market since the 1980's. *See* Sanger Dec., ¶5. This evidence—together with the existence of twenty-nine similar third-party designs on the trademark registers (Exhs. F – X to Bettinger Dec.)—indicates that LS&Co.'s alleged enforcement efforts against other third-parties are too little, too late.

LS&Co. would like this Court to *infer* that third-parties are copying the arcuate mark, thereby indicating its "strength." LS&Co. Opposition, p. 7. But LS&Co. has not a shred of evidence that any of the similar third-party designs on the market were intended to duplicate the arcuate design. Moreover, it is difficult to credit LS&Co.'s belief that third-parties are duplicating its arcuate design when LS&Co. has asserted claims against several third-parties alleging that their designs infringed the arcuate trademark, but in settlements of those claims

allowed no less than thirteen similar designs to remain on the marketplace. *See* Abercrombie's Opposition to LS&Co.'s Motion for Summary Judgment, pp. 3-5.

Abercrombie has also demonstrated that similar stitching designs crowding the market have significantly impacted the strength of the arcuate design, which perfectly coincides with the plummet in consumer recognition of the arcuate mark and the enormous drop in LS&Co.'s sales. *See* Abercrombie's Motion for Summary Judgment, pp. 7-8, & n.6. Contrary to LS&Co.'s claim, its survey evidence from prior cases requires no expert interpretation to see that the arcuate design has experienced a plummet in consumer recognition. LS&Co.'s attempt to obscure its downward spiral fails. The fact of the matter is, though, Abercrombie's 17% recognition figure is fully supported by Dr. Ford's testimony. As he indicated in his deposition, Dr. Scott's survey showed actual recognition of the arcuate design in the "teens or low twenties." *See* Dr. Ford Deposition, p. 177:25-178:5, attached as Exhibit A to the Declaration of Rachel R. Davidson in Support of Defendant Abercrombie & Fitch Trading Co.'s Reply re Its Motion for Summary Judgment ("Davidson Dec."). For example, in *Levi Strauss v. Edwin*, LS&Co. produced a "jeans recognition" survey. *See* Supplemental Expert Report of Carol A. Scott, July 27, 2001, attached as Exhibit B to the Davidson Dec. In that survey, 53% of the individuals surveyed that identified the Levi's back pocket as a Levi's product did so because of the "back pocket stitching" or the "stitching design." *Id.* at LS-A&F009588. By contrast, 35.7% of the individuals surveyed that identified a "Lucky" jeans as a Levi's product did so because of the "pocket stitching" or "stitching design." *Id.* When the percentage in the control group (Lucky) is subtracted form the percentage in the test group (Levi's), the recognition is 17.3%. This simple subtraction of the control group percentage from the test group percentage is "standard protocol." *Kargo Global, Inc.,* 2007 WL 2258688 at *18 n.8 .

Furthermore, LS&Co.'s reliance on its advertising and sales is meaningless. If a party is to rely on sales and advertising figures to establish that its mark is famous, then it is

incumbent on that party to place the figures in context, for example, by showing that the product is a leading product in its category. *Fossil Inc. v. Fossil Group*, 49 U.S.P.Q. 2d 1451, 1457 (T.T.A.B. 1998). Raw sales and advertising figures—which is all LS&Co. has introduced here—are generally not sufficient by themselves to establish that the mark is famous. *Id*. (mark not famous where party failed to put its sales and advertising figures in perspective by comparing them to the sales and advertising figures for similar products).

Considering that LS&Co.'s advertisements display many other product features other than the arcuate design, LS&Co.'s sales and advertising figures cannot be attributed to the arcuate stitching mark alone. *See* Exhs. C-N to Declaration of Robert Hanson in support of LS&Co.'s Motion for Summary Judgment ("Hanson Dec."). LS&Co. provides only raw figures and does not even attempt to put its advertising figures into context with other competing products or break down what portion of the total expenditures are attributable only to the arcuate design. *See* Hanson Dec. ¶¶ 9-23. The Court is left to speculate as to what advertising and sales figures relate only to the arcuate design and the actual impact of LS&Co.'s arcuate design alone on the minds of consumers. *General Mills, Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270, 1277 (T.T.A.B. 1992). For these reasons, LS&Co.'s mark is weak and this factor remains in Abercrombie's favor.

### 4. LS&Co.'s Assertions that the Two Designs are Similar Is Unfounded.

LS&Co.'s effort to manufacture similarities between the designs amounts to an act of desperation. It's first identified similarity—both designs take the "general shape" of an arcing "V" not only is verifiably wrong, but improperly claims trademark rights in a "general shape" or "look" of an arcing "V." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 525 F.Supp.2d 576, 594 (S.D.N.Y. 2007) is directly on point. In that case, Louis Vuitton, similarly to LS&Co. here, claimed trademark rights in a design pattern consisting of "styled shapes and letters," which it used on its handbags. The court rejected Louis Vuitton's attempt to claim ownership rights in a general shape or "look". It stated:

> Louis Vuitton seeks to take advantage of the theories underlying initial interest and post-sale confusion indirectly to assert rights in a 'look.' . . . Accepting Louis Vuitton's argument would lead to the absurd premise that its Multicolore Monogram trademark would be infringed by any bag with relatively the same color and shape of the Louis Vuitton handbag when viewed from a few blocks away.

*Id.* LS&Co.'s attempt to take advantage of post-sale confusion indirectly to assert trademark rights in "[the] general shape" of an arcing "V," should similarly be rejected.

LS&Co.'s second identified similarity is based on purported stitching similarities between the designs which "sometimes" exist. LS&Co. fails to offer any evidentiary support for its claim that the RUEHL design has ever contained a double line of stitching like the arcuate. *Cf.* LS&Co.'s registrations, Exh. B to Complaint *with* Exh. D to Supplemental Declaration of Gia Cincone in support of LS&Co.'s Opposition. Moreover, the "curved or arched set of *two lines*" was a feature that the T.T.A.B. cited as constituting "the overall impression and perception" of the Lee Cooper stitching design and LS&Co.'s arcuate in the *Vivat Holdings PLC* case that LS&Co. cites. *See* Opposition, p. 12 (emphasis supplied). The accused RUEHL design contains no such feature. Exh. C to Complaint.

Faced with these crucial differences, LS&Co. attempts to minimize them by asserting that, in the post-sale setting, the differences in the designs "will likely not be noticed and certainly not reliably credited by consumers" because the designs will be seen as worn by people who are moving and bending. *Id.* at 13. Once again, LS&Co. cites no evidence to support its assertion. LS&Co.'s arguments, offered with no supporting facts, are not evidence, and they certainly are not sufficient to create an issue of fact. Furthermore, contrary to Levi's claim, the existence of widespread third-party designs similar to the arcuate being used in the marketplace is *not* contradictory to Abercrombie's position, but underscores Abercrombie's point that, in such a crowded market consumers will distinguish the designs from each other, and thus consumer confusion is less likely. *See Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) ("In such a crowd,

customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other").

### 5. Third Party Settlement Agreements Are Relevant And Admissible.

This season, LS&Co. has decided to change its wardrobe of arguments. In contrast to arguments LS&Co. made just a few years ago in prior litigation, it no longer believes that its settlements with third-party infringers are "important evidence" that should be admitted. It no longer believes that third-party settlements are "probative of strength and fame" of its trademark. It no longer believes Fed. Rule Evid. 408 does not bar admissibility of third-party settlements. Davidson Decl., Exh.C at p.2. Whatever is fashionable, LS&Co. will wear—even if its prior admissions completely undermine its present position.

In support of its motion, Abercrombie submits LS&Co.'s prior settlement agreements, including a settlement in a 2004 case involving a stitching design LS&Co. refers to as "Brand X",[2] to establish: (1) LS&Co.'s arcuate mark has lost significance and fame because LS&Co. has allowed admittedly infringing marks to be sold in the marketplace; (2) LS&Co.'s has failed to uniformly police and enforce its trademark rights; and (3) LS&Co.'s has waived its rights to enforce its trademark against Abercrombie. LS&Co. has explicitly admitted that "settlements are highly probative of the strength and fame of a trademark, and courts *routinely* admit such evidence." *Id.* p. 2 (emphasis added). It also admits that third-party settlement agreements are relevant to LS&Co.'s scope of enforcement and public recognition of its mark. *Id.* Abercrombie is taking the same position here. Now, when the tables are turned, LS&Co. has a sudden change of heart.

As LS&Co. has recognized, Courts routinely admit settlement agreements in trademark cases. *See*, *e.g. Mcdonald's Corp. v. McBagel's, Inc.*, 649 F. Supp. 1268, 1274

---

[2] For the sake of consistency, and to alleviate the need to file this brief under seal, Abercrombie will also refer to the stitching design from the third-party case as "Brand X." The referenced third-party is identified in Abercrombie's Motion for Summary Judgment, p. 10-11.

(S.D.N.Y. 1986) (court relied on settlement agreements to determine distinctiveness of mark); *American Intern't Group, Inc. v. London Am. Intern't*, 664 F.2d 348, 352 (2d Cir. 1981) (court reviewed evidence of enforcement in evaluating strength of mark); *Richards v. Cable News Network, Inc.*, 15 F. Supp. 2d 683, 691 (E.D. Pa. 1998) (court held plaintiffs' mark to be weak after evaluating settlement agreement relied by plaintiff to establish strength of trademark); *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*, 748 F.2d 669, 674-75 (Fed. Cir. 1984) (prior enforcement and success used to establish fame of mark); *Quill Natural Spring Water, Ltd. v. Quill Corp.*, 1994 U.S. Dist LEXIS 14418, *21-22 (N.D. Ill. 1994) (settlement agreements relied on to indicate strength of mark). Abercrombie seeks to do exactly what these cases authorize and LS&Co., itself, has condoned: to show that the arcuate mark has lost significance and is not, as LS&Co. claims, a strong or famous mark. For example, Abercrombie relies on the RP55 settlement to show that LS&Co. is knowingly allowing allegedly infringing third-party designs to remain in the marketplace. LS&Co.'s actions here are directly relevant to Abercrombie's affirmative defense and counterclaim for abandonment.

LS&Co. summarized appropriately the merits of the position that third-party settlement agreements are inadmissible under Rule 408 when it said this is a "straw man argument." Davidson Decl., Ex. C at p. 2. Tellingly, LS&Co. does not articulate exactly how Abercrombie is utilizing LS&Co.'s settlement agreements to establish liability or lack thereof in violation of Rule 408. LS&Co. relies on *Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*, 486 F. Supp. 414, 423 (S.D.N.Y. 1980), to support its position that trademark settlement agreements are barred by Fed. Rule Evid. 408. *Playboy* is factually distinguishable.

In *Playboy*, the defendant sought to use a settlement agreement between Playboy and Playgirl, a magazine not in direct competition with Playboy. *Id.* at 422-23. In rejecting the use of the settlement agreement, the court emphasized that the settlement agreement with Playgirl did not concern an area that was "most crucial to maintaining [Playboy's]

commercial value." *Id.* at 423. The court emphasized the different markets targeted by the respective magazines and noted that Playgirl was marketed to heterosexual females while Playboy targeted heterosexual males. *Id.* at 422. In contrast to the emphasis on different markets in *Playboy* and LS&Co.'s assertions in this case that the Brand settlement involved a jean that "catered to a different market and involved a different seller" (Opposition pp. 14, n. 8, 16), LS&Co. emphasized in the previous litigation that Brand X used the same marketing channels and targeted the same consumers as LS&Co. (LS&Co.'s Motion for Summary Judgment in *LS&Co. v. RP55, Inc.*, p. 15.) LS&Co. has made the same claims with respect to Abercrombie here. Accordingly, LS&Co.'s settlement agreement with Brand X is directly relevant to the strength and fame of LS&Co.'s arcuate mark, as well as the scope of its enforcement—factors to which LS&Co. has admitted its prior settlement agreements are relevant. *Id*. Davidson Dec. Ex.C p. 3. Unlike in fashion, LS&Co. should not be allowed to pick and chose its wardrobe to match the occasion.

LS&Co.'s attempt to distinguish the facts of *Swedish Beer Export Co. v. Canada Dry Corp.*, 469 F.2d 1096 (C.C.P.A. 1972) and *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441 F. Supp. 1220 (S.D.N.Y. 1977) does nothing to undermine the applicability of their principles here: LS&Co.'s agreement permitting Brand X—also a jeans seller in a market admittedly overlapping with LS&Co.—to use a similar stitching design undermines LS&Co.'s likelihood of confusion and is a factor that weighs strongly in Abercrombie's favor.

**6.    Lack of Overlap in Marketing Channels Weighs in Abercrombie's Favor.**

LS&Co. claims that the parties' marketing channels overlap because both parties sell jeans on the Internet.[3] Opposition, p. 17. The Ninth Circuit disagrees. "The general consensus that has emerged to date among the Courts of Appeals on this issue is that '[s]ome

---

[3] LS&Co.'s citation to the presence of a video on YouTube.com showing the RUEHL jeans underscores the frailty of its argument. LS&Co. knows full well that this video was improperly taken from Abercrombie, and was posted on YouTube without Abercrombie's authorization. It is does not constitute "marketing" by Abercrombie. A&F's Response to LS&Co.s 2nd Set of RFP, No. 51.

use of the Internet for marketing . . . does not alone and as a matter of law constitute overlapping marketing channels.'" *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002) (emphasis in original); *M2 Software, Inc., v. Madacy Entertainment*, 421 F.3d 1073, 1083-84 (9th Cir. 2005) (no overlap in marketing channels where products both appeared on the internet); *see also*, *Therma-Scan, Inc. v. Thermoscan*, Inc., 295 F.3d 623, 637 (6th Cir. 2002) ("reference to Internet use is no more proof of a company's marketing channels than the fact that it is listed in the Yellow Pages of the telephone directory"). Thus, this *Sleekcraft* factor weighs in Abercrombie's favor as a matter of law.

Knowing this, LS&Co. claims that the parties' marketing channels are immaterial, because this is solely a post-confusion case. Opposition, p. 18. Other than declare this factor irrelevant, LS&Co. fails to explain how its cursory dismissal of this *Sleekcraft* factor advances its case, or otherwise makes a difference in this case. In fact, LS&Co.'s position that marketing channels are irrelevant ends any debate on whether this *Sleekcraft* factor creates an issue of fact. LS&Co. concedes it does not.

**7.     Jeans Purchasers Are Sophisticated.**

LS&Co. asserts that Abercrombie presented no evidence of jeans purchasers' sophistication and then asserts that "a jeans purchase is not momentous for some consumers" and that purchasers of apparel products as gifts "may not be as versed in the differences among brands as the recipient." Opposition, p. 19. In contrast to LS&Co. which, despite its same critique of Abercrombie, cites *no evidence* to support its assertions, Abercrombie presented evidence that LS&Co. admittedly targets "progressive consumers" or "modern progressives" whose tastes are "sophisticated." Exh. B to Keyes Dec. at 61:1-12; 89-2-15. Abercrombie also cited evidence that the parties' jeans are sold around $100 or higher. *Id.* at 55:2-16; 58:24-59:25; Exh. D to Keyes Dec. at 45:1-15. Purchasers at these price points are not casual buyers as LS&Co. suggests. *See Blue Bell, Inc. v. Jaymar-Ruby, Inc.*, 497 F.2d 433, 435-436 n.5 (2d Cir. 1974) (expensive price range and fairly detailed purchasing process

reduce likelihood that consumers will be misled; purchases, which involved personal examination and fitting of sportswear, were not "casual").

### 8. Evidence of Abercrombie's Lack of Intent to Capitalize on the Arcuate Design is Undisputed.

LS&Co.'s groundless evidentiary objections and attempt to discredit the testimony of its own executive officer, Mr. Breitbard, is just plain damage control. <u>LS&Co.'s current position amounts to a charge that its own President willfully infringed its trademark.</u> Opposition p. 20. That position illustrates the extent of LS&Co.'s desperation. The bottom line is LS&Co.'s assertions that Abercrombie intended to capitalize on the arcuate design are not supported by the evidence *See* Exh A to Bettinger Dec. at 74:7-17; 76:11-14; 77:4-78:3; 78:10-14; 78:20-79:6; 82:2-12; 83:6-11; 85:10-18.

LS&Co. tries to establish intent, by asserting that Abercrombie's "efforts to create a design for RUEHL jeans almost all involve derivatives of other marks." Opposition p. 20. LS&Co. relies solely on three pictures paired next to pictures of three registered trademarks by other companies, one of which is the arcuate. *See* Opposition, pp. 20-21. LS&Co., however, fails to mention that the three proposed designs it characterizes as "almost all" of Abercrombie's efforts to create a design for RUEHL jeans are only three among approximately seventy pages of proposed designs for the RUEHL jeans. *See* Exh. K to Supp. Cincone Dec. at 25:12-21; Exh. D to Davidson Dec. This deliberate manipulation of the evidence again underscores the hopelessness of LS&Co's case.

In any event, LS&Co. cites no legal authority for the proposition that Abercrombie's consideration of various designs for its RUEHL jeans, somehow suggests that Abercrombie intended to capitalize on any other company's design. Its claim is flatly contradicted by the clear evidence in this case. *See* Opposition, pp. 20-21. *See* Exh. C to Keyes Dec. at 45:9-47:9; Exh. A to Bettinger Dec. at 76:18-78:23; 81:19-83:25; 92:14-94:23. This factor is not even close. It unquestionably weighs in favor of Abercrombie.

**C.   Abercrombie is Entitled to Summary Judgment on LS&Co.'s Trademark Dilution Claim**

**1.   As a Matter of Law, the Arcuate Mark is Not Famous.**

LS&Co.'s own cited legal authority holds that the Arcuate mark is not famous. It cites *Levi Strauss & Co. v. Vivat Holdings PLC*, 2000 TTAB LEXIS 817 (Trademark Trial & App. Bd. Dec. 19, 2000). In *Vivat,* the Trademark Trial and Appeals Board held that the arcuate mark was not famous due to widespread third-party use. LS&Co.'s submission of sales and advertising figures did not change the result. *Vivat* is directly on point. But, even without *Vivat,* the evidence presented by Abercrombie, including the extensive third-party use of similar designs and LS&Co.'s own survey evidence showing a tremendous drop in consumer recognition of the double arcuate establishes as a matter of law that LS&Co.'s arcuate design is not famous.

LS&Co. has the burden to establish that the arcuate mark is famous. First, it has failed to connect its sales and advertising of the arcuate in context with the sales and advertising of competitors in the marketplace. *Fossil Inc. v. Fossil Group*, 49 U.S.P.Q. 2d 1451, 145 (T.T.A.B. 1998) Moreover, the impact of the arcuate on the minds of consumers by virtue of LS&Co.'s sales and advertising is speculative, at best. *General Mills, Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1220, 1277 (T.T.A.B. 1992). Second, LS&Co.'s has not met its burden, simply because its claims do not have evidentiary support. LS&Co. cites no evidence for the proposition that the arcuate is "reinforced to the public when these jeans are worn – in huge numbers – in everyday life. Opposition. p. 21. Just because LS&Co. says the arcuate mark is famous does not make it so.

**2.   As a Matter of Law There is No Likelihood of Dilution.**

There is another equally compelling reason LS&Co.'s dilution claims fail is that LS&Co. cannot prove that the RUEHL design is likely to cause dilution. First, LS&Co. argument shows that the RUEHL design and arcuate are not identical. Opposition, p. 23.

Second, LS&Co. is not engaging in substantially exclusive use of the mark as evidenced by the presence of numerous third-party designs *in use* on the market, many for a considerable length of time, including the Brand X design, which includes the same downward-sloping arches that LS&Co. claims is the feature of the arcuate. Third, as discussed in Abercrombie's Motion and related Reply to Exclude Dr. Sood's Report, LS&Co.'s reliance on Dr. Sood's "recognition survey" is misplaced as those survey results and his conclusions are "meaningless." Ford Rebuttal, ¶ 31, Exh. C to Declaration of Michael J. Bettinger in Support of Motion to Exclude. Fourth, as set forth above, LS&Co. has no evidence—other than mere conjecture drawn from pairing a few selected pictures side-by-side—that Abercrombie intended to associate the RUEHL design with the arcuate. Opposition, pp. 22, 24.

Lastly, the *Nabisco* and *Starbucks* cases relied upon by LS&Co. were decided before the Trademark Dilution Revision Act of 2006 (the "TDRA") was enacted and *Starbucks* involved a state dilution claim under Oregon law. *Starbucks Corp. v. Lundberg*, 2005 U.S. Dist. LEXIS 32660, \*17 (D. OR. November 29, 2005). Recent authority makes clear that evidence of confusion cannot be used to establish dilution:

> Infringement by a likelihood of confusion and dilution can coexist as legal findings only if it is proven that a significant number of customers are likely to be confused and that among a significant number of other customers who are **not confused**, by the defendant's use will illegally dilute by blurring or tarnishment, but **one state of mind does not overlap with the other in one person**.

*Louis Vuitton*, 525 F. Supp. 2d at 599 (emphasis supplied).

LS&Co.'s unsupported assertion, that it does not "make sense" that a "confused" consumer mistakenly identifying a RUEHL jean as produced by LS&Co. establishes dilution is nothing more than a self-serving opinion. Opposition, p. 24. It is also not the law. The mental connection in the consumers' mind for dilution purposes "'is not that which serves as the basis of liability for trademark infringement—the mistaken belief that the plaintiff is in some way associated with defendant's goods—but rather is the accurate recognition that a

mark associated with the plaintiff is now also in use as an identifying symbol by another.'" *See* 4 McCarthy § 24:72 (2008) (citing Restatement (Third) of Unfair Competition, § 25, comment f (1995). Telling, LS&Co. fails entirely to address these authorities, instead relies on out-dated, inapposite case law.

### III. CONCLUSION

For the reasons set forth herein, Abercrombie respectfully requests this Court grant Abercrombie's motion.

Dated: September 12, 2008   Respectfully submitted,

**K&L Gates LLP**

By: */s/Rachel R. Davidson*
Michael J. Bettinger
Rachel R. Davidson
J. Michael Bettinger

Attorneys for Defendant
ABERCROMBIE & FITCH TRADING CO.