TOWNSEND AND TOWNSEND AND CREW LLP
GREGORY S. GILCHRIST (State Bar No. 111536)
GIA L. CINCONE (State Bar No. 141668)
RAQUEL PACHECO (State Bar No. 245328)
Two Embarcadero Center, Eighth Floor
San Francisco, California  94111
Telephone: (415) 576-0200
Facsimile: (415) 576-0300
Email: gsgilchrist@ townsend.com;
glc@townsend.com; rpacheco@townsend.com

Attorneys for Plaintiff/Counterdefendant
LEVI STRAUSS & CO.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LEVI STRAUSS & CO., | Case No.    C-07-03752 JSW |
| Plaintiff/Counterdefendant, | **PLAINTIFF LEVI STRAUSS & CO.'S OBJECTIONS TO EVIDENCE SUBMITTED BY DEFENDANT ABERCROMBIE & FITCH TRADING CO.** |
| v. | |
| ABERCROMBIE & FITCH TRADING CO., | |
| Defendant/Counterclaimant. | |
| ABERCROMBIE & FITCH TRADING CO., | Date:          September 26, 20008 |
| Defendant/Counterclaimant, | Time:          9:00 a.m. |
| | Courtroom:   2, 17th Floor |
| v. | Honorable Jeffrey S. White |
| LEVI STRAUSS & CO., | |
| Plaintiff/Counterdefendant. | |

1

# TABLE OF CONTENTS

2
**Page**

3  I.    INTRODUCTION ....................................................................................................1

4  II.   THIRD PARTY SETTLEMENT AGREEMENTS ARE INADMISSIBLE..................1

5        A.    Federal Rule Of Evidence 408 Applies To Third Party Settlements....................1

6        B.    The Third Party Settlements Are Inadmissible Under Rule 408 .........................2

7  III.  SURVEYS FROM THIRD PARTY CASES AND A&F'S ANALYSIS OF
       THEM IS INADMISSIBLE .......................................................................................4

8
9        A.    The Surveys Were Conducted At Different Times Using Different
             Methodologies And Were Never Designed To Produce A
             Comparative Analysis .....................................................................................5

10
11       B.    A&F's Analysis Must Be Excluded ..................................................................6

12 IV.   CONCLUSION .......................................................................................................7

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Green v. Baca*,
    226 F.R.D. 624 (C.D. Cal. 2005)................................................................................ 2

*Howmedica Ostenonics Corp. v. Tranquil Prospects, Ltd.*,
    482 F. Supp.2d 1045 (N.D. Ind. 2007).................................................................. 5, 7

*Hudspeth v. Commissioner of Internal Revenue Serv.*,
    914 F.2d 1207 (9th Cir. 1990)................................................................................. 2

*Invitrogen Corp. v. Clontech Labs., Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005)............................................................................ 5, 7

*Nabisco, Inc. v. PF Brands, Inc.*,
    50 F. Supp. 2d 188 (S.D.N.Y. 1999), *aff'd*,
    191 F.3d 208 (2d Cir. 1999)................................................................................... 4

*Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*,
    486 F. Supp. 414 (S.D.N.Y. 1980) ...................................................................... 3, 4

*United States v. Contra Costa County Water Dist.*,
    678 F.2d 90 (9th Cir. 1982).................................................................................... 2

**Rules**

Federal Rule of Civil Procedure 26 ............................................................................ 1

Federal Rule of Evidence 408 ......................................................................... 1, 2, 3, 4

Federal Rule of Evidence 701 ................................................................................... 4

Federal Rule of Evidence 702 .............................................................................. 1, 4

## I.    INTRODUCTION

Abercrombie & Fitch Trading Co. ("A&F") relies heavily on inadmissible evidence to claim that Levi Strauss & Co.'s ("LS&CO.") Arcuate Trademark is "fatally weak" and "abandoned" rather than famous.  The contested evidence consists of third party settlement agreements, as well as surveys in third party cases from which A&F makes arguments that were not disclosed in expert discovery, are not sponsored by A&F's expert, and include conclusions and reasoning no expert would ever support.  Combined with A&F's attempt to exclude Dr. Sanjay Sood's testimony and survey, this evidence is the centerpiece of A&F's opposition to LS&CO.'s pending partial summary judgment motion and A&F's summary judgment motion.

The third party settlements do not involve the pocket stitching design at issue in this case.  The conundrum posed by A&F's reliance on these agreements is that -- if LS&CO.'s mark is suffering somehow due to the presence of these designs in the marketplace -- there is no merit to A&F's argument that its own, more similar design should continue unabated.  There is more, however, than an absence of logic to A&F's contentions.  The rules of evidence do not permit the parties to engage in a protracted debate about the similarities and significance of settlement terms between LS&CO. and third parties.  The settlements are inadmissible under Federal Rule of Evidence 408 to prove a defense to LS&CO.'s infringement claims.

The third party surveys are not sponsored by any expert and were never conducted for the comparative purposes to which A&F now puts them.  Without an expert sponsor who can say that the contemplated comparisons are legitimate or appropriate, the surveys and A&F's analysis of them are inadmissible hearsay for which no exception exists, and violate the Federal Rule of Civil Procedure 26 disclosure requirement that any evidence under Federal Rule of Evidence 702 be identified and described by an expert report.  The arguments based on the surveys explain why A&F did not ask its "renowned" expert to draw the conclusions it advances in its brief.  The arguments ignore the express limitations and differing methodologies of the surveys, and rely on wholly illegitimate comparisons.

## II.    THIRD PARTY SETTLEMENT AGREEMENTS ARE INADMISSIBLE

### A.    Federal Rule Of Evidence 408 Applies To Third Party Settlements

Federal Rule of Evidence 408 ("Rule 408") provides that evidence of a party "furnishing or

offering or promising to furnish – or accepting or offering or promising to accept – a valuable

consideration in compromising or attempting to compromise a claim" is "not admissible on behalf of

any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as

to validity or amount."  The comments to the 1972 Proposed Rules confirm that the rule applies to

settlement agreements between a party to the litigation and a third person:  "While the rule is

ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken

with respect to completed compromises when offered against a party thereto.  This latter situation will

not, of course, ordinarily occur except when a party to the present litigation has compromised with a

third person."  Fed. R. Evid. 408, Advisory Committee Note.

The Ninth Circuit applies Rule 408 to exclude evidence of settlement agreements when the

party seeking to introduce such evidence was not a party to the settled litigation or to the compromise

agreement.  *Hudspeth v. Commissioner of Internal Revenue Serv.*, 914 F.2d 1207, 1213-14 (9th Cir.

1990); *United States v. Contra Costa County Water Dist.*, 678 F.2d 90, 92 (9th Cir. 1982); *see also*

*McDevitt v. Guenther*, 522 F. Supp. 2d 1272, 1284-86 (D. Haw. 2007) (following *Hudspeth* and

*Contra Costa County Water Dist.*); *Green v. Baca*, 226 F.R.D. 624, 640-41 (C.D. Cal. 2005) (same);

*Cook v. Yellow Freight Sys.*, 132 F.R.D. 548, 554 (E.D. Cal. 1990) (same).  The Ninth Circuit, and

district courts within the Circuit, all have emphasized that admitting evidence of settlement

agreements between a party to the litigation and a third party for the purpose of proving or disproving

liability for a claim or the value of a claim undermines the policies underlying Rule 408.  Permitting

third parties to take advantage of perceived protections in settlement agreements would severely

compromise the public policy favoring compromise and settlement of disputes.  *See, e.g., Hudspeth*,

914 F.2d at 1213-14; *Contra Costa County Water Dist.*, 678 F.2d at 92; *Green*, 226 F.R.D. at 641;

*Cook*, 132 F.R.D. at 554.

**B.     The Third Party Settlements Are Inadmissible Under Rule 408**

This rule bars evidence of trademark settlements in exactly the circumstances in which A&F

offers settlement agreements in this matter.  For example, a trademark defendant tried to take

advantage of a settlement that Playboy Enterprises had reached with the publishers of "Playgirl"

magazine.  The court ruled that the settlement was irrelevant:

To consider the terms of that settlement in this action would be improper and unjustified. It is well-established that statements made for purposes of settlement negotiations are inadmissible, and Rule 408 of the Federal Rules of Evidence extends the exclusion to completed compromises when offered against the compromiser. . . . [T]hat plaintiff settled with PLAYGIRL does not in fact establish what a court would have decided had the parties proceeded to trial. A host of factors may affect a litigant's decision to settle. Nor should hindsight be the guide in assessing the wisdom of plaintiff's settlement. Plaintiff might have made a mistake in not pursuing its rights with appropriate zeal against PLAYGIRL, but this does not preclude it from protecting its mark from future confusion with a magazine in direct competition for plaintiff's established market.

*Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F. Supp. 414, 423 n.10 (S.D.N.Y. 1980).

A&F offers no explanation for why it should receive the protection of settlements with other parties, some of them going back many years and involving designs that look nothing like the Ruehl design. These settlements most often involve agreements on behalf of third parties that eliminate use of stitching designs from the market. [1] A&F identifies no relevance to these agreements and, as discussed in other contexts related to these motions, has offered very little evidence to show that any of these designs are actually in use or that they have had any actual bearing on consumer impressions regarding the Arcuate Trademark. One thing is clear: the fact of the third party settlements -- as apart from the fact that products are or are not on the market -- has no bearing on public perceptions of the mark. But public perception of the marks, not LS&CO.'s settlement strategies and third party transactions, is the only issue at stake in LS&CO.'s motions regarding fame and abandonment.

The settlement agreements also have no bearing on any other issue in the case. LS&CO.'s decisions to compromise claims regarding third parties' liability for different marks used on different products in different channels of distribution, or simply to turn its focus to brands like Ruehl that are

---

[1] The settlement agreements are specifically discussed in A&F's Motion for Summary Judgment at pages 10-11 and in A&F's Opposition to LS&CO.'s Motion for Summary Judgment at pages 3-4 and 16-17. The settlement evidence is provided in Exhibits A (page 168), F through K, M, and O of the Declaration of J. Michael Keyes In Support of A&F's Motion for Summary Judgment and Exhibit X of the Declaration of Rachel R. Davidson in Support of A&F's Opposition to LS&CO.'s Motion for Summary Judgment.

1   capable of doing more harm, have nothing to do with whether A&F's design is likely to be confusing.

2   If the few settlements that A&F selectively has introduced are somehow relevant, then LS&CO. must

3   be permitted to argue about the particulars regarding settlements involving several hundred designs

4   that it has agreed with third parties that they must stop using.  It is precisely to avoid endless collateral

5   disputes about the meaning, distinctions and significance of settlements that motivates their exclusion.

6       The premise of Rule 408 has particular application in trademark cases.  If every settlement

7   with any party also protects any future infringer, then there is no reason for a trademark owner to

8   compromise any case.  If LS&CO. had to gauge the potential arguments, however farfetched or

9   lacking in reason, that any prospective litigant might make in the future about a third party settlement,

10  it would have no incentive to settle any case.  Rule 408 protects the incentive to settle and guards

11  against retrospective examination of the distinctions between one case and another, and motivations

12  and reasons for settling one case on terms that might not be offered in a different case.  *See Playboy*

13  *Enterprises*, 486 F. Supp. at 422-23 n.10; *Nabisco, Inc. v. PF Brands, Inc.*, 50 F. Supp. 2d 188, 203

14  (S.D.N.Y. 1999), *aff'd*, 191 F.3d 208 (2d Cir. 1999).

15      A&F has no rationale for how the so-called "admissions" it would glean from the settlements

16  are relevant to any issue that does not violate the policies of Rule 408.  The settlement agreements and

17  A&F's arguments about them should be stricken.

18  **III.    SURVEYS FROM THIRD PARTY CASES AND A&F'S ANALYSIS OF THEM IS
         INADMISSIBLE**

19

20      Federal Rule of Evidence 701 requires experts for any opinions that rely on "scientific,

21  technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  A&F

22  offers survey reports that were served on parties in other cases.[2]  A&F well knows that this type of

23  survey requires foundation and explanation from an expert and is otherwise inadmissible hearsay.

24

25  _____

26  [2] The analysis of the survey reports from prior cases is on pages 7-8 of A&F's Motion for Summary Judgment and pages 5-6 of A&F's Opposition to LS&CO.'s Motion for Summary Judgment.  The survey evidence is provided in Exhibits Y, Z, AA, and BB of the Declaration of Michael J. Bettinger in Support of A&F's Motion for Summary Judgment.

27

28

1  A&F offered its own survey on likelihood of confusion but did not ask its expert, advertised by A&F

2  as renowned, to opine on these surveys or to support its own analysis of them.  *See, e.g., Invitrogen*

3  *Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney

4  argument regarding the meaning of technical evidence is no substitute for competent, substantiated

5  expert testimony."); *Howmedica Ostenonics Corp. v. Tranquil Prospects, Ltd.*, 482 F. Supp.2d 1045,

6  1065 (N.D. Ind. 2007) (same).  A&F disclosed no expert to provide the evidence on which it now

7  relies.  Declaration of Gia L. Cincone in Support of Objection ¶ 8 ("Objection Cincone Dec.").

8      **A.    The Surveys Were Conducted At Different Times Using Different Methodologies
        And Were Never Designed To Produce A Comparative Analysis**

9

10      The surveys that A&F has submitted test varying populations and were performed using

11  different procedures and different stimuli.  A&F has not accurately reported the results.  For example,

12  there were two phases to the Lois survey that was done in 1984; they were conducted near the same

13  time using the same methodologies and yet produced significantly different "recognition" results.

14  Phase 1 of the survey showed 72% recognition.  Phase 2 showed 86%.  Despite this occasional

15  variability, the results are quite consistent and show high recognition of the mark.  The actual results

16  of the surveys are shown below:

17

| Lois Phase 1 (1984)(video): | 72% (males and females 14-35)  (Bettinger Decl. Exh. Y at 7) |
|---|---|
| Lois Phase 2 (1984)(video): | 86% (males and females 14-35)  (Bettinger Decl. Exh. Y at 8) |
| 1997 (purpose unidentified)(video): | 71% (males and females 18-65)  (Bettinger Decl. Exh. Z at LS-A&F009630-LS-A&F009631) |
| Edwin (2001)(video): | 74.5% (males and females 18-65 screened for shopping at upscale department stores) (Betttinger Decl. Exh. AA at LS-A&F009534) |
| Indigo Red (2004)(photo): | 58% (males 15-50) (Bettinger Decl. Exh. BB at Ex A, Pg. 7) |

26      A&F tries to nullify the consistency and magnitude of these results by using results from

27  earlier surveys without making adjustments, but then performing inconsistent calculations on more

28  recent surveys to manufacture a "trend" upon which it summarily concludes that consumer recognition

1   has dropped.  For example, the 2001 survey showed that 74.5% of consumers recognized and

2   identified the Levi's® jeans they were shown.  A&F reduces this to 55.4% because the report shows

3   that, of the 74.5% who called the jeans LEVI'S®, 55.4% explicitly called out the stitching design as

4   the reason for their identification.  A&F did not perform this calculation on the earlier 1997 survey

5   data.  If A&F had done a comparable calculation for the 1997 data, the comparable result would be

6   51.12%.[3]  This comparison would actually suggest a slight increase in recognition in 2001 from the

7   1997 survey, if it were in any sense an "apples to apples" comparison (which due to the varying

8   population, procedures and stimuli, etc., it is not).

9           For its ultimate conclusion, A&F turns to the 2004 survey, and indulges in *two* subtractions

10  using wholly mismatched survey findings.  It first reduces the 58% who identified the jeans as

11  LEVI'S® to 33.89% which was the subset of respondents that explicitly identified pocket stitching as

12  the reason for their answer.  Then, A&F reduces this 33.89% to 17.84% by subtracting the 16% of

13  respondents who misidentified a control jean as LEVI'S® jeans (***without bothering to make the same***

14  ***subtraction to the control sample to limit this population to those who purported to rely on the***

15  ***stitching***).[4]  Without performing these machinations, not sponsored by any expert, A&F's "pattern"

16  disappears and is supported by a single survey result that shows a slightly lower, recognition figure

17  that still is enormously impressive.

18          **B.      A&F's Analysis Must Be Excluded**

19          There is no foundation laid for A&F's reliance on these surveys.  As discussed above, the

20  surveys that A&F has submitted test varying populations and were performed using different

21  procedures and different stimuli.  Accompanying this objection is the declaration of Dr. Carol Scott

22  _____

23  [3] The data shows that 71% called the jeans LEVI'S® and 72% of that population called out stitching
    as the reason (71% x 72% = 51.12%).

24

25  [4] The experts testified that neither of these subtraction tactics is useful.  Dr. Ford, A&F's expert,
    testified that he thinks that the unadjusted numbers in the total respondent population are more useful

26  than the subset that explicitly attempts to articulate the reasons for recognizing a brand.  Supplemental
    Declaration of Gia L. Cincone Ex. B at 154-56.  Dr. Scott, who performed several of the surveys

27  involved, testified that subtractions of a selected control is not appropriate, even putting aside A&F's
    subtraction of mismatched numbers.  Objection Cincone Dec. Ex. E at 83-86.

28

1  who identifies the need for a rigorous analysis of the survey methods and results in order to make any

2  appropriate comparisons.  Declaration of Carol A. Scott ¶ 4.  A&F does not even provide a witness

3  capable of sponsoring the analysis, much less a carefully drawn comparison that survives even cursory

4  scrutiny.  Courts have held that "[u]nsubstantiated attorney argument regarding the meaning of

5  technical evidence is no substitute for competent, substantiated expert testimony."  *Invitrogen Corp.*,

6  429 F.3d at 1068; *Howmedica Ostenonics Corp.*, 482 F. Supp. 2d at 1065.

7       Because there is no foundation laid for reliance on these surveys and they are supplemented by

8  nothing more than mere attorney argument, this evidence should be excluded.

9  **IV.    CONCLUSION**

10       For the reasons stated, the third party settlements and surveys relied on by A&F must be

11  excluded from consideration of the pending motions.  This evidence was included in Exhibits A (page

12  168), F through K, M, and O of the Declaration of J. Michael Keyes In Support of A&F's Motion for

13  Summary Judgment, Exhibit X of the Declaration of Rachel R. Davidson in Support of A&F's

14  Opposition to LS&CO.'s Motion for Summary Judgment, and Exhibits Y, Z, AA, and BB of the

15  Declaration of Michael J. Bettinger in Support of A&F's Motion for Summary Judgment.

16

17  DATED:  September 12, 2008            Respectfully submitted,

18

19

20                      By:  */s/ Gregory S. Gilchrist*
                             Gregory S. Gilchrist
21                           Gia L. Cincone
                             Raquel Pacheco
22                           TOWNSEND AND TOWNSEND AND CREW
                             LLP
23                           Two Embarcadero Center, Eighth Floor
                             San Francisco, California  94111
24                           Telephone: (415) 576-0200
                             Facsimile: (415) 576-0300
25
                             Attorneys for Plaintiff/Counterdefendant
26                           LEVI STRAUSS & CO.

27  61497867 v2

28