# EXHIBIT B

1           UNITED STATES DISTRICT COURT
2
3           NORTHERN DISTRICT OF CALIFORNIA
4
5  Levi Strauss & Co.,                          **CERTIFIED COPY**
6           Plaintiff,
7  -vs-                                  CASE No.   C07-03752-JSW
8
   Abercrombie & Fitch Trading Co.,
9
            Defendant.
10 _____/
11
12
13
            DEPOSITION OF JEAN FOWLER
14
            Friday, May 16, 2008
15
16
17
            REPORTED BY:  GINA L. PETERSEN
18                        CSR No. 9447
19
20
21
         BONNIE L. WAGNER & ASSOCIATES
22        41 SUTTER STREET, SUITE 1605
           SAN FRANCISCO, CA  94104
23              (415) 982-4849
24
25

1  talking general matters or are you asking for a particular
2  documents.
3      Q.  General matters.
4      A.  If I was asked to sign a document, I would
5  generally ask what I was signing.
6      Q.  Did you generally read documents that you signed?
7      A.  I don't remember.  By principle I would have
8  asked the question.  I'm sure I didn't read thick files.
9  I know I didn't read thick files.  I know that.
10     Q.  Ms. Fowler, do you know what an affidavit is?
11     A.  It's something you swear to as the truth.  I
12 don't know that I could define it specifically.
13     Q.  Were you aware that there are certain documents
14 that the contents of which before you sign you have to
15 verify the accuracy of statements in the document under
16 oath?
17     MS. CINCONE:  You are asking if she is aware of
18 that now?
19     MS. DAVIDSON:  Is she aware there are documents
20 like that, at any time in her lifetime.
21     THE WITNESS:  Well, the only time I have been
22 under oath is when I have been as a juror in a courtroom.
23 I considered anything that was handed to me to be signed
24 at Levi's to have been well researched and well
25 documented.  It was the company culture to do one's best

1  work and to do it honestly because I wouldn't have known
2  all the details; and whatever it had been, they spent
3  months working on.  I would have accepted the word of
4  whoever presented it to me, whatever explanation was given
5  by that person, attorney or anyone else.  It was up to the
6  company standard, and I would have signed it.
7  BY MS. DAVIDSON:
8      Q.  Would it be fair to say that you really trusted
9  the people that gave you the particular document to sign
10 that they did their job or investigation, whatever was
11 required to process that document?
12     A.  That is a fair statement.
13     Q.  Do you remember while you were employed at Levi's
14 whether you signed an affidavit before?
15     A.  Before I was employed at Levi's?
16     Q.  No, I'm sorry.
17         While you were employed at Levi's, do you
18 remember signing an affidavit in any capacity?
19     A.  I do not remember.
20     Q.  Do you remember ever seeing an affidavit?
21     A.  I do not remember.
22         MS. DAVIDSON:  I think we left off on exhibits in
23 Durban's deposition at 74.
24         Let's mark this as Exhibit 74.
25                    (Whereupon, Defendants' Exhibit 74

1  claim of ownership of such mark for such goods or services
2  or to the registrant's right to register the same or to
3  keep the same on the register; right?
4       A.  Right.
5       Q.  So the answer is "yes" you did not conduct any
6  investigation?
7       A.  Yes, I did not conduct any investigation.
8       Q.  We are almost getting there.  The next sentence
9  is, "There is no proceeding involving rights pending and
10 not disposed of either in the Patent and Trademark Office
11 or in the courts and that all statements made of her own
12 knowledge are true and statements made on information
13 believed to be true with respect to that there is no
14 proceedings involving said rights pending and not disposed
15 of either in the Patent and Trademark Office or in the
16 courts."
17      Did you conduct any investigation or verify the
18 accuracy of that independently before you signed the
19 document?
20      A.  I did not.
21      Q.  If you can remember, to the best of your
22 knowledge, was there a process -- I apologize if you
23 testified to this earlier -- if you received a document
24 you would investigate or check with people as to, you
25 know, the accuracy of the contents of the document that

1  you were signing?
2      A.  I would ask what the document was that I was
3  signing of whoever presented it to me.  I had trust in my
4  co-workers to be presenting me something that they had
5  thoroughly researched or worked on, and I didn't have any
6  reason not to trust them.
7      Q.  Do you have any recollection as to who, if
8  anybody, gave you this document?
9      A.  I have no recollection.
10     Q.  You testified that you did not do any work with
11 Levi's trademarks or trademark registrations.
12     A.  I personally did not.
13     Q.  That being said, is there any reason you can
14 think of as to why you had signed a document involving or
15 which was an affidavit involving the arcuate design, which
16 is a trademark at Levi's Strauss?
17         MS. CINCONE:  I object for lack of foundation,
18 but if you have some understanding, you can testify to
19 that.
20         THE WITNESS:  I was asked to sign documents which
21 required an officer's signature.  I don't believe any of
22 the attorneys, other than the General Counsel, were
23 officers, so they would have to have the signature of
24 somebody else, some other officer of the company.
25 BY MS. DAVIDSON:

1  Q. You mentioned that you trusted people, in some
2  cases it may have been counsel, to do their part whether
3  it be an investigation or verification of documents that
4  they gave you.
5  What is the basis for that trust?
6  A. The company I considered to be extremely ethical.
7  Before I was hired, I attended a weekend seminar of all of
8  legal departments, which was on ethics. I was being
9  considered for employment, so I was there I think for them
10 to look me over and for me to look them over.
11 I was extremely impressed with the fact that the
12 company would take its people offsite for a weekend to
13 study ethics and bring in outside professors and we read
14 such things as Sir Thomas Moore. I can't give you the
15 curriculum for the weekend, but it was very impressive to
16 me that they went to that length to stress ethical issues,
17 the importance of ethical issues.
18 It certainly was the company culture for
19 everyone to do his or her job very thoroughly. I knew the
20 attorneys, you know, as you know fellow employees. I
21 don't think it was ethical for them to discuss cases,
22 frankly. I know that is the case when you are on a jury
23 in court. You simply cannot talk about what you just
24 heard and observed.
25 I trusted them to do their jobs, and I would ask

1  what I was signing and they would tell me in a few words
2  what I was signing, but I did not do personal outside
3  investigation.
4      Q.  And you mentioned that you went to an ethics
5  seminar.  Was it prior to your actual decision to be
6  employed by Levi's?
7      A.  Right.
8      Q.  Do you remember any particular topics at that
9  seminar?  For example, did they discuss duties with
10 respect to signing documents or legal issues that
11 employees needed to know?
12     A.  It was not a how-to seminar. It was a -- it was
13 on ethics.
14     Q.  Just in general.
15     A.  Just general -- as it applied to business in
16 general.  I keep going back to the company culture of
17 certainly wanting to be an ethical company.  That was
18 their reputation outside the company as well insofar as I
19 knew what the reputation was.
20         I'm sure it would have seemed to me at the time
21 that if I had gone back and done an investigation of what
22 was being put in front of me, it would be doing a
23 duplicate job, and I wasn't trained as an attorney, so I
24 trusted what was put in front of me.  I did ask what I was
25 signing and beyond that, I did not go further with it.

1  question.
2              **EXAMINATION BY MS. CINCONE**
3  BY MS. CINCONE:
4      Q.  Ms. Fowler, while you were employed at Levi's
5  Strauss and Co., were you aware of anyone in the legal
6  department doing anything that you considered unethical or
7  dishonest in any way?
8      A.  No.
9          MS. CINCONE:  Thank you.  That is all I have.
10         MS. DAVIDSON:  On May 22nd, Tom Onda's deposition
11 was taken.
12         MS. CINCONE:  May 14th.
13         MS. DAVIDSON:  May 14th, I apologize.
14         On May 14th, Thomas Onda's deposition was taken
15 by counsel for Abercrombie, and during that deposition
16 Exhibits 62, 63 and 64 were submitted into evidence.
17         They were jeans submitted by Abercrombie's
18 counsel.  Abercrombie's counsel today hereby stipulates
19 that Abercrombie will retain the originals of those
20 Exhibits 62, 63 and 64, and it is my understanding that
21 the court reporter will retain photocopies of those
22 exhibits.
23         MS. CINCONE:  Yes, that's fine, thank you.
24         MS. DAVIDSON:  We're off the record.
25                 (Whereupon, the deposition was