1

2

3

4

5                                    **NOT FOR CITATION**

6                       IN THE UNITED STATES DISTRICT COURT

7

8                       FOR THE NORTHERN DISTRICT OF CALIFORNIA

9    LEVI STRAUSS & CO.,

10          Plaintiff,                              No. C 07-03752 JSW

11   v.                                             **ORDER ON MOTIONS FOR**
                                                    **SUMMARY JUDGMENT AND**
12   ABERCROMBIE & FITCH TRADING                    **MOTION TO EXCLUDE**
     COMPANY,
13
            Defendant.
14

15   _____/

16                                    **INTRODUCTION**

17          Now before the Court are: (1) the Motion for Summary Judgment filed by Defendant

18   Abercrombie & Fitch Trading Co. ("Abercrombie"); (2) the Motion for Summary Judgment on

19   Defendant's Counterclaims and Selected Affirmative Defenses, and for Partial Summary

20   Judgment on Plaintiff's Claim of Trademark Dilution, filed by Plaintiff Levi Strauss & Co.

21   ("LS&CO"); and (3) the Motion to Exclude Report, Testimony, and Survey Evidence of Dr.

22   Sanjay Sood, filed by Abercrombie.[1]  The Court has considered the parties' papers, the record in

23   this case, relevant legal authority, and has had the benefit of oral argument.

24          The Court HEREBY GRANTS IN PART AND DENIES IN PART LS&CO's motion

25   for summary judgment, DENIES Abercrombie's motion to exclude, and DENIES

26   Abercrombie's motion for summary judgment.

27

28

_____

          [1]      Hereinafter, the Court shall abbreviate these motions as follows:
"Abercrombie MSJ," "LS&CO MSJ," and "Abercrombie Mot. to Exclude."  The Court also
shall use these abbreviations when it references supporting, opposing and reply declarations.

*United States District Court*
For the Northern District of California

**BACKGROUND**[2]

**A.      The Parties, the Arcuate Mark, and the Accused Ruehl Design.**

LS&CO is an apparel company that sells denim jeans bearing, among other marks, the "Arcuate Stitching Design Trademark ("the Arcuate mark")."  (*See* Compl. ¶¶ 4, 6, 8, Ex. A.) LS&CO has manufactured and sold goods bearing the Arcuate mark since 1873.  (Declaration of Lynn Downey Supporting LS&CO MSJ ("Downey Decl."), ¶ 5, Exs. A1-A4.)  LS&CO owns, among others, the following registrations for the Arcuate mark: U.S. Registration No. 404,248 (the "'248 Registration"); and U.S. Registration No. 1,139,254 (the "'254 Registration").  (*Id.* ¶ 9, Ex. B; Declaration of Thomas N. Onda Supporting LS&CO MSJ ("Onda Decl., ¶ 15, Exs. G-H).)[3]  Between 1980 and 2007, LS&CO generated substantial revenues from the sale of billions of net units of Levi's brand garments.  (Declaration of Will Mitchell Supporting LS&CO's MSJ ("Mitchell Decl."), ¶ 4, Ex. A.)[4]

LS&CO has used the Arcuate mark in print advertising and point of sale materials since at least 1897.  (Downey Decl., ¶¶ 12-13, Exs. E1-E30; Declaration of Robert Hanson Supporting LS&CO MSJ ("Hanson Decl."), ¶ 17, Exs. F-G.)  LS&CO also advertises the Arcuate mark on television, at the cinema, through outdoor advertising, and on the internet. (*Id.*, ¶ 14, Ex. F; Hanson Decl., ¶¶ 9-12, 14-16, 18-23, Exs A, C, E, H-K.)  LS&CO admits that it does not specifically track which advertising expenditures pertain to advertisements that display only the Arcuate mark.  However, LS&CO attests that "virtually all" of Levi's brand jeans bear the Arcuate mark" and that 90-95% of Levi's brand products display the Arcuate mark.  (Hanson Decl., ¶ 25.)  LS&CO also expends, on an annual basis, substantial sums for advertising expenditures for Levi's brand products.  (Mitchell Decl., ¶ 6; *see also* Hanson Decl., ¶ 9, Ex. B (expenditures for 2006-2007).)

---

[2]      The following facts are undisputed, unless otherwise noted.

[3]      Mr. Onda is LS&CO's Global Intellectual Property Counsel, a position he has held since 1999.

[4]      Mr. Mitchell is LS&CO's Vice President, Levi's brand, Finance.  (Mitchell Decl., ¶¶ 1-2.) The exact figures are confidential and have been filed under seal.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    LS&CO views the Arcuate mark as "an important part of LS&CO's mission to maintain

2    the strength and global presence of the LEVI's® brand."  (Hanson Decl., ¶ 27.)  LS&CO asserts

3    that because it views the Arcuate mark to be one of its most important assets, "the company

4    devotes substantial resources to monitoring the marketplace for infringements and stopping any

5    infringements or counterfeits it discovers, through litigation if necessary," and by way of

6    advertising campaigns warning potential infringers and counterfeiters of the consequences of

7    such actions.  (Onda Decl., ¶¶ 3-5, 7, Ex. C.)  LS&CO attests that its monitoring and policing

8    efforts have always exceeded several million dollars on an annual basis.  (*Id.*, ¶ 4.)

9    Abercrombie is an apparel company founded in 1892.  (Declaration of Michael Doty

10   Supporting Abercrombie MSJ ("Doty Decl."), ¶¶ 3-6.)  In 2004, Abercrombie launched a

11   clothing brand under the name "Ruehl No. 925," which includes a line of women's denim jeans.

12   (*Id.*, ¶ 8; Declaration of Michael J. Keyes Supporting Abercrombie MSJ ("Keyes Supp. Decl."),

13   Ex. C (Deposition of Kevin Cothren ("Cothren Depo.") at 11:6-13:3.)  The initial stitching

14   design on the Ruehl back pocket was an "R" on the corner.  (*See* Abercrombie MSJ at 2:4-8

15   (depicting original design).)  In 2005, Abercrombie decided the Ruehl jeans required a more

16   "iconic" stitching design, which would come to be associated exclusively with the Ruehl brand.

17   (Cothren Depo. at 28:17-29:25.)  Abercrombie's design team decided upon the stitching design

18   at issue in this case (the "accused Ruehl design").  (*Id.* at 34:12-21, 46:24-48:24; Declaration of

19   Michael J. Bettinger Supporting Abercrombie MSJ ("Bettinger Supp. Decl."), Ex. A

20   (Deposition of Mark Breitbard ("Breitbard Depo.") at 69:18-21, 76:11-14).)[5]

21   **B.      The Survey Evidence.**

22   LS&CO retained Dr. Sanjay Sood ("Dr. Sood") to determine the level of recognition of

23   the Arcuate mark and the likelihood of confusion between the Arcuate mark and the accused

24   Ruehl design.  (Declaration of Dr. Sanjay Sood Supporting LS&CO MSJ, Ex. A (Sood Report

25   at 2).)

26

27

28        [5]        The Arcuate mark and the accused Ruehl design are depicted in the
attachments to this Order.

3

**United States District Court**
For the Northern District of California

1            **1.        The Consumer Recognition Survey.**

2            In May and June of 2008, Dr. Sood conducted a nationwide mall intercept survey of 302

3    participants.  The interviews were done on a double-blind basis in Boston, Chicago, Dallas, Los

4    Angeles, and Tampa, with participants between 18-64 years of age.[6]  (Sood Report at 4-5.)  The

5    participants were asked to look at color photographs of back pockets of three brands of jeans:

6    Levi's, Lee, and Lucky.  The pictures were presented individually and the interviewer rotated

7    the order of presentation across the three brands.  (*Id.* at 6, Ex. 8.)  Participants were then asked

8    a series of questions and were instructed that if he or she did not know the answer to a question

9    or did not have an answer, to advise the interviewer of that fact.  (*Id.* at 5-6, Ex. 5.)  The first

10    question was: "Have you seen jeans with this style of pocket stitching before?"  If a participant

11    answered "yes" or "don't know," he or she was asked: "Do you associate jeans with this style of

12    pocket stitching with one brand or company, more than one brand or company, don't know?"

13    (*Id.* at 5-6, Ex. 5.)  Participants then were asked to identify the name of the brand(s) or

14    company(ies) that he or she associated with the photograph.  This process was repeated for each

15    of the three photographs.  (*Id.* at 6, Ex 5.)

16            According to Dr. Sood's report, 234 of the 302 participants (77.5%) recognized the

17    Levi's back pocket stitching.  (*Id.* at 6, Ex. 9C.)  In contrast, 150 of 302 participants (49.7%)

18    recognized the Lee pocket stitching and 141 of 302 participants (46.7%) recognized the Lucky

19    pocket stitching.  (*Id.* at 6-7, Ex. 9C.)  Dr. Sood reported that 162 of 302 participants (53.6% )

20    associated the Levi's back pocket stitching with one brand, and 117 of those 162 persons

21    (72.2%) identified Levi's as that brand.  (*Id.* at 7, Exs. 9E, 9G.)  In contrast, 80 of 302

22    participants (26.6 %) identified the pocket stitching on the Lee jeans with one brand or

23    company and 39 of those 80 persons (48.8%) correctly identified Lee as that brand, and 68 of

24    302 participants (22.5%) identified the pocket stitching on the Lucky jeans with one brand or

25

26            [6]        In addition, the participants were screened to ensure that: (1) no one in their
household worked for an advertising agency, a public relations firm, or a marketing research
company; (2) no one in their household worked for a company that manufactured,
27    distributed, or sold jeans; (3) no one in their household worked for a store in the mall at
which they were interviewed; (4) the interviewee had not heard about the topic or subject of
28    any interviews being conducted in the mall; and (5) the interviewee had not participated in a
market research study, other than a political poll, in the last 6 months.  (Sood Report at 5.)

4

United States District Court

For the Northern District of California

company and 4 of those 68 persons (5.9%) correctly identified Lucky as that brand.  (*Id.*)  Of the 302 participants, 159 (52.6%) correctly identified the Levi's jean as a Levi's jean, 48 (15.9%) correctly identified the Lee jean as a Lee jean, and 6 (2.0%) correctly identified the Lucky jeans as a Lucky jean.  (*Id.*, Ex. 9H.)

### 2.    The Likelihood of Confusion Survey.

In May and June 2008, Dr. Sood also conducted a nationwide mall intercept survey of 299 female participants in Boston, Chicago, Dallas, Los Angeles and Tampa.  The interviews also were conducted on a double blind basis.  (Sood Report at 7.)  Survey participants were between 20-45 years of age and either had purchased jeans, which cost at least $75, in the last six months or planned to do so in the next six months.  (*Id.* at 8.)[7]

The participants in this survey were shown a photograph of a female wearing a pair of Levi's jeans "from the back side such that the person wearing the jeans is posed in a stance as if she were striding or waiting at a street corner."  (*Id.* at 9.)  This photograph was placed on a wall just above hip level, and the participant was instructed to "look at these jeans as if she saw someone wearing them on the street."  (*Id.*)  After the participant was finished looking at that photograph, the interviewer put it away and then showed the participant four photographs of four different brands of jeans, Citizens for Humanity, Seven for All Mankind, Ruehl, and True Religion.

These four photographs showed a woman wearing the jeans from the same perspective as the first photograph and were placed on the wall one at a time, with the order of the photographs rotated.  (*Id.* at 9-10, Ex. 14.)  The interviewer then asked the participant asked a series of questions and instructed the participants that "[i]f you don't know or don't have an answer, please let me know that."  (*Id.*, Ex. 11.)  The first question was: "Do you think that any of these jeans are made, sponsored or endorsed by the same company that made the jeans you saw in the first picture? Or, do you think that none of these jeans are made, sponsored or endorsed by the same company that made the jeans you saw in the first picture?"  (*Id.* at 10, Ex.

---

[7]    Dr. Sood also used the screening criteria set forth above in note 6.  (Sood Report at 8.)

11.)[8]  If the participant answered in the affirmative as to one, or more, of the jeans, she was asked: "Which one or ones do you think are made, sponsored or endorsed by the same company that made the jeans you saw in the first picture?"  For each pair of jeans that a participant identified in response to the second question, she was asked: "What is it about these jeans that makes you say that it is made, sponsored or endorsed by the same company that made the jeans that you saw in the first picture?"  The participant was prompted once with "anything else?"  (*Id.* at 10, Ex. 11.)

123 of 299 participants (41.1%) answered yes to the first question.[9]  (*Id.*, Ex. 15C.)  92 of 299 participants (30.8%) selected the Ruehl jeans as being made, sponsored or endorsed by LS&CO, and 66 of 299 participants (22.1%) identified the Ruehl jeans exclusively.  (*Id.* at 11, Exs. 15D-15F.)  In contrast, 34 of 299 participants (11.4%) identified the Citizens jeans as being made, sponsored or endorsed by LS&CO, and 13 of 299 participants (4.3%) identified Citizens exclusively, 25 of 299 participants (8.4%) identified the True Religion jeans, and 10 of 299 participants (3.3%) identified True Religion exclusively, and 12 of 299 participants (4.0%) identified Seven jeans, and 5 of 299 participants (1.7%) identified Seven exclusively.  (*Id.*)  Dr. Sood also reported that 47 of 299 participants (15.7%) mentioned that "stitching" and/or the pocket was what caused them to identify the Ruehl jeans with the Levi's jeans.  (*Id.* at 11, Exs. 15G, 15 H.)  In contrast, mentions of the pocket and/or stitching for the other jeans were: 21 out of 299 (7%) for those participants who identified the Citizens jeans, 12 of 299 (4%) for those participants who identified the True Religion jeans; and 3 out of 299 (1%) for those participants who identified the Seven jeans.  (*Id.*)

**C.**    **The *Lois Sportswear* Litigation and LS&CO's 1986 Section 15 Affidavit.**

On December 13, 1982, Lois Sportswear, U.S.A., Inc. ("Lois") filed a declaratory relief action against LS&CO in the United States District Court for the Southern District of New York.  (*See* Declaration of Gia Cincone Supporting LS&CO MSJ ("Cincone Supp. Decl."), Ex.

---

[8]    It is undisputed that Dr. Sood did not instruct interviewers to rotate the order in which they posed this first question.

[9]    141 of 299 participants (47.2%) had a negative response to this question.

United States District Court
For the Northern District of California

A; Declaration of Rachel R. Davidson in Opposition to LS&CO MSJ ("Davidson Opp. Decl."),

Ex. A.)[10]  In its Complaint, Lois sought, *inter alia*, declarations the stitching design used on the

back of its jeans did not infringe upon LS&CO's rights in the Arcuate mark and did not

otherwise violate the Lanham Act.  (Cincone Supp. Decl., Ex. A at 8.)  Lois did not file any

affirmative claims seeking cancellation of LS&CO's registrations for the Arcuate mark.  (*See*

*id.*, Ex. A.)

On January 5, 1983, LS&CO filed its answer and asserted counterclaims against Lois

for, *inter alia*, infringement and dilution.  (*Id.*, Ex. B.)  LS&CO also initiated an action against

Textiles Confecciones Europas SA ("Textiles"), the company that manufactured the Lois jeans

at issue.  (*Id.*, Ex. C.)[11]  In its answer to Levi's counterclaims, Lois denied that the Arcuate mark

"serves as a means of designating origin with the defendant, and that the public recognizes that

design as an indication that defendant is the source of garments on which it appears."  (*Id.*, Ex.

D ¶ 4.)  Lois also asserted, as affirmative defenses, that the Arcuate mark either never

functioned as a designation of source origin or, due to other's use of the mark and LS&CO's

failure to police the mark, ceased to function a designation of source or origin.  (*Id.*, Ex. D ¶¶

15-17.)  Textiles also denied that the Arcuate mark functioned as a designation of origin and

raised the same affirmative defenses.  (*Id.*, Ex. E ¶¶ 4, 15-17.)

The parties moved for summary judgment, and LS&CO prevailed.  *See Lois Sportswear*

*U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735 (S.D.N.Y. 1985), *aff'd* 799 F.2d 867 (2d

Cir. 1986).  In January 1986, after Lois and Textiles had filed their Notice of Appeal, LS&CO

filed a combined "Section 8 and Section 15 Affidavit" for the '254 Registration, in which it

stated that "there is no proceeding involving said rights pending and not disposed of either in

the Patent and Trademark Office or in the courts."  (Cincone Supp. Decl., Exs. I, J.)  This

affidavit was signed LS&CO's Assistant Corporate Secretary, Jean L. Fowler, who stated that

---

[10]     LS&CO and Abercrombie each submit copies of pleadings from the *Lois Sportswear* Complaint.  For ease of reference, the Court shall cite exhibits submitted with the Cincone Supporting Declaration.

[11]     The two actions subsequently were consolidated, and it is undisputed that LS&CO was not realigned as a plaintiff in the *Lois Sportswear* action.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  "all statements made of her own knowledge are true and all statements made on information and

2  belief are believed to be true." (*Id.*, Ex. I at 2.)[12]  Ms. Fowler did not personally investigate the

3  statements contained in the affidavit.  Rather, she relied on the persons who prepared the

4  documents for her signature to have researched the issues presented.  (*See* Davidson Opp. Decl.,

5  Ex. Q (Deposition of Jean Fowler ("Fowler Depo.") at 22:13-23:12, 26:15-21, 28:4-33:4).)

6  **D.     The Procedural History of the Instant Litigation.**

7          On December 5, 2005, Abercrombie filed an intent to use application for the accused

8  Ruehl design.  (Cincone Supp. Decl., Ex. S.)  LS&CO learned about Abercrombie's application,

9  through a watch notice, "in late January 2006."  (Onda Supp. Decl., ¶ 16.)  Mr. Onda avers that

10  he immediately called counsel for Abercrombie to express LS&CO's concerns over the design.

11  (*Id.*)  In March 2006, Abercrombie's trademark counsel sent an email, titled "[p]ossible Levi

12  challenge of new Ruehl women's pocket design" to Mr. Breitbard, in which he asked whether

13  Abercrombie was using the accused Ruehl design and whether he could get a sample.

14          Abercrombie's application to register the accused Ruehl design, limited to jackets, was

15  published in the Offical Gazette on January 16, 2007.  LS&CO filed its opposition on February

16  9, 2007.  (*Id.*, Ex. U.)  The parties engaged in discovery in the opposition proceedings in May

17  and June 2007.  LS&CO contends that it did not learn the accused design had been used in

18  commerce until it received that discovery.  (*See id.*, Ex. V (Abercrombie Response to

19  Interrogatory 6).)[13]

20          On July 20, 2007, LS&CO filed the instant suit, in which it asserts claims for trademark

21  infringement, trademark dilution, and unfair competition under the Lanham Act, as well as

22  claims of infringement, dilution and unfair competition under California law.  (Compl., ¶¶ 16-

23  36.)  On February 7, 2008, pursuant to stipulation, Abercrombie filed an Amended Answer and

24  Counterclaim ("AAC"), in which it seeks cancellation of the Arcuate mark based on alleged

---

26  [12]     The affidavit does not specify which statements were made on information and belief.  (Cincone Supp. Decl., Ex. I.)

28  [13]     The parties agree that Abercrombie's response to this interrogatory erroneously reflects that the accused design's first use in commerce was February 2005.  The correct date is February 2006.  (*See* Declaration of Reid Wilson Opposing LS&CO MSJ ("Wilson Opp. Decl."), ¶ 3.)

1    fraud upon the USPTO and abandonment.  (*See, e.g.,* AAC, ¶¶ 28-29.)  Abercrombie also

2    asserted affirmative defenses of, *inter alia*, waiver, estoppel, laches, acquiescence,

3    abandonment, unclean hands, and trademark misuse.  (*Id.* ¶¶ 50-59.)

4         The Court shall address additional facts pertinent to these motions, as necessary, in its

5    analysis.

**ANALYSIS**

**A.    Applicable Legal Standards to Motions for Summary Judgment.**

8         A principal purpose of the summary judgment procedure is to identify and dispose of

9    factually unsupported claims.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).

10   Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and

11   admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

12   any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

13   Civ. P. 56(c).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact

14   finder to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49

15   (1986).  A fact is "material," if the fact may affect the outcome of the case.  *Id.* at 248.  "In

16   considering a motion for summary judgment, the court may not weigh the evidence or make

17   credibility determinations, and is required to draw all inferences in a light most favorable to the

18   non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

19        The party moving for summary judgment bears the initial burden of identifying those

20   portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine

21   issue of material fact.  *Celotex*, 477 U.S. at 323.  Where the moving party will have the burden

22   of proof on an issue at trial, it must demonstrate affirmatively that no reasonable trier of fact

23   could find other than for the moving party.  *Id.*; *see also Nissan Fire & Marine Ins. Co. v. Fritz

24   Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the non-moving party meets its initial burden, the

25   party opposing summary judgment must go beyond the pleadings and, by its own evidence, "set

26   forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

27   Further, the non-moving party must "identify with reasonable particularity the evidence that

28   precludes summary judgment."  *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th 1996) (stating that it

United States District Court
For the Northern District of California

is not a district court's task to "scour the record in search of a genuine issue of triable fact"). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

**B.    Evidentiary Issues.**

**1.    LS&CO's Objections to Abercrombie's Evidence of Third Party Settlements.**

Abercrombie has introduced evidence of settlements between LS&CO and third-party jean manufacturers to support its motion for summary judgment and to oppose LS&CO's motion. Evidence of "furnishing or offering or promising to furnish – or accepting or offering or promising to accept – a valuable consideration in compromising or attempting to compromise the claim" is not admissible "on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount." Fed. R. Civ. P. 408. Rule 408 does not apply, however, when the evidence is offered for a different purpose. *Id.*

Abercrombie argues that it is not using the settlement agreements to establish liability and argues that LS&CO has urged courts to consider evidence of settlements in connection with the Arcuate mark's strength and fame. Abercrombie argues that it is doing the same in this case, albeit for the purpose of demonstrating the Arcuate mark is not strong or famous.[14] The Court does not find Abercrombie's arguments persuasive and concludes that, in fact, Abercrombie has offered the settlements on issues relating to liability or to the validity of LS&CO's claims. Accordingly, the Court SUSTAINS LS&CO's objections and has not considered the settlement agreements to resolve the pending motions.

**2.    LS&CO's Objections to Surveys Used in Other Litigation.**

Abercrombie also relies on surveys that LS&CO prepared for other litigation. Abercrombie argues that the results of these surveys support its argument that recognition of the

---

[14]    Abercrombie also argues that its expert relied on these settlements to choose the control jeans for its expert's survey. (Abercrombie Resp. to Obj. at 2:21-3:6.) Although that may be an argument in favor of admitting the settlements at trial, Abercrombie did not offer the settlements for that purpose in its motion.

United States District Court
For the Northern District of California

1   Arcuate mark has diminished to the point where it no longer functions as a mark.  (*See*

2   Abercrombie MSJ at 7:6-8:13; Abercrombie Opp. to LS&CO MSJ at 5:21-6:12; Bettinger

3   Supp. Decl. Exs. Y, Z, AA and BB.)  Abercrombie does not merely refer to the surveys.  Rather,

4   it engages in further analysis of the results of those surveys and contends that its analysis shows

5   that the percentage of persons surveyed who recognized the Arcuate mark is lower than the

6   percentage reflected in the surveys.  Abercrombie relies only on attorney argument and does not

7   provide expert testimony to support its calculations or its analysis.  *See* Fed. R. Evid. 701.

8          "Unsubstantiated attorney argument regarding the meaning of technical evidence is no

9   substitute for competent, substantiated expert testimony."  *Invitrogen Corp. v. Clontech Labs.,*

10  *Inc.,* 429 F.3d 1052, 1068 (Fed. Cir. 2005).  The Court SUSTAINS LS&CO's objections to

11  these surveys and has not considered them to resolve the pending motions.

12          **3.      Abercrombie's Motion to Exclude Dr. Sood's Testimony and Survey
                     Evidence.**

13

14          As set forth above, LS&CO retained Dr. Sood to conduct two surveys on the issues of

15  likelihood of confusion and dilution and on consumer recognition of the Arcuate mark.

16  Abercrombie moves to exclude Dr. Sood's expert report, his testimony, and all evidence

17  relating to these two surveys.

18          If scientific, technical, or other specialized knowledge will assist the trier of
            fact to understand the evidence or to determine a fact in issue, a witness
19          qualified as an expert ..., may testify thereto in the form of an opinion or
            otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the
20          testimony is the product of reliable principles and methods, and (3) the
            witness has applied the principles and methods reliably to the facts of the
21          case.[15]

22  Fed. R. Evid. 702.  "The proponent of the survey bears the burden of establishing its

23  admissibility."  *Keith v. Volpe,* 858 F.2d 467, 480 (9th Cir. 1988).  In general, a court may

24  _____

25         [15]     As a preliminary matter, although Abercrombie takes great pains to
    demonstrate that Dr. Sood had never created a survey on these issues before, and is not
26  familiar with the *Sleekcraft* factors, it has not moved to exclude his testimony on the basis
    that he should not be qualified as an expert on these issues.  The Court has reviewed Dr.
27  Sood's education and experience and concludes that he is qualified to design and conduct
    consumer surveys and to testify about his results.  The fact that the surveys in this case
28  happened to be his first foray into trademark litigation may, in the end, bear on the weight
    the finder of fact gives to his results.  *See, e.g., Louis Vuitton Malletier v. Dooney & Bourke,*
    *Inc.*, 525 F. Supp. 2d 599, 583 (S.D.N.Y. 2007).

**United States District Court**
For the Northern District of California

11

1   admit a survey if it is conducted according to generally accepted principles and if it is relevant.

2   Challenges to defects in methodology normally affect the weight to be accorded the survey,

3   rather than its admissibility.  *See, e.g., Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir.

4   1997); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997).  If,

5   however, the methods used are so deficient as to render the survey unreliable, a court should

6   exclude a survey.  *See, e.g.,* Fed. R. Evid. 403.

                        **a.        Consumer Recognition Survey.**

8           Abercrombie argues that Dr. Sood's consumer recognition survey is fatally flawed

9   because it did not account for the problem of "spurious recognition," *i.e.* it did not include a

10  fictional stitching design to test whether participants would recall seeing something that does

11  not exist, it lacked a control cell, and the questions were vague.  As to the latter objection, when

12  the Court reviews the questions in the context of the survey, the Court does not find them to be

13  so inherently ambiguous that they affect the reliability of the survey.  Further, the interviewer

14  rotated the order in which the photographs were shown to participants.

15          With respect to the issue of "spurious recognition," Dr. Sood explains that he did not

16  create a fictional design because of the many stitching designs on the market.  Abercrombie's

17  expert, Dr. Ford noted the same problem.  (*See* Supplemental Declaration of Sanjay Sood in

18  Opposition to Abercrombie Mot. to Exclude, ¶ 14; Supplemental Declaration of Gia Cincone in

19  Opposition to Abercrombie Mot. to Exclude, Ex. B (Deposition of Gerald L. Ford at 132:2-

20  133:4).)  Finally, although Dr. Sood did not use a separate control group, he did use control

21  jeans within his survey.  Accordingly, the Court concludes that Abercrombie's concerns go to

22  the weight, rather than the admissibility of this survey.

                        **b.        Likelihood of Confusion Survey.**

24          Abercrombie argues that Dr. Sood's "likelihood of confusion" survey used leading

25  questions, created demand effects, lacked a proper control, utilized an underinclusive universe,

26  lacked marketplace conditions, and suffered from "order bias."  The Court is not persuaded that

27  the questions posed were unduly suggestive.  Indeed, in many of the cases on which

28  Abercrombie relies, the courts found questions to be leading because they identified the

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   trademarked product and the accused product in the question.  *See, e.g., Riviana Foods Inc. v.*

2   *Societe Des Produits Nestle S.A.*, 33 U.S.P.Q.2d 1669, 1671 (S.D. Tex. 1994).  The Court also

3   concludes that Abercrombie's objections regarding the possibility of order bias, demand effects

4   and the lack of marketplace conditions go to the weight to be given to Dr. Sood's survey, rather

5   than its admissibility.

6          In addition, although Dr. Sood did not use a separate control group, he did use control

7   products in the photos shown to survey participants and asked participants open ended

8   questions about why they believed a particular jean was sponsored, endorsed or manufactured

9   by the maker of the first set of jeans they had seen.  Thus, Dr. Sood's methods account for non-

10  trademark related confusion.  The Court concludes that any failure to use a separate control

11  does not render the results of the survey so unreliable that it should be excluded.  *See, e.g,*

12  *Storck USA, L.P. v. Farley Candy Co.*, 797 F. Supp. 1339, 1408 (N.D. Ill. 1992) (evaluating

13  survey similar in design to Sood Survey, which utilized control products but not a control cell).

14

15         Finally, Abercrombie contends that Dr. Sood's universe was significantly underinclusive

16  because he focused on the target market for Ruehl jeans.  Thus, Abercrombie argues the survey

17  is not a reliable indicator of likelihood of confusion.  *See* Diamond, Shari Seidman, "Reference

18  Guide on Survey Research," *Reference Guide on Scientific Evidence* at 241 (2d ed. 2000)

19  ("Reference Guide") (noting that if a survey universe is underinclusive, "the survey's value

20  depends on the extent to which the excluded population is likely to react differently from the

21  included population").  Although in some circumstances the appropriate universe is the junior

22  user's market, if goods are identical, it is appropriate to focus on both users' markets.  *See, e.g.,*

23  *Citizens Banking Corp. v. Citizens First Bancorp, Inc.*, 2007 WL 4239237 at * 5 (E.D. Mich.

24  Dec. 3, 2007); *see also* Reference Guide at 239 ("[I]n trademark litigation, the relevant

25  population in some disputes may include all prospective and actual purchasers of the plaintiffs'

26  goods or services and all prospective and actual purchasers of the defendant's goods or

27  services.").

28

13

United States District Court

For the Northern District of California

1     In this case, Dr. Sood's universe consisted of women between 20-45, who had either

2  purchased jeans costing at least $75 in the last six months or planned to make such a purchase

3  in the next six months.  Abercrombie's expert, Dr. Ford, argues that the universe should have

4  included girls and women 13 (or at least 18) years of age or older and should not have been

5  limited to persons who purchased jeans within a specific price point.  Although Dr. Ford's

6  results differed from Dr. Sood's, Dr. Ford does not explain how, or why, the persons he

7  contends were excluded from the survey universe would react differently from those included in

8  the population.  Accordingly, the Court concludes that any defects in the universe go to the

9  weight to be afforded Dr. Sood's opinions, rather than the admissibility of the survey or his

10  testimony.

11     Finally, the Court concludes that the combination of Abercrombie's objections do not

12  render the results of the surveys so inherently unreliable that they should be excluded.

13  Therefore, the Court DENIES Abercrombie's motion to exclude Dr. Sood's report, the survey

14  evidence, and his testimony.

15  **C.      LS&CO's Motion for Summary Judgment on Abercrombie's Counterclaims and
         Affirmative Defenses is Granted.**

16

17     LS&CO moves for summary judgment on Abercrombie's counterclaim for cancellation,

18  which is based on theories of fraud on the USPTO and upon abandonment.  LS&CO also moves

19  for summary judgment on Abercrombie's affirmative defenses of abandonment, unclean hands,

20  trademark misuse, waiver, laches, estoppel, acquiescence, and consent.[16]

21     **1.      LS&CO is entitled to judgment on the cancellation counterclaim based on
         fraud.**

22

23     Abercrombie seeks to cancel the Arcuate Trademark on the basis that LS&CO

24  committed fraud on the USPTO when it filed the Section 15 Affidavit in January 1986.  To

25  prevail on its counterclaim, Abercrombie must show that LS&CO made a false representation

26

27  [16]     In its motion, LS&CO also refers to an affirmative defense regarding a
    judicial estoppel.  (LS&CO MSJ at 20 n.11.)  Although paragraph 58 contains some of the

28  language quoted by LS&CO, the remaining language does not appear in Abercrombie's
    AAC at either paragraphs 58 or 59, which pertain the affirmative defenses of abandonment
    and unclean hands.

1    regarding a material fact, LS&CO knew or believed that the representation was false, LS&CO

2    intended that the USPTO rely upon the misrepresentation, the USPTO reasonably relied on the

3    misrepresentation, and Abercrombie suffered damages as a result.  *See Robi v. Five Platters,*

4    *Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990).  Further, Abercrombie bears a "heavy" burden of

5    proof on its counterclaim.  *Id.*

6         Abercrombie's fraud argument is based on LS&CO's statements in the January 1986

7    Affidavit that "there is no proceeding involving [its] rights pending in the Patent and Trademark

8    Office or in a court and not finally disposed of."  *See* 15 U.S.C. § 1065(a).  Abercrombie

9    contends LS&CO's statement that no proceeding was pending was knowingly false in light of

10   the *Lois Litigation*.  LS&CO asserts that Abercrombie cannot show this affidavit was materially

11   false, because at the time LS&CO filed the Section 15 Affidavit, the USPTO did not consider "a

12   proceeding involving the mark in which the owner is the plaintiff, where there is no

13   counterclaim involving the owner's rights in the mark, to be a 'proceeding involving these

14   rights' that would preclude the filing or acknowledgment of a § 15 affidavit."  Trademark

15   Manual of Examining Procedure ("TMEP") § 1605.04.  It is undisputed that LS&CO was not

16   the plaintiff in the *Lois Sportswear* litigation, and it also is undisputed that neither Lois

17   Sportswear nor Textiles asserted counterclaims against LS&CO.  LS&CO argues that, for

18   purposes of its counterclaims against Lois, LS&CO stood in the plaintiff's position and, thus, it

19   reasonably believed that it was not required to disclose the *Lois Sportswear* litigation.

20        A statement in an application or an affidavit submitted to the USPTO can be false and

21   yet not be fraudulent.  *See Metro Traffic Control v. Shadow Network, Inc.*, 104 F.3d 336, 340

22   (Fed. Cir. 1997); *eCash Technologies, Inc. v. Guagliardo*, 210 F. Supp. 2d 1138, 1149 (E.D.

23   Cal. 2001.)  Thus, "[s]tatements of honest, but perhaps incorrect belief or innocently made

24   inaccurate statements of fact do not constitute 'fraud.'"  *eCash Technologies*, 210 F. Supp. 2d at

25   1149 (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 31:66

26   at 31-117 and 31-118 (2000)).  In this case, Abercrombie bears the burden to show there are

27   material issues of fact that call LS&CO's intent into question.  Abercrombie relies, in part, on

28   the fact that LS&CO had filed its Section 8 affidavit for the '254 registration four months early.

United States District Court

For the Northern District of California

1    Abercrombie also relies on the fact that Ms. Fowler had not personally investigated or

2    confirmed the information contained in the affidavit.[17]  However, Ms. Fowler attests that she

3    relied on the information provided to her by her co-workers at LS&CO.  Abercrombie puts forth

4    no evidence to show that LS&CO did not adequately investigate the statements made in the

5    January 1986 Affidavit or that LS&CO did not have a reasonable and honest belief that its

6    statement that no proceedings were pending was true.

7         Taking the facts and all reasonable inferences therefrom in the light most favorable to

8    Abercrombie, the Court concludes it has not met its burden to overcome LS&CO's motion for

9    summary judgment.  LS&CO is, therefore, entitled to summary judgment on Abercrombie's

10   counterclaim for fraud.  Because Abercrombie's affirmative defenses of unclean hands and

11   trademark misuse rest on the same facts, LS&CO is entitled to summary judgment on those

12   affirmative defenses.  (*See* AAC ¶¶ 57, 59; Abercrombie Opp. to LS&CO MSJ at 23:11-13.)

13        **2.    LS&CO is entitled to judgment on the counterclaim based on abandonment.**

14        The Lanham Act provides that a mark will be "abandoned,"

15   [w]hen any course of conduct of the owner, including acts of omission as well
     as commission, causes the mark to become the generic name for the goods or
16   services or in connection with which it is used or to otherwise lose
     significance as a mark.

17

18   15 U.S.C. § 1127.  "Abandonment of a trademark, being in the nature of a forfeiture, must be

19   strictly proved."  *Prudential Ins. Co. of America v. Gibralter Financial Corp. of Calif.,* 694 F.

20   2d 1150, 1156 (9th Cir. 1982); *see also Electro Source, LLC v. Badness-Kalb-Aetna Group,*

21   *Inc.*, 458 F.3d 931, 935 n.2 (9th Cir. 2006).  "While the Ninth Circuit has not defined the

22   'strictly proved' standard further, the majority of courts applying that standard have found that

23   evidence of abandonment must be clear and convincing."  *Cash Processing Services v.*

24   ─────────────────────

25   [17]    Abercrombie relies on *Standard Knitting, Ltd. v. Toyota Jidosha Kabushiki
     Kaisha*, 2006 TTAB LEXIS 9 (Jan. 10, 2006) for the proposition that because Ms. Fowler
26   did not have personal knowledge of the matters set forth in the declaration, she was obliged
     to investigate them.  First, the Section 15 Affidavit notes that at least some of the statements
     may have been made on information and belief.  (*See* Cincone Supp. Decl., Ex. I.)  Second,
27   the statements at issue in the *Standard Knitting* case were factual matters pertaining to
     whether particular goods were "now in use in commerce."  The TTAB concluded that the
28   declarant's purported mistake was not reasonable because the meaning of that statement was
     not ambiguous.  The facts in this case simply are not analogous.

1   *Ambient Entertainment, Inc*., 418 F. Supp. 2d 1227, 1232 (D. Nev. 2006) (citing *EH Yacht*

2   *LLC v. Egg Harbor, LLC,* 84 F. Supp. 2d 556, 564 (D.N.J. 2000), in turn citing McCarthy §

3   17.12) and *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F. Supp. 1339,

4   1355 (E.D.N.Y. 1994)).

5           To support its claim for abandonment, Abercrombie primarily relies upon the third

6   party settlements and the surveys from other litigation, which the Court has excluded.

7   However, even if the Court were to consider this evidence, it would not alter the Court's

8   conclusion.  It is possible that the presence of other jeans manufacturers using designs

9   purportedly similar to the Arcuate mark has impacted the commercial strength of that mark.

10  *See, e.g., Adidas-America, Inc. v. Payless Shoe Source, Inc,.*, 546 F. Supp. 2d 1029, 1078 (D.

11  Or. 2008) (noting that "third party uses of [allegedly similar] designs is relevant to the strength

12  of the mark, not abandonment").  However, only when all rights of protection have been lost

13  can a party be found to have abandoned its trademark.

14          Dr. Sood's survey, however, establishes that notwithstanding the presence of third

15  parties using purportedly similar designs, the public still recognizes the Arcuate mark as a

16  source indicator for Levi's brand jeans.  (Sood Report at 6-7.)  Abercrombie has not put forth

17  admissible evidence that rebuts Dr. Sood's conclusions.  Accordingly, the Court concludes that

18  Abercrombie has failed meet its strict burden of proof and has failed to put forth facts from

19  which a reasonable jury could conclude that the Arcuate mark has lost all significance as a

20  mark.  LS&CO is entitled to judgment in its favor on this aspect of Abercrombie's

21  counterclaim.  For these same reasons, LS&CO is entitled to judgment on Abercrombie's

22  affirmative defense of abandonment.

23          **3.      LS&CO is entitled to judgment on Abercrombie's remaining affirmative
                      defenses.**

24

25          LS&CO also moves for summary judgment on Abercrombie's affirmative defenses of

26  estoppel, laches, acquiescence, and consent.

27                  **a.      Laches.**

28

17

To prevail on its laches defense, Abercrombie must show that LS&CO unreasonably delayed in filing suit and that it suffered prejudice as a result of LS&CO's unreasonable delay. *Danjac LLC v. Sony Corp.*, 265 F.3d 942, 955 (9th Cir. 2001). Abercrombie asserts that the Court should measure LS&CO's delay from January 2006, when LS&CO learned of Abercrombie's intent to use application, to July 2007, when LS&CO filed suit. "Generally speaking, the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit in which the defendant seeks to counterpose the laches defense." *Danjac*, 265 F.3d at 952.[18]

Under Section 1125(a), a party may be liable if it "uses in commerce any word, term, name, symbol, or device ... which is likely to cause confusion ... ." 15 U.S.C. § 1125. Given the "use in commerce" requirement, the Court concludes that it is appropriate to look to when LS&CO claims to have learned Abercrombie was using the accused Ruehl design in commerce. Although, it is undisputed that Abercrombie first used the Ruehl mark in commerce in February 2006, LS&CO asserts that it did not learn that Abercrombie actually had used the accused design commerce until June or July 2007 and that, thereafter, it filed suit. (*See* Wilson Decl., ¶ 3; Cincone Supp. Decl., Ex. V; Cincone Reply Decl., Ex. F at ¶ 10.)

It is undisputed that the intent to use application was under Abercrombie's name. It also is undisputed that the Ruehl brand is not advertised or promoted through traditional media and is offered for sale only the 24 Ruehl retail stores and, as of January 2008, through the internet. (Doty Supp. Decl., ¶¶ 12-15.) Even if the Court accepts as true Abercrombie's belief that LS&CO was known for pursing infringer's aggressively, *see* Wilson Opp. Decl. ¶ 4, there is no evidence in the record to show that LS&CO learned that the design was being used on the Ruehl brand before Abercrombie responded to discovery in the TTAB proceedings.

---

[18] In addition, if a claim is filed within the limitations period, there is a strong presumption that laches does not apply. *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 997 (9th Cir. 2006). Conversely, if claims are filed outside the statute of limitations period, there is a presumption that laches would apply. *Id.* In trademark cases, the Ninth Circuit applies a four year statute of limitations. *Id.* LS&CO filed suit on July 20, 2007. Thus, any claims that had accrued, or that LS&CO should have known had accrued, before July 20, 2003 would be outside the limitations period and presumptively barred. Abercrombie does not rely on any conduct outside of the limitations period to support its laches defense. Thus, LS&CO is entitled to the presumption that the defense will not apply.

**United States District Court**
For the Northern District of California

1   LS&CO's assertion that it did not learn of the infringing conduct until June 2007 stands

2   uncontradicted.  LS&CO filed suit one month later on July 20, 2007.  Abercrombie has not

3   come forth with evidence to establish LS&CO unreasonably delayed in filing suit.

4   Accordingly, LS&CO is entitled to summary judgment on Abercrombie's laches defense.

5        **b.**  **Estoppel, Consent and Acquiescence.**

6     At the hearing, Abercrombie confirmed that its "estoppel" defense is based on estoppel

7   by acquiescence.  That defense also requires a showing of "unreasonable and inexcusable"

8   delay.  *See E & J Gallo Winery v. Pasatiempos Gallo, S.A.*, 905 F. Supp. 1403, 1414 (E.D. Cal.

9   1994).  Abercrombie has failed to establish this element of its estoppel by acquiescence

10  defense for the reasons set forth above with regard to its laches defense.  Moreover, each of

11  these defenses requires more than merely "passive" consent.  *See Adidas-America*, 546 F.

12  Supp. 2d at 1075 (citing *Plasticolor Molded Prods. v. Ford Motor Co.*, 698 F. Supp. 199, 202-

13  03 (C.D. Cal. 1988)).

14    When LS&CO learned of Abercrombie's intent-to-use application, LS&CO notified

15  Abercrombie that it had concerns about the design, it opposed the application, and filed suit

16  within a month after learning that Abercrombie actually was using the mark in commerce.  The

17  Court concludes that no reasonable jury could conclude that LS&CO's conduct between the

18  time it learned of the intent-to-use application and the time it filed suit could be construed as

19  acquiescing to or consent to Abercrombie's use of the accused Ruehl design.  LS&CO is

20  entitled to judgment on these affirmative defenses.

21  **D.**  **There are Disputed Issues of Fact on LS&CO's Dilution Claim.**

22    LS&CO also moves for summary adjudication on the issue of whether the Arcuate

23  mark is "famous," for purposes of its dilution claim.  Abercrombie, in turn, has moved for

24  summary judgment on LS&CO's dilution claim on the basis that: the Arcuate mark is not

25  famous; lacks distinctiveness; and that LS&CO has not shown a likelihood of dilution.

26  LS&CO's federal dilution claim is governed by the Trademark Dilution Revision Action Act

27  of 2006 ("TDRA").  The TDRA defines dilution as follows:

28     Subject to the principles of equity, the owner of a famous mark that is
       distinctive, inherently or through acquired distinctiveness, shall be entitled

United States District Court

For the Northern District of California

> to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).   "Dilution is a cause of action invented and reserved for a select class of marks – those marks with such powerful consumer associations that even non-competing uses can impinge on their value. ... Therefore, to meet the 'famousness' element of protection under the dilution statutes, a mark must be truly prominent and renowned."  *Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 875 (9th Cir. 1999) (internal quotes and citation omitted); *see also Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002) ("the mark must be a household name").

To prevail on its dilution claim, LS&CO must demonstrate that the accused Ruehl design is identical, or nearly identical, to the Arcuate mark.  *Thane*, 305 F.3d at 905.  In addition, LS&CO must prove that "(1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the plaintiff's mark became famous; and (4) the defendant's use presents a likelihood of dilution of the distinctive value of the mark."  *Avery Dennison,* 189 F.3d at 874.  Under the TDRA, a "famous" mark is a mark that "is widely recognized by the general consuming public of the United States as a designation of the source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).

In order to determine whether a given mark is famous, a court may consider the following factors: (1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties;" (2) "[t]he amount, volume, and geographic extent of sales or services offered under the mark;" (3) "[t]he extent of actual recognition of the mark;" and (4) "[w]ether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."  *Id.* § 1125(c)(2)(A)(i)-(iv).

It is undisputed that the Arcuate mark is a registered mark, and having granted LS&CO's motion for summary judgment on the counterclaim, both the '248 and '254

20

United States District Court

For the Northern District of California

1   Registrations have become incontestable.  Abercrombie does not contest the fact that LS&CO

2   has been using the Arcuate mark on its products since at least 1873.  Abercrombie also has not

3   disputed the amount of money LS&CO expends on advertising or the number of units it has

4   sold over the years.  Abercrombie does, however, put forth evidence that suggests LS&CO's

5   sales have declined in recent years.  (Keyes Supp. Decl., Ex. E (Deposition of Will Mitchell

6   ("Mitchell Depo.") at 17:20-33:18, Ex. Q; Bettinger Supp. Decl., Ex. KK.)  Abercrombie,

7   however, notes that it is undisputed that LS&CO does not separate its advertising figures to

8   specify how much is spent advertising the Arcuate mark alone, rather than in combination with

9   LS&CO's other house marks.  Thus, Abercrombie argues it would be pure speculation to

10  conclude that, as a result of these advertising efforts, the general consuming public associates

11  the Arcuate mark with LS&CO.  Abercrombie relies in part on *Fossil Inc v. Fossil Group*, 49

12  U.S.P.Q.2d 1451, 1998 WL 962201 (T.T.A.B. 1998) for this proposition.

13          In the *Fossil* case, however, the trademark owner attempted to demonstrate the fame of

14  its mark by relying *only* on advertising and sales.  *See id.* at 1998 WL 962201 at * 7 (noting

15  that, unless the raw sales and advertising figures are extraordinarily large, the better practice is

16  "to submit ... consumer and trade testimony as well as newspaper and magazine articles

17  discussing" the trademark owner's products).  That is not the case here, where LS&CO also

18  introduces evidence of unsolicited third party recognition of the Arcuate mark.  (Onda Supp.

19  Decl., ¶ 8, Exs. D.1-D.9, E.)

20          In contrast, in *Nissan Motor Co., Ltd. v. Nissan Computer Corp.*, 2007 U.S. Dist.

21  LEXIS 90487 (C.D. Cal. Sept. 21, 2007), the district court relied, in part, on the plaintiff's

22  extensive and substantial advertising expenditures to support its conclusion that the "NISSAN"

23  mark was famous.  *Id.* at *33.  Although it is clear that LS&CO engages in a large amount of

24  advertising, this case, unlike *Nissan*, involves a design mark, and LS&CO's other house marks

25  appear on products with the Arcuate mark.  Further, many of the articles that LS&CO submits

26  to show third party recognition of the Arcuate mark are dated.  Indeed, of the nine articles

27  submitted, only one appears to have been published in this decade.  Abercrombie also

28  introduces evidence that there are numerous third parties using designs that are purportedly

similar to the Arcuate mark.  Finally, although the Court has concluded that Abercrombie has not established a genuine issue of material fact to show the Arcuate mark has lost *all* significance as a mark, the Court concludes that Dr. Ford's criticisms of Dr. Sood's consumer recognition survey may bear on the issue of whether LS&CO can show the mark is "famous" for purposes of its dilution claim.

The TTAB has stated that it was "reluctant" to find the Arcuate mark famous on a record that appears similar to this case.  *See Levi Strauss & Co. v. Vivat Holdings PLC*, 2000 TTAB LEXIS 817 (Dec. 19, 2000).  In light of third party usage of purportedly similar marks, the lack of specific figures for advertisements bearing only the Arcuate mark, the age of the materials regarding third party recognition, and the survey evidence, the Court concludes that there are facts from which a reasonable juror could reach a determination in either party's favor on the question of fame.

In addition, as noted above, LS&CO must show that the accused Ruehl design is identical or nearly identical to the Arcuate mark.  "For marks to be nearly identical to one another, they must be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same," and this test is more stringent in the dilution context, than in the infringement context.  *Thane*, 305 F.3d at 907 (internal quotations omitted).  The Court has compared the Arcuate mark and the accused Ruehl design, and it cannot conclude as a matter of law that a reasonable juror could find for either party on the issue of whether the two marks are "identical" for dilution purposes.

Accordingly, LS&CO's motion for summary adjudication on its dilution claim is DENIED, and Abercrombie's motion for summary judgment on the dilution claim is DENIED.

**E.   Abercrombie's Motion for Summary Judgment on the Infringement and Unfair Competition Claims Is Denied.**

In addition to moving for summary judgment on the dilution claim, Abercrombie also moves for summary judgment on each of LS&CO's federal, and state, infringement and unfair competition claims.  To state a claim for infringement under Section 43(a), a plaintiff must meet three basic elements: (1) distinctiveness; (2) nonfunctionality; and (3) likelihood of

United States District Court

For the Northern District of California

confusion. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992). "Likelihood of confusion exists when customers viewing the mark would probably assume that the product ... is associated with the source of a different product ... identified by a similar mark." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir. 1987) (internal quotations and emphasis omitted); *see also GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir. 2000) (internal quotations omitted).

"Likelihood of confusion requires that confusion be probable, not simply a possibility." *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir. 1987); *see also Playboy Enterprises, Inc. v. Terri Welles, Inc.*, 78 F. Supp. 2d 1066, 1083 (S.D. Cal. 1999) ("There must be a *substantial* likelihood that the public will be confused.") (emphasis in original) (citation omitted), *rev'd in part on other grounds*, 279 F.3d 796 (9th Cir. 2002). To determine whether there is a likelihood of confusion between the marks, the Ninth Circuit applies the eight factor *Sleekcraft*[19] test: (1) the strength of the marks; (2) the similarities of the marks; (3) the proximity of the goods; (4) evidence of actual confusion; (5) the marketing channels used; (6) the degree of care likely to be exercised by the consumer; (7) the defendant's intent in selecting the mark; and; (8) the likelihood of expansion of the parties' product lines.[20]  *Id.*

The factors are intended to guide the court in assessing the basic question of likelihood of confusion. *Eclipse Assoc. Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990). The presence or absence of a particular factor does not necessarily drive the determination of likelihood of confusion. *E. & J. Gallo*, 967 F.2d at 1290-91. "Whether confusion is likely is a factual determination woven into law." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 (9th Cir. 1985). Trial courts disfavor deciding trademark cases in summary judgment because the ultimate issue is so inherently factual. *Id.* at 1356 n.5. Additionally, the question of likelihood of confusion is routinely submitted for jury determination as a question of fact. *Id.*

---

[19]     *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

[20]     Abercrombie asserts that this factor is not relevant in this case. (*See* Memorandum of Points and Authorities in Support of Abercrombie & Fitch Trading Co.'s Motion for Summary Judgment ("Abercrombie MPA") at 4 n.2.)

**2.      There are issues of fact in dispute on likelihood of confusion.**

As noted, one of the *Sleekcraft* factors is actual confusion.  Abercrombie introduced evidence from its expert Dr. Ford to suggest that consumers do not confuse the accused Ruehl design with the Arcuate mark.  LS&CO, in turn, offers Dr. Sood's survey to show confusion, and the Court has determined that the survey is admissible.  Further, although Abercrombie argues that, interpreted correctly, Dr. Sood's survey does not show an actionable amount of confusion, the Court concludes that the competing surveys raise genuine issues of disputed fact on the element of "actual confusion."

In addition, the Court concludes that LS&CO has put forth evidence to show that there are factual disputes on other *Sleekcraft* factors.  For example, although Abercrombie argues that LS&CO's mark is weak due to the presence of other third party jean manufacturers, LS&CO has put forth evidence of its registered and incontestable mark.  In addition, the Court cannot conclude that a reasonable jury would not view the accused Ruehl design as similar to the Arcuate mark.

Accordingly, Abercrombie's motion for summary judgment is DENIED.

**CONCLUSION**

For the foregoing reasons, LS&CO's motion for summary judgment is GRANTED IN PART AND DENIED IN PART, Abercrombie's motion to exclude Dr. Sood's report, testimony, and survey evidence is DENIED, and Abercrombie's motion for summary judgment is DENIED.  If, in light of this Order, the parties resolve their differences before the pretrial conference, they shall notify the Court in writing.

**IT IS SO ORDERED.**

Dated: October 16, 2008

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California