1   TOWNSEND AND TOWNSEND AND CREW LLP
    GREGORY S. GILCHRIST (State Bar No. 111536)
2   GIA L. CINCONE (State Bar No. 141668)
    RAQUEL PACHECO (State Bar No. 245328)
3   Two Embarcadero Center, Eighth Floor
    San Francisco, California  94111
4   Telephone: (415) 576-0200
    Facsimile: (415) 576-0300
5   Email:  gsgilchrist@townsend.com, glcincone@townsend.com, rpacheco@townsend.com

6   Attorneys for Plaintiff
    LEVI STRAUSS & CO.
7
    _____
8
    MICHAEL J. BETTINGER (State Bar No. 122196)
9   RACHEL R. DAVIDSON (State Bar No. 215517)
    K&L GATES LLP
10  55 Second Street, Suite 1700
    San Francisco, CA 94105
11  Phone:  415-882-8200
    Facsimile:  415- 882-8220
12
    J. MICHAEL KEYES (PRO HAC VICE)
13  KJIRSTIN J. GRAHAM (State Bar No. 239485)
    K&L GATES LLP
14  618 West Riverside Avenue, Suite 300
    Spokane WA  99201-0602
15  Phone:  509-624-2100
    Facsimile:  509-456-0146
16
    Attorneys for Defendant
17  ABERCROMBIE & FITCH TRADING CO.

18

19                    UNITED STATES DISTRICT COURT

20           FOR THE NORTHERN DISTRICT OF CALIFORNIA

21                      SAN FRANCISCO DIVISION

22

23  LEVI STRAUSS & CO.,                   Case No.    C 07-03752 JSW

24                  Plaintiff,            **PROPOSED STIPULATED AND
                                          DISPUTED JURY INSTRUCTIONS**
25          v.
                                          **Pretrial Conf.: November 24, 2008**
26  ABERCROMBIE & FITCH TRADING CO.,      **Trial:          December 15, 2008**
                                          **Courtroom:      2**
27                  Defendant.

28

Plaintiff Levi Strauss & Co. ("LS&CO.") and Defendant Abercrombie & Fitch Trading Co. ("A&F") hereby submit their joint proposed stipulated and disputed jury instructions as follows.

| NINCH CIRCUIT MANUAL OF MODEL JURY INSTRUCTIONS - CIVIL | | | | | |
|---|---|---|---|---|---|
| Jury Instruction Number | Jury Instruction Title | Given as Proposed | Given as Modified | Refused | Withdrawn |
| 1.1 (A, B or C) | Duty of Jury | | | | |
| 1.2 | Claims and Defenses | | | | |
| 1.3 | Burden of Proof-Preponderance of the Evidence | | | | |
| 1.6 | What is Evidence | | | | |
| 1.7 | What is Not Evidence | | | | |
| 1.9 | Direct and Circumstantial Evidence | | | | |
| 1.10 | Ruling on Objections | | | | |
| 1.11 | Credibility of Witnesses | | | | |
| 1.12 | Conduct of the Jury | | | | |
| 1.13 | No Transcript Available to the Jury | | | | |
| 1.14 | Taking Notes | | | | |
| 1.15 | Questions to Witnesses by Jurors | | | | |
| 1.18 | Bench Conferences and Recesses | | | | |
| 1.19 | Outline of Trial | | | | |
| 2.1 | Stipulated Testimony | | | | |
| 2.2 | Stipulations of Fact | | | | |
| 2.3 | Judicial Notice | | | | |
| 2.4 | Deposition in Lieu of Live Testimony | | | | |
| 2.8 | Impeachment Evidence – Witness | | | | |

| 2.10 | Use of Interrogatories of a Party | | | | |
|------|-----------------------------------|--|--|--|--|
| 2.11 | Expert Opinion | | | | |
| 2.12 | Charts and Summaries Not Received in Evidence | | | | |
| 2.13 | Charts and Summaries Received in Evidence | | | | |
| 2.14 | Evidence in Electronic Format | | | | |
| 3.1 | Duty to Deliberate | | | | |
| 3.2 | Communication with Court | | | | |
| 3.3 | Return of Verdict | | | | |
| 3.4 | Additional Instructions of Law | | | | |
| 3.5 | Deadlocked Jury | | | | |

**Stipulated Instruction No. 1**

**Preliminary Instruction—Trademark**

The plaintiff, Levi Strauss & Co., seeks damages against the defendant, Abercrombie & Fitch Trading Company, for trademark infringement, trademark dilution and unfair competition. Abercrombie denies infringing the trademark and unfairly competing.  To help you understand the evidence that will be presented in this case, I will explain some of the legal terms you will hear during this trial.

A trademark is a word, a name, a symbol, a device, or a combination of them that indicates the source of goods. The owner of a trademark has the right to exclude others from using that trademark.

A person acquires the right to exclude others from using a trademark by being the first to use it in the marketplace. Rights in a trademark are obtained only through commercial use of the mark. The owner of a trademark has the right to exclude others.

A trademark owner may enforce the right to exclude others in an action for infringement or unfair competition.

The owner of a may obtain a certificate of registration issued by the United States Patent and Trademark Office.  Thereafter, when the owner brings an action for infringement, the owner may rely on the registration certificate to prove that the owner has the right to exclude others from using the trademark in connection with the type of goods specified in the certificate.

In this case, the plaintiff, Levi Strauss & Co., contends that the defendant, Abercrombie & Fitch Trading Company, has infringed Levi Strauss's trademark. Levi Strauss has the burden of proving by a preponderance of the evidence that it is the owner of a valid trademark and that Abercrombie infringed that trademark. Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that Abercrombie infringed Levi Strauss's trademark.

You should base your decision on all the evidence, regardless of which party presented it.

Levi Strauss & Co. and Abercrombie & Fitch Trading Company are persons as that term is used in these instructions.

1    <u>Authority</u>:        Ninth Circuit Model Civil Jury Instruction No. 15.0 (modified).

1

2

3

**Stipulated Instruction No. 2**

**Definition—Trademark**

4       A trademark is any word, name, symbol or device used by a person to identify and distinguish

5   that person's goods from those of others and to indicate the source of the goods, even if that source is

6   generally unknown.

7       A person who uses the trademark of another may be liable for damages.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   <u>Authority</u>:       Ninth Circuit Model Civil Jury Instruction No. 15.1 (modified).

26

27

28

**Disputed Instruction No. 3 Offered By LS&CO.**

**Anonymous Source Rule**

The function of a trademark is to allow a consumer to expect that all goods with the same trademark come from the same source, even if the consumer cannot identify the source by name.  The consumer may not know, or care about, the name of the corporation that makes the product.  But the consumer is entitled to assume that all products carrying the trademark are affiliated with or sponsored by that single, anonymous source.

Authority:  *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 380 (9th Cir.), *cert. denied*, 429 U.S. 830 (1976); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 155 (9th Cir.), *cert. denied*, 374 U.S. 830 (1963); McCarthy, *McCarthy on Trademarks* § 3.9 at 3-22 (3d ed. 2006).

1

2

**A&F's Objection To Disputed Instruction No. 3 Offered By LS&Co.**

3

4

5

     A&F believes that the purpose of trademarks is adequately addressed in Stipulated Instruction Nos. 1 and 4.  Moreover, as set forth in A&F's separate memorandum,  LS&CO. is claiming that its trademark is "famous", the anonymous source rule simply need not be recited to the jury.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 4**

**Trademark Liability – Theories and Policies (15 U.S.C. §§ 1114(1), 1125(a))**

The trademark laws balance three often-conflicting goals: 1) protecting the public from being misled about the nature and source of goods and services, so that the consumer is not confused or misled in the market; 2) protecting the rights of a business to identify itself to the public and its reputation in offering goods and services to the public; and 3) protecting the public interest in fair competition in the market.

The balance of these policy objectives vary from case to case, because they may often conflict. Accordingly, each case must be decided by examining its specific facts and circumstances, of which you are to judge.

In my instructions, I will identify types of facts you are to consider in deciding if Abercrombie is liable to Levi Strauss for violating the trademark law.  These facts are relevant to whether Abercrombie is liable for:

1. infringing Levi Strauss's registered trademark rights, by using a trademark in a manner likely to cause confusion among consumers;

2.  diluting Levi Strauss's trademark rights by using a design that diminishes the ability of Levi Strauss's trademark to indicate a single source; or

3. unfairly competing, by using a trademark in a manner likely to cause confusion as to the origin or quality of Levi Strauss's goods.

<u>Authority</u>:      Ninth Circuit Model Civil Jury Instruction No. 15.4 (modified).

1

**Stipulated Instruction No. 5**

2

**Infringement – Elements and Burden of Proof – Trademark (15 U.S.C. § 1114(1))**

3

4       On Levi Strauss's claim for trademark infringement, Levi Strauss has the burden of proving

5   each of the following elements by a preponderance of the evidence that:

6           1. the arcuate design is a valid, protectable trademark;

7           2. Levi Strauss owns the arcuate design as a trademark; and

8           3. Abercrombie used a mark similar to the arcuate design without the consent of Levi Strauss

9   in a manner that is likely to cause confusion among ordinary purchasers as to the source of the goods.

10      If you find that each of the elements on which Levi Strauss has the burden of proof has been

11  proved, your verdict should be for Levi Strauss.  If, on the other hand, Levi Strauss has failed to prove

12  any of these elements, your verdict should be for Abercrombie.

13

14

15

16

17

18

19

20

21

22

23  <u>Authority</u>:      Ninth Circuit Model Civil Jury Instruction No. 15.5.

24

25

26

27

28

1

**Stipulated Instruction No. 6**

2

**Infringement—Elements—Presumed Validity and Ownership—Registered Trademark**

3

**(15 U.S.C. §§ 1057, 1065 and 1115)**

4

5     I gave you instruction number 5 that requires Levi Strauss to prove by a preponderance of the

6     evidence that the trademark is valid and protectable and that Levi Strauss owns the trademark.  A valid

7     trademark is a word, name, symbol, device, or any combination of these, that indicates the source of

8     goods and distinguishes those goods from the goods of others. A trademark becomes protectable after

9     it is used in commerce.

10    One way for Levi Strauss to prove trademark validity is to show that the trademark is

11    registered. An owner of a trademark may obtain a certificate of registration issued by the United States

12    Patent and Trademark Office and may submit that certificate as evidence of the validity and

13    protectability of the trademark and of the certificate holder's ownership of the trademark covered by

14    that certificate.

15    Exhibit ___ contains certificates of registration from the United States Patent and Trademark

16    Office for U.S. Registration No. 404,248, U.S. Registration No. 1,139,254, and U.S. Registration No.

17    2,794,649.  They were submitted by Levi Strauss as proof of the validity of the trademark and that

18    Levi Strauss owns the trademark.

19    U.S. Registration No. 404,248 shows that Levi Strauss owns the stitching design trademark

20    shown in the certificate for a design accomplished by "stitching the double arcuate designs on the hip

21    pockets with orange colored thread or by painting the lines of said design on the hip pockets with

22    orange colored paint" as used on waistband type overalls.

23    U.S. Registration No. 1,139,254 shows that Levi Strauss owns the stitching design trademark

24    shown in the certificate as used on pants, jackets, skirts, dresses or shorts.

25    U.S. Registration No. 2,794,649 shows that Levi Strauss owns the stitching design trademark

26    shown in the certificate as used on pants, jeans, shorts, shirts, T-shirts, blouses, skirts, and jackets.

27

28    <u>Authority</u>:      Ninth Circuit Model Civil Jury Instruction No. 15.7 (modified).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 7 Offered By A&F**

**Continuing Commercial Impression**

Levi Strauss claims that Abercrombie has infringed certain arcuate designs that Abercrombie claims are not covered by Levi Strauss's U.S. Trademark Registration Nos. 404,248, 1,139,254 and 2,794,649.  These arcuate designs that Abercrombie claims are not covered by the Registrations are attached to these Instructions as Exhibit A  and are referred to as the "Disputed Designs."

You must first decide whether the Disputed Designs create the same overall commercial impression as the designs as depicted in the Registrations.  You should find the Disputed Designs create the same overall commercial impressions if they are so similar to the designs depicted in the Registrations that consumers generally would regard them as essentially the same.

If you find that any or all of the Disputed Designs do not create the same overall commercial impression, you should next consider Jury Instruction Nos. 8-11.

If you find that all of the Disputed Designs create the same overall commercial impression as the designs depicted in the Registrations, you should disregard Jury Instructions 8-11 and move on to consider the rest of these instructions starting with Jury Instruction No. 12.

<u>Authority</u>:  *Van Dyne-Crotty, Inc. v. Wear-Guard Corp*., 926 F.2d 1156, 1159 (Fed. Cir. 1991); *Adventis, Inc. v. Consolidated Property Holdings, Inc*. L 1134129, 4-5  (W.D.Va. 2006). *Brookfield Communications, Inc. v. West Coast Entertainment Corp*., 174 F.3d 1036, 1048 (9th Cir. 1999).

1

**LS&CO.'s Alternative To Disputed Instruction Nos. 7-11 Offered By A&F**

2

**(to follow Disputed Instruction No. 15)**

3

4 In considering whether Abercrombie's Ruehl design is confusingly similar with Levi Strauss's

5 trademark , you should compare the Ruehl design against the arcuate design as it appears in any of

6 Levi Strauss's registrations, or any version of the arcuate design that creates the same overall

7 commercial impression as the versions in Levi Strauss's registrations.  If any of the Levi Strauss

8 designs that are in evidence do not present the same overall commercial impression as the arcuate

9 design as it appears in the registrations, then you should resolve the likelihood of confusion issue only

10 with regard to those Levi Strauss designs that do present the same overall commercial impression as

11 the arcuate design.

12

13

14

15

16

17 <u>Authority</u>:  *Veryfine Products, Inc. v. Colon Brothers, Inc.*, 799 F. Supp. 240, 255 (D.P.R. 1992);

18 *Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1117 (S.D.N.Y. 1981); *Li'l Red Barn,*

19 *Inc. v. Red Barn System, Inc.*, 322 F. Supp. 98, 107-08 (N.D. Ind. 1970).

20

21

22

23

24

25

26

27

28

1

**Disputed Instruction No. 8 Offered By A&F**

2

**Infringement—Elements—Validity—Unregistered Marks**

3

4        Instruction ____ requires Levi Strauss to prove by a preponderance of the evidence that **the**

5    **Disputed Designs** are valid trademarks.  A valid trademark is a symbol that is either:

6            1. inherently distinctive; or

7            2. descriptive, but has acquired a secondary meaning.

8            Only a valid trademark can be infringed.  Only if you determine Levi Strauss proved by a

9    preponderance of the evidence that each Disputed Design is a valid trademark should you consider

10   whether Levi Strauss owns it or whether Abercrombie's actions infringed it.

11           Only if you determine that each Disputed Design is not inherently distinctive should you

12   consider whether it is descriptive but became distinctive through the development of secondary

13   meaning, as I will direct in Instruction ____.

14

15

16

17

18

19   <u>Authority</u>:        Ninth Circuit Model Civil Jury Instruction No. 15.8 (modified)

20

21

22

23

24

25

26

27

28

1

2

**LS&CO.'s Objection to Disputed Instruction Nos. 7-11 Offered By A&F**

3      As set forth in LS&CO.'s memorandum of law regarding the disputed instructions, LS&CO.

4  believes all of these instructions are inappropriate.  LS&CO. also objects to the definition for the jury

5  of the term "Disputed Designs."  If the Court determines that some version of A&F's proposed

6  instructions is appropriate, LS&CO. reserves the right to propose additional alternatives.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 9 Offered By A&F**

**Infringement—Elements—Validity—Unregistered Mark—Distinctiveness**

How distinctively or strongly a trademark indicates that a good comes from a particular source even if unknown is an important factor to consider in assessing its validity and Instruction ___ for determining whether the trademark used by Abercrombie creates for consumers a likelihood of confusion with Levi Strauss's trademark.

Levi Strauss asserts that the Disputed Designs are valid and protectable trademarks for its clothing items, namely denim bottoms. Levi Strauss contends that Abercrombie's use of the RUEHL stitching design in connection with Abercrombie's denim bottoms infringes Levi Strauss's trademark and is likely to cause confusion about the origin of the **goods bearing the RUEHL stitching design**. In order to determine if Levi Strauss has met its burden of showing that the Disputed Designs are valid trademarks, you should classify them on the spectrum of trademark distinctiveness that I will explain in this instruction.

An inherently distinctive trademark is a word, symbol or device, or combination of them, which intrinsically identifies a particular source of a good in the market. The law assumes that an inherently distinctive trademark is one that almost automatically tells a consumer that it refers to a brand or a source for a product, and that consumers will be predisposed to equate the trademark with the source of a product.

<u>Spectrum of Marks</u>

Trademark law provides protection to distinctive or strong trademarks. Conversely, trademarks that are not as distinctive or strong are called "weak" trademarks and receive less protection from infringing uses. Trademarks that are not distinctive are not entitled to any trademark protection. For deciding trademark protectability you must consider whether a trademark is inherently distinctive. Trademarks are grouped into four categories according to their relative distinctiveness.  These four categories are, in order of strength or distinctiveness: arbitrary (which is inherently distinctive), suggestive (which also is inherently distinctive), descriptive (which is protected only if it acquires in consumers' minds a "secondary meaning" which I explain in Instruction 15.10 and generic trademarks

1  (which are entitled to no protection).

2      Arbitrary Trademarks. The first category is "inherently distinctive" trademarks. They are

3  considered strong marks and are clearly protectable. They involve the arbitrary, fanciful or fictitious

4  use of a word **or symbol** to designate the source of a product.  Such a trademark is a word that in no

5  way describes or has any relevance to the particular product it is meant to identify. It may be a

6  common word **or symbol** used in an unfamiliar way.  It may be a newly created **symbol** which is

7  applied in a fanciful, fictitious or unfamiliar way, solely as a trademark.

8      For instance, the common word "apple" became a strong and inherently distinctive trademark

9  when used by a company to identify the personal computers that company sold. The company's use of

10  the word "apple" was arbitrary or fanciful because "apple" did not describe and was not related to

11  what the computer was, its components, ingredients, quality, or characteristics. "Apple" was being

12  used in an arbitrary way to designate for consumers that the computer comes from a particular

13  manufacturer or source.

14      Suggestive Trademarks. The next category of marks is suggestive trademarks. These

15  trademarks are also inherently distinctive but are considered weaker than arbitrary trademarks. Unlike

16  arbitrary trademarks, which are in no way related to what the product is or its components, quality, or

17  characteristics, suggestive trademarks imply some characteristic or quality of the product to which

18  they are attached. If the consumer must use imagination or any type of multi-stage reasoning to

19  understand the trademark's significance, then the trademark does not describe the product's features,

20  but suggests them.

21      A suggestive use of a word involves consumers associating the qualities the word suggests to

22  the product to which the word is attached. For example, when "apple" is used not to indicate a certain

23  company's computers, but rather "Apple-A-Day" Vitamins, it is being used as a suggestive trademark.

24  "Apple" does not describe what the vitamins are. However, consumers may come to associate the

25  healthfulness of "an apple a day keeping the doctor away" with the supposed benefits of taking

26  "Apple-A-Day" Vitamins.

27      Descriptive Trademarks. The third category of marks is descriptive trademarks. These

28  trademarks directly identify or describe some aspect, characteristic, or quality of the product to which

1  they are affixed in a straightforward way that requires no exercise of imagination to be understood.

2      For instance, the word "apple" is descriptive when used in the trademark "CranApple" to

3  designate a cranberry-apple juice. It directly describes ingredients of the juice. Other common types of

4  descriptive trademarks identify where a product comes from, or the name of the person who makes or

5  sells the product. Thus, the words "Apple Valley Juice" affixed to cider from the California town of

6  Apple Valley is a descriptive trademark because it geographically describes where the cider comes

7  from. Similarly, a descriptive trademark can be the personal name of the person who makes or sells

8  the product. So, if a farmer in Apple Valley, Judy Brown, sold her cider under the label "Judy's Juice"

9  (rather than Cran Apple) she is making a descriptive use of her personal name to indicate and describe

10  who produced the apple cider and she is using her first name as a descriptive trademark.

11      Generic Trademarks. The fourth category of trademarks is entitled to no protection at all. They

12  are called generic trademarks and they give the general name **or symbol** of the product of Levi

13  Strauss. They are part of our common language which we need to identify all such similar products.

14  They are the common name **or symbol** for the product to which they are affixed. It is the general

15  name for which the particular product or service is an example.

16      It is generic if the term answers the question "what is the product being sold?" If the average

17  relevant consumer would identify the term with all such similar products, regardless of the

18  manufacturer, the term is generic and not entitled to protection as a trademark.

19      Clearly, the word apple can be used in a generic way and not be entitled to any trademark

20  protection. This occurs when the word is used to identify the fleshy, red fruit from any apple tree.

21      The computer maker who uses that same word to identify the personal computer, or the

22  vitamin maker who uses that word on vitamins, has no claim for trademark infringement against the

23  grocer who used that same word to indicate the fruit sold in a store. As used by the grocer, the word is

24  generic and does not indicate any particular source of the product. As applied to the fruit, "apple" is

25  simply the common name for what is being sold.

26      <u>Mark Distinctiveness and Validity</u>

27      If you decide that the Disputed Designs are arbitrary or suggestive, they are to considered

28  inherently distinctive. An inherently distinctive trademark is valid and protectable.

1    On the other hand, if you determine that the Disputed Designs are generic, they cannot be

2  distinctive and therefore are not valid nor protectable. You must render a verdict for Abercrombie on

3  the charge of infringement in Instruction ___.

4    If you decide that the Disputed Designs are descriptive, you will not know if the trademark is

5  valid or invalid until you consider if it has gained distinctiveness by the acquisition of secondary

6  meaning, which I explain in Instruction ___.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  <u>Authority</u>:    Ninth Circuit Model Civil Jury Instruction No. 15.9 (modified).

25

26

27

28

1

**LS&CO.'s Objection to Disputed Instruction Nos. 7-11 Offered By A&F**

2

3          As set forth in LS&CO.'s memorandum of law regarding the disputed instructions, LS&CO.

4   believes all of these instructions are inappropriate.  LS&CO. also objects to the definition for the jury

5   of the term "Disputed Designs."  If the Court determines that some version of A&F's proposed

6   instructions is appropriate, LS&CO. reserves the right to propose additional alternatives.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**Disputed Instruction No. 10 Offered By A&F**

**Infringement—Elements—Validity—Distinctiveness—Secondary Meaning**

3

4      If you determined in Instruction 15.9 that any of the Disputed Designs are descriptive, you

5   must consider the recognition that the mark has among prospective purchasers. This market

6   recognition is called the trademark's "secondary meaning."

7      A symbol **has** a secondary meaning when it has been used in such a way that its primary

8   significance in the minds of the prospective purchasers is not the product itself, but the identification

9   of the product with a single source, regardless of whether consumers know who or what that source is.

10   You must find that the preponderance of the evidence shows that a significant number of the

11   consuming public associates the unregistered arcuate design with a single source, in order to find that

12   it has acquired secondary meaning.

13      You may consider the following factors when you determine whether the Disputed Designs

14   have acquired a secondary meaning:

15      1.  Purchaser Perception. Whether the people who purchase the product that bears the claimed

16   trademark associate the trademark with the owner;

17      2. Advertisement. To what degree and in what manner the owner may have advertised under

18   the claimed trademark;

19      3. Demonstrated Utility. Whether the owner successfully used this trademark to increase the

20   sales of its product;

21      4. Extent of Use. The length of time and manner in which the owner used the claimed

22   trademark;

23      5.  Exclusivity. Whether the owner's use of the claimed trademark was exclusive;

24      6. Copying. Whether Abercrombie intentionally copied the owner's trademark; and

25      7. Actual Confusion.  Whether Abercrombie's use of the **RUEHL stitching design** has led to

26   actual confusion.

27      Descriptive marks are protectable only to the extent you find they acquired distinctiveness

28   through secondary meaning by the public coming to associate the mark with the owner of the mark.

1   Descriptive marks are entitled to protection only as broad as the secondary meaning they have

2   acquired, if any. If they have acquired no secondary meaning, they are entitled to no protection and

3   cannot be considered a valid mark.

4        Levi Strauss has the burden of proving that the Disputed Designs have acquired a secondary

5   meaning. Abercrombie has the burden of proving that the unregistered arcuate designs lack a

6   secondary meaning.

7        The mere fact that Levi Strauss is using symbol, or that Levi Strauss began using it before

8   Abercrombie, does not mean that the trademark has acquired secondary meaning. There is no

9   particular length of time that a trademark must be used before it acquires a secondary meaning.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   <u>Authority</u>:    Ninth Circuit Model Civil Jury Instruction No. 15.10 (modified).

25

26

27

28

1

**LS&CO.'s Objection to Disputed Instruction Nos. 7-11 Offered By A&F**

2

3        As set forth in LS&CO.'s memorandum of law regarding the disputed instructions, LS&CO.

4   believes all of these instructions are inappropriate.  LS&CO. also objects to the definition for the jury

5   of the term "Disputed Designs."  If the Court determines that some version of A&F's proposed

6   instructions is appropriate, LS&CO. reserves the right to propose additional alternatives.

7        With regard to A&F's Disputed Instruction No. 10, LS&CO. also objects to the reference to

8   actual confusion, which is irrelevant to secondary meaning.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed Instruction No. 11 Offered By A&F**

2

**Infringement—Elements— Ownership—Generally**

3

4        The law entitles the trademark owner to exclude others from using that trademark.

5        A person acquires the right to exclude others from using a trademark by being the first to use it

6    in the marketplace.

7        If you find Levi Strauss's Disputed Designs to be valid that is, inherently distinctive, you must

8    consider whether Levi Strauss used the Disputed Designs as a trademark for Levi Strauss's denim

9    bottoms before Abercrombie began to use the RUEHL stitching designs to market its denim bottoms

10    in the area where Levi Strauss sells its denim bottoms.

11        A trademark is "used" for purposes of this instruction when it is transported or sold in

12    commerce and the trademark is attached to the product, or placed on its label or container.

13        If you find by a preponderance of the evidence that Levi Strauss has not shown that Levi

14    Strauss used **the Disputed Designs** before Abercrombie's use of the RUEHL stitching design, then

15    you cannot conclude that Levi Strauss is the owner of **those particular Disputed Designs as a**

16    **trademark** for purposes of Instruction ____.

17

18

19

20

21

22

23

24

25    <u>Authority</u>:       Ninth Circuit Model Civil Jury Instruction No. 15.12 (modified).

26

27

28

1

**LS&CO.'s Objection to Disputed Instruction Nos. 7-11 Offered By A&F**

2

3       As set forth in LS&CO.'s memorandum of law regarding the disputed instructions, LS&CO.

4   believes all of these instructions are inappropriate.  LS&CO. also objects to the definition for the jury

5   of the term "Disputed Designs."  If the Court determines that some version of A&F's proposed

6   instructions is appropriate, LS&CO. reserves the right to propose additional alternatives.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 12**

**Infringement—Likelihood of Confusion—Factors—Sleekcraft Test**

**(15 U.S.C. §§ 1114(1) and 1125(a))**

You must consider whether Abercrombie's use of the Ruehl design is likely to cause confusion about the source of Levi Strauss's or Abercrombie's goods.

I will suggest some factors you should consider in deciding this. The presence or absence of any particular factor that I suggest should not necessarily resolve whether there was a likelihood of confusion, because you must consider all relevant evidence in determining this.  As you consider the likelihood of confusion you should examine the following:

1. Strength or Weakness of Levi Strauss's Mark. The more the consuming public recognizes Levi Strauss's trademark as an indication of origin of Levi Strauss's goods, the more likely it is that consumers would be confused about the source of Abercrombie's goods if Abercrombie uses a similar mark.

2. Abercrombie's Use of the Mark. If Abercrombie and Levi Strauss use their trademarks on the same, related, or complementary kinds of goods there may be a greater likelihood of confusion about the source of the goods than otherwise.

3. Similarity of Levi Strauss's and Abercrombie's Marks. If the overall impression created by Levi Strauss's trademark in the marketplace is similar to that created by Abercrombie's trademark in appearance, there is a greater chance of likelihood of confusion. Similarities in appearance, sound or meaning weigh more heavily than differences in finding the marks are similar.

4. Actual Confusion. If use by Abercrombie of Levi Strauss's trademark has led to instances of actual confusion, this strongly suggests a likelihood of confusion. However actual confusion is not required for a finding of likelihood of confusion. Even if actual confusion did not occur, Abercrombie's use of the trademark may still be likely to cause confusion. As you consider whether the trademark used by Abercrombie creates for consumers a likelihood of confusion with Levi Strauss's trademark, you should weigh any instances of actual confusion against the opportunities for such confusion. If the instances of actual confusion have been relatively frequent, you may find that

there has been substantial actual confusion. If, by contrast, there is a very large volume of sales, but only a few isolated instances of actual confusion you may find that there has not been substantial actual confusion.

     5. Abercrombie's Intent. Knowing use by Abercrombie of Levi Strauss's trademark to identify similar goods may strongly show an intent to derive benefit from the reputation of Levi Strauss's mark, suggesting an intent to cause a likelihood of confusion. On the other hand, even in the absence of proof that Abercrombie acted knowingly, the use of Levi Strauss's trademark to identify similar goods may indicate a likelihood of confusion.

     6. Marketing/Advertising Channels. If Levi Strauss's and Abercrombie's goods are likely to be sold in the same or similar stores or outlets, or advertised in similar media, this may increase the likelihood of confusion.

     7. Purchaser's Degree of Care. The more sophisticated the potential buyers of the goods or the more costly the goods, the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution may be. They may be less likely to be confused by similarities in Levi Strauss's and Abercrombie's trademarks.

     8. Product Line Expansion. When the parties' products differ, you may consider how likely Levi Strauss is to begin selling the products for which Abercrombie is using Levi Strauss's trademark. If there is a strong possibility of expanding into the other party's market, there is a greater likelihood of confusion.

Authority:     Ninth Circuit Model Civil Jury Instruction No. 15.16.

1

**Disputed Instruction No. 13 Offered by LS&CO.**

2

**Likelihood of Confusion – Types of Confusion**

3

**(Source, Affiliation, Connection)**

4

5
You must consider whether a consumer will likely be confused as to the source of the

6
products, that is, whether consumers might be confused about who manufactures or produces

7
Abercrombie's products bearing the trademark.

8
You must also consider whether consumers are likely to be confused about an affiliation,

9
connection, or sponsorship, that is, whether consumers might be confused about an affiliation or

10
connection between the producer of products with the arcuate design and the producer of products

11
with the Ruehl design, or about whether Levi Strauss has sponsored Abercrombie's products or its use

12
of the Ruehl design.

13

14

15

16

17

18

19

20

21

22

23

24
Authority:  15 U.S.C. § 1125(a); *Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 806-07

25
(9th Cir. 2003).

26

27

28

1

**A&F's Objection To Disputed Instruction No. 13 Offered By LS&Co.**

2

3        A&F believes that Jury Instruction No. 12 already adequately addresses that confusion is

4    actionable and there is no need for a separate instruction.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed Instruction No. 14 Offered by LS&CO.**

2

**Likelihood of Confusion – Types of Confusion**

3

**(Point of Sale, Post Sale, Initial Interest)**

4

5       You should consider confusion that may arise at the point of sale when a consumer purchases

6  or considers purchasing Abercrombie's goods.

7       You should also consider whether there is a likelihood of post-sale confusion.  A likelihood of

8  post-sale confusion occurs when it is likely that a trademark that is observed away from the point of

9  sale will be confused as being the same as another trademark, affiliated with another trademark, or

10  sponsored by the owner of another trademark.  In this case, post-sale confusion would involve

11  consumers seeing a garment bearing the Ruehl design outside the retail store, perhaps when worn by a

12  passer-by, and becoming confused about whether the garment was made or sponsored by the same

13  company that makes products bearing the arcuate design, or made by an affiliate of the company that

14  makes products bearing the arcuate design.

15       You should also consider the possibility of initial interest confusion.  A likelihood of initial

16  interest confusion occurs when it is likely that, due to the confusing similarity of the Ruehl design and

17  the arcuate design, a consumer develops an interest in Abercrombie's products in the belief that

18  products are made or sponsored by Levi Strauss, or by an affiliate of Levi Strauss.  In this case, initial

19  interest confusion would involve consumers, due to the similarity between the arcuate design and the

20  Ruehl design, developing an interest in Abercrombie's products in the belief that the products are

21  made or sponsored by the same company that makes products bearing the arcuate design , or are made

22  by an affiliate of the company that makes products that bear the arcuate design.  Initial interest

23  confusion does not depend on whether the consumer actually is confused at the time he or she makes a

24  purchase.

25       You should use the same factors in considering the likelihood of post-sale confusion and

26  initial interest confusion that you have been instructed to use in considering the likelihood of

27  confusion at the time of purchase.  However, some of the factors may not apply to post-sale confusion

28  or initial interest confusion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18   <u>Authority</u>:        *Playboy Enterprises, Inc. v. Netscape Communications, Corp.*, 354 F.3d 1020, 1026

19   (9th Cir. 2004); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036,

20   1054 (9th Cir. 1999); *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1405

21   (9th Cir. 1997); *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*,

22   944 F.2d 1446 (9th Cir. 1991); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d

23   Cir. 1986); *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817 (9th Cir. 1980).

24

25

26

27

28

1

**A&F's Objection To Disputed Instruction No. 14 Offered By LS&Co.**

2

3        A&F believes that Jury Instruction No. 12 adequately addresses that confusion is actionable.

4    Moreover, as set forth in A&F's separate memorandum opposing Disputed Instruction No. 14,

5    LS&Co. has already admitted it is aware of no actual confusion and, therefore, an instruction on

6    "point of sale" and "initial interest" confusion is not warranted.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 15 Offered By LS&CO.**

**Likelihood of Confusion – Similarity as a Likelihood of Confusion Factor**


Trademarks used on related goods are more likely to cause confusion than when used on unrelated goods.  Therefore, the degree of similarity between the trademarks required for a likelihood of confusion is less when the trademarks are used on identical or closely related goods.

Authority:      *Official Airlines Guides, Inc. v. Goss*, 6 F.3d 1385 (9th Cir. 1993); *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979); *Guess?, Inc. v. Tres Hermanos*, 993 F. Supp. 1277 (C.D. Cal. 1997).

1

**A&F's Objection To Disputed Instruction No. 15 Offered By LS&Co.**

2

3        A&F believes that Jury Instruction No. 12 adequately addresses relatedness of the goods.

4  Moreover, as set forth in A&F's separate memorandum opposing disputed Instruction No. 15, these

5  "presumptions" set forth are used in the context of summary judgment and/or preliminary injunction

6  proceedings, not jury trials.

**Disputed Instruction No. 16 Offered by LS&CO.**

**Likelihood of Confusion – Similarity as a Likelihood of Confusion Factor—No Side By Side Comparison**

When you examine the degree of similarity between the arcuate design and the Ruehl design, you should not conduct a side-by-side comparison of the two designs.  Instead, you should consider the overall impression created by the Ruehl design as a whole and as it appears in the marketplace, to determine how similar it is to the arcuate design.  The question is not whether consumers would likely be confused if they saw products side by side bearing the Ruehl design and the arcuate design.  Rather, the question is whether confusion is likely when a consumer separately encounters products bearing the Ruehl design.

Authority:  *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999); *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993); *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980); *Adidas America, Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1052 (D. Or. 2008); *E. & J. Gallo Winery v. Consorzio Del Gallo Nero*, 782 F. Supp. 457, 466 (N.D. Cal. 1991); *Powerfood, Inc. v. Sports Science Institute*, 1993 U.S. Dist. LEXIS 2191 at *17-18 (N.D. Cal. 1992).

1

**A&F's Objection To Disputed Instruction No. 16 Offered By LS&Co.**

2

3      A&F believes that Jury Instruction No. 12 adequately addresses similarity of the goods and

4  that this instruction is a misstatement of the law as set forth in A&F's separate memorandum.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 17**

**Infringement—Likelihood of Confusion—Factor—Strength of Trademark**

How strongly a trademark indicates that a good comes from a particular source even if unknown is an important factor to consider in Instruction No. 12 for determining whether the Ruehl design used by Abercrombie creates for consumers a likelihood of confusion with Levi Strauss's mark. Stronger marks are marks more likely to be remembered and associated by consumers with the mark owner, and stronger marks are given greater protection.

The strength of a trademark is measured in two ways: conceptual and commercial. Conceptual strength derives from the nature of the mark itself. Commercial strength derives from the effect of use and advertising of the mark on consumers' perceptions.

**Conceptual Strength**

Trademark law provides great protection to distinctive or strong trademarks. Conversely, trademarks that are not as distinctive or strong are called "weak" trademarks and receive less protection from infringing uses. Trademarks are grouped into categories according to their relative strength.

**Arbitrary Trademarks**. The first category is "inherently distinctive" trademarks. They are considered strong trademarks and are clearly protectable. They involve the arbitrary, fanciful or fictitious use of a word or design to designate the source of a product. Such a trademark is a word or design that in no way describes or has any relevance to the particular product it is meant to identify. It may be a common word or design used in an unfamiliar way. It may be a newly created (coined) word or design which is applied in a fanciful, fictitious or unfamiliar way, solely as a trademark.

**Suggestive Trademarks**. The next category of marks is suggestive marks. These trademarks are also inherently distinctive but are considered weaker than arbitrary trademarks. Unlike arbitrary trademarks, which are in no way related to what the product is or its components, quality, or characteristics, suggestive trademarks suggest some characteristic or quality of the product to which they are attached. If the consumer must use imagination or any type of multi-stage reasoning to understand the trademark's significance, then the trademark does not describe the product's features,

1    but suggests them.

2    **Descriptive Trademarks**. The third category of trademarks is descriptive trademarks. These

3    marks directly identify or describe some aspect, characteristic, or quality of the product to which they

4    are affixed in a straightforward way that requires no exercise of imagination to be understood.

5    Descriptive trademarks are weak unless they hold commercial strength.

6    <u>**Commercial Strength**</u>

7    Commercial strength relates to the degree that consumers are exposed to the mark and

8    associate it with a particular source, even if the name of that source is unknown.  Relevant factors in

9    determining the commercial strength of a mark include the volume of sales of products bearing the

10   trademark, the amount of advertising associated with the trademark, the length of time the trademark

11   has been in use, and the degree of consumer recognition of the trademark.

12

13

14

15

16

17

18

19

20

21

22   <u>Authority</u>:  Ninth Circuit Model Civil Jury Instruction No. 15.17 (modified); *Entrepreneur Media, Inc.*

23   *v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002); *GoTo.com, Inc. v. The Walt Disney Company*, 202 F.3d

24   1199, 1207 (9th Cir. 2000); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174

25   F.3d 1036, 1054 (9th Cir. 1999); *Accuride International, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536

26   (9th Cir. 1989).

27

28

**Disputed Instruction No. 18 Offered by LS&CO.**

**Likelihood of Confusion – Strength – Third Party Trademarks**

Evidence of third party use [or registration] of stitching designs may bear on the strength of Levi Strauss's trademark.  Extensive third-party use of Levi Strauss's mark by others might tend to show that consumers are likely to associate the mark with companies and meanings other than Levi Strauss.  However, if consumers continue to associate the trademark with Levi Strauss and Levi Strauss's secondary meaning despite extensive third-party use, then the third-party uses would tend to show the strength of the association created by Levi Strauss's Arcuate mark.

In considering whether third party uses have weakened Levi Strauss's mark or are a sign of the mark's strength, you should consider the nature, extent, and length of time of the third party uses and the extent to which they are recognized by consumers.  You should also consider the degree to which Levi Strauss has enforced its rights to prevent others from using similar designs.

Authority:  *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1027 n.33 (9th Cir. 2004); *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976); *Levi Strauss & Co. v. Lois Sportswear U.S.A., Inc.*, 631 F. Supp. 735, 742 (S.D.N.Y. 1985), *aff'd*, 799 F.2d 867 (2d Cir. 1986).

1

**A&F's Alternative to Disputed Instruction No. 18 Offered by LS&CO.**

2

**Crowded Market as a Factor In Determining Strength of the Plaintiff's Trademark**

3

4       In determining the strength of the plaintiff's arcuate trademark, you may consider the presence

5   of similar marks or stitching designs on similar goods in the marketplace.  A mark that is hemmed in

6   on all sides by similar marks on similar goods may not be very distinctive, because it is merely one of

7   a crowd of marks and, in such a crowd, customers may not likely be confused between any two of the

8   crowd and may have learned to carefully pick out one from the other.

9

10

11

12

13

14

15

16

17

18

19

20

21

22   **Authority:**  *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir.

23   1988) (abrogated in part on other grounds); *see also, Matrix Motor Co., Inc. v. Toyota Jidosha*

24   *Kabushiki Kaisha,* 290 F. Supp. 2d 1083, 1091 (C.D. Cal. 2003); *Halo Management, LLC v. Interland,*

25   *Inc.*, 308 F. Supp. 2d 1019, 1034 (N.D. Cal. 2003); *Skechers U.S.A., Inc. v. Vans, Inc.*, No. CV 07-

26   01703, 2007 WL 4181677, *5 (N.D. Nov. 20, 2007).

27

28

**Disputed Instruction No. 19 Offered By LS&CO.**

**Likelihood of Confusion – Intent as a Likelihood of Confusion Factor**

Levi Strauss is not required to prove that Abercrombie acted in bad faith or with fraudulent intent.

However, if Levi Strauss does prove that Abercrombie deliberately adopted Levi Strauss's trademark with the intent of profiting or obtaining some advantage from the goodwill and reputation which Levi Strauss has built up in its trademark, an inference of likelihood of confusion may be drawn, because Abercrombie has shown by its actions that it expects confusion will be created. In other words, if Abercrombie knowingly adopted a trademark similar to Levi Strauss's, you can presume that Abercrombie accomplished its purpose -- that is, that the public will be deceived. The burden then shifts to Abercrombie to prove by a preponderance of the evidence that its efforts to create confusion were not successful.

Intent need not be shown by direct evidence. It may be proved by circumstantial evidence.

Authority:      *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1148 (9th Cir. 2002); *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979); *HMH Publishing Co. v. Brincat*, 504 F.2d 713 (9th Cir. 1974); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 12 U.S.P.Q.2d (BNA) 1657 (E.D. Cal. 1989), *modified on other grounds and aff'd*, 967 F.2d 1280 (9th Cir. 1992).

1          **A&F's Objection To Disputed Instruction No. 19 Offered By LS&Co.**

2

3          A&F believes that Jury Instruction No. 12 adequately addresses the intent factor under the

4     Sleekcraft analysis.  A&F has provided a separate memorandum explaining in more detail its

5     opposition to this instruction.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 20**

**Likelihood of Confusion – Actual Confusion – Proof by Survey Evidence**

Proof of actual confusion is not necessary to show likely confusion.  It is a factor to consider. Levi Strauss may prove that there is actual confusion through direct evidence of actual confusion or through a survey conducted by an expert.  Abercrombie may negate proof that there is actual confusion by showing that there have been no instances of actual confusion since the Ruehl stitching design was introduced into the market and by showing that a survey conducted by an expert indicates there is no likelihood of confusion.

Authority:  *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1026 n.28 (9th Cir. 2004); *Thane International, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002); *Anheuser-Busch, Inc. v. Customer Co., Inc.*, 947 F. Supp. 422, 425 (N.D. Cal. 1996); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992).

1

**Disputed Instruction No. 21 Offered by A&F**

2

**Effect of Release Provision In Settlement Agreement**

3       You have heard evidence that Abercrombie's expert witness Dr. Gerald Ford used a

4   photograph of a Lucky Brand Dungarees, Inc. jean (the "Sweet 'n' Low" jean) depicting a back pocket

5   stitching design as a control design in his survey.  You have also heard evidence that, in a previous

6   case, Levi Strauss brought a claim against Lucky Brand Dungarees, Inc. for its use of the Sweet 'n'

7   Low design claiming that it was an infringement of the arcuate trademark.  You have heard evidence

8   that Levi Strauss and Lucky Brand Dungarees, Inc. subsequently settled that case by entering into a

9   settlement agreement that did not preclude Lucky Brand Dungarees from using the Lucky Design.

10      You have heard evidence that Abercrombie's expert witness Dr. Gerald Ford used a

11  photograph of an RP55, Inc. jean (the "Indigo Red" jean) depicting a back pocket stitching design as

12  another control in his survey.  You have also heard evidence that, in a previous case, Levi Strauss

13  brought a claim against RP55, Inc. for its use of the Indigo Red design claiming that it was an

14  infringement of the arcuate trademark.  You have heard evidence that Levi Strauss and RP55, Inc.

15  subsequently settled that case by entering into a settlement agreement in which the plaintiff agreed

16  that it would not assert any claims against RP55, Inc. arising out of its rights in its arcuate trademark

17  or challenge any use by RP55, Inc. of the Indigo Red back pocket stitching design used as a control in

18  Dr. Ford's survey.

19      In considering whether the control designs used by Dr. Ford in his surveys were appropriate

20  controls, you may consider that Levi Strauss is barred from bringing any claim for trademark

21  infringement against Lucky Brand Dungarees, Inc. for its use of the Sweet 'n' Low design.  You may

22  also consider that Levi Strauss is barred from bringing any claim for trademark infringement against

23  RP55, Inc. for its use of the Indigo Red design.

24  **Authority:** Cal. Civ. Code § 1541 (a release extinguishes the obligation for which it is given);

25  *Communitycare HMO, Inc. v. MemberHealth, Inc.*, 2006 U.S. Dist. LEXIS 28121, 14-15 (N.D. Okla.

26  May 8, 2006); *contrast Adidas Am., Inc. v. Payless Shoesource, Inc.*, 529 F. Supp. 2d 1215, 1225

27  (D. Or. 2007).

28

1

**LS&CO.'s Objection to Disputed Instruction No. 21 Offered by A&F**

2

3    LS&CO. has moved to exclude Dr. Ford's survey and to exclude evidence of the Lucky and

4    Indigo Red settlements.  Regardless of the outcome of those motions, A&F's proposal misstates the

5    facts concerning the Lucky and Indigo Red disputes and inaccurately claims that LS&CO. is barred

6    from challenging those designs in the future.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 22**

**Trademark Damages – Defendant's Profits**
**(15 U.S.C. § 1117(a))**

If you find for Levi Strauss on Levi Strauss's infringement or unfair competition claim, Levi Strauss is entitled to any profits earned by Abercrombie that are attributable to the infringement, which Levi Strauss proves by a preponderance of the evidence.

Profit is determined by deducting all expenses from gross revenue.

Gross revenue is all of Abercrombie's receipts from using the trademark in the sale of its product. Levi Strauss has the burden of proving Abercrombie's gross revenue by a preponderance of the evidence.

Expenses are all operating overhead and production costs incurred in producing the gross revenue. Abercrombie has the burden of proving the expenses and the portion of the profit attributable to factors other than use of the infringed trademark by a preponderance of the evidence.

Unless you find that a portion of the profit from the sale of the Ruehl products using the trademark is attributable to factors other than use of the trademark, you shall find that the total profit is attributable to the infringement.

Authority:  Ninth Circuit Model Jury Instruction Nos. 15.25 and 15.26 (modified).

**Stipulated Instruction No. 23**

**Trademark Damages—Intentional Infringement (15 U.S.C. § 1117(b))**

If you find that Abercrombie infringed Levi Strauss's trademark, you must also determine whether Abercrombie used the trademark intentionally, knowing it was an infringement.

Please answer the following question on the special interrogatory form: Do you find that Abercrombie intentionally used the trademark knowing it was an infringement?

Authority:        Ninth Circuit Model Jury Instruction No. 15.27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Stipulated Instruction No. 24**

**Trademark Dilution – Elements and Burden of Proof**

In this case, Levi Strauss contends that Abercrombie has diluted Levi Strauss's trademark. "Dilution" means a lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence of absence of competition, actual or likely confusion, mistake, deception, or economic injury.

To prove this claim, Levi Strauss has the burden of proving by a preponderance of the evidence that its trademark is famous; that Abercrombie's use of its Ruehl design began after Levi Strauss's mark became famous; and that Abercrombie's use of its Ruehl design is likely to cause dilution by blurring or dilution by tarnishment.

Authority: 15 U.S.C. § 1125(c)(1); 15 U.S.C. § 1127; *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2007).

1

**Stipulated Instruction No. 25**

2

**Trademark Dilution – Fame of Plaintiff's Mark**

3

4      A trademark is famous if it is widely recognized by the general consuming public of the United

5  States as a designation of the source of the goods or services of the trademark's owner.  In

6  determining whether Levi Strauss's mark is famous, you may consider several factors I will describe

7  for you in a moment. These factors are only suggestions and may not constitute all of the possible

8  types of evidence indicating whether a mark is famous. The presence or absence of any one particular

9  factor on this list should not necessarily determine whether a trademark is famous. You should

10  consider all the relevant evidence in making your determination. The factors you should consider are:

11      1.      the duration, extent and geographic reach of advertising and publicity of the trademark,

12  whether advertised or publicized by Levi Strauss or third parties;

13      2.      the amount, volume, and geographic extent of sales of goods offered under the mark;

14      3.      the extent of actual recognition of the mark; and

15      4.      whether the mark was federally registered.

16

17

18

19

20

21

22

23

24  <u>Authority</u>:  A.B.A. Model Jury Instruction 2.6.2; 15 U.S.C. § 1125(c)(2); *Jada Toys, Inc. v. Mattel,*

25  *Inc.*, 518 F.3d 628, 635 (9th Cir. 2007).

26

27

28

**Stipulated Instruction No. 26**

**Trademark Dilution – Dilution by "Blurring" or "Tarnishment"**

Dilution by "blurring" is an association arising from the similarity between Abercrombie's design and Levi Strauss's famous trademark that impairs the distinctiveness of the famous trademark. Dilution by tarnishment is an association arising from the similarity between Abercrombie's design and Levi Strauss's famous trademark that harms the reputation of the famous trademark. In determining whether a trademark is likely to cause dilution by blurring or by tarnishment, you may consider all relevant factors, including the following:

1.  the degree of similarity between Abercrombie's Ruehl design and the famous trademark;

2.  the degree of inherent or acquired distinctiveness of the famous trademark;

3.  the extent to which Levi Strauss is engaging in substantially exclusive use of the trademark;

4.  the degree of recognition of the famous trademark;

5.  whether Abercrombie intended to create an association with the famous trademark; and

6.  any actual association between Abercrombie's Ruehl design and the famous trademark.

Authority: A.B.A. Model Jury Instruction 2.6.4 (modified); 15 U.S.C. § 1125(c)(2); *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635-36 (9th Cir. 2007).

1

2

3

**Disputed Instruction No. 27 Offered by LS&CO.**

**Trademark Dilution – Elements -- Similarity**

4

5

6

7

8

9

10

11

    In determining the degree of similarity between the Ruehl design and the arcuate design, you should consider whether the designs are used on competing goods and whether the designs are highly similar or not.  If the designs are used on competing goods, it is more likely that consumers will perceive similarities in the designs.  If the goods are not competing, it is less likely that consumers will perceive similarities in the designs.  If the prominent features of the Ruehl design and the arcuate design are identical or nearly identical, it is more probable that dilution is likely.   If the prominent features of the Ruehl design and the arcuate design are not identical or nearly identical, then it is less likely that the Ruehl design will cause dilution.

12

13

14

15

16

17

18

19

20

21

22

23

Authority**:**  *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635-36 (9th Cir. 2007); *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1180 (9th Cir. 2007); *Thane International, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 906 (9th Cir. 2002); *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796, 806 n.41 (9th Cir. 2002); *SG Services Inc. v. God's Girls Inc.*, 2007 U.S. Dist. LEXIS 61970 at *24 (C.D. Cal. 2007); *Century 21 Real Estate LLC v. Century Insurance Group*, 2007 U.S. Dist. LEXIS 9720 at *45 (D. Az. 2007).

24

25

26

27

28

1

**A&F's Alternative to Disputed Instruction No. 27 Offered by LS&CO.**

2

3      In determining the degree of similarity between the Ruehl design and the arcuate designs, you

4   should consider whether the Ruehl design is identical, or nearly identical, to the arcuate designs.   In

5   order to be nearly identical, the two designs must be similar enough that a significant segment of the

6   target group of customers sees the two marks as essentially the same.

7

8

9

10

11

12

13

14

15

16   Authority:  *Thane Int'l Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 905(9th Cir.2002); *Jada Toys, Inc. v.*

17   *Mattel, Inc.*, 518 F.3d 628, 634 (9th Circ.  2008)

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed Instruction No.  28 Offered By LS&CO.**

2

**Relationship Between Trademark Confusion and Trademark Dilution**

3

4        Evidence that establishes a likelihood of confusion also is sufficient to establish a likelihood of

5    dilution.  This is because if a consumer is confused about a trademark, that confusion also likely will

6    diminish the distinctiveness of the mark.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    <u>Authority</u>:  *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635-36 (9th Cir. 2008); *Nissan Motor Co. v.*

23    *Nissan Computer Corp.*, 378 F.3d 1002, 1007 (9th Cir. 2004); *Nabisco, Inc. v. PF Brands, Inc.*, 191

24    F.3d 208, 219 (2d Cir. 1999); *Starbucks Corp. v. Lundberg*, 2005 U.S. Dist. LEXIS 32660 at *21-22

25    (D. Or. 2005).

26

27

28

1

**A&F's Alternative to Disputed Instruction No. 28 Offered by LS&CO.**

2

**Relationship Between Trademark Confusion and Trademark Dilution**

3

4      Evidence of a likelihood of confusion is not sufficient to establish a likelihood of dilution.

5 Levi Strauss must prove that a significant number of consumers are likely to be confused and that

6 among a significant number of other consumers who are not confused, Abercrombie & Fitch Trading

7 Co.'s use of the RUEHL stitching design will cause a likelihood of dilution of the arcuate stitching

8 design. This is because one state of mind does not overlap with the other.

9

10

11

12

13

14

15

16

17

18

19

20

21

22 <u>Authority</u>: *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 576, 599 (S.D.N.Y.

23 2007); 4 McCarthy § 24:72 (2008).

24

25

26

27

28

**Stipulated Instruction No. 29**

**Federal Law Claims and California Law Claims Subject to Same Analysis**

In this case, Levi Strauss has also brought claims against Abercrombie for trademark infringement under California state law.  The analysis and proof of Levi Strauss's California law claims is the same as the analysis and proof of the claims under federal law.

<u>Authority</u>:  *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635-36 (9th Cir. 2008).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No.  30**

**California Law Infringement Claim – Punitive Damages**

**(Bifurcated Trial – First Phase)**

If you decide that Abercrombie's conduct caused Levi Strauss harm, you must decide whether that conduct justifies an award of punitive damages.  The amount, if any, of punitive damages will be an issue decided later.

At this time, you must decide whether Levi Strauss has proved by clear and convincing evidence that Abercrombie engaged in that conduct with malice or oppression.

"Malice" means that Abercrombie acted with intent to cause injury or that Abercrombie's conduct was despicable and was done with a willful and knowing disregard of the rights of another.  A person acts with knowing disregard when he or she is aware of the probable consequences of his or her conduct and deliberately fails to avoid those consequences.

"Oppression" means that Abercrombie's conduct was despicable and subject Levi Strauss to cruel and unjust hardship in knowing disregard of its rights.

Please answer the following question on the special interrogatory form: Do you find that Abercrombie acted with malice or oppression?

<u>Authority</u>:  CACI No. 3946 (modified).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>EXHIBIT A</u>





Exhibit A-3





Exhibit A-4





Exhibit A-5





Exhibit A-6