1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

**NOT FOR CITATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LEVI STRAUSS & CO.,

          Plaintiff,

   v.

ABERCROMBIE & FITCH TRADING
COMPANY,

          Defendant.

_____/

No. C 07-03752 JSW

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW ON
PLAINTIFF LEVI STRAUSS &
CO.'S TRADEMARK DILUTION
CLAIM**

On July 20, 2007, Plaintiff, Levi Strauss & Company ("LS&CO"), filed this lawsuit

against Defendant Abercrombie & Fitch Trading Company ("A&F").  LS&CO brought claims

for trademark infringement, unfair competition, and trademark dilution under federal and

California law, claiming that A&F violated LS&CO's rights in its Arcuate stitching design

trademark (the "Arcuate mark").[1]

      LS&CO's trademark infringement and unfair competition claims were tried to a jury,

which rendered a verdict in favor of A&F on December 22, 2008.  LS&CO's trademark dilution

claim alleges that A&F's use of the Ruehl design creates a likelihood of dilution by blurring of

LS&CO's Arcuate mark, in violation of 15 U.S.C. § 1125(c).  LS&CO's dilution claim seeks

injunctive relief and attorneys' fees, but not damages.  Accordingly, with the parties' consent,

the Court sought advisory opinions from the jury on certain factual issues related to the dilution

claim.  Fed. R. Civ. Proc. 39(c)(1); Fed. R. Civ. P. 52(a); *see also Everest Capital Ltd. v.*

---

[1]    LS&CO withdrew its state law claims during the course of the trial.  (Trial
Transcript ("Tr.") 12/19/08 at 57:18-21.)

1   *Everest Funds Mgmt., L.L.C.*, 399 F.3d 755, 762 n. 4 (8th Cir. 2005) ("even when there is no

2   right to a jury trial, if a dilution claim is tried with other claims that must be submitted to the

3   jury, the court has discretion to submit the dilution claim to the jury on an advisory basis").  The

4   Court is free to accept or reject the advisory jury's findings, in whole or in part, and is obligated

5   to make its own independent assessment of the issues submitted to the advisory jury.  *Ashland*

6   *v. Ling-Temco-Vought, Inc.*, 711 F.2d 1431, 1438 (9th Cir. 1983); *see also OCI, Wyoming v.*

7   *PacifiCorp*, 479 F.3d 1199, 1206 (10th Cir. 2007).  "While the district court may exercise its

8   discretion to accept or reject the advisory jury's verdict, the advisory jury's decision is not

9   binding on the district court and the district court has the 'ultimate responsibility' for deciding

10  the case's legal and factual issues."  *OCI, Wyoming*, 479 F.3d at 1206 (citations omitted).  The

11  Court still is required to make its own findings of fact and conclusions of law under Fed. R. Civ.

12  P. 52(a).  *Id.* at 1205-06.

13        The Court is not required, however, to set out its findings and conclusions in

14  excruciating detail.  "As stated in the advisory committee notes to Rule 52, 'the judge need only

15  make brief, definite, pertinent findings and conclusions upon the contested matters; there is no

16  necessity for over elaboration of detail or particularization of facts.'" *Id.* at 1204. (quoting Fed.

17  R. Civ. P. 52 Notes of Advisory Committee on 1946 Amendments).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

18

19  **A.    Findings of Fact.**

20        1.    LS&CO is a Delaware corporation with its principal place of business in San

21  Francisco, California.  (Docket No. 276, Joint Proposed Pretrial Order, Stipulated Facts ¶ III.a

22  (hereinafter, "Stipulated Facts").)

23        2.    LS&CO manufactures and distributes casual apparel, including denim jeans,

24  under the LEVI'S® brand name, and it has manufactured and sold garments displaying its

25  Arcuate mark since 1873.  (*Id.* at ¶¶ III.b, d.)

26        3.    A&F is an Ohio corporation with its principal place of business in New Albany,

27  Ohio.  (*Id.* at ¶ III.e.).

28

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

1    4.      A&F manufactures and distributes casual apparel, including denim jeans, under

2    the Ruehl® brand name (and other brands), which are sold throughout the United States.  (*Id.* at

3    ¶ III.f.)

4    5.      In February 2006, A&F began selling jeans bearing a back pocket stitching

5    design (the "Ruehl design").  (*Id.* at ¶ III.g.)  A&F has applied for federal trademark registration

6    of the Ruehl design.  (Joint Proposed Pretrial Order at ¶ I.)

7    6.      A&F sells jeans bearing the Ruehl design only in its 27 Ruehl stores and on its

8    website (www.ruehl.com).  (Stipulated Facts at ¶¶ III.h-l.)

9    7.      LS&CO did not consent to A&F's use of the Ruehl design.  (*Id.* at ¶ III.m.)

10   8.      LS&CO owns the following trademark registrations for the Arcuate mark: (a) U.

11   S. Registration No. 404,248; (b) U. S. Registration No. 1,139,254; (c) U. S. Registration No.

12   2,794,649; and (d) California Registration No. 088399.  (*Id.* at ¶ III.c.)  The Arcuate mark has

13   been registered on the Principal Register since 1943.  (Trial Exhibits ("TX") 293, 294, 295.)

14   9.      LS&CO's U.S. Registration Nos. 404,248 and 1,139,254 are incontestable under

15   the provisions of 15 U.S.C. § 1065, which is conclusive evidence of the validity of the marks

16   depicted in these registrations, LS&CO's ownership of these marks, and LS&CO's exclusive

17   right to use the marks in commerce.  (*Id.*)

18   10.     LS&CO has an enforcement program designed to protect its rights in the Arcuate

19   mark, and it has taken steps to enforce those rights against uses of pocket stitching that are

20   adopted by others.  (Tr. 12/18/08 at 421:4-15.)  LS&CO monitors the market, and while it does

21   not challenge every stitching design on jeans, it challenges those designs that it concludes are

22   likely to erode the Arcuate mark's significance.  (*Id.* at 421:21-423:5.)  Within the past 15

23   years, LS&CO's enforcement program has led to 400-500 matters involving its Arcuate mark.

24   (*Id.* at 421:16-20.)

25   11.     The Arcuate mark and the Ruehl design are seen on back pockets of, primarily,

26   blue denim jeans.  (TX 98, 123, 321, 352, 353, 357, 363.)

27   12.     The Arcuate mark generally consists of two parallel lines stitched in two arches

28   that meet at a point in the middle of the back pocket, although LS&CO has used slight

United States District Court

For the Northern District of California

1   variations on the basic mark.  (Tr. 12/17/08 107:10-13, 111:24-113:4, 150:13-25, TX 123, 352,

2   353, 357, 363.)

3        13.    The Ruehl design generally consists of an embroidered script "R" that was

4   flipped upside down, with the legs of the "R" extended to the edges of the pocket.  It generally

5   sits lower on the pocket than the Arcuate mark, and the right and left pocket designs create a

6   mirror image of each other.  The Ruehl design also includes a swooping loop toward the center

7   of the pocket.  A&F also has used slight variations on the basic Ruehl mark.  (Tr. 12/17/08 at

8   203:25-208:14, TX 98, 321.)

9        14.    A&F developed a backstory for the Ruehl brand that is similar to the Levi

10  Strauss's life story.  A&F used the backstory on hangtags on its products.  (Tr. 12/17/08 at 62:7-

11  64:20, 182:5-183:16, 183:22-184:17.)

12       15.    Lee Holman, who created the Ruehl design, worked for LS&CO Europe before

13  A&F hired him.  (*Id.* at 184:18-185:8.)  Mr. Holman did not testify at trial.  Mark Breitbard was

14  the General Manager of the Ruehl brand.  Mr. Breitbard chose the Ruehl design, although

15  A&F's CEO, Michael Jeffries, "had the final say" on the selection of the design.  (*Id.* at 179:10-

16  13, 180:12-18, 181:12-16, 188:12-189:8, 199:7-16.)[2]

17       16.    Mr. Breitbard testified that he was aware of the Arcuate mark before he went to

18  work for A&F.  (*Id.* at 193:11-18.)  Mr. Breitbard also testified that he wanted to change the

19  original stitching design for the Ruehl brand "to create something that was more distinctive and

20  premium."  (*Id.* at 200:14-22.)  According to Mr. Breitbard, the only proposed designs

21  submitted by Mr. Holman that reminded him of other jeans in the market place were designs

22  with "R's" on them.  (*Id.* 186:23-189:4, 201:15-202:2, 202:3-24, 213:16-214:9; TX 126, 221,

23  222, 224, 237-f.)  Although LS&CO presents evidence of stitching designs that it suggests are

24  similar to Mr. Holman's proposed designs, the Court finds Mr. Breitbard's testimony to be

25  credible.

26

27

28  _____

    [2]    At the time of trial, Mr. Breitbard was LS&CO's President of Levi's Brand
    Retail for the United States.

4

United States District Court

For the Northern District of California

1    17.    Since 1980, LS&CO has sold over three billion LEVI'S® brand garments,

2  deriving about $53 billion of revenue from those sales.  Although LS&CO does not track sales

3  of products bearing the Arcuate mark, testimony at trial established that at least 95% of those

4  garments bear the Arcuate mark.  Currently, LS&CO sells approximately 80 million pairs of

5  jeans per year that display the Arcuate mark.  (Tr. 12/17/08 at 90:20-91:21, 132:5-20; TX 281.)

6    18.    LS&CO has been displaying the Arcuate trademark in its catalogs since 1908,

7  and it has displayed the mark in its television and print advertising and on product labeling for

8  decades.  (Tr. 12/17/08 at 75:8-76:24, 77:19-78:8, 79:24-84:7; TX 244, 245-248, 251, 257.)

9  LS&CO advertises the LEVI'S® brand nationwide.  Since 1997, LS&CO has spent between

10  $65 million and $185 million per year on advertising and promotion of the LEVI'S® brand.

11  (Tr. 12/17/08 at 92:12-95-1; TX 280.)  LS&CO does not track the amount of advertising

12  expenditures that are spent on advertisements bearing the Arcuate mark, but the testimony at

13  trial established that the majority of LS&CO's advertising features the Arcuate mark.  (Tr.

14  12/17/08 at 99:4-14, 104:20-105:6; TX 245-248, 251, 257.)

15    19.    LS&CO retained Dr. Sanjay Sood to conduct two surveys: (i) a survey to test the

16  recognition of LS&CO's Arcuate trademark (the "Recognition Survey"); and (ii) a survey to

17  test whether potential purchasers in a post sale environment were likely to be confused as to the

18  Ruehl design (the "Confusion Survey").[3]  (Tr. 12/17/2008 at 265:16-19.)  A&F retained Dr.

19  Gerald Ford to analyze and critique the survey methodologies employed by Dr. Sood in both the

20  Recognition Survey and the Confusion Survey.  (Tr. 12/18/08 at 362:13-18.)

21    20.    Dr. Sood teaches at the Anderson Graduate School of Management at U.C.L.A.,

22  where he has won teaching awards.  He also has taught at the Haas School at the University of

23  California at Berkeley.  Dr. Sood is on the editorial review boards of the Journal of Consumer

24  Research, the Journal of Consumer Psychology, and the Journal of Marketing Research, and he

25  has published articles based on data obtained through consumer research surveys in a number of

26  marketing journals.  (Tr. 12/17/08 at 261:20-265:13.)  Prior to this trial, Dr. Sood had not

27

28    [3]    Each survey was a double blind survey.  (*Id.* at 282:21-283:6.)

5

United States District Court

For the Northern District of California

1  conducted either type of survey for use in a trademark litigation matter, had not published any

2  papers on the subject, and his classes have not addressed the issue.  However, his classes and

3  his research encompass brand management.  (*Id.* at 262:22-263:1, 267:19-268:4, 268:23-269:6;

4  Tr. 2/18/08 at 330:24-331:9.)

5  　　　　21.　　With respect to Dr. Sood's Confusion Survey, Dr. Sood surveyed 299 women

6  who were first shown a photograph of a model wearing a LEVI'S® jean featuring the left back

7  pocket with the Arcuate mark.  That photo was then removed, and respondents were shown a

8  second series of four photographs showing the Ruehl jeans and three "control" jeans bearing

9  other back pocket stitching designs.  Respondents were asked if they thought any of the second

10  series of jeans were made, sponsored, or endorsed by the same company that made the first

11  (LEVI'S®) jeans they had seen.  They were then asked which one(s) and why.  (Tr. 12/18/08

12  316:15-324:23, 326:24-327:10; 336:18-340:11; TX 361.)[4]

13  　　　　22.　　Approximately 59% of the participants answered "no" or "I don't know," when

14  they were asked if they thought any of the jeans shown in the second set of photographs were

15  associated with the LEVI'S® jeans.  (Tr. 12/18/08 at 324:24-325:11, 384:11-16.)

16  Approximately 30% of all respondents identified the Ruehl jeans as made, sponsored or

17  endorsed by the same company that made the LEVI'S® jeans, as compared to lower

18  percentages for the "control" jeans.  (*Id.* at 326:14-23.)  Approximately 20 percent of the total

19  population of participants mentioned "some sort of stitching associated with the Ruehl jean."

20  (*Id.* at 327:11-23, 345:21-25.)  Dr. Sood testified that in his opinion, the Ruehl design would

21  erode the distinctiveness of the Arcuate mark, in light of what he opined was a significant level

22  of confusion between the Ruehl jeans and the LS&CO jeans.  (*Id.* at 328:2-12.)

23  　　　　23.　　Dr. Sood testified that he selected the control jeans based on information that he

24  was provided about brands that qualified as premium jeans and based on information he

25  received from sales persons in response to questions about which brands were available and

26  

27  　　　　[4]　　The order of these photos was rotated in order to control for order bias.  (Tr.
28  12/17/08 at 282:11-20; Tr. 12/18/08 at 322:17-323:2.)  The participants were shown the
photos individually and then the interviewer pinned all four photos on the wall.  (Tr.
12/18/08 at 321:15-23.)

popular.  Dr. Sood also testified that he was trying to make all the jeans look as similar as he could, with the exception of the element for which he was testing.  (Tr. 12/17/08 at 281:6-21; Tr. 2/18/08 at 321:24-322:11, 351:5-9.)  Dr. Sood agreed that none of the control jeans had "downward sloping arches."  (Tr. 12/18/08 at 341:2-23.)  One of the control jeans selected was made by Seven for All Mankind, and Dr. Sood chose a style with an "A" pocket stitching design.  (*Id.* at 339:1-8.)  Dr. Sood admitted that another style of Seven for All Mankind jeans is more similar to the Ruehl design and to the Arcuate mark, and that he could have used it as a control instead of the "A" design.  (*Id.* at 342:3-19, 343:12-16; TX 364.)  Dr. Sood testified that he chose the "A" style, because he could not find the other style in a finish and color that was similar to the other controls.  (Tr. 12/18/08 at 343:17-344:3.)

24.     LS&CO did not present evidence of instances of actual confusion between jeans bearing the Ruehl design and jeans bearing the Arcuate mark.

25.     With the exception of visual depictions of the two designs, Dr. Sood's testimony regarding the results of the Confusion Survey was LS&CO's only evidence that the Ruehl design was identical or nearly identical to the Arcuate mark.

26.     With respect to Dr. Sood's Recognition Survey, 302 respondents were shown photographs of LEVI'S®, Lucky and Lee jeans featuring the back pocket stitching on each. Respondents were asked if they had seen jeans with that "style of pocket stitching" before, whether they associated the pocket stitching with one brand or company, and the name of the brands or companies that they associated with the product.  (Tr. 12/17/08 at 274:21-277:13.) 77.5% of respondents said they had seen the Arcuate mark before, a "substantially higher" percentage than either of the other jeans.  Dr. Sood testified that a total of 117 of 302 respondents, or approximately 38%, identified the Arcuate mark as associated with Levi's.  (*Id.* at 277:24-279:24, Tr. 12/18/08 at 347:17-348:5.)  Dr. Sood also acknowledged that some of those respondents could be guessing and that, if one accounted for guesses, approximately 32% to 35% of the respondents actually associated the Arcuate mark with LS&CO.  (Tr. 12/18/08 at 349:1-12.)

27.     Dr. Ford has been engaged in commercial marketing research and consulting for over 30 years.  (*Id.* at 358:8-14.)  He has been qualified as an expert in consumer survey designs in over 50 trademark cases spanning his 33 year career.  (*Id.* at 361:6-9.)  Dr. Ford also has been qualified as an expert in Canada, France, and Norway.  (*Id.* at 361:10-13.)  Dr. Ford has written fifteen publications summarizing case law on intellectual-property surveys, primarily trademark-related surveys, which have been published by organizations such as the American Intellectual Property Law Association, the American Bar Association, Practicing Law Institute, and the International Trademark Association.  (*Id.* at 360:18-23.)  Dr. Ford also has given presentations on the subject of consumer surveys in trademark litigation to members of those organizations, as well as the American Marketing Association and the Market Research Association.  (*Id.* 360:8-17.)  Since 1998, Dr. Ford has sat as one of only two non-lawyers on the editorial review board for *The Trademark Reporter*, a legal journal on the subject of trademarks.  (*Id.* at 360:24-361:5.)

28.     Dr. Ford testified that, in his opinion, Dr. Sood's Confusion Survey was not conducted in accordance with generally accepted and standard practices and that the survey was "so flawed that it renders the survey results" and Dr. Sood's conclusions "meaningless."  (*Id.* at 363:13-364:3.)  Dr. Ford further opined that the Confusion Survey was flawed, because it utilized leading questions, lacked appropriate controls, utilized an underinclusive universe, lacked marketplace conditions, suffered from a question order bias, and lacked an explicit "don't know" alternative to a closed-ended question.  (*Id.* at 364:8-364:17; 365:10-375:8.)

29.     Dr. Ford specifically criticized Dr. Sood's choice of control jeans, in part because selecting controls based on their popularity means that it would be less likely that you would measure "noise," *i.e.* elements other than true confusion, from those controls.  Dr. Ford also stated that, in general, "you want to have a control that ... is non-infringing, but has as many of the elements as the test stimuli would have, but lacks that ... infringing element."  (*Id.* at 366:21-368:5; *see also id.* at 392:21-393:6, 399:1-5.)  In Dr. Ford's opinion, the presentation of the control jeans coupled with a leading question resulted in what he likened to a "biased police line-up."  (*Id.* at 366:5-13, 368:6-12, 380:6-14.)  According to Dr. Ford, because Dr.

United States District Court

For the Northern District of California

1  Sood did not use an appropriate control cell, "there's no way to tell whether or not the

2  confusion that he measured was caused by the design in the Ruehl jeans, as opposed to the

3  survey procedures, questions, and methodology." (*Id.* at 370:5-11.)

4      30.    Dr. Ford also opined that Dr. Sood's Recognition Survey was flawed and that the

5  flaws were so significant as to "render the survey results meaningless, and the conclusions Dr.

6  Sood draws from those results unreliable." (*Id.* at 375:9-22.) Dr. Ford further opined that the

7  survey was flawed, because it did not control for spurious recognition, used ambiguous

8  questions, lacked an appropriate control cell, and suffered from order bias. (*Id.* at 375:24-

9  379:24.)

10     31.    Dr. Ford testified that if a likelihood of confusion survey is conducted in a valid

11 and reliable manner, a finding that ten percent or more of the population is confused is

12 problematic to a trademark owner. (*Id.* at 383:3-14, 400:24-402:1.) Dr. Ford stated that he had

13 conducted surveys using photographs and within a population that was likely to shop in the

14 alleged infringer's stores, rather than the different population that was likely to be interested in

15 purchasing the trademark owner's goods. (*Id.* at 393:11-394:9, 395:13-396:5.) Dr. Ford also

16 testified that he had used control cells, in which the control did not look similar to the test cell.

17 (*Id.* at 386:13-388:18.) In his view, however, these surveys did not suffer from the same flaws

18 he attributed to Dr. Sood's survey. (*Id.* at 400:11-23.)

19     32.    The Court denied a pre-trial motion to strike Dr. Sood's testimony on the basis

20 that the results of his survey were not so inherently unreliable that they should be excluded, and

21 it concluded that any defects in Dr. Sood's methodology went to the weight to be afforded his

22 opinions, rather than to admissibility. (Docket No. 215, Order on Motions for Summary

23 Judgment and Motion to Exclude at 11:14-14:12).) Based on Dr. Ford's experience, his cogent

24 explanation of the generally accepted principles by which consumer surveys should be designed

25 and implemented, and his thorough critique of Dr. Sood's surveys, the Court finds Dr. Ford's

26 testimony and critiques persuasive and more reliable than the testimony and survey evidence

27 offered by Dr. Sood. Accordingly, the Court finds that Dr. Ford's testimony should be given

28 more weight than Dr. Sood's testimony.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court

For the Northern District of California

**B.      Conclusions of Law.**

1.      The Trademark Dilution Revision Act of 2006, codified at 15 U.S.C. § 1125(c), governs LS&CO's claim for trademark dilution.[5]  "Dilution is a cause of action invented and reserved for a select class of marks - those marks with such powerful consumer associations that even non-competing uses can impinge their value."  *Thane Int'l Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 907 (9th Cir. 2002).

2.      LS&CO asserts that A&F's use of the Ruehl design will dilute the Arcuate mark by blurring.  "Dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.  15 U.S.C. § 1125(c)(2)(B).  A likelihood of dilution can arise regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.  15 U.S.C. § 1125(c)(1).

3.      To prevail on its dilution claim, LS&CO has the burden of proving by a preponderance of evidence the following elements: (a) that LS&CO is the owner of a trademark that is famous; (b) that the famous mark is distinctive, either inherently or through acquired distinctiveness; (c) that A&F is making or has made use in commerce of an identical or nearly identical trademark, in this case the Ruehl design; (d) that A&F's use of its Ruehl design began after LS&CO's Arcuate mark became famous; and (e) that A&F's use of its Ruehl design is likely to cause dilution by blurring of LS&CO's Arcuate mark.  15 U.S.C. § 1125(c); *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 634 (9th Cir. 2007).

4.      LS&CO argues that the TDRA does not require a finding that the marks be "identical or nearly identical" to one another.  The Ninth Circuit, however, continues to recognize the "identical or nearly identical" requirement as an element of a claim for trademark dilution.  *See Jada Toys*, 518 F.3d at 634; *Perfumebay.com, Inc. v. eBay Inc.*, 506 F.3d 1165, 1180-81 (9th Cir. 2007) (but noting that court also should consider "whether the plaintiff's mark 'is so highly distinctive that consumers are likely to view a junior mark that is a bit

---

[5]      Congress enacted the TDRA in response to the United States Supreme Court's decision in *Moseley v. V Secret Catalogue, Inc.*, 437 U.S. 418, 433 (2003), which required a plaintiff to prove "actual dilution."  The TDRA provides that a plaintiff only needs to prove a likelihood of dilution.  *See, e.g.,* 15 U.S.C. § 1125(c)(1); *adidas-America, Inc. v. Payless Shoe Source, Inc.*, 546 F. Supp. 2d 1029, 1060 (D. Ore. 2008).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

different as essentially the same as the senior one'") (quoting *Thane In'tl*, 305 F.3d at 907 n.7); *Thane Int'l*, 305 F.3d at 906; *see also Visa Int'l Serv. Ass'n v. JSL Corp.*, 590 F. Supp. 2d 1306, 1316 (D. Nev. 2008); *adidas-America*, 546 F. Supp. 2d at 1061, 1063.

5.      The advisory jury found that the Ruehl design and the Arcuate mark were not identical or nearly identical.  (Docket No. 352, Special Verdict Form, Question 6.)  In order to be nearly identical, the two marks must be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same. *Jada Toys, Inc.,* 518 F.3d at 634; *adidas-America*, 546 F. Supp. 2d at 1063.  "In the dilution context, the 'similarity of the marks' test is more stringent than in the infringement context.'" *adidas-America*, 546 F. Supp. 2d at 1063 (citing *Thane Int'l*, 305 F.3d at 905).

6.      The evidence demonstrates the LS&CO has expended significant amounts of money advertising the Arcuate mark.  Dr. Sood's Recognition Survey also lends support to the conclusion that the Arcuate mark is recognized by the public. *Perfumebay*, 506 F.3d at 1180-81 (concluding that district court erred by failing to consider strength of mark when evaluating identity element).  However, even if the Arcuate mark is a strong and distinctive mark, this is not a case where the two marks at issue involve only minor differences, which might weigh in LS&CO's favor. *Thane Int'l*, 305 F.3d at 906-07 & n.7 (noting that similarity requirement may be less stringent in situations where senior user's mark is highly distinctive and the junior mark is used on related products, such that a court could find identicality even where minor differences exist).  A&F also has not incorporated the Arcuate mark into the Ruehl design as a "'separate, visually identifiable element.'" *adidas-America*, 546 F. Supp. 2d at 1064 (quoting *Thane Int'l*, 305 F.3d at 907).

7.      The *adidas-America* case is instructive, albeit distinguishable from the facts in this case.  In *adidas-America*, the plaintiff's mark consisted of a three-stripe design.  The defendant made shoes bearing four-stripe designs.  The court concluded that a reasonable jury could conclude that the two marks were identical or nearly identical, because, if the defendant removed the fourth stripe, "its stripe design would be virtually indistinguishable from [the plaintiff's] mark in angularity, placement, size and equidistance." *adidas-America*, 546 F.

1   Supp. 2d at 1064.  Here, the Arcuate mark consists of two parallel lines stitched in two

2   symmetrical arches that meet at a point in the middle of the back pocket.  In contrast, the Ruehl

3   design is not "virtually indistinguishable" from the Arcuate mark.  Rather, it consists of an

4   embroidered script "R" that was flipped upside down and the legs extended to the edges of the

5   pocket.  The Ruehl design also sits lower on the pocket, and the right and left back pocket

6   designs create a mirror image of each other.  Although the legs of the upside down "R" create a

7   slight arch, the central feature of the design is a unique swooping loop toward the center of the

8   pocket.  None of the Arcuate designs in evidence has a "dipsy doodle" or any kind of infinity

9   loop under them.  This evidence demonstrates that a significant segment of the target group of

10   customers would not view the marks as essentially the same.

11        8.     According to Dr. Sood's Confusion Survey, approximately 30 % of the

12   consuming public viewed the two marks as similar.  However, the Court finds Dr. Ford's

13   criticisms of Dr. Sood's methodology persuasive, particularly with respect to Dr. Sood's choice

14   of control jeans.  In light of the fact that the stitching on the control jeans varied so greatly from

15   the Arcuate mark, the Court is not persuaded that Dr. Sood's survey reliably accounted for

16   "noise."  Because of the flaws inherent in Dr. Sood's Recognition Survey, there was insufficient

17   evidence presented that a significant segment of the target group of customers would see the

18   Ruehl design and the Arcuate mark as essentially the same.

19        9.     Therefore, the Court concludes, consistent with the advisory jury's finding, that

20   LS&CO has not established that A&F is making commercial use of a mark that is identical or

21   nearly identical to the Arcuate mark.

22        10.    The advisory jury also found that the Ruehl design is not likely to cause dilution

23   by blurring of the Arcuate mark.  (Special Verdict Form, Question 8.)  To evaluate this element

24   of LS&CO's dilution claim, the Court considers all relevant factors, including the following: (a)

25   the degree of similarity between the Ruehl design and the Arcuate mark; (b) the degree of

26   inherent or acquired distinctiveness of the Arcuate mark; (c) the extent to which LS&CO is

27   engaging in substantially exclusive use of the Arcuate mark; (d) the degree of recognition of the

28   Arcuate mark; (e) whether A&F intended to create an association with the Arcuate mark; and (f)

United States District Court

For the Northern District of California

1    any actual association between the Ruehl design and the Arcuate mark.  15 U.S.C. §

2    1125(c)(2)(B).

3          11.    As noted, the test for similarity of the marks is more stringent in the dilution

4    context than for likelihood of confusion purposes, and the two marks must be "essentially the

5    same mark."  *Thane Int'l*, 305 F.3d at 906.  For the reasons set forth above, the Court finds that

6    the Ruehl design and the Arcuate mark are not visually similar.  Furthermore, as set forth above,

7    the Court does not find the results of Dr. Sood's survey to be entitled to any great weight.  Thus,

8    LS&CO has not put forth persuasive evidence of actual association between the Arcuate mark

9    and the Ruehl design.  Therefore, these factors weigh in A&F's favor and against a finding of

10   likelihood of dilution.

11         12.    The Court also concludes that A&F did not intend to create an association with

12   the Arcuate mark.  The back-story created for the Ruehl brand does bear some similarity to the

13   history of LS&CO.  As set forth above, however, the Court finds credible Mr. Breitbard's

14   testimony that he selected the Ruehl design in order to create a unique brand identity.  The

15   Court also credits his testimony that he did not associate the design with other marks, including

16   the Arcuate mark.  The Court finds that this factor also supports a finding of no likelihood of

17   dilution.

18         13.    LS&CO's enforcement efforts demonstrate that it attempts to maintain

19   substantially exclusive use of the Arcuate mark.  However, it is evident from the record that

20   there are numerous pocket stitching designs that enter the market place, which may or may not

21   infringe the Arcuate mark.  Notwithstanding the presence of these designs, Dr. Sood's

22   Recognition Survey demonstrates that the public still associates the Arcuate mark with LS&CO.

23   On the facts of this case, the Court finds the substantially exclusive use factor to be neutral.

24         14.    Having considered all of the evidence, even if the degree of inherent or acquired

25   distinctiveness of the Arcuate mark and the degree of recognition of the mark weigh in

26   LS&CO's favor, the Court finds that those factors do not outweigh the factors that weigh in

27   A&F's favor.  Accordingly, the Court concludes, consistent with the advisory jury's finding,

28

1   that LS&CO has not met its burden to establish by a preponderance of the evidence that the

2   Ruehl design is likely to cause dilution by blurring of the Arcuate mark.[6]

3          15      Because LS&CO did not establish each of the elements of its claim for dilution,

4   A&F is entitled to a judgment of non-liability on LS&CO's dilution claim.  A separate

5   judgment shall issue, and the Clerk is directed to close the file.

6          **IT IS SO ORDERED.**

7

8   Dated: April 22, 2009

                                            _____
9                                           JEFFREY S. WHITE
                                            UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27          [6]      Because the Court concludes that LS&CO did not prove that the Ruehl design
    is identical or nearly identical to the Arcuate mark and did not prove that it is likely to dilute
28   the Arcuate trademark, the Court does not address the remaining elements of LS&CO's
    dilution claim, including whether the Arcuate mark is famous and distinctive.

**United States District Court**
For the Northern District of California

15